## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| Miyano Machinery USA Inc., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. **08 C 526** |
| v. | ) | |
| | ) | Hon. Virginia Kendall |
| MiyanoHitec Machinery, Inc., | ) | |
| Thomas ("Tom") Miyano, a/k/a | ) | Magistrate Judge Nolan |
| Toshiharu Miyano and Steven | ) | |
| Miyano, a/k/a Shigemori Miyano, | ) | |
| | ) | |
| Defendants | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| MiyanoHitec Machinery, Inc., | ) | |
| Thomas ("Tom") Miyano, a/k/a | ) | |
| Toshiharu Miyano and Steven | ) | |
| Miyano, a/k/a Shigemori Miyano, | ) | |
| | ) | |
| Counterclaim-Plaintiffs | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Miyano Machinery USA Inc. and | ) | |
| Counterclaim-Defendants | ) | |
| Miyano Machinery Inc., | ) | |
| Third-Party Defendants. | ) | |
| | ) | |

## REPLY TO DEFENDANTS', COUNTERPLAINTIFFS' RESPONSE IN OPPOSITION TO MOTION OF GEORGE H. KOBAYASHI AND MASUDA, FUNAI, EIFERT & MITCHELL, LTD., TO QUASH SUBPOENA OR FOR ENTRY OF PROTECTIVE ORDER

1.    The Motion to Quash Subpoena should be granted and a protective order entered prohibiting the deposition of attorney George H. Kobayashi, in light of Defendants' failure to meet their burden, as articulated by this Court. For the reasons stated herein, Defendants have not demonstrated any reason or need to depose one of the attorneys of record herein for Third-Party Defendant, Miyano Machinery Inc. (hereinafter referred to as "MMJ").

2.      Plaintiff, Miyano Machinery USA Inc. (hereinafter referred to as "MMU"), which is a wholly-owned subsidiary of MMJ, initiated this action against its former president, Tom Miyano, his son and their newly-formed company, MiyanoHitec Machinery, Inc., to protect MMU's interest in certain trademarks and servicemarks, avoid likely confusion, deception, and mistake in the machine tool industry due to MiyanoHitec's intention to compete with MMU using the same or confusingly similar trademarks and trade names, seek declaratory relief regarding various administrative actions brought by defendants in the U.S. Trademark Office against MMU, and for further causes of action.

3.      Through their Answer, Affirmative Defenses and Counterclaims, Defendants have attacked Plaintiff's rights by asserting, on information and belief, that MMU engaged in fraud by making allegedly false representations in its submissions to the U.S. Patent and Trademark Office ("PTO") in order to obtain or maintain its registrations.  Specifically, Defendants have alleged:

- MMU obtained through fraud U.S. Trademark Registration No. 3,328,718 for the mark MIYANO® (Answer ¶¶11, 87, 89, Second Defense);
- MMU fraudulently renewed  U.S. Trademark Registration No. 1,217,317 for the Triangle Winged M mark because the mark was allegedly not in use at the time MMU filed a Declaration of Continued Use (Answer ¶80, Fourth Defense); and
- MMU allegedly made false statements of use to fraudulently obtain the allowance of its application to register the Triangle Winged M mark as a servicemark (serial number 77/176,918) (Answer ¶121, Fifth Defense).

4.      The sole basis of Defendants' fraud allegations, which are alleged on information and belief, are that (1) MMU knew of the existence of Defendants and that Defendants Tom and Steven Miyano were using their surname in connection with goods falling within applicant's

description of goods/services and (2) that the marks were not in use as represented by MMU in its submissions to the PTO. Defendants have come forward with no support for the allegations of fraud.[1]

5.     For a trademark declaration to be considered fraudulent, it is well established that the declarant must have made a false statement of fact with knowledge of the falsity at the time the declaration was made. *DeMert & Dougherty, Inc. v. Chesebrough-Pond's, Inc.*, 348 F.Supp. 1194, 1197 (ND IL 1972). The Court in *DeMert* further held that an action for fraud at common law further requires that the fact be material, that the declarant know or have good reason to know of reliance on his statement by another person, and that there was in fact reliance, causing damages. *Id.* It follows that if there is no statement that misrepresents a material fact, there can be no reliance causing damage. In the absence of a material misrepresentation, there is no reason to determine if the statement was made with the intent to defraud and accordingly, no need to depose the declarant as to the basis for the statements in his declaration.

