# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| MIYANO MACHINERY USA, INC., )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>MIYANOHITEC MACHINERY, INC., THOMAS )<br>("TOM") MIYANO, a/k/a TOSHIHARU )<br>MIYANO and STEVEN MIYANO, a/k/a )<br>SHIGEMORI MIYANO, )<br>)<br>Defendants. )<br>_____ )<br>MIYANOHITEC MACHINERY, INC., THOMAS )<br>("TOM") MIYANO, a/k/a TOSHIHARU )<br>MIYANO and STEVEN MIYANO, a/k/a )<br>SHIGEMORI MIYANO, )<br>)<br>Counterplaintiffs, )<br>)<br>v. )<br>)<br>MIYANO MACHINERY, INC. and MIYANO )<br>MACHINERY USA, INC., )<br>)<br>Counterdefendants. ) | No. 08 C 526<br><br>Judge Virginia M. Kendall<br>Magistrate Judge Nan R. Nolan |

## MEMORANDUM OPINION AND ORDER

Plaintiff Miyano Machinery USA, Inc. ("MMU") is suing MiyanoHitec Machinery, Inc., Thomas ("Tom") Miyano and Steven Miyano for trademark infringement, cybersquatting, unfair competition, unfair trade practices, and declaratory judgment with respect to certain marks which are used with machine tools and as service marks. Defendants have counterclaimed against MMU and its parent corporation, Miyano Machinery, Inc. ("MMJ") for declarations that the marks have been canceled and are invalid, and charging Counterdefendants with unfair competition, deceptive trade practices, and false designation.[1]

---

[1] In the interest of simplicity, the court will refer to Defendants/Counterplaintiffs as "Defendants." The court will refer to Plaintiff/Counterdefendants by their individual acronyms, MMU

Currently before the court are (1) a motion to quash a subpoena served on one of MMU's attorneys, George H. Kobayashi; (2) Defendants' motion to compel, to pierce the attorney-client and work product privileges and to enforce the subpoena; and (3) MMU's cross-motion for an order compelling the return of privileged documents and for a protective order. For the reasons set forth below, the motion to quash and the cross-motion are both granted and the motion to compel is denied.

**BACKGROUND**

Defendant Tom Miyano served as the president and chairman of MMU until approximately December 31, 2003. During that time, MMU – and, possibly, Tom Miyano personally – was represented by the law firm of Masuda Funai Eifert & Mitchell, Ltd. ("MFEM"). George Kobayashi, an attorney with MFEM, signed two declarations that were included with MMU's applications to the U.S. Patent and Trademark Office ("PTO") for the four trademarks and one service mark at issue in this case (collectively, "trademarks" or "marks"): (1) R. 3,328,718 - MIYANO; (2) R. 1,527,809 - MIYANO (stylized); (3) R. 1,217,317 U.S. Reg No. 1,217,318 - Triangle Winged M; (4) S. 77/176918 - Triangle Winged M; and (5) R. 1,473,925 - MIYANO THE WORLD LEADER IN PRECISION.

Mr. Kobayashi's November 5, 2002 declaration was made in connection with MMU's application for renewal of the Triangle Winged M and MIYANO marks for use on machines. His September 13, 2007 declaration was made in connection with MMU's application to register the Triangle Winged M and MIYANO marks as service marks. In both declarations, Mr. Kobayashi represented that the factual information provided was based on "information and belief." (*See* Exs. A and B to Def. Mot.) MFEM and Mr. Kobayashi continued to represent MMU after Tom Miyano left the company and they are currently serving as counsel for both MMU and MMJ in this lawsuit.

---

and MMJ.

In response to MMU's complaint, Defendants filed an Answer, Affirmative Defenses and Counterclaims alleging, among other things, that MMU fraudulently obtained the MIYANO and Triangle Winged M marks by (1) failing to disclose that Defendants were using the Miyano name "in connection with goods falling within Plaintiff's description of goods/services"; and (2) falsely certifying that MMU was using the Triangle Winged M mark at the time of the applications. (Second, Fourth, Fifth Defenses; Counterclaim Counts II - IV.) On February 1, 2008, MMU filed a motion for preliminary injunction and the parties commenced expedited discovery.

On March 19, 2008, Defendants served a subpoena on Mr. Kobayashi requiring that he appear for a deposition and produce the following:

> All documents and communications, electronic or otherwise, relating to applications and registrations of trademarks by, for or on behalf of Miyano Machinery USA, Inc., or its predecessors, from and after January 1, 1990.

