**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Miyano Machinery USA Inc., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. **08 C 526** |
| v. | ) | |
| | ) | Hon. Virginia Kendall |
| MiyanoHitec Machinery, Inc., | ) | |
| Thomas ("Tom") Miyano, a/k/a | ) | Magistrate Judge Nolan |
| Toshiharu Miyano and | ) | |
| Steven Miyano, a/k/a | ) | |
| Shigemori Miyano, | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) | |
| MiyanoHitec Machinery, Inc., | ) | |
| Thomas ("Tom") Miyano, a/k/a | ) | |
| Toshiharu Miyano and | ) | |
| Steven Miyano, a/k/a | ) | |
| Shigemori Miyano, | ) | |
| | ) | |
| Counterclaimants, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Miyano Machinery, Inc. and | ) | |
| Miyano Machinery USA Inc., | ) | |
| | ) | |
| Counterdefendants. | ) | |

**APPENDIX OF NON-WEST PUBLISHED CASES CITED**
**IN DEFENDANTS' MEMORANDUM IN RESPONSE TO**
**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

## Appendix of Non-West Published Cases

1.  *Emilio Pucci Societa a Responsibilita Limitata v. Pucci Corp.*, 1988 WL 135542 (N.D. Ill. 1988).

2.  *Gaffrig Performance Industries, Inc. v. Livorsi Marine, Inc.*, 2003 WL 23144859 (N.D. Ill. 2003).

3.  *MacKenzie-Childs, Ltd. v. MacKenzie-Childs*, 2008 WL 111196 (W.D. N.Y. 2008).

4.  *Krause v. Krause Publications Inc.*, 2005 WL 3175174, 76 U.S.P.Q.2d 1904, 1913 (2005).

5.  *John Nissen Mannequins*, 227 U.S.P.Q. 569, 571 (1985).

6.  *Laub v. Industrial Dev. Lab., Inc.*, 1959 WL 6084, 121 U.S.P.Q. 595 (1959).

7.  *MB Financial Bank, N.A. v. MB Real Estate Services, L.L.C.*, 2003 WL 22765022 (N.D. Ill. 2003).

8.  *Patterson v. World Wrestling Entertainment, Inc.*, 2006 WL 273527 (E.D. Wis. 2006).

9.  *Navistar Intern. Transp. Corp. v. Freightliner Corp.*, 1998 WL 911776 (N.D. Ill. 1998).

10. *Rauland Borg Corp. v. TCS Management Group, Inc.*, 1995 WL 242292 (N.D. Ill. 1995).

11. *Clarus Transphase Scientific, Inc. v. Q-Ray, Inc.*, 2006 WL 4013750 (N.D. Ill. 2006).

12. *Metavante Corp. v. Medavant, Inc.*, 2006 WL 1277903 (E.D. Wis. 2006).

13. *Charter Nat. Bank and Trust v. Charter One Financial, Inc.*, 2001 WL 1035721 (N.D. Ill. 2001).

14. *Borden, Inc. v. Kraft, Inc.*, 1984 WL 1458, 17 (N.D. Ill. 1984).

15. *Stokely-Van Camp, Inc. v. Coca-Cola Co.*, 1987 WL 6300, 3 (N.D. Ill. 1987).

16. *Medinol Ltd. v. Neuro Vasx Inc.*, 67 U.S.P.Q. 2d 1205, 1208 (T.T.A.B. 2003).

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing APPENDIX OF NON-WEST PUBLISHED CASES

CITED IN DEFENDANTS' MEMORANDUM IN RESPONSE TO PLAINTIFF'S MOTION

FOR PRELIMINARY INJUNCTION was filed via the Court's ECF system and thus also sent by

email on June 6, 2008 to the following:


Edward D. Manzo
COOK, ALEX, MCFARRON, MANZO,
CUMMINGS & MEHLER, LTD.
200 West Adams Street, Suite 2850
Chicago, IL 60606

Phone:  (312) 236-8500
Fax:  (312) 236-8176

emanzo@cookalex.com


June 6, 2008                                    /s/Geoffrey A. Baker

# APPENDIX 1



Emilio Pucci Societa a Responsibilita Limitata v.
Pucci Corp.
N.D.Ill.,1988.

United States District Court, N.D. Illinois, Eastern
Division.
EMILIO PUCCI SOCIETA a Responsibilita Limit-
ata and Emilio Pucci Perfumes International, Inc.,
Plaintiffs,
v.
PUCCI CORP., Defendant.
**No. 82 C 7907.**

Dec. 13, 1988.

*MEMORANDUM OPINION AND ORDER*

ANN C. WILLIAMS, District Judge.
**\*1** The plaintiffs Emilio Pucci Societa A Respons-
ibilita Limitata and Emilio Pucci Perfumes Interna-
tional, Inc.[FN1] bring this four count complaint al-
leging violations of federal and state trademark
statutes and common law. The plaintiffs move this
court for summary judgment on Counts I and III of
their complaint and on Count I of the defendant
Pucci Corporation's ("Pucci Corp.") counterclaim
pursuant to Federal Rule of Civil Procedure 56. The
plaintiffs also move the court to reconsider an as-
pect of its March 25, 1987 opinion. The plaintiffs'
motions are granted for the following reasons.

I

*Rule 56 Summary Judgment*

Summary judgment pursuant to Federal Rules of
Civil Procedure 56(c) is appropriate when the mov-
ing party uses the

pleadings, depositions, answers to interrogatories,
and admissions on file together with the affidavits,

if any, [to] show that there is no genuine issue as to
any material fact and that the moving party is en-
titled to judgment as a matter of law.

Fed.R.Civ.P. 56(c). A material fact is one that
"must be outcome determinative under the applic-
able law." *Big O Tire Dealers, Inc. v. Big O Ware-
house,* 741 F.2d 160, 163 (7th Cir.1984); *see also
Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248
(1986) (substantive law determines material facts);
*Egger v. Phillips,* 710 F.2d 292, 296 (7th Cir.) (en
banc), *cert. denied,*464 U.S. 918 (1983). A genuine
dispute about a material fact arises when "the evid-
ence is such that a reasonable jury could return a
verdict for that party." *Anderson,* 477 U.S. at 248.

After the movant has made a properly supported
summary judgment motion, "the nonmovant does
have the burden of setting forth specific facts show-
ing the existence of a genuine issue of fact for tri-
al." *Shlay v. Montgomery,* 802 F.2d 918, 920 (7th
Cir.1986); *see also Matushita Electric Industrial
Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586
(1986) (the nonmovant "must do more than simply
show that there is some metaphysical doubt as to
the material facts.") The nonmovant *may not* rely
on the allegations or denials in its pleadings to es-
tablish a genuine issue of fact. *See*Fed.R.Civ.P. 56(e).

Furthermore, summary judgment *must* be entered
"against a party who fails to make a showing suffi-
cient to establish the existence of an element essen-
tial to that party's case, and on which that party will
bear the burden of proof at trial." *Celotex Corp. v.
Catrett,* 477 U.S. 317, 322 (1986). Finally, "the tri-
al judge must accept as true the nonmovant's evid-
ence, must draw all legitimate inferences in the
nonmovant's favor, and must not weigh the evid-
ence on the credibility of witnesses." *Valentine v.
Joliet Township High School District,* 802 F.2d
981, 986 (7th Cir.1986) (emphasis added).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                 Page 2
Not Reported in F.Supp., 1988 WL 135542 (N.D.Ill.), 10 U.S.P.Q.2d 1541
**(Cite as: Not Reported in F.Supp., 1988 WL 135542 (N.D.Ill.))**

II

*Counterclaim: Count I*

The defendant brings Count I of its counterclaim for trademark infringement pursuant to the Trademark Act of 1946, as amended, The Lanham Act, 15 U.S.C. §§ 1051-1127. The plaintiffs previously moved for summary judgment with regard to this count. The court denied the plaintiffs' motion because "there [was] a genuine issue of material fact regarding the uncontestability of defendant's registration." *Pucci v. Pucci Corp.,* 2 U.S.P.Q.2d 1958, 1960 (N.D.Ill.1987) (William, J.). Under § 1065 of the Lanham Act, a mark becomes uncontestable when a registrant has filed the required affidavit and used the mark in connection with the goods or services specified on its registration for five continuous years after the registration date. *Id.* (and cases cited within). The plaintiffs have renewed their motion for summary judgment on the grounds that the defendant has failed to file the statutorily required affidavit. The plaintiffs filed their statement of undisputed facts as required by Northern District of Illinois General Rule 12(e). These facts, which establish the defendant's failure to file the requisite affidavit, are deemed admitted because they were not controverted by the defendant as required by General Rule 12(f). *See* N.D.Ill.Gen.R. 12; *Fisher v. Samuels,* 691 F.Supp. 63, 67 (N.D.Ill.1988) (Williams, J.).

**\*2** Consequently, there is no longer a dispute as to whether the defendant's mark is uncontestable. It is not. As a result, the plaintiffs' previously asserted defenses of laches and estoppel are applicable. *See Pucci,* 2 U.S.P.Q.2d at 1959-60. The defense of laches, which the court previously applied to bar Counts II, III, and IV of the defendant's counterclaim, will bar Count I as well. *Id.* at 1960-61. Accordingly, the plaintiffs' motion for summary judgment with regard to Count I of the defendant's counterclaim is granted.

III

*Counts I and III: Trademark Infringement*

In Counts I and III of their complaint, the plaintiffs allege that the defendant infringed on their trademark for perfumes.[FN2] The facts contained within the plaintiffs' statement of undisputed facts are deemed admitted for the purposes of this motion for the same reasons stated above although the various legal conclusions that have been mixed into the statement will be disregarded.[FN3] To prevail on their trademark infringement claim, the plaintiffs must demonstrate that there is

(1) a valid, protectible mark; and (2) a likelihood of confusion, mistake or deception in defendant's use of the trademark.

*Charles Schwab & Co. v. The Hibernia Bank,* 665 F.Supp. 800, 803 (N.D.Ca.1987); *see also United Carbide Corp. v. Ever-Ready, Inc.,* 531 F.2d 366, 377 (7th Cir.), *cert. denied,* 429 U.S. 830 (1976).

*a. Valid Mark*

The plaintiffs obtained the registration for their trademark for EMILIO Pucci, Registration No. 830,931, for perfumes on November 14, 1967.[FN4] The "Emilio Pucci" mark, as a personal name, is generally regarded as a descriptive mark.[FN5] *See Yarmuth-Dion, Inc. v. D'ion Furs,* 835 F.2d 990, 993 (2d Cir.1987) (and authorities cited within). A descriptive mark is entitled to protection under the Act only if it has acquired distinctiveness and secondary meaning. *Yarmuth-Dion,* 835 F.2d at 993; *Abraham Zion,* 761 F.2d at 104. In this case, the patent office's determination assists the plaintiff in their quest to establish the validity of their mark. The plaintiffs' registration of their trademark is "prima facie evidence of the validity of registration, [their] ownership of the mark, and of [their] exclusive right to use the mark in commerce in connection with the goods or services specified in the certific-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ate, subject to any conditions and limitations stated therein." 15 U.S.C. § 1057. Moreover, the patent office must have "concluded that the mark was not 'merely descriptive' " since it allowed the mark to be registered. *See Union Carbide,* 531 F.2d at 378 (citing to 15 U.S.C. § 1052(e)); *see also Abraham Zion,* 761 F.2d at 104 ("[t]erms that are descriptive but not generic may be registered as trademarks *only if* they have acquired 'secondary meaning.' ") (emphasis added). The patent office's conclusion "must be con sidered prima facie correct by a court considering the validity of a trademark." Thus, the patent office's determination, which the defendant has not challenged, suggests that the plaintiffs' mark has acquired secondary meaning.

**\*3** In any event, there is ample evidence to show that the "Emilio Pucci" mark has acquired a secondary meaning. A showing of secondary meaning establishes that the "[mark] and the business have become synonymous in the mind of the public, submerging the primary meaning of the term [or mark] in favor of its meaning as a word identifying that business." *Abraham Zion,* 761 F.2d at 104. The court must consider " '[t]he amount and manner of advertising, volume of sales, the length and manner of use, direct consumer testimony and consumer surveys.' " *Union Carbide,* 531 F.2d at 380,*quoting* the district court's findings. In this case, the plaintiffs have engaged in extensive national advertising since at least 1965. Total sales for their perfume have exceeded one million dollars. Furthermore, the plaintiffs have received extensive unsolicited media coverage of their products. *See Yarmuth-Dion,* 835 F.2d at 993 (unsolicited media coverage is a factor to be considered when determining whether secondary meaning has been established). Consequently, the court concludes that the plaintiffs' mark has acquired a secondary meaning.

### b. Likelihood of Confusion

The court must next determine whether a likelihood of confusion exists. The determination of whether a likelihood of confusion exists is a question of fact.

*McGraw-Edison Co. v. Walt Disney Productions,* 787 F.2d 1163, 1167 (7th Cir.1986). Moreover, " '[a] variety of factors may be material in assessing the likelihood of confusion.' " *Id., quoting American International Group, Inc. v. London American International Corp., Ltd.,* 664 F.2d 348, 351 (2d Cir.1981). Among the factors to consider are the

1) similarity of the marks; 2) similarity of the products; 3) area and manner of concurrent advertising and use; 4) degree of care likely to be exercised by [the] consumer; 5) strength of the plaintiff's mark; 6) actual confusion; and 7) intent to the infringer to palm off its products as those of another.

*McGraw-Edison,* 787 F.2d at 1166 (citing to *Union Carbide Corp. v. Ever-Ready, Inc.,* 531 F.2d at 381-83)). No factor, standing alone, is dispositive although the "similarity of the marks, intent of the alleged infringer, and evidence of actual confusion are considered 'the more important' factors." *W.H. Brady Co. v. Lem Products, Inc.,* 659 F.Supp. 1355, 1365 (N.D.Ill.1987) (Nordberg, J.), *quoting Ziebart International Corp. v. After Market Associates, Inc.,* 802 F.2d 220, 226 (7th Cir.1986); *McGraw-Edison,* 787 F.2d at 1168.

In this case, several factors can be evaluated rather quickly. The parties' products are similar. *See Union Carbide,* 531 F.2d at 382 ("the more closely products are related the more likely sources may be confused"). In addition, the allegedly infringing acts occurred when Pucci Corp. used the "Pucci" trademark to advertise its goods in *Town and Country* and *Playboy* which are both magazines with nationwide circulation. The plaintiffs also advertise their perfume in national magazines with the "Pucci" trademark. Next, there is no evidence of actual confusion although a likelihood of confusion can be established without such evidence. *See International Kennel Club v. Mighty Star, Inc.,* 846 F.2d 1079, 1090 (7th Cir.1988). Finally, as noted above, the plaintiffs' mark has acquired a secondary meaning. Consequently, this mark is to be considered a strong one. *See R.J. Toomey Co. v.*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Toomey,* 683 F.Supp. 873, 878 (D.Mass.1988) (and authority cited within).

**\*4** The court will now consider the similarity of the parties mark. When evaluating the similarity of two marks, the appropriate "test is the consumers' state of mind when faced with the marks individually." *Union Carbide,* 531 F.2d at 382; *see also Source Services Corp. v. Chicagoland Jobsource, Inc.,* 643 F.Supp. 1523, 1528 (N.D.Ill.1986) (Shadur, J.). Consequently, the marks should not be evaluated with a side-by-side comparison. *Chicagoland Jobsource,* 643 F.Supp. at 1528. The allegedly confusing marks need not be identical to establish liability. *Source Services Corp. v. Source Telecomputing Corp.,* 635 F.Supp. 600, 606 (N.D.Ill.1986) (Rovner, J.). Moreover, "[e]ach mark must be considered as a unit [and] individual elements should not form the basis of comparison" although "the dominent portion of a mark, if any, is entitled to greater weight in evaluating the likelihood of confusion." *Id.* (citing to *Scandia Down Corp. v. Euroquilt, Inc.,* 772 F.2d 1423, 1430-31 (7th Cir.1985), *cert. denied,*475 U.S. 1147 (1986)).

In this case, both parties use the "Pucci" mark although there are some minor variations in the style with which the marks are printed. Any confusion likely to be created by these similar marks is heightened by the defendant's reference to its reputation as a creator and designer of fashion. *See* Complaint, Exhibit 6. Although the defendant may well have such a reputation, the plaintiffs have an extensive *national* reputation in the fashion area. *See Pucci,* 2 U.S.P.Q.2d at 1959-60. Any reference to a fashion reputation is, if anything, going to increase the confusion resulting from the use of very similar marks.

Moreover, as this court previously found, the defendant should have known of the plaintiffs' marketing of wearing apparel and accessories since the early sixties. *Id.* at 1959. In light of this, the defendant's use of the "Pucci" mark along with the reference to a fashion reputation to advertise perfume in one of its ads could reasonably be inter-

preted as an attempt to pass its goods off as those of the plaintiffs'. The court, however, will not draw this inference for the purposes of this summary judgment motion. *See Valentine,* 802 F.2d at 986.

Finally, the court will determine the degree of care likely to be exercised by the consumers. When making this determination, the court may consider several factors including the expense of the products. *See Schwinn Bicycle Co. v. Ross Bicycles, Inc.,* 678 F.Supp. 1336, 1346-47 (N.D.Ill.1988) (Hart, J.). In this case, the meager evidence submitted on the cost of the plaintiffs' products indicates that they sold for between $7.50 and $45.00 in 1975. *See* Plaintiffs' Exhibit 3, at 140. The defendant received two orders for $20.00 each from New York following its ad in the October 1981 issue of *Town and Country. See* Lawrence Pucci Affidavit at ¶ 4. Thus, the parties products are relatively inexpensive. As the Seventh Circuit has held, "where the product involved [is] a low value item, the risk of confusion is greater 'because purchasers are unlikely to complain when dissatisfied, which would bring to light confusion; but rather they are likely simply to avoid all products produced by the company which they believe produced the product which caused the trouble.' " *Maxim's Ltd. v. Badonsky,* 772 F.2d 388, 393 (7th Cir.1985), *quoting Union Carbide,* 531 F.2d at 383.

**\*5** A review of the relevant factors reveals that there is no dispute as to any fact which is material to the determination of a likelihood of confusion. Consequently, this court will grant the plaintiffs' motion for summary judgment as to Counts I and III of the complaint. As to the relief, this court has the "power to grant injunctions according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office." 15 U.S.C. § 1116. *Berghoff Restaurant Co., Inc. v. Lewis W. Berghoff, Inc.,* 499 F.2d 1183, 1185 (7th Cir.1974). In this case, the defendant has been found to infringe on the plaintiffs' trademark. Notwithstanding

Not Reported in F.Supp.                                                                                    Page 5
Not Reported in F.Supp., 1988 WL 135542 (N.D.Ill.), 10 U.S.P.Q.2d 1541
**(Cite as: Not Reported in F.Supp., 1988 WL 135542 (N.D.Ill.))**

this, the defendant has established a line of co-lognes and other skin care items for men beginning in 1957. Lawrence Pucci Affidavit at ¶ 1. The defendant has, with the exception of the infringing acts, confined its sales and advertising to the Chicago metropolitan area. *Id.* at ¶¶ 2-5. Thus, the defendant has "established a personal reputation in the particular business involved, based on skills, knowledge and expertise acquired during years in the industry." *See Bertolli USA, Inc. v. Filippo Bertolli Fine Foods, Ltd.,* 662 F.Supp. 203, 207 (S.D.N.Y.1987) (and cases cited within). The plaintiffs concede that the defendant may have a statutory prior use defense with respect to the Chicago metropolitan area. Plaintiffs' Memorandum in Support of Summary Judgment at 8.

In consideration of the above, the court will require the defendant to display the name "Lawrence" prior to the name "Pucci" with the same style print and size of letters in connection with the advertising and sale of its perfume anywhere outside of the Chicago metropolitan area. *See Burger King of Florida, Inc. v. Hoots,* 403 F.2d 904, 906-07 (7th Cir.1968); *V & V Food Products, Inc. v. Cacique Cheese Co., Inc.,* 683 F.Supp. 662, 666 (N.D.Ill.1988) (Bua, J.) (and cases cited within); *Thrifty Rent-A-Car System, Inc. v. Thrift Cars, Inc.,* 639 F.Supp. 750, 756 (D.Mass.1986), *aff'd,*831 F.2d 1177 (1st Cir.1987) ("[a]s at common law, the junior user's reputation, advertising, and sales delimit its [area of prior continuous use]"). Furthermore, the defendant must include a disclaimer which states that its product is "not associated or related to Emilio Pucci." *See Berghoff.* 499 F.2d at 1186 (similar relief approved); *Joseph Scott Co. v. Scott Swimming Pools, Inc.,* 764 F.2d 62, 67-69 (2d Cir.1985) (same) (and cases cited within); *Taylor Wine Co. v. Bully Hill Vineyards,* 569 F.2d 731, 733-36 (1d Cir.1978) (same).

IV

*Motion for Reconsideration*

The plaintiffs' motion for reconsideration of this court's March 25, 1987 order is granted to the extent of acknowledging that the 1957 dinner between Emilio and Lawrence Pucci was held in Chicago rather than in New York as the court's opinion initially stated.

*Conclusion*

**\*6** For the foregoing reasons, the court grants relief as stated above.

> FN1 The plaintiffs will be collectively referred to as "E. Pucci" for the purposes of this opinion.

> FN2 Count I is brought pursuant to 15 U.S.C. § 1114 of the Lanham Act and Count III is brought pursuant to New York General Business Law § 368. The language of the pertinent portions of these statutes is similar. *Compare*15 U.S.C. § 1114(a), (b)*with*N.Y. General Business Law § 368(a), (b); *see also Amoco Oil Co. v. D.Z. Enterprises, Inc.,* 607 F.Supp. 595, 599-600 (E.D.N.Y.1985) (some conduct violated both provisions).

> FN3 The court notes that the defendant has failed to respond to all three of the plaintiffs' motions for summary judgment despite the fact that it sought and received several extensions of time in which to file responses. It is unclear as to why the defendant did not respond to these motions. It is, however, clear that the pursuit of such a dubious legal strategy has its costs.

> FN4 The plaintiffs' mark is not, contrary to their contention, incontestable under 15 U.S.C. § 1065 because the record fails to reflect that they filed the requisite affidavit as required by the statute. *See*15 U.S.C. § 1065(3).

> FN5 "Words and phrases used to designate

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                           Page 6
Not Reported in F.Supp., 1988 WL 135542 (N.D.Ill.), 10 U.S.P.Q.2d 1541
**(Cite as: Not Reported in F.Supp., 1988 WL 135542 (N.D.Ill.))**

    products are entitled to varying degrees of statutory protection depending on whether they are classified as (1) generic, (2) descriptive, (3) suggestive, or (4) fanciful or arbitrary." *Abraham Zion Corp. v. Lebow,* 761 F.2d 93, 104 (2d Cir.1985).

N.D.Ill.,1988.

Emilio Pucci Societa a Responsibilita Limitata v. Pucci Corp.

Not Reported in F.Supp., 1988 WL 135542 (N.D.Ill.), 10 U.S.P.Q.2d 1541

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# APPENDIX 2





Gaffrig Performance Industries, Inc. v. Livorsi
Marine, Inc.
N.D.Ill.,2003.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern
Division.
GAFFRIG PERFORMANCE INDUSTRIES, INC.,
Plaintiff/Counter-Defendant,
v.
LIVORSI MARINE, INC., Defendant/
Counter-Plaintiff.
**Nos. 99 C 7778, 99 C 7822.**

Dec. 22, 2003.

Stephen G. Kehoe, Bellows & Bellows, Harry F.
Wiggins, Attorney at Law, Chicago, IL, for
plaintiff/counter-defendant.
Allen H. Gerstein, Gregory James Chinlund, Mar-
shall, Gerstein & Borun, Chicago, IL, for defend-
ant/counter-claimant.

*MEMORANDUM OPINION AND ORDER*

HIBBLER, J.
**\*1** On December 1, 1999, Livorsi Marine, Inc.
("LMI") brought an action against Gaffrig Perform-
ance Industries, Inc. ("GPI2") alleging (i) common
law infringement of the **GAFFRIG PRECISION
INSTRUMENTS**, GAFFRIG, and GAFFRIG II
trademarks; (ii) false designation of origin and un-
fair competition; (iii) trademark dilution under the
Lanham Act and common law; and (iv) trademark
infringement, trademark imitation, trademark dilu-
tion, deceptive trade practices and consumer fraud
under Illinois law for allegedly using the GAFFRIG
and GAFFRIG PERFORMANCE INDUSTRIES
marks in connection with the promotion and sale of
the marine products listed in LMI's federal certific-
ates of registration. On that same day, GPI2 sued
LMI, alleging that LMI obtained the federal regis-
tration for its **GAFFRIG PRECISION INSTRU-
MENTS** trademark by fraudulent means, and that

GPI2 had superior rights in the GAFFRIG marks,
such that LMI's use of the GAFFRIG marks consti-
tutes: (i) trademark infringement under 35 U.S.C. §
1114; (ii) false designation of origin in violation of
15 U.S.C. § 1125(a); and (iii) a deceptive trade
practice and consumer fraud under Illinois law.
These actions were consolidated by stipulation of
the parties on March 29, 2000.

After a bench trial was held before this Court on
March 11, 12, 13, 14, and 15, 2002, the Court finds
as follows:

*FINDINGS OF FACT*

1. On July 24, 1984, James Gaffrig incorporated
"**Gaffrig Precision Instruments**, Inc." ('GPI").
((Amended) Joint Statement of Uncontested Facts
("Uncontested"), ¶ 4.)

2. James Gaffrig was the majority owner, chief ex-
ecutive, and president of GPI for the length of its
existence. (Uncontested, ¶ 5.)

3. Andrew Gorchynsky was minority co-owner, dir-
ector and secretary of GPI from 1988 until July
1990. (Trial Transcript ("Trial Tr.") at 354.)

4. Between 1984 and 1988, GPI began manufactur-
ing and selling speedometers, mufflers, silencers,
flame arrestors, headers and throttle brackets under
the **GAFFRIG PRECISION INSTRUMENTS**
and/or GAFFRIG marks. (Uncontested, ¶ 6.)

5. On April 12, 1988, Gaffrig, on behalf of GPI,
entered into an Asset Purchase Agreement (APA)
with Michael Livorsi. (Uncontested, ¶¶ 18-20.)

6. Under the APA, GPI sold, assigned, transfered,
and conveyed to Livorsi the assets of GPI's speedo-
meter business. The conveyance included certain
quantities of: Pitot Tube, Pitot Tube Mount, AN # 4
Hose Fitting, Speedo Head Fitting 1/4 NPT, Pitot
Tube Fitting, Push-Lock Hose Feet, Pick-Up As-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

sembles with Fittings; Liquid Filled Completed; Dry Gauges; Raw Gauges; Tell Tale Needles; Glycerin; Oil Tester; Screens; and Vinyl Wash. (APA, § 1, Exhibit ("Ex.") A.)

7. The APA gave Livorsi the exclusive right to use the GAFFRIG trademarks in connection with the manufacture and sale of speedometers and in advertising subject to the two-year limitation in Section 9 of the APA. (APA, §§ 1, 9.)

8. Section 1 of the APA stated that "Livorsi shall have the right to use the **GAFFRIG PRECISION INSTRUMENTS** trade name in connection with the manufacture and sale of speedometers and in advertising subject to Section 9 herein."(APA, § 1.)

**\*2** 9. Section 9 of the APA stated that "[i]n consideration of the purchase of the assets, GPI agrees that neither it nor James W. Gaffrig (who is a major shareholder of GPI) shall, during the period of two years which commences on the closing date, directly or indirectly, engage in or render services to any business engaged in manufacturing or selling finished or semi-finished speedometers, or acquire an interest as stockholder, director, partner, agent or individual, in any such business."(APA, § 9.)

10. The APA did not restrict GPI from making and selling speedometers after two years, or from using of the GAFFRIG marks on speedometers or other products after the expiration of the license, on April 12, 1990. (APA, §§ 1-9.)

11. Gaffrig and GPI were not restricted from the manufacture or sale of other products, or from the use of the GAFFRIG marks on other products during this two year time. (APA, § 9(b)).

12. The APA stated that the purchase price for the speedometer assets was $20,000 minus the amount of liabilities of GPI to Livorsi. (APA, § 2.)

13. On April 12, 1988, Livorsi and Gaffrig also entered into a "License Agreement" (LA). The APA stated that the LA, together with the APA, was to be considered an entire agreement. APA §

17. In the LA, Gaffrig sold to Livorsi an exclusive license to manufacture, use, market and sell products based on or utilizing Gaffrig's patent no. 4,622,850 covering a certain pitot mount assembly. APA § 2.1. The license was to end on December 31, 1997. (APA, § 3.)

14. Under the LA, GPI kept ownership of at least one piece of equipment related to its speedometer business: a certain pitot tube mount described in United States patent NO. 462285, owned by Gaffrig. (LA, § 2.)

15. Under the LA, Livorsi agreed to pay Gaffrig a 3% royalty on annual sales of speedometers exceeding $50,000. (LA, § 5.1, Ex. A.)

16. Between 1988 and November 1990, GPI continued to manufacture and sell marine mufflers, silencers, flame arrestors, headers, and throttle brackets under the **GAFFRIG PRECISION INSTRUMENTS** and/or GAFFRIG marks. (Uncontested, ¶ 6.)

17. LMI was incorporated by Michael Livorsi on May 16, 1988. Livorsi is the owner and president of LMI. (Uncontested, ¶¶ 22-23.)

18. Livorsi and Gaffrig were the two directors of LMI. (Joint Written Consent by the Sole Shareholder and Directors of LMI, LMI Ex. 106.)

19. Livorsi began using the GAFFRIG and **GAFFRIG PRECISION INSTRUMENTS** marks in connection with the promotion and sale of marine speedometers, pitot tubes and pitot tube mounts shortly after the APA was signed on April 12, 1988. (Uncontested, ¶ 24.)

20. By 1989, LMI expanded its line of marine products to include other types of marine instruments and marine gauges (e.g., tachometers and various types of fluid level and pressure gauges), and LMI used the GAFFRIG trademarks in connection with the promotion and sale of these products. (Uncontested, ¶ 25.)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 23144859 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 23144859)**

Page 3

**\*3** 21. GPI made an Assignment for the Benefit of Creditors (ABC) in October or November of 1990 because GPI was unable to pay its bank debts. (Trial Tr. at 656-58.)

22. On November 16, 1990, Gaffrig incorporated GPI2 as a new Illinois corporation. (Uncontested, ¶ 8.)

23. Gaffrig became the president and sole owner of GPI2. (Uncontested, ¶ 8.)

24. Most of GPI's employees continued to work for GPI2 in the same or similar positions to what they had in GPI: Robert Divilbiss continued to work as general manager; Michael Schultz continued to work in assembling and shipping parts; and Angel Castenada continued to work as a welder. (Trial Tr. at 56, 661-62.)

25. There was no written assignment of any assets from GPI to GPI2. (Uncontested, ¶ 9.)

26. Gaffrig moved some equipment from GPI to GPI2. (Trial Tr. at 56.)

27. On December 5, 1990, GPI's assets were auctioned off for the benefit of creditors in an ABC proceeding. ((Amended) Joint Statement of Contested Issues and Facts ("Contested"), ¶ 4.)

28. By December 9, 1990, LMI had expanded its product line to include vacuum gauges, trim meters, compasses, depth finders, tool cases, and instrument cases, and was using the GAFFRIG trademarks in connection with the promotion and sale of these products. (Uncontested, ¶ 26.)

29. By late 1990, GPI2 began manufacturing the same marine products-mufflers, silencers, flame arrestors, headers and throttle brackets-that had previously been manufactured and sold by GPI using the GAFFRIG and the GAFFRIG PERFORMANCE INDUSTRIES marks. (Uncontested, ¶ 12.)

30. By January 1991, GPI2 was also advertising and selling those same types of GAFFRIG marine products and continues to do so to this day. (Uncontested, ¶ 12.)

31. On February 1, 1991, Livorsi and Gaffrig entered into another written agreement whereby Gaffrig sold his rights under U.S. Patent No. 4,622,850, covering the pitot tube Gaffrig had previously licensed to Livorsi under the LA. In the February 1991 agreement, in exchange for certain consideration, Gaffrig agreed to refrain from making the pitot tubes covered by the patent until at least February 1, 2001, and he relinquished any interest in LMI's instrument engine gauges business "which may currently exist from previous oral contracts."(GPI2 Ex. 39.)

32. Beginning in 1991, LMI purchased mufflers and flame arrestors from GPI2 and sold them bearing the **GAFFRIG PRECISION INSTRUMENTS** and LIVORSI MARINE trademarks. GPI2 was unaware at this time that LMI was removing the "Gaffrig Performance Industries, Inc ." stickers from the mufflers and passing them off as its own. (Trial Tr. at 741, 760-61.)

33. In 1991, GPI2 began manufacturing at least samples of speedometer gauges. (Trial Tr. at 493.)

34. By 1991, GPI2 manufactured, advertised, and sold marine products, including at least mufflers, silencers, and flame arrestors, using the GAFFRIG PERFORMANCE INDUSTRIES and GAFFRIG marks. (Uncontested, ¶ 12.)

**\*4** 35. Beginning in 1991, LMI promoted its products bearing the GAFFRIG trademark in press releases in marine industry publications. (Uncontested ¶ 35.)

36. On December 2, 1991, GPI was dissolved involuntarily by the Illinois Secretary of State. (Uncontested ¶ 7.)

37. On March 9, 1992, LMI filed an application in the United States Patent and Trademark Office (PTO) to register the **GAFFRIG PRECISION INSTRUMENTS** trademark for use on the marine

Not Reported in F.Supp.2d                                                                 Page 4
Not Reported in F.Supp.2d, 2003 WL 23144859 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 23144859)**

products it was currently selling, including engine monitoring devices, marine controls such as throttle handle assemblies, mufflers, silencers, and flame arrestors; marine navigational instruments including compasses and depth sounders; marine operational gauges and other devices including speedometers and pitot mount assemblies, tachometers, fuel, water and oil monitoring instruments, bilge monitors, and flow meters; and other boating accessories, and was using the GAFFRIG trademarks in connection with the promotion and sale of these products. (Uncontested, ¶ 29.)

38. In March 1992, LMI was aware that GPI2 was using a confusingly similar mark on at least mufflers and flame arrestors. (Trial Tr. at 760-61; Uncontested, ¶¶ 40-41.)

39. On June 4, 1992, the PTO initiated an office action in which it stated that LMI must "indicate whether 'Gaffrig' has any significance in the relevant trade, any geographical significance or any meaning in a foreign language;" and "disclaim the descriptive wording 'precision instruments' apart from the mark as shown" because the terms merely describe a feature of navigational instruments. (Uncontested, ¶ 30; LMI Ex. 2.)

40. On June 24, 1992, LMI responded that "[t]he name 'Gaffrig' has no significance in the relevant trade other than to identify one of applicant's lines of Marine instruments and has no geographical significance."LMI also agreed that "[n]o claim is made to the exclusive right to use 'precision instruments' apart from the mark as shown."(Uncontested, ¶ 30; LMI Ex. 2.)

41. Mr. Gaffrig died in December 1992, at which point ownership of GPI2 passed to Mr. Gaffrig's widow, Patricia Gaffrig. (Uncontested, ¶¶ 10-11.)

42. LMI's trademark registration application was published for opposition on August 10, 1993, and went unopposed. (Uncontested, ¶ 31.)

43. In 1993, GPI2 and LMI entered into an oral agreement whereby GPI2 agreed to sell mufflers and flame arrestors to LMI for 20% under original equipment manufacturer (OEM) prices, and LMI agreed to sell speedometers and gauges to GPI2 for 20% under OEM prices. LMI sold GPI2's products as its own. GPI2 did not alter LMI's mark on the products. The parties continued this arrangement until at least 1997. (Trial Tr. at 577.)

44. LMI's trademark registration for the **GAFFRIG PRECISION INSTRUMENTS** trademark issued on November 2, 1993, as Registration No. 1,801,915. The goods for which the trademark applied were identified as: "Marine instruments and controls, namely: engine monitoring devices, throttles, tachometers, memory tachometers, controls, and mufflers; marine navigational instruments, namely compasses and depth sounders; and marine operational devices, namely, both liquid filled and dry speedometers, pitot mount assemblies, both electronic and mechanical monitoring instruments for fuel and oil pressure, fuel level, trim, water and oil temperature, water and fuel pressure and vacuum boost, water temperature indicators, bilge monitors, and flo-meters, together with all parts thereof."(Uncontested, ¶ 31.)

**\*5** 45. By 1995, GPI2 was aware that LMI was removing the GAFFRIG PERFORMANCE INDUSTRIES stickers from the mufflers, and continued selling the mufflers to LMI. (Trial Tr. at 313.)

46. Since 1997, LMI has also used the GAFFRIG II mark on its marine products and packaging advertised in the U.S. and abroad. (Uncontested, ¶¶ 33-34.)

47. Mike Schultz purchased GPI2 from Ms. Gaffrig in January 1997 and is currently the owner and president of the company. (Uncontested, ¶¶ 13-14.)

48. On March 17, 1997, Livorsi sent Schultz a letter stating that he considered GPI2's use of the GAFFRIG PERFORMANCE INDUSTRIES mark to be an infringement of Livorsi's registered **GAFFRIG PRECISION INSTRUMENTS** trademark.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(Uncontested, ¶ 38.)

49. On September 7, 1999, LMI filed with the PTO a Combined Declaration of Use and Incontestability under 15 U.S.C. §§ 1058 and 1065 in connection with the **GAFFRIG PRECISION INSTRU-MENTS** trademark. (Uncontested, ¶ 36.)

50. The Declaration was accepted and acknowledged by the PTO, and the **GAFFRIG PRECISION INSTRUMENTS** trademark registration was granted incontestible status. (Uncontested, ¶ 37.)

51. LMI has continued its use of the GAFFRIG, **GAFFRIG PRECISION INSTRUMENTS**, and GAFFRIG II marks in connection with the promotion and sale of its line of marine products to the present day. (Uncontested, ¶ 32.)

52. GPI2 currently sells marine mufflers, silencers, flame arrestors, throttle brackets, speedometers, and other various types of marine gauges and instruments with the GAFFRIG marks and the GAFFRIG PERFORMANCE INDUSTRIES mark. (Uncontested, ¶¶ 15-16.)

## CONCLUSIONS OF LAW

I. Trademark Infringement and Unfair Competition under the Lanham Act, 15 U.S.C. §§ 1125(a) and 1114; Trademark Dilution and Unfair Competition Arising Under the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS § 505/2; and Deceptive Practices Arising Under the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS § 510/2.

Both LMI and GPI2 allege that the other committed common law trademark infringement and unfair competition under the Lanham Act,[FN1] deceptive trade practices under the Illinois Uniform Deceptive Trade Practices Act, and various violations under the Illinois Consumer Fraud and Deceptive Business Practices Act. GPI2 claims that LMI's continued use of the GAFFRIG, **GAFFRIG PRE-**CISION INSTRUMENTS, and GAFFRIG II marks and registration of the **GAFFRIG PRECISION INSTRUMENTS** mark after its license to use the mark expired was in derogation of GPI2's senior rights and constituted trademark infringement, unfair competition, and a violation of the aforementioned Illinois statutes. LMI claims that GPI2's continued use of the GAFFRIG, **GAFFRIG PRECISION INSTRUMENTS**, and GAFFRIG PERFORMANCE INDUSTRIES marks after LMI acquired secondary meaning in the marks and registered the marks constituted trademark infringement, unfair competition, and a violation of the aforementioned Illinois statutes. Section 43 of the Lanham Act provides that:

> FN1. LMI's claim of trademark infringement under 765 ILCS § 1035/15 does not apply here. This statute was repealed in 1998, and its closest current equivalent is 765 ILCS § 1036/65. Section 1036/65, however, only provides a remedy for dilution of a mark that is so inherently distinctive that it is "famous." LMI, however, does not argue and provides no evidence of the eight factors under the statute that could make the GAFFRIG marks famous. Even if the GAFFRIG marks were found to be famous, however, LMI's claims under 765 ILCS § 1035/15 would be analyzed in the same manner as the other claims in this section.

**\*6** [a]ny person who, on or in connection with goods or services, or any container for goods, uses in commerce any word, term, name, symbol or device, or any combination thereof ... which is likely to cause confusion, or to cause mistake, or to deceive as to affiliation, connection, or association of such person with another person, or as to the origin, sponsorship or approval of his or her goods, services, or commercial activities by another person, ... shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Page 6
Not Reported in F.Supp.2d, 2003 WL 23144859 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 23144859)**

Lanham Act, § 43, 15 U.S.C. § 1125(a)(1)(A).

A trademark is any word, name, symbol or device, or any combination of those, that is adopted and used by a manufacturer or a merchant to identify its products and to distinguish them from those manufactured or sold by others, or to designate the source or origin of a product, usually the manufacturer or seller of the product. Lanham Act, § 45, 15 U.S.C. § 1127; *Sands, Taylor & Wood Co. v. Quaker Oats Co.,* 978 F.2d 947, 953 (7th Cir.1992). To prove trademark infringement or unfair competition under the Lanham Act, 15 U.S.C. §§ 1125(a) and 1114, the parties must establish that (i) they own a valid, protectable mark; and (ii) the use of either the same or a similar mark by the accused party creates a likelihood of consumer confusion as to the source of goods sold under the mark. *CAE, Inc. v. Clean Air Eng'g, Inc.,* 267 F.3d 660, 673-74 (7th Cir.2001); *Platinum Home Mortgage Corp. v. Platinum Fin. Group, Inc.,* 149 F.3d 722, 726 (7th Cir.1998)."Claims for unfair competition and deceptive business practices brought under Illinois statutes are to be resolved according to the principles set forth under the Lanham Act," and thus, a party cannot prevail on its claims under the Deceptive Trade Practices Act, 815 ILCS § 510/2, or the Consumer Fraud and Deceptive Business Practices Act, 815 ILCS § 505/2, if the party does not own a valid, protectable mark. *Spex, Inc. v. Joy of Spex, Inc.,* 847 F.Supp. 567, 579 (N.D.Ill.1994) (citing *Gimix, Inc. v. JS & A Group, Inc.,* 699 F.2d 901, 908 (7th Cir.1983); *Thompson v. Spring-Green Lawn Care Corp.,* 126 Ill.App.3d 99, 104-05, 81 Ill.Dec. 202, 466 N.E.2d 1004 (1st Dist.1984) (Illinois courts look to federal case law and apply the same analysis to state infringement claims). A party who has not registered its marks with the PTO bears the burden to establish protection under the Lanham Act. *Platinum,* 149 F.3d at 727.

A. Likelihood of Confusion

In this case, the parties agree that the **GAFFRIG PRECISION INSTRUMENTS**, GAFFRIG, GAF-FRIG II, and GAFFRIG PERFORMANCE INDUS-TRIES marks (collectively, the "GAFFRIG marks") are confusingly similar to consumers when used in connection with the promotion and sale of the marine products manufactured, advertised, and/or sold by both parties, and consumers of the marine products manufactured, advertised, and/or sold by both parties have suffered actual confusion caused by the parties' use of their respective marks. Both parties currently sell marine mufflers, silencers, flame arrestors, throttle brackets, speedometers, and other various types of marine gauges and instruments. The likelihood of confusion, however, easily extends to the rest of the marine items sold by LMI: engine monitoring devices, throttle controls, marine navigational instruments including compasses and depth sounders, marine, tachometers, fuel, water and oil monitoring instruments, bilge monitors, flow meters and other boating accessories. In assessing the likelihood of consumer confusion, the Seventh Circuit considers:

**\*7** (1) the similarity between the marks in appearance and suggestion, (2) the similarity of the products, (3) the area and manner of concurrent use of the products, (4) the degree of care likely to be exercised by consumers, (5) the strength of the plaintiff's marks, (6) any evidence of actual confusion, and (7) the defendant's intent to palm off its goods as those of the plaintiff's. None of these factors are dispositive and the proper weight given to each will vary in each case. However, the similarity of the marks, the defendant's intent, and evidence of actual confusion are of particular importance.

*Promatek Indus., Ltd. v. Equitrac Corp.,* 300 F.3d 808, 812 (7th Cir.2002) (internal citations omitted). The parties agree on the similarity of the marks and actual confusion in the marketplace. LMI's trademark application explained that the additional marine items sold by LMI are used in conjunction with the other marine items (which are sold by both parties), and therefore, the confusion in the marketplace would extend to these additional items as

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

well.

B. Ownership of the GAFFRIG Trademarks

Therefore, the only remaining issue in determining the merits of the parties' claims is the validity of the mark; i.e., who owns the right to the GAFFRIG trademarks. LMI holds a federally registered trademark in the **GAFFRIG PRECISION INSTRUMENTS** mark,[FN2] which it claims is *prima facie* evidence that it owns the right to the GAFFRIG trademarks. GPI2, on the other hand, argues that it holds superior common law trademark rights, and that the federally registered trademark was achieved by fraud. A federal trademark application is always subject to previously established common law trademark rights of another party. *Johnny Blastoff, Inc. v. Los Angeles Rams Football Co.,* 188 F.3d 427, 434-35 (7th Cir.1999) (citing *The Money Store v. Harriscorp Fin., Inc.,* 689 F.2d 666, 672 (7th Cir.1982) (quoting J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 19:2, at 656)). In order to determine who owns the rights to the GAFFRIG marks, the Court must determine: first, the nature of GPI's common law rights in the GAFFRIG marks; second, whether LMI has common law rights in the GAFFRIG marks; third, whether GPI assigned its common law rights to GPI2; and fourth, whether LMI has federally registered rights in the GAFFRIG marks or whether LMI committed fraud in the procurement of its federal trademark registration.

> FN2. Since the initiation of this lawsuit, LMI was issued a federal trademark registration for the GAFFRIG trademark on January 15, 2002 (U.S. Registration No. 2,528,898), and for the GAFFRIG II trademark on February 5, 2002 (U.S. Registration No. 2,535,322).

1. What Rights Did GPI Have In The GAFFRIG Marks Between 1984 And 1988?

Although the parties do not dispute that GPI had

common law rights in the GAFFRIG marks from 1984 to 1988, they do not agree on the nature of those rights; that is, whether the GAFFRIG marks are primarily a surname or inherently distinctive. Because the nature of the marks changes the analysis that follows, the Court will decide this issue first. The Lanham Act states that a mark that is "primarily a surname" is descriptive and may be registered only if it is shown that the mark has acquired secondary meaning, such that the mark "has become distinctive of the applicant's goods in commerce."15 U.S.C. § 1052(e), (f). A mark is primarily a personal name, or surname, if the primary significance of the mark to the purchasing public is that of a personal name or surname. *Peaceable Planet, Inc. v. Ty, Inc.,* No. 01 C 7350, 2003 WL 22024992, at *5 (N.D.Ill.2003) (citing *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.,* 192 F.3d 337, 345 (2d Cir.1999); *In re Hutchinson Tech., Inc.,* 852 F.2d 552, 554 (Fed.Cir.1988)). If the mark is primarily a personal name, then the senior user must prove the existence of secondary meaning in its mark at the time and place that the junior user first began use of that mark. *Johnny Blastoff,,* 188 F.3d at 433-34 (internal citations omitted).*See also Zazu Designs v. L'Oreal, S.A.,* 979 F.2d 499, 503 (7th Cir.1992). In contrast, if the family feature or surname is distinctive enough to trigger recognition in and of itself, then the mark may be inherently distinctive. *Spraying Systems Co. v. Delavan, Inc.,* 975 F.2d 387, 395 (7th Cir.1992). If the mark is inherently distinctive, then the party to first use the mark has ownership rights to it.

**\*8** The parties have offered no evidence that the GAFFRIG marks are inherently distinctive. Rather, the parties' evidence of the popularity and recognition of the GAFFRIG marks is attributable to the secondary meaning that has become attached to the marks. Therefore, the Court finds that the GAFFRIG marks are primarily a surname, and the question remains as to when the GAFFRIG marks acquired secondary meaning. The parties' evidence supports a finding that the GAFFRIG marks acquired secondary meaning from GPI's use of the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 23144859 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 23144859)**

marks between 1984 and 1988. LMI agrees that GPI was the first to use and manufacture products under the **GAFFRIG PRECISION INSTRU-MENTS** trademark. In addition, LMI agrees that GPI established exclusive rights in the use of the **GAFFRIG PRECISION INSTRUMENTS** trademark on marine speedometers and related marine gauges in 1984, which Gaffrig possessed until April 12, 1988. Indeed, the evidence shows that the trademark, **GAFFRIG PRECISION INSTRUMENTS**, did acquire secondary meaning between 1984 and 1988, as even Livorsi admitted that by 1988, the GAFFRIG marks had acquired recognition in the marine industry as representative of a superior marine product. Thus, the GAFFRIG marks had a distinctiveness or secondary meaning warranting trademark protection before Gaffrig and Livorsi entered into the APA in 1988, and GPI had priority of ownership at that time.

2. Did LMI Acquire Common Law Rights In The GAFFRIG Marks By Virtue Of The APA In 1988?

LMI claims that GPI assigned all of its rights in the GAFFRIG marks to LMI by virtue of the Asset Purchase Agreement (APA) Livorsi and GPI signed on April 12, 1988.[FN3]GPI2, however, argues that the APA constituted a two-year license of the **GAFFRIG PRECISION INSTRUMENTS** mark to LMI. The Court agrees with GPI2.

> FN3. GPI2 attempts to argue that the APA is invalid for lack of consideration because LMI allegedly did not pay the full $20,000 owing to Gaffrig under the APA or the required 3% royalties to Gaffrig. Contrary to GPI2's claims, failure to pay the full amount owing under a contract does not render a contract invalid. Instead, it gives GPI a remedy for breach of contract. A contract may be invalid for want or lack of consideration, but here, GPI2 agrees that the contract stated the consideration that must be paid. GPI2 instead claims that the consideration was not paid in full. Thus,

the APA is a valid agreement regardless of whether Livorsi provided the consideration for the 1988 APA.

Contrary to LMI's arguments, the plain language of the APA shows that Livorsi purchased all of the assets of GPI's speedometer business, except one pitot tube assembly (a speedometer-related item) which Livorsi agreed to license from Gaffrig for nine years, and a two-year exclusive license from GPI to manufacture and sell the speedometers with the **GAFFRIG PRECISION INSTRUMENTS** mark. During this two-year period, Gaffrig agreed not to manufacture or sell speedometers. The APA states, in relevant part:

Livorsi shall have the right to use the **GAFFRIG PRECISION INSTRUMENTS** trade name in connection with the manufacture and sale of speedometers and in advertising subject to Section 9 herein.

APA, Section 1.
In consideration of the purchase of the assets, GPI agrees that neither it nor James W. Gaffrig (who is a major shareholder of GPI) shall, during the period of two years which commences on the closing date, directly or indirectly, engage in or render services to any business engaged in manufacturing or selling finished or semi-finished speedometers, or acquire an interest as stockholder, director, partner, agent or individual, in any such business.

APA, Section 9.

**\*9** LMI's arguments appear to overlook the text of the APA itself. First, nowhere does the APA even suggest that Livorsi would get more than a right to use the **GAFFRIG PRECISION INSTRUMENTS** mark in connection with speedometers. Second, Section 1 states that it must be read in conjunction with Section 9, which specifically limited Gaffrig's exclusion from the speedometer market to only two years. Because the APA did not limit Gaffrig's use of the **GAFFRIG PRECISION INSTRUMENTS** mark on any other marine products, GPI2 is correct

Not Reported in F.Supp.2d                                                                                          Page 9
Not Reported in F.Supp.2d, 2003 WL 23144859 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 23144859)**

that Section 9, read in conjunction with Section 1, also limited Livorsi's exclusive use of the **GAFFRIG PRECISION INSTRUMENTS** marks on speedometers to two years.

LMI attempts to divert the Court's attention from the APA by pointing to extrinsic evidence which purportedly supports LMI's understanding of the APA: testimony by Gorchynsky and Livorsi regarding the purported intent of the APA to assign the GAFFRIG PRECISION INSTRUMENT mark and all derivative marks and the entire gauge business to Livorsi. However, if the language of the contract itself unambiguously answers the question at issue, the inquiry is over.*Much v. Pacific Mut. Life Ins. Co.,* 266 F.3d 637, 643 (7th Cir.2001) (interpreting Illinois law).“In such a case, the intent of the parties must be determined solely from the contract's plain language, and extrinsic evidence outside the ‘four corners' of the document may not be considered.”*Id.* (citing *Omnitrus Merging Corp. v. Ill. Tool Works, Inc.,* 256 Ill.App.3d 31, 195 Ill.Dec. 701, 628 N.E.2d 1165, 1168 (Ill.App.Ct.1993)).*See also Bowles v. Quantum Chem. Co.,* 266 F.3d 622, 635 (7th Cir.2001) ( “[A]s a general rule, an unambiguous contract should be construed without reference to extrinsic evidence....[I]f the language of the contract provides an answer, then the inquiry is over; parol evidence is neither necessary nor admissible.”) (internal citations omitted). As explained above, the language of the APA did unambiguously answer the question at issue. Therefore, the Court will not consider Livorsi's and Gorchynsky's interpretation of the APA.

Moreover, despite LMI's arguments, its two-year right to the mark was not accompanied by the goodwill of the business. Goodwill includes the corporate identity, confidence, reputation, and recognition of the product. *Sands,* 978 F.2d at 957. GPI's agreement to provide its customer lists to LMI did not amount to a transfer as the evidence showed that Gaffrig continued to make other recognized marine products with the **GAFFRIG PRECISION IN-**

**STRUMENTS** and GAFFRIG marks. In addition, GPI was properly ensuring that it provided actual quality control over the products LMI produced with the **GAFFRIG PRECISION INSTRU-MENTS** marks, as GPI was required to do in a licensing agreement.*Sterling Drug, Inc. v. Lincoln Labs., Inc.,* 322 F.2d 968 (7th Cir.1963); Trial Tr. at 113-15, 649.

In sum, the above discussion shows that GPI did not assign its rights to the **GAFFRIG PRECISION INSTRUMENTS** in 1988. As such, GPI maintained its ownership of the **GAFFRIG PRECI-SION INSTRUMENTS** and GAFFRIG marks. Consequently, LMI's use of the GAFFRIG and **GAFFRIG PRECISION INSTRUMENTS** marks on items other than speedometers during the two years of the APA license, and LMI's use of those and the GAFFRIG II marks on speedometers and other items after the two year period, constituted an infringement of GPI's common law trademark. An ex-licensee's continued use of the trademark after the period of the license is a violation of trademark law. *Gorenstein,* 874 F.2d at 435.

3. Did GPI Assign Its Common Law Rights In The GAFFRIG Marks To GPI2?

**\*10** GPI2 claims that GPI assigned its common law rights in its trademarks to GPI2 when Gaffrig created GPI2 on November 16, 1990. The Court agrees with GPI2. Gaffrig's actions after July 1990 demonstrate that Gaffrig assigned his rights in the marks to GPI2. In July 1990, Gaffrig became the sole shareholder of GPI. Gaffrig created GPI2 in November 1990 (which Divilbiss stated was “almost immediately” after GPI's doors were closed), before GPI's assets were auctioned in December 1990, and before GPI was dissolved by the Illinois Secretary of State in December 1991. GPI2 had an almost identical workforce as GPI, including Gaffrig himself, Schultz, Angel Castenada, and Divilbiss. GPI2 began producing almost immediately the same or similar products as GPI (mufflers, flame arrestors, and throttle brackets, and

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 23144859 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2003 WL 23144859)

eventually even more marine products), and GPI2 affixed the GAFFRIG marks on these products. The evidence above demonstrates that the goodwill in the GAFFRIG marks traveled with Gaffrig to GPI2, and that Gaffrig assigned his trademark rights to GPI2. Thus, GPI2 succeeded to GPI's rights in the GAFFRIG marks.

LMI, however, argued that GPI could not have assigned its trademark rights to GPI2 for several alternative reasons: (1) GPI abandoned its rights to the GAFFRIG marks when it signed the APA with Livorsi; (2) GPI transferred its rights to the GAFFRIG marks in an Assignment for the Benefit of Creditors; (3) the mark inured to GPI's, rather than Gaffrig's benefit; (4) there was no written assignment from GPI to GPI2; or (5) the alleged transfer of the mark was not accompanied by the transfer of any physical assets. The Court deals with each of these arguments in turn.

a. Did GPI abandon its rights to the GAFFRIG marks when it signed the APA with Livorsi?

LMI argues that GPI abandoned all of its rights to the GAFFRIG marks under the APA before it could transfer any rights to GPI2. A mark is deemed abandoned if its use has been discontinued with an intent not to resume such use or if there has been nonuse for 3 consecutive years. 15 U.S.C.A. § 1127. Contrary to divesting or abandoning its trademark rights, however, the APA expressly contemplated GPI's return to the speedometer market after two years. In addition, GPI continued to manufacture other marine products with the GAFFRIG and **GAFFRIG PRECISION INSTRUMENTS** marks, such as mufflers and flame arrestors, throughout the two year term and afterward.

Moreover, this Court has already held that the APA only conveyed a license to LMI to use the GAFFRIG marks. A licensee's use of a mark inures to the benefit of the licensor, and the licensee acquires no ownership rights in the mark itself. *Gorenstein Enter.s, Inc. v. Quality Care-USA, Inc.,* 874 F.2d

431, 435 (7th Cir.1989) (internal citations omitted); *Smith v. Dental Prod.s Co. .,* 140 F.2d 140, 148 (7th Cir.1944) ("A grant of an exclusive use of a trade-mark, limited as to duration and place, whether made in contracts for sale of its associated wares or by specific license, does not convey title or establish ownership of the trade-mark in the licensee or in one who purchases marked goods for resale."); *United States Jaycees v. Phila. Jaycees,* 639 F.2d 134, 143 (3d Cir.1981); *Prof'l Golfers' Assn. v. Bankers Life & Cas. Co.,* 514 F.2d 665, 670 (5th Cir.1975). Therefore, the Court finds that GPI did not abandon its rights to the GAFFRIG marks when it signed the APA.

b. Did GPI transfer its rights to the GAFFRIG marks in an Assignment for the Benefit of Creditors?

**\*11** LMI also alleges that GPI could not have assigned its rights in the marks to GPI2 because GPI transferred all of its assets in an Assignment for the Benefit of Creditors ("ABC") before the assets were auctioned off in December 1990. Because the ABC document is not in the record, LMI relies on its witness, Robert Divilbiss for the proposition that all of GPI's assets were transferred in the ABC; however, Divilbiss admitted that he never actually read the ABC document, and he could not remember exactly when the transfer occurred. In contrast, Schultz testified that Gaffrig, as the sole shareholder of GPI and GPI2 at the time, assigned his common law rights in the GAFFRIG marks to GPI2, in addition to transferring necessary equipment, machinery, employees, and raw materials to GPI2.

The existence of the ABC and the accompanying transfer of assets does not necessarily mean that the GAFFRIG marks were assigned for the benefit of creditors as well. "[A] trademark owner will not necessarily be found to have abandoned marks upon liquidation of a business if the owner intends to reestablish his business."*Koretz v. Heffernan,* No. 92 C 5419, 1993 WL 524438, at \*6 (N.D.Ill.1993) (citing *Berni v. Int'l Gourmet Rest.s of Am., Inc.,*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

838 F.2d 642, 647 (2d Cir.1988)). In *Berni,* the Second Circuit held that:

We have recognized that a trademark may be retained by its owner even though the existing business' assets are sold. Where the owner has sold its equipment, inventory and other assets, discharged its work force and announced that it has discontinued manufacturing its products, it may nevertheless retain a protectable interest in its mark, if it evidences an intention not to abandon the mark. That intention can be inferred from evidence that the owner is undertaking to resume use of the mark within a reasonable time after the sale of the other assets.

*Berni,* 838 F.2d at 646-647 (internal citations omitted).*See also Pappan Enter.s, Inc. v. Hardee's Food Sys., Inc.,* 143 F.3d 800, 806 (3rd Cir.1998) ("Courts have recognized that a trademark owner's decision to reduce the size of its business or to cease operations alone does not undermine the owner's legal right to enforce and protect its trademark.") The Court finds that the evidence as laid out above shows that the GAFFRIG marks were assigned to GPI2, and not for the benefit of creditors.

c. Did the mark inured to GPI's or Gaffrig's benefit?

Even if the marks were not assigned for the benefit of creditors, however, LMI argues that Gaffrig, as an individual shareholder, could not assign the rights to the marks because a trademark inures to the corporation and not to an individual. Although generally this principle is true, courts may presume that a real person who owns all the stock of a corporation controls the corporation so that use of the mark by the corporation inures to the benefit of the real person, who is presumed to be the "owner" of the mark. *See In re Hand,* 231 U.S.P.Q. 487 (T.T.A.B.1986) (Trademark Manual of Examining Procedure § 1201.03(b) presumption of sufficient control over a wholly owned subsidiary corporation applies to a real person as well as to a corporation.) *See also Smith v. Coahoma Chemical Co. Inc.,* 46

C.C.P.A. 801, 264 F.2d 916, 920 (C.C.P.A.1959); McCarthy, § 16:36, at 16-59. In this case, Gaffrig, whose name forms the basis of the marks at issue, became the sole owner of GPI after July 1990, before the ABC or the auction of the assets. Consequently, the use of the GAFFRIG marks inured to Gaffrig's benefit, and he was the owner of the GAFFRIG trademarks. Therefore, Gaffrig had the ability to assign his rights in the marks to GPI2, and he did so as explained above.

d. Does the lack of a written assignment from GPI to GPI2 preclude an assignment?

**\*12** LMI next argues that GPI2's claim of an assignment of the rights in the marks fails because GPI2 has no evidence of a written assignment. "Assignments of trademark rights do not have to be in writing, but an implied agreement to transfer requires conduct manifesting agreement, not just conduct that might be characterized as being shady or otherwise inequitable."*TMT North America, Inc. v. Magic Touch GmbH,* 124 F.3d 876, 884 (7th Cir.1997) (internal citations omitted). Unlike in *TMT,* however, the evidence here is not ambiguous or contradictory. As explained above, Gaffrig owned the GAFFRIG marks, he did not give the marks up in the ABC, and then he did all he could, short of a written document, to assign the GAFFRIG marks to GPI2. Gaffrig created GPI2 in November 1990 (which Divilbiss stated was "almost immediately" after GPI's doors were closed), before GPI's assets were auctioned in December 1990, and before GPI was dissolved by the Illinois Secretary of State in December 1991. GPI2 had an almost identical workforce as GPI, including Gaffrig himself, Schultz, Castenada, and Divilbiss. GPI2 began producing almost immediately the same or similar products as GPI, and GPI2 affixed the GAFFRIG marks on these products. Therefore, Gaffrig's conduct manifested an agreement to assign his trademark rights to GPI2.

e. Did Gaffrig transfer his rights in the marks even though the alleged transfer of the marks was not ac-

companied by the transfer of any physical assets?

Finally, LMI argues that Gaffrig did not transfer his rights in the GAFFRIG marks to GPI2 because there was no accompanying transfer of any physical assets. This argument is without merit. Even if the physical assets were transferred in the ABC, "transfer of a mark need not be accompanied by the transfer of any physical or tangible assets in order to be valid. All that is necessary is the transfer of the goodwill to which the mark pertains."*Sands,* 978 F.2d 947, 956 (7th Cir.1992) (internal citations omitted). In addition, "assignments of marks separate from the underlying business have been upheld when the assignee is producing a product ... substantially similar to that of the assignor [such that] consumers would not be deceived or harmed or when there is continuity of management. Thus, a trademark may be validly transferred without the simultaneous transfer of any tangible assets, as long as the recipient continues to produce goods of the same quality and nature previously associated with the mark."*Defiance Button Machine Co. v. C & C Metal Products Corp.,* 759 F.2d 1053, 1059 -1060 (2nd Cir.1985). In this case, GPI2 produced products substantially similar to GPI and kept nearly the same workforce as at GPI. The evidence above demonstrates that the goodwill in the GAF-FRIG marks traveled with Gaffrig to GPI2, and that Gaffrig did assign his trademark rights to GPI2. Thus, GPI2 succeeded to GPI's rights in the GAF-FRIG marks.

4. Does LMI Have Any Ownership Rights In The GAFFRIG Marks By Virtue Of Its Federal Trademark Registration Of The **GAFFRIG PRECISION INSTRUMENTS** Name?

**\*13** LMI claims that it is entitled to a presumption that its federal registration of the **GAFFRIG PRE-CISION INSTRUMENTS** trademark is valid, and GPI2 bears the burden of overcoming the presumption by clear and convincing evidence. GPI2 claims that LMI committed fraud in the procurement of its federal registration, and that the registration is thus

invalid. LMI is correct that the registration of a mark is *prima facie* evidence of "the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the registration."15 U.S.C. § 1115. *See also*15 U.S.C. § 1057(b). In addition, a mark that has become incontestable-such as happened in this case in 1999-"shall be conclusive evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce."*Id.*

However, a federal trademark registration, even one that has grown to incontestability, can be vitiated with proof of fraud. A federal trademark registration "shall not preclude another person from proving any legal or equitable defense or defect, including those set forth in subsection (b) of this section, which might have been asserted if such mark had not been registered."15 U.S.C. § 1115. With regard to an incontestable mark, section (b) states that "[s]uch conclusive evidence of the right to use the registered mark ... shall be subject to the following defenses or defects: (1) That the registration or the incontestable right to use the mark was obtained fraudulently."15 U.S.C. § 1115(b). Furthermore, Section 15 U.S.C. § 1065, specifically excepts from incontestable status situations where there are "ground[s] for which application to cancel may be filed at any time under paragraphs (3) and (5) of section 1064 of this title," and where "the use of a mark registered on the principal register infringes a valid right acquired under the law of any State or Territory by use of a mark or trade name continuing from a date prior to the date of registration under this chapter of such registered mark."15 U.S.C. § 1065.

GPI2 claims that LMI committed fraud in the procurement of its federal registration of the **GAF-FRIG PRECISION INSTRUMENTS** mark by

Not Reported in F.Supp.2d                                                                    Page 13
Not Reported in F.Supp.2d, 2003 WL 23144859 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 23144859)**

stating to the PTO that (1) the name "Gaffrig" had no significance other than to identify LMI's products; and (2) Livorsi had used the mark since 1984.[FN4] LMI disputes these claims, arguing that it did not intentionally make any false or misleading statements to the PTO in connection with its application for registration of the **GAFFRIG PRECISION INSTRUMENTS** mark. To establish that LMI committed fraud in the procurement of the federal registration, GPI2 must prove by clear and convincing evidence: (1) the false representation regarding a material fact; (2) the registrant's knowledge or belief that the representation is false; (3) the intention to induce action or refraining from action in reliance on the misrepresentation; (4) reasonable reliance on the misrepresentation; and (5) damages proximately resulting from the reliance. *Thomas Industries, Inc. v.. L.E. Mason Co.,* No. 90 C 4099, 1991 WL 83821, at *2 (N.D.Ill. May 12, 1991) (citing *San Juan Prod.s, Inc. v. San Juan Pools of Kansas, Inc.,* 849 F.2d 468, 473 (10th Cir.1988)). *See also United Phosphorus, Ltd. v. Midland Fumigant, Inc.,* 205 F.3d 1219, 1226 - 1227 (10th Cir.2000); *Texas Pig Stands, Inc. v. Hard Rock Cafe Intern., Inc.,* 951 F.2d 684, 693 (5th Cir.1992).

> FN4. The Court finds no merit in GPI2's second claim of fraud. On November 11, 1991, in a Declaration to the Patent and Trademark Office, Livorsi stated that the GAFFRIG and **GAFFRIG PRECISION INSTRUMENTS** marks were first used in the summer of 1984. Livorsi stated that he did not intend to represent that the first use was by Livorsi, and indeed, the first use by Gaffrig was in 1984. The Trademark Trial and Appeals Board has repeatedly held that an erroneous date of first use is immaterial to an allegation of fraud, because an erroneously asserted date, even if intentional, could not result in the allowance of a registration which would otherwise not be allowed, so long as the applicant used the mark prior to filing the application. *West-*

*ern Worldwide Enter.s Group Inc. v. Qinqdao Brewery,* 17 U.S.P.Q.2d 1137, 1141 (T.T.A.B.1990) (The Board repeatedly has held that the fact that a party has set forth an erroneous date of first use does not constitute fraud unless, inter alia, there was no valid use of the mark until after the filing of the application). In this case, however, GPI2 has provided no evidence that LMI intentionally misstated the date of his first use, and thus GPI2 cannot satisfy the elements of fraud in this instance.

**\*14** LMI attempts to argue that GPI2 is merely alleging "fraud in the oath," that is, a false statement in the trademark registration applicant's oath "that no other person, firm, corporation, or association, to the best of [the applicant's] knowledge and belief, has the right to use such mark in commerce." *See* 15 U.S.C. § 1051. In matters of fraud in the oath, an applicant's good faith belief that it is the senior user is sufficient to negate allegations of fraud. *San Juan Prods.,* 849 F.2d at 472 (citation omitted); *United Phosphorus,,* 205 F.3d at 1226 -1227; McCarthy, § 31:77, at 31-140. However, unlike most of the cases where fraudulent procurement is at issue, the fraud at issue here did not occur in the oath Livorsi took in his trademark registration application. In this case, the PTO did not leave room for LMI's "good faith belief" in whether he was the senior user. The PTO initiated an office action on June 4, 1992, requiring that "the applicant must indicate whether Gaffrig has any significance in the relevant trade, any geographical significance or any meaning in a foreign language. 37 C.F.R. section 2.61(b)." Livorsi responded that "[t]he name "Gaffrig" has no significance in the relevant trade other than to identify one of applicant's lines of Marine instruments and has no geographical significance."

GPI2 claims that this response constitutes fraudulent procurement, and this Court agrees. First, this misrepresentation was false because GPI2 has shown by clear and convincing evidence that its use

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                Page 14
Not Reported in F.Supp.2d, 2003 WL 23144859 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 23144859)**

of the name "Gaffrig" did have significance in the marine trade at the time of LMI's trademark application. In addition, this representation is material because without this misrepresentation, the federal registration should not, or would not, have been issued. Second, LMI knew that the representation was false. Livorsi admitted that he knew that GPI2 was producing at least some marine items, such as mufflers and flame arrestors, at the time of LMI's registration application. Thus, even according to Livorsi's testimony, the name "Gaffrig" had at least some significance in the relevant trade. Third, LMI intended to induce the PTO into relying on his representation and issuing him a registered trademark. Fourth, the PTO reasonably relied on this misrepresentation because in his application, Livorsi verified that all facts set forth in his application were true to the best of his knowledge. And, fifth, GPI2 has proved damages proximately resulting from the reliance, as the PTO registered GPI2's trademark to LMI due to LMI's misrepresentations.

LMI's arguments to the contrary are unavailing. LMI argues that an applicant has no duty to investigate and report to the PTO all other possible users of the same or a similar mark, or the fact that "Gaffrig" was James Gaffrig's surname. Although it is true that in the initial application there is no duty to so investigate and report, as explained above, in this case the PTO explicitly requested this information. Moreover, the Seventh Circuit contemplated that the registration process would include an *ex parte* search and examination by the PTO examiner. *Money Store v. Harriscorp Fin., Inc.,* 689 F.2d 666, 671 (7th Cir.1982). The PTO's office actions are part of such a search and examination, and LMI was obligated to truthfully answer whether there was other significant use of the mark-regardless of whether LMI believed them to be junior users-in response to the PTO questioning. LMI further points out that the Trademark Manual of Examining Procedure (2d Edition, May 1993, rev. April 1997) at 1211.02(a) places the initial burden on the examining attorney to establish the mark is primarily a surname-which is exactly why LMI is under a duty to

answer truthfully when the examiner followed up with an office action asking for the significance of the name Gaffrig. Therefore, the Court finds that GPI2 proved clearly and convincingly that LMI committed fraud in its trademark application.

II. False Designation of Origin Under the Lanham Act, 15 U.S.C. § 1125(a)(1)(A) and Unlawful Trademark Imitation Under the Illinois Counterfeit Trademark Act, 765 ILCS § 1040/2.

**\*15** Both GPI2 and LMI brought claims for false designation of origin under the Lanham Act, and LMI also claimed unlawful trademark imitation under Illinois law. Any person who uses a false designation of origin in connection with goods and services that is likely to cause confusion as to: (1) the origin of that company's goods; (2) that company's affiliation, connection or association with another company; or (3) the endorsement or approval of the goods by another person, is liable to anyone who is or is likely to be damaged by the false designation of origin. 15 U.S.C. § 1125. A plaintiff must prove the following three elements to state a claim for false designation of origin under the Lanham Act: "(1) that the defendant used a false designation of origin or false description or representation in connection with goods or services; (2) that such goods or services entered interstate commerce; and (3) that the plaintiff is a person who believes he is likely to be damaged as a result of the misrepresentation."*Kennedy v. Nat'l Juvenile Detention Ass'n,* 187 F.3d 690, 695-96 (7th Cir.1999) (citing *Web Printing Controls Co., Inc. v. Oxy-Dry Corp.,* 906 F.2d 1202, 1204 (7th Cir.1990)).

Generally, allegations of false designation of origin are either "passing-off" claims or "reverse passing-off" claims. *Francorp, Inc. v. Siebert,* No. 00 C 1248, 2002 WL 731170, at \*2 (N.D.Ill.2002) (citing *Web Printing,* 905 F.2d at 1203 n. 1.) LMI's claim is one of "passing-off," that GPI2's use of the GAF-FRIG and GAFFRIG PERFORMANCE INDUS-TRIES marks on its marine products created a likelihood of confusion by "passing off" GPI2's

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

products as LMI's products.*Francorp,* 2002 WL 731170, at *2. GPI2 alleges claims of "passing off and "reverse passing-off." GPI2 claims that LMI removed the name or trademark of GPI2's product and sold it with a different name, thus confusing the public.*Id.* Livorsi testified that LMI did, in fact, remove GPI2's marks and replace them with LMI's GAFFRIG marks. In addition, GPI2 claims that LMI's continued use and registration of the GAFFRIG marks after its license to use the mark expired constituted "palming off" (the same as "passing off"), as it falsely led the public to believe that the GAFFRIG marks or GPI were still connected to LMI. *See Kennedy,* 187 F.3d at 696.

A claim for unlawful trademark imitation under the Illinois Counterfeit Trademark Act is similar to an allegation of "passing off" or "palming off" under a Lanham Act claim for false designation of origin. Illinois law, 765 ILCS § 1040/2, provides for criminal penalties for "[w]hoever counterfeits or imitates any trade-mark or service mark of which he or she is not the rightful owner or in any way utters or circulates any counterfeit or imitation of such a trade-mark or service mark or knowingly uses such counterfeit or imitation or knowingly sells or disposes of or keeps or has in his or her possession, with intent that the same shall be sold or disposed of...." Courts analyze this claim in the same manner as the Lanham Act claim. *See Dorr-Oliver, Inc. v. Fluid-Quip, Inc.,* 94 F.3d 376, 379 (7th Cir.1996); *S Indus., Inc. v. Diamond Multimedia Sys., Inc.,* 17 F.Supp.2d 775, 780 (N.D.Ill.1998).

**\*16** LMI's claims must fail because the Court has found that GPI2 had a valid ownership right in the GAFFRIG marks. Therefore, GPI2's use of the GAFFRIG PERFORMANCE INDUSTRIES and GAFFRIG marks do not constitute a false designation of origin, but rather properly show GPI2's ownership of the marks. To the contrary, LMI's use of the GAFFRIG marks, and its admitted removal of GPI2's marks and replacement with its own, constituted a false designation of origin since LMI did not have a valid ownership right in the marks. In

addition, GPI2 was damaged by LMI's passing off and reverse passing off of the marine products it sold.

### III. Laches

LMI further claims that GPI2 should be barred from raising any claims for trademark infringement or false designation of origin because GPI2 had known for years about LMI's use of the GAFFRIG marks before initiating this lawsuit. The Lanham Act specifically contemplates that both injunctive relief and awards of damages for violations of 15 U.S.C. § 1125 shall be subject to the principles of equity, which include the doctrine of laches. *Hot Wax, Inc. v. Turtle Wax. Inc.,* 191 F.3d 813, 822 (7th Cir.1999).

The equitable doctrine of laches is derived from the maxim that those who sleep on their rights, lose them. Laches addresses delay in the pursuit of a right when a party must assert that right in order to benefit from it. For laches to apply in a particular case, the party asserting the defense must demonstrate: (1) an unreasonable lack of diligence by the party against whom the defense is asserted and (2) prejudice arising therefrom.

*Hot Wax,* 191 F.3d at 820. In addition, for laches to occur, a plaintiff must have actual or constructive notice of the defendant's activities.*Chattanoga Mfg., Inc. v. Nike, Inc.,* 301 F.3d 789, 793 (7th Cir.2002)."[A] trademark owner is chargeable with information it might have received had due inquiry been made."*Id .* at 793.GPI2 had actual or constructive notice of LMI's infringing activities as early as 1993, when LMI received a federally registered trademark for **GAFFRIG PRECISION INSTRUMENTS**, because registration of a mark provides constructive notice throughout the United States of the registrant's claim to ownership. 15 U.S.C. § 1072; *Park 'N Fly, Inc. v. Dollar Park and Fly. Inc.,* 469 U.S. 189, 202, 105 S.Ct. 658, 83 L.Ed.2d 582 (U.S.1985). In addition, Schultz testified that as early as 1993, GPI2 was purchasing

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 16
Not Reported in F.Supp.2d, 2003 WL 23144859 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 23144859)**

gauges, instruments and controls from LMI. GPI2 received these items with the GAFFRIG marks as they had been attached by LMI, and Schultz testified that GPI2 did not alter these marks.

With regard to the first prong of the laches test-an unreasonable lack of diligence by the party against whom the defense is asserted-the Seventh Circuit has stated that "it cannot be equitable for a well-informed merchant with knowledge of a claimed invasion of right, to wait to see how successful his competitor will be and then destroy with the aid of court decree, much that the competitor has striven for and accomplished."*Hot Wax,* 191 F.3d at 823 (citation omitted). In *Chattanoga,* the Seventh Circuit held that courts should refer to analogous state statutes of limitations to determine whether a presumption of laches should apply in a Lanham Act case. *Chattanoga,* 301 F.3d at 793-94. The Seventh Circuit upheld the district court's finding that the party's delay was unreasonable where the district court held that the most analogous Illinois limitation period was the three-year statute of limitations found in the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/10.

**\*17** In *Chattanoga,* the plaintiff's delay of at least nine years created a presumption of laches because it far exceeded the statute of limitations in the Illinois Consumer Fraud and Deceptive Business Practices Act. Because the plaintiff failed to rebut this presumption and excuse its delay, the district court found the plaintiff's delay to be unreasonable. *Chattanoga,* 301 F.3d at 793 -794. In this case GPI2 delayed a *maximum* of nine years (LMI's license to use the GAFFRIG marks expired in 1990 and GPI2 did not file suit until 1999) and a minimum of six years (when in 1993 GPI2 began purchasing items from LMI and LMI registered the mark). Using the same statute of limitations used in *Chattanoga* as a guide, the Court finds GPI2's delay unreasonable under the reasoning of *Chattanoga* and *Hot Wax.*A presumption of laches arose after the three year period set forth in the Illinois Consumer Fraud and Deceptive Business Practices Act, and

GPI2 failed to rebut this presumption. GPI2 has put forth no argument or facts justifying its six to nine year delay. Rather, GPI2 tries to argue that it did not have notice of LMI's use and registration of the GAFFRIG marks until 1995, even though Schultz's testimony shows that GPI2 had notice by 1993. Moreover, GPI2 does not even attempt to justify its delay after 1995, which is still greater than the relevant three year statute of limitations. Therefore, GPI2 failed to rebut the presumption of laches and demonstrated an unreasonable lack of diligence in asserting its trademark infringement claims.

With regard to the second prong of the laches test-prejudice-the Seventh Circuit has held that:

A defendant has been prejudiced by a delay when the assertion of a claim available some time ago would be 'inequitable' in light of the delay in bringing that claim and ensues when a defendant has changed his position in a way that would not have occurred if the plaintiff had not delayed. In this context, we have explained that laches is a question of degree. To this end, if only a short period of time has elapsed since the accrual of the claim, the magnitude of prejudice required before the suit should be barred is great, whereas if the delay is lengthy, prejudice is more likely to have occurred and less proof of prejudice will be required.

*Hot Wax,* 191 F.3d at 824 (internal citations omitted). Rather than seeking cancellation in the PTO or otherwise contesting LMI's use of the marks, in 1996 GPI2 expanded its use of the GAFFRIG and GAFFRIG PERFORMANCE INDUSTRIES marks by manufacturing a broader range of marine products, similar to LMI's products, and applying the marks to them. In the meanwhile, LMI was investing a great deal of money in the GAFFRIG marks in advertising, marketing, legal fees, and registration fees, and LMI presented tax returns and other evidence demonstrating this. This is similar to the situation in *Hot Wax,* where the Seventh Circuit found the defendant was prejudiced because (i) plaintiff permitted defendant's advertising and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

product development to go unchecked for years; (ii) plaintiff idly sat by while defendant invested significant amounts of time and money in product development and advertising; and then, (iii) rather than contesting defendant's rights, plaintiff attempted to break into the same market with similar products. Had GPI2 pressed its claims in a timely manner, LMI "could have invested its time and money in other areas or simply renamed its products."*Hot Wax,* 191 F.3d at 824. Accordingly, the Court finds that GPI2 unreasonably delayed bringing suit, and LMI was thereby prejudiced.

IV. Remedies

**\*18** As a remedy for LMI's trademark infringement and false designation of origin, GPI2 seeks damages and wrongfully derived profits from LMI, in addition to an injunction against LMI's use of the GAFFRIG marks. A finding of laches bars a trademark infringement plaintiff, GPI2, from recovering damages or wrongfully derived profits during the time prior to filing suit. *James Burroughs Ltd. v. Sign of Beefeater, Inc.,* 572 F.2d 574, 578 (7th Cir.1978). However, "[u]pon a showing of infringement ... the plaintiff may still be entitled to injunctive relief ... and to damages and profits for the period subsequent to the filing of suit" because of the continuous nature of trademark infringement. *Id.* Under the Lanham Act courts have power to grant injunctions according to the principles of equity. An injunction is only denied "if the delay is so prolonged and inexcusable that it would be inequitable to permit the plaintiff to seek injunctive relief as to future activities."*Hot Wax,* 191 F.3d at 825. In *Hot Wax,* the court found that the plaintiff's delay was prolonged and inexcusable because it waited more than 20 years to file suit. *Id.* The delay in the instant case-six to nine years-does not fall into this category, and GPI2 may acquire injunctive relief. The Court, however, denies GPI2 damages and profits for the period subsequent to the filing of suit because of GPI2's failure to excuse its delay or to provide evidence of these damages or profits.

GPI2, however, argues that LMI should be barred from using its defense of laches because LMI had unclean hands in the fraud it committed in procurement of its trademark application. Fraud in the procurement of a registered mark constitutes unclean hands. *Elec. Info. Publ'ns, Inc. v. C-M Periodicals, Inc.,* 163 U.S.P.Q. 624, 633 (N.D.Ill.1969). A party's unclean hands may stand as an obstacle to the application of the doctrine of laches in certain circumstances. The notion of unclean hands working as a bar to the application of laches stems from the belief that an equitable defense, such as laches, cannot be used to reward a party's inequities or to defeat justice. *Hot Wax,* 191 F.3d at 825 (citing *Precision Inst. Mfg. Co. v. Auto. Maint. Mach. Co.,* 324 U.S. 806, 814, 65 S.Ct. 993, 89 L.Ed. 1381 (1945) (unclean hands "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief")).*See also Jarrow Formulas, Inc. v. Nutrition Now, Inc.,* 304 F.3d 829, 841 (9th Cir.2002).

In this case, the Court would come to the same result whether or not LMI's unclean hands barred it from asserting the laches defense.

In the interests of justice the court should not automatically condone the defendant's infractions because the plaintiff is also blameworthy, thereby leaving two wrongs unremedied and increasing injury to the public.... The relative extent of each party's wrong upon the other and upon the public should be taken into account and an equitable balance struck.

**\*19** *Republic Molding Corp. v. B.W. Photo Util.s,* 319 F.2d 347, 350 (9th Cir.1963). An equitable balance in this case involves granting GPI2 an injunction against LMI's use of the GAFFRIG marks, but not rewarding GPI2 with damages. Whether or not laches applies to GPI2, this Court recognizes that GPI2 is not clear of wrong, since not only did it wait many years before raising the issue of LMI's infringement before the Court, but GPI2 allowed LMI to continue spending money on advertising while GPI2 attempted to break further into the mar-

ket. Moreover, despite the fraud in its application, LMI believed that it had a senior right to the GAF-FRIG marks. Therefore, because of LMI's violations of Section 1125 of the Lanham Act and its fraudulent registration of the GAFFRIG marks, GPI2 is entitled to an injunction under 15 U.S.C. § 1116 against LMI's use of any trademark or tradename incorporating the word GAFFRIG, or the use of such a mark on, or in connection with the sale of, any marine products. However, no damages will be awarded to GPI2 in light of LMI's belief that it had senior rights to the marks and GPI2's delay.

Furthermore, "[i]n any action involving a registered mark the court may determine the right to registration, order the cancellation of registrations, in whole or in part, restore canceled registrations, and otherwise rectify the register with respect to the registrations of any party to the action."Lanham Act, § 37, 15 USCA § 1119. In addition, the Lanham Act permits cancellation of a registration at any time if the registration of the mark was obtain fraudulently, even if the mark has acquired incontestable status. Lanham Act, §§ 14(c), 33(b)(1); 15 U.S.C. §§ 1064(c), 1115(b)(1). A party in an infringement suit is not barred from counterclaiming for cancellation merely because he never petitioned the PTO to cancel. *Nancy Ann Storybook Dolls, Inc. v. Dollcraft Co.,* 197 F.2d 293, 295-96 (9th Cir.1952). Therefore, the Court orders the cancellation of the federal trademark registrations issued to LMI for the (1) **GAFFRIG PRECISION IN-STRUMENTS** trademark (U.S. Registration No. 1,801,915); (2) GAFFRIG trademark (U.S. Registration No. 2,528,898); and (3) GAFFRIG II trademark (U.S. Registration No. 2,535,322).

In conclusion, the Court orders that: (1) GPI2's request for an injunction against LMI's use of any trademark or tradename incorporating the word GAFFRIG, or the use of such a mark on, or in connection with the sale of, any marine products, is GRANTED; and (2) LMI's federal trademark registrations for the **GAFFRIG PRECISION INSTRU-MENTS** trademark (U.S. Registration No.

1,801,915); the GAFFRIG trademark (U.S. Registration No. 2,528,898); and the GAFFRIG II trademark (U.S. Registration No. 2,535,322) will be CANCELLED. All other relief is DENIED.

IT IS SO ORDERED.

N.D.Ill.,2003.
Gaffrig Performance Industries, Inc. v. Livorsi Marine, Inc.
Not Reported in F.Supp.2d, 2003 WL 23144859 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# APPENDIX 3



Slip Copy                                                                                                    Page 1
Slip Copy, 2008 WL 111196 (W.D.N.Y.)
**(Cite as: 2008 WL 111196 (W.D.N.Y.))**

MacKenzie-Childs, Ltd. v. MacKenzie-Childs
W.D.N.Y.,2008.
Only the Westlaw citation is currently available.
United States District Court,W.D. New York.
MacKENZIE-CHILDS, LTD., Plaintiff,
v.
Victoria MacKENZIE-CHILDS, Richard MacKen-
zie-Childs and V & R Emprise, LLC, Defendants.
Victoria MacKenzie-Childs, Richard MacKenzie-
Childs, Plaintiff,
v.
Pleasant Rowland, MacKenzie-Childs, Ltd., MCL
Acquisition Corporation, MCNY Acquisition Cor-
poration and MacKenzie-Childs of New York, Ltd.,
Defendants.
**No. 06-CV-6107T.**

Jan. 9, 2008.

Jerauld E. Brydges, Stephen B. Salai, Harter,
Secrest and Emery, LLP, Rochester, NY, for
MacKenzie-Childs Ltd.
Howard D. Leib, New York, NY, Linda T.
Prestegaard, Phillips Lytle LLP, Rochester, NY,
Paul G. Marshall, The Marshall Firm, New York,
NY, for Victoria MacKenzie-Childs, Richard
MacKenzie-Childs and V & R Emprise, LLC.

**DECISION and ORDER**

MICHAEL A. TELESCA, District Judge.

*INTRODUCTION*

**\*1** Plaintiff MacKenzie-Childs, Ltd., a manufac-
turer and seller of ceramic goods and housewares,
brings this action pursuant to the Lanham Act and
New York state law claiming that the defendants
Victoria MacKenzie-Childs and Richard MacKen-
zie-Childs, and V & R Emprise, Ltd., have, *inter
alia,* infringed plaintiff's trademarks and engaged in
unfair competition. Specifically, plaintiff contends
that it is the owner of the trademarks "Victoria and
Richard MacKenzie-Childs," "Victoria and Richard

MacKenzie-Childs, Ltd.," "MacKenzie-Childs,
Ltd.," and a stylized logo featuring a
thistle.[FN1]Plaintiff alleges that the defendants,
(who are competing manufacturers and sellers of
ceramic goods and household items) are infringing
upon its marks by using the names "Victoria and
Richard MacKenzie-Childs," "Victoria and
Richard", "The Original MacKenzie-Childs," and
the name "V & R Emprise" with a logo featuring a
thistle.

> FN1. Although plaintiff's Complaint al-
> leges that it is the owner of trademarks in-
> corporating the name "McKenzie-Childs,"
> (with the name "MacKenzie" being spelled
> without an "a") it is clear from the record
> (and the plaintiff's corporate name
> "MacKenzie-Childs, Ltd.,") that the cor-
> rect spelling of the name "MacKenzie" is
> with an "a". Accordingly, the Court pre-
> sumes that plaintiff's alleged marks incor-
> porate the correct spelling of the name
> "MacKenzie."

Defendants deny that the plaintiff owns trademark
rights to the names "Victoria and Richard MacKen-
zie-Childs," "Victoria and Richard MacKenzie-
Childs, Ltd.," or "MacKenzie-Childs," and there-
fore claim that they have not infringed upon
plaintiff's marks. Defendants also claim that be-
cause their logo is distinct from the plaintiff's logo,
it does not infringe plaintiff's mark. Defendants fur-
ther contend that they own the rights to the mark
"MacKenzie-Childs" and that the plaintiff, and
third-party defendants, are infringing upon that mark.

Before the court are several motions. Plaintiff, and
third-party defendants Pleasant Rowland and
MacKenzie-Childs of New York, Ltd., move for
partial summary judgment dismissing all of defend-
ants' counterclaims. Plaintiff further moves for
summary judgment on its claim of trademark in-
fringement, and for a permanent injunction perman-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                     Page 2
Slip Copy, 2008 WL 111196 (W.D.N.Y.)
(Cite as: 2008 WL 111196 (W.D.N.Y.))

ently enjoining the defendants from using the marks "MacKenzie-Childs," "Victoria and Richard Mackenzie-Childs," "Victoria and Richard," and the thistle logo used by V & R Emprise.

Defendants oppose the plaintiff's motion, and move for partial summary judgment with respect to their claims under the Visual Artist Rights Act; New York Civil Rights Law and General Business Law. Defendants also seek judgment in their favor on their common law claims of unfair competition, defamation, and tortious interference with business relationships.

### BACKGROUND

In 1974, Defendants Richard Childs ("Richard") and Victoria MacKenzie ("Victoria") married. In 1983, they began making and selling ceramic goods of their own design. In 1985, the couple decided to incorporate their business, and incorporated under the name "Victoria and Richard MacKenzie-Childs, Ltd." ("the Company") Sometime thereafter, the Company registered two trademarks: "Victoria and Richard MacKenzie-Childs, Ltd." and "MacKenzie-Childs, Ltd.1983 Aurora New York."The Company also registered the mark "MacKenzie-Childs, Ltd. Aurora New York MC 1983."By 1995, the Company decided to stop using the first names of Victoria and Richard in the Company's logos, and in that same year, abandoned the trademark "Victoria and Richard MacKenzie-Childs, Ltd." According to the defendants, the Company's products did not bear any mark using the first names of Victoria and Richard after 1995.

*2 In 1999, Richard and Victoria incorporated a second company, "MacKenzie-Childs, NY, Ltd." In the late 1990's, Victoria and Richard MacKenzie-Childs, Ltd. and MacKenzie-Childs, NY, Ltd. ("The Companies") experienced a downturn in business, and in 2000, the Companies were several million dollars in debt. According to the defendants, the bank which held most of the Companies' debt installed a new President of the Companies,

MacDonell Roehm, Jr. ("Roehm"), and shortly thereafter, Roehm, against the wishes of Richard and Victoria, began looking for ways to reorganize the Companies and limit the bank's losses.

According to the defendants, Roehm approached Third-Party Defendant Pleasant Rowland ("Rowland") to determine whether or not she was interested in investing in the Companies. Thereafter, according to the defendants, Rowland purchased (at a discount) the Companies' debt from the bank, and, on the same day that she purchased the debt, called the Companies' loan. Because the Companies were unable to repay the debt, they were forced into bankruptcy.

With the Companies in bankruptcy, Rowland created two acquisition companies, and through those companies, made an offer to purchase the assets of the Companies. The purchase offer was accepted by Roehm and approved by the bankruptcy court. Shortly after the asset sale was completed, Roehm took a position with Rowland's new Company which had purchased the Companies' assets.

Pursuant to the terms of the asset sale, the Companies agreed to sell, *inter alia,*"All Intellectual Property ... and all goodwill associated with the foregoing ...." Asset Purchase Agreement at p. 2. "Intellectual Property" is defined in the Asset Purchase Agreement in relevant part as

mean[ing] all intellectual property, including, without limitation, ... all trademarks, service marks, trade dress, logos, trade names, brand names and corporate names (including, without limitation, the name "MacKenzie-Childs", and all derivatives thereof), together with all translations, adaptations, derivations, and combinations thereof and including all good will associated therewith, and all applications, registrations, and renewals in connection therewith ....

Asset Purchase Agreement at p. 37.

Following the completion of the sale of the Com-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                      Page 3
Slip Copy, 2008 WL 111196 (W.D.N.Y.)
**(Cite as: 2008 WL 111196 (W.D.N.Y.))**

panies' assets, Rowland renamed her acquisition companies MacKenzie-Childs, Ltd., and MacKenzie-Childs of New York, Ltd. The company formerly known as Victoria and Richard MacKenzie-Childs, Ltd. was renamed MC Aurora, Ltd., and the company formerly know as MacKenzie-Childs, NY, Ltd. was renamed MC Madison, Ltd.

According to the defendants, following the sale of the assets of the Companies, Rowland offered Victoria and Richard $10,000,000 not to compete with Rowland's companies, and not to use their name in competition with her companies. Richard and Victoria declined Rowland's offer, and defendants claim that as a result, Rowland (who owned much of the couples' personal debt) called Richard and Victoria's personal loans, and thereby caused Richard and Victoria to file for bankruptcy protection. Richard and Victoria contend that Rowland purchased many of the couples' personal assets and property in the bankruptcy proceeding.

**\*3** In 2005, Richard and Victoria decided to reenter the ceramics business, and incorporated a company known as V & R Emprise, LLC. V & R Emprise branded its products with a logo consisting of the names "Victoria and Richard" and an emblem design incorporating a torch bearing stylized "V" and "R" initials and the word "emprise, and a thistle. V & R Emprise filed trademark applications for the logos, which plaintiff has opposed.

On February 22, 2006, Plaintiff Mackenzie-Childs, Ltd. filed suit against Richard and Victoria, and V & R Emprise, LLC., claiming that the defendants are infringing upon their trademarks. Plaintiff seeks an injunction prohibiting the defendants from using the names "MacKenzie-Childs," "Victoria and Richard MacKenzie-Childs," "Victoria and Richard," and the thistle design used by V & R Emprise.

On May 22, 2006, defendants filed a counterclaim against plaintiff, Pleasant Rowland, and MacKenzie-Childs of New York, Ltd., claiming that the plaintiff/counterclaim defendants do not own rights

to the name "MacKenzie-Childs" or "Richard and Victoria MacKenzie-Childs, Ltd.," and as a result, are liable to the defendants under a host of federal and state laws, and common-law causes of action. Specifically, defendants contend that because they cancelled their trademark "Richard and Victoria MacKenzie-Childs, Ltd.," in 1995, the trademark was not an asset of the company that could be sold as part of the Asset Purchase Agreement. Defendants further contend that the name "MacKenzie-Childs" cannot be used by the plaintiff/counterclaim-defendants because the original Companies did not have a trademark for that name, and accordingly, could not convey it in the Asset Purchase Agreement.

## DISCUSSION

I. *Motions for Summary Judgment Standard of Review*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."When considering a motion for summary judgment, all inferences and ambiguities must be resolved in favor of the party against whom summary judgment is sought. *R.B. Ventures, Ltd. v. Shane,* 112 F.3d 54 (2nd Cir.1997). If, after considering the evidence in the light most favorable to the nonmoving party, the court finds that no rational jury could find in favor of that party, a grant of summary judgment is appropriate. *Annis v. County of Westchester,* 136 F.3d 239, 247 (2nd Cir.1998).

II. *Plaintiff's Motion for Summary Judgment*

A. *Trademark Infringement*

Plaintiff alleges that it is the owner of the marks

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

"Richard and Victoria MacKenzie-Childs, Ltd.", "MacKenzie-Childs, Ltd.1983 Aurora New York", and "MacKenzie-Childs". Plaintiff alleges that defendants have infringed these marks in connection with their attempts to reenter the ceramic and housewares market under the corporate name "V & R Emprise" and by using the trademark "Victoria and Richard".

**\*4** To establish a claim of trademark infringement under the Lanham Act, a plaintiff must demonstrate that " 'it has a valid mark entitled to protection and that the defendant's use of it is likely to cause confusion.'" *Arrow Fastener Co. v. Stanley Works,* 59 F.3d 384, 390 (2nd Cir.1995) (quoting *Gruner + Jahr USA Publishing v. Merideth Corp.,* 991 F.2d 1072, 1075 (2nd Cir.1993).

In the instant case, plaintiff contends that it is the rightful owner of the valid marks "Richard and Victoria MacKenzie-Childs, Ltd.", "MacKenzie-Childs, Ltd.1983 Aurora New York", and "MacKenzie-Childs", and that it is the owner of the corporate names Victoria and Richard MacKenzie-Childs, Ltd. and MacKenzie-Childs, NY, Ltd. In support of this contention it relies on the terms of the asset purchase agreement which provides that the plaintiff purchased "all intellectual property, including, without limitation, ... all trademarks, service marks, trade dress, logos, trade names, brand names and *corporate names (including, without limitation, the name "MacKenzie-Childs", and all derivatives thereof)*...." (emphasis added).

While it is undisputed that the plaintiff owns the trademark "MacKenzie-Childs, Ltd.1983 Aurora New York", "MacKenzie-Childs, Ltd. Aurora New York MC 1983." and the corporate names "Victoria and Richard MacKenzie-Childs, Ltd." and "MacKenzie-Childs, NY, Ltd .", defendants claim that the plaintiff is not the rightful owner of the trademarks "Richard and Victoria MacKenzie-Childs, Ltd." or "MacKenzie-Childs". In support of their argument, they contend that the original Companies abandoned the use of the trademark "Richard and Victoria MacKenzie-Childs, Ltd."

prior to 1995, and therefore, that name was not, and could not have been sold to the plaintiff in the asset purchase sale. Defendants further allege that the name "MacKenzie-Childs" was never trademarked and is not a corporate name, and accordingly, the plaintiff did not purchase, nor may it use, that name.

It is axiomatic that the owner of a trademark may abandon the mark. Pursuant to the Lanham Act, a trademark is abandoned when the trademark holder discontinues use of the mark with the intent not to continue using it. 15 U.S.C. § 1127. A trademark is presumptively abandoned if the mark has not been used for three or more consecutive years. Moreover, the trademark owner may expressly abandon a mark by cancelling the mark. *See Defiance Button Machine Co. v. C & C Metal Products,* 759 F.2d 1053, 1059 (2nd Cir.1985). A trademark that is abandoned may not be conveyed to another. An abandoned trademark is not capable of assignment. *Money Store v. Harris Corp. Finance, Inc.,* 689 F.2d 666 (7th Cir.1982) (*citing Avon Shoe Co. v. David Crystal, Inc.,* 171 F.Supp. 293 (S.D.N.Y.1959), aff'd, 279 F.2d 607 (2d Cir.1960), cert. denied, 364 U.S. 909, 81 S.Ct. 271, 5 L.Ed.2d 224).

Here the evidence in the record suggests that the original companies abandoned the trademark "Richard and Victoria MacKenzie-Childs, Ltd." in 1995 when it cancelled the mark, and when it stopped using the mark. If in fact the mark was abandoned, then the original Companies could not have conveyed that mark in the asset sale. Although there is no evidence in the record to suggest that the mark was not abandoned, because there has been no discovery on the issue, the court can not say, at this stage, as a matter of law, that the mark was abandoned. I therefore deny plaintiff's motion for summary judgment seeking a declaration that it is the owner of the mark "Victoria and Richard MacKenzie-Childs, Ltd.". Because there is no dispute that the plaintiff purchased the trademark "MacKenzie-Childs, Ltd.1983 Aurora New York"

and "MacKenzie-Childs, Ltd. Aurora New York MC 1983." in the 2001 asset purchase sale, I grant plaintiff's motion for summary judgment seeking a declaration that it is the owner of those trademarks.

**\*5** With respect to the purported trademark "MacKenzie-Childs", defendants allege that because the name "MacKenzie-Childs" was neither trademarked by the original Companies, nor the corporate name of either of the Companies, that name, as a matter of law, could not have been conveyed to the plaintiff in the 2001 asset sale, and therefore the plaintiff and counterclaim defendants do not have the right to use that trademark, nor prohibit the defendants from using that trademark.

There is no evidence in the record to suggest that the original Companies ever trademarked the name "MacKenzie-Childs" standing alone, nor is there any evidence to suggest that either Richard or Victoria, as individuals, authorized any entity to use the name "MacKenzie-Childs" standing alone. Accordingly, despite the fact that the asset purchase agreement purported to sell the name "MacKenzie-Childs" to the plaintiff, there is no evidence in this record to suggest that the original Companies had the authority to convey that trademark.

While plaintiff alleges that "Victoria and Richard voluntarily transferred, [in the asset sale] for due consideration the right to use the intellectual property of their company, including their names ...."*See* Plaintiff's Memorandum of Law in Support of its Motion for Summary Judgment at p. 16, that contention is not correct, as neither Richard nor Victoria were the "sellers" in the asset sale. Rather, the companies (which were no longer under the control of Richard or Victoria) were the sellers, and Richard and Victoria did not receive *any* consideration in the sale. Because Richard and Victoria, as individuals, did not sell their names, and there is no evidence in the record before the court indicating that the original Companies had the right to sell the name "MacKenzie-Childs, I deny plaintiff's motion for summary judgement seeking a declaration that it

is the owner of the trademark "MacKenzie-Childs."

Plaintiff's allegation that the thistle design used by defendants infringes on plaintiff's trademark, presents a question of fact that makes it inappropriate for resolution on a motion for summary judgment. There are questions of fact as to whether or not the designs are similar and/or confusing. Accordingly, I deny plaintiff's motion for summary judgment with respect to the thistle design.

B. *Misrepresentation under 15 U.S.C. § 1125a*

Defendants contend in the Second Cause of Action of their Counterclaim that the Plaintiff, by using the mark "MacKenzie-Childs" has misrepresented the source of the goods it creates, and has tried to create the impression that its goods are made by Richard and Victoria, all in violation of 15 U.S.C. § 1125a. Plaintiff and Counterclaim defendants move for summary judgment dismissing this claim.

15 U.S.C. § 1125a provides in relevant part that:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which-

**\*6** (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                              Page 6
Slip Copy, 2008 WL 111196 (W.D.N.Y.)
**(Cite as: 2008 WL 111196 (W.D.N.Y.))**

by such act.

Plaintiff moves for summary judgment against the defendants with respect to this claim on grounds that plaintiff owns the trademark names at issue, and therefore cannot be liable for using the trademarked names in commerce. Because I have granted plaintiff's motion for a declaratory judgment that it is the owner of the marks "MacKenzie-Childs, Ltd.1983 Aurora New York" and "MacKenzie-Childs, Ltd. Aurora New York MC 1983" I find that use of those names does not constitute misrepresentation. However, there is a question as to whether or not plaintiff has the right to the mark "MacKenzie-Childs" standing alone, and I decline to grant plaintiff's motion for summary judgment with respect to the use of the mark "MacKenzie-Childs".

C. *Visual Artist Rights Act*

Defendants Richard and Victoria claim in the Third and Fourth Causes of Action of their Counterclaim that the plaintiff and counterclaim defendants have used Richard and Victoria's names on works of art which were not created by them, and by so doing, have violated the Visual Artists Rights Act. Richard and Victoria further contend that the plaintiff and counterclaim defendants have intentionally mutilated, distorted, or otherwise modified their works of art in violation of the Visual Artists Rights Act.

Section 106A of the Visual Artists Rights Act ("VARA") provides in relevant part that:

the author of a work of visual art ... shall have the right ... to prevent the use of his or her name as the author of any visual work of art which he or she did not create ... [and] shall have the right to prevent the use of his or her name as the author of a visual work of art in the event of a distortion, mutilation, or other modification of the work which would be prejudicial to his or her honor or reputation; and ... subject to [certain] limitations ... shall have the right to prevent any intentional distortion, mutila-

tion, or other modification of that work which would be prejudicial to his or her honor or reputation, and any intentional distortion, mutilation, or modification of that work is a violation of that right ....

17 U.S.C. § 106A. Accordingly, to state a claim under VARA, a plaintiff must first establish that he or she is the author of a visual work of art. A "work of visual art" is defined in relevant part as:
a painting, drawing, print, or sculpture, existing in a single copy, in a limited edition of 200 copies or fewer that are signed and consecutively numbered by the author, or, in the case of a sculpture, in multiple cast, carved or fabricated sculptures of 200 or fewer that are consecutively numbered by the author and bear the signature or other identifying mark of the author ....

**\*7** 17 U.S.C. § 101.

Plaintiff and the counterclaim defendants move for summary judgment against Richard and Victoria with respect to their claims under the Visual Artists Rights Act on grounds that the defendants have failed to allege that plaintiff has used the defendants' names on any work of visual art, and further contend that such an allegation would be impossible, because plaintiff and the counterclaim defendants have not created any works of visual art as that term is defined under VARA.

I find, however, that Richard and Victoria have stated a cause of action under VARA, and that summary judgment with respect to their VARA counterclaims is premature. Richard and Victoria, consistent with the notice-pleading provisions of Rule 8 of the Federal Rules of Civil Procedure, have alleged that they are the authors of works of visual art as defined by VARA. *See* Answer and Counterclaim at ¶ 92. Richard and Victoria have further alleged that they object to the plaintiff and counterclaim defendants' use of their names on works of art which they did not create, and that the plaintiff and counterclaim defendants have modified their works of art without permission, and to their detri-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 7
Slip Copy, 2008 WL 111196 (W.D.N.Y.)
**(Cite as: 2008 WL 111196 (W.D.N.Y.))**

ment. *See* Answer and Counterclaim at ¶¶ 93, 94, 97, 98. Such claims state a cause of action under VARA.

With respect to the plaintiff and counterclaim defendants' claims that Richard and Victoria have never produced works of visual art as that term is used in VARA, this court cannot make such a finding as a matter of law given the fact that no discovery has taken place on the issue.

Plaintiff and counterclaim defendants further contend that because the works of art, if any, that were created by Richard and Victoria were works for hire, they cannot be considered works of visual art under VARA. Again, however, this contention is premature, as there has been no discovery on this issue. Accordingly, I deny without prejudice plaintiff and counterclaim defendants' motion for summary judgment with respect to Richard and Victoria's claims under VARA.

D. *New York Civil Rights Law and Section 133 of the New York General Business Law.*

In the Fifth and Sixth Causes of Action of their Counterclaim, Richard and Victoria allege that the plaintiff and counterclaim defendants' use of the name "MacKenzie-Childs" violates their rights under Sections 50 and 51 of the New York Civil Rights Law and Section 133 of the New York Business Law.

Section 50 of the New York Civil Rights Law provides in relevant part that "A person, firm or corporation that uses for advertising purposes or for the purposes of trade, the name, portrait or picture of any living person without having first obtained the written consent of such person ... is guilty of a misdemeanor."Section 51 of the Civil Rights Law creates a private right of action for alleged violations of § 50. Section 133 of the General Business Law provides in relevant part that:

No person, firm or corporation shall, with intent to deceive or mislead the public, assume, adopt or use

as, or as part of, a corporate, assumed or trade name, for advertising purposes or for the purposes of trade, or for any other purpose, any name, designation or style, or any symbol or simulation thereof, or a part of any name, designation or style, or any symbol or simulation thereof, which may deceive or mislead the public as to the identity of such person, firm or corporation or as to the connection of such person, firm or corporation with any other person, firm or corporation ....

**\*8** N.Y. Gen. Bus. Law. § 133.

Plaintiff argues that it is entitled to use the name "MacKenzie-Childs" because it purchased that right in the asset sale. However, for the reasons set forth above, I find that it is not clear from the record that the original companies had the authority to convey the name "MacKenzie-Childs" to the plaintiff, nor is it clear that Richard or Victoria authorized the original companies to use the name "MacKenzie-Childs." Because Richard and Victoria, as individuals, did not sell the use of the name "MacKenzie-Childs" to the plaintiff, and because there is no evidence in the record before the court indicating that as a matter of law the original Companies had the right to sell the name "MacKenzie-Childs," I find that Richard and Victoria have stated a claim under Sections 50 and 51 of the New York Civil Rights Law and Section 133 of the New York General Business Law, and therefore, I deny plaintiff's motion for summary judgment with respect to these claims.

E. *Misappropriation, Unfair Competition, Deceptive Acts, and False Advertising*

Defendants, in the Seventh Cause of Action of their Counterclaim, contend that the plaintiff and counterclaim defendants have misappropriated the name "MacKenzie-Childs" and have unlawfully used that name in connection with their business. Defendants' Eighth Counterclaim alleges that the plaintiff and counterclaim defendants' use of the trademark "MacKenzie-Childs" constitutes unfair competition

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

pursuant to Section 360-l of the New York General Business Law. Defendants' Ninth Counterclaim alleges that the plaintiff and counterclaim defendants' use of the trademark "MacKenzie-Childs" constitutes a deceptive business practice under Section 349 of the New York General Business Law. Defendants' Tenth Counterclaim alleges that the plaintiff and counterclaim defendants engaged in false advertising by using the name "MacKenzie-Childs" in commerce in violation of Section 350 of the New York General Business Law.

Plaintiff and counterclaim defendants contend that because they own the trademark "MacKenzie-Childs," they possess the lawful right to use that name. Accordingly, the plaintiff and counterclaim defendants seek summary judgment against the defendants with respect to the Seventh, Eighth, Ninth and Tenth Causes of Action set forth in defendants' Counterclaims.

As stated above, however, it is not clear at this early stage of the litigation whether or not the Companies had the authority to sell the name "MacKenzie-Childs." As a result, it can not be said as a matter of law that the plaintiff's use of the name "MacKenzie-Childs" is lawful. Additionally, defendants have stated a claim under Section 349 of the New York General Business Law in that the Complaint, when read as a whole, alleges that the plaintiff and counterclaim defendants have engaged in deceptive business practices that have harmed the public. Although the plaintiff alleges that the public has not been harmed by any of its alleged acts, that question is unsuitable for resolution at this stage of the litigation, prior to any discovery on the issue. I therefore deny plaintiff's motion for summary judgment with respect to Counterclaims Seven, Eight, Nine, and Ten.

### F. *Defamation*

**\*9** Richard and Victoria allege in their Eleventh Cause of Action that the plaintiff's use of the name "MacKenzie-Childs" on work that was not created by either Richard or Victoria (and which in the opinion of Richard and Victoria is inferior) suggests that Richard and Victoria designed those works, and therefore constitutes a defamation of them by the plaintiff.

To state a claim of defamation under New York law, a plaintiff must allege the existence of "a false statement, published without privilege or authorization to a third party, constituting fault as judged by, at a minimum, a negligence standard, and, it must either cause special harm or constitute defamation per se."*Dillon v. City of New York,* 261 A.D.2d 34, 704 N.Y.S.2d 1, 5 (N.Y.A.D. 1 Dept., 1999).

Richard and Victoria's allegations fail to set forth statements that are false or constitute fault. Accordingly, this claim is dismissed without prejudice.

### G. *Tortious Interference with Contract*

Defendants' Twelfth Cause of Action alleges that the plaintiff and counterclaim defendants have tortiously interfered with their business relationships by threatening the defendants' clients, and attempting to induce those clients not to sell the defendants' goods.

To state a claim for tortious interference with business relations, the plaintiff must show: (1) business relations with a third party; (2) interference with those relations; (3) that the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) injury to the plaintiff. *Scutti v. Park Place Entertainment Corp.,* 322 F.3d 211, 215 (2003). In this case, the defendants/counterclaim-plaintiffs have made such allegations.

Plaintiff moves for summary judgment against the defendants on grounds that it was justified in its actions because it was attempting to enforce its rights as the rightful owner of its trademarks, and because it did not have a wrongful purpose for contacting the defendants' clients, it can not be held liable for tortious interference. Because however, there has

Slip Copy                                                                                      Page 9
Slip Copy, 2008 WL 111196 (W.D.N.Y.)
**(Cite as: 2008 WL 111196 (W.D.N.Y.))**

been no discovery with respect to this issue, I de-
cline to hold as a matter of law that the plaintiff did
not have a wrongful purpose in contacting the de-
fendants' clients and deny plaintiff's motion for
summary judgment.

H. *Fraud on the Trademark Office and Cancella-
tion of Trademarks.*

Defendants' Thirteenth Counterclaim seeks a de-
claration from this Court preventing the trademark
office from issuing the trademark
"MacKenzie-Childs" to the plaintiff. According to
the Counterclaim, the plaintiff fraudulently failed to
inform the trademark office that the name
"MacKenzie-Childs" is the name of living persons,
and that those living persons object to the use of
their names by the plaintiff.

Defendants' Fourteenth Counterclaim seeks a can-
cellation of the trademarks "MacKenzie-Childs,
LTD. Aurora, New York MC 1983" and
"MacKenzie-Childs, LTD.1983 Aurora, New York"
on grounds that the plaintiff has used those marks
in an intentionally deceptive way.

**\*10** Plaintiff moves for summary judgment against
the defendants on grounds that it owns the marks
"MacKenzie-Childs, LTD. Aurora, New York MC
1983" and "MacKenzie-Childs, LTD.1983 Aurora,
New York," and that it purchased the right to use
the mark "MacKenzie-Childs."

As stated previously in this Decision, there is a dis-
pute as to the ownership of the name
"MacKenzie-Childs," accordingly, I decline to
grant plaintiff's motion for summary judgment dis-
missing this claim. Additionally, while it is undis-
puted that plaintiff is the owner of the marks
"MacKenzie-Childs, LTD. Aurora, New York MC
1983" and "MacKenzie-Childs, LTD.1983 Aurora,
New York," there has been no discovery with re-
spect to the defendants' claim that plaintiff has used
these marks to intentionally deceive the public. Ac-
cordingly, I deny plaintiff's motion for summary

judgment with respect to this claim.

III. *Defendants' motion for Summary Judgment*

Defendants move for partial summary judgment
against the plaintiff and counterclaim defendants
and seek an order that they are entitled to use the
trade name "Victoria and Richard." Defendants
claim that the plaintiff and counterclaim defendants
do not own any mark that incorporates the names
"Victoria" or "Richard," and that because the marks
are sufficiently distinct from the marks owned by
the plaintiff, the trade name "Victoria and Richard"
does not infringe any mark owned by the plaintiff.
Plaintiff contends that it owns the rights to the mark
"Victoria and Richard MacKenzie-Childs, Ltd.,"
either by purchasing it in the asset sale or through
continuing goodwill, and that the mark "Victoria
and Richard" is confusingly similar to its mark.

I find that there are questions of fact that preclude
granting defendants' motion for summary judgment
at this early stage of the litigation, prior to the initi-
ation of discovery. However, pursuant to defend-
ants' request for "other and further relief which as
to the Court may seem just, proper and equitable"
(*See* Defendants' Notice of Cross Motion, docket
item no. 27) [FN2] I hereby issue a preliminary in-
junction maintaining the status quo with respect to
defendants' use of the mark "Victoria and Richard",
and the thistle and torch logo, and enjoin plaintiff
from interfering with the defendants' continued use
of the mark "Victoria and Richard".

> FN2.*See also* Memorandum of Law in
> Support of Defendants and Counterclaim
> Plaintiffs' Motion for Partial Summary
> Judgement and in Opposition to Plaintiff's
> and Counterclaim Defendants' Motion For
> Summary Judgement at 9-10 ("Victoria
> and Richard are clearly entitled to a ruling
> finding that they, and only they, are own-
> ers of all trademark rights as to the mark
> "Victoria and Richard" and enjoining
> plaintiff from interfering with Victoria and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Richard's use of said mark.")

Although the evidence in the record strongly suggests that the plaintiff does not own the mark, "Victoria and Richard MacKenzie-Childs, Ltd." such a finding can not be made conclusively at this time because discovery is needed to determine whether or not the mark "Victoria and Richard MacKenzie-Childs, Ltd." was abandoned prior to the 2001 asset sale. Pursuant to the terms of that sale, plaintiff purchased the intellectual property of the Companies, including the trademarks "MacKenzie-Childs, Ltd.1983 Aurora New York" and "MacKenzie-Childs, Ltd. Aurora New York MC 1983."While plaintiff contends that it also purchased rights to the mark "Victoria and Richard MacKenzie-Childs, Ltd.," that mark had been cancelled in 1995, six years prior to the asset sale. Furthermore, according to the defendants, the mark had been abandoned as of 1993, when the original companies decided to stop using the names "Richard" and "Victoria" on the Companies' products. As such, the mark "Victoria and Richard MacKenzie-Childs, Ltd.," was presumptively abandoned well before the asset sale ever took place, and if so, could not have been transferred in the asset sale. While there is no evidence in the current record to suggest that the mark was not abandoned, plaintiff should be given an opportunity to develop such evidence. Accordingly, I deny defendants' motion for summary judgment on this issue.

**\*11** I do, however, find that the defendants are entitled to an injunction maintaining the status quo with respect to defendants' use of the mark "Victoria and Richard" and the thistle and torch logo, and prohibiting the plaintiff from interfering with the defendants' use of those marks. To be entitled to a preliminary injunction, a party must demonstrate: (1) that it is subject to irreparable harm; and (2) that it will either likely succeed on the merits of the case, or that there are sufficiently serious questions going to the merits of the case to make them a fair ground for litigation and that a balancing of the hardships between the parties

weighs decidedly in favor of the party requesting the relief. *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2nd Cir.1979).

For the reasons set forth above, I find that the defendants will likely succeed on their claim that plaintiff does not own the trademark "Victoria and Richard MacKenzie-Childs, Ltd." Additionally, because the mark "Victoria and Richard" is not a derivative of any mark owned by the plaintiff, I find that defendants will likely succeed on their claim that they are entitled to use the mark "Victoria and Richard." I further find that the defendants have sufficiently established that they will be irreparably harmed if their right to use the trademark "Victoria and Richard" is interfered with by the plaintiff. In a trademark case, irreparable harm may be demonstrated by establishing likelihood of success on the merits, even in the absence of proof of actual injury to business. *Hasbro, Inc. v. Lanard Toys, Ltd.,* 858 F.2d 70, 73 (2nd Cir.1988) ("In a Lanham Act case a showing of likelihood of confusion establishes both a likelihood of success on the merits and irreparable harm.")

With respect to the thistle and torch emblem, questions of fact preclude any grant of summary judgment on the issue of whether or not the defendants' emblem infringes on the plaintiff's mark. While neither party has established that it will likely succeed on the merits with respect to infringement claims involving the thistle and torch emblem, the claims are legally cognizable and constitute a serious basis for litigation. *See Jackson Dairy, Inc.,* 596 F.2d at 72 (where party seeking injunction is unable to establish likelihood of success on the merits, party must demonstrate that there are sufficiently serious questions going to the merits of the case to make them a fair ground for litigation, and that a balancing of the hardships between the parties weighs decidedly in favor of the party requesting the relief). In the instant case, the harm that would befall the defendants if they were not allowed to continue to use the design of their choosing is greater than the harm that would befall the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

plaintiff as a result of defendants' continued use of the logo. The logo currently used by the defendants is used in conjunction with the mark "Victoria and Richard," and as such, there is little likelihood of confusion that could be created by the defendants' use of the logo. I therefore enjoin plaintiff and counterclaim defendants from interfering with the defendants' use of its thistle and torch emblem in conjunction with the mark "Victoria and Richard."

IV. *Plaintiff's motion for Injunctive Relief*

**\*12** Plaintiff seeks an injunction permanently enjoining the defendants from using the marks "MacKenzie-Childs," "Victoria and Richard MacKenzie-Childs," "Victoria and Richard," and the thistle logo used by V & R Emprise. "To obtain a permanent injunction, a plaintiff must demonstrate (1) actual success on the merits and (2) irreparable harm."*Cartier v. Aaron Faber, Inc.,* 512 F.Supp.2d 165, 171 (S.D.N.Y., 2007) (citing *Gucci Am., Inc. v. Duty Free Apparel, Ltd.,* 286 F.Supp.2d 284, 290 (S.D.N.Y.2003)).

In the instant case, for the reasons set forth in section II above, I find that plaintiff has failed to establish actual success on the merits of its Lanham Act claims, and therefore I deny plaintiff's request for a permanent injunction.

### CONCLUSION

For the reasons set forth above, I hereby:

1) deny plaintiff's motion for summary judgment in its favor on the issue of infringement by defendants' use of the marks "Victoria and Richard" and the thistle and torch logo (Section II(A));

2) deny plaintiff's motion for summary judgment seeking a declaration that it is entitled to use the mark "MacKenzie-Childs"

3) grant plaintiff's motion for summary judgment seeking a declaration that it is entitled to use the

marks "MacKenzie-Childs, Ltd.1983 Aurora New York" and "MacKenzie-Childs, Ltd. Aurora New York MC 1983."(Section II(A));

4) deny plaintiff's motion for summary judgment seeking a declaration that it is the owner of the mark "Victoria and Richard MacKenzie Childs, Ltd." (Section II(A));

5) deny plaintiff's motion for summary judgment seeking dismissal of defendants' Second Counterclaim alleging misrepresentation. (Section II(B));

6) deny plaintiff's motion for summary judgment seeking dismissal of defendants' Third and Fourth Counterclaims alleging violations of the Visual Artists Rights Acts (Section II(C));

7) deny plaintiff's motion for summary judgment seeking dismissal of defendants' Fifth and Sixth Counterclaims alleging violations of New York Civil Rights and General Business laws (Section II(D));

8) deny plaintiff's motion for summary judgment seeking dismissal of defendants' Seventh, Eighth, Ninth, and Tenth Counterclaims alleging misappropriation, unfair competition, deceptive business practices, and false advertising. (Section II(E));

9) grant plaintiff's motion for summary judgment seeking dismissal of defendants' Eleventh Counterclaim alleging defamation (Section II(F));

10) deny plaintiff's motion for summary judgment seeking dismissal of defendants' Twelfth Counterclaim alleging tortious interference with contract (Section II(G));

11) deny plaintiff's motion for summary judgment seeking dismissal of defendants' Thirteenth and Fourteenth Counterclaims alleging violations of trademark law (Section II(H));

12) deny defendant's motion for summary judgment seeking a declaration that it is entitled to use the trademark "Victoria and Richard" (Section III);

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                      Page 12
Slip Copy, 2008 WL 111196 (W.D.N.Y.)
**(Cite as: 2008 WL 111196 (W.D.N.Y.))**

**\*13** 13) deny defendants' motion for summary judg-
ment seeking a declaration that it is entitled to use
the thistle and torch logo (Section III);

14) grant defendants' motion for a preliminary in-
junction and enjoin the plaintiff and counter-claim
defendants from interfering with defendants' use of
the mark "Victoria and Richard" and the thistle and
torch logo (Section III);

15) deny plaintiff's motion for injunctive relief.
(Section IV).

Finally, due to the complexity of the issues presen-
ted in this case, and in light of the fact that discov-
ery has not yet taken place, I direct the parties to
enter into mediation before Magistrate Judge
Payson. The parties shall contact Judge Payson to
schedule the mediation. Discovery, and defendants'
motion to disqualify counsel shall be stayed
pending the outcome of the mediation process.

ALL OF THE ABOVE IS SO ORDERED.

W.D.N.Y.,2008.
MacKenzie-Childs, Ltd. v. MacKenzie-Childs
Slip Copy, 2008 WL 111196 (W.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# APPENDIX 4

76 U.S.P.Q.2D 1904                                                                                      Page 1
2005 WL 3175174 (Trademark Tr. & App. Bd.), 76 U.S.P.Q.2d 1904
(Cite as: 76 U.S.P.Q.2d 1904)

c

Krause

v.

Krause Publications Inc.

U.S. Patent and Trademark Office Trademark Trial and Appeal Board

Cancellation No. 92041171

Decided November 18, 2005

## TRADEMARKS AND UNFAIR TRADE PRACTICES

**1 Registration and its effects -- Non-registrable subject matter -- Surnames (§ 315.0411)**

**Types of marks -- Names -- Individuals and surnames (§ 327.1703)**

Name "identifies" particular living individual, within meaning of Lanham Act's Section 2(c), 15 U.S.C. § 1052(c), only if individual bearing name in question will be associated with mark as used on goods or services, either because person is so well known that public would reasonably assume connection, or because individual is publicly connected with business in which mark is used.

**2 Registration and its effects -- Non-registrable subject matter -- Surnames (§ 315.0411)**

**Types of marks -- Names -- Individuals and surnames (§ 327.1703)**

Cancellation petitioner whose surname is "Krause" is not so well known to public in general that connection between petitioner and respondent's "Krause Publications" mark would be presumed, since there is insufficient evidence to establish that petitioner's activities in fields of numismatics, car collecting, and publishing of hobby magazines, which are niche markets, are well known to general public, and since petitioner's philanthropic activities are more local than national in scope, and it is unlikely that public in general knows of petitioner through his philanthropy.

**3 Registration and its effects -- Non-registrable subject matter -- Surnames (§ 315.0411)**

**Types of marks -- Names -- Individuals and sur-**

names (§ 327.1703)

Evidence is sufficient to establish that cancellation petitioner, whose surname is "Krause," is publicly connected with fields of numismatics, car collecting, and publishing of hobby magazines such that connection between petitioner and respondent's "Krause Publications" mark would be presumed by those who are interested in these fields, and by consumers of goods and services identified in respondent's registration, since petitioner started his publishing business as sole proprietorship under name "Krause Publications," with that trade name intended to refer to petitioner, since petitioner was associated with respondent corporation as president and/or board chairman for nearly 50 years, since respondent has acknowledged petitioner's contributions in books and in advertisements in respondent's various publications, since petitioner has co-authored three publications in field of numismatics, has acquired extensive car collection, and has received awards in both numismatics and car hobby fields, and since respondent has produced no evidence to show that name "Krause" in "Krause Publications" refers to someone other than petitioner in relevant fields.

**4 Registration and its effects -- Non-registrable subject matter -- Surnames (§ 315.0411)**

**Types of marks -- Names -- Individuals and surnames (§ 327.1703)**

Cancellation petitioner, whose surname is "Krause," has not demonstrated that he is publicly connected with entertainment services in nature of competitions and awards in field of cutlery identified in respondent's registration for "Krause Publications" trademark, since there is no evidence that petitioner has written or lectured in this field, or that he has made significant contributions to field, and since petitioner admitted during deposition that he has had no personal involvement in area of competitions or awards involving knives or cutlery.

**5 Registration and its effects -- Non-registrable subject matter -- Surnames (§ 315.0411)**

**Types of marks -- Names -- Individuals and sur-**

2005 WL 3175174 (Trademark Tr. & App. Bd.), 76 U.S.P.Q.2d 1904
**(Cite as: 76 U.S.P.Q.2d 1904)**

names (§ 327.1703)

Cancellation petitioner, whose surname is "Krause," did not implicitly consent to respondent's registration of trademark "Krause Publications" when he incorporated his "Krause Publications" business, sold his stock in respondent to set up employee stock option plan, and pledged respondent's assets, including trademarks and trade names, to finance expansion and acquisitions, since petitioner's incorporation of business, and his consent to use of his name in connection with business, did not constitute consent to registration of mark by that business, and since there are no provisions in financing documents of record in which petitioner stated that "Krause Publications" mark is respondent's property.

**6 Registration and its effects -- Non-registrable subject matter -- Surnames (§ 315.0411)**

**Types of marks -- Names -- Individuals and surnames (§ 327.1703)**

**Practice and procedure in Patent and Trademark Office -- Interpartes proceedings -- Opposition and cancellation -- In general (§ 325.0305.01)**

**JUDICIAL PRACTICE AND PROCEDURE**

**Procedure -- Defenses -- Estoppel (§ 410.1805)**

Cancellation petitioner, whose surname is "Krause," is not estopped from challenging respondent's registration of "Krause Publications" mark by respondent's decades-long use of mark and petitioner's silent acquiescence thereto, since instant case involves right to register "Krause Publications," rather than right to use such mark, since equitable defense of acquiescence in opposition or cancellation proceeding does not begin to run until mark is published for opposition, since petitioner brought instant cancellation proceeding approximately eight months after publication date of underlying application, and six months after issuance of registration, and since this relatively short period cannot be viewed as unreasonable delay.

**\*1905** Petition of Chester L. Krause to cancel trademark registration owned by Krause Publications Inc. Petition granted in part and dismissed in part.

John A. Clifford and Andrew S. Ehard, of Merchant & Gould, Minneapolis, Minn., for petitioner.

Daniel T. Flaherty and Brian G. Gilpin, of Godfrey & Kahn, Appleton, Wis., for respondent.

Before Seeherman, Hairston, and Zervas, administrative trademark judges.

Hairston, J.

A petition has been filed by Chester L. Krause to cancel a registration issued to Krause Publications, Inc. for the mark KRAUSE PUBLICATIONS (PUBLICATIONS is disclaimed) for the following goods and services:

Magazines featuring information regarding all of the following subject matters, antiques and collectibles, collectible card games, interior decorating, comics, antique automobiles and military vehicles, business information for professional crafters, arts and crafts, fantasy sports, hunting, firearms, collectible toy cars, trucks, farm equipment and other related vehicles, rock and roll memorabilia, stamp collecting, scrap booking and memory crafts, business information for the post-frame building construction industry, rural construction, sports memorabilia, numismatics, coins, and collectible paper money (including stocks and bonds), toys, movies and related memorabilia, knives, business management for the sports card industry; trading cards on knives, series of books and price guides relating to antiques and other collectibles, coins and firearms; calendars in Class 16;

Dissemination of advertising of others relating to hobby and collectible items via a global computer network; arranging and conducting trade shows featuring knives, daggers, swords, and cutlery; arranging and conducting trade shows featuring coins; arranging and conducting trade shows featuring sports cards, antiques and other collectibles in Class 35;

Entertainment services in the nature of competitions and awards in the field of cutlery in Class 41;

2005 WL 3175174 (Trademark Tr. & App. Bd.), 76 U.S.P.Q.2d 1904
**(Cite as: 76 U.S.P.Q.2d 1904)**

and

Conducting awards programs to recognize excellence in designs and themes of newly minted coins in Class 42. [FN1]

**\*1906** As grounds for cancellation, petitioner asserts that he "has been active in publishing newspapers and magazines in the fields of antiques and collectables, collectable cards and card games, numismatics, coins, memorabilia, and matters of interest to collectors of all kinds since at least 1952;" that he "has also been active in the field of disseminating advertising within the hobby, collectable, and craft industry, hosting competitions, conferences, assemblies, and the like in the field of collectables, including collectible cutlery, and conducting award and incentive programs concerning numismatics and coins since at least the 1970's;" that "at all times Petitioner employed the surname KRAUSE in conducting his business and hobby interests;" and that "Petitioner's rights in the name KRAUSE predate the first use dates claimed by Registrant."

Further, petitioner alleges that he "founded a periodical called *Numismatic News*, first published on October 13, 1952 and published continuously thereafter up to the present day;" that petitioner "has been personally active in this field for over 50 years, and is well known in the field of magazines for collectors and hobbyists of all kinds, and is well known in the field of dissemination of advertising for others within this field of interest, related entertainment services within this field, and conducting award programs with respect to coins and numismatics;" that petitioner "has made numerous appearances at shows, conferences, conventions, and gatherings of collectors and hobbyists for decades and has made 100's of such appearances beginning at least in the 1970s;" that "from a time long prior to the dates of first use claimed in Registration No. 2,573,101, the name KRAUSE has been well-known and associated with Petitioner in the fields of collecting and publishing;" and that "Petitioner's personal fame and reputation in these fields is sub-

stantial and continuing."

Also, petitioner alleges that he "was involved in founding a company called Krause Publications which later became Respondent Krause Publications, Inc.;" that "Petitioner served as president, and in other capacities at various times of Registrant;" that he "stepped down as President of Registrant on December 31, 1990;" that he "is no longer involved in the day-to-day operations of Registrant, and is unable to control the quality and nature of the goods and services Registrant produces under the registered mark;" that "the name Krause in KRAUSE PUBLICATIONS represents and identifies a particular living individual, namely Petitioner, and Petitioner has not given his written consent for the registration of that name in Registration No. 2,573,101;" and that Registration No. 2,573,101 issued in violation of Section 2(c) of the Trademark Act. [FN2]

Respondent, in its answer, admits that petitioner has been active in the field of collecting coins, paper money, and cars, but asserts that between the date respondent was incorporated in 1964 and petitioner's retirement as president of respondent in 1990, petitioner's only activity in publishing newspapers and magazines and in disseminating advertising in the fields of antiques and collectibles was through respondent. Further, respondent admits that it did not submit a written consent signed by petitioner when it applied for registration, but denies that such consent is necessary, including a specific denial that the mark KRAUSE PUBLICATIONS identifies petitioner. Respondent denied the remaining allegations of the petition to cancel.

As affirmative defenses, respondent asserts that "[i]n 1964, at the time that Krause Publications was incorporated, Chester Krause transferred all of the going concern of the business known as 'Krause Publications,' including the trade name and trademark KRAUSE PUBLICATIONS, to the company;" that "since the date of its incorporation, the Company has operated as a separate entity and has continuously used the trade name and trademark

COPR. © 2008 The Bureau of National Affairs, Inc.

76 U.S.P.Q.2d 1904
2005 WL 3175174 (Trademark Tr. & App. Bd.), 76 U.S.P.Q.2d 1904
**(Cite as: 76 U.S.P.Q.2d 1904)**

KRAUSE PUBLICATIONS in its business;" that in 1988 the Company formed an employee stock ownership plan (ESOP), and between 1988 and 1995 petitioner sold all of his shares of stock in respondent to the ESOP; that the shares of stock in respondent that petitioner had previously given to family members as gifts were redeemed by respondent between 1988 and 1998; that to finance the purchase of shares of stock in respondent, respondent borrowed millions *1907 of dollars, with loans secured by respondent's corporate assets, including all of its trademarks; and that these corporate borrowings were done with the full knowledge of petitioner. Further, respondent asserts that "since the date that Krause Publications was incorporated, and continuing for a number of years even after the sale of all of Chester Krause's stock in the Company in 1995, Chester Krause did not object to the use of the name KRAUSE PUBLICATIONS by the Company; it was only when the Company's stock was sold a second time--by the ESOP to the current owner F&W Publications, Inc.--did Chester Krause raise any objection to the continued use and registration of the KRAUSE PUBLICATIONS name by the Company."

Further, respondent asserts that petitioner would be unjustly enriched if he were permitted to convert to his own use a valuable asset of the Company--the Company's trade name and trademark KRAUSE PUBLICATIONS--following the sale of his stock in Krause Publications to the ESOP; that petitioner breached his fiduciary duty as an officer and director of the Company when he sold his shares in the Company to the ESOP without disclosing his intent to sell less than his entire interest in the business, and therefore he is precluded from obtaining the relief he seeks due to unclean hands; and that petitioner acquiesced in Krause Publications' use and registration of the name KRAUSE PUBLICATIONS, has waived any objection thereto, and is estopped from objecting to such use and registration.

The record consists of the pleadings, and the file of the involved registration. Petitioner Chester Krause has submitted his testimony deposition (with exhibits) and the testimony depositions (with exhibits) of Clifford Mishler, former chairman of the board and president of respondent; Patricia Klug, former employee of respondent; Kenneth Nimocks, president of the Wisconsin chapter of the American Numismatics Association; Edward Rochette, former executive director of the American Numismatics Association; Barry J. Meguiar, president and CEO of Meguiar's Incorporated; and Andrew S. Ehard, associate attorney at petitioner's law firm. In addition, petitioner submitted, under notice of reliance, respondent's answers to petitioner's interrogatories and requests for admissions; and the discovery depositions of Roger Case, former president of respondent, and Arlyn Sieber, assistant to the president of respondent.

Respondent submitted the testimony deposition that it took of petitioner Chester L. Krause; and notices of reliance on petitioner's answers to respondent's discovery requests, the discovery deposition (with exhibits) of petitioner, and copies of registrations owned by respondent. Pursuant to the parties' stipulation, respondent submitted portions of the discovery deposition (with exhibits) of Bruce Meagher, assistant secretary of respondent; correspondence exchanged between the parties; purchase and sale agreements; corporate resolutions; financing documents; and articles from printed publications.

Briefs have been filed, but an oral hearing was not requested.

Before turning to the merits of the case, we note that respondent interposed numerous objections during the taking of petitioner's testimony depositions in this case and asks that we deem inadmissible all testimony to which it objected. The Board does not ordinarily strike testimony taken in accordance with the applicable rules on the basis of substantive objections; rather, such objections are considered by the Board in its evaluation of the probative value of the testimony at final hearing. TBMP Section 707.03(c). In this case, we have not

COPR. © 2008 The Bureau of National Affairs, Inc.

stricken any testimony offered by petitioner. But, in reading petitioner's evidence, we have considered the trial testimony in light of respondent's objections. Where we have relied on testimony to which respondent objected, it should be apparent to the parties that we have deemed the material both admissible and probative to the extent indicated in the opinion.

Petitioner, testifying in his own behalf, stated that in 1952 he started a monthly publication in the field of coins and coin collecting known as "Numismatic News." In 1960 petitioner purchased the publication "Coin Press" and changed the name to "Coins Magazine." During this time, petitioner operated his publishing business as a sole proprietorship under the name "Krause Publications," with the trade name intended to refer to petitioner as the sole owner of both publications. In 1964 petitioner incorporated his publishing business in Wisconsin under the name "Krause Publications, Inc." This company is now the respondent in the current proceeding. In 1988 petitioner, as president of respondent corporation, established an Employee Stock Ownership *1908 Plan (ESOP) whereby employees are allowed to purchase shares in the company. The record shows that respondent corporation has grown into a major publisher of hobby magazines, newspapers and price guides with over 650,000 subscribers and revenues in excess of $50 million a year. For nearly fifty years, petitioner was associated with respondent as its president and/or chairman of the board and subsequently as an employee. In 2002 petitioner was terminated as an employee of respondent.

Petitioner is an avid coin collector and estimates his collection at approximately 50,000 pieces. Since 1972 petitioner has coauthored "The Standard Catalog of World Coins." This catalog is considered the worldwide authority for coin collectors. The "Standard Catalog of United States Paper Money" also bears petitioner's name, and this catalog has been published annually since the early 1980s. Petitioner testified that he "[has] all the illustrative material in that catalog and devised the method of cataloging it in the right order. . ." (Krause 6/16/04 testimony dep., p. 187.) In the early 1980s petitioner coauthored a publication titled "Guidebook of Franklin Mint Issues," which has since been discontinued.

Petitioner testified that he has lectured at "probably a dozen meetings" of the American Numismatic Association over the years, as well as at a number of other clubs and associations devoted to numismatics. (Krause 6/16/04 dep., p. 69.) For example, the record shows that petitioner lectured at a meeting of the Red Rose Coin Club of Lancaster, Pennsylvania on October 4, 1971; at a meeting of the Gateway Coin Club of San Antonio, Texas on October 13, 1984; at a joint meeting of the Society of Paper Money Collectors and the International Bank Note Society on August 8, 1986; and at the 1986 American Numismatic Association annual convention.

Petitioner was the recipient of the American Numismatics Association's (ANA) highest honor, the Farran Zerbe Award, in 1977; and the ANA's Numismatist of the Year Award in 1999. Additionally, petitioner has been enshrined in the ANA's Hall of Fame. Ed Rochette, former executive director of ANA, testified that "my personal opinion is that Chet Krause is the most recognizable living person involved in the hobby today," (Rochette dep., pp. 22-23), and that "the hobby today is because of Chet Krause and no other person." (Rochette dep., p. 74).

In 1961, President Kennedy appointed petitioner to the United States Assay Commission, whose purpose was to determine whether the coins of the United States were issued in accordance with legal requirements for weight, fineness and count.

Petitioner also is an avid collector of vehicles and related items. His collection was the subject of a film made by the Society of Automotive Historians entitled "A Walk Through Automotive History With Chet Krause." In 2002 the Society bestowed on petitioner its "Friend of Automotive History

COPR. © 2008 The Bureau of National Affairs, Inc.

2005 WL 3175174 (Trademark Tr. & App. Bd.), 76 U.S.P.Q.2d 1904

**(Cite as: 76 U.S.P.Q.2d 1904)**

Award." Petitioner received the first annual "Collector Car Hobby's Person of the Year Award" in 1995 by Meguiar's Incorporated. Barry Meguiar, CEO of Meguiar's Incorporated, testified that "[t]he purpose of the award is to honor people who have made, personally made an impact on the Car Hobby and helped take it to another level, helped to expand the awareness of the hobby, to attract other people in the hobby." (Meguiar dep., p. 22).

Petitioner testified that he is a founder of the Iola (Wisconsin) Car Show and Swap Meet, an event that attracts more than 130,000 collectors and automotive historians annually. In the summer of 1994 petitioner auctioned off a large portion of his vehicles and related items at an event that was attended by more than 3,000 collectors.

Petitioner's contributions to respondent Krause Publications have been highlighted in three books published in connection with respondent's forty, forty-five and fifty year anniversaries. The books are titled, respectively, "The History of Krause Publications - Just Plain Chet"; "A Building Is Only As Good As Its Foundation - Krause Publications' Traditions and Philosophies at 45 Years;" and "Pioneer Publisher - The Story of Krause Publications' First 50 Years."

At a 1995 ceremony honoring petitioner, respondent's then-president Cliff Mishler stated that "[petitioner will] always constitute the real embodiment of Krause Publications, regardless of your ownership or lack thereof, your business role, or your physical presence in the business . . . it should never and can never be any other way." (Petitioner's exhibit 55; Mishler dep., pp. 17-19).

**\*1909** In 2002 respondent placed in its various publications print advertisements celebrating its 50th anniversary. The advertisements include a picture of petitioner standing atop a tank he owned at the time with the headline: "When the boss owns the tank, you tend to work harder." The remainder of the advertisement reads:

In 1952, Chet Krause created Numismatic News from a desk in his family's home in rural Iola, Wisconsin. Today, Krause Publications is the world's largest hobby and collectibles publisher. While his enterprise has grown beyond his wildest dreams, Chet is still the same dedicated collector he's always been. Help Chet and everyone at Krause Publications celebrate an anniversary that is truly golden.

(Petitioner's exhibit 35).

Petitioner also is a philanthropist, having made substantial gifts to the Marshfield Clinic Laird Center and the Rawhide Boys Ranch, both of which are located in Wisconsin. Also, petitioner purchased snow-grooming equipment for the cross-country ski trails in his hometown of Iola, Wisconsin. The town of Iola has bestowed on petitioner the 2002 Outstanding Citizen Award, has held a "Chet Krause Day", and renamed a street in his honor. In 1990 the U.S. Small Business Administration named petitioner Wisconsin Small Business Person of the Year.

Petitioner's attorney testified that he conducted an Internet search using the Google search engine for the name "Chester L. Krause" that returned approximately 17,000 references. A representative sample of the results of the search was made of record and it shows that the majority of the references are to books that petitioner has authored. Also, petitioner's attorney conducted a search of the "Lexis ALL-NEWS" database for the name Chester L. Krause that returned 64 articles about petitioner. Petitioner made of record each of the articles, in its entirety. The articles are taken from a variety of newspapers, ranging from "The Post-Crescent" (Appleton, Wisconsin) to the "Chicago Tribune" and "New York Times." The vast majority of the articles relate to coin and paper money collecting and mention petitioner; others relate to petitioner's philanthropic activities and his association with respondent Krause Publications.

It is petitioner's position that he has achieved

COPR. © 2008 The Bureau of National Affairs, Inc.

2005 WL 3175174 (Trademark Tr. & App. Bd.), 76 U.S.P.Q.2d 1904
**(Cite as: 76 U.S.P.Q.2d 1904)**

renown in the multiple fields of numismatics, car collecting, business, publishing and philanthropy; and that he is so well known by the public in general that they would assume a connection between petitioner and the mark KRAUSE PUBLICATIONS. Alternatively, petitioner contends that he is publicly connected with the business in which the mark KRAUSE PUBLICATIONS is used such that an association would be presumed between petitioner and the mark KRAUSE PUBLICATIONS.

Respondent argues that petitioner has not demonstrated that he is well known to the public in general or that he is publicly connected with the fields in which the mark KRAUSE PUBLICATIONS is used. According to respondent, petitioner is at most known by a limited number of persons as a collector of coins and cars. Respondent argues that KRAUSE PUBLICATIONS refers to respondent; that through written agreements and actions, petitioner has given his implied consent to register the mark; and that petitioner has waived any rights he may have had in the mark KRAUSE PUBLICATIONS in that petitioner has acquiesced in respondent's use and registration of the mark.

Section 2(c) of the Trademark Act, 15 U.S.C. § 1052(c), prohibits registration of a mark that consists of or comprises a name, portrait, or signature identifying a particular living individual except by his written consent. The provisions of Section 2(c) are applicable to a "name . . . identifying a particular living individual," be it a full name, a nickname or a surname, so long as the name points to a particular living person. See In re Sauer, 27 USPQ2d 1073 (TTAB 1993), aff'd, 26 F.3d 140, 32 USPQ2d 1479 (Fed. Cir. 1994), and the cases cited therein. Thus, the mark KRAUSE PUBLICATIONS, although it includes only the surname of petitioner, would fall within the provisions of Section 2(c) if petitioner establishes that KRAUSE, as used on or in connection with the goods and services set forth in the involved registration, points uniquely to him "as a particular living individual."

    1 A name is considered to "identify" a particular

living individual for purposes of Section 2(c) only if the "individual bearing the name in question will be associated with the mark as used on the goods [or services], **\*1910** either because the person is so well known that the public would reasonably assume the connection, or because the individual is publicly connected with the business in which the mark is used." Martin v. Carter Hawley Hale Stores, Inc., 206 USPQ 931, 933 (TTAB 1979). See also, In re Sauer, supra; and Ross v. Analytical Technology Inc., 51 USPQ2d 1269 (TTAB 1999).

In the *Martin* case, registration of the mark NEIL MARTIN was sought for men's shirts. Opposer Neil Martin, although well known in his own professional and social circles, failed to establish that he was so famous as to be recognized by the public in general or that "he is or ever was publicly connected or associated with the clothing field." Id. at 933. Thus, the Board found that opposer's name did not fall within the provisions of Section 2(c).

The opposite conclusion was reached in the *Sauer* case, where the mark sought to be registered was BO BALL for a sports ball. The Board found the name BO to be the recognized nickname of Bo Jackson, a professional football and baseball star, and further found that he was so well known by the public in general that use of the name BO in connection with a sports ball would lead to the assumption that he was in some way associated with the goods.

In the *Ross* case, where the applicant sought to register the mark ROSS for electrochemical analysis equipment, the evidence was found sufficient to establish a Section 2(c) claim. The Board found that opposer, Dr. James W. Ross, Jr., was publicly connected with the electrochemical analysis equipment field and that use of the name ROSS in connection with equipment in the field would lead to the assumption that Dr. Ross was in some way associated with the goods. The evidence showed that the name ROSS was intentionally selected by the applicant to be used as a mark for electrodes because of op-

COPR. © 2008 The Bureau of National Affairs, Inc.

poser's development of the product, and the association of opposer with the product was acknowledged by applicant.

2 In the present case, the record fails to establish that petitioner is so well known by the public in general that a connection between petitioner and the mark KRAUSE PUBLICATIONS would be presumed. Petitioner has not demonstrated that his renown in the fields of business, numismatics, car collecting, and publishing is at a level anywhere near that of Bo Jackson in the *Sauer* case. The evidence establishing the fame of Bo Jackson consisted of Bo Jackson baseball and football cards; advertisements for Bo Jackson figurines and toys; a copy of a tag from a Bo Jackson model baseball glove; a copy of a Cheerios cereal box referring to Bo Jackson; and copies of magazines with articles about and cover references to Bo Jackson. These are the kinds of items that are purchased by a substantial portion of the public. Also, it is common knowledge that the general public is exposed to professional athletes through television and radio broadcasts of games and other sports programming. In the present case, the fields of numismatics, car collecting, and publishing of hobby magazines are niche markets and there is insufficient evidence to establish that petitioner's activities in these fields are well known to the general public. Further, petitioner's philanthropic activities clearly are more local than national in scope, and it is unlikely that the public in general knows of petitioner as a result of these activities.

Thus, on the record before us, we find that petitioner has not demonstrated that he is so well known by the public in general that persons would assume a connection between petitioner and the mark KRAUSE PUBLICATIONS.

3 However, we find that there is sufficient evidence to establish that petitioner is publicly connected, at the very least, with the fields of numismatics, car collecting, and publishing activities related thereto, such that a connection between

petitioner and the mark KRAUSE PUBLICATIONS would be presumed by people who have an interest in these fields. Moreover, since respondent's registration covers, inter alia, magazines featuring antique automobiles and numismatics, conducting trade shows featuring coins, and conducting award programs regarding coins, this connection would be assumed by the consumers of respondent's goods and services as identified in Classes 16, 35 and 42.

The record shows that petitioner started his publishing business as a sole proprietorship under the name "Krause Publications," with the trade name intended to refer to petitioner. Petitioner was associated with respondent as its president and/or chairman of the board for nearly fifty years. Additionally, respondent itself has acknowledged petitioner's contributions **\*1911** in three books highlighting such contributions as well as advertisements acknowledging such contributions in respondent's various publications.

Also, petitioner has coauthored at least three publications in the field of numismatics, including "The Standard Catalog of World Coins," which is considered the worldwide reference authority for coin collectors. Further, petitioner has lectured across the country on the subject of numismatics and is the recipient of awards from national and local organizations in recognition of his contributions to the field.

Insofar as the field of car collecting is concerned, petitioner is the recipient of the 1995 "Collector Car Hobby's Person of the Year Award" in recognition of his contributions to this field. His extensive car collection was the subject of a film by the Society of Automotive Historians and he is a founder of the Iola Car Show and Swap Meet.

Additionally, it is significant that respondent produced no witnesses or other evidence to show that the name "Krause" appearing in KRAUSE PUBLICATIONS INC. refers to someone other than petitioner in the field of numismatics, car collecting

COPR. © 2008 The Bureau of National Affairs, Inc.

and publishing activities related thereto. In Reed v. Bakers Engineering & Equipment Co., 100 USPQ 196, 199-200 (Exam'r in Chief 1954), Paul Reed filed a petition to cancel the registration of the mark REED REEL OVENS for baker's ovens. The evidence showed that the name "Reed" in the mark REED REEL OVENS was selected because of its reference to petitioner Paul Reed, the engineer who designed and built the ovens, and that Mr. Reed was initially active in the partnership that sold the ovens. The Examiner in Chief stated that:

It seems to me that "Reed" on the ovens also identified petitioner to the customers at least during the first several years of the business in view of the personal contact of the petitioner with the customers in installing and servicing the ovens. Under these circumstances, it seems to me that the burden of proof is upon the respondent to show that Reed does not refer to and identify petitioner . . . and respondent produced no witnesses to show that the name Reed appearing in 'Reed Reel Ovens' does not refer to and identify petitioner in the particular trade.

Id at 199-200.

In the present case, the record shows that petitioner started his publishing business as a sole proprietorship under the name "Krause Publications," with the trade name intended to refer to petitioner. Further, the record shows that petitioner was associated with respondent as its president and/or chairman of the board for nearly fifty years. As in Reed, the respondent here has not rebutted the showing that, because of petitioner's activities, purchasers would make an association between petitioner and the mark KRAUSE PUBLICATIONS.

In view of the foregoing, we find that petitioner has demonstrated that he is publicly connected with at least some of the goods and services identified in respondent's registration in Classes 16 (e.g., magazines featuring information regarding antique automobiles, numismatics and coins), 35 (e.g., arranging and conducting trade shows featuring

coins) and 42 (conducting awards programs to recognize excellence in designs and themes of newly minted coins). To prevail under Section 2(c) against a class in respondent's registration, petitioner is not required to demonstrate that he is publicly connected with all of the goods and services listed in the class. Rather, it is sufficient that petitioner has shown that he is publicly connected with at least some of the goods and services in that class. Cf., In re Analog Devices Inc., 6 USPQ2d 1808, 1810 (TTAB 1988), aff'd without pub. op., 871 F.2d 1097, 10 USPQ2d 1879 (Fed. Cir. 1989) ["... it is a well settled legal principle that where a mark may be merely descriptive of one or more items of goods in an application but may be suggestive or even arbitrary as applied to other items, registration is properly refused if the subject matter for registration is descriptive of any of the goods for which registration is sought."]; and Tuxedo Monopoly, Inc. v. General Mills Fun Group, 648 F.2d 1335, 209 USPQ 986, 988 (CCPA 1981) ["[A] likelihood of confusion must be found if the public, being familiar with appellee's use of MONOPOLY for board games and seeing the mark on any item that comes within the description of goods set forth by appellant in its application, is likely to believe that appellee has expanded its use of the mark, directly, or under a license, for such item."] [emphasis in original].

4 Petitioner has not demonstrated, however, that he is publicly connected with the services in Class 41, namely, "entertainment *1912 services in the nature of competitions and awards in the field of cutlery." There is no evidence that petitioner has authored or lectured in the field or that he has made significant contributions to the field. In this regard, we note that petitioner has not argued in his main brief or reply brief that he is well known in the field of cutlery. Also, we note the following testimony of petitioner during his discovery deposition:

Q. Have you ever had personal involvement in the area of competitions or awards involving knives or

COPR. © 2008 The Bureau of National Affairs, Inc.

cutlery?

A. No, I haven't.

(Krause discovery dep., pp. 159-160).

We turn next to respondent's arguments that petitioner implicitly consented to the registration of KRAUSE PUBLICATIONS. In this regard, respondent argues that petitioner gave his implicit consent to register when petitioner incorporated his business; when petitioner subsequently sold his stock in respondent to set up an Employee Stock Option Plan (ESOP); and when petitioner, as president and chairman of the board of respondent, pledged respondent's assets, including trademarks and trade names, to finance expansion and acquisitions.

In support of its position that petitioner gave his implicit consent when petitioner incorporated the business and subsequently sold stock to set up the ESOP, respondent relies on Dovenmuehle v. Gilldorn Mortgage Midwest Corp., 871 F.2d 697, 10 USPQ2d 1550 (7th Cir. 1989) and In re D.B. Kaplan, 225 USPQ 342 (TTAB 1985). Citing Dovenmuehle v. Gilldorn, respondent argues that "implied consent is considered sufficient in the context of a sale of a business without a reservation of rights because the intent to transfer goodwill and trademarks to the buyer is presumed when a business is sold as a going concern, even if goodwill and trademarks are not specifically mentioned in the contract of sale." (Brief, p. 9). In the Dovenmuehle case, plaintiffs claimed defendants' use of a trade name violated § 43 of the Lanham Act. The issues on appeal were "first, whether the district court correctly held that plaintiffs lacked standing under § 43(a) of the Lanham Act to challenge defendants' use of the trade name 'Dovenmuehle,' and second, whether the district court could properly award defendants the cost of court reporter charges for deposition transcript charges under 28 U.S.C. § 1924." Id. at 1551. The case did not involve a Section 2(c) claim and clearly is not authority for respondent's contention that petitioner gave his implied consent to register

on the facts of the present case.

In Kaplan, the Board found consent to the use and registration of the mark D.B. KAPLAN's DELICATESSEN implicit in the terms of a "buy out" agreement. Donald Kaplan, one of the original shareholders, officers and directors of the applicant corporation, entered into a "buy out" agreement that specifically provided that the mark D.B. KAPLAN's DELICATESSEN and any mark confusingly similar thereto was the property of D.B. Kaplan's Delicatessen, Inc. and further specifically provided that Donald Kaplan could not use D. B. KAPLAN's DELICATESSEN in any subsequent business venture. The Board held that the record supported a finding that Donald Kaplan consented to applicant's use and registration of the mark D.B. KAPLAN's DELICATESSEN in that "Kaplan has clearly relinquished to applicant corporation all rights in the mark 'D.B. Kaplan Delicatessen' which comprises his name and has agreed that he cannot use it in any subsequent business. We think that these provisions are beyond a mere 'consent to use' situation and that a reasonable reading of this provision clearly implies that consent to applicant's registration of the mark was contemplated." Id. at 344.

5 In the present case, the incorporation of petitioner's business is not akin to the "buy out" agreement in Kaplan. There is no evidence that petitioner expressly stated that the mark KRAUSE PUBLICATIONS is the property of respondent. Neither did petitioner agree to refrain from use of the name Krause in any subsequent business. Petitioner's mere incorporation of his business does not constitute his written consent to that business's (i.e., respondent's) registration of the mark KRAUSE PUBLICATIONS.

In In re New John Nissen Mannequins, 227 USPQ 669 (TTAB 1985), the Board considered whether the appearance of one's name in a deed of incorporation constituted the required consent under Section 2(c). The applicant therein, John Nissen Mannequins, appealed from a final refusal to register

2005 WL 3175174 (Trademark Tr. & App. Bd.), 76 U.S.P.Q.2d 1904

**(Cite as: 76 U.S.P.Q.2d 1904)**

the mark JOHN NISSEN MANNEQUINS under Section 2(c) of the Trademark Act because the *1913 mark consisted of a name identifying a particular living individual, namely John Nissen, whose written consent had not been made of record. John Nissen was a founder of the applicant's predecessor, John Nissen Mannequins. Applicant argued that John Nissen provided his written consent to register the subject mark because John Nissen's name appeared in the deed of incorporation of applicant's predecessor corporation and because applicant's use and registration of the mark in other countries showed implied consent. The Board held that neither the appearance of Mr. Nissen's name in the deed of incorporation of applicant's predecessor nor any consent implied from the issuance to applicant and applicant's predecessor of foreign registrations incorporating the name John Nissen constituted the written consent required by Section 2(c). In the present case, too, the appearance of petitioner's name in documents incorporating his business does not constitute the written consent required by Section 2(c).

There is a distinction between the right to use a name and the right to register one. A person may give express or implied consent to the use of his name, but that does not necessarily mean that he consents to the registration of it. Thus, even if we were to find that petitioner had impliedly consented to respondent's use of his name in connection with the business as it was conducted at the time petitioner was involved with respondent, such consent would not constitute a consent to register petitioner's name as a trademark. [FN3]

Respondent has offered no legal support for its contention that petitioner gave his implied consent to register KRAUSE PUBLICATIONS when, as president and chairman of the board of respondent, he pledged assets of respondent, including trademarks and trade names, to finance expansion and acquisitions. Respondent has pointed to no provisions (and we have found none) in the financing documents made of record where petitioner stated that the

mark KRAUSE PUBLICATIONS is the property of respondent. In short, the circumstances in this case are readily distinguishable from those in *Kaplan*.

Lastly, respondent argues that given its decades long use of the mark KRAUSE PUBLICATIONS and petitioner's silent acquiescence in that use, petitioner is estopped from challenging respondent's registration.

> 6 As the Board noted in *Ross*, supra at 1276, "in view of the personal nature of [a Section 2(c) claim], we see no overriding public policy or interest which would preclude the assertion of equitable defenses against [such a] claim." We find, however, that respondent herein has no right to raise the equitable defense of acquiescence on the facts of this case, which involves respondent's right to register the mark KRAUSE PUBLICATIONS, rather than its right to use such mark.

A predecessor to our primary reviewing Court, the Court of Customs and Patent Appeals, addressed the distinction between the right to register and the right to use in terms of acquiescence in James Burrough, Ltd. v. La Joie, 462 F.2d 570, 174 USPQ 329 (CCPA 1972). There, the applicants began use of the mark SIGN OF THE BEEFEATER for a restaurant in 1957. In 1959 and 1960 the opposer sent letters to applicants requesting that they desist from using the term BEEFEATER for their restaurant. The applicants ignored the letters and indeed expanded their business to at least six restaurants. Opposer took no further action against applicants until 1967. The Board found that opposer had acquiesced in the applicants' use of their mark. On appeal, the court rejected applicant's acquiescence defense, stating:

We have no difficulty in concluding that the board erred in sustaining the applicant's equitable defense in this case. In Salem Commodities, Inc. v. Miami Margarine Co., 44 CCPA 932, 244 F.2d 729, 114 USPQ 124

Appellant was clearly under no duty to attack ap-

pellee's right to use the mark if it did not choose to do so, on penalty of being deprived of the right to oppose an application **\*1914** to register. It could not take the latter action, of course, until after appellee applied for registration and the application was published for the purpose of opposition.

Appellant cannot properly be charged with acquiescence in appellee's right to *registration* until appellant became aware that such a right had been asserted by appellee. [Emphasis in original.]

The court in Salem recognized a distinction between the right to use a mark and the statutory right to register which is of significance when § 19 is sought to be relied upon in defense to an opposition. Thus, under § 7(b) of the Lanham Act, 15 U.S.C. 1057(b), registration is more than evidence of the right to use. It is prima facie evidence "of the validity of the registration, registrant's ownership of the mark, and of registrant's exclusive right to use the mark in commerce *in connection with the goods or services specified in the certificate*, subject to any conditions and limitations stated therein." [Emphasis in original.] Moreover, in the present case, appellant may have acquiesced only in the use of the words SIGN OF THE BEEFEATER in conjunction with a picture to identify a restaurant in which no liquor is served and which closes relatively early in the evening whereas registration is sought on the words alone for "restaurant services" broadly. Applicants' equitable standing in an action by this opposer to enjoin their actual use of SIGN OF THE BEEFEATER, if ever brought, would be one matter. However, in this opposition, which is aimed only at preventing registration of the specified mark, a broader and somewhat different goal than enjoining the actual use of the mark, and which is timely brought only after the applicants seek registration, the applicants have not established this opposer's acquiescence in this registration.

It is clear, therefore, that the equitable defense of acquiescence in an opposition or cancellation proceeding does not begin to run until the mark is pub-

lished for opposition. See also National Cable Television Association, Inc. v. American Cinema Editors Inc., 937 F.2d 1572, 19 USPQ2d 1424 (Fed. Cir. 1991) [laches runs from the time from which action could be taken against the trademark rights inhering from registration].

Petitioner brought this cancellation proceeding on November 22, 2002, approximately eight months after the publication date of the underlying application and six months after issuance of the registration. This relatively short period cannot be viewed as an unreasonable delay. Thus, we find that respondent has not demonstrated that petitioner's Section 2 (c) claim is barred by acquiescence.

In sum, we find that petitioner has established that, with respect to Classes 16, 35 and 42 of the subject registration, the registered mark consists of the name of a particular living individual, namely Chester Krause, and that this name has been registered without his written consent.

*Decision*: The petition to cancel Registration No. 2,573,101 in Classes 16, 35 and 42 is accordingly granted, and the petition to cancel the registration in Class 41 is dismissed. Classes 16, 35 and 42 will be cancelled from the registration in due course.

> FN1. Registration No. 2,573,101, issued May 28, 2002; claiming January 7, 1969 as the dates of first use as to the goods in Class 16; May 12, 1981 as the dates of first use as to the services in Class 35; June 1995 as the dates of first use as to the services in Class 41; and the year 1983 as the dates of first use as to the services in Class 42.

> FN2. Petitioner also pleaded a claim of likelihood of confusion. However, petitioner presented no argument in support of such a claim in either his main brief or reply brief and we therefore deem plaintiff to have waived this pleaded ground.

COPR. © 2008 The Bureau of National Affairs, Inc.

2005 WL 3175174 (Trademark Tr. & App. Bd.), 76 U.S.P.Q.2d 1904
**(Cite as: 76 U.S.P.Q.2d 1904)**

> FN3. On the other hand, a consent to register a name as a trademark, even without a specific reference to a consent to use, would impliedly constitute a consent to use the name, since a federal registration may not be obtained (with an exception not relevant here) or maintained without use.

P.T.O. T.T.A.B.

76 U.S.P.Q.2D 1904

END OF DOCUMENT

COPR. © 2008 The Bureau of National Affairs, Inc.

# APPENDIX 5





227 U.S.P.Q. 569                                                                                                     Page 1
1985 WL 71932 (Trademark Tr. & App. Bd.), 227 U.S.P.Q. 569
**(Cite as: 227 U.S.P.Q. 569)**

C

In re New John Nissen Mannequins

Patent and Trademark Office Trademark Trial and Appeal Board

Decided September 26, 1985
United States Patents Quarterly Headnotes

**TRADEMARKS**
**[1] Marks and names -- Names -- Individuals (§ 67.5215)**
Applicant which claims name of living individual as mark for its mannequin company did not satisfy written consent requirements of 15 USC 1052(c) by furnishing printed copy of deed of incorporation of applicant's predecessor in which named individual is listed as one who established that company.

**\*570** Appeal from Trademark Examining Attorney.

Application for trademark registration of New John Nissen Mannequins, Serial No. 355,555, filed March 19, 1982. From decision refusing registration, applicant appeals. Affirmed.

Jesse B. Grove, Jr., and Bacon & Thomas, both of Arlington, Va., for applicant.

Larry Bauman, Trademark Examining Attorney, Law Office 8 (Sidney Moskowitz, Managing Attorney) for Patent and Trademark Office.

Before Rice, Simms, and Sams, Members.

Simms, Member.

New John Nissen Mannequins, a Belgian joint stock company, has appealed from the final refusal of the Trademark Examining attorney to register the mark JOHN NISSEN MANNEQUINS and design for "shop window mannequins; shop window equipment viz. shelves, stands, and mock-furniture." [FN1] The Examining Attorney has refused registration on the Principal Register under Section

2(c) of the Trademark Act, 15 U.S.C. §1052(c), because applicant's mark "consists of or comprises a name . . . identifying a particular living individual," namely, John Nissen, whose written consent has not been made of record as required by that provision. [FN2]

The record of this case establishes that Mr. John Meinike Nissen, a Danish sculptor, was a founder of applicant's predecessor, John Nissen Mannequins. That company was created for the purpose of selling mannequins and related goods under the trademark JOHN NISSEN MANNEQUINS. Applicant argues, first, that the name John Nissen in applicant's mark identifies applicant (New John Nissen Mannequins), a juristic person, and not Mr. Nissen and that, therefore, no written consent of Mr. Nissen is necessary. Second, even assuming that the words JOHN NISSEN in the trademark identify the natural person John Nissen, applicant contends that he has consented as a matter of law to applicant's use and registration by his creation of applicant's predecessor in interest under the name John Nissen Mannequins and by his allowing applicant and applicant's predecessor to use and register trademarks incorporating his name for mannequins and related goods in other countries. [FN3] As evidence of Mr. Nissen's written consent to use his name, applicant points to a printed copy of the deed of incorporation of applicant's predecessor and the partial translation thereof, in which Mr. Nissen is listed as one of the individuals who appeared before a notary to establish that company. This, according to applicant, establishes that Mr. Nissen has given his written consent to applicant's use and registration of the mark. Finally, the record contains a declaration of an avowed expert on Belgian law stating that, under Belgian law, when a natural person allows a corporation to use his name in its corporate name or as part of a trademark, then the corporation is considered to own exclusive rights to use the name as part of the corporate name or as the trademark and that the natural person is

COPR. © 2008 The Bureau of National Affairs, Inc.

1985 WL 71932 (Trademark Tr. & App. Bd.), 227 U.S.P.Q. 569
**(Cite as: 227 U.S.P.Q. 569)**

considered to have given the corporation his consent to use his name, and that, under the facts of this case, Mr. Nissen is therefore considered to have given his consent to the use of his name.

[1] There can be no doubt from this record that applicant's mark comprises the name of a living individual, John Nissen. However, and despite applicant's arguments to the contrary, we do not believe that the appearance of Mr. Nissen's name in the deed of incorporation of applicant's predecessor constitutes the writtenconsent **\*571** required by Section 2(c) of the Act. Nor does any consent implied from the issuance to applicant and applicant's predecessor of foreign registrations incorporating the name of John Nissen (which have not been made of record) constitute the requisite "written consent." Even assuming, however, that this record establishes the consent of John Nissen to use his name as part of applicant's trade name and trademark, such consent does not necessarily qualify as written consent to federal registration. McCarthy, *Trademarks and Unfair Competition* (2d ed. 1984) §13:12 and In re D. B. Kaplan Delicatessen, 225 USPQ 342, 344 (TTAB 1985). The statutory language is clear in its prohibition of registration where the mark comprises the name of a living individual except by his written consent. Applicant has failed to supply the written consent to register of the living individual named in its mark. See also TMEP Section 1204.02 and Examination Guide 7-84.

Decision: The refusal to register is affirmed.

> FN1 Serial No. 355,555, filed March 19, 1982, claiming first use since May 11, 1973 and first use in commerce with the United States since 1976. Applicant has disclaimed the word "Mannequins" apart from the mark.

> FN2 Section 2(c) provides:No trademark by which the goods of the applicant may be distinguished from the goods of others

shall be refused registration on the principal register on account of its nature unless it

\* \* \* \* \*

(c) consists of or comprises a name, portrait, or signature identifying a particular living individual except by his written consent, or the name, signature, or portrait of a deceased President of the United states during the life of his widow, if any, except by the written consent of the widow.

> FN3 According to a declaration of applicant's managing director, applicant and its predecessor have registered trademarks incorporating JOHN NISSEN MANNEQUINS for mannequins and related goods on the International Register (covering the Federal Republic of Germany, Austria, France, Italy, Monaco and Switzerland) and in Denmark and South Africa.

P.T.O. T.T.A.B.

227 U.S.P.Q. 569

END OF DOCUMENT

COPR. © 2008 The Bureau of National Affairs, Inc.

# APPENDIX 6





121 U.S.P.Q. 595

1959 WL 6084 (Trademark Tr. & App. Bd.), 121 U.S.P.Q. 595

**(Cite as: 121 U.S.P.Q. 595)**

LAUB

v.

INDUSTRIAL DEVELOPMENT LABORATOR-
IES, INC.

Patent Office Trademark Trial and Appeal Board

Decided June 10, 1959

United States Patents Quarterly Headnotes

**TRADEMARKS**

**[1] Marks and names subject to ownership --
Names -- Individuals (§ 67.5215)**

**Opposition--Motions (§ 67.585)**

**Registration -- Consent of another (§ 67.741)**

Opposer alleges that he is inventor of product on
which applicant uses opposer's surname as trade-
mark, that opposer granted exclusive license to
third party under whom applicant is sublicensee,
that mark as used by applicant identifies opposer,
and that opposer has not given applicant written
consent to registration; applicant having admitted
that there is association between product and op-
poser, and that it has not obtained opposer's writ-
ten consent to registration, section 2(c) of 1946 Act
precludes registration; opposer's motion for sum-
mary judgment is granted.

**\*595** Trademark opposition No. 38,473 by John H.
Laub against Industrial Development Laboratories,
Inc., application, Serial No. 47,858. On opposer's
motion for summary judgment. Motion granted.

CHRISTIE, PARKER & HALE, Pasadena, Calif.,
for Laub.

MAX L. LIBMAN, Washington, D. C., for Indus-
trial Development Laboratories, Inc.

Before LEACH, WALDSTREICHER, and LE-
FKOWITZ, Members.

LEFKOWITZ, Member.

An application has been filed by Industrial Devel-
opment Laboratories, Inc., to register "LAUB" for a
flowmeter employed in apparatus for measuring the
flow of liquids or fluids.

Registration has been opposed by John H. Laub on
the ground that opposer is the inventor of an appar-
atus for measurement and control of the flow of flu-
ids known as a flowmeter; opposer has granted an
exclusive license for the manufacture and sale of
flowmeters under his patent to a third party under
whom applicant is a sub-licensee; the mark
"LAUB" as used by applicant serves to identify op-
poser, a particular living individual; and applicant
has not obtained his written consent to the registra-
tion of the name "LAUB".

Applicant in its answer has admitted the allegations
of opposer's pleading but specifically denies that it
has not obtained consent to use "LAUB", and has
affirmatively alleged that opposer, by his actions,
has in effect given his consent to such use, and is
now estopped thereby to question applicant's right
of registration.

Oposer has moved for summary judgment on the
ground that in view of the admissions made in ap-
plicant's answer there is no genuine issue as to any
material facts, and that he is entitled to judgment as
a matter of law. In support of the motion, he has
submitted an affidavit to the effect that he has never
given his written consent to applicant to register a
trademark consisting of "LAUB".

[1] Section 2(c) precludes the registration of a
trademark consisting of or comprising a name
identifying a particular living individual "except
by his written consent". In the instant case, ap-
plicant admits that there is an association
between the product in connection with which it
uses the term "LAUB" and opposer, and that it
has not obtained opposer's written consent to the
registration thereof. In the absence of such writ-
ten consent, registration must be refused. See:

COPR. © 2008 The Bureau of National Affairs, Inc.

121 U.S.P.Q. 595                                                    Page 2
1959 WL 6084 (Trademark Tr. & App. Bd.), 121 U.S.P.Q. 595
**(Cite as: 121 U.S.P.Q. 595)**

   Reed v. Bakers Engineering & Equipment Com-
pany, 100 USPQ 196 (Comr., 1954).

                    **Decision of the Board**
The motion is therefore granted, the opposition is
sustained, and registration to applicant is refused.

Pat.Off. T.T.A.B.

121 U.S.P.Q. 595

END OF DOCUMENT

COPR. © 2008 The Bureau of National Affairs, Inc.

# APPENDIX 7



MB Financial Bank, N.A. v. MB Real Estate Services, L.L.C.
N.D.Ill.,2003.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern Division.
MB FINANCIAL BANK, N.A., Plaintiff,
v.
MB REAL ESTATE SERVICES, L.L.C., Defendant.
**No. 02 C 5925.**

Nov. 21, 2003.

Frederick H. Cohen, Oscar L. Alcantara, Salvador Kurt Karottki, Goldberg, Kohn, Bell, Black, Rosenbloom & Moritz, Ltd., Chicago, IL, for Plaintiff/Counter-Defendant.
Roger L. Longtin, Keith William Medansky, Richard Allan Janney, Perry Chris Siatis, Stephen Lawrence Agin, Mark I. Feldman, Alan S. Dalinka, Piper Rudnick LLP, Chicago, IL, for Defendant/Counter-Claimant.

*MEMORANDUM OPINION*

DERYEGHIAYAN, J.
**\*1** This matter is before the court on Plaintiff MB Financial Bank, N .A.'s ("Bank") objections to Magistrate Judge Mason's June 20, 2003, report and recommendation recommending a denial of Bank's request for a preliminary injunction and on Defendant MB Real Estate Services, L.L.C.'s ("Real Estate") objections to Magistrate Judge Mason's June 20, 2003, report and recommendation. For the reasons stated below we overrule Bank's objections and overrule Real Estate's objections and, in accordance with Judge Mason's report and recommendation, we deny Bank's request for a preliminary injunction.

BACKGROUND

Bank is a national banking association that offers a variety of personal and commercial banking services. In regards to real estate, Bank serves as a trustee for personal trusts and estates, and provides services for land trusts. Bank does not make decisions concerning the lease, or sale of the trust properties although it does pursue foreclosures in connection with real estate financing. Bank, through a subsidiary, provides financing for real estate developments and provides advice concerning zoning issues, but the subsidiary does not act as a real estate broker.

According to Bank, in June 1997 Bank's predecessor, Manufacturers Bank, began using the word mark "MB" and a stylized mark incorporating the "MB." Between 1997 and 2001 Bank was involved in several mergers. Bank asserts that in March of 1999 it began using the word mark "MB FINANCIAL BANK." In the fall of 2001 Bank decided to adopt its present name of "MB Financial Bank, N.A." On July 10, 2001, the U.S. Patent and Trademark Office ("PTO") issued Bank a trademark registration for the "MB FINANCIAL" word mark. In approximately October 2001, Bank began using the "MB Financial Bank" work mark, a new "mb" logo and a "mb financial bank" logo. In conjunction with the 2001 merger Bank engaged in a promotional campaign to promote its new "mb" and "mb financial bank" logos.

Real Estate is engaged in the commercial real estate business which deals with property management, leasing, and corporate services such as tenant representation. Real Estate represents commercial tenants that are interested in renewing their lease or are interested in executing a new lease. Real Estate "cold calls" potential customers in the Chicago area to promote its tenant representation services. Real Estate also provides financial counseling relating to areas such as land acquisition, zoning, financing, construction, marketing, and distribution. Real Estate does not provide banking services. It does not act as a lender, financier, or as an equity source or mortgage broker.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Real Estate began as a real estate advisory service firm called "Miglin-Beitler, Inc." In 2000 the then fifty percent owner of Real Estate, Howard Milstein, decided to form a national commercial real estate company. In 2001 Real Estate incorporated "MB" into its name which was intended to stand for Milstein Brothers. Bank brings a trademark infringement claim against Real Estate citing ownership of the "MB" logo, the "MB" word mark, the "MB FINANCIAL" word mark, the "mb" logo, the "mb financial bank" logo, and the "MB financial Bank" word mark, Bank requested a preliminary injunction and Judge Mason issued a report and recommendation recommending the denial of the request. Bank and Real Estate are now before this court and both have filed objections to Judge Mason's report and recommendation.

## LEGAL STANDARD

**\*2** A district court judge may "designate a magistrate judge to conduct hearings, including evidentiary hearings, and to submit to a judge of the court proposed findings of fact and recommendations for the disposition, by the judge of the court, of any motion...."28 U.S.C. § 636(b)(1)(B). If a party objects to a magistrate judge's proposed findings of fact and recommendations, the party must serve written objections and the district court judge who referred the matter to the magistrate shall review the portions objected to under the *de novo* standard. 28 U.S.C. § 636(b)(1)(C).

## DISCUSSION

A movant seeking a preliminary injunction has the burden of establishing: 1) a likelihood of success on the merits, 2) that the movant has no adequate remedy at law, and 3) that the movant will suffer irreparable harm if the preliminary injunction request is not granted. *AM General Corp. v. Daimler Chrysler Corp.,* 311 F.3d 796, 803 (7th Cir.2002); *Eli Lilly & Co. v. Natural Answers, Inc.,* 233 F.3d 456, 461 (7th Cir.2000). If the movant meets the

above burden, then the court must consider the potential irreparable harm to the non-movant if the court were to grant the preliminary injunction and the court must consider whether the preliminary injunction is in the best interest of the pubic. *AM General Corp.,* 311 F.3d at 803-04. If the court in assessing the likelihood of success on the merits factor, determines that the plaintiff has a "greater than negligible change of winning" then the court should turn to a sliding scale analysis and balance the likelihood of success and the potential harms caused by granting or not granting the motion for preliminary injunction. *Id.*

### *I. Likelihood of Success on the Merits*

The Lanham Act prohibits the unauthorized use, or reproduction of a registered trademark. 15 U.S.C. § 1114(1). In order to succeed on a trademark infringement claim a plaintiff must establish: 1) that he owns a mark protected under the Lanham Act, and 2) the use of the mark by the defendant is likely to cause confusion among potential consumers. *CAE, Inc. v. Clean Air Engineering, Inc.,* 267 F.3d 660, 673-74 (7th Cir.2001); *Packman v. Chicago Tribune Co.,* 267 F.3d 628, 638 (7th Cir.2001); *Barbeque Marx, Inc. v. 551 Ogden, Inc.,* 235 F.3d 1041, 1043 (7th Cir.2000).

### *A. Protectable Marks*

A mark that is registered with the PTO is presumed to be valid *CAE, Inc.,* 267 F.3d at 673, although registration of a mark is not necessary for Lanham Act protection. *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 768, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992). A mark is protected under the Lanham Act if it is used in commerce. *See Sands, Taylor & Wood Co. v. The Quake Oats Co.,* 978 F.2d 947, 953-55 (7th Cir.1992)(stating that a word or phrase operates as a trademark when it is used to identify itself as the source of the product and "to create in the public an awareness of the uniqueness of the source...."). In this case Bank asserts that it

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 3
Not Reported in F.Supp.2d, 2003 WL 22765022 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22765022 (N.D.Ill.))**

owns six marks.

**\*3** Judge Mason concluded that the "MB FINAN-CIAL" word mark, the "mb" logo, the "mb financial bank" logo, and the "MB financial Bank" word mark were protected marks and neither of the parties have objected to that conclusion. Judge Mason also found that Bank had a protected interest in the "MB" word mark based on the fact that Bank began using the mark in commerce beginning in 1997. Real Estate objects to Judge Mason's finding and argues that there is no evidence that Bank began using the Mark until 2001. Real Estate's objection is irrelevant because Real Estate has not shown that it would be the senior user even if we were to find that Bank began using the mark in 2001. We also note that there is evidence of use of the mark by Bank prior to 2001 which again would render Real Estate's objection meaningless.

Judge Mason also found that the "MB" logo was not a protected mark because Bank had abandoned the mark. An owner of a registered mark will lose his exclusive right to use the mark if he fails to use the mark in commerce. 15 U.S.C. § 1127; *Sands, Taylor & Wood Co.,* 978 F.2d at 955. A mark is deemed to be abandoned if it is not put to a bona fide use and if it was discontinued, there is no intent to resume the use of the mark. 15 U.S.C. § 1127; *Sands, Taylor & Wood Co.,* 978 F.2d at 954-55. The defendant has the burden of establishing abandonment. *Id.* at 955-56.A party establishes a prima facie case of abandonment by establishing non-use for three consecutive years. 15 U.S.C. § 1127. The opposing party may rebut the presumption by presenting evidence that explains the non-use or indicates an intent to resume use.*Sands, Taylor & Wood Co.,* 978 F.2d at 954-55.

Judge Mason concluded that Bank intended to abandon the "MB" logo at the time of the final merger in the fall of 2001 when Bank began the promotional campaign to promote its new marks. At the time of the merger Bank posted a memo on its internet cite that instructed its employees to remove items that displayed the "MB" logo. Bank also posted another memo entitled "Out With the Old, In With the New" and a memo entitled "A New Era in Banking!" in which Bank introduced its new "mb" logo to its customers. Judge Mason also concluded that Bank had not used the "MB" logo in advertising since November 2001. Since that time all new Bank ATM cards, debit cards, checks, monthly statements, and outdoor signs depicted the new Bank logo. Judge Mason noted, however, that all of the ATM cards, and debit cards issued before the merger would continue to depict the "MB" logo until they were replaced by the customers. Also, after the merger the "MB" logo continued to appear on piece of engraved glass at one of Bank's branches and on a billboard. Bank states that Real Estate's position is only supported by "unpublished, non-precedential, or wholly distinguishable authority."However, Bank has neglected to cite controlling authority in support of its position as well. Bank introduced a new logo in 2001. It did what it could to remove the old logo from the public eye and it actively promoted the fact that the "MB" logo was no longer its logo. Therefore, we find that there is sufficient evidence that Bank discontinued the use of the "MB" logo at the time of the merger and that the mark was abandoned.

**\*4** Bank also argues that it did not abandon the "MB" logo because is continued to use the "key element" of the mark in its new logo. *See Sands, Taylor & Wood Co.,* 978 F.2d at 955 (stating that there is generally not abandonment if the plaintiff makes minor changes to the mark and thus retains the key element of the original mark). We agree with Judge Mason that the changes in the Bank logo were not minor. Bank changed the logo from capital block letters to lower case letters, Bank also changed the color of the letters and the logo backgrounds. Bank makes much of the fact that its mark is distinctive because of the arbitrary combination of the capital letters "MB." We agree that such a combination is distinctive and we also find that to change the color and background of the logo and particularly to change the letters from uppercase to lower case would significantly alter the distinctive

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                     Page 4
Not Reported in F.Supp.2d, 2003 WL 22765022 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22765022 (N.D.Ill.))**

"MB" logo. Thus, we agree with Judge Mason that the new logo changed the "basic, overall commercial impression created on buyers."*Id.* Bank also argued that even if Bank discontinued its use of the "MB" logo, it is protected because there was residual goodwill after the mark's abandonment. However, we agree with Judge Mason that if there is any residual goodwill in this case it would be minimal. Therefore, we overrule Bank's objection to Judge Mason's finding that Bank abandoned the "MB" logo and thus owned no protected interest in that logo.

*B. Consumer Confusion*

In determining whether the use of the mark is likely to cause confusion among consumers a court should consider the following seven factors: "(1) similarity between the marks in appearance and suggestion; (2) similarity of the products; (3) the area and manner of concurrent use; (4) the degree of care likely to be exercised by consumers; (5) the strength of the plaintiff's mark; (6) whether actual confusion exists, and (7) whether the defendant intended to 'palm off' his product as that of the plaintiff."*CAE, Inc.,* 267 F.3d at 677-78. No one factor is dispositive and the court should balance the seven factors. *Id.;Packman,* 267 F.3d at 643. However, the similarity of the marks factor, the actual confusion factor, and the intent factor are particularly important. *CAE, Inc. .,* 267 F.3d at 678;*Packman,* 267 F.3d at 643.

*1. Similarity Between Marks*

A comparison between marks should consider the marks in all the manners that the marks are presented to the public. *Barbeque Marx, Inc. v. 551 Ogden, Inc.,* 235 F.3d 1041, 1044 (7th Cir.2000)(stating that if a word mark is presented to the public orally and in a visual form, the court must consider both the similarities in the marks' appearance and consider the similarities of the marks in their spoken form). The court should not base its

finding solely on a side-by-side comparison, but should also consider "what happens in the marketplace." *Packman,* 267 F.3d at 643. In this case Judge Mason found that Bank's mark and Real Estate's mark are not similar. Judge Mason found that the above mentioned differences in the letter type, color, and background of the parties' logos were significant and that any differences in their spoken form were not sufficient to tilt this factor in Bank's favor.

**\*5** Bank argues that the court's comparison of the "MB" word mark should not include evaluating the differences in the marks' appearance such as type style, color, and background. We acknowledge that Real Estate's name which has an "M" next to a "B" is similar to the interests in Bank's word marks that contain the letters "MB." However, that similarity is not sufficient to alter our ultimate determination on this factor or to alter our ultimate conclusion regarding the issuance of an injunction.

We agree with Judge Mason that the parties' marks are not visually similar for the reasons stated above in connection with the abandonment issue. Also, although Bank argues that the marks are presented to the public in an oral fashion, we find that the similarity factor still tilts in favor of Real Estate. The inclusion of the word "Real Estate" orally after "MB" as opposed to the word "Bank" suggests a different entity. If, for example, a consumer receives a cold call from Real Estate, he might think that a real estate company that uses the initial's MB is calling him, but there is no reason why he would be confused and think that a Bank that uses those same initials was calling him or was responsible for the call. Bank argues that a court should not conduct its own side-by-side comparison, but rather must consider the marks as seen and/or heard by consumers that "may have a general, vague, or even hazy, impression or recollection of [plaintiff's] marks."*See James Burrough Ltd. v. Sign of the Beefeater, Inc.,* 540 F.2d 266, 275 (7th Cir.1976)(indicating that court the comparison is not the same comparison done for copyright infringement and that the court

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

should not conduct a side-by-side comparison from its own perspective, but rather should consider "what occurs in the marketplace."). Keeping this proviso in mind, we find that the marks are not sufficiently similar. Therefore, we overrule Banks objections to Judge Mason's findings regarding the similarity of the marks.

### 2. Similarity Between Products or Services

In assessing the similarity between the parties' products or services factor, the court should not focus its attention solely on the similarity of the products and services offered by the parties. *CAE, Inc.,* 267 F.3d at 679. Consumer confusion may exist even if the parties offer "quite different" products or services or are not in direct competition. *Id.* The proper inquiry is "whether the public is likely to attribute the products and services to a single source."*Id.* Judge Mason found that the parties' services were materially different and found that the factor weighed in Real Estate's favor. We disagree. Although the parties' services are not identical they are closely connected in many areas such as real estate financing and zoning. Although Bank does not sell real estate or advise tenants it does deal with real estate issues in its business. Therefore, we sustain Bank's objection to Judge Mason's finding that the similarity of services factor tilts in favor of Real Estate.

### 3. Area and Manner of Concurrent Use

**\*6** Judge Mason concluded that there was significant overlap in the parties' customer base and found in favor of Bank on the concurrent use factor. Real Estate has not objected to this finding and we agree with Judge Mason.

### 4. Degree of Care By Consumers

In determining the degree of care likely to be exercised by consumers the court must consider the potential consumers of both parties. *CAE, Inc.,* 267

F.3d at 682. The sophistication of potential consumers may be a relevant consideration when assessing the likely degree of care exercised by consumers.*Id.* at 683.Also, if the product is widely available and is inexpensive, the likelihood is increased that the consumers will not exercise much care in purchasing the product or service. *Id.* Judge Mason concluded that Bank's customers and Real Estate's customers are sophisticated purchasers and that therefore, the consumer care factor titled in Real Estate's favor. We agree with Judge Mason's reasoning. We also note that the services of banking and real estate dealings are areas that consumers do not enter into lightly. As the evidence indicates in this case, the customers are sophisticated and the services are not inexpensive. Therefore, we overrule Bank's objection to Judge Mason's finding in favor of Real Estate on the consumer care factor.

### 5. Strength of Mark

To assess the strength of a trademark the court should inquire into the trademark's "distinctiveness, meaning its propensity to identify the products sold as emanating from a particular source."*CAE, Inc.,* 267 F.3d at 684;*Eli Lilly & Co. v. Natural Answers, Inc.,* 233 F.3d 456, 464 (7th Cir.2000). There are five general categories of trademarks. *CAE, Inc.,* 267 F.3d at 684. Listed in order of distinctiveness from the least distinctive to the most distinctive the categories are as follows: generic, descriptive, suggestive, arbitrary, and fanciful. *Id.* When the plaintiff uses a mark which is an unpronounceable group of letters some factors that the Seventh Circuit considers in determining the strength of the mark include: 1) how long the mark was used, 2) the amount of sales of products or services connected to the mark, 3) the amount of money spent on advertising the mark, 4) the use or non-use of the letter combination by the plaintiff's subsidiaries or divisions, and 5) the registration by the plaintiff of other trademarks that contain the letter grouping. *See id.* at 685(considering factors used by district court). Judge Mason found that the arbitrary arrangement of letters such as "MB" is the strongest

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 6
Not Reported in F.Supp.2d, 2003 WL 22765022 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22765022 (N.D.Ill.))**

of all trademarks and found in Bank's favor on the strength of mark factor. Real Estate objects to Judge Mason's proposed finding. Bank argues that it spent over $7 million on advertising the MB marks, its assets and revenue are considerable, and that Bank has some registered trademarks that contain the MB letter grouping. We find, as did Judge Mason, that the MB mark falls within the arbitrary category of marks and overrule Real Estate's objections to Judge Mason's finding that the "MB" mark is strong.

### 6. Actual Confusion

**\*7** Evidence of actual confusion is entitled to substantial weight in the likelihood of confusion analysis. *Id.* at 686.One instance of actual confusion has been found by the Seventh Circuit to be adequate to find in favor of the plaintiff on the actual confusion factor. *Id.* However, the Seventh Circuit has also found in some cases that a showing of only a few instances of actual confusion is de minimis and is insufficient to tilt the actual confusion factor in the favor the plaintiff. *Packman,* 267 F.3d at 645. Judge Mason found in favor of Real Estate on the actual confusion factor because Bank failed to provide evidence of actual confusion. In this case Bank introduced statements that it claims shows that consumers thought that Real Estate and Bank were affiliated. The statements relied upon by Bank to show actual confusion were take from persons such as a vice president of a bank, a real estate attorney, an owner of a title company, a Bank employee, and a treasurer for a company. Many of the witnesses are not end-user consumers and the focus of our inquiry must remain on the confusion of the consumers rather than delving into the issue of whether or not the middleman was confused as well. Bank introduced some testimony that Bank customers that had appointments with Bank mistakenly entered an "MB Realty," but we agree with Judge Mason that such evidence is insufficient to show actual confusion of potential consumers. Therefore, we overrule Bank's objections to Judge Mason's finding in favor of Real Estate on the actu-

al confusion factor. We also note that Bank claims that there is additional evidence of actual confusion that was stricken by Judge Mason and we find no error in his granting of Real Estate's motion to strike the additional evidence.

### 7. Intent to Confuse Consumers

Whether or not the defendant intended there to be confusion between the defendant's product or service and the plaintiff's product or service is an important factor under the consumer confusion analysis. *Id.* at 644.*See CAE, Inc.,* 267 F.3d at 684 (indicating that a court should consider whether the defendant intended to "palm off" his goods as the plaintiff's goods and stating that intent is irrelevant if there is undisputed evidence that the defendant acted in good faith). Judge Mason found that Bank failed to show an intent by Real Estate to create confusion between its mark and Bank's marks. We agree. Real Estate's historical development which involved the Milstein brothers offers an entirely plausible explanation as to why Real Estate chose to incorporate the letters "MB" into its name. We are not persuaded with Bank's argument that the fact that Real Estate began using the "MB" mark without conducting a trademark search shows an intent by Real Estate to create confusion among consumers. Therefore, we overrule Bank's objection to Judge Mason's ruling in favor of Real Estate on the intent to confuse factor.

### 8. Balancing of Consumer Confusion Factors

**\*8** After considering the above seven factors we find that the equities favor Real Estate's position that there is not a substantial likelihood that Real Estate's use of its mark will cause confusion among consumers. Therefore, we find that Real Estate has not shown a likelihood that it will succeed on the merits.

### II. Adequate Remedy at Law and Irreparable Harm

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 7
Not Reported in F.Supp.2d, 2003 WL 22765022 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22765022 (N.D.Ill.))**

In a trademark infringement case there is generally no adequate remedy at law and irreparable harm in the absence of an injunction is generally presumed because of the potential harm to the plaintiff's intangible goodwill. *Ty, Inc. v. The Jones Group,* 237 F.3d 891, 902-03 (7th Cir.2001); *Instrumentalist Co. v. Marine Corps League,* 509 F.Supp. 323, 333 (N.D.Ill.1981)(stating that there generally is no adequate remedy at law in a trademark case because it is difficult to prove the number of potential customers that did not purchase the goods or services of the plaintiff because of the infringer). Judge Mason found that Bank established that it had no adequate remedy at law, but found that the fact that Bank delayed in bringing the present action after learning of the alleged infringement undercut Bank's claim that it faces irreparable harm. *See Ohio Art Co. v. Lewis Galoob Toys, Inc. .,* 799 F.Supp. 870, 887 (N.D.Ill.1992)(finding that the presumption of irreparable harm is rebutted if plaintiff delays in seeking injunctive relief). Judge Mason thus found that Bank had not established irreparable harm. Judge Mason commented that Bank knew of Real Estate's use of the mark since 2001 and that Bank waited to seek a preliminary injunction after filing this action. Bank argues that it did not seek a preliminary injunction sooner because its was investigating the issue and was engaging in cease and desist settlement negotiations with Real Estate. Bank argues that once it discovered incidents of actual confusion it sought the preliminary injunction. A court can consider the fact there was a delay by the plaintiff in seeking relief when the court addresses the irreparable harm issue. *See Ty, Inc. v. The Jones Group,* 237 F.3d at 902(stating that a "[d]elay in pursuing a preliminary injunction may raise questions regarding the plaintiff's claim that he or she will face irreparable harm if a preliminary injunction is not entered.") Also, evidence of whether or not the defendant was lulled into a false sense of security by the delay and relied on the plaintiff's delay is pertinent to the issue of whether a delay indicates a lack of potential irreparable harm. *Id.* at 903.

In this case Bank's predecessor learned that Real Estate was using "MB" in its name back in 2001 when Real Estate was called MB Beitler. Bank admits that it learned of Real Estate's name change to its current form in January of 2002. However, Bank did not contact Real Estate regarding the "MB" mark until March of 2002. No cease and desist letters had been sent in the interim. Bank did not file the suit until August 20, 2002, and Bank did not file the motion for preliminary injunction until October 8, 2002. These delays are inconsistent with Bank's assertions that it faces irreparable harm. While the delays should not impede Bank's ability to pursue its claim, they do support a finding that Bank is not entitled to the extraordinary relief of a preliminary injunction. *See Barbeque Marx, Inc. v. 551 Ogden, Inc.,* 235 F.3d 1041, 1044 (7th Cir.2000)(stating that a "preliminary injunction is a very serious remedy, 'never to be indulged in except in a case clearly demanding it.' ').

### III. Balancing of Interests and Harms

**\*9** Judge Mason found that Bank faces limited harm if the motion for a preliminary injunction is not granted. He noted that Real Estate is much smaller and lesser known that Bank. He also noted that Real Estate does not engage is much advertising. On the other hand Judge Mason found that Real Estate's goodwill is tied up in its business and that it would face irreparable harm if it was not allowed to use its name. Judge Mason also found that although it is in the public's interest not to be confused, there is not a likelihood of confusion in this instance. We agree with Judge Mason's findings. We also find that it is in the public interest to allow businesses to operate when possible without the intervention of the courts and thus court's should ensure that there is an adequate basis before stepping in and affecting business operations by the use of a preliminary injunction prior to a trial on the merits. The public interests also favors encouraging free enterprise and that interest would not be served if Bank were allowed to impose its control over apparently dissimilar marks in a separate line of busi-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ness without a trial on the merits of Bank's claim.

## CONCLUSION

Based on the foregoing analysis, we rule in accord-
ance with Judge Mason's report and recommenda-
tion and we deny Bank's motion for a preliminary
injunction.

N.D.Ill.,2003.
MB Financial Bank, N.A. v. MB Real Estate Ser-
vices, L.L.C.
Not Reported in F.Supp.2d, 2003 WL 22765022
(N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# APPENDIX 8



Patterson v. World Wrestling Entertainment, Inc.
E.D.Wis.,2006.
Only the Westlaw citation is currently available.
United States District Court,E.D. Wisconsin.
Albert PATTERSON d/b/a World Wrestling Asso-
ciation, Superstars of Wrestling, Inc.; and d/b/a
W.W.A. Superstars, Plaintiff,
v.
WORLD WRESTLING ENTERTAINMENT,
INC.; and Good Humor Corporation, d/b/a Good
Humor Breyers Ice Cream, Defendants.
WORLD WRESTLING ENTERTAINMENT,
INC., Counterclaimant,
v.
Albert PATTERSON d/b/a World Wrestling Asso-
ciation, Superstars of Wrestling, Inc.; and d/b/a
W.W.A. Superstars, Counter-defendant.
**No. 03-C-0374.**

Jan. 31, 2006.

Charles D. Boutwell, Boutwell Law Office, North-
brook, IL, for Plaintiff.
Curtis B. Krasik, Jerry S. McDevitt, Julie R. Fen-
stermaker, Kirkpatrick & Lockhart Nicholson Gra-
ham LLP, Pittsburgh, PA, Shepard A. Davis, Bur-
ton & Davis, Milwaukee, WI, for Defendants.

DECISION AND ORDER

RANDA, Chief J.

*NATURE OF THE CASE*

**\*1** This is an unfair competition and trademark in-
fringement action between competitors in the
wrestling entertainment field. The plaintiff, Albert
Patterson d/b/a World Wrestling Association, Su-
perstars of Wrestling, Inc., and d/b/a W.W.A. Su-
perstars ("Patterson"), claims that the Defendants
World Wrestling Entertainment, Inc. ("WWE" or
"the Defendant wrestling business") and Good Hu-
mor Corporation, d/b/a Good Humor Breyers Ice
Cream ("Good Humor") (collectively "the Defend-

ants") are infringing upon his marks-World Wrest-
ling Association, WWA, Superstar Wrestling, Su-
perstars Wrestling, Superstars of Wrestling, Super-
stars of Pro Wrestling, WWA Superstar Wrestling,
WWA Superstars Wrestling, WWA Superstars of
Wrestling, and WWA Superstars of Pro Wrestling.
In a sense, this action is a re-match because of pre-
vious related trademark litigation in this district,
*United Wrestling Association, Inc., d.b.a. U.W.A.
Superstar Wrestling v. Titan Sports, Inc.,* Case No.
90-C-0991 (E.D.Wis.) ("the 1990 action"), that was
terminated by consent decree.

*Jurisdiction*

This Court has jurisdiction over the federal claims
in this action pursuant to 28 U.S.C. § 1331, 15
U.S.C. § 1121, and 28 U.S.C. § 1338(a). Supple-
mental jurisdiction over Patterson's state law claims
is afforded by 28 U.S.C. § 1367. Venue lies in this
district under 28 U.S.C. § 1391(b) & (c).

This decision addresses the motion for summary
judgment filed by the Defendants seeking dismissal
of all five claims [FN1] brought against them by Pat-
terson.[FN2]

> FN1. Count One is a unfair competition
> claim under 15 U.S.C. § 1125(a) and at
> common law. (Compl.¶ XI.) Count Two
> (Federal Unfair Competition) is a false
> designation of origin claim under 15
> U.S.C. § 1125(a). (Compl.¶ XXXI.) Count
> Three states that the Defendants' unfair
> competition, as described in Count One
> (Compl.¶¶ I-XXV), was a wilful violation
> of 15 U.S.C. § 1125(a). (Compl.¶ XXXV.)
> Count Four states that the Defendants mis-
> appropriated Patterson's unique methods of
> advertising claim. (Compl. ¶¶ XXXVII &
> XL.) Count Five is a Wisconsin statutory
> claim of trademark infringement under
> Wis. Stat. § 132.01*et seq.* (Compl.¶

XLVI.)

FN2. The Defendants state that because of discovery problems their summary judgment motion does not address their counterclaims. Although the Defendants state they intend to file such a motion, the deadline for filing such dispositive motions has passed.

Before delving into the motion, the Court addresses a recent documentary submission. On January 10, 2006, Patterson filed additional documents as part of his response to the Defendants' motion which, he states, became available to him after his response to the Defendants' motion was filed. Patterson's response to the summary judgment motion was filed on June 5, 2005. Over six months have since passed and the briefing of the motion has long since closed. Patterson's new documents will not be considered at this eleventh hour. The Court's analysis of the parties' voluminous summary judgment submissions was well into its final stages when it received Patterson's filing. The Court will not prolong the process by considering these new submissions and the Defendants rejoinder thereto.

*Standard for Summary Judgment*

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."Fed.R.Civ.P. 56(c); *see also, Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A party "opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial."*Doe v. Cunningham,* 30 F.3d 879, 883 (7th Cir.1994) (quoting *Anderson,* 477 U.S. at

248; also citing *Celotex Corp.,* 477 U.S. at 324;*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *United States v. Rode Corp.,* 996 F.2d 174, 178 (7th Cir.1993)).

**\*2** "Material facts" are those facts that under the applicable substantive law "might affect the outcome of the suit."*See Anderson,* 477 U.S. at 248. A dispute over "material facts" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."*Id.* The burden of showing the needlessness of a trial-(1) the absence of a genuine issue of material fact and (2) an entitlement to judgment as a matter of law-is upon the movant. In determining whether a genuine issue of material fact exists, the Court must consider the evidence in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co., Ltd.,* 475 U.S. at 587.

Failure to respond to a summary judgment motion does not automatically result in judgment against the non-moving party. *See Cunningham,* 30 F.3d at 883. "A party is never required to respond to a motion for summary judgment in order to prevail since the burden of establishing the nonexistence of a material factual dispute always rests with the movant."*Id.* (citations omitted).

*Relevant Facts*[FN3]

FN3. Unless accompanied by citation, the following facts are based on the Defendants' proposed findings of fact ("PFOF") and Patterson's statement of facts in opposition to the Defendants' motion for summary judgment, to the extent that both are undisputed. The Defendants did not file any response to Patterson's statement of facts in opposition to their summary judgment motion. Citations to all quoted material are provided even though such facts are undisputed.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Patterson responded to a number of the Defendants' proposed findings of fact stating that he "has no knowledge to admit or deny this fact."(*See* Pl.'s Resp. to Defs.' Proposed Findings of Fact in Supp. of Defs.' Mot. for Summ. J. ("Pl.'s Resp. to Defs.' PFOF") ¶¶ 61, 94.) Civil L.R. 56.2(b)(1) ( E.D.Wis.) requires:

[a] specific response to the movant's proposed findings of fact, clearly delineating only those findings to which it is asserted that a genuine issue of material fact exists. The response must refer to the contested finding by paragraph number and must include specific citations to evidentiary materials in the record which support the claim that a dispute exists.

Patterson's response to the Defendants' proposed findings of fact ¶¶ 61 and 94, is tantamount to an acknowledgment that the fact is undisputed.

Furthermore, Rule 56(e) of the Federal Rules of Civil Procedure provides that "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence and shall show affirmatively that the affiant is competent to testify to the matters stated therein."Statements outside the affiant's personal knowledge or statements that are the result of speculation or merely conclusory do not meet this requirement. *See Stagman v. Ryan,* 176 F.3d 986, 995 (7th Cir.1999)(citing *Box v. A & P Tea Co.,* 772 F.2d 1372, 1378 (7th Cir.1985)). Hearsay evidence is also inadmissible. *Friedel v. City of Madison,* 832 F.2d 965, 970 (7th Cir.1987). Where objected to by a party, the Court has excluded proposed findings of fact which do not meet the evidentiary standard of Rule 56(e). However, despite the De-

fendants' objection to Patterson's affidavit as self-serving, "a self-serving affidavit is an acceptable method for a non-moving party to present evidence of disputed facts" provided that the evidence meets the usual requirements for evidence presented on summary judgment-including the requirements that it be based on personal knowledge and set forth specific facts showing that there is a genuine issue of material fact for trial.*Payne v. Pauley,* 337 F.3d 767, 773 (7th Cir.2003).

These facts trace, to the extent not disputed, the history of Patterson's wrestling business and that of WWE. The facts are complicated and, at times, confusing because both wrestling businesses have been known by multiple names and have used multiple marks. The factual recitation is further complicated by a confidential agreement regarding the use of "WWF" as a trademark between the Defendant wrestling business and the WWF-World Wide Fund for Nature ("the Fund"). The Defendant wrestling business was found to have breached that agreement by the English Court of Appeals in *WWF-World Wide Fund for Nature (formerly World Wildlife Fund) and World Wildlife Fund Inc. v. World Wrestling Federation Entertainment Inc.,* [2004] EWCA Civ 1 196 (Eng.) ("English Court of Appeals' decision"), prompting certain changes by the Defendant wrestling business.

*Patterson and His Business Entities*

In 1969, Patterson became involved in the wrestling entertainment business with Justi Fontaine ("Fontaine") in Milwaukee, Wisconsin ("Milwaukee"). In 1974, Fontaine died and Patterson took over the business. Patterson was the sole owner of the local wrestling promotion entity called United Wrestling Association, Inc., ("United Wrestling"), during the 1970's and early 1980's. United Wrestling promoted periodic wrestling shows at small venues in Milwaukee and surround-

Not Reported in F.Supp.2d                                                    Page 4
Not Reported in F.Supp.2d, 2006 WL 273527 (E.D.Wis.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 273527 (E.D.Wis.))**

ing towns under the names "United Wrestling Association," "U.W.A.," "Super Star Wrestling," and "Superstars of Wrestling."

Patterson also performed as a wrestler and first won the WWA ("World Wrestling Association") belt in December 1977. Patterson's first promotional use of the "WWA" and "World Wrestling Association" marks was in 1978.[FN4]Specifically, Patterson first used those marks for purposes of promoting entertainment in the form a wrestling match on March 5, 1978, at the "Palace" [FN5] in Milwaukee. Approximately 500 people attended that event.

> FN4. For purposes of this litigation, Patterson does not claim promotional use of the marks "World Wrestling Association" or "WWA" until 1978.

> FN5. The parties have not provided any descriptive information about the "Palace." However, Exhibit 46 of the Plaintiff's Exhibits in Opposition to the Defendants' Motion for Summary Judgment, consisting of United Wrestling Association posters and advertisements of events Patterson produced from 1978 through 1989, includes a March 5, poster listing the Palace, 355 South 27th Street in Milwaukee as a venue. The year "1978" is handwritten on the poster.

**\*3** Eventually, United Wrestling declared bankruptcy and ceased all operations in about 1984. Patterson used a variety of other business entities in his wrestling entertainment business. King Kong Enterprises Inc. was incorporated on June 24, 1988. (Pl.'s Exs. in Opp'n to Defs.' Mot. for Summ. J. ("Pl.'s Exs."), Vol. V, Ex. 49.) On July 19, 1989, King Kong Enterprises Inc. filed with the Wisconsin Secretary of State, a statement of adoption of the trade name "World Wrestling Association" "in any form, size, color, or style of lettering; as it pertains to the promotion of wrestling matches, ticket sales, goods and services" and a statement of adoption of the trade name "WWA Super Stars of Pro

Wrestling" in any form, size, color, or size of lettering; as it pertains to promoting wrestling matches and promoting ticket sales." (*Id.*)

Beginning in 1989, at wrestling event promoted by Patterson caps were sold bearing the mark "World Wrestling Assoc.0' W.W.A. Superstars'0." After 1989 and up to the present, T-shirts sold at similar events bore the mark "World Wrestling Association Superstars of Wrestling."Generally, these caps and T-shirts were sold at live events organized by Patterson's business entities.

The early rumblings of a conflict could be heard even back then. In August 1989, Patterson's attorney sent letters to Vincent McMahon ("V.McMahon") [FN6] and Gold Bond Ice Cream, Inc., (a predecessor-in-interest to Good Humor) demanding that they stop using the trademarks, "Superstars of Wrestling," "Superstars of Pro Wrestling," and "Superstar Wrestling." These letters, dated August 2, and August 11, 1989, do not claim any rights to "World Wrestling Association" and "WWA" or demand that V. McMahon or Gold Bond Ice Cream stop using "World Wrestling Federation" and "WWF," although Patterson knew that the Defendant wrestling business as doing business under those marks at that time.

> FN6. V. McMahon is the chairman of the Defendant wrestling business. The business was founded by his father in 1963. At its founding, the entity was known as World Wide Wresting Federation ("WWWF"). At some point, Capital Wrestling Corporation ("Capital Wrestling") operated WWWF. Another business entity, Titan Sports, Inc., ("Titan") also operated WWWF and its successors.

In a letter dated December 27, 1989, to V. McMahon, Patterson offered to sell to Titan, an entity which operated WWWF and its successors, his tradenames identified as "1. Super Star Wrestling" and "2. Super Stars of Wrestling." (Defs.' App. in Supp. of Mot. for Summ. J. ("Defs.' App."), Ex. 3

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                              Page 5
Not Reported in F.Supp.2d, 2006 WL 273527 (E.D.Wis.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 273527 (E.D.Wis.))**

(Patterson Dep. Nov. 22-23, 2004) 282, Ex. 26.)

On June 6, 1991, United Wrestling was merged into World Wrestling Assoc. (W.W.A.) Inc. (Pl.'s Exs., Ex. 50.) After the merger, the WWA mark was used in a 1991 press conference, by announcer Harold A. Naboisek ("Naboisek") (using the business name David Starr) who introduced the wrestler Gargantua,[FN7] as a new "WWA" wrestler. "WWA" was also used in the 1992 African World Festival [FN8] live wrestling event.

> FN7. The Court suspects his tag-team was Pentagruel!

> FN8. The African World Festival, held on Milwaukee summer festival grounds, is referred to by several names in the parties' proposed findings of fact. To avoid confusion, the Court refers to the festival as the "African World Festival."

From 1993 to the present, Patterson's business entities continued to use, and to be known by, names other than the World Wrestling Association or the WWA. Between 1992 and 1993, Patterson aired UWA wrestling matches from the 1980's, on certain local access cable channels in Wisconsin, under the program title "Superstars of Wrestling." A June 12, 1996, letter from the African World Festival identifies Patterson's company as "Superstars of Wrestling."

**\*4** Patterson has not made a profit from his wrestling business endeavors since 1979. The federal tax return filed for WWA/Superstar Wrestling, Inc., in 1993, reported a net loss of approximately $29,500. Personally, Patterson has not filed a personal income tax return for over 20 years.

Patterson purchased all of the assets of United Wrestling on December 7, 1992, for $9.500. Verified records from the Wisconsin Department of Financial Institutions demonstrate that WWA/Superstar Wrestling, Inc., Patterson's wholly-owned corporation, which he claimed owned the marks,

was administratively dissolved on November 4, 1994.

Patterson's September 3, 2004, Supplemental Responses to Interrogatory No. 5 of the Defendants' First Set of Interrogatories contains a list of 40 wrestling shows from 1978 to 2003 that were promoted as "World Wrestling Association" and "WWA" shows. The list was compiled from Patterson's memory. On March 8, 2005, Patterson served a Supplemental Response to the Defendants' First Set of Interrogatories that added a June 19, 2001, show, to Patterson's "Schedule of Use of WWA Wrestling, Inc."

During his November 22, 2004, deposition, Patterson was questioned with the promotional materials for pre-1993 shows listed on his "Schedule of Use of WWA Wrestling, Inc.," that do not in any way reference "World Wrestling Association" or "WWA." Initially, Patterson maintained that they were "World Wrestling Association" and "WWA" shows based on other unidentified evidence. However, eventually Patterson conceded that he did not promote any wrestling shows using "World Wrestling Association" or "WWA" until years later than his alleged 1978 first use.

During his November 23, 2004, deposition, Patterson stated that he did not offer to sell the marks "World Wrestling Association" and "WWA" to V. McMahon because "I did not think I had exclusive rights to World Wrestling Association at that time."(Defs.' App., Ex. 3, 287.) Also, during Patterson's November 22, 2004, deposition, he stated that, at the conclusion of the 1990 Action, he understood that he required "a consent statement" and "a release" from World Wrestling Federation or WWF to use "World Wrestling Association" as the name of his business.

### WWE

WWE, a publicly traded corporation on the New York Stock Exchange, is an integrated media and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                     Page 6
Not Reported in F.Supp.2d, 2006 WL 273527 (E.D.Wis.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 273527 (E.D.Wis.))**

entertainment company principally engaged in the development, promotion and marketing of television programming, pay-per-view programming, and live arena events, and the licensing and sale of branded consumer products featuring its "World Wrestling Entertainment" brand of entertainment. WWE has developed into an international media conglomerate that is a leading provider of family entertainment.

Currently, WWE produces and distributes seven weekly television programs that reach over ten million households each week. WWE is the largest provider of pay-per-view revenue in the world with 5.6 million purchases of WWE's 12 pay-per-view events in 2004. WWE's Wrestlemania XX pay-per-view event in March 2004 grossed the highest pay-per-view revenue ever recorded. WWE promotes over 300 live events annually, which are attended by over 1.64 million people. WWE's nationally circulated magazines sold over 4.3 million copies in 2004.

**\*5** The mark "WWE" is a highly popular licensed property. "WWE"-branded video games sold over four million units [FN9] in 2004 and "WWE"-branded books have sold over five million gross units to date with 13 titles appearing on the *New York Times* Best Seller List, including three number one best seller books and one best seller at number two. "WWE" home videotapes sold over 1.8 million units in 2003 and released 27 new titles. Other "WWE"-branded merchandise is sold through national retailers such as Wal-Mart, Target and Toys R Us, as well as directly through "WWE's" website, catalog and at live events. WWE's website, www.wwe.com, receives 6.8 million visits per month with more than eight million video streams downloaded monthly.

> FN9. "Unit" is not defined in the Defendants' proposed findings of fact. A definition of "unit" is "single thing." *See http://dictionary.oed.com* (type "item" in "find word" box and click enter.)

*Good Humor*

Good Humor is WWE's licensee.[FN10]

> FN10. Patterson admits there is an agreement between Good Humor and WWE. (Pl.'s Resp. to Defs.' PFOF ¶ 76.) However, Patterson denies that WWE owns the marks it purports to license and therefore asserts that Good Humor cannot be a licensee. (*Id.*) Patterson maintains that WWE was merely a licensee of "WWF" from the Fund which owned that mark and all of its progeny. (*Id.*) Patterson's arguments with respect to the contractual agreement between the Fund and WWE are questions of law for the Court. However, the proper legal characterization of that agreement is not germane to the issues raised by the Defendants' motion for summary judgment and therefore will not be analyzed in this decision.

*Prior Litigation Between Patterson & Titan*

The 1990 action, Patterson's first trademark infringement lawsuit against Titan, WWE's predecessor-in-interest, was resolved by a November 25, 1992, settlement entered as a written Consent Order ("the Consent Order") by United States District Judge Thomas J. Curran on January 22, 1993. The Consent Order precludes WWE from using the names "Superstars of Wrestling," [FN11] "Superstar Wrestling," and "Superstars of Pro Wrestling" in conjunction with wrestling activities. The Consent Order expressly states: "This judgment does not preclude any party from using the term 'Superstars .' " (Defs.' App., Ex. 8 (Consent Order) 2.) The action was dismissed with prejudice. (*Id.*)

> FN11. An amended judgment in the 1990 action entered on December 7, 1993, changed the term from "Superstar of Wrestling" to "Superstars of Wrestling."

Shortly after entry of the Consent Order, Patterson

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 273527 (E.D.Wis.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 273527 (E.D.Wis.))**

Page 7

brought an order to show cause why Titan should not be held in civil contempt for allegedly violating the injunction.[FN12]He claimed, among other things, that the Defendant wrestling business's use of "WWF's Superstars" violated the Consent Order. During the November 17, 1993, hearing on the motion, Patterson told the court that he had been operating under "WWA Superstars since 1989." (Defs.' App., Ex. 23 (Nov. 17, 1993, Order to Show Cause Hearing in the 1990 action, Tr. 9).) Judge Curran stated "there's no evidence of that." (*Id.*) In denying the contempt motion, Judge Curran stated:

> FN12. Paragraph 79 of the Defendants' proposed findings of fact, which is not disputed, incorrectly refers to the motion as a motion for sanctions. This characterization is contrary to the transcript of the proceedings and the docket of the 1990 action.

As to the issue of whether the defendant's use of a confusingly similar mark has been a violation, the court would have been sympathetic toward this position would it not have been for the fact that the Secretary of State's office shows that the plaintiff after this injunction was entered sought to change the name of King Kong Enterprises to Superstars of Wrestling, WWA Superstars, Inc.

Certainly in the court's mind that is confusing and is likely to confuse the public ....just by reading this, "WWA Superstars Inc." is so close to "WWF Superstars" that I can't conceive of any reason for that change other than to piggyback the benefits that might flow from the identity of WWF which changed its name previously pursuant to the injunctive relief sought and received in this court.

**\*6** (Defs.' App., Ex. 23, Tr. 37-38 (emphasis added).)

As of her January 16, 1992, deposition, L. McMahon [FN13] did not claim ownership of any entity named "Worldwide Wrestling." From 1980 to 1982, Titan used the trade name or logo "Worldwide Wrestling Federation." [FN14] but she

did claim ownership of "World Wrestling Federation." In her sworn declaration to the United States Patent and Trademark Office ("PTO"), filed on June 3, 1983, in connection with Serial No: 73/428666, L. McMahon declared that the first use of the service mark, "World Wrestling Federation," was in February of 1983. Although Patterson claims that he began using the marks "World Wrestling Association" and "WWA" in 1978, he did not allege in the 1990 action that "World Wrestling Federation" or "WWF" infringed his "World Wrestling Association" or "WWA" marks.

> FN13. L. McMahon is V. McMahon's wife. The deposition of L. McMahon was taken in the 1990 action. She testified at that deposition she was Titan's Executive Vice President and a member of its board of directors. (Pl.'s Exs., Vol. 1, Ex. 4 (L. McMahon Dep. Jan. 16, 1992) 10.)

> FN14. From 1980 to 1982, Titan used the trade name or logo "Worldwide Wrestling Federation."

*WWE's Predecessors*

The World Wide Wrestling Federation ("WWWF") was the name of the wrestling organization founded by V. McMahon's father in 1963. V. McMahon and L. McMahon believed that these names were cumbersome-that there were too many words in the original name and were difficult to repeat. Therefore, the organization's name was changed to "World Wrestling Federation" or "WWF," [FN15]

> FN15. There is a factual dispute regarding the year that Titan began to use the names "World Wrestling Federation" and "WWF." (*Compare,* Defs.' PFOF ¶ 33 with Pl's Resp. to Defs.' PFOF ¶ 33.) There is also a factual dispute regarding the exact year that Titan began using the "stacked" "WWF" logo and the exact year that it began using the "scratch logo." Examples of the "stacked" and "scratch" logos are in

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 8
Not Reported in F.Supp.2d, 2006 WL 273527 (E.D.Wis.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 273527 (E.D.Wis.))**

the factual materials submitted in support of the Defendants' proposed findings of fact and are appended to this decision.

Titan bought a company called Capitol Wrestling in June of 1982. From 1980 to 1982, Titan's principal activity from 1980 through 1982 was as a promotion company. Titan used the talent of Capitol Wrestling which operated under the name of "WWWF."

In 1984 or 1985, Patterson watched "WWF Superstars of Wrestling" *WrestleMania I* in which the "World Wrestling Federation" and "WWF" marks were featured prominently. (Defs.' App. Ex. 3, 225:19-226:15, Ex. 12 (WrestleMania I-X8).) [FN16] On January 1, 1996, Patterson sent the Defendant wrestling business a complaint alleging trademark infringement that was virtually identical to the complaint in this action. Patterson did not file that particular complaint in any court.

> FN16.*WrestleMania I* took place at Madison Square Garden in New York City, New York, on March 31, 1985. (Defs.' App., Ex. 12.) However, the identifying sticker on *WrestleMania I* videotape jacket and the videotape cassette bear a 1998 Titan copyright mark. (*Id.*) The introductory portion of the videotape contains promotional material for *WrestleMania* events I through XIII. (*Id.*)*WrestleMania XIII* took place on March 23, 1997. (*Id.*) The " 'WWF' scratch logo" appears on the videotape.(*Id* .)

On January 12, 1988, WWF-the former WWW-Fchanged its name to Titan.[FN17]More changes were coming. On July 29, 1999, Titan changed its name to "World Wrestling Federation Entertainment, Inc." And finally, fFollowing the English Court of Appeals' decision, "World Wrestling Federation Entertainment, Inc." changed its name to "World Wrestling Entertainment, Inc." on June 12, 2002.

> FN17. This fact seemingly conflicts with the undisputed fact that Titan was a promotion company from 1980 to 1982. Specifically, Titan operated a business, but that entity was not named "Titan" until at least six years later. However, the conflict is not material and both facts are undisputed.

*Fund*

The Fund began using the mark "WWF" in 1961. The mark "WWF" has been owned by the Fund under Serial Number 72223194 and Registration Number 81716 since at least 1965, when it was registered. The Fund filed for registration of "WWF" on May 8, 1981, and the mark was registered under number 733090997.[FN18]The mark under registration number 1305671 is owned by the Fund with respect to "IC 028, U.S. 022; IC 025 U.S. 039; IC 024 U.S. 042; IC 020 U.S. 050; IC 018 U.S. 003; IC 016 U.S. 022 037 038; IC 014 U.S. 027, 28; IC 009 U.S. 036; and IC 008 U.S. 023."(Pl.'s Statement of Facts in Opp'n to Defs.' Mot. to Summ. J. ("Pl.'s Statement of Facts") ¶ 4.)

> FN18. This fact seemingly conflicts with the preceding fact. However, the preceding fact is based on paragraph 2 of Patterson's statement of facts in opposition to Defendants' motion for summary judgment and the instant fact is based on paragraph 3 of such facts.

**\*7** On January 20, 1994, the Fund and Titan entered into an agreement pursuant to which Titan received limited permission to use the mark "WWF." The agreement provided that neither party would disclose the terms or existence of the agreement. (Pl.'s Exs., Vol. I, Ex. 1 at 12 (Art. 7).) [FN19] The January 20, 1994, agreement was preceded by a September 12, 1989, letter agreement between Titan and the Fund's predecessor, World Wildlife Fund. (Pl.'s Exs., Vol. I, Ex. 1, Art. 5 & Annex 3.) In that letter, Titan agreed not to use the mark "WWF" in "Times Roman" typeface if the World Wildlife Fund, in re-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                        Page 9
Not Reported in F.Supp.2d, 2006 WL 273527 (E.D.Wis.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 273527 (E.D.Wis.))**

turn, would not oppose Titan's federal trademark re-
gistration of "WWF" in "Class 41, Serial No.
770,628." (*Id.*)

> FN19. Paragraph 18 of Patterson's statement
> of facts in opposition to the defend-
> ants' motion for summary judgment refers
> to the agreement as a "licensing agree-
> ment." However, the document is titled
> "Agreement." (Pl.'s Exs., Ex. 1, 1.) The
> Defendants did not respond to Patterson's
> statement of facts, but at page two of their
> summary judgment reply brief, they state
> that the agreement is not a license agree-
> ment. An unsworn statement in a brief
> does not meet the requirements of
> Fed.R.Civ.P. 56(e) and, therefore, does not
> create a genuine issue of material fact.

> However, the Court is not bound by Pat-
> terson's conclusory characterization of
> the agreement as a licensing agreement.
> Discerning the nature of the contract
> between the Defendant wrestling busi-
> ness and the Fund is a question of law
> for the Court.

*Trademark Proceedings in the United States-
"WWF" Superstars*

Titan (d/b/a The "World Wrestling Federation"
Corporation) filed an application with the PTO for
registration of the mark "WWF Superstars" on May
26, 1992, claiming a date of first use of April 18,
1992. The mark "WWF Superstars" filed May 26,
1992, did not have a disclaimer; [FN17] Titan's ap-
plication did not disclose its written agreement re-
garding the "WWF" mark with the Fund.

> FN17.Section 1056(a) of Title 15 of the
> United States Code provides: "The Direct-
> or may require the applicant to disclaim an
> unregistrable component of a mark other-
> wise registrable. An applicant may volun-
> tarily disclaim a component of a mark
> sought to be registered."15 U.S.C. §

1056(a)(2000).

In 1995, Superstars of Wrestling (WWA Super-
stars) Inc., a Wisconsin corporation, and Patterson
instituted cancellation proceedings before the PTO
Trademark and Trial Appeals Board ("TTAB")
with respect to the "WWF Superstars" mark. (Defs.'
App., Ex. 31, 1.) Titan filed a motion for sanctions.

In its decision on the petition to cancel and motion
for sanctions, mailed on August 12, 1999, the
TTAB amended the case caption, identifying only
one corporate "plaintiff," Superstars of Wrestling
(WWA Superstars) Inc. (*Id.* 1-2.)Because the Su-
perstars of Wrestling (WWA Superstars) Inc. failed
to respond to Titan's motion for sanctions, the
TTAB granted the motion for sanctions by denying
the petition to cancel as a sanction. (*Id.* 6.) The
TTAB also dismissed the petition to cancel on the
alternative basis that, as a matter of law, Superstars
of Wrestling (WWA Superstars) Inc. was not en-
titled to relief because there was "no likelihood of
confusion among consumers because of the con-
temporaneous use and registration of the parties' re-
spective marks."(*Id.* 9.)

In its discussion of the petition to cancel, the TTAB
stated that Superstars of Wrestling (WWA Super-
stars) Inc. could suffer no real damages from Ti-
tan's registration of the mark "WWF Superstars."
(*Id.*) The TTAB noted that Judge Curran had found
each party to the 1990 action was entitled to use
"Superstars." (*Id.*) The TTAB stated that Titan's
coupling of the acronym "WWF" with
"Superstars," and registration of the resultant com-
posite with its disclaimer of "Superstars" could not
be the source of damage to Superstars of Wrestling
(WWA Superstars) Inc. (*Id.*)The TTAB made such
determination citing the corporate plaintiff's
pleaded marks-"Superstars of Wrestling" with a
star design framed by the letters "S" and "W,"
"Superstars of Wrestling," "Superstar Wrestling,"
and "Superstars of Pro Wrestling." (*Id.*)

**\*8** Titan's PTO application for "WWF Superstars"
under IC 41 with respect to entertainment services,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 10
Not Reported in F.Supp.2d, 2006 WL 273527 (E.D.Wis.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 273527 (E.D.Wis.))**

namely television wrestling programs featuring wrestling exhibitions and live performances by professional wrestlers/entertainers [FN18] under registration number 1819240, was ultimately cancelled by Lynne G. Beresford, Deputy Commissioner for Trademark Examination Policy.[FN19](Pl.'s Exs., Vol. I, Ex. 12.) [FN20]This cancellation followed Titan's surrender of registration number 1819240 for cancellation and the Deputy Commissioner's finding that (1) the petitioner (Titan) [FN21] was the owner of the registration and had complied with the requirements of Section 7(e) of the Trademark Act of 1946; and (2) that the Examiner of Trademarks had recommended the cancellation of the registration.(*Id.*)

> FN18. Titan's application originally sought registration of "WWF Superstars" for "entertainment services, namely television programs featuring wrestling exhibitions and other related entertainment and the live performances by professional wrestlers/entertainers."(Pl.'s Exs., Vol. I, Ex. 11 at 74/278657 (emphasis added).)

> FN19. Section 7(e) of the Trademark Act of 1946, 15 U.S.C. § 1057(e) states:

> Upon application of the registrant the Director may permit any registration to be surrendered for cancellation, and upon cancellation appropriate entry shall be made in the records of the Patent and Trademark Office. Upon application of the registrant and payment of the prescribed fee, the Director for good cause may permit any registration to be amended or to be disclaimed in part: *Provided,* That the amendment or disclaimer does not alter materially the character of the mark. Appropriate entry shall be made in the records of the Patent and Trademark Office and upon the certificate of registration or, if said certificate is lost or destroyed, upon a certified copy thereof.

15 U.S.C. § 1057(e) (2000).

> FN20. Patterson has presented proposed findings of fact with respect to the cancellation of the "WWF Superstars" trademark. (Patterson's Statement of Facts ¶¶ 19 & 19.) (Two consecutive factual statements in Patterson's Statement of Facts are numbered "19.") However, the parties disagree on the reason for the cancellation. The Court's statement is based on the Deputy Commissioner's determination. (Pl.'s Exs., Vol. I, Ex.12.)

> FN21. In Patterson's Statement of Facts, he maintains that the trademark was cancelled upon his petition. (Patterson's Statement of Facts ¶ 19(2nd).) However, Patterson is not referenced in the Deputy Commissioner's December 31, 2002, cancellation letter. (Pl.'s Exs., Vol. I, Ex. 12.) He was also not the owner of Trademark Registration No. 1819240. Furthermore, the Superstars of Wrestling (WWA Superstars) Inc.'s cancellation petition was dismissed on August 12, 1999. (Pl.'s Exs., Ex. 12 (http://tarr.uspto.gov/servlet/tarr?regser=serial & entry=74278657).)

*Impact of Trademark Proceedings in England*

The Court of Appeals' decision in *WWF-World Wide Fund for Nature (formerly World Wildlife Fund),* [2004] EWCA Civ 1 196, (Eng .), led to changes by the Defendant wrestling business. In May 2002, WWF changed its brand name to "World Wrestling Entertainment" and "WWE." FN22Those names currently are the Defendant wrestling business's principal brand identifiers for all aspects of its business. On November 7, 2002, the Defendant wrestling business also voluntarily withdrew its application with the PTO for the " 'WWF' scratch logo."

> FN22. WWE has never used the marks "World Wrestling Association" or

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

"WWA."

In WWE's Annual Report for the fiscal year ending on April 30, 2002, pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 ("Form 10-K Report") filed with the United States Securities and Exchange Commission ("SEC"), WWE states:

World Wrestling Entertainment, Inc., formerly known as World Wrestling Federation Entertainment, Inc., was incorporated in Delaware in 1987, and in 1988 we merged with our predecessor company, which had existed since 1980. In October 1999, we sold 11,500,000 shares of Class A common stock to the public at an initial offering price of $17.00.

(Pl.'s Exs., Vol. II, Ex. 14 (Certified copy of PTO document relating to Trademark Application 78/119,535),[FN23] Form 10-K Report, Pt. I, Item 1, 1.) In the Form 10-K Report, World Wrestling Entertainment described the litigation in England, stating:

> FN23. This statement is based on paragraph 20 of Patterson's statement of facts. Patterson incorrectly attributes the quoted material to the 2002 annual report of World Wrestling Entertainment, Inc.

In April 2000, the WWF-World Wide Fund for Nature (the "Fund") instituted legal proceedings against us in the English High Court seeking injunctive relief and unspecified damages for alleged breaches of an agreement between the Fund and us. The Fund alleges that our use of the initials "WWF" in various contexts including ... (ii) our "scratch" logo violate the terms of the agreement between the Fund and us. In January 2001, the Fund filed for summary judgment on its claims. On August 10, 2001 the trial judge granted the Fund's motion for summary judgment, holding that we breached the parties' 1994 agreement by using the 'wwf' website addresses and scratch logo and that a trial is not warranted on these issues. On October 1,

2001, the judge issued a form of written injunction barring most uses of the initials "WWF", including in connection with the 'wwf' website addresses and the use of the scratch logo, by us and our licensees. On February 27, 2002, the Court of Appeal affirmed the trial judge's decision and dismissed our appeal; and on June 10, 2002, the House of Lords declined to hear our appeal. We have five months from the date of the House of Lords' decision to comply with the injunction. We intend to comply with the injunction and to seek modification of the injunction where it is impractical or impossible to comply. Prior to the House of Lords' decision, we took steps to change our name to "World Wrestling Entertainment, Inc." and to revise our logo and switch our initials to "WWE". These changes have been incorporated into our television and pay-per-view shows, promotional materials used by us and our various distributors, affiliates and licensees, advertising campaigns as well as our corporate stationary and facilities and statutory filings with state and federal agencies. However, certain other aspects of the injunction as issued may be impracticable or difficult to comply with, and unless modified or clarified, may adversly affect the use or repackaging of our historical video library containing our former logo and verbal references to "WWF" and our licensing program that uses our former logo on a variety of retail products, including toys and video games. The Fund also has pending before the trial court a damages claim associated with our use of the initials "WWF."
**\*9** (Pl.'s Exs., Vol. II, Ex. 14, Form 10-K Report, Pt. I, Item 3, 10.) [FN24]

> FN24. This statement is based on paragraph 20 of Patterson's statement of facts. Patterson incorrectly attributes the quoted material to WWE's 2002 annual report.

*WWE and its Recent Activities*

WWE's experience is that wrestling fans are highly knowledgeable and loyal with respect to professional wrestling programming and merchandise. WWE merchandise is designed to promote the de-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

velopment of WWE characters and storylines.

The announcement of World Wrestling Federation's or WWF's name change in a May 6, 2002, press release, was accompanied by an extensive marketing or "rebranding" campaign to educate consumers that the goods and services they expected would continue to be provided under "World Wrestling Entertainment" and "WWE." The rebranding campaign unveiled a new "scratch logo" (comprised of the letters "WW") as WWE's principal brand identifier, which is stylistically the same as its old "scratch logo" (comprised of the letters "WWF"), except for the removal of the letter "F." The rebranding campaign emphasized the continuation of the desirable qualities of the "WWF" brand, specifically its image of "attitude ."

As WWF's May 6, 2002, press release explained, while "World Wrestling Entertainment" and "WWE" were intended to emphasize certain diversification of entertainment properties, WWE's business activities, including in particular its core sports entertainment television programming and live events, remained unaltered and the principal focus of the company.

Based on the modification of the "scratch logo," and the emphasis on the brand's continuing "attitude," the rebranding campaign adopted the slogan "Get the 'F' Out," which was the centerpiece of a multi-million dollar advertising initiative through television, print, radio and Internet media. "WWE's" television programming, live events and merchandise are promoted with state-of-the-art graphics, designs, and visual presentation. "Substantially all" of WWE's goods and services are uniformly branded with WWE's scratch logo. (Defs.' PFOF ¶ 90.) The "scratch logo" appears in the bottom right corner of all WWE television programming and home video products. For merchandise, the "scratch logo" is depicted either as a part of the design on the merchandise itself or on the "hangtag." [FN25](Defs.' App., Ex.1 (L. McMahon Aff.), ¶ 25, Ex. C.) The words "World Wrestling Entertainment" also appear with the "WW"

"scratch logo" on some products postdating May 2002. (Defs.' App., Ex. 16 (Dec.2002 & Oct. 2003 Covers of *Raw Magazine* ); Ex. 17 (Videotape jacket and cassettes of *WrestleMania XIX* and *WrestleMania XX* ).)

> FN25. A "hangtag" is "a tag attached to a piece of merchandise giving information about its composition and proper care and use."*See* http:// www.yourdictionary.com (type "hangtag" in "search" box and click "go").

Since May 2002, when WWF adopted the marks "World Wrestling Entertainment" and "WWE," it has promoted seven live events in Milwaukee at the Bradley Center (in addition to prominently offering goods and services in Milwaukee through its weekly programing, monthly pay-per-view events, and sale of branded merchandise).

*Patterson's Recent Activities*

Since May 2002, Patterson held two shows at the United Community Center, 1028 South 9th Street in Milwaukee. Patterson has produced evidence in this litigation of eight wrestling shows [FN26] that used the marks "World Wrestling Association" and "WWA": (1) a wrestling performance at African World Festival in Milwaukee from August 6 through August 7, 1993, with a banner emblazoned with "WWA Superstars of Wrestling" and Patterson wearing a "WWA" T-shirt; (2) footage from "WWA" Wrestle Mayhem II on May 7, 1993, that "evidences certain use of 'WWA." ' (3) footage from "WWA" Detroit Raw on August 8, 1993, that "evidences certain use of 'WWA' '-Patterson claims such footage was later replayed on a satellite pay-per-view channel; (4) footage of a live wrestling performance on February 12, 1993, at the Waukesha Expo Center, in Waukesha County, Wisconsin with "a single use of 'World Wrestling Association." ' [FN27] The show was taped for rebroadcast. Patterson claims such footage was later replayed on a local access cable channel; (5) footage

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 13
Not Reported in F.Supp.2d, 2006 WL 273527 (E.D.Wis.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 273527 (E.D.Wis.))**

of a wrestling performance at the MECCA [FN28] on April 8, 1993, with the name "WWA Superstars of Wrestling" on a banner; (6) undated footage from another wrestling performance that shows a banner with the name "World Wrestling Association WWA Superstar;" (7) a wrestling performance at the United Community Center in Milwaukee on June 23, 2002, that "advertises certain uses of World Wrestling Association and WWA"; and (8) a wrestling performance at the United Community Center on June 7, 2003, that "advertise[d] certain uses of World Wrestling Association and WWA." (Defs.' PFOF ¶ 66.) Among the foregoing eight uses, Patterson inconsistently used different names relating to "WWA Superstars of Wrestling," "World Wrestling Association WWA Superstars" and "World Wrestling Association Superstars of Wrestling."

FN26. The parties disagree regarding the number of shows which, in any way, used the marks "World Wrestling Association" or "WWA." The Defendants assert that Patterson has produced evidence of only eight shows.

FN27. Patterson estimates that 300-400 people attended the event. (Defs.' App., Ex. 3 at 312.)

FN28. The MECCA Arena ("Arena") (currently known as the U.S. Cellular Arena, also formerly known as The Milwaukee Arena and Wisconsin Center Arena), an indoor arena located in Milwaukee, was completed in 1950. The Arena sat 12,200 for basketball and was the home of the NBA Milwaukee Bucks from 1968 through 1988. It also hosted the men's basketball team of Marquette University and the International Hockey League Milwaukee Admirals. All three teams moved to the Bradley Center in 1988. Since 1998, when the Arena underwent a major renovation, it has been home to the Milwaukee Wave of the Major Indoor Soccer League and University of Wisconsin-Milwaukee

Panthers' men's college basketball. *See* http:// wikipedia.org (in search box, type "U.S. Cellular Arena," click "go").

**\*10** A May 19, 1992, press release states that "Albert Patterson, President of the World Wrestling Association, announced today that Superstars of Wrestling will return to the airwaves on Saturday, June 6, 1992, at 8:30 a.m. (Pl.'s Exs., Vol. V, Ex. 53.) [FN29]In August 1992, Patterson presented a "WWA" wrestling event at the African World Festival. (Defs.' App., Ex. 3 at 349-54.) Patterson presented "WWA" wrestling shows at the African World Festival, an annual event, in August 1993, 1994, 1995, 1996, 1997, and 1998, with an estimated annual attendance of 1,500 persons based on the seating capacity of the venue. (Defs.' App., Ex. 3 at 349-54.) [FN30]Patterson advertised a *WrestleMayhem II* show at the MECCA for May 1, 1993, using "World Wrestling Association" and "WWA Superstars of Wrestling." (Pl.'s Exs. Vol. V, Ex. 57.) At the "Jublilee Festival 93'," in Detroit, Michigan, Patterson also presented the "WWA Superstars of Wrestling" show on August 7 and August 8, 1993. (Pl.'s Exs., Vol. V, Ex. 60.) The event was taped for cable and aired on Labor Day. (*Id.*)

FN29. This fact is based on Patterson's Statement of Facts ¶ 97. However, that statement references a series of press releases, but the cited exhibit contains only one press release dated May 19, 1992.

FN30. This statement is based on Patterson's Statement of Facts ¶ 93.

Patterson also presented a show at the Eagles Club, 2401 Wisconsin Avenue, Milwaukee, Wisconsin on September 17, 1995, featuring the marks "World Wrestling Association" and "WWA Super Stars." (Pl.'s Exs., Vol. V, Ex. 63.) At the same venue on December 3, 1995, Patterson presented a show using the marks "World Wrestling Assoc." and "WWA Super Star Wrestling." (Pl.'s Exs., Vol. V, Ex. 64.) At the Rave, which is at the same physical

Not Reported in F.Supp.2d                                                                                                          Page 14
Not Reported in F.Supp.2d, 2006 WL 273527 (E.D.Wis.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 273527 (E.D.Wis.))**

location as the Eagles Club, Patterson also presen-ted a wrestling show by the W.W.A. Superstars Inc., on August 3, 1997. (Pl.'s Exs., Ex. 78.) On September 13, 1998, Patterson presented a wrest-ling show at the Eagles Club using the marks "World Wrestling Assoc." and "W.W.A. Super-star." (*See* Pl.'s Exs., Vol. V, Ex. 66 & Defs.' App., Ex. 3 at 374-75.) The show was videotaped. (*Id.*)

On June 19, 1999, and again on June 19, 2000, Pat-terson presented a "WWA Superstars of Wrestling" event with approximately 2,500 people in attend-ance at each event. On June 19, 2003, Patterson presented a "WWA Superstars of Wrestling" show at the Martin Luther King Center on Martin Luther King Drive in Milwaukee. Free T-shirts bearing the marks "Superstars of Wrestling" "WWA Super-stars" were given out by one of the event's spon-sors, Reed Furniture.

In June 2000, "World Wrestling Association Super-stars of Wrestling, Inc.," performed an event at the Puerto Rican Fair. After that, "World Wrestling As-sociation Superstars of Wrestling, Inc.," performed annually at the Puerto Rican Fair through 2003, when that fair was cancelled.

In 1999 and 2000, the "World Wrestling Associ-ation Superstars of Wrestling" did four co-performances with Rampage Wrestling. Wrestler Jeff May ("May") entertained at some of the shows. The banner on the ring read: "WWA Superstars of Wrestling." (*Id.* at 365-66.)

Under a license agreement between Patterson and Resort Live, Inc., a wrestling show took place in Sydney, Australia featuring Dennis Rodman [FN31] ("Rodman"), using the marks "World Wrestling As-sociation," "WWA," and "Superstars of Wrestling." The show was videotaped. A licensing acknowledg-ment by Resort Live at the end of the videotape version of the program reads:

> FN31. Rodman, nicknamed "The Worm," has been described as:

[an] eccentric, abrasive basketball play-er, born in Trenton, New Jersey, USA. He started his professional career with the Detroit Pistons, winning two champi-onships (1989-90) with them before join-ing the Chicago Bulls, winning consec-utive championships in 1996-8. He led the NBA (National Basketball Associ-ation) in rebounding for seven consecut-ive seasons (1992-8). He signed for the LA (Los Angeles) Lakers in 1998, but was waived by the club after less than three months.

> *See* http://www.biography.com (citing Crystal Reference (2004)) (in "Bio Search" area click "Go," in new screen at search "name" box, enter "Dennis Rodman" and in "Keyword" box type "Basketball," click on "Submit Query" box).)

**\*11** Superstars of Wrestling is a trademark of Al-bert P. Patterson D/B/A WWA Superstars of Wrest-ling in the United States and other countries. Used under license from Albert P. Patterson D/B/A WWA Superstars of Wrestling.
(Pl's Exs., Vol. V, Ex. 73.)

A press release for the June 7, 2003, performance Patterson staged at the United Community Center states, " 'World Wrestling Association Superstars of Wrestling,' Inc." centered on the sheet with the phrase split onto separate lines after "Association." (Defs.' App., Ex. 27, 300145; Pl.'s Exs., Vol. V, Ex. 77.) The next line reads word "presents," the line beneath it reads "W.W.A. Superstars Wrestling Live." (Id.) Other than the words "press release," the press release appears in the uniform rather styl-ized font. (Id.)

Photographs from a June 23, 2002, event staged by Patterson depict a black banner with white letters reading: "World Wrestling Assoc.0" in the first line of block letters and "W.W.A. Superstar's"0 on the second line, in slightly larger but similar block style

letters. (Defs.' App., Ex. 27, 1-3 (unnumbered).) In the middle of the banner a large stylized block letter "S" abuts the right side of a large white star with the letter "S" in the middle . (Id.) A large stylized block letter "W," abuts the left side of star.(Id.) The bottom line of the banner bears a white rectangle with black block letters which read: "SUPERSTARS OF WRESTLING." (Id.)

A black baseball-style visored cap bears white stitched block style letters is similar to the first to lines of Patterson's banner. (Defs.' App., Ex. 33). The cap reads: "World Wrestling Assoc.0" in the first line of block letters and "W.W.A. Superstar's"0 on the second line, in slightly larger but similar block style letters. (Id.)

According to his testimony at his November 2004 deposition, Patterson is claiming that the Defendant wrestling business's use of "World Wrestling Federation" and "WWF," as well as "World Wrestling Entertainment," and "WWE" are confusingly similar to his marks "World Wrestling Association" and "WWA." In his deposition, Patterson was asked, "The way you promoted characters, the way you created characters, was it any different than the way every other promotion was promoting characters at the time?"(Defs.' App., Ex. 3, 56.) Patterson responded, "I guess it would be the same."(*Id.*)

Patterson filed for registration of the mark "World Wrestling Association" under Serial Number 75/879939 for entertainment services in the nature of wrestling matches; wrestling videotape production; and entertainment services in the nature of on-going television programs featuring wrestling" and "promoting wrestling competitions of others." (Pl.'s Exs., Vol. V, Ex. 79.) In a final action mailed February 21, 2002, the PTO determined that there was a likelihood of confusion between "World Wrestling Association" and "World Wrestling Federation." (*Id.*) After such determination, Patterson filed this action while also advising the PTO of its pendency. As a result, the PTO took no further action on the trademark application for "World Wrestling Association" and the findings with respect to Serial

Number 75/879938.

### ANALYSIS

**\*12** Before attempting to strike a blow at the substance of Patterson's claims, the Defendants launch a volley of procedural defenses. The Court will first address these defenses.

### Preclusion of Action/Claims

The Defendants first argue that Patterson's claims are fundamentally inconsistent with both resolution of the 1990 action and his course of conduct over the past 20 years. The Defendants therefore invoke the doctrines of res judicata, judicial estoppel, and laches. Patterson respectively argues that res judicata does not apply, there can be no judicial estoppel without prior litigation of the issue, and laches does not put his claims to rest.

### Res Judicata

Res judicata is intended to protect "a victorious party from being dragged into court time and time again by the same opponent on the same cause of action."*Lee v. Vill. of River Forest,* 936 F.2d 976, 981 (7th Cir.1991) (quoting *Magnus Elec., Inc. v. La Republica Arg.,* 830 F.2d 1396, 1403 (7th Cir.1987)). Federal law applies if the prior judgment was rendered in federal court on federal law claims. *See Hudson v. Hedge,* 27 F.3d 274, 276 (7th Cir.1994); *Connor v. Reinhard,* 847 F.2d 384, 394 (7th Cir.1988); *In re. Energy Co-op., Inc.,* 814 F.2d 1226, 1230 (7th Cir.1987). Under federal law, the requirements for res judicata are: (1) a final judgment on the merits; (2) an identity of the causes of actions; and (3) an identity of the parties or their privies. *See Golden v. Barenborg,* 53 F.3d 866, 869 (7th Cir.1995); *In re. Energy Co-op., Inc.,* 814 F.2d at 1230.

In its March 24, 2004, decision and order on the Defendants' motion to dismiss this action, the Court

Not Reported in F.Supp.2d                                                    Page 16
Not Reported in F.Supp.2d, 2006 WL 273527 (E.D.Wis.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 273527 (E.D.Wis.))**

ruled that the judgment in the 1990 action constituted a "prior judgment" for purposes of res judicata analysis. (Court's March 29, 2004, Decision and Order, at 10 (citing *Verband der Zuechter des Oldenburger Pferdes e.V. v. Int'l Sporthorse Registry Inc.,* 55 U.S.P.Q.2d 1550, 1556, 1999 WL 33109652 (N.D.Ill.1999).) With respect to an identity of causes of action, the Court concluded that there was none. (*Id.* at 12.) With respect to privity, the Court concluded that Patterson was in privity with the plaintiffs, but Good Humor had not established that it was in privity with Titan. (*Id.* at 12.)

Now, at the summary judgment stage, the Defendants ask the Court to revisit its determinations. The finding of a final judgment has not been assailed by the parties. Furthermore, the undisputed facts presented to the Court now show that the Defendant wrestling business has a license agreement with Good Humor.[FN32] Thus, privity between these two entities has now been shown.

> FN32. Patterson asserts that the Defendant wrestling business has no rights in the "WWF" mark, because the Defendant wrestling business had a license agreement with the Fund. That contention need not be resolved in addressing the Defendants' motion for summary judgment.

The Court is left to analyze the final element-the identity of causes of action. In previously holding that there was no identity of causes of action,[FN33] the Court relied upon the allegations of Patterson's complaint, which challenges the Defendant wrestling business's use of the marks-(1) "World Wrestling Association," (2) "WWA, Superstar Wrestling, Superstars Wrestling," (3) "Superstars of Wrestling," (4) "Superstars of Pro Wrestling," (5) "WWA Superstar Wrestling," (6) "WWA Superstars Wrestling," (7) "WWA Superstars of Wrestling," and (8) "WWA Superstars of Pro Wrestling." The Defendants rely upon Patterson's statement in his November 2004, deposition that "WWE" and "World Wrestling Entertainment" are confusingly similar to his marks, "WWA" and "World Wrestling Associ-

ation." However, this contention was already noted in the Court's March 29, 2004, decision. The Court stated:

> FN33. A claim is deemed to have "identity" with a previously litigated matter if it is based on the same, or nearly the same, factual allegations arising from the same transaction or occurrence. *Kratville v. Runyon,* 90 F.3d 195, 198 (7th Cir.1996) (quoting *Brzostowski v. Laidlaw Waste Sys., Inc.,* 49 F.3d 337, 338-39 (7th Cir.1995) and citing *Restatement (Second) of Judgments* § 24 (1982)). *See also, Jet, Inc. v. Sewage Aeration Sys.,* 223 F.3d 1360, 1363 (Fed.Cir.2000).

**\*13** In the 1990 litigation, the plaintiffs challenged Titan's use of the marks Superstar Wrestling, Superstars of Wrestling, and Superstars of Pro Wrestling. Titan no longer exists. Titan is now using WWE and the name World Wrestling Entertainment.

In the instant case, this claim was not raised during the prior litigation nor could have it since the prior litigation was nearly a decade before WWE began using WWE and World Wrestling Entertainment. Thus, Patterson's claims do not arise from the same transaction or occurrence. *See Chromalloy American Corp., v. Kenneth Gordon (New Orleans)., Ltd.,* 736 F.2d 694, 698 (Fed.Cir.1984)("The claim against LADY GORDON is simply not the same claim as one against GORDON OF NEW ORLEANS. The 'transactional facts' are different in that a different mark used over a different period of time is involved."); *Realex Chemical Corporation v. S.C. Johnson & Son, Inc.,* 849 F.2d 299, 303 (8th Cir.1988). *See also, Metromedia Steakhouses, Inc., v. Pondco li Inc.,* 28 U.S.P.Q.2d 1205 (Trademark Trial & App. Bd.1993); *Institut National Des Appellations d'Origine v. Brown-Forman,* 47 U.S.P.Q.2d 1875, 1892-96 (Trademark Trial & App. Bd.1998). Thus, the claims in this case differ from the claims in the 1990 action.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                 Page 17
Not Reported in F.Supp.2d, 2006 WL 273527 (E.D.Wis.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 273527 (E.D.Wis.))**

Thus, such argument is not persuasive. There is no complete identity of the causes of actions between the 1990 action and the instant action.

The Defendants contend that Patterson was aware of their use of certain marks well before the present litigation, yet he chose not to litigate the issue. Insofar as Patterson failed to raise those issues, the Defendants argue that the opportunity forever passed and res judicata now closes the door on relief. Specifically, the Defendants argue that Patterson consented to their use of "WWF" and "World Wrestling Federation" and was aware of Titan's usage of the marks during the 1990 action.[FN34]The final pretrial report for the 1990 action refers to the marks "WWF" and "World Wrestling Federation." During her deposition in the 1990 action, L. McMahon also claimed ownership in "World Wrestling Federation." Thus, during the course of the 1990 action, Patterson knew that the marks "WWF" and "World Wrestling Federation," were being used by Titan. The Defendants have established that Patterson's infringement claims based on "WWF" and "World Wrestling Federation" are barred by res judicata because those claims existed during the pendency of the 1990 action and arose out of the same transactions at issue in that litigation. Patterson could have litigated the alleged infringement of the "World Wrestling Federation" and "WWF" at that time. Having failed to do so, Patterson's claims against the Defendants based on their use of "WWF" and "World Wrestling Federation" are barred by res judicata and subject to dismissal on summary judgment.

> FN34. There is a dispute as to whether Patterson consented to the Defendant wrestling business's use of the terms-the Defendants rely upon a purported joint final pretrial report in the 1990 action, though neither Patterson nor his attorney signed that report. (See Defs.App., Ex. 2 (Final Pretrial Order on the Counter and Third Party Claims filed Jan. 6, 1992, 4).) So, the Defendants have not established that Pat-

terson consented to Titan's use of "World Wrestling Federation" and "WWF."

The Defendants also assert that res judicata bars Patterson's claims involving "WWF Superstars" and "WWE Superstars." Their assertion relies on the Consent Order stating that neither party is barred from using "Superstars," their characterization of Judge Curran's statements at the November 1992 contempt hearing, and Patterson's 1995 TTAB cancellation proceedings. Taking these sources in order: The Consent Order itself does not contain any discussion of the marks "WWF Superstars" or "WWE Superstars." ("WWE" was not used by the Defendant wrestling business until May 2002). Because it did not contemplate these marks, the Consent Order does not provide a basis for res judicata. Even though, Judge Curran rejected Patterson's claim that "WWF Superstars" infringed on "WWA Superstars" during the November 1992 contempt hearing, that hearing was not part of the consent judgment. The written Consent Order preceded the contempt hearing. In fact during the contempt hearing, Judge Curran considered only whether the Defendant wrestling business had violated the Consent Order, not whether the Defendant wrestling business was infringing Patterson's marks. The contempt hearing does not provide a basis for establishing that res judicata bars Patterson's infringement claims against "WWF Superstars" and "WWE Superstars."

**\*14** Additionally, the record does not support the Defendants' contentions of res judicata based on Patterson's 1995 TTAB cancellation proceedings against the Defendant wrestling business's "WWF Superstars" mark. To the extent, the Defendants assert that the TTAB held that res judicata barred that proceeding, their contention is not support by the record of that proceeding. To the extent, the Defendants are relying upon the TTAB's alternative holding on the motion to dismiss-that the consent decree allowed either party to use "Superstars," and, consequently, the Defendant wrestling business's use of the acronym "WWF" with

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

"Superstars" could not be the source of damage to Patterson-neither party cites any case law regarding the res judicata effect of TTAB proceedings on subsequent district court proceedings. "[A] litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority, forfeits the point."*Cent. States, Se. & Sw. Areas Pension Fund v. Schilli Corp.,* 420 F.3d 663, 669 (7th Cir.2005) (citations omitted). Thus, the Defendants have not demonstrated res judicata as to Patterson's claims of infringement based on the marks "WWF Superstars" and "WWE Superstars."

*Judicial Estoppel*

The Defendants also maintain that Patterson's infringement claims based on the Defendants' use of the marks "WWE" and "World Wrestling Entertainment" are barred by judicial estoppel. The doctrine of judicial estoppel prevents a party from adopting a position in a legal proceeding contrary to a position successfully argued in an earlier legal proceeding. *Johnson v. ExxonMobil Corp.,* 426 F.3d 887, 891 (7th Cir.2005). Judicial estoppel is "an equitable concept providing that a party who prevails on one ground in a lawsuit may not ... in another lawsuit repudiate that ground."*United States v. Hook,* 195 F.3d 299, 306 (7th Cir.1999) (quoting *Ogden Martin Sys. of Indianapolis v. Whiting Corp.,* 179 F.3d 523, 526 (7th Cir.1999)). The purpose of this doctrine is to protect the integrity of the judicial process. *New Hampshire v. Maine,* 532 U.S. 742, 749, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001).

For judicial estoppel to apply, (1) the latter position must be clearly inconsistent with the earlier position; (2) the facts at issue must be the same in both cases; and (3) the party to be estopped must have prevailed upon the first court to adopt the position. *Urbania v. Cent. States, Se. & Sw. Areas Pension Fund,* 421 F.3d 580, 589 (7th Cir.2005) (citing *Hook,* 195 F.3d at 306.) A fourth factor to be considered is whether the operative facts remain the same in both cases. *Jarrard v. CDI Telecomm., Inc. .,* 408 F.3d 905, 915 (7th Cir.2005).

In raising judicial estoppel, the Defendants maintain that Patterson represented in the 1990 action that the "WWF" mark, and the "World Wrestling Federation" mark "does not infringe upon any of Patterson's claimed marks."(Defs.' Br. in Supp. of Mot. for Summ. J. at 27 (citing Defs.' PFOF ¶ 28).) Paragraph 28 of the Defendants' proposed findings of facts cites the Final Pretrial Order on the Counter and Third Party Claims marked as Exhibit 2 in the Defendants' Appendix in Support of their Motion for Summary Judgment. The finding of fact is contested by Patterson, who points out that he did not sign the document. (See Pl.'s Resp. to Defs.' PFOF ¶ 28 & Defs.' App. Ex. 2 at 4.) Thus, there is a disputed issue of material fact regarding Patterson's purported representation in the 1990 action. Given such a factual dispute, the Defendants have not established the first prong of judicial estoppel, namely, that Patterson's current position is "clearly inconsistent" with his earlier position. *Urbania,* 421 F.3d at 589.

*Laches*

**\*15** The Defendants also assert that Patterson's claims with respect to "World Wrestling Federation," "WWF" and "WWF Superstars" are barred by laches. Laches is an equitable doctrine derived from the maxim that those who sleep on their rights lose them. *Hot Wax, Inc. v. Turtle Wax, Inc.,* 191 F.3d 813, 820 (7th Cir.1999)."For laches to apply in a trademark infringement case, the defendant must show that the plaintiff had knowledge of the defendant's use of an allegedly infringing mark, *see Saratoga Vichy Spring Co. v. Lehman,* 625 F.2d 1037, 1040 (2d Cir.1980), that the plaintiff inexcusably delayed in taking action with respect to the defendant's use, and that the defendant would be prejudiced by allowing the plaintiff to assert its rights at this time."*Chattanoga Mfg., Inc. v. Nike, Inc.,* 301 F.3d 789, 792-93 (7th Cir.2002) (citing *Hot Wax,* 191 F.3d at 820 and 5 J. Thomas McCarthy,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 273527 (E.D.Wis.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 273527 (E.D.Wis.))**

*McCarthy on Trademarks and Unfair Competition* § 31:1, at p. 31-8 (2001)). Prejudice to a defendant due to a delay may be established when the plaintiff's assertion of a previously available claim would be inequitable in light of the plaintiff's delay in bringing the claim and a defendant has changed position in a way that would not have occurred but for the plaintiff's delay. *See Hot Wax,* 191 F.3d at 824. Laches is a question of degree: if the delay is lengthy, prejudice is more likely to have occurred and less proof of prejudice will be required. *Id.*

The Defendants cite to both federal law and Wisconsin common law regarding laches. (See Defs' Br. in Supp. of Mot. for Summ. J. 28.) However, the application of federal, not state, law controls. *Hot Wax,* 191 F.3d at 820-21. Nonetheless, state law plays a role in analyzing whether laches applies.*Id.* Because the Lanham Act does not contain a statute of limitations, federal courts have referred to analogous state statutes of limitations to determine whether a presumption of laches should apply. *Id.* at 821 (citing *Wilson v. Garcia,* 471 U.S. 261, 266-67, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985)). However, whether a Lanham Act claim has been brought within the analogous state statute of limitations is not the sole indicator of whether laches may be applied in a particular case. *Hot Wax, Inc.,* 191 F.3d at 821-22. The multiple considerations as previously outlined are to be considered.

The Defendants suggest that the Court use the three-year statute of limitations contained in Wis. Stat. § 100.18(11)(b)(3) of the Wisconsin Deceptive Trade Practices Act. (Defs.' Br. in Supp. of Mot. for Summ. J. 28-29.) As authority, they cite *Chattanoga Manufacturing Inc.,* 301 F.3d at 793, wherein the Court of Appeals affirmed the application of the three-year statute of limitations of the Illinois Consumer Fraud and Deceptive Practices Act, the analogous Illinois statute, to a Lanham Act laches issue. While Patterson opposes the application of laches to the action, he has not responded to the Defendants' suggestion regarding the relevant statute of limitations. (Mem. in Opp'n to Defs' Mot.

for Summ. J. 25-27.) So, the Court will use the three-year Wisconsin statute of limitations as a guide.

**\*16** In 1984 or 1985, Patterson watched "WWF Superstars of Wrestling" *WrestleMania I* in which the "World Wrestling Federation" and "WWF" marks featured prominently. More than ten years later, on January 1, 1996, Patterson sent WWE a complaint that was virtually identical to the complaint in this action. However, Patterson still delayed filing the instant action for another seven years. Cumulatively, Patterson delayed over eighteen years before filing this action. Because Patterson exceeded the three-year guidepost statute of limitations, the presumption of prejudice attaches. *See Hot Wax,* 191 F.3d at 821. During that span of time, Patterson filed an action against the Defendant wrestling business but he did not challenge the use of "WWF" or "World Wrestling Federation." Between 1984 and June 12, 2002, the Defendant wrestling business invested in the "WWF," "World Wrestling Federation," and "WWF Superstars" marks. During the period of Patterson's inaction, the Defendant wrestling business advertised and developed its wrestling entertainment products. *See Id.* at 824.Under the circumstances, Patterson's claims arising out of the Defendant wrestling business's use of "WWF," "World Wrestling Federation," and "WWF Superstars" marks are barred by laches.

*Lanham Act Claims*

Given the Court's determinations on res judicata and laches, the Court need only address Patterson's trademark infringement claims related to the Defendants' use of the marks "World Wrestling Entertainment" and "WWE." To prevail on a Lanham Act claim, a plaintiff must establish that (1) its mark is protectable, and (2) the defendant's use of the mark is likely to cause confusion among consumers. *Packman v. Chi. Tribune Co.,* 267 F.3d 628, 638 (7th Cir.2001) (citing *Eli Lilly & Co. v. Natural Answers, Inc.,* 233 F.3d 456, 461 (7th Cir.2000)). While federal registration of a mark

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 20
Not Reported in F.Supp.2d, 2006 WL 273527 (E.D.Wis.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 273527 (E.D.Wis.))**

provides it with certain advantages, including the presumption of validity (see 15 U.S.C. § 1115(a); *CAE, Inc. v. Clean Air Eng'g, Inc.,* 267 F.3d 660, 673 (7th Cir.2001)), a mark need not be registered to be protected under the Lanham Act. *See Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 768, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992). A mark is also protectable once it is used in commerce. 15 U.S.C. §§ 1125(a), 1127. *See also, TMT N. Am., Inc. v. Magic Touch GMbH,* 124 F.3d 876, 881 (7th Cir.1997); *Sands, Taylor & Wood Co. v. Quaker Oats Co.,* 978 F.2d 947, 954-55 (7th Cir.1992).

In a trademark dispute, the Court first inquires whether any party has trademark rights in the words or symbols that are at issue. *See, TMT N. Am., Inc.,* 124 F.3d at 881. A party can prevail by establishing rights through "priority of use" if the party demonstrates that it used the allegedly infringing mark first. *Zazu Designs v. L'Oreal, S.A.,* 979 F.2d 499, 503 (7th Cir.1992). A party can also establish priority of use by demonstrating that it used a variation of the mark first. *See Navistar Int'l Transp. Corp. v. Freightliner Corp.,* 52 U.S.P.Q.2d 1074, 1076 (N.D.Ill.1998).

### Tacking

**\*17** Courts apply a "tacking" rule when analyzing situations involving priority based on a party's use of a mark. The "tacking" rule allows a party to add time spent using an older mark to the time spent using a newer mark, if both marks make "the same continuing commercial impression." *Id.* at 1076-77.Tacking is a question of fact. *Id.* at 1076.The court of appeals for this circuit has not formally adopted tacking, but it has adopted a similar rule in the somewhat analogous situation of abandonment. *Id.* (citing *Sands, Taylor & Wood Co. v. Quaker Oats Co.,* 978 F.2d 947, 955 (7th Cir.1992) ("Minor changes in a mark which did not change the basic, overall commercial impression created on buyers will not constitute any abandonment [when determining priority of use].") Com-

mercial impression is the impression of the consumers of the product. *Navistar Int'l Transp. Corp.,* 52 U.S.P .Q.2d at 1079. The party asserting the tacking doctrine must support it with probative evidence. *Id.* The standard for demonstrating tacking is "far higher than the likelihood of confusion standard applicable to the underlying trademark dispute."*Id.* at 1080.

The record establishes that Patterson first used the marks "World Wrestling Association" and "WWA" for wrestling entertainment services on March 5, 1978, in conjunction with a wrestling event at the Palace in Milwaukee. In 1989, King Kong Enterprises, a business incorporated in June 1988, filed a statement of adoption of the trade name "World Wrestling Association" with the Wisconsin Secretary of State. Beginning in 1989, business entities organized by Patterson sold caps and T-shirts with "World Wrestling Association" and variants such as "W.W.A." and "World Wrestling Assoc." The mark "WWA" was also used in a 1991 press conference promoting the wrestler Gargantua and at the 1992 African World Festival live wrestling event. Patterson promoted eight wrestling events between 1993 and 2003 using the marks "World Wrestling Association" and "WWA" shows.

However, the Defendants assert that Patterson does not possess protectable trademark rights in "World Wrestling Association" and "WWA" because his claims are barred by the Defendant wrestling business's priority of use and, under the doctrine of tacking, the Defendant wrestling business's priority of use applies to "World Wrestling Entertainment" and "WWE." Patterson counters that, as a licensee of the mark "WWF" from the World Wildlife Fund, the Defendant wrestling business did not have an ownership right in the "WWF" mark. (Patterson's Mem. in Opp'n to Defs.' Mot. for Summ. J. ("Patterson's Opp'n Mem.") at 13.) Patterson, further contends that to the extent the Defendant wrestling business had an ownership right in "World Wrestling Federation," it has abandoned FN35 that ownership and that ownership does not

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                     Page 21
Not Reported in F.Supp.2d, 2006 WL 273527 (E.D.Wis.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 273527 (E.D.Wis.))

tack. The Court proceeds to weigh these arguments.

> FN35. A defense of abandonment results in the loss of trademark rights against the world. *TMT N. Am., Inc.,* 124 F.3d at 881.

The Court begins by noting that the Defendant wrestling business was formed in 1963 and used the name "World Wide Wrestling Federation." At some disputed time, the Defendant wrestling business began using "World Wrestling Federation." In a June 3, 1983, declaration to the PTO, L. McMahon claimed that the Defendant wrestling business began using "World Wrestling Federation" in February 1983. In January 1994, the Defendant wrestling business entered into a confidential agreement with the Fund allowing the Defendant wrestling business limited permission to use the "WWF" mark. In May 2002, "WWF" changed its brand name to "World Wrestling Entertainment" and "WWE." The brand name change was accompanied by a massive rebranding campaign including a new "scratch" logo with the letters "WW," and emphasis on the brand's continuing attitude.

**\*18** In presenting their tacking argument, the Defendants rely extensively on *Navistar International Transportation Corporation.,* 52 U.S.P.Q.2d at 1074, an Illinois district court trademark infringement case involving competing truck manufacturers. *Navistar,* addressed whether the years dating back to 1970 could be tacked onto the defendant's post-1994 use of the American LaFrance Eagle mark on fire trucks, which would give the defendant priority over the plaintiff's use of the mark.

Tacking is based on whether two marks make the same commercial impression on consumers. *Navistar Int'l Transp. Inc.,* 52 U.S.P.Q .2d at 1080. Asserting the continuity of the commercial impression of its marks, the Defendant wrestling business relies on paragraphs 57 through 65 of the Defendants' proposed findings of fact, which are based on the affidavit of L. McMahon. (*See* Defs.' Br. in Supp. of Mot. for Summ. J 16-17.) While L. McMahon is the chief executive officer of the Defendant wrest-

ling business (L. McMahon Aff. ¶ 2), she is not a consumer of its products. Thus, her affidavit does not constitute competent evidence of the continuity of commercial impression. *See Navistar Int'l Transp. Corp.,* 52 U.S.P.Q.2d at 1081-82. The Defendants have not presented any other evidence demonstrating that the "WWE" and "World Wrestling Entertainment" marks and their earlier marks create the same commercial impression. Thus, because the Defendants failed to carry their burden of showing the continuity of commercial impression, they are not entitled to summary judgment on their tacking theory.[FN36]

> FN36. This case is seemingly more complex than *Navistar* because the Defendant wrestling business claims tacking as to a mark which has undergone more than a single name/mark change. The Court need not belabor the issue because the Defendant wrestling business has not presented the requisite evidence of the commercial impression of *consumers* of their products.

*Patterson's Interest*

The Defendants maintain that Patterson never acquired trademark rights in "World Wrestling Association" and "WWA" because he has not made bona fide use of the marks in commerce. Patterson argues to the contrary and also maintains that the Defendants' market presence and wrongful claim of ownership of "WWF" in its trademark applications have precluded him from developing his marks.

With respect to bona fide use of the trademarks, an entity only acquires rights in a trademark through commercial use of the mark. *Johnny Blastoff, Inc., v. L.A. Rams Football Co.,* 188 F.3d 427, 434 (7th Cir.1999). Under the common law, ownership is conferred upon the person who employs the first actual use of a mark in a genuine commercial transaction. Also under common law, the winner of the race to the marketplace establishes exclusive use of the mark.*Zazu Designs v. L'Oreal, S.A.,* 979 F.2d 499, 503 (7th Cir.1992). To establish use, the mark

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

must be attached to the product or service sold to the public and must be continuous and bona fide. *Id.* at 502 n.†-503. As long as there is genuine use of the mark in commerce, ownership may be established even if the first uses are not extensive and do not result in "deep market penetration or widespread recognition."*See Allard Enters. Inc. v. Advanced Programming Res.,* 146 F.3d 350, 358 (6th Cir.1998); *Kathreiner's Malzkaffee Fabriken v. Pastor Kneipp Medicine Co.,* 82 F. 321, 326 (7th Cir.1897) (for rights in a mark to accrue, "[i]t is not essential that its use has been long continued, or that the article should be widely known, or should have acquired great reputation.").

***19** The parties dispute the exact number of times that Patterson used the marks "WWA," "World Wrestling Association," and "World Wrestling Association WWA" between 1993 and the present. However, the Defendants concede that Patterson has established eight uses of such marks between 1993 and 2003. Patterson has established additional uses of the marks during that time. Construing the evidence in the light most favorable to Patterson, the non-movant, the record also reflects that he did use the "World Wrestling Association" or "WWA" or "World Wrestling Association WWA" marks on more than eight occasions. The mark was used at several events staged at the Eagles Club, for seven consecutive years at annual African World Festival, at the Rodman show in Australia, in August 1993 in Detroit, and in four co-produced shows with Rampage Wrestling. Viewing the evidence in the light most favorable to the non-movant, Patterson has presented sufficient evidence upon which a reasonable jury could find that he engaged in bona fide use of the "WWA," "World Wrestling Association" and "World Wrestling Association WWA" marks.

*Likelihood of Confusion*

Further, the Defendants contend that there is no likelihood of confusion between the Defendants' "WWE" and "World Wrestling Entertainment" marks and Patterson's marks. Patterson maintains that the PTO found a likelihood of confusion between "World Wrestling Federation" and "World Wrestling Entertainment" and the testimony of Naboisek and May provides evidence of actual confusion.[FN37](*See* Patterson's Opp'n Mem. 26.) Patterson also maintains that the Defendant wrestling business's market presence and its wrongful claim of ownership precluded Patterson from developing his marks.

> FN37. On the final page of his brief, Patterson asks the Court to consider his response brief as a motion for summary judgment. He also states that the Defendants did not request leave to file a brief in excess of 30 pages.
>
> Rule 7 of the Federal Rules of Civil Procedure provides: "[a]n application to the court for an order shall be by motion which, unless made during a hearing, shall be made in writing, shall state with particularity the grounds therefor, and shall set forth the relief or order sought."Patterson's brief is not a motion and will not be treated as such.Fed.R.Civ.P. 7.
>
> Furthermore, Civil L.R. 7.1(f) (E.D.Wis) states:
>
> Except by permission of the Court, principal briefs on motions must not exceed 30 pages and reply briefs must not exceed 30 pages, exclusive of pages containing the statement of facts, the proposed findings of fact as required by Civil L.R. 56.2, exhibits, and affidavits, but inclusive of headings and footnotes.
>
> About 7 1/2 pages of the Defendants' brief in support of their motion for summary judgment is a statement of the facts (labeled as an introduction). The remaining 1 1/2 pages exceed the mandatory page limit. But, in the absence of a prop-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

er motion challenging the excess pages, the Court will take no action.

In this circuit, the following factors are used to evaluate whether a likelihood of confusion exists in a trademark case: (1) the similarity of the marks in appearance and suggestion; (2) the similarity of the products; (3) the area and manner of concurrent use; (4) the degree of care likely to be used by consumers; (5) the strength of the plaintiff's mark; (6) whether any actual confusion exists; and (7) the defendant's intent to palm off its goods as those of the plaintiffs. *See Packman,* 267 F.3d at 643. "None of these factors by itself is dispositive of the likelihood-of-confusion question, and different factors will weigh more heavily from case to case depending on the particular facts and circumstances involved."*Int'l Kennel Club of Chi., Inc. v. Mighty Star, Inc.,* 846 F.2d 1079, 1087 (7th Cir.1988) (internal citations and quotation marks omitted). As a consequence, the "weight and totality of the most important factors in each case will ultimately be determinative of the likelihood of confusion, not whether the majority of the factors tilt the scale in favor of one side or the other."*Schwinn Bicycle Co. v. Ross Bicycles, Inc.,* 870 F.2d 1176, 1187 (7th Cir.1989). Even though no one factor is decisive, the similarity of the marks, the intent of the defendant, and evidence of actual confusion are the "most important factors" in a likelihood-of-confusion case. *G. Heileman Brewing Co., Inc. v. Anheuser-Busch, Inc.,* 873 F.2d 985, 999 (7th Cir.1989); *see also Eli Lilly & Co. v. Natural Answers, Inc.,* 233 F.3d 456, 462 (7th Cir.2000).

**\*20** Likelihood of confusion is question of fact. *See Packman,* 267 F.3d at 643. Nevertheless, this issue may be resolved on summary judgment "if the evidence is so one-sided that there can be no doubt about how the question should be answered."*Id.* (citation omitted).

Although Patterson's brief does not address the seven factors which comprise the likelihood-of-confusion analysis, he relies on the contention that the PTO found a likelihood of confusion

between his marks and "World Wrestling Federation" and relies upon that finding as a basis for arguing that there is also a likelihood of confusion between his marks and "World Wrestling Entertainment," "World Entertainment," and "WW." [FN38]

> FN38. Patterson states that the PTO found a "substantial likelihood of confusion." (Pl's Opp'n Mem. at 26 (citing Pl.'s Exs., Ex. 79).) However, the PTO found a "likelihood of confusion." (Pl.'s Exs., Vol. V, Ex. 79 (PTO Final Action) at 2-3.)

Patterson does not cite any legal authority regarding the import of a PTO finding. The Defendants argue that reliance upon the PTO's determination is misplaced. In support of their positions, they cite, among other cases, the unpublished decision of *Miquel Torres, S.A. v. Cantine Mezzacorona, S.C.A.R.L.,* No. 99-1935, 2004 WL 2126869, at \*3 (4th Cir. Sept.24, 2004).[FN39] In *Miquel Torres,* a district court rejected Torres's collateral estoppel argument based on a prior TTAB finding of likelihood of confusion, that had been affirmed by the Federal Circuit. The district court explained that the TTAB likelihood-of-confusion analysis differs from the "likelihood of confusion analysis employed in a full blown infringement action."*Id. See also John Morrell & Co. v. Doyle,* 97 F.2d 232, 234-35 (7th Cir.1935).

> FN39. The Fourth Circuit permits citation to unpublished opinions when no other decision "would serve as well." 4th Cir. R.App. P. 36(c).*See also, United States v. Reneslacis,* 349 F.3d 412, 416 (7th Cir.2003).

The appeals court agreed and emphasized the key to determining whether controlling effect should be accorded to a prior TTAB ruling or a Federal Circuit affirmation on the likelihood of confusion is whether rulings have taken into account the context of the marketplace in a meaningful way.*Torres,* 2004 WL 2126869, at \*3. *Torres* further held that a district court cannot altogether omit consideration

Not Reported in F.Supp.2d                                                                    Page 24
Not Reported in F.Supp.2d, 2006 WL 273527 (E.D.Wis.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 273527 (E.D.Wis.))**

of the TTAB's factual determinations insofar as they are relevant to the infringement analysis. *Id.* The *Torres* court stated "at the very least, such findings should be considered 'powerful *evidence*' of the presence (or lack thereof) of one or more of the factors that must be considered in an infringement action."*Id.* (quoting *Am. Online, Inc. v. AT & T Corp.,* 243 F.3d 812, 817 (4th Cir.2001)).

Here, Patterson relies on the PTO determination that there was a likelihood of confusion between his "World Wrestling Association" mark and the "World Wrestling Federation" mark, but leaps from that decision to the likelihood of confusion between his "World Wrestling Association" and "WWA" marks and "World Wrestling Entertainment," "World Wrestling," and "WW." (Patterson Opp'n Mem 27.)

The PTO decision only addressed the likelihood of confusion between "World Wrestling Federation" and "World Wrestling Association." The PTO first found that the two marks were "substantially similar in appearance and commercial impression," stating that the only difference was that Patterson's proposed mark contained the word "Association" whereas the registered mark had the word "Federation." (Pl.'s Exs., Vol. V, Ex. 79 at 2-3.) The PTO noted that the two words have essentially the same meaning and are synonyms. (*Id.*) Second, the PTO compared the services to determine whether they were related or if the activities surrounding their marketing were such that confusion as to origin was likely. (*Id.* at 3.) The PTO concluded that Patterson and the Defendant wrestling business had overlapping services-both offered wrestling related entertainment services for television. The PTO found that Patterson's services were closely related to the goods of the applicant, explaining that commonly audio and videocassettes originate from the same source that offers sporting-type entertainment services. (*Id.*) Thus, the PTO concluded there was a likelihood of confusion among consumers as to the source of the goods and services because the "World Wrestling Association" and "World Wrest-

ling Federation" marks were substantially similar and the offered goods and services were closely related. (*Id.*)

**\*21** The PTO was not presented with the question of the likelihood of confusion between Patterson's marks and "World Wrestling Entertainment" and the " 'WWE scratch logo.' ' Furthermore as to the marks before it, the PTO did not address two of the most important factors under this circuit's test for analyzing the likelihood of confusion in a trademark infringement case-the intent of the defendant and evidence of actual confusion. *See G. Heileman Brewing,* 873 F.2d at 999. Additionally, the PTO conducted a side-by-side comparison of the marks, rather than considering them in the marketplace as is required in this circuit's case law. *See Packman,* 267 F.3d at 643. Further, the PTO failed to address other relevant factors including the area and manner of concurrent use, the degree of care likely to be used by consumers, or the strength of Patterson's marks. *See Id.*

If the Court were addressing the likelihood of confusion between Patterson's "World Wrestling Association" and the "World Wrestling Federation" marks, the PTO's findings would constitute evidence with respect to the seven relevant likelihood of confusion factors. *See Torres,* 2004 WL 2126869, at *3. However, the only issue now before the Court is the likelihood of confusion between Patterson's marks and the "World Wrestling Entertainment" and "WWE" logo. The PTO decision adjudicating a different issue is of tangential importance. Patterson has provided not justification for leaping from the PTO's decision on the likelihood of confusion between "World Wrestling Federation" mark as compared to the "World Wrestling Association," to the likelihood of confusion between the "WWE," and/or "World Wrestling Entertainment" marks and/or the "WWA" and "World Wrestling Association" marks.

*a. Similarity of the Marks*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 25
Not Reported in F.Supp.2d, 2006 WL 273527 (E.D.Wis.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 273527 (E.D.Wis.))**

To determine whether two marks are similar, the Court must consider what happens in the market-place; a side-by-side comparison of the marks is insufficient. *Packman,* 237 F.3d at 643. Patterson's most recently used "World Wrestling Association" and "WWA" is a June 7, 2003, performance at the United Community Center. The press release for that show states, " 'World Wrestling Association Superstars of Wrestling', Inc." and "W.W.A. Superstars Wrestling Live" in the same stylized font. A different format and version of Patterson's marks are depicted in photographs of a black banner used at a June 23, 2002, event staged by Patterson. The banner exhibits white letters reading: "World Wrestling Assoc.0" in the first line of block letters and "W.W.A. Superstar's"0 on the second line, in slightly larger but similar block style letters. A large stylized block letter "S" abuts the right side of a large white star with the letter "S" in the middle and a large stylized block letter "W," abuts the left side of same star. The bottom line of the banner contains a white rectangle with black block letters, spelling "SUPERSTARS OF WRESTLING."

**\*22** A photograph of a black baseball-style visored cap, which is also part of the record, is stitched with white block style letters similar to the first two lines of Patterson's banner. The cap reads: "World Wrestling Assoc.0" in the first line of block letters and "W.W.A. Superstar's"0 on the second line, in slightly larger but similar block style letters. Among eight events produced by Patterson, he variously used "WWA Superstars of Wrestling," "World Wrestling Association WWA Superstars" and "World Wrestling Association Superstars of Wrestling."

The "WWE' scratch logo," which the Defendant wrestling business has used since May 2002, consists of the letters "WW" vertically stacked in type which has a raw or scribble-type appearance. This logo appears on substantially all WWE's goods and services. The "scratch logo" also consistently appears in the bottom right center of all WWE television programing and home video products.

At times, the Defendant wrestling business also used the words "World Wrestling Entertainment" with its scratch logo. Patterson uses "World Wrestling Association." The words "Association" and "Entertainment" do not sound similar. Both words have distinct meanings. "Association" means "[a]n organized group of people who share a common interest, activity or purpose."*Webster's II, New Riverside University Dictionary* at 132. "Entertainment" means something that holds a person's attention. *See Id.* at 435.Unlike the words "Association" and "Federation," considered by the PTO, the Court finds that "Association" and "Entertainment" are not synonym or synonymous.

While both Patterson and the Defendant wrestling business use the mark "WW," and the phrase "World Wrestling," the appearance and placement of the letters and words are distinct such that a consumer would not associate one product with the other. *See Packman,* 267 F.3d at 643. Differences in packaging, coloring and labeling can be significant in determining whether there is a likelihood of confusion. *Id.* at 644.The distinctiveness of Patterson's and the Defendant wrestling business's mark weighs against any likelihood of confusion. *Id.*

### b. Defendants' Intent

The Defendants' intent may bolster a claim of likelihood of confusion. *Id.* A party may present evidence that the defendants are trying to "pass off" their products as having come from the plaintiff. *Id.* Despite construing the evidence in the light most favorable to Patterson, there is no evidence that the Defendants intended to "palm their goods off" as having come from Patterson. To the contrary, in the 1990 action, Judge Curran observed that Patterson might be attempting to "piggyback" the benefits which might flow from the identity of WWF.

### c. Evidence of Actual Confusion

Patterson has not proffered any admissible evidence of actual confusion. The testimony of Naboisek, the

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 273527 (E.D.Wis.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 273527 (E.D.Wis.))**

WWA announcer, and May, who wrestled for WWA, constitutes the only evidence of actual confusion Patterson has mustered. May once told someone that he worked for "World Wrestling Association;" the person understood this to mean that May wrestled for the Defendant wrestling business. May's report of what the unidentified person told him is inadmissible hearsay evidence. *Friedel,* 832 F.2d at 970. Patterson has also presented Naboisek's testimony that De Angelo, a fan, thought Naboisek worked for "WWF." Nabosiek's testimony about DeAngelo's statement is also inadmissable hearsay evidence. *Id.* Even if this evidence were admissible and the purported individual was a consumer of wrestling events or related products, *de minimis* evidence of confusion is properly discounted. *See Packman,* 267 F.3d at 645 (holding evidence of four phone calls from two friends, the plaintiff's father and a former co-worker received by the plaintiff were not probative of, or "material" to, the issue of actual confusion.)

### d. Remaining Likelihood of Confusion Factors

**\*23** Both parties promote and produce wrestling shows and market videotapes of their shows, as well as T-shirts and caps. However, the Defendant wrestling business has nationally circulated magazines and has "WWE"-branded video games, books, and other WWE merchandise sold on its website and through national retailers. In addition, WWE's services and products have a distinctive style and manner, minimizing the likelihood of confusion with Patterson's products and services. Most of WWE's products are branded with its scratch logo. *See Id.* at 645.

In terms of area and manner of use, Patterson primarily promotes and sells his products in the southeastern Wisconsin. The Defendant wrestling business, a publically traded corporation on the New York Stock Exchange, is an international media giant. Patterson's distribution area is clearly smaller than that of the Defendants. *See Id.* at 646. The distinction between the areas where the

parties' products appear minimizes the likelihood of confusion. *See Id.*

The sole evidence on the degree of care exercised by consumers, is that wrestling fans are highly knowledgeable and loyal with respect to professional wrestling programming and merchandise. Such evidence indicates that the relevant consumers are sophisticated and would be careful in choosing wrestling events and related products. In other words, they would likely be able to differentiate the parties' respective products. Patterson has not raised a genuine issue of material fact with respect to the sophistication of consumers, which weighs against the likelihood of confusion. *See Id.*

Finally, in considering the strength of Patterson's mark, the Defendants maintain that Patterson's marks are extremely weak, citing the absence of evidence of consumer recognition of Patterson's marks, the limited area in which Patterson has used the marks, and Patterson's minimal expenditures of money on the marks. (Defs.' Br. in Supp. of Mot. for Summ. J. at 36.) The Defendants do not cite any case law indicating that the foregoing is relevant to the strength of the mark (*see id.*), and Patterson does not address the issue.

However, the strength of the mark in trademark parlance refers to the classification of a mark. Trademarks are classified in one of four categories-fanciful, arbitrary, descriptive, and generic. *See Sullivan v. CBS Corp.,* 385 F.3d 772, 776 (7th Cir.2004). The amount of protection available tends to increase from generic to fanciful. *Id.* Generic words are entitled to no protection, whereas fanciful words are usually entitled to strong protection. *Id.* The PTO examiner found that the words "Wrestling Association" alone are descriptive. (Pl.'s Exs., Vol. V, Ex. 79, 1.) A descriptive term is one that describes a characteristic or ingredient of a product. *Sullivan,* 385 F.3d at 776. However, the addition of the "World" to the mark, given the geographic scope of Patterson's business, makes "World Wrestling Association," arbitrary. *See Id.* ("Survivor" is an arbitrary mark for a band .)

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 273527 (E.D.Wis.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 273527 (E.D.Wis.))**

The Court need not extensively consider the strength of Patterson's mark. The three most important elements of "likelihood of confusion" have not been established. Considering all the evidence related to the seven relevant factors in the light most favorable to Patterson, there is insufficient evidence upon which a jury could reasonably find for Patterson on the issue of the likelihood of confusion between his marks "World Wrestling Association" and "WWA" and the marks "WWE" and "World Wrestling Entertainment" used by the Defendants. Therefore, summary judgment dismissing Patterson's Lanham Act claims is granted.

### Advertising Claim

**\*24** The Defendants maintain that Patterson's advertising claim fails as a matter of law. Patterson has not responded to the Defendants' contention.

Count Four, which alleges that the Defendants misappropriated Patterson's unique method of advertising involving Patterson's selection and promotion of a collection of wrestlers each possessing a unique persona, fails as a matter of law.

Section 43(a) of the Lanham Act proscribes the use in commerce of a word, name, or symbol in connection with:

any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities.

15 U.S.C. § 1125(a). This section protects against misrepresentations or false statements made in connection with the advertising and marketing of goods or provision of services, misappropriation of the efforts of others, and confusion or likelihood of confusion as to source, sponsorship, or association of goods or services. *See Two Pesos, Inc. v. Taco Cabana,* 505 U.S. 763, 767, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992).

Despite construing the parties' factual submissions in the light most favorable to Patterson, the Defendants have established that there is no genuine dispute of material fact regarding whether Patterson devised a unique method of advertising. The factual materials before the Court do not include any evidence upon which a reasonable jury could conclude that the Defendants misappropriated a unique method of advertising devised by Patterson. *See Anderson,* 477 U.S. at 248. Therefore, as a matter of law, the Defendants have established that they are entitled to summary judgment dismissing Count Four of Patterson's complaint.

### Patterson's State Law Claim

Count Five is a claim of trademark infringement under Wis. Stat. § 132.01*et. seq.* The factors analyzed in assessing the likelihood of confusion under a Wisconsin statutory trademark claim are the same as those applied by the federal courts in this judicial circuit. Therefore, the Court's determination that the Defendants are entitled to summary judgment dismissing Patterson's Lanham Act trademark infringement claims is likewise dispositive of Patterson's state statutory claim. Therefore, Patterson's state law trademark infringement claim is dismissed.

NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:

The Defendants' motion for summary judgment (Docket No. 76) DISMISSING the claims of Patterson's complaint is granted.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 28
Not Reported in F.Supp.2d, 2006 WL 273527 (E.D.Wis.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 273527 (E.D.Wis.))**

The matter will proceed on the Defendants' counter-
claims against Patterson.

E.D.Wis.,2006.
Patterson v. World Wrestling Entertainment, Inc.
Not Reported in F.Supp.2d, 2006 WL 273527
(E.D.Wis.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# APPENDIX 9



Navistar Intern. Transp. Corp. v. Freightliner Corp.
N.D.Ill.,1998.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern
Division.
NAVISTAR INTERNATIONAL TRANSPORTA-
TION CORP., Plaintiff and Counterdefendant,
v.
FREIGHTLINER CORP. and AMERICAN LA-
FRANCE CORP., Defendants and Counter-
plaintiffs.
**No. 96 C 6922.**

Dec. 28, 1998.


MEMORANDUM OPINION

GRADY, District J.
*1 Before the court are the parties' cross motions
for summary judgment. For the reasons explained
below, plaintiff's motion is granted and defendants'
motion is denied.


BACKGROUND

The facts relevant to these cross motions for sum-
mary judgment were outlined in a previous opinion
dated September 16, 1998. The following passages
are from that opinion:
Plaintiff Navistar is a truck manufacturer that owns,
among other trademarks, a federally registered
trademark in the word EAGLE. Plaintiff has used
this mark since 1981. Defendants, American La-
France Corporation and its parent company Freight-
liner Corporation, also manufacture trucks. More
specifically, they make fire trucks. Defendants have
a registered trademark for the design that appears
below:
We refer to this mark as defendants' "composite"
mark ... Defendants have used this mark since 1970.
The origin of this particular dispute dates back to

late 1995, when defendants launched a promotional
campaign for a new fire truck. As part of this cam-
paign, defendants adopted a new three-word mark
for the truck: AMERICAN LAFRANCE EAGLE.
(Incidentally, defendants have applied to register
this mark in the Patent and Trademark Office.) De-
fendants' campaign also used slogans such as "The
Eagle Has Landed." Plaintiff objected to defend-
ants' use of the word "eagle" because it thought
customers would likely confuse defendants' use of
the word "eagle" with plaintiff's EAGLE mark.
Plaintiff filed a six-count complaint alleging,
among other things, that defendants are infringing
plaintiff's EAGLE mark by using the word "eagle"
as a trademark. It also alleges that defendants' use
of the mark AMERICAN LAFRANCE EAGLE is
likely to cause confusion with plaintiff's EAGLE
mark. Among several requests for relief, plaintiff
asks the court to order defendants to withdraw their
application to register the AMERICAN LA-
FRANCE EAGLE application and to enjoin defend-
ants from using the word "eagle" as a trademark ...
... Because it is crucial to keep straight the three
specific marks and one potential mark at issue in
this case, we identify them again before moving on.
Plaintiff has a registered trademark for the word
EAGLE. Defendants have a registered composite
mark (a.k.a. the "AMERICAN LAFRANCE plus
bird design" mark). Defendants are also using, and
have filed an application to register, the word mark
AMERICAN LAFRANCE EAGLE. And finally,
according to plaintiff, defendants are using the
word "eagle" standing alone as a trademark.


Several months ago, the parties submitted cross
summary judgment motions on plaintiff's claims,
defendants' eight affirmative defenses and defend-
ants' two-part counterclaim for declaratory judg-
ment. We resolved most of the plethora of issues
raised by the cross motions. *See* Memorandum
Opinion Dated September 16, 1998.[FN1] One such
issue was how the "continuing commercial impres-
sion" rule, also known as the "tacking" rule, ap-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1998 WL 911776 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

plied to the priority of use dispute in this case. We originally decided that the tacking rule presented a question of law for the court to decide and then we resolved the issue. *See* Memorandum Opinion Dated September 16, 1998 at 5. Upon reconsideration, we vacated that holding and held that tacking was a question of fact for the fact finder.*Navistar v. Freightliner,* 96 C 6922, 1998 WL 786388, *5 (N.D.Ill. Nov. 6, 1998). Because we determined that tacking was not a question of law, we also vacated our earlier resolution of the issue and ordered the parties to rebrief the issue as if it were a question of fact to be decided on summary judgment.*Id.* at 5-6. We specifically asked the parties to address the evidentiary showing required in order for tacking to be appropriate. *Id.* at 6. The parties have completed their briefing, and we can now resolve the issue of tacking as it relates to both parties' motions for summary judgment, explained in more detail below.

> FN1. Among other things, we (1) denied summary judgment to defendants on plaintiff's allegations of infringement based on defendants' use of the word "eagle"; (2) granted summary judgment to plaintiff on defendants' fourth, fifth, seventh and eighth affirmative defenses; (3) denied summary judgment to plaintiff on the first aspect of defendants' counterclaim; and (4) granted summary judgment to plaintiff on the second aspect of defendants' counterclaim.

*DISCUSSION*

A. Priority of Use and the Tacking Rule

**\*2** A party in a trademark dispute can prevail under the doctrine of "priority of use" if the party demonstrates that it used the allegedly infringing mark first. *Zazu Designs v. L'Oreal, S.A.,* 979 F.2d 499, 503 (7th Cir.1992). A party can also establish priority of use by demonstrating that it used a variation of the infringing mark first. Situations involving priority based on variations of trademarks are governed by the "tacking" rule, which allows a party to add time spent using an older mark to the time spent using a newer mark if both marks make the "same, continuing commercial impression." *Lincoln Logs, Ltd. v. Lincoln Pre-Cut Log Homes, Inc.,* 971 F.2d 732, 735 (Fed.Cir.1992); *see also Data Concepts, Inc. v. Digital Consulting, Inc.,* 150 F.3d 620, 623 (6th Cir.1998) (same statement of the rule); 2 J. THOMAS MCCARTHY, TRADEMARK LAW AND UNFAIR COMPETITION § 17:26, at 17-40 ("[N]either **abandonment** nor loss of the ability to **tack**-on to achieve priority will occur if the new form of the mark creates the same commercial impression as did the old form.").

The reason for the tacking rule is that "[t]rademark rights inure in the basic commercial impression created by a mark, not in any particular format or style."MCCARTHY § 17:26. This flexibility in trademark law allows users to modernize their trademarks without losing years of accumulated value in, or goodwill toward, their trademarks. *Id.* Although the Seventh Circuit has never formally adopted the **tacking** rule, it has adopted a similar rule in the somewhat analogous context of **abandonment**. *See Sands, Taylor & Wood Co. v. Quaker Oats Co.,* 978 F.2d 947, 955 (7th Cir.1992) ("Minor changes in a mark which do not change the basic, overall commercial impression created on buyers will not constitute any abandonment [when determining priority of use]."). We add that neither party disputes the applicability of the rule. *Cf.*MCCARTHY § 17:26 (mentioning no cases rejecting the rule).

Defendants have raised the tacking rule in this case in the following manner: first, they argue that they have priority with respect to their composite mark because it is older than plaintiff's EAGLE mark; secondly, they argue that their priority in the composite mark also gives them priority with regard to the AMERICAN LAFRANCE EAGLE mark because the two marks make the same commercial impression; FN2 and thirdly, they argue that their priority in the composite mark also gives them pri-

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1998 WL 911776 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

ority with regard to the mark EAGLE because these two marks make the same commercial impression as well.[FN3]With these arguments in mind, we turn to an analysis of the tacking rule.

> FN2. Defendants currently seek summary judgment based on this argument.

> FN3. Plaintiff seeks summary judgment rejecting this argument, which was raised by defendants in connection with their sixth affirmative defense.

1. A Threshold Issue: Whether Defendants Can Avail Themselves of the Tacking Rule

A threshold issue is plaintiff's contention that tacking is appropriate only when an older mark is no longer being used, having been replaced by a newer mark. Plaintiff points to evidence indicating that defendants are still using their older mark (i.e., the composite mark). In response, defendants argue that tacking is appropriate even if a party continues to use the older mark.

**\*3** Plaintiff's view of the law on tacking is problematic because it lacks authority. Plaintiff provides no case law holding that a party seeking to tack must have discontinued use of the older mark, and we found no such case. If given the chance, plaintiff might respond that this issue has never arisen because parties seeking to tack have ordinarily discontinued use of their older marks. But the fact that past litigants have chosen a certain course of action does not help us determine what the law should be.

Just as plaintiff's view lacks precedent, so does defendants'. One case potentially supports defendants, but it did not squarely address the issue of whether a party seeking to tack must have discontinued use of its older mark. *See Humble Oil & Refining Co. v. Sekisui Chem. Co.,* 165 U.S.P.Q. 597, 602 (T.T.A.B.1970) (permitting tacking of one mark onto another while mentioning that party had simultaneously used both marks).

Fortunately, we need not base our decision on the scant precedent. A more solid ground is a consideration of the reasons why a party should be required to discontinue its use of an older mark in order to invoke the tacking rule. It is significant that plaintiff does not suggest any such reasons. The only reason we can imagine would be to prevent a trademark owner from expanding the scope of its statutorily-granted protection. At first blush, it seems that if defendants can use both marks, their protection would expand. But we must remember that "[t]rademark rights inure in the basic commercial impression created by the mark, not in any particular format or style."MCCARTHY § 17:26. McCarthy's point suggests to us that defendants' right in the commercial impression created by their mark is not limited to one particular form. We see no reason why defendants should not be allowed to claim priority by tacking onto the older mark even if they are still using it, so long as the older and newer marks make the same commercial impression. Accordingly, we accept defendants' view that tacking can be appropriate even when the party continues to use the older mark.

2. Test for Tacking

Because defendants can avail themselves of the tacking rule, we must determine how the rule should be applied. We have held that tacking is a question of fact, not law. *Navistar v. Freightliner,* 96 C 6922, 1998 WL 786388, \*5 (N.D.Ill. Nov. 6, 1998).[FN4] In that November opinion, we also pointed out that the Seventh Circuit has never outlined an evidentiary test for tacking, and that the parties have never presented the court with a test for determining whether tacking is appropriate. *Id.* at \*6. We ordered the parties to brief the legal and factual aspects of this issue so we could determine whether it is susceptible of resolution on summary judgment. *Id.*

> FN4. For some reason, defendants continue to argue that tacking presents a question of law. We reject their argument for the following reasons: (1) defendants have had

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 4
Not Reported in F.Supp.2d, 1998 WL 911776 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

two opportunities to convince the court on this issue (i.e., on their motion for summary judgment and on plaintiff's motion for reconsideration of the disposition of defendants' motion); (2) we have fully considered this issue and come to our conclusion that tacking is a question of law, see *Navistar v. Freightliner,* 1998 WL 786388 at *5 ("[W]e conclude that plaintiff is correct that tacking should be considered a question of fact in the Seventh Circuit."); and (3) defendants do not seek further, formal reconsideration of our conclusion; they simply reargue the issue without reference to any standard for reconsideration.

As the language of the tacking rule suggests, the test is relatively simple. *Cf. ILCO Corp. v. Ideal Sec. Hardware Corp.,* 527 F.2d 1221, 1224 (C.C.P.A.1976) ("The only requirement in [situations of tacking] is that the mark be modified in such a fashion as to retain its trademark impact and symbolize a single and continuing commercial impression."). The following series of questions may be helpful in analyzing disputes about tacking: (1) do the marks make the same commercial impression? [FN5]; (2) are the two impressions continuous? [FN6]; and finally, (3) are the marks being used on the same or substantially similar goods or services?[FN7] We add that the party seeking to tack bears the burden of establishing each prong of the test. *ICON Solutions, Inc. v. IKON Office Solutions, Inc.,* 97-4178, 1998 U.S. Dist. LEXIS 9101, *21 (E.D. Pa. June 12, 1988) (stating that party seeking to tack "bears the burden of proving that [the] two marks are indistinguishable") (citing *Yeager Fuel, Inc. v. Pennsylvania Power & Light Co.,* 22 F.3d 1260, 1266 (3d Cir.1994)).

> FN5. The "commercial impression" of a trademark is the "meaning" or "idea" it conveys, or the "mental reaction" it evokes. *Spice Islands, Inc. v. Frank Tea & Spice Co.,* 505 F.2d 1293, 1296 (C.C.P.A.1974).

Defendants propose that two marks make the same commercial impression if there is proof that:

The marks are similar, visually, aurally, and in connotation, and they impart the same amount of information. Thus, differences between the marks are minor, *i.e.,* added elements are not relevant in identifying the origin of the goods and the modifications nonetheless retain the mark's distinctive characteristics.

Defendants' Supplemental Brief on Tacking at 4 (citations omitted). Not only is this proposed analysis stated in unclear grammatical terms, but it is also misguided: the fundamental inquiry is whether the two marks make the same commercial impression, not whether the two marks are similar in appearance. Of course, two marks that are similar in appearance *may* make the same commercial impression, but that will not necessarily be true.

On a similar note, plaintiff proposes that "even if two marks create the same continuing commercial impression, tacking is improper if the later mark attempted to be 'tacked' differs materially from or alters the character of the original mark."Plaintiff's Opening Memorandum, at 8. Some courts have adopted this as a consideration. *See, e.g., Lincoln Logs,* 971 F.2d at 735. We believe this consideration is inappropriate because it shifts the focus away from the true inquiry, which is whether two marks make the same commercial impression. Even if a new mark "alters the character" of an old mark, it is possible for the two marks to make the same commercial impression (depending, of course, on what "character" means). Besides, any change to a mark would necessarily "alter" its exact character; applying this rule literally would mean that no change would be permissible. This is not the law.

Even the "material difference" standard mentioned in plaintiff's proposal is problematic. No decision we read suggested or applied a standard for materiality, and in any event, it seems that a material difference would exist only if consumers perceived the new mark differently, which brings us back to the question of the impressions made by the marks on consumers. Considered in this vein, applying a materiality test would basically be a duplication of ef-

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1998 WL 911776 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

forts to determine the marks' commercial impressions. Furthermore, although several courts mention plaintiff's proposed consideration, we found no case justifying it, and plaintiff has not attempted to justify it. In light of our doubts about its worth, we decline plaintiff's invitation to add this consideration.

> FN6. By "continuous," we simply mean that the same impression must continue from the old mark to the new mark. *See* McCarthy § 17:25 ("The test is one of continuity. A mark can be modified or changed without abandonment or loss of priority if done in such a way that the continuing common element of the mark retains its impact and symbolizes a continuing commercial impression.").

Plaintiff proposes a much stricter, two-fold test for continuity: first, a party seeking to tack must demonstrate the commercial impression of the older trademark dating back to its first use in commerce; and second, the party must demonstrate that this commercial impression continued up to the time when the new trademark was first used. If applied here, defendants would have to demonstrate the commercial impression of its composite mark back in 1970. They would then have to demonstrate that this impression continued through 1995, when they began using the AMERICAN LAFRANCE EAGLE mark. Plaintiff cites several cases that purportedly support this strict view, but our reading of them leads us to conclude that they do not. One case cited by plaintiff did mention that a party had "always" used an element of its trademark in a certain way, but the court did not hold that a party seeking to tack must demonstrate the commercial impression of the prior trademark dating back to its first use in commerce. *Owens-Illinois, Inc. v. Optimist Int'l,* 173 U.S.P.Q. 120, 127 (T.T.A.B.1972). Even if *Owens-Illinois* did support plaintiff's view, we would disagree with such a holding because we find defendants' criticism of plaintiff's view to be valid: trademark law does not (and should not) require a decades-old mark to continue to evoke the *exact same* commercial reaction today that it

evoked at its birth or else lose its accumulation of good will from prior use over those decades.

We are disappointed that plaintiff's counsel failed to inform the court that one of the decisions they cited had been vacated. *See Sterling Bank v. Sterling Bank & Trust, FSB,* 94 CV 8378, 1996 WL 339849 (C.D.Cal. May 14, 1996), vacated pursuant to settlement, 1996 WL 500946 (C.D.Cal. July 5, 1996). Although vacating an opinion pursuant to a settlement does not necessarily negate the logic of the opinion, it is still important to inform a court of the fact of vacatur.

> FN7. This is not an exhaustive list of potentially relevant considerations. For example, if a party is claiming priority of use based on an older mark, it probably must demonstrate its rights in that older mark. Here, the parties do not contest that defendants have rights in their composite mark, at least for the purposes of these cross motions.

**\*4** To elaborate further, the two marks at issue must make the same impression, so that the party seeking to tack is not allowed to expand its trademark rights. There must not be "the tacking of a mark with a narrow commercial impression onto one with a broader commercial impression," a result which "would be clearly contrary to well-established principles of trademark law." *Van Dyne-Crotty, Inc. v. Wear-Guard Corp.,* 926 F.2d 1156, 1160 (Fed.Cir.1991). As for whose impression matters, it is the impression of consumers for the product at issue that matters. *See Data Concepts,* 150 F.3d at 623 (6th Cir.1998) (tacking permitted "only if ... consumers consider both as the same mark"); *Van Dyne-Crotty,* 926 F.2d at 1159 ("the consumer should consider both as the same mark"); *ICON Solutions,* 1998 U.S. Lexis at \*16 (quoting *Van Dyne-Crotty* );*see also ILCO Corp.,* 527 F.2d at 1224 ("commercial impression is gauged by the impact on the public, in this case hardware store operators and their customers").[FN8]

> FN8. Our emphasis on the impressions of

consumers is bolstered by Seventh Circuit precedent in an analogous trademark context-the "likelihood of confusion" test for infringement. *See, e.g., Dorr-Oliver, Inc. v. Fluid-Quip, Inc.,* 94 F.3d 376, 382 (7th Cir.1996) ("the proper inquiry centers on the confusion of customers in the market for the particular products at issue"); *Scandia Down Corp. v. Euroquilt, Inc.,* 772 F.2d, 1423, 1428 (7th Cir.1985) ("[T]he legal question is not whether the marks look similar to us, but whether they look similar to the ordinary consumers of bedding products."); *James Burroughs Ltd. v. Sign of the Beefeater, Inc.,* 540 F.2d 266, 275 (7th Cir.1976) ("Though the marks must be compared, they must be compared in the light of what occurs in the marketplace, not in the courtroom."); *Imperial Service Sys. v.. ISS Int'l,* 701 F.Supp. 655, 658 (N.D.Ill.1988) ("[The] test is the consumers' state of mind when faced with the marks individually.").

Defendants argue that we can apply a tacking test without resort to evidence of consumers' perceptions, but we disagree. Because the inquiry is how consumers perceive the marks, there must be some evidence demonstrating those perceptions. It is inconsequential that no case holds that a party seeking to tack must submit consumer perception evidence. It is also inconsequential that some cases decide tacking without such evidence; most, if not all, of these decisions view tacking as a question of law to be determined by the court. We have concluded that, in this Circuit, tacking is a question of fact and one who asserts the doctrine must, therefore, support it with probative evidence.[FN9]

> FN9. If the change to the mark is de minimus (that is, basically unnoticeable), perhaps it would be appropriate for the finder of fact, without being provided evidence on consumers' perceptions, to conclude that there is no genuine issue as to whether

consumers perceive the two marks as making the same commercial impression. We found no precedent addressing this scenario, nor has either party addressed it. This is not problematic because our case does not involve a "de minimus" change to defendants' mark. We have a party that has changed a composite mark that included two words and two pictorials to a word mark with three words.

Furthermore, it is irrelevant that the "likelihood of confusion" test for infringement does not require consumer perception evidence. Although the likelihood of confusion test is similar to the tacking test, the standard for tacking is "far higher than the likelihood of confusion standard applicable to the underlying trademark infringement dispute."*ICON Solutions,* 1998 U.S. Dist. LEXIS 9101 at *16. The test for infringement is whether there is a *likelihood* that consumers would confuse the marks (or, more precisely, a likelihood that the marks would confuse the consumers). The test for tacking is whether two marks make the same commercial impression-not whether it is *likely* that they will make the same commercial impression. Considering the matter in this light, it is clear why tacking can require a more substantial evidentiary showing than infringement.

B. Application of the Tacking Rule to this Case

1. Defendants' Motion for Summary Judgment

Defendants claim that their use of the allegedly infringing AMERICAN LAFRANCE EAGLE mark has priority over plaintiff's use of its EAGLE mark. Defendants contend their priority is based on the fact that their AMERICAN LAFRANCE EAGLE mark makes the same commercial impression as the composite mark they have been using since 1970. They claim the years dating back to 1970 can be tacked onto their post-1994 use of the AMERICAN LAFRANCE EAGLE mark. This would give them priority over plaintiff's use of the EAGLE mark, which began in 1981.

Not Reported in F.Supp.2d                                                                                                      Page 7
Not Reported in F.Supp.2d, 1998 WL 911776 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

a. A preliminary issue: the applicability of the doctrine of legal equivalents

**\*5** Defendants insist that when applying the test for tacking to their composite and AMERICAN LAFRANCE EAGLE marks, we must first apply the doctrine of legal equivalents. This doctrine, also known as "picture-word equivalency," is used in the context of infringement. It holds that trademark rights in a picture mark encompass rights in a word if the picture evokes the mental impression of the word (or vice versa).*See, e.g., Mobil Oil Corp. v. Pegasus Petroleum Corp.,* 818 F.2d 254 (2d Cir.1987) (upholding district court finding that consumers would likely confuse defendant's word mark PEGASUS with plaintiff's picture mark of a flying horse). Defendants' view is that because the pictorial image of a bird in their composite mark is the literal equivalent of an eagle, "the doctrine operates to translate the AMERICAN LAFRANCE and eagle design mark into its equivalent: the word mark AMERICAN LAFRANCE EAGLE."Defendants' Supplemental Brief on Tacking at 6.

Although we recognize the validity of the doctrine of equivalents, we disagree with defendants' argument that the doctrine plays a part in the tacking inquiry. Tacking and legal equivalency are distinct inquiries that apply in different ways and, most importantly, in different contexts. Tacking is applied in the priority of use context; the doctrine of legal equivalents is applied in the infringement context: if a trademark owner sues for infringement of his word mark, the scope of his rights covers the pictorial equivalent of his word mark (or vice versa). We have found no case applying the doctrine of legal equivalents in the context of priority disputes. The governing rule in priority disputes is the tacking rule. Significantly, defendants state in their final brief that the doctrine of legal equivalents is "admittedly a distinct doctrine" from tacking. Defendants' Reply Brief on Tacking at 3.

The doctrine of legal equivalents and the tacking rule involve different inquiries that require different evidentiary showings. Specifically, as we have stated, tacking is to be determined based on evidence of the commercial impression of consumers, whereas legal equivalence can be determined without such evidence. *See Mobil Oil,* 818 F.2d at 257 (determination of legal equivalence based on "common sense" and testimony from company executives). We see no reason to depart from a tacking analysis in priority disputes in favor of a test used in another context.[FN10]

> FN10. Defendants argue that "tacking is based on and is a logical outgrowth of the doctrine of legal equivalents."Defendants' Supplemental Brief on Tacking at 3-4. They provide no support for this conten- tion.

Importantly, defendants have not cited a decision applying the doctrine of legal equivalents in a priority dispute. Instead, defendants emphasize that in our September 16th opinion, we said that the doctrine of legal equivalents "informed" our tacking analysis. *See* Memorandum Opinion Dated September 16, 1998 at 8 n. 2 (concluding that defendants' marks made the same commercial impression, based in part on conclusion that bird pictorial was the legal equivalent of the word "eagle"). But we have now rejected that reasoning. *See Navistar,* 1998 WL 786388 at \*5. In the September decision, we were operating under the assumption that tacking was a matter of law to be decided by the court, and we thought the doctrine of legal equivalents was a useful tool that informed courts about the commercial reality of consumers' perceptions. Memorandum Opinion Dated September 16, 1998 at 8, n. 2. We have since ruled that tacking is a question of fact to be decided by the fact finder based on evidence of consumers' perceptions. *See Navistar,* 1998 WL 786388 at \*5[FN11] ; *supra.*Now we regard the doctrine as an unnecessary tool: evidence of consumers' perceptions is required, and a party seeking to tack should not be able to invoke the doctrine of legal equivalents in an attempt to avoid presenting such evidence.[FN12]

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                        Page 8
Not Reported in F.Supp.2d, 1998 WL 911776 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

FN11. To be clear, we have vacated the following portion of our September 16th opinion: from the second paragraph on page five all the way through and including the first paragraph on page nine. Defendants should no longer cite to that portion of the opinion.

FN12. Even if we are wrong in concluding that the doctrine of equivalents should not be applied in the context of priority disputes, the doctrine would still not allow the defendants to prevail here. Defendants ask us to legally equate their composite mark with a word mark, but there is no precedent that supports such an equation. The doctrine of legal equivalents is invoked to equate a word mark with a picture mark. *See, e.g., Mobil Oil,* 818 F.2d at 257 (equating word mark PEGASUS with plaintiff's picture mark of a flying horse); *In re Duofold Inc.,* 184 U.S.P.Q. 638, 640 (T.T.A.B.1974) (pictorial of a golden eagle "might well trigger the recollection of" the GOLDEN EAGLE word mark); *Izod, Ltd. v. Zip Hosiery Co.,* 160 U.S.P.Q. 202, 203 (C.C.P.A.1969) (word mark TIGER HEAD is the legal equivalent of a pictorial representation of a feline's head). The language of one case underscores our point: the doctrine of legal equivalents is founded on the "sound basis that the pictorial representation and its literal equivalent conjure up the same mental image or suggestion." *In re Duofold Inc.,* 184 U.S.P.Q. at 640. Such a "sound basis" does not exist here because defendants are not seeking to convert a pictorial representation into its literal equivalent. They are seeking to convert a composite mark with two pictorial representations and a phrase into a three-word mark.

Another problem with defendants' proposed application of the doctrine of legal equivalents is that they ask us to conclude that their two marks are legal equivalents because one element in the composite mark (the bird pictorial) could be considered the equivalent of one element in their word mark (the word "eagle"). There is no authority for the proposition that if one component of a mark is the legal equivalent of one component of another mark, then the two marks are legal equivalents.

On a related note, we previously remarked that the new mark's lack of a Maltese cross pictorial was an immaterial difference when comparing the two marks. *Id.* at 6. Defendants hearken back to this remark to support their doctrine of legal equivalents argument. Their argument is problematic because our remark has been vacated, and in any event, the remark was made in connection with our tacking analysis, not in connection with any analysis involving the doctrine of legal equivalents. The doctrine of legal equivalents does not render differences between marks as "immaterial"; it operates solely to equate two marks when they are literal or pictorial equivalents.

b. Returning to the tacking inquiry

**\*6** As for establishing priority based on the tacking rule, defendants make two arguments. First, they quote portions of our September 16th opinion where we reasoned that their two marks make the same commercial impression. For example, they quote our remark that the absence of the Maltese cross in the new mark is "immaterial" because the cross was "hardly noticeable" to begin with. See Opinion Dated September 16, 1998 at 6. The problem with defendants' argument is that we have vacated this reasoning. *See supra* note. Tacking is a question of fact, and furthermore, it is a question of fact that depends on consumers' perceptions, not on our opinion about what is "hardly noticeable."

Defendants also attempt to prevail under the tacking rule by claiming that they provided evidence of the commercial impression made by their two marks when they originally filed for summary judgment. Defendants do not explain this evidence or incorporate it into their briefs; they simply direct us to ten different parts of the materials they submitted. *See* Defendants' Response to Plaintiff's Supple-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                        Page 9
Not Reported in F.Supp.2d, 1998 WL 911776 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

mental Brief at 7.

One reference is to a paragraph in the affidavit of William Thomas, Marketing Manager for American LaFrance Corporation. Thomas attests that his company chose the mark AMERICAN LAFRANCE EAGLE "in order to create a connection between the new trucks and the trucks that the company sold under the [composite mark]." This testimony is irrelevant. The motive of the company in adopting the three-word mark has no bearing on consumers' perceptions of the two marks.

Another citation is to the affidavit of Arnold Heller, the Vice President of Sales for American LaFrance Corporation. Heller attests that the AMERICAN LAFRANCE EAGLE mark "connects the new fire trucks with the trucks that American LaFrance sold for over twenty years under the [composite mark]." This conclusory statement sheds no light on what the actual commercial impressions of the marks are.FN13Equally unhelpful is a supplemental declaration by Heller to which defendants cite.

> FN13. Defendants also cite another paragraph in Heller's declaration-¶ 4-but this paragraph does not offer relevant evidence on consumers' perceptions. Incidentally, when the parties briefed the original cross motions for summary judgment several months ago, plaintiff filed a motion to strike certain testimony in ¶ 4 of Heller's affidavit. *See* Navistar's Motion to Strike Dated July 10, 1998. Plaintiff also sought to strike testimony in a different affidavit (and documents attached to that second affidavit). Because we are not relying on any of this disputed testimony, plaintiff's motion is denied as moot.

We need not parse through the remaining materials to which defendants have directed us. It is clear that defendants are not entitled to summary judgment on their tacking theory. Genuine factual issues exist as to whether the original and later marks create the same commercial impression. Defendants' motion

will be denied.

### C. Likelihood of Confusion

When we decided defendants' original summary judgment motion and ruled that defendants had priority with regard to the mark AMERICAN LA-FRANCE EAGLE, we had no need to consider defendants' back-up argument that they are not infringing because there is no likelihood of confusion between plaintiff's EAGLE mark and defendants' AMERICAN LAFRANCE EAGLE mark. This issue was fully briefed at that time, and defendants ask us to consider their likelihood of confusion argument now. It is appropriate for us to do so.

The Seventh Circuit uses seven factors to determine whether confusion about trademarks is likely: (1) similarity of the marks; (2) similarity of the products; (3) area and manner of concurrent use; (4) care likely to be exercised by consumers; (5) strength of the plaintiff's mark; (6) actual confusion; and (7) any intent of defendant to "palm-off his product as that of another."*Smith Fiberglass Prods., Inc. v. Ameron, Inc.,* 7 F.3d 1327, 1329 (7th Cir.1993). No one factor is determinative. *International Kennel Club v. Might Star, Inc.,* 846 F.2d 1079, 1087 (7th Cir.1988); *see also Navistar,* 1998 WL 786388 at *3 n. 3 (concluding that the Seventh Circuit has not abandoned this maxim).

**\*7** The first factor is the similarity of the marks. An obvious similarity here is that both marks use the word "eagle." An obvious difference is that defendants' mark additionally uses the words "American LaFrance." This difference reduces the likelihood of confusion. *Cf. Ziebart Intern. Corp. v. After Market Assocs.,* 802 F.2d 220, 226-27 (7th Cir.1986) (prominent display of different names on marks reduces likelihood of confusion of otherwise similar marks). But while this difference reduces the likelihood of confusion, we cannot say as a matter of law that it eliminates the likelihood. The fact remains that the marks both use the word "eagle." *Cf. A.T. Cross Co. v. Jonathan Bradley Pens, Inc.,*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

470 F.2d 689, 692 (2nd Cir.1972) (adding words to a mark "does not save the day" because "a purchaser could well think plaintiff had licensed defendant as a second user"). There is a genuine factual issue regarding this factor. *See O'Connor v. DePaul University,* 123 F.3d 665, 669 (7th Cir.1997) (in considering a summary judgment motion, the court construes all evidence in the light most favorable to the nonmoving party).

The second factor is whether the parties' products are similar. Defendants argue that they use their AMERICAN LAFRANCE EAGLE mark on fire trucks while plaintiff uses its EAGLE mark on highway trucks. According to defendants, the United States Patent and Trademark Office does not include highway trucks and fire trucks in the same class under its product classification system. Defendants also emphasize that plaintiff's own expert opined that the products are different. Finally, defendants point out that plaintiff has agreed to let Chrysler use an EAGLE mark on Chrysler truck products (apparently on trucks for personal use), an agreement which allegedly demonstrates that plaintiff understands that not all trucks are the same.

It is true that the parties' products are not the same. But the question is whether the products are *similar. Smith,* 7 F.3d at 1329. Furthermore, the products "need not be in direct competition" and they "need not be identical." *Forum Corp. of North America v. Forum, Ltd.,* 903 F.2d 434, 442 (7th Cir.1990). Fire trucks and highway trucks are similar enough. Besides, plaintiff has submitted evidence showing that the parties sell trucks in each other's markets. Plaintiff's 12N Statement ¶ 68 (defendants sell trucks in the "heavy-duty" truck market); *id.* ¶ 69 (citing Deposition of David Johanesson at 106-107, which says that one of plaintiff's models bearing its EAGLE mark was purchased for use as a fire truck). There is a genuine factual issue regarding this factor.

The third factor, area and manner of concurrent use, depends on whether there is a "relationship in use,

promotion, distribution, or sales" between the parties' goods. *Forum,* 903 F.3d at 442. Defendants emphasize (1) that use of the goods does not overlap because the parties' trucks serve different purposes-defendants' trucks are purchased for use as fire trucks, while plaintiff's trucks are purchased for commercial highway shipping use; (2) that marketing of the goods does not overlap because defendants advertise their trucks almost exclusively in fire truck magazines, magazines which plaintiff allegedly avoids; and (3) that distribution channels are separate because the parties use distinctly different dealers.

**\*8** Plaintiff submits evidence that it has marketed some of its trucks at fire industry trade shows. Plaintiff's 12N Statement at ¶ 72 (Deposition of Cameron Jacobsen at 15-25) (stating that at fire industry trade shows, plaintiff uses photographs to market two particular trucks that bear its EAGLE mark). There is also evidence that plaintiff has advertised in trade publications marketed to the fire services industry. *Id.* (Deposition of Cameron Jacobsen at 16). Moreover, as stated in connection with the previous factor, there is evidence of overlapping use of the parties' goods-one of plaintiff's trucks was purchased for use as a fire truck. Because there is evidence of overlapping trade channels for the parties' trucks, there is a genuine issue of material fact as to this factor.

The fourth factor is the degree of care likely to be exercised by consumers. Defendants argue that if the cost of the products at issue is high, or if the purchasers are sophisticated, confusion is less likely because purchasers are more likely to be discriminating. *See Ford Motor Co. v. Summit Motor Prods.,* 930 F.2d 277, 293 (3d Cir.1991) ("[S]ome buyer classes, for example, professional buyers, or consumers of very expensive goods, will be held to a higher standard of care than others."). The Seventh Circuit has expressed its belief that purchasers of high value items are "likely to study the product they are purchasing more carefully than the purchaser of a low value item."*Union Carbide v. Ever-*

Not Reported in F.Supp.2d                                                                    Page 11
Not Reported in F.Supp.2d, 1998 WL 911776 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

*Ready,* 531 F.2d 366, 388 (7th Cir.1976). The products at issue here are relatively expensive. A custom fire truck chassis such as one manufactured by defendants can apparently cost between $120,000 and $250,000. Of course, an expensive product does not guarantee that confusion is unlikely: "There is substantial case law to indicate that even those who deal in the most sophisticated expensive marketplace may be led astray."*Koppers Co. Inc. v. Krupp-Koppers,* 517 F.Supp. 836, 845 (W.D.Pa.1981), *aff'd mem.,*676 F.2d 686 (3d Cir.1982). While it is probable that consumers of expensive truck products like the ones at issue here will exercise a large degree of care, there is still a genuine issue as to this factor.

The fifth factor is the strength of plaintiff's mark. This factor depends in part upon third-party use of marks similar or identical to plaintiff's. *See, e.g, Singh v. V. Patel & Sons, Inc.,* 851 F.Supp. 318, 325 (N.D.Ill.1994) (stating that "widespread third-party usage of the elemental components of [plaintiff's] mark can greatly dilute its strength"). Defendants estimate that there are approximately sixty active registrations for EAGLE word marks in the trademark class that includes highway trucks such as plaintiff's. Plaintiff responds with survey evidence demonstrating that over 76% of respondents had seen or heard of an EAGLE heavy-duty truck. Over 71% of respondents identified plaintiff or its predecessors as the manufacturer of the EAGLE truck. As for third-party use of the word "eagle," plaintiff contends that its expert found that fewer than 1% of survey respondents named a manufacturer other than plaintiff. Based on these results, plaintiff's survey expert concluded that "the name EAGLE is clearly a well known and famous mark for a truck ."Defendants respond that plaintiff's expert report is flawed because it sampled such a narrow universe as to make it irrelevant. This argument only serves to create a genuine issue of material fact as to this factor.

**\*9** The sixth factor is whether there has been any actual confusion. Although defendants have been

using their AMERICAN LAFRANCE EAGLE mark for over a year, there is no evidence that any consumer has actually confused defendants' mark with plaintiff's. However, "actual confusion is not essential to show likelihood of confusion."*Nike,* 6 F.3d 1225, 1231 (7th Cir.1993).[FN14] Moreover, plaintiff has submitted survey evidence demonstrating confusion, and survey evidence is an acceptable substitute for evidence of actual confusion. *See AHP Subsidiary Holding Co. v. Stuart Hale Co.,* 1 F.3d 611, 618 (7th Cir.1993). Plaintiff's expert report indicates that a survey respondent believed that defendant Freightliner was the manufacturer of the EAGLE heavy-duty truck. 12N at 76. Defendants criticize the survey's methodology, but the survey does not demonstrate the absence of a genuine issue of fact as to the likelihood of confusion. *See id.*FN15

> FN14. Defendants rely on a different portion of the *Nike* decision, which stated that " 'it is certainly proper for the trial judge to infer from the absence of actual confusion that there was also no likelihood of confusion." ' *Nike,* 6 F.3d at 1231 (quoting *McGregor-Doniger Inc. v. Drizzle Inc.,* 599 F.2d 1126, 1136 (2d Cir.1979)). Defendants ask us to draw such an inference from plaintiff's lack of evidence of actual confusion. Putting aside the possibility that the passage defendants rely upon may be inconsistent with the *Nike* passage we quote in the text above, we point out that drawing such an inference would violate the rules of summary judgment. We cannot draw an inference in favor of the defendants because they are the movants here. *See O'Connor v. DePaul University,* 123 F.3d 665, 669 (7th Cir.1997) (in considering a summary judgment motion, the court construes all evidence and inferences that reasonably can be drawn therefrom in the light most favorable to the nonmoving party).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                          Page 12
Not Reported in F.Supp.2d, 1998 WL 911776 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

FN15. In *AHP,* the Seventh Circuit concluded that the district court "was premature in rejecting the survey evidence proffered."1 F.3d at 618. The court stated that although survey evidence may be "so flawed as to be completely unhelpful to the trier of fact and therefore inadmissible, such situations will be rare."*Id.* (citation omitted). The court concluded that "any shortcoming in [these particular] survey results go to the proper weight of the survey and should be evaluated by the trier of fact."*Id.*

The final factor is whether defendants adopted the AMERICAN LAFRANCE EAGLE mark in bad faith. There is no "smoking gun" evidence that defendants deliberately adopted their new mark in an effort to trade on plaintiff's good will. But there is evidence that plaintiff warned defendants twice about its federally registered trademark rights in EAGLE. Plaintiff's 12N Statement at ¶ 79. Also, defendants were aware of plaintiff's use of an EAGLE mark, *id.* at ¶ 80, and defendants' management personnel discussed plaintiff's use of the word EAGLE but, in the words of one of defendants' executives, "it didn't stop us from going ahead."*Id* . at ¶ 84 (citing Deposition of Debra Nicholsen at 55). This evidence creates a genuine issue of material fact on this factor.

The question at this stage is whether defendants have presented undisputed facts showing they are entitled to judgment as a matter of law. FED. R. CIV. P. 56(c) (summary judgment should be granted upon a demonstration "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law"). Clearly, defendants have not made such a showing. *See Kennedy v. Children's Serv. Soc'y of Wis.,* 17 F.3d 980, 983 (7th Cir.1994) ("A dispute over material facts is genuine if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party." ') (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)); *McGrath v.*

*Gillis,* 44 F.3d 567, 569 (7th Cir.1995) (The court will enter summary judgment against a party who does not "come forward with evidence that would reasonably permit the finder of fact to find in [its] favor on a material question."). This issue should go to a jury. *Cf. Nike,* 6 F.3d at 1228 (reversing summary judgment grant in favor of plaintiff in trademark case because "a jury may well disagree" on the confusion issue), *AHP,* 1 F.3d at 616 ("We have stated a number of times that the trial court's ultimate conclusion on the likelihood of confusion is a finding of fact. Accordingly, a motion for summary judgment must be approached with great caution.") (citation omitted); *Imperial Service Sys. v. ISS Int'l,* 701 F.Supp. 655, 658 (N.D.Ill.1988) (questions regarding the degree of similarity between two trademarks are "peculiarly jury questions").

2. Plaintiff's Motion for Partial Summary Judgment

**\*10** Plaintiff seeks partial summary judgment on defendants' sixth affirmative defense, which asserts that defendants "possess the exclusive right to use the mark EAGLE in connection with fire trucks and fire truck chassis as a result of defendants' prior registration of [the composite mark]." This "priority of use" affirmative defense is unrelated to defendants' above-analyzed "priority of use" argument. There, defendants were arguing they had priority of use for their AMERICAN LAFRANCE EAGLE mark. Here, defendants are arguing that they have priority with respect to their use of the word "eagle" as a mark. To be clear, we are no longer discussing plaintiff's use of the phrase "American LaFrance Eagle" as a mark.

When the parties originally argued their cross motions, it appeared that defendants were arguing that their right to use the word "eagle" as a mark was based on two independent grounds. First, defendants argued that the doctrine of equivalents operated to give defendants priority for the word "eagle" because their composite mark was the legal equivalent of the word "eagle." Our rejection of de-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

fendants' argument on the doctrine of equivalents is not at issue here.

The second ground was tacking. Defendants were claiming priority by tacking use of their composite mark onto use of the mark "eagle," claiming that the two made the same commercial impression. We rejected that ground as well, deciding that defendants' composite mark did not make the same commercial impression as their EAGLE mark. Of course, our decision was based on the premise that tacking was a question of law for the court to decide. We subsequently held that tacking was a question of fact, and as part of that holding, we gave defendants "an opportunity to prove that the commercial impression of their EAGLE mark and composite mark is the same."*Navistar,* 1998 WL 786388 at *7.

Defendants have chosen to forgo this opportunity. They unequivocally state that they do not seek to tack their use of the word "eagle" to their use of the composite mark. Defendants' Response to Plaintiff's Supplemental Brief on Tacking, at 2 n. 2. Consequently, we have no choice but to reject tacking as a ground for defendants' sixth affirmative defense. Defendants have not provided any other ground to prevail on this affirmative defense. We therefore grant plaintiff summary judgment on defendants' sixth affirmative defense.

*CONCLUSION*

Defendants' summary judgment motion is denied. Plaintiff's summary judgment motion is granted with respect to defendants' sixth affirmative defense.

N.D.Ill.,1998.
Navistar Intern. Transp. Corp. v. Freightliner Corp.
Not Reported in F.Supp.2d, 1998 WL 911776 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# APPENDIX 10



Not Reported in F.Supp.                                                                                    Page 1
Not Reported in F.Supp., 1995 WL 242292 (N.D.Ill.)
**(Cite as: 1995 WL 242292 (N.D.Ill.))**

Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois, Eastern
Division.
RAULAND BORG CORPORATION, Plaintiff,
v.
TCS MANAGEMENT GROUP, INC., Defendant.
**No. 93 C 6096.**

April 24, 1995.

*MEMORANDUM OPINION AND ORDER*
NORDBERG, District Judge.

**\*1** Before the Court is Defendant TCS Management
Group's Motion for Summary Judgment.

BACKGROUND FACTS

On October 6, 1994, Plaintiff Rauland-Borg Cor-
poration ("Rauland-Borg") filed its Complaint in
this Court against Defendant TCS Management
Group ("TCS"). In its Complaint, Rauland-Borg al-
leges that as early as July 10, 1970, it adopted and
used the trademark "RAULAND TELECENTER"
and a variety of other "TELECENTER" marks in-
cluding, "TELECENTER IV," "TELECENTER
4400," "TELECENTER 5000," "TELECENTER
5500" and "TELECENTER TCS," in connection
with the sales and promotion of a variety of tele-
communication products. (Complaint at ¶ 6.) On
March 26, 1974, Rauland Borg obtained United
States Registration No. 980,908 for the "RAU-
LAND TELECENTER" mark when used in con-
nection with "private administrative telephone com-
munication systems." *Id.* at ¶ 9.

On January 21, 1991, Rauland Borg filed a federal
trademark application for the mark "TELECEN-
TER." *Id.* at ¶ 10. However, such application was
suspended by the United States Patent and Trade-
mark Office pending the disposition of a federal
trademark application filed by TCS on September
15, 1990. *Id.* at ¶¶ 10, 11. In its application, TCS

sought to register the mark "TELECENTER SYS-
TEM - THE WORLD'S LEADING RESOURCE
PLANNING SYSTEM" in connection with com-
puter software programs used to manage call center
operations where a high volume of incoming calls
are answered. *Id.* at ¶ 11.

Rauland Borg alleges that TCS's use of the mark
"TELECENTER SYSTEM" in connection with its
software products is likely to cause confusion and
to deceive Rauland Borg's customers or potential
customers into believing that TCS's product is Rau-
land Borg's product or that TCS's product is some-
how sponsored by Rauland Borg. *Id.* at ¶ 14. Given
TCS's alleged unauthorized use of the mark "TELE-
CENTER SYSTEM," Rauland-Borg asserts that
TCS is liable under the Lanham Act, 15 U.S.C. §§
1114(a) and 1125(a), for federal trademark in-
fringement and unfair competition. Additionally,
Rauland Borg alleges that TCS has engaged in
practices in violation of the Illinois Deceptive
Trade Practices Act, 815 ILCS 510, and the Illinois
Anti-Dilution Act, 765 ILCS 1035/15, and in unfair
competition in violation of Illinois common law.
Based on its allegations, Rauland Borg asks the
Court to enjoin TCS from using the "TELECEN-
TER" mark and to require TCS to reimburse Rau-
land Borg for its damages.

TCS brings the instant Motion for Summary Judg-
ment asserting first that it is entitled to judgment as
a matter of law on Rauland Borg's federal trade-
mark claims because no genuine issue of material
facts exists with regard to the likelihood of confu-
sion between Rauland Borg's products and TCS'
products. Alternatively, TCS argues that, even if
Rauland Borg has demonstrated that a genuine is-
sue of fact exists with regard to the likelihood of
confusion between the parties' products, TCS is still
entitled to judgment because, under the doctrine of
unclean hands, Rauland Borg is not entitled to the
injunctive relief or damages it seeks. According to
TCS, the doctrine of unclean hands bars relief be-
cause Rauland Borg intentionally misrepresented

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                                Page 2
Not Reported in F.Supp., 1995 WL 242292 (N.D.Ill.)
(Cite as: 1995 WL 242292 (N.D.Ill.))

that the mark "TELECENTER" was the subject of a federal trademark registration. Finally, as to the RAULAND TELECENTER mark, TCS argues that Rauland Borg represented that the mark was still in use in interstate commerce even though the mark had long been abandoned, and thus Rauland Borg Rauland Borg fraudulently renewed its federal registration for the mark. Accordingly, TCS asserts that the federal registration for the mark RAU-LAND TELECENTER should be cancelled and the Court should grant judgment in favor of TCS.

ANALYSIS

**2** Under the Federal Rules of Civil Procedure, summary judgment is appropriate if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The initial burden rests on the moving party to show that the "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any" fail to establish a genuine issue of material fact, and entitle the moving party to judgment as a matter of law. *Id.* Once the moving party has met its initial burden, the nonmoving party must produce evidence that creates a genuine issue; the nonmoving party may not rest upon its pleadings. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-326 (1986). Although the evidence and all reasonable inferences from the record are drawn in the non-movant's favor, *see Griffin v. Thomas,* 929 F.2d 1210, 1212 (7th Cir. 1991), the non-movant must cast more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). "A motion for summary judgment is not an appropriate occasion for weighing the evidence; rather, the inquiry is limited to determining if there is a genuine issue for trial." *Lister v. Stark,* 942 F.2d 1183, 1187 (7th Cir. 1991) (quoting *Lohorn v. Michal,* 913 F.2d 327, 331 (7th Cir. 1990)).

*Likelihood of Confusion*

Section 1114(a) of the Federal Trade-mark Act

states in relevant part:

> (1) Any person who shall, without the consent of a registrant (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause a mistake or to deceive ...
> shall be liable in a civil action by the registrant for the remedies hereinafter provided.

15 U.S.C. § 1114(a). Similarly, Section 1125(a) of the Federal Trade-mark Act also requires a showing of likelihood of confusion:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services or commercial activities,
> shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(A).

According to the Seventh Circuit, "[t]he linchpin of both common law and federal statutory trademark infringement claims is whether consumers in the relevant market confuse the alleged infringer's mark with the complainant's mark." *AHP Subsidiary Holding Co. v. Stuart Hale Co.,* 1 F.3d 611, 615 (citing J. Thomas McCarthy, Trademarks and Unfair Competition § 23:1, at 42- 44 (2d ed. 1984). Courts evaluate the likelihood of confusion in a trademark infringement claim by analyzing the following seven factors: (1) similarity between the marks in appearance and suggestion; (2) similarity of the products; (3) area and manner of concurrent

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                                                                      Page 3
Not Reported in F.Supp., 1995 WL 242292 (N.D.Ill.)
**(Cite as: 1995 WL 242292 (N.D.Ill.))**

use; (4) degree of care likely to be exercised by consumers; (5) strength of complainant's mark; (6) actual confusion; and, (7) intent of defendant "to palm off his product as that of another." *AHP Subsidiary Holding Co.,* 1 F.3d at 615 (citing *Forum Corp. of North America v. Forum Ltd.,* 903 F.2d 434, 439 (7th Cir. 1990)). Rauland Borg's state law claims of unfair competition and violation of the Illinois Deceptive Trade Practices Act are analyzed with regard to the same likelihood of confusion factors as federal trademark claims. *McGraw-Edison Co. v. Walt Disney Products,* 787 F.2d 1163, 1174 (7th Cir. 1987)).

**\*3** None of the seven factors in a likelihood of confusion analysis is dispositive and their appropriate weight will vary from case to case. *AHP Subsidiary Holding,* 1 F.3d at 616. In fact the Seventh Circuit has often cautioned:

> [T]he plaintiff need not prove each and every factor in order to prevail. However, the converse is also true; neither is it required that the defendant refute each and every factor. The weight and totality of the most important factors in each case will ultimately be determinative of the likelihood of confusion, not whether the majority of factors tilt the scale in favor of one side or the other.

*Id.* (citing *Schwinn Bicycle Co. v. Ross Bicycles, Inc.,* 870 F.2d 1176, 1187 (7th Cir. 1989)). The Seventh Circuit has also warned that the trial court's ultimate conclusion on the issue of likelihood of confusion is a finding of fact, and thus a motion for summary judgment must be approached with great caution. *AHP Subsidiary Holding,* 1 F.3d at 616.

It is undisputed that Rauland Borg's marks, RAULAND TELECENTER and TELECENTER, and TCS' mark, TELECENTER SYSTEM, are virtually identical. (Pl's Stmt. of Additional Facts at ¶ 4; Def's Resp. at ¶ 4.) The parties also agree that at this time there are no episodes of actual confusion, misdirected mail, telephone calls, orders, inquiries or complaints. (Pl's 12(m) Stmt. at ¶¶ 9, 10; Def's 12(n) Stmt. at ¶¶ 9, 10.) However, as to the remaining six factors in the likelihood of confusion analysis, the parties disagree as to whether a genuine issue of material fact exists.

1. Similar Products

TCS asserts that its products are not similar to Rauland Borg's products. According to TCS, Rauland Borg sells private administrative telephone communication systems which include such items as programmable telephone handsets, programmable loud speakers, room speakers, microphones, digital displays, programmable digital clock signal controls, AM-FM cassette tape players, call control consoles for processing internal/external communications, programmable electronic clocks and programmable electronic bulletin boards. (Pl's Ex. B entitled File History of Rauland Borg's Registration and TELE-CENTER application at P000282.) At this time, TCS does not sell any of the hardware which Rauland Borg sells. Rather, TCS concentrates on computer software programs for management of call center operations wherein a high volume of calls are answered. (Complaint at ¶ 11; Answer at ¶ 11.)

In addition to highlighting the differences between the products sold by Rauland Borg and those currently sold by TCS, TCS emphasizes that Rauland Borg initially represented that the parties goods were considerably different. Specifically, Rauland Borg stated,

> [A]pplicant believes that the TCS product comprises computer software which performs a highly specialized function relating to assisting in the work-force management of telephone centers, particularly those run by large companies to offer toll-free information or ordering lines.... The intended uses are considerably different from applicant's goods which are aimed primarily at school and university settings.

**\*4** (Documents Produced by Plaintiff at P000282-P000286.)

Rauland Borg's responds to TCS' contentions by noting that, although its products are not identical to those of TCS, they are not sufficiently different

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 242292 (N.D.Ill.)
(Cite as: 1995 WL 242292 (N.D.Ill.))

Page 4

to preclude a likelihood of confusion as to the source of the products. Relying on the deposition testimony of Hank Plaisier, Rauland Borg's Vice President of Sales and Marketing, Rauland Borg notes that each of its administrative telephone communication systems contains a core software program for voice mail communications, call routing and call answering. (Plaisier's Dep. at 8-9, 14- 15.) Moreover, Rauland Borg sells an interactive voice response software package entitled TELECENTER IVR. (Plaisier's Dep. at 14-15, 24, 59.) Accordingly, Rauland Borg concludes that the evidence suggests that both parties sell software for telephone communications systems under the TELE-CENTER mark. [FN1]

Although the parties' products are not identical, this Court notes that identical products are not a prerequisite for a finding of likelihood of confusion. "[A] trademark protects the owner against not only its use upon the articles to which he has applied but also upon such other articles as might naturally or reasonably be supposed to come from him. *Forum Corporation of North America,* 902 F.2d at 442 (citing *Helene Curtis Indus. v. Church & Dwight Co.,* 560 F.2d 1325, 1331 (7th Cir. 1977), *cert. denied,* 434 U.S. 1070 (1978).

Rauland Borg has produced evidence which indicates that its hardware can be marketed and sold for an application which answers a high volume of incoming calls. (Affidavit of Kenneth James, Executive Vice-President and Chief Operating Officer for Rauland Borg, at ¶ 15.) Accordingly, Rauland Borg contends that its product can be integrated with TCS' products in the same application or location. *Id.* TCS disputes Rauland Borg's contention noting that a prerequisite for the use of TCS software is an Automatic Call Distributor and that a letter from Rauland Borg to Sprint OEM Products Group indicates that Automatic Call Distribution has little applicability to Rauland Borg's Telecenter system. (Documents Produced by Plaintiff at P003557.) In response, Rauland Borg points out that the letter written by Peter Holtermann, Rauland Borg's En-

gineering Manager, to Sprint OEM Products Group merely indicates the extensive knowledge and experience of Rauland Borg's employees and the necessity of choosing topics from Sprint's training program which would be most beneficial to Rauland Borg's employees. *Id.* Thus, Rauland Borg implies that the letter does not indicate that Automatic Call distribution has little applicability to the Telecenter system, but rather that Rauland Borg's experienced employees did not need training in the application of Automatic Call Distribution.

The Court notes that the paragraph of the letter which details the extensive knowledge and experience of Rauland Borg's employees, and suggests that Sprint tailor its training session to Rauland Borg, exists separate and apart from the paragraph which discusses the applicability of Automatic Call Distribution to Telecenter. *Id.* However, the Court agrees with Rauland Borg that the letter cannot be read as an admission that Automatic Call Distribution has *no* connection with Rauland Borg's TELECENTER products, especially given Hank Plaisier's deposition testimony that Rauland Borg's products are used in connection with an Automatic Call Distributor. (Plaisier's Dep. at 35, 42-45.)

**\*5** TCS asserts that a review of Rauland Borg's promotional literature demonstrates that the only reference to Automatic Call Distribution is in the TELECENTER DSI brochure, Documents Produced by Plaintiff at P000475-478, and that TELECENTER DSI was not mentioned in the Complaint because it was unavailable prior to May 1994. However, the fact that TELECENTER DSI was not specifically mentioned in the Complaint does not mean that the Court should not consider the Automatic Call Distribution capabilities of TELECENTER DSI in assessing the likelihood of confusion and in determining the similarities between Rauland Borg's and TCS' products. Based on the evidence presented by Rauland Borg, this Court concludes that a reasonable trier of fact could find that at least one of Rauland Borg's products had Automatic Call Distribution capabilities, and thus that the parties products

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                                    Page 5
Not Reported in F.Supp., 1995 WL 242292 (N.D.Ill.)
**(Cite as: 1995 WL 242292 (N.D.Ill.))**

could be integrated in the same application.

Finally, as to Rauland Borg's initial representation to the Patent and Trademark Office that its products and TCS' products are different and perform different functions in different markets, this Court finds that such a representation is not dispositive. Rauland Borg notes that its statement was made early on before it had an opportunity to thoroughly assess the potential confusion between the parties' products. It is up to the trier of fact to accord the appropriate weight to Rauland Borg's initial representation to the Patent and Trademark Office. As both Rauland Borg and TCS market telecommunications software under the mark TELECENTER and as some of the evidence suggests that the parties' products can be integrated into the same application, this Court finds that a genuine issue of material fact exists with regard to whether the products are sufficiently similar so as to cause a likelihood of confusion.

2. Area and Manner of Concurrent Use

TCS argues that it sells its goods in different markets and to different customers, and thus the parties do not compete. (Gordon's Aff. at ¶ 5 stating that to the best of his knowledge, the parties have no common customers, have never competed for a customer and do not have common distributors.) As evidence of the absence of competition between the parties, TCS asserts that it is undisputed that the parties advertise the availability of their respective goods in different magazines and attend different trade shows. (Def's 12(m) Stmt. at ¶¶ 5, 7; Pl's 12(n) Stmt. at ¶¶ 5, 7.) American School and University is a representative magazine in which Rauland Borg advertises and Call Center Magazine is a representative magazine in which TCS advertise. (Def's 12(m) Stmt. at ¶ 5; Pl' 12(n) Stmt. at ¶ 5.) [FN2]

Although the undisputed evidence indicates that the parties do not compete directly, *see* Def's 12(m) Stmt. at ¶ 4; Pl's 12(n) Stmt. at ¶ 4, the Seventh Circuit has not required direct competition between

goods or parties as a prerequisite to a finding of likelihood of confusion. *Forum Corp. of North America,* 903 F.2d at 442. It is enough that there exists a relationship between the goods such that persons encountering them under their respective marks are likely to assume that they originate at the same source or that there is some association between the sources. *Id.* at 442; *see also Charrette Corp. v. Bowater Communication Papers, Inc.,* 13 U.S.P.Q.2d 2040, 2042 (TTAB 1989).

**\*6** Both Rauland Borg and TCS sell and market products in the field of telecommunications. Although Rauland Borg originally considered educational, health care and correctional facilities to be its primary markets for its Telecenter system, Rauland Borg has expanded its markets to include industrial, commercial and office applications, including industrial plants, airports and even a race track. (James' Aff. at ¶¶ 12, 14; Plaisier's Dep. at 84-85.) Moreover, Rauland Borg emphasizes that TCS' literature indicates that it sells its telecommunications consulting and professional education services to various markets including private business, government agencies, health care organizations, educational institutions and equipment and network service providers. (James Quiggens, TCS' Vice President of Sales, Dep. at 89-92, Ex. 11.) Although James Gordon, TCS' President, notes that TCS does not market it consulting services under the TELE-CENTER SYSTEM mark (*see* Gordon's Aff. at ¶ 2), James Quiggens testified that TCS would market and sell its software products to educational and health care facilities if the opportunity arose - i.e. if such markets had incoming call center needs which met the qualifying parameters of TCS. (Quiggens' Dep. at 90-92.) Rauland Borg has also presented evidence indicating that the parties share at least three customers: Eastman Kodak Company, Boeing and the United States General Services Administration. (James Aff. at ¶ 16; Gordon's Second Aff. at ¶ 5; Plaintiff's Ex. C entitled Current Telecenter System Users.)

In addition to evidence which suggests some simil-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                                                                          Page 6
Not Reported in F.Supp., 1995 WL 242292 (N.D.Ill.)
**(Cite as: 1995 WL 242292 (N.D.Ill.))**

arity in the parties' present markets, Rauland Borg focuses on materials which suggest that the future plans of the parties will create an even greater overlap in the parties' markets. In his deposition testimony, James Quiggens indicates that TCS is developing a network of "marketing partners" which includes telephone and telecommunication hardware manufacturers which are competitors of Rauland Borg. (Quiggens' Dep. at 99-100; Kenneth James' Aff. at ¶ 13.) Similarly, Hank Plaisier testified at his deposition that Rauland Borg has formed key alliances with other companies in the communications field and may be marketing a variety of telecommunication systems with voice mail software and Automatic Call Distributor capabilities. (Plaisier's Dep. at 40-45.)

Although the parties may not directly compete with each other, this Court finds that at least some of the evidence indicates that the parties are expanding into each other's primary markets and that the parties share a few customers. Given the similarity between the goods, the possibility of integration and the overlap in the markets, this Court concludes that a reasonable trier of fact could find that a consumer might assume that the goods originate at the same source or that there is some association between the sources.

3. Degree of Sophistication of Consumers

TCS claims that both Rauland Borg's consumers and the private administrative telephone systems which Rauland Borg sells are sophisticated. (Plaisier's Dep. at 86-87; Def's 12(m) Stmt. at ¶ 11.) In fact, TCS emphasizes that Hank Plaisier, Rauland Borg's Vice President of Sales and Marketing, testified that Rauland Borg's customers have become increasingly more sophisticated because telecommunications departments, not the maintenance departments, are making telecommunications decisions. (Plaisier's Dep. at 86-87.)

**\*7** While Rauland Borg does not dispute the fact that its private administrative telephone systems are sophisticated, it does contest TCS' claim that Rau-

land Borg's consumers are sophisticated. (Pl's 12(n) Stmt. at ¶ 11.) Counter to TCS' characterization of Hank Plaisier's testimony, Rauland Borg points out that Hank Plaisier actually testified that, although Rauland Borg's consumers were becoming increasingly more sophisticated, Rauland Borg still had plenty of the less sophisticated, less savvy consumers who have only a minimal notion of their telecommunications needs and requirements. (Plaisier's Dep. at 86-87.) Kenneth James, Rauland Borg's Executive Vice President and Chief Operating Officer, also affirmed that Rauland Borg's customers range from general maintenance people to those knowledgeable about telecommunications equipment. (James Aff. at ¶ 17.) James stated that, even though Rauland Borg's TELECENTER system can be considered technologically sophisticated, the TELECENTER system does not require a sophisticated consumer or user. [FN3] *Id.*

While both parties agree that TCS' customers and TCS' software is very sophisticated, *see* Def's 12(m) at ¶ 12; Pl's 12(n) at ¶ 12), Rauland Borg has put forth sufficient evidence to create a genuine issue of material fact with regard to the sophistication of the consumers and users of Rauland Borg's TELECENTER products. Moreover, even if both TCS' and Rauland Borg's consumers could be considered sophisticated business persons, that alone does not automatically diminish the likelihood that they would be confused as to source upon seeing a software program, which bears a nearly identical mark to telephone systems hardware equipment which can be integrated with the software. *See In re TIE/Communications, Inc.,* 3 U.S.P.Q.2d 1457, 1458 (1987). Accordingly, this Court concludes that the degree of sophistication of the parties' consumers is not a factor which weighs in favor of granting judgment as a matter of law for TCS.

4. Strength of the Mark

In support of its contention that Rauland Borg's mark is weak and merely descriptive, TCS cites Rauland Borg's promotional literature which states, "This new 'TELECENTER' concept of school com-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                                        Page 7
Not Reported in F.Supp., 1995 WL 242292 (N.D.Ill.)
**(Cite as: 1995 WL 242292 (N.D.Ill.))**

munications and program distribution derives its name from its function as an automatic, push button dialing TELEphone administrative control CENTER." (Pl's Ex. A entitled Rauland Borg's use of RAULAND TELECENTER and TELECENTER at P000225.) Rauland Borg responds that merely because its early literature describes the derivation of the mark as a derivation of a "TELEphone administrative control CENTER" does not mean that after almost twenty-five years of use, the mark is weak and merely descriptive. Rauland Borg claims that, when it adopted the mark RAULAND TELECENTER in 1970, its trademark search showed TELECENTER to be a distinctive mark unused by others in the telecommunications field. (Pl's Ex. D entitled Rauland Borg's Telecenter Search Report at P000210-224.)

**\*8** Relying on its promotional brochures, Rauland Borg notes further that, since 1970, it has extensively advertised and promoted the marks RAULAND TELECENTER and TELECENTER. (Pl's Ex. A entitled Rauland Borg's use of RAULAND TELECENTER and TELECENTER.) Moreover, William Krucks, the President and Chief Executive Officer of Rauland Telecenter, states, in his declaration attached to Rauland Borg's application for federal registration of the term TELECENTER, that for the period from October 1, 1980 to September 30, 1990, Rauland Borg spent more than $680,000 in direct advertising and promotional costs for goods bearing the TELECENTER mark. (Pl's Ex. B entitled File History of Rauland Borg's Registration and TELECENTER application at P000243-244.) Krucks declares that Rauland Borg's sales of products bearing the TELECENTER mark have earned approximately $36 million. *Id.*

As further support of the strength of its mark, Rauland Borg cites the report of its expert Aron Levko, the National Director of Coopers & Lybrand's Intellectual Property Practice. Based on his findings and analysis, Aron Levko opines there is an overlap in terms of the customers and markets the parties serve and in terms of the types of products and services that they provide. (Levko Aff. at ¶ 3.) According to Levko, as both parties' products are in the telecommunications field and are capable of being integrated into the same equipment and location, there is a likelihood of confusion. *Id.* Levko values the Rauland TELECENTER trademark at $3,626,553 and concludes that TCS has caused erosion of Rauland's mark in the amount of $1,709,194. *Id.* at ¶ 8.

TCS challenges the accuracy of Levko's report noting that prior to rendering his opinion, Levko did not speak with William Krucks or Hank Plaisier or review any of the deposition testimony given in the case. (Levko's Dep. at 31.) TCS also emphasizes that Levko has not conducted a market survey, talked to any of Rauland Borg's customers, determined whether there were any episodes of actual confusion or inquired whether the parties advertised in the same magazines or attended the same trade shows. *Id.* at 32, 37-38, 46, 49, 53. The parties' debate regarding the reliability of Levko's conclusions and the weight to be accorded his opinions convinces the Court that a genuine issue of fact exists with respect to the strength of Rauland Borg's mark making summary judgment inappropriate.

As further evidence of weakness, TCS contends that third party use of the term TELECENTER within the telecommunications industry is widespread. TCS notes that one of its attorneys, James McElroy, searched the Lexis/Nexis database in August, 1994 to determine the extent of third party usage of the mark TELECENTER within the telecommunications industry. (TCS attorney Grady Garrison's Aff. at ¶ 3.) The Lexis/Nexis search produced at least twenty-two references to third party use of the term TELECENTER within the telecommunications industry. *Id.* at Attachment B.

**\*9** Rauland Borg attorney Lynn Tannehill responds that she has reviewed the twenty-two articles attached to Garrison's affidavit and has concluded that many of the articles do not support TCS' assertion that the mark TELECENTER is widespread in the telecommunications industry. (Tannehill Aff. at

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                                                                    Page 8
Not Reported in F.Supp., 1995 WL 242292 (N.D.Ill.)
**(Cite as: 1995 WL 242292 (N.D.Ill.))**

¶ 18.) Tannehill notes that four of the articles refer to the use of a telecenter by a global floral service, two articles refer to a building named TELECENTER which is part of the TELEPORT complex on Statten Island, three articles refer to the term call centers, two articles discuss use of the word telecenter as a contraction for the term "telework center," referring to a satellite or home work center, and one article refers to a telemarketing group. *Id.*

The remaining ten articles do refer to the term TELECENTER in relation to the telecommunications industry. *Id.* However, eight of these ten articles refer to the use of the term TELECENTER by Gil Gordon Associates, and Tannehill notes that Rauland Borg wrote a cease and desist letter to Mr. Gordon on August 18, 1994 referencing Gordon's misuse of the term TELECENTER *Id.* at ¶ 19; Tannehill Aff. Attachment 7 at P001944. Mr. Gordon responded to Rauland Borg's cease and desist letter by promising to omit the word Telecenter from its conference brochure. *Id.*

The last two articles reference use of the term TELECENTER by Sprint/United and Northern Telecom. (Tannehill Aff. at ¶ 18.) Rauland Borg introduces letters written to Sprint/United indicating its objection to Sprint/United's use of the term TELECENTER and a letter from Northern Telecom indicating its willingness to stop using the term TELECENTER upon Rauland Borg's agreement to dismiss any legal action filed against Northern Telecom. *Id.* at Attachment 8; Pl's Ex. H entitled Rauland Borg's Policing Correspondence at P002891-2894, P004470-4472. Finally, this Court notes that at least one court has held that appearance of a term or mark in a LEXIS/NEXIS excerpt has little value in connection with the question of likelihood of confusion in the absence of proof that third parties have actually used the term or mark in connection with the sale of related good in related fields. *Charrette Corp.,* 13 U.S.P.Q.2d at 2043.

In addition to the LEXIS/NEXIS articles evidencing third party use of the term telecenter, TCS notes, and Rauland Borg does not contest, that

USTELECENTERS, Inc. of Boston, Massachusetts owns federal trademark registrations for the mark U.S. TELECENTERS for (a) installation and repair services in the field of business telephone systems (Reg. No. 1,588,178 issued March 20, 1990), and for (b) franchise services offering technical assistance in the establishment and operation of centers for the sale, installation and repair of business telephone systems (Reg. No. 1,588,098 issued March 20, 1990). (Def's 12(m) Stmt. at ¶ 27; Pl's 12(n) Stmt. at ¶ 27.) TCS notes further that on March 16, 1987, Rauland Borg consented to U.S. TELECENTERS' use of the mark TELECENTERS. (Documents produced by Rauland Borg at P001586, P001980.) Accordingly, TCS argues that, if Rauland Borg consented to U.S. TELECENTERS' use of the mark TELECENTER in connection with telephone equipment services because Rauland Borg believed there was no risk of likelihood of confusion, Rauland Borg admits *a fortiori* that TCS' use of the mark TELECENTER in connection with its software will not create a likelihood of confusion.

**\*10** Rauland Borg counters that TCS has misrepresented Rauland Borg's agreement with U.S. TELECENTERS. The agreement states that U.S. TELECENTERS will use "Telecenters" only in conjunction with a prefix such as "USX" and then only as a tradename, servicemark or as its corporate name. *Id.; See* Documents Produced by Rauland Borg at P002035-2036. Rauland Borg and U.S. TELECENTERS also agreed that, when U.S. TELECENTERS sells products, it will use a trademark on these products which does not include "Telecenters." *Id.*

The Court agrees with TCS that a trier of fact might interpret Rauland Borg's agreement with U.S. TELECENTERS as an admission that use of the mark "TELECENTERS" in connection with telephone equipment services would not create a likelihood of confusion, and thus use of the mark in connection with telephone products would also not create a likelihood of confusion. However, the Court notes that a trier of fact might also reasonably con-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                                                   Page 9
Not Reported in F.Supp., 1995 WL 242292 (N.D.Ill.)
**(Cite as: 1995 WL 242292 (N.D.Ill.))**

clude that the agreement between U.S. TELECENTERS and Rauland Borg evidences Rauland Borg's determination that the likelihood of confusion is not as great if the mark is used only in connection with a prefix and only in relation to telephone services as opposed to if the mark is used in connection with telephone products. Consequently, this Court concludes that Rauland Borg's agreement with U.S. TELECENTERS does not present conclusive evidence that Rauland Borg's mark is weak, and unlikely to create a likelihood of confusion.

Given its submissions evidencing an extensive history of advertisement and promotion of products which bear the mark TELECENTER, a significant number of trade and trademark directories which associate the term TELECENTER with Rauland Borg, *see* Pl's Ex. Gentitled Use of TELECENTER by Others Referencing Rauland Borg, Aron Levko's assessment of the value of the mark, and repeated efforts to police unauthorized uses of its mark, the Court concludes that Rauland Borg has produced sufficient material to create a genuine issue of fact regarding the strength of its mark.

5. Intent to "Palm Off"

As to the final factor in the likelihood of confusion analysis, Rauland Borg observes that, when TCS conducted a trademark search prior to adopting the mark TELECENTER, it discovered Rauland Borg's federal registration for the mark RAULAND TELECENTER along with several references to Rauland Borg's common law use of the mark TELECENTER. (Pl's Ex. I entitled TCS Search Report on TELECENTER.) Rauland Borg also notes that James Gordon's deposition testimony indicates that, other than the search report, TCS did not conduct, nor did an attorney direct it to conduct, any research regarding actual use of the mark TELECENTER. (Gordon Dep. at 23-25.) Rauland Borg contends that, by choosing a mark already recognized in the industry, Rauland Borg contends that TCS caused erosion to Rauland's TELECENTER mark and was unjustly enriched. (Levko's Aff. at ¶¶ 4, 7, 8.) From such evidence, Rauland Borg con-

cludes, and this Court agrees, that, a trier of fact could reasonably conclude TCS knew of Rauland Borg's federal registration of the mark RAULAND TELECENTER and common law use of TELECENTER when it decided to adopt the mark TELECENTER SYSTEM, and thus TCS intended to palm off its products as Rauland Borg's products.

6. Conclusion

**\*11** Although it is undisputed that there is no evidence of episodes of actual confusion, Rauland Borg has presented sufficient evidence such that a trier of fact could reasonably find that both parties market telephone communications systems under the mark TELECENTER and that the parties' products can be integrated in the same application. Similarly, even though it is uncontested that the parties do not compete directly, Rauland Borg has offered sufficient material to suggest a relationship between the parties' goods such that persons encountering them might assume they originate from the same source. From the materials presented, a reasonable trier of fact could find that the parties' present markets overlap and that the parties' future plans suggest further expansion into the other's primary markets. Additionally, testimony from various Rauland Borg officers indicates that Rauland Borg has a wide variety of consumers ranging from the sophisticated telecommunications consultant to the unsophisticated general maintenance employee.

Finally, Rauland Borg provides a variety of materials evidencing an extensive history of advertisement and promotion and efforts to police unauthorized uses of its mark all of which indicate that a genuine issue of fact exists regarding the strength of its mark. Given all of the evidence submitted by Rauland Borg in support of its contention that consumers are likely to confuse the source of Rauland Borg's TELECENTER products and TCS' TELECENTER SYSTEM products, this Court concludes that a reasonable trier of fact could find that a likelihood of confusion exists, and thus granting judgment as matter of law in favor of TCS is inappropriate.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                                                      Page 10
Not Reported in F.Supp., 1995 WL 242292 (N.D.Ill.)
**(Cite as: 1995 WL 242292 (N.D.Ill.))**

*Likelihood of Dilution*

Rauland Borg's claim that TCS has engaged in practices in violation of the Illinois Anti-Dilution Act, 765 ILCS 1035/15, is not dependent upon a likelihood of confusion inquiry, but rather on a separate likelihood of dilution inquiry. *AHP Subsidiary Holding,* 1 F.3d at 619. Under the Illinois Anti-Dilution Act, the relevant factors to be considered are "the distinctiveness of the mark and whether the mark is being diluted." *McGraw-Edison,* 787 F.2d at 1174 (citing *Hyatt Corporation v. Hyatt Legal Services,* 736 F.2d 1153, 1157 (7th Cir.), *cert. denied,* --- U.S. ---- (1984). Whether a mark is distinctive depends on the type of mark, the length of time the mark has been used, the scope of advertising and promotions, the nature and extent of the business and the scope of the first user's reputation. *McGraw-Edison,* 787 F.2d at 1174.

Although the derivative nature of the TELECENTER mark does not make distinctiveness easier to show, this Court has already noted that Rauland Borg has presented evidence indicating use of the mark for approximately twenty-five years and an extensive history of advertisement and promotion for products which contain the mark. Rauland Borg has also offered materials which evidence third party identification of the TELECENTER mark with Rauland Borg and its efforts to police unauthorized uses of its mark. All of these materials indicate Rauland Borg's significant efforts to preserve the distinctiveness of its mark. Rauland Borg has also submitted Aron Levko's affidavit and supporting materials as proof of the erosion or dilution caused by TCS's use of the TELECENTER SYSTEM mark. (Levko's Aff. at ¶¶ 7, 8.) While a reasonable trier of fact might ultimately discredit Levko's opinion and find that Rauland Borg has not adequately preserved the distinctiveness of its mark, this Court holds that Rauland Borg has presented sufficient evidence of distinctiveness and dilution to survive TCS' motion for summary judgment on Rauland Borg's Anti-Dilution Act claim.

*Unclean Hands*

*12 TCS asserts that, even if this Court finds that a genuine issue of fact exists with regard to the likelihood of confusion between Rauland Borg's TELECENTER products and TCS' TELECENTER SYSTEM products, TCS is nevertheless entitled to judgment because Rauland Borg's unclean hands bar it from pursuing either injunctive relief or damages.

The doctrine of unclean hands dictates that "one seeking equitable relief cannot take advantage of his own wrongdoing." *Comp-U-Tronix Discount Radar Detectors, Inc. v. Landmark Electronics Company,* No. 90 C 6582, 1991 WL 236877 at * 2 (N.D. Ill. Oct. 30, 1991) (citing *Fair Automotive Repair, Inc. v. Car Service Systems, Inc.,* 471 N.E.2d 554, 558 (1984)). As explained by the Seventh Circuit,

> If the plaintiff creates or contributes to the situation on which it relies, the court denies equitable relief in order to deter wrongful conduct. 'One who has defrauded his adversary to his injury will not be heard to assert a right in equity.'

*Polk Bros. Inc. v. Forest City Enterprises, Inc.,* 776 F.2d 185, 193 (7th Cir. 1985) (quoting *Fruling v. County of Champaign,* 420 N.E.2d 1066, 1071 (Ill. App. Ct. 1981)).

In support of its assertion that Rauland Borg is barred from obtaining the relief it seeks under the doctrine of unclean hands, TCS notes that it is uncontested that, since 1984, Rauland Borg has indicated in its promotional literature and trademark manuals that the mark TELECENTER standing alone is federally registered. (Def's 12(m) Stmt. at ¶ 20; Pl's 12(n) Stmt at ¶ 20.) TCS notes further that Rauland Borg's trademark manuals, which were reviewed by Rauland Borg's counsel prior to being issued to distributors, contain the following statement:

> The [encircled R] may only be used when a registration has actually been issued by the United States Patent and Trademark Office which covers the particular mark as used on the goods to which you intend to affix it. If you are using a new mark

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                                                        Page 11
Not Reported in F.Supp., 1995 WL 242292 (N.D.Ill.)
**(Cite as: 1995 WL 242292 (N.D.Ill.))**

... and a registration has not yet been obtained, then the symbol "TM" must be used instead of [the encircled R] until such time as a registration is issued.

(Documents Produced by Rauland at P000602; Def's 12(m) Stmt at ¶ 22; Pl's 12(n) stmt. at ¶ 22.)

Citing *Urecal Corp. v. Masters,* 413 F.Supp. 873 (N.D. Ill. 1976), TCS argues that such behavior, standing alone, bars any right to injunctive relief or damages. In *Urecal,* the court held that the doctrine of unclean hands barred plaintiff's claim for unfair trade practices even though defendant admitted that it had passed off cans of paint, not actually manufactured or sold by plaintiff, as plaintiff's product. *Id.* at 875-76. The *Urecal* court noted that plaintiff's claim of unfair trade practices was premised upon a trademark which bore the encircled "R", symbolic of registration, even though the mark had never in fact been registered. Accordingly, the *Urecal* court concluded that invoking the doctrine of unclean hands to bar plaintiff's relief was necessary to protect the consuming public from dishonesty. *Id.* at 875.

**\*13** In *Shatel Corp. v. Mao Ta Lumber and Yacht Corp.,* 697 F.2d 1352, 1355 (11th Cir. 1983), the court recognized that misunderstandings about the use of the registration symbol are common, *see* U.S. Department of Commerce, *Trademark Manual of Examining Procedure* § 902.04 (1979), and thus courts are reluctant to find unclean hands where the misuse of the registration symbol was negligent or immaterial to the litigation. Accordingly, the *Shatel* court upheld the district court's refusal to apply the doctrine of unclean hands where a plaintiff's misuse of the registration symbol in connection with its mark was inadvertent. 697 F.2d at 1355.

While Rauland Borg does not deny that its promotional literature and trademark manuals misrepresented that the mark TELECENTER was federally registered, it asserts that the doctrine of unclean hands should not bar relief because Rauland Borg's misrepresentation was inadvertent. Rauland Borg asserts that TCS has produced no evidence to sug-

gest that Rauland Borg intended to deliberately deceive the public by representing that the mark TELECENTER standing alone was federally registered. Rauland Borg asserts further that, on June 30, 1994, William Krucks testified that it was his "contention" that the mark TELECENTER standing alone was federally registered and on June 29, 1994, Kenneth James testified that it was his "understanding" that the mark TELECENTER standing alone was federally registered. (Kruck's Dep. at 56; James' Dep. at 10.) In his affidavit, Kenneth James also states that Rauland Borg has always considered its protectible mark to be TELECENTER because RAULAND was simply the name of the company. (James' Aff. at ¶ 7.) James attests that its use of the encircled "R" together with its mark TELECENTER was in good faith without any intent to mislead the public. *Id.*

Despite William Kruck's deposition testimony and Kenneth James' deposition testimony and affidavit, TCS contends that the following facts preclude this Court from concluding that a reasonable trier of fact could find that Rauland Borg's misrepresentations regarding its federal registration of the mark TELECENTER was inadvertent and unintentional. On January 15, 1991, William Krucks executed a federal trademark application for registration of the mark TELECENTER standing alone. (Documents Produced by Rauland Borg at P000239-246.) On September 10, 1991, William Krucks was advised of the distinction between RAULAND TELECENTER and TELECENTER by a copy of a letter which Rauland Borg's attorneys sent to TCS' attorneys. *Id.* at P001004-1006. On February 7, 1992, William Krucks signed an Agreement and Consent with TCS which attested to the fact that Rauland Borg had an application pending for the mark TELECENTER. *Id.* at P001110-1113. On February 12, 1992, both William Krucks and Kenneth James attended a meeting of Rauland Borg's Board of Directors and at that meeting, were instructed that the United States Patent and Trademark Office had not yet approved of Rauland Borg's application for federal registration of the term TELECENTER stand-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                                    Page 12
Not Reported in F.Supp., 1995 WL 242292 (N.D.Ill.)
**(Cite as: 1995 WL 242292 (N.D.Ill.))**

ing alone. *Id.* at P0003379-3387. On or about July 6, 1992, William Krucks received a copy of the Notice of Opposition which Rauland Borg filed in response to TCS' application for federal registration of its mark TELECENTER SYSTEM and which explicitly distinguished the federally registered mark RAULAND TELECENTER, from the pending application for the mark TELECENTER. *Id.* at P001277-1286. On October 6, 1993, Rauland Borg filed its Complaint in the present action distinguishing the federally registered RAULAND TELECENTER mark from the TELECENTER mark. (Complaint ¶¶ 9, 10.) On March 9, 1994, William Krucks was copied with a letter which his attorney had sent to The Telecenter and which distinguished the two marks. (Documents Produced by Plaintiff at P001608-1609.)

**\*14** Despite all of the above uncontested facts indicating that Rauland Borg had repeatedly distinguished its federally registered mark, RAULAND TELECENTER, from its TELECENTER mark, for which a registration application was pending, TCS points out that William Krucks and Kenneth James testified in June, 1994 that it was their understanding that the mark TELECENTER, standing alone, was federally registered. TCS notes further that, on October 19, 1994, Rauland Borg distributed promotional literature which indicated that TELECENTER, standing alone, was federally registered. *Id.* at P004243.

In its defense, Rauland Borg, citing *Central National Life Insurance v. Fidelity & Deposit Co. of Maryland,* 626 F.2d 537 (7th Cir. 1980), argues that, even though the parties agree on the above stated facts, summary judgment is inappropriate because the parties disagree on the inferences which may be reasonably drawn from those facts. This Court agrees with Rauland Borg that summary judgment is inappropriate where the parties disagree on the inferences which may be reasonably drawn from the undisputed facts, *see Prime Leasing Inc. v. The Vanderbilt University,* No. 90 C 6828, 1991 WL 278313 at \*4 (N.D. Ill. Dec. 17, 1991)

(citing *Bowyer v. United States Department of Air Force,* 804 F.2d 428, 430 (7th Cir. 1986)). As misunderstandings about the use of the registration symbol are common, this Court finds that, even given the undisputed facts listed above, a trier of fact could reasonably infer that Rauland Borg, William Krucks and Kenneth James understood the mark TELECENTER, standing alone, to be federally registered and that Rauland Borg did not intend to deceive any consumers or competitors.

A reasonable trier of fact could find that lay persons, such as William Krucks and Kenneth James, negligently, not deliberately, testified that they understood the mark TELECENTER standing alone to be federally registered. While such deposition testimony might be used to challenge Krucks' and James' credibility, it is insufficient on a motion for summary judgment to bar Rauland Borg from obtaining relief. Clearly, such deposition testimony could not have deceived TCS. TCS knew that Rauland Borg had filed an application for the registration of the term TELECENTER standing alone in 1991, and TCS had entered into an agreement with Rauland Borg in 1992 which indicated that the application for registration of the term TELECENTER standing alone was still pending. TCS had also previously had a trademark search.

Additionally, the Court notes that, although federal registration provides additional benefits, it does not determine substantive rights. Even alleged intentional misrepresentations regarding federal registration might not affect Plaintiff's claimed common law right to ownership of the mark. Accordingly, at this time the Court finds that it would be inappropriate to conclude as a matter of law that Rauland Borg is barred by its unclean hands from pursuing injunctive relief and damages.

*Fraudulent Renewal of the Federal Registration of RAULAND TELECENTER*

**\*15** Finally, TCS contends that Rauland Borg's federal registration for its RAULAND TELECENTER mark should be cancelled, pursuant to 15 U.S.C. §§

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1064(3) and 1119, because it was fraudulently procured. Section 1064(3) provides:

A petition to cancel a registration of a mark ... may be filed by any person who believes he is or will be damaged by the registration of the mark ... [a]t any time if [the] registration was obtained fraudulently ...

15 U.S.C. § 1064(3). Section 1119 gives a federal court power to cancel a registration in any action involving a registered mark. 15 U.S.C. § 1119.

In a case similar to the present one, **Torres v. Cantine Torresella S.r.l., 808 F.2d 46 (Fed. Cir. 1986)**, the Federal Circuit held,

**If a registrant files a verified renewal application stating that his registered mark is currently in use in interstate commerce and that the label attached to the application shows the mark as currently used when, in fact, he knows or should know that he is not using the mark as registered and that the label attached to the registration is not currently in use, he has knowingly attempted to mislead the PTO.**
**808 F.2d at 49**. The court in **Torres** noted that, an essential element of the application for renewal is the registrant's averment that the mark as registered is in current use for the goods covered by the registration. **Id. at 48**. The purpose of this requirement is to ensure that marks which are no longer in use are removed from the register. **Id.** Accordingly, the **Torres** court found that, where an applicant for renewal of a trademark was not currently using the mark as registered, but rather an altered mark with a slightly redesigned logo, his representation, in his renewal application, that the mark as registered was still in use in interstate commerce perpetuated a fraud on the Patent and Trademark Office. **Id. at 47-49**.

Relying on **Torres,** TCS asserts that this Court must cancel Rauland Borg's federal registration for the mark RAULAND TELECENTER because Rauland Borg made fraudulent misrepresentations in its renewal application. TCS notes that, on February 14, 1994, Rauland Borg submitted a renewal application to the Patent and Trademark Office in which William Krucks declared that the following statement was true,

The mark shown in said registration is still in use in interstate commerce on private administrative telephone communication systems as recited in the registration and a specimen showing the mark as currently used in commerce is attached.

(Plaintiff's Ex. B entitled File History of Rauland Borg's Registration and TELECENTER application at P000205-207.) The mark attached was RAULAND TELECENTER as originally registered. **Id.** TCS asserts that, despite William Krucks' declaration as to the veracity of the statements in the renewal application, both Krucks and Hank Plaisier testified in their depositions that the RAULAND TELECENTER mark had not been used in years. [FN4] Specifically, Hank Plaisier testified that he was not aware of any products being sold that bear the mark RAULAND TELECENTER as it appears in the federal registration. (Plaisier's Dep. at 51.)

**\*16** In addition to the deposition testimony of Hank Plaisier, TCS notes that by a minute order docketed November 7, 1994, this Court required Rauland Borg to "provide at Rauland Borg samples of any of its goods which as of February 14, 1994 were both bearing the specimen used in plaintiff's renewal application and being sold or offered for sale in interstate commerce by Rauland Borg." TCS contends that when it arrived at Rauland Borg headquarters to view samples of such goods, Lynn Tannehill, one of Plaintiff's attorneys, informed TCS' attorney that there were no goods to inspect or photograph because Rauland Borg merely provided to its distributors replacement parts for earlier versions of its products and only the earlier versions of the products displayed the mark as originally registered. (TCS Attorney Grady Garrison at ¶ 4.)

In response to TCS' contention that Rauland Borg no longer sells products in interstate commerce which bear the RAULAND TELECENTER trademark, Rauland Borg relies on the affidavits of Kenneth James and Lynn Tannehill. In his affidavit

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                                                    Page 14
Not Reported in F.Supp., 1995 WL 242292 (N.D.Ill.)
**(Cite as: 1995 WL 242292 (N.D.Ill.))**

Kenneth James states, that Rauland Borg has re-placement parts for early versions of the Telecenter system located at its headquarters in Skokie, Illinois and that these replacement parts display the RAU-LAND TELECENTER mark. (James Aff. at ¶ 9.) Kenneth James states further, and Lynn Tannehill confirms, that, on November 20, 1994, he had one of the TELECENTER I replacement parts bearing the RAULAND TELECENTER mark pulled from inventory so that Tannehill could provide it to TCS' attorneys for inspection. *Id.* at ¶ 10; Tannehill Aff. at ¶¶ 8-9. Tannehill also states that she allowed TCS' attorney to take the specimen with him as he could not obtain a photographer to photograph the part. (Tannehill Aff. at ¶ 13.) Tannehill adamantly denies telling TCS' attorney that there were no goods to photograph because Rauland Borg merely provided its distributors with replacement parts for earlier versions of its products and that only the earlier versions of the products displayed the mark as originally registered. *Id.* at ¶ 14.

The statements in James' and Tannehill's affidavits do not necessarily conflict with Plaisier's deposition testimony as Plaisier testified that he was not *aware* of any products being sold that displayed the mark RAULAND TELECENTER. (Plaisier's Dep. at 51.) While it may be unlikely that Hank Plaisier, Vice President of Sales and Marketing, would be un-aware of replacement parts bearing the mark RAU-LAND TELECENTER and being sold in interstate commerce, the Court finds that construing all reas-onable inferences in favor of Rauland Borg, a trier of fact could find, based on Kenneth James affi-davit, that Rauland Borg was selling replacement parts bearing the mark RAULAND TELECENTER and Hank Plaisier was simply unaware of such sales.

However, TCS argues that, even if James' and Tan-nehill's affidavits create a genuine issue of fact with regard to whether replacement parts, bearing the federally registered mark, are warehoused at Rau-land Borg, Rauland Borg has not presented any evidence to indicate that such parts are in use in the

marketplace. Section 1059 of the Federal Trade-Mark Act states that a specimen or facsimile show-ing current use of the mark must be attached to a verified application for renewal. 15 U.S.C. § 1509(a). The term "use in commerce" is defined by the Act as "the bona fide use of a mark in the ordin-ary course of trade, and not made merely to reserve a right in a mark." 15 U.S.C. § 1127. A mark shall be deemed to be in use in commerce when the mark is placed in any manner on the goods, their contain-ers, or displays associated with the goods and the "goods are sold or transported in commerce."

**\*17** Contrary to TCS' contention that Rauland Borg has presented no evidence that its replacement parts, which display the mark RAULAND TELE-CENTER, are sold or transported in interstate com-merce, this Court finds that a trier of fact could reasonably infer from Kenneth James' affidavit that such replacement parts bearing the registered mark are sold or transported in interstate commerce. In his affidavit, Kenneth James states, "[a]lthough some of [the] versions of the TELECENTER sys-tem have been phased out, Rauland maintains re-placement parts for these systems because there are numerous early systems still in use in the market-place." (James' Aff. at ¶ 8.) From such a statement, a reasonable trier of fact could infer that, as numer-ous early systems are still in use in the market, Rauland Borg maintains and sells replacement parts, bearing the registered mark, to the users of such systems. [FN5]

Accordingly, unlike the renewal applicant in *Torres,* Rauland Borg has provided sufficient evid-ence such that a reasonable trier of fact could find that Rauland Borg did not procure a fraud on the Patent and Trademark Office when it represented that the RAULAND TELECENTER mark was still in use in interstate commerce on private administra-tive telephone communication systems. As Rau-land Borg has provided sufficient evidence to create a genuine issue of fact with respect to whether the RAULAND TELECENTER mark is still in use in interstate commerce on private administrative tele-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                                                          Page 15
Not Reported in F.Supp., 1995 WL 242292 (N.D.Ill.)
**(Cite as: 1995 WL 242292 (N.D.Ill.))**

phone systems, TCS is not entitled to judgment as a matter of law on its claim that Rauland Borg has abandoned the mark. *See* 15 U.S.C. § 1127. This Court refuses TCS' invitation to cancel Rauland Borg's federal registration for the RAULAND TELECENTER mark because the renewal was fraudulently procured or because the mark has been abandoned.

CONCLUSION

For the foregoing reasons, TCS' Motion for Summary Judgment is denied.

> FN1. Additionally, Rauland Borg asserts that TCS does not only sell computer software programs for high volume call center operations. Rauland Borg notes that James Gordon, TCS' President and Director, testified that TCS is currently developing a software product for smaller customers. (Gordon's Deposition at 39-41.) However, what Rauland Borg ignores is that James Gordon also testified that TCS would not market or sell this product under the TELECENTER mark, but rather under a private label. *Id.* It is not clear how long this commitment would last.

> FN2. Even though it is uncontested that the parties advertise in different magazines and attend different trade shows, Rauland Borg asserts that it may have distributors who advertise in magazines used by TCS and distributors who attend trade shows attended by TCS. (Pl's 12(n) Stmt. at ¶ 5.) Yet, Rauland Borg does not support its speculation with any evidence of specific distributors who advertise Rauland Borg's products in the same magazines in which TCS advertises its products or who attend trade shows also attended by TCS.

> FN3. Rauland Borg also posits that, as it sells most of its goods through a network of independent distributors, it is not aware

of all of the end users of its products and their relative sophistication. (James' Aff. at ¶ 4.) However, the Court notes that Rauland Borg presents no evidence from any of its independent distributors indicating that the end-users of Rauland Borg's products are less than sophisticated consumers.

> FN4. TCS cites William Kruck's deposition testimony at pages 14-15. However, neither side has provided these pages to the Court.

> FN5. Rauland Borg has also presented evidence which indicates that its registered mark appears on brochures which explain the evolution of TELECENTER. However, Rauland Borg states only that the brochure is used as a sales tool and at trade shows, *see* James' Aff. at ¶ 11, and provides no evidence to suggest that the brochure is used together with point-of-sale window or counter displays or that the brochure travels with the goods. Thus, based on the materials provided, this Court cannot find that Rauland Borg's brochure is so closely associated with the goods that a purchaser viewing the display would directly associate the mark with the goods. *See In re Ancha Electronics,* 1 U.S.P.Q.2d 1318, 1319-20 (TTAB 1986).

Not Reported in F.Supp., 1995 WL 242292 (N.D.Ill.)

END OF DOCUMENT

# APPENDIX 11



Clarus Transphase Scientific, Inc. v. Q-Ray, Inc.
N.D.Ill.,2006.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois,Eastern
Division.
CLARUS TRANSPHASE SCIENTIFIC, INC.,
Plaintiff,
v.
Q-RAY, INC., an Illinois corporation, QT, Inc., an
Illinois corporation, Bio-Ray, Inc., an Illinois cor-
poration, Bio-Metal, an Illinois corporation, Que Te
Park, an individual, Jung Joo Park, an individual,
and Does 1-10, Defendants.
**No. 06 C 4634.**

Oct. 6, 2006.

Christopher W. Loweth, Joseph R. Marconi, John-
son & Bell, Ltd., Chicago, IL, for Plaintiff.
Michael Andrew Ficaro, Richard Henry Tilghman,
Ross Edward Kimbarovsky, Lisa Colleen Sullivan,
Ungaretti & Harris LLP, Chicago, IL, Craig Alan
Hansen, John C. Gorman, Gorman & Miller, San
Jose, CA, for Defendants.

### *REPORT AND RECOMMENDATION*

JEFFREY COLE, United States Magistrate Judge.
**\*1** Imitation, it is said, is the sincerest form of flat-
tery. Perhaps in some contexts, but never in Lan-
ham Act cases, where intense ire and demands for
injunctive relief are the order of the day. This is
such a case. Plaintiff, Clarus Transphase Scientific,
Inc. ("Clarus"), sought a preliminary injunction
pursuant to Rule 65, Federal Rules of Civil Proced-
ure, restraining and enjoining defendants from: (1)
manufacturing, advertising, marketing, distributing
or selling Q-Ray pendants that are identical or con-
fusingly similar to plaintiff's Q-Link Pendants, (2)
using any trademarks or trade dress that are identic-
al or confusingly similar to Clarus's registered and
common law trademarks or trade dress, and (3) us-
ing any design that is substantially similar to

Clarus's copyrighted pendant designs.[FN1]Clarus's
motion for preliminary injunction has been referred
to me by Judge Pallmeyer for a report and recom-
mendation. *See*28 U.S.C. § 636(b)(1)(A).

> FN1. The plaintiff originally filed this ac-
> tion in the Northern District of California.
> That court granted the defendants' motion
> to transfer venue to the Northern District
> of Illinois on August 16, 2006.*Clarus
> Transphase Scientific, Inc. v. Q-Ray, Inc.,*
> No.06-3450, 2006 WL 2374738 (N.D.Cal.
> Aug.16, 2006).

### I.

### THE PARTIES AND THEIR PRIOR RELA-
### TIONSHIP

#### A.

#### The Plaintiff

Clarus is a California corporation that manufactures
pendants, enhanced with what it calls "Sympathetic
Resonance Technology" or SRT. SRT, as Clarus's
CEO and president, Mr. Robert Williams, would
have it, enhances the human biofield. (Declaration
of Robert Williams, ¶ 3). In 1991, Mr. Williams
and his partners invented this so-called technology,
which the plaintiff claims "produces a resonant en-
ergy that works to optimize the human
biofield."(*Id.* at ¶ 3). The original Q-Link pendant-
which was called the "Q-Link Classic Pen-
dent"-was diamond-shaped and made of black
plastic. It was solid on one side, while the other
contained the so-called "technology" components,
which consisted of a copper appearing coil and
what appeared to be an etching of a circuit board,
above which are the QLink and SRT 2 trademarks
on a crystalline substrate. (*Memorandum of Law in*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 2
Slip Copy, 2006 WL 4013750 (N.D.Ill.)
**(Cite as: 2006 WL 4013750 (N.D.Ill.))**

*Support of Plaintiff's Motion,* at 5, 8) ("*Plaintiff's Memorandum*" ).*See Plaintiff's Exh.* 1.

Since 1994, Clarus has manufactured and sold the Classic model, which it claims has been popular around the United States and the world. (*Plaintiff's Memorandum,* at 1). The diamond-shaped configuration of the Classic pendant remained the same for approximately 11 years, until February of 2005, when Clarus introduced two new pendant designs: the "New Q," a triangular shaped black plastic pendant, and the "Pebble," which Clarus describes as a teardrop-shaped pendant made of a sterling silver (collectively, the "Q-Link Pendants"). (Williams Decl. ¶ 8).[FN2] Clarus claims that it and its licensees have spent over two million dollars marketing the Q-Link Pendants through "infomercials" and magazine advertisements. The Q-Link Pendants display what Clarus calls its "longstanding (since 1994) and exclusive coil design trademark (the "Coil Design Trademark")" (*Plaintiff's Memorandum,* at 1), which is a coil of extremely thin copper wire. (*Plaintiff's Memorandum,* at 3, Fig. 1).

> FN2. Clarus also advertises the Pebble in gold. It sells for $999.99, unlike the silver Pebble, which sells for $299. The gold model is not part of this case.

**\*2** The designation "coil design trademark" is inexact. On April 3, 2006, Clarus applied for registration of its "Coil Design" as a trademark with the United States Patent & Trademark Office. Clarus claimed a mark consisting "of the configuration of a wire coil, and excluding the pendant itself. Application 78/852549 (available at http://portal.uspto.gov/external/). The application was denied on September 14, 2006, on the grounds that the proposed mark comprised a configuration of the goods that is not inherently distinctive and would not be perceived as a mark. (Defendants' Ex. 2).

Clarus is the record owner of United States Trademark Registration No. 2,044,801 for the trademark, "Q-LINK," in block-letter form for "pendant jew-

elry." (Declaration of Attorney Michael Hoisington, at ¶ 3; Ex. A). The registration issued in May of 1997 and is current, valid and has become incontestable. (*Id.*). Clarus claims The Q-LINK mark has been used continuously in connection with Clarus's Q-Link Pendants in the United States since 1994 (Hoisington Decl. ¶ 3), although the trademark registration indicates first use as May 1995. (Ex. A).

Clarus is also the record owner of United States Trademark Registration No. 2,715,870 for the trademark "QLINK" in block letter form for "electronic devices comprised of electronic resonating cells, electronic tuning boards, and electrical copper coils for the reduction of quantum noise in physical, chemical, biological and human systems to protect the user from radiation, relieve fatigue, improve mental concentration and alertness, and improve energy levels and stamina."(Hoisington Decl. ¶ 3; Ex. A). This registration issued in May of 2003 and is current and valid. (Hoisington Decl. ¶ 3; Ex. A). Clarus claims that the QLINK mark has been used continuously in connection with its Q-Link Pendants in the United States since 1994 (Hoisington Decl. ¶ 3), although, again, the trademark registration indicates first use as May 1995. (Ex. A).

**B.**

**The Defendants**

The defendant corporations-QT, Inc.; Q-Ray, Inc.; Bio-Ray, Inc.; and Bio-Metal, Inc.-are Illinois corporations. Individual defendant, Que Te Park is the founder of QT, Inc. His wife, Jung Joo Park, is also named as a defendant. The names of two of the corporations are derived from Mr. Park's initials. According to the defendants, Q-Ray, Inc., Bio-Ray, Inc., and Bio-Metal, Inc. are not presently engaged in business, and Mrs. Park has never had any dealings with the pendants.

Like the plaintiff, QT, Inc. has had a long history

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

selling jewelry that purportedly enhances one's overall well being. In approximately 1995, QT began selling what it calls "Bio-Magnetic Regulator/Ionized" bracelets under the name Q-Ray Ionized Bracelet. (Affidavit of Charles Chang Park (President of defendant QT; officer of defendants Q-Ray, Bio-Ray, and Bio-Metal) ¶¶ 6, 8). Defendants claim-falsely it would appear-that these bracelets helped "balance the negative and positive ions in the body to increase bio-energy and general well being."(*Id.*).[FN3] The Q-Ray Ionized Bracelet consists of a C-shaped piece of mineral-component metal fitted at either end with round balls, which defendant refers to as the "terminals" of the bracelet. (*Id.* ¶ 7; Ex. 1). The bracelets come in different metallic colors and finishes, but the common element is the C-shape, which defendants submit is "essential to the Ionization Technology." (*Id.* ¶ 9). QT applied for trademark protection for "Q-Ray" in 1999, and was granted a trademark on February 15, 2000. (Hoisington Decl. ¶ 5). First use was listed as September of 1995. (*Id.*).

> FN3. The Federal Trade Commission recently brought an action against the defendants pursuant to the Federal Trade Commission Act, claiming defendants marketed their bracelets in a deceptive and misleading manner by representing that the bracelet provided immediate, significant or complete pain relief and that scientific tests proved their pain-relief claims. In fact, a scientific study performed by the Mayo Clinic Jacksonville resulted in a finding that the ionized bracelets were no more effective for treating muscle and joint pain than were placebo bracelets. On September 8, 2006, Magistrate Judge Denlow concluded that the defendants lacked competent and reliable scientific evidence to substantiate their claim that the bracelet provided immediate, significant, or complete relief from various types of pain, as required under the Federal Trade Commission Act. He also concluded that the de-

fendants' claim that the bracelet provided immediate, significant, or complete relief from various types of pain was materially misleading in violation of the Federal Trade Commission Act. *See FTC v. QT, Inc.,* No. 03 C 3578, 2006 WL 2587914 (N.D.Ill. Sept.8, 2006). The defendants have a suit pending against the Mayo Clinic, alleging, among other things, commercial disparagement, common law fraud, and tortious interference with prospective economic advantage. Essentially, the defendants contend that the clinical trials on the bracelets were significantly flawed. *QT, Inc. v. Mayo Clinic Jacksonville,* No. 05 C 6387, 2006 WL 1371426 (N.D.Ill. May 15, 2006).

### C.

### The Parties' Prior Distribution Relationship

**\*3** In 1997, the parties entered into a one-year agreement whereby Mr. Park would be the exclusive distributor of Q-Link products in Korea. (*Plaintiff's Memorandum,* at 6; *Defendants' Opposition to Plaintiff's Motion,* at 3). According to defendants, Mr. Park invested $20,000 to purchase Q-Link Classic pendants for Korean distribution. (*Defendants' Opposition to Plaintiff's Motion,* at 4). The relationship came to an unhappy end, leaving QT with a large inventory of the Classic pendants. (*Defendants' Opposition to Plaintiff's Motion,* at 4).

### D.

### The Defendants' Expansion Of Their Product Line

After achieving staggering, nationwide, commercial success with its bracelets QT decided to expand into other types of "bio-magnetic ionized" jewelry. (Charles Chang Park Aff. ¶ 13).[FN4] First, QT in-

Slip Copy                                                                                                    Page 4
Slip Copy, 2006 WL 4013750 (N.D.Ill.)
**(Cite as: 2006 WL 4013750 (N.D.Ill.))**

corporated its "ionized technology" into a ring. (*Id.*). Next, in early 2006, QT designers began developing a pendant that would incorporate the so-called "bio-magnetic ionized technology" and the C-shape design of QT's bracelets. (*Id.*). The defendants deny that they copied Q-Link's pendants, and that the "Q-Ray Ionized Pendant" was their creation. (*Id.*). QT has applied for a registration of the trademark, "Ionized Pendant." (*Id.* ¶ 14). The pendants developed are available in two designs: the "Q-Ray Alpha Tear Drop" and the "Q-Ray Beta Space Age Triangle." (*Id.* ¶ 16). More on those designs later.

> FN4. Between January 1, 1996 and June 30, 2003, gross sales from the Q-Ray bracelets were $137,172,907. One of the prime modes of advertising for QT was infomercials. *FTC v. QT, Inc.,* 2006 WL 2587914 at *1, 44.

According to Mr. Park, sales of the Q-Ray pendants commenced in June of 2006.(*Id.* ¶ 18). That date, however, does not comport with Clarus's version of the facts. According to Clarus's general manager of manufacturing, QT was marketing and promoting its new pendant product as early as January 26, 2006. (*Declaration of Patti Parlee* ("*Parlee Decl.*") at ¶ 3). It is impossible on the state of the present record to determine who has the better of the argument since the defendants' full-page advertisement in the Professional Golfers' Association ("PGA") convention Daily News introducing the new Q-Ray pendants, is undated. (*Plaintiff's Memorandum,* at 6; Ex. C). Moreover, there is the inconsistent concession by Clarus that the Q-Ray pendants were not released until the summer of 2006. (*Plaintiff's Memorandum,* at 7).

Convinced that QT had adopted a trademark and coil design for a product that was confusing similar to Clarus's own Q-LINK mark and (purported) Coil Design Trademark-indeed, Clarus calls the QT offering a "knock-off" product with the exact design and size as Clarus's pendents-Clarus contacted Mr. Park and demanded that he stop using Clarus's pro-

prietary intellectual property. (Parlee Decl. ¶ 3). While the defendants have denied copying Clarus's new pendant designs, Clarus contends that Mr. Park admitted copying in a conversation he had with Ms. Parlee, whose recollection of the conversation goes like this:

I asked Mr. Park why he was copying our products. He denied that the Q-Ray pendants were copies. I reiterated that they were nearly identical to the Clarus pendants. Mr. Park then mistakenly asserted they were different because instead of having a complete coil, Q-Ray had placed a gap in the coil. I again asserted that the pendants were clear copies of Clarus's proprietary designs. In response, Mr. Park said that there was nothing Clarus could do about copying, because Clarus did not have a patent.

**\*4** (*Plaintiff's Memorandum,* at 7; *Parlee Decl.* ¶ 3).

## II.

### THE PRODUCTS AND THE DEFENDANTS' MODE OF ADVERTISING

#### A.

#### The New Q-Link Pendants

The plaintiffs have provided specimens of the Classic Pendant (which is no longer being marketed) (*Plaintiff's Ex.* 1) and what it calls its "Current Q-Link Pendant." (*Plaintiff's Ex.* 2). The plaintiff's "New Q" pendant is shaped along the lines of an isosceles triangle, but, with the sharp angles rounded off, and the top (where it is attached to the cord) flattened. It is made of smooth, semi-shiny black plastic with a copper-colored circle of wire resting within the inner border of the triangle. The balance of the space within the triangle and within the circle is black. There appears across the diamet-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

er of the open black space inside the circle in a very distinctive type face, "Q-LiNK," in white letters. The font is, for lack of a better word, "futuristic" in appearance.[FN5]

> FN5. Pictures of the products are found attached to the plaintiff's supporting memorandum and supplemental submission.

Clarus's description, to the contrary, the trademark is *not* in all caps. (*Plaintiff's Memorandum,* at 16), The "L" is a capital letter, but because of the font, it has a rounded bottom and thus tends to have a somewhat different appearance than the usual capital "L." The "N" is exceptionally wide and looks like an inverted "U." The distinctive type face contributes to the lower case letter appearance of the mark. (*See Plaintiff's Ex.* 2). The new model pendant is also sold in white. *See* www.qlinkgolf.com. The tail of the "Q" hangs straight down in the six o'clock position, rather than to the right side. The body of the Q is squarish, resembling a square with rounded-off corners rather than a circlular "O." The "Coil Design Trademark" and enclosed **"Q-LinK"** are inlaid, giving the face of the pendant a slightly concave surface. The inset portion is covered in clear plastic. On the back of the new pendant is a very distinctive and stylized letter "Q" in white on both the white and black versions.[FN6] Finally, the pendant hangs from the triangle's base, with the vertex angle pointing down.

> FN6. There is also a titanium version and a gold version of the "Pebble," but the plaintiff raises no issue with those models.

Clarus calls the "Pebble" a "teardrop-shaped" pendant, although the shape does not really resemble a teardrop. The shape is less evocative and more amorphous-more like a random *pebble* than a teardrop. It is an irregular quadrangle with the corners rounded off. The "Pebble" is made of sterling silver, and has a circular inset ringed with a copper-colored circle. *See* www.qlinkgolf.com. Within the circle, instead of "Q-LINK," there are a series of three concentric black circles. Each of

these circles is broken into a number of arcs-first twelve, then four, then four again. As with the "New Q," the inset portion is covered in clear plastic, and the face of the pendant is slightly concave. The pendant hangs from one rounded corner of the quadrangle. The mark "Q-Link" does not appear on the pendant.

The first Q-Ray pendant, called the "Alpha Teardrop" can truly be said to be teardrop-shaped, essentially a circle dangling by a triangular protrusion. The pendant is black plastic, but with a textured surface. Within the "teardrop" is a "C" shape, which can be copper, green, or red in color. The opening of the "C" is in about the four o'clock position. Within the C is the QT trademark "Q-RAY." It is set forth in recessed letters, smooth as opposed to the rest of the textured surface-neither painted nor printed. The font is block letters, sans-serif, and all uppercase: **Q-RAY.** The tips of the letters are rounded off, and the hyphen between "Q" and "R" is a dot. The "C" is inlaid, but the inside of the "C" encompassing the **Q-RAY** protrudes slightly from the face of the pendant, giving it a somewhat convex surface. The "C" portion is covered in clear plastic, but the inside of the "C" where the "Q-RAY" is located is not covered. On the back of the pendant-also in recessed lettering, neither painted nor printed-is the word *"Ionized"* in an oval, with "U.S.A." below it.

**\*5** The second Q-Ray pendant-the "Beta Space Age Triangle"-is, like the Clarus "New Q", shaped along the lines of a uniformly rounded off isosceles triangle. It, too, is black plastic, but like the "Alpha Teardrop," is flat black and textured, rather than smooth and shiny. Unlike the "New Q" its hangs from its vertex angle, not its base. It is, as the defendants suggest, a "stalagmite" to Clarus's "stalactite." Its inset is the same as that of the Q-Ray Alpha Teardrop pendant. The backs of the two pendants are the same as well. *See Plaintiff's Exs.* 4, 5 and 6.

A.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                          Page 6
Slip Copy, 2006 WL 4013750 (N.D.Ill.)
**(Cite as: 2006 WL 4013750 (N.D.Ill.))**

### The Pendants' Packaging

The packaging of the parties' respective pendants could not be more dissimilar. The box for the "New Q" is square, measuring approximately 4 1/4 x 4 1/4 x 1 3/4 inches. It is made of a thin cardboard with a glossy finish. The detachable lid lifts straight up from the bottom of the box. The box is mostly tan in color, in varying shades. The "Q" found on the back of the "New Q" pendant is depicted on the lid in a light shade of tan compared with the background. Inside the "Q" is a photograph of the "New Q" pendant lying in grass. Below the "Q" is the trademark **Q-LinK** in white lettering. Below that is the following sentence, in white lettering, on a darker tan background: "The Q-Link Pendant is the Tour-tested way to ENHANCE your focus, your CONCENTRATION and your ability to make BETTER DECISIONS, BETTER SHOTS and BETTER SCORES."**Q-LinK** appears in white lettering on all four sides of the box, and on two of those sides, the following appears above it in black lettering: "THE Q-LINK EQUATION. Less Stress + Greater Focus = Lower Scores. In this context, the connotation of the "Link" of "Q-Link" is that of "Links" in the sense of a golf course. Inside, the "New Q" is housed on a black, very light weight, flexible, plastic base. Perhaps significantly, the pendant is housed on the base so that the first the buyer sees upon opening the box is the stylistic "Q," not the circle of copper, which the plaintiff contends is so distinctive and so associated with it.

The "Pebble" comes in a box within a box. The exterior box is made of white cardboard, a good deal heavier than that of the "New Q" box. The box is rectangular, measuring about 3 x 3 3/4 x 1 1/2 inches, and is completely blank. The lid lifts straight up from the bottom of the box and is not attached. Inside rests a slightly smaller, sturdy black jewelry box, that opens on a hinge and springs shut. The top of this box is rounded. No lettering at all-no mention of "Q-LINK"-appears anywhere on either box. There is a small white card that rests on the interior jewelry box that says *The Pebble*" in

black script and identifies the designer. The "Pebble" itself rests inside the jewelry box on a black, velvet-like material.

The exterior boxes for the "Q-Ray" pendants are made of a thin, black, shiny cardboard, and are square, measuring 4 x 4 x 1 1/2 inches. The box displays no pictures. Just above the center of the front of the box, the registered trademark **Q-RAY**® appears in silver in the same font as used on the pendant. The letters are all capital, in a traditional font, and are silver in color. Below that, the word "Ionized" appears in black text within a silver oval, next to which is the symbol ®. The back of the box is plain with a black and silver sticker sealing the top of the box. The sticker reads, in silver lettering:

*1983-2006.*

23

*YEARS OF EXCELLENCE*

QT, Inc.

**\*6** The box opens by pulling either the top or bottom flap out of the box. The interior boxes are both a square jewel cases, with lids that open and shut on a springed hinged. As with the exterior box, the word "Q-RAY" appears in silver font across the front of the box. The back of the box bears a white sticker that reads, "Ionized Pendant Alpha" or, as the case may be, "Ionized Pendant Alpha." Inside the interior boxes, the Q-Ray pendants sit on black, velvet-like material. The pendant is not centered, but near the top edge of the box. Also on the material is a large sticker with text and the picture of a close-up view of the C-shaped coil. The text makes reference to the Q-Ray Ionized Bracelet: "All the benefits of the Q-Ray Ionized Bracelet are now available in the Q-Ray Ionized Pendant."Tucked into the top lid of the interior box is a Q-Ray brochure, touting ionization and again drawing the ref-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 4013750 (N.D.Ill.)
**(Cite as: 2006 WL 4013750 (N.D.Ill.))**

Page 7

erence between the ionization technology of the Q-Ray Bracelets and the Q-Ray Pendants. The "C" shape of the bracelets is compared to the "C" inset of the pendants.

## III.

## ANALYSIS

### A.

### Standard For Injunctive Relief

In order to obtain a preliminary injunction, Clarus must demonstrate a reasonable likelihood that it will prevail on the merits of the suit, that there is no adequate remedy at law, and that it will suffer irreparable harm without injunctive relief. *Christian Legal Society v. Walker,* 453 F.3d 853, 859 (7th Cir.2006); *Incredible Technologies, Inc. v. Virtual Technologies, Inc.,* 400 F.3d 1007, 1011 (7th Cir.2005); *Pelfresne v. Village of Lindenhurst,* 2004 WL 1660812 (N.D.Ill.2004) (Pallmeyer, J.).[FN7]

> FN7. As this case was originally brought in the Northern District of California, the parties relied upon Ninth Circuit law in their briefs. Clarus submits that there is no significant difference between Ninth Circuit and Seventh Circuit law on the issues in this matter.

If these requirements are satisfied, the degree of irreparable harm to the plaintiff must be balanced against the harm that the defendant will suffer if the injunction is granted. *Incredible Technologies,* 400 F.3d at 1011. As part of the calculus, there must be a consideration of the effect the injunction will have on the public. *Promatek Industries, Ltd. v. Equitrac Corp.,* 300 F.3d 808, 813 (7th Cir.2002). A strong showing as to the likelihood of success will permit a weaker showing as to the balance of harms posed by the grant or denial of interim in-

junctive relief to carry the day. *Bloedorn v. Francisco Foods, Inc.,* 276 F.3d 270, 298 (7th Cir.2001). In the context of trademark infringement, the Seventh Circuit has cautioned that " '[a] preliminary injunction is a very serious remedy, never to be indulged in except in a case clearly demanding it.' "*Barbecue Marx, Inc. v. 551 Ogden, Inc.,* 235 F.3d 1041, 1044 (7th Cir.2000). Here, after a review of the parties' written submissions and after a lengthy oral argument, I cannot recommend a finding that Clarus has demonstrated it has a reasonable likelihood of succeeding on its claims. As such, I cannot recommend that Clarus be granted injunctive relief.

### B.

### Trademark Infringement Under Section 32 Of The Lanham Act

**\*7** In order to prevail on its claim that the defendants are infringing on its "Q-LINK" trademark in violation of § 32 of the Lanham Act,[FN8] Clarus must show that its mark is entitled to protection and that there is a likelihood of confusion between its mark and the defendants' mark. *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.,* 543 U.S. 111, 117, 125 S.Ct. 542, 160 L.Ed.2d 440 (2004); *Sullivan v. CBS Corp.,* 385 F.3d 772, 775-76 (7th Cir.2004). Clarus registered its mark "Q-LINK" in May of 1997. Registration of a mark under § 2 of the Lanham Act, 15 U.S.C. § 1052, enables the owner to sue an infringer under § 32, 15 U.S.C. § 1114; it also entitles the owner to a presumption that its mark is valid, *see* § 7(b), 15 U.S.C. § 1057(b), and ordinarily renders the registered mark incontestable after five years of continuous use. *See* § 15, 15 U.S.C. § 1065; *Wal-Mart Stores, Inc. v. Samara Bros., Inc.,* 529 U.S. 205, 209, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000).

> FN8. In pertinent part, that section provides:

> (1) Any person who shall, without the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                     Page 8
Slip Copy, 2006 WL 4013750 (N.D.Ill.)
**(Cite as: 2006 WL 4013750 (N.D.Ill.))**

consent of the registrant

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or

(b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive,

shall be liable in a civil action by the registrant for the remedies hereinafter provided. Under subsection (b) hereof, the registrant shall not be entitled to recover profits or damages unless the acts have been committed with knowledge that such imitation is intended to be used to cause confusion, or to cause mistake, or to deceive. 15 U.S.C. § 1114(1)

Clarus's "Q-LINK" mark is manifestly entitled to protection, and the defendants do not argue otherwise. The plaintiff's focus is on likelihood of confusion between its mark and the defendants' Q-Ray mark. In assessing the likelihood of confusion, courts have identified seven relevant factors that help in deciding the ultimate question: (1) the similarity of the marks; (2) the similarity of the products; (3) the area and manner of concurrent use; (4) the degree of care likely to be used by consumers; (5) the strength of the plaintiff's mark; (6) whether any actual confusion exists; and (7) the de-

fendant's intent to palm off its goods as those of the plaintiff. *Sullivan v. CBS Corp.,* 385 F.3d 772, 776 (7th Cir.2004); *Promatek Indus., Ltd. v. Equitrac Corp.,* 300 F.3d 808, 812 (7th Cir.2002). None of these factors by itself is dispositive of the likelihood of confusion question, and different factors will weigh more heavily from case to case depending on the particular facts and circumstances involved. *Ty, Inc. v. Jones Group, Inc.,* 237 F.3d 891, 898 (7th Cir.2001). As a consequence, the weight and totality of the most important factors in each case will ultimately be determinative of the likelihood of confusion, not whether the majority of the factors tilt the scale in favor of one side or the other. *Id.* Even though no one factor is decisive, the similarity of the marks, the intent of the defendant, and evidence of actual confusion are the most important factors in a likelihood of confusion analysis. *Id.*[FN9]

FN9. Clarus' brief in support of its motion for a preliminary injunction often fails to cite to specific portions of the record to support its contentions. *See, e.g., Plaintiff's Memorandum,* at 6(no licensing agreement); 14 (no evidence of licensees); 17(no citation to evidence of marketing); 18 (no citation to evidence regarding types of customers); 21(no citation to piece of evidence containing SRT mark); no citation to any examples of claimed advertising)). At oral argument, Clarus' counsel explained that the evidence was "a part of the record," including certain matters that were under seal. The Seventh Circuit has been consistent in its admonition that it is not a judge's responsibility to scour the record on a party's behalf. *See Adams v. Wal-Mart Stores, Inc.,* 324 F.3d 935, 937 (7th Cir.2003); *Albrechtsen v. Bd. of Regents of Univ. of Wis. Sys.,* 309 F.3d 433, 436 (7th Cir.2002); *United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir.1991) ("judges are not like pigs hunting for truffles.")."An advocate's job is to make it easy for the court

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

to rule in his client's favor ....”*Dal Pozzo v. Basic Machinery Co., Inc.,* 463 F.3d 609, 2006 WL 2548250, *4 (7th Cir.2006).

**1.**

**Similarity of Marks**

First, Clarus argues that there is a similarity of the marks because:

Plaintiff's mark is Q-LINK. Defendants' mark is Q-RAY. Both marks are displayed on the party's pendants in the center of the coil in capital letters.... Notably, the New Q Pendants display the Q-Link mark in a stylized and large font on the pendant and packaging .... Defendants' use of the Q-RAY mark placed on its pendants exactly like Clarus places its Q-LINK mark makes source confusion among consumers all the more likely because of the similar display of the mark.

**\*8** (*Plaintiff's Memorandum,* at 16).

Although, “[t]he character of every act depends on the circumstances in which it is done,”*Schenck v. United States,* 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470 (1919) (Holmes, J.), Clarus' argument ignores the entire history of the Q-Ray mark. In trademark infringement cases, there is usually a common thread: a newcomer adopts a similar trade name, arbitrary in character, to that which has found acceptance in the marketplace. Although there is a universe of other names that the newcomer could have selected, one close to that of a competitor is selected, often with “no reasonable explanation ... why the name need be used.”*Lambert Pharmacal Co. v. Bolton Chemical Corp.,* 219 F. 325, 326 (S.D.N.Y.1915) (L.Hand, J.). In that context, the multifactor analysis (including the marks' similarity) is essential.

In this case, however, the Q-Ray mark was selected based on Mr. Park's name, was properly registered, has been in use since 1995, and has enjoyed enorm-

ous commercial success throughout the nation in connection with its sale of bracelets that appeal to that segment of the public seeking the restorative benefits purportedly resulting from use of the product. Hence, Clarus' claim that the marks are confusingly similar puts out of view facts critical to the ultimate analysis in this case.

There is a second aspect to the argument that needs mention. Although Clarus contends that the marks are confusingly similar, that argument blends almost imperceptibly into an argument that it is not so much the mark similarity but its usage in the overall design and presentation of the Q-Ray pendants that makes the Q-Ray mark itself confusingly similar. In any event, Clarus' fundamental premise of mark-similarity is faulty. Both marks are *not* displayed in the center of the coil in capital letters. Q-LINK is displayed in a mix of capital and lower-case letters in the center of a circle in white in the distinctive type face discussed earlier.[FN10]The overall appearance of the inside of the pendant is flat. Q-RAY is, in fact, displayed in capital letters on what visually appears to be a raised circle in black lettering. The surrounding coil is visually a “C” angled downwards. The opening in the coil reveals the black substrate and thus gives the raised portion of the pendant on which appears the name “Q-Ray” the appearance of a black “Q.” In short, as used on the pendants, the marks are not confusingly similar.

> FN10.*See Plaintiff's Exh.* 2-5; *Plaintiff's Brief* (containing pictures of the pendants); and *Plaintiff's Supplemental Briefing re: Direct Customer Sales,* Exhs. 3 and 4.

Clarus also focuses on the use of the letter “Q” in both marks. It argues that the letter is the dominant and most significant portion of both marks, and that it stands out visually from the balance of the marks. In assessing the similarity of the two marks, the court must compare “sound, sight and meaning.” *Henri's Food Products Co., Inc. v. Kraft, Inc.,* 717 F.2d 352, 355 (7th Cir.1983). On the one hand, “if one word or feature of a composite trademark is the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

salient portion of the mark, it may be given greater weight than the surrounding elements."*Sullivan,* 385 F.3d at 777 (*citing Henri's Food Prods.,* 717 F.2d at 356);3 McCarthy on Trademarks and Unfair Competition § 23:42 (4th ed.2006 database update) ("It is appropriate ... to give greater weight to the important or 'dominant' parts of a composite mark, for it is that which may make the greatest impression on the ordinary buyer"). On the other, each mark must be viewed as a whole, *Sullivan,* 385 F.3d at 777;*Henri's Food Prods.,* 717 F.2d at 355, and a single letter cannot constitute a trademark unless it has been proven to have acquired secondary meaning. *Louis Vuitton Malletier v. Dooney & Bourke, Inc.,* 454 F.3d 108, 116 (2nd Cir.2006); 1 McCarthy on Trademarks and Unfair Competition § 7:11 (4th ed.2006 database update) ("Whether a single letter ... always used as part of a composite mark functions separately as a mark depends upon the probable impact upon the consumer.... if the letter does not, in itself, create a separate commercial impression apart from the whole, it does not function as a mark by itself"); *Professional Sound Services, Inc. v. Guzzi,* 349 F.Supp.2d 722, 731 (S.D.N.Y.2004) (plaintiff is required to show that its use of a single letter is capable of distinguishing its goods from those of others, *i.e.,* its use of the letter "S" is distinctive); *Quality Semiconductor, Inc. v. QLogic Corp.,* No. 93-20971, 1994 WL 409483, *2 (N.D.Cal.) (N.D.Cal. May 13, 1994) (plaintiff's "Q" is a unique stylized version of the letter which creates a distinct commercial impression and its promotions have resulted in buyers associating plaintiff and its products with the "Q" mark).

**\*9** Here, it is not so clear that the "Q" in "Q-LINK" is the salient portion of the mark in the way "Beanie" was found to be the salient portion of the trademark "Beanie Babies" in *Ty, Inc. v. Jones Group, Inc.,* 237 F.3d 891, 898-99 (7th Cir.2001), or "Miracle" was found to be the dominant portion of the trademark "Miracle Whip" in *Henri's Food Products,* 717 F.2d at 356. And, indeed, Clarus cites no case law on this issue. In *Henri's Food Products,* the court compared the marks

"Yogowhip" and "Miracle Whip," and found that while the word "whip," was prominent and identical, when the marks were viewed as a whole, as they would be by consumers, there could be no confusion.*Henri's Food Prods.,* 717 F.2d at 355.

Similarly, in *Sullivan,* the court noted that the although the dominant portion of the mark was the word "Survivor," the word never appeared alone in any of the merchandise at issue. *Sullivan,* 385 F.3d at 778;*see also Nabisco, Inc. v. Warner-Lambert Co.,* 220 F.3d 43, 46 (2nd Cir.2000) (calling DENTYNE ICE and ICE BREAKERS "at best marginally similar because of the common use of 'Ice.' "); *Nutri/System, Inc. v. Con-Stan Industries, Inc.,* 809 F.2d 601, 606 (9th Cir.1987) (affirming trial court holding that "Nutri/System" and "Nutri-Trim"were dissimilar in terms of appearance, sound, and meaning). The fact that both Clarus's and defendants' marks both begin with a "Q" is simply not enough to tip the scales in Clarus's favor on the issue of similarity.

Beyond that, although the "Qs" in both marks are set off by hyphens, the balance of the marks are not similar. "Link" and "Ray" are two different words, and they neither appear similar textually, nor sound similar when spoken or read aloud. *See AMF, Inc. v. Sleekcraft,* 599 F.2d 341, 351 (9th Cir.1979) (sound is considered an important factor because the trademarks are often spoken as reputation is often conveyed by word of mouth). In *Sleekcraft,* the comparison between the words "Sleekcraft" and "Slickcraft," revealed the only difference to be found in a small part of one syllable. 599 F.2d at 350-51. In the instant case, two entirely different words are added to the "Q," and the sound-not to mention to appearance-is entirely different.

In addition, the two words have completely unrelated meanings. *See Nutri/System, Inc. v. Con-Stan Industries, Inc.,* 809 F.2d 601, 606 (9th Cir.1987) (holding that "Nutri/System" and "Nutri-Trim"were entirely distinct, despite having "Nutri" as a common element, especially since "System" and "Trim" were significant words which indicate dif-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 11
Slip Copy, 2006 WL 4013750 (N.D.Ill.)
**(Cite as: 2006 WL 4013750 (N.D.Ill.))**

ferent origins). As already noted, Clarus's use of "Link" in the context of its claims regarding improvement of golf performance gives "Link" the connotation of "golf links." "Ray" has no similar connotation.

As used on the parties' pendants, the two "Qs" are not even similar in appearance. Clarus's "Q," as already noted, is set forth in a font that is readily distinguishable from the defendants' "Q." The "tail" of the Clarus "Q" hangs straight down in the six o'clock position, and its body resembles a square with rounded-off corners. The tail of the defendants' "Q" hangs to the right side, as is more commonly the case, and its body is the more common circular "O." The difference in fonts-and in cases, as already noted-carries over to the balance of the marks. Overall, viewing the marks as a whole, the impression is one of dissimilarity, despite the single letter the marks do have in common. The factor of similarity-which is among the most important-weighs against Clarus.

### 2.

### Similarity of Products

**\*10** There is no doubt that Clarus' and the defendants' products are similar. Both are "healthy lifestyle" pendants. The technologies that make the pendants something other than decorative differ, however-at least according to the parties and their advertising. Clarus' Q-LINK pendants operate through Sympathetic Resonance Technology (what it calls SRT technology) that enhances the biofield, while Q-Ray pendants operate through biomagnetic ionization. (*Defendants' Opposition to Plaintiff's Motion,* at 15). While this distinction is emphasized by the defendants, for purposes of the similarity of product analysis, it is a quiddity. *See Sullivan; Ty, Inc.* This factor favors Clarus.

### 3.

### Area and Manner Of Concurrent Use

The third factor in the likelihood of confusion analysis assesses "whether there is a relationship in use, promotion, distribution, or sales between the goods or services of the parties."*CAE, Inc. v. Clean Air Engineering, Inc.,* 267 F.3d 660, 681 (7th Cir.2001). For example, in *Ty, Inc.,* the court held that the area of concurrent use overlapped when the parties sold their products in the same stores, advertised in the same magazines, and targeted the same general audience. 237 F.3d at 901.[FN11]Both parties admittedly sell their products via infomercials and the internet. (*Plaintiff's Memorandum,* at 18; *Defendants' Opposition to Plaintiff's Motion,* at 19). But interestingly, of the four websites Clarus cites as evidence that the pendants are sold side by side-http://www.qeshop.com; http://www.healthnstuff.com; http://www.holistec.com/; http://www.magnetictherapysales.com-none advertised both parties' pendants when visited September 21, 2006. A brief search revealed the first few websites offering Q-Ray pendants did not also offer Q-Link pendants. (*See* http://www.naturesbracelets.com/qpendant.html; http:// www.bocabracelets.com/; http://www.asseenontv.com/prod-pages/). Instead, the websites offered Q-Ray bracelets on one link, and Q-Link pendants on another.[FN12]

> FN11. The court in *Ty, Inc.* Suggested four factors that can be important in this analysis: (1) the relative geographical distribution areas; (2) whether there exists evidence of direct competition between the products; (3) whether the products are sold to consumers in the same type of store; (4) whether the products are sold in the similar section of a particular store; (5) whether the product is sold through the same marketing channels. 237 F.3d at 900. The parties do not provide any evidence pertaining to-or indeed, address at any length-the first two factors, and their products are

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

not sold in the traditional "store." As such, I focus on the manner in which the products are marketed and sold, and the target audience.

FN12. Mr. Park's son, James Park, has apparently, at one point, sold not only Q-Ray bracelets and Q-Link pendants on his website, but Q-Ray bracelets as well. (Hoisington Decl. ¶ 10). This was no longer the case during the consideration of Clarus's motion.

Clarus has not pointed to a website where the products at issue here-the pendants-are sold side by side. The parties may employ the same general means of marketing and product delivery, but Clarus has simply not demonstrated that the both parties' pendants are found in proximity to one another. In this day and age, to say that both products are sold via internet websites is akin to saying both products are sold in stores.

Clarus also contends that the parties target the same audience for their products. According to Clarus, both market extensively to the golf and sports industries, as well as to healthy lifestyle consumers. (*Plaintiff's Memorandum,* at 17). But for Clarus, at least, the golf connection is overwhelming. Its very name connotes golf; its packaging also indicates that the Q-Link pendant is a product made for golfers-touting better shotmaking and better scoring. The pendant is shown on the face of the box in which it comes nestled in fairway grass. The Q-Link website (http://www.qlinkxzone.com/) has a heading of testimonials from a series of professional golfers. Upon entering the website, one learns that the pendant was named best new product at the 2005 PGA Fall Expo, and that "200+ Touring Pros Won't Step a Foot on the Green without it."Indeed, there is even a Q-Link website dedicated to golf: http:// www.qlinkgolf.com.

**\*11** Even Clarus' brief in support of its motion for injunctive relief stresses its products' "link" with golfers:

More than 200 professional golfers wear the Q-Link, including Bruce Fleisher, Justin Rose, Mark Calcavecchia, Greg Owen, Tom Pernice Jr., Tom Jenkins, Charles Howell III and Tommy Armor III. More than 120 PGA, LPGA, Champions Tournament, and European PGA tournaments have been won by golfers who wear the Q-Link, including Ernie Els, Bruce Fleisher and Davis Love III.

(*Plaintiff's Memorandum,* at 14) (citations to Williams Decl. omitted).

To be sure, the brief also numbers Deepak Chopra and Anthony Robbins as customers, as well as unnamed "World Champion runners, sailors, swimmers, Olympic Athletes, Pro-Bowlers, Tennis Pros, Formula-One drivers, professional soccer, hockey and Rugby players .... actors, musicians, models and spiritual leaders. (*Id.*). But as references to customers stray from the world of golf, those references become far less specific. Similarly, at the oral argument on this motion, Clarus's counsel was very specific in referring to some of Clarus's choices of advertising media: the Golf Channel, Golf Magazine, Golf Digest. He was very general and somewhat vague as to others: some healthy lifestyle magazines. Overall, the stress is clearly on golf, with the balance of the target audience assuming secondary importance.

The defendants argue that their product is geared toward a much broader market, a general audience of "persons interested in health and well-being."(*Defendants' Opposition to Plaintiff's Motion,* at 15). While the defendants concede that this may include golfers, golfers are not the target audience. Clarus submits that Q-Ray "markets extensively to the golf and sports industries," but offers no citation to any examples. (*Plaintiff's Memorandum,* at 14).[FN13] The Q-Ray website heading claims its products "offer[ ] a natural and effective method to increase one's bio-energy, vitality, and feelings of well-being."(http://www.qray.com/). Farther down on the opening page, the website explains that the "Q-Ray is designed to naturally balance the negative and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

positive energy forces in your body to achieve a state of 'Chi,' where you will feel and perform at your best, and have more energy to lead an active lifestyle."Farther down from that, the website does boast that "Q-Ray wearers include professional golfers, Olympic runners and professional coaches and trainers who wear their Q-Ray all of the time."

> FN13. To be sure, there is evidence in the record that Q-Ray promoted its products at a PGA show (Parlee Decl. ¶ 5). But oddly, Clarus does not discuss this in the section of its brief on the parties' marketing habits.

Thus, there is overlap in the parties' target audiences, at least when viewed "from a distance." Upon closer inspection, Clarus's audience is golfers first, healthy lifestyle consumers second. The defendants target healthy lifestyle consumers in general, and if this includes golfers, so be it. There is the same general overlap in product delivery-internet sites and infomercials-but, like the target audience analysis, a closer inspection reveals specific websites do not necessarily or even generally offer both companies' pendants. At best, for Clarus, the "area and manner of concurrent use" factor favors neither Clarus nor defendants.

### 4.

### The Degree Of Care Likely To Be Used By Consumers

***12** The fourth factor in the analysis examines the degree of care used by the types of consumers purchasing the products at issue. Clarus argues that the parties' goods are relatively "low-cost" pendants, so consumers are assumed to exercise less care in their purchases, making confusion more likely. (*Plaintiff's Memorandum,* at 18). To be sure, the more widely accessible and inexpensive the products and services, the more likely that consumers will exercise a lesser degree of care and discrimination in their purchases. *See CAE, Inc. v.*

*Clean Air Engineering, Inc.,* 267 F.3d 660, 683 (7th Cir.2001); *Au-Tomotive Gold, Inc. v. Volkswagen of America, Inc.,* 457 F.3d 1062, 1076 (9th Cir.2006) ("Confusion is less likely where buyers exercise care and precision in their purchases, such as for expensive *or sophisticated items.*") (Emphasis supplied).

However, the only support for the argument that the pendants in this case are "inexpensive" as that concept is used in the cases, is Clarus' *ipse dixit* that they are. The drastic remedy of a preliminary injunction cannot be granted on the basis of unsupported, tendentious conclusions in a brief. *Cf. Packman v. Chicago Tribune Co.,* 267 F.3d 628, 646 (7th Cir.2001); *Nike, Inc. v. Just Did It Enterprises,* 6 F.3d 1225, 1230 (7th Cir.1993) (where record contained no evidence on the degree of care customers might exercise because of the type of merchandise at issue, it left open the possibility that there would be no confusion).[FN14]

> FN14. The Seventh Circuit has repeatedly cautioned both bench and bar that unsupported statements in lawyers' briefs do not count. *See IFC Credit Corp. v. Aliano Brothers General Contractors, Inc.,* 437 F.3d 606, 610-611 (7th Cir.2006); *United States ex rel. Feingold v. AdminaStar Federal, Inc.,* 324 F.3d 492, 494 (7th Cir.2003).

The pendants at issue sell in the "retail range of $129 to $149."(*Plaintiff's Memorandum,* at 18). The "Pebble" sells for from $299 up to $349. (http:// www.qlinkxzone.com/newQP.php; http:// www.intheholegolf.com/store/qlinkpeb.html).[FN15] But even at $129, these are not the kinds of items that fall into the scope of what the courts have denominated as sufficiently low cost that it is fair to conclude that the consumer is unlikely to exercise care in his or her purchasing decision. *See, e.g., Nike, Inc. v. Just Did It Enterprises,* 6 F.3d 1225, 1230 (7th Cir.1993) ("... we cannot agree that as a matter of law customers routinely purchase a $39.95 item without looking carefully at the

product information."); *Reno Air Racing Ass'n., Inc. v. McCord,* 452 F.3d 1126, 1136 (9th Cir.2006) (t-shirts and other merchandise which is relatively inexpensive); *Au-Tomotive Gold, Inc. v. Volkswagen of America, Inc.,* 457 F.3d 1062, 1076 (9th Cir.2006) (key chains and license plate covers found to be inexpensive); *Surfvivor Media, Inc. v. Survivor Productions,* 406 F.3d 625, 634 (9th Cir.2005) (the consumer is likely to exercise very little care in purchase of small, inexpensive goods such as sunscreen); *Gray v. Meijer, Inc.,* 295 F.3d 641, 649 (6th Cir.2002) (inexpensive and fungible products, such as snack food).

> FN15. The titanium version of the Q-Ray pendant sells for $199.95.

Nor can it be said that the pendants are "unsophisticated" items. *Au-Tomotive Gold, Inc. v. Volkswagen of America,* 457 F.3d at 1076. Quite the contrary. These are not the kinds of products that generate impulse purchases. Rather, they appeal to a sophisticated community of buyers looking not for inexpensive jewelry, but for something to improve their overall well-being. In fact, Clarus' boast that its pendants are based on new, cutting-edge technology (*Plaintiff's Memorandum,* at 18) is manifestly intended to appeal to sophisticated buyers, not to casual and unsophisticated purchasers of costume jewelry. Clarus' very focused sales pitch presupposes the very level of sophistication on the part of potential customers that its present argument denies exists.

**\*13** In *Barbecue Marx, Inc. v. 551 Ogden, Inc.,* 235 F.3d 1041, 1045 (7th Cir.2000), the plaintiff argued that many people did not consider a $20 barbecue dinner expensive, and, as such, might even forget the precise name of a restaurant recommended to them. The court, however, noted that the record reflected that many such customers were "barbecue afficionados," rendering the low cost of the meal essentially non-dispositive. *Id.* at 1045.

Are some of the customers unsophisticated? Perhaps, although it is impossible to say how many.

But that does not alter the analysis. In *Indianapolis Colts, Inc. v. Metropolitan Baltimore Football Club Ltd. Partnership,* 34 F.3d 410, 414 (7th Cir.1994), Judge Posner, speaking for a unanimous panel, explained that "[t]here is great variance in consumer competence, and it would be undesirable to impoverish the lexicon of trade names merely to protect the most gullible fringe of the consuming public. The Lanham Act does not cast the net of protection so wide."34 F.3d at 414.[FN16]

> FN16. Judge Posner's unwillingness to make the Lanham Act a function of the gullibility of the most susceptible members of the public echoes Learned Hand's comments in the First Amendment context:
>
> > I question whether in the end men will ... not believe that truth and beauty are too precious to society at large to be mutilated in the interests of those most likely to pervert them to base uses ... Yet, if the time is not yet when men think innocent all that which is honestly germane to a pure subject, however little it may mince its words, still I scarcely think they would forbid all which might corrupt the most corruptible, or that society is prepared to accept for its own limitations those which may perhaps be necessary to the weakest of its members ... To put thought in leash to the average conscience of the time is perhaps tolerable, but to fetter it by the necessities of the lowest and least capable seems a fatal policy. *United States v. Kennerley,* 209 F. 119, 120 (S.D.N.Y.1913).
>
> > It may well be that some customers do not care about the origins of their pendants. But in this circuit-unlike some others-they are not considered in the determination whether there is a likelihood of confusion.*Syndicate Sales, Inc. v. Hampshire Paper Corp.,* 192 F.3d 633, 636 (7th Cir.1999) (*citing*3 J. Thomas

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23:5, at 23-16 to 23-17 (1999)).

Some courts have concluded that where purchasers are a mix of sophisticated and unsophisticated customers, the court must apply the "least sophisticated consumer" test. *See* the discussion in *Brookfield Communications, Inc. v. West Coast Entertainment Corporation,* 174 F.3d 1036, 1060 (9th Cir.1999). That is not the test in this circuit. But even if it were, there is no evidence to support Clarus' contention that potential purchasers of putative health enhancing pendants are anything but sophisticated and discerning consumers-at least in this area.

**5.**

**The Strength Of The Plaintiff's Mark**

Defendants concede that "Q-LINK" mark is a fanciful mark and therefore strong one. (*Defendants' Opposition to Plaintiff's Motion,* at 14). This factor favors Clarus.

**6.**

**Whether Any Actual Confusion Exists**

Proof of actual confusion is not necessary to Clarus' case. *See Promatek Industries, Ltd. v. Equitrac Corp.,* 300 F.3d 808, 812 (7th Cir.2002) (finding absence of evidence of any actual consumer confusion not dispositive where other factors weighed in plaintiff's favor). But having submitted that the factor overwhelmingly favors it, Clarus has made only an exceedingly brief and cursory argument, consisting of a single paragraph:

Evidence of actual confusion is not necessary to prevail on an infringement claim. *See Academy of Motion Picture Arts & Sciences v. Creative House Publications, Inc.,* 944 F.2d 1446, 1456 (9th Cir.1991). However, proof of actual confusion is persuasive proof that future confusion is likely.*Sleekcraft,* 599 F.2d at 352. Clarus received numerous inquires from attendees at the PGA show-Where the first Q-Ray Pendant ad and prototype pendants were introduced-about whether or not the Q-Ray pendants were from Clarus. (Parlee Decl. at ¶ 5). This factor overwhelmingly favors Clarus.

(*Plaintiff's Memorandum,* at 17).

Ms. Parlee's declaration states:

While I was at the PGA show, I was approached by a number of attendees who saw the Q-Ray pendants advertisement in the Trade Show News and were confused about whether Clarus or Q-Ray was the source of the Q-Ray pendants. One attendee told me that he spoke with a representative of Q-Ray who claimed that Q-Ray was the originator of the Q-Link.

(Parlee Decl. at ¶ 5).

Ms. Parlee's declaration proves only that some unspecified number of people-perhaps as few as two-spoke to her about the pendants. What they said actually said is excluded from her declaration. We have only her conclusion that they were "confused." The problem is not so much that the alleged conversations with Ms. Parlee are hearsay under Rule 801, Federal Rules of Evidence-depending on what was said, the statements could well have been admissible under 803(3). Rather, the problem is that Ms. Parlee's declaration is hopelessly conclusory. It is impossible to know whether *her* conclusion that people were confused is accurate. If one knew what was actually said, her conclusion could be tested and either invalidated or sustained. But, as things now stand, one is forced to take at face value her assessment, and that, a court ought

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

not do. Just as it is unthinkable, for example, that a witness would be allowed to testify that he had been "threatened" by the defendant, Ms. Parlee's conclusion that people were "confused" cannot be the basis for the kind of factual finding that Clarus asks be made.

**\*14** In short, there is simply an absence of evidence (beyond Ms. Parlee's conclusion) of actual confusion, and that is not enough.[FN17] *Cf. Smith Fiberglass Products, Inc. v. Ameron, Inc.,* 7 F.3d 1327, 1331 (7th Cir.1993) ( "Here, however, [plaintiff] presented no instances of actual confusion, but rather sought to admit into evidence a vague hearsay account of what may have been actual confusion."); *Platinum Home Mortg. Corp. v. Platinum Financial Group, Inc.,* 149 F.3d 722, 729 (7th Cir.1998) (*de minimus* evidence of actual confusion does not necessarily establish a likelihood of consumer confusion).

> FN17. At the oral argument, I explained my view of what I believed to be the inadequacy of Ms. Parlee's declaration. I denied the plaintiff's request to file additional declarations.

The actual confusion issue weighs against Clarus.

## 7.

## Defendants' Intent

The final factor to consider in the analysis is the defendants' intent. Clarus relies on the fact that the defendants are former licensees, and argues that "they chose to adopt a trademark confusingly similar to the one they had previously used under license from Clarus (and likewise chose to change almost nothing about the product's look and feel)." (*Plaintiff's Memorandum,* at 19). It argues that the inference of intent to deceive is especially strong when the parties have had a prior relationship, relying on *Beer Nuts, Inc. v. Clover Club Foods Co.,*

805 F.2d 920, 927 (10th Cir.1986). The argument essentially ignores the facts of the case.

First, the defendants did not adopt their trademark "Q-Ray" in the wake of their relationship with Clarus. That mark had been adopted and registered in 1995, the same year Clarus first used "Q-Link," albeit a few months later. Second, there is no evidence to support the tacit contention that the adoption of the "Q-Ray" trademark stemmed from an attempt to copy Clarus' "Q-Link" mark. To the extent there is any evidence, it supports the defendants' contention that the Q-Ray mark was a natural choice stemming from Mr. Park's first name, "Que." Third, there is the fact that there is a natural progression from marketing healthy lifestyle bracelets, and then to rings, and then to pendants. *Nutri/System, Inc.,* 809 F.2d at 606 (finding no intent to deceive where defendant expanded into field after plaintiff, but used a mark it had already been using, had advertised, and felt comfortable with).

Fourth, the relationship with the defendants ended years ago and involved activities in Korea, not the United States. Finally, the record demonstrates that defendants did not intend to "pass off" their pendants as those of Clarus. *See CAE, Inc.,* 267 F.3d at 686 (intent is relevant only if the defendant intended to palm off its goods as those of the plaintiff). In marketing their pendants, defendants tend to emphasize the link between the "C" shape of their bracelets and the "C" shape inset in their pendants. This "C", if one is to believe the advertising, is an integral component of defendant's "biomagnetic ionization." Aside from a single instance which was apparently the result of an error, the defendants make no suggestion that their pendants and technology are in any connected with Clarus's pendants and their technology. This factor, too, weighs against Clarus.

## 8.

## Conclusion

**\*15** After consideration of the factors relevant to an examination of the likelihood of confusion, the balance clearly favors the defendants. The similarity of the marks, the degree of care likely to be used by consumers, whether any actual confusion exists, and whether the defendants intended to pass off their goods as those of the plaintiff all favor the defendants. So the three most important factors-the similarity of the marks, the intent of the defendant, and evidence of actual confusion, *Ty, Inc.,* 237 F.3d at 898-all weigh against Clarus. Only the similarity of the products and the strength of the plaintiff's mark favor Clarus. But the defendants' mark is no less strong. The area and manner of concurrent use, at best, favors neither side. Consequently, Clarus has failed to demonstrate a likelihood of success on the merits of its trademark infringement claim and thus, it is not entitled to a preliminary injunction against the defendants.

### C.

### Trade Dress And Unfair Competition

Clarus contends that the defendants committed a violation of Section 43(a) of the Lanham Act "by copying the Coil Design Trademark, the SRT Trademark [sic], and the overall appearance of the Q-Link Pendant configuration."(*Plaintiff's Memorandum,* at 20). Admittedly, Clarus has no registered trademark in any of these things. But, in addition to protecting registered marks, the Lanham Act, in § 43(a), gives a producer a claim for the use by any person of "any word, term, name, symbol, or device, or any combination thereof ... which ... is likely to cause confusion ... as to the origin, sponsorship, or approval of his or her goods ...."15 U.S.C. § 1125(a); *Wal-Mart Stores, Inc. v. Samara Bros., Inc.,* 529 U.S. 205, 209, 120 S.Ct. 1339, 146 L.Ed.2d 182(U.S.2000). To merit protection for its unregistered trade dress, Clarus must show that it is distinctive and not functional. 15 U.S.C. § 1125(a)(3)); *Wal-Mart,* 529 U.S. at 210. And, of course, to succeed on its claim of trade dress infringement, Clarus must prove likelihood of confusion. 15 U.S.C. § 1125(a)(1)(A); *Wal-Mart,* 529 U.S. at 210. I address this latter element first, as likelihood of confusion is dispositive of Clarus's claim. *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 769, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992) (liability under § 43(a) requires proof of the likelihood of confusion); *Syndicate Sales,* 192 F.3d at 636 (focusing on likelihood of confusion as dispositive).

### 1.

### Likelihood Of Confusion

Although Clarus has struggled, both in its brief and at oral argument, defining just what it hopes to protect, it is apparent that it claims as trade dress, "the overall image of [its] product"; "the overall appearance of the Q-Link Pendant configuration."(*Plaintiff's Memorandum,* at 20). This is not an easy claim on which to succeed, especially when the plaintiff gives the issues attendant to such a claim short shrift. *See Thomas & Betts Corp. v. Panduit Corp.,* 65 F.3d 654, 657-58 (7th Cir.1995) ("Trade dress protection in the configuration of the product itself opens up another can of worms.").

**\*16** In the context of likelihood of confusion, the Seventh Circuit described the hurdles to such a claim in *Syndicate Sales, Inc. v. Hampshire Paper Corp.,* 192 F.3d 633 (7th Cir.1999):

In a product configuration trade dress infringement, ... consumers do not have to rely on a potentially distinctive configuration to identify the source of the product; rather, they can generally look to the packaging, trademarks, and advertising used to market the product, which are typically much less ambiguous. Consumers therefore have less need, and so are much less likely, to rely on a product configuration as an indicator of the product's

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

source. Accordingly, they are less likely to be confused as to the sources of two products with substantially similar configurations.

192 F.3d at 637 (*quoting Versa Prods. Co. v. Bifold Co.,* 50 F.3d 189, 203 (3rd Cir.1995)). So here, consumers have the trademarks on the very pendants-**Q-LinK** and **Q-RAY;** already determined not to be similar-to rely upon to identify the sources of the pendants. Distinctive labeling and packaging is a strong indication that there is no likelihood of confusion. *Syndicate Sales,* 192 F.3d at 637. There is a prominent disclosure of the producer's name on the product, which is "[t]he most common and effective means of apprising intending purchasers of the source of goods. *Syndicate Sales,* 192 F.3d at 637. Even in a case where there is evidence of deliberate copying of the product design, differences in labeling and packaging are enough to thwart confusion as to the source of the goods. *Syndicate Sales,* 192 F.3d at 638. This weighs against Clarus's trade dress claim.[FN18]

> FN18. The parties disagree as to whether packaging is significant in this case, as the products are generally sold over the internet or through infomercials. But to the extent it is, again, this factors works against Clarus. The packaging, as described *supra,* is radically different.

At the oral argument I asked Clarus' counsel whether if Tiffany's decided to copy the Q-Link pendants and put its name conspicuously in the center of the pendant, whether Clarus have a trade dress claim. The question went essentially unanswered.

The factors to be considered in the likelihood of confusion of trade dress analysis are essentially identical to those applicable to the trade mark analysis: 1) the similarity of the trade dresses; 2) the area and manner of concurrent use; 3) the degree of care likely to be used by consumers; 4) the strength of the plaintiff's trade dress; 5) actual confusion; and 6) intent of the defendant to palm off its product as that of the plaintiff. *Syndicate Sales,* 192

F.3d at 636;*Thomas & Betts Corp. v. Panduit Corp.,* 138 F.3d 277, 296 (7th Cir.1998). As already concluded, the factors of degree of care likely to be used by consumers, whether any actual confusion exists, and the defendants' intent to pass off its goods as those of the plaintiff all favor the defendants. The similarity of the trade dress-as opposed to the trade marks-remains to be determined.FN19

> FN19. In the preceding trademark analysis, only the similarity of the products and the strength of the plaintiff's mark favor Clarus. In the trade dress analysis, the strength of trade dress is tied to distinctiveness which, as already noted, is a separate element of an infringement claim that Clarus must prove.

Trade dress is the "total image or overall appearance of a product," including size, shape, color, texture, and graphics. *AM General Corp. v. Daimler-Chrysler Corp.,* 311 F.3d 796, 814 (7th Cir.2002). There are four pendants at issue here, two from Clarus and two from defendants. But Clarus's "Pebble" pendant ought not to have been included in this lawsuit. It is made of sterling silver, while the other three pendants are black plastic. It has no lettering, while the other three display either "Q-Link" or "Q-Ray." Its shape is amorphous, like a random pebble, while the other pendants are configured as triangles or teardrops. And it displays concentric copper and black circles, while the other three do not. Clarus' description of this pendant in its briefs as a "teardrop," when in its advertising it calls it the "Pebble," is unconvincing and obviously designed to equate it to the defendants' "Alpha Teardrop" pendant. But this attempt to subordinate reality to semantics runs afoul of the Supreme Court's oft repeated admonition that the logic of words should yield to the logic of realities. *DiSanto v. Pennsylvania,* 273 U.S. 34, 43, 47 S.Ct. 267, 71 L.Ed. 524 (1927).*See also Schmidt v. Ottawa Medical Center,* 322 F.3d 461, 464 (7th Cir.2003).

**\*17** In sum, there is no hint of trade dress infringe-

ment as it relates to the "Pebble."

The other three pendants are all made of black plastic. Clarus's "New Q" is an upside-down, rounded-off isosceles triangle, while the defendants' "Beta Space Age Triangle" is, like the Clarus "New Q", a rounded-off isosceles triangle, but it hangs rightside-up. So the shape is similar, but the positioning is not. The defendants' "Alpha Teardrop," is a different shape, what can truly be said to be teardrop-shape. While all three pendants are black plastic, the "New Q" has a shiny, smooth surface, while the defendants' pendants have a textured, dull surface. And while the face of the "New Q" is somewhat concave, the faces of the defendants' pendants are somewhat convex. All three pendants have circular insets. The "New Q" 's inset is ringed with the copper-colored circle it calls its "Coil Design Trademark"-which the Patent and Trademark Office has denied trademark status to. The insets of the defendants' pendants are ringed with the "C" that stems from the bracelets they have long marketed. The two are no more similar than an "O" and a "C." Finally, what simply cannot be missed, is the differing trademarks-already discussed-labeling all the pendants. So there is some slight similarity-color, material, shape-but overall, the pendants are dissimilar.[FN20]

> FN20. It is worth noting that, throughout these proceedings, Clarus had made much of its "coil design." But to discern that the copper circle of Clarus's pendant is in fact a coil wopuld require so close an inspection that there would not be the slightest risk of confusing Clarus's pendants with those of defendants.

The factor of similarity of trade dress weighs slightly against Clarus in regard to its "New Q," but overwhelmingly so in regard to the "Pebble." In addition, the factors of degree of care likely to be used by consumers, whether any actual confusion exists, and the defendants' intent to palm off its goods as those of the plaintiff all favor the defendants. Combining that with the labeling of the pendants, *see Syndicate Sales,* 192 F.3d at 637, results in the conclusion that Clarus has failed to demonstrate a likelihood of confusion to support its trade dress claim. Consequently, it has failed to demonstrate a likelihood of success on the merits.

Given the foregoing, no analysis of Clarus's presentation on functionality and distinctiveness is necessary. But if it were, Clarus would not fare well. Clarus does not bother to address these issues until its reply brief and, even there, its arguments are unconvincing and essentially unsupported.

**2.**

**Functionality**

Trade dress protection may not be claimed for product features that are functional. *Dastar Corp. v. 20th Century Fox Film Corp.,* 539 U.S. 23, 37, 123 S.Ct. 2041, 156 L.Ed.2d 18 (2003); *TrafFix Devices, Inc. v. Marketing Displays, Inc.,* 532 U.S. 23, 29, 121 S.Ct. 1255, 149 L.Ed.2d 164 (2001); *Two Pesos,* 505 U.S. at 775. Thus, not surprisingly, Clarus argues that its coil design is not functional:

The Coil is simply an amplifying antenna that could properly function in many different shapes or sizes-its shape is not necessary to its function. In fact, it does not even need to be visible. Clarus chose to display the Coil Design because it liked the shape and unique appearance.

**\*18** (*Plaintiff's Reply,* at 4). In support of these assertions, Clarus relies on the declaration of its president, Mr. Williams, who contends that the selection of a circular, coil design was intended to be purely aesthetic. Any other shape would have been just as functional. (Williams Decl., ¶ 3). This aesthetic choice was carried over to the new pendants. (Williams Decl. ¶ 4).

But functionality is not limited to the strictly utilitarian. "Aesthetic appeal can be functional; often we

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

value products for their looks."*Eco Mfg. LLC. v. Honeywell Intern., Inc.,* 357 F.3d 649, 654 (7th Cir.2003) (*citing Qualitex Co. v. Jacobson Products Co.,* 514 U.S. 159, 169-70, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995))

As the court explained in *Thomas & Betts:*

Features of a product may serve primarily to signify its source (*e.g.,* the pink color of Owens-Corning fiberglass insulation, see *In re Owens-Corning Fiberglas Corp.,* 774 F.2d 1116 (Fed.Cir.1985)), these features are still part of the product itself and may be valued by consumers as such ("I just could not sleep at night if the insulation above my head wasn't pink").

65 F.3d at 657. It must be remembered that trade dress protection only extends to the role of such features as signifier of source, because when competitors are barred from duplicating features whose value to consumers is intrinsic and not exclusively as a signifier of source, competition is unduly hindered. *Id.*

In the instant case, it is not clear that the "coil design" is a signifier of source. The evidence Clarus has presented-Mr. Williams' assertions regarding the design-is essentially a concession that the coil design serves an aesthetic function rather than a source-identification function. A seller should not be allowed to obtain, in the name of trade dress, a monopoly over the elements of a product's appearance that either are not associated with a particular producer or that have value to consumers that is independent of identification. *Publications Intern., Ltd. v. Landoll, Inc.,* 164 F.3d 337, 339 (7th Cir.1998). Based on Mr. Williams' very clear statementes, it would seem that this is exactly what Clarus is attempting to do.

Clarus also falls short on the issue of distinctiveness. The Supreme Court has spoken at length on the issue of whether product design could be inherently distinctive:

It seems to us that design, like color, is not inherently distinctive. The attribution of inherent distinctiveness to certain categories of word marks and product packaging derives from the fact that the very purpose of attaching a particular word to a product, or encasing it in a distinctive packaging, is most often to identify the source of the product. Although the words and packaging can serve subsidiary functions-a suggestive word mark (such as "Tide" for laundry detergent), for instance, may invoke positive connotations in the consumer's mind, and a garish form of packaging (such as Tide's squat, brightly decorated plastic bottles for its liquid laundry detergent) may attract an otherwise indifferent consumer's attention on a crowded store shelf-their predominant function remains source identification. Consumers are therefore predisposed to regard those symbols as indication of the producer, which is why such symbols "almost *automatically* tell a customer that they refer to a brand," and "immediately ... signal a brand or a product 'source.' "... In the case of product design, as in the case of color, we think consumer predisposition to equate the feature with the source does not exist. Consumers are aware of the reality that, almost invariably, even the most unusual of product designs-such as a cocktail shaker shaped like a penguin-is intended not to identify the source, but to render the product itself more useful or more appealing.

**\*19** *Wal-Mart Stores, Inc.,* 529 U.S. at 212-213 (citations omitted).*See also Dastar Corp.,* 539 U.S. at 36.

Consequently, a product design cannot be protected under § 43(a) of the Lanham Act without a showing that it has acquired "secondary meaning." *Wal-Mart Stores, Inc.,* 529 U.S. at 214;*see also Dastar Corp.,* 539 U.S. 23 at 36, 123 S.Ct. 2041, 156 L.Ed.2d 18;*TrafFix Devices, Inc.,* 532 U.S. at 28-29. This means that Clarus must prove that its trade dress-its product configuration-has somehow achieved secondary meaning. In other words, it is up to Clarus to show that consumers understand the design elements to signify the goods' *origin* and not

just its attributes. *Bretford Mfg., Inc. v. Smith System Mfg. Corp.,* 419 F.3d 576, 579 (7th Cir.2005).

Clarus submits that it has spent millions in advertising, and has sold over 600,000 pendants. (*Plaintiff's Reply,* at 2). But it has not provided any evidence regarding its sales or advertising. The fact that Clarus has sold pendants and has extensively advertised its products does not prove that the *coil design* has achieved secondary meaning.[FN21]" '[S]econdary meaning' is acquired when 'in the minds of the public, the primary significance of a product feature [here the coil design] ... is to identify the source of the product rather than the product itself.'"*Qualitex Co. v. Jacobson Prods. Co.,* 514 U.S. 159, 163, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995) (*quoting Inwood Labs., Inc. v. Ives Labs., Inc.,* 456 U.S. 844, 851 n. 11, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982)). Clarus must submit evidence that the coil design "prompts [Clarus] in buyers' minds." *Bretford Mfg.,* 419 F.3d at 579. Secondary meaning can be established "through direct consumer testimony, consumer surveys, length and manner of use, amount and manner of advertising, volume of sales, place in the market and proof of intentional copying."*Thomas & Betts Corp. v. Panduit Corp.,* 138 F.3d 277, 291 (7th Cir.1998).

> FN21. It is, the coil design, and not the copper color of the coil that Clarus insists has acquired a secondary meaning. Thus, even the change of color of the coil from copper to red or green-as the defendants have done-is not, according to Clarus, sufficient to remove confusion in the public's mind.

Clarus has not so much as intimated that it has direct consumer testimony or consumer surveys. It is undisputed that it has used the coil design for approximately 12 years, but that is only the beginning of the analysis.*International Kennel Club of Chicago, Inc. v. Mighty Star, Inc.,* 846 F.2d 1079, 1087 (7th Cir.1988) (50 years of use in combination with advertising and substantial free publicity); *A.J. Canfield Co. v. Vess Beverages, Inc.,* 796 F.2d 903,

907 (7th Cir.1986) (use for 13 years, combined with substantial advertising and free publicity). The advertising must in some way focus on the feature claimed to have acquired secondary meaning and to have prompted consumers to consider the claimed trade dress as an indicator of source.*Thomas & Betts Corp.,* 138 F.3d at 292. Without that focus and prompting, the necessary relationship in the public's mind between the origin of the product and the feature claimed to be distinctive cannot be assumed to exist. Hypothesis without proof is not enough in any context. *Compare Louth v. McCollum,* 424 F.3d 631, 634 (7th Cir.2005) (Posner, J.); *Alexander v. City of South Bend,* 433 F.3d 550, 556-557 (7th Cir.2006); *United States v. Landry,* 257 F.2d 425, 431 (7th Cir.1958).

**\*20** Since Clarus has not provided specimens of its claimed prior advertising, its content cannot be reviewed, and thus, no conclusions can be drawn about its message and the sufficiency of that message to have created a secondary meaning in the coil design. For all one knows, the advertising does not even show the coil design or make any mention of it. Or, the references may be so penumbral as to invalidate Clarus' current argument. Beyond saying that it has spent a good deal on advertising, Clarus has made no attempt to explain how that advertising prompted consumers to connect the copper-colored circle with "Q-Link" as a signifier of the source of the pendants.

To the extent there is evidence of advertising, it leads to the conclusion that the copper coil has not acquired a secondary meaning. Indeed, in some advertising, it is the back of the pendants with the highly stylized "Q" that seems to be the advertising's focal point. *See Defendants' Exh.* 1. And even where advertising does show the coil, there is nothing that particularly focuses on it. Even the Q-Link home web page, www.q-linkproducts.com, takes no note of and makes no mention of the coil. The same is true of the websites that Clarus notes in its supporting memorandum.

In sum, there is simply nothing in the record from

which it can be concluded that the coil design has acquired a secondary meaning.[FN22]

> FN22. Clarus incorrectly argues that use of trade dress for over five years constitutes a *prima facie* case of secondary meaning. (*Reply,* at 2). Under the Lanham Act, the trademark commissioner may accept five years' exclusive and continuous use of a mark as *prima facie* evidence of secondary meaning. 15 U.S.C. § 1052(f). Here, however, the commissioner has rejected Clarus's showing. And, in any event, such evidence has only "some bearing on the issue of secondary meaning."*Thomas & Betts,* 138 F.3d at 295-296.

### D.

### Copyright Infringement

Finally, Clarus claims that the defendants have infringed its copyright on the "New Q" and "Pebble" pendants. In order to succeed on this claim, Clarus must establish two elements: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original. *Feist Publications, Inc. v. Rural Telephone Service Co.,* 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991); *Incredible Technologies, Inc. v. Virtual Technologies, Inc.,* 400 F.3d 1007, 1011 (7th Cir.2005); *Twentieth Century Fox Film Corp. v. Entertainment Distributing,* 429 F.3d 869, 876 (9th Cir.2005). A certificate of copyright registration constitutes a *prima facie* presumption of validity. *Mid America Title Co. v. Kirk,* 59 F.3d 719, 721 (7th Cir.1995). Here, however, Clarus's applications for registration of the "New Q" and "Pebble" pendant designs has been rejected by the Copyright Office. (*Plaintiff's Memorandum,* at 22 n. 5). As such, there is no presumption in Clarus's favor on the initial element of ownership of a valid copyright. In the absence of presumption in Clarus's favor, the district court makes an independent de-

termination regarding Clarus's ownership of a valid copyright; a *de novo* determination as to whether plaintiff's work is copyrightable. *Ward v. National Geographic Soc.,* 208 F.Supp.2d 429, 445 (S.D.N.Y.2002); *Morelli v. Tiffany and Co., Inc.,* No. 00-1961, 2001 WL 179898, *1 (E.D.Pa. Jan.10, 2001). That means Clarus must provide *proof* on this issue.

The emphasis on "proof" is deliberate. On the issue of ownership of a valid copyright, there is merely the legal conclusion by Clarus' president that Clarus is "the owner of the copyrighted designs for the both the New Q and Pebble pendants designs," and that it "owns the technology and related intellectual property, including ... copyrights in the Q-Link Pendants."(Williams Decl. at ¶ 5). Mr. Williams also states that "[t]he pendants were designed by an international design team...."(*Id.* at ¶ 8). All that means, however, is that he did not design it, and seemingly, neither did Clarus. There is no indication that the design team worked for Clarus, and no basis for concluding that the pendants constitute "works for hire," or whether the design team assigned its rights in their work to Clarus. *See Gaiman v. McFarlane,* 360 F.3d 644, 650 (7th Cir.2004) (discussing "work for hire"). There is also the unexplored question of whether the pendants are even copyrightable works. With so much of its copyright claim left to speculation, it cannot be said that Clarus has demonstrated a likelihood of success on the claim's merits.

### CONCLUSION

**\*21** The plaintiff has failed to demonstrate a likelihood of success on the merits of its claims for trademark infringement, trade dress infringement, and copyright infringement. Accordingly, it is hereby recommended that the plaintiff's motion for a preliminary injunction order [9] be DENIED.

N.D.Ill.,2006.
Clarus Transphase Scientific, Inc. v. Q-Ray, Inc.
Slip Copy, 2006 WL 4013750 (N.D.Ill.)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 4013750 (N.D.Ill.)
**(Cite as: 2006 WL 4013750 (N.D.Ill.))**

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# APPENDIX 12



Metavante Corp. v. Medavant, Inc.
E.D.Wis.,2006.
Only the Westlaw citation is currently available.
United States District Court,E.D. Wisconsin.
METAVANTE CORPORATION, Plaintiff,
v.
MEDAVANT, INC. f/k/a Proxymed, Inc., Defend-
ant.
**No. 05-C-1275.**

May 5, 2006.

David G. Hanson, Kent A. Lee, Paul J.
Stockhausen, Reinhart Boerner Van Deuren SC,
Lee M. Seese, Lori S. Meddings, S. Edward Sar-
skas, Michael Best & Friedrich LLP, Milwaukee,
WI, for Plaintiff.
Jane C. Schlicht, Cook & Franke SC, Milwaukee,
WI, Michael J. Brown, Curtis Mallet-Prevost Colt
& Mosle LLP, New York, NY, Peter E. Fleming,
III, Curtis Mallet-Prevost Colt & Mosle LLP, Stam-
ford, CT, for Defendant.

### DECISION AND ORDER

Hon. RUDOLPH T. RANDA, Chief Judge.
**\*1** The present case involves a trademark dispute in
which the plaintiff, Metavante Corporation (the
"Plaintiff"), has brought suit against MedAvant,
Inc. (the "Defendant") for trademark infringement
under 15 U.S.C. §§ 1114(1) & 1125(a) and trade-
mark dilution under 15 U.S.C. § 1125(c). This suit
was filed shortly after the Defendant changed its
name from "ProxyMed, Inc." to "MedAvant, Inc."
The Plaintiff has motioned for a preliminary injunc-
tion to bar the Defendant's use of the name
"MedAvant" during the course of this litigation.FN1

> FN1. The Plaintiff, without seeking per-
> mission from this Court and pursuant to no
> Civil Local Rule, submitted a supplemental
> brief in support of its motion for a prelim-

inary injunction on April 4, 2006. The De-
fendant filed a Rule 7.4 Motion to strike
the supplemental brief. The Court agrees
with the Defendant, and strikes the
Plaintiff's supplemental brief. Civil Local
Rule 7.1 governs the briefing of motions,
and unless the Court grants permission, the
parties' briefs are limited to what is
provided in that rule.

> In addition, Civil Local Rule 7.1(f)
> provides that the parties' principal briefs
> cannot exceed 30 pages, and the reply
> brief cannot exceed 15 pages. Neverthe-
> less, the Plaintiff submitted a reply brief
> that was 26 pages in length, and the De-
> fendant submitted a principal brief that
> was 34 pages in length. While the Court
> considered their briefs in their entirety
> for purposes of deciding this motion, the
> Court directs both parties to follow the
> Civil Local Rules in the future.

### BACKGROUND

**The Plaintiff Metavante's Business**

The Plaintiff, Metavante, is a wholly-owned tech-
nology subsidiary of Marshall & Ilsley Corporation
("M & I"), a publicly-traded bank holding company
headquartered in Milwaukee, Wisconsin.
(Swearngan Dec. ¶ 2.) In 1964, as M & I began
providing data processing services to correspondent
banks, the entity now known as Metavante was
formed under the name "M & I Data Services"
("MIDS") to perform M & I's new data processing
services. *(Id.* at ¶ 4.) In 1967, MIDS initiated the
first remote bank processing operation in the United
States, and it also performed the first official
TYME transaction at an ATM in Wisconsin in
1976. *(Id.* at ¶ 5.) More recently, beginning in the
1990's, MIDS created technologies allowing for in-
ternet banking transactions over the internet.*(Id .* at

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 2
Not Reported in F.Supp.2d, 2006 WL 1277903 (E.D.Wis.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 1277903 (E.D.Wis.))**

¶ 6.)

In early 2000, MIDS decided to rename itself "Metavante." On July 5, 2000, Metavante applied for a trademark registration in the United States for the mark "Metavante," and on February 4, 2003, the United States Patent and Trademark Office registered the mark "Metavante" for technology and services pertaining to financial transactions.[FN2]

> FN2. The Plaintiff's trademark in "Metavante" was registered for the following goods and services:
>
> Computer software and technology implementation consulting for financial service providers; bill payment services.
>
> Computer software for use by financial services providers to conduct electronic banking, trust accounting, electronic funds transfers, electronic bill presentment and payment, and financial transaction processing, including ATM, credit and debit card transactions; computer software for use by financial services providers to manage customer relationships; computer software for customer statement formatting.
>
> Providing outsourced services for others in the field of financial services and software.
>
> TM # 2684696

Starting in 2003, the Plaintiff began acquiring companies that expanded its services and technology into the healthcare industry. First, on December 9, 2003, the Plaintiff purchased Printing For Systems, Inc. (PSI), which is a provider of identification cards to the healthcare industry. (Swearngan Decl. ¶ 19.) Second, on May 6, 2005, the Plaintiff announced the acquisition of Advanced Financial Solutions, Inc. (AFS), which is a check-imaging technology provider. *(Id.* at ¶ 20.)Third, on May 10, 2005, the Plaintiff acquired Med-i-Bank, Inc.

("MBI"), which is a payment services company targeting employee benefit and consumer-directed healthcare accounts ("CDHCs").*(Id.* at ¶ 21.)And finally, on November 22, 2005, the Plaintiff announced the purchase of Adminisource Corporation ("Adminisource"), which is a provider of health care payment distribution services.[FN3]*(Id.* at ¶ 23.)The Plaintiff claims that these four acquisitions developed a full product line specifically intended to target and serve the healthcare industry under the name "Metavante."

> FN3. Despite announcing the acquisition of Adminisource on November 22, 2005, it appears the Plaintiff did not actually acquire Adminisource until January 3, 2006, which was after the Plaintiff filed its complaint in this lawsuit. (Lettko Decl. ¶ 4.)

These acquisitions allowed the Plaintiff to administer CDHCs and health saving accounts ("HSAs"). The CDHCs and HSAs that the Plaintiff administers allow patients to save money in an IRA-like account to pay for all deductible healthcare expenses. (Lettko Decl. ¶ 32.) Specifically, the Plaintiff provides the necessary technology to allow the patient to transfer money from his HSA or CDHC to the treating doctor by presenting a debit card for payment. *(Id.* at ¶ 34.)The Defendant, MedAvant, claims that its business in the healthcare industry is much different than the one conducted by the Plaintiff.

**The Defendant MedAvant's Business**

**\*2** The Defendant, who now uses the name "MedAvant," originally was incorporated in 1989 under the name "ProxyMed" as a technology provider for pharmacies. *(Id.* at ¶ 3.) Today, the Defendant has expanded to become an organization that hosts a Preferred Provider Organization ("PPO"), which is a network of doctors who offer their services at a discount to insurance companies who direct patients to them. *(Id.)* The Defendant also hosts a national health insurance claims clear-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                  Page 3
Not Reported in F.Supp.2d, 2006 WL 1277903 (E.D.Wis.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 1277903 (E.D.Wis.))**

inghouse. *(Id.)* The Defendant's clearinghouse ensures that the electronic claims submitted by physicians and other providers of care are in the correct format for receipt by insurance companies. *(Id.)* In addition, the Defendant offers electronic prescribing technology and services that allow doctors to send prescriptions and authorizations for prescription refills electronically. *(Id.)* The Defendant also provides technology and services that enable diagnostic labs to electronically send lab reports to hospitals and physicians. *(Id.)* The Defendant's business does not include services related to HSAs and CDHCs, nor does it offer payment services of any kind. *(Id.)*

On December 2, 2005, ProxyMed changed its name to "MedAvant Healthcare Solutions." *(Id.* at ¶ 1.) Less than a week later, the Plaintiff filed a complaint, alleging that the use of the "MedAvant" name was a trademark infringement, in violation of 15 U .S.C. §§ 1114(1) & 1125(a), and a trademark dilution, in violation of 15 U.S.C. § 1125(c). Shortly thereafter, the Plaintiff filed a motion for a preliminary injunction to bar the Defendant's use of the name "MedAvant."

## DISCUSSION

A preliminary injunction is an extraordinary and drastic remedy, and the party seeking a preliminary injunction bears a high burden of persuasion. *See Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997). To succeed on a motion for a preliminary injunction, the moving party must first make a threshold showing of "(1) some likelihood of prevailing on the merits, and (2) an inadequate remedy at law and irreparable harm if preliminary relief is denied."*Erickson v. Trinity Theatre, Inc.,* 13 F.3d 1061, 1067 (7th Cir.1994). If this threshold is met, the Court must then also consider "(3) the irreparable harm the nonmovant will suffer if preliminary relief is granted, balanced against the irreparable harm to the movant if relief is denied; and (4) the public interest, meaning the effect that granting or denying the injunction will have on nonparties."*Id.*

## A. Trademark Infringement

A party seeking a preliminary injunction for trademark infringement is likely to succeed on the merits if it can demonstrate a likelihood of consumer confusion. *Promatek Indus. Ltd. v. Equitrac Corp.,* 300 F.3d 808, 812 (7th Cir.2002). The Seventh Circuit has outlined seven factors to consider in evaluating the likelihood of confusion:

(1) the similarity between the marks in appearance and suggestion, (2) the similiarity of the products, (3) the area and manner of concurrent use of the products, (4) the degree of care likely to be exercised by consumers, (5) the strength of the plaintiff's marks, (6) any evidence of actual confusion, and (7) the defendant's intent to palm off its goods as those of the plaintiff's.

**\*3** *Id.* None of these factors are dispositive, and the appropriate weight given to each factor will depend on the circumstances of each case.*Id.*

The first factor, the similarity of the marks, weighs in the Plaintiff's favor. To determine the similarity of trademarks, a court may look to the sound, sight and meaning of the marks. *See Henri's Food Products Co., Inc. v. Kraft, Inc.,* 717 F.2d 352, 355-56 (7th Cir.1983). Here, "Metavante" and "MedAvant" are quite similar in spelling, having only two minor distinctions: "MedAvant" uses a "d" instead of a "t" and it also lacks an ending "e." These minor spelling changes have little effect phonetically as "Metavante" sounds very similar to "MedAvant" when spoken. Furthermore, the meaning of "MedAvant" cannot be sufficiently different from that of "Metavante" because neither "MedAvant" nor "Metavante" are actual words. Therefore, the two marks are very similar.

The second factor requires the Court to weigh the similarity of the products. Federal registration of a trademark is *prima facie* evidence of ownership, validity and the exclusive right to use the mark "in commerce on or in connection with the goods or services specified in the registration subject to any

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

conditions or limitations stated therein."15 U.S.C. § 1115(a). As mentioned above, the Plaintiff's trademark in "Metavante" is limited to technology and services pertaining to financial transactions. In contrast, the Defendant processes insurance claims submitted by healthcare providers. Thus, the Plaintiff's trademark cannot be used as *prima facie* evidence that the Plaintiff and the Defendant offer similar products and services because the Plaintiff's trademark does not cover those products and services offered by the Defendant. The Plaintiff may still succeed in demonstrating a similarity of products and services, but bears the burden of demonstrating such a similarity.

The Plaintiff concedes that its operations were unrelated to the healthcare industry for many years, but contends that it has targeted the healthcare industry beginning in late 2003 by acquiring PFS, AFS, MIB, and Adminisource. However, none of these subsidiaries provide a competing product with that of the Defendant. Based upon the evidence presented by the Plaintiff, it is unclear how a consumer might confuse the Plaintiff's products with that of the Defendant. That is not to say that a reasonable consumer might not confuse the products as a result of the marks being similar; the Plaintiff just has not made a clear showing that this is likely to occur.

The third factor in determining the likelihood of confusion concerns the area and manner of concurrent use of the products. This factor considers the channels of commerce used by the parties in marketing and selling their products. *See Forum Corp. of N. Am. v.. Forum, Ltd.,* 903 F.2d 434, 442 (7th Cir.1990). While the Plaintiff has appeared with the Defendant at a couple different trade shows, the Plaintiff's participation was through MBI, one of the its subsidiaries, and no reference was made to "Metavante" on the vendor list. (Lettko Dec. ¶ 9, Ex. B.) The Plaintiff contends, though, that it is working toward integrating its healthcare-related subsidiaries under the "Metavante" moniker and will begin distributing business cards, marketing

materials, and attending trade shows using this name. (Swearngan Dec. ¶ 6, Ex. B.) The Court also takes judicial notice that the Plaintiff has filed an application with the United States Patent and Trademark Office after filing this action to expand its trademark protection to the field of "healthcare administration." [FN4] In essence, it appears that the Plaintiff and the Defendant are now in a race to use their respective marks in similar marketing channels.

> FN4. Trademark Application No. 78787315 was filed on January 9, 2006.

**\*4** It is not an uncommon occurrence for companies to race to the market with similar trademarks, but there is a vast distinction between when one company has an established use over the other and when neither company has an established use. The Plaintiff has not provided convincing evidence that, prior to initiating this suit, it has used the "Metavante" mark in similar streams of commerce to that of the Defendant. Lacking a demonstration of an established use in a given market, a party bringing suit for trademark infringement may still have protection in "product markets in which it does not now trade but into which it might reasonably be expected to expand in the future."*Sands, Taylor & Wood Co. v. Quaker* Oats Co., 978 F.2d 947, 958 (7th Cir.1992). Nevertheless, the Plaintiff has provided no evidence to indicate that it might expand its product line to those that compete directly with the Defendant. As such, this factor must weigh in favor of the Defendant.

The fourth factor to consider in analyzing a likelihood of confusion is the sophistication of the consumers. The more a consumer is likely to research a product before purchasing it, the less likely the consumer is to confuse different trademarks. *See AM Gen. Corp. v. DaimlerChrysler Corp.,* 311 F.3d 796, 827-28 (7th Cir.2002). The Defendant submits evidence demonstrating that it averages between ninety to 180 days to complete each sale. (Lettko Dec. ¶ 15.) This implies that a great deal of care and research goes into the purchase of the products

Not Reported in F.Supp.2d                                                                                                Page 5
Not Reported in F.Supp.2d, 2006 WL 1277903 (E.D.Wis.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 1277903 (E.D.Wis.))**

at issue and that the consumers are anything but "impulse buyers." Accordingly, this factor must also weigh in favor of the Defendant.

The fifth factor concerns the strength of the trademark itself. The stronger the trademark, the greater protection it receives from the courts. *Nike, Inc. v. "Just Did It" Enters.,* 6 F.3d 1225, 1231 (7th Cir.1993). The Plaintiff's trademark "Metavante" is a made-up word with no English language definition and must be given the strongest protection as a fanciful mark. *See Eli Lilly & Co. v. Natural Answers, Inc.,* 233 F.3d 456, 462 (7th Cir.2000). However, "[t]he term 'strength' as applied to trademarks refers to the distinctiveness of the mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular ... source."*Id.* at 464 (citations omitted). Because the focus of this factor is with regard to likelihood of consumer confusion, evidence of advertising and sales must be considered circumstantial and secondary to a showing of how consumers perceive the mark. *See Platinum Home Mortgage Corp. v. Platinum Fin. Grp.,* 149 F.3d 722, 729 (7th Cir.1998).

The Plaintiff has not met its burden in demonstrating the strength of its mark. While "Metavante" is a fanciful mark and the Plaintiff has gone through considerable length to detail its expense in developing the "Metavante" brand, the focus in determining the strength of a mark is on the relevant consumers. Here, the Plaintiff fails to address whether consumers in the healthcare industry would even recognize the Plaintiff's mark, let alone associate it with the Defendant's products. Accordingly, this factor must weigh in favor of the Defendant.

**\*5** The sixth factor concerns evidence of actual confusion. The Plaintiff cites two examples it deems to be proof of "actual confusion," but the Court accords neither of the examples any weight. The Plaintiff claims that on two occasions, individuals expressed confusion about whether "MedAvant" referred to "Metavante." (Swearngan Dec. ¶ 10.) However, there is no evidence that either individual was a customer of either Metav-

ante or MedAvant. Accordingly, this factor also weighs in favor of the Defendant. *See CAE, Inc. v. Clean Air Engineering, Inc.,* 267 F.3d 660, 686 (7th Cir.2001) (according little weight to evidence of confusion when the person confused was not a customer).

And finally, the seventh factor considers whether the Defendant intended to pass itself off as the Plaintiff by using a similar name. The Plaintiff presented no evidence that the Defendant acted in bad faith when it changed its name to "MedAvant." Thus, this factor weighs in favor of the Defendant as well.

After weighing all the evidence in light of these seven factors, the Court finds that the Plaintiff has not met its burden of demonstrating a likelihood of confusion. The Plaintiff, for nearly forty years, targeted an unrelated market and only entered the healthcare industry when it purchased four existing businesses that provide financial transaction services for doctors and patients. These services are not provided by the Defendant. Furthermore, the Plaintiff's trademark is not registered for use in the healthcare industry. Thus, based on what the Plaintiff has presented thus far, the Court finds that the Plaintiff has not made a strong showing that it is likely to succeed on the merits of its trademark infringement action.

**B. Trademark Dilution**

The Plaintiff also argues the Court should grant a preliminary injunction because it is likely to succeed on its trademark dilution claim. The Plaintiff asserts that, in order to win its trademark dilution claim, one element it must prove is that the name "MedAvant" is *likely* to cause dilution, citing *Eli Lilly & Co. v. Natural Answers, Inc.,* 233 F.3d 456, 466 (7th Cir.2000). However, the United States Supreme Court, in *Moseley v. v. Secret Catalogue, Inc.,* 537 U.S. 418 (2003), held that a plaintiff is required to make "a showing of actual dilution, rather than a likelihood of dilution."*Id.* at 433.The Su-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1277903 (E.D.Wis.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 1277903 (E.D.Wis.))**

                                                                              Page 6

preme Court stated that "where the marks at issue are not identical, the mere fact that consumers mentally associate the junior user's mark with a famous mark is not sufficient to establish actionable dilution."*Id.* In this case, the Plaintiff offered no indication that it is likely to prove actual dilution of its trademark. Accordingly, the Court cannot grant a preliminary injunction on the basis of the Plaintiff's trademark dilution claim either.

NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:

Plaintiff's Motion for a Preliminary Injunction (Docket No. 4) is **DENIED.**

**\*6** Defendant's Rule 7.4 Motion to Strike Supplemental Memorandum and Declaration (Docket No. 66) is **GRANTED.**

E.D.Wis.,2006.
Metavante Corp. v. Medavant, Inc.
Not Reported in F.Supp.2d, 2006 WL 1277903 (E.D.Wis.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# APPENDIX 13



Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 1035721 (N.D.Ill.), 65 U.S.P.Q.2d 1684

**(Cite as: Not Reported in F.Supp.2d, 2001 WL 1035721 (N.D.Ill.))**

Charter Nat. Bank and Trust v. Charter One Financial, Inc.

N.D.Ill.,2001.

United States District Court, N.D. Illinois, Eastern Division.
CHARTER NATIONAL BANK AND TRUST, Plaintiff,
v.
CHARTER ONE FINANCIAL, INC., Charter One Bank, Fsb and St. Paul Federal Bank for Savings, Defendants.
**No. 01 C 0905.**

Sept. 4, 2001.

*MEMORANDUM, OPINION AND ORDER*

ANDERSEN, J.

**\*1** This case is before the Court on the Motion for a Preliminary Injunction brought by plaintiff Charter National Bank & Trust. After consideration of our original order granting in part a temporary restraining order, several days of testimony, hundreds of exhibits and hundreds of pages of legal briefs, we deny plaintiff's motion.

*BACKGROUND*

On May 15, 2001, we entered a Memorandum, Opinion and Order in which we granted in part and denied in part plaintiff's motion for a temporary restraining order. This case involves a trademark dispute. Plaintiff, Charter National Bank & Trust, currently operates three branches in Hanover Park, Hoffman Estates and Schaumburg, Illinois. Defendant, Charter One, is a large interstate bank, chartered federally, which operates approximately 70 branches in the Chicago area.

Plaintiff argues that is has acquired common law rights in the mark "charter." Therefore, we attempted to determine the date it began using the mark. Although we requested a specific time line, plaintiff was unable to demonstrate the exact date upon which it began using the name Charter Bank and Trust of Illinois at the Hanover Park facility. The parties agree that plaintiff began using that mark sometime in 1986. Since 1987, it has displayed a large sign in front of the Hanover Park branch with the words "Charter Bank". In 1993, it acquired the Hoffman Estates and Schaumburg branches. Since 1993, those branches have displayed large signs with the words "Charter Bank". Although plaintiff never registered it's mark, it claims to have acquired a common law right in the term "Charter Bank" because it has continuously operated banking establishments using that mark since 1987.

However, plaintiff has changed its legal name several times. It originally operated under the name Hanover Park State Bank. In 1986, it began using the mark "Charter Bank and Trust of Illinois."In 1993, Charter Bank and Trust of Illinois was acquired by the First National Bank of Hoffman Estates. The combined entity began to use the mark "Charter Bank and Trust, N.A." In 1996, plaintiff began using the mark "Charter National Bank & Trust." During the preliminary injunction hearing we heard testimony that customers have referred to the entity as "Charter Bank" from 1987 to the present.

Defendant, Charter One, operates on a national scale. It filed a federal registration for the mark "Charter One" before the United States Patent and Trademark Office on October 10, 1990. It has continuously operated under that trade name since its registration. Charter One made its first foray into the Chicago market by acquiring St. Paul Federal Bank for Savings in 1999. Between the acquisition and January 2001, it operated St. Paul's fifty-eight Chicago locations under the trade name "St. Paul."In January of 2001, defendant announced that it was changing its name in the Chicago market from St. Paul to Charter One Bank.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 2
Not Reported in F.Supp.2d, 2001 WL 1035721 (N.D.Ill.), 65 U.S.P.Q.2d 1684
**(Cite as: Not Reported in F.Supp.2d, 2001 WL 1035721 (N.D.Ill.))**

On February 6, 2001, counsel for plaintiff Charter National Bank and Trust sent a letter to Charter One demanding that it cease using the mark "charter" because his client asserted common law rights as the senior user in Chicago area. Because Charter One continued use its name, plaintiff filed the instant lawsuit on February 8, 2001, seeking injunctive relief. While this court was analyzing the motion for a temporary restraining order, defendant agreed to refrain from displaying the mark "Charter One" on the outside of branches in a geographic area surrounding Charter National Bank and Trust's three branches. On May 15, 2001, we granted in part and denied in part plaintiff's motion for a temporary restraining order. We held that plaintiff had shown a reasonable likelihood of success on the merits based on its submission of evidence of brochures, advertisements, signs and evidence of actual confusion. Therefore, we entered a TRO which prohibited Charter One from "operating any type of bank facility using the word 'charter' on any outdoor signs within the geographic area between Lake Cook Road, on the north, I290, I355/Illinois 53, on the east, North Avenue, on the south, and the Fox River, on the west."

### DISCUSSION

**\*2** In order to determine whether to grant a preliminary injunction, we must find that the moving party has demonstrated: (1) a reasonable likelihood of success on the merits, and (2) no adequate remedy at law. *Mil-Mar Shoe Co., Inc. v. Shonac Corp.,* 75 F.3d 1153, 1156 (7 [th] Cir.1996). If the moving party successfully establishes those criteria, then we consider: (3) the irreparable harm the non-moving party will suffer if the injunction is granted balanced against the irreparable harm the moving party will suffer if the injunction is denied, and (4) the effect our action will have on the public interest. *Id.*"If it is plain that the party seeking the preliminary injunction has no case on the merits, the injunction should be refused regardless of the balance of the harms."*Green River Bottling Co. v. Green River Corp.,* 997 F.2d 359, 361 (7 [th]

Cir.1993).

Trademarks are generally classified into five categories of increasing distinctiveness: (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary and (5) fanciful. *Two Pesos Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 767-68 (1992). Defendant contends that "charter", as applied to banking services, is generic. In order to proceed to the next step in our analysis, plaintiff must convince this court that it has a reasonable likelihood of showing that "charter" is at least descriptive because generic marks receive no trademark protection. *Id.* Plaintiff contends that the term "charter" is at least entitled to the protection accorded to suggestive marks. Plaintiff bears the burden of showing that its mark can be protected because it has failed to federally register its mark. *Technical Publishing Co. v. Lebhar-Friedman, Inc.,* 729 F.2d 1136, 1139 (7 [th] Cir.1984). After extensive analysis, we have determined that use of the term "charter" to denote banking services is either generic or descriptive use and, therefore, we will examine both classifications.

A generic term is one that is commonly used to name or designate a kind of good. *Liquid Controls Corp. v. Liquid Control Corp.,* 802 F.2d 934 (7 [th] Cir.1986). A generic term specifies the type of thing in common parlance.*Gimix, Inc. v. JS & A Group, Inc.,* 699 F.2d 901, 905 (7 [th] Cir.1983). A descriptive mark describes the ingredients, qualities or characteristics of the good or service. *Id.* The difference between "generic" and "descriptive" terms is the degree of distinctiveness and their relative ability to serve as a source-identifier of particular goods and services. *Mil-Mar,* 75 F.2d at 1158.

However, plaintiff contends that its mark is at least suggestive. The Seventh Circuit has applied a test to determine whether a mark is descriptive or suggestive. "If the mark imparts information directly, it is descriptive. If it stands for an idea which requires some operation of the imagination to connect it with the goods, it is suggestive."A. Seidel, S. Dalroff, and E. Gonda, *Trademark Law and Practice* § 4.06, at 77 (1963)(quoted in *The Money Store v.*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                        Page 3
Not Reported in F.Supp.2d, 2001 WL 1035721 (N.D.Ill.), 65 U.S.P.Q.2d 1684
**(Cite as: Not Reported in F.Supp.2d, 2001 WL 1035721 (N.D.Ill.))**

*Harriscorp Finance, Inc.,* 689 F.2d 666, 673-74 (7 th Cir.1982); *Sands, Taylor & Wood Co. v. Quaker Oats Co.,* 978 F.2d 947, 952 (7 th Cir.1992). The question we must consider is how much imagination, if any, is necessary to connect charter with banking services.

**\*3** The parties have submitted a myriad of definitions beginning with plaintiff's counsel's recitation of a portion of the Magna Carta in his closing. Webster's International defines a charter as "1: written instrument or contract (as a deed) executed in due form, 2a: an instrument in writing from the sovereign power of a state or country granting or guaranteeing rights, franchises, or privileges b: an instrument in writing creating and defining the franchises of a city, university, company, or other public or private corporation. *Webster's Third New International Dictionary* 378 (3 rd ed.1993). Webster's Collegiate contains the identical definition. *Webster's Ninth New Collegiate Dictionary* 228 (9 th ed.1990).

What we must decide is whether the term "charter" requires so much imagination to link it to a bank that the term should be protected. All parties agree that banks must be chartered by either the state or federal government. Illinois law refers to "national charter banks and banks organized in other states" as categories of banks. 205 ILCS 5/13; 20 Ill. Reg.1939. The United States Code refers to "chartered bank" as a category of bank throughout the code. See 12 U.S.C.A. § 29, 12 C.F.R. § 263.81(d), 12 U.S.C.A. § 266, 12 U.S.C.A. § 1841, 12 U.S.C.A. § 2902, 12 U.S.C.A. 3106(a)(C), 12 U.S.C.A. 1817. Furthermore, defendant has conducted a variety of searches including a Lexis-Nexis search and a search of Yellow Pages over the world wide web. Through the Lexis search, defendants have unearthed a large number of articles describing "charter" banks as a type of bank. The sources on these articles run the gamut from popular news periodicals, like the Fresno Bee and the Tulsa World, to more specific business periodicals like Texas Banking. However, given the large number of popular press references to "charter" banks that defendant was able to unearth, it is clear that a portion of the public understands the descriptive quality of the term "charter."

After an examination of the on-line Yellow Pages, a search submitted by defendant of "charter" on the U.S. Trademark Electronic Search System ("TESS"), and a Dun & Bradstreet report on "charter national" submitted by defendant, it is clear to this court that "charter" is a term used frequently to describe banks and other businesses. Although we do not believe that it takes no imagination to connect charter with a bank, the fact that many banks use charter coupled with the legal necessity of obtaining a charter before operating as a bank shows that it does not require much imagination to connect the two ideas. While not as generic a term as "bank", "charter", in this context, describes the fact that the bank is licensed by the government. Because the mark "imparts information directly it is descriptive." *Sands,* 978 F.2d at 952. Therefore, it is clear to this Court that the plaintiff has no reasonable likelihood of establishing that "charter" is suggestive as applied to banking services.

**\*4** The decision of whether "charter" is descriptive or generic is much closer. Since "charter" is commonly used by other banks, the popular press, and statute, to denote a type of bank, it is a term which designates a kind of service. *Mil-Mar,* 75 F.3d at 1157, *Johnny Blastoff v. Los Angeles Rams Football Co.,* 188 F.3d 427, 438 (7 th Cir.1999). We believe that the term may be generic and, therefore, unprotectable. However, we will analyze this issue assuming that "charter" is descriptive.

In order to protect a descriptive mark, the plaintiff must establish that the mark has acquired a secondary meaning. *Mil-Mar,* 75 F.3d at 1157. Secondary meaning refers to the manner in which a consumer identifies a business by reference to a trademark. *Vaughan Mfg. Co. v. Brikam Int'l, Inc.,* 814 F.2d 346, 348 (7 th Cir.1987).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

We must consider several factors to decide whether secondary meaning has been acquired or established: (1) the amount and manner of advertising; (2) the sales volume; (3) the length and manner of use; (4) consumer testimony; and (5) consumer surveys. *Platinum Home Mortgage Corp. v. Platinum Financial Group, Inc.,* 149 F.3d 722, 728 (7 th Cir.1998). Plaintiff has presented very little in the way of evidence in any of the five above categories.

Eugene Ognibene, the president of Charter National Bank & Trust, testified that the bank advertised in the following ways: (1) sending direct mail to customers and non-customers (it would buy advertising lists to find the non-customers); (2) print advertising in the Yellow Pages, the Daily Herald and the Northwest Suburban edition of the Chicago Tribune; (3) statement stuffers to current customers; and (4) advertisements on its webpage. All these forms of advertising referred to the plaintiff as "Charter National Bank and Trust", some referred to it as "Charter National", some referred to plaintiff simply as "Charter", and only the webpage referred to plaintiff as "cn-bank". Ognibene testified that Charter National Bank and Trust typically budgets $180,000 a year for advertising and typically spends the entire sum. That sum is insufficient to convince this Court that the public at large would associate the mark "charter" with plaintiff. Ognibene further testified that the bank consciously attempted to spread the budget out over the entire Chicago metropolitan area. It is this court's opinion that the use of such a relatively small sum to cover an area as large and heavily populated as Chicago is plainly insufficient to show that the recognition of the plaintiff exists above the general static accompanying a consumer's life in an active advertising market like Chicago.

The second factor we must consider is sales volume. Ognibene testified that Charter National Bank & Trust has about 15,000 customers. Over 150,000 individuals live in Hoffman Estates, Schaumburg and Hanover Park. Approximately 8 million individuals reside in the Chicago metropol-

itan area. Even if all of plaintiffs customers resided in Hoffman Estates, Schaumburg and Hanover Park and we were attempting to determine whether plaintiff had achieved a secondary meaning in those geographical areas, we would be hard pressed to do so based on its sales volume. Over 81% of Charter National Bank & Trust's deposit customers, by far the bulk of its business, live within four miles of one of the three branches. We cannot conclude that 15,000 customers is enough to show a secondary meaning has been established in the minds of Chicago banking consumers.

**\*5** The third factor is the length and the manner of use. Sometime in 1986, the plaintiff began using a variation on the mark "charter." Plaintiff is currently on its third version of its official name using "charter." It started as "Charter Bank & Trust of Illinois" then moved to "Charter Bank & Trust, N.A." and, finally, is currently using "Charter National Bank & Trust." On advertisements, plaintiff uses "Charter National Bank & Trust", "Charter National", "Charter", and "cn-bank." The use of multiple identifying marks lessens the likelihood that members of the public have developed an identification between plaintiff and the mark "charter." Plaintiff has been using some form of the mark "charter" for almost fifteen years and we did hear testimony that bank customers commonly refer to banks using the first or first and second word of the title, but plaintiff would have to show a longer period of consistent use in advertisements and relations with the public for this factor to weigh in it's favor.

The fourth and fifth factors are consumer testimony and consumer surveys. Plaintiff has presented no consumer testimony or survey evidence. However, plaintiff has presented evidence of actual customer confusion. Since the inception of this litigation, plaintiff has instructed its employees to keep a log of instances in which it has been confused with Charter One Bank. Those logs have been filed with the court. Examples of confusion run from individuals walking in and thinking that Charter National Bank & Trust is Charter One to other banks

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

mistaking the two institutions. Plaintiff has documented several hundred instances of what it terms "actual confusion."

Testimony, by some of the individuals responsible for compiling the logs, has shown that in virtually all instances, the consumer or other bank knew it was searching for Charter One, but mistakenly contacted Charter National Bank & Trust. 172 of those instances of confusion occurred over the phone. 130 of the instances of confusion occurred by customers actually entering one of Charter National Bank & Trust's branches. Of that 130, 123 of the walk-ins occurred at the Hanover Park Branch. Defendant has argued that the confusion is generated by the fact that we have ordered it to cover its sign across the street from that location.

This confusion is not of the kind or scope which could convince this Court that Charter National Bank & Trust has acquired a secondary meaning. These customers are looking for Charter One, they know they are looking for Charter One, and testimony showed that several were disappointed or even angry when they realized that plaintiff was not associated with Charter One. If anything, this evidence shows that defendant has acquired a secondary meaning in the minds of consumers and when consumers think of the mark "charter", they associate it with Charter One Bank, not plaintiff. Plaintiff cannot show that it has lost a single customer because of confusion generated by the similarity of names. We have heard testimony that all of plaintiff's customers know the bank, in fact, most customers are known by name by the receptionist. Therefore, the only confusion is generated by individuals who know they are looking for Charter One and mistakenly believe that plaintiff is somehow connected to Charter One. This type of confusion cannot be used by plaintiff to show that it has acquired a secondary meaning in the mind of consumers because, by definition, this type of confusion proves that plaintiff's existence has not been noticed by the consumers who are confused.

**\*6** After a careful analysis of the factors which we

must consider in order to determine whether Charter National Bank & Trust can show that it has acquired a secondary meaning, we hold that it has not shown a reasonable likelihood of success on the merits. In its final filing, Charter National Bank & Trust informed the court, for the first time since the inception of this litigation, that it intended to complete a survey. Perhaps that evidence could tip the scale, but at this point, based on the evidence before the court, plaintiff cannot show that "charter" has achieved a secondary meaning in the minds of consumers which identifies with its products and services. Therefore, even if "charter" is a descriptive and not generic mark, plaintiff does not have a reasonable likelihood of success on the merits because it cannot show that it has acquired a secondary meaning.

A final issue that arose as part of the preliminary injunction hearing is whether Douglas Lichtman is qualified to testify as an expert under the standards established by *Daubert* and its progeny under Federal Rule of Evidence 702. *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579 (1993); *Kumho Tire Co. v. Carmichael,* 526 U.S. 137 (1999); *General Electric Co., v. Joiner,* 522 U.S. 136 (1997). As a trial court, we must function as a "gatekeeper" with respect to the screening of expert testimony in order to assure the reliability and relevancy of expert testimony. *Kumho,* 526 U.S. at 147. In the instant case, defendant has challenged Professor Lichtman's credentials to testify about trademark law.

Since June of 1998, Professor Lichtman has been employed as an assistant professor of law at the University of Chicago. From June of 1997 through May of 1998, he was employed as a Fellow at Yale Law School. His academic credentials are impressive. He was graduated from Yale Law School in 1997 as an Olin Fellow in Law, Economics and Public Policy and as a Coker Teaching Fellow in Constitutional Law. He attended Duke University and was graduated first in his class with a B.S.E. in Electrical Engineering and Computer Science. He has published seven works, on subjects including

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 6
Not Reported in F.Supp.2d, 2001 WL 1035721 (N.D.Ill.), 65 U.S.P.Q.2d 1684
**(Cite as: Not Reported in F.Supp.2d, 2001 WL 1035721 (N.D.Ill.))**

telecommunications law, patents and jury reform. None of the works that Professor Lichtman has published focuses on trademark law, but he is currently researching a project that has a focus in trademark law. Furthermore, the classes that he has taught while an assistant professor at the University of Chicago contain a trademark component. During the preliminary injunction hearing, Professor Lichtman testified that he considers himself an expert able to testify about trademark law, patent law, and law involving emerging technology. Professor Lichtman has never done any practical work on a trademark. He has never drafted a trademark application, defended a trademark or prosecuted a trademark.

Professor Lichtman is not currently qualified to testify as an expert on trademark law. Courts have recognized that expertise may be acquired through practical experience, academic experience or simply through observing the work of others. *De-Paepe v. General Motors Corp.,* 141 F.3d 715, 719 (7 th Cir.1998); *Wetherill v.. University of Chicago,* 565 F.Supp. 1553, 1563-64 (N.D.Ill.1983)(Shadur, J.). However, Professor Lichtman has no special qualification over the average lawyer in the field of trademark. He testified that he is qualified as an expert because "I am incredibly well read in the area, read all relevant law, read a lot of the relevant cases, read a lot of the commentary, try to understand what the next issues will look like, try to understand the policies that caused us to design the law the way we did, their strengths and weaknesses. The details of practicing trademark law, that is not what I do."Essentially, Professor Lichtman is asking this Court to certify him as an expert because he has done what any motivated lawyer could do, namely, study precedent. There is no special or unique perspective, other than his intelligence, which Professor Lichtman can bring to the court. It is difficult to reconcile Professor Lichtman's lack of overall experience with his claim to be an expert in so many wide-ranging areas of the law. Given that none of his published work involves trademark law and that trademark law only comprises a small sub-

set of larger topics which he teaches, we cannot find Professor Lichtman qualified as an expert.

**\*7** However, we have considered his legal arguments. In our opinion, he advanced no arguments that could not have been presented to this court as legal argument in a brief or memorandum. As our opinion makes clear above, we rejected Professor Lichtman's analysis that, using the imagination test, "charter" is a suggestive mark.

*CONCLUSION*

The Motion for a Preliminary Injunction brought by Charter National Bank & Trust is denied because plaintiff cannot show a reasonable likelihood of success on the merits. Defendant's motion to disqualify the testimony of Professor Douglas Lichtman is granted.

It is so ordered.

N.D.Ill.,2001.
Charter Nat. Bank and Trust v. Charter One Financial, Inc.
Not Reported in F.Supp.2d, 2001 WL 1035721 (N.D.Ill.), 65 U.S.P.Q.2d 1684

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# APPENDIX 14



BORDEN, INC., Plaintiff, v. KRAFT, INC., Defendant.
N.D.Ill. 1984.

United States District Court, N.D. Illinois, Eastern
Division.
BORDEN, INC., Plaintiff,
v.
KRAFT, INC., Defendant.
No. 84 C 5295.

September 28, 1984.

Gerald L. Angst Walter C Carlson SIDLEY &
AUSTIN One First National Plaza 60603, for
plaintiff.
Jerome Gilson Gary M. Ropski Thomas M.
O'Malley WILLIAM BRINKS OLDS HOFFER
GILSON and Lione, Ltd. One IBM Plaza, Suite
4100 60611, for defendant.

MEMORANDUM OF FINDINGS AND CONCLU-
SIONS

LEIGHTON, District Judge.

*I. Introduction*

**\*1** This is a suit in which the plaintiff seeks to en-
join and recover damages for certain advertising
which it alleges is false and deceptive. Defendant is
one of plaintiff's competitors; the action is brought
pursuant to Section 43(a) of the Lanham Act, 15
U.S.C. 1125(a) and certain provisions of the Illinois
Uniform Deceptive Trade Practices Act,
Ill.Rev.Stat., ch. 121-1/2, par. 312.

Before the court is plaintiff's motion for prelimin-
ary injunction, with due notice. The record consists
of the complaint, answer, and a motion for relief
<u>pendente lite</u>. In support of their respective posi-
tions, the parties have submitted affidavits and sup-
plemental affidavits. The court has heard testimony
of witnesses and has received exhibits in evidence.

Memoranda have been filed supplementing the oral
submissions of counsel. Thus, the court is fully ad-
vised.

At the end of the parties' presentations, this court
made its ruling from the bench and entered an order
denying plaintiff's motion, it being understood that
the denial was to take effect and become appealable
on the filing of this memorandum of findings and
conclusions. Accordingly, and in conformance with
Rule 52(a), Fed.R.Civ.P., the court makes its find-
ings of fact, reaches its conclusions of law, and
enters a dispositive order.

*II. Findings of Fact*

1. Plaintiff, Borden, Inc. (Borden), is a corporation
organized and existing under the laws of the State
of New Jersey, and has its principal place of busi-
ness in Columbus, Ohio.

2. It is a producer of various food and chemical
products. Among the food products which it pro-
cesses, advertises and offers for sale is a line of
singly-wrapped pasteurized process, 'all dairy'
cheese food slices. (Carfora Aff., ¶¶3, 5) Plaintiff
also produces imitation/substitute cheese slices.
(Cmplt, ¶4) One such product is a substitute cheese
slice called CHEEZTWIN. (Carfora Dep., p. 36;
DDX 4) Another substitute cheese product pro-
duced and sold by plaintiff is Lite-Line Low Cho-
lesterol. (Carfora Dep., pp. 52-52a; DDX 5)

3. Plaintiff is a competitor of defendant Kraft in a
number of categories; both its all-dairy and imita-
tion/substitute slices are in direct competition with
Kraft's own singly-wrapped pasteurized process,
all-dairy cheese food slices. (Carfora Aff., ¶3; Blue
Aff., ¶¶4, 5)

4. Defendant Kraft, Inc. (Kraft), is incorporated un-
der the laws of the State of Delaware and has its
principal place of business in Illinois.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                     Page 2
Not Reported in F.Supp., 1984 WL 1458 (N.D.Ill.), 224 U.S.P.Q. 811
**(Cite as: Not Reported in F.Supp., 1984 WL 1458 (N.D.Ill.))**

5. It is a major manufacturer and marketer of food products, well-known to the public for its nutritious, high-quality food and dairy products sold under such widely recognized brand names as KRAFT, VELVEETA, SEALTEST, PARKAY, MIRACLE WHIP, PHILADELPHIA BRAND and BREYERS. (Blue Aff., Ex. L) Kraft produces, advertises and sells a line of singly-wrapped pasteurized process 'all dairy' cheese food slices under the brand name KRAFT Singles (Kraft Singles). (Blue Aff., ¶4; Woodford Aff., ¶2; Carfora Aff., ¶3)

6. In the process slice category, Kraft is the market leader. Its Kraft Singles account for 32% of the category and private label slices rank second 23%. Imitation/substitute slices of various brands, including Borden's, rank at 8% of the market category. Borden cheese food slices account for 7% and Kraft's Velveeta slices for 5%. (Carfora Aff., ¶5)

**\*2** 7. In early 1983, Kraft decided to implement an advertising campaign for its Kraft Singles in 1984 which would provide the consumer with one or more reasons why the consumer should purchase Kraft Singles over other slices, particularly 'imitation' and 'substitute' slices, such as Borden's CHEEZTWIN sandwich slices, which had enjoyed significant growth in the cheese slice category. (Blue Aff., ¶5)

8. The recent and expansive growth of the imitation/substitute cheese slice product line is illustrated by Borden's own entries in this line. CHEEZTWIN was introduced in late 1981, and the Lite-line substitute entered the market in the fall of 1982. (Carfora Dep., pp. 44, 52)

9. It was decided that the advertising campaign would stress Kraft Singles' '5 ounces of milk per slice' and good cheese tast attributes as two reasons to purchase Kraft Singles. (Blue Aff., ¶6; Ex. A)

10. In october 1983, Kraft conducted a study which indicated that even without any advertising of its '5 ounces' attribute, 59% of the consumers polled believed that Kraft Singles contained more milk than

other brands. Sixty-seven percent of the consumers polled thought that Kraft Singles had a better cheese flavor than other brands. (Blue Aff., ¶7; Ex. B)

11. During the weeks of December 12 through December 26, 1983, Kraft produced a video commercial referred to as 'Shopping Dad.' (Blue Aff. ¶¶8, 14; Ex. C) The 'Shopping Dad' commercial was first aired on or about January 16, 1984, and was terminated on or about April 9, 1984. (Blue Aff., ¶8)

12. This commercial depicts a father-shopper in a supermarket dairy section who queries a lady shopper why she chooses Kraft Singles over the other cheese slices in the dairy case. The woman responds, first, that Kraft puts five ounces of milk to every slice. The video then cuts away to a demonstration which shows two empty glasses and a package of Kraft Singles. Milk is poured into one glass up to a premarked two-ounce level as the voiceover announcer states, 'Some slices use only this much milk. . . .' Milk is then poured into a second glass up to a premarked five-ounce level, as the voice-over announcer states, '. . . but Kraft puts five full ounces of milk into every delicious slice.' The video then cuts back to the shopping dad and lady shopper. The lady offers a Kraft slice to Dad, commenting, 'Best of all, taste.' Dad takes a bite of the cheese slice and agrees, 'Great cheese taste.' The thirty-second 'Shopping Dad' commercial finishes with a close-up shot of a glass filled with five ounces of milk alongside a Kraft Singles package. The voice-over announcer states, 'Kraft Singles. Five ounces of milk in every delicious slice.' (Blue Aff., Exs. C, E)

13. The original version of the 'Shopping Dad' commercial contained a 'superscript' (printed words which are superimposed on the video portion of the commercial) which read, 'Milk amounts based on cheese content.' This superscript was displayed during the '5 oz. vs. 2 oz.' demonstration of the commercial. (Blue Aff., Ex. C)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                              Page 3
Not Reported in F.Supp., 1984 WL 1458 (N.D.Ill.), 224 U.S.P.Q. 811
**(Cite as: Not Reported in F.Supp., 1984 WL 1458 (N.D.Ill.))**

**\*3** 14. Beginning the week of February 13, 1984, the superscript of the 'Shopping Dad' commercial was modified to include a statement to reflect that the standard of comparison in the 5 ounces vs. 2 ounces demonstration was to 'substitute' cheese slices only. (Blue Aff., ¶¶16, 18; Ex. E) The revised superscript stated: 'Milk comparison based upon cheese substitute slices.'(Blue Aff., ¶¶16, 18; Ex. E) By the week of February 19, 1984, all Kraft Singles commercials on all three networks carried the complete, network-approved superscript explanation. (Blue Aff., ¶19)

15. Along with the 'Shopping Dad' commercial, the Kraft Singles 1984 television advertising campaign includes four versions of a television commercial known as 'Tell Me When,' I through IV. (Blue Aff., ¶21) The 'Tell Me When' commercials are all live testimonials in which consumers are asked how much milk goes into one slice of Kraft cheese. As an interviewer pours milk into a measuring glass, the consumers are asked to tell the interviewer at what level to stop. In each commercial, the consumer instructs the interviewer to stop at a level of less than 5 ounces. In two of the commercials, 'Tell Me When' I and IV, the interviewer responds, 'Some slices stop there . . . But Kraft puts 5 ounces of milk into every slice,' as he pours milk into another measuring glass to the 5-ounce level. In the other two 'Tell Me When' commercials, II and III, the interviewer responds, 'Some <u>imitation</u> slices stop there. But Kraft puts 5 full ounces of milk in each slice.'(emphasis added) In each of the four commercials, the consumers then comment on the 'good', 'creamy', or 'cheesy' taste of Kraft Singles. The voice-over finishes with the comment, 'Kraft Singles. Five ounces of milk in every delicious slice.'(Blue Aff., Exs. G-J; Blue Supp. Aff., ¶5, Ex. D)

16. Each of the 'Tell Me When' commercials has a superscript which is displayed during the pouring demonstration. The two commercials, I and IV, which were run on a rotational basis beginning the second week of April 1984 until June 23, 1984, had a superscript which read: 'Depicted comparison to cheese substitute slices. Milk amount based on cheese content.'(Blue Aff., ¶¶10, 22; Exs. G, J)

17. The other two 'Tell Me When' commercials, II and III, which are scheduled to begin airing July 15, 1984 and will air intermittently until October 13, 1984, have superscripts which read: 'Depicted comparison to imitation cheese slices. Milk amounts based on cheese content.'(Blue Aff. ¶¶10, 26 Exs. H, I)

18. The superscript installed in the 'Tell Me When' commercials is larger and has increased boldness compared with the superscript of the discontinued 'Shopping Dad' commercial.

19. As part of the 5 ounces/good taste advertising campaign, limited print media was utilized in May and June 1984. (Blue Aff., ¶8) The print advertising used the same 'comparison of milk content' concept used in the television commercials. (Blue Aff., ¶20) One print ad, however, which ran only in a limited number of May magazines, did not contain a comparison description akin to that used in the commercials. (Blue Aff., ¶20, Ex. F). New print advertising which will be run in August and September 1984, corresponding with the 'Tell Me When' II and III commercials, will contain a description of the comparison product (imitation slices). (Blue Aff., ¶27)

**\*4** 20. Throughout the development and production of its advertising, Kraft made every attempt to ensure that the intended message of its advertising was being clearly and accurately stated. (Blue Aff., ¶12)

21. The above-mentioned superscripts were added to clarify the type of products to which the Kraft Singles were compared. (Blue Aff., ¶12) Such superscripts are a widely-used and well-accepted technique for communicating part of a commercial message. (Beach Aff., ¶3) The size and typeface of the superscripts used in all the Kraft commercials are typical of that used in the advertising business.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                     Page 4
Not Reported in F.Supp., 1984 WL 1458 (N.D.Ill.), 224 U.S.P.Q. 811
**(Cite as: Not Reported in F.Supp., 1984 WL 1458 (N.D.Ill.))**

(Beach Aff., ¶4)

22. The superscripts in all of the Kraft 'five ounces of milk' commercials comply with each of the networks' guidelines. (Blue Supp. Aff., ¶2; Exs. M-1, M-2)

23. The announcer's voice-over of the two 'Tell Me When' commercials, II and III, which have not yet been aired, expressly and specifically states that the '5 ounces vs. 2 ounces' comparison is to some imitation cheese slices. (Blue Aff., ¶¶25, 26; Exs. H, I; Blue Supp. Aff., ¶4, Ex. N)

24. Kraft Singles contain approximately 5 ounces of milk in each slice, and the Kraft claim with respect to the milk content of slices of Kraft Singles is true and accurate. (Carfora Aff., ¶6; Crawford Aff., ¶10; Woodford Aff., ¶5, Ex. D)

25. Laboratory analysis performed by Kraft in December 1983, prior to commencement of the Kraft Singles Advertising Campaign, establishes that Kraft Singles utilize 5.15 ounces of milk to make the cheese portion of each 3/4 oz. slice. (Woodford Aff., ¶5, Ex. D)

26. Plaintiff Borden agrees that it takes about 5 ounces of milk to make the cheese that goes into a single 3/4 oz. slice of process cheese food. (Crawford Aff., ¶10)

27. There are a variety of products similar in appearance, packaging and general taste to Kraft Singles, but which are different in composition. Such slices do not meet a standard of identity and, under the federal nomenclature, must be called 'imitation' or 'substitute.' (Woodford Aff., ¶3) Such imitation/substitute slices compete with Kraft Singles which is considered an 'all-dairy' cheese slice product. (Carfora Aff., ¶5; Blue Aff., ¶4) All of these cheese slices are typically displayed next to each other in the same location in retail stores. (Blue Aff., ¶4; Carfora Dep., pp. 40-41; Blue Supp. Aff., ¶5; Ex. O-1) 28. An 'imitation' cheese slice product is one which is a substitute for and re-

sembles a pasteurized process cheese food slice product but is nutritionally inferior to same. (Nelson Aff., p. 4)

28. An 'imitation' cheese slice product is one which is a substitute for and resembles a pasteurized process cheese food slice product but is nutritionally inferior to same. (Nelson Aff., ¶4)

29. A 'substitute' cheese slice product is one which is a substitute for and resembles a pasteurized process cheese food product and is nutritionally equivalent to same. (Nelson Aff., p. 4)

30. The major difference between a 'pasteurized process cheese food' slice (i.e., Kraft Singles) and an imitation/substitute slice is that all or a portion of the milk used in the former is replaced by vegetable oil in the latter. (Woodford Aff., ¶4; Crawford Aff., ¶13; DDX 4)

**\*5** 31. Examples of better known imitation/substitute cheese slices are Borden's CHEEZTWIN sandwich slices and FISHER SANDWICH-MATE. (Woodford Aff., ¶ 4, Exs. B, C; DDX 4, 6) Another slice in this category is Borden's Lite-line low cholesterol. (Carfora Dep. pp. 52-52a; DDX 5)

32. In December 1983, prior to commencement of the Kraft Singles Advertising Campaign, Kraft performed technical analyses of the Borden CHEEZTWIN and Fisher SANDWICH-MATE substitute products to determine the amount of cheese in each product and, based upon the amount of cheese, the milk content of each product. (Woodford Aff., ¶5)

33. The Kraft analyses showed that the Borden CHEEZTWIN product contained cheese at a level which utilizes only 0.74 ounces of milk. The Fisher substitute product had only 0.25 ounces of milk. (Woodford Aff., ¶5; Ex. D)

34. An analysis of the Borden Lite-Line low cholesterol substitute has a milk content, based upon the amount of cheese, at a level of 1.53 to 1.81 ounces per 3/4 oz. slice. (Silvio Supp. Aff., ¶2, Ex. B)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                          Page 5
Not Reported in F.Supp., 1984 WL 1458 (N.D.Ill.), 224 U.S.P.Q. 811
**(Cite as: Not Reported in F.Supp., 1984 WL 1458 (N.D.Ill.))**

35. Plaintiff Borden agrees that the cheese content of imitation/substitute cheese slices represents as little as two ounces or less of milk. (Carfora Aff., ¶6; Crawford Aff., ¶16)

36. Kraft requested network clearance for its proposed advertising in October 1983. The networks, as well as the Kraft legal staff, requested substantiation of certain claims, including proof that Kraft Singles have five ounces of milk in every slice and proof that Kraft Singles have great cheese taste. (Blue Aff., ¶12)

37. All questions concerning substantiation were answered, and the original 'Shopping Dad' commercial aired on NBC and CBS during the week of January 9, 1984. (Blue Aff., ¶¶13, 15)

38. The ABC network requested that Kraft modify its 'Shopping Dad' commercial to include a superscript that the standard of comparison in the five ounces vs. two ounces comparison was to substitute cheese slices. (Blue Aff., ¶16) To accommodate the network's request, Kraft installed an expanded superscript explanation of the depicted comparison. (Blue Aff., ¶18)

39. By February 13, 1984, all of the Kraft commercials were approved for broadcast by the three major networks, ABC, NBC and CBS, as in compliance with their respective broadcast standards. (Blue Aff., ¶18; Beach Aff., ¶14; Blue Supp. Aff., ¶2; Exs. M-1 to M-3)

40. As part of routine procedure for Kraft advertising, Kraft conducted qualitative communication checks on the 'Shopping Dad' and 'Tell Me When' I and IV commercials which were aired. This research indicates that Kraft's 'five ounces of milk in every slice' claim is the primary message communicated by the commercials. The research also shows that consumers tend to focus on Kraft Singles' product benefits such as nutrition, taste and creaminess. Consumers do not focus on a comparison of milk content between brands. (Stanek Aff., ¶¶ 9-10)

41. In noe of the Kraft research was there a single mention of any Borden product by responding consumers. (Stanek Aff., ¶10)

**\*6** 42. Due to the deficiencies of the Borden market research, Kraft decided to engage the services of an independent expert in the field of market research, Dr. Robert C. Sorensen, to undertake a fair and impartial study of the reaction of viewers to the Kraft 'Tell Me When II' Revised and 'Tell Me When III' Revised television commercials. This study was conducted from July 6 to July 10, 1984 in the same counties in which Borden conducted its initial research, i.e., Levitown and Huntington, Long Island, New York. In an open-ended and non-leading fashion, the study surveyed what purchasers of individually wrapped cheese slices perceive to be the content and implications of the 'Tell Me When' II and III commercials. (Sorensen Rpt., p. 4)

43. Dr. Sorensen concluded as follows based upon the findings in his survey:

a. The Kraft television commercials in question were perceived as introducing a new and unique element of information concerning Kraft Singles cheese slices, to wit: the existence of 5 ounces of milk in or used for each individual slice.

b. The Kraft television commercials reinforce what is already a high-quality image for either the Kraft corporate name or the Kraft cheese brand name, in that people either affirm their respect for Kraft or fail to express any significant criticism of Kraft products or of this commercial's content and techniques. This suggests that consumers bring strong support for Kraft to their viewing of this and other commercials featuring the Kraft brand.

c. The Kraft television commercials clearly communicate a claim for strong comparative superiority for Kraft Singles cheese slices, yet fail to arouse viewers to voluntarily single out competing companies or brands. Even when they are specifically asked, only 1.5% of the total survey respondents cite Borden. The comparison of Kraft with some

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                    Page 6
Not Reported in F.Supp., 1984 WL 1458 (N.D.Ill.), 224 U.S.P.Q. 811
**(Cite as: Not Reported in F.Supp., 1984 WL 1458 (N.D.Ill.))**

other brands of slices and/or with imitation cheeses in people's minds almost never provokes viewers of these commercials to identify another company or brand by name. (Sorensen Rpt., p. 20)

44. Dr. Sorensen's study showed that specific companies and specific brands are almost never singled out by people stating what went through their minds with respect to what they saw and heard in the television commercials. In replying to open-ended questions, approximately 2% of the viewers identified another specific brand or company with respect to the amount of milk per slice; none of them named 'Borden.' Two-thirds of the total survey respondents stated that they agreed that 'Kraft Singles was compared to other individually wrapped slices.' Of those noting the comparison, only 1.5% stated that Borden was the specific brand or company to which the comparison was made. Finally, the overwhelming majority, 96.5% of the people responding, said that they found nothing 'confusing or difficult to understand in the commercial.' (Sorensen Rpt., pp. 15-19)

45. Accordingly, Dr. Sorensen concluded that no basis exists for the allegation that these television commercials promoting Kraft Singles cheese slices known as the 'Tell Me When II' and 'Tell Me When III' television commercials cause viewers by deception or any other means to deprecate, depreciate or discount cheese slices products carrying Borden as a brand name or source of origin, or to make an invidious comparison between Kraft and Borden individually wrapped cheese slice products. (Sorensen Rpt., p. 21)

**\*7** 46. After receiving the critique by Dr. Robert C. Sorensen of their earlier Rothstein-Tauber studies, Borden obtained the services of Burke Marketing Research in connection with a study whose purpose was 'to measure consumer understanding of a thirty-second television commercial for Kraft Singles.' (Burke Study, p. 1, Intro.) The fact that this study used open-ended questions in place of the leading questions used in the earlier Borden surveys conducted by Rothstein-Tauber is an admission of

Borden that the earlier studies may not have been admissible or probative on the issue of whether or not the Kraft television commercials communicated anything about the Borden cheese slices products. In view of this later Burke study, the court gives little weight to the earlier Rothstein-Tauber studies.

47. Among others, the Burke study provided the following information with respect to the Kraft 'Tell Me When' commercials. Of the people surveyed who responded that the commercial made comparative milk statements, 102 out of 253 or 41% of that group (25% of the total respondents) expressly stated that the comparison was between Kraft singles and 'imitation' or 'cheaper/generic/store brands.' Perhaps more important, of the 151 that viewed the commercial as making a statement between Kraft Singles and 'other brand/companies' or 'other cheese products/ slices,' only 21 or 5% of the total respondents mentioned Borden. [Comments relating to 'imitation' and 'cheaper/generic/store brands' in the context of Borden cheese slices, made by 1.7% of the total respondents, are omitted from this analysis because Borden does not dispute that such comments are accurate.] Thus, Borden's own research demonstrates that <u>very few</u> people mention Borden in the context of a comparison between Kraft Singles and other brands/companies or other cheese products/slices in general. The number that do mention Borden is certainly <u>not</u> substantial.

48. Since beginning to work with J. Walter Thompson (JWT), the advertising agency responsible for producing the Kraft Singles advertising in September 1983, Kraft has spent in excess of $9 million in developing, producing, testing and airing commercials embodying the '5 ounces of milk' and 'good cheese taste' themes of the campaign. (Blue Aff., ¶11)

49. Kraft's 'Shopping Dad' commercial was produced at a cost of approximately $120,000.00, and its 'Tell Me When' commercials cost in excess of $135,000.00. (Blue Aff., ¶¶14, 22)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

50. Changes which Kraft has made to the super-scripts and voice-overs of the 'Tell Me When' II and III commercials have cost several thousand dollars. These are modifications made at the reequest of Borden. (Blue Aff., ¶¶25, 26; see DFF 45, infra)

51. Kraft has purchased television time and magazine space at a cost of over $4 million for the advertising scheduled to commence July 15, 1984 and continue until October 1984. (Blue Aff., ¶28)

52. Kraft has committed approximately $900,000.00 for special packaging and support materials as part of a major promotion which relies upon the '5 ounces of milk' campaign. (Blue Aff., ¶29)

**8** 53. On January 27, 1984, Borden first complained to Kraft about its 'Shopping Dad' commercial and requested that the reference to 'some slices' therein be more 'specifically defined.' (Blue Aff., ¶17; Carfora Aff., Ex. 2)

54. Subsequent to this request, Kraft expanded the superscript to state: 'Milk comparisons based upon cheese content. Depicted comparison to cheese substitute slices.'

55. Despite the installation of the superimposed description of the comparison, Borden continued to protest airing of the 'Shopping Dad' commercial and Kraft agreed to a meeting with Borden representatives on May 17, 1984. (Blue Aff., ¶24; Carfora Aff., ¶4) By this time, the airing of the 'Shopping Dad' commercial had terminated pursuant to its scheduling, and copies of the two 'Tell Me When' commercials, I and IV, which were then airing, were supplied to Borden. (Blue Aff., ¶24)

56. Borden objected to the 'Tell Me When' commercials and demanded three modifications, two of which Kraft agreed to and which will be implemented in the 'Tell Me When' II and III versions to be aired beginning July 15, 1984. In these commercials, Kraft alters the voice-over during the comparison sequence to expressly and specifically state

that the comparison is to imitation slices. In addition, the superscript reads that the comparison is to imitation slices rather than substitute. (Blue Aff., ¶15)

57. The third demand, to which Kraft refused to agree, was that Kraft modify the video portion of the 'Tell Me When' commercial by inserting a mock-up package labeled 'Imitation Cheese Slices' during the comparison sequence. Such a modification would be an unlawful tampering with a testimonial ad. (Blue Aff., ¶25)

58. Borden filed suit on June 22, 1984, some five months after learning of the Kraft commercials.

59. Borden is unable at present to measure the impact, if any, which the Kraft advertising has had upon the sales of Borden's pasteurized process cheese food slices. (Corfora Aff., ¶20)

60. During the period that the Kraft Singles '5 ounces of milk' campaign was running, January 1984 to May 24, 1984, the sales of Borden slices has increased a significant 8.3%, and Borden has made a significant market share gain of 1/2 of a market share point. (Blue Aff., ¶34, Ex. K) During this same period, the sales volume of Kraft Singles, the market leader, increased only 2.4%, and its market gain has been only 1/10 of a market share point. (Blue Aff., ¶34; Ex. K)

61. Borden's lack of injury or damage is also substantiated by its conduct with respect to its own commercials and those of others involving comparative advertising. Starting this year, Borden has run a television commercial comparing Borden's product, KRYLON spray paint, and an 'other leading national brand.' Borden's spokesman first explains that the KRYLON paint sprays on smoothly and without running or dripping. Then, with the use of 'supers,' Borden explains that the KRYLON spray paint is dry after 12 minutes and an 'other leading national brand' is not dry even after an hour. (Beach Supp. Aff., ¶3, Ex. A) Borden is thus well aware of the unobjectionable use of supers in

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                          Page 8
Not Reported in F.Supp., 1984 WL 1458 (N.D.Ill.), 224 U.S.P.Q. 811
**(Cite as: Not Reported in F.Supp., 1984 WL 1458 (N.D.Ill.))**

comparative advertising, even where the name of the compared brand is not mentioned specifically in the commercial, and the comparison could, by implication, refer to various other brands.

**\*9** 62. In the particular area of cheese products, LAND O LAKES has been running two implicitly comparative television commercials at various times since 1980: one entitled 'Honest Farmer,' and the other entitled 'Milk Pour.' In each of these commercials, the theme emphasized is '4-QUART' cheese, i.e., that '4 qts. of fresh milk go into every pound' of cheese LAND O LAKES sells in association with the phrase '4-QUART.' Cheese is displayed in the commercials in both slices and chunk form. (Beach Supp. Aff., ¶4, Ex. B)

63. For 3/4 oz. slices, four quarts of milk in every pound translates into 6 ounces of milk per slice, and for 2/3 oz. slices, four quarts of milk in every pound is about 5.3 ounces per slice. Based on this '4-QUART' statement, and to be consistent with the position that Borden has taken with the Kraft commercials, one would have expected Borden to argue that the LAND O LAKES commercials imply that all other brands of cheese, including Borden, use less milk, and in particular, less than about 5 ounces per slice. Even though these commercials were first run about four years ago, and this '4-QUART' theme has been used since then, Borden has not challenged these LAND O LAKES television commercials. (Beach Supp. Aff., ¶4; Carfora Dep., pp. 137-38) This failure to challenge another competitor in the cheese slices area amounts to an acquiescence on behalf of Borden in the type of advertising that Kraft is using for its Kraft singles television commercials.

64. A print advertisement comparing the calories and fat percentage of Kraft's LIGHT 'N LIVELY lowfat cottage cheese with those of Borden's regular cottage cheese was run one time only around March 3, 1984 in Best Food Day Week. This print ad was terminated according to a preplanned program and is not scheduled to run again. (Creighton Aff., ¶¶3, 4, Ex. A)

65. In its 'Tell Me When' II and III commercials, Kraft states that it 'puts 5 full ounces of milk into each slice' of Kraft Singles. These commercials finish with voice-over announcer stating, 'Kraft Singles. Five ounces of milk in every delicious slice.'(Blue Aff., Exs. H, I; Blue Supp. Aff., ¶5, Ex. D)

66. The majority of Kraft Singles slices, over 60%, are 3/4 oz. in weight. Approximately 75% of the 3/4 oz. slices contain between 5.15 and 5.60 ounces of milk, per slice, based on cheese content. (Blue Supp. Aff., ¶10)

67. The Kraft Singles product package mock-up displayed in the 'Tell Me When' II and III commercials is intended to and does approximate the size and appearance of the Kraft Singles package of 16 slices which contains the 3/4 oz. slice size. (Blue Supp. Aff., ¶11)

68. Less than 40% of Kraft Singles are sold in slices of 2/3 oz. in weight. These 2/3 oz. slices contain slightly less milk than the majority 3/4 oz. slices. Based on cheese content alone, the 2/3 oz. slices have between 4.6 and 5.0 ounces of milk. If milk-derived ingredients are considered in determining milk content, the milk content of the Kraft Singles 2/3 oz. slice would equal 5 ounces of milk. (Blue Supp. Aff., ¶10; Carfora Aff., ¶6)

**\*10** 69. Plaintiff acknowledges and admits that '[e]ach Kraft slice . . . contains approximately 5 ounces of milk as do all of the other brands of 'all-dairy' slices . . ..' (Carfora Aff., ¶6)

70. All slices of Kraft Singles do contain 5 ounces of milk, based upon cheese content alone, (1) when the range of variations of milk per slice is rounded up from a range of 4.6 to 5.0 or down from a range of 5.15 to 5.6 and (2) when the majority of purchases of Kraft Singles is considered, i.e., the 3/4 oz. size, in which there are between 5.15 and 5.6 ounces of milk per slice. (Blue Supp. Aff., ¶11)

71. The statement that Kraft puts 5 full ounces of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

milk into each slice of Kraft Singles is true and accurate. (Blue Supp. Aff., ¶11)

### III. Conclusions of Law

1. The court has jurisdiction over the parties and the subject matter of this suit pursuant to 28 U.S.C. §§ 1332, 1338(a) and (b) and 15 U.S.C. § 1121. Venue is proper in the Northern District of Illinois, Eastern Division, pursuant to 28 U.S.C. § 1391(c).

2. Plaintiff's motion for preliminary injunction relates to the two 'Tell Me When' commercials, II and III, which began running on July 15, 1984. All of the other Kraft Singles commercials based upon the 'five ounces of milk' theme have terminated and are not scheduled to rerun. Likewise, the complained-of print media advertising has terminated, except for the print advertising which will correspond with the 'Tell Me When' II and III commercials. Inasmuch as the other television commercials and print advertising have ceased and are not likely to rerun, any equitable relief pertaining to such past advertising would be inappropriate. Schutt Mfg. Co. v. Riddell, Inc., 673 F.2d 202, 207 (7th Cir. 1982).

3. It is settled law that the burden of showing a clear right to preliminary injunctive relief is on the plaintiff, Avins v. Widner College, Inc., 421 F. Supp. 858, 860 (D. Del. 1976); and it must satisfy the traditional prerequisites for issuance of such relief. See Calvin v. Conlisk, 520 F.2d 1, 7 (7th Cir. 1975); cf. Roland Machinery Company v. Dresser Industries, nc., No. 84-1509, slip op. at 10-16.

4. A preliminary injunction is an extraordinary remedy.F.E.L. Publications, Ltd. v. Nat'l Conference of Catholic Bishops, 466 F. Supp. 1034, 1039 (N.D. Ill. 1978). The court's power to issue such relief, especially a mandatory injunction such as the one sought here, should be sparingly exercised.United States v. Spectro Foods Corp., 544 F.2d 1175, 1181 (3d Cir. 1976).

5. The standard for issuance of a preliminary injunction is well established. Four factors enter into the court's determination whether to grant such extraordinary relief:

(1) whether the plaintiff has at least a reasonable likelihood of success on the merits;

(2) whether the plaintiff has an adequate remedy at law and will be irreparably harmed if the injunction does not issue;

(3) whether the threatened injury to the plaintiff outweights the threat that the injunction may inflict irreparable harm on the defendant; and

**\*11** (4) whether the granting of a preliminary injunction will disserve the public interest.

Wesley-Jessen Div. of Shering Corp. v. Bausch & Lomb, Inc., 698 F.2d 862, 846 (7th Cir. 1983); Mile High Upholstery Fabric Co. v. General Tire & Rubber Co., 221 U.S.P.Q. 217, 221 (N.D. Ill. 1983) (Marshall, J.); Ragold, Inc. v. Ferrero, U.S.A., Inc., 506 F. Supp. 117, 123 (N.D. Ill. 1980) (Aspen, J.).

6. If plaintiff is unable to show a likelihood of success on the merits, its request for a preliminary injunction must be denied. Signode Corp. v. Weld-Loc Systems, Inc., 700 F.2d 1108, 1111 (7th Cir. 1983); Koly v. Board of Education, 576 F.2d 747, 749 (7th Cir. 1978).

7. This standard of 'reasonable likelihood of success' requires, at the very least, a showing that the plaintiff has a 'good chance' of succeeding on the merits of its claim.Local Division 519, Amalgamated Transit Union, AFL-CIO v. LaCrosse Municipal Transit Authority, 585 F.2d 1340, 1351 (7th Cir. 1978); Ragold Inc. v. Ferrero, U.S.A., Inc., 506 F. Supp. 117, 124 (N.D. Ill 1980).

8. Where a plaintiff has failed to make a strong showing of both irreparable harm and a balance of equities in its favor, as here, the plaintiff must show more than just a 'good chance' of prevailing on the merits.Ragold, supra, 507 F. Supp. at 124. Plaintiff Borden has failed to show even a 'good chance' of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                      Page 10
Not Reported in F.Supp., 1984 WL 1458 (N.D.Ill.), 224 U.S.P.Q. 811
**(Cite as: Not Reported in F.Supp., 1984 WL 1458 (N.D.Ill.))**

success.

9. It has also failed to demonstrate a reasonable likelihood of success on the merits of its claim under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). This section 'does not have boundless application as a remedy for unfair trade practices.' Alberto-Culver Co. v. Gillette Co., 194 U.S.P.Q. 84 (N.D. Ill. 1976), quoting Alfred Dunhill Ltd. v. Interstate Cigar Co., 499 F.2d 232, 237 (2d Cir. 1974). See John O. Butler v. Oral B. Co., 183 U.S.P.Q. 334 (N.D. Ill. 1974). Not all comparative advertising claims fall within the scope of section 43(a). Bernard Food Industries Inc. v. Dietene Co., 415 F.2d 1279, 1283 (7th Cir. 1969), cert. denied, 397 U.S. 912 (1970); Ragold, Inc. v. Ferrero, U.S.A., Inc., 506 F. Supp. 117, 128 (N.D. Ill. 1980).

10. To prevail under the section plaintiff must prove that defendant made false or misleading statements of fact as to its own product. Bernard Food Industries, Inc. v. Dietene Co., 415 F.2d 1279, 1283-84 (7th Cir. 1969), cert. denied, 397 U.S. 912 (1970); Ragold, Inc. v. Ferrero, U.S.A., Inc., 506 F. Supp. 117, 124 (N.D. Ill. 1980); Dexter-Lawson Products, Ltd. v. R. B. Graphics Equipment, Inc., 209 U.S.P.Q. 308, 309 (N.D. Ill. 1979); Alberto-Culver Co. v. Gillette Co., 194 U.S.P.Q. 84, 86 (N.D. Ill. 1976); Skil Corp. v. Rockwell Int'l Corp., 375 F. Supp. 777, 783 (N.D. Ill. 1974). Plaintiff has failed to prove that Kraft's advertising claims with respect to its own product, Kraft Singles, are false, misleading or deceptive.

11. False advertising or representations made by a defendant about a plaintiff's product are not covered by section 43(a). Bernard Food Industries, Inc. v. Dietene Co., 414 F.2d 1279, 1283 (7th Cir. 1969), cert. denied, 397 U.S. 912 (1970); Ragold, Inc. v. Ferrero, U.S.A., Inc., 506 F. Supp. 117, 128 (N.D. Ill. 1980). See Vibrant Sales, Inc. v. New Body Boutique, Inc., 652 F.2d 299, 303 n.3 (2d Cir. 1981) (disparagement of another's product is not cognizable under section 43(a)). Even if the Kraft advertising made an express, blatantly false state-

ment with respect to a Borden product (e.g., that Borden's all-dairy cheese slices have 2 ounces or less of milk), this statement would not be covered by section 43(a) because it is a false statement with respect to another's product, not a product put into commerce by the party making the false statement.

**\*12** 12. In the leading case of Bernard Food Industries, Inc. v. Dietene Co., 415 F.2d 1279 (7th Cir. 1969), cert. denied, 397 U.S. 912 (1976), the Seventh Circuit held that where the defendant, in comparing its food product to plaintiff's, made false representations of fact as to plaintiff's product, a cause of action did not arise under section 43(a). 415 F.2d at 1283-84. Even assuming, as Borden contends, that the Kraft commercials mislead consumers into believing that all of Borden's cheese slices contain less milk than Kraft Singles, Borden fails to prove a violation of section 43(a). Bernard Food unequivocally holds that '[f]alse advertising or representations made by a defendant about a plaintiff's product are not covered by section 43(a).' Id. at 1283.

13. It is well established that in order to obtain relief under Section 43(a) of the Lanham Act for false comparative advertising, a plaintiff must prove each of the following elements:

(1) Defendant made false statements of fact about its own product;

(2) Those statements actually deceive or have a tendency to deceive a substantial segment of their audience;

(3) Such deception is material, in that it is likely to influence the purchasing decision;

(4) Defendant caused its falsely advertised goods to enter interstate commerce; and

(5) Plaintiff has been or is likely to be injured, stemming either from a decline in sales or a loss in good will.

Ragold, Inc. v. Ferrero, U.S.A., Inc., 506 F. Supp.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                      Page 11
Not Reported in F.Supp., 1984 WL 1458 (N.D.Ill.), 224 U.S.P.Q. 811
**(Cite as: Not Reported in F.Supp., 1984 WL 1458 (N.D.Ill.))**

117, 124 (N.D. Ill. 1980) (Aspen, J.); Skil Corp. v. Rockwell International Corp., 375 F. Supp. 777, 783 (N.D. Ill. 1974).

14. Plaintiff has failed to establish that the ??

?? that 3/4 oz. slices are the majority-selling slices with which the consuming public is most familiar. Inasmuch as some of Kraft's 2/3 oz. slices have 5 ounces of milk and all Kraft's 3/4 oz. slices have in excess of 5 ounces of milk, the Kraft advertising statement is true and accurate.

17. Most importantly, the Kraft '5 ounces' claim must be viewed in the context of the overall advertising statement and comparison made. The Kraft advertising will be read by consumers as representing either or both of the following: (1) that slices of Kraft Singles have significantly more milk than would otherwise be supposed, or (2) that Kraft Singles are superior to imitation cheese slices or have significantly more milk than imitation slices. Neither is an erroneous impression, and therefore there is no violation of Section 43(a).See Toro co. v. Textron, Inc., 499 F. Supp. 241, 252 (S.D.N.Y. 1980).

18. The fact that some of Kraft's 2/3 oz. slices have slightly less than 5.0 ounces of milk is not of sufficient substance that the miniscule difference would affect a consumer's purchasing decision. See Toro Co. v. Textron, Inc., 499 F. Supp. 241, 252-53 (S.D.N.Y. 1980). The slight difference between 4.6 oz. and 5.0 oz. is not 'serious enough to constitute a misrepresentation' under Section 43(a).Glenn v. Advertising Publications, Inc., 251 F. Supp. 889, 904 (S.D.N.Y. 1966).

**\*13** 19. Plaintiff has likewise failed to establish that Kraft's advertising violates Subsection 2(5) of the Illinois Uniform Deceptive Trade Practices Act.Ill.Rev.Stat. ch. 121-1/2, § 312(5). Kraft's claim that it puts 5 ounces of milk into every slice of Kraft Singles is neither false nor deceptive.

20. When a challenged advertisement is implicitly

rather than explicitly false, its tendency to violate the Lanham Act by misleading, confusing or deceiving the public should be tested by public reaction.Coca-Cola Co. v. Tropicana Products, Inc., 690 F.2d 312, 317 (2d Cir. 1982); American Home Products Corp. v. Johnson & Johnson, 577 F.2d 160, 165 (2d Cir. 1978).

21. Plaintiff offered two market research reports by Rothstein-Tauber in support of its contention that the Kraft advertising is false and misleading; both reports relate to Kraft commercials which have rotated off the air. The reports are, for this reason alone, of little, if any, relevance. This is particularly true in light of the fact that the 'Tell Me When' II and III commercials, which are the subject of this motion for preliminary injunction and are scheduled to air from July 15, 1984 to September 30, 1984, do not rely on a superscript alone to express that the depicted '5 oz. v. 2 oz.' comparison is to substitute/imitation cheese slices. In the 'Tell Me When' II and III commercials, the voice-over announcer expressly states, 'Some imitation slices stop there.' The significant differences between the earlier Kraft commercials, upon which the Borden market research results rely, and the subject commercials, greatly diminish the value of the test reports, even if the methodology employed was not objectionable and biased.

22. A more compelling reason for not giving credence to the two Borden/Rothstein-Tauber surveys is that the methodology employed in them is so flawed as to render them useless. Survey methodology must conform with the following standards which ensure trustworthiness, accuracy, and reliability:

1. A proper universe must be examined and a representative sample chosen;

2. the persons conducting the survey must be experts;

3. the data must be properly gathered and accurately reported;

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                 Page 12
Not Reported in F.Supp., 1984 WL 1458 (N.D.Ill.), 224 U.S.P.Q. 811
**(Cite as: Not Reported in F.Supp., 1984 WL 1458 (N.D.Ill.))**

4. the sample design, the questionnaires and the manner of interviewing must meet the standards of objective surveying and statistical techniques;

5. the survey must be conducted independently of the attorneys involved in the litigation;

6. the interviewers or sample designers must be trained and unaware of the purposes of the survey or the litigation; and

7. the survey respondents must be similarly unaware.

Wuv's International, Inc. v. Love's Enterprises, Inc., 208 U.S.P.Q. 736, 754 (D. Col. 1980); see State Wholesale Grocers v. Great Atlantic & P. Tea Co., 154 F. Supp. 471, 497-98 (N.D. Ill. 1957).

23. The value of a survey depends on the manner in which it was conducted-whether the techniques used were slanted or fair. Rhodes Pharmacal Co. v. FTC, 208 F.2d 382, 387 (7th Cir. 1954). The probative value of surveys and reaction tests depend upon the authorship and wording of questions asked interviewees.Sunbeam Corp. v. Sunbeam Furniture Corp., 134 F. Supp. 614, 619 (N.D. Ill. 1955). A survey must be conducted on an objective basis, and the procedures used must be in accordance with accepted standards recognized in the field of statistical surveys.United States v. E. I. DuPont De Nemours, 177 F. Supp. 1, 18 (N.D. Ill. 1959).

**\*14** 24. A survey must be fairly and scientifically conducted by qualified experts and impartial interviewers.James Burrough, Ltd. v. Sign of Beefeater, Inc., 540 F.2d 266, 278 (7th Cir. 1976).

25. The basis of Borden's Rothstein-Tauber surveys is not objective. The Borden employees involved in the market testing of the Kraft commercials described the objective of both tests as follows: 'The purpose of this test was to determine if consumers who are exposed to the Kraft commercial believe that Borden SWS [singly-wrapped slices] has only two ounces of milk per slice compared to Kraft's five ounces per slice.'(Pltf's Exs. 5(a), 5(b), 8) The

reports of the survey prepared by the market research firm, Rothstein-Tauber, express the same objective. (Pltf's Ex. 8-May 1984 Rpt.; April 1984 Rpt.) The surveys, therefore, were based on and performed pursuant to a preconceived notion; as a consequence, they lack the objectivity required for surveys to be fairly and impartially conducted.

26. Furthermore, the questionnaires do not meet the standards of objective surveying and statistical techniques. The main 'test cell' questionnaire methodology utilizes a 'forced exposure' method, i.e., requiring a person to see the Kraft commercial twice on the spot in the context of what was asked the respondents both prior to and after the showing of the commercials. Furthermore, the sole product use question, put to each respondent in the screening procedure as the next-to-the-last question prior to the showing of the Kraft cheese slices commercial, is one which deals with use of 'individually wrapped cheese slices.' (Sorensen Aff., ¶14) Given the forced exposure method plus an undisguised screening question to sensitize a consumer to such an unnatural extent, the outcome of the Rothstein-Tauber surveys was biased. It is unlikely that the respondents' perceptions about the Kraft Singles product featured in the commercial and other competing brands was natural, customary or even rational.

27. Bias is present in other areas as well. The key Question No. 6 in the Rothstein-Tauber surveys is asked only after people have not only been force fed the Kraft commercial, but also, in earlier questions, were specifically asked to contrast Kraft with other brands. Reacting to the obligation to come up with a conclusion about the number of ounces of milk in unspecified Borden cheese slices in the wake of the Kraft commercial being played for them twice, it would not be surprising if respondents fed back to their interviewers what their interviewers may have seemed to been encouraging them to say. In short, comparisons of Kraft cheese slices with Borden cheese slices are forced upon survey respondents with the consequence of stimu-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

lating perception that may deviate substantially from the effect actually caused by the television commercials in the normal viewing situation. For these reasons, this court gives little or no weight to the Rothstein-Tauber surveys conducted for Bor- den.

**\*15** 28. In contrast, the Kraft survey conducted by Dr. Robert C. Sorensen conformed fully to the standards set forth in the Handbook of Recommended Procedures For the Trial of Protracted Cases, 25 F.R.D. 341, 429 (1960), and also mentioned in such cases as Wuv's International, Inc. v. Love's Enterprises, Inc., 208 U.S.P.Q. 736, 754 (D. Col. 1980) and State Wholesale Grocers v. Great Atlantic & Pacific Tea Co., 154 F. Supp. 471, 497-98 (N.D. Ill. 1957). The Sorensen survey is thus admissible and this court gives great weight to it, and to the conclusions drawn by Dr. Sorensen. Based on his results, and to Dr. Sorensen's careful analysis of them, this court concludes that the Kraft 'Tell Me When II' and 'Tell Me When III' television commercials do not cause and are not likely to cause consumers to believe that Borden cheese slices contain significantly less milk than KRAFT SINGLES cheese slices.

29. Since only 1.5% of the total respondents in the Soresen survey referred to Borden in connection with any comparison between KRAFT SINGLES cheese slices and any other cheese slices, Borden has not established that the Kraft advertisements 'actually deceived or have the tendency to deceive a substantial segment of their audience . . ..'Skil Corp. v. Rockwell International Corp., 375 F. Supp. 777, 783 (N.D. Ill. 1974) Borden's own recent survey conducted by Burke confirms the insignificance of the number of people that mention Borded: only 5% of the total respondents, after subtracting those who accurately refer to the Borden cheese slices that do have less milk than KRAFT SINGLES cheese slices.

30. Plaintiff has not demonstrated a reasonable likelihood of success on the merits of its claims under § 2(8) of the Illinois Uniform Deceptive Trade Prac-

tices Act.Ill.Rev.Stat. ch. 121-1/2 § 312(8). This section is a codification of the common law tort of commercial disparagement.Crinkley v. Dow Jones and Co., 67 Ill.App.3d 869, 876, 385 N.E.2d 714, 719 (1st Dist. 1979); see Custom Business Systems, Inc. v. Boise Cascade Corp., 68 Ill. App. 3d 50, 51, 385 N.E.2d 942, 943 (2d Dist. 1979).

31. Plaintiff must prove that the alleged disparaging statements refer specifically to it. If the supposedly disparaging statements do not refer to plaintiff by name, then it must prove that the public knew the statements referred to the plaintiff. Smith-Victor Corporation v. Sylvania Electric Products, Inc., 242 F. Supp. 302, 307 and 311 (N.D. Ill. 1965).

32. The advertising statement that Kraft puts five ounces of milk into every cheese slice while some imitation cheese slices contain two ounces or less of milk cannot be understood to refer specifically to Borden or its products, as required by the statute. The fact that the vast and overwhelming majority of consumers do not understand the subject commercials to refer to Borden or its products is demonstrated by the credible survey evidence. The Sorensen Survey shows that when the milk content of Kraft Singles is compared with imitation, slices, consumers almost never identify a company or brand by name. Only 27% of the respondents in the Sorensen survey identified a specific brand a company with respect to the amount of milk per slice. Even when specifically asked, only 1.5% of the total survey respondents mentioned Borden. Consumers do not interpret the demonstrated comparison as a Kraft vs. Borden comparison, and do not feel that the commercials depreciate or discount Borden brand products. Likewise, Borden's own Burke Marketing Research Study shows that only 5% of the total respondents even mentioned Burden (after subtracting those who accurately identified those Borden cheese slices that do have less milk than Kraft Singles cheese slices).

**\*16** 33. Another reason plaintiff has failed to demonstrate a reasonable likelihood of success on the merits of its claims under § 2(8) of the Decept-

Not Reported in F.Supp.                                                          Page 14
Not Reported in F.Supp., 1984 WL 1458 (N.D.Ill.), 224 U.S.P.Q. 811
**(Cite as: Not Reported in F.Supp., 1984 WL 1458 (N.D.Ill.))**

ive Trades Practices Act is that it has failed to show that the alleged disparaging statements are false or misleading representations of fact.Ill.Rev.Stat. ch. 121-1/2 § 312(8). The statement that some imitation cheese slices contain two ounces or less of milk is true. Even if Borden were identified, its products in the imitation/substitute category do in fact have less than two ounces of milk. Therefore, the complained-of advertising is not disparagement.

34. Nor has plaintiff demonstrated a reasonable likelihood of success on the merits of its claims under § 2(12) of the Illinois Uniform Deceptive Trade Practices Act.Ill.Rev.Stat. ch. 121-1/2), § 312(12). Plaintiff must show that defendant's statements create a likelihood of confusion or misunderstanding.Ill.Rev.Stat. ch. 121-1/2, § 312(12). In the context of this statute, 'likelihood of confusion' exists when the accused conduct is likely to confuse or mislead consumers as to the source or origin of a product or services.T. J. Hooker v. Columbia Pictures Industries, 551 F. Supp. 1060, 1064 (N.D. Ill. 1982). 'Likelihood of confusion' has the same meaning in unfair competition cases under the Deceptive Trade Practices Act as it has in trademark infringement cases.Id.

35. The statement that Kraft puts five ounces of milk into every cheese slice while some imitation cheese slices contain two ounces or less of milk certainly does not mislead or confuse consumers as to the source or origin of Kraft singles. Moreover, the Sorensen survey demonstrates that the level of confusion, of any type, is de minimis. Only 3.5% of the respondents found something confusing or difficult to understand in the commercial.

36. Preliminary injunctions are routinely denied in trademark cases if there is laches-an undue delay of even weeks or months in seeking such relief once the plaintiff has or should have knowledge of the wrong.See, e.g., Programmed Tax Systems, Inc. v. Raytheon Co., 419 F. Supp. 1251 (S.D.N.Y. 1976) (four-month delay); Le Cordon Bleu S.a.r.l. v. BPC Publishing Ltd., 327 F. Supp. 267 (S.D.N.Y. 1971) (eight to thirteen-week delay). Such delay speaks

volumes about whether a plaintiff is being irreparably injured. Borden's delay clearly indicates that Borden was not being injured at all during Kraft's rapidly increasing commercial broadcasts.

37. Borden was aware of Kraft's television commercials at least as early as January 1984, well over five months ago. (Carfora Aff., ¶4) The parties negotiated from time to time during this period. The previous Kraft commercials were broadcast nationwide without interruption at substantial cost to Kraft. (Blue Aff., ¶11) Although Borden could have filed this action in January, it chose to sit by while Kraft continued to build its consumer franchise with the commercials and sat on its alleged rights for several months, waiting until the objectionable commercials had run their course. Plaintiff's right to preliminary injunctive relief is therefore barred by laches.

*17 38. Although the question of irreparable injury need not be addressed if a motion can be disposed of on the issue of probability of success on the merits, Crane Co. v. Harsco Corp., 509 F. Supp. 115, 118 (D. Del. 1981), a failure to demonstrate irreparable harm is of itself fatal to an application for an injunction.See Oburn v. Shapp, 521 F.2d 142, 151 (3d Cir. 1975), cert. denied, 430 U.S 968 (1977).

39. A plaintiff must offer something more than a mere subjective belief that he is likely to be injured as a result of the false advertising.Coca-Cola Co. v. Tropicana Products, Inc., 690 F.2d 312, 316 (2d Cir. 1982); Johnson & Johnson v. Carter-Wallace, Inc., 631 F.2d 186, 189 (2d Cir. 1980). The plaintiff must submit proof which provides a reasonable basis for that belief.Vidal Sassoon, Inc. v. Bristol-Meyers Co., 661 F.2d 272, 278 (2d Cir. 1981). The likelihood of injury and causation element will not be presumed, but must be demonstrated.Coca-Cola Co. v. Tropicana Products Inc., 690 F.2d 312, 316 (2d Cir. 1982).

40. Irreparable harm must be shown with particularity, and plaintiff must make a clear showing of immediate irreparable injury.See Continental

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Group, Inc. v. Amoco Chemicals Corp., 614 F.2d 351, 359 (3d Cir. 1980).

41. Plaintiff fails to identify precisely how it would be irreparably harmed if a preliminary injunction is not issued. It merely makes a broad, vague claim of irreparable injury caused by a false impression created in the mind of the consumers. The credible evidence, however, demonstrates no such harm. Since the Kraft commercials started being aired in January, Borden's market share has actually increased due to a substantial sales increase. (Blue Aff., ¶34) The significance of its 8.3% sales increase is demonstrated by the fact that, during the same period, cheese slice sales volume of Kraft, the market leader, has increased only 2.4%. These facts vividly illustrate that Borden has not and will not be irreparably harmed by Kraft's advertising campaign.

42. Another factor which indicates there is no irreparable harm is Borden's own delay in bringing suit. Borden delayed bringing suit for almost six months, during which time it was not being injured at all by Kraft's commercials. Certainly it cannot now be heard to claim immediate irreparable injury.'A trademark owner that strongy believed its customers were being deceived would hardly have remained idle for such an extended period of time.'Amstar Corp. v. Domino's Pizza, Inc., 615 F.2d 252, 265 (5th Cir. 1980), cert. denied, 449 U.S 899 (1980).

43. The 'irreparable harm' necessary to warrant the extraordinary remedy of preliminary injunctive relief is that which not only has a great or substantial adverse effect on the movant, but which also cannot be compensated for in damages.American Hospital Association v. Harris, 477 F. Supp. 665, 667 (N.D. Ill. 1979), aff'd, 625 F.2d 1328 (7th Cir. 1980); Merrill Lynch, Pierce, Fenner & Smith, Inv. v. E. F. Hutton & Co., 403 F. Supp. 336, 343 (E.D. Mich. 1975). Not only is defendant Kraft clearly able to respond in damages, but Borden has failed to demonstrate that its claimed injury cannot be compensated for in money damages. To the contrary,

Borden has requested money damages to run 'corrective' advertising.

**\*18** 44. In determining whether a preliminary injunction should issue, the court must weigh the 'convenience of the parties and possible injuries to them accordingly as they may be affected by the granting or withholding of the injunction.'Doeskin Products v. United Paper Co., 195 F.2d 356, 358 (7th Cir. 1952), citing Yakus v. United States, 321 U.S. 414, 440 (1944). It is clear that the harm which an injunction will inflict upon defendant Kraft far outweighs any threatened injury to the plaintiff.

45. Plaintiff's failure to pursue legal action for a five-month period during which defendant continued its advertising must be weighed against plaintiff in balancing the equities.See Brennan v. Hawley Products Co., 182 F.2d 945 (7th Cir. 1950), cert. denied, 340 U.S. 865 (1950); Machinery Corp. v. J. D. Adams Mfg. Co., 135 F.2d 617 (7th Cir. 1943)

46. Plaintiff's inability to identify any measurable harm is in marked contrast to the consequences that would flow to Kraft if a preliminary injunction were issued. If this court were to grant Borden's motion, the impact upon Kraft would be devastating. Kraft has already spent over $9 million in the developing, producing, testing and airing the complained-of commercials. (Blue Aff., ¶11) This investment would be lost if the advertising campaign was enjoined at this time. (Blue Aff., ¶33)

47. If forced to withdraw its ad campaign, Kraft would have to liquidate television time and magazine space now reserved. (Blue Aff., ¶28) The current schedule calls for $4 million in space and time to be spent before the year's end. (Blue Aff., ¶28) Time would not permit production of new advertising, and the Kraft Singles brand would be left without any advertising. (Blue Aff., ¶28) Other injuries and pecuniary losses would result, ranging from forced withdrawal of promotional and incentive programs to injury to business reputation and

Not Reported in F.Supp.                                                                 Page 16
Not Reported in F.Supp., 1984 WL 1458 (N.D.Ill.), 224 U.S.P.Q. 811
**(Cite as: Not Reported in F.Supp., 1984 WL 1458 (N.D.Ill.))**

the Kraft-retailer relationshp.

48. Kraft could not be adequately compensated for its direct losses in the event the injunction were later dissolved or reversed. Customer relations would be disrupted, and Kraft's business reputation would be tarnished.

49. A preliminary injunction is not warranted when such extraordinary expense and injury to defendant would result.Arco Fuel Oil. Co. v. Atlantic Richfield Co., 427 F.2d 517, 519 (2d Cir. 1970).

50. The granting of a preliminary injunction will disserve the public interest. Advertising constitutes protectible commercial speech under the First Amendment to the United States Constitution. Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 770 (1975) Comparative advertising is to be encouraged because it helps inform the consuming public.

51. Plaintiff's entire course of action since January 1984 constitutes nothing more than an anticompetitive ploy designed to harass and frustrate its main competitor and market leader. Where a party is simply trying to obtain a commercial advantage, the courts will refuse to grant relief.Proctor & Gamble Co. v. Chesebrough-Pond's Inc., No. 84-0093, slip op. at 26 (S.D.N.Y. 6/11/84).

**\*19** 52. A preliminary injunction must be denied where the application and affidavits reveal that a plaintiff's contentions as to issue of fact and law are seriously disputed.Avins v. Widener College, Inc., 421 F. Supp. 858, 862 (D. Del. 1976). Here, plaintiff's contentions with respect to defendant's advertising, its interpretation as to the application of section 43(a) and the requisites of Illinois law of disparagement and likelihood of confusion and its survey evidence are all, at the very least, in dispute, if not fully refuted by defendant.

53. With respect to the plaintiff's survey evidence in particular, and especially in light of defendant's own survey evidence, the best that can be said is

that there is an ambiguity as to whether or not consumers are misled. Moreover, plaintiff's survey results present too many unresolved issues. In a situation such as this, where the best that can be said is that there is an ambiguity as to whether or not consumers are misled. Moreover, plaintiff's survey results present too many unresolved issues. In a situation such as this, where the best that can be said about plaintiff's case is that ambiguities exist, plaintiff has not sustained its burden of proof.William H. Rover, Inc. v. American Home Products, Inc., No. 83-7808, slip op. at 16-18 (N.D.N.Y. 3/7/84).

*IV. Decision*

Based on these principles of law, and the facts thus found, plaintiff's motion for a preliminary injunction must be denied. An appropriate order will be entered.

So ordered.

N.D.Ill. 1984.
Borden, Inc. v. Kraft, Inc.
Not Reported in F.Supp., 1984 WL 1458 (N.D.Ill.), 224 U.S.P.Q. 811

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# APPENDIX 15



Not Reported in F.Supp.                                                                                Page 1
Not Reported in F.Supp., 1987 WL 6300 (N.D.Ill.), 2 U.S.P.Q.2d 1225
**(Cite as: Not Reported in F.Supp., 1987 WL 6300 (N.D.Ill.))**



Stokely-Van Camp, Inc. v. Coca-Cola Co.
N.D.Ill.,1987.

United States District Court, N.D. Illinois, Eastern
Division.
STOKELY-VAN CAMP, INC., an Indiana corpora-
tion, Plaintiff,
v.
The COCA-COLA COMPANY, a Delaware cor-
poration, Defendant.
**No. 86 C 6159.**

Jan. 30, 1987.


MEMORANDUM OPINION AND ORDER

LEINENWEBER, District Judge.
**\*1** This case is before the court on plaintiff's mo-
tion for a preliminary injunction. For the reasons
set forth herein, the motion is denied.

This case involves two beverage producers,
Stokely-Van Camp, Inc. ("Stokely") and the Coca-
Cola Company ("Coke"), who began to market dif-
ferent beverage products under the same name, RE-
FRESH. Stokely produces an orange-flavored
lightly carbonated beverage containing 25 percent
fruit juices. This product is sold in bottles under the
REFRESH label. Coke produces an iced tea bever-
age which is dispensed from fountains in restau-
rants and convenience stores. Each company claims
the exclusive right to call its beverage REFRESH.


*FACTS*

In late 1985, Stokely began to use the name RE-
FRESH in connection with consumer testing re-
garding the concept of its new beverage. Stokely
continued to develop the product and on March 25,
1985 shipped a case of its product in bottles with a
label printed in black and white to an out-of-state
wholesaler who did not resell the product. On

March 25, 1986, Stokely filed a petition before the
Trademark Trial and Appeal Board to cancel for
non-use a trademark registration for REFRESH that
had been owned by an Australian company.

On May 5, 1985, Stokely began additional con-
sumer testing of three formulations of REFRESH.
Questionnaires were sent to 1800 consumers in 15
cities across the country to test their reaction to an
advertisement that described the product. The ad-
vertisement included a picture of a bottle of
Stokely's product with the name REFRESH on the
label. Subsequently, samples of Stokely's product
were sent to the homes of the respondents who in-
dicated that they would be interested in trying it.

On May 20, 1986, another case of the beverage was
sent to the same wholesaler. He did not resell the
product and was reimbursed for its purchase price.
On July 14, 1986, shipments began to be regularly
sent from Maryland to Tucson. Distribution was be-
gun in Tucson convenience stores and continues to
the present.

On July 3, 1986, a trademark application for
Stokely's product name was sent to the Patent and
Trademark Office. The application was docketed on
July 8, 1986. The final judgment canceling the Aus-
tralian company's trademark was issued on August
20, 1986.

In August of 1986, additional market tests were
conducted. Consumers participated in taste tests
conducted in shopping malls across the country.
The complaint in this case was filed on August 19,
1986.

Coke introduced its REFRESH iced tea to the pub-
lic on May 17, 1986, at the National Restaurant As-
sociation convention in Chicago. The name for the
product was chosen shortly before. At the conven-
tion Coke set up displays and distributed samples
and press kits. A press release was issued on May
18, 1986 announcing the introduction of REFRESH

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                Page 2
Not Reported in F.Supp., 1987 WL 6300 (N.D.Ill.), 2 U.S.P.Q.2d 1225
**(Cite as: Not Reported in F.Supp., 1987 WL 6300 (N.D.Ill.))**

iced tea.

On May 23, 1986, a letter was sent to all independent bottlers regarding REFRESH iced tea. In June, sales presentations were made at the wholesale and retail levels. On June 30, 1986, the first sale was made. In July, 1986, sales and promotional activities continued in the Southwestern states and in Illinois at the wholesale and retail level.

### DISCUSSION

**\*2** In order to obtain a preliminary injunction a plaintiff must demonstrate the following: (1) it has no adequate remedy at law and will suffer irreparable harm if the injunction is not granted; (2) it has some likelihood of success on the merits; (3) that any irreparable harm to the plaintiff caused by a failure to enjoin the activity outweighs the irreparable harm to the defendant caused by the injunction; and (4) the public interest will not be disserved if the injunction issues. *A.J. Canfield Co. v. Vess Beverages, Inc.,* 796 F.2d 903, 906 (7th Cir.1986); *Maxim's, Ltd. v. Badonsky,* 772 F.2d 388, 390 (7th Cir.1985). These factors are to be balanced against each other. Where the harm to the plaintiff only slightly outweighs the harm to the defendant the plaintiff needs to show a fairly clear cut likelihood of success on the merits. *Maxim's,* 772 F.2d at 391. If the harm to the defendant outweighs the harm to the plaintiff to a significant degree then the injunction must be denied regardless of the plaintiff's likelihood of success. *Id.*

It is clear in this case that plaintiff, assuming it has superior rights in REFRESH, would be irreparably harmed if the injunction is not issued. In a trademark infringement case, irreparable harm is presumed and is not remedied by a remedy at law. This irreparable harm arises because of Stokely's inability to control the nature and quality of Coke's product named REFRESH. *A.J. Canfield,* 796 F.2d at 908-909; *Wesley-Jenson Divn. of Schering Corp. v. Bausch & Lomb, Inc.,* 698 F.2d 862, 867 (7th Cir.1984). Since both products are beverages it

seems clear that there would be a likelihood of confusion between the two products. There is also the likelihood that consumers would become confused as to the source of the two products, perhaps by thinking that they are part of the same product line. Consumers may develop certain conceptions about the term REFRESH based on Coke's product and advertisements. Stokely would lose control over the reputation of the mark REFRESH. This type of harm is irreparable.

Any harm to Stokely must be weighed against the irreparable harm which Coke would suffer if the injunction is granted.

If an injunction is granted Coke would have to stop all marketing of its iced tea under the REFRESH name. It is presently marketing the product in several Southwestern states and in Illinois. To date, it has sold approximately 16,000 gallons of the iced tea syrup, which equals 104,000 gallons of iced tea. Coke would have to rename the product as well as change the name on all existing products, advertisements, promotionals and programs. This would be very costly and time consuming. A change of name after such a large scale marketing program would cause a loss of the goodwill that Coke has built up since May.

This does not appear to be a case in which the balance of harms favors plaintiff by a substantial amount. Coke has launched a much more extensive marketing program for its product than has Stokely. To prevent it from proceeding would be quite costly and would cause substantial irreparable harm if it turns out that the injunction was wrongly granted. Stokely, on the other hand, has undertaken a much less extensive program. Although distribution continues in Tucson convenience stores, Stokely's future plans have been put on hold pending a change in their advertisements. Stokely could lessen the irreparable harm to itself by requesting an early discovery cut-off date and early trial date so that the case may proceed expeditiously to final judgment. Since much of the discovery appears to have been completed an early trial date would seem

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                                 Page 3
Not Reported in F.Supp., 1987 WL 6300 (N.D.Ill.), 2 U.S.P.Q.2d 1225
**(Cite as: Not Reported in F.Supp., 1987 WL 6300 (N.D.Ill.))**

feasible. A trial date within the next few months would allow Stokely to stay within or near its present marketing schedule and would lessen any irreparable harm to Stokely which may be caused by the lack of a preliminary injunction.

**\*3** Another consideration which weighs against granting the preliminary injunction is that in May Stokely knew that Coke was about to introduce a product by the same name. Stokely could have made more of an active attempt to notify Coke of its potentially infringing activities. Rather, Stokely chose to wait three months before filing suit while Coke was spending substantial amounts to market its product. Although this is too short of a time for the equitable doctrine of laches to apply, the fact that Stokely waited three months indicates a lack of a need for the extraordinary remedy of a preliminary injunction.

Accordingly, this appears to be a case in which the irreparable harm to the defendant if the injunction is granted exceeds the irreparable harm to the plaintiff if the injunction is not granted. In such a situation the preliminary injunction should be denied and no further analysis is needed. *Maxim's,* 772 F.2d at 391. Therefore, since the balance of harms tips in favor of Coke the motion for a preliminary injunction will be denied.

However, even if the balance of harms had been in favor of Stokely, at best it would have been tipped only slightly in favor of Stokely. When the balance of harms is tipped just slightly in favor of the plaintiff, the plaintiff must show a "fairly clear cut" likelihood of prevailing on the merits. *Maxim's,* 772 F.2d at 391. Even if the balance of harms favored Stokely by a small margin, Stokely would not prevail because it is not fairly clear cut that Stokely would succeed on the merits.

The parties have raised the issue of whether the term REFRESH is descriptive or suggestive. Although the term REFRESH appears to the court to be suggestive rather than descriptive,[FN1] a patent office determination that a mark is or is not de-

scriptive is entitled to a rebuttable presumption of validity.[FN2] Accordingly, because of these competing considerations the court cannot find that Stokely has a fairly clear cut likelihood of prevailing on the merits of its assertion that the term REFRESH is suggestive.

Further, even if the term was found to be suggestive, Stokely has not shown that it is fairly clear cut that it was the first to use the mark in a manner which establishes superior rights in a mark. At this point it is not clear that the consumer testing which Stokely conducted in May, 1986 was enough to establish rights in the mark before Coke introduced its product at the National Restaurant Association show or before Coke began to sell its product to wholesalers.

Accordingly, the motion for a preliminary injunction is denied.

IT IS SO ORDERED.

> FN1. The term REFRESH does not specifically describe any characteristic, ingredient or quality of either iced tea or a carbonated fruit juice beverage. In *Watkins Products, Inc. v. Sunway Fruit Products, Inc.,* 311 F.2d 496, 499 (7th Cir.1962), the court found that FRESHIE was a suggestive term as applied to a beverage base product. In *Money Store v. Harriscorp Finance, Inc.,* 689 F.2d 666 673-674 (7th Cir.1982), the court determined that MONEY STORE could describe any number of financial services centers. The court held that MONEY STORE was suggestive. REFRESH might appear to be suggestive also.

> FN2. A determination by the patent office that a mark is registrable is considered prima facie evidence that the term is suggestive or, if descriptive, has secondary meaning. 15 U.S.C. § 1052(e); *Canfield,* 796 F.2d at 906-907. Stokely has admitted

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 4
Not Reported in F.Supp., 1987 WL 6300 (N.D.Ill.), 2 U.S.P.Q.2d 1225
**(Cite as: Not Reported in F.Supp., 1987 WL 6300 (N.D.Ill.))**

   that if REFRESH is found to be descript-
   ive, Stokely would not be entitled a pre-
   liminary injunction.

N.D.Ill.,1987.

Stokely-Van Camp, Inc. v. Coca-Cola Co.

Not Reported in F.Supp., 1987 WL 6300 (N.D.Ill.),
2 U.S.P.Q.2d 1225

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# APPENDIX 16



 Westlaw.

67 U.S.P.Q.2D 1205                                                                    Page 1
2003 WL 21189780 (Trademark Tr. & App. Bd.), 67 U.S.P.Q.2d 1205
**(Cite as: 67 U.S.P.Q.2D 1205)**

Medinol Ltd.
v.
Neuro Vasx Inc.

U.S. Patent and Trademark Office Trademark Trial
and Appeal Board

Cancellation No. 92040535

Decided May 13, 2003

**TRADEMARKS AND UNFAIR TRADE PRAC-
TICES**
**1 Registration and its effects -- Federal registra-
tion -- Procedure, form, and content -- Amend-
ments or corrections (§ 315.0303.04)**
**Practice and procedure in Patent and Trade-
mark Office -- Fraud or inequitable conduct (§
325.07)**
Cancellation respondent's motion to amend its re-
gistration for "Neurovasx" trademark to delete
"stents" from identification of goods, and for sum-
mary judgment, is denied, since petitioner alleges
that respondent knowingly made material misrep-
resentation to U.S. Patent and Trademark Office in
order to obtain its registration, since registration
would not have issued without respondent's misrep-
resentation, in its statement of use, that mark had
been used in connection with stents, and since pro-
posed deletion does not remedy alleged fraud, in
that, if procurement of registration was fraudulent
with respect to use of mark on stents, then entire
resulting registration is void.
**2 Practice and procedure in Patent and Trade-
mark Office -- Fraud or inequitable conduct (§
325.07)**
Cancellation petitioner is entitled to summary judg-
ment that respondent procured registration for its
"Neurovasx" trademark through fraud, since identi-
fication of goods in application as filed and pub-
lished included two items, stents and catheters,
since respondent indicated in its statement of use
that mark had been used in connection with both
items, even though it had only been used on cathet-

ers, since respondent knew or should have known at
time it submitted statement of use that mark was
not in use on all identified goods, and since re-
spondent's assertion that inclusion of stents in no-
tice of allowance was "apparently overlooked" does
not undercut conclusion that respondent knew or
should have known that statement of use was ma-
terially incorrect.

**\*1205** Petition of Medinol Ltd. for cancellation of
trademark registration owned by respondent Neuro
Vasx Inc. On respondent's motion to amend its re-
gistration, and for summary judgment. Denied; pe-
titioner is granted summary judgment on issue of
fraud in respondent's procurement of its registra- tion.

Before Simms, Walters, and Rogers, administrative
trademark judges.

By the Board.

Now ready for decision is respondent's motion to
amend its registration and for summary judgment,
filed on January 9, 2003. The motion has been fully
briefed. [FN1]

Registration No. 2,377,883
On August 15, 2000, Registration No. 2,377,883
("'883 Registration") was granted to the respondent
herein for the mark NEUROVASX for "medical
devices, namely, neurological stents and catheters."
Application 75/326,112, which matured into the in-
volved registration, was filed based on respondent's
stated intent to use the mark on the above-noted
goods.

Following publication for opposition, a notice of al-
lowance was issued on July 28, 1998, in which ap-
plicant's goods were identified as originally set
forth in the application. Subsequently, respondent
filed two requests for an extension of time in which
to file a statement of use. The second extension,
filed on July 18, 1999, contained the following
statement:

COPR. © 2008 The Bureau of National Affairs, Inc.

67 U.S.P.Q.2D 1205                                                                                                    Page 2
2003 WL 21189780 (Trademark Tr. & App. Bd.), 67 U.S.P.Q.2d 1205
**(Cite as: 67 U.S.P.Q.2d 1205)**

X Applicant has not used the mark in commerce yet on all goods/services specified in the Notice of Allowance; **\*1206** however, applicant has made the following ongoing efforts to use the mark in commerce on or in connection with each of the goods/ services specified above:

Applicants [sic] continue their efforts to promote and publicize the recited goods.

Finally, on January 7, 2000, respondent filed a statement of use, which stated in relevant part as follows:

Applicant is using the mark in commerce on or in connection with the following goods/services:

X Those goods/services identified in the Notice of Allowance in this Application.

Those goods/services identified in the Notice of Allowance in this applicationexcept (identify those goods/services to bedeleted from this application):

Date of first use of mark anywhere: at least as early as November 15, 1999. [ [FN2] ]

The statement of use concluded with the required declaration:

The undersigned being hereby warned that willful false statements and the like so made are punishable by fine or imprisonment, or both, . . . and that such willful false statements may jeopardize the validity of the application or any resulting registration, declares that . . . the mark is now in use in commerce; and all statements made of his own knowledge are true and all statements made on information and belief are believed to be true.

The statement of use was signed by Jeffrey A. Lee, identified as respondent's President/CEO. The statement of use was accepted by the trademark examining attorney and on August 15, 2000, the '883 Registration issued.

The Pleadings

On May 1, 2002, petitioner filed a petition for cancellation of the '883 Registration, alleging that at the time respondent submitted its statement of use to the United States Patent and Trademark Office ("USPTO" or "office"), it had not used the mark on or in connection with stents, and indeed has not done so since. Petitioner alleged that the '883 Registration was procured by respondent's knowingly false or fraudulent statements, and that "said false statements were made with the intent to induce authorized agents of the PTO to grant said registration, and reasonably relying upon the truth of said false statements, the PTO did, in fact, grant said registration to Registrant." [FN3] Petition ¶ 8. According to Petitioner, "[i]n view of [these] allegations, Registrant is not entitled to continue registration . . . since Registrant . . . committed fraud in the procurement of the subject registration." Petition ¶ 11.

Respondent's answer, filed September 26, 2002, states, *inter alia*, that it

has no further interest in continuing registration of the NEUROVASX registration for "stents" and respectfully requests, pursuant to 15 U.S.C. § 1068, partial cancellation of Registrant's U.S. Trademark Registration 2,377,883 by deleting the word "stents" from the list of goods upon which the mark is used.

Answer ¶ 2. Further, "[i]n response to paragraph 7 of the Petition, Registrant admits that it has not used the mark NEUROVASX in connection with "stents. . .." Answer ¶ 3.

The answer continues:

In response to paragraphs 8 and 9 of the Petition, Registrant denies the allegations and affirmatively states that in the Statement of Use submitted prior to the registration of NEUROVASX it was stated that Registrant was using the mark for goods/services. In the Statement of Use a box was checked to incorporate a text passage stating that the goods/ services were "Those goods/services **\*1207** identi-

COPR. © 2008 The Bureau of National Affairs, Inc.

fied in the Notice of Allowance in this application." At the time the Statement of Use was prepared, the fact that the goods identified in the Notice of Allowance also included "stents," in addition to catheters, was apparently overlooked. Registrant denies each and every other allegation of paragraphs 8 and 9.

Answer ¶ 5.

Finally, after agreeing that it is not entitled to continued registration for "stents," Answer ¶¶ 6-7, the answer concludes with respondent's "petition for cancellation in part" of its own '883 Registration, by deleting "stents" from the identification of goods. [FN4]

Respondent's Pending Motion
On January 9, 2003, respondent filed a combined motion to amend its registration to delete "stents," [FN5] and for summary judgment:

Registrant, in order to dispose of all issues in the cancellation proceeding, has also moved for an order under Trademark Rule 2.127(a) and Rule 56 of the Federal Rules of Civil Procedure dismissing the above Cancellation with prejudice upon entry of the above discussed amendment to Registration 2,337,883. The grounds for granting the summary judgment are as set forth in "Registrant's Answer and Petition for Cancellation in Part", filed September 26, 2002 and are incorporated herein by reference. Amending the Registration to delete the reference to a product upon which the mark was not used prior to registration responds fully to the contentions made by Petitioner as a basis for the Cancellation Petition. The filing of the present motion is timely under Trademark Rule 2.127(e)(l) since it is being filed prior to the commencement of the first 30-day testimony period, which is now scheduled to close April 30, 2003.

Motion at 2-3.

Respondent's motion to amend was not submitted with the consent of petitioner, and the motion for

summary judgment was not supported by any affidavits or other evidence. Respondent's motion was unverified and was signed by counsel, as was its answer which is incorporated by reference into the motion.

By its response, petitioner objected to respondent's proposed amendment, and argued that -- even if allowed -- the amendment would not cure the fraud alleged in the petition for cancellation. Petitioner's position is that fraud in procuring a registration taints the entire registration. If it were otherwise, applicants would have little incentive to tell the truth; if caught in their misstatements, they could merely delete any unused goods, but would end up with no less than what they were entitled to claim in the first place, with no adverse consequences.

Respondent's reply brief directly addresses the fraud issue for the first time. In relevant part, respondent argues that

[w]hile Registrant freely admits that an error was made, there is simply no basis for alleging that the error constituted fraud. Petitioner has cited no pertinent case law supporting their contention that a full trial is needed solely to consider that issue. To the contrary, even if fraud were hypothetically found here, it has been purged by Registrant's two affirmative attempts made to delete stents from the goods description. [FN6]

Similarly, Registrant's admission that the description of goods was in error and the filing of Registrant's timely motion seeking to correct the registration, demonstrate that "no genuine issue as to any material fact" remains. Petitioner has failed to cite any evidence that there was any intent to commit fraud at the time the error was made. Neither evidence nor law suggests that Registrant ought not be entitled to amend the Registration to correctly refer to only those goods with which the mark has been used.

Applicable Law
A registration involved in a Board *inter partes* pro-

COPR. © 2008 The Bureau of National Affairs, Inc.

ceeding may be amended pursuant **\*1208** to Trademark Act § 7(e) and Trademark Rules 2.133 and 2.173. While Trademark Rule 2.133(a) provides that a motion to amend may be granted by the Board, it has been longstanding Board practice to reserve decision on unconsented amendments until trial or until the case is decided upon summary judgment. *See generally* TBMP § 514.03. If a registrant contends that it is entitled to registration with some restriction to the identified goods or services, such a matter must be raised either as an affirmative defense in its answer or by way of a motion to amend its registration to include the restriction. See *e.g.,* Personnel Data Systems Inc. v. Parameter Driven Software Inc. , 20 USPQ2d 1863 (TTAB 1991); TBMP § 514.03.

A party is entitled to summary judgment when it has demonstrated that there are no genuine issues as to any material fact, and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see* Celotex Corp. v. Catrett , 477 U.S. 317 (1987). The evidence must be viewed in a light favorable to the nonmoving party, and all justifiable inferences are to be drawn in the nonmovant's favor. Opryland USA Inc. v. The Great American Music Show, Inc. , 970 F.2d 847, 23 USPQ2d 1471 (Fed. Cir. 1992).

Discussion
There is no genuine issue of material fact at hand. It is undisputed that respondent filed an intent-to-use based application reciting its intended goods as "medical devices, namely, neurological stents and catheters." It is also undisputed that at the time registrant filed its statement of use (and at all times since), it has used the mark on catheters but not on stents.

Moreover, there is no question that respondent's proposed amendment is generally appropriate both legally and factually, being limiting in nature. Trademark Rule 2.173(b). Finally, respondent has proffered the payment for the proposed amendment to its registration. Trademark Act § 7(e). [FN7]

1  We agree with petitioner, however, that re-

spondent is not entitled to judgment as a matter of law. The fraud alleged by petitioner is that respondent knowingly made a material representation to the USPTO in order to obtain registration of its trademark for the identified goods. There is no question that the statement of use would not have been accepted nor would registration have issued but for respondent's misrepresentation, since the USPTO will not issue a registration covering goods upon which the mark has not been used. *See* Trademark Rule 2.88(c); [FN8] TMEP § 1109.03 ("The applicant may not file a statement of use until the applicant has made use of the mark in commerce on or in connection with all goods/services specified in the notice of allowance, unless the applicant files a request to divide.")

Most importantly, however, deletion of the goods upon which the mark has not yet been used does not remedy an alleged fraud upon the Office. If fraud can be shown in the procurement of a registration, the entire resulting registration is void. General Car and Truck Leasing Systems, Inc. v. General Rent-A-Car Inc. , 17 USPQ2d 1398, 1401 (S.D. Fla. 1990), *aff'g* General Rent-A-Car Inc. v. General Leaseways, Inc. , Canc. No. 14,870 (TTAB May 2, 1998). Allowing respondent's amendment would be beside the point; even if "stents" were deleted from the registration, the question remains whether or not respondent committed fraud upon the Office in the procurement of its registration. [FN9]

Accordingly, because it has not demonstrated that it is entitled to judgment as a matter **\*1209** of law, respondent's motion to amend and for summary judgment is DENIED.

As noted above, there are no genuine issues of material fact on this record, and it does not appear that further discovery and trial will reveal any such facts. Under such circumstances, the Board may *sua sponte* enter summary judgment, if appropriate, for the non-moving party. The Clorox Co. v. Chemical Bank , 40 USPQ2d 1098, 1106 (TTAB 1996). *See also* TBMP § 528.08, and cases cited therein.

COPR. © 2008 The Bureau of National Affairs, Inc.

Petitioner alleges that respondent's submission of its admittedly erroneous statement of use constituted fraud in the procurement of the subject registration. A trademark applicant commits fraud in procuring a registration when it makes material representations of fact in its declaration which it knows or should know to be false or misleading. Torres v. Cantine Torresella S.r.l. , 808 F.2d 46, 1 USPQ2d 1483, 1484-85 (Fed. Cir. 1986).

We are aware that respondent denies that its intent in submitting its statement of use was fraudulent. Reply Br. at 1-2. Moreover, cases involving questions of intent are often said to be unsuited to resolution by summary judgment. *See, e.g.,* Copelands' Enterprises Inc. v. CNV Inc. , 945 F.2d 1563, 20 USPQ2d 1295, 1299 (Fed. Cir. 1991).

Nonetheless, as Judge Nies aptly pointed out in *Imperial Tobacco*:

In every contested abandonment case, the respondent denies an intention to abandon its mark; otherwise there would be no contest. Under Fed. R. Civ. P. 56, . . . one must, however, proffer more than conclusory testimony or affidavits. An averment of no intent to abandon is little more than a denial in a pleading.

Imperial Tobacco Ltd. v. Philip Morris Inc. , 14 USPQ2d 1390, 1394 (TTAB 1990). [FN10] While *Imperial Tobacco* was an abandonment case, we find its discussion of the element of intent relevant to the case at bar.

The appropriate inquiry is therefore not into the registrant's subjective intent, but rather into the objective manifestations of that intent. "We recognize that it is difficult, if not impossible, to prove what occurs in a person's mind, and that intent must often be inferred from the circumstances and related statement made by that person." First Int'l Serv. Corp. v. Chuckles Inc. , 5 USPQ2d 1628, 1636 (TTAB 1988). *See*, *Torres*, 1 USPQ2d at 1484-85; [FN11] *General Car and Truck*, 17 USPQ2d at 1400 ("proof of specific intent to commit fraud is

not required, rather, fraud occurs when an applicant or registrant makes a false material representation that the applicant or registrant knew or should have known was false"); Western Farmers Ass'n v. Loblaw Inc. , 180 USPQ 345, 347 (TTAB 1973).

2 Here, the identification of goods in the application as filed and published included two items: stents and catheters. Notwithstanding that the mark was not in use on one of the two (stents), respondent indicated when it filed its statement of use that the mark was in use on "those goods identified in the Notice of Allowance in this Application."

There were only two goods identified in the notice of allowance; the mark was either in use on both, or it was not. Respondent signed its statement of use under penalty of "fine or imprisonment, or both, . . . and [knowing] that such willful false statements may jeopardize the validity of the application or any resulting registration. . .." Statements made with such degree of solemnity clearly are -- or should be -- investigated thoroughly prior to signature and submission to the USPTO. Respondent will not now be heard to deny that it did not read what it had signed.

The undisputed facts in this case clearly establish that respondent knew or should have known at the time it submitted its statement of **1210** use that the mark was not in use on all of the goods. Neither the identification of goods nor the statement of use itself were lengthy, highly technical, or otherwise confusing, and the President/CEO who signed the document was clearly in a position to know (or to inquire) as to the truth of the statements therein. [FN12]

Respondent's explanation for the misstatement (which we accept as true) -- that the inclusion of stents in the notice of allowance was "apparently overlooked" -- does nothing to undercut the conclusion that respondent knew or should have known that its statement of use was materially incorrect. Respondent's knowledge that its mark was not in

COPR. © 2008 The Bureau of National Affairs, Inc.

use on stents -- or its reckless disregard for the truth -- is all that is required to establish intent to commit fraud in the procurement of a registration. While it is clear that not all incorrect statements constitute fraud, the relevant facts in this record allow no other conclusion. We find that respondent's material misrepresentations made in connection with its statement of use were fraudulent.

Accordingly, summary judgment is entered in petitioner's favor on the issue of fraud.

One further matter remains: in order to prevail, petitioner must establish not only a valid ground for cancellation, but must prove its standing, as well. While petitioner's allegation that its pending trademark application has been refused in view of the '883 Registration would, if proven, suffice to establish standing, petitioner has not yet submitted any evidence on this point.

Petitioner is therefore allowed until THIRTY DAYS from the mailing date of this order in which to submit a showing that there is no genuine issue of fact as to standing, and that it is entitled to judgment on the issue of standing as a matter of law. Paramount Pictures Corp. v. White , 31 USPQ2d 1768, 1775- 76 (TTAB 1994). Respondent is allowed until FIFTY DAYS from the mailing date of this order to file a response thereto, if desired. If petitioner's showing is sufficient to establish petitioner's entitlement to summary judgment on the issue of standing, summary judgment on standing will be entered in favor of petitioner and the petition for cancellation will be granted. If petitioner's showing is not sufficient on the issue of standing, proceedings will resume on that issue alone.

This proceeding remains otherwise SUSPENDED pending petitioner's response.

> FN1. Applicant filed a reply brief, which we have considered because it clarifies the issues. *See* Trademark Rule 2.127(a) (consideration of a reply brief discretionary).

> FN2. Respondent did not allege a date of first use in commerce as required by Trademark Rule 2.88(b)(1)(ii). Simultaneous with the statement of use, respondent filed a final request for an extension of time including the following statement:

Applicant believes that it has made valid use of the mark in commerce, as evidenced by the Statement of Use submitted with request; however, if the Statement of Use is found by the Patent and Trademark Office to be fatally defective, applicant will need additional time in which to file a new Statement.

> FN3. Petitioner further alleged that it is damaged by respondent's registration in that its application for the mark NIROVASCULAR was refused registration in light of the '883 Registration.

> FN4. By order dated October 31, 2002, the Board indicated that respondent's "petition for cancellation in part" was in the nature of an affirmative defense (namely, that respondent is entitled to maintain its registration, if it is allowed to delete "stents"), and was reserved for trial.

> FN5. Respondent's proposed identification of goods would read in its entirety, "medical devices, namely, neurological catheters."

> FN6. Respondent's "two affirmative attempts" appear to be (1) respondent's "petition" for cancellation in part of its own registration, *see supra* note 4, and (2) respondent's current motion to amend. Respondent does not contend that it sought to correct its identification of goods prior to registration or at any time prior to the filing of the petition for cancellation.

> FN7. Trademark Rule 2.173 requires that a registrant seeking amendment of its registration submit a (1) written and signed re-

COPR. © 2008 The Bureau of National Affairs, Inc.

67 U.S.P.Q.2D 1205
2003 WL 21189780 (Trademark Tr. & App. Bd.), 67 U.S.P.Q.2d 1205
**(Cite as: 67 U.S.P.Q.2d 1205)**

quest for amendment; (2) supported by a verification or declaration under Trademark Rule 2.20; (3) the required fee (currently $100); and (4) the original certificate of registration or a certified copy thereof (if the original has been lost or destroyed). While respondent has complied with the first and third requirements, it has not filed a declaration or verification, nor has it submitted its registration certificate. Nonetheless, if respondent's motion for summary judgment was meritorious, we would likely allow respondent time to cure these defects in its motion to amend.

FN8. Trademark Rule 2.88(c) provides, in relevant part, that

[t]he statement of use may be filed only when the applicant has made use of the mark in commerce on or in connection with all of the goods or services, as specified in the notice of allowance, for which applicant will seek registration in that application, unless the statement of use is accompanied by a request in accordance with § 2.87 to divide out from the application the goods or services to which the statement of use pertains.

FN9. Needless to say, if respondent ultimately prevails on the issue of fraud, "stents" must be deleted from the registration; applicant may not maintain a registration under Trademark Act § 1 for goods upon which it has never used the mark.

FN10. Unlike the case in *Imperial Tobacco*, respondent here has not submitted an affidavit or any other evidence supporting its version of the facts surrounding its signing of the statement of use or its denial of the intent to commit fraud. However, because we are considering the question of whether to enter summary judgment in favor of petitioner, even though it has not so moved, we consider respondent's statements as we would those

of a non-movant, and accept the statements as true. Cf. TBMP § 528.01, and cases cited therein ("The nonmoving party must be given the benefit of all reasonable doubt as to whether genuine issues of material fact exist; and the evidentiary record on summary judgment, and all inferences to be drawn from the undisputed facts, must be viewed in the light most favorable to the nonmoving party.").

FN11. The problem of fraud arises because Torres submitted a label that he knew *or should have known* was not in use that contained a mark clearly different from the one in use. In addition, he submitted an affidavit stating the mark was in use on wine, vermouth, and champagne when he knew it was in use only on wine.

*Torres*, 1 USPQ2d at 1485 (emphasis added).

FN12. We further note that the identification of goods -- including "stents" -- was printed on the registration certificate mailed to respondent on or about August 15, 2000. Although the certificate provided further notice that the registration covered stents, respondent did not seek to amend the identification to delete stents until after this proceeding was filed nearly two years later. *See* Space Base Inc. v. Stadis Corp.,17 USPQ2d 1216, 1219 (TTAB 1990) ("a person can commit fraud upon the Office by willfully failing to correct his or her own misrepresentation, even if originally innocent, as long as that person subsequently learns of the misrepresentation, and knows that the Office has relied upon that misrepresentation in conferring a substantive benefit upon that person to which the person knows it is not entitled." (interpreting Smith v. Olin,209 USPQ 1033 (TTAB 1981))). Respondent's failure to point out its misstatement and seek correction thereof prior to the filing of the pe-

COPR. © 2008 The Bureau of National Affairs, Inc.

67 U.S.P.Q.2D 1205                                                                           Page 8
2003 WL 21189780 (Trademark Tr. & App. Bd.), 67 U.S.P.Q.2d 1205
**(Cite as: 67 U.S.P.Q.2d 1205)**

    tition for cancellation clearly supports our
finding that the misstatement was inten-
tional.

P.T.O. T.T.A.B.

67 U.S.P.Q.2D 1205

END OF DOCUMENT

COPR. © 2008 The Bureau of National Affairs, Inc.