**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Miyano Machinery USA Inc., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. **08 C 526** |
| v. | ) | |
| | ) | Hon. Virginia Kendall |
| MiyanoHitec Machinery, Inc., | ) | |
| Thomas ("Tom") Miyano, a/k/a | ) | Magistrate Judge Nolan |
| Toshiharu Miyano and | ) | |
| Steven Miyano, a/k/a | ) | |
| Shigemori Miyano, | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) | |
| MiyanoHitec Machinery, Inc., | ) | |
| Thomas ("Tom") Miyano, a/k/a | ) | |
| Toshiharu Miyano and | ) | |
| Steven Miyano, a/k/a | ) | |
| Shigemori Miyano, | ) | |
| | ) | |
| Counterclaimants, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Miyano Machinery, Inc. and | ) | |
| Miyano Machinery USA Inc., | ) | |
| | ) | |
| Counterdefendants. | ) | |

**CORRECTED, REDACTED MEMORANDUM IN RESPONSE TO**
**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

<strong>Page</strong>

TABLE OF CONTENTS ............................................................................................................ i

TABLE OF AUTHORITIES ..................................................................................................... iii

I.    INTRODUCTION AND STATEMENT OF FACTS ............................................................... 1

II.    ARGUMENT ................................................................................................................... 4

    A.  MMU Is Unlikely to Succeed On the Merits .............................................. 5

        1.    MMU Has Not Shown That It Owns Protectible Marks ..................... 6

            a.    "Miyano" Is a Surname ......................................................... 6

            b.    Secondary Meaning Has Not Been Established ..................... 7

                i.    MMU Has No Direct Evidence of Secondary Meaning ...................... 8

                ii.    MMU's Circumstantial Evidence of Secondary Meaning Is Insufficient ...................... 9

            c.    The Plain Text Miyano Mark Is Not Protectible ................. 11

                i.    MMU's Plain Text MIYANO Mark Was Cancelled and Expressly Abandoned ...................... 11

                ii.    The Miyanos Did Not Consent to Registration of the Plain Text MIYANO ...................... 12

            d.    "Miyano Machinery USA, Inc." Is Not a Protectible Trade Name .............. 15

            e.    Triangle Winged M Is Not Protectible ................................. 16

                i.    The Miyanos Are the Rightful Owners the Triangle Winged M Mark ...................... 16

                ii.    The Triangle Winged M Was Abandoned ...................... 17

                iii.    Change in Format of the Mark Precludes MMU From Tacking On To Prior Use ...................... 20

                iv.    Fraud in the Service Mark Application and Renewal of the Trademark for the Triangle Winged M ...................... 22

        2.    MMU Has Not Shown Likelihood of Confusion ................................. 24

            a.    Similarity of the Marks as a Whole and MMU's Improper Dissection ........ 24

            b.    The Similarity of the Products ............................................. 28

            c.    The Area and Manner of Concurrent Use ............................. 28

            d.    The Degree of Care .............................................................. 29

            e.    Strength of Mark .................................................................. 30

            f.    Actual Confusion ................................................................. 32

            g.    The Defendants' Intent ........................................................ 32

h.     Likelihood of Confusion Factors Conclusion ................................................ 33

B.  Irreparable Harm ............................................................................................ 34

C.  Balance of the Harms ...................................................................................... 37

D.  Public Interest ................................................................................................. 42

III.    CONCLUSION ................................................................................................................. 43

TABLE OF AUTHORITIES

## CASES

*AM General Corp. v. DaimlerChrysler Corp.,* 311 F.3d 796, (7th Cir. 2002) .............................34

*Barbecue Marx, Inc. v. 551 Ogden, Inc.,* 235 F.3d 1041 (7th Cir. 2000)...........................4, 32, 33

*Benrose Fabrics Corp. v. Rosenstein,* 183 F.2d 355 (7th Cir. 1950)..............................................39

*Black & Decker Corp. v. Dunsford,* 944 F.Supp. 220 (S.D. N.Y. 1996).........................................9

*Borden, Inc. v. Kraft, Inc.,* 1984 WL 1458 (N.D. Ill. 1984) .................................................34, 37

*Brennan's Inc. v. Brennan,* 512 F.Supp.2d 559 (S.D. Miss. 2007) ...................................36, 37, 40

*Brennan's, Inc. v. Brennan's Restaurant, L.L.C.,* 360 F.3d 125 (2nd Cir. 2004).............6, 7, 25, 27

*Charter Nat. Bank and Trust v. Charter One Financial, Inc.,* 2001 WL 1035721,

    (N.D. Ill. 2001).................................................................................................................30

*Chicago Tribune Co. v. Fox News Network, LLC,* 520 F.Supp.2d 930 (N.D. Ill. 2007).....5, 24, 37

*Citibank, N.A. v. Citytrust,* 756 F.2d 273 (2nd Cir. 1985) .............................................................34

*Clarus Transphase Scientific, Inc. v. Q-Ray, Inc.,* 2006 WL 4013750

    (N.D. Ill. 2006)............................................................................................25, 26, 29, 32

*Continente v. Continente,* 244 F.Supp. 688 (D.C. Cal. 1965) ......................................................37

*Courtenay Communications Corp. v. Hall,* 334 F.3d 210 (2nd Cir. 2003)....................................31

*Eli Lilly & Co. v. Natural Answers, Inc.,* 233 F.3d 456 (7th Cir. 2000)........................................33

*Emilio Pucci Societa a Responsibilita Limitata v. Pucci Corp.,* 1988 WL 135542

    (N.D. Ill. 1988)....................................................................................................................6

*Estate of P.D. Beckwith, Inc., v. Commissioner of Patents,* 252 U.S. 538 (U.S. 1920) ...............25

*Flynn v. AK Peters, Ltd.,* 377 F.3d 13 (1st Cir. 2004).......................................................6, 7, 8, 15

*Gaffrig Performance Industries, Inc. v. Livorsi Marine, Inc.,* 2003 WL 23144859

    (N.D. Ill. 2003)....................................................................................................................8

*Garden v. Parfumerie Rigaud, Inc.*, 151 Misc. 692, 271 N.Y.S. 187 (Sup. Ct. 1933) .................14

*Goodman v. Illinois Dept. of Financial and Prof'l Regulation*, 430 F.3d 432

    (7th Cir. 2005).........................................................................................................4

*Gruner + Jahr USA Pub., a Div. of Gruner + Jahr Printing and Pub. Co. v.*

    *Meredith Corp.*, 991 F.2d 1072 (2nd Cir. 1993) .................................................14

*Herbko Intern., Inc. v. Kappa Books, Inc.*, 308 F.3d 1156 (Fed. Cir. 2002) ................................25

*Hot Stuff Foods, LLC v. Mean Gene's Enterprises, Inc.*, 468 F.Supp.2d 1078 (S.D. 2006)....12, 14

*Howe Scale Co. v. Wyckoff, Seamans & Benedict*, 198 U.S. 118 (1905) .....................................38

*IFC Credit Corp. v. Aliano Brothers General Contractors, Inc.*, 437 F.3d 606

    (7th Cir. 2006).......................................................................................................25

*In re New John Nissen Mannequins*, 227 U.S.P.Q. 569 (1985).....................................................12

*In re Penthouse International, Ltd.*, 565 F.2d 679 (C.C.P.A. 1977) ................................................9

*International Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079

    (7th Cir. 1988).........................................................................................................8

*Keaton and Keaton v. Keaton*, 842 N.E.2d 816 (Ind. 2006)...........................................................8

*Knaack Mfg. Co. v. Rally Accessories, Inc.*, 955 F. Supp. 991 (N.D. Ill. 1997)...........................30

*Krause v. Krause Publications Inc.*, 2005 WL 3175174, 76 U.S.P.Q.2d 1904 (2005) .................12

*Laub v. Industrial Dev. Lab., Inc.*, 1959 WL 6084, 121 U.S.P.Q. 595 (1959).............................12

*Levit Corp. v. Levitt*, 593 F.2d 463 (2nd Cir. 1979).....................................................................41

*MacKenzie-Childs, Ltd. v. MacKenzie-Childs*, 2008 WL 111196 (W.D. N.Y. 2008)..................11

*Mazurek v. Armstrong,* 520 U.S. 968 (1997)..................................................................................4

*MB Financial Bank, N.A. v. MB Real Estate Services, L.L.C.*, 2003 WL 22765022

    (N.D. Ill. 2003)................................................................................................18, 34

*McKillip Industries, Inc. v. Integrated Label Corp.*, 477 F.Supp.2d 928 (N.D. Ill. 2006)............24

*Medinol Ltd. v. Neuro Vasx Inc.*, 67 U.S.P.Q. 2d 1205 (T.T.A.B. 2003).....................................42

*Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc.*, 128 F.3d 1111 (7th Cir. 1997) ...................32

*Metavante Corp. v. Medavant, Inc.*, 2006 WL 1277903 (E.D. Wis. 2006)....................................29

*Navistar Intern. Transp. Corp. v. Freightliner Corp.*, 1998 WL 911776 (N.D. Ill. 1998)............20

*Nutri/System, Inc. v. Con-Stan Industries, Inc.*, 809 F.2d 601 (9th Cir.1987).............................27

*Packman v. Chicago Tribune Co.*, 267 F.3d 628 (7th Cir. 2001)......................................................32

*Patterson v. World Wrestling Entertainment, Inc.*, 2006 WL 273527 (E.D. Wis. 2006).............20

*Peaceable Planet, Inc. v. Ty, Inc.*, 362 F.3d 986 (7th Cir. 2004) ................................................6, 16

*Personeta, Inc. v. Persona Software, Inc.*, 418 F.Supp.2d 1013 (N.D. Ill. 2005) .........5, 29, 32, 34

*Platinum Home Mortg. Corp. v. Platinum Financial Group, Inc.*, 149 F.3d 722

    (7th Cir. 1998)...........................................................................................................5, 7, 8

*Pro-Cuts v. Schilz-Price Enters., Inc.*, 27 U.S.P.Q.2d 1224 (T.T.A.B. 1993)..............................21

*Rauland Borg Corp. v. TCS Management Group, Inc.*, 1995 WL 242292

    (N.D. Ill. 1995)........................................................................................................22

*Reed v. Bakers Engineering & Equipment Co.*, 100 U.S.P.Q. 196 (Chief Examiner 1954) .........14

*Rust Environment & Infrastructure, Inc. v. Teunissen,* 131 F.3d 1210 (7th Cir. 1997) ..........28, 29

*Sands, Taylor & Wood, Co. v. Quaker Oats Co.*, 978 F.2d 947 (7th Cir. 1992)

    *aff'd in part, rev'd in part*, 34 F.3d 1340 (7th Cir. 1994).......................................17, 18, 30

*Schwinn Bicycle Co. v. Ross Bicycles, Inc.*, 870 F.2d 1176 (7th Cir. 1989)....................................5

*SparkNet Communications, L.P. v. Bonneville Int'l Corp.*, 386 F.Supp. 2d 965

    (N.D. Ill. 2005)...................................................................................................27, 28

*Stokely-Van Camp, Inc. v. Coca-Cola Co.*, 1987 WL 6300 (N.D. Ill. 1987) ...............................34

*Sullivan v. CBS Corp.*, 385 F.3d 772 (7th Cir. 2004) .............................................................26, 27

*Syndicate Sales, Inc. v. Hampshire Paper Corp.,* 192 F.3d 633 (7th Cir.1999)...........................29

*815 Tonawanda Street Corp. v. Fay's Drug Co.*, Inc., 842 F.2d 643 (2nd Cir. 1988)...................30

*Torres v. Cantine Torresella S.r.l.*, 808 F.2d 46 (Fed. Cir. 1986) ..........................................22, 23

*Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891 (7th Cir. 2001)...................................................5, 33, 34

*United States ex rel. Feingold v. AdminaStar Federal, Inc.,* 324 F.3d 492 (7th Cir. 2003)...........25

## TREATISES

*McCarthy on Trademarks & Unfair Competition* § 9:2 (4th ed. 2005)............................................6

*McCarthy on Trademarks & Unfair Competition* § 13:37 (4th ed. 2005)....................................14

*McCarthy on Trademarks & Unfair Competition* § 16:36 (4th ed. 2005)....................................17

*McCarthy on Trademarks & Unfair Competition* § 17:3 (4th ed. 2005).......................................11

*McCarthy on Trademarks & Unfair Competition* § 17:26 (4th ed. 2005)....................................20

*McCarthy on Trademarks & Unfair Competition* § 29:8 (4th ed. 2005).......................................17

I.    **INTRODUCTION AND STATEMENT OF FACTS**

In 1899 Tom and Steven Miyano's predecessors founded the Japanese company that is known today as Miyano Machinery, Inc. (MMJ).  From its inception until 2004, MMJ remained a family business run and operated by the Miyano family.  In 1975, Tom Miyano forged new ground, setting up MMU, a subsidiary of MMJ in the United States.  MMU is MMJ's exclusive distributer of MMJ products in the United States.  From 1996 to 2004 Tom Miyano served as President of MMU and later as Chairman of the Board of MMU.  (Doc. 15, Marchionne Decl. at ¶ 10).

