**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| Miyano Machinery USA Inc., | ) | |
| | ) | |
|    Plaintiff, | ) | |
| | ) | Civil Action No. **08 C 526** |
|       v. | ) | |
| | ) | Hon. Virginia Kendall |
| MiyanoHitec Machinery, Inc., | ) | |
| Thomas ("Tom") Miyano, a/k/a Toshiharu Miyano | ) | Magistrate Judge Nolan |
| and Steven Miyano, a/k/a Shigemori Miyano, | ) | |
| | ) | |
|    Defendants | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| | ) | |
| MiyanoHitec Machinery, Inc., | ) | |
| Thomas ("Tom") Miyano, a/k/a Toshiharu Miyano | ) | |
| and Steven Miyano, a/k/a Shigemori Miyano, | ) | |
| | ) | |
|    Counterclaim-Plaintiffs | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Miyano Machinery USA Inc. | ) | |
|    Counterclaim-Defendant, and | ) | |
| | ) | |
| Miyano Machinery Inc., | ) | |
|    Third-Party Defendant | ) | |
| | ) | |

# REPLY TO DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

I.   INTRODUCTION.................................................................................................1

  A.   The Facts Support Entry of a Preliminary Injunction ................................. 3

  B.   Defendants Deliberately Targeted MMU's Name and Marks..................... 7

  C.   Defendants Misstate the Role of the IRCJ................................................ 9

II.  ARGUMENT ...................................................................................................10

  A.   Plaintiff Has Demonstrated Likely Success on the Merits ....................... 10

    (1)   Plaintiff's Trade Name and Trademarks are Protectable .................. 10

      a.   MMU's Registered Plain-Text MIYANO® is Protectable...................... 10

        i.   Defendants Have Failed to Present Any Argument or Evidence to Rebut the
        Presumption that MMU's Registered MIYANO Trademark has Acquired
        Secondary Meaning ...................................................................... 10

        ii.   MMU's Plain-Text Mark Was Neither Cancelled Nor Abandoned.................. 11

        iii.   MMU Received Defendant Tom Miyano's Written Consent ........................ 14

        iv.   Defendants' Four Bases for Cancelling the MIYANO® Trademark are
        Unsupported in Fact and Law. ........................................................ 16

      b.   The "Miyano" Trade Name is Protectable ......................................... 17

        i.   "Miyano" is a Trade Name of Plaintiff Entitled to Protection ......................... 17

        ii.   The Word "Miyano" Is Not Perceived as a Surname......................... 18

        iii.   Survey Evidence is Not Required for a Preliminary Injunction ................... 19

      iv.   Plaintiff Has Shown Secondary Meaning For Its Trade
              Name and Trademarks ..................................................... 20

      c.   MMU's Triangle Winged M Mark is Protectable .................................... 22

        i.   MMU has Common Law Rights in the Triangle Winged M Mark................... 22

        ii.   Plaintiff Owns the Triangle Winged M and MIYANO marks ........................ 22

        iii.   Defendants Arguments Regarding Tacking Fail ................................ 23

        iv.   MMU Never Abandoned the Triangle Winged M Mark .............................. 29

        v.   Defendants' Affidavits Not Only Fail to Support Abandonment, but in Fact
        Refute that Such has Occurred.......................................................... 32

        vi.   Defendants' Have Not Establish Fraud ........................................ 35

i

**(2)      Plaintiff MMU Has Overwhelmingly Shown A Likelihood of Confusion** ......... 36

    **a.      Defendants' Marks Are Unquestionably Confusingly Similar to Plaintiff's Marks** ...................................................................................................... 36

    **b.      Defendants Sell The Same Products** ................................................. 38

    **c.      Area and Manner of Use** ................................................................... 39

    **d.      Customer's Degree of Care – Customers Will Suffer from Initial Interest** ...... 39

    **e.      Strength of the Mark Favors Plaintiff MMU** ................................... 40

    **f.      Actual Confusion** .............................................................................. 41

    **g.      Defendants' Intent** ............................................................................. 41

    **h.      Likelihood Of Confusion Summary** ................................................. 42

**B.      Defendants Fail to Refute Irreparable Harm** ............................................... 42

**C.      Defendants Fail to Refute Plaintiff's Balance of Harm Showing** ............................ 44

**D.      Public Interest** ................................................................................................ 45

**III.      CONCLUSION** ................................................................................................**46**

# TABLE OF AUTHORITIES

**Cases**                                                                                     **Page**

*Alford Mfg. Co. v. Alfred Electronics*,
  137 U.S.P.Q. 250 (T.T.A.B. 1963), *aff'd*, 333 F.2d 912 (C.C.P.A. 1964). ...............................14

*Autotech Tech. Ltd. v. Automationdirect.com, Inc.*,
  2007 U.S. Dist. LEXIS 60474 (N.D. Ill. Aug. 17, 2007)............................................................33

*Brennan's Inc. v. Brennan*,
  360 F.3d 125 (2nd Cir. 2004)..............................................................................................44, 45

*Brooks Bros. v. Brooks Clothing of California, Ltd.*,
  60 F. Supp. 442 (S.D. Cal. 1945)................................................................................................18

*Brookfield Communications, Inc. v. West Coast Entertainment Corp.*,
  174 F.3d 1036 (9th Cir. 1999) ....................................................................................................24

*Brunswick Corp. v. Jones*,
  784 F.2d 271 (7th Cir. 1986) ......................................................................................................10

*CAE, Inc. v. Clean Air Engineering, Inc.*,
  67 F.3d 660 (7th Cir. 2001) ........................................................................................................11

*Clarus Transphase Scientific, Inc. v. Q-Ray, Inc.*,
  2006 WL 4013750 (N.D. Ill. 2006) ......................................................................................15, 21

*Consumers Petroleum Co. v. Consumers Co. of Illinois*,
  169 F.2d 153 (7th Cir. 1948) ......................................................................................................44

*Cumulus Media, Inc. v. Clear Channel Communications, Inc.*,
  304 F.3d 1167 (11th Cir. 2002) ..................................................................................................13

*Dorr-Oliver, Inc., v. Fluid-Quip, Inc.*,
  94 F.3d 376 (7th Cir. 1996) ........................................................................................................40

*Electro Source, LLC v. Brandess-Kalt-Aetna Group, Inc.*
  458 F.3d 931 (9th Cir. 2006) ......................................................................................................35

*Eli Lilly & Co. v. Natural Answers, Inc.*,
  233 F.3d 456 (7th Cir. 2000) ................................................................................................41, 45

*Emergency One, Inc. v. Am. FireEagle, Ltd.*,
  228 F.3d 531 (4th Cir. 2000) ......................................................................................................31

*Fuji Photo Film Co. v. Shinohara Shoji Kabushiki Kaisha,*
  754 F.2d 591 (5th Cir. 1985) ................................................................5, 32

*Gilbert/Robinson, Inc. v. Carrie Beverage-Missouri, Inc.,*
  989 F.2d 985 (8th Cir. 1993) ........................................................................12

*Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons,*
  365 F. Supp. 707 (S.D.N.Y. 1973), *aff'd* 523 F.2d 1331 (2d Cir. 1975) ..................................40

*Henri's Food Products Co.,*
  717 F.2d 352 (7th Cir. 1983) ....................................................................36, 37

*Howe Scale Co. v. Wyckoff, Seamans & Benedict*
  198 U.S. 118 (1905).........................................................................................44

*In re Chatam Int'l, Inc.,*
  380 F.3d 1340 (Fed. Cir. 2004)................................................................37, 38

*In re Dell,*
  71 U.S.P.Q.2d 1725 (T.T.A.B. 2004) ..............................................................31

*In re McKee Baking Co.,*
  218 U.S.P.Q. 287 (T.T.A.B. 1983) ...................................................................15

*In re Umax Data Systems, Inc.,*
  40 U.S.P.Q.2d 1539, 1996 WL 657223 (Com'r Pat. & Trademarks)..................25, 26

*IFC Credit Corp. v. Aliano Brothers General Contractors, Inc.*
  437 F.3d 606 (7th Cir. 2006) ..................................................................15, 21

*International Kennel Club of Chicago, Inc. v. Mighty Star, Inc.,*
  846 F.2d 1079 (7th Cir. 1988) ..............................................10,19,20 ,22, 45

*ISP.Net, LLC v. Qwest, Communs. Int'l, Inc.,*
  2003 U.S. Dist. LEXIS 9076 (S.D. Ind. 2003) .......................................................14

*Keebler Co. v. Nabisco Brands, Inc.,*
  1992 U.S. Dist. LEXIS 6826 (N.D. Ill. May 19, 1992) ................................................29

*LLC v. U.S. Search.com, Inc.,*
  300 F.3d 517 (4th Cir. 2002) ..........................................................................11

*Lady Esther, Ltd. v. Lady Esther Corset Shoppe,* Inc.,
  317 Ill. App. 451 (Ill. App. Ct. 1943) .................................................................46

*Liquid Controls Corp. v. Liquid Control Corp.*,
  802 F.2d 934 (7th Cir. 1986) ....................................................................11

*Mackenzie-Childs, Ltd. v. Mackenzie-Childs*,
  2008 U.S. Dist. LEXIS 1717 (W.D.N.Y. Jan. 9, 2008) .............................13

*Money Store v. Harriscorp Finance, Inc.*,
  689 F.2d 666 (7th Cir. 1982) .........................................................14, 16, 35

Paris Glove of Canada, Ltd. v. SBC/Sport Corp.,
  2007 WL 2422997 (T.T.A.B. 2007) ......................................................25, 26

*Peaceable Planet, Inc. v. Ty, Inc*
  362 F.3d 986 (7th Cir. 2004) ................................................................18, 19

*Personeta, Inc. v. Persona Software, Inc.*,
  418 F. Supp. 2d 1013 (N.D. Ill. 2005) ...............................................39, 40, 41

*Pro-Cuts v. Schilz-Price Enters., Inc.*,
  27 U.S.P.Q.2d 1224 (T.T.A.B. 1993) .........................................................24

*Retail Servs. v. Freebies Publ'g*,
  364 F.3d 535, 542 (4th Cir. 2004) ..............................................................11

*Sands, Taylor & Wood Co. v. Quaker Oats Co.*,
  978 F.2d 947 (7th Cir. 1992)
  *aff'd* in part, *rev'd* in part, 34 F.3d 1340 (7th Cir. 1994) ........................12

*Société Civile Des Domaines Dourthe Frères v. S.A. Consortium Vinicole De Bordeaux Et De La Gironde*, 6 USPQ2d 1205 (TTAB 1988) .................................................17

*Teter, Inc. v. Rheem Mfg. Co.*,
  334 F.2d 784 (7th Cir. 1964) .....................................................................30

*Ty, Inc. v. Jones Group, Inc.*,
  237 F.3d 891 (7th Cir. 2001) .....................................................................10

**STATUTES**

15 U.S.C. § 1052(c) ...............................................................................14, 15
15 U.S.C. § 1052(e) ....................................................................................11
15 U.S.C. § 1064(3) ....................................................................................11
15 U.S.C. § 1115(a) ....................................................................................17
15 U.S.C. § 1115(b) ....................................................................................23
15 U.S.C. § 1125(a) ....................................................................................26
15 U.S.C. § 1127............................................................................................17, 21

**OTHER AUTHORITIES**

37 C.F.R. § 2.28 .................................................................................................12

37 C.F.R. § 2.51 .................................................................................................29

37 C.F.R. § 2.52 ............................................................................................13, 28

Trademark Manual of Examination Procedure § 1206.03(b)(5th ed. 2007).................................17

Trademark Manual of Examination Procedure § 1604.13(5th ed. 2007) .....................................28

**TREATIES**

*Hawes Trademark Registration Practice* §5:9 (2004)..............................................................28

*Hawes Trademark Registration Practice* §24:7(2004)........................................................25, 28

*McCarthy on Trademarks and Unfair Competition* § 17:4 (4th ed. 2005)....................................34

*McCarthy on Trademarks and Unfair Competition* § 17:12(4th ed. 2005)....................................29

*McCarthy on Trademarks and Unfair Competition* § 17:27(4th ed. 2005).................23, 24, 25, 26

*McCarthy on Trademarks and Unfair Competition* § 17:26(4th ed. 2005)............................23, 24

*McCarthy on Trademarks and Unfair Competition* § 31:74 (4th ed. 2005)..................................13

*McCarthy on Trademarks and Unfair Competition* § 31:76 (4th ed. 2005)..................................16

# I. INTRODUCTION

Plaintiff's most important assets, its company name and trademarks, are being usurped by Defendants who plan to use confusingly similar names and marks in direct competition with Plaintiff in connection with the advertisement and sale of goods of the same nature – machine tools – marketed to the same customers in the same channels of trade and geographic region(s).

Defendants have no product to show or sell yet. However, they are on track to have a machine tool, being made in India for them, to exhibit at a major trade show ("IMTS") that will occur in Chicago starting on September 8, 2008. IMTS is one of the two largest and most important shows in the machine tool industry worldwide. Defendants insist on using the same name by which Plaintiff is known (and uses as a trademark), MIYANO, at IMTS and elsewhere, along with a logo mark that is confusingly similar to one of Plaintiff's marks. Defendants have secured a booth on the same floor as Plaintiff's booth and are listed with the show as "MiyanoHitec Machinery."

Plaintiff seeks a preliminary injunction against Defendants' uses of the "Miyano" trade name, the MIYANO trademark and the Winged M trademark. The use by Defendants of the "Miyano" trade name, the MIYANO trademark, or the Winged M mark will cause immediate irreparable injury to Plaintiff. Moreover, such uses by Defendants are unnecessary and appear to be calculated for the very purpose of harming Plaintiff to the enrichment of Defendants.[1]

In response to Plaintiff's February 1, 2008 motion (Doc. 14) and supporting papers (Doc. 23), and after several court-approved extensions, Defendants filed a responsive brief (Doc. 117). Following this Court's June 18, 2008 Order (Doc. 123) barring Defendants' use of materials derived from Plaintiff's privileged document, Defendants filed a redacted brief (Doc. 124).

---

[1] Soon after defendant Tom Miyano separated from Plaintiff (in September 2006), he joined Hitec Machinery International Inc. ("HiTec"), which his son, S. Miyano, had established and was running since March of 2005. Thereafter, HiTec was renamed as MiyanoHitec Machinery Inc. [emphasis added] Also, Defendants set up a website claiming the history of Plaintiff as their own, using both "Miyano" and "Miyano Machinery," and displaying a prominent portion of a mark that had been used for decades by Plaintiff (the "Triangle Winged M" mark) in the United States.

Abbreviations and Definitions: As all of the parties in this case include the name "Miyano," to minimize confusion we refer to Plaintiff Miyano Machinery USA, Inc. either as "Plaintiff" or the acronym "MMU." In the trade, however, MMU is known in this country as "Miyano." Plaintiff's Japanese parent company is the third party defendant, Miyano Machinery, Inc., which we will refer to with the acronym "MMJ." Deposition transcripts cited herein have the following format: [*Witness Name*] Tr.p.:lines. Documents previously filed in this case are referred to by their document number ("Doc. _") and/or associated exhibit number. Translations of exhibits written in Japanese are included with the respective exhibit. To avoid confusion, Exhibits attached to this reply follow the numbering in Plaintiff's opening memorandum (Doc. 23) and begin with Exh. 42.

Defendants raise a number of issues. In short, Defendants: (1) assert that *Miyano* is a (Japanese) surname and claim an absolute right to use that name to compete with Plaintiff; (2) assert that various (Japanese) trademark rights were owned by Sumiko Miyano, which Tom Miyano allegedly inherited; (3) assert various infirmities in Plaintiff's rights; (4) deny likelihood of confusion; (5) allege delay by Plaintiff to preclude equitable relief; and (6) deny the balance of harm or that public interest favors Plaintiff. These fail for a variety of reasons, including:

(1) Neither Illinois law nor federal law confers an absolute right to use one's surname in competition when the use violates rights of another or is likely to confuse, mislead, or deceive. Also, the word "Miyano" is not commonly used in the U.S. as a surname; in the industry, it designates *Plaintiff*, as Tom Miyano attests.