A material misrepresentation arises if the registration should not have issued if the truth were known to the examiner. *McCarthy §31:67; see also Northwestern Corp. v. Gabriel Mfg. Inc.,* 1996 U.S. LEXIS 19275 (*N.D. Ill. Dec. 10, 1996)(fraud involves a willful withholding of material information or fact which, if disclosed to the Office would have resulted in the disallowance of the registration sought or to be maintained.); *Zip Dee, Inc. Dometic Rop.,* 900 F. Supp. 1004, 1010 (N.D. Ill. 1995)(test is whether – considering all the evidence that was before him – the Examiner would still have allowed the registration if the misrepresentations was removed the decision-making mix.)

---

[1] Defendants have argued that privileged e-mails between MMU and its attorney, which were inadvertently produced, are evidence of the alleged fraud. Movant adopts the arguments made by MMU in its Response to Defendants' Motion to Compel Production, to Pierce Claimed Attorney-Client and Work Product Privilege and to Enforce Subpoena for Deposition, as well as Plaintiff's Cross-Motion for an Order Compelling the Return of Privileged Documents and a Protective Order.

6.     Defendants have ostensibly issued a subpoena to attorney George Kobayashi to examine him regarding certain declarations that he caused to be submitted to the Trademark Office in performing legal services for MMU. In connection with U.S. Trademark Registration No. 3,328,718 for the mark MIYANO®, attorney Kobayashi submitted the following declaration on February 20, 2007:

> The undersigned, being hereby warned that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 18 U.S.C. Section 1001, and that such willful false statements, and the like, may jeopardize the validity of the application or any resulting registration, declares that he/she is properly authorized to execute this application on behalf of the applicant: **he/she believes the applicant to be the owner of the trademark/service mark sought to be registered**, or, if the application is being filed under 15 U.S.C. Section 1051(b), **he/she believes applicant to be entitled to use such mark in commerce; to the best of his/her knowledge and belief no other person, firm, corporation, or association has the right to use the mark in commerce**, either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion, or to cause mistake, or to deceive; and that all statements made of his/her own knowledge are true; **and that all statements made on information and belief are believed to be true**. (Emphasis added)

7.     It is undisputed that as of February 20, 2007, applicant MMU knew that Defendants had established MiyanoHitech Machinery Inc. and were using marks that infringe MMU's marks.  The only question is whether it was fraudulent not to provide such information to the PTO.

8.     The Trademark Trial and Appeal Board has held that a party asserting fraud based on the applicant's alleged failure to disclose another user must allege facts, which, if proven, would establish that:

(1)  there was in fact another use of the same or confusingly similar mark at the time the oath was signed;

(2)  the other user had legal rights superior to applicant's rights;

(3)  applicant knew that the other user had rights in the mark superior to applicant's and either believed that a likelihood of confusion would result from applicant's use of its mark or had no reasonable basis for believing otherwise; and

(4)  applicant, in failing to disclose these facts to the Patent and Trademark Office, intended to procure a registration to which applicant was not entitled.

*Ohio State University v. Ohio University,* 51 U.S.P.Q.2d 1289, 1999 WL 517202 (TTAB 1999). *See also,* 6 McCarthy, *Trademarks and Unfair Competition 4th* §31:75.

9.      Charges of fraud in the procurement of a trademark registration are disfavored as a defense and must be shown by clear and convincing evidence in order to provide a basis for either cancellation or damages.  6 McCarthy, *Trademarks and Unfair Competition 4th* §31:68, citing *The Money Store v. Harriscorp Finance, Inc.*, 689 F.2d 666, 670 (7th Cir. 1982).  In *The Money Store,* the plaintiff appealed the district court's cancellation of its federally registered service mark, "THE MONEY STORE" for money lending services, based on its conclusion that plaintiff acted fraudulently in asserting that "to the best of its knowledge and belief, no other person had the right to use mark in commerce at the time it filed its application." Prior to filing the application, plaintiff had obtained a trademark search which disclosed no federal registrations or other interstate uses of "THE MONEY STORE" for money lending services. The search did disclose, however, a pending application for the mark for advertising and public relations services as well as four (4) state registrations.  Vacating the fraud ruling, the Seventh Circuit noted that multiple opportunities exist for challenging a trademark application or registration, including the fact that a mark is published for 30 days in the Official Gazette of the Patent Office