(Ex. A to Motion to Quash.) Shortly thereafter, Defendants moved to disqualify MFEM as counsel for MMJ; Mr. Kobayashi and MFEM responded with a motion to quash the subpoena. At a hearing on April 8, 2008, the court instructed the parties to meet and confer regarding both matters. Defendants subsequently withdrew the motion to disqualify and the parties further agreed amongst themselves that MFEM would produce non-privileged documents responsive to the subpoena that are contained in their files and that relate to the five trademarks at issue in this case.

On April 10, 2008, Defendants served Interrogatories on MMU seeking specific information relating to the five trademarks. MFEM and MMU agreed to respond to the interrogatories, to produce non-privileged documents, and to provide a privilege log of documents that were withheld. MMU provided this response on May 1, 2008, along with the names of six individuals knowledgeable about the circumstances surrounding the Kobayashi declarations. Defendants, however, deemed the response inadequate. During a telephone conference on May 6, 2008, Defendants apparently explained that they were seeking "all MMU's information and beliefs relating to or bearing on the declarations made by Mr. Kobayashi in the applications at issue." (Def. Mot.

3

¶ 14.) Defendants claim that, to date, MMU and MFEM have produced only (1) public documents; (2) non-responsive and irrelevant documents; (3) 174 pages of additional documents not relating to the factual information Mr. Kobayashi relied upon in the trademark applications; and (4) a privilege log. Defendants claim that the privilege log, which MMU revised on May 9, 2008, is inadequate in its entirety, but they offer no specific argument in that regard.

Rather, Defendants focus on "Exhibit L," bates-stamped MMU0017647-17649, which MMU mistakenly produced to Defendants but now seek to recover as privileged. Exhibit L is a January 8, 2008 email from Mr. Kobayashi to Gentaro Kakumae, the head of MMU's accounting department, and Mr. Kakumae's undated response. Defendants argue that Exhibit L demonstrates that Mr. Kobayashi "did not have sufficient factual information on which to base his declarations." (Def. Mot. ¶ 29.) Defendants insist that Exhibit L is not protected by the attorney-client or work product privileges, and that even if it is, the privilege should be pierced because the document evidences a fraud on the PTO. Defendants also claim to need the deposition of Mr. Kobayashi to discover his factual knowledge regarding the five trademarks at issue here. In essence, Defendants' several theories are all designed to secure information setting forth the factual bases for MMU's claimed use of the trademarks. MMU and MFEM disagree with all of Defendants' arguments and ask that the court order the return of Exhibit L, deem their production complete, and bar the deposition of Mr. Kobayashi.

## DISCUSSION

**A. Exhibit L**

Defendants dispute the privileged nature of Exhibit L and argue that the crime-fraud exception to the privilege applies in any event. Before addressing these arguments, the court first notes that Defendants also suggest that the court should conduct an *in camera* review of all of the documents identified on MMU's privilege log to determine whether they are in fact privileged. (Def. Mot. ¶ 36.) The only basis for this suggestion is Defendants' claim that "[i]t is impossible to determine from the privilege log . . . if any of the myriad documents relate to the factual bases for the declarations proffered in support of the marks in issue." (*Id.* ¶ 35.) Defendants presumably believe that the court will uphold their position with respect to Exhibit L and seek to extrapolate the finding to all documents on the privilege log. As discussed below, any such presumption is misplaced.

Moreover, Defendants have not explained how the specific log entries are legally deficient. Under *Allendale Mut. Ins. Co. v. Bull Data Sys., Inc.*, 145 F.R.D. 84 (N.D. Ill. 1992), a privilege log must identify the following information for each separate document: the date; the author and recipients, including their capacities; the subject matter of the document; the purpose for its production; and a specific explanation of why it is privileged. *Id.* at 86. Defendants do not argue that MMU's privilege log lacks any of this identifying information, and aside from the generalization above, they have not provided any basis for concluding that the documents are not in fact privileged. *Cf. Petrovic v. City of Chicago*, No. 06 C 6111, 2007 WL 2410336, at *2 (N.D. Ill. Aug. 21, 2007) (privilege log of audio recordings inadequate where it did not provide a description of the subject matter or identify the interview date or the interviewer). Defendants' mere speculation that the documents might reveal discoverable facts is not sufficient.