During the course of the Miyano family's ownership of MMJ, several trademarks were registered in Japan that came to be owned by Tom's mother, Sumiko Miyano.  The marks registered to Sumiko Miyano included the Winged M logo standing alone and the Winged M logo inside a Triangle with the family surname "Miyano."  Harada Decl. at ¶¶ 6, 11, and 13.  In 1997, the board of directors of MMJ decided to discontinue the use of the Triangle Winged M, Miyano mark.  Tom Miyano Decl. ¶13 and Exh. B; see also Takamori Decl. ¶¶ 9-10; Nakajima Decl. ¶¶ 7-8.  MMJ determined that it would no longer use the Triangle Winged M mark, but rather would use the stylized Miyano surname.  Sumiko Miyano continued to own and license the use of her marks to MMJ until her death in December of 2002.  Sumiko Miyano's ownership rights in the trademarks were inherited by Tom Miyano.  Tom continues to own the rights to these marks today.  Harada Decl. at ¶¶ 6, 9, 11, 12, and 13; Tom Miyano Decl. ¶17.

In 2004, the Industrial Revitalization Corporation of Japan ("IRCJ") intervened in MMJ's business affairs.  The Japanese Ministry of Finance created the IRCJ as part of Prime Minister Koizumi's attempts to address Japan's languishing economy.  The IRCJ threatened to cause MMJ to fail if Tom Miyano did not cooperate in the IRCJ take-over of MMJ.  This threat was

not an idle one; of the 41 Japanese companies taken over by the IRCJ, MMJ is the only one now in existence.  As part of the IRCJ takeover, Tom Miyano was required to pay approximately $1 million dollars in cash and surrender 90% of his stock in MMJ.  According to the IRCJ press release, Tom was required to resign as president of MMJ, to decline any retirement benefits and the IRCJ cancelled, without compensation, 80% of Tom Miyanos's shares in MMJ.  See MMU Complaint (Exh. 8 to Doc.1).  Tom Miyano was also forced to surrender his ownership interest in MMU and eventually to resign from MMU.  At no time did Tom Miyano sell or transfer to the IRCJ, MMJ or MMU the rights to use his surname or trademarks, nor did Tom Miyano agree not to compete with MMJ or MMU.  Nor did Tom Miyano sell the goodwill associated with his name or his reputation to MMJ and MMU.

After pushing the Miyano family out of MMJ and MMU, the IRCJ floated shares of MMJ on the Tokyo Stock Exchange.  Initially, in September of 2006, 5,000,000 shares of MMJ stock were offered at ¥ 425.  Needless to say, the IRCJ profited handsomely from the public listing of MMJ on the Tokyo Stock Exchange, as did MMJ's other creditors.  All, of course, at the expense and destruction of a well-run, long-lived family-owned business.

Shortly after being forced out of MMJ, Steven Miyano, Tom Miyano's son, established Hitec Machinery International, Inc. in Barrington Hills, IL.  In November of 2006, the name of the business was changed to MiyanoHitec Machinery Inc. and the company began using Tom Miyano's Winged M mark on the company's website (as registered by Sumiko Miyano in Japan in 1954).  That mark is much like the Miyano surname; it is a symbol of the Miyano family.  Decl. of Tom Miyano at ¶ 17.

In November of 2006, Tom Miyano met with Mr. Saito of MMJ.  During that meeting, Tom advised Mr. Saito of the existence of MiyanoHitec Machinery's business in the United

States.  Shortly after Tom's meeting with Mr. Saito, MMU rushed to the USPTO to register new trademarks.  First, MMU, through its trademark attorney, Mr. George Kobayashi, registered the Miyano family name as a word mark without the consent of either Tom or Steven Miyano.  Further, even though MMU knew about Tom and Steven Miyanos' new business in the United States, Mr. Kobayashi's declaration in support of this application falsely stated that no one else had a right to use the mark in the United States nor did MMU advise the trademark office about Tom and Steven Miyanos' new business.  Furthermore, even though MMU claimed priority for the mark through 1975, MMU did not disclose that it had previously registered the MIYANO word mark in 1988 and abandoned that registration in 1995.

A few months later, MMU, through Mr. Kobayashi, applied for registration of the Triangle Winged M mark for services.  MMU seeks to register a form of the Triangle Winged M mark featuring the name Miyano in block form.  However, the specimens of use submitted to the trademark office feature a different mark having the name Miyano in a script form.  The discrepancy between the mark sought to be registered and the mark actually in use was not brought to the attention of the trademark office.  Also, MMU claimed use of the mark from 1970, despite the 1997 decision by the board of directors to abandon the use of the Triangle Winged M mark and the differences in the mark as actually used.

In its application for registration of the Triangle Winged M mark for services, MMU also referenced their existing registration for the Triangle Winged M mark pertaining to goods.  That registration was maintained through the filing in 2002 of a statement of continued use by Mr. Kobayashi.  In a declaration supporting the statement of continued use, Mr. Kobayashi falsely stated that the mark was in continued use for the described goods, namely power lathes and bar feeders therefor.  As noted above, the decision was made in 1997 to cease use of the mark and

MMU has failed to produce any evidence of a machine on which the mark was used in 2002. Further, the specimen of use submitted to the trademark office with the statement of continued use was merely a drawing of the Triangle Winged M mark featuring the name Miyano in block form, which MMJ and MMU had ceased using on machines long before 1997. To date, MMU has not identified the information and belief relied upon by Mr. Kobayashi in signing the 2002 declaration of continued use.

After applying for these "new" trademarks, MMU sent cease and desist letters to the Miyanos, demanding that Tom and Steven stop all use of their surname in connection with their new business. MMU also demanded that MMU stop using its Winged M in connection with the business. In an attempt to avoid the present costly litigation, Tom and Steven Miyano changed to doing business under the name "Tom and Steven Miyano Machinery" and added a disclaimer to their website to dispel any possible confusion. However, MMU was not satisfied with the changes and MMU initiated this action against Tom and Steven Miyano and MiyanoHitec Machinery, Inc. In fact, there appears to be no name under which Tom and Steven Miyano can do business that would satisfy MMU. According to MMU's past Chairman, MMU fears for its ability to compete with Tom Miyano under any circumstances because Tom is so well known to customers. (Exh. 1, Marchionne Dep. Tr. at 125:18-24).

## II.    ARGUMENT

"A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing,* carries the burden of persuasion." *Goodman v. Illinois Dept. of Financial and Prof'l Regulation,* 430 F.3d 432, 437 (7th Cir. 2005) (emphasis in original) *citing Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997); *see also Barbecue Marx, Inc. v. 551 Ogden, Inc.,* 235 F.3d 1041 (7th Cir. 2000) ("A preliminary injunction is a very serious

4

remedy, never to be indulged except in a case clearly demanding it.") *citing Schwinn Bicycle Co. v. Ross Bicycles, Inc.,* 870 F.2d 1176, 1184 (7th Cir. 1989).

To obtain the requested preliminary injunction, MMU "must show that it (1) is likely to succeed on the merits; (2) has no adequate remedy at law; (3) will suffer irreparable harm which, absent injunctive relief, outweighs the irreparable harm [defendants] will suffer if the injunction is granted; and (4) the injunction will not harm the public interest." *Chicago Tribune Co. v. Fox News Network, LLC*, 520 F.Supp.2d 930, 932 (N.D. Ill. 2007). MMU "has the burden of proof to make a clear showing that it is entitled to the relief it seeks." *Id.* To prevail in an action for trademark infringement, MMU must establish: "(1) that it has a protectible trademark, and (2) a likelihood of confusion as to the origin of the defendant's product." *Id.*

### A.    MMU Is Unlikely to Succeed On the Merits

To show likely success on its claim for trademark infringement, MMU must show "(1) that it has a protectable trademark, and (2) a likelihood of confusion as to the origin of the defendant's product." *Personeta, Inc. v. Persona Software, Inc.*, 418 F.Supp.2d 1013, 1016 (N.D. Ill. 2005) quoting, *Ty, Inc. v. Jones Group,* 237 F.3d 891, 897 (7th Cir. 2001). Likewise, to prevail on a claim for unfair competition under Section 1125(a), MMU must show that 1) it has a protectable mark; and 2) the infringement of the mark. *See*, *Platinum Home Mortgage Corp.*, 149 F.3d at 726.

MMU has not met its high burden of persuasion, clearly showing that the asserted marks are entitled to trademark or trade name protection. Neither has MMU shown any likelihood of confusion. Since MMU has not carried its burden to show likely success on the merits, MMU's motion for preliminary injunction must be denied.

### 1.    MMU Has Not Shown That It Owns Protectible Marks

In its motion for a preliminary injunction, MMU asserts three marks against the Defendants:  1) the plain text MIYANO mark; 2) the dissected trade name "Miyano" (which viewed as a whole is "Miyano Machinery USA, Inc."); and 3) the Triangle Winged M mark with the Miyano name for both goods and services.  As discussed below, MMU does not own a protectable interest in these marks.  Accordingly, MMU is not able to succeed on the merits and MMU's motion for a preliminary injunction must be denied.

### a.    "Miyano" Is a Surname

All three of MMU's asserted marks contain the surname "Miyano."  Congress and the courts agree that "a mark that is primarily merely a surname is not registrable in the absence of secondary meaning.  *Peaceable Planet, Inc. v. Ty, Inc.*, 362 F.3d 986, 990 (7th Cir. 2004); citing, 15 U.S.C. §§ 1052(e)(4), (f).  "[A] personal name, is generally regarded as a descriptive mark.  A descriptive mark is entitled to protection under the Act only if it has acquired distinctiveness and secondary meaning."  *Emilio Pucci Societa a Responsibilita Limitata v. Pucci Corp.*, 1988 WL 135542, 2 (N.D. Ill. 1988)(App. 1).