(2) The ownership of Japanese trademark rights may be of interest to those in Japan, but trademark rights are territorial in nature.  Ownership in a given country is determined solely and exclusively by the laws of that country, which in this case, is the United States.  Moreover, to the extent that Tom Miyano attempts to claim he is the owner of certain trademarks in Japan, his failure to assign them to MMJ is a clear violation of an agreement under which MMJ received financial assistance and Tom Miyano was relieved of personal liability on corporate debts of over $130 million.

(3) Defendants do not even approach meeting their heavy burden of proof in showing that Plaintiff's common law rights and registered federal rights are infirm.

(4) Defendants' suggestion (that because *some* of these machine tools are expensive, sophisticated customers will not likely be confused, and this outweighs all the other factors), is speculative and unsupported. Moreover, Defendants ignore the initial interest confusion they are likely to cause.

(5) Plaintiff did not delay to the point of losing the right to seek equitable relief. First, Defendants hid their name change and mark adoption from MMJ. When MMU discovered that Defendants would be exhibiting at the IMTS, it sought an amicable resolution. When it became clear that Defendants were not going to respect Plaintiff's rights, Plaintiff prepared for this suit and moved for a preliminary injunction long before the September 8, 2008 trade show. Defendants were not lulled into a false sense of security.

(6) The balance of harm and public interest certainly favor avoiding confusion and Defendants' predatory tactics. Defendants can easily revert to the name they had, HiTec

Machinery International Inc. They should not be permitted to infect the marketplace with confusingly similar names and marks.

Positioning himself as a victim, Tom Miyano suggests that an agency of the Japanese Ministry of Finance (the IRCJ) "targeted" MMJ, stole it from him, and profited handsomely. This wild theory is not only implausible and offensive to the Japanese Government but also omits several salient facts:  (1) there was no targeting -- Tom Miyano himself directed MMJ to apply for debt relief, (2) he knew in advance what he would have to give up (personally) in exchange for debt relief, and (3) **he became excused from personal liability on corporate debts of over $130 million.** He also (4) ignores mentioning the harm that this caused the senior management team of MMJ (all senior managers surrendered their entire retirement benefits).

MMU's motion for a preliminary injunction is well founded, and Defendants' defenses are not. MMU respectfully urges this Court to enter the preliminary injunction forthwith. Nevertheless, MMU is prepared to present its case at the forthcoming hearing on Friday, July 18.

## A.  The Facts Support Entry of a Preliminary Injunction

Plaintiff's Statement of Facts in its brief (Doc. 23) is generally undisputed by Defendants' brief (Doc. 124).  Defendants add a long narrative of alleged facts, mostly unsupported by any evidence. Defendants refer often to MMJ which was run by Tom Miyano until 2004.[2]

From its very inception, the corporate name of Plaintiff MMU always included the name "Miyano" together with the word "Machinery." Exh.  43, Marchionne Dep. Tr. 28:10-17. It sometimes ended with the suffix "Inc." and at other times "U.S.A." or a combination of both. *Id.* Since 1975, Plaintiff has consistently referred to itself as "Miyano." *See*, *e.g.*, Exh. 44, *See* Doc. 15, Decl. of Marchionne ¶¶ 16-17. The term "Miyano" is featured in MMU's advertisements. *See*, *e.g.,* Exh. 45. Third parties use the "Miyano" trade name to identify Plaintiff.[3] For example, a 1989 article in *U.S. News and World Report* refers to MMU as "Miyano."[4] Even defendant

---

[2] MMJ did not always include the name "Miyano." Witnesses have testified that the founder was Hajimue Kakuta , the step-father of Toshimori Miyano. Mr. Kakuta died childless, and Toshimori Miyano inherited and/or ran the company, changing its name to include the family name "Miyano." Exh. 42, T. Miyano Tr. at 11:21-16:11.  After Toshimori died, defendant Tom Miyano, his son, ran the Japanese parent company and caused the incorporation of the U.S. subsidiary, Plaintiff MMU.

[3] *See* Doc. 23, Exh. 6 ("Over 200 major machines to be auctioned… and large numbers of miscellaneous machining devices from well-known brands such as…  Miyano…"); *see also* Doc. 23, Exhs. 8 and 11.

[4] Doc. 23, Exh. 10, p. 1: "Miyano, Yamaha and Hitachi are shipping out machine tools, golf carts and computer disk drives [from the United States]."

Tom Miyano acknowledges that the term "Miyano" is the trade name of Plaintiff and is the term that "…customers used to identify the source of machines marketed and sold by MMU." (Decl. of T. Miyano, Doc. 115, ¶6).

Throughout its whole history, Plaintiff has continuously used "Miyano" in various forms as trademarks, corporate, and trade names. Exh. 43, Marchionne Tr. 28:10-17. In addition, Plaintiff has used a composite logo mark – the so-called Triangle Winged M – continuously (for decades) in connection with machines and machine tools, warranties, and services.[5]  Plaintiff has never abandoned any trademark right in these marks.

Plaintiff's registered trademarks are listed in the chart on page 2 of its opening brief (Doc. 23). Representations of these trademarks are given below.  In each of these representations, the word MIYANO is clearly readable.[6]

   

<u>Plaintiff's Ownership in the U.S.</u> In the United States, Plaintiff owns the common law rights in the trade name "MIYANO," MIYANO marks, and Triangle Winged M mark as well as the associated federal trademark registrations.[7]  Plaintiff's ownership is irrefutable -- affidavits and declarations signed by defendant Tom Miyano himself, filed with the U.S. Trademark Office, attest to such ownership *by the corporation*.[8]  In these affidavits and declarations, Tom Miyano stated that the MIYANO marks and the Triangle Winged M mark were owned by the corporation MMU (or its predecessors), and that no other person (including himself), firm, corporation, or association had the right to use the marks in commerce.[9]  The trademark registrations for the Triangle Winged M (Reg. No. 1,217,317), the Stylized Miyano (Reg. No. 1,527,809) and Miyano Motto mark (Reg. No. 1,473,925) in which these declarations and

---

[5] Exh.  46a, Answers to Interrogatories, pp. 6-50 and 61-70.
[6] Each of the designs supports the standard character (plain-text) registration of MIYANO (U.S. Registration No. 3,328,718), which is made without a specific claim to font, style, or color.
[7] The MIYANO marks include the plain-text MIYANO® (Reg. No. 3,328,718), Stylized Miyano (Reg. No. 1,527,809) and Miyano Motto mark (Reg. No. 1,473,925). *See* Doc. 23, Exhs. 1-5.
[8] Doc. 23, Exhs. 36, 37, and 38; Doc. 15, Dec. of Marchionne ¶ 11; Exh.  42, T. Miyano Tr. at 101:4-118:18; Exh.  47 (Triangle Winged M renewal).
[9]  *See* exhibits cited in footnote 8, *supra*.

affidavits were filed are now incontestable. As such, each registration is conclusive evidence of ownership.[10]  Plaintiff's rights have not changed due to Tom Miyano's departure.

Moreover, ownership, licensing, use and renewal of Japanese trademarks in Japan, as asserted by Defendants (Doc. 124, p. 1, 33, etc.), have no bearing on Plaintiff's trademarks and rights in the United States.[11]

Plaintiff's Long Use of the Marks and Name.  Plaintiff's marks and MIYANO name are ubiquitous and are reviewed for example in Plaintiff's 127-page set of interrogatory answers. Exhs. 46a-b.  Plaintiff has used "MIYANO" and the "MIYANO MACHINERY" name and marks and Triangle Winged M mark on its machine tools, service reports given to the customers, warranty agreements signed and returned by customers, time studies for machine tools, packing slips, invoices, building signage, advertisements, 3-ring binders, company checks, envelopes, letterhead, folders which are distributed to customers, on awards presented by Plaintiff, and on shirts worn by company personnel when on official business or when repairing and servicing machine tools.[12]  Through these uses for over 20 years in the United States, Plaintiff has developed tremendous goodwill in MIYANO and Triangle Winged M as trade names and trademarks. Doc. 15, Decl. of Marchionne, ¶ 19

For over 30 years, Plaintiff worked very hard to build up its reputation in the U.S.  Henry Marchionne has 50 years of experience in the machine tool industry and testified that it "[t]akes long years to establish a company in any name." Exh. 43, Marchionne Tr. at 26:24-27:12 and 124:8-125:4.  Plaintiff did that long ago, and since then, MIYANO machine tools have been well known in the machine tool industry.

Facts Concerning Defendants. In contrast, Defendants have sold no products and no services yet. Doc. 124, p. 28; Exh. 50, S. Miyano Tr. at 142:20-143:4.  The first product is to be exhibited at the IMTS show in September, 2008 in Chicago. Doc. 124, p. 28. Machines that

---

[10] 15 U.S.C. § 1115(b)("To the extent that the right to use the registered mark has become incontestable under section 15 [15 U.S.C. §1065], the registration shall be conclusive evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce."

[11] *See Fuji Photo Film Co. v. Shinohara Shoji Kabushiki Kaisha*, 754 F.2d 591, 600 (5th Cir. 1985) ("Fuji correctly assigns as error the trial court's admission of evidence of the parties' foreign trademark usage and occurrences. The concept of territoriality is basic to trademark law; trademark rights exist in each country solely according to that country's statutory scheme.")

[12] *See* Doc. 15,  Declaration of Marchionne ¶¶16-31; *see* Exh.  48 Derek Olczak Tr., 75:8-77:20; and for examples see Exh.  49).

Defendants plan to sell are discussed below in the likelihood of confusion discussion.

Defendant Steven Miyano, president and sole owner of the defendant corporation, has no background in the machine tool industry. Exh. 50, S. Miyano Tr. at 19:11-18; 28:20-29:1; and 32:8-13. His education is in economics, and his only prior full time employment was at an accountancy firm in Japan for a brief tenure. *Id.* at 9:2-10:11. He is not an experienced engineer, *id.* at 73:1-24 and 81:1-24, yet he claims to be solely "designing" an intricate piece of expensive equipment, *id.* at 49:2-8 and 72:17-73:18, to be manufactured by a company in India. *Id.* at 74:4-5. Steven Miyano does not have a personal reputation in the machine tool industry, he has not published any papers, third parties have not recognized him based on his skills, knowledge or expertise, Exh. 46a, p. 111, and he has at most only three years of experience in the industry through the defendant corporation.

Defendant Tom Miyano worked principally as an executive and owner of MMJ and MMU. He testified that while at MMU, he rarely visited with customers, just "two times a year." Exh. 42, T. Miyano Tr. at 29:10-16. He denies that he has any ownership interest in defendant MiyanoHitec and is not an officer of defendant MiyanoHitec. Exh. 50, S. Miyano Tr. at 33:9-34:10. He claims design experience, but he is not designing defendant MiyanoHitec's equipment. *Id.* at 64:17-65:5.

Defendants claim and have previously represented to this Court (Exh. 51, Tr. of Feb. 7, 2008, pp. 9-10) and Plaintiff (Exh. 52, Defendants' Response to MMU's cease-and-desist) that they are using an assumed name, "Tom and Steven Miyano Machinery." Exh.50, S. Miyano Tr. at 127:1-129:24. Such representations are grossly misleading. The picture shown below (left) was taken on May 14, 2008 at a trade fair in Michigan and shows that even if Defendants somewhere use the assumed name, they most prominently exhibit the corporate name MIYANOHITEC MACHINERY, INC. See Exhibits 53-55; Defendants also still use the web address www.Miyanohitec.com. See Doc.1, Exh. 24.



Defendants claim that they use disclaimers. Doc. 115, Declaration of T. Miyano, ¶ 25.  In their brief or declarations attached thereto, however, Defendants do not provide any specimens illustrating how disclaimers are actually used.  The whole truth is that the disclaimer Defendants actually use is microscopic in comparison to their huge sign at trade shows,[13] "MIYANOHITEC MACHINERY, INC.," or in comparison to the rest of the lettering on their business cards, a version of which is shown above. Exh.50, S. Miyano Tr. at 146:21-23. The "disclaimer" appears on the tiny white paper at the extreme left side of the photo above, beneath the "M" in "Machinery." It plainly is incomparable to other sign lettering.

Accordingly, the status quo is that Plaintiff has long-established common law rights in MIYANO as a mark, in "Miyano" and "Miyano Machinery" as trade names, and in the Triangle Winged M mark; and further that Plaintiff is the owner of several federal trademark registrations for these properties. Defendants, on the other hand, by their admission have not sold anything under these marks or names but want to do so and have planned to exhibit at the IMTS show in Chicago in September 2008 under the name "MIYANOHITEC MACHINERY."[14]

## B. Defendants Deliberately Targeted MMU's Name and Marks

Discovery has yielded additional facts regarding Defendants' intent to confuse customers as to the association between Plaintiff and Defendants.  As set forth in Plaintiff's opening brief (Doc. 23), Defendants asserted the corporate history of MMU as their own and then stated that they had "re-established a new company in the name of 'MIYANOHITEC MACHINERY, INC.'" Doc. 23, Exh. 20. They also knowingly selected the Winged M mark identical to the top portion of MMU's Triangle Winged M and a corporate name similar to MMU's corporate name.

Before adopting the Winged M mark, Defendants used another mark and the corporate name "Hitec Machinery International Inc." Exh. 50, S. Miyano Tr. at 30:21-31. This previous mark used by the Defendants, the Triangle Winged *H* mark, is shown below.[15]  The elements (*i.e.* an equilateral triangle, a single letter and wings superimposed at the top, and the trade name "Hitec" of the corporation located at the base) of Defendants' Triangle Winged *H* mark are

---

[13] Defendants have apparently been attending minority business shows around the U.S. They do not exhibit any product yet, since they have none. *See* Doc. 115, Dec. of T. Miyano, ¶ 24.

[14] Doc. 23, Exh. 28, p. 12, (listing the Defendants as MiyanoHitec); *see also* Doc. 23, Exh. 29-30.

[15] Exh. 50, S. Miyano Tr. at 36:9-37:9  (The Triangle Winged *H* only appeared on Defendants' business cards)

identical to Plaintiff's Triangle Winged M mark, shown next to it.



Steven Miyano applied to have the Triangle Winged **H** mark registered with U.S. Trademark Office on July 15, 2005 alleging July 14, 2005 as the date of first use in commerce.[16] The Triangle Winged **H** mark was rejected by the Trademark Office in a communication dated February 12, 2006. Exh. 57. The application for the Triangle Winged **H** was abandoned for failure to answer the Trademark Office on September 18, 2006. Exh. 58. Thereafter, Defendants adopted the Winged M mark, which they allege using in commerce beginning on November 3, 2006.[17]

Defendants' decision to change the name of company from "Hitec Machinery International, Inc." to "MiyanoHitec Machinery, Inc." is reflected in at least some documents.[18] Steven Miyano, president of MiyanoHitec Machinery, Exh. 50, S. Miyano Tr. at 32:8-13, stated in his deposition that he changed Defendants' corporate name because "Well, I thought I ***had*** to put my family name inside." *Id.* at 30:21-31:7. (emphasis added).

Notwithstanding that they made this name change in September or October 2006, Defendants concealed it from MMU's parent, MMJ, at a meeting in Japan on November 7, 2006 when Tom and Steven Miyano met with two top executives of MMJ, Mr. Saito and Mr. Nakagiri. Even though Defendants had already changed the corporate name from to "MiyanoHitec Machinery, Inc.," *See* Doc. 23, Exh. 33, and allegedly had begun using the Winged M mark, *id.*, Defendants hid these actions from MMJ. Instead, Defendants presented business cards with their prior Hitec company name and prior Winged H logo mark. Exh. 59, Saito Tr. at 33:6-11; *see also* Exh. 60 hereto.

At that November 2006 meeting with Mr. Saito, Tom Miyano requested that MMJ assign Plaintiff MMU's logo marks (*i.e.* designs which had been registered including the Triangle Winged M mark) to him. Exh. 59, Saito Tr. at 73:1-74:7. In his deposition, Tom Miyano admitted requesting assignment of the Triangle Winged M mark, Exh. 42, T. Miyano Tr. at

---

[16] Exh. 56, p. 1 ("First use anywhere: At least as early as 0714/2005").

[17] *See* Doc. 23, Exh. 33, Defendant's Amended Petition, ¶4. "Petitioners began using the [Winged M] mark shown above in paragraph 2 in the United States at least as early as November 3, 2006."

[18] Documents filed with the IL Secretary of State indicate that a resolution to change the name was adopted by Defendants' corporation on Sept. 11, 2006. Doc. Exh. 19 (p. 8 of 10). Defendant S. Miyano testified that he thought the change took place in October 2006. Exh. 50, S. Miyano Tr. at 30:21-31:7.