and anyone who believes he would be damaged by such mark may file an opposition or thereafter seek cancellation of a registration after it is issued. 689 F.2d at 671. Moreover, the Court held that the Lanham Act does not mandate a pre-application search and to imply a duty would be inconsistent with the statutory scheme for trademark registration and would diminish the importance of the role played by the Trademark Examiner. *Id.* Notwithstanding the information that plaintiff had from the trademark search, which it did not disclose to the PTO, the Seventh Circuit held that it could not find any evidence that plaintiff intended to mislead the PTO in its federal registration. 689 F.2d at 673. In the instant case, Defendants have failed to properly plead fraud with the particularity required by the Federal Rules and have submitted no proof, let alone clear and convincing evidence of fraud.

10.    Nothing in the oath or the Lanham Act requires an applicant to disclose third parties who in fact may be using the mark, but do not, in the applicant's belief, possess the legal right to use such mark. 6 McCarthy, *Trademarks and Unfair Competition 4th* §31:76, *see also, Dial-A-Mattress Operating Corp. v. Mattress Madness,* 841 F. Supp. 1339 (E.D.N.Y. 1994), recons. denied, 847 F. Supp. 18 (E.D.N.Y. 1994), ops. combined at 33 U.S.P.Q.2d 1961, 1971 (E.D.N.Y. 1994) ("The applicant has no obligation, however, to disclose known users believed to be infringing the applicant's rights in the mark"; no fraud found.); *Society of Accredited Marine Surveyors, Inc. v. Scanlan,* 75 U.S.P.Q.2d 1944, 2005 WL 670541 (D. Mass. 2005) (there is no obligation on the applicant to disclose to the PTO any other known users of the mark).

11.    MMU had (and still have) no reason to believe that it was not the owner of the MIYANO® mark or that Defendants had greater trademark rights in the mark based on the decades of usage of the mark by MMU and its predecessor entities, which is evidenced by at least the earlier registration of the same mark (U.S. Trademark Registration No. 1,529,343 for

the mark MIYANO® issued on March 14, 1989) and U.S. Trademark Registration No. 1,527,809 for the stylized MIYANO® mark, which was registered on March 7, 1989. Accordingly, the statements in the declaration are neither false nor misleading.

12.     Nor is it fraud for an applicant not to disclose to the PTO that a mark is a surname with no other significance. *Societe Civile Des Domaines v. S.A. Consortium Vinicole de Bordeaux et de la Gironde*, 6 U.S.P.Q.2d 1205, 1988 WL 252476 (TTAB 1988). In this case, the mark MIYANO® had clearly acquired secondary meaning through MMU's extensive use and was no longer primarily merely a surname.[2]

13.     The second prong of Defendants' attack is that MMU allegedly was not using the Triangle Winged M mark as a trademark or service mark as stated in the Declarations submitted by attorney Kobayashi on behalf of MMU. There is no question that if an applicant alleges use of a mark and such statement was false that such a false statement would be a material misrepresentation and that but for such misrepresentation, the PTO would not issue or maintain a registration. Therefore, Defendants relentlessly insist that they are entitled to depose attorney Kobayashi to determine whether he actually had a factual basis for his declarations. Defendants accuse MMU of asserting the attorney-client privilege to withhold relevant information from them regarding MMU's use.