Having rejected Defendants' cursory argument for review of the entire privilege log, the court turns to their arguments regarding Exhibit L.

**1.    Privilege**

The Seventh Circuit test to determine attorney-client privilege is: (1) where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived. *United States v. White*, 950 F.2d 426, 430 (7th Cir. 1991). The purpose of the privilege is to "encourage full disclosure and to facilitate open communication between attorneys and their clients." *United States v. BDO Seidman*, 337 F.3d 802, 810 (7th Cir. 2003). In addition to protecting statements made by the client, the privilege also protects statements from the lawyer to the client "where those communications rest on confidential information obtained from the client, or where those communications would reveal the substance of a confidential communication by the client." *Rehling v. City of Chicago*, 207 F.3d 1009, 1019 (7th Cir. 2000) (internal citations omitted).

A document may be protected by the work product privilege if it is created by an attorney "in anticipation of litigation." FED. R. CIV. P. 26(b)(3); *Logan v. Commercial Union Ins. Co.*, 96 F.3d 971, 976 (7th Cir. 1996). The work product doctrine is a qualified privilege that "exists because 'it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel.'" *Eagle Compressors, Inc. v. HEC Liquidating Corp.*, 206 F.R.D. 474, 478 (N.D. Ill. 2002) (quoting *Hickman v. Taylor*, 329 U.S. 495, 510 (1947)). The party invoking the attorney-client or work product privilege bears the burden of establishing that the privilege applies. *BDO Seidman*, 337 F.3d at 811; *Avery Dennison Corp. v. UCB Films PLC*, No. 95 C 6351, 1998 WL 293002, at *2 (N.D. Ill. May 28, 1998).

Defendants do not dispute that Exhibit L is a communication between an attorney and his client. Rather, they argue that the information contained in the document does not relate to any legal advice, and state that "[t]he factual underpinnings of a trademark application to the PTO are

6

not privileged." (Def. Mot. ¶ 31 (citing *Suh v. Yang*, No. 96-20891, 1997 U.S. Dist. LEXIS 20077, at *13 (N.D. Cal. Nov. 18, 1997)). MMU stresses that the document itself bears the marking "ATTORNEY-CLIENT PRIVILEGED COMMUNICATION," and insists that it was prepared "in connection with legal advice sought by Plaintiff regarding the filing of the Complaint and Preliminary Injunction." (MMU Mot. ¶ 17.)

For purposes of this motion, the court accepts Defendants' general proposition that "neither a trademark application to the PTO nor its factual underpinnings are privileged." *Suh*, 1997 U.S. Dist. LEXIS 20077, at *13. *But see Knogo Corp. v. United States*, 213 U.S.P.Q. 936 (1986), *accepted by In re Spalding Sports Worldwide, Inc.*, 203 F.3d 800 (Fed. Cir. 2000). Defendants' own case, however, confirms that "the attorney-client dialectic which gave [those facts] birth should be" privileged. *Suh*, 1997 U.S. Dist. LEXIS 20077, at *13. The court has conducted an *in camera* review of Exhibit L and concludes that it is protected under both the attorney-client and work product privileges. The document consists of questions posed to MMU by its attorney for the purpose of determining whether MMU had sufficient information to proceed with filing the motion for preliminary injunction and complaint in this case. Contrary to Defendants' suggestion, those questions do not themselves constitute "facts" that must be disclosed. Rather, the questions reflect counsel's effort to conduct due diligence prior to rendering legal advice regarding this lawsuit.

Exhibit L was clearly created in anticipation of litigation and is a communication made in connection with the provision of legal advice. *See Mattenson v. Baxter Healthcare Corp.*, 438 F.3d 763, 767-68 (7th Cir. 2006) ("The work-product doctrine shields materials that are prepared in anticipation of litigation."); *Equity Residential v. Kendall Risk Mgmt., Inc.*, 246 F.R.D. 557, 563 (N.D. Ill. 2007) (attorney-client privilege protects "those communications which relate to the giving or seeking of legal advice.") Thus, Defendants' motion to compel must be denied unless some exception to the privilege applies.