"Personal names are included in the class of common words that may not secure protected trademark status until secondary meaning has attached."  *Flynn v. AK Peters, Ltd.*, 377 F.3d 13, 20 (1st Cir. 2004).  Surnames are inherently indistinctive, meaning surnames are weak and are protected only after a showing that the mark has acquired distinctiveness through secondary meaning.  *Id. see also*, McCarthy § 9:2 ("[P]ersonal names that are used as names of business and corporate organizations require proof of secondary meaning for legal protection.").  In reversing the grant of a preliminary injunction, the Second Circuit emphasized the absence "from the district court's analysis [of] any demonstration of acquired distinctiveness in the

relevant market… ."  *Brennan's, Inc. v. Brennan's Restaurant, L.L.C.*, 360 F.3d 125, 133 (2nd

Cir. 2004).  "Because the district court's legal analysis on this matter was insufficient, its

findings d[id] not … support the conclusion that plaintiff ha[d] a strong mark."  *Id.*

Similarly, here, MMU has no evidence to show that any of its marks have obtained

secondary meaning in any relevant market.  Indeed, numerous MMU witnesses have testified

that MMU has no objective evidence, no survey evidence, essentially no evidence at all that any

of its marks have acquired secondary meaning.  (See, e.g. Exh. 2, Minemura Dep. Tr. at 89:16-

90:9)(MMU's 30(b)(6) designee) .

### b.    Secondary Meaning Has Not Been Established

Secondary meaning can be established by showing direct evidence through consumer

testimony and consumer surveys or through the use of circumstantial evidence shown by:  1)

length and manner of use; 2) sales volume; 3) amount and manner of advertising.  *Flynn v. AK

Peters, Ltd.*, 377 F.3d 13, 20 (1st Cir. 2004).  MMU has the burden of proof showing secondary

meaning.  *Platinum Home Mortg. Corp. v. Platinum Financial Group, Inc.*, 149 F.3d 722,

727 (7th Cir. 1998) ("When the identifying "word, term, name, symbol or device" claimed as a

trade name or mark is not registered with the United States Patent and Trademark Office, the

burden is on the claimant… to establish that it is entitled to protection under § 43(a) of the

Lanham Act.")  "The establishment of secondary meaning in a word is an issue of fact, and the

individual seeking protection for a mark bears the burden of proving that secondary meaning has

attached within the relevant class of consumers."  *Flynn v. AK Peters, Ltd.*, 377 F.3d 13, 19 (1st

Cir. 2004).

> Proof of secondary meaning entails ***vigorous evidentiary
> requirements***.  The plaintiff must not only show that it used a
> personal name as a trademark, but that a substantial portion of the
> consuming public associates the name specifically with its

> business. Furthermore, the plaintiff must show that these
> consumers base purchasing decisions upon seeing the trademark
> (i.e. the personal name) on the product.

*Flynn v. AK Peters, Ltd.*, 377 F.3d 13, 20 (1st Cir. 2004) (emphasis added).

> Personal names, including surnames, are not "inherently
> distinctive" and are only protectable as trademarks or trade names
> upon proof of secondary meaning... The existence of secondary
> meaning is a question of fact, with the burden of proof on the
> person claiming rights in the name. Tracking the original common
> law roots of this doctrine, we think that ***where the alleged trade
> name is the surname of the alleged infringer, the burden is even
> higher.***

*Keaton and Keaton v. Keaton*, 842 N.E.2d 816, 821 (Ind. 2006) (emphasis added). Accordingly,

MMU's burden of proof that the surname "Miyano" has acquired secondary meaning is

vigorous.

Also, secondary meaning for a surname must be shown ***at the time*** that the junior user

***first began use*** of the mark. *Gaffrig Performance Industries, Inc. v. Livorsi Marine, Inc.*, 2003

WL 23144859, 7 (N.D. Ill. 2003)(App. 2)("If the mark is primarily a personal name, then the

senior user must prove the existence of secondary meaning in its mark ***at the time and place that

the junior user first began use*** of that mark.") (emphasis added).

### i.    MMU Has No Direct Evidence of Secondary Meaning

MMU has not submitted "any consumer testimony or consumer surveys to support its

assertion that it has acquired secondary meaning. While not fatal to its request, the absence of

that evidence weighs against [MMU]." *Platinum Home Mortg. Corp. v. Platinum Financial

Group, Inc.*, 149 F.3d 722, 728 (7th Cir. 1998). "Consumer testimony and consumer surveys are

the only direct evidence on this question ... [t]he other factors are relevant in a more

circumstantial fashion." *International Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846

F.2d 1079, 1085 (7th Cir. 1988). Since MMU has not submitted any consumer testimony or

surveys, MMU has failed to present any direct evidence of secondary meaning, ignoring the two most important factors in the analysis. *Black & Decker Corp. v. Dunsford*, 944 F.Supp. 220, 227 (S.D. N.Y. 1996)("Consumer surveys are the most direct and persuasive evidence of secondary meaning.").

　　　To reiterate, MMU has no evidence of secondary meaning and has conducted no surveys of any kind. (*See* Minemura Dep. Tr. at 90:8-9).

### ii.　　MMU's Circumstantial Evidence of Secondary Meaning Is Insufficient

　　　As circumstantial evidence for the "manner and length of use" factor, MMU argues that it "has used the 'Miyano' trade name continuously for the last 33 years." (Doc. 23 at 14). This statement is clearly misleading. MMU's complaint admits that it has "had several iteration of names" since 1975: "Miyano Machinery"; "Miyano Machinery U.S.A. Inc." in 1987; "Miyano Machinery USA Inc." in 1995; "Miyano Machinery Inc." in 2004; and "Miyano Machinery USA Inc." MMU Complaint (Doc. 1) at ¶ 9. Accordingly, over the last 33 years, MMU has never used "Miyano," standing alone, as its trade name.

　　　Furthermore, MMU attempts to transfer its use of the stylized Miyano ***trademark*** into use for its trade name, and cites *In re Penthouse International, Ltd.*, 565 F.2d 679, 683 (C.C.P.A. 1977) for the proposition that trademark registrations are evidence of secondary meaning for a trade name. However, the issue in *In re Penthouse* was whether a jewelry design was functional in nature and therefore not registerable. *Id*. at 680-81. Even though jewelry designs are not registerable, Penthouse's jewelry design was its trademark. *Id*. at 682. The court stated that the fact that the design was registered as a trademark for other products was evidence that the design was capable of functioning as a trademark and therefore allowed the registration of the jewelry design. *Id*. at 683. Accordingly, *In re Penthouse* is distinguishable and does not hold that the

registration of a trademark is evidence of secondary meaning for a trade name.  MMU has

presented no credible evidence of its "manner and length of use" of the "Miyano" trade name.

As evidence of "sales volume," MMU argues that a 4.7 % market share for machine

tools is evidence of secondary meaning for the trade name Miyano.  (Doc. 23 at 15).  Such a

minimal market share is insufficient to satisfy the vigorous burden of proof required for

secondary meaning.

As evidence of "advertising," MMU spent only $198,000 per year on advertising

associated with the "Miyano" name.  *Id*.  Further, MMU cites Exhibit 16 (of doc. 23), which is a

**1986** advertisement showing the use of the *stylized* "Miyano" trademark and listing "Miyano

Machinery Japan Inc." and "Miyano Machinery USA Inc." as the company names.  Furthermore,

in 1986, MMU had not yet cancelled and abandoned the plain text registration for the mark

"MIYANO."  Nor had MMJ and MMU yet decided to abandon the Miyano winged M triangle

mark.  The fact that MMU's only evidence of advertising is a 1986 trade show brochure, shows

the weakness of MMU's circumstantial evidence of secondary meaning.

Further, the testimony of MMU's past Chairman, Hank Marchionne, indicates that

whatever secondary meaning that the United States machine tool industry attaches to the name

"Miyano" is actually associated with Tom Miyano, not MMU:

> if [customers] see the same name and they see Tom Miyano, they are not going
> to ignore it and they know him.  So you say I am just guessing.  Wouldn't you
> go over to say hello to Tom if you knew him and he will try to push his product
> on you.  So I know it will help him.  I don't think that it is fair that Miyano with
> some 34 to 36 years of building up a reputation and then he is going to use the
> name and steal part of it from us.

(Exh. 1, Marchionne Dep. Tr. at 127:18-24).

MMU has presented absolutely no direct evidence of secondary meaning that the name

"Miyano" is associated with MMU and MMU's circumstantial evidence of secondary meaning is

minimal at best.  Accordingly, MMU has not carried its burden of showing secondary meaning

for the "Miyano" surname (as either a trade name or as a trademark).

c.    **The Plain Text Miyano Mark Is Not Protectible**

i.    **MMU's Plain Text MIYANO Mark Was Cancelled and Expressly Abandoned**

MMU argues that it has superior rights in the plain text MIYANO trademark because it

was registered and has been in use since 1975.  (Doc. 23 at 11).  However, MMU's is not entitled

to the 1975 priority date.   MMU originally registered the plain text MIYANO mark on May 2,

1988 (Serial Number: 73725705).  But, in 1995, the original plain text MIYANO mark was

cancelled under Section 8 for failure to file a declaration of continued use between the 5th and 6th

years after registration of the mark.  Accordingly, MMU expressly abandoned the plain text

MIYANO mark and the mark was cancelled on September 18, 1995.

> It is axiomatic that the owner of a trademark may abandon the mark.  Pursuant to the Lanham Act, a trademark is abandoned when the trademark holder discontinues use of the mark with the intent not to continue using it. 15 U.S.C. § 1127.  A trademark is presumptively abandoned if the mark has not been used for three or more consecutive years.  ***Moreover, the trademark owner may expressly abandon a mark by cancelling the mark.***

*MacKenzie-Childs, Ltd. v. MacKenzie-Childs*, 2008 WL 111196, 4 (W.D. N.Y. 2008)(App. 3)

(Emphasis Added).

Since MMU cancelled and abandoned the plain text Miyano mark, MMU may not

reclaim any use of the plain text mark prior to 1995.  Indeed, MMU cannot claim any use of the

abandoned, plain text Miyano mark until MMU proves resumed use.  "Rights lost as a result of

abandonment are not revived by such subsequent use.  Once a period of non-use results in

abandonment, a resumption of use thereafter cannot cure the preceding abandonment.  Such a

resumption represents a new and separate use with a new date of first use."  *McCarthy* § 17:3.

Therefore, MMU must prove resumption of use of the previously abandoned, plain text Miyano mark and a new date of first use.

Accordingly, MMU cannot claim a priority date of 1975 for the plain text MIYANO mark. MMU's claim of continual use of the plain text Miyano mark since 1975, after MMU expressly abandoned the mark in 1995 was a material misrepresentation of fact to the USPTO. MMU's misrepresentation is grounds for cancellation of MMU's federal registration of the plain text Miyano mark.

### ii.      The Miyanos Did Not Consent to Registration of the Plain Text MIYANO

15 U.S.C. §1052(c) bars the registration of a trademark which "[c]onsists of or comprises a name, portrait, or signature identifying a particular living individual except by his written consent." 15 U.S.C. §1052(c). "The statute requires the written consent of a particular individual in certain cases and if this written consent does not exist in those cases in which it is required there can not be any registration." *Hot Stuff Foods, LLC v. Mean Gene's Enterprises, Inc.*, 468 F.Supp.2d 1078, 1091 (S.D. 2006). "Consent to register must be distinguished from consent to use. There may very well be consent to use without any consent to register. And neither is consent to register sufficient under the statute unless it is a written consent as specified in the statute." *Id*. at 1092, *see also Krause v. Krause Publications Inc.*, 2005 WL 3175174, 76 U.S.P.Q.2d 1904, 1913 (2005)(App. 4) (no implied consent to register trademark when no documents state that name of cancellation petitioner is the property of the respondent); *In re New John Nissen Mannequins*, 227 U.S.P.Q. 569, 571 (1985)(App. 5) (Even if record establishes consent to use name as part of trade name, such consent does not qualify as written consent to register.); *Laub v. Industrial Dev. Lab.*, *Inc.*, 1959 WL 6084, 121 U.S.P.Q. 595 (1959)(App. 6)

(registration refused when no written consent was given although applicant contended that the opposer had, by his actions, consented to use of trademark).