123:11-125:4, demonstrating he appreciated that Plaintiff owns the Triangle Winged M mark in the United States. *Id*. at 125:2, "A. Triangle 'M' mark is only register [sic] by M.M.U."

MMJ specifically declined the Defendants' request for the assignment of MMU's "logo marks," Exh. 61; s*ee also* Exh. 60, Saito Tr. at 73:1-74:7, and Steven Miyano, on behalf of Tom Miyano, acknowledged MMJ's refusal.[19]

### C.  Defendants Misstate the Role of the IRCJ

Tom Miyano would have this court believe that a Japanese government agency "targeted" his company to prevent it from being moved to the U.S. and to reap huge financial rewards. The fact is that while Tom Miyano was president of MMJ, it became unable to reduce the principal on its huge debt load and was in danger of foreclosure or bankruptcy. Exh. 62, Ito Tr. at 69:8-72:8.  Tom Miyano was personally liable as a guarantor of those business loans amounting to ¥13 billion (approximately $130 million). *Id*. at 71:1-12. Had there been a default and foreclosure, he would have to pay the loans himself. *Id*. at 74:18-75:12.

When the Government of Japan created the Industrial Revitalization Corporation of Japan ("IRCJ"), Tom Miyano saw an opportunity to be relieved of his personal obligations and caused MMJ to make application to the IRCJ for financial aid.  The application process was voluntary. Defendants admit in their Answer to the Complaint (Doc. 29) that MMJ's *"application for assistance"* was accepted by the IRCJ on June 4, 2004. Doc. 29, Answer ¶ 26, p. 8.

Tom Miyano knew that the deal with the IRCJ would cost the management team at MMJ to lose their retirement benefits, and they have so testified. Exh.  62, Ito Tr. at 75:19-76:9; Exh. 42, T. Miyano Tr. at 86:7-11. This was the way that management had to "take responsibility" for the corporate failure. Mr. Ito, for example, testified that he lost his entire retirement benefits that he had accrued while working for the company. Exh.62, Ito Tr. at 82:21-83:8. Perhaps most importantly, because of the IRCJ assistance, Tom Miyano was relieved of personal obligations of over $130 million of debt. Exh. 62, Ito Tr. at 71:1-72:8; *see also* Exh. 42, T. Miyano Tr. at 75:22-79:18. While Tom Miyano may have lost his own retirement benefits also, he knew going into the IRCJ deal that he would be divested of stock and have to leave the company. Exh. 62, Ito Tr. at 75:19-76:9; Exh. 42, T. Miyano Tr. at 86:7-11.

A key part of the IRCJ work-out was an assignment of assets by Tom Miyano.  The agreement was among Tom Miyano, MMJ, and the IRCJ. Tom Miyano was relieved as a co-

---

[19] Exh. 61; *see also* Exh. 60, Saito Tr. at 74:20-77:20 and Exh. 42, T.Miyano Tr. at 136:21-137:10.

guarantor of MMJ's loans in exchange for a ¥92,374,130 payment to MMJ (approximately $1 million), transfer of his MMJ stock, and an assignment to MMJ of assets inherited from his mother, Sumiko Miyano, as set forth in the "Agreement," Exh. 63. He was required to assign to MMJ inherited assets not listed on the schedule attached to Agreement. (Exh. 63, Art. 4, Sec. 3). The Japanese trademarks owned by Sumiko, which might be assets Tom inherited,[20] were not listed on the schedule as exclusions from Tom Miyano's assignment, Exh. 63. As a result, even if Tom Miyano inherited these Japanese rights, he is obligated to assign these marks to MMJ.[21]

## II.    ARGUMENT

### A.  Plaintiff Has Demonstrated Likely Success on the Merits

Defendants argue that MMU has a "high burden of persuasion" and misstate the law. (Doc. 124, p. 5). At the preliminary injunction stage, the threshold for showing likelihood of success is low. *Brunswick Corp. v. Jones*, 784 F.2d 271, 274 (7th Cir. 1986). Plaintiff MMU need only demonstrate that its chances are "better than negligible."[22] *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 897 (7th Cir. 2001) *citing International Kennel Club of Chicago, Inc. v. Mighty Star, Inc.,* 846 F.2d 1079, 1084 (7th Cir. 1988).

#### (1)  Plaintiff's Trade Name and Trademarks are Protectable

Plaintiff MMU asserts infringement of its MIYANO trademark, "Miyano" trade name, and Triangle Winged M trademark and service mark. Plaintiff has established that these marks are entitled to protection. Defendants have not shown that the marks are not protectable and that the secondary meaning has not been established.

##### a.  MMU's Registered Plain-Text MIYANO® is Protectable

###### i.  Defendants Have Failed to Present Any Argument or Evidence to Rebut the Presumption that MMU's Registered MIYANO

---

[20] *See* Exh. 64, pp. 2, 6, and 7. In his application for registration, Tom Miyano states to the Trademark Office that the marks are inherited and submits a "tax report" as proof.

[21] While the rights to the mark in Japan are not at issue and do not affect Plaintiff's rights in the U.S., Plaintiff is responding to Defendants' serious misstatement of facts. Defendants would have this Court believe that the IRCJ was in the business of canceling debts owed to the banks and then making (alleged) windfall profits for itself by selling stock on the Japanese Stock Exchange. That proposition, though preposterous and unsupported by evidence, is still inconsistent with the notion that the IRCJ did not care about keeping the corporate identity. It would have been unthinkable for the agency not to preserve the corporate identity. For *at least* this reason, Tom Miyano was required to agree to assign all assets relating to the business, and he did so. Defendant Tom Miyano is contractually bound to assign any trademark rights he may have inherited from his mother.

[22] In contrast, the lower court in *Ty Inc. v. Jones Group, Inc.*, found that "perhaps up to a fifty-fifty chance of prevailing on [the] permanent injunction" was "a pretty decent chance of winning." 237 F.3d at 897.

**Trademark has Acquired Secondary Meaning**

Defendants pronounce on page 11 of their Response that MMU has not carried its burden of showing secondary in connection with the MIYANO trademark. On the contrary, <u>Defendants have not overcome the presumption</u> that the registered plain-text MIYANO® trademark (U.S. Reg. No. 3,328,718) is valid and at a minimum has obtained secondary meaning.

Plaintiff has superior rights in its MIYANO® trademark, as it registered the mark on the Principal Register and has used the mark in commerce since 1975. [*See* Exhibit 1]. Under the Lanham Act, a "mark registered on the principal register shall be prima facie evidence of the validity of the registered mark..." 15 U.S.C. §1115(a); *CAE, Inc. v. Clean Air Engineering, Inc.*, 267 F.3d 660, 673 (7th Cir. 2001). Registered trademarks are <u>presumed</u> not to be descriptive or generic, or if descriptive, then they have acquired secondary meaning. *Liquid Controls Corp. v. Liquid Control Corp.*, 802 F.2d 934, 936 (7th Cir. 1986). See also *U.S. Search, LLC v. U.S. Search.com, Inc.*, 300 F.3d 517, 524 (4th Cir. 2002) ("With the certificate of registration, the registrant [in this case, MMU] obtains prima facie evidence that its mark is not generic in the eyes of the relevant public, *see* 15 U.S.C. § 1064(3), and that its mark is not 'merely' descriptive, but at a minimum is descriptive **and** has obtained secondary meaning, *see* 15 U.S.C. § 1052(e).") (internal quotes omitted, emphasis in original).

Without a certificate of registration, the owner would be required to establish that the disputed mark was sufficiently distinctive to warrant trademark protection in the first place. *Retail Servs. v. Freebies Publ'g*, 364 F.3d 535, 542 (4th Cir. 2004)  The effect of the presumption that arises from registration is to satisfy that burden in the absence of rebutting evidence. *Id*. The evidence of secondary meaning supplied by Plaintiff in its Memorandum in Support (Doc .23) just bolsters its argument. Defendants have failed to rebut the presumption created by the MMU's U.S. Registration No. 3,328,718 with any evidence or argument. Thus, MMU has established at this stage that it has a protectable mark in the plain-text MIYANO®, U.S. Registration No. 3,328,718.

> ii.    **MMU's Plain-Text Mark Was Neither Cancelled Nor Abandoned**

Defendants' argument that MMU is not entitled to a priority date of 1975 for the plain-text MIYANO mark misrepresents both the facts and the law. (Doc. 124, page 11). Defendants argue that Reg. No. 3,328,718 is not entitled to a 1975 priority date because in 1995, it did not renew an earlier registration for the plain-text mark. Defendants conclude (without any citation

to caselaw) that as a result, Plaintiff MMU made material misrepresentations to the Trademark Office based its application asserting a priority date of 1975.

Defendants' argument fails for the following reasons: (1) as a matter of law "express abandonment" of a registration requires an affirmative written act, which Plaintiff MMU did not undertake; (2) as a matter of law, the defense of abandonment requires the Defendants to show (i) discontinuance of the mark and (ii) and an-intent not resume and Defendants show neither; (3) even if this Court were to accept Defendants' position, their conclusion fails as a matter of law, an incorrect priority date is not a material misrepresentation or a basis for cancellation.

"Express abandonment" is specifically defined in trademark law as an affirmative act that cancels the trademark application or registration. 37 C.F.R. § 2.28 defines "express abandonment" as calling for a written statement.[23]  Defendants fail to identify any written statement of abandonment or withdrawal, as required to show express abandonment. No abandonment of these rights occurred.

 Second, the non-renewal of the federal registration does not affect the underlying common law rights in the mark which exist independent of the registration.[24] "Allowing a federal registration to expire does not *per se* prove abandonment."[25] Rather, "[t]he party asserting abandonment bears the burden of persuasion with respect to two facts: (1) non-use of the mark by the legal owner, and (2) lack of intent by that owner to resume use of the mark in the reasonably foreseeable future." *Id. Sands, Taylor & Wood, Co. v. Quaker Oats Co.*, 978 F.2d 947, 955 (7th Cir. 1992) *aff'd* in part, *rev'd* in part, 34 F.3d 1340 (7th Cir. 1994).("A mark is deemed to be abandoned when its use has been discontinued with intent not to resume such

---

[23] 37 C.F.R. § 2.28 provides, "An application may be expressly abandoned by filing in the Patent and Trademark Office **a written statement of abandonment** or withdrawal of the application signed by the applicant, or the attorney or other person representing the applicant. Except as provided in § 2.135, the fact that an application has been expressly abandoned shall not, in any proceeding in the Patent and Trademark Office, affect any rights that the applicant may have in the mark which is the subject of the abandoned application." (emphasis added)

[24] *Gilbert/Robinson, Inc. v. Carrie Beverage-Missouri, Inc.*, 989 F.2d 985, 991 (8th Cir. 1993) ("Unlike the registration of a patent, a trademark registration of itself does not create the underlying right to exclude. Nor is a trademark created by registration. While federal registration triggers certain substantive and procedural rights, the absence of federal registration does not unleash the mark to public use. The Lanham Act protects unregistered marks as does the common law.")

[25] *Rodgers v. Wright*, 544 F. Supp. 2d 302 (S.D.N.Y. 2008) *citing* 3 McCarthy on Trademarks and Unfair Competition § 17:4 n.5 (4th ed 2005) *and Baker v. Parris, 777 F. Supp. 299*, 303 (S.D.N.Y. 1991) (finding no abandonment where trademark owner did not renew the registration, as there was no dispute that trademark owner had continued to use the mark in commerce).

use.").[26]

Federal courts impose a heavy burden of proof on Defendants who allege abandonment, and they have the burden of persuasion.[27] Defendants herein have not provided any evidence of intent-not-to-resume or discontinuance of all uses of "Miyano" such that the plain-text form, which does not claim any specific style, font, or color, was abandoned.[28] Rather, based on the testimony of Henry Marchionne, Plaintiff MMU continuously used "Miyano" on its machine tools. (*See* Doc. 15, Dec. of Marchionne, ¶ 16-17). An example of a brochure published in March of 1996, showing use of the "Miyano" name and trademark is attached as Exhibit 65. It would be legal error to accept Defendants' position that MMU abandoned rights in its plain-text mark, which existed in common law separate and apart from the registration.

Finally, assuming *arguendo* Defendants' position, their conclusion is also contrary to law. Defendants conclude on page 12 of their Memorandum in Response (Doc. 124) that MMU's claim of first-use/priority back to 1975 in its plain-text MIYANO trademark application (Reg. No. 3,328,718) was a material misrepresentation and is grounds for cancellation. Defendants do not cite any case in support for this conclusion. On the contrary, courts have universally determined that a mistaken date of first use is not fraudulent or material so long as use preceded the application date.[29] To prove fraud that would result in cancellation, there would have to be a material misrepresentation, and "the claim of a date of first use is not a material allegation as long as the first use in fact preceded the application date."[30]

---

[26] In the case cited by Defendants, *MacKenzie-Childs, Ltd. v. MacKenzie-Childs*, the court reviewed both evidence of intent and discontinuance of use and could not concluded that abandonment took place. *Mackenzie-Childs, Ltd. v. Mackenzie-Childs*, 2008 U.S. Dist. LEXIS 1717, 12-13 (W.D.N.Y. Jan. 9, 2008).

[27] "Because a finding of abandonment works an involuntary forfeiture of rights, federal courts uniformly agree that Defendants asserting an abandonment defense face a 'stringent,' 'heavy' or 'strict burden of proof.'" *Cumulus Media, Inc. v. Clear Channel Communications, Inc.*, 304 F.3d 1167, 1175 (11th Cir. 2002)

[28] Plain-text or standard character marks are defined in 37 C.F.R. §2.52(a): "Standard character (typed) drawing. Applicants who seek to register words, letters, numbers, or any combination thereof **without claim to any particular font style, size, or color** must submit a standard character drawing that shows the mark in black on a white background." (emphasis added) *See Trademark Manual of Examination Procedure ("TMEP")* § 807.03, Exhibit 66

[29] *6 McCarthy on Trademarks & Unfair Competition* §31:74 (4th ed. 2005)("Fraud has often been alleged because a trademark registrant claimed a date of first use in a use-based application which was earlier than actual date of first use. Such an attack seems always to have failed on the facts, the courts saying that the falsity was either not fraudulent or not material.")(*see cases cited therein*)

[30] *Pony Express Courier Corp. v. Pony Express Delivery Service*, 872 F.2d 317, 319 (9th Cir. 1989).

As Defendants are alleging that Plaintiff committed fraud by misstating the date of first use, it is <u>Defendants' burden</u> to show, by clear and convincing evidence, a different first use date.[31]  Notably, Defendants do not contend that MMU was not using the MIYANO trademark prior to its application. In fact, MMU has demonstrated long and continuing use of the Miyano trademark.  As result, Defendants' arguments are not grounds for cancelling the mark,[32] and Defendants' argument regarding abandonment fails as a matter of law.

### iii. MMU Received Defendant Tom Miyano's Written Consent

Defendants argue that Plaintiff MMU never received Tom Miyano's consent to register the mark (Doc. 124, page 13). Defendants gloss over the several applications and declarations signed by defendant Tom Miyano and the case law cited by Plaintiff (Doc. 23, page 13) stating that these applications demonstrate his consent. Cases cited by Defendants relating to right-to-*use* versus right-to-*register* are irrelevant because the trademark registrations were already undertaken at Tom Miyano's direction[33] and his signature appears on the applications to register the MIYANO marks.[34]  Each of these applications and declarations identified Plaintiff as the owner of the mark.[35]

According to the *Trademark Manual of Examining Procedure* (TMEP), when the person who signed the application is the particular individual identified by the mark, as here, then his consent to registration is presumed. TMEP §1206.03(b)(5th ed. 2007)(*see cases cited therein*)(Exhibit 66). Defendant Tom Miyano gave his consent to register the stylized MIYANO, the MIYANO motto, and the standard character MIYANO trademark, as he signed the applications and the declarations which were filed with U.S. Patent and Trademark Office.[36]  His signature on these applications satisfies the "written consent" aspect of §1052(c).  *Alford Mfg. Co. v. Alfred Electronics*, 137 U.S.P.Q. 250 (T.T.A.B. 1963), *aff'd*, 333 F.2d 912 (C.C.P.A.