14.     The key factual question is whether MMU made use of the marks as alleged in the declarations. Through affidavits submitted in support of its Motion for Preliminary Injunction, its voluminous responses to interrogatories and production requests, as well as the deposition testimony of witnesses, MMU has come forward with substantial evidence of its use of the Winged Triangle M mark as a trademark and as a service mark as of the time of the filing of the

---

[2] 15 U.S.C. §1052 provides, in pertinent part: "No trademark by which the goods of the applicant may be distinguished from the goods of others shall be refused registration on the principal register on account of its nature unless it – *** (e)(4) is primarily merely a surname, …"

declarations in question.   These factual bases are set forth in paragraphs 31 and 38 of MMU's Response to Defendants' Motion to Compel Production, to Pierce Claimed Attorney-Client and Work Product Privilege and to Enforce Subpoena for Deposition, which was filed on May 20, 2008 (Doc. 89), and incorporated herein by reference.   Such evidence includes, without limitation, (a) MMU's refurbishment and sale of used machines bearing the Triangle Winged M trademark (Declaration of Henry Marchionne at ¶30), (b) use of the mark on new machine Standard Warranty Policies and installation Service Reports, (c) use of the mark in connection with the sale of Miyano machine tool replacement parts and part assemblies, (d) use of the mark on Miyano Ocean and Mectron machine tools and warranty and installation documents, (e) use of the marks on service reports and invoices and (f) use of the mark on shirts worn be MMU service personnel.

15.     While Defendants may not like the evidence obtained, the production by MMU of such supporting evidence demonstrating its use of the marks in question eliminates any need for Defendants to take the extreme measure of deposing one of MMU's attorneys.   As stated previously, if the statement alleging use is not false, there is no need to delve into the declarant's intent.  Defendants offer utterly no showing of any falsehood.

16.     Defendants have made abundantly clear through their discovery requests and examination of MMU's witnesses that their objective is not to obtain the underlying facts regarding usage, but to pierce the attorney-client privilege.   Rather than ask MMU a direct question (i.e. Was MMU using the various marks at the time the subject declarations were filed on behalf of MMU, and if so, describe such usage), Defendants propounded a convoluted interrogatory requiring MMU to:

**INTERROGATORY NO. 1**

State in detail the circumstances surrounding any declaration filed on behalf of MMU in the prosecution, application or registration for each of the trademarks in suit including, but not limited to, setting forth the specific information and belief(s) relied upon by George Kobayashi in filing any such declaration and identifying the person(s) and/or document(s) that are the source(s) of each such information and belief, and identify the three persons (other than Counterdefendant's counsel of record in this action) most knowledgeable about same.

Notwithstanding its objections, MMU answered the interrogatories and provided extensive information.

17.    The portions of deposition testimony cited by Defendants in their Response Brief highlight that Defendants' objective is not to discover the facts surrounding the registration of the marks.   On May 19, 2008, Defendants took the deposition of Mr. Akihiko Minemura, MMU's General Manager, who was testifying pursuant to Rule 30(b)(6), for approximately 8 hours.

```
P61

    8    Q.    Do you have any understanding of the
    9    basis for Mr. Kobayashi's declarations under
   10    penalty of perjury to the trademark office that
   11    Miyano Machinery USA was using the triangle logo
   12    on machine tools?
```

(Objections and statements by the interpreter deleted)

```
P63
    1         Q.    Actually, I think the question was do
    2    you have an understanding of what the information
    3    and basis was for Mr. Kobayashi signing the
    4    declaration?
```

(Objections and statements by the interpreter deleted)

```
P64
   15    BY THE WITNESS:
   16         A.    Since my recollection is not clear, I
   17    cannot answer the question.
```

Shortly thereafter, Mr. Minemura testified that MMU was using the Triangle Winged M mark on

machine tools in 2002 when the declaration was filed.  (Minemura Dep. at pp. 48-50)

```
     23    BY MR. BAKER:
     24         Q.    Didn't Miyano Machinery USA stop using
P49
      1    the triangle trademark at some point in the late
      2    1990s?
      3         A.    I don't know that they did.
      4         Q.    Can you point to any specific examples
      5    of use by Miyano Machinery USA of the triangle
      6    logo on any machine tool between the year 2000 and
      7    the year 2007?

        ****

     11    BY THE WITNESS:
     12         A.    Yes.
     13    BY MR. BAKER:
     14         Q.    What specific machines?  Please list
     15    all of them?

        ****

     18    BY THE WITNESS:
     19         A.    GN series.  MTV series.  Warranty
     20    policies.  Service reports.  Service technician
     21    work clothes, shirts.  On the polo shirts and
     22    other shirts that were given to the employees,
     23    distributors and customers.  On the web sites
     24    related to -- relating to the machine parts
                                                          50
      1    sales.
      2    That is all I can remember right now.
```