    **2.**      **Waiver**

Defendants have not expressly argued that MMU waived the privilege by inadvertently producing the document.[2] To avoid any dispute, however, the court now holds that no waiver occurred. Courts must balance five factors to determine whether waiver has occurred when a document is produced inadvertently: (1) the reasonableness of the precautions taken to protect the document; (2) the time taken to rectify the error; (3) the scope of discovery; (4) the extent of the disclosure; and (5) the overriding issue of fairness. *Urban Outfitters, Inc. v. DPIC Companies, Inc.*, 203 F.R.D. 376, 380 (N.D. Ill. 2001). Defendants stress that Exhibit L was not marked "confidential" or "attorneys' eyes only" in conformance with the parties' agreement. (Def. Mot. ¶ 26.) MMU counters that the document internally bears the marking "ATTORNEY-CLIENT PRIVILEGED COMMUNICATION."

Regardless, the balancing test weighs in favor of preserving the privilege in this case. MMU has produced more than 22,000 pages of documents on an expedited schedule due to the pending motion for preliminary injunction. MMU had an attorney organize all documents and remove those that are privileged, but Exhibit L was mistakenly produced on April 4, 2008 on a CD-ROM disk. MMU discovered the inadvertent production five weeks later on May 8, 2008 and immediately sent Defendants a letter requesting that it be returned. *See* FED. R. CIV. P. 26(b)(5)(B). Notably, for two weeks during this five-week period, MMU's counsel was in Japan for depositions relating to this case. As discussed below, moreover, the document does not assist Defendants in establishing a fraud on the PTO, and they have not otherwise shown that they will suffer any prejudice if MMU is allowed to assert the privilege. Given the expedited nature of discovery, the scope of documents

---

[2] Defendants similarly do not argue that MMU has effected a waiver by placing the advice of its attorneys "at issue" in this case. (Def. Resp. ¶ 23.) *See Claffey v. River Oaks Hyundai*, 486 F. Supp. 2d 776, 778 (N.D. Ill. 2007) (quoting *Garcia v. Zenith Elecs. Corp.*, 58 F.3d 1171, 1175 n.1 (7th Cir. 1995) ("The attorney-client privilege may be waived 'when the client asserts claims or defenses that put his attorneys' advice at issue in the litigation.'"))

produced, the limited extent of disclosure and the lack of any demonstrable prejudice to Defendants, the court finds that MMU did not waive its privilege with respect to Exhibit L.

### 3. Crime-Fraud Exception

This leaves Defendants' assertion that the privilege should be pierced by the crime-fraud exception. Specifically, Defendants claim that:

> If Plaintiff cannot and does not come forward with an explanation to demonstrate that Kobayashi actually had a factual basis for his declarations executed in 2002 and 2007 as the reasonable inference from questions 4 and 5 in Exhibit "L" belie, then the privileges asserted should be pierced as being in furtherance of fraud on the PTO.

(Def. Mot. ¶ 34.) Defendants also suggest that the court should conduct an *in camera* review of all of the documents on MMU's privilege log to determine whether the privilege should be pierced. (*Id.* ¶ 36.)

"The crime-fraud exception places communications made in furtherance of a crime or fraud outside the attorney-client privilege." *United States v. BDO Seidman, LLP*, 492 F.3d 806, 818 (7th Cir. 2007). *See also Apotex Corp. v. Merck & Co.*, 229 F.R.D. 142, 146 (N.D. Ill. 2005) (quoting *Clark v. United States*, 289 U.S. 1, 15 (1933)) (the attorney-client privilege "takes flight if the relation is abused. A client who consults an attorney for advice that will serve him in the commission of a fraud will have no help from the law.") The exception is based on a recognition that "when the advice sought relates '*not to prior wrongdoing*, but to *future wrongdoing*,' the privilege goes beyond what is necessary to achieve its beneficial purposes." *Id.* (quoting *United States v. Zolin*, 491 U.S. 554, 562-63 (1989)) (emphasis in original).

To overcome the privilege under the crime-fraud exception, a party must present prima facie evidence that "'gives colour to the charge' by showing 'some foundation in fact.'" *Id.* (quoting *United States v. Al-Shahin*, 474 F.3d 941, 946 (7th Cir. 2007)). The Seventh Circuit has held that a prima facie showing of fraud does not require evidence sufficient to support a verdict but, rather, enough evidence to require the party "in the best position to explain things, to come forward with that

9

explanation." *Matter of Feldberg*, 862 F.2d 622, 625-26 (7th Cir. 1988). The privilege will remain "if the district court finds [the] explanation satisfactory." *BDO Seidman*, 492 F.3d at 818.