MMU argues that Tom Miyano gave implied consent to the registration of the plain text MIYANO mark because Tom Miyano had previously signed documents for the registration of the stylized Miyano mark in 1988 and 1994. (Doc. 23 at 6, Exh. 36). MMU's argument is contrary to the express language in the statute. *See* 15 U.S.C. § 1052(c). In 1994, when the stylized Miyano documents were signed, MMU already had the plain text MIYANO mark registered. Then the very next year (1995), MMU abandoned the original plain text MIYANO mark registration, which the trademark office cancelled. MMU argues that Tom Miyano gave implied consent to re-register the same plain text MIYANO mark in 2007 because 14 years ago Tom consented to the registration of the stylized Miyano mark even though MMU cancelled the original plain text Miyano mark the following year. Tom Miyano was never advised by any attorney at Masuda Funai (including Nancy Sasamoto, presently counsel for MMJ, who filed the application for the original plain text Miyano mark) that he was surrendering any right to use his own name. Any implication of Tom's consent died when MMU, then under the management and control of Tom Miyano, abandoned the original registration for the MIYANO word mark. In the case of Steven Miyano, there is absolutely no evidence that he consented to convey the right to use his family name.

Furthermore, it is well established that any consent **to use** the Miyano surname in a mark does **not** qualify under Section 2(c) as consent to obtain a federal registration.[1] *See*, McCarthy, §

---

[1] "The mere incorporation of a business and consent to the business's use of the mark does not constitute implied consent to the *registration* of the mark. *Krause v. Krause Publications, Inc.,* 76 USPQ2d 1904 (TTAB 2005)(App. 4) (Cancellation petitioner did not give implied consent to register when he incorporated the business, sold his stock in the business and pledged his assets to finance expansion and acquisitions, and acquiesced in the corporation's use of the mark for 50 years, where there was no evidence that petitioner expressly stated that the mark was the property of the corporation and petitioner did not agree to refrain from use of the name in any subsequent business); *In re New John Nissen Mannequins,* 227 USPQ 569 (TTAB 1985) (consent to register not implied from appearance of the

13:37, *citing Reed v. Bakers Engineering & Equipment Co.*, 100 U.S.P.Q. 196 (Chief Examiner 1954); *Garden v. Parfumerie Rigaud, Inc.*, 151 Misc. 692, 271 N.Y.S. 187 (Sup. Ct. 1933). Therefore, even if Tom Miyano (or Sumiko Miyano) did consent to allow MMU to use the stylized Miyano mark, the consent to use is not sufficient to register the plain text MIYANO surname (which conveys much greater rights) ("the actual trademark registration in this case protects not the name or the word "parents," but rather the stylized logo of that name including the unusual form and shape of the letters comprising the word." *Gruner + Jahr USA Pub., a Div. of Gruner + Jahr Printing and Pub. Co. v. Meredith Corp.*, 991 F.2d 1072, 1078 (2nd Cir. 1993).

The Miyanos did not give written consent to MMU authorizing the registration of the plain text Miyano mark. Therefore, MMU registered the plain text mark contrary to § 2d of the Lanham Act and the mark may be cancelled at any time. *Hot Stuff Foods, LLC v. Mean Gene's Enterprises, Inc.*, 468 F.Supp.2d 1078, 1091 (S.D. 2006) ("Cancellation of a trademark registration is allowed at 'any time' if the registration was obtained contrary to the provisions of 15 U.S.C. § 1052(c)"). A district court has concurrent power with the Patent and Trademark Office to secure cancellation of a trademark registration so that the entire controversy may be resolved in a single forum. *Id*. at 1089-90.

This Court has at least four independent bases to cancel the plain text Miyano mark registered by MMU. MMU has made material misrepresentations to this Court and to the USPTO by: 1) claiming continual use of "the MIYANO mark for 33 years" (despite its express

---

name "John Nissen" in a deed of incorporation of applicant's predecessor, nor from existence of foreign registrations incorporating the name). *Compare, In re D.B. Kaplan Delicatessen*, 225 USPQ 342, 344 (TTAB 1985) (consent to the use and registration of the mark D. B. KAPLAN'S DELICATESSEN, for restaurant services, found to be implicit in the terms of a "buy-out" agreement that relinquished all property rights in the name and forbade its use by the named party in any subsequent business)." *TMEP § 1206.03(b) Implicit Consent.*

abandonment of the plain text Miyano mark in 1995); 2) failing to obtain the consent of the

Miyanos to register their surname (under § 2(c) as discussed above); 3) asserting that no other

entity has a right to use the Miyano name in commerce;[2] and 4) failing to inform the USPTO that

"Miyano" is a common Japanese surname with no particular English equivalent.  As a result of

MMU's misrepresentations, the USPTO improperly registered the plain text MIYANO mark to

MMU.  Accordingly, this Court has the authority to cancel and is asked to cancel MMU's federal

registration of the plain text MIYANO surname.

### d.    "Miyano Machinery USA, Inc." Is Not a Protectible Trade Name

MMU argues that its trade name is entitled to protection, even without registration.[3]

(Doc. 23 at 13).  As discussed above, a surname typically requires secondary meaning to be

entitled to protection.  *Flynn v. AK Peters, Ltd.*, 377 F.3d 13, 20 (1st Cir. 2004) (Surnames "are

inherently indistinctive, i.e., weak and are permitted trademark protection only upon a showing

---

[2] MMU's only argument that it has not committed fraud is that "defendants do not have any rights to use the mark in connection with a competitive business that would likely cause confusion."  (Doc. 23 at 19).  However, courts have routinely stated that "a man may use his own name reasonably and honestly for a legitimate purpose in his own business."  *Horlick's Malted Milk Corp. v. Horlick*, 143 F.2d 32, 35 (7th Cir. 1944).  In the cases concerned with a person's use of his own surname, courts emphasize the principle that "the power of the court is properly directed towards the correcting of an abuse of the right to use a personal name rather than the denial of that right."  *Horlick's Malted Milk Corp. v. Horlick*, 143 F.2d 32, 35 (7th Cir. 1944). "[T]o prohibit an individual from using his true family surname is to take away his identity: without it he cannot make known who he is to those who may wish to deal with him; and that is so grievous an injury that courts will avoid imposing it, if they possibly can."  *Taylor Wine Co., Inc. v. Bully Hill Vineyards, Inc.*, 569 F.2d 731, 735 (2nd Cir. 1978).  At minimum, MMU should have advised the trademark examiner that Tom and Steven Miyano were active in the machine tool industry so that examination could have proceeded on an informed basis instead of under a cloud of deception.

[3] The cases cited by MMU as support for "trade names are entitled to additional protection" do not concern trade name infringement.  In *McTavish Bob Oil Co. v. Disco Oil Co.*, 345 F.Supp. 1379, 1380 (D.C. Ill. 1972), the issue was "Does a plaintiff with an unregistered trademark, which was first used by plaintiff after defendant registered the trademark with the state, have a claim against defendant under § 43(a) for defendant's using the trademark, on the ground that such use constitutes either a "false designation of origin" or a "false description or representation." "The court finds that plaintiff's complaint does not allege facts tending to show that defendants used a "false designation of origin" or a "false description or representation" which would state a claim under § 43(a)."  *Id.* at 1381.  "Case dismissed."  *Id.*  In *Processed Plastic v. Warner Comm*, the court did not discuss trade names, but rather a symbol, namely the symbol on a toy car representing the General Lee car, from the Dukes of Hazard.  675 F.2d 852, 857 (7th Cir. 1982).  The quote by MMU is from footnote 7, clarifying that the symbol for the General Lee is actionable under 43(a) if it has secondary meaning.  The case does not stand for what MMU claims, namely that "Federal registration is not required to assert § 43(a)" for trade names.

that they have become strong marks by acquiring distinctiveness through secondary meaning.").

In the 7th Circuit, secondary meaning is required whenever any one of the following three

concerns is met: 1) "a reluctance to forbid a person to use his own name in his own business;" 2)

"some names are so common-such as "Smith," "Jones," "Schwartz," "Wood," and "Jackson"-

that consumers will not assume that two products having the same name therefore have the same

source, and so they will not be confused by their bearing the same name." and 3) "that

preventing a person from using his name to denote his business may deprive consumers of useful

information." *Peaceable Planet, Inc. v. Ty, Inc.*, 362 F.3d 986, 990 (7th Cir. 2004).

Here all three concerns apply and, therefore, secondary meaning is required. The first

concern is met because MMU is attempting to prevent a person (Tom and Steven Miyano) from

using his own name in business. The second concern is met because there Miyano is a common

Japanese surname. The third concern is met because MMU is attempting to deprive consumers

of useful information, by preventing Tom and Steve Miyano from using their family name to

denote their business and to inform customers that Tom Miyano is back in the industry. Since at

least one of the three concerns applies (in fact all three apply), MMU must establish secondary

meaning for the trade name Miyano Machinery USA, Inc.

As discussed above, MMU has presented no direct evidence of secondary meaning; and

has only presented minimal circumstantial evidence of secondary meaning (citing use of its

registered trademarks and not its trade name) and MMU's past chairman testified that consumers

associate the name with Tom Miyano. Therefore, MMU does not have a protectable interest in

the surname "Miyano" standing alone[4] and its motion for preliminary injunction should be

denied.

---

[4] MMU cites no authority for its dissection of its corporate name for trade name infringement (MMU dissects
Miyano Machinery USA, Inc. analyzing only "Miyano" as a trade name). Since the normal rules of trademark

### e.    The Triangle Winged M Is Not Protectible

#### i.    The Miyanos Are the Rightful Owners the Triangle Winged M Mark

"Where an individual adopts and uses a mark and later orally licenses its use to a corporation of which he or she is the president, the individual, not the corporation, is the owner of the mark and the proper party to apply for registration."  McCarthy § 16:36.  "Similarly, if an employee merely gives an oral license to its employer to use his personal name as a mark, the employee remains the owner of the personal name mark."  *Id*.  When the U.S. distribution agreement expires, the U.S. distributor has no right to continue use of the mark.  A federal registration granted to such an ex-distributor is void ab initio since it was granted to someone other than the trademark "owner."  McCarthy § 29:8.

Sumiko Miyano owned and Tom Miyano inherited the Miyano surname, the Flying M and the Triangle Winged M in Japan.  The surname and the Triangle Winged M were licensed to MMJ for use in Japan and the U.S.  Accordingly, Tom Miyano is the true owner of the disputed marks.  Any use of the marks by MMJ or MMU accrued to Tom Miyano, and when Tom Miyano was forced out of MMJ and MMU, he retained the rights and ownership of the marks.  Accordingly, MMU's registrations are "void ab initio" since they were granted to someone other than the rightful trademark owner.

#### ii.    The Triangle Winged M Was Abandoned

Abandonment of a mark is shown when the mark's use has been discontinued with the intent not to resume such use.  *Sands Taylor & Wood Co.*, 978 F.2d at 955.  "The defendant has the burden of establishing abandonment."  *Id*.  A prima facie case of abandonment may be established by showing non-use of the mark for three consecutive years.  *Id*.

---

infringement analysis apply to trade name infringement, the anti-dissection rule should apply equally to trade names, as it does to trademarks

A mark is abandoned when there is no longer a bona fide use of the mark such that it is discontinued and there is no intent to resume the use of the mark. *MB Financial Bank, N.A. v. MB Real Estate Services, L.L.C.*, 2003 WL 22765022, 3 (N.D. Ill. 2003)(App. 7); citing *Sands, Taylor & Wood Co.,* 978 F.2d at 954-55. "Residual use, such as token use, use by sale of the remaining inventory containing the mark, or use merely to prevent others from using the mark, are not bona fide uses under the Lanham Act." *Id*. at 9. "***An announcement that a mark will not be used in the future is strong evidence of an intent to abandon a mark***." *Id*. at 8 (internal citation omitted) (emphasis added).