---

[31] *See Money Store v. Harriscorp Finance, Inc.,* 689 F.2d 666, 670 (7th Cir. 1982) ("A party seeking cancellation of a registered trademark on grounds of fraud must demonstrate the alleged fraud by "clear and convincing evidence."); *See also ISP.Net, LLC v. Qwest, Communs. Int'l, Inc.*, 2003 U.S. Dist. LEXIS 9076 *12, f.n. 3 (S.D. Ind. 2003) "[Defendant] bears the burden of proof on this issue. Therefore, the cited authority does not support [Defendant's] argument in favor of materiality, nor does [Defendant] contradict the case law indicating that a first-use date is *not material* to the validity of a trademark registration").

[32] *Pony Express Courier Corp. v. Pony Express Delivery Service*, 872 F.2d 317, 319 (9th Cir. 1989).

[33] Doc. 115, Dec. of Thomas Miyano, ¶ 15.

[34] Exh.  42, Thomas Miyano Tr. at 101:4-118:18; *see* Doc. 15, Dec. of Marchionne ¶11.

[35] Defendants provide no evidence that consent was limited to use.

[36]  U.S. Trademark Reg. Nos. 1,527,809; 1,473,925; and 1,529,343; s*ee* Doc. 23, Exhs. 36, 37, and 38.

1964).

As to Plaintiff's Registration 3,328,718 (filed and registered in 2007) for the MIYANO trademark, Plaintiff did not have to obtain Tom Miyano's consent to register because his consent was already of record in the file of a valid registration for a mark comprised in whole or in part of the same name. This includes the Stylized Miyano mark (Reg. No. 1,527,809) and the Miyano Motto mark (Reg. No. 1,473,925), which continue to this day.   TMEP §1206.03(b)(5th ed. 2007)(Exhibit 66) (citing *In re McKee Baking Co.*, 218 U.S.P.Q. 287 (T.T.A.B. 1983) (applicant's claim of ownership of a prior registration that includes a consent to register in the record held sufficient for purposes of complying with the consent requirement of §2(c) of the Lanham Act [15 U.S.C. §1052(c)])).

Tom Miyano did not sign just one application or declaration; he signed several -- over several years.[37]  Each time, he gave his consent and declared that the corporation was the owner of the mark.[38]  His defense, 14 years after-the-fact and now that he is not part of the company, is that each time he signed one of the documents, "he was unaware that was surrendering any right to use his own name." (*See* Doc. 124, p. 13) However, one cannot sign a paper in ignorance of its contents and thereafter excuse such ignorance by the mere plea that he was neglectful, or in this case unaware, of the circumstances.[39]

Defendants also argue that Tom Miyano's (previously-given) consent to register expired when the prior registration was not renewed.  They offer no case law or factual evidence demonstrating that the consent was withdrawn in view of the multiple declarations and applications stating that MMU is the owner of the mark and evidence such consent.[40]

Consequently, Defendants have no likelihood of prevailing on their defense under §1052(c).

---

[37] Exh.  42, Thomas Miyano Tr. at 101:4-118:18; *See also* Exh.  47 (Triangle Winged M renewal); *See* Doc. 23, Exhs. 36, 37, and 38.

[38]  Prior to 2004, Tom Miyano "had the ultimate authority at MMU on all trademark decisions and the ultimate authority regarding direction of implementing those decisions."Doc. 115, Decl. of Thomas Miyano, ¶ 15.

[39] *See Prudential Ins. Co. v. Miller Brewing Co.*, 789 F.2d 1269, 1278 (7th Cir. 1986) *quoting Knight & Bostwick v. Moore,* 203 Wis. 540, 542,  234 N.W. 902, 903 (Wis. 1930)

[40] Defendants Memorandum in Response (Doc. 124, p. 25) As Defendants themselves admonish, "The Seventh Circuit has repeatedly cautioned both bench and bar that unsupported statements in lawyers' briefs do not count." *Clarus Transphase Scientific, Inc. v. Q-Ray, Inc.*, 2006 WL 4013750, 12 (N.D. Ill. 2006)(App. 11); *citing, See IFC Credit Corp. v. Aliano Brothers General Contractors, Inc.*, 437 F.3d 606, 610-611 (7th Cir. 2006); *United States ex rel. Feingold v. AdminaStar Federal, Inc.*, 324 F.3d 492, 494 (7th Cir. 2003).

### iv. Defendants' Four Bases for Cancelling the MIYANO® Trademark are Unsupported in Fact and Law.

Defendants list four bases for cancelling the current plain-text MIYANO® trademark (Reg. No. 3,328,718) at pp. 14-15 of their brief. All four concern allegations that MMU fraudulently made material misrepresentations to the USPTO. To be meritorious, these allegations must be supported by clear and convincing evidence.[41] Defendants' arguments, however, are unsupported factually and fail as matter of law.

Defendants' first two bases, (1) the non-renewal of the MIYANO® registration in 1995 and (2) alleged failure to obtain consent, fail for reasons set forth above.[42] Defendants offer two more arguments, again without citation to case law or facts in support: (3) that MMU asserted that no other (person) has the right to use the "Miyano" name and (4) that MMU failed to inform the USPTO that "Miyano" is a Japanese surname. These additional arguments also fail.

With regard to basis (3), Plaintiff explained in its opening brief (Doc. 23, p. 12) how, as a matter of law, MMU did not mislead the Trademark Office.[43] In a footnote, Defendants quote multiple cases, none of which support their conclusion that "… MMU should have advised the trademark examiner that Tom and Steven Miyano were active in the machine tool industry..." Defendants' assertion is contrary to law, as "[t]here is nothing in the oath or the statute which require [the] applicant to disclose anyone who in fact may be using the mark, but does not, in the applicant's belief possess the legal *right* to use." *McCarthy* §31:76 (emphasis in original)(*see cases cited therein* at n. 5) *see also Money Store v. Harriscorp Finance, Inc.,* 689 F.2d 666, 670-673 (7th Cir. 1982)(The applicant does *not* have a duty to investigate and report all other possible users of the same or similar mark.).

Defendants' fourth basis ((4) failing to inform the USPTO that "Miyano" is a Japanese surname) also fails. *McCarthy on Trademarks* is clear that the applicant has no duty to disclose

---

[41] *See Money Store,* 689 F.2d at 670 ("A party seeking cancellation of a registered trademark on grounds of fraud must demonstrate the alleged fraud by 'clear and convincing evidence.'")

[42] Specifically, Defendants have not shown abandonment or fraud or that Tom Miyano's consent was ineffective.

[43] Tom Miyano does *not* have the right to use the mark that would likely cause confusion. Defendants have stated that they sold their ownership of MMU. *See* Doc. 23 Exh. 20. At the least, the trademark rights reside with MMU, based on the applications and declarations Tom Miyano filed in the Trademark Office stating Plaintiff MMU was the owner. As result, Tom Miyano and Defendants are estopped from using the word MIYANO or in commerce in such a way that would cause confusion, mistake or deception.

information to the Trademark Office (PTO) regarding whether a mark is a surname:

> An applicant has **no burden** to disclose facts that may help show that the designation is barred under § 2(e), such as that it is a surname. It is the burden of the PTO Examining Attorney to prove that the mark is primarily merely a surname. The applicant has **no duty** in the original application to disclose that it knows that the mark is the surname of someone.

*McCarthy* §31:69(emphasis added). Moreover, whether a term is a common surname in a foreign country has <u>no significance</u> in the United States. See *Société Civile Des Domaines Dourthe Frères v. S.A. Consortium Vinicole De Bordeaux Et La Gironde,* 6 USPQ2d 1205 (TTAB 1988) ("The fact that DOURTHE is recognized as a surname in France has no bearing on its right to be registered in the United States.")[44]

Defendants have not shown a single basis as to why the MIYANO® trademark (Reg. No. 3, 328,718) is invalid or should be cancelled. Moreover, Defendants have not overcome the presumptions of validity, ownership, and right to exclude others, including Defendants, created by virtue of the registration. 15 U.S.C. § 1115(a). Consequently, Plaintiff's MIYANO® trademark is protectable.

### b. The "Miyano" Trade Name is Protectable

#### i. "Miyano" is a Trade Name of Plaintiff Entitled to Protection

Defendants argue that MMU mislead the court in stating that it has used the "Miyano" trade name for last 33 years.[45] Defendants take an unreasonable and unsupported view that "trade name" means only the corporate name registered with the Secretary of State.[46] Rather, the term "trade name" is broader and means "*any name* used by a person to identify his or her business or vocation."(emphasis added) 15 U.S.C. § 1127.[47] The term "Miyano" is the trade name of Plaintiff MMMU and has been used for over 30 years to identify MMU to customers in the United States.[48] Through its extensive use and as evidenced by Tom Miyano's declarations,

---

[44] According to two internet databases, "Miyano" is a rare surname, with fewer than 33 individuals having that surname. *See* Exh. 46b, (Exhibit B to Plaintiff's Responses to Interrogatories)

[45] Doc. 124, p. 9, "[a]ccordingly, over the last 33 years, MMU has never used 'Miyano,' standing alone as its trade name."

[46] *See* Doc. 15, Dec. of Marchionne, ¶15: "MMU has had several iterations of **official names** all beginning with "Miyano Machinery," including Miyano Machinery U.S.A. Inc., Miyano Machinery (U.S.A.) Inc…"

[47] *See also* Restatement 3rd of Unfair Competition, § 12 (1995) ("A trade name is a word, name, symbol, device, or other designation, or a combination of such designations, that is distinctive of a person's business or other enterprise and that is used in a manner that identifies that business or enterprise and distinguishes it from the businesses or enterprises of others.")

[48] Doc. 15, Dec. of Marchionne, ¶¶ 15-16 and ¶¶ 34-43.

Plaintiff is the owner of the "Miyano" name and mark.[49]  Defendants' brief does not contest the testimony of Henry Marchionne with regard to the length and manner of use of Miyano. (Doc. 15, Dec. of Marchionne, ¶¶ 15-16).   Nor have they provided any law as to why Plaintiff is not entitled to claim "Miyano" as its trade name.[50]

### ii.    The Word "Miyano" Is Not Perceived as a Surname

Defendants argue that because "Miyano" is a surname, it requires strong evidence of secondary meaning. However, the public does not perceive the word Miyano to be a personal name, but the name of a corporation.

Defendants cite *Peaceable Planet, Inc. v. Ty, Inc.*, for a holding that secondary evidence is required for a personal name only when one of the following is met: (1) a reluctance to forbid a person to use his own name in his own business; (2) a name that is so common that consumers will not assume that two products having the same name therefore have the same source; (3) a conviction that preventing a person from using his name to denote his business may deprive consumers of useful information. 362 F.3d 986, 989-990 (7th Cir. 2004).  The Court in *Peaceable Planet* cautioned that "the 'rule' that personal names are not protected as trademarks until they acquire secondary meaning is a generalization, and its application is to be guided by the purposes that we have extracted from the case law." *Id.* at 990. Further, "when none of the purposes that animate the 'personal name' rule is present, and application of the 'rule' would impede rather than promote competition and consumer welfare, an exception should be recognized." *Id.*  Here an exception should apply.

First, customers use the word "Miyano" to identify the source of machines marketed and sold by Plaintiff. (Doc. 115, Dec. of T. Miyano, ¶ 25).  Additionally, as stated above, defendant Tom Miyano signed multiple declarations stating that Plaintiff was the owner of the Miyano mark and that no one else, including himself, could use the mark in commerce.  Tom Miyano is therefore estopped, and there should be no reluctance in preventing him from using his name. Moreover, defendant Steven Miyano is a newcomer, without a reputation in the industry. As the

---

[49] Exh.  42, Thomas Miyano Tr. at 101:4-118:18; *See also* Exh.  47 *and* Doc. 23, Exhs. 36, 37, and 38]
[50] Defendants' argument is also contrary to common sense. *See Brooks Bros. v. Brooks Clothing of California, Ltd.*, 60 F. Supp. 442, 454 (S.D. Cal. 1945) ("In considering a case like this, we must take into consideration the habits of the American buying public. Just as Americans are prone to abbreviate names, and Young Men's Christian Association became, first, the Y.M.C.A., and later --  especially among the soldiers --  the Y, so do they abbreviate longer business names. And Sears, Roebuck & Co. becomes Sears, J. W. Robinson Co. becomes Robinson's, R. H. Macy & Co. becomes Macy's, John Wanamaker becomes Wanamaker's, Tiffany & Co. becomes Tiffany's, and John B. Stetson becomes Stetson's.")

newcomer, he has the entire lexicon of names available to him and not absolute right to use his surname as a trademark or name.[51]

As to the second point articulated in *Peaceable Planet*, the word Miyano is a rare surname in the United States, and thus in the United States market wouldn't be considered as a surname. According to at least two popular internet telephone directories, the only individuals named Miyano located in Illinois are the Defendants, to the best of Plaintiff's knowledge.[52]

Finally, Defendants argue that an injunction would deprive customers of useful information, i.e. that Tom Miyano has returned to the industry. However, Tom Miyano testified that he is not and has not been affiliated with the Defendant corporation.[53] Defendants' own evidence does not support the proposition that Tom Miyano is "back" in the industry. In his declaration, Tom Miyano states that he is currently unemployed.[54] Thus, customers are not being deprived of information. As <u>none</u> of the three concerns articulated in *Peaceable Planet* apply, Plaintiff respectfully submits that it does not need to demonstrate secondary meaning in connection with its "Miyano" trade name or trademarks.

### iii.  Survey Evidence is Not Required for a Preliminary Injunction

Defendants attack MMU's lack of consumer surveys at this stage of proceedings. However, the Seventh Circuit has directly addressed this argument and rejected it.

> Not surprisingly, the defendants attack the absence of a consumer survey in the evidence produced by the plaintiff at the preliminary injunction hearing… …the plaintiff may resort to evidence other than a survey in attempting to demonstrate a "better than negligible" chance of establishing secondary meaning. For these reasons, the plaintiff's burden at the preliminary injunction stage is slight, and on two separate occasions this court has declined to mandate a consumer survey at this preliminary stage. *See A.J. Canfield*, 796 F.2d at 908 ("Although Canfield [the plaintiff] did not introduce its own survey, it was not required to do so in order to prevail on a preliminary injunction motion."); *Vaughan Manufacturing Co.*, 814 F.2d at 346.[55]

The other evidence presented by Plaintiff , including (1) the length and manner of use, (2) the sales volume, and (3) the amount and manner of advertising, demonstrate that at this stage that Plaintiff has met its burden.

---

[51] *Basile, S.p.A. v. Basile*, 899 F.2d 35, 39-40 (D.C. Cir. 1990)
[52] Exh.  46b, ("Exh.  B" to the Answers to Interrogatories).
[53] Exh.  42, Thomas Miyano Tr. 47:4-48:6.
[54] Doc. 115, Declaration of Tom Miyano, ¶ 25.
[55] *Int'l Kennel Club of Chicago, Inc., supra*, 846 F.2d at 1085-86  (preliminary injunction affirmed)

### iv. Plaintiff Has Shown Secondary Meaning For Its Trade Name and Trademarks

MMU's evidence, even without a survey, demonstrates a "better than negligible" chance of establishing secondary meaning. *Int'l Kennel Club, Inc*., 846 F.2d at 1085. "If through use the public has come to identify the term with a plaintiff's product or service, the words have acquired a 'secondary meaning' and would become a protectable trademark." *Id.* at 1085. First, Defendants admit that the word MIYANO is indeed associated by customers with the Plaintiff. Defendant Tom Miyano himself states in his declaration that "based on [his] personal experience interacting with customers in the United States machine tool industry, it was [his] name – particularly his surname [MIYANO] – **that those customers used to identify the source of the machines marketed and sold by MMU**."(emphasis added)(Doc. 115, Dec. of T. Miyano, ¶6).