18.    Defendant also fail to cite to Mr. Minemura's testimony regarding MMU's use of

the Winged M mark with services (Minemura Dep. at pp. 106-107).

```
P106 16    BY MR. ALEX:
     17         Q.    I would like to present you two more
```

```
18        documents.  Directing your attention to Exhibit --
19        The first document has been marked as Exhibit 98
20        and the second one has been marked as Exhibit 99,
21        and right now I am directing your attention to
22        Exhibit 98.  Do you recognize that document?
23             A.    Yes.
24             Q.    What is it?
```

P107

```
 1             A.    It is called a service report, a
 2        document that we submit after we provide services
 3        to customers.
 4             Q.    Is there a date on the service report?
 5             A.    Yes.
 6             Q.    What is the date?
 7             A.    I believe it is March 26th, 2002.
 8             Q.    Do you recognize what appears up at
 9        the top left of the service report?
10             A.    Yes.
11             Q.    What do you see?
12             A.    It is a triangle trademark for
13        Miyano.
14             Q.    Have you ever seen a service report
15        that does not have the triangle winged M
16        trademark?
17             A.    Not as far as I can remember.
18             Q.    So as far as you know, this form that
19        is used for purposes of identifying services
20        rendered by MMU is the only form used as a service
21        report?
22             A.    Yes, as far as I know.
```

19.    It is likewise telling that Defendants filed their May 14, 2008 Motion to Compel Production, to Pierce Claimed Attorney-Client and Work Product Privilege and to Enforce Subpoena for Deposition (Doc. 84) without submitting MMU's complete May 12, 2008 Responses to Defendants' First Set of Interrogatories.    MMU has since submitted the Interrogatory Responses as Exhibit 5 to its May 20 Response to said Motion (Doc. 89).  The

Interrogatory Responses set forth specific information and evidence demonstrating MMU's use of the subject marks.

20.    Defendants cite *Hunt International Resources Corp. v. Binstein*,  98 F.R.D. 689 (ND IL 1983), for the proposition that the appropriate method where a party has subpoenaed an attorney is to allow the deposition of an attorney and permit the attorney witness to claim privilege as may be required.  The Seventh Circuit has not addressed this issue. However, courts in the Northern District of Illinois have rejected this approach repeatedly and adopted the approach of the Eighth Circuit Court of Appeals as set forth *in Shelton v. American Motors Corp.*, 805 F.2d 1323 (8th Cir. 1987). *See Stalling v. Union Pac. R.R. Co.,* 2004 WL 783056 (N.D.Ill.2004); *M&R Amusement Corp. v. Blair*, 142 F.R.D. 304, 305 (ND IL 1992). *Hernandez v. Longini*, 1997 WL 754041 (N.D.Ill.1997); *Harriston v. Chicago Tribune Co.,* 134 F.R.D. 232 (N.D.Ill.1990); *Joslyn Corp. v. RTE Corp.,* 1988 WL 102104 (N.D.Ill.1988); *Marco Island Partners v. Oak Dev. Corp.,* 117 F.R.D. 418, 420 (N.D.Ill.1987).

21.    The *Shelton* court held that depositions of opposing counsel should be limited to where the party seeking to take the deposition has shown that (1) no other means exist to obtain the information than to depose opposing counsel, …(2) the information sought is relevant and nonprivileged; and (3) the information is crucial to the preparation of the case.  805 F.2d at 1327. As this Court stated in *Stalling,* if there are other available sources of information, such as depositions of other witnesses, written interrogatories and requests for production or requests to admit, which do not involve the same dangers as an oral deposition of opposing counsel, they should be employed.

22.    In this case, Defendants have already obtained, through methods of discovery other than deposition MMU's attorney, the nonprivileged information that they allegedly seek.