As noted, Defendants' primary support for its claim of fraud are questions 4 and 5 of Exhibit L, which Defendants have produced to the court *in camera*. The Supreme Court has stated that "[b]efore engaging in *in camera* review to determine the applicability of the crime-fraud exception, the judge should require a showing of a factual basis adequate to support a good faith belief by a reasonable person." *Zolin*, 491 U.S. at 572 (internal quotation omitted). As the Court explained, "[a] blanket rule allowing *in camera* review as a tool for determining the applicability of the crime-fraud exception . . . would place the policy of protecting open and legitimate disclosure between attorneys and clients at undue risk." *Id.* at 571. In light of this holding, the *Apotex* court has observed that "[i]f a showing of [reasonable belief] is needed as a threshold for a court simply to review privileged material to determine if the exception applies, then it is reasonable to infer that a greater showing is needed to apply the exception and order disclosure." 229 F.R.D. at 147. *See also Ferguson v. Lurie*, 139 F.R.D. 362, 367 (N.D. Ill. 1991) (agreeing that "the reasonable belief test is not the appropriate standard for determining whether to release documents under the crime-fraud exception.")

Defendants suggest that MMU perpetrated a fraud on the PTO that justifies piercing the privilege by (1) asserting that the factual allegations contained in the declarations supporting the trademark applications for the Triangle Winged M mark were based on Mr. Kobayashi's information and belief; even though (2) Mr. Kobayashi did not in fact have any factual basis for his statements. (Def. Mot. ¶ 34.) Defendants argue that *in camera* review is appropriate here based on the following factual evidence. First, Defendants claim that notwithstanding Mr. Kobayashi's November 2002 declaration of use, MMU's Rule 30(b)(6) witness, Akihiko Minemora, testified that between 2000 and 2007, MMU only used the Triangle Winged M mark on "GN" series and "MTV" series machines. (Ex. B to Def. Reply.) Mr. Minemora stated that sometime in the past, the MTV model

machines "were produced by MMU's group company called Mectron and currently those MTV machines are produced by the same Mectron which is [now] an independent company." (Ex. C to Def. Reply.) Mr. Minemora subsequently clarified that Mectron was never in fact owned by MMU, and he was unaware whether MMJ owns Mectron. (*Id.*)

As for the GN series machines, Defendants note that they are produced in Japan by MMJ. Defendants claim, however, that in 1997, by action of MMJ's Board of Directors, MMJ stopped using the Triangle Winged M mark on machines. Moreover, the MMJ website indicates that the GN series of machines are Ocean Brand machines, and not MMJ brand machines. (Def. Reply ¶ 8.) Defendants object that "[o]ut of 11 pages of pictures and descriptions, there is only one place where a triangle logo appears, and that is on an unidentified machine pictured at the bottom of page 6 of the website." According to Defendants, "the 20 GN machines produced and sold by MMU probably didn't have the triangle logo on them at all." (*Id.*)

Defendants further claim that MMU's supporting documentation purporting to show its use of the Triangle Winged M service mark in September 2007 is not identical to the mark MMU was seeking to register. (Def. Reply, at 5 and Exs. F and G.) Specifically, Defendants argue that the service mark in use included a stylized "Miyano," whereas the service mark requested included the word "MIYANO" in block letters. Defendants suggest that "[i]t is plain that the service mark requested was not the same as the service mark declared to have been in use," which Mr. Kobayashi "knew or should have known." (*Id.*)

In the court's view, none of these examples justifies piercing the privilege with respect to Exhibit L. Defendants' statements regarding the GN and MTV series machines, and the alleged conflict between the service mark being used and the one being registered may support Defendants' underlying defenses and counterclaims for fraud, but they do not give "foundation in fact" to the assertion that MMU consulted with Mr. Kobayashi for advice that would assist it in committing a crime or fraud. *BDO Seidman*, 492 F.3d at 818. *See also In re Grand Jury*

11

*Subpoenas*, 144 F.3d 653, 660 (10th Cir. 1998) (requiring "prima facie evidence that the allegation of attorney participation in the crime or fraud has some foundation in fact.") Significantly, as noted, Exhibit L is an email dated January 8, 2008 – after both declarations were submitted to the PTO – consisting of questions posed to MMU by its attorney for the purpose of determining whether MMU had sufficient information to proceed with filing the motion for preliminary injunction and complaint in this case. As such, it cannot be construed as a communication made "in furtherance of a crime or fraud" on the PTO. *Id.* (exception applies to advice sought for *future* wrongdoing).