MMU argues that it has not abandoned the Triangle Winged M trademark for goods and that its renewal of the mark was not fraudulent. As support MMU argues that it has used the Triangle Winged M mark on invoices, packing slips and services for the last 24 years. (Doc. 23 at 16). However, MMU hides the fact that it stopped using the Triangle Winged M mark in 1997 and only shows sporadic use of a non-identical mark in the subsequent years.

MMU's corporate witness testified that the Triangle Winged M trademark for goods has been used in recent years on the MTV and GN series of machines. However, he also testified that the MTV machines are manufactured by the Mectron Corporation, which is independent of MMJ and MMU. Further, the logo used by Mectron on its machines prominently features the word "Mectron" along with the script Miyano, so that the mark is substantially different from the registered mark and designates a different source for the goods, i.e. the Mectron Corporation. Certain machines of the GN series appear to sporadically use a logo that features the word "Ocean" along with the script Miyano, so that this mark is also substantially different from the registered mark. Finally, MMU's 30(b)(6) witness testified that of approximately 1500 machines sold since the year 2000, only about 20 were of the GN series and of those, the witness was

certain of only one machine that displayed any version of the Triangle Winged M design. (See Exh. 2, Minemura Dep. Tr. at 54:1-57:12).

Furthermore, Tom Miyano owns the Japanese trademark for the Winged M design mark and the Triangle Winged M design that he inherited from Sumiko Miyano and her predecessors. MMJ's use of the Triangle Winged M design was under license from Sumiko Miyano and her predecessors. In 1997, the directors of MMJ, and consequently MMU, stopped using the Triangle Winged M mark and decided to thereafter solely use the stylized Miyano trademark for sale of machines for MMJ and MMU, who merely distributes in the United States the machines manufactured by MMJ. See Takamori Decl. ¶¶ 9-10; see also Nakajima Decl. ¶¶ 7-8.

It was only after learning that Tom and Steven Miyano were using their Winged M mark that MMU quickly filed for the trademark registration of the Triangle Winged M for use with services. In its application, MMU submitted to the USPTO an old discontinued Triangle Winged M logo featuring a block M Miyano. However, the mark sought to be registered is different from the mark shown in the specimen of use and as shown in the mark as shown in MMU's exhibits in its Motion for Preliminary Injunction.[5] The chart below illustrates the difference between the Triangle Winged M design mark as registered for services by MMU and the mark as shown in MMU's exhibits. Any sporadic use of the Triangle Winged M mark after 1997 was mere residual use, not sufficient to act as a source indicator, and the goodwill in the mark was lost. Accordingly, MMU's Triangle Winged M mark was abandoned.

---

[5] Exhibit 9 to Doc. 23 does show a folder with the older registered mark. However, there is no evidence that these folders are currently used by MMU. Furthermore, the company name on the folder is "Miyano Machinery (USA) Inc." which was MMU's corporate name from 1986 to 1995. *See* Complaint (Doc. 1) at ¶ 9.

| MMU's Original Registration With The Plain Text Miyano Name | MMU's Exhibits Showing The Stylized Miyano Name |
|---|---|
|  |  |

### iii.    Change in Format of the Mark Precludes MMU From Tacking On To Prior Use

"Tacking is a question of fact." *Patterson v. World Wrestling Entertainment, Inc.*, 2006 WL 273527, 17 (E.D. Wis. 2006)(App. 8). "The party asserting the tacking doctrine must support it with probative evidence. The standard for demonstrating tacking is far higher than the likelihood of confusion standard applicable to the underlying trademark dispute." *Id.* "Situations involving priority based on variations of trademarks are governed by the tacking rule, which allows a party to add time spent using an older mark to the time spent using a newer mark if both marks make the same, continuing commercial impression." *Navistar Intern. Transp. Corp. v. Freightliner Corp.*, 1998 WL 911776, 2 (N.D. Ill. 1998)(App. 9). The two marks must have the same impression on buyers, "so that the party seeking to tack is not allowed to expand its trademark rights." *Id.* at 4.

The "same, continuing commercial impression test requires a greater, albeit undefined, degree of similarity to permit tacking on, the court saying that tacking on is only occasionally permitted in the rare instances where the old and new formats are legal equivalents." McCarthy § 17:26.

Summarizing the new, more rigorous and demanding application
of the "tacking" rule, the Trademark Board stated:  A party seeking

20

> to "tack" its use of an earlier mark onto its use of a later mark for
> the same goods or services may do so only if the earlier and later
> marks are legal equivalents, or are indistinguishable from one
> another.  To meet the legal equivalents test, the marks must create
> the same commercial impression and cannot differ materially from
> one another.  Thus, the fact that two marks may be confusingly
> similar does not necessarily mean that they are legal equivalents.

*Id*. citing *Pro-Cuts v. Schilz-Price Enters., Inc.*, 27 U.S.P.Q.2d 1224, 1226-27 (T.T.A.B. 1993)

(Holding that applicant cannot tack for priority purposes the older use of PRO-KUT in

distinctive lettering framed by two palm trees onto the later use of PRO-CUTS in different

distinctive lettering, framed by a rounded rectangle.)[6]

Even if MMU has not abandoned the Triangle Winged M mark as registered, it is not

entitled to "tack" onto the priority date of a different mark.  MMU attempts to avoid the "tacking

rule" by acting as if its new Triangle Winged M mark with the stylized Miyano name is identical

the prior registered Triangle Winged M with the plain text Miyano name.  MMU's exhibits in the

Motion for Preliminary Injunction show only one single example of the Triangle Winged M with

the block M Miyano as registered.  (Doc. 23 Exh. 9)(showing a folder with the Triangle Winged

M and plaint text Miyano and Miyano's trade name of "Miyano Machinery (USA) Inc.").

However, this folder is clearly a left over, residual use of the old Miyano Triangle Winged M

mark, as MMU admits in its complaint that the name "Miyano Machinery (USA) Inc." was the

company's name between 1986 and 1995.  (Doc. 1 at ¶ 9).  All of the other examples of use of

the Triangle Winged M mark use the stylized Miyano name and are recent uses of the mark

(since 2003).  Since MMU's recent use of the new Triangle Winged M mark with the stylized

---

[6] "Our sister circuits have explicitly recognized the ability of a trademark owner to claim priority in a mark based on the first use date of a similar, but technically distinct, mark-but only in the exceptionally narrow instance where "the previously used mark is 'the legal equivalent of the mark in question or indistinguishable therefrom' such that consumers 'consider both as the same mark.'"  *Iowa Health System v. Trinity Health Corp.*, 177 F. Supp. 2d 897, 920 (N.D. Iowa 2001) *quoting*, *Data Concepts, Inc. v. Digital Consulting, Inc.*, 150 F.3d 620, 623 (6th Cir.1998) (quoting *Van Dyne-Crotty, Inc. v. Wear-Guard Corp.*, 926 F.2d 1156, 1159 (Fed.Cir.1991))[.]

Miyano name is different than the registered Triangle Winged M mark it is not entitled to the earlier priority date.

MMU has presented no evidence showing a continuing commercial impression between it old and new Triangle Winged M marks. Also, MMU has not shown that the marks are legal equivalents. Accordingly, MMU has not carried the rigorous and demanding burden of showing that it is entitled to tack on its new use with the old use of a different mark. Therefore, MMU is not entitled to the 1975 priority date it has claimed for the Triangle Winged M marks.

> **iv.    Fraud in the Service Mark Application and Renewal of the Trademark for the Triangle Winged M**

"Fraud in procuring a trademark registration or renewal occurs when an applicant knowingly makes false, material representations of fact in connection with his application." *Torres v. Cantine Torresella S.r.l.*, 808 F.2d 46, 48 (Fed. Cir. 1986). "A petition to cancel a registration of a mark ... may be filed by any person who believes he is or will be damaged by the registration of the mark ... [a]t any time if [the] registration was obtained fraudulently ... 15 U.S.C. § 1064(3). Section 1119 gives a federal court power to cancel a registration in any action involving a registered mark." *Rauland Borg Corp. v. TCS Management Group, Inc.*, 1995 WL 242292, 15 (N.D. Ill. 1995)(App. 10), citing, 15 U.S.C. § 1119.

> If a registrant files a verified renewal application stating that his registered mark is currently in use in interstate commerce and that the label attached to the application shows the mark as currently used when, in fact, he knows or should know that he is not using the mark as registered and that ***the label attached to the registration is not currently in use***, he has knowingly attempted to mislead the PTO.

*Id.* (emphasis added).

> [W]here an applicant for renewal of a trademark was not currently using the mark as registered, but rather an altered mark with a

> ***slightly redesigned logo***, his representation, in his renewal
> application, that the mark as registered was still in use in interstate
> commerce perpetuated a fraud on the Patent and Trademark Office.

*Id.* citing *Torres* at 47-49 (emphasis added).

MMU knew or should have known that its application for and renewal of the Triangle Winged M marks with the ***plain text*** block M Miyano name (the marks as registered) were no longer being used in commerce, as MMU's evidence consistently shows only the Triangle Winged M mark with the ***stylized*** Miyano name.[7]  Accordingly, MMU's application for the Triangle Winged M mark for services[8] and its renewal of the same mark for goods were both obtained by misleading the Patent and Trademark Office, because the trademarks were not being used as registered but rather as an ***altered mark*** with a ***redesigned*** logo.  See *id.*; *Torres* at 47-49.

REDACTED

Magistrate Judge Nolan ruled on that and a related motion today, June 6, 2008.  The Miyanos anticipate further discovery on these issues before the July 18 hearing and will likely seek this Court's guidance on these issues.  The Miyanos also anticipate filing a terse supplemental memorandum on these issues.

---

[7] The lone exception is Exhibit 9 to Doc. 23 showing use of the plain text version between 1986 and 1995.  See discussion at FN 5, *supra*.

[8] MMU argues that rebuilding machines and reselling the machines to new customers is evidence of use of the mark for services.  However, a "service" is "the performance of labor for the benefit of another."  *Huthwaite, Inc. v. Sunrise Assisted Living, Inc.*, 261 F.Supp.2d 502, 512 (E.D. Va. 2003).  Thus rebuilding machines for resale does not constitute a service.

Since MMU has misled the Patent and Trademark Office by knowingly applying for and renewing marks that were not actually being used, MMU has fraudulently expanded its trademark rights in the asserted Triangle Winged M marks. Accordingly, this Court is asked to cancel MMU's registration no. 1,217,317 (for goods) and application no. 77/176,918 (for services)

### 2.    MMU Has Not Shown Likelihood of Confusion

Even if MMU can establish a protectable trademark or trade name, it has not shown likelihood of confusion sufficient to warrant a preliminary injunction. MMU must establish a likelihood of confusion. *Chicago Tribune Co. v. Fox News Network, LLC*, 520 F.Supp.2d 930, 934 (N.D. Ill. 2007).

> In assessing the likelihood of confusion, courts have identified seven relevant factors that help in deciding the ultimate question: (1) the similarity of the marks; (2) the similarity of the products; (3) the area and manner of concurrent use; (4) the degree of care likely to be used by consumers; (5) the strength of the plaintiff's mark; (6) whether any actual confusion exists; and (7) the defendant's intent to palm off its goods as those of the plaintiff.

*Chicago Tribune Co. v. Fox News Network, LLC*, 520 F.Supp.2d 930, 934 (N.D. Ill. 2007). The test is an equitable balancing test in which the court weighs each of the seven factors and balances them against one another. *Barbecue Marx*, 235 F.3d at 1044.