Even without its trademark registration and the supporting testimony from defendant Tom Miyano, Plaintiff has shown secondary meaning supporting its common law rights in the word "Miyano" and its derivatives through evidence of its (1) the length and manner of use; (2) the sales volume; (3) the amount and manner of advertising, and (4) intentional copying. (Doc. 23, pages 14-15). Thus, the term "Miyano" is the trade name of Plaintiff and has been used for over 30 years to identify MMU to customers in the United States. (Doc. 15, Dec. of Marchionne, ¶¶ 15-16). Plaintiff sells machines in connection with the word "Miyano." (Exh. 67). The word has appeared prominently on the side of its headquarters since it was built. *Id.* The word "Miyano" also appears on shirts worn by MMU employees when performing their corporate duties or at trade shows. *Id.* The word "Miyano" is featured in MMU's federally registered trademarks filed starting in 1981. (*See* Doc. 23, Exhs. 1-5). The word "Miyano" is featured in advertisements distributed in the United States, such as, for example, on the covers of its 1986 IMTS brochure, its 1996 product brochure, and its 2006 "Guide to Miyano." (*respectively,* Exh. 16, Exhs. 65, and 68). Plaintiff's use of just the word "Miyano" has created an association of that word with third-parties such that they use the term "Miyano" to refer to MMU.[56] Defendants in their brief do not contest these facts or the testimony of Marchionne with regard to

---

[56] *See* Defendants' counsel has even used the "Miyano" to refer to MMU when addressing this Court: "MR. KARTON: …We feel that Miyano, MMU, is attempting to usurp a mark that is owned personally by Tom Miyano…" Exh. 51, Transcript of Motion Hearing, Feb. 7, 2008, p. 9, lines 8-18. *see also* Doc. 23, Exhs. 6, 7, 8, 10, 11 and 12].

[56] Exh. 46b, (Exhibit B to Plaintiff's Answers to Interrogatories).

the length and manner of use.[57] Similar facts have been found by courts to weigh in favor of the Plaintiff.[58]

Defendants do not question the testimony regarding Plaintiff's average annual spending ($198,000) on advertising over the last ten years.[59] (Doc. 15, Dec. of Marchionne, ¶35 and ¶40). Likewise, Defendants do not deny that MMU advertises in national magazines such as *Production Machining*, *Manufacturing Engineering*, *Today's Medical Development*, *Aerospace Manufacturing & Design*, and *Today's Manufacturing World*. *Id*. Defendants do not question the importance of trade shows, the amount MMU has spent on trade shows, or the national trade shows it attends.[60] (Doc. 23, p. 15)(*See also* Doc. 15, Dec. of Marchionne, ¶¶ 37-43).

Defendants merely question the sufficiency of the evidence demonstrating the amount and manner of advertising by pointing to one example of an advertisement included with Plaintiff's opening brief.[61] The advertisement, however, demonstrates that Plaintiff MMU has prominently used the word "Miyano" without surrounding identifiers to refer to MMU since at least 1986. Defendants' arguments imply that the stylized form of the words does not support secondary meaning just the word "Miyano." However, Defendants cite no case law for this point. Rather, a "trade name" is "any name used" and is not limited to a specific representation of that name. 15 U.S.C. §1127. Defendants also argue that the advertising took place prior to alleged abandonment of the federal registration for the marks. As discussed *supra*, however, their arguments regarding alleged cancellation or abandonment fail as a matter of law. Moreover, Defendants do not explain how such theories affect the analysis of the amount spent on advertising.[62]

Defendants do not contest that MMU has held 4.7% of the market,[63] that sales in

---

[57] Doc. 15, Dec. of Marchionne, ¶¶ 15-17.
[58] *See Worsham Sprinkler Co. v. Wes Worsham Fire Prot.*, LLC, 419 F. Supp. 2d 861, 870 (E.D. Va. 2006) ("'Worsham Sprinkler Company, Inc.,' 'Worsham Sprinkler Company, ' and 'Worsham Sprinkler' have been used in the relevant market for over thirty five years…. Therefore, the length and exclusivity factor weighs in favor of Plaintiff.")
[59] Doc. 15, Dec. of Marchionne, ¶35 and ¶40.
[60] Doc. 23, p. 15. *See also* Doc. 15, Dec. of Marchionne, ¶¶ 37-43.
[61] Doc. 23, p. 10. For additional examples *see* Exhs. 65 and 67.
[62] Defendants' Memorandum in Response (Doc. 124, p. 25) "The Seventh Circuit has repeatedly cautioned both bench and bar that unsupported statements in lawyers' briefs do not count." *Clarus Transphase Scientific, Inc. v. Q-Ray, Inc.*, 2006 WL 4013750, 12 (N.D. Ill. 2006)(App. 11); *citing, See IFC Credit Corp. v. Aliano Brothers General Contractors, Inc.*, 437 F.3d 606, 610-611 (7th Cir. 2006); *United States ex rel. Feingold v. AdminaStar Federal, Inc.*, 324 F.3d 492, 494 (7th Cir. 2003).
[63] No one in the industry has more than 20% of the market. *See* Doc. 15, Dec. of Marchionne, ¶ 33.

connection with the "Miyano" name generated revenues that averaged from $18 million to $35 million per year between 1997 and 2006, or that over the same ten-year period, services rendered in connection with the "Miyano" name ranged from $200,000 to $540,000 per year. (Doc. 23, page15). Rather, Defendants merely question the sufficiency of these figures to demonstrate secondary meaning, and they do not cite any case law or fact to support their conclusion.[64]

Secondary meaning is also demonstrated by third-parties using the "Miyano" trade name to refer to Plaintiff and its products.  For example, a 1989 article in *U.S. News and World Report* refers to Plaintiff simply as "Miyano."[65]

Defendants argue that the brief excerpt of testimony of Henry Marchionne indicates that term "Miyano" is associated with Tom Miyano. (Doc. 124, p. 10). Defendants, however, misstate and mischaracterize the testimony. The "name" which Mr. Marchionne refers to in his testimony is the trade name of Plaintiff (i.e. "Miyano"). (*See* Exh.43, Marchionne Tr. at 127:5-17)  In his next sentence on the next page of the transcript, Mr. Marchionne finishes his answer to the question and clarifies that:

> "I don't think it is fair that Miyano [MMU] with some 34-36 years of building up a reputation and then he [Tom Miyano] is going to use the name to steal part of it from us."  Exh. 43, Marchionne Dep. Tr. at 126:1-4

Plaintiff respectfully submits that it has demonstrated secondary meaning regarding both its trade name and trademark.

### c.  MMU's Triangle Winged M Mark is Protectable

#### i.  MMU has Common Law Rights in the Triangle Winged M Mark

Defendants do not contradict that MMU's continued use of the Triangle Winged M mark in close association with its business and related services, such as repair and refurbishing, has created a trademark/service mark entitled to protection under 15 U.S.C. §1125(a)(§43(a) of the Lanham Act) and the common law, separate and apart from the rights granted by the registration (Reg. No. 1,217,317). Consequently, Plaintiff's Triangle Winged M mark is protectable at least under §1125.

#### ii. Plaintiff Owns the Triangle Winged M and MIYANO marks

Defendants argue that Plaintiff was only a licensee of Sumiko Miyano and Tom Miyano.

---

[64]  *See Int'l Kennel Club, Inc*., 846 F.2d at 1086.
[65] Doc. 23, Exh. 10, p. 1 ("Miyano, Yamaha and Hitachi are shipping out machine tools, golf carts and computer disk drives [from the United States]."); *see also* Doc. 23,  Exhs. 6, 7, 8, 11 and 12].

Defendants' position is contrary to considerable evidence. First, Defendants do not provide any evidence of that a license was ever consummated between defendant Tom Miyano and Plaintiff for marks in the United States. Second, as noted above, in declarations signed by Tom Miyano in connection with the Triangle Winged M registration (Reg. No. 1,217,317)[66] and the MIYANO marks[67] he declared, under the penalty of perjury, that MMU was the <u>owner</u> of the marks (in the United States). (*See* Doc. 23, Exhs. 36, 37, and 38). Third, ownership of the Triangle Winged M mark is incontestable, based on the declaration[68] signed by Tom Miyano. The registration of the Triangle Winged M is <u>conclusive</u> evidence that MMU owns the registered mark. (15 U.S.C. § 1115(b)) Finally, Defendant Tom Miyano testified that at the November 2006 meeting he asked that Plaintiff assign the Triangle Winged M as, according to his testimony, "Triangle 'M' mark is only register [sic] by M.M.U." (Exh. 42, T. Miyano Tr. 125:2). Likewise, the other MIYANO marks are registered and rightfully owned by MMU.

### iii. Defendants Arguments Regarding Tacking Fail

Defendants argue that the minor change in the font used in the Triangle Winged M means that Plaintiff cannot claim the earlier uses of the marks, i.e., cannot tack. However, Defendants' arguments are flawed. *McCarthy* states the following with respect to the test of continuity in very the same section quoted by Defendants:

> The test is one of continuity. **A mark can be modified or changed without abandonment or loss of priority if done in such a way that the continuing common element of the mark retains its impact and symbolizes a continuing commercial impression**. [citation omitted] **Trademark rights inure in the basic commercial impression created by a mark, not in any particular format or style.**

McCarthy §17:26 (emphasis added). "The law permits a user who changes the form of its mark to retain the benefit of its use of the earlier form, without abandonment, if the new and old forms create the same, continuing commercial impression." *Id.*

Furthermore, "use of a trademark in a slightly different form than shown in a federal registration does not constitute abandonment." McCarthy §17:27. "Minor changes in a mark

---

[66] *See* Exh. 47, "TOSHIHARU MIYANO declares and states that he is the President of Miyano Machinery (U.S.A.) Inc…. that Miyano Machinery (U.S.A.) Inc. owns the above-identified registration [Reg. no.1,217,317]..."

[67] Plain-text Miyano (Reg. No. 1,529,343), Stylized Miyano (Reg. No. 1,527,809), and Miyano Motto mark (Reg. No. 1,473,925)

[68] *See* footnote 66

which do not change the basic, overall commercial impression created on buyers will not constitute any abandonment and will not interrupt the user's chain of ownership back to adoption and use of the original form." *Id.*   The logic, as explained in *McCarthy,* is that

> Without tacking, a trademark owner's priority in his mark would be reduced each time he made the slightest alteration to the mark, which would discourage him from altering the mark in response to changing consumer preferences, evolving aesthetic developments, or new advertising and marketing styles.

*McCarthy §17:27* (citing *Brookfield Communications, Inc. v. West Coast Entertainment Corp.,* 174 F.3d 1036, 1048 (9th Cir. 1999).

Defendants recite language from *McCarthy* suggesting that the test for tacking imposes a "greater" degree of similarity without saying what this greater degree is.  By "greater", Defendants simply mean "that the required degree of similarity between new and old formats is greater than the familiar test of a likelihood of confusion."  *McCarthy 17:26* (emphasis added). The authorities Defendants cite also fail to support their attempt to deny tacking in the case at bar.  For example, Defendants cite *Pro-Cuts v. Schilz-Price Enters., Inc.,* 27 U.S.P.Q.2d 1224 (T.T.A.B. 1993). However, the marks at issue in *Pro-Cuts* were remarkably different from each other (and omitted from Defendant's brief):

     

As evident from the above comparison, the marks in *Pro-Cuts* differed in every way possible, including in their "spelling," "pluralization," and "design." *Pro-Cuts* at 1227.

Contrary to the marks that were compared in *Pro-Cuts,* the two Triangle Winged M designs in the instant case present a textbook example of when tacking is permitted:  two virtually identical marks used in the same manner on or in connection with the same goods.  As explained below, there is ample, independent evidence to support the conclusion that the marks identified below create the same, continuing commercial impression.

 

First, "mere changes in background or styling, or modernization, are not ordinarily considered to be material changes in the mark." *TMEP § 1604.13; see McCarthy 17:27* (a "change in lettering style" held not to constitute abandonment and therefore permit tacking) *See also Hawes Trademark Registration Practice* §24:7(2004) ("A word normally can be varied as to the style of lettering, size, and other elements of form without resulting in a material alteration of the mark.")  The only change between the two versions is a slight change of the font chosen to reflect the Miyano name.  All other elements of the mark, including the dominant Winged M element in combination with the triangle, are unchanged.

The question is whether the second design is a material alteration[69] of the first.  Design changes that were determined to be <u>non-material</u> alterations are illustrated below.  In these cases, the design changes were far more significant than in the instant case, because the word element undergoing a change in font or format was the *only* element of the mark, whereas in the instant case, it is one among other more dominant and impressionable components.

The following two cases are illustrative: *In re Umax Data Systems, Inc.*, and *Paris Glove of Canada, Ltd. v. SBC/Sport Corp.*

*In re Umax Data Systems, Inc.,*          

Mark as Registered                Proposed Amended Mark

---

[69] *See* TMEP§807.14  The test for determining whether an amendment is a material alteration is as follows: The modified mark must contain what is the essence of the original mark, and the new form must create the impression of being essentially the same mark. The general test of whether an alteration is material is whether the mark would have to be republished after the alteration in order to fairly present the mark for purposes of opposition. If one mark is sufficiently different from another mark as to require republication, it would be tantamount to a new mark appropriate for a new application.
*In re Hacot-Colombier*, 105 F.3d 616, 620, 41 USPQ2d 1523, 1526 (Fed. Cir. 1997), *quoting Visa International Service Association v. Life-Code Systems, Inc.*, 220 USPQ 740,743-44 (TTAB 1983). This test applies to an amendment of the description of a mark as well as to an amendment of the mark on a drawing. *In re Thrifty, Inc.*, 274 F.3d 1349, 61 USPQ2d 1121 (Fed. Cir. 2001).

*Paris Glove of Canada, Ltd. v. SBC/Sport Corp.*





In the first case, the change was considered to be a 'minimal' change in stylization of the term UMAX.[70]  In the second case, *Paris Glove of Canada, Ltd. v. SBC/Sport Corp*, the TTAB concluded the following:

> We find that, although the displays are not identical, they are substantially the same.  Thus, there is no material alteration between the original, registered AQUA STOP rectangular form of the mark which shows the words depicted on two lines, and the semicircular and linear forms which depict the words on one line and, in the case of the semicircular form, as one word.  <u>This is because the commercial impression of the mark is dependent upon the literal terms AQUA STOP and not on the rectangular, semicircular or linear forms of display.</u>[71]

Second, the key or dominant element of the Triangle Winged M is the Winged M, and where such is preserved, abandonment will not be found for purposes of tacking and priority. *McCarthy 17:27*  ("Because small changes in trademark format are a minor element on which to base a drastic holding of abandonment, <u>the courts hardly ever find abandonment where the key element of the mark continues through new formats.</u>")(emphasis added).   The key element of the Triangle Winged M design, which gives it its distinctiveness as a source identifier, is the "Winged M" component.  The Winged M is not merely an arbitrary, non-verbal design element, but highly impressionable indicia that is easily identified, communicated, and retained -- both orally and visually.

As the dominant element of the design, the Winged M component is twice the size of the lettering that appears beneath and strategically positioned in the apex of the Triangle.  The wings of the M create a point of contrast and distinction with the triangle boundary, which yields to permit the wings to extend beyond the perimeter of the design.  It is no surprise that the preferred, shorthand nomenclature (i.e. the "Triangle Winged M" design) used by all for this design derives from its dominant or key element, i.e. the "Winged M".

---

[70] *In re Umax Data Systems, Inc.*, 40 U.S.P.Q.2d 1539, 1996 WL 657223 (Com'r Pat. & Trademarks)("the nature of the proposed change is such that the commercial impression of the modified mark is essentially the same as that of the original mark.")

[71] *Paris Glove of Canada, Ltd. v. SBC/Sport Corp.*, 2007 WL 2422997 (TTAB 2007)

Independent evidence which supports the conclusion that the Winged M is a dominant or key element of the Triangle Winged M design is found in the March 20, 2008 Office Action (official report from the U.S. Trademark Office) on Defendant Tom Miyano's Winged M trademark application (U.S. App. No. 77/351,695). (Exh. 69)  The examining attorney at the Trademark Office is presumed to be competent and skilled in carrying out his assigned duties. The examining attorney found a likelihood of confusion between the Winged M mark being applied for by Defendant Tom Miyano's Winged M mark and the Triangle Winged M trademark of U.S. Reg. No. 1, 217,317.  Part of his analysis was based on his observation of the two marks, which he explained as follows:

> Applicant's mark M (with design element) is highly similar to the cited registered mark M MIYANO (with design element).  The M designs in both of the marks are identical; they both consist of the letter M with a wing design.
>
> The marks are compared in their entireties under a Section 2(d) analysis. Nevertheless, **one feature of a mark may be recognized as more significant in creating a commercial impression.  Greater weight is given to the dominant feature in determining whether there is a likelihood of confusion**.

(Exh. 69) (emphasis added).  The examining attorney clearly recognized the "Winged M" as the dominant feature of the Triangle Winged trademark of U.S. Reg. No. 1,217,317.