Therefore, the deposition of attorney Kobayashi should also be prohibited as duplicative pursuant to Federal Rule 26(b)(1). *Marco Island Partners v. Oak Dev. Corp.*, 117 F.R.D. at 420. Courts have the discretion to limit pretrial discovery if the discovery sought is unreasonably cumulative or duplicative and it is particularly appropriate to exercise this discretion when a party seeks to depose its opponent's attorney. Defendants make no attempt to demonstrate how attorney Kobayashi's testimony regarding the factual basis for the declarations filed on behalf of MMU would differ from the testimony elicited from MMU directly.

23.    Deposing an opponent's attorney is a drastic measure. "It not only creates a side-show and diverts attention from the merits of the case, its use also has a strong potential for abuse." *M&R Amusement Corp. v. Blair*, 142 F.R.D. at 305. Thus, a motion to depose an opponent's attorney should be viewed with a jaundiced eye.

24.    Defendants' bare allegations of fraud have been amply rebutted by the evidence of use submitted by MMU. Defendants have shown neither the propriety nor the need to depose attorney Kobayashi. In addition, Defendants' claim that the privilege log prepared and provided by Masuda Funai Eifert & Mitchell is "inadequate in that it fails to meet the standards established by law" as asserted at paragraph 25 of their Motion to Compel Production, to Pierce Claimed Attorney-Client and Work Product Privilege and to Enforce Subpoena for Deposition (Doc. 84) is wholly without specificity or support and the request for an *in camera* inspection by the Court of the withheld documents should be denied.

WHEREFORE, attorney George Kobayashi and the law firm of Masuda, Funai, Eifert & Mitchell, Ltd. move this Court for an order quashing the subpoena and for entry of a protective order forbidding the deposition of George H. Kobayashi and for such other relief this Court deems fair.

Dated: May 28, 2008                Respectfully submitted,

**GEORGE H. KOBAYASHI and**
**MASUDA, FUNAI, EIFERT & MITCHELL,**
**LTD.**


By:/s/_Nancy E. Sasamoto_____
      One of Their Attorneys


Nancy E. Sasamoto, Esq.
Steven L. Katz, Esq.
Masuda, Funai, Eifert & Mitchell, ltd.
203 N. LaSalle Street, Suite 2500
Chicago, IL  60601-1262
(312) 245-7500


N:\SYS12\11097\LIT\Reply to Defs' Counterplts' Resp in Opp to Motion of GHKv3.doc

COPY

1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


MIYANO MACHINERY USA,,            )
Inc.,                             )
                                  )
            Plaintiff,            )
                                  )   CIVIL ACTION
            -vs-                  )   NO. 08 C 526
                                  )
MIYANOHITEC MACHINERY,            )
INC., THOMAS ("TOM") MIYANO       )
a/k/a TOSHIHARU MIYANO and        )
STEVEN MIYANO, a/k/a              )
SHIGEMORI MIYANO,                 )
                                  )
            Defendant.            )


DEPOSITION OF AKIHIKO MINEMURA

MAY 19, 2008 - 10:15 A.M.

        The Deposition of AKIHIKO MINEMURA,
taken pursuant to the Rules of Civil Procedure
for the United States District Courts pertaining
to the taking of depositions, taken before Jerry
Satterlee, a Certified Shorthand Reporter within
and for the State of Illinois, at 200 West Adams
Street, Suite 2850, Chicago, Illinois.

1     (THE INTERPRETER WAS DULY SWORN.)

2          TAKAYUKI HOSHINO,

3   was duly sworn to truly and accurately translate

4   from the English language to the Japanese

5   language and from the Japanese language to the

6   English language to the best of his ability.

7          (THE WITNESS WAS DULY SWORN)

8          AKIHIKO MINEMURA,

9   called as a witness herein, having been first

10  duly sworn, was examined and testified through an

11  interpreter as follows:

12                    EXAMINATION

13  BY MR. BAKER:

14       Q.    Good morning.   Could you please tell

15  us your name?

16       A.    Akihiko Minemura.

17       MR. BAKER:  Is there a remote chance the

18  interpreter could spell that for Jerry.

19       THE INTERPRETER: A-K-I-H-I-K-O.  And his

20  last name is M-I-N-E-M-U-R-A.

21       MR. BAKER:  And can you pronounce it for

22  me?