Even assuming Defendants could establish a "factual basis adequate to support a good faith belief by a reasonable person" that an *in camera* review of Exhibit L would reveal evidence that the crime-fraud exception applies, actual review of the specific contents of Exhibit L reveals no such thing. Defendants direct the court to questions 4 and 5, which relate to MMU's use of the Triangle Winged M mark on uniforms and machines. MMU's email response to question 4 reflects that the company has evidence of such use on uniforms. As for use on machines, MMU provides the following as supporting examples: (1) MMU's refurbishment and sale of used machines bearing the Triangle Winged M trademark; (2) use of the Triangle Winged M mark on new machine Standard Warranty Policies and installation Service Reports; (3) use of the Triangle Winged M mark in connection with the sale of Miyano machine tool replacement parts and part assemblies; (4) use of the Triangle Winged M mark on Miyano Ocean and Mectron machine tools, and warranty and installation documents; and (5) use of the mark on service reports and invoices. (Pl. Resp. ¶ 38; Pl. Reply ¶ 14.)

Defendants may dispute the accuracy or merit of these examples, but the court is satisfied that they suffice to defeat Defendants' request to pierce the attorney-client and work product privileges. Specifically, MMU has set forth its bases for asserting that the Triangle Winged M mark was in use at the time of the applications. Whether or not this assertion proves genuine or correct, it is a satisfactory explanation for Defendants' fraud charges for purposes of the crime-fraud

exception. *BDO Seidman*, 492 F.3d at 818. Under these circumstances, the court will not conduct an *in camera* review of every document identified on MMU's privilege log to assess Defendants' crime-fraud theory. *Zolin*, 491 U.S. at 572. In addition, the court stresses that its findings with respect to piercing the attorney-client privilege are separate and distinct from any future determination regarding the validity of Defendants' affirmative defenses and counterclaims charging MMU with fraud.[3]

Defendants are ordered to return the original CD-ROM containing Exhibit L to MMU. MMU, in turn, will produce to Defendants a revised version of the disk without the privileged document. Defendants are ordered to destroy all copies of Exhibit L in its possession, whether in paper or electronic format, and they may not use or disseminate the document in any manner.

**B.     Mr. Kobayashi's Deposition**

Defendants next seek to obtain the factual information they want by deposing Mr. Kobayashi. Federal Rule 30(a)(1) does not exempt attorneys from being deposed, "even if he or she represents a party to the litigation in issue." *Taylor Mach. Works, Inc. v. Pioneer Distrib. Inc.*, No. 06-1126, 2006 WL 1686140, at *1 (C.D. Ill. June 19, 2006) (quoting *Hunt Int'l Resources Corp. v. Binstein*, 98 F.R.D. 689, 690 (N.D. Ill. 1983)). That said, courts have recognized that deposing opposing counsel "provides a unique opportunity for harassment; it disrupts the opposing attorney's preparation for trial, and could ultimately lead to disqualification of opposing counsel if the attorney is called as a trial witness." *Id.* (quoting *Marco Island Partners v. Oak Develop. Corp.*, 117 F.R.D. 418, 420 (N.D. Ill. 1987)). As a result, "courts historically have looked with disfavor on attempts to [de]pose opposing counsel." *Id.*

---

[3]     For this reason, the court has not addressed (1) MMU's arguments as to whether Mr. Kobayashi's declarations contained material misrepresentations or omissions constituting fraud on the PTO (Pl. Reply ¶¶ 5-12.); or (2) Defendants' arguments as to whether MMU demonstrated sufficient market penetration to establish trademark rights. (Def. Reply ¶¶ 12, 13.)

Courts have adopted two approaches to resolving disputes regarding attorney depositions. One requires the attorney to attend the deposition and raise objections in response to specific questions. *See Hunt Int'l Resources Corp.*, 98 F.R.D. at 690. The other approach limits depositions "to where the party seeking to take the deposition has shown that (1) no other means exist to obtain the information than to depose opposing counsel, . . .; (2) the information sought is relevant and nonprivileged; and (3) the information is crucial to the preparation of the case." *Shelton v. American Motors Corp.*, 805 F.2d 1323, 1327 (8th Cir. 1986). The Seventh Circuit has not expressly adopted either method, but numerous courts in this district have followed the *Shelton* approach. *See Stalling v. Union Pacific R.R. Co.*, No. 01 C 1056, 2004 WL 783056, at *2 (N.D. Ill. Jan. 23, 2004) (collecting cases).