### a.    Similarity of the Marks as a Whole and MMU's Improper Dissection

MMU's similarity of the marks analysis is flawed as MMU has improperly dissected the marks to fabricate similarity. The appropriate analysis is to exam "the similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression." *In re E.I. du Pont de Nemours & Co.*, 476 F.2d 1357, 1361 (C.C.P.A. 1973). "The Seventh Circuit has warned that dissecting marks often leads to error." *McKillip Industries, Inc. v.*

24

*Integrated Label Corp.*, 477 F.Supp.2d 928, 930 (N.D. Ill. 2006).  In comparing conflicting

marks, a mark may not be dissected or split into parts and each part compared to find similarity,

rather, the marks must be considered in their entireties.   See *Estate of P.D. Beckwith, Inc., v.*

*Commissioner of Patents*, 252 U.S. 538, 546, (U.S. 1920) ("The commercial impression of a

trade-mark is derived from it as a whole, not from its elements separated and considered in

detail.  For this reason it should be considered in its entirety, and to strike out any considerable

part of it, certainly any conspicuous part of it, would be to greatly affect its value."); *Brennan's,*

*Inc. v. Brennan's Restaurant, L.L.C.*, 360 F.3d 125, 133 (2nd Cir. 2004) ("When evaluating the

similarity of marks, courts consider the overall impression created by a mark.  Each mark must

be compared against the other as a whole; juxtaposing fragments of each mark does not aid in

deciding whether the compared marks are confusingly similar.").  MMU's analysis for each of its

asserted marks improperly dissects the marks and only compares the pieces of the marks, not the

marks as a whole.  Accordingly, MMU's similarity analysis is improper.

    With regard to the MMU Triangle Winged M mark, MMU argues that the "winged M" is

the dominant portion of the mark, but MMU provides no support for its conclusion.  "The

Seventh Circuit has repeatedly cautioned both bench and bar that unsupported statements in

lawyers' briefs do not count."  *Clarus Transphase Scientific, Inc. v. Q-Ray, Inc.*, 2006 WL

4013750, 12 (N.D. Ill. 2006)(App. 11); citing, *See IFC Credit Corp. v. Aliano Brothers General*

*Contractors, Inc.,* 437 F.3d 606, 610-611 (7th Cir. 2006); *United States ex rel. Feingold v.*

*AdminaStar Federal, Inc.,* 324 F.3d 492, 494 (7th Cir. 2003).

    Generally, in a word and design composite mark, the ***words*** are the dominant portion of

the mark.  *Herbko Intern., Inc. v. Kappa Books, Inc.*, 308 F.3d 1156, 1165 (Fed. Cir. 2002) ("The

words dominate the design feature."); TPEP § 1207.01(c)(ii)("If a mark comprises both a word

and a design, greater weight is often given to the word, because it is the word that purchasers would use to refer to or request the goods or services."). MMU has presented no evidence that the flying M of the Triangle Winged M mark is the dominant portion of the mark. Since the word portion of the mark is presumed the dominant portion and since a composite mark must be analyzed in its entirety, MMU's analysis is flawed and improper.

Furthermore, MMU ignores the differences in the marks. MMU's Triangle Winged M includes the word "Miyano" in a stylized format and a triangle design around both the winged M and the word Miyano. MMU has come forth with no evidence that the marks considered as a whole would be considered similar in the mind of the relevant consumer. "The marks, when viewed in their entirety, are quite different." *Sullivan v. CBS Corp.*, 385 F.3d 772, 778 (7th Cir. 2004)(CBS' "Survivor" mark on CDs was not similar to "Survivor" mark on CDs for the music band Survivor). Accordingly, this factor should weigh in favor of the Defendants.

With respect to the trade names, MMU first ignores the fact that MiyanoHitec Machinery, Inc. does business as "Tom and Steven Miyano Machinery" and then applies that same flawed dissection approach with respect to its trade name and the plain text "Miyano" mark. MMU combines its analysis of the plain text MIYANO mark and the alleged Miyano tradename. MMU's company name is "Miyano Machinery USA, Inc.," yet MMU dissects the name, declares without support that the word Miyano is dominant, and compares the dissected word with a dissected portion of Defendants' corporate name. As discussed above, this is an improper dissection of the "Miyano Machinery USA, Inc." name, resulting in a flawed similarity analysis.

"In assessing the similarity of the two marks, the court must compare sound, sight and meaning" and "each mark must be viewed as a whole." *Clarus Transphase Scientific, Inc. v. Q-*

*Ray, Inc.*, 2006 WL 4013750, 8 (N.D. Ill. 2006)(App. 11). Even if the Defendants' corporate name, rather than its business name, is analyzed, when taken as a whole, "MiyanoHitec Machinery, Inc." is distinct in sound from "Miyano Machinery USA Inc." The addition of Hitec adds two additional syllables to the Miyano name and omits the three syllables of the "USA" in MMU's name. Furthermore, the Hitec connected to Miyano and the omission of the USA changes the appearance of the name. "In a case comparing the marks "Yogowhip" and "Miracle Whip," the court acknowledged that the word "whip," was prominent and identical, but it held that when consumers viewed the labels as a whole, as they always would at the grocery store, there could be no confusion." *Sullivan v. CBS Corp.*, 385 F.3d 772, 778 (7th Cir. 2004); *see also*, *Nutri/System, Inc. v. Con-Stan Industries, Inc.,* 809 F.2d 601, 606 (9th Cir.1987) (affirming trial court holding that "Nutri/System" and "Nutri-Trim"were dissimilar in terms of appearance, sound, and meaning). The balance of the marks, Hitec and USA are two different words, and they neither appear similar textually, nor sound similar when spoken or read aloud. Likewise, "Tom & Steven Miyano Machinery" is aurally and visually distinct from "Miyano Machinery USA, Inc." and, clearly, includes the first names of the individuals. Even if the Court should find the marks to be similar, the addition of the first names removes any likely confusion. *Brennan's, Inc. v. Brennan's Restaurant, L.L.C.*, 360 F.3d 125, 130 (2nd Cir. 2004) ("the marks are similar, but Terrance Brennan's use of the first name "Terrance" in its mark reduces their similarity and reduces potential confusion.").

When comparing "MiyanoHitec Machinery, Inc." against the plain text "MIYANO" mark, the marks are also distinct. Even if two marks employ the same or similar words, where Defendants' use of the mark contains additional information and is therefore more specific, the two marks are not similar in appearance and suggestion. *See SparkNet Communications, L.P. v.*

*Bonneville Int'l Corp.*, 386 F.Supp. 2d 965, 975 (N.D. Ill. 2005) (defendant's radio slogans "70's, 80's WHATEVER WE WANT!" and "TODAY'S NEW MUSIC WHATEVER WE WANT!" are not similar to plaintiff's radio slogan "PLAYING WHAT WE WANT").

Accordingly, when viewing each of MMU's asserted marks ***in their entireties***, the dissimilarities in sound, sight and meaning far outweigh any purported similarities. This factor weighs in favor of the Defendants.

**b.      The Similarity of the Products**

Even if both parties offer the same product or service, the question is not whether the products are interchangeable, but "whether the public is likely to attribute the products and services to a single source." *Sparknet*, 386 F. Supp. 2d at 976 (citation omitted). If the products or services do not have a similar format or feel, consumers are unlikely to be confused as to their source. *See id.* at 975-76.

At present, the Defendants have not sold any products, so there are no products to compare. (Exh. 1, Marchionne Dep. Tr. at 127:11-128:3). Further, the machine currently being manufactured for IMTS 2008 is more complex than any machine made by MMJ and distributed by MMU.

**c.      The Area and Manner of Concurrent Use**

Defendants concede that they will be marketing their machines at the IMTS in Chicago later this summer. However, as explained in the next section, the degree of care shown by actual and potential purchasers of the competing machines completely mitigates any effect that this factor might have on the Court's likelihood of confusion analysis.

28

#### d.    The Degree of Care

The greater the degree of care exercised by a customer, the less likely the consumer is to be confused.  See *Teunissen*, 131 F.3d at 1217.  MMU admits that its customers are sophisticated.  (Doc. 23 at 21)(MMU's machines "typically cost tens-of-thousands of dollars and therefore, purchasers of them are generally sophisticated.").  Many of MMU's lathes are sold for well over $100,000.00 each.  "This implies that a great deal of care and research goes into the purchase of the products at issue and that the consumers are anything but 'impulse buyers.'" *Metavante Corp. v. Medavant, Inc.*, 2006 WL 1277903, 4 (E.D. Wis. 2006)(App. 12); see also *Clarus Transphase Scientific, Inc. v. Q-Ray, Inc.*, 2006 WL 4013750, 12 (N.D. Ill. 2006)(App. 11) ("Confusion is less likely where buyers exercise care and precision in their purchases, such as for expensive or sophisticated items.").

Instead of discussing the degree of care or sophistication of the consumer, MMU argues that "initial interest confusion" causes this factor to weigh in its favor.  (Doc. 23 at 21).  However, in the 7th Circuit, when consumers are sophisticated, there is no initial interest confusion.

> Additionally, the Seventh Circuit has indicated that initial interest confusion is inappropriate when the consumers of a product are sophisticated.  *Syndicate Sales, Inc. v. Hampshire Paper Corp.,* 192 F.3d 633, 638 (7th Cir.1999) (stating that post-sale inspection can cure initial interest confusion when consumers of the products are sophisticated); *Rust Environment & Infrastructure, Inc. v. Teunissen,* 131 F.3d 1210, 1217 (7th Cir. 1997) (sophistication of consumers in seeking wastewater engineers made initial interest confusion unlikely).

*Personeta, Inc. v. Persona Software, Inc.*, 418 F.Supp.2d 1013, 1018 (N.D. Ill. 2005).

> Both parties agree that the products are expensive and highly technical.  Additionally, the selling cycles for both parties' products are long: typically eighteen months to two years. The court agrees that, at the point of sale, the customers of both

29

companies are highly sophisticated and unlikely to be confused.

*Id*.

Here, it is undisputed that consumers are sophisticated and the products are expensive. Furthermore, Mr. Saito testified that the selling cycle is in "some cases, one week, some cases, six months, in other cases, two years." (Exh. 3, Saito Dep. Tr. at 46:6-7). MMU's current president testified that that sales cycle may last as long as one and a half years for many customers. (Exh. 4, Nagasawa Dep. Tr. at 49:3-14). Accordingly, the selling cycle is long, the customers are sophisticated and the "degree of care factor" weighs heavily in favor of the Defendant.

### e.     Strength of Mark

The mere fact that a plaintiff may own federal trademark registrations for its mark "creates no presumption of strength in its mark nor does it broaden the scope of the mark's protection." See *Knaack Mfg. Co. v. Rally Accessories, Inc.*, 955 F. Supp. 991, 1002-03 (N.D. Ill. 1997). "[T]he term 'strength' as applied to trademarks refers to the distinctiveness of the mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular source." *Sands, Taylor & Wood, Co. v. Quaker Oats Co.*, 978 F.2d 947, 959 (7th Cir. 1992) *aff'd in part, rev'd in part*, 34 F.3d 1340 (7th Cir. 1994). Trademarks are typically placed in one of five categories of increasing distinctiveness or strength: (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary and (5) fanciful. *Charter Nat. Bank and Trust v. Charter One Financial, Inc.*, 2001 WL 1035721, 2 (N.D. Ill. 2001)(App. 13).

"A generic term is one that is commonly used to name or designate a kind of good. A descriptive mark describes the ingredients, qualities or characteristics of the good or service." *Charter Nat. Bank and Trust v. Charter One Financial, Inc.*, 2001 WL 1035721, 2 (N.D. Ill.