Third, all witnesses who Defendants questioned on the matter testified that they consider the versions of the Triangle Winged M mark shown *supra* to be the same design.[72]

Fourth, the U.S. PTO examining attorney assigned to MMU's Triangle Winged M service mark application compared the two forms of MMU's Triangle Winged M design, and concluded that the two designs were "**substantially exact**" representations of one another, a standard which the TTAB has noted is *more rigorous* than the "material alteration" standard.[73]

---

[72] Exh. 70, Minemura Tr. 75: 5 -21; 125: 2 -22.

[73] *In re Larios,* 35 U.S.P.Q.2d 1214, 1218 (TTAB Mar. 30, 1995, the TTAB commented on these two respective thresholds of similarity in the context of its consideration of a proposed amendment to a drawing for an application filed under Section 44.   In that ruling, the TTAB noted the following:

> The Board, in Visa International Service Association v. Life-Code Systems, Inc., 220 USPQ 740, 743-44 (TTAB 1983), articulated the following test for determining whether a change in a mark constitutes a material alteration thereof:

The drawing and specimen, which the examining attorney approved as being in compliance with one another, appear respectively on the right and left below:



| Specimen Approved by Examining Attorney | Drawing of Mark in Triangle Winged M Service Mark Application |
|---|---|

As defined by 37 C.F.R. §2.52, the "drawing depicts the mark sought to be registered."[74] The drawing is compared to the specimen by the examining attorney under 37 C.F.R. §2.51, which states:

---

> The modified mark must contain what is the essence of the original mark, and the new form must create the impression of being essentially the same mark. The general test of whether an alteration is material is whether the mark would have to be republished after the alteration in order to fairly present the mark for purposes of opposition. If one mark is sufficiently different from another mark as to require republication, it would be tantamount to a new mark appropriate for a new application. [citation omitted]
>
> **The material alteration test, as is apparent from the above, is not quite as rigorous as the substantially exact representation standard and thus allows for a bit more leeway or flexibility with respect to permissible change in a mark and the concomitant amendment of the drawing thereof.**

*In re Larios,* 35 U.S.P.Q.2d 1214, 1218 (emphasis added).
[74] The "drawing depicts the mark sought to be registered." 37 C.F.R. § 2.52.  As explained by *Hawes*:

> 37 C.F.R. § 2.52 was amended in 1999 to state that the drawing depicts the mark sought to be registered.  Prior to this amendment to the rules, the mark sought to be registered was determined by the specimens filed with the application for an application based on use in commerce and by the foreign registration for an application based upon foreign registration. The TTAB has held that 1999 amendment to 37 C.F.R. § 2.52 now means that the drawing filed with the original application is determinative of the mark for which registration is sought. [citation omitted]. This clears up any ambiguities that might result from any inconsistencies between the description of the mark, specimens and the drawings.

*Hawes §5:9.*

> In an application filed under §1(a) of the Trademark Act, the drawing of the mark
> must be a <u>substantially exact representation</u> of the mark as used on or in
> connection with the goods or services, as shown by the specimens.

37 C.F.R. §2.51 (emphasis added).  Had the examiner concluded that the mark shown in the drawing was <u>not</u> a substantially exact representation of the mark shown in the specimen, he would not have approved both the drawing and specimen ss being in compliance with one another.  This analysis is a core duty of the examiner performed in the examination of each and every application.  Furthermore, this analysis cannot be done, and more importantly, is not done, other than by performing a side by side comparison of the drawing and the specimen. Defendants arguments that the respective versions of Triangle Winged M are anything other than legally equivalent for purposes of tacking as well as substantially exact under 37 C.F.R. §2.51 is misplaced and ignores the facts of record and applicable law.

### iv.  MMU Never Abandoned the Triangle Winged M Mark

Defendants come nowhere near to meeting the standard they must meet in order to shift the burden of proof, let alone establish the clear and convincing threshold necessary to prevail. Moreover, Defendants misstate and/or ignore the overwhelming evidence of MMU's continuing use of the Triangle Winged M both "on" as well as "in connection with" the respective goods and services.

The <u>only</u> evidence which Defendants cite in support of their abandonment defense are (1) a 1997 internal MMJ corporate document (hereinafter the April 1997 Ringi), (2) the declarations of three witnesses who offer nothing more than statements of their perception and understanding of MMJ's intent back in April 1997, and (3) the testimony of only one witness, MMU's Rule 30(b)(6) witness, regarding use of the Triangle Winged M on the sale of only certain new machines.  None of the evidence or arguments put forth by Defendants supports the conclusions for which they are asserted.

To prevail on an abandonment defense, the defendant must prove that plaintiff (1) ceased use of the mark in question, (2) with the intent not to resume.  Defendants must prove abandonment by clear and convincing evidence.  *McCarthy §17:12; see also, Keebler Co. v. Nabisco Brands, Inc.,* 1992 U.S. Dist. LEXIS 6826 (N.D. Ill. May 19, 1992)(at 33).  While one may establish a rebuttable presumption of abandonment by establishing non-use for three

consecutive years, "[t]he owner of the trademark need only produce evidence to rebut the presumption while the ultimate burden of persuasion rests on the defendant." *Roulo v. Russ Berrie & Co.,* 886 F.2d 931, 938 (7th Cir. 1989).

Defendants ignore the numerous, legitimate trademark uses, as well as service mark uses which MMU makes of the Triangle Winged M mark. Illustrations of these uses follow.

New Machine Warranty Policies & Intallation Services. In connection with the sale of new machine tools, MMU issues a two-page Standard Warranty Policy which prominently displays the Triangle Winged M design with registration symbol (®) at top of both pages of this document.[75]



The document clearly uses the Triangle Winged M to identify Miyano Machinery, Inc. of Wood Dale, IL, as the source of the machine tool being sold and the party who is standing behind the product for the period of time set forth in the warranty. MMU guarantees that the product will be free from defects in material and workmanship, and if not, it will repair or replace all parts that do not conform to the warranty. The specific machine model and serial number are entered on page two of the document and it is presented to the customer who signs, dates, and returns it to MMU. Plaintiff has produced more than 400 Triangle Winged M Standard Warranty Policies which accompanied the sale of new Miyano brand machines from 1995 to present. (Exhibit 44).

MMU's use of the Triangle Winged M on new machine Standard Warranty Policies constitutes actual trademark use of the Triangle Winged M under applicable law. *See* In re *Bose Corp.,* 546 F.2d 893 (CCPA 1976)(appearance of INTERAUDIO[TM] on warranty card recognized as actual trademark use); *Teter, Inc. v. Rheem Mfg. Co.,* 334 F.2d 784 (7th Cir. 1964)(warranty cards signed and returned by purchasers are specimens that reflect actual trademark use).

---

[75] Minemura Tr. 112:9-113:13, 116:16 – 118:24, and 122:7 – 123:10; see also Exh. 44 entitled "MIYANO MACHINERY INC. STANDARD WARRANTY POLICY FOR ALL NEW MIYANO MACHINES." Since at least 1998 to the present, MMU has used a two-page version of this document attached as Exh. 44. Before this time, MMU used a one-page version of this document which also displayed the Triangle Winged M trademark with registration symbol (®). MMU has produced over 400 standard warranty policies dating back to 1995.

Additional use of the Triangle Winged M in connection with new machine sales occurs on the accompanying installation service reports.



<u>Miyano Parts Web Site.</u> MMU also uses the Triangle Winged M mark in association with parts and part assemblies which it sells through the company's parts web site at http://parts.miyano-usa.com.[76] This constitutes legitimate trademark use under applicable law. *See In re Dell,* 71 U.S.P.Q.2d 1725 (TTAB 2004)(web site through which goods are ordered constitutes point of sale display and use of trademark in the banner constitutes actual trademark use). An example of Plaintiff's use is as shown at the right: (Exh. 67).

<u>Aquistion, Refurbishment and Sale of Used Miyano Machines.</u> Where MMU acquires title, refurbishes, and then sells old Miyano machines bearing the Triangle Winged M mark in a reconditioned state, such activities constitute yet another legitimate trademark use of the Triangle Winged M.[77] Representative examples of such refurbishment and resale by MMU of used Miyano Machines bearing the Triangle Winged M include the May 2002 sale[78] of a BNE-46S machine and the February 2008 sale[79] of a BND-34s.

<u>Triangle Winged M on Miyano Ocean and Miyano Mectron Machines.</u> Plaintiff's trademark use of the Triangle Winged M is also supported by its appearance in the Triangle Winged M composite mark of Miyano Ocean and Mectron machines. MMU's sale and servicing of Miyano Ocean machines from at least 2001 to present[80] and Miyano Mectron Machines until at least 2005 provide additional, independent support for MMU's continuing rights in the

---

[76] See Exh. 46a, pp 31-33, (Plaintiff's Response to Defendants' Interrogatories).

[77] Defendants are quick to point out in footnote 8 on pg. 23 of their brief that rebuilding machines for resale does not constitute a service. This argument misses the point. Where MMU acquires title, rebuilds, and then sells old machines bearing the Triangle Winged M, such activities have implications more for continuing <u>trademark</u> rights in the Triangle Winged M. See *Emergency One, Inc. v. Am. FireEagle, Ltd.*, 228 F.3d 531, 536 (4th Cir. 2000)("Exclusive repair and recycling services like those offered by E-One might be sufficient commercial use of the mark to prevent abandonment, but only if E-One used the mark on the repaired or remanufactured goods or 'on documents associated with the goods or their sale.'").

[78] *See* Doc. 15, Dec. of Marchionne, ¶30

[79] *See* Exh. 46a, pg. 28 (Plaintiff's Response to Defendants' Interrogatories).

[80] Miyano Ocean Machines are currently available through MMU. The most recent sale of a Miyano Ocean machine was in December 2007. Exh. 72, Nagasawa Tr. 80:1-81:24.

Triangle Winged M.  MMU is the exclusive distributor of these products in the United States.
MMU is the party that stands behind these machines when they are sold, and guarantees that they
are free from defects in material and workmanship, and if not will repair or replace non-
compliant parts.

Repair, Rebuilding and Reconditioning Services.  The Triangle Winged M is also used as
a service mark in connection with providing various warranty and non-warranty services,
including machine repair, rebuilding and reconditioning.[81]  Such use occurs on service reports
bearing the Triangle Winged M which itemize the specific work performed.[82] Also, uniforms
worn by MMU service personnel when they visit customers to perform service work display the
Triangle Winged M design.[83]

### v. Defendants' Affidavits Not Only Fail to Support Abandonment, but in Fact Refute that Such has Occurred

Nowhere in their response brief do Defendants indicate when they believe abandonment
occurred.  To the extent Defendants set forth any specific allegation to support their argument
that MMU abandoned its trademark or service mark rights in the Triangle Winged M, it is in the
section of their brief that has no citations to the record. (Doc. 124, pages 3-4).  By deliberately
avoiding any substantiated statement directed to how, where, and when the alleged abandonment
occurred, they seek to avoid ever being proven wrong.  Defendants overlook the fact that they
have the burden of proof on this issue.

The 1997 Ringi.  The April 1997 internal MMJ corporate document (hereinafter the April
1997 Ringi) does not support the conclusion that MMU formally abandoned its rights in the
Triangle Winged M mark either as a trademark or service mark.

First, the April 1997 Ringi advised directors of MMJ, the parent company in Japan, that
the Japanese Triangle Winged M trademark registration for the Triangle Winged M was up for
renewal and solicited their opinion on whether it should be renewed in that country.[84]  Neither
the April 1997 Ringi itself, the evidence of record, nor the Defendants themselves suggest that

---

[81] Exh. 46a, p. 3, 67-69; Exh. 48, Olczak Tr. at 18:12-18; 26:2-24; Exh. 70, Minemura Tr. at 111:2–112:8.
[82] *See*, Exh. 48, Olczak Tr. at 79:1 – 82:1; Exh. 70, Minemura Tr. at 111:2-112:8 113:14-116:14.
[83] Exh.  46a, p. 3, 67-69; Exh.  48, Olczak Tr. at 75:11 – 77:20; 65:11-66:2.
[84] As noted previously, *See Fuji Photo Film Co. v. Shinohara Shoji Kabushiki Kaisha,* 754 F.2d 591, 600 (5th Cir. 1985)("The concept of territoriality is basic to trademark law; trademarks rights exist in each country solely according to that country's statutory scheme.")

any action was contemplated with regard to the United States trademark registration for the Triangle Winged M, either then or at anytime in the future.

Second, the April 1997 Ringi also solicited directors for feedback regarding a proposal that would, if instituted, begin in June 1997 to no longer affix the mark to unspecified products. The document makes no representation about specifically which or whether all products would be addressed under this proposal, even if it were to go into effect.  Moreover, the proposal does not attempt to address the numerous other ongoing, legitimate trademark and service mark uses of the Triangle Winged M mark, wherever those uses occurred, *i.e.* in Japan, the United States, and throughout the world.  MMU has briefly addressed those in the previous section.

Third, and most important, as events subsequent to 1997 reveal, while the precise manner in which MMU used the Triangle Winged M mark as both a trademark and service mark in the United States may have changed over time, use from a trademark and service mark standpoint was never discontinued, and MMU never abandoned its registered or common law rights in the mark in the United States.

At most, the April 1997 Ringi is a proposal that solicited feedback from MMJ officials concerning activities, which in the document itself, are not fully defined, and if they took place, would have occurred in Japan.  This is not the "intent" which is relevant for purposes of proving abandonment.  The intent at issue for abandonment purposes is the intent not to resume once use has been discontinued.  "Consequently, unless the trademark use is actually terminated, the intent not to resume use prong of abandonment does not come into play."  *See Electro Source, LLC v. Brandess-Kalt-Aetna Group, Inc.* 458 F.3d 931 (9th Cir. 2006)(cited in *Autotech Tech. Ltd. v. Automationdirect.com, Inc.,* 2007 U.S. Dist. LEXIS 60474 (N.D. Ill. Aug. 17, 2007).  As explained herein, MMU never terminated either its use of the Triangle Winged M amrk, either as a trademark or service mark.

<u>Defendants' Third Party Declarations Fail to Support Abandonment.</u>  The Declarations of Messrs. Nakajima and Takamori also fail to set forth sufficient information or detail to establish relevant and persuasive facts bearing on the issue of abandonment.

First, with respect to timing, Messrs. Nakajima and Takamori do not claim to explain what actually fact occurred <u>after 1997</u>.[85]  In fact, despite having been executed in 2008, the

---

[85]  Mr. Nakajima in ¶7 of his Declaration refers to "the decision" regarding certain trademarks being made in either 1996 or 1997, but no later.  In ¶ 8, he states, "<u>Based on my memory of that time,</u> every member

declarants intentionally abstain from making any representations as to what occurred or did not occur after 1997. Accordingly, their testimony, like MMJ's April 1997 Ringi is directed merely to the issue of MMJ's intent (and not MMU's) to discontinue a use in the future made during a period of legitimate trademark use. This is not the "intent" which is relevant for purposes of proving abandonment.

Second, these Declarants are located in, and their observations are about, Japan. None of the Declarants claim to have been present in the United States or claim to have direct, first-hand knowledge that would contradict any of the numerous ways in which MMU actually used the Triangle Winged M as a trademark and service mark in the United States.

Third, it is noteworthy that Defendants cite the testimony of declarants Takamori and Nakajima, but not Tom Miyano, in the section of their brief that focused on the issue of abandonment. (Doc. 124, pp. 17-20). As noted above, Messrs. Takamori and Nakajima abstain from making any specific representation about the actual use of the Triangle Winged M after 1997 in Japan, and more importantly, at any time in the United States.

Tom Miyano is the only declarant to attempt -- albeit through vague, conclusory, and unsupported statements that are contradicted by the record – to set forth MMU's activities involving the Triangle Winged M mark after 1997. Yet Defendants avoid citing to his declaration in this section of the brief where presumably his testimony would matter most. (Doc. 124, pp. 17-19). Several reasons to explain this failure come to mind. One of them is that Tom Miyano is on record as having demonstrated his belief that MMU maintains valid, registered and common law trademark rights in the United States in the Triangle Winged M. (*See supra*). Tom's request to be assigned these rights in November 2006 affirms the validity of MMU's rights. It is settled law that an abandoned trademark is not capable of assignment, because once the mark has been abandoned through nonuse, there is no property right. *McCarthy §17:4.* Having been denied the transfer of these rights, Tom Miyano now seeks to negate their exercise by MMU by arguing now that they are invalid due to an abandonment which he claims occurred in 1997. Thus, his actions in November 2006 belie his present argument. The fact is that Tom

of the board agreed . ." In this second statement, Mr. Nakajima again confirms that he is commenting only on events which occurred in 1996 or 1997 at the latest.