23       THE INTERPRETER:  "Ah-kee-hee-ko

24  Min-ay-mur-ra." (PHON.)

6

1          MR. BAKER:   "Min-ay-mur-ra." (PHON.)

2   BY MR. BAKER:

3          Q.    Mr. Minemura, could you tell us for

4   whom you work and in what position?

5          A.    At present?

6          Q.    Yes.

7          A.    The company is Miyano Machinery USA.

8   My current title is general manager.

9          Q.    Could you tell us what your role -- in

10  your role as general manager, could you tell us

11  what your responsibilities are?

12         A.    Basically, I am responsible for in

13  charge of various things.  To stand in for the

14  president when he is not present.  In particular

15  purchasing, general affairs, accounting are my

16  responsibilities among other things.

17         Q.    Could you tell us how long you have

18  been in the United States?

19         A.    Up to now?

20         Q.    Yes.

21         A.    Since August of last year.

22         Q.    And during that time from August '07

23  until today, have you been the general manager of

24  MMU?

52

1      MR. MANZO:  Object to the form of the

2   question.

3   BY THE WITNESS:

4      A.    My understanding of that question, my

5   understanding what happened back then was the

6   board was decided to --

7         (A DISCUSSION IN JAPANESE WAS HAD.)

8            My understanding as far as that

9   question is concerned is what happened back then

10  is the board decided not to renew the triangle

11  logo trademark through the Japanese system called

12  ringisho.

13      MR. MANZO:  Through what?

14      THE INTERPRETER:  Ringisho.

15      MR. MANZO:  Could you spell it?

16      THE INTERPRETER:  R-I-G-I-S-H-O.

17      MS. LEWIS:  R-I-N-

18      THE INTERPRETER: R-I-N-G-I-S-H-O.

19  Ringisho.

20      MR. MANZO:  Ringisho.

21  BY MR. BAKER:

22      Q.    Didn't Miyano Machinery USA stop using

23  the triangle trademark at some point in the late

24  1990s?

53

1        A.    I don't know that they did.

2        Q.    Can you point to any specific examples

3    of use by Miyano Machinery USA of the triangle

4    logo on any machine tool between the year 2000 and

5    the year 2007?

6        MS. LEWIS:  Can you clarify what year?

7    From 2000 to 2006 or-7?

8        MR. BAKER:  I said seven.

9    BY THE WITNESS:

10       A.    Yes.

11   BY MR. BAKER:

12       Q.    What specific machines?  Please list

13   all of them?

14       MR. MANZO:  Can I just hear the question.

15            (THE RECORD WAS READ.)

16   BY THE WITNESS:

17       A.    GN series.  MTV series.  Warranty

18   policies.  Service reports.  Service technician

19   work clothes, shirts.  On the polo shirts and

20   other shirts that were given to the employees,

21   distributors and customers.  On the web sites

22   related to -- relating to the machine parts

23   sales.

24            That is all I can remember right now.

65

 1          A.    Yes.  Mectron is the one -- are the
 2  ones that put the trademarks on the products.
 3          Q.    Do you know who George Kobayashi is?
 4          A.    Yes, I do.
 5          Q.    Do you know that George Kobayashi
 6  signed a declaration in November 2002 claiming
 7  that Miyano Machinery USA was continuing to use
 8  the triangle logo?
 9          A.    I have never seen that document.
10          Q.    Do you have any understanding of the
11  basis for Mr. Kobayashi's declarations under
12  penalty of perjury to the trademark office that
13  Miyano Machinery USA was using the triangle logo
14  on machine tools?
15          THE INTERPRETER:  Could you reread the
16  question?
17          MR. MANZO:  I will object to the question.
18              (THE QUESTION WAS READ.)
19          MR. MANZO:  And I am going to instruct --
20          MS. LEWIS:  I don't think it was quite
21  accurate.
22          THE INTERPRETER:  Would you reread the
23  question.
24              (THE QUESTION WAS READ.)

1          (THE QUESTION WAS RETRANSLATED.)

2          MR. MANZO:  And I am sorry, have you

3     finished translating?

4          THE INTERPRETER:  Yes.

5          MR. MANZO:  I am going to instruct the

6     witness that he may not in his answer communicate

7     information exchanged between the company and Mr.