Applying the *Shelton* factors here, the court first agrees with Defendants that information regarding the factual bases for Mr. Kobayashi's declarations, including that MMU is using the trademarks at issue, are relevant and not privileged. This does not mean, however, that the information must come directly from Mr. Kobayashi. In MMU's view, Defendants have already received this information from other sources, namely, written interrogatories. (MFEM Mot. ¶ 16.) *See also Stalling*, 2004 WL 783056, at *2. MMU argues that it has provided "substantial evidence" regarding the use of the Triangle Winged M mark in the Complaint, in the Affidavit and Memorandum in Support of Summary Judgment, and in its 124-page response to Defendants' interrogatories. MMU also notes that it has produced invoices and service reports purporting to show the use of the Triangle Winged M mark. (Pl. Resp. ¶ 31.)

Defendants claim that Mr. Kobayashi's deposition is nonetheless warranted here because MMU's interrogatory responses are inadequate, and because MMU's Rule 30(b)(6) witness did not have knowledge of the facts supporting the claimed usage of the marks at the time of the applications. The court disagrees. Viewing all of the circumstances in this case, the court concludes that, at this time, Defendants have not satisfied their burden of showing that no means

14

exist to obtain the requested information other than to depose Mr. Kobayashi. First, MMU identified four people other than Mr. Kobayashi who have knowledge of the circumstances surrounding the declarations in issue. Notably, Defendants concede that MMU's Rule 30(b)(6) witness is not one of those people. It is not clear whether Defendants have deposed, or even attempted to depose any of the four named individuals regarding MMU's use of the various marks. This is certainly an avenue to pursue prior to deposing MMU's attorney.

That said, the court does caution MMU and MFEM, that statements between Mr. Kobayashi and his client regarding the factual bases for Mr. Kobayashi's representations in his declarations are not privileged and must be disclosed. Objections similar to those raised during the deposition of Mr. Minemora are improper. (*See* Ex. D to Def. Resp., at 8-9 (in response to question seeking the witness's "understanding of the facts underlying Mr. Kobayashi's . . . declaration[s]," attorney improperly "instruct[ed] him not to communicate the contents of *any* communication that went between the company and Mr. Kobayashi's law offices in either direction."))

As for the interrogatories, Defendants do not discuss MMU's specific answers or explain how they are deficient. The court's own review revealed that MMU's answer to interrogatory no. 1 essentially traces the application and prosecution histories of the marks, and identifies the "specimens" filed in connection with each application. (Ex. 5 to MMU Resp.) MMU's answer to interrogatory no. 2 includes pictures of a standard warranty policy, a machine tool study sheet, the Miyano web page, and certain machines and machine tools, all of which purport to demonstrate usage of the various marks. MMU also directs Defendants to documents bates stamped MMU 00026-000931 for pictures of machines bearing the plain text MIYANO mark. (*Id.* at 39.) MMU's answer to interrogatory no. 4 describes places the MIYANO and Triangle Winged M marks appear, such as on business cards, company checks, packing slips, and envelopes, and in advertisements, trade journals, articles and trade shows. (*Id.* at 48-49.) MMU's answer to interrogatory no. 5 provides more details with respect to the Triangle Winged M mark, in the form of document

references by bates number. (*Id.* at 63-65.) MMU also directs Defendants to six pages of documents relating to the MIYANO marks, stating that the cited pages "illustrate respectively, the 1986 and 2007 product line." (*Id.* at 71.) To the extent Defendants seek more detailed information, they should propound additional interrogatories or other written discovery requests.

## CONCLUSION

For the reasons stated above, the Motion to Quash the Subpoena or for Entry of Protective Order [Doc. 45] is granted. Defendants' Motion to Compel Production, to Pierce Claimed Attorney-Client and Work Product Privilege and to Enforce Subpoena for Deposition [Doc. 84] is denied. Plaintiff's Cross-Motion for an Order Compelling the Return of Privileged Documents and a Protective Order [Doc. 92] is granted.

ENTER:

Dated: June 6, 2008

_____
NAN R. NOLAN
United States Magistrate Judge