2001)(App. 13)(citations omitted).  The difference between "generic" and "descriptive" terms is the degree of distinctiveness and their relative ability to serve as a source-identifier of particular goods and services.  *Id.*

MMU does not deny that its plain text MIYANO mark and its "Miyano Machinery USA, Inc." trade name are descriptive and thus require secondary meaning for protection.  (Doc. 23 at 22).  First, Miyano is a surname, which is descriptive unless it has secondary meaning.  *815 Tonawanda Street Corp. v. Fay's Drug Co.*, Inc., 842 F.2d 643, 648 (2nd Cir. 1988) ("surnames and first names-are generally regarded as descriptive terms which require proof of secondary meaning.")  "Machinery" is either a generic term or merely descriptive and "USA" is a geographical term, which is also descriptive and therefore weak.  Accordingly, MMU's asserted Miyano marks are very weak marks and the strength of mark factor weighs in favor of Defendants.

With respect to the Triangle Winged M mark, MMU argues that the mark is an arbitrary or fanciful design mark.  (Doc. 23 at 23).  As discussed above the plain text Miyano portion of the mark is merely descriptive and MMU has not shown that the additional design elements transform the mark in its entirety into an arbitrary or fanciful mark.[9]

> the distinctive display of descriptive or otherwise unregistrable components of a mark cannot bestow registrability on a mark as a whole unless the features are of such a nature that they would serve to distinguish the mark in its entirety or it can be shown through competent evidence that the unitary mark displayed in the assertedly distinctive manner does in fact create a distinctive commercial impression separate and apart from the descriptive significance of its components.

---

[9] "[T]he finding by the district court that the "parents" portion of the mark-divorced from the stylized typeface and its particular placement on the magazine cover-was extremely weak was not clearly erroneous."  *Gruner %8f Jahr USA Pub., a Div. of Gruner %8f Jahr Printing and Pub. Co. v. Meredith Corp.*, 991 F.2d 1072, 1078 (2nd Cir. 1993).

*Courtenay Communications Corp. v. Hall*, 334 F.3d 210, 216 (2nd Cir. 2003). MMU uses the descriptive Miyano name with additional design elements. However, MMU has not shown a separate commercial impression apart from the descriptive use of the surname Miyano. Accordingly, MMU's unsupported claim of strong marks is insufficient and the strength of mark factor weighs in favor of Defendants. "[U]nsupported statements in lawyers' briefs do not count." *Clarus Transphase Scientific, Inc. v. Q-Ray, Inc.*, 2006 WL 4013750, 12 (N.D. Ill. 2006)(App. 11).

### f.    Actual Confusion

MMU states that one of the three most important factors in a likelihood of confusion analsyis is "evidence of actual confusion." (Doc. 23 at 18). MMU also admits that it has ***no evidence*** of actual confusion. (Doc. 23 at 23). Accordingly, this important factor weighs heavily in favor of Defendants.

### g.    The Defendants' Intent

"[I]n the trademark infringement context, 'intent' refers to the intent to confuse customers, not merely the intent to use a mark that is already in use somewhere else. *Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc.*, 128 F.3d 1111, 1120 (7th Cir. 1997). "This factor looks primarily for evidence that the defendants are attempting to 'pass off' their products as having come from the plaintiff." *Packman v. Chicago Tribune Co.,* 267 F.3d 628, 644 (7th Cir. 2001).

In direct contrast with 7th Circuit precedent, MMU argues that the Court should infer intent from the Defendants' prior knowledge of MMU's trademarks and from the Defendants' continued use of their name and mark after receiving cease and desist letters from MMU. (Doc.

23 at 23-24).  However, the 7th Circuit has considered these arguments and consistently found

that intent cannot be inferred from mere knowledge of another's use of a similar mark.

> Cases in the Seventh Circuit do not support Personeta's argument
> that this court should infer intent merely from Persona's knowledge
> of Personeta's similar name.  *Barbecue Marx,* 235 F.3d at 1046
> (stating that knowledge of a competitor's similar name is not
> enough to show intent on the part of the defendant); *Meridian,* 128
> F.3d at 1120 ("[I]n the trademark infringement context, 'intent'
> refers to the intent to confuse customers, not merely the intent to
> use a mark that is already in use somewhere else.").

*Personeta, Inc. v. Persona Software, Inc.*, 418 F.Supp.2d 1013, 1019 (N.D. Ill. 2005).

MMU has presented no evidence that the Defendants have intended to pass off its

products or services as having come from MMU.  On the contrary, it is the Defendants who have

superior ownership rights in the Winged M mark and Miyano name in Japan and the evidence

shows that those in the industry associate the Miyano surname with Tom Miyano.  Furthermore,

after receiving cease and desist letters from MMU, Defendants added their first names to their

tradename and added a disclaimer to dispel any possible confusion, proving that Defendants had

no intent to palm off their goods as those of MMU.  Accordingly, the intent factor weighs

strongly in favor of Defendants.

### h.    Likelihood of Confusion Factors Conclusion

MMU asserts that the three most important factors are "the similarity of the marks, the

intent of the defendant, and evidence of actual confusion."  (Doc. 23 at 18); *see also Eli Lilly &*

*Co. v. Natural Answers, Inc.*, 233 F.3d 456, 462 (7th Cir. 2000).  "[T]he weight and totality of the

most important factors in each case will ultimately be determinative of the likelihood of

confusion, not whether the majority of the factors tilt the scale in favor of one side or the other."

*Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 898 (7th Cir. 2001).

All three of these factors favor Defendants.  First, when MMU's marks are considered in their entireties, there is little similarity in the marks.  Second, MMU admits that there is no actual confusion.  Third, MMU has failed to show bad faith or intent to palm off goods and the Defendants have a *bona fide* right to use their Miyano name in connection with their business.  Accordingly, all of the most important factors, according to MMU, weigh in favor of Defendants.[10]  *Barbecue Marx, Inc. v. 551 Ogden, Inc.*, 235 F.3d 1041, 1046 (7th Cir. 2000) ("The key factors in this case are lack of evidence regarding [Defendant's] intent and actual confusion on the part of consumers, and a reasonably high level of customer care.  These factors strongly militate against imposing a preliminary injunction.").  The degree of care exercised by the purchasers of these complex and expensive machines over a multi-year sales process also weighs strongly in favor of Defendants.  Therefore, MMU has not shown that it is likely to succeed on the merits as it has not shown likelihood of confusion and, in fact, the facts indicate that MMU is likely to fail on the merits.  "A party with no chance of success on the merits cannot attain a preliminary injunction."  *AM General Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 804 (7th Cir. 2002).

## B.    Irreparable Harm

To be entitled to a preliminary injunction, MMU must "prove that it has no adequate remedy at law and as a result, will suffer irreparable harm if the injunction is not issued." *Personeta, Inc. v. Persona Software, Inc.*, 418 F.Supp.2d 1013, 1019 -1020 (N.D. Ill. 2005). "[A]lthough irreparable harm is generally presumed in trademark infringement cases, that presumption is overcome where the plaintiff delays in seeking injunctive relief, because a court

---

[10] Even if only two of these factors weigh in favor of Defendants, this is enough to preclude a preliminary injunction.  "Similarity in marks is the only one of these factors that favors plaintiff.  I conclude that on this record, plaintiff has shown only that there is a possibility that it may prevail in this action." *Chicago Tribune Co. v. Fox News Network, LLC*, 520 F.Supp.2d 930, 940 (N.D. Ill. 2007) (denying motion for preliminary injunction).

may infer that there is no threat of irreparable harm." *MB Financial Bank, N.A. v. MB Real Estate Services, L.L.C.*, 2003 WL 21462501, 21 (N.D. Ill. 2003)(App. 7); see also *Borden, Inc. v. Kraft, Inc.*, 1984 WL 1458, 17 (N.D. Ill. 1984)(App. 14) (no irreparable harm where plaintiff delayed six months in bringing suit); *Stokely-Van Camp, Inc. v. Coca-Cola Co.*, 1987 WL 6300, 3 (N.D. Ill. 1987)(App. 15) ("the fact that Stokely waited three months indicates a lack of a need for the extraordinary remedy of a preliminary injunction"); but see *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 902 -903 (7th Cir. 2001) (preliminary injunction affirmed despite plaintiff waiting eight months to seek injunctive relief).

Additionally, a delay in pursuing a preliminary injunction may deprive plaintiff of the presumption of irreparable harm which might otherwise apply, thus requiring the plaintiff to prove irreparable harm.  See *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2nd Cir. 1985) ("Significant delay in applying for injunctive relief in a trademark case tends to neutralize any presumption that infringement alone will cause irreparable harm pending trial, and such delay alone may justify denial of a preliminary injunction for trademark infringement.")

MMU knew at least as early as November of 2006 that Steven Miyano was operating his company as MiyanoHitec Machinery.  On November 3, 2006 papers were filed with the Illinois Secretary of State to establish the business name, MiyanoHitec Machinery, Inc.  (Doc. 23 at Exh. 19, p. 3).  Four days later, on November 7, 2006, the Miyanos met with MMJ senior executive, Messrs. Saito and Nakagiri, at a restaurant near the JIMTOF trade show in Tokyo.  Tom Miyano Decl. at ¶ 13; (Exh. 3, Saito Dep. Tr. at 24:1-5).  The Miyanos discussed with the MMJ executives the business in the United States and possible business ventures with MMJ.  (Exh. 3, Saito Dep. Tr. at 24-25).  MMU's past chairman, Hank Marchionne, testified that he also learned of Tom and Steven Miyano's new business in the middle of 2006 – possibly as early as May.

35

(Exh. 1, Marchionne Dep. Tr. at 92:6-14).  Even if MMU did not know that the MIYANOS were using their surname with the business in November, MMU admits that by late January or early February 2007 MMU knew that the business was named MiyanoHitec Machinery, Inc.  (Exh. 5, MMU's Response to Counterclaimants' First Set of Interrogatories, No. 14).

Soon after obtaining the MIYANOS business cards, on February 20, 2007, MMU rushed to the USPTO (rather than the courthouse) to register the plain text MIYANO word mark.  (Doc. 23 at 2 (chart)).  A month later MMU sent a cease and desist letter to Tom Miyano.  (Doc. 23, Exh. 21).  After the letter, MMU delayed without explanation, waiting until February of 2008 to file its motion for a preliminary injunction (the "Motion").          **REDACTED**

MMU's 12 to 15 month[11] delay in filing its Motion for Preliminary Injunction is fatal to its claim of irreparable harm.[12]  During the delay, MMU rushed to the USPTO registering the plain text MIYANO word mark (No. 3,328,718, filed 2/20/07) and later the Triangle Winged M Mark for services (No. 77/176,918, filed 5/9/07).  (Doc. 23 at 2 (chart)).  MMU waited until after the new plain text MIYANO mark registered and then asserted both of its new marks against the MIYANOS.  In light of MMU's improper conduct, including its false statements to the USPTO,[13] MMU's delay in filing the Motion was unreasonable and unexcused, warranting denial of the Motion.

---

[11] If MMU discovered during the November 7, 2006 meeting that the MIYANOS were using their surname with their business, then the delay is approximately 15 months.  If MMU did not know until February 5th of 2007, then MMU's delay in fling the Preliminary Injunction motion on February 1, 2008 (Doc. 14) was approximately 12 months.

[12] Furthermore, MMU knew long before November 2006 that Tom Miyano owned the rights in Japan to the Winged M design mark and the winged M with MIYANO (Block font) with Triangle fence.  Tom Miyano Decl. ¶ 17.

[13] See discussion regarding fraud on the USPTO *Supra*.