Mr. Takamori in ¶'s 9 and 10 gives his perception of events which by his own account is undated, but after comparing with the statements of others, would have occurred no later than 1997.

Miyano appreciated the continuing validity of MMU's rights in the Triangle Winged M, and at least for this reason, requested its assignment.

Significantly, in his recent declaration, Tom Miyano suggests that use continued through 2002 and even after in paragraph 14:

> From the time that MMU **phased out use [of the Triangle Winged M] in 1997 through (and even after) 2002**, MMU did not use the triangle logo shown in Reg. No. 1,217,317 on any machines sold in the United States by MMU, including power lathes and bar feeders.

To the extent that even Tom Miyano admits that MMU's use of the Triangle Winged M continued "even after" 2002, his declaration directly contradicts Defendants' basic premise that abandonment occurred in 1997.[86]  Taking the assertions of the Defendants as true (which MMU does not), even without considering any of the evidence set forth by MMU, Defendants fail to set forth an uncontradicted, non-conclusory position[87] on when and how MMU discontinued with the intent of not resuming all relevant uses of the Triangle Winged M as a service mark and trademark.

### vi.  Defendants' Have Not Establish Fraud

An important predicate to Defendants' fraud allegations is that the Triangle Winged M with 'Miyano' stylized is a material alteration of the Triangle Winged M with "Miyano" in block letters.  Defendants are simply wrong and cannot meet their burden.[88]

First, when properly analyzed in the manner set forth in the discussion regarding tacking, these two marks clearly have the same continuing, commercial impression.  Any difference between them does not rise to the level of a material alteration, as that term is defined.

Second, as also explained in the discussion regarding tacking, not only are these two designs legally equivalent, they are substantially exact representations of one another, which as explained in the tacking section, is generally regarded as a more rigorous standard than material alteration.

---

[86] Defendants state without any support or citation, "MMU claimed use of the mark from 1970, despite the 1997 decision by the board of directors to abandon the use of the Triangle Winged M mark and the differences in the mark as actually used."

[87] Introductory clause of ¶14 of Tom Miyano's Declaration, if read literally, alleges in conclusory fashion that MMU phased out the Triangle Winged M at some unspecified time after 2002.

[88] *See Money Store,* 689 F.2d at 670 ("A party seeking cancellation of a registered trademark on grounds of fraud must demonstrate the alleged fraud by 'clear and convincing evidence.'")

Third, Plaintiff never abandoned its rights in the Triangle Winged M design for either goods or services.  Plaintiff has produced significant evidence to support its continuing common law and registered trademark and service mark rights in the Triangle Winged M, all of which refute Defendants conclusion that "MMU has mislead the Patent and Trademark Office by knowingly applying for and renewing marks that were not actually being used." (Doc. 124, p. 23).  To the extent that Defendants state they anticipate filing an additional memorandum on these issues, Plaintiff will respond to those pleadings at the time they are filed.

### (2) Plaintiff MMU Has Overwhelmingly Shown A Likelihood of Confusion

Plaintiff has shown that its MIYANO® trademark, "Miyano" trade name, and Triangle Winged M marks are protectable. Defendants argue that factors weigh in their favor with regard to their Winged M mark, MiyanoHitec Machinery, Inc. corporate name, and the Tom and Steven Miyano Machinery assumed name. Defendants fail to mention that the Trademark Office has twice recently rejected their applications to register the Winged M mark based on likelihood of confusion with Plaintiff's Triangle Winged M registration (Reg. No. 1,217,317). (Exhs. 69 and 71). With regard to Defendants' marks and names, confusion is likely to occur.

### a. Defendants' Marks Are Unquestionably Confusingly Similar to Plaintiff's Marks

Defendants argue that MMU has improperly dissected the marks to fabricate similarity. Defendants' argument and analyses are flawed, as Plaintiff MMU did not dissect the marks but focused on the marks entitled to protection and weighed the salient portion of the each mark.[89] The Seventh Circuit has stated that "if one word or feature of a composite trade mark is the salient portion of the mark it may be given greater weight than the surrounding portion."[90]

Defendants admit in their Answer to the Complaint (Doc. 29, page 12, ¶ 48) that they "use a Winged M design that is ***nearly identical*** to the Winged M component of mark shown in trademark registration 1,217,317…" Similarity is not "fabricated," if the marks are nearly identical by Defendants' own admission.

---

[89] *See* Doc. 23, p. 19 *and  Ty, Inc. v. Jones Group Inc.*, 237 F.3d 891, 898 (7th Cir. Ill. 2001) ("Therefore, it seems proper that the magistrate judge would focus upon the mark entitled to protection--that is, the "Beanie" mark--when comparing the two products.")

[90] *Ty*, 237 F.3d at 898 (*citing Henri's Food Prods. Co., Inc. v. Kraft, Inc.,* 717 F.2d 352, 356 (7th Cir. 1983))



| Defendants' Winged M | Plaintiff MMU's Winged M | Plaintiff MMU's Triangle Winged M |
|---|---|---|

Moreover, as stated above, the Trademark Office has twice recently rejected Defendants' application for federal registration (Serial No. 77/351,695 and 77/371,395) of the Winged M mark based on likelihood of confusion with Plaintiff's Triangle Winged M federal registration (Reg. No. 1,217,317). In connection with Defendants' Application Serial No. 77/351,695, a Trademark Examiner stated that Defendants' Winged M mark "is highly similar to the cited registration M MIYANO [Triangle Winged M mark]…" (Exh. 69). Thereafter, a *different* Trademark Examiner refused registration of Defendants' Winged M mark in its Application Serial No. 77/371,395, citing a likelihood of confusion based again on Plaintiff's Triangle Winged M mark. (Exh. 71) The second Trademark Examiner stated that Plaintiff's Triangle Winged M and Defendants' Winged M have "the same 'M'-with-wings design."

It is clear that the Winged M portion is considered the salient portion of both marks and is entitled to be weighed more heavily. Defendants admit that the Winged M's are nearly identical. Viewed in their entirety, weighing the identical portion, the Defendants' Winged M and the Triangle Winged M mark are so similar such as to cause confusion.

Defendants' analysis of MMU's "Miyano" trade name[91] and MIYANO trademark versus Defendants' corporate name is also flawed, as it places too much emphasis on the generic components and not enough on the marks entitled to protection. Defendants admit in their Response that "'Machinery' is either a generic term or merely descriptive." (Doc. 124, page 31). The presence of a generic term, such as "Machinery," makes little difference in comparing otherwise similar marks.[92] Likewise, "the presence in both conflicting marks or trade names of commonly used generic indicators such as 'Inc.' cannot either add or lessen any likelihood of confusion that would otherwise exist." Thus, the salient portion of the Defendants' company

---

[91] Defendants argue that focusing on "Miyano" is improper dissection; however, "Miyano" is the trade name is entitled to protection and, therefore, the proper focus. *See Ty, Inc. v. Jones Group Inc.*, 237 F.3d 891, 898 (7th Cir. Ill. 2001).

[92] *Henri's Food Products Co.*, 717 F.2d at 356 (7th Cir. 1983) ("When one portion of a composite mark is a descriptive or generic word, that feature of the mark may be of less significance in designating a source of origin.") *See also In re Chatam Int'l, Inc.*, 380 F.3d 1340, 1343 (Fed. Cir. 2004) (the descriptive word "GOLD" counted little in comparing the marks.)

name is "MiyanoHitec" which is almost identical visually and aurally to Plaintiff's "Miyano" trade name and trademark. Defendants admit that "MiyanoHitec" and "Miyano" are at least partially similar. (Exh. 50, S. Miyano Tr. 101:19-103:14). Both words start with and incorporate the dominant portion "Miyano;" Defendants merely add "Hitec." *Id.* Even though it should be given less weight, the word "Machinery" next to "MiyanoHitec" reinforces this similarity and further hides "Hitec," at least aurally. Viewed as a whole the marks, weighing the salient portions, Defendants' corporate name is confusingly similar to Plaintiff's trade name and MIYANO mark.[93]

Defendants also erred when comparing Defendants' alleged business name "Tom and Steven Miyano Machinery" to Plaintiff's "Miyano" trade name and MIYANO trademark. Like "Machinery" as discussed above, the addition of Defendants' personal names do not add anything to the commercial impression of the mark and are properly discounted in comparing the overall impression.[94] The remaining portion of Defendants' business name, "Miyano" is the dominant portion.[95] Viewed in their entireties, with non-dominant features appropriately discounted, the marks are confusingly similar.

When Defendants' names and mark are viewed in their entireties, with the salient portions appropriately weighed, Defendants marks are confusingly similar to Plaintiff's "Miyano" trade name, MIYANO trademark and Triangle Winged M mark. This factor weighs in Plaintiff's favor.

### b. Defendants Sell The Same Products

Defendants state that they have not sold any products, so there are no products to compare. However, Defendants intend to sell the same products to the same customers, as

---

[93] *See Van Auken Co. v. Van Auken Steam Specialty Co*., 57 Ill. App. 240, 242 (Ill. App. Ct. 1894). "In ordinary speech, of either company only [the name] Van Auken would be spoken, as we say of railroads, the Alton, the Burlington, the Rock Island."

[94] Many courts have found the mere addition of a first name insufficient to prevent confusion. *See*, e.g., *Nina Ricci, S.A.R.L. v. E.T.F. Enterprises, Inc.*, 889 F.2d 1070, 1073 (Fed. Cir. 1989); J*ohn B. Stetson v. Stephen L. Stetson Co.*, 85 F.2d 586 (2d Cir.) (STEPHEN L. STETSON infringes [**32] STETSON), cert. denied, 299 U.S. 605, 57 S. Ct. 232, 81 L. Ed. 446 (1936). E. & J. Gallo Winery v. Gallo Cattle Co., 967 F.2d 1280, 1292 (9th Cir. 1992) *See also In re Chatam Int'l, Inc.*, 380 F.3d at 1343 ("With respect to JOSE, the Board correctly observed that the term simply reinforces the impression that GASPAR is an individual's name. Thus, in accord with considerable case law, the JOSE term does not alter the commercial impression of the mark… After discounting any commercial impression of JOSE and GOLD, Chatam is left with GASPAR as the dominant feature of its mark.") *and  McCarthy* §23:50.

[95] *See E. & J. Gallo Winery*, 967 F.2d at 1292 (Finding the surname "Gallo" to be the dominate portion of the marks).

indicated on their website (*See* Doc. 23, pp. 3 and 8). Moreover, Defendant Stephen Miyano testified that Defendants supply "various systems such as CNC lathes, machining centers, and CNC grinders."[96] As set forth in Plaintiff's Memorandum (Doc. 23, pp. 20-21), these are the same products sold by MMU or products consumers are likely to attribute to a single source, *i.e.* Plaintiff MMU. Consequently, this factor weighs heavily in Plaintiff MMU's favor.

### c.  Area and Manner of Use

Defendants concede that both Plaintiff and Defendants are competing in the same markets in the same geographical region for the same customers. Defendants argue that the sophistication of actual and potential purchasers mitigate this factor. However, the case which Defendants cite for the proposition that when consumers are sophisticated, there is no initial interest confusion, actually held the opposite. The court in *Personeta, Inc. v. Persona Software, Inc.*, found that sophisticated consumers can suffer initial interest confusion prior to a purchase.[97] Thus, the consumer sophistication does <u>not</u> mitigate the area and manner of use (i.e. the relationship in use, promotion, distribution or sales, etc.), because these activities may lead to initial interest confusion. Thus, this factor weighs heavily in Plaintiff MMU's favor.

### d.  Customer's Degree of Care – Customers Will Suffer from Initial Interest

Defendants erroneously argue that sophisticated customers are not prone to initial interest confusion. Defendants cite *Personeta, Inc. v. Persona Software, Inc.* and cases cited therein, for the proposition that "when consumers are sophisticated, there is no initial interest confusion." The Court in *Personeta, Inc.* examined the sophistication of consumers both prior and at point of sale and found that while the sophistication of consumers was high *at the point of sale*, it was <u>not</u> at times prior thereto.[98] Plaintiff specifically argues this point in its opening brief (Doc. 23, p. 22). In connection with the information gathering stage, specifically at trade shows and conducting research on the internet, customers are not wary or discriminating; they may be lured and form quick impressions. (*See* Exh. 72, Nagasawa Tr. 88:5-90:24.). "This confusion could harm [Plaintiff's] goodwill if, for example, a customer mistakenly contacts [Defendants] and

---

[96] Exh. 50, S. Miyano Tr. 107:12-6

[97] *Personeta, Inc. v. Persona Software, Inc.*, 418 F. Supp. 2d 1013, 1018 (N.D. Ill. 2005) ("The court finds that the degree of sophistication of consumers at the RFQ stage favors finding a likelihood of confusion.")

[98] *Personeta, Inc.* 418 F. Supp. 2d at 1017 ("Actionable trademark infringement, however, is not limited to confusion occurring at the time of sale.")

suffers 'perceived slights or disagreements.'"[99] As in *Personeta, Inc.,* the degree of sophistication of consumers at these initial information gathering stages favors finding a likelihood of confusion.

With initial interest confusion, the damages lies in the presale appropriation of goodwill. By definition, initial interest confusion addresses confusion or uncertainty based on first impressions. Such harm is not remedied merely because the potential customer eventually learns of the true identity of the infringer or the lack of affiliation between the infringer and the mark owner. The infringer has already received the opportunity to further solicit the potential customer based on the predictable draw of the mark owner's protected assets, namely its commercial identity, trademarks, and trade names.[100]

### e.  Strength of the Mark Favors Plaintiff MMU

Plaintiff's "Miyano" trade name, MIYANO® trademark and Triangle Winged M mark are strong marks entitled to protection. Tom Miyano admitted that the word "Miyano" is used customers by in the United States "to identify the source of the machines marketed and <u>sold by MMU</u>." (Doc. 115, Dec. of Thomas Miyano, ¶ 6). As admitted by Defendants, the word "Miyano" identifies the goods sold under the mark as emanating from a particular source, i.e. Plaintiff.[101] This association is based on the extensive use of Plaintiff's trade name and trademarks.[102] "While personal names used as trademarks are not inherently distinctive, they are *treated as strong marks upon a showing of secondary meaning.*" *E. & J. Gallo Winery,* 967 F.2d at 1291.

The Triangle Winged M Mark is strong, as a whole, as it is fanciful or arbitrary. The design includes a triangle with a superimposed M and wings, which are ornamental features. Defendants improperly segregate the components, contrary to the case they cite, of the Triangle Winged M without considering the mark as a whole. Moreover, the question presented in *Courtenay Communs. Corp. v. Hall* was not whether the mark was strong but whether it was entitled to any protection under the Lanham Act such that the plaintiff's complaint could survive

---

[99] *Personeta, Inc.*, 418 F. Supp. 2d at 1018 *quoting Meridian Mut. Ins. Co. v. Meridian Ins. Group*, 128 F.3d 1111, 1117 (7th Cir. Ill. 1997)

[100] See generally, *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons*, 365 F. Supp. 707, 717 (S.D.N.Y. 1973), *aff'd* 523 F.2d 1331 (2d Cir. 1975) and *Dorr-Oliver, Inc., v. Fluid-Quip, Inc*., 94 F.3d 376, 382 (7th Cir. 1996).

[101] *Sands, Taylor & Wood, Co. v. Quaker Oats Co.*, 978 F.2d at 959.

[102] *See* Doc. 23, pp. 14-15 and *supra* for Plaintiff's analysis of secondary meaning.

a Rule 12(b)(6) motion to dismiss. This case does address whether The Triangle Winged M mark is entitled to additional protection as an arbitrary or fanciful design mark. Such marks are strong marks under the likelihood of confusion analysis. *See Personeta, Inc.*, 418 F. Supp. 2d at 1118. Therefore, Plaintiff's trade name, trademarks and service mark are strong marks, deserving of strong protection.