8     Kobayashi.

9          THE INTERPRETER:  Company and I am sorry?

10         MR. MANZO:  And Mr. Kobayashi.

11    BY THE WITNESS:

12         A.    He doesn't understand how Mr.

13    Kobayashi came up in this discussion.

14         MR. MANZO:  What was the end of his answer?

15         THE INTERPRETER:  He does not quite

16    understand how Mr. Kobayashi came up in this

17    discussion.

18    BY MR. BAKER:

19         Q.    Does he understand the question before

20    him?

21         A.    You mean about George Kobayashi?

22         Q.    I mean literally did he understand the

23    exact question and the instruction for that

24    matter?

67

1    A.    By the last question, you mean

2  whether or not Mr. Kobayashi signed the document?

3    Q.    Actually, I think the question was do

4  you have an understanding of what the information

5  and basis was for Mr. Kobayashi signing the

6  declaration?

7    MR. MANZO:  I would offer an objection.

8  Are you asking --

9    MR. BAKER:  Jerry, could you reread the

10  question back.

11         (THE QUESTION WAS READ.)

12    THE INTERPRETER:  He would like to say

13  something.

14    MR. BAKER:  Of course.

15  BY THE WITNESS:

16    A.    Because there are other Kobayashis in

17  the company, could you be specific about the

18  George Kobayashi you are talking about?

19  BY MR. BAKER:

20    Q.    Sure.  See the gentleman sitting at

21  the end of the table with the blue suit and orange

22  tie?  That is George Kobayashi.

23    A.    I was misunderstanding.

24    MR. BAKER:  Not at all.

68

1          Could you read the question one more

2   time.  Sorry about that.

3   BY THE WITNESS:

4          A.    A long time ago there was a person in

5   my company called George Kobayashi.

6          MR. BAKER:  Understood.

7          A.    That is the total confusion.

8          MR. BAKER:  I understand.

9               Now read the question back.

10              (THE QUESTION WAS READ.)

11          MS. LEWIS:  "Do you have any

12   understanding."

13          (THE QUESTION WAS RETRANSLATED.)

14          MR. MANZO:  And my instruction to the

15   witness again is your response may not reveal

16   communications between the company MMU and the

17   law offices of George Kobayashi.

18   BY THE WITNESS:

19          A.    Since my recollection is not clear, I

20   cannot answer the question.

21          MR. MANZO:  Can you take a break?

22          MR. BAKER:  Absolutely.

23              (A RECESS WAS HAD.)

24   BY MR. BAKER:

111

1    Japanese.

2    BY MR. ALEX:

3         Q.    I would like to present you two more

4    documents.  Directing your attention to Exhibit --

5    The first document has been marked as Exhibit 98

6    and the second one has been marked as Exhibit 99,

7    and right now I am directing your attention to

8    Exhibit 98.  Do you recognize that document?

9         A.    Yes.

10        Q.    What is it?

11        A.    It is called a service report, a

12   document that we submit after we provide services

13   to customers.

14        Q.    Is there a date on the service report?

15        A.    Yes.

16        Q.    What is the date?

17        A.    I believe it is March 26th, 2002.

18        Q.    Do you recognize what appears up at

19   the top left of the service report?

20        A.    Yes.

21        Q.    What do you see?

22        A.    It is a triangle trademark for

23   Miyano.

24        Q.    Have you ever seen a service report

1    that does not have the triangle winged M

2    trademark?

3         A.    Not as far as I can remember.

4         Q.    So as far as you know, this form that

5    is used for purposes of identifying services

6    rendered by MMU is the only form used as a service

7    report?

8         A.    Yes, as far as I know.

9         Q.    I would like to direct your attention

10   to the next document which has been marked as

11   Exhibit 99.  Do you recognize that document?

12        A.    Yes.

13        Q.    And what is that?

14        A.    It is a document agreement that is

15   given to our customers either before or after

16   sale.

17        Q.    Can I ask you to turn to the second

18   page of the document, and what do you see on the

19   second page?

20        A.    The signature by Hank Marchionne who

21   is one of our company's managers.

22        Q.    What else do you see?

23        A.    A date.

24        Q.    And what date is that?