Alternatively, MMU's improper delay and misconduct deprive MMU of the presumption of irreparable harm. Without the presumption, MMU has no evidence of any actual harm. MMU has presented no evidence of any actual business loss, no evidence of any consumer confusion and no damage to its reputation. When a plaintiff has not shown that confusion poses a threat to the business, profits or reputation of the plaintiff, there is no irreparable harm. See, *Brennan's Inc. v. Brennan*, 512 F.Supp.2d 559, 573 (S.D. Miss. 2007). "Plaintiff fails to identify precisely how it would be irreparably harmed if a preliminary injunction is not issued. It merely makes a broad, vague claim of irreparable injury caused by a false impression created in the mind of the consumers." *Borden, Inc. v. Kraft, Inc.*, 1984 WL 1458, 17 (N.D. Ill. 1984)(App. 14). Since MMU has no evidence of irreparable harm, it has failed to carry its burden and the Motion for Preliminary Injunction must be denied.

### C.    Balance of Harms

MMU has the burden of showing that the harm it will suffer absent injunctive relief, outweighs the harm defendants will suffer if the injunction is granted. *Chicago Tribune Co. v. Fox News Network, LLC*, 520 F.Supp.2d 930, 932 (N.D. Ill. 2007). Instead of presenting evidence on how it will be harmed, MMU discusses how the harm that the MIYANOS will suffer, should be discounted. MMU fails to carry its burden of showing that its harm outweighs the harm to Defendants.

As MMU knows, the harm to Defendants would be substantial if a preliminary injunction issues, precluding the MIYANOS from using their surname and family owned flying M in connection with their business. "The right to do business under one's own name is one of the sacred rights known to the law; and a family name is incapable of exclusive appropriation, and cannot be thus monopolized." *Continente v. Continente,* 244 F.Supp. 688, 690 (D.C. Cal. 1965).

"The Supreme Court has ruled that a man may use his own name reasonably and honestly for a legitimate purpose in his own business and that the first user, in choosing a family name for his business, assumes the risk of others of the same name using such name fairly in their own business." *Id*. (internal citations omitted).

In *Brennan's Inc. v. Brennan*, the sons of the co-owners of the famous Brennan's restaurant of New Orleans started similar restaurants in Destin, Florida and Gulf Port, Mississippi with the name "Clark and Blake Brennan's Royal B." 512 F.Supp.2d 559, 560 (S.D. Miss. 2007). In denying the preliminary injunction, the court recognized the harm that would result to the sons if they were precluded from using their surname in their business. *Id*. at 574 ("there is an appropriate judicial reluctance to preclude an individual's business use of his own surname when such is honest and straight forward, with no attempt to confuse the public… courts are naturally reluctant wholly to forbid a man to do business in his own name and have generally refused to do so.")(internal citations omitted)(internal quotations omitted). The court found no likely confusion, no irreparable injury and that the balance of harms favored denial of the preliminary injunction. *Id*.

In *Howe Scale Co. v. Wyckoff, Seamans & Benedict*, E. Remington and his three sons manufactured firearms until the father died and the sons continued the business as "E. Remington & Sons." *Howe Scale Co. v. Wyckoff, Seamans & Benedict*, 198 U.S. 118, 121 (1905). E. Remington & Sons became well known for "the Remington rifle" and the company also sold sewing machines and typewriting machines. *Id*. E. Remington & Sons sold the typewriter portion of the business, along with the exclusive right to use the name "Standard Remington Typewriter." *Id*. at 121-22. After the sale, two sons of Samuel Remington (the former president of Remington & Sons) entered a business with Z. G. Sholes (an inventor of an

improved typewriter) manufacturing and selling typewriters under the name "The Remington-Sholes" and later under "Remington-Sholes, Chicago" and "Rem-Sho." *Id*. at 122-23. The advertising of the typewriters contained a disclaimer to caution customers against confusion with the "Standard Remington Typewriter." *Id*. at 123.

Overturning the Second Circuit's injunction against the use of the surname "Remington" the United States Supreme Court held "that, in the absence of contract, fraud, or estoppels, any man may use his own name, in all legitimate ways, and as the whole or a part of a corporate name." *Id*. at 140. The Court reasoned that a surname cannot be exclusively appropriated against others of the same name with a legitimate purpose for its use. *Id*. at 135. Necessity is not the test of the right to use a surname as a person is not obligated to "abandon the use of his name or to unreasonably restrict it." *Id*. at 137. Furthermore, it is "natural that those who had invented the machine, and given all their time and means in introducing it to the public" should be allowed to use their own name as the company name and in so doing are "exercising only the common privilege that every man has to use his own name in business" if not a cover for unfair competition. *Id*. at 139. Availing themselves of the general family reputation attached to their surname does not in itself justify an assumption that the purpose was to confuse consumers. *Id*. "Purchasers may be mistaken, but they are not deceived by false representations, and equity will not enjoin against telling the truth." *Id*. at 140.

The 7th Circuit has recognized and followed the Supreme Court's holding in *Howe Scale*, stating that "[i]n the absence of contract, fraud or estoppel, any man may use his own name in all legitimate ways and as the whole or a part of a corporate name; it is only when the use is dishonest or fraudulent that the court may interfere." *Benrose Fabrics Corp. v. Rosenstein*, 183 F.2d 355, 359 (7th Cir. 1950) (Seventh Circuit affirming judgment that no likelihood of confusion

between "Benrose" for fabrics used for wearing apparel and "Ben Rose" for fabrics for interior decorating).

MMU has not shown any fraud or any improper use of the MIYANO surname by the Miyanos. Further, the Miyanos have many inventions as evidenced by 23 patents, and have a strong family reputation of which they are very proud. Tom Miyano Decl. ¶¶ 4, 5 and 9. These facts, along with the disclaimer used by the Miyanos shows that there is no intent to deceive and "equity will not enjoin against telling the truth." *Howe Scale*, at 140. Accordingly, MMU's preliminary injunction must be denied because it would result in a substantial harm to the Miyanos, far outweighing any harm to MMU.

Furthermore, the Miyanos will be harmed by being required to change their business name once again. In an attempt to expressly distinguish themselves from MMU, Defendants have already changed their business name and added a disclaimer as many courts have required. But MMU is not satisfied with the Miyanos addition of their first names and insists on pushing forward with its attempt to squelch competition. The Second Circuit has specifically noted that adding a first name is "meaningful:"

> We agree with the district court that the addition of the first name "Terrance" to defendant's mark is meaningful. Judge McKenna found that Terrance Brennan, through his restaurants Picholine and Artisanal, has become a well-known chef in Manhattan, and that the use of his first name suggests a restaurant connected with the Terrance Brennan of Picholine and Artisanal instead of a restaurant connected with Brennan's in New Orleans.

*Brennan's, Inc. v. Brennan's Restaurant, L.L.C.*, 360 F.3d 125, 133 (2nd Cir. 2004). Clearly, the Miyanos' use of their first name shows a connection between them and their goods and services and also distinguishes them even further form MMU. Forbidding them from using their own names would preempt them from trading on their own reputations.

> The concept that there should be some qualified right to use one's own name as a mark, has resulted in a great reluctance of judges to issue an absolute injunction against any use of a personal name mark. As the Second Circuit observed, "courts generally are hesitant to afford strong protection to proper names, since to do so preempts others with the same name from trading on their own reputation." The majority of cases result in an injunction requiring some change in format, the addition of prefixes or suffixes, or disclaimers, while permitting the junior user to retain, in some form, the use of his own name: "… courts are naturally reluctant wholly to forbid a man to do business in his own name and have generally refused to do so.

MCCARTHY § 13:9. "To prevent all use of [a man's personal name] is to take away his identity; without it he cannot make known who he is to those who may wish to deal with him; and that is so grievous an injury that courts will avoid imposing it, if they possibly can." *Brennan's, Inc. v. Brennan's Restaurant, L.L.C.*, 360 F.3d 125, 131-132 (2nd Cir. 2004) (Preliminary injunction was denied because use of first name for mark for New York restaurant TERRANCE BRENNAN'S distinguishes it from the New Orleans' restaurant BRENNAN'S).

MMU argues that Defendants are using MMU's marks in bad faith. (Doc. 23 at 26). However, there is no evidence of any bad faith on the part of the Defendants. To the contrary, Defendants are the rightful owners of the marks that they are using in connection with their business. MMU also argues that the surname transfers to the new owners of a business. *Id*. However, this is only true when the owner of the surname has ***sold*** its ***good will*** in the business, which was not done here. *Id*. at 27; *quoting Levit Corp. v. Levitt*, 593 F.2d 463 (2nd Cir. 1979)("Where… the infringing party has previously ***sold*** his business, ***including*** use of his name and ***its goodwill***, to the plaintiff, sweeping injunctive relief is more tolerable.")(emphasis added). Here, Tom Miyano was forced to ***surrender*** or divest his shares of MMJ and MMU stock at a great financial loss. Furthermore, at no time did Tom surrender his ownership of the Miyano name or the Winged M marks. Tom signed no agreements transferring the goodwill in his

company or his surname to MMU.  Nor did Tom sign a non-compete agreement with MMU.  To divest Tom and the Miyanos of their right to their family name and the marks owned by the family would be a great harm and injustice to the Miyanos.  For all of the reasons above, the balance of harms weighs against issuing an injunction.

### D.    Public Interest

Clearly, the public interest is not served by enjoining people from using their own name to sell their goods and services.  This is particularly true where, as here, Defendants have affirmatively added their first names to their surnames to avoid confusion.  Likewise, Defendants have affirmatively disclaimed any association with Plaintiff and consistently take active steps to distinguish themselves from MMU.

Additionally, MMU has engaged in questionable conduct by making material misrepresentations to the USPTO by falsely claiming consent from the Miyanos to register their surname.  MMU has also misrepresented its lack of continual use of the marks, has submitted a label to the USPTO showing the Triangle Winged M not as used in commerce and has attempted to hide its express abandonment of the plain text Miyano mark.  These actions should have serious consequences, particularly since submitting a claim of use in connection with goods or services for which a mark is not actually in use constitutes a misrepresentation of material fact sufficient to support a finding of fraud on the USPTO.  See *Medinol Ltd. v. Neuro Vasx Inc.*, 67 U.S.P.Q. 2d 1205, 1208 (T.T.A.B. 2003)(App. 16).  The public interest is not served by rewarding misconduct through issuing an injunction.  Moreover, this Court should not issue an injunction to MMU whose hands are clearly unclean.

### III.   CONCLUSION

For the foregoing reasons, this Court should deny MMU's request for a preliminary injunction.  Additionally, this Court should grant Defendants' attorneys fees and costs, as well as such further and other relief as the Court deems appropriate.


DATED:  June 6, 2008

Respectfully submitted,

/s/ Geoffrey A. Baker
Robert M. Karton
ROBERT M. KARTON, LTD.
77 W. Washington St., Suite 900
Chicago, Illinois 60602-2804
(312)214-0900 telephone
(312)214-4230 facsimile
robert@karton.us

Vernon W. Francissen
FRANCISSEN PATENT LAW, P.C.
FRANCISSEN PATENT LAW, P.C.
53 W. Jackson Blvd., Suite 1320
Chicago, Illinois 60604
(312)294-9980 telephone
(312)275-8772 facsimile
vern@francissenpatentlaw.com

Geoffrey A. Baker
Anthony E. Dowell
Geoffrey D. Smith
Dowell Baker, P.C.
201 Main Street, Suite 710
Lafayette, Indiana 47901
(765) 429-4004 telephone
(765) 429-4114 facsimile

gabaker@dowellbaker.com

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing CORRECTED, REDACTED MEMORANDUM IN

RESPONSE TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION was filed via

the Court's ECF system and thus also sent by email on June 18, 2008 to the following:


Edward D. Manzo
COOK, ALEX, MCFARRON, MANZO,
CUMMINGS & MEHLER, LTD.
200 West Adams Street, Suite 2850
Chicago, IL 60606

Phone:  (312) 236-8500
Fax:  (312) 236-8176

emanzo@cookalex.com


June 18, 2008                                    /s/Geoffrey A. Baker