### f. Actual Confusion

Defendants inexplicably argue that the lack of actual confusion weighs in their favor. However, evidence of actual confusion is not required to prove that a likelihood of confusion exists.[103] Additional discovery has yielded suggestive evidence of actual confusion. As testified by Henry Marchionne during his deposition, when he contacted the organizers of the IMTS show ("The Association for Manufacturing Technology" or "AMT") upon hearing the name Miyano Machinery representative, the AMT responded "Oh, you are MiyanoHitec." (Exh. 43, Marchionne Tr. 98:10-99:15). Plaintiff has also received an inquiry from Dun & Bradstreet asking if there was any relationship between Defendants and Plaintiff. (Exh. 43; Exh. 70, Minemura Tr. 44:1-46:9).[104] As a result, this factor too, weighs in Plaintiff's favor.

### g. Defendants' Intent

Defendants' intent to cause confusion can be inferred from the circumstances in addition to their knowing of MMU's marks. Defendants have not accidently selected one similar mark, but rather multiple infringing marks, starting with the Triangle Winged ***H***.[105] After the Defendant company had been operating for more than a year as "Hitec Machinery International, Inc.," Defendants deliberately added the word "Miyano" in the corporate name, because as Steven Miyano, president of MiyanoHitec Machinery, stated in his deposition "Well, I thought I ***had*** to put my family name inside." (Exh. 50, S. Miyano Tr. at 30:21-31:7)(emphasis added).

Also, as noted already, Defendants hid from MMJ executives their adoption of the Winged M and the "MiyanoHitec" corporate name, while asking for an assignment of Plaintiff's marks. (*see supra*) Defendants listed the corporate history on their website as their own and

---

[103] *Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 465 (7th Cir. 2000) ("We have previously made clear, however, that evidence of actual confusion is not essential to a finding of a likelihood of confusion.")

[104] *See Perl Brand Foods Corp. v. Deli Direct From Perl, Inc.*, 1989 U.S. Dist. LEXIS 17473 (N.D. Ill. Oct. 16, 1989)(weighing confusion by Dun & Bradstreet in the analysis)

[105] *See supra* and Doc 23, pp. 23-24

falsely stated that they had "re-established" the company.[106] Defendants stated that in response to Plaintiff's cease-and-desist letter that they have assumed another business name and use a disclaimer. (Exh. 52)  However, Defendants still hold themselves out as MIYANOHITEC. (Exhs. 53, 54, and 56) As stated above and shown in recent photographs, Defendants still most prominently exhibit the corporate name MIYANOHITEC MACHINERY, INC., and the disclaimers are not readily visible.  It is clear that Defendants intend to profit from the goodwill belonging to Plaintiff in the machine tool industry. Plaintiff respectfully submits that this factor also weighs in its favor.

### h.    Likelihood Of Confusion Summary

Contrary to Defendants' assertions, the factors as a whole weigh in Plaintiff MMU's favor.[107]  Plaintiff's marks and Defendants marks' are similar if not nearly identical when the proper analysis, appropriately weighing the salient portions, is conducted.  The products of Plaintiff and Defendants are competitive and likely to be attributed to the same source. Defendants concede that the area and manner of use factor favors Plaintiff, such that both Plaintiff and Defendants advertise and operate in the same area.  At this early stage of litigation, Plaintiff has found some indications of actual confusion. Finally, Defendants' continuing intent to pass off their goods can be inferred from their continuing actions. Arguably all of the factors, including those which the Seventh Circuit has identified as "most important," weigh in Plaintiff's favor.[108]

### B.    Defendants Fail to Refute Irreparable Harm

Defendants argue that Plaintiff delayed in filing this lawsuit and seeking injunctive relief, and thus cannot show irreparable harm.  The facts that Defendants allege (Doc. 124, p. 35) are unsupported and misleading, as is the statement that Plaintiff's delay is without explanation. Trademark injuries are "presumed to be irreparable because it is virtually impossible to ascertain the precise economic consequences of intangible harms, such as damage to reputation and loss of goodwill, caused by such violations." *Ty,* 237 F.3d at 902. Defendants argue that such presumption is overcome by showing delay.  The Seventh Circuit, however, does "not support a

---

[106] Doc. 23, pp. 23-24, See Doc. 23, Exh. 20

[107] *Ty*, 237 F.3d at 897. ("None of these factors by itself is dispositive of the likelihood of confusion question, and different factors will weigh more heavily from case to case depending on the particular facts and circumstances involved.")

[108] In at least one case, the Seventh Circuit affirmed the issuance of a preliminary injunction when only one of the "most important factors" – similarity of the marks – favored the plaintiff. *Ty*, 237 F.3d at 901.

general rule that irreparable injury cannot exist if the plaintiff delays in filing its motion for preliminary injunction."[109] The test for whether the delay is acceptable is "whether the defendant has been lulled into a false sense of security or had acted in reliance on the plaintiff's delay." *Id.* The burden is on the Defendants to show <u>affirmative evidence</u> of being "lulled."[110]

Defendants have not been lulled into any false sense of security. Rather, they were the aggressors, seeking to cancel MMU's trademarks in other proceedings before the U.S. Trademark Office. (*See* Plaintiff's opening brief, Doc.23, pp. 9-10.). After receiving a cease-and-desist letter in March 2007, Defendants filed three separate proceedings with the Trademark Office.  These proceedings have been pending since April 2007.  In the proceedings, Defendants acknowledged that they were threatened with legal action, putting them on notice of Plaintiff's rights. (Doc. 23, Exh. 33: Amended Petition for Cancellation, ¶¶ 2 and 4).

Without factual support, Defendants allege that "MMU knew at least as early as November 2006 that Steven Miyano was operating his company as MiyanoHitec Machinery." This is factually false. While documents were filed with the Secretary of State on November 3, 2006, these documents indicated that Defendants had decided to change their name months earlier.[111]  Defendants then purposefully misled MMJ officials at their November 7, 2006 meeting by giving them business cards with their old company name. (Exh. 60).

Defendants argue that Henry Marchionne learned of the Defendants and their business in the middle of 2006, but that does not mean that he learned of the trademark use, howeverS. Defendants selectively cite and include a portion from Mr. Marchionne's rough, uncertified and unsigned deposition transcript without including the related testimony on the next page in which the witness clarified the answer in a manner that <u>directly contradicts</u> the proposition for which it is cited by Defendants. As is self-evident from a review of the testimony that Defendants omit, Mr. Marchionne clarified that he believed that Defendants were operating as Hitec Machinery International, Inc. – not MiyanoHitec as implied by Defendants – in May 2006.(Exh. 43, Marchionne Dep. Tr. at 93:19- 94:4).

For these reasons and the reasons explained in its Memorandum (Doc. 23, p. 24) Plaintiff

---

[109] *Ty, Inc. v. Jones Group, Inc.*, 98 F. Supp. 2d 988, 991 (N.D. Ill. 2000) *aff'd,*237 F.3d 891 (7th Cir. 2001).  (citing *Ideal Industries, Inc. v. Gardner Bender,* 612 F.2d 1018, 1025 (7th Cir. 1979)).

[110] *Ty,* 237 F.3d at 902 ("Jones has not presented any affirmative evidence that Ty's delay in seeking a preliminary injunction caused Jones to be lulled into a false sense of security or that Jones in any way relied on Ty's delay.").

[111] *See* Doc. 23, Exh. 19 (p. 8 of 11).

will suffer irreparable harm. The alleged "delay" is acceptable given the three separate proceedings before the Trademark Office.  Defendants have not overcome the presumption of irreparable harm associated with trademark infringement recognized by the Seventh Circuit. Plaintiff respectfully submits that this element of the analysis should be resolved in its favor.

### C.    Defendants Fail to Refute Plaintiff's Balance of Harm Showing

Defendants argue that the "substantial harm to the [Defendants] far outweighs any harm to MMU." Defendants extensively cite *Howe Scale Co. v. Wyckoff, Seamans & Benedict,* 198 U.S. 118 (1905) and *Brennan's Inc. v. Brennan,* 360 F.3d 125 (2nd Cir. 2004), both of which are distinguishable.

The quotes cited by Defendants from *Howe Scale Co. v. Wyckoff, Seamans & Benedict* were explicitly abrogated by the Supreme Court's later holding in *L. E. Waterman Co. v. Modern Pen Co. (1914).*[112] The Seventh Circuit has recognized the abrogation of *Howe Scale Co.* in *Consumers Petroleum Co. v. Consumers Co. of Illinois.*[113]  Modern courts have steadily migrated away from these earlier holdings.  "The courts are now consistent in imposing tighter restrictions on the second comer in the face of possible confusion (essentially by upping the reasonableness threshold of *Waterman*)."[114]  A junior user's right to use his name thus must yield to the extent its exercise causes confusion with the senior user's mark.[115]

*Brennan's Inc. v. Brennan* is distinguishable in that the parties were two restaurants and resided in separate geographic markets (in the southeast for the plaintiff, in New York for the defendant). The Second Circuit agreed that with the lower court that the addition of personal

---

[112]  *L. E. Waterman Co. v. Modern Pen Co.*, 235 U.S. 88, 94 (U.S. 1914) ("In support of this proposition the defendant lays hold of language in *Howe Scale Co. v. Wyckoff, Seamans & Benedict*, 198 U.S. 118, 140, and in other books, to the effect that courts will not interfere with the use of a party's own name 'where the only confusion, if any, results from a similarity of the names and not from the manner of the use.' But, whatever generality of expression there may have been in the earlier cases, it now is established that when the use of his own name upon his goods by a later competitor will and does lead the public to understand that those goods are the product of a concern already established and well known under that name, and when the profit of the confusion is known to and, if that be material, is intended by the later man, the law will require him to take reasonable precautions to prevent the mistake.")

[113] *Consumers Petroleum Co. v. Consumers Co. of Illinois*, 169 F.2d 153, 159 (7th Cir. 1948) ("The most important of these cases are the Howe Seale Company case… we think their rationale has been considerably limited by the more recent decisions…")

[114] *Basile, S.p.A.* 899 F.2d at 39 (Modifying the district courts preliminary injunction to further prevent use of the defendant's surname, because "we believe[d] the ordered relief render[ed] the Lanham Act protection meaningless.")

[115] *Id.*

name was meaningful given the differing geographic markets.[116]

In the present case, however, Defendants admit that the area and manner of use, including geographic scope, is the same (Doc. 124, p. 28). Moreover, Defendants do not hold themselves out to the public using their personal names. The corporate name MIYANOHITEC MACHINERY, INC. is always prominent. Moreover, the defendant corporation and its president, Steven Miyano, do not have background in the machine tool industry.[117]

Defendants in this case are estopped from using the marks. Defendant Tom Miyano declared that the corporation is the owner of the marks. Defendant Tom Miyano recognized this and sought assignment from MMU or its MMU's "logo marks" after the Defendants sold their interest in MMU and MMJ.

Defendants also state that they have added a disclaimer; they do not point to any actual evidence of its use. Many courts have held that a disclaimer does not serve to cure a case of trade mark infringement.[118] The evidence in this case indicates that Defendants selectively use disclaimers or minimize their presence.[119] These are the exactly the reasons why the Seventh Circuit articulated in *Int'l Kennel Club of Chicago, Inc.* that a party's "reputation and goodwill <u>should not</u> be rendered forever dependent on the effectiveness of fineprint disclaimers often ignored by consumers." 846 F.2d at 1093.

Moreover, the nonexistent sales by Defendants minimize any potential harm to them posed by an injunction.[120] Defendants have the opportunity to revert back to their original name "Hitec Machinery International, Inc." The balance of harms, therefore, weighs in favor of issuing an injunction.

### D.    Public Interest

Finally, the public interest is served by the injunction because enforcement of the trademark laws prevents consumer confusion.[121] The modern view of the case law is to prevent confusion by even those who use their own name.

---

[116] *Brennan's, Inc.*, 360 F.3d at 133 ("...the use of his first name suggests a restaurant connected with the Terrance Brennan of Picholine and Artisanal instead of a restaurant connected with Brennan's in New Orleans.")
[117] *Basile, S.p.A. v. Basile*, 899 F.2d 35, 40 (D.C. Cir. 1990) (Defendant's "interest in the use of his name is peculiarly weak. He has no reputation in the United States as a watchmaker.")
[118] 4 *McCarthy on Trademarks & Unfair Competition* §23:51 (4th ed. 2005)
[119] *See supra* and Plaintiff's opening brief, Doc. 23, p. 27
[120] *Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 469 (7th Cir. 2000)
[121] *Id.*

## III.    CONCLUSION

It is clear that the relevant public is likely to be deceived into thinking there is some connection or association between Plaintiff and Defendants. Along with that, the good-will of Plaintiff MMU, which MMU built up at great expense over a many years, would be whittled away.[122]  Without an injunction, Defendants usurp the benefit that Plaintiff owns in it trade name, "Miyano," MIYANO® trademark, and Triangle Winged M trademark. Defendant Tom Miyano, meanwhile, has already received relief from over $130 million of debt guarantees for what he "gave up"[123] (*i.e. sold*).  The newcomer to the field should not be permitted to purloin (or impugn Plaintiff's reputation for quality and goodwill).

For these reasons, Plaintiff respectfully requests that this Court issue a preliminary injunction against the Defendants, Thomas Miyano, Steven Miyano and MiyanoHitec Machinery, Inc.


Dated: June 20, 2008                              Respectfully submitted,


                                                  _s/ Edward D. Manzo_____
                                                  Edward D. Manzo
                                                  Joel Bock
                                                  Louis J. Alex
                                                  Jason R. Smalley
                                                  Attorneys for Plaintiff


Edward D. Manzo   I.D. # 03124728
Joel Bock          I.D. # 00239984
Louis J. Alex      I.D. # 06274458
Jason R. Smalley    I.D. # 06287426
COOK, ALEX, McFARRON, MANZO,
CUMMINGS & MEHLER, LTD.
200 West Adams Street, Suite 2850
Chicago, IL 60606
Phone:  (312) 236-8500
Fax:  (312) 236-8176
emanzo@cookalex.com

---

[122] *Lady Esther, Ltd. v. Lady Esther Corset Shoppe*, Inc., 317 Ill. App. 451, 459 (Ill. App. Ct. 1943)(injunction affirmed)
[123] *See* Doc. 23, Exhs. 20 and 22.

## CERTIFICATE OF SERVICE

The undersigned declares that he/she is over the age of 18 years, not a party to this action, and employed in the County of Cook, by Cook, Alex, McFarron, Manzo, Cummings & Mehler, Ltd., Attorneys at Law, 200 West Adams Street, Suite 2850, Chicago, Illinois 60606.

On the date listed below, I caused the filing of the foregoing **Reply to Defendants' Response to Plaintiff's Motion for Preliminary Injunction** with all its attachments and exhibits.  I caused the service of these aforementioned documents on the following individuals, as addressed below, by the means indicated, and on the date listed below:

| | | |
|---|---|---|
| Geoffrey A. Baker | Robert M. Karton | Vernon W. Francissen |
| Geoffrey D. Smith | ROBERT M. KARTON, LTD. | FRANCISSEN PATENT LAW, P.C. |
| DOWELL BAKER, P.C. | 77 W. Washington St., Suite 900 | 53 W. Jackson Blvd., |
| 201 Main Street, Suite 710 | Chicago, Illinois 60602-2804 | Suite 1320 |
| Lafayette, Indiana 47901 | (312)214-0900 telephone | Chicago, Illinois 60604 |
| (765) 429-4004 telephone | (312)214-4230 facsimile | (312)294-9980 telephone |
| (765) 429-4114 facsimile | robert@karton.us | (312)275-8772 facsimile |
| gabaker@dowellbaker.com | | vern@francissenpatentlaw.com |

Nancy E. Sasamoto
Steven L. Katz
George H Kobayashi
MASUDA, FUNAI, EIFERT & MITCHELL, LTD.
203 N. LaSalle St.
Suite 2500
Chicago, IL 60601
312-245-7500 telephone
nsasamoto@masudafunai.com
skatz@masudafunai.com
gkobayashi@masudafunai.com

\_\_\_\_	(BY ELECTRONIC MEANS) I caused this document to be electronically mailed (emailed) to the addressee(s) shown above.

\_X\_	(BY ELECTRONIC MEANS) I cause each such document to be sent by electronic means through the Electronic Court Filing system to the addressee(s) shown above, pursuant to LR 5.9.

Executed on June 20, 2008 at Chicago, Illinois.

Signed:	s/ Edward D. Manzo