**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Miyano Machinery USA Inc., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. **08 C 526** |
| v. | ) | |
| | ) | Hon. Virginia Kendall |
| MiyanoHitec Machinery, Inc., | ) | |
| Thomas ("Tom") Miyano, a/k/a Toshiharu Miyano | ) | Magistrate Judge Nolan |
| and Steven Miyano, a/k/a Shigemori Miyano, | ) | |
| | ) | |
| Defendants | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| | ) | |
| MiyanoHitec Machinery, Inc., | ) | |
| Thomas ("Tom") Miyano, a/k/a Toshiharu Miyano | ) | |
| and Steven Miyano, a/k/a Shigemori Miyano, | ) | |
| | ) | |
| Counterclaim-Plaintiffs | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Miyano Machinery USA Inc. | ) | |
| Counterclaim-Defendant, and | ) | |
| | ) | |
| Miyano Machinery Inc., | ) | |
| Third-Party Defendant | ) | |

# Unreported Cases and Other Authorities

1963 WL 7919 (Trademark Tr. & App. Bd.), 137 U.S.P.Q. 250
**(Cite as: 137 U.S.P.Q. 250)**

HALFORD MANUFACTURING COMPANY
v.
ALFRED ELECTRONICS

Patent Office Trademark Trial and Appeal Board

Decided Jan. 25, 1963
United States Patents Quarterly Headnotes

**TRADEMARKS**
**[1] Marks and names subject to ownership --
Names -- Individuals (§ 67.5215)**
Written consent to registration of surname as
trademark is manifested by fact that individual, as
corporation's president, executed corporation's
application to register mark.

**\*250** Trademark interference No. 5,905 between
Alford Manufacturing Company, application, Serial
No. 100,209, filed July 5, 1960, and Alfred
Electronics, Registration No. 677,965, issued May 5,
1959, and Registration No. 684,034, issued Aug. 25,
1959. Alford Manufacturing Company held entitled
to registration and Registration Nos. 677,965 and
684,034 cancelled at 136 USPQ 390. On petition for
reconsideration. Petition denied.

EZEKIEL WOLF, WOLF & GREENFIELD,
Boston, Mass., for Alford Manufacturing Company.

HARVEY G. LOWHURST, Palo Alto, Calif., for
Alfred Electronics.

Before LEACH, WALDSTREICHER, and
LEFKOWITZ, Members.

LEFKOWITZ, Member.

The senior party, Alfred Electronics, has filed a
petition for reconsideration of the Board's decision of
December 12, 1962 wherein it was held that the
junior party, Alford Manufacturing Company,
was entitled to the registration for which it has made
application and that the senior party's registrations
would be canceled in due course. The junior party
has filed a brief in opposition thereto.

[1] The issues raised by the senior party in its
petition were fully considered and determined by
the Board in arriving at its conclusion that the
junior party was using the term "ALFORD" in the
manner of a trademark at the time it filed its
application to register the same. The written
consent to the registration of the mark "ALFORD"
by Andrew Alford, the individual, is manifested by
the fact that said person executed the application of
the junior party.

**Decision**
The decision is adhered to and the petition is
accordingly denied.

Pat.Off. T.T.A.B.

137 U.S.P.Q. 250

END OF DOCUMENT

2007 U.S. Dist. LEXIS 60474, *



Analysis
As of: Jun 16, 2008

AUTOTECH TECHNOLOGIES LIMITED PARTNERSHIP, Plaintiff, v.
AUTOMATIONDIRECT.COM, INC., TIMOTHY HOHMANN and KOYO
ELECTRONICS INDUSTRIES CO., LTD., Defendants.
AUTOMATIONDIRECT.COM, INC., Plaintiff, v. AUTOTECH TECHNOLOGIES
L.P., AVG ADVANCED TECHNOLOGIES, INC., SHALLI INDUSTRIES, INC.,
and SHALABH KUMAR, Defendants.

No. 05 C 5488

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
ILLINOIS, EASTERN DIVISION

2007 U.S. Dist. LEXIS 60474

August 17, 2007, Decided
August 17, 2007, Filed

**SUBSEQUENT HISTORY:** Motion denied by Autotech Techs. Ltd. P'ship v. AutomationDirect.Com, Inc., 2007 U.S. Dist. LEXIS 67295 (N.D. Ill., Sept. 10, 2007)

**PRIOR HISTORY:** Autotech Techs. L.P. v. AutomationDirect.Com, Inc., 2007 U.S. Dist. LEXIS 55397 (N.D. Ill., July 26, 2007)

**COUNSEL:** [*1] For Autotech Technologies Limited Partnership, an Illinois limited partnership, Plaintiff: Kenneth M Suggs, LEAD ATTORNEY, Francis M. Hinson, Janet, Jenner & Suggs, LLC, Columbia, SC; Cary S. Fleischer, Chuhak & Tecson, Chicago, IL; David Seth Argentar, Sanjay Shivpuri, Chuhak & Tecson, P.C., Chicago, IL; Keith Allen Klopfenstein, Keith A. Klopfenstein, Esq., Chicago, IL.

For AutomationDirect.Com, Inc., Defendant: Robert Eliot Shapiro, LEAD ATTORNEY, Barack Ferrazzano Kirschbaum & Nagelberg LLP, Chicago, IL; Alan R. Lipton, Barry Francis MacEntee, Hinshaw & Culbertson, Chicago, IL; James A. Trigg, Susan A Cahoon, Kilpatrick Stockton LLP, Atlanta, GA; Virginia S Taylor, Kilpatrick Stockton, Atlanta, GA.

For Timothy Hohmann, Defendant: Alan R. Lipton, Barry Francis MacEntee, Hinshaw & Culbertson, Chicago, IL; James A. Trigg, Susan A Cahoon, Kilpatrick Stockton LLP, Atlanta, GA; Virginia S Taylor, Kilpatrick Stockton, Atlanta, GA; Robert Eliot Shapiro,

Barack Ferrazzano Kirschbaum & Nagelberg LLP, Chicago, IL.

For Koyo Electronics Industries, Co., Ltd., Defendant: James A. Trigg, LEAD ATTORNEY, Susan A Cahoon, LEAD ATTORNEY, Kilpatrick Stockton LLP, Atlanta, GA; Virginia S Taylor, LEAD ATTORNEY, [*2] Kilpatrick Stockton, Atlanta, GA; Robert Eliot Shapiro, Barack Ferrazzano Kirschbaum & Nagelberg LLP, Chicago, IL; Wendi E. Sloane, Barack, Ferrazzano, Kirschbaum, & Nagelberg, Chicago, IL.

For AutomationDirect.Com, Inc., Counter Claimant: Barry Francis MacEntee, Hinshaw & Culbertson, Chicago, IL.

For Autotech Technologies Limited Partnership, an Illinois limited partnership, Counter Defendant: Cary S. Fleischer, LEAD ATTORNEY, Chuhak & Tecson, Chicago, IL; Francis M. Hinson, Janet, Jenner & Suggs, LLC, Columbia, SC; Keith Allen Klopfenstein, Keith A. Klopfenstein, Esq., Chicago, IL.

For Autotech Technologies Limited Partnership, an Illinois limited partnership, Counter Defendant: Francis M. Hinson, Janet, Jenner & Suggs, LLC, Columbia, SC; Keith Allen Klopfenstein, Keith A. Klopfenstein, Esq., Chicago, IL.

For AVG Advanced Technology Limited Partnership, Shalabh Kumar, Counter Defendants: Keith Allen Klopfenstein, Keith A. Klopfenstein, Esq., Chicago, IL.

**JUDGES:** JAMES F. HOLDERMAN, Chief Judge.

**OPINION BY:** JAMES F. HOLDERMAN

**OPINION**

MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, Chief Judge:

In the summer of 2004, the business relationship of Autotech Technologies Limited Partnership ("Autotech") and AutomationDirect.com, [*3] Inc. ("ADC") began to sour. After more than four years of working together to manufacture and distribute operator interface panels for automation control systems, the parties went their separate ways. Now before this court, Autotech and ADC each claim, among other allegations, trademark rights in the words "EZTOUCH" and "EZTEXT," which had previously been affixed to their common product.

Pending before the court are ADC's Motion for Summary Judgment as to the Trademark Claims of All Parties and for Entry of a Permanent Injunction (Dkt. No. 235) and Autotech's Cross Motion for Summary Judgment (Dkt. No. 256). For reasons stated below, both motions are denied.

SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When facing cross summary judgment motions, the court construes "all facts and inferences therefrom in favor of the party against whom the motion under consideration [*4] is made." *First National Bank of Manitowoc v. Cincinnati Ins. Co.,* 485 F.3d 971, 976 (7th Cir. 2007) (citations omitted). Issues related to trademark infringement, such as the protectability of a particular word or phrase or a likelihood of confusion, "may be resolved on summary judgment 'if the evidence is so one-sided that there can be no doubt about how the question should be answered.'" *Packman v. Chicago Tribune Co.,* 267 F.3d 628, 637 (7th Cir. 2001) (quoting *Door Sys., Inc. v. Pro-Line Door Sys., Inc.,* 83 F.3d 169, 171 (7th Cir. 1996)). In performing this analysis, it is not for the court to make credibility determinations or to weigh conflicting evidence. *Abdullahi v. City of Madison,* 423 F.3d 763, 773 (7th Cir. 2005).

BACKGROUND AND PROCEDURAL HISTORY

On September 8, 1999, Autotech and ADC entered into an agreement whereby ADC agreed to market and distribute certain automation control panels to be manufactured by Autotech ("the 1999 Agreement") (Declaration of ADC President Thomas C. ("Tim") Hohmann, Ex. 1). Pursuant to the terms of the 1999 Agreement, this line of products was to be "specifically designed for ADC," who was to be the exclusive distributor. (1999 Agreement PP [*5] 1.3-1.5). Although the parties now dispute whether Autotech or ADC was ultimately responsible for originating the marks EZTOUCH and EZTEXT, they agree that neither party employed the marks prior to 2000, when ADC began advertising the EZTOUCH and EZTEXT products pursuant to the 1999 Agreement. The first products were not sold under the EZTOUCH and EZTEXT marks until early 2001.

For approximately four years, the contractual relationship between the parties appears to have worked well for both businesses. [1] In June, 2004, however, ADC informed Autotech that it did not intend to extend the 1999 Agreement, and the 1999 Agreement expired according to its terms on December 31, 2004. During the latter half of 2004 and early 2005, as their joint business relationship began to dissolve, Autotech and ADC each sought registration of the marks EZTOUCH and EZTEXT with the United States Patent and Trademark Office ("PTO"). [2] The parties also filed lawsuits against one another, which have been consolidated before this court. [3]

---

1   A 2002 addendum to the 1999 Agreement addressed Autotech's use of the same Graphical User Interface as that used in the EZTOUCH panels in a different line of products (called [*6] "G Squared" and "Q Squared"). (*See* Hohmann Decl., Ex. 12).

2   On July 1, 2004, Autotech's sister company, AVG Advanced Technologies ("AVG"), filed U.S. App. No. 78/444,916 for the mark EZTOUCH. Shortly thereafter, on July 16, 2004, ADC submitted U.S. App. No. 76/602,557 for the mark EZTOUCH. AVG's application was refused by the PTO on May 23, 2007, on the grounds that the mark is merely descriptive. ADC's application was suspended in September, 2005, in part pending the outcome of this lawsuit.

Regarding the EZTEXT mark, AVG filed U.S. App. No. 78/474,446 for the mark EZTEXT on August 26, 2004, while ADC submitted U.S. App. No. 78/575,386 for the mark EZTEXT on February 25, 2005. The PTO published AVG's mark for comment in August, 2005, and ADC filed its opposition to the registration of AVG's mark. ADC's opposition to AVG's registration of the mark EZTEXT has been pending before the

Case 1:08-cv-00526    Document 129    Filed 06/21/2008    Page 5 of 128

Page 3
2007 U.S. Dist. LEXIS 60474, *

Trademark Trial and Appeal Board since October 7, 2005. Meanwhile, ADC's own application was suspended on March 20, 2006, again in part pending the outcome of this litigation.
3   On April 11, 2005, ADC filed a lawsuit in the Northern District of Georgia (case number 05 CV 961), alleging that Autotech had engaged **[*7]** in false advertising, copyright infringement, trademark infringement, unfair competition, and deceptive trade practices. Five months later, on September 15, 2005, Autotech filed a lawsuit in the Circuit Court of Cook County against ADC (case number 05 CH 15714), alleging breach of contract, breach of fiduciary duties, aiding and abetting the breach of fiduciary duties, and fraudulent misrepresentation. The Illinois case was removed to the Northern District of Illinois on September 23, 2005, and assigned case number 05 C 5488. On January 12, 2006, after a detailed discussion of the relevant factors, the Northern District of Georgia ordered case number 05 CV 961 transferred to the Northern District of Illinois pursuant to 28 U.S.C. § 1404(a), where it was consolidated with case number 05 C 5488.

After the expiration of the 1999 Agreement, and pursuant to an agreement signed on November 12, 2004, ADC continued to use the EZTOUCH and EZTEXT marks for purposes of selling its remaining inventory. (*See* Hohmann Decl. P 41, Ex. 38) ("the 2004 Agreement"). At the same time, the parties explicitly acknowledged their ongoing dispute over ownership rights in the alleged EZTOUCH trademark. (2004 **[*8]** Agreement P 1.4). In September, 2005, ADC launched its C-more product line to replace the EZTOUCH line of products. In its catalog and online, ADC has referred to certain EZTOUCH and EZTEXT products as "no longer available" "obsolete" and "discontinued." (*See* Declaration of Autotech President Shalabh Kumar P 31, Ex. 12; Hohmann Decl. P 56, Ex. 50). ADC also invited its customers to "consider our next generation EZTouch compatible C-more touch panel." (Kumar Decl. P 31, Ex. 12).

Meanwhile, in January, 2005, Autotech launched a new business under the trade name "EZAutomation," through which it has marketed a variety of operator interface products under the names EZTOUCH ENHANCED, EZTEXT ENHANCED, EZ TOUCHPLC, EZ TEXTPLC, and EZ TOUCHSCREEN. (Hohmann Decl. P 43, Ex. 39; Kumar Decl. P 21). On its website, Autotech compares the EZTOUCH ENHANCED product to the version of the EZTOUCH product sold by ADC, and compares the EZTEXT ENHANCED product to the version of the EZTEXT product sold by ADC.

LEGAL ANALYSIS

ADC seeks summary judgment in its favor with respect to five of its counterclaims: [4] (Counterclaim # 7) federal unfair competition under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); (Counterclaim **[*9]** # 9) common law trademark infringement and unfair competition, pursuant to Georgia and Illinois law; (Counterclaim # 10) unfair and deceptive trade practices, pursuant to the Georgia and Illinois Uniform Deceptive Trade Practice Acts, O.C.G.A. §§ 10-1-370 *et seq.*, and 815 Ill. Comp. Stat. 510/1 *et seq.;* (Counterclaim # 11) state trademark infringement under O.C.G.A. § 10-1-450; and (Counterclaim # 12) violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/1 *et seq.* Furthermore, ADC also seeks summary judgment in its favor on Autotech's claim for trademark infringement pursuant to § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (Count IX).

    4   ADC's counterclaims are asserted against Autotech, AVG, Shalli Industries, Inc., and Shalabh Kumar (President of Autotech).

Autotech, in its cross motion for summary judgment, seeks a declaratory judgment that ADC does not possess any trademark rights in the marks EZTOUCH and EZTEXT, in accordance with Autotech's claim for trademark infringement (Count IX). At the same time, however, Autotech specifically requests that this court *not* determine issues of trademark enforceability, instead voicing a preference **[*10]** that the United States Patent and Trademark Office ("PTO") make the determination whether the alleged marks are protectable under federal trademark law.

Because the question of ownership has the potential to affect the scope of the court's further analysis, the court begins with the question of which party owns the rights to the alleged trademarks. Unfortunately, the Seventh Circuit's law on trademarks has not addressed this issue with great frequency.

Looking to other courts that have considered the issue, the court finds that generally, "the question of ownership of a trademark as between the manufacturer of a product to which the mark is applied and the exclusive distributor of that product is a matter of agreement between them." *Energy Jet, Inc. v. Forex Corp.,* 589 F. Supp. 1110, 1116 (D.C. Mich. 1984); *see also Sengoku Works Ltd. v. RMC Int'l, Ltd.,* 96 F.3d 1217, 1220 (9th Cir. 1996). In this case, however, the question of trademark ownership was not addressed by the parties in the 1999 Agreement. [5] Furthermore, the parties explicitly noted their *disagreement* on the question of trademark ownership in the 2004 Agreement. (2004 Agreement P 1.4). Because there is no controlling agreement **[*11]** on the issue of ownership, the court must rely on other evi-

dence to ascertain the owner of any potential trademark rights.

> 5   The court is not persuaded by Autotech's argument that the indemnification clause of the 1999 Agreement indicates an agreement as to Autotech's ownership of the alleged trademarks. This clause states that Autotech will indemnify ADC against claims "related to the design and manufacturing of the Products, including [Autotech] developed documentation and software for breach of or infringement of patent and intellectual property rights." (1999 Agreement P 2.8). On its face, this clause appears to refer to third party claims brought against ADC.

The court begins with the general presumption that ownership lies with the manufacturer. *Sengoku Works,* 96 F.3d at 1220. However, where the "goods pass through [the distributor's] hands in the course of trade and [the distributor] gives them the benefit of [its] reputation or of [its] name and business style," the presumption in favor of the manufacturer can be rebutted. *Victor Tool & Mach. Corp. v. Sun Control Awnings, Inc.,* 299 F. Supp. 868, 874 (E.D. Mich. 1968). In determining which party has superior ownership rights, courts  [*12] look to a number of factors, including (1) which party invented or created the mark; (2) which party first affixed the mark onto the product; (3) which party's name appeared on packaging and promotional materials in conjunction with the mark; (4) which party exercised control over the nature and quality of the goods on which the mark appeared; (5) which party was viewed by customers as standing behind the goods, *e.g.* the party that received customer complaints; and (6) which party paid for advertising and promotion of the trademarked product. *Thermion, Inc. v. Thermion Metalizing Sys., Inc.,* 423 F. Supp. 2d 1146, 1152 (W.D. Wash. 2006) (quoting McCarthy § 16.48); *see also Wrist-Rocket Mfg. Co. v. Saunders,* 379 F. Supp. 902, 909 (D. Neb. 1974) *("Wrist-Rocket I"), aff'd in part, rev'd in part,* 516 F.2d 846 (8th Cir. 1975) *("Wrist-Rocket II"); Tactica Int'l, Inc. v. Atl. Horizon Int'l, Inc.,* 154 F. Supp. 2d 586, 600 (S.D.N.Y. 2001); *Omega Nutrition U.S.A., Inc. v. Spectrum Mktg., Inc.,* 756 F. Supp. 435, 438-39 (N.D. Cal. 1991). As the Third Circuit has recognized, "[t]he decisive question is not who manufactured the article sold under a given trademark, but which business or article is  [*13] symbolized by it." *Premier Dental Prods. Co. v. Darby Dental Supply Co., Inc.,* 794 F.2d 850, 854 (3d Cir. 1986) (quoting Callmann, *Unfair Competition, Trademarks and Monopolies* § 17.16 (4th ed., 1981)). The court analyzes each of these factors in turn.

A. Which Party Invented or Created the Marks

ADC asserts that its President, Thomas C. (Tim) Hohmann ("Hohmann"), originated the names EZTOUCH and EZTEXT to refer to the touch screen and text-screen products sold pursuant to the 1999 Agreement. (Hohmann Decl. P 12). Hohmann attests that "I personally thought up these trademarks and we evaluated them along with other possible names developed by ADC." (*Id.*). In support of this argument, ADC submits a chain of emails showing the development of EZTOUCH and EZTEXT names and logos by ADC artist Jamie Hipple. (Hohmann Decl., Ex. 7-8).

Autotech President Shalabh Kumar ("Kumar") agrees that "it may probably be true that Timothy [sic] Hohmann first came up with the exact specific name 'EZTouch,'" but Kumar also emphasizes that the overall development of the mark was a "joint effort." (Kumar Decl. P 7). Furthermore, Kumar attests that "ADC did not come up with the name EZText, I did." (Kumar Decl. [*14] P 7).

At the summary judgment stage, it is not the court's role to weigh competing evidence. Because it is a disputed question of fact whether either ADC or Autotech was ultimately responsible for originating the marks in question, the court finds that this factor cannot weigh in favor of either party's ownership rights to the disputed marks, at this point in the proceedings.

B. Which Party First Affixed the Marks onto the Product

Unlike traditional trademarks, the marks EZTOUCH and EZTEXT are not affixed to the operator control panels themselves or to the packaging of the products. (Hohmann Supp. Decl. P 8). Rather, the marks are used to promote the products in both print catalogs and online advertising, and are also displayed in user manuals and on the software start-up screens of the products. (*Id.*). In this case, ADC argues that it was the first to use the marks EZTOUCH and EZTEXT in commerce because it promoted the products by these names in ADC's 2000 catalog and on the homepage of ADC's website. On the other hand, Autotech argues that it was first to affix the marks to the products' user manuals and software.

It is clear to the court that Autotech and ADC each made use of the marks  [*15] in accordance with their respective rights and obligations, as outlined in the 1999 Agreement. As in *Omega Nutrition,* the first use of the marks was a joint effort between the parties. *Omega Nutrition,* 756 F. Supp. at 438 ("[the manufacturer] does not even argue that this first use took place *independently* of [the distributor]") (emphasis in original). ADC's use of the marks for advertising purposes was not independent of the 1999 Agreement with Autotech. Instead, both parties agreed that ADC would engage in this type of advertising for their mutual benefit.

Because the EZTOUCH and EZTEXT marks were first used for the benefit of both parties, the court finds that this factor does not weigh in favor of either party on the question of ownership.

C. Which Party's Name Appeared in Conjunction with the Marks

Throughout its promotional literature, ADC generally refers to the EZTOUCH and EZTOUCH products in a possessive manner. For example, ADC's 2000 catalog states "We are proud to introduce our new line of operator interface panels: EZText and EZTouch panels." (Hohmann Decl. P 22, Ex. 13). ADC also advertised that "We named our panels EZTouch because they are the easiest to configure." (Hohmann **[\*16]** Decl. P 22, Ex. 14). ADC regularly ran advertisements comparing "ours" (AutomationDirect) versus "theirs" (*e.g.* Allen-Bradley). (Hohmann Decl. P 22, Ex. 15). While ADC's catalog also includes a boilerplate disclaimer, stating "All product names, trademarks, and registered trademarks are the property of their respective manufacturers. AutomationDirect disclaims any proprietary interest in the marks and names of others," (Kumar Decl. Ex. 4), the court finds that the use of the designation "others" in conjunction with the "ours vs. theirs" comparison indicates no intent to disclaim ownership in the EZTOUCH and EZTEXT marks.

At the same time, ADC also highlighted the fact that AVG (Autotech's sister company) designed the EZTOUCH and EZTEXT line of products exclusively for ADC. (Hohmann Decl. P 23; Kumar Decl. P 8). For example, the 2000 catalog emphasized that ADC worked together with AVG to design the new PLC touch panels, stating "Since these products were designed from scratch to be marketed and sold by Automationdirect.com, our standards were high." (Kumar Decl. P 8, Ex. 2b). The EZTEXT advertisements similarly spoke of AVG's role in designing and manufacturing that product. (Hohmann **[\*17]** Decl. P 23, Ex. 19) ("Since [AVG] did such a great job designing and manufacturing the world's most practical touch panels exclusively for us, it only made sense that we ask them to design the world's most practical text panels.").

ADC's house trademark appeared on every page of the user manual and on the start-up screens for the software run on the EZTOUCH and EZTEXT products. (Hohmann Decl. PP 25, 27, Ex. 21-23, 25-27). The shipping labels emphasized that the products were "Sold by Automationdirect.com" and "Manufactured in USA by AVG." (Hohmann Decl. P 25, Ex. 24). Similar labels appeared on the products themselves. (Ex. 25 at p. 29, 49). As mentioned above, neither the products nor the packaging utilized the alleged trademarks themselves.

Both parties cite to *Omega Nutrition* in support of the argument that these uses of the marks require a finding of ownership in their favor. In *Omega Nutrition,* the district court held that the parties' use of the mark in question did not overcome the presumption of ownership that was conferred upon the distributor when the distributor registered the mark with the PTO. *Omega Nutrition,* 756 F. Supp. at 439. Relevant to this issue, the court noted **[\*18]** that the labels on the product "prominently featured [the distributor's] brand name and logo directly above the trademark, while the only mention made of [the manufacturer] was in tiny print in the lower left hand corner of the label." *Id.* In this case, the advertising and use of the marks makes abundantly clear that (1) the products were manufactured by Autotech (AVG), and (2) that ADC was the exclusive distributor of the products. Unlike in *Omega Nutrition,* in conjunction with the use of the EZTOUCH and EZTEXT marks, *both* parties' identities and roles are consistently emphasized. Neither logo or name is more or less prominent than the other, as they are both similarly sized and situated in the text and on the labels.

This factor again does not weigh in favor of either Autotech or ADC.

D. Which Party Exercised Control over the Nature and Quality of the Goods

According to the terms of the 1999 Agreement, Autotech was contractually responsible for manufacturing the goods in question. (1999 Agreement P 5.1). However, ADC argues that it contributed significantly to both the design of the EZTOUCH and EZTEXT products and the continued oversight of the products' quality. For example, ADC asserts **[\*19]** that it contributed to the original design of the products at the outset by generating at 28-page set of specifications for the new line of operator interface panels. (Hohmann Decl. P 9, Ex. 2). Autotech flatly disputes this assertion, arguing that "ADC simply copied [Autotech's specifications for an earlier product] word-by-word and resent them to Autotech as June 1999 specifications of the new panels to be designed for the ADC marketing channel." (Kumar P 36). Nonetheless, it is undisputed that ADC did have some input in the specifications it wished to see incorporated into the new products. (*See* Autotech's Response to ADC's Statement of Undisputed Material Facts, Dkt. No. 251 ("Autotech Resp.") P 41).

ADC also participated in product testing and evaluation, although the parties dispute the usefulness of ADC's list of 130 deficiencies found in the EZTOUCH prototype. (Hohmann Decl. P 10, Ex. 3-4; Kumar Decl. P 37-38). However, in a December 22, 2000 email to Hohmann, Kumar praised ADC's efforts, stating "AVG expresses its gratitude to ADC for jumping in to help test

the product. I am once again stating the fact in writing that ADC has gone way beyond the call of its duty in helping [*20] AVG develop the EZ Touch." (Hohmann P 11, Ex. 5).

The parties agree that ADC fielded warranty claims for the EZTOUCH and EZTEXT products, while Autotech was ultimately responsible for providing repair, replacement or credit to both ADC and its customers. (*See* 1999 Agreement PP 2.5-2.6; Hohmann Decl. P 30; Kumar Decl. P 18; Autotech Resp. P 49). Autotech and ADC often communicated with each other about warranty problems, defect rates, and other quality issues. (*See* Autotech Resp. PP 51-52.).

Although the undisputed evidence tends to show that ADC was involved in issues of quality control, this does not necessarily mean that ADC "bore the brunt of the responsibility of maintaining the quality of the product." *Omega Nutrition,* 756 F. Supp. at 439. On the contrary, the court finds that the back-and-forth communications between Autotech and ADC suggest (again) a joint effort between the parties. (*See, e.g.,* Hohmann Decl. P 32, Ex. 31). While "ADC monitors and reports defects to its manufacturers," (Hohmann Decl. P 32), it is clear that Autotech was the party responsible for coming up with solutions to correct these defects. Unlike in *Omega Nutrition,* ADC has not produced "an impressive array [*21] of evidence" that ADC had the power to "demand" the correction of product defects or that Autotech was required to inform ADC before making changes to the manufacturing process.

At the same time, it is entirely possible that ADC was ultimately responsible for the quality of the EZTOUCH and EZTEXT products. The resolution of disputed questions of fact regarding ADC's involvement at the initial product development and testing stages may shed some light on this issue. The court therefore finds this factor cannot be resolved in favor of either party on summary judgment.

E. Which Party Was Viewed by Customers as Standing Behind the Goods

It is clear that ADC was the initial customer contact point for the EZTOUCH and EZTEXT panels. (Autotech Resp. P 46). Specifically, customers were directed to call or fax ADC for issues of technical support, or to visit ADC's website. (ADC's Statement of Undisputed Material Facts, Dkt. No. 237 ("ADC's SMF"), P 47). Customers seeking in-warranty repairs were also directed to contact ADC. (ADC's Reply to Autotech's Statements of Additional Facts, Dkt. No. 273 ("ADC Reply"), P 47). However, all out-of-warranty repairs were directed to Autotech. (*Id.*). In its [*22] 2004 and 2005 reader surveys, Control Design magazine ranked ADC as one of the leaders in operator interface service and support.

(Hohmann P 29, Ex. 30). Neither Autotech nor any of its affiliates was recognized in these surveys.

Autotech points to statements posted on ADC's customer forum recognizing that Autotech (AVG) is the manufacturer of the EZTOUCH panels as evidence that customers looked to Autotech as standing behind the quality of the EZTOUCH and EZTEXT products. (*See* Kumar Decl. P 28, Ex. 11). However, many of these comments refer to both ADC and Autotech as sources of repair. (*E.g.,* "I tried to buy a spare back light but Automationdirect does not sell it, they told me to contact the manufacturer AVG." (Ex. 11, p. 6); "I bet it will [sic] very easy for Automationdirect to get it and sell it as a spare part." (Ex. 11, p. 7); "Anyone at AD or AVG want to comment on the possibility of a replacement bulb?" (Ex. 11, p. 9)). At most, the website tends to show that the customers viewed the ADC online forum as a way to get answers from both ADC and Autotech as to issues regarding quality.

Autotech points out that it was contractually obligated to maintain the approval of Underwriters [*23] Laboratories, (1999 Agreement P 2.7), and argues that "[a]nybody who calls Underwriter Laboratories is told that the products have been approved because the manufacturer went through a process to have its products approved and that the manufacturer, Autotech, is approved and certified to manufacture the products for consumer safety." (Dkt. No. 305 at 12). The court is not persuaded by this line of argument, as any relationship between agency approval and the consuming public's association of Autotech with the alleged trademarks is tenuous, at best. Furthermore, this was a contractual duty assigned to Autotech for the benefit of both parties.

The evidence before the court indicates that both Autotech and ADC worked with customers on issues of quality control. While ADC may have been the first place that a majority of customers would have turned for assistance with the EZTOUCH and EZTEXT panels, Autotech was certainly a known entity to customers, as well. Once again, this factor requires a precision of balancing and weighing of the evidence that is inappropriate on summary judgment.

F. Which Party Paid for Advertising and Promotion of the Product

It is undisputed that the parties created [*24] a joint account that made funds available for advertising and promotions. (*See* 1999 Agreement PP 6.1-6.5). At the outset, each party contributed $ 150,000 to this joint account. (*Id.* P 6.1). Subsequent contributions were made by ADC pursuant to a formula whereby ADC invested a portion of the gross sales in the account. (*Id.*). Autotech also contributed approximately $ 80,000 to the account

based on a percentage of its sales of G*Squared and Q*Squared products. (Hohmann Decl. P 18).

Over the course of the 1999 Agreement, ADC asserts that it paid all expenses associated with its catalog and website, as well as approximately $ 500,000 on trade show attendance and displays. (Hohmann PP 16, 20). ADC also claims that it made over $ 2,000,000 in payments to advertisers for trade media advertising EZTOUCH and EZTEXT products, but was reimbursed for only $ 1,400,000 of these payments through the joint account. (Hohmann P 18).

Noting Autotech's share of ownership in the joint account, Kumar attests that "Autotech paid $ 1,250,000 from the investment account for advertising that was Autotech's share of the expense. ADC spent approximately the same amount for advertising and promoting the products." [*25] (Kumar Decl. P 31). Autotech argues that it has spent significantly more on advertising than ADC since the termination of the 1999 Agreement. However, because the question before the court is which party had ownership of the EZTOUCH and EZTEXT marks at the time the alleged infringement began, Autotech's post-dissolution figures are not relevant.

It appears that the specific figures regarding advertising payments are disputed between the parties. ADC does not suggest a dollar figure for its catalog and website expenses, but it does assert that it spent an unreimbursed $ 1,100,000 for trade shows and trade media advertising. On the other hand, it is unclear whether Autotech argues that ADC spent $ 1,250,000 of its own money (plus $ 1,250,000 from the joint account), or whether Autotech is arguing that ADC was actually reimbursed $ 2,500,000 from the joint account ($ 1,250,000 of which would have been Autotech's "share" and $ 1,250,000 of which would have been ADC's "share").

It is difficult for the court to determine on the evidence before it whether ADC contributed more to the advertising and promotion of EZTOUCH and EZTEXT than it was reimbursed from the joint account. Neither party [*26] has submitted financial documents in support of their arguments. Because this is a disputed question of fact, the court finds that this factor does not weigh in favor of either party.

SUMMATION

As the above analysis demonstrates, at this point in the proceedings the court cannot determine the question of ownership of the EZTOUCH and EZTEXT marks. While summary judgment is appropriate "if the evidence is so one-sided that there can be no doubt about how the question should be answered," *Packman v. Chicago Tribune Co.,* 267 F.3d 628, 637 (7th Cir. 2001), in this case questions of disputed fact and the need to balance undisputed facts preclude the granting of summary judgment for any party. The questions of fact in this case are best left for resolution at trial.

The court notes that it remains an open question whether either mark is protectable under federal trademark law. Both EZTOUCH and EZTEXT appear to be descriptive marks, as the PTO found in May, 2007, when evaluating AVG's application for EZTOUCH. Confusingly, it seems that Autotech has now changed its position on trademark infringement, stating in its March 22, 2007 filing that "the trademark EZTouch is not protectable" because "the [*27] names appear to be generic." (Dkt. No. 288 at 2). This directly conflicts with Autotech's earlier argument that "[s]econdary meaning is clearly in favor of Autotech." (Dkt. No. 252 at 12). On the other hand, ADC has consistently argued that secondary meaning has been developed by the marks, such that consumers think of ADC as the source of the products associated with these marks. In support of its argument, ADC has relied on evidence of advertising expenditures and sales revenue as stated in the Hohmann Declaration, but ADC has not produced any documentary evidence in support of its figures. ADC has also failed to identify which portion of advertising funds was spent on advertising the EZTOUCH mark as compared to the EZTEXT mark. To succeed with its trademark claims, ADC will at some point need to sufficiently establish that the alleged trademarks have indeed acquired secondary meaning.

Finally, the court notes that it is unpersuaded by Autotech's argument that ADC has abandoned its use of the marks at this time. Both marks are currently used by ADC to sell its remaining inventory of operator interface panels that were manufactured by Autotech. This constitutes a *bona fide* use of the [*28] alleged marks. *See Electro Source, LLC v. Brandess-Kalt-Aetna Group, Inc.,* 458 F.3d 931, 937-38 (9th Cir. 2006). There is no evidence before the court that ADC has actually discontinued its use of either mark, therefore there can be no abandonment at this time.

CONCLUSION

For the reasons stated above, ADC's Motion for Summary Judgment as to the Trademark Claims of All Parties and for Entry of a Permanent Injunction (Dkt. No. 235) and Autotech's Cross Motion for Summary Judgment (Dkt. No. 256) are both denied.

JAMES F. HOLDERMAN

Chief Judge, United States District Court

Date: August 17, 2007

Slip Copy                                                                                                          Page 1
Slip Copy, 2006 WL 4013750 (N.D.Ill.)
**(Cite as: 2006 WL 4013750 (N.D.Ill.))**

C Clarus Transphase Scientific, Inc. v. Q-Ray, Inc.
N.D.Ill.,2006.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois,Eastern
Division.
CLARUS TRANSPHASE SCIENTIFIC, INC.,
Plaintiff,
v.
Q-RAY, INC., an Illinois corporation, QT, Inc., an
Illinois corporation, Bio-Ray, Inc., an Illinois
corporation, Bio-Metal, an Illinois corporation, Que
Te Park, an individual, Jung Joo Park, an individual,
and Does 1-10, Defendants.
**No. 06 C 4634.**

Oct. 6, 2006.

Christopher W. Loweth, Joseph R. Marconi, Johnson
& Bell, Ltd., Chicago, IL, for Plaintiff.
Michael Andrew Ficaro, Richard Henry Tilghman,
Ross Edward Kimbarovsky, Lisa Colleen Sullivan,
Ungaretti & Harris LLP, Chicago, IL, Craig Alan
Hansen, John C. Gorman, Gorman & Miller, San
Jose, CA, for Defendants.

### REPORT AND RECOMMENDATION

JEFFREY COLE, United States Magistrate Judge.
**\*1** Imitation, it is said, is the sincerest form of
flattery. Perhaps in some contexts, but never in
Lanham Act cases, where intense ire and demands for
injunctive relief are the order of the day. This is such
a case. Plaintiff, Clarus Transphase Scientific, Inc.
("Clarus"), sought a preliminary injunction pursuant
to Rule 65, Federal Rules of Civil Procedure,
restraining and enjoining defendants from: (1)
manufacturing, advertising, marketing, distributing or
selling Q-Ray pendants that are identical or
confusingly similar to plaintiff's Q-Link Pendants, (2)
using any trademarks or trade dress that are identical
or confusingly similar to Clarus's registered and
common law trademarks or trade dress, and (3) using
any design that is substantially similar to Clarus's
copyrighted pendant designs.[FN1]Clarus's motion for
preliminary injunction has been referred to me by
Judge Pallmeyer for a report and recommendation.
See 28 U.S.C. § 636(b)(1)(A).

>      FN1. The plaintiff originally filed this action
>      in the Northern District of California. That
>      court granted the defendants' motion to

transfer venue to the Northern District of
Illinois on August 16, 2006.*Clarus
Transphase Scientific, Inc. v. Q-Ray, Inc.,
No.06-3450, 2006 WL 2374738 (N.D.Cal.
Aug.16, 2006).*

### I.

### THE PARTIES AND THEIR PRIOR
### RELATIONSHIP

### A.

### The Plaintiff

Clarus is a California corporation that manufactures
pendants, enhanced with what it calls "Sympathetic
Resonance Technology" or SRT. SRT, as Clarus's
CEO and president, Mr. Robert Williams, would
have it, enhances the human biofield. (Declaration of
Robert Williams, ¶ 3). In 1991, Mr. Williams and his
partners invented this so-called technology, which the
plaintiff claims "produces a resonant energy that
works to optimize the human biofield."(*Id.* at ¶ 3).
The original Q-Link pendant-which was called the
"Q-Link Classic Pendent"-was diamond-shaped and
made of black plastic. It was solid on one side, while
the other contained the so-called "technology"
components, which consisted of a copper appearing
coil and what appeared to be an etching of a circuit
board, above which are the QLink and SRT 2
trademarks on a crystalline substrate. (*Memorandum
of Law in Support of Plaintiff's Motion,* at 5, 8)
("*Plaintiff's Memorandum*" ).*See Plaintiff's Exh.* 1.

Since 1994, Clarus has manufactured and sold the
Classic model, which it claims has been popular
around the United States and the world. (*Plaintiff's
Memorandum,* at 1). The diamond-shaped
configuration of the Classic pendant remained the
same for approximately 11 years, until February of
2005, when Clarus introduced two new pendant
designs: the "New Q," a triangular shaped black
plastic pendant, and the "Pebble," which Clarus
describes as a teardrop-shaped pendant made of a
sterling silver (collectively, the "Q-Link Pendants").
(Williams Decl. ¶ 8).[FN2] Clarus claims that its
licensees have spent over two million dollars
marketing the Q-Link Pendants through
"infomercials" and magazine advertisements. The Q-
Link Pendants display what Clarus calls its

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

"longstanding (since 1994) and exclusive coil design trademark (the "Coil Design Trademark")" (*Plaintiff's Memorandum,* at 1), which is a coil of extremely thin copper wire. (*Plaintiff's Memorandum,* at 3, Fig. 1).

> FN2. Clarus also advertises the Pebble in gold. It sells for $999.99, unlike the silver Pebble, which sells for $299. The gold model is not part of this case.

**\*2** The designation "coil design trademark" is inexact. On April 3, 2006, Clarus applied for registration of its "Coil Design" as a trademark with the United States Patent & Trademark Office. Clarus claimed a mark consisting of "the configuration of a wire coil, and excluding the pendant itself. Application 78/852549 (available at http://portal.uspto.gov/external/). The application was denied on September 14, 2006, on the grounds that the proposed mark comprised a configuration of the goods that is not inherently distinctive and would not be perceived as a mark. (Defendants' Ex. 2).

Clarus is the record owner of United States Trademark Registration No. 2,044,801 for the trademark, "Q-LINK," in block-letter form for "pendant jewelry." (Declaration of Attorney Michael Hoisington, at ¶ 3; Ex. A). The registration issued in May of 1997 and is current, valid and has become incontestable. (*Id.*). Clarus claims The Q-LINK mark has been used continuously in connection with Clarus's Q-Link Pendants in the United States since 1994 (Hoisington Decl. ¶ 3), although the trademark registration indicates first use as May 1995. (Ex. A).

Clarus is also the record owner of United States Trademark Registration No. 2,715,870 for the trademark "QLINK" in block letter form for "electronic devices comprised of electronic resonating cells, electronic tuning boards, and electrical copper coils for the reduction of quantum noise in physical, chemical, biological and human systems to protect the user from radiation, relieve fatigue, improve mental concentration and alertness, and improve energy levels and stamina."(Hoisington Decl. ¶ 3; Ex. A). This registration issued in May of 2003 and is current and valid. (Hoisington Decl. ¶ 3; Ex. A). Clarus claims that the QLINK mark has been used continuously in connection with its Q-Link Pendants in the United States since 1994 (Hoisington

Decl. ¶ 3), although, again, the trademark registration indicates first use as May 1995. (Ex. A).

**B.**

**The Defendants**

The defendant corporations-QT, Inc.; Q-Ray, Inc.; Bio-Ray, Inc.; and Bio-Metal, Inc.-are Illinois corporations. Individual defendant, Que Te Park is the founder of QT, Inc. His wife, Jung Joo Park, is also named as a defendant. The names of two of the corporations are derived from Mr. Park's initials. According to the defendants, Q-Ray, Inc., Bio-Ray, Inc., and Bio-Metal, Inc. are not presently engaged in business, and Mrs. Park has never had any dealings with the pendants.

Like the plaintiff, QT, Inc. has had a long history selling jewelry that purportedly enhances one's overall well being. In approximately 1995, QT began selling what it calls "Bio-Magnetic Regulator/Ionized" bracelets under the name Q-Ray Ionized Bracelet. (Affidavit of Charles Chang Park (President of defendant QT; officer of defendants Q-Ray, Bio-Ray, and Bio-Metal) ¶¶ 6, 8). Defendants claim-falsely it would appear-that these bracelets helped "balance the negative and positive ions in the body to increase bio-energy and general well being."(*Id.*).[FN3] The Q-Ray Ionized Bracelet consists of a C-shaped piece of mineral-component metal fitted at either end with round balls, which defendant refers to as the "terminals" of the bracelet. (*Id.* ¶ 7; Ex. 1). The bracelets come in different metallic colors and finishes, but the common element is the C-shape, which defendants submit is "essential to the Ionization Technology." (*Id.* ¶ 9). QT applied for trademark protection for "Q-Ray" in 1999, and was granted a trademark on February 15, 2000. (Hoisington Decl. ¶ 5). First use was listed as September of 1995. (*Id.*).

> FN3. The Federal Trade Commission recently brought an action against the defendants pursuant to the Federal Trade Commission Act, claiming defendants marketed their bracelets in a deceptive and misleading manner by representing that the bracelet provided immediate, significant or complete pain relief and that scientific tests proved their pain-relief claims. In fact, a

scientific study performed by the Mayo Clinic Jacksonville resulted in a finding that the ionized bracelets were no more effective for treating muscle and joint pain than were placebo bracelets. On September 8, 2006, Magistrate Judge Denlow concluded that the defendants lacked competent and reliable scientific evidence to substantiate their claim that the bracelet provided immediate, significant, or complete relief from various types of pain, as required under the Federal Trade Commission Act. He also concluded that the defendants' claim that the bracelet provided immediate, significant, or complete relief from various types of pain was materially misleading in violation of the Federal Trade Commission Act. *See FTC v. QT, Inc.,* No. 03 C 3578, 2006 WL 2587914 (N.D.Ill. Sept.8, 2006). The defendants have a suit pending against the Mayo Clinic, alleging, among other things, commercial disparagement, common law fraud, and tortious interference with prospective economic advantage. Essentially, the defendants contend that the clinical trials on the bracelets were significantly flawed. *QT, Inc. v. Mayo Clinic Jacksonville,* No. 05 C 6387, 2006 WL 1371426 (N.D.Ill. May 15, 2006).

### C.

### The Parties' Prior Distribution Relationship

**\*3** In 1997, the parties entered into a one-year agreement whereby Mr. Park would be the exclusive distributor of Q-Link products in Korea. (*Plaintiff's Memorandum,* at 6; *Defendants' Opposition to Plaintiff's Motion,* at 3). According to defendants, Mr. Park invested $20,000 to purchase Q-Link Classic pendants for Korean distribution. (*Defendants' Opposition to Plaintiff's Motion,* at 4). The relationship came to an unhappy end, leaving QT with a large inventory of the Classic pendants. (*Defendants' Opposition to Plaintiff's Motion,* at 4).

### D.

### The Defendants' Expansion Of Their Product Line

After achieving staggering, nationwide, commercial success with its bracelets QT decided to expand into other types of "bio-magnetic ionized" jewelry. (Charles Chang Park Aff. ¶ 13).[FN4] First, QT incorporated its "ionized technology" into a ring. (*Id.*). Next, in early 2006, QT designers began developing a pendant that would incorporate the so-called "bio-magnetic ionized technology" and the C-shape design of QT's bracelets. (*Id.*). The defendants deny that they copied Q-Link's pendants, and that the "Q-Ray Ionized Pendant" was their creation. (*Id.*). QT has applied for a registration of the trademark, "Ionized Pendant." (*Id.* ¶ 14). The pendants developed are available in two designs: the "Q-Ray Alpha Tear Drop" and the "Q-Ray Beta Space Age Triangle." (*Id.* ¶ 16). More on those designs later.

> FN4. Between January 1, 1996 and June 30, 2003, gross sales from the Q-Ray bracelets were $137,172,907. One of the prime modes of advertising for QT was infomercials. *FTC v. QT, Inc.,* 2006 WL 2587914 at *1, 44.

According to Mr. Park, sales of the Q-Ray pendants commenced in June of 2006.(*Id.* ¶ 18). That date, however, does not comport with Clarus's version of the facts. According to Clarus's general manager of manufacturing, QT was marketing and promoting its new pendant product as early as January 26, 2006. (*Declaration of Patti Parlee* ("*Parlee Decl.*") at ¶ 3). It is impossible on the state of the present record to determine who has the better of the argument since the defendants' full-page advertisement in the Professional Golfers' Association ("PGA") convention Daily News introducing the new Q-Ray pendants, is undated. (*Plaintiff's Memorandum,* at 6; Ex. C). Moreover, there is the inconsistent concession by Clarus that the Q-Ray pendants were not released until the summer of 2006. (*Plaintiff's Memorandum,* at 7).

Convinced that QT had adopted a trademark and coil design for a product that was confusing similar to Clarus's own Q-LINK mark and (purported) Coil Design Trademark-indeed, Clarus calls the QT offering a "knock-off" product with the exact design and size as Clarus's pendents-Clarus contacted Mr. Park and demanded that he stop using Clarus's proprietary intellectual property. (Parlee Decl. ¶ 3). While the defendants have denied copying Clarus's new pendant designs, Clarus contends that Mr. Park

admitted copying in a conversation he had with Ms. Parlee, whose recollection of the conversation goes like this:

I asked Mr. Park why he was copying our products. He denied that the Q-Ray pendants were copies. I reiterated that they were nearly identical to the Clarus pendants. Mr. Park then mistakenly asserted they were different because instead of having a complete coil, Q-Ray had placed a gap in the coil. I again asserted that the pendants were clear copies of Clarus's proprietary designs. In response, Mr. Park said that there was nothing Clarus could do about copying, because Clarus did not have a patent.

**\*4** (*Plaintiff's Memorandum,* at 7; *Parlee Decl.* ¶ 3).

## II.

## THE PRODUCTS AND THE DEFENDANTS' MODE OF ADVERTISING

### A.

### The New Q-Link Pendants

The plaintiffs have provided specimens of the Classic Pendant (which is no longer being marketed) (*Plaintiff's Ex.* 1) and what it calls its "Current Q-Link Pendant." (*Plaintiff's Ex.* 2). The plaintiff's "New Q" pendant is shaped along the lines of an isosceles triangle, but, with the sharp angles rounded off, and the top (where it is attached to the cord) flattened. It is made of smooth, semi-shiny black plastic with a copper-colored circle of wire resting within the inner border of the triangle. The balance of the space within the triangle and within the circle is black. There appears across the diameter of the open black space inside the circle in a very distinctive type face, "Q-LiNK," in white letters. The font is, for lack of a better word, "futuristic" in appearance.[FN5]

> **FN5.** Pictures of the products are found attached to the plaintiff's supporting memorandum and supplemental submission.

Clarus's description, to the contrary, the trademark is *not* in all caps. (*Plaintiff's Memorandum,* at 16). The "L" is a capital letter, but because of the font, it has a rounded bottom and thus tends to have a somewhat different appearance than the usual capital "L." The "N" is exceptionally wide and looks like an inverted "U." The distinctive type face contributes to the lower case letter appearance of the mark. (*See Plaintiff's Ex.* 2). The new model pendant is also sold in white. *See* www.qlinkgolf.com. The tail of the "Q" hangs straight down in the six o'clock position, rather than to the right side. The body of the Q is squarish, resembling a square with rounded-off corners rather than a circular "O." The "Coil Design Trademark" and enclosed **"Q-LinK"** are inlaid, giving the face of the pendant a slightly concave surface. The inset portion is covered in clear plastic. On the back of the new pendant is a very distinctive and stylized letter "Q" in white on both the white and black versions.[FN6] Finally, the pendant hangs from the triangle's base, with the vertex angle pointing down.

> **FN6.** There is also a titanium version and a gold version of the "Pebble," but the plaintiff raises no issue with those models.

Clarus calls the "Pebble" a "teardrop-shaped" pendant, although the shape does not really resemble a teardrop. The shape is less evocative and more amorphous-more like a random *pebble* than a teardrop. It is an irregular quadrangle with the corners rounded off. The "Pebble" is made of sterling silver, and has a circular inset ringed with a copper-colored circle. *See* www.qlinkgolf.com. Within the circle, instead of "Q-LINK," there are a series of three concentric black circles. Each of these circles is broken into a number of arcs-first twelve, then four, then four again. As with the "New Q," the inset portion is covered in clear plastic, and the face of the pendant is slightly concave. The pendant hangs from one rounded corner of the quadrangle. The mark "Q-Link" does not appear on the pendant.

The first Q-Ray pendant, called the "Alpha Teardrop" can truly be said to be teardrop-shaped, essentially a circle dangling by a triangular protrusion. The pendant is black plastic, but with a textured surface. Within the "teardrop" is a "C" shape, which can be copper, green, or red in color. The opening of the "C" is in about the four o'clock position. Within the C is the QT trademark "Q-RAY." It is set forth in recessed letters, smooth as opposed to the rest of the textured surface-neither painted nor printed. The font is block letters, sans-serif, and all uppercase: **Q-RAY.** The tips of the

Slip Copy                                                                                    Page 5
Slip Copy, 2006 WL 4013750 (N.D.Ill.)
**(Cite as: 2006 WL 4013750 (N.D.Ill.))**

letters are rounded off, and the hyphen between "Q" and "R" is a dot. The "C" is inlaid, but the inside of the "C" encompassing the **Q-RAY** protrudes slightly from the face of the pendant, giving it a somewhat convex surface. The "C" portion is covered in clear plastic, but the inside of the "C" where the "Q-RAY" is located is not covered. On the back of the pendant-also in recessed lettering, neither painted nor printed-is the word *"Ionized"* in an oval, with "U.S.A." below it.

**\*5** The second Q-Ray pendant-the "Beta Space Age Triangle"-is, like the Clarus "New Q", shaped along the lines of a uniformly rounded off isosceles triangle. It, too, is black plastic, but like the "Alpha Teardrop," is flat black and textured, rather than smooth and shiny. Unlike the "New Q" its hangs from its vertex angle, not its base. It is, as the defendants suggest, a "stalagmite" to Clarus's "stalactite." Its inset is the same as that of the Q-Ray Alpha Teardrop pendant. The backs of the two pendants are the same as well. *See Plaintiff's Exs.* 4, 5 and 6.

## A.

### The Pendants' Packaging

The packaging of the parties' respective pendants could not be more dissimilar. The box for the "New Q" is square, measuring approximately 4 1/4 x 4 1/4 x 1 3/4 inches. It is made of a thin cardboard with a glossy finish. The detachable lid lifts straight up from the bottom of the box. The box is mostly tan in color, in varying shades. The "Q" found on the back of the "New Q" pendant is depicted on the lid in a light shade of tan compared with the background. Inside the "Q" is a photograph of the "New Q" pendant lying in grass. Below the "Q" is the trademark **Q-LinK** in white lettering. Below that is the following sentence, in white lettering, on a darker tan background: "The Q-Link Pendant is the Tour-tested way to ENHANCE your focus, your CONCENTRATION and your ability to make BETTER DECISIONS, BETTER SHOTS and BETTER SCORES."**Q-LinK** appears in white lettering on all four sides of the box, and on two of those sides, the following appears above it in black lettering: "THE Q-LINK EQUATION. Less Stress + Greater Focus = Lower Scores. In this context, the connotation of the "Link" of "Q-Link" is that of

"Links" in the sense of a golf course. Inside, the "New Q" is housed on a black, very light weight, flexible, plastic base. Perhaps significantly, the pendant is housed on the base so that the first the buyer sees upon opening the box is the stylistic "Q," not the circle of copper, which the plaintiff contends is so distinctive and so associated with it.

The "Pebble" comes in a box within a box. The exterior box is made of white cardboard, a good deal heavier than that of the "New Q" box. The box is rectangular, measuring about 3 x 3 3/4 x 1 1/2 inches, and is completely blank. The lid lifts straight up from the bottom of the box and is not attached. Inside rests a slightly smaller, sturdy black jewelry box, that opens on a hinge and springs shut. The top of this box is rounded. No lettering at all-no mention of "Q-LINK"-appears anywhere on either box. There is a small white card that rests on the interior jewelry box that says "*The Pebble*" in black script and identifies the designer. The "Pebble" itself rests inside the jewelry box on a black, velvet-like material.

The exterior boxes for the "Q-Ray" pendants are made of a thin, black, shiny cardboard, and are square, measuring 4 x 4 x 1 1/2 inches. The box displays no pictures. Just above the center of the front of the box, the registered trademark **Q-RAY®** appears in silver in the same font as used on the pendant. The letters are all capital, in a traditional font, and are silver in color. Below that, the word "Ionized" appears in black text within a silver oval, next to which is the symbol ®. The back of the box is plain with a black and silver sticker sealing the top of the box. The sticker reads, in silver lettering:

*1983-2006.*

23

*YEARS OF EXCELLENCE*

QT, Inc.

**\*6** The box opens by pulling either the top or bottom flap out of the box. The interior boxes are both a square jewel cases, with lids that open and shut on a springed hinged. As with the exterior box, the word "Q-RAY" appears in silver font across the front of the box. The back of the box bears a white sticker

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that reads, "Ionized Pendant Alpha" or, as the case may be, "Ionized Pendant Alpha." Inside the interior boxes, the Q-Ray pendants sit on black, velvet-like material. The pendant is not centered, but near the top edge of the box. Also on the material is a large sticker with text and the picture of a close-up view of the C-shaped coil. The text makes reference to the Q-Ray Ionized Bracelet: "All the benefits of the Q-Ray Ionized Bracelet are now available in the Q-Ray Ionized Pendant."Tucked into the top lid of the interior box is a Q-Ray brochure, touting ionization and again drawing the reference between the ionization technology of the Q-Ray Bracelets and the Q-Ray Pendants. The "C" shape of the bracelets is compared to the "C" inset of the pendants.

### III.

### ANALYSIS

### A.

### Standard For Injunctive Relief

In order to obtain a preliminary injunction, Clarus must demonstrate a reasonable likelihood that it will prevail on the merits of the suit, that there is no adequate remedy at law, and that it will suffer irreparable harm without injunctive relief. *Christian Legal Society v. Walker,* 453 F.3d 853, 859 (7th Cir.2006); *Incredible Technologies, Inc. v. Virtual Technologies, Inc.,* 400 F.3d 1007, 1011 (7th Cir.2005); *Pelfresne v. Village of Lindenhurst,* 2004 WL 1660812 (N.D.Ill.2004) (Pallmeyer, J.).[FN7]

> [FN7.] As this case was originally brought in the Northern District of California, the parties relied upon Ninth Circuit law in their briefs. Clarus submits that there is no significant difference between Ninth Circuit and Seventh Circuit law on the issues in this case.

If these requirements are satisfied, the degree of irreparable harm to the plaintiff must be balanced against the harm that the defendant will suffer if the injunction is granted. *Incredible Technologies,* 400 F.3d at 1011. As part of the calculus, there must be a consideration of the effect the injunction will have on the public. *Promatek Industries, Ltd. v. Equitrac*

*Corp.,* 300 F.3d 808, 813 (7th Cir.2002). A strong showing as to the likelihood of success will permit a weaker showing as to the balance of harms posed by the grant or denial of interim injunctive relief to carry the day. *Bloedorn v. Francisco Foods, Inc.,* 276 F.3d 270, 298 (7th Cir.2001). In the context of trademark infringement, the Seventh Circuit has cautioned that " '[a] preliminary injunction is a very serious remedy, never to be indulged in except in a case clearly demanding it.' "*Barbecue Marx, Inc. v. 551 Ogden, Inc.,* 235 F.3d 1041, 1044 (7th Cir.2000). Here, after a review of the parties' written submissions and after a lengthy oral argument, I cannot recommend a finding that Clarus has demonstrated it has a reasonable likelihood of succeeding on its claims. As such, I cannot recommend that Clarus be granted injunctive relief.

### B.

### Trademark Infringement Under Section 32 Of The Lanham Act

**\*7** In order to prevail on its claim that the defendants are infringing on its "Q-LINK" trademark in violation of § 32 of the Lanham Act,[FN8] Clarus must show that its mark is entitled to protection and that there is a likelihood of confusion between its mark and the defendants' mark. *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.,* 543 U.S. 111, 117, 125 S.Ct. 542, 160 L.Ed.2d 440 (2004); *Sullivan v. CBS Corp.,* 385 F.3d 772, 775-76 (7th Cir.2004). Clarus registered its mark "Q-LINK" in May of 1997. Registration of a mark under § 2 of the Lanham Act, 15 U.S.C. § 1052, enables the owner to sue an infringer under § 32, 15 U.S.C. § 1114; it also entitles the owner to a presumption that its mark is valid, *see* § 7(b), 15 U.S.C. § 1057(b), and ordinarily renders the registered mark incontestable after five years of continuous use. *See* § 15, 15 U.S.C. § 1065; *Wal-Mart Stores, Inc. v. Samara Bros., Inc.,* 529 U.S. 205, 209, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000).

> [FN8.] In pertinent part, that section provides:
>
> (1) Any person who shall, without the consent of the registrant
>
> (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the

sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or

(b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive,

shall be liable in a civil action by the registrant for the remedies hereinafter provided. Under subsection (b) hereof, the registrant shall not be entitled to recover profits or damages unless the acts have been committed with knowledge that such imitation is intended to be used to cause confusion, or to cause mistake, or to deceive. 15 U.S.C. § 1114(1)

Clarus's "Q-LINK" mark is manifestly entitled to protection, and the defendants do not argue otherwise. The plaintiff's focus is on likelihood of confusion between its mark and the defendants' Q-Ray mark. In assessing the likelihood of confusion, courts have identified seven relevant factors that help in deciding the ultimate question: (1) the similarity of the marks; (2) the similarity of the products; (3) the area and manner of concurrent use; (4) the degree of care likely to be used by consumers; (5) the strength of the plaintiff's mark; (6) whether any actual confusion exists; and (7) the defendant's intent to palm off its goods as those of the plaintiff. *Sullivan v. CBS Corp.,* 385 F.3d 772, 776 (7th Cir.2004); *Promatek Indus., Ltd. v. Equitrac Corp.,* 300 F.3d 808, 812 (7th Cir.2002). None of these factors by itself is dispositive of the likelihood of confusion question, and different factors will weigh more heavily from case to case depending on the particular facts and circumstances involved. *Ty, Inc. v. Jones Group, Inc.,* 237 F.3d 891, 898 (7th Cir.2001). As a consequence, the weight and totality of the most

important factors in each case will ultimately be determinative of the likelihood of confusion, not whether the majority of the factors tilt the scale in favor of one side or the other. *Id.* Even though no one factor is decisive, the similarity of the marks, the intent of the defendant, and evidence of actual confusion are the most important factors in a likelihood of confusion analysis. *Id.*[FN9]

> FN9. Clarus' brief in support of its motion for a preliminary injunction often fails to cite to specific portions of the record to support its contentions. *See, e.g., Plaintiff's Memorandum,* at 6(no licensing agreement); 14 (no evidence of licensees); 17(no citation to evidence of marketing); 18 (no citation to evidence regarding types of customers); 21(no citation to piece of evidence containing SRT mark); no citation to any examples of claimed advertising)). At oral argument, Clarus' counsel explained that the evidence was "a part of the record," including certain matters that were under seal. The Seventh Circuit has been consistent in its admonition that it is not a judge's responsibility to scour the record on a party's behalf. *See Adams v. Wal-Mart Stores, Inc.,* 324 F.3d 935, 937 (7th Cir.2003); *Albrechtsen v. Bd. of Regents of Univ. of Wis. Sys.,* 309 F.3d 433, 436 (7th Cir.2002); *United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir.1991) ("judges are not like pigs hunting for truffles.")."An advocate's job is to make it easy for the court to rule in his client's favor ...."*Dal Pozzo v. Basic Machinery Co., Inc.,* 463 F.3d 609, 2006 WL 2548250, *4 (7th Cir.2006).

### 1.

### Similarity of Marks

First, Clarus argues that there is a similarity of the marks because:

Plaintiff's mark is Q-LINK. Defendants' mark is Q-RAY. Both marks are displayed on the party's pendants in the center of the coil in capital letters.... Notably, the New Q Pendants display the Q-Link mark in a stylized and large font on the pendant and packaging .... Defendants' use of the Q-RAY mark

Slip Copy                                         Page 8
Slip Copy, 2006 WL 4013750 (N.D.Ill.)
**(Cite as: 2006 WL 4013750 (N.D.Ill.))**

placed on its pendants exactly like Clarus places its Q-LINK mark makes source confusion among consumers all the more likely because of the similar display of the mark.

**\*8** (*Plaintiff's Memorandum,* at 16).

Although, "[t]he character of every act depends on the circumstances in which it is done,"*Schenck v. United States,* 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470 (1919) (Holmes, J.), Clarus' argument ignores the entire history of the Q-Ray mark. In trademark infringement cases, there is usually a common thread: a newcomer adopts a similar trade name, arbitrary in character, to that which has found acceptance in the marketplace. Although there is a universe of other names that the newcomer could have selected, one close to that of a competitor is selected, often with "no reasonable explanation ... why the name need be used."*Lambert Pharmacal Co. v. Bolton Chemical Corp.,* 219 F. 325, 326 (S.D.N.Y.1915) (L.Hand, J.). In that context, the multifactor analysis (including the marks' similarity) is essential.

In this case, however, the Q-Ray mark was selected based on Mr. Park's name, was properly registered, has been in use since 1995, and has enjoyed enormous commercial success throughout the nation in connection with its sale of bracelets that appeal to that segment of the public seeking the restorative benefits purportedly resulting from use of the product. Hence, Clarus' claim that the marks are confusingly similar puts out of view facts critical to the ultimate analysis in this case.

There is a second aspect to the argument that needs mention. Although Clarus contends that the marks are confusingly similar, that argument blends almost imperceptibly into an argument that it is not so much the mark similarity but its usage in the overall design and presentation of the Q-Ray pendants that makes the Q-Ray mark itself confusingly similar. In any event, Clarus' fundamental premise of mark-similarity is faulty. Both marks are *not* displayed in the center of the coil in capital letters. Q-LINK is displayed in a mix of capital and lower-case letters in the center of a circle in white in the distinctive type face discussed earlier.[FN10] The overall appearance of the inside of the pendant is flat. Q-RAY is, in fact, displayed in capital letters on what visually appears to be a raised circle in black lettering. The

surrounding coil is visually a "C" angled downwards. The opening in the coil reveals the black substrate and thus gives the raised portion of the pendant on which appears the name "Q-Ray" the appearance of a black "Q." In short, as used on the pendants, the marks are not confusingly similar.

> FN10.*See Plaintiff's Exh.* 2-5; *Plaintiff's Brief* (containing pictures of the pendants); and *Plaintiff's Supplemental Briefing re: Direct Customer Sales,* Exhs. 3 and 4.

Clarus also focuses on the use of the letter "Q" in both marks. It argues that the letter is the dominant and most significant portion of both marks, and that it stands out visually from the balance of the marks. In assessing the similarity of the two marks, the court must compare "sound, sight and meaning." *Henri's Food Products Co., Inc. v. Kraft, Inc.,* 717 F.2d 352, 355 (7th Cir.1983). On the one hand, "if one word or feature of a composite trademark is the salient portion of the mark, it may be given greater weight than the surrounding elements."*Sullivan,* 385 F.3d at 777 (*citing Henri's Food Prods.,* 717 F.2d at 356);3 McCarthy on Trademarks and Unfair Competition § 23:42 (4th ed.2006 database update) ("It is appropriate ... to give greater weight to the important or 'dominant' parts of a composite mark, for it is that which may make the greatest impression on the ordinary buyer"). On the other, each mark must be viewed as a whole, *Sullivan,* 385 F.3d at 777;*Henri's Food Prods.,* 717 F.2d at 355, and a single letter cannot constitute a trademark unless it has been proven to have acquired secondary meaning. *Louis Vuitton Malletier v. Dooney & Bourke, Inc.,* 454 F.3d 108, 116 (2nd Cir.2006); 1 McCarthy on Trademarks and Unfair Competition § 7:11 (4th ed.2006 database update) ("Whether a single letter ... always used as part of a composite mark functions separately as a mark depends upon the probable impact upon the consumer.... if the letter does not, in itself, create a separate commercial impression apart from the whole, it does not function as a mark by itself"); *Professional Sound Services, Inc. v. Guzzi,* 349 F.Supp.2d 722, 731 (S.D.N.Y.2004) (plaintiff is required to show that its use of a single letter is capable of distinguishing its goods from those of others, *i.e.,* its use of the letter "S" is distinctive); *Quality Semiconductor, Inc. v. QLogic Corp.,* No. 93-20971, 1994 WL 409483, \*2 (N.D.Cal.) (N.D.Cal. May 13, 1994) (plaintiff's "Q" is a unique stylized

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

version of the letter which creates a distinct commercial impression and its promotions have resulted in buyers associating plaintiff and its products with the "Q" mark).

**\*9** Here, it is not so clear that the "Q" in "Q-LINK" is the salient portion of the mark in the way "Beanie" was found to be the salient portion of the trademark "Beanie Babies" in *Ty, Inc. v. Jones Group, Inc.,* 237 F.3d 891, 898-99 (7th Cir.2001), or "Miracle" was found to be the dominant portion of the trademark "Miracle Whip" in *Henri's Food Products,* 717 F.2d at 356. And, indeed, Clarus cites no case law on this issue. In *Henri's Food Products,* the court compared the marks "Yogowhip" and "Miracle Whip," and found that while the word "whip," was prominent and identical, when the marks were viewed as a whole, as they would be by consumers, there could be no confusion.*Henri's Food Prods.,* 717 F.2d at 355.

Similarly, in *Sullivan,* the court noted that the although the dominant portion of the mark was the word "Survivor," the word never appeared alone in any of the merchandise at issue. *Sullivan,* 385 F.3d at 778;*see also Nabisco, Inc. v. Warner-Lambert Co.,* 220 F.3d 43, 46 (2nd Cir.2000) (calling DENTYNE ICE and ICE BREAKERS "at best marginally similar because of the common use of 'Ice.' "); *Nutri/System, Inc. v. Con-Stan Industries, Inc.,* 809 F.2d 601, 606 (9th Cir.1987) (affirming trial court holding that "Nutri/System" and "Nutri-Trim"were dissimilar in terms of appearance, sound, and meaning). The fact that both Clarus's and defendants' marks both begin with a "Q" is simply not enough to tip the scales in Clarus's favor on the issue of similarity.

Beyond that, although the "Qs" in both marks are set off by hyphens, the balance of the marks are not similar. "Link" and "Ray" are two different words, and they neither appear similar textually, nor sound similar when spoken or read aloud. *See AMF, Inc. v. Sleekcraft,* 599 F.2d 341, 351 (9th Cir.1979) (sound is considered an important factor because the trademarks are often spoken as reputation is often conveyed by word of mouth). In *Sleekcraft,* the comparison between the words "Sleekcraft" and "Slickcraft," revealed the only difference to be found in a small part of one syllable. 599 F.2d at 350-51. In the instant case, two entirely different words are added to the "Q," and the sound-not to mention to appearance-is entirely different.

In addition, the two words have completely unrelated meanings. *See Nutri/System, Inc. v. Con-Stan Industries, Inc.,* 809 F.2d 601, 606 (9th Cir.1987) (holding that "Nutri/System" and "Nutri-Trim"were entirely distinct, despite having "Nutri" as a common element, especially since "System" and "Trim" were significant words which indicate different origins). As already noted, Clarus's use of "Link" in the context of its claims regarding improvement of golf performance gives "Link" the connotation of "golf links." "Ray" has no similar connotation.

As used on the parties' pendants, the two "Qs" are not even similar in appearance. Clarus's "Q," as already noted, is set forth in a font that is readily distinguishable from the defendants' "Q." The "tail" of the Clarus "Q" hangs straight down in the six o'clock position, and its body resembles a square with rounded-off corners. The tail of the defendants' "Q" hangs to the right side, as is more commonly the case, and its body is the more common circular "O." The difference in fonts-and in cases, as already noted-carries over to the balance of the marks. Overall, viewing the marks as a whole, the impression is one of dissimilarity, despite the single letter the marks do have in common. The factor of similarity-which is among the most important-weighs against Clarus.

### 2.

### Similarity of Products

**\*10** There is no doubt that Clarus' and the defendants' products are similar. Both are "healthy lifestyle" pendants. The technologies that make the pendants something other than decorative differ, however-at least according to the parties and their advertising. Clarus' Q-LINK pendants operate through Sympathetic Resonance Technology (what it calls SRT technology) that enhances the biofield, while Q-Ray pendants operate through bio-magnetic ionization. (*Defendants' Opposition to Plaintiff's Motion,* at 15). While this distinction is emphasized by the defendants, for purposes of the similarity of product analysis, it is a quiddity. *See Sullivan; Ty, Inc.* This factor favors Clarus.

### 3.

### Area and Manner Of Concurrent Use

The third factor in the likelihood of confusion analysis assesses "whether there is a relationship in use, promotion, distribution, or sales between the goods or services of the parties."*CAE, Inc. v. Clean Air Engineering, Inc.,* 267 F.3d 660, 681 (7th Cir.2001). For example, in *Ty, Inc.,* the court held that the area of concurrent use overlapped when the parties sold their products in the same stores, advertised in the same magazines, and targeted the same general audience. 237 F.3d at 901.[FN11]Both parties admittedly sell their products via infomercials and the internet. (*Plaintiff's Memorandum,* at 18; *Defendants' Opposition to Plaintiff's Motion,* at 19). But interestingly, of the four websites Clarus cites as evidence that the pendants are sold side by side-http://www.qeshop.com; http://www.healthnstuff.com;   http://www.holistec.com/; http://www.magnetictherapysales.com-none advertised both parties' pendants when visited September 21, 2006. A brief search revealed the first few websites offering Q-Ray pendants did not also offer Q-Link pendants. (*See* http://www.naturesbracelets.com/qpendant.html; http://   www.bocabracelets.com/; http://www.asseenontv.com/prod-pages/). Instead, the websites offered Q-Ray bracelets on one link, and Q-Link pendants on another.[FN12]

FN11. The court in *Ty, Inc.* Suggested four factors that can be important in this analysis: (1) the relative geographical distribution areas; (2) whether there exists evidence of direct competition between the products; (3) whether the products are sold to consumers in the same type of store; (4) whether the products are sold in the similar section of a particular store; (5) whether the product is sold through the same marketing channels. 237 F.3d at 900. The parties do not provide any evidence pertaining to-or indeed, address at any length-the first two factors, and their products are not sold in the traditional "store." As such, I focus on the manner in which the products are marketed and sold, and the target audience.

FN12. Mr. Park's son, James Park, has apparently, at one point, sold not only Q-Ray bracelets and Q-Link pendants on his website, but Q-Ray bracelets as well. (Hoisington Decl. ¶ 10). This was no longer the case during the consideration of Clarus's motion.

Clarus has not pointed to a website where the products at issue here-the pendants-are sold side by side. The parties may employ the same general means of marketing and product delivery, but Clarus has simply not demonstrated that the both parties' pendants are found in proximity to one another. In this day and age, to say that both products are sold via internet websites is akin to saying both products are sold in stores.

Clarus also contends that the parties target the same audience for their products. According to Clarus, both market extensively to the golf and sports industries, as well as to healthy lifestyle consumers. (*Plaintiff's Memorandum,* at 17). But for Clarus, at least, the golf connection is overwhelming. Its very name connotes golf; its packaging also indicates that the Q-Link pendant is a product made for golfers-touting better shotmaking and better scoring. The pendant is shown on the face of the box in which it comes nestled in fairway grass. The Q-Link website (http://www.qlinkxzone.com/) has a heading of testimonials from a series of professional golfers. Upon entering the website, one learns that the pendant was named best new product at the 2005 PGA Fall Expo, and that "200+ Touring Pros Won't Step a Foot on the Green without it."Indeed, there is even a Q-Link website dedicated to golf: http://www.qlinkgolf.com.

**\*11** Even Clarus' brief in support of its motion for injunctive relief stresses its products' "link" with golfers:

More than 200 professional golfers wear the Q-Link, including Bruce Fleisher, Justin Rose, Mark Calcavecchia, Greg Owen, Tom Pernice Jr., Tom Jenkins, Charles Howell III and Tommy Armor III. More than 120 PGA, LPGA, Champions Tournament, and European PGA tournaments have been won by golfers who wear the Q-Link, including Ernie Els, Bruce Fleisher and Davis Love III.

(*Plaintiff's Memorandum,* at 14) (citations to

Slip Copy                                                                                      Page 11
Slip Copy, 2006 WL 4013750 (N.D.Ill.)
**(Cite as: 2006 WL 4013750 (N.D.Ill.))**

Williams Decl. omitted).

To be sure, the brief also numbers Deepak Chopra and Anthony Robbins as customers, as well as unnamed "World Champion runners, sailors, swimmers, Olympic Athletes, Pro-Bowlers, Tennis Pros, Formula-One drivers, professional soccer, hockey and Rugby players .... actors, musicians, models and spiritual leaders. (*Id.*). But as references to customers stray from the world of golf, those references become far less specific. Similarly, at the oral argument on this motion, Clarus's counsel was very specific in referring to some of Clarus's choices of advertising media: the Golf Channel, Golf Magazine, Golf Digest. He was very general and somewhat vague as to others: some healthy lifestyle magazines. Overall, the stress is clearly on golf, with the balance of the target audience assuming secondary importance.

The defendants argue that their product is geared toward a much broader market, a general audience of "persons interested in health and well-being."(*Defendants' Opposition to Plaintiff's Motion,* at 15). While the defendants concede that this may include golfers, golfers are not the target audience. Clarus submits that Q-Ray "markets extensively to the golf and sports industries," but offers no citation to any examples. (*Plaintiff's Memorandum,* at 14).[FN13] The Q-Ray website heading claims its products "offer[ ] a natural and effective method to increase one's bio-energy, vitality, and feelings of well-being."(http://www.qray.com/). Farther down on the opening page, the website explains that the "Q-Ray is designed to naturally balance the negative and positive energy forces in your body to achieve a state of 'Chi,' where you will feel and perform at your best, and have more energy to lead an active lifestyle."Farther down from that, the website does boast that "Q-Ray wearers include professional golfers, Olympic runners and professional coaches and trainers who wear their Q-Ray all of the time."

> FN13. To be sure, there is evidence in the record that Q-Ray promoted its products at a PGA show (Parlee Decl. ¶ 5). But oddly, Clarus does not discuss this in the section of its brief on the parties' marketing habits.

Thus, there is overlap in the parties' target audiences, at least when viewed "from a distance." Upon closer inspection, Clarus's audience is golfers first, healthy lifestyle consumers second. The defendants target healthy lifestyle consumers in general, and if this includes golfers, so be it. There is the same general overlap in product delivery-internet sites and infomercials-but, like the target audience analysis, a closer inspection reveals specific websites do not necessarily or even generally offer both companies' pendants. At best, for Clarus, the "area and manner of concurrent use" factor favors neither Clarus nor defendants.

### 4.

### The Degree Of Care Likely To Be Used By Consumers

**\*12** The fourth factor in the analysis examines the degree of care used by the types of consumers purchasing the products at issue. Clarus argues that the parties' goods are relatively "low-cost" pendants, so consumers are assumed to exercise less care in their purchases, making confusion more likely. (*Plaintiff's Memorandum,* at 18). To be sure, the more widely accessible and inexpensive the products and services, the more likely that consumers will exercise a lesser degree of care and discrimination in their purchases. *See CAE, Inc. v. Clean Air Engineering, Inc.,* 267 F.3d 660, 683 (7th Cir.2001); *Au-Tomotive Gold, Inc. v. Volkswagen of America, Inc.,* 457 F.3d 1062, 1076 (9th Cir.2006) ("Confusion is less likely where buyers exercise care and precision in their purchases, such as for expensive *or sophisticated items.*") (Emphasis supplied).

However, the only support for the argument that the pendants in this case are "inexpensive" as that concept is used in the cases, is Clarus' *ipse dixit* that they are. The drastic remedy of a preliminary injunction cannot be granted on the basis of unsupported, tendentious conclusions in a brief. *Cf. Packman v. Chicago Tribune Co.,* 267 F.3d 628, 646 (7th Cir.2001); *Nike, Inc. v. Just Did It Enterprises,* 6 F.3d 1225, 1230 (7th Cir.1993) (where record contained no evidence on the degree of care customers might exercise because of the type of merchandise at issue, it left open the possibility that there would be no confusion).[FN14]

> FN14. The Seventh Circuit has repeatedly cautioned both bench and bar that

Slip Copy                                                                                                Page 12
Slip Copy, 2006 WL 4013750 (N.D.Ill.)
**(Cite as: 2006 WL 4013750 (N.D.Ill.))**

unsupported statements in lawyers' briefs do not count. *See IFC Credit Corp. v. Aliano Brothers General Contractors, Inc., 437 F.3d 606, 610-611 (7th Cir.2006); United States ex rel. Feingold v. AdminaStar Federal, Inc., 324 F.3d 492, 494 (7th Cir.2003).*

The pendants at issue sell in the "retail range of $129 to $149."(*Plaintiff's Memorandum,* at 18). The "Pebble" sells for from $299 up to $349. (http://www.qlinkxzone.com/newQP.php; http://www.intheholegolf.com/store/qlinkpeb.html).[FN15] But even at $129, these are not the kinds of items that fall into the scope of what the courts have denominated as sufficiently low cost that it is fair to conclude that the consumer is unlikely to exercise care in his or her purchasing decision. *See, e.g., Nike, Inc. v. Just Did It Enterprises, 6 F.3d 1225, 1230 (7th Cir.1993)* ("... we cannot agree that as a matter of law customers routinely purchase a $39.95 item without looking carefully at the product information."); *Reno Air Racing Ass'n., Inc. v. McCord, 452 F.3d 1126, 1136 (9th Cir.2006)* (t-shirts and other merchandise which is relatively inexpensive); *Au-Tomotive Gold, Inc. v. Volkswagen of America, Inc., 457 F.3d 1062, 1076 (9th Cir.2006)* (key chains and license plate covers found to be inexpensive); *Surfvivor Media, Inc. v. Survivor Productions, 406 F.3d 625, 634 (9th Cir.2005)* (the consumer is likely to exercise very little care in purchase of small, inexpensive goods such as sunscreen); *Gray v. Meijer, Inc., 295 F.3d 641, 649 (6th Cir.2002)* (inexpensive and fungible products, such as snack food).

> FN15. The titanium version of the Q-Ray pendant sells for $199.95.

Nor can it be said that the pendants are "unsophisticated" items. *Au-Tomotive Gold, Inc. v. Volkswagen of America, Inc., 457 F.3d at 1076.* Quite the contrary. These are not the kinds of products that generate impulse purchases. Rather, they appeal to a sophisticated community of buyers looking not for inexpensive jewelry, but for something to improve their overall well-being. In fact, Clarus' boast that its pendants are based on new, cutting-edge technology (*Plaintiff's Memorandum,* at 18) is manifestly intended to appeal to sophisticated buyers, not to casual and unsophisticated purchasers of costume jewelry. Clarus' very focused sales pitch presupposes

the very level of sophistication on the part of potential customers that its present argument denies exists.

**\*13** In *Barbecue Marx, Inc. v. 551 Ogden, Inc., 235 F.3d 1041, 1045 (7th Cir.2000),* the plaintiff argued that many people did not consider a $20 barbecue dinner expensive, and, as such, might even forget the precise name of a restaurant recommended to them. The court, however, noted that the record reflected that many such customers were "barbecue afficionados," rendering the low cost of the meal essentially non-dispositive. *Id. at 1045.*

Are some of the customers unsophisticated? Perhaps, although it is impossible to say how many. But that does not alter the analysis. In *Indianapolis Colts, Inc. v. Metropolitan Baltimore Football Club Ltd. Partnership, 34 F.3d 410, 414 (7th Cir.1994),* Judge Posner, speaking for a unanimous panel, explained that "[t]here is great variance in consumer competence, and it would be undesirable to impoverish the lexicon of trade names merely to protect the most gullible fringe of the consuming public. The Lanham Act does not cast the net of protection so wide."*34 F.3d at 414.*[FN16]

> FN16. Judge Posner's unwillingness to make the Lanham Act a function of the gullibility of the most susceptible members of the public echoes Learned Hand's comments in the First Amendment context:
>
> > I question whether in the end men will ... not believe that truth and beauty are too precious to society at large to be mutilated in the interests of those most likely to pervert them to base uses ... Yet, if the time is not yet when men think innocent all that which is honestly germane to a pure subject, however little it may mince its words, still I scarcely think they would forbid all which might corrupt the most corruptible, or that society is prepared to accept for its own limitations those which may perhaps be necessary to the weakest of its members ... To put thought in leash to the average conscience of the time is perhaps tolerable, but to fetter it by the necessities of the lowest and least capable seems a fatal policy. *United States v.*

*Kennerley, 209 F. 119, 120 (S.D.N.Y.1913).*

It may well be that some customers do not care about the origins of their pendants. But in this circuit-unlike some others-they are not considered in the determination whether there is a likelihood of confusion.*Syndicate Sales, Inc. v. Hampshire Paper Corp., 192 F.3d 633, 636 (7th Cir.1999)* (*citing*3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23:5, at 23-16 to 23-17 (1999)).

Some courts have concluded that where purchasers are a mix of sophisticated and unsophisticated customers, the court must apply the "least sophisticated consumer" test. *See* the discussion in *Brookfield Communications, Inc. v. West Coast Entertainment Corporation, 174 F.3d 1036, 1060 (9th Cir.1999).* That is not the test in this circuit. But even if it were, there is no evidence to support Clarus' contention that potential purchasers of putative health enhancing pendants are anything but sophisticated and discerning consumers-at least in this area.

## 5.

### The Strength Of The Plaintiff's Mark

Defendants concede that "Q-LINK" mark is a fanciful mark and therefore strong one. (*Defendants' Opposition to Plaintiff's Motion,* at 14). This factor favors Clarus.

## 6.

### Whether Any Actual Confusion Exists

Proof of actual confusion is not necessary to Clarus' case. *See Promatek Industries, Ltd. v. Equitrac Corp., 300 F.3d 808, 812 (7th Cir.2002)* (finding absence of evidence of any actual consumer confusion not dispositive where other factors weighed in plaintiff's favor). But having submitted that the factor overwhelmingly favors it, Clarus has made only an

exceedingly brief and cursory argument, consisting of a single paragraph:

Evidence of actual confusion is not necessary to prevail on an infringement claim. *See Academy of Motion Picture Arts & Sciences v. Creative House Publications, Inc., 944 F.2d 1446, 1456 (9th Cir.1991).* However, proof of actual confusion is persuasive proof that future confusion is likely.*Sleekcraft, 599 F.2d at 352.* Clarus received numerous inquires from attendees at the PGA show-Where the first Q-Ray Pendant ad and prototype pendants were introduced-about whether or not the Q-Ray pendants were from Clarus. (Parlee Decl. at ¶ 5). This factor overwhelmingly favors Clarus.

(*Plaintiff's Memorandum,* at 17).

Ms. Parlee's declaration states:

While I was at the PGA show, I was approached by a number of attendees who saw the Q-Ray pendants advertisement in the Trade Show News and were confused about whether Clarus or Q-Ray was the source of the Q-Ray pendants. One attendee told me that he spoke with a representative of Q-Ray who claimed that Q-Ray was the originator of the Q-Link.

(Parlee Decl. at ¶ 5).

Ms. Parlee's declaration proves only that some unspecified number of people-perhaps as few as two-spoke to her about the pendants. What they said actually said is excluded from her declaration. We have only her conclusion that they were "confused." The problem is not so much that the alleged conversations with Ms. Parlee are hearsay under Rule 801, Federal Rules of Evidence-depending on what was said, the statements could well have been admissible under 803(3). Rather, the problem is that Ms. Parlee's declaration is hopelessly conclusory. It is impossible to know whether *her* conclusion that people were "confused" is accurate. If one knew what was actually said, her conclusion could be tested and either invalidated or sustained. But, as things now stand, one is forced to take at face value her assessment, and that, a court ought not do. Just as it is unthinkable, for example, that a witness would be allowed to testify that he had been "threatened" by the defendant, Ms. Parlee's conclusion that people were "confused" cannot be the basis for the kind of

Slip Copy
Slip Copy, 2006 WL 4013750 (N.D.Ill.)
(Cite as: 2006 WL 4013750 (N.D.Ill.))

Page 14

factual finding that Clarus asks be made.

**\*14** In short, there is simply an absence of evidence (beyond Ms. Parlee's conclusion) of actual confusion, and that is not enough.[FN17] *Cf. Smith Fiberglass Products, Inc. v. Ameron, Inc., 7 F.3d 1327, 1331 (7th Cir.1993)* ( "Here, however, [plaintiff] presented no instances of actual confusion, but rather sought to admit into evidence a vague hearsay account of what may have been actual confusion."); *Platinum Home Mortg. Corp. v. Platinum Financial Group, Inc., 149 F.3d 722, 729 (7th Cir.1998)* (*de minimus* evidence of actual confusion does not necessarily establish a likelihood of consumer confusion).

> FN17. At the oral argument, I explained my view of what I believed to be the inadequacy of Ms. Parlee's declaration. I denied the plaintiff's request to file additional declarations.

The actual confusion issue weighs against Clarus.

## 7.

### Defendants' Intent

The final factor to consider in the analysis is the defendants' intent. Clarus relies on the fact that the defendants are former licensees, and argues that "they chose to adopt a trademark confusingly similar to the one they had previously used under license from Clarus (and likewise chose to change almost nothing about the product's look and feel)." (*Plaintiff's Memorandum,* at 19). It argues that the inference of intent to deceive is especially strong when the parties have had a prior relationship, relying on *Beer Nuts, Inc. v. Clover Club Foods Co., 805 F.2d 920, 927 (10th Cir.1986)*. The argument essentially ignores the facts of the case.

First, the defendants did not adopt their trademark "Q-Ray" in the wake of their relationship with Clarus. That mark had been adopted and registered in 1995, the same year Clarus first used "Q-Link," albeit a few months later. Second, there is no evidence to support the tacit contention that the adoption of the "Q-Ray" trademark stemmed from an attempt to copy Clarus' "Q-Link" mark. To the extent there is any evidence, it supports the defendants'

contention that the Q-Ray mark was a natural choice stemming from Mr. Park's first name, "Que." Third, there is the fact that there is a natural progression from marketing healthy lifestyle bracelets, and then to rings, and then to pendants. *Nutri/System, Inc., 809 F.2d at 606* (finding no intent to deceive where defendant expanded into field after plaintiff, but used a mark it had already been using, had advertised, and felt comfortable with).

Fourth, the relationship with the defendants ended years ago and involved activities in Korea, not the United States. Finally, the record demonstrates that defendants did not intend to "pass off" their pendants as those of Clarus. *See CAE, Inc., 267 F.3d at 686* (intent is relevant only if the defendant intended to palm off its goods as those of the plaintiff). In marketing their pendants, defendants tend to emphasize the link between the "C" shape of their bracelets and the "C" shape inset in their pendants. This "C", if one is to believe the advertising, is an integral component of defendant's "biomagnetic ionization." Aside from a single instance which was apparently the result of an error, the defendants make no suggestion that their pendants and technology are in any connected with Clarus's pendants and their technology. This factor, too, weighs against Clarus.

## 8.

### Conclusion

**\*15** After consideration of the factors relevant to an examination of the likelihood of confusion, the balance clearly favors the defendants. The similarity of the marks, the degree of care likely to be used by consumers, whether any actual confusion exists, and whether the defendants intended to pass off their goods as those of the plaintiff all favor the defendants. So the three most important factors-the similarity of the marks, the intent of the defendant, and evidence of actual confusion, *Ty, Inc., 237 F.3d at 898*-all weigh against Clarus. Only the similarity of the products and the strength of the plaintiff's mark favor Clarus. But the defendants' mark is no less strong. The area and manner of concurrent use, at best, favors neither side. Consequently, Clarus has failed to demonstrate a likelihood of success on the merits of its trademark infringement claim and thus, it is not entitled to a preliminary injunction against the defendants.

## C.

### Trade Dress And Unfair Competition

Clarus contends that the defendants committed a violation of Section 43(a) of the Lanham Act "by copying the Coil Design Trademark, the SRT Trademark [sic], and the overall appearance of the Q-Link Pendant configuration."(*Plaintiff's Memorandum,* at 20). Admittedly, Clarus has no registered trademark in any of these things. But, in addition to protecting registered marks, the Lanham Act, in § 43(a), gives a producer a claim for the use by any person of "any word, term, name, symbol, or device, or any combination thereof ... which ... is likely to cause confusion ... as to the origin, sponsorship, or approval of his or her goods ...."15 U.S.C. § 1125(a); *Wal-Mart Stores, Inc. v. Samara Bros., Inc.,* 529 U.S. 205, 209, 120 S.Ct. 1339, 146 L.Ed.2d 182(U.S.2000). To merit protection for its unregistered trade dress, Clarus must show that it is distinctive and not functional. 15 U.S.C. § 1125(a)(3)); *Wal-Mart,* 529 U.S. at 210. And, of course, to succeed on its claim of trade dress infringement, Clarus must prove likelihood of confusion. 15 U.S.C. § 1125(a)(1)(A); *Wal-Mart,* 529 U.S. at 210. I address this latter element first, as likelihood of confusion is dispositive of Clarus's claim. *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 769, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992) (liability under § 43(a) requires proof of the likelihood of confusion); *Syndicate Sales,* 192 F.3d at 636 (focusing on likelihood of confusion as dispositive).

### 1.

### Likelihood Of Confusion

Although Clarus has struggled, both in its brief and at oral argument, defining just what it hopes to protect, it is apparent that it claims as trade dress, "the overall image of [its] product"; "the overall appearance of the Q-Link Pendant configuration."(*Plaintiff's Memorandum,* at 20). This is not an easy claim on which to succeed, especially when the plaintiff gives the issues attendant to such a claim short shrift. *See Thomas & Betts Corp. v. Panduit Corp.,* 65 F.3d 654, 657-58 (7th Cir.1995) ("Trade dress protection in the configuration of the product itself opens up another

can of worms.").

**\*16** In the context of likelihood of confusion, the Seventh Circuit described the hurdles to such a claim in *Syndicate Sales, Inc. v. Hampshire Paper Corp.,* 192 F.3d 633 (7th Cir.1999):

In a product configuration trade dress infringement, ... consumers do not have to rely on a potentially distinctive configuration to identify the source of the product; rather, they can generally look to the packaging, trademarks, and advertising used to market the product, which are typically much less ambiguous. Consumers therefore have less need, and so are much less likely, to rely on a product configuration as an indicator of the product's source. Accordingly, they are less likely to be confused as to the sources of two products with substantially similar configurations.

192 F.3d at 637 (*quoting Versa Prods. Co. v. Bifold Co.,* 50 F.3d 189, 203 (3rd Cir.1995)). So here, consumers have the trademarks on the very pendants-**Q-LinK** and **Q-RAY;** already determined to not be similar-to rely upon to identify the sources of the pendants. Distinctive labeling and packaging is a strong indication that there is no likelihood of confusion. *Syndicate Sales,* 192 F.3d at 637. There is a prominent disclosure of the producer's name on the product, which is "[t]he most common and effective means of apprising intending purchasers of the source of goods. *Syndicate Sales,* 192 F.3d at 637. Even in a case where there is evidence of deliberate copying of the product design, differences in labeling and packaging are enough to thwart confusion as to the source of the goods. *Syndicate Sales,* 192 F.3d at 638. This weighs against Clarus's trade dress claim.[FN18]

> FN18. The parties disagree as to whether packaging is significant in this case, as the products are generally sold over the internet or through infomercials. But to the extent it is, again, this factors works against Clarus. The packaging, as described *supra,* is radically different.

At the oral argument I asked Clarus' counsel whether if Tiffany's decided to copy the Q-Link pendants and put its name conspicuously in the center of the pendant, whether Clarus have a trade dress claim. The question went essentially unanswered.

The factors to be considered in the likelihood of confusion of trade dress analysis are essentially identical to those applicable to the trade mark analysis: 1) the similarity of the trade dresses; 2) the area and manner of concurrent use; 3) the degree of care likely to be used by consumers; 4) the strength of the plaintiff's trade dress; 5) actual confusion; and 6) intent of the defendant to palm off its product as that of the plaintiff. *Syndicate Sales,* 192 F.3d at 636;*Thomas & Betts Corp. v. Panduit Corp.,* 138 F.3d 277, 296 (7th Cir.1998). As already concluded, the factors of degree of care likely to be used by consumers, whether any actual confusion exists, and the defendants' intent to pass off its goods as those of the plaintiff all favor the defendants. The similarity of the trade dress-as opposed to the trade marks-remains to be determined.[FN19]

> **FN19.** In the preceding trademark analysis, only the similarity of the products and the strength of the plaintiff's mark favor Clarus. In the trade dress analysis, the strength of trade dress is tied to distinctiveness which, as already noted, is a separate element of an infringement claim that Clarus must prove.

Trade dress is the "total image or overall appearance of a product," including size, shape, color, texture, and graphics. *AM General Corp. v. DaimlerChrysler Corp.,* 311 F.3d 796, 814 (7th Cir.2002). There are four pendants at issue here, two from Clarus and two from defendants. But Clarus's "Pebble" pendant ought not to have been included in this lawsuit. It is made of sterling silver, while the other three pendants are black plastic. It has no lettering, while the other three display either "Q-Link" or "Q-Ray." Its shape is amorphous, like a random pebble, while the other pendants are configured as triangles or teardrops. And it displays concentric copper and black circles, while the other three do not. Clarus' description of this pendant in its briefs as a "teardrop," when in its advertising it calls it the "Pebble," is unconvincing and obviously designed to equate it to the defendants' "Alpha Teardrop" pendant. But this attempt to subordinate reality to semantics runs afoul of the Supreme Court's oft repeated admonition that the logic of words should yield to the logic of realities. *DiSanto v. Pennsylvania,* 273 U.S. 34, 43, 47 S.Ct. 267, 71 L.Ed. 524 (1927).*See also Schmidt v. Ottawa Medical Center,* 322 F.3d 461, 464 (7th Cir.2003).

**\*17** In sum, there is no hint of trade dress infringement as it relates to the "Pebble."

The other three pendants are all made of black plastic. Clarus's "New Q" is an upside-down, rounded-off isosceles triangle, while the defendants' "Beta Space Age Triangle" is, like the Clarus "New Q", a rounded-off isosceles triangle, but it hangs rightside-up. So the shape is similar, but the positioning is not. The defendants' "Alpha Teardrop," is a different shape, what can truly be said to be teardrop-shape. While all three pendants are black plastic, the "New Q" has a shiny, smooth surface, while the defendants' pendants have a textured, dull surface. And while the face of the "New Q" is somewhat concave, the faces of the defendants' pendants are somewhat convex. All three pendants have circular insets. The "New Q" 's inset is ringed with the copper-colored circle it calls its "Coil Design Trademark"-which the Patent and Trademark Office has denied trademark status to. The insets of the defendants' pendants are ringed with the "C" that stems from the bracelets they have long marketed. The two are no more similar than an "O" and a "C." Finally, what simply cannot be missed, is the differing trademarks-already discussed-labeling all the pendants. So there is some slight similarity-color, material, shape-but overall, the pendants are dissimilar.[FN20]

> **FN20.** It is worth noting that, throughout these proceedings, Clarus had made much of its "coil design." But to discern that the copper circle of Clarus's pendant is in fact a coil wopuld require so close an inspection that there would not be the slightest risk of confusing Clarus's pendants with those of defendants.

The factor of similarity of trade dress weighs slightly against Clarus in regard to its "New Q," but overwhelmingly so in regard to the "Pebble." In addition, the factors of degree of care likely to be used by consumers, whether any actual confusion exists, and the defendants' intent to palm off its goods as those of the plaintiff all favor the defendants. Combining that with the labeling of the pendants, *see Syndicate Sales,* 192 F.3d at 637, results in the conclusion that Clarus has failed to demonstrate a likelihood of confusion to support its trade dress

Slip Copy                                                                                     Page 17
Slip Copy, 2006 WL 4013750 (N.D.Ill.)
**(Cite as: 2006 WL 4013750 (N.D.Ill.))**

claim. Consequently, it has failed to demonstrate a likelihood of success on the merits.

Given the foregoing, no analysis of Clarus's presentation on functionality and distinctiveness is necessary. But if it were, Clarus would not fare well. Clarus does not bother to address these issues until its reply brief and, even there, its arguments are unconvincing and essentially unsupported.

### 2.

### Functionality

Trade dress protection may not be claimed for product features that are functional. *Dastar Corp. v. 20th Century Fox Film Corp.,* 539 U.S. 23, 37, 123 S.Ct. 2041, 156 L.Ed.2d 18 (2003); *TrafFix Devices, Inc. v. Marketing Displays, Inc.,* 532 U.S. 23, 29, 121 S.Ct. 1255, 149 L.Ed.2d 164 (2001); *Two Pesos,* 505 U.S. at 775. Thus, not surprisingly, Clarus argues that its coil design is not functional:

The Coil is simply an amplifying antenna that could properly function in many different shapes or sizes-its shape is not necessary to its function. In fact, it does not even need to be visible. Clarus chose to display the Coil Design because it liked the shape and unique appearance.

**\*18** (*Plaintiff's Reply,* at 4). In support of these assertions, Clarus relies on the declaration of its president, Mr. Williams, who contends that the selection of a circular, coil design was intended to be purely aesthetic. Any other shape would have been just as functional. (Williams Decl., ¶ 3). This aesthetic choice was carried over to the new pendants. (Williams Decl. ¶ 4).

But functionality is not limited to the strictly utilitarian. "Aesthetic appeal can be functional; often we value products for their looks." *Eco Mfg. LLC. v. Honeywell Intern., Inc.,* 357 F.3d 649, 654 (7th Cir.2003) (*citing Qualitex Co. v. Jacobson Products Co.,* 514 U.S. 159, 169-70, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995))

As the court explained in *Thomas & Betts:*

Features of a product may serve primarily to signify

its source (*e.g.,* the pink color of Owens-Corning fiberglass insulation, see *In re Owens-Corning Fiberglas Corp.,* 774 F.2d 1116 (Fed.Cir.1985)), these features are still part of the product itself and may be valued by consumers as such ("I just could not sleep at night if the insulation above my head wasn't pink").

65 F.3d at 657. It must be remembered that trade dress protection only extends to the role of such features as signifier of source, because when competitors are barred from duplicating features whose value to consumers is intrinsic and not exclusively as a signifier of source, competition is unduly hindered. *Id.*

In the instant case, it is not clear that the "coil design" is a signifier of source. The evidence Clarus has presented-Mr. Williams' assertions regarding the design-is essentially a concession that the coil design serves an aesthetic function rather than a source-identification function. A seller should not be allowed to obtain, in the name of trade dress, a monopoly over the elements of a product's appearance that either are not associated with a particular producer or that have value to consumers that is independent of identification. *Publications Intern., Ltd. v. Landoll, Inc.,* 164 F.3d 337, 339 (7th Cir.1998). Based on Mr. Williams' very clear statements, it would seem that this is exactly what Clarus is attempting to do.

Clarus also falls short on the issue of distinctiveness. The Supreme Court has spoken at length on the issue of whether product design could be inherently distinctive:

It seems to us that design, like color, is not inherently distinctive. The attribution of inherent distinctiveness to certain categories of word marks and product packaging derives from the fact that the very purpose of attaching a particular word to a product, or encasing it in a distinctive packaging, is most often to identify the source of the product. Although the words and packaging can serve subsidiary functions-a suggestive word mark (such as "Tide" for laundry detergent), for instance, may invoke positive connotations in the consumer's mind, and a garish form of packaging (such as Tide's squat, brightly decorated plastic bottles for its liquid laundry detergent) may attract an otherwise indifferent

consumer's attention on a crowded store shelf-their predominant function remains source identification. Consumers are therefore predisposed to regard those symbols as indication of the producer, which is why such symbols "almost *automatically* tell a customer that they refer to a brand," and "immediately ... signal a brand or a product 'source.' "... In the case of product design, as in the case of color, we think consumer predisposition to equate the feature with the source does not exist. Consumers are aware of the reality that, almost invariably, even the most unusual of product designs-such as a cocktail shaker shaped like a penguin-is intended not to identify the source, but to render the product itself more useful or more appealing.

*19*Wal-Mart Stores, Inc.,* 529 U.S. at 212-213 (citations omitted).*See also* *Dastar Corp.,* 539 U.S. at 36.

Consequently, a product design cannot be protected under § 43(a) of the Lanham Act without a showing that it has acquired "secondary meaning." *Wal-Mart Stores, Inc.,* 529 U.S. at 214;*see also* *Dastar Corp.,* 539 U.S. 23 at 36, 123 S.Ct. 2041, 156 L.Ed.2d 18;*TrafFix Devices, Inc.,* 532 U.S. at 28-29. This means that Clarus must prove that its trade dress-its product configuration-has somehow achieved secondary meaning. In other words, it is up to Clarus to show that consumers understand the design elements to signify the product's *origin* and not just its attributes. *Bretford Mfg., Inc. v. Smith System Mfg. Corp.,* 419 F.3d 576, 579 (7th Cir.2005).

Clarus submits that it has spent millions in advertising, and has sold over 600,000 pendants. (*Plaintiff's Reply,* at 2). But it has not provided any evidence regarding its sales or advertising. The fact that Clarus has sold pendants and has extensively advertised its products does not prove that the *coil design* has achieved secondary meaning.[FN21]" '[S]econdary meaning' is acquired when 'in the minds of the public, the primary significance of a product feature [here the coil design] ... is to identify the source of the product rather than the product itself.'"*Qualitex Co. v. Jacobson Prods. Co.,* 514 U.S. 159, 163, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995) (*quoting* *Inwood Labs., Inc. v. Ives Labs., Inc.,* 456 U.S. 844, 851 n. 11, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982)). Clarus must submit evidence that the coil design "prompts [Clarus] in buyers' minds."

*Bretford Mfg.,* 419 F.3d at 579. Secondary meaning can be established "through direct consumer testimony, consumer surveys, length and manner of use, amount and manner of advertising, volume of sales, place in the market and proof of intentional copying."*Thomas & Betts Corp. v. Panduit Corp.,* 138 F.3d 277, 291 (7th Cir.1998).

> FN21. It is, the coil design, and not the copper color of the coil that Clarus insists has acquired a secondary meaning. Thus, even the change of color of the coil from copper to red or green-as the defendants have done-is not, according to Clarus, sufficient to remove confusion in the public's mind.

Clarus has not so much as intimated that it has direct consumer testimony or consumer surveys. It is undisputed that it has used the coil design for approximately 12 years, but that is only the beginning of the analysis.*International Kennel Club of Chicago, Inc. v. Mighty Star, Inc.,* 846 F.2d 1079, 1087 (7th Cir.1988) (50 years of use in combination with advertising and substantial free publicity); *A.J. Canfield Co. v. Vess Beverages, Inc.,* 796 F.2d 903, 907 (7th Cir.1986) (use for 13 years, combined with substantial advertising and free publicity). The advertising must in some way focus on the feature claimed to have acquired secondary meaning and to have prompted consumers to consider the claimed trade dress as an indicator of source.*Thomas & Betts Corp.,* 138 F.3d at 292. Without that focus and prompting, the necessary relationship in the public's mind between the origin of the product and the feature claimed to be distinctive cannot be assumed to exist. Hypothesis without proof is not enough in any context. *Compare* *Louth v. McCollum,* 424 F.3d 631, 634 (7th Cir.2005) (Posner, J.); *Alexander v. City of South Bend,* 433 F.3d 550, 556-557 (7th Cir.2006); *United States v. Landry,* 257 F.2d 425, 431 (7th Cir.1958).

*20* Since Clarus has not provided specimens of its claimed prior advertising, its content cannot be reviewed, and thus, no conclusions can be drawn about its message and the sufficiency of that message to have created a secondary meaning in the coil design. For all one knows, the advertising does not even show the coil design or make any mention of it. Or, the references may be so penumbral as to

invalidate Clarus' current argument. Beyond saying that it has spent a good deal on advertising, Clarus has made no attempt to explain how that advertising prompted consumers to connect the copper-colored circle with "Q-Link" as a signifier of the source of the pendants.

To the extent there is evidence of advertising, it leads to the conclusion that the copper coil has not acquired a secondary meaning. Indeed, in some advertising, it is the back of the pendants with the highly stylized "Q" that seems to be the advertising's focal point. *See Defendants' Exh.* 1. And even where advertising does show the coil, there is nothing that particularly focuses on it. Even the Q-Link home web page, www.q-linkproducts.com, takes no note of and makes no mention of the coil. The same is true of the websites that Clarus notes in its supporting memorandum.

In sum, there is simply nothing in the record from which it can be concluded that the coil design has acquired a secondary meaning.[FN22]

> [FN22.] Clarus incorrectly argues that use of trade dress for over five years constitutes a *prima facie* case of secondary meaning. (*Reply,* at 2). Under the Lanham Act, the trademark commissioner may accept five years' exclusive and continuous use of a mark as *prima facie* evidence of secondary meaning. 15 U.S.C. § 1052(f). Here, however, the commissioner has rejected Clarus's showing. And, in any event, such evidence has only "some bearing on the issue of secondary meaning." *Thomas & Betts,* 138 F.3d at 295-296.

### D.

### Copyright Infringement

Finally, Clarus claims that the defendants have infringed its copyright on the "New Q" and "Pebble" pendants. In order to succeed on this claim, Clarus must establish two elements: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original. *Feist Publications, Inc. v. Rural Telephone Service Co., Inc.,* 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991); *Incredible Technologies, Inc. v. Virtual Technologies,*

*Inc.,* 400 F.3d 1007, 1011 (7th Cir.2005); *Twentieth Century Fox Film Corp. v. Entertainment Distributing,* 429 F.3d 869, 876 (9th Cir.2005). A certificate of copyright registration constitutes a *prima facie* presumption of validity. *Mid America Title Co. v. Kirk,* 59 F.3d 719, 721 (7th Cir.1995). Here, however, Clarus's applications for registration of the "New Q" and "Pebble" pendant designs has been rejected by the Copyright Office. (*Plaintiff's Memorandum,* at 22 n. 5). As such, there is no presumption in Clarus's favor on the initial element of ownership of a valid copyright. In the absence of presumption in Clarus's favor, the district court makes an independent determination regarding Clarus's ownership of a valid copyright; a *de novo* determination as to whether plaintiff's work is copyrightable. *Ward v. National Geographic Soc.,* 208 F.Supp.2d 429, 445 (S.D.N.Y.2002); *Morelli v. Tiffany and Co., Inc.,* No. 00-1961, 2001 WL 179898, *1 (E.D.Pa. Jan.10, 2001).* That means Clarus must provide *proof* on this issue.

The emphasis on "proof" is deliberate. On the issue of ownership of a valid copyright, there is merely the legal conclusion by Clarus' president that Clarus is "the owner of the copyrighted designs for the both the New Q and Pebble pendants designs," and that it "owns the technology and related intellectual property, including ... copyrights in the Q-Link Pendants."(Williams Decl. at ¶ 5). Mr. Williams also states that "[t]he pendants were designed by an international design team...."(*Id.* at ¶ 8). All that means, however, is that he did not design it, and seemingly, neither did Clarus. There is no indication that the design team worked for Clarus, and no basis for concluding that the pendants constitute "works for hire," or whether the design team assigned its rights in their work to Clarus. *See Gaiman v. McFarlane,* 360 F.3d 644, 650 (7th Cir.2004) (discussing "work for hire"). There is also the unexplored question of whether the pendants are even copyrightable works. With so much of its copyright claim left to speculation, it cannot be said that Clarus has demonstrated a likelihood of success on the claim's merits.

### CONCLUSION

**\*21** The plaintiff has failed to demonstrate a likelihood of success on the merits of its claims for trademark infringement, trade dress infringement,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 20
Slip Copy, 2006 WL 4013750 (N.D.Ill.)
**(Cite as: 2006 WL 4013750 (N.D.Ill.))**

and copyright infringement. Accordingly, it is hereby recommended that the plaintiff's motion for a preliminary injunction order [9] be DENIED.

N.D.Ill.,2006.
Clarus Transphase Scientific, Inc. v. Q-Ray, Inc.
Slip Copy, 2006 WL 4013750 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

71 U.S.P.Q.2D 1725                                                                                                                  Page 1

2004 WL 1942043 (Trademark Tr. & App. Bd.), 71 U.S.P.Q.2d 1725
**(Cite as: 71 U.S.P.Q.2d 1725)**

▷In re Dell Inc.

U.S. Patent and Trademark Office Trademark Trial
and Appeal Board

Serial No. 75851765

Decided August 12, 2004

**TRADEMARKS AND UNFAIR TRADE
PRACTICES**
**1** Registration and its effects -- Federal
registration -- Procedure, form, and content --
Specimens (§ 315.0303.02)
Registration and its effects -- Federal registration
-- Procedure, form, and content -- Statement of
use (§ 315.0303.14)
 Website page that displays product and provides
means of ordering product can qualify as "display
associated with the goods" within meaning of 37
C.F.R. § 2.56 and 15 U.S.C. § 1127, provided mark
appears on Web page in manner that associates mark
with goods, since many goods and services are
offered for sale online, since Web pages that display
goods and their trademarks and provide for online
purchase of such goods are not merely advertising, in
that they provide link for ordering as well as showing
goods and features thereof, since such Website
functions as electronic retail store, and Web page is
equivalent of "shelf-talker" or banner that encourages
consumer to buy product, and since consumer who
uses link on Web page to purchase goods online is
equivalent to consumer who sees shelf-talker and
then purchases item in brick-and-mortar store.
**2** Registration and its effects -- Federal
registration -- Procedure, form, and content --
Specimens (§ 315.0303.02)
Registration and its effects -- Federal registration
-- Procedure, form, and content -- Statement of
use (§ 315.0303.14)
 Single Website page submitted as specimen showing
actual trademark use of applicant's "Quietcase" mark
for internal cases for computer hardware qualifies as
"display associated with the goods" within meaning
of 37 C.F.R. § 2.56 and 15 U.S.C. § 1127, since this
single Web page is used as vehicle for ordering
product shown thereon, and thus is point-of-sale
display by which actual sale is made, and since Web
page will be viewed as whole by consumers, and
"Quietcase" mark thus is sufficiently prominent on

specimen Web page that consumers will recognize it
as trademark for applicant's computer hardware, even
though mark does not appear next to photograph of
goods, and is shown in smaller type size than other
words appearing on Web page.

**\*1725** Appeal from refusal of application for
trademark registration (William T. Verhosek,
examining attorney; Margaret K. Lee, managing
attorney).

 Intent-to-use application of Dell Inc. for registration
of "Quietcase" as trademark for computer hardware
and internal cases for computer hardware. Applicant
appeals from final refusal of registration for failure to
submit specimen showing actual trademark use.
Reversed.

 Doreen L. Costa and Abigail Rubinstein, of Baker
Botts, New York, N.Y., for applicant.

 Before Seeherman, Walters, and Chapman,
administrative trademark judges.

 Seeherman, J.

 Dell Inc., by change of name from Dell Computer
Corporation, has applied to register QUIETCASE as
a trademark for goods identified, as amended, as
"computer hardware; internal cases for computer
hardware being parts of computer work stations." The
application, which was filed on November 17, 1999,
was originally based on an asserted bona fide
intention to use the mark in commerce. It was
approved by the Examining Attorney, published for
opposition, and eventually a notice of allowance
issued. Applicant filed several requests for an
extension of time to file its statement of use. On May
9, 2002, applicant filed a statement of use, alleging
first use and first use in commerce on January 31,
2002. On September 17, 2002, the Examining
Attorney issued an Office action in which he found
the specimen submitted in support of the statement of
use to be unacceptable; on October 23, 2002,
applicant filed an "insurance" request for an
extension of time to file its statement of use.

 Registration was ultimately finally refused on the
basis that applicant has failed to submit a specimen
which evidences actual trademark **\*1726** use. It is

COPR. © 2008 The Bureau of National Affairs, Inc.

2004 WL 1942043 (Trademark Tr. & App. Bd.), 71 U.S.P.Q.2d 1725
**(Cite as: 71 U.S.P.Q.2d 1725)**

from this refusal that applicant has filed the present appeal.

 The appeal has been fully briefed. [FN1] Applicant did not request an oral hearing.

 The sole issue in this appeal is whether the specimen submitted by applicant on May 9, 2002 with its statement of use is acceptable to show use of the mark in connection with the identified goods. [FN2]

Trademark Rule 2.56 provides, in part:

§ 2.56 Specimens.

 (a) An application under section 1(a) of the Act, an amendment to allege use under § 2.76, and a statement of use under § 2.88 must each include one specimen showing the mark as used on or in connection with the goods, or in the sale or advertising of the services in commerce.

 (b)(1) A trademark specimen is a label, tag, or container for the goods, or a display associated with the goods. The Office may accept another document related to the goods or the sale of the goods when it is not possible to place the mark on the goods or packaging for the goods.

 Section 45 of the Trademark Act states, in part, that:

 For purposes of this Act, a mark shall be deemed to be in use in commerce--

 (1) on goods when--

 (A) it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale . . . .

 The specimen submitted by applicant is a printout of a page taken from its website, which it asserts to be a display associated with the goods. During the course of examination, the Examining Attorney appeared to accept that a website page could, in theory, be a display associated with the goods, but that applicant's particular website page was not acceptable because of

the manner in which the mark appeared on it. In his brief, however, the Examining Attorney also states that the specimen is mere advertising, and does not constitute a display at all. Applicant contends in its reply brief that the Examining Attorney had not previously objected to the specimen on the basis that it is mere advertising.

 It appears to us that the Examining Attorney has made the statement that the specimen is mere advertising because of the distinction that is made in the case law between advertising, which does not constitute evidence of trademark use, and a display associated with the goods, which does. "Specimens are invalid for registration purposes only if they constitute mere advertising." Lands' End Inc. v. Manbeck, 797 F.Supp. 511, 24 USPQ2d 1314, 1316 (E.D. Va. 1992), quoting In re Shipley Co., 230 USPQ 691, 694 (TTAB 1986). The Examining Attorney seems to be taking the position that because the specimen is mere advertising, it is not a display associated with the goods or, perhaps, that because the specimen is not a display associated with the goods, it is mere advertising.

 With respect to the question of whether a website page can constitute a display associated with the goods, it is true, as the Examining Attorney points out, that traditionally "displays associated with the goods" have been banners, shelf-talkers and other point-of-sale material. However, in Lands' End, the Court held that a catalog could also be a display associated with the goods. Lands' End was attempting to register KETCH as a trademark for purses, and

 submitted a page of its catalogue showing the picture of a purse, a verbal description, and the term "KETCH" as they allege constitutes trademark usage. The alleged trademark "KETCH" appears prominently in large bold lettering on the display of purses in the Lands' End specimen in a manner which closely associates the term with the purses.

24 USPQ2d at 1315.

**\*1727** As the Court reiterated in that decision, citing In re ShipleyCo., 230 USPQ at 694 (TTAB 1986), "A point of sale location provides a customer with the opportunity to look to the displayed mark as a means of identifying and distinguishing the source of goods." 24 USPQ2d at 1316. In *Shipley*, the Board

2004 WL 1942043 (Trademark Tr. & App. Bd.), 71 U.S.P.Q.2d 1725
**(Cite as: 71 U.S.P.Q.2d 1725)**

found that a specimen showing the mark at a trade show booth was an acceptable "display associated with the goods" because the trade show booth was a sales counter for the applicant's products, even though the chemicals being sold were not physically present at the booth. The Court found this situation analogous to the catalog involved in *Lands' End*; the customer could associate this display of the mark with the goods in deciding whether to buy the product. Using the catalog, a customer could associate the product with the trademark in the display, and make a decision to purchase by filling out the sales form and sending it in or by calling in a purchase by phone.

1 Following the reasoning of the *L ands' End* decision, we hold that a website page which displays a product, and provides a means of ordering the product, can constitute a "display associated with the goods," as long as the mark appears on the webpage in a manner in which the mark is associated with the goods. It is a well-recognized fact of current commercial life that many goods and services are offered for sale on-line, and that on-line sales make up a significant portion of trade. Applicant itself sells many goods on-line. In the declaration of Deborah McNair, a Communications Specialist for applicant, she states that in 1997

Dell became the first company to record $1 million in online sales. Today, Dell operates one of the highest volume Internet commerce sites in the world based on Microsoft Corp.'s Windows operating system. Approximately half of Dell's business is Web-enabled.Indeed, in 2000 alone Dell surpassed sales of 50 million dollars per day via the Dell web site.

In today's commercial environment, we must recognize that the banners, shelf-talkers and other point of purchase displays that are associated with brick and mortar stores are not feasible for the on-line shopping setting. Web pages which display goods and their trademarks and provide for the on-line ordering of such goods are, in fact, electronic displays which are associated with the goods. Such uses are not merely advertising, because in addition to showing the goods and the features of the goods, they provide a link for ordering the goods. In effect, the website is an electronic retail store, and the webpage is a shelf-talker or banner which encourages the consumer to buy the product. A consumer using the link on the webpage to purchase the goods is the equivalent of a consumer seeing a shelf-talker and taking the item to the cashier in a brick and mortar store to purchase it.

2 The Examining Attorney has asserte d that a single webpage does not fit within the *Lands' End* determination of a display associated with the goods because it is not an actual catalog nor is it an electronic catalog. However, the point made in *Lands' End* was not that, to be a display associated with the goods, the specimen had to be a catalog (whether actual or electronic). The single webpage submitted in the present case is used as a vehicle for ordering the product shown on the webpage. As the Examining Attorney has acknowledged, the specimen directs

prospective purchasers to "Buy Online" through the icon "Customize it". This is much akin to online retail stores['] icon of "Add to cart" or a shopping cart icon.

Office action mailed April 18, 2003.

The single webpage is, thus, a point of sale display, a display by which the actual sale is made.

The Examining Attorney has also asserted that, even if a single webpage would be acceptable as a point of sale display, the particular webpage submitted by applicant as a specimen does not meet the requirements of *Lands' End* because it does not prominently display the mark with the product. The Examining Attorney points to the following language in Section 904.06(a) of the Trademark Manual of Examining Procedure (3d ed., rev. May 2003):

[E]xamining attorneys should accept any catalog or similar specimen as a display associated with the goods, provided: (1) it includes a picture of the relevant goods; (2) it shows the mark sufficiently near the picture of the goods to associate the mark with the goods; and (3) it includes the information necessary to order the goods, ( *e.g.*, a phone number, mailing address, or e-mail address). Any form of advertising that satisfies these criteria should be construed as a **\*1728** display associated with the goods. It is not necessary that the specimen list the price of the goods.

71 U.S.P.Q.2D 1725                                                                                        Page 4

2004 WL 1942043 (Trademark Tr. & App. Bd.), 71 U.S.P.Q.2d 1725
**(Cite as: 71 U.S.P.Q.2d 1725)**

 It is the Examining Attorney's position that applicant's specimen is unacceptable because it does not show the mark sufficiently near the picture of the goods to associate the mark with the goods, in that the mark is not near the photograph of the goods, and the mark is not prominently displayed, but "is in small font type and inconspicuously a part of a laundry list of descriptions and features for the goods." Brief, p. 7.

 In order to determine whether the mark which appears on the specimen is displayed in such a way that a customer can easily associate the mark with the identified goods, we must look to the specimen itself, a copy of which is reproduced below:



**\*1729** As can be seen, a photograph of the computer workstation appears in the top portion of the webpage. Information about the features of this workstation appear both next to the photograph, and

COPR. © 2008 The Bureau of National Affairs, Inc.

71 U.S.P.Q.2D 1725                                                            Page 5

2004 WL 1942043 (Trademark Tr. & App. Bd.), 71 U.S.P.Q.2d 1725
**(Cite as: 71 U.S.P.Q.2d 1725)**

also below the heading, "NEXT GENERATION INTEL XEONPERFORMANCE IN A HIGHLY SCALABLE WORKSTATION." Listed in the bullet points below this heading is the trademark at issue: "QuietCaseTM acoustic environment, provides easy access to system interior and supports tool-less upgrades and maintenance of key internal components."

The Examining Attorney is certainly correct that the trademark QUIETCASE does not appear next to the photograph of the goods. However, as applicant points out, the particular workstation is the only product on the webpage. Thus, it is clear that this is the product to which the trademark QUIETCASE refers. The Examining Attorney is also correct that the mark QUIETCASE is shown in a smaller type size than other words appearing on the webpage. However, it must be remembered that the specimen is a webpage, and that when it is actually viewed it will fill the consumer's monitor screen. Thus, the mark will appear larger than it does in the specimen contained in the file, or as reproduced in this opinion. Further, the mark appears in a bullet listing of information about the product. This list will be carefully perused by potential consumers because it contains information that is critical to the purchasing decision. In addition, in the particular bullet fact, the mark appears at the beginning of a line and is followed by the "TM" trademark indicator. This use of the designation "TM" next to QUIETCASE lends a degree of visual prominence to the term. But see, In re Brass-Craft Manufacturing Co., 49 USPQ2d 1849 (TTAB 1998); In re Remington Products Inc., 3 USPQ2d 1714 (TTAB 1987) (mere use of the "TM"indicator cannot transform an otherwise unregistrable term into a trademark).

In the context of the specimen webpage, we find that QUIETCASE is sufficiently prominent that consumers will recognize it as a trademark for the computer hardware shown on the webpage. [FN3] See In re Hydron Technologies Inc., 51 USPQ2d 1531 (TTAB 1999), in which the Board found that copies of individual images taken from a video recording of an infomercial was a display associated with the goods, even though the mark was shown by itself on a separate screen print, and there was always intervening material between the showing of the mark and the ordering information. The Board held

that when the infomercial was considered as a viewer would perceive it, the slogan mark was associated with the goods which were the subject of the video. In the same way, the specimen webpage will be viewed as a whole, and QUIETCASE will be perceived as a trademark for the goods.

Decision: The refusal of registration is reversed.

FN1. Applicant's request for an extension of time to file its reply brief is granted.

FN2. With its request for reconsideration, filed with a certificate of mailing dated October 16, 2003, applicant submitted a substitute specimen which was asserted to have been in use "prior to the expiration of the Fifth Extension of Time to file a Statement of Use." Because this fifth extension was filed after the "insurance" fourth extension request, the Examining Attorney advised applicant that the fifth extension was not allowed, and therefore that any specimen which was used after the expiration of the fourth extension was not acceptable. Applicant does not dispute this decision, and agrees that the only issue in this appeal is the acceptability of the original specimen.

FN3. It appears from the bullet information that QUIETCASE is being used as a trademark to identify a feature of the hardware. No objection to the specimen was raised on this basis, and we have therefore not considered this point in our decision on appeal.

P.T.O. T.T.A.B.

71 U.S.P.Q.2D 1725

END OF DOCUMEN

Not Reported in F.Supp.2d                                          Page 1
Not Reported in F.Supp.2d, 2003 WL 21254430 (S.D.Ind.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 21254430 (S.D.Ind.))**

**H**ISP.Net, LLC v. Qwest Communications Intern.,
Inc.
S.D.Ind.,2003.
Only the Westlaw citation is currently available.
United States District Court,S.D.
Indiana,Indianapolis Division.
**ISP.NET**, LLC d/b/a IQuest Internet, Plaintiff,
v.
**QWEST** COMMUNICATIONS
INTERNATIONAL, INC., Defendant.
**No. IP 01-0480-C-B/S.**

May 27, 2003.

Daniel J. Lueders, Woodard, Emhardt, Naughton,
Moriarty & McNett, Indianapolis, IN, for Plaintiff.
William T. Gallagher, Townsend and Townsend and
Crew, San Francisco, CA, James W. Riley Jr., Riley,
Bennett & Egloff, Indianapolis, IN, David E. Sipiora,
Townsend and Townsend And Crew, Denver, CO,
Defendant.

### *ENTRY DENYING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT*

SARAH EVANS BARKER, District Judge.
**\*1** This matter comes before the Court on
Defendant's motion for partial summary
judgment.[FN1]Plaintiff ISP.Net, LLC, d/b/a IQuest
Internet ("IQuest") has filed suit against Defendant
Qwest Communications International, Inc. ("Qwest")
for federal trademark infringement, as well as a
variety of state law claims. Qwest contends that
certain fraudulent representations made to the Patent
and Trademark Office ("PTO") in the application
process for one of the trademarks at issue renders the
mark unregisterable and, therefore, precludes IQuest
from asserting its rights to that mark against Qwest.
IQuest responds that 1) this motion is untimely
because Qwest nowhere asserted its allegations of
fraud in prior pleadings, and, alternatively, 2) Qwest
cannot establish that it is entitled to summary
judgment on the fraud claim. For the reasons set forth
in detail below, we *DENY* Qwest's Motion for Partial
Summary Judgment.

> FN1. Although IQuest has styled its
> response to this motion as a "Memorandum
> in Opposition to Defendant's Motion for
> Partial Summary Judgment and ... in

Support of Plaintiff's Cross Motion for
Summary Judgment," the brief in no way
addresses the requisite showing or provides
supporting evidence to warrant a grant of
summary judgment in favor of IQuest.
Therefore, taking the substance of the brief
over its form, we view the opposition brief
as simply a response to Qwest's Motion for
Partial Summary Judgment.

*Factual Background*[FN2]

> FN2. The full context for the present
> dispute, though not set out in either party's
> Statement of Material Facts, is set out in the
> briefing on the present motion. Where
> background facts become material to the
> disposition of the present motion, those facts
> include citation to the factual assertions and
> supporting materials provided by the parties.

Plaintiff IQuest is an Indiana corporation that has
been in the business of providing Internet access
services since 1993. Compl. ¶ 1. Defendant Qwest is
a Delaware corporation that now does business in the
state of Indiana. *Id.* ¶¶ 3-4.A recurring character in
this dispute, John Aleshe, a.k.a. "Robert Hoquim,"
founded Small Systems, an Indianapolis company
engaged in the sale of computer parts and, later, the
provision of Internet access services. Def.'s Mot. for
Partial Summ. J. at 5., Ex. E. Sometime around or
after June 1994, Aleshe changed the name of the
Internet access portion of Small Systems to IQuest or
IQuest Internet ("Old IQuest").*Id.*, Ex. J. Aleshe, all
the time using the Hoquim identity, became the
founder and majority shareholder of Old IQuest.

On February 17, 1995, Aleshe filed U.S. Trademark
Application No. 74/635,618 ("the '618 application"),
seeking federal trademark protection for the name
"IQuest" and its accompanying artwork. On April 4,
1995, Old IQuest sent a letter to Multitronics, an
Internet service provider operating in Alabama under
the name "InterQuest," stating that Multitronics' use of
the domain name iquest.com, which had been a
registered domain name since October 1993,
constituted an infringement of Old IQuest's
trademark rights. Def.'s Statement of Undisputed
Facts ¶¶ 14-16. In response, Multitronics filed a
complaint in an Alabama federal court seeking
declaratory judgement that Multitronics' use of the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2003 WL 21254430 (S.D.Ind.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 21254430 (S.D.Ind.))**

iquest.com domain name did not infringe Old IQuest's trademark rights. On August 19, 1996, Old IQuest filed its own complaint against Multitronics in this court, seeking, *inter alia,* an injunction requiring Multitronics to assign the iquest.com domain name to Old IQuest. *Id.* ¶ 17.On April 30, 1997, the parties entered into a settlement agreement resolving their dispute prior to final adjudication.

Qwest contends that Aleshe made the following false representations to the PTO in the '618 application: 1) Aleshe signed the verified declaration using the name "Robert Hoquim"; 2) Aleshe described IQuest Network Services as an Indiana corporation; 3) Aleshe stated that the IQuest Internet mark (with accompanying design) was used as early as May 1, 1993; and 4) Aleshe asserted that "to the best of [his] knowledge and belief no other person, firm, corporation, or association has the right to use the mark in commerce, either in the identical form thereof or in such near resemblance thereto as to be likely, ... to cause confusion, or to cause mistake, or to deceive ..." Consideration of the '618 application was suspended in February 1996, pending the disposition of an unrelated cancellation proceeding. On August 6, 1996, Old IQuest filed another registration application ("the '761 application") for the IQUEST word mark. The application contained assertions identical to those in the '618 application, but omitted the design portion of the earlier application. On July 22, 1997, the PTO formally accepted Old IQuest's '618 application for registration (U.S. Trademark Reg. No. 2,080,534, the "'534 registration").

**\*2** In 2000, Aleshe sold the assets of Old IQuest to IQuest, the Plaintiff in this action. Aleshe died of an apparent heart attack in May 2000. On April 9, 2001, IQuest filed this lawsuit, alleging federal servicemark infringement; federal unfair competition; federal dilution; and state unfair competition and infringement. IQuest sought cancellation of Qwest's federal registrations and a declaratory judgment on the likelihood of confusion between the services marketed under the Qwest and IQuest names. Qwest filed the present motion for partial summary judgment on August 13, 2002.

### Standard of Review

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). However, summary judgment is not a substitute for a jury's determination about credibility. Under Rule 56(c) of the Federal Rules of Civil Procedure, the court should grant summary judgment if and only if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. *See*Fed.R.Civ.P. 56(c); *Jay v. Intermet Wagner Inc.,* 233 F.3d 1014, 1016 (7th Cir.2000).

On a motion for summary judgment, the moving parties must first come forward and identify those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, that the parties believe demonstrate the absence of a genuine issue of material fact. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the moving parties have met the threshold burden of supporting the motion, the opposing party must "set forth specific facts showing that there is a genuine issue for trial."Fed.R.Civ.P. 56(e). In determining whether a genuine issue of material fact exists, the court must construe all facts in the light most favorable to and draw all reasonable inferences in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Haefling v. United Parcel Serv., Inc.,* 169 F.3d 494, 497 (7th Cir.1999). The existence of "some alleged factual dispute between the parties," or "some metaphysical doubt," however, does not create a genuine issue of fact. *Piscione v. Ernst & Young, L.L .P.,* 171 F.3d 527, 532 (7th Cir.1999). The proper inquiry is whether a rational trier of fact could reasonably find for the party opposing the motion with respect to the particular issue. *See, e.g.,* *Jordan v. Summers,* 205 F.3d 337, 342 (7th Cir.2000). We apply this standard with great care, noting the Seventh Circuit's caution that, although no firm rule precludes summary judgment in cases involving fraud claims, "summary judgment will often be inappropriate ... because the district court would be required to resolve the subjective issue of fraudulent intent."*Federal Deposit Ins. Corp. v. Lauterbach,* 626 F.2d 1327, 1335 n. 12 (7th Cir.1980).

### Legal Issues

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 3
Not Reported in F.Supp.2d, 2003 WL 21254430 (S.D.Ind.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 21254430 (S.D.Ind.))**

1. Timeliness

**\*3** As a preliminary matter, IQuest contends that Qwest's motion is untimely because none of the fraud allegations forming the basis for the motion appeared in any of Qwest's amended answers, which were filed prior to the fraud motion. We have previously noted that allegations of trademark fraud must also be pled with particularity in accordance with *Federal Rule of Civil Procedure 9(b).Oreck Corp. v. Thomson Consumer Electronics, Inc., 796 F.Supp. 1152, 1159 (S.D.Ind.1992).* It follows, then, that the total absence of such allegations from the pleadings would fail to satisfy the heightened requirement.

We begin, however, by noting that, after filing its motion for partial summary judgment, Qwest filed its Third Amended Answer and Counterclaims, which included specific reference to the timing, nature, and content of allegedly fraudulent statements to the PTO. Moreover, after filing its response to Qwest's motion and raising the timeliness argument, IQuest filed its Reply to Qwests's Third Amended Answer and Counterclaims. In order to alleviate some of the procedural tension in this chronology, and because we find that we can decide this motion on the evidence before the Court, we will address the merits of Defendant's fraud motion.

2. Fraud claim

Qwest contends that fraudulent representations made by Aleshe to the PTO in the '618 application renders the '534 registration invalid and the '716 application unregisterable and, therefore, precludes IQuest from asserting its rights to those marks against Qwest. A claim of fraud in the procurement of a federal trademark requires the following elements be alleged and proven: 1) a false representation regarding a material fact; 2) knowledge or belief that the representation is false ("scienter"); 3) an intention to induce the listener to act or refrain from acting in reliance on the misrepresentation; 4) reasonable reliance on the misrepresentation; 5) damage proximately resulting from such reliance. *United Phosphorus, Ltd. v. Midland Fumigant, Inc., 205 F.3d 1219, 1226 (10th Cir.2000), citing San Juan Prods., Inc. v. San Juan Pools of Kansas, Inc., 849 F.2d 468, 473 (10th Cir.1988).* A party seeking cancellation of a registered trademark on grounds of fraud must demonstrate the alleged fraud by "clear

and convincing evidence." *Money Store v. Harriscorp Finance, Inc., 689 F.2d 666, 670 (7th Cir.1982); V & V Food Prods., Inc. v. Cacique Cheese Co., Inc., 683 F.Supp. 662, 666 (N.D.Ill.1988).*

*a. Identity of applicant and description of Indiana corporation*

Qwest contends that John Aleshe's use of the assumed name "Robert Hoquim" when signing the '618 application and his inaccurate assertion in the application that IQuest Internet Services was an Indiana corporation constitute fraud on the PTO sufficient to justify cancellation of the '534 registration. In evaluating whether statements to the PTO amount to fraud, we weigh not only their truth or falsity but also their materiality to the registration decision. Material facts are those " 'which, if disclosed, would result in refusal by the Office to register the mark.' " *Buti v. Impressa Perosa, S.R.L., 935 F.Supp. 458, 474 (S.D.N.Y.1996), quoting Adolphe Lafont S.A. v. S.A.C.S.E., 228 U.S.P.Q. 589, 593 (T.T.A.B.1985), citing Rogers Corp. v. Fields Plastics & Chemicals, Inc., 176 U.S.P.Q. 280, 283 (T.T.A.B.1972).* While we credit Qwest's evidence as to the falsity of these alleged misstatements, we find that Qwest has not provided clear and convincing evidence to establish that the identity of the registration applicant or the status of IQuest as an Indiana corporation were material to the PTO's approval of the '618 application.

*b. First use date*

**\*4** Here, Qwest contends and offers significant support for the proposition that, despite Aleshe's assertion in the '618 application that the IQuest mark was first used in May 1993, the true first-use date for the mark occurred as late as May or June 1994. Even assuming Qwest were able to prove the 1994 first-use date by clear and convincing evidence, such a representation would not amount to fraud on the PTO. The Trademark Board has consistently held that a misstatement of the date of first use in an application for registration is not fraudulent as long as there has been some use of the mark prior to the filing date.[FN3]*Aveda Corp. v. Evita Marketing, Inc., 706 F Supp. 1419, 1426 (D.Minn.1989), citing Colt Industries Operating Corp. v. Olivetti Controllo Numerico S.p.A., 221 U.S.P.Q. 73, 76*

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 21254430 (S.D.Ind.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 21254430 (S.D.Ind.))**

(T.T.A.B.1983); *CarX Service Systems, Inc. v. Exxon Corp.,* 215 U.S.P.Q. 345, 351 (T.T.A .B.1982); *Visual Information Institute, Inc. v. Vicon Industries, Inc.,* 209 U.S.P.Q. 179, 185-86 (T.T.A.B.1979). Here, the alleged 1994 first-use date preceded the date of the '618 application by at least nine months. Viewed in light of the governing legal standard, this alleged misstatement does not constitute a fraudulent representation and, therefore, does not mandate cancellation of the '534 registration.

FN3. Qwest contends that the first-use date appearing in the '618 application is material to the validity of the registration because Aleshe's attestation of exclusivity necessarily depends on his assertion of a use of the mark prior to that of Multitronics. However, the secondary legal authority Qwest cites for this proposition states

> In inter partes proceedings, a trademark registration in and of itself is proof of use only as of its filing date, not as of the date of first use claimed in the registration. However, in some cases, there may be some evidentiary advantage to an earlier claimed use date, for a heavier burden of proof is imposed when a registrant seeks to prove actual use earlier than the claimed use date. That is, there occasionally may be some incremental evidentiary benefit to a registrant claiming an early use date. However, in the vast majority of cases, a misstatement of use date within the pre-filing time frame will be immaterial both the validity of the registration and to registrant's burden of proof.

MCCARTHY § 31:74 (2003). Qwest maintains, based on this passage, that the misstated first use date is material to the registration approval, and therefore constitute a fraudulent misstatement, because "[i]n order to provide even a colorable basis for the statutory claim of exclusivity, IQuest had to create a first use date ahead of October 1993, when Multitronics undisputedly began using the IQUEST mark."While the cited passage discusses the burden of proof applicable

to a registrant who seeks to prove an actual use date prior to the claimed use date, it does not support the more sweeping conclusion that Qwest advocates regarding the materiality of first-use dates generally. IQuest need not and is not attempting to prove the first-use date in this instance; Qwest bears the burden of proof on this issue. Therefore, the cited authority does not support Qwest's argument in favor of materiality, nor does it contradict the case law indicating that a first-use date is not material to the validity of a trademark registration. *Pony Exp. Courier Corp. of America v. Pony Exp. Delivery Service,* 872 F .2d 317, 319 (9th Cir.1989); *Aveda Corp.,* 706 F.Supp. 1419;*Colt Indus. Operating Corp. v. Olivetti Controllo Numerico S.p.A.,* 221 U.S.P.Q. 73, 1983 WL 51834 (T.T.A.B.1983).

*c. Exclusivity*

Finally, Qwest contends that Multitronics' rights in the "IQuest" mark were superior to those of IQuest, that Aleshe knew this, and, therefore, that he must have intended his statements regarding exclusivity in the '618 application (and, subsequently, in the '761 application) to mislead the PTO. When challenging an application for registration on this basis, a party must establish that: (1) there was in fact another use of the same or a confusingly similar mark at the time the oath was signed; (2) the other user had legal rights superior to applicant's rights; (3) applicant knew that the other user had rights in the mark superior to applicant's, and either believed that a likelihood of confusion would result from applicant's use of its mark or had no reasonable basis for believing otherwise; and (4) applicant, in failing to disclose these facts to the Patent and Trademark Office, intended to procure a registration to which applicant was not entitled. *Ohio State Univ. v. Ohio Univ .,* 51 U.S.P.Q.2d 1289, 1293 (T.T.A.B.1999); *Intellimedia Sports Inc. v. Intellimedia Corp.,* 43 U.S.P.Q.2d 1203, 1206 (T.T.A.B.1997).

Even assuming that Qwest could prove by clear and convincing evidence that Multitronics' use of the iquest.com domain name was the same as or confusingly similar to the IQUEST mark at the time

Not Reported in F.Supp.2d                                                                 Page 5
Not Reported in F.Supp.2d, 2003 WL 21254430 (S.D.Ind.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 21254430 (S.D.Ind.))**

Aleshe filed the '618 application, we find that Qwest has not provided sufficient evidence to establish the superiority of Multitronics' rights in the mark or Aleshe's knowledge or belief regarding such superiority. The dispute between IQuest and Multitronics over their respective rights in the IQUEST mark was settled by the parties before a court could pass on the relative priority of their rights in the mark. There is no direct evidence of Aleshe's alleged knowledge of the superiority of rights as between Multitronics and IQuest. Qwest contends, however, that there is only one inference to be drawn from Aleshe's statements and, as a result, only one reasonable conclusion regarding his knowledge of Multitronics' competing legal rights-that Aleshe knew Multitronics' rights were superior and therefore intentionally misprepresented the existence of those rights. Drawing all reasonable inferences in favor of the non-moving party, however, we find that Aleshe's statements to the PTO were also consistent with the inference that IQuest's rights were superior to those of Multitronics. Because we cannot resolve these questions without rendering factual determinations as to Aleshe's knowledge and intent, Qwest's Motion for Partial Summary Judgment is *DENIED*.

### Conclusion

**\*5** Defendant Qwest moved for partial summary judgment on the basis that allegedly fraudulent statements made in the '618 application and repeated in the '761 application should invalidate IQuest's claimed protection under the ' 534 registration. For the reasons set out in detail above, we find that Qwest has failed to offer clear and convincing evidence to establish each essential element of the alleged fraud committed on the PTO in the '618 application. Therefore, Qwest's Motion for Partial Summary Judgment on this ground is *DENIED*.

S.D.Ind.,2003.
ISP.Net, LLC v. Qwest Communications Intern., Inc.
Not Reported in F.Supp.2d, 2003 WL 21254430 (S.D.Ind.)

END OF DOCUMENT

1992 U.S. Dist. LEXIS 6826, *

LEXSEE 1992 U.S. DIST. LEXIS 6826



Caution
As of: Jun 20, 2008

**KEEBLER COMPANY, Plaintiff, v. NABISCO BRANDS, INC., Defendant.**

**Civil Action No. 92 C 2848**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*1992 U.S. Dist. LEXIS 6826*

**May 18, 1992, Decided
May 19, 1992, Docketed**

**SUBSEQUENT HISTORY:**    Adopting Order of May 21, 1992, Reported at *1992 U.S. Dist. LEXIS 6987.*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff trademark holder sought a preliminary injunction against defendant infringer. The trademark holder claimed that its trademark and trade dress were infringed upon and commenced suit for the infringement as well as the infringer's violation of federal and state unfair competition statutes.

**OVERVIEW:** The trademark holder acquired the rights to the term "Supreme." The infringer sought to use the trade name for cookies. The trademark holder commenced suit in trademark and trade dress infringement with related causes of action for unfair competition under federal and state law and sought a preliminary injunction. The magistrate granted the injunction. The court held that: (1) there was irreparable harm if the injunction was not granted because there was no other remedy at law; (2) there was a less than negligible likelihood success on the merits on the trademark infringement claim because the trademark holder did not use the mark on cookies for 20 years; (3) however, there was a likelihood of success on the trade dress infringement claim because the trade dress of the trademark holder's product was inherently distinctive and there was likelihood of confusion because the trademark holder used the same basic elements in its trade dress for its "Supreme" cookies over the past 10 years that the infringer used; and (4) the balance of harms favored the trademark holder and the injunction was in the public interest because of the likelihood of confusion.

**OUTCOME:** The court granted the preliminary injunction against the infringer on the trademark holder's trade dress claim and enjoined the infringer from selling cookies of similar trade dress to the trademark holder.

**JUDGES:** [*1] GUZMAN

**OPINION BY:** RONALD A. GUZMAN

**OPINION**

Judge Marovich

Magistrate Judge Guzman

TO: HONORABLE GEORGE M. MAROVICH, JUDGE

UNITED STATES DISTRICT COURT

HONORABLE SIR:

*REPORT AND RECOMMENDATION of Magistrate Judge Ronald A. Guzman*

*FINDINGS OF FACT*

1. Plaintiff, Keebler Company ("Keebler"), is a Delaware corporation with offices located at 677 Larch Avenue, Elmhurst, Illinois 60126.

2. Defendant, Nabisco Brands, Inc. ("Nabisco"), is a Delaware corporation and is doing business at 1700 Higgins Road, Des Plaines, Illinois 60018.

3. Both are leading manufacturers of cookies in direct national competition with each other.

4. Nabisco's products bear its well-known Nabisco name and red triangle logo (Thomas). Keebler's products bear its well-known Keebler name and tree design logo (Hanna, Thomas).

5. This action arises under the Trademark and Unfair Competition Laws of the United States (*15 U.S.C. § 1051, et seq.*), as hereinafter more fully appear, and jurisdiction is based upon *15 U.S.C. § 1121, 28 U.S.C. § 1331*, and *28 U.S.C. § 1338*.

6. Venue is proper in the Northern District of Illinois under *28 U.S.C. § 1391(b)* and under *28 U.S.C. § 1391(c)* because Nabisco is subject to personal **[*2]** jurisdiction in this District and therefore, for purposes of venue, resides in this District.

7. This action was commenced on April 29, 1992, by the filing of a Complaint for Injunctive and Other Relief. A Motion for a Temporary Restraining Order was filed the same day, and the Motion was heard by Judge Marovich on April 30, 1992. On May 1, 1992, Keebler's Motion for Preliminary Injunction was set for hearing, and the hearing was held on May 8, 10 and 11, 1992.

8. Count I of the Complaint alleges trademark and Trade Dress infringement pursuant to *15 U.S.C. § 1125(a)*. Count II of the Complaint alleges trademark infringement pursuant to *15 U.S.C. § 1114(1)*. Count III of the Complaint alleges common law unfair competition under the laws of Illinois and other states. Count IV of the Complaint alleges deceptive and unfair trade practices, pursuant to the Illinois Uniform Deceptive Trade Practices Act, Ill. Rev. Stat. Ch. 121 1/2, § 311, et seq. Count V of the Complaint alleges common law and statutory dilution, pursuant to the Illinois Anti-Dilution Act, Ill. Rev. Stat. Ch. 140, § 22, et seq. Count VI of the Complaint alleges unfair trade practices, pursuant to the Consumer Fraud and **[*3]** Deceptive Business Practices Act, Ill. Rev. Stat. Ch. 121 1/2, § 261, et seq.

9. For over 130 years, Keebler and its predecessor companies have actively engaged in the business of manufacturing and marketing snack items, including cookies, crackers and more recently, salty snacks. Keebler is one of the nation's largest manufacturers of such goods and extensively markets and advertises its products throughout the United States to retail, convenience and food service customers. Keebler also manufactures and sells prepared food products, such as lasagna through its food service division.

10. Keebler's predecessor companies first began selling cookies under the "Supreme" trademark in 1912.

11. Keebler has sold a variety of products, including cookies and currently sells lasagna under its "Supreme" trademark.

12. Keebler is the owner of the following subsisting United States Trademark registration for its "Supreme" trademark:

| REG. NO. | ISSUE DATE | MARK | GOODS |
|---|---|---|---|
| 124,976 | 04/01/19 | Supreme | cookies, crackers, cookie and cracker |
| | | | sandwiches, biscuits, wafers, and ice |
| | | | cream cones |
| | | | |
| | | Plaintiff's Exhibit 20 | |

13. In October 1991, Nabisco began development of a pecan shortbread **[*4]** product to be sold under the mark "Pecan Supremes." As of this time, Nabisco has not yet begun to sell products under the "Pecan Supremes" mark.

1992 U.S. Dist. LEXIS 6826, *

14. As between the parties, Keebler was the first to adopt and use the trademark "Supreme" for cookies and is the present user of the mark on lasagna.

15. Cookies, crackers and a wide variety of other products bearing the "Supreme" trademark were sold by Keebler or its predecessors-in-interest throughout the United States up until the late 1960's. However, Keebler has not used the "Supreme" trademark in commerce for cookies, crackers or baked goods since the late 1960's (Plaintiff's Exhibits 21-23, 31; Hanna, Stevens).

16. Beginning about 1983, Keebler spent considerable time and money developing a line of premium-priced cookie products termed the "International Classics" line and including one cookie product proposed to be sold under the trademark "Coffee Supremes." This product however was never sold (Plainiiff's Exhibits 24-27).

17. Subsequently, the Keebler's "Supreme" trademark has been often considered for use by Keebler in connection with cookie concepts and products.

18. In January 1991, Keebler's Food Services division began **[*5]** selling a lasagna product under the "Supreme" mark. "Supreme" lasagna is marketed to the food service industry and food service operators and is sold at grocery store deli counters and is served at restaurants, hospitals and schools throughout the United States (Plaintiff's Exhibit 53).

19. Sales for "Supreme" lasagna were approximately 1.2 million dollars in 1991 and have surpassed $ 500,000 in the first quarter of 1992.

20. Keebler's "Supreme" lasagna is Keebler's most extensively advertised frozen product. Advertisements and coupons for it appear in a variety of magazines, and table tents bearing the mark are used in restaurants (Plaintiff's Exhibits 50-52).

21. The market for Keebler's lasagna however is the trade, e.g., restaurants, hospitals, and schools; the product is not sold on grocery or supermarket shelves (Goodman).

22. Other than the evidence of lack of actual use no other evidence of intent to abandon has been presented.

23. Pecan shortbread cookies are part of a known and defined segment of the cookie market called "fruit and nut" cookies.

24. Keebler sells and has sold for over thirty-five years its shortbread cookies, baked with pecans, under its "Pecan Sandies" **[*6]** trademark (Plaintiff's Exhibits 1, 3A-3H).

25. Keebler is the owner of the following United States Trademark registration for its "Pecan Sandies" trademark:

| REG. NO | ISSUE DATE | MARK | GOODS |
|---|---|---|---|
| 648,660 | 07/16/57 | | Pecan cookies, crackers, |
| | | Sandies | and cracker sandwiches, biscuits, |
| | | | wafers, and ice cream cones |
| | | | |
| | | Plaintiff's Exhibit 2 | |

26. Since their introduction, Keebler's "Pecan Sandies" cookies have been widely marketed, and Keebler has spent substantial sums of money, time and effort to promote and advertise its "Pecan Sandies" cookies.

27. Keebler's "Pecan Sandies" cookies are distributed nationwide and are Keebler's second largest selling cookie, representing 13% of Keebler cookie tonnage (Plaintiff's Exhibit 56).

28. The volume of Keebler's "Pecan Sandies" shortbread cookies sold is over 12 times that of Nabisco's "Pecan Shortbread," and Keebler's "Pecan Sandies" cookies are the leading selling shortbread cookie product in the market (Plaintiff's Exhibit 56).

29. Keebler advertises and has advertised its "Pecan Sandies" cookies through magazine advertisements, television commercials, national and local coupons, mass-transit billboard advertising and free standing **[*7]** inserts ("FSI's") placed in major metropolitan area newspapers (Plaintiff's Exhibits 4-19).

30. For the period January 1, 1983 to December 31, 1992, Keebler has spent and will spend in excess of $ 20 million to advertise and promote its pecan shortbread cookies.

31. In addition, Keebler also appears at national trade shows and provides sales materials for its various cookie products, including its "Pecan Sandies" cookies.

32. As a result of this extensive advertising and promotion and the public's acceptance of the product, Keebler's "Pecan Sandies" cookies have become the best selling shortbread cookie in the United States with sales in excess of $ 60 million dollars annually.

33. Since at least 1981, Keebler's "Pecan Sandies" pecan shortbread cookies have been sold in a Trade Dress consisting of at least the following elements: a yellow background color applied to the specific configuration of the generally rectangular cookie package; Keebler's trademark, "Pecan Sandies;" the phrase, "Rich Shortbread Cookies With Crunchy Pecans;" a brown-colored lettering for the mark and descriptive phrase; stacking of the words of the mark; the serif type style of the mark; and the photographs [*8] of several cookies arranged together and of pecans, appearing on the front panel (Plaintiff's Exhibit 3D through 3I) (the current package).

34. No packaging for any pecan or other shortbread cookie now on the market utilizes the exact same combination of elements arranged in the same exact manner.

35. There was testimony by some of the witnesses that yellow is generally believed in the industry to connote a "rich buttery" flavor and of course, the words "rich shortbread cookies with crunchy pecans" is descriptive of certain characteristics of the cookies themselves; as are the pictures of the cookies and pecans on the front of the package. Therefore, there is some evidence that several of the elements of Keebler's "Pecan Sandies" Trade Dress are functional.

36. Keebler's pecan shortbread cookies in its current "Pecan Sandies" Trade Dress have, for over ten years, been widely marketed to the grocery trade and advertised and extensively offered to the public throughout the United States, under both its registered trademark "Pecan Sandies" and its Trade Dress. By virtue of such long and extensive use, Keebler's "Pecan Sandies" mark and its "Pecan Sandies" Trade Dress have gained widespread [*9] and favorable public acceptance and recognition by both the trade and the public.

37. Keebler's "Pecan Sandies" Trade Dress has acquired strong secondary meaning in the minds of the public who equate the "Pecan Sandies" Trade Dress with Keebler as the source of products bearing this appearance.

38. Nabisco is the largest manufacturer of cookie products in the United States.

39. For many years to the present, Nabisco has been selling a pecan shortbread product under the mark "Pecan Shortbread."

40. The packaging for Nabisco's currently marketed "Pecan Shortbread" is a white package with blue lettering (Plaintiff's Exhibit 30).

41. In September of 1991, Nabisco's marketing group recommended that Nabisco introduce a new shortbread product specifically targeted at Keebler's pecan shortbread cookie market share (Plaintiff's Exhibit 62; Tessler Deposition, pp. 145 and 150). Sharon Tessler, one of Nabisco's Associate Product Managers, circulated a memorandum to the marketing group noting that "the "Pecan Sandies" name and impactful package bring equity to Keebler's franchise. In contrast, Nabisco's Pecan Shortbread has no brand name, and its recessive package does not stand out on the [*10] shelf" (Plaintiff's Exhibit 56).

42. Taste tests were conducted of Nabisco's pecan shortbread cookie versus Keebler's "Pecan Sandies" cookies (Plaintiff's Exhibit 62; Tessler Deposition, p. 200).

43. In January or February of 1992, Nabisco's marketing department also suggested the introduction of a "Mini Pecan Supremes" to directly challenge Keebler's "Bite-Size "Pecan Sandies." A die roll was ordered for the Nabisco's "Mini "Pecan Sandies"" specifically based upon the size of Keebler's "Mini "Pecan Sandies" product (Plaintiff's Exhibit 54).

44. Nabisco's marketing department also suggested that the new pecan shortbread cookie should retail at $ 2.99. This is the same price as Keebler's "Pecan Sandies" shortbread cookies (Plaintiff's Exhibit 62; Tessler Deposition, p. 185).

45. Several names were considered for Nabisco's new pecan shortbread product, including "Pecan Shorties," "Pecan Scotties" and "Pecan Supremes."

1992 U.S. Dist. LEXIS 6826, *

46. Nabisco selected the name PECAN SUPREMES based on a name selection contest conducted among its sales force. The name PECAN SUPREMES was proposed by 29 people (Tessler).

47. When Nabisco's attorneys discovered a federal registration for the mark "Scottie" for **[*11]** candy, Nabisco had outside counsel contact Scott's of Wisconsin, the owner of that registration, and proposed that Scott's assign its "Scottie" trademark to Nabisco or alternatively consent to Nabisco's use of the "Pecan Scotties" mark. However, Scott's declined to accept Nabisco's proposal.

48. On September 30, 1991, attorneys for Nabisco ordered a trademark search of the "Pecan Supremes" mark from Corsearch. The results of the search were received by Nabisco on or about October 1, 1991 and revealed Keebler's federal registration of the mark "Supreme" for cookies (Defendant's Exhibit AA).

49. In October 1991, after reviewing that information, Mr. Hartman advised the marketing group that the mark PECAN SUPREMES was available and on 10/2/91 filed an application to register PECAN SUPREMES (Hartman; D. Exhibit BB).

50. Although Nabisco was aware of Keebler's registration of "Supreme" in October 1991, no one at Nabisco investigated the use or non-use of the Keebler's "Supreme" mark prior to filing an application to register "Pecan Supremes" or prior to granting approval for Nabisco's adoption and marketing a line of pecan shortbread cookies under the "Pecan Supremes" trademark.

51. **[*12]** The marketing department received the legal department's approval for the yellow-gold "Pecan Supremes" Trade Dress on December 23, 1991 (Plaintiff's Exhibit 55).

52. In January, Nabisco's "Pecan Supremes" packaging went into production (Plaintiff's Exhibit 62; Tessler Deposition, p. 193).

53. On January 6, 1992, Nabisco's Intent-to-Use application for the mark "Pecan Supremes" was rejected by the Patent and Trademark Office on the grounds that it was likely to cause confusion with Keebler's federal registration for its "Supreme" mark (Defendant's Exhibit 66). The trademark examiner did not cite Keebler's registration of the Pecan Sandies mark against Nabisco's application for registration of Pecan Supremes (Hartman, Spatz).

54. On or about January 20, 1992, Mr. Hartman instructed Ms. Richard, a secretary of his office, to contact Keebler's customer service department to determine if Keebler had any use of the mark SUPREME. Ms. Richard regularly conducts such searches for Mr. Hartman as part of her duties at Nabisco. Ms. Richard was advised by the customer service department at Keebler that Keebler did not use the SUPREME mark for cookies. Within a day or two Ms. Richard also checked **[*13]** all available Keebler packaging at a grocery store and determined that none of the Keebler cookie packages displayed the word SUPREME (Hartman).

55. On January 22, 1992, Nabisco entered into a contract with Valassis Inserts for the insertion of FSI's promoting its "Pecan Supremes" shortbread cookies in newspapers nationwide. Nabisco paid $ 128,902 as the cost of this promotion (Plaintiff's Exhibit 60). The cost of the coupon redemption to Nabisco was estimated to be between $ 700,000 and $ 750,000 (Plaintiff's Exhibit 62; Tessler Deposition II, p. 71). So while it knew that Keebler owned the trademark "Supreme" for cookies and on the strength of a phone call to Keebler's consumer information number and a walk through of one grocery store, Nabisco committed to over $ 100,000.00 worth of advertising and promotions.

56. On or about January 31, 1992, after Nabisco had already begun plans and expended money to advertise its "Pecan Supremes" cookies, Joanne Spatz, one of Keebler's attorneys, was contacted by Mr. Hartman and was asked to consent to Nabisco's registration of its proposed "Pecan Supremes" trademark in connection with cookies. Mr. Hartman represented that the U.S. Patent **[*14]** and Trademark Office Examiner had rejected Nabisco's attempt to register "Pecan Supremes."

57. On February 27, 1992, Mr. Hartman received a letter from Ms. Spatz dated February 18, 1992, stating that Keebler would not consent to Nabisco's request for consent to use of the mark "SUPREME." In the letter Ms. Spatz said: "If Keebler were to consent to Nabisco's use and then decided to introduce its own 'SUPREME' product, the likelihood of confusion would be significant" (Hartman).

58. On or about March 19, 1992, notwithstanding Keebler's explicit refusal to consent to Nabisco's use of the "Supreme" trademark, Keebler learned that Nabisco had begun marketing to the trade of a sample "Pecan Supremes" pecan shortbread cookie package and thereafter obtained a sample package of Nabisco's "Pecan Supremes."

Case 1:08-cv-00526    Document 129    Filed 06/21/2008    Page 45 of 128

Page 6
1992 U.S. Dist. LEXIS 6826, *

59. On March 23, 1992, Ms. Spatz contacted Mr. Hartman by telephone and again reiterated Keebler's position concerning Nabisco's use of the "Supreme" trademark. She also advised Mr. Hartman of Keebler's concern over the similarities between Keebler's Trade Dress for its "Pecan Sandies" shortbread cookies, and Nabisco's yet to be introduced "Pecan Supremes" packaging.

60. On March 25, 1992, [*15] after Ms. Spatz's call, Nabisco revised its contract with Valassis Inserts to increase the number of newspapers in which its "Pecan Supremes" FSI's would appear and agreed to pay an additional sum of money for the expanded service (Plaintiff's Exhibit 59).

61. On April 1, 1992, Craig S. Stevens, Vice President, General Counsel and Secretary of Keebler telephoned James A. Kirkman, Senior Vice-President, General Counsel and Secretary of Nabisco to reiterate Keebler's position that Nabisco's sample pecan shortbread packaging infringed not only Keebler's established Trade Dress for its shortbread cookie packaging, but also Keebler's federally registered "Supreme" and "Pecan Sandies" trademarks. Mr. Kirkman indicated that he was not aware of the problem or Nabisco's new sample packaging for its proposed product and promised to call Mr. Stevens back.

62. Late on April 16, 1992, Mr. Kirkman telephoned Mr. Stevens and offered to modify the background color of the sample package at a future date. However, he said Nabisco planned to continue to use the objected-to-package to introduce its product and to leave that package on the market until all inventory was sold.

63. On April 24, 1992, [*16] Nabisco sent Keebler a letter stating, in part: "As I advised you on April 16, Nabisco would be willing to accommodate Keebler by changing the color of the package to a buff tan (specimen enclosed). We have, at least for the time being, stopped further printing of the yellow bag, and can also confirm that we could begin packaging product in the new bag on or about May 11. On that schedule, we would expect to exhaust our inventory of product in the yellow bags by mid-June." Nabisco sent a sample of the proposed package with the April 24, 1992, letter (Stevens, Hartman; Exhibit V).

64. Despite Keebler's stated objections and the Patent and Trademark Office's refusal to register the "Pecan Supremes" mark, Nabisco continued to market and advertise to the trade and has plans to advertise and sell to the public, commencing on May 17, 1992, pecan shortbread cookies in packaging bearing a substantially similar to Keebler's established "Pecan Sandies" Trade Dress. As of this date, Nabisco has produced 3.2 million packages of its "Pecan Supremes" in the complained of packaging and has distributed these packages to 130 distribution centers nationwide. All of these packages, with the exception [*17] of some shipped to stores in Indianapolis, remain in Nabisco distribution centers and under Nabisco's control.

65. Keebler never responded to Nabisco's request for information to show it had use of the SUPREME mark for any goods and never mentioned the use of SUPREME for lasagna (Hartman).

66. A variety of package designs were considered for the new product. A warm buttery color was desired, somewhere between off white and golden. Initially a buff background color was favorably considered. But this color was abandoned at the objection of the sales force. (Plaintiff's Exhibit 62;, Tessler Deposition, pp. 158-159).

67. Side-by-side comparisons were made of Keebler's "Pecan Sandies" Trade Dress and the proposed "Pecan Supremes" package by Nabisco's marketing department. No brand of pecan shortbread cookies except Keebler's "Pecan Sandies" cookies were present or compared to Nabisco's "Pecan Supremes" package at various Nabisco marketing meetings concerning the "Pecan Supreme" package because the marketing department was unaware of and unable to find any other brands of pecan shortbread either in local markets or through an Info Scanning data base (Plaintiff's Exhibit 62; Tessler Deposition, [*18] pp. 167-170).

68. An initial descriptor was considered for the new product consisting of the phrase "Rich Shortbread Cookies, Loaded with Pecans." When this phrase was rejected by the Sales Department as being too "blue-collar," the descriptor phrase "Rich Shortbread Cookies Baked with Crispy Pecans" was substituted and appears on Nabisco's "Pecan Supremes" current packaging (Plaintiff's Exhibit 62; Tessler Deposition, pp. 166, 173, 179).

69. After the initial buff background color was rejected by the Sales Department, a variety of other background colors were considered, including green and magenta. Ultimately, it was decided to use a yellow-gold color for the package's background (Plaintiff's Exhibit 62; Tessler Deposition, p. 160).

70. Nabisco also planned to initiate a promotion for the period May 17, 1992 to June 7, 1992 whereby purchasers of Keebler's "Pecan Sandies" shortbread cookies would be given a coupon for Nabisco's "Pecan Supremes' cookies at the check-out line (Plaintiff's Exhibit 62, Tessler Deposition, pp. 189-190).

71. The word "Supremes" in Nabisco "Pecan Supremes" mark is virtually identical to Keebler's federally registered "Supreme" mark.

72. A close inspection [*19] of the two trademarks reveals that Nabisco's "Pecan Supremes" mark also closely resembles Keebler's "Pecan Sandies" mark in sound and sight. Both marks contain the same number of syllables; they have the same stress pattern, with primary accent on the first syllable and secondary accent on the second syllable of both words. The initial and final sounds of "Sandies" and "Supremes" are also acoustically similar. Therefore, the marks are similar in sight and sound.

73. The descriptors of both products are also very similar in sight and sound. Keebler's "Rich Shortbread Cookies With Crunchy Pecans" is very similar to Nabisco's "Rich Shortbread Cookies Baked With Crispy Pecans".

74. Although not exactly the same, both Keebler's and Nabisco's packaging include similar shades of yellow applied to the background, shades of brown either for or around the lettering for the mark and descriptive phrase; stacking of the words of the trademark; some similarities in the type style; and photographs of several cookies and pecans arranged around the cookies, appearing on the front panel and in identical locations on the side panel.

75. The "Pecan Supremes" package has bolder and more centralized [*20] lettering for the trade mark with a burgundy color surrounding the trade mark, the word "PECAN" is in white upper case lettering, as opposed to Keebler's brown lowercase lettering, and the "Pecan Supremes" logo is more dominant of the packaging than is Keebler's "Pecan Sandies." The Nabisco package also has the word "new!" in somewhat smaller type - but in the color red.

76. The "Pecan Sandies" package has a seal proclaiming it to be America's most popular shortbread cookie and on the lower right hand front of the package in yellow and white smaller type set in strips of blue and red background, an announcement that the product is "Low Cholesterol" and "Low in Saturated Fat." The "Pecan Supremes" package does not have either of these elements.

77. The "Pecan Sandies" of course have the "Keebler" brand name and distinctive logo and the "Pecan Supremes" have the "Nabisco" brand name and distinctive logo on the upper left hand corner of the package - the usual placement which the consumer is undoubtedly accustomed to.

78. A close comparison of the two packages results in a finding that they do project the same overall visual image due mainly to the size and shape of the bag, the background [*21] color, the use of the similar trademarks and descriptions and the pictures of the cookies and pecans which are prominently displayed.

79. Various elements of the PECAN SUPREMES package are common to other Nabisco packages. The use of the rectangular bag is common to Nabisco. Most of Nabisco's packages feature product photographs. Nabisco sells other cookies in predominantly yellow packaging and uses a stacked arrangement of words for many of its brand names (Thomas; Exhibit A-D, S and T).

80. Nabisco intends that its PECAN SUPREMES product will compete directly with Keebler's PECAN SANDIES product. There is no direct evidence, however, that Nabisco attempted to copy Keebler's packaging or trade on Keebler's goodwill by adopting a confusing package (Tessler, Thomas).

81. The product in the packaging is of course, of the same type, namely, pecan shortbread cookies. The goods of both parties will be sold in the same stores and will be marketed in the same aisle of such stores.

82. The goods are also marketed to the same consumers. In fact, Nabisco was aware of the characteristics of the typical purchaser of Keebler's "Pecan Sandies" and intended to target this same consumer group. [*22] Nabisco also intends to take advantage of the similarity of consumers through a coupon promotion whereby purchasers of Keebler's "Pecan Sandies" cookies would be given a coupon for Nabisco's "Pecan Supreme" cookies (Plaintiff's Exhibit 62, Tessler Deposition, pp. 189-190).

83. The two products are also to be the same weight for substantially the same price (at $ 2.99).

84. A further factor to consider is that Nabisco chose to go ahead with production and substantial expenditures in advertising commitments of its trademarks and trade dress for its new pecan shortbread cookies after having actual no-

tice of Keebler's registrations and rights in the trademarks "Supreme" and "Pecan Sandies" and with the knowledge that Keebler was objecting to its trade dress.

85. Nabisco began production and sales to retailers of its PECAN SUPREMES product in February and March 1992. In that same time period, Nabisco purchased newspaper coupon advertising. The PECAN SUPREMES newspaper advertising is part of a group advertisement depicting the advertisements of other companies as well as Nabisco, has already been printed and will be distributed by an independent company on May 31, 1992. The advertisement [*23] is no longer in Nabisco's control and cannot be cancelled by Nabisco (Thomas, Lees).

86. Prior to the filing of this suit, retailers around the country had also made commitments to run their own newspaper advertising for the PECAN SUPREMES product based on Nabisco's commitment to begin distribution of the product for sale during the week of May 17. That retailer advertising will begin the week of May 17, 1992, is not in Nabisco's control and cannot be cancelled by Nabisco (Thomas, Lees).

87. Prior to this suit, Nabisco stopped printing the yellow packaging. Nabisco has approximately 3.2 million filled packages of cookies in the yellow package. These are located in about 105 Nabisco distribution centers around the country ready for delivery to retailers. The cost of the filled packages is about 3.7 million dollars (Thomas, Lees).

88. Nabisco has agreed to replace the yellow package with a buff-tan colored package pending the final resolution of this lawsuit. That package is in production, and Nabisco has destroyed 10% of its yellow packaging which was not already filled. Nabisco expects that its existing inventory of yellow packages should be sold out of the stores by mid-June, [*24] or within about 35 days. Nabisco is also prepared to put a 1-1/4" x 1-3/8" blue sticker bearing the words "New! From Nabisco" on each of its yellow packages to further emphasize that it is a Nabisco product (Thomas, Lees).

89. Nabisco's sales force has been instructed to place Nabisco's PECAN SUPREMES cookies in the middle of the Nabisco cookie section of grocery stores next to Nabisco's CHIPS AHOY cookies.

90. Cookies of the type at issue in this case are sold through grocery outlets. Both Keebler and Nabisco distribute their products to grocery outlets using mainly their own sales forces which are responsible for shelving the products in the stores to the extent the retailers allow this. Cookie products are often, but not always shelved according to manufacturer, that is, all of the Nabisco products in one section, all of the Keebler products in their own section, and so forth. Store brands are usually placed between the Keebler and the Nabisco product sections (Hanna, Thomas, Lees). At least one major retailer however, Kroger, shelves cookies according to type of cookie and not according to manufacturers. In this major chain, the two packages in question here may very well appear [*25] next to each other in head to head competition (Hanna).

91. It is common in the cookie and cracker market to find similar product types in similar package colors. Historically, Nabisco, Keebler and other manufacturers have marketed similar product types with similar package colors. For example, both Nabisco and Keebler sell vanilla wafer products in yellow packaging, as do many other manufacturers. Nabisco, Keebler and other manufacturers sell products like Nabisco's RITZ crackers in red packaging and products like Keebler's CLUB crackers in green packaging. Products like Nabisco's OREO cookies are commonly sold in blue packaging. Several manufacturers use yellow-gold packaging for pecan shortbread cookies (Hanna, Lees).

92. Virtually every color is in use by cookie manufacturers, making it almost impossible to select new colors without using a color already in use. The primary colors - red, yellow and blue - are widely used (Lees).

93. Many manufacturers use yellow as a packaging color for cookies and crackers. In addition to the PECAN SUPREMES product, Nabisco uses yellow packaging for a number of products, including FIG NEWTONS, LORNA DOONE, TEDDY GRAHAMS, and NILLA WAFERS.

[*26] 94. Since consumers when selecting cookie and cracker products in stores are often confronted with a wide array of similarly colored cookie and cracker products, it is probable that such consumers are less likely to be confused or misled merely by similarities in the color of packaging.

95. Keebler has regularly changed the package design of its PECAN SANDIES product, but since the early 1980's the changes have been small details. The current package (Plaintiff's Exhibit 3-I) was adopted in 1991. Keebler first used a similar trade dress with different shades of yellow in the early 1980's. Keebler no longer claims rights in the shades of yellow it used prior to the current package (Hanna).

96. Nabisco would suffer harm if enjoined from selling its existing inventory of product on the currently scheduled dates. First, it would have to destroy 3.7 million dollars worth of product. The cookies could not be repackaged because

1992 U.S. Dist. LEXIS 6826, *

they are fragile and would be damaged from the handling that would occur if repackaging were attempted. If the packages were over-wrapped or if the package or logo was covered, the product would not be marketable because consumers would think it was a reject or **[*27]** had been tampered with. Finally, the product has a limited shelf life and would not be of marketable quality if stored pending the final outcome of this case (Thomas, Lees).

97. The most serious harm to Nabisco would be with its customer and consumer relations. Nabisco has made commitments to retailers to delivery product for sale beginning the week of May 17. Based on those commitments, retailers have committed to newspaper advertising, which in turn will create consumer demand for the PECAN SUPREMES product. The failure to make the product available as advertised is unprecedented in Nabisco's history. If the product is not delivered, consumer expectations will be damaged at the expense of both Nabisco and its retailers. The failure to have the product available might suggest to some a recall for health reasons and therefore tarnish Nabisco's reputation for wholesome, quality products. Retailers will be angry with Nabisco for not fulfilling its commitments. That reaction will damage Nabisco's ability to obtain future retailer commitments for product and will damage the relationship of trust formed between retailers and the Nabisco sales force. Nabisco has about 100,000 retail accounts **[*28]** and estimates that the losses that would accrue from the damage to its relations with retailers from the failure to fulfill its commitments on PECAN SUPREMES would be hundreds of millions of dollars (Thomas, Lees).

98. Keebler's evidence of injury is by necessity less concrete, since the events that could cause that injury have yet to occur. Mr. Hanna testified that the PECAN SUPREMES product could cause a short term down turn in sales. In the long run he stated there was "a possibility" of dissatisfied customers if the product did not meet their expectations. If the quality was poor, Keebler "could possibly" lose customers on a permanent basis. Even if the quality was good, Mr. Hanna stated he "believes" the sale of the PECAN SUPREMES product would damage the distinctiveness of Keebler's trade dress (Hanna).

*CONCLUSIONS OF LAW AND DISCUSSION*

This is an action for trademark and trade dress infringement with related causes of action for unfair competition under federal and state law. Keebler seeks a preliminary injunction against Nabisco's introduction of its Pecan Supreme pecan shortbread cookies. A preliminary injunction is an extraordinary remedy. *Fox Valley Harvestore, Inc. v. A.O. Smith Harvester Products, Inc., 554 F.2d 1096, 1097 (7th Cir. 1976)*. **[*29]** To obtain preliminary injunction relief, Keebler must establish the following factors:

> 1. That there is no adequate remedy at law which exists and that irreparable harm will be suffered by it if the injunction is not issued;

> 2. That the irreparable harm suffered by Keebler if the injunction is denied outweighs the irreparable harm which will be suffered by Nabisco if the injunction is erroneously granted;

> 3. That it, Keebler, has a reasonable likelihood of prevailing on the merits; and

> 4. That the injunction will serve the public interest.

*Turtle Wax, Inc. v. First Brands Corp., 781 F.Supp. 1314, 1317 (N.D. Ill. 1991)*, citing *Somerset House, Inc. v. Turnock, 900 F.2d 1012, 1014-15 (7th Cir. 1990)*.

Each element must be shown before an injunction will issue. The 7th Circuit has held that the injunction test involves a "sliding scale" which requires a plaintiff to show substantially greater relative harm if it has a poor likelihood of success on the merits. *Roland Machinery Co. v. Dresser Industries, Inc., 749 F.2d 380, 392 (7th Cir. 1984)*.

*IRREPARABLE HARM*

It has generally been **[*30]** held that the damages suffered due to unfair competition are, by their very nature, irreparable and very difficult, if not impossible, to measure in terms of monetary damages. *A.G. Canfield Co. v. Vess Beverages, Inc. 612 F.Supp 1081, 1089 (N.D. Ill. 1985)*, affirmed *796 F.2d 903 (7th Cir. 1986)*. One of the reasons for this is that the loss of confidence in the consumer may not be felt immediately and is inherently difficult to measure, as

is damage to one's reputation in the marketplace. In *Wesley - Jessen Division of Schering Corp. v. Bausch and Lomb, Inc., 698 F.2d 862, 867 (7th Cir. 1983)*, the Appellate Court held "Courts readily find irreparable harm in trademark infringement cases because of the victim's inability to control the nature and quality of the infringer's goods. " As pointed out in the Findings of Fact above, although it is not possible at this time for direct and concrete evidence of irreparable injury to be offered because the sale of the alleged infringing product has not yet commenced, the possibility of loss of market share and damage to reputation, all due to consumer confusion, is sufficient to establish **[*31]** irreparable harm to the plaintiff.

### *LIKELIHOOD OF SUCCESS ON THE MERITS*

#### Federal Trademark Infringement

In order to show a likelihood of success on the merits as to its trademark infringement case, Keebler must prove its ownership of a valid trademark and that the use of the mark being challenged is likely to cause confusion among the consumers. *Munters Corporation v. Matsui American, Inc., 909 F.2d 250, 252 (7th Cir. 1990)*. As noted in factual finding no. 12 above, Keebler is the owner of Trademark Register No. 124976 for the trademark "Supreme" for goods, including cookies, crackers, sandwiches, wafers, and ice cream cones. This is *prima facie* evidence of the validity of the registration of Keebler's ownership of the mark and of Keebler's exclusive right to use the mark on cookies and other included products. *Ye Olde Tavern Cheese Products, Inc. v. Planters Peanuts Division Standard Brands, Inc., 261 F.Supp. 200 (N.D. Ill. 1966)*, affirmed *394 F.2d 833 (7th Cir. 1966)*. Rights in trademarks, however, arise from use, not merely from registration. *John Morrell and Company v. Reliable Packing Company, 295 F.2d 314, 316 (7th Cir. 1961)*. **[*32]** The Landham Act requires that the owner use its trademark in commerce in order to establish and preserve his exclusive rights therein. The term "use in commerce" means the bona fide use of a mark in the ordinary course of trade, and not merely to reserve a right and a mark. A mark shall be deemed used in commerce,

1. On goods when

a) it is placed in any manner on the goods or their containers or that it is placed associated therewith on the bags, tags, labels, affixed thereto, or if the nature of the goods makes such placement impracticable, then on the documents associated with the goods or their sale and

b) the goods are sold or transported within commerce, . . . *15 U.S.C. § 1127 (1990)*.

Section 45 provides that a mark shall be deemed to be abandoned:

1. When its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances. Non use for two consecutive years shall be *prima facie* evidence of abandonment. "Use" of a mark means the bona fide use of that mark made in the ordinary course of trade and not made merely to reserve a right in a mark. *Id. See also Roulo v. Russ Berrie & Company, Inc., 886 F.2d 931, 938 (7th Cir. 1989)*. **[*33]**

Abandonment of the defense to a claim of infringement of trademark rights and a ground for cancellation of Federal Trademark Registration under *15 U.S.C. § 1064*. Abandonment is also a defense to a claim of incontestable trademark rights.

The burden of proof as to abandonment is on the party asserting the abandonment. The party asserting abandonment must prove this by clear and convincing evidence. Proof of two years of non use creates a rebuttable presumption of abandonment. Once non use for two years is established, a burden of production to explain the non use or establish the existence of an intent to resume use arises on the part of the owner of the mark. This burden of production, however, requires only that the trademark owner produce evidence to rebut the presumption. Once this is done, the ultimate burden of persuasion of abandonment rests and remains with the party asserting the abandonment. *Roulo v. Russ Berrie, Inc., supra; Exxon Corporation v. Humble Exploration Co., Inc., 695 F.2d 96, 99 (5th Cir. 1983)*. A mere subjective intent to continue use, however, is not sufficient to overcome the *prima facie* evidence of abandonment, **[*34]** rather,

the owner must show specific plans for commercial use of the mark, not just an intent not to abandon. *Exxon Corporation v. Humble Exploration Company, Inc., supra at 102-103.*

As the factual findings above make clear, Keebler has shown direct and substantial evidence of the fact that it is now using the "Supreme" trademark on its product Bernardi's Supreme Lasagna. It has also shown tests, plans, and investment of funds in development of products which contemplated the use of the mark "Supreme," although it is uncontested that these other products never went to market. Defendant Nabisco emphasizes the fact that Bernardi's Supreme Lasagna is not a competing product, and that, therefore, the use of the mark "Supreme" in such a product is not sufficient to show use. This same issue was confronted by Judge Prentiss Marshall in *Sands, Taylor and Wood v. The Quaker Oats Company,* No. 84 C 8075, U.S. District Court, Northern District of Illinois, Eastern Division, decided December 20, 1990, Memorandum Opinion, not reported in Fed. Supp., also cited as 1990 WL 251914. At page 7, thereof, Judge Marshall states as follows:

> "Defendant's contention that plaintiff's [*35] only use of THIRST-AID is on the Murray's label at the institutional level, is clearly contrary to the law and the evidence. It is axiomatic that the trademark laws do not require direct competition between the party's products for an actionable infringement claim." *Union Carbide Corporation v. Ever-Ready, Inc., 531 F.2d 366, 382 (7th Cir. 1976).* Consequently, lack of direct competition does not support an abandonment defense. That plaintiff primarily used the THIRST-AID mark at the institutional level on ice cream toppings while defendant marketed its product at retail on an isotonic beverage does not constitute non use for purposes of abandonment. *Lyon Metal Products, Inc. v. Lyon, 134 U.S.P.Q. 31 (1962)* (Use of Trademark Through One Channel of Distribution does not constitute abandonment)."

This holding and reasoning is directly applicable to the case before us. Lack of direct competition between Bernardi's Supreme Lasagna, which is sold mainly on an institutional level and not to the retail public, and defendant Nabisco's "Pecan Supremes" does not support an abandonment defense. Judge Marshall goes on to note:

> "The totality of [*36] plaintiff's efforts to find a product at retail for THIRST-AID reflect a clear intent to exploit the market in the reasonably foreseeable future by permitting its use by others. *See, Silverman v. CBS, Inc., 870 F.2d 40, 47 (2nd Cir. 1989).*"

Similarly, in the case before us, Keebler has shown, as the factual findings above demonstrate, substantial efforts to exploit the mark "Supreme" and a substantial use of that mark in its Bernardi's Supreme Lasagna product. I therefore recommend that the court find that there has been no abandonment of the "Supreme" trademark by Keebler.

But, lack of abandonment is not enough in order for Keebler to maintain a trademark infringement action with respect to its mark "Supreme." Keebler must also establish that there is a likelihood of confusion in the consuming public for the use of that mark by Nabisco. *Henri's Food Products Company v. Kraft, Inc., 717 F.2d 352, 354 (7th Cir. 1983).* Unlike a patent or a copyright, a trademark does not grant a monopoly. The function of a trademark is to designate source, and its protection is accordingly limited to the prevention of likelihood of confusion. *United Drug Company v. Theodore Rectanus Co., 248 U.S. 90 [*37]* (918). A showing of a mere possibility of deception and confusion is not enough. *Nebraska Consolidated Mills Co. v. Shawnee Milling Co., 198 F.2d 36, 38 (10th Cir. 1952).* There must be proof that an appreciable number of potential purchases will, in fact, be deceived. *Restatement of Torts,* Sec. 728, comment (a) (1938). So in order to show that it is entitled to a preliminary injunction on the basis of its trademark "Supreme," Keebler must establish more than a mere possibility of deception or confusion. In making this determination, it has been held that the court must stand in the shoes of the ordinary purchaser and take into account the normally prevalent conditions of the market and the manner in which purchasers make their choices. *General Mills, Inc. v. Kellog Company, 824 F.2d 622, 627 (8th Cir. 1987).*

The fact that the term "Supreme" is itself a descriptive term, also works to make the likelihood of confusion weaker. Because it is less likely that in the mind of the consumer, the term will be seen as a trademark, as opposed to merely a descriptive word. It is also true that Keebler has not used the mark "Supreme" on a cookie product [*38] for more than twenty years. In fact, Keebler's exhibit no. 21 shows that at one time, Keebler did use the trade name or trademark "Supreme" in a large number of cookies, crackers, candies, and other snacks. But at that time it used the term

1992 U.S. Dist. LEXIS 6826, *

"Supreme" inside of a logo which included a depiction of a cooking pot with the further trade name "Kitchen Rich" in all of its products. This distinctive logo has not been used by Keebler for many years, and it is doubtful that any one in the public who observed the term "Supreme" on Nabisco's "Pecan Supremes" would confuse this product and take it to be one of Keebler's Supreme Kitchen Rich products of many years ago. Further, the evidence also shows that there are dozens of federal registrations of marks containing the work "Supreme" for food products. This fact, along with the fact of the lack of use by Keebler of the term "Supreme" on any cookie product for over twenty years, as well as the fact that the current use of the mark "Supreme" by Keebler is on a product that does not compete on any level with the product being complained of in this petition for relief, and the fact that the use of the term in its current lasagna product by Keebler [*39] differs significantly from the prior use of twenty years ago, which was at that time, prevalent and likely to have been easily recognized by the public, leads me to recommend that the court find that there is no likelihood that the consuming public will confuse the origin of Nabisco's "Pecan Supremes" by virtue of the use of the mark "Supreme." And I, therefore, further recommend that although abandonment of the "Supreme" mark has not been shown, that the court find that there is less than a negligible likelihood of success on the merits as to Keebler's Trademark Infringement action.

### Trade Dress Infringement

To establish a cause of action for trade dress infringement, Keebler must prove both 1) that the trade dress of its "Pecan Sandies" product is protectible - that is, it is inherently distinctive or has acquired secondary meaning, and 2) that there is a likelihood of confusion with respect to the original of the defendant's "Pecan Supremes" product. *See Roulo v. Russ Berrie & Company, 886 F.2d 931, 935 (7th Cir. 1989), cert. denied 493 U.S. 1075, 110 S.C. 1124 (1990).* As noted above, in order to show a protectible trade [*40] dress, Keebler must establish either that its trade dress is inherently distinctive, or that it has acquired secondary meaning in the marketplace. Two tests exits for analyzing the inherent distinctiveness of a trade dress:

    1) That enunciated by the 2nd Circuit in *Seabrook Foods, Inc. v. Bar-Well Foods, Limited 568 F.2d 1342 (C.C.P.A. 1977)* (the "Seabrook Test"), and

    2) the alternative test utilized by the 5th Circuit in *Chevron Chemical Co. v. Voluntarily Purchasing Groups, Inc., 659 F.2d 695,* (5th Cir. 1981) *cert. denied, 457 U.S. 1126, 102 S.C. 2947 (1982).*

To date, the 7th Circuit has not identified a definitive test to be applied in determining whether a trade dress is inherently distinctive. *Blue Coral, Inc. v. Turtle Wax, Inc., 664 F.Supp. 1153, 1160 (N.D. Ill. 1987)* (Aspen, J.). Given the 7th Circuit's silence as to which of the tests ought to be applied, if either, both Judge Aspen, in the *Blue Coral* decision and Judge Rovner, in *Turtle Wax, Inc. v. First Brands Corp., 781 F.Supp. 1314 (N.D. Ill. 1991)* have applied both tests in their analyses. [*41] I will do the same.

The principle rule of protectibility in inherently distinctive trade dresses, in the absence of secondary meaning was established in *Chevron Chemical Co. v. Voluntary Purchasing Groups, 659 F.2d 695, 702 (5th Cir. 1981) (cited with approval* by the 7th Cir. in *Blau Plumbing, Inc. v. S.O.S. Fix-It, Inc., 781 F.2d 604, 608 (7th Cir. 1986).* In *Chevron,* the plaintiff was unable to prove secondary meaning for a particular trade dress, despite the fact that the product had been on the market in the trade dress for over five years. The court there held that the trade dress of *Chevron's* product was a common-law trademark, and found that the colors of the trade dress presented in *Chevron's* particular geometric pattern created a distinctive visual impression. The court then concluded that a trade dress which was arbitrary and served no function either to describe the product or assist in its effective packaging would be protectible, even in the absence of a finding of secondary meaning. Under this holding then, the elements which must be established are 1) that the trade dress is arbitrary and 2) that the trade dress [*42] serves no function to either describe the product or assist in its effective packaging. Applying these legal principles to the facts, I find, and I recommend that the court find, that the "Pecan Sandies" trade dress is not inherently distinctive within the meaning of the law as delineated in the *Chevron* case.

The evidence, as summarized in the factual findings above, establishes the following. The trade dress that Keebler claims is protectible consists of the following elements:

1992 U.S. Dist. LEXIS 6826, *

    A yellow background color applied to the specific configuration of the generally rectangular cookie package; Keebler's trademark, "Pecan Sandies;" The phrase "Rich Shortbread Cookies With Crunchy Pecans;" a brown colored lettering for the mark and descriptive phrase. The stacking of the words of the mark the serif type style of the mark and the photographs of several cookies arranged together and of pecans appearing on the front panel (See Plaintiff's Exhibit No. 3D through 3I - the current package.)

    Clearly, the word "pecan" in Keebler's trademark "Pecan Sandies" is a descriptive word. It is functional in that it describes the product. As does the phrase "Rich Shortbread Cookies with Crunchy [*43] Pecans. " This phrase further describes the nature and quality of the product being sold and, as such, is certainly functional and not arbitrary or capricious. The photographs of the several cookies on the front of the package as well as the photographs of the pecans on the front of the package also are elements that are clearly functional in that they serve to describe again the product being sold. The configuration of the package being generally rectangular is not functional. It does not serve in any way to describe the product, nor is it necessary for efficient packaging. This element of the trade dress is, I believe, arbitrary as is the placement of the pictures of the cookies and the pecans, both with respect to each other and with respect to the package. Also arbitrary are the lettering on the package and the color and type style for the trademark and the descriptor. To a certain extent, the background color of yellow can also be said to be arbitrary, although this is somewhat blurred by the testimony of several witnesses that yellow is generally believed in the industry to connote a rich buttery flavor. If chosen for this purpose, then the color yellow becomes, to some degree [*44] at least, functional in its indirect description of the product. There was also some testimony by Nabisco executives that their choice of the color yellow for the "Nabisco Pecan Supremes" was influenced by the desire to get a color that is bright and stands out in a large shelf full of products. This, of course, would add another functional element to the color yellow. A consideration of the above elements leads me to conclude, and I recommend that the court find, that the "Pecan Sandies" trade dress, although it contains some arbitrary elements, is primarily functional in that it serves to describe the qualities of the product.

    As pointed out above, the 11th Circuit has adopted a different test to determine whether a trade dress is inherently distinctive, i.e., the "Seabrook Test." In the *Seabrook* case, the court set forth the key factors to consider when determining whether a design for a trademark is inherently distinctive. According to this test, the court must determine whether the design in question is a common basic shape or design. Whether it is unique or unusual in a particular field, or whether it was a mere refinement of a commonly adopted and well known form of ornamentation [*45] for the particular class of goods viewed by the public as a dress or ornamentation for the goods. The parties have essentially agreed in the presentation of their evidence that the two products in question will be sold in the same supermarket aisle and although the exact location of each of the cookies will vary from store to store, the two goods will find themselves generally placed in one of two ways. Either the cookies will be placed among all of the other cookie and snack type products of the particular brand, or they will be placed in direct competition with each other - that is, all cookies of the same type regardless of which brand name will be placed together for the consumer to view. Given this testimony, the field or class of goods to which Keebler's "Pecan Sandies" belongs. It is not limited merely to the segment or field of fruit and nut cookies, but rather we may expect it to be competing for the consumer's attention with a whole host of other types of cookies and crackers. When viewed against the backdrop of the large number of exhibits of other cookie products introduced both by the plaintiff and the defendant in this case, it is clear that the "Pecan Sandies" trade [*46] dress, although the exact combination of elements it contains is undoubtedly unique, the overall visual impression of the package is neither unique nor unusual in the field of goods, with which it competes. The generally rectangular package is common, as can be seen by comparing the same to Plaintiff's Exhibits no. 21 and 30, Defendant's Exhibit S, W, X, Y, and JJ. These exhibits and the testimony establish clearly that this particular rectangular type of packaging has been in existence for a long time and is used by a large number of different manufacturers for different cookie products. A cursory glance at almost every single package of cookies introduced into evidence, and there were at least thirty such, also establishes that photographs of the cookie products on the front of and on the side of the packaging is extremely common, almost universal, as is the use of descriptive phrases to describe the qualities of the product. As pointed out above in the factual findings, and again as can be seen by a review of the packages introduced into evidence, the color combination of yellow or yellow orange, or golden yellow with white or brown lettering is also neither unique or unusual, [*47] but no more than a refinement of common elements found in packaging of many different types of cookies, including Nabisco's Fig Newtons, Honey Teddy Grahams, Nilla Wafers, and Keebler's Vanilla Wafers, as well as Barton's Pecanorific Pecan Shortbread cookies, Food Lyon's Pecanorific Shortbread cookies, and Nature's Best Pecan Shortbread Cookies. Plaintiff's own exhibit no. 21 also contains numerous examples of previously used packaging containing shades of

yellow and brown. Neither can I find any evidence to support the conclusion that the stacking of the trademark name is unique or unusual. Quite the contrary appears to be true from all of the exhibits that have been introduced. A substantial number, if not an actual majority has the trademark stacked rather than stretched out along the lengths of the packaging. Based upon the above considerations, I conclude and I recommend that the court find that the plaintiff Keebler has failed to establish even a more than negligible likelihood of success in proving that its trade dress is protectible under the "Seabrook" standard.

Lacking in inherent distinctiveness then, Keebler must establish secondary meaning as the only other alternative [*48] to proving a protectible trade dress. The determination as to whether or not trade dress has acquired a secondary meaning is a question of fact. The following factors are to be considered in making such a determination:

a) Consumer testimony

b) Consumer surveys

c) Exclusivity, length and manner of use

d) Amount and manner of advertising

e) Amount of sales and number of customers

f) Established place in the market and

e) Proof of intentional copying

*Turtle Wax, Inc. v. First Brands Corp., 781 F.Supp. 1314, 1323 (N.D. Ill. 1991).*

There was no testimony or evidence presented with regards to consumer surveys, nor was their any consumer testimony. However, Keebler did establish both length and manner of use of its trade dress and a certain degree of exclusivity in that regard. As noted above in the factual findings, the evidence clearly supports the conclusion that Keebler has used the same basic elements in its trade dress for the "Pecan Sandies" cookies over the last ten years. Although there have been changes, I find that these changes have been small and insignificant and mainly in the form of details as [*49] opposed to any change in the overall visual impression of the package. The "Pecan Sandies" product in this particular trade dress has been widely marketed to the grocery trade and advertised extensively throughout the United States. This was specifically admitted in the testimony of Sharon Tessler, one of Nabisco's associate product managers who circulated a memorandum noting that "The Pecan Sandies name and impactful package bring equity to the Keebler Franchise. In contrast, Nabisco's pecan shortbread has no brand name and its recessive package does not stand out on

the shelf." Keebler's "Pecan Sandies" cookies are its second largest selling cookie, representing 13% of Keebler's cookie tonnage. "Pecan Sandies" for example, sell over 12 times in volume that which is sold by Nabisco's pecan shortbread cookie. Keebler's "Pecan Sandies" are the leading shortbread cookie product in the market in the United States. Keebler's advertising of its "Pecan Sandies" cookies includes magazine advertisements, television commercials, national and local coupons, mass transit billboard advertising and free standing inserts placed in major metropolitan area newspapers. For the period between January [*50] 1, 1983 to December 31, 1992, Keebler has spent and will spend in excess of 20 million dollars to advertise and promote its pecan shortbread cookies. Thus, Keebler, through its evidence has established both a substantial period of use of this particular trade dress, a large and varied amount of advertising, a pre-eminent place in the market of shortbread cookies in the United States, and that its sells a large amount of its "Pecan Sandies" cookies and has done so over the ten years in this particular trade dress. It is difficult to believe that a product could be so successful for so long without the formation of secondary meaning for its trade dress in the mind of the consumer. The only other pecan shortbread cookies of which any evidence was presented that appear in packaging which can be called in any way similar were regional brands that were not marketed throughout the entire United States and whose packaging is only somewhat similar to Keebler's "Pecan Sandies." A comparison of plaintiff's exhibit 3I, with defendant's exhibit W, X and Y is sufficient to establish that although there are some similarities in the package products, there are sufficient distinctions to allow Keebler [*51] to claim that its trade dress over the last ten years has been relatively exclusive. I therefore find, and I recommend that the court find, that Keebler has successfully established that it has a reasonable likelihood of success in establishing the element of secondary meaning on the merits at trial.

### Likelihood of Confusion

Having established a protectible trade dress by virtue of secondary meaning, it is now incumbent upon Keebler to prove that there is a likelihood of confusion with respect to the origin of Nabisco's "Pecan Supremes" package. *Roulo v. Russ Berrie & Co., supra.* I have already recommended to the court that it find there is no likelihood of confusion with respect to the assertion of trademark infringement. The issue which will now be addressed is the likelihood of confusion with respect to the trade dress of the two products.

Among the factors which are relevant to the determination of confusion are the degree of similarity between the trade dress in appearance and suggestion; the similarity of the products for which they are used; the area and manner of concurrent use; the degree of care likely to be exercised by consumers; the [*52] strength of plaintiff's mark and trade dress; evidence of actual confusion; and intent on the part of the alleged infringer. *International Kennel Club of Chicago, Inc. v. Mighty Star, Inc., 846 F.2d 1079, 1087 (7th Cir. 1988).* Although I had previously determined that there is no likelihood of confusion because of the use of the mark "Supremes" by Nabisco, for purposes of determining whether or not there is a likelihood of confusion due to the overall visual impression of the trade dress, it is appropriate to point out that Nabisco's "Pecan Supremes" mark very closely resembles Keebler's "Pecan Sandies" mark in both sound and sight. *See for example G. D. Searle & Co. v. Chas. Pfizer & Co., 265 F.2d 385, 387 (7th Cir. 1959).* The descriptors of both products are also extremely similar in sight and sound. Keebler's "Rich Shortbread Cookies with Crunchy Pecans" is very similar to Nabisco's "Rich Shortbread Cookies Baked with Crispy Pecans." Both packages include closely similar shades of yellow in the background. Similarities were also found in the shades of brown used for the lettering for the trademark and the descriptive phrases; the stacking [*53] of the words of the trademark; photographs of the several cookies and the pecans arranged the cookies which appear on the front panel and in identical locations on the side panels. To be sure, there are some differences. The "Pecan Supremes" package has bolder and more centralized lettering for the trademark with a burgundy color surrounding the trademark, the word "Pecan" is in uppercase white lettering as opposed to Keebler's lowercase brown lettering, and the "Pecan Supremes" logo is more dominant of the packaging than is Keebler's "Pecan Sandies." The Nabisco package also has the word "New!" in somewhat similar type, but in a red color. The "Pecan Sandies" package has a seal proclaiming it to be "American's Most Popular Shortbread Cookie" and on the lower right hand front of the package in yellow and white smaller type set in the background of strips of blue and red, it contains an announcement that the product is "low cholesterol" and "low in saturated fat." The "Pecan Supremes" package has none of these distinctions. Finally, both packages have the distinctive brand name and logo of the two well known companies. It is clear that neither of these two logos could ever be mistaken [*54] for the other.

The two products for which the trade dresses in question are being used are of course similar products. They are both shortbread cookies with pecans, and, as such, will have the same likely purchasers or consumers attracted to them. The products compete head-to-head on a national market, with both of these major companies selling to the same major retailers. In analyzing the degree of care likely to be exercised by consumers, several factors come in to play. First, it has been established, as set out in the findings of fact, that there is a tendency in the market for the different producers of cookie and cracker products, and snacks to use similar colors to denote similar types of cookies. For example, Kee-

1992 U.S. Dist. LEXIS 6826, *

bler's "Club Style" crackers, as shown in defendants's exhibit 14, is packaged in a green background box. Also packaged in green boxes are Nabisco's "Waverly" crackers which are of the same type as Keebler's "Club" and Kroger's "Country Club" crackers and Hy Vee's "Rich and Crisp" crackers, as well as Parade's "Gourmet Crackers." See defendant's exhibits G, H, I, J, and K. The same can be said of Nabisco's "Ritz Crackers," which come in a red box, and Keebler's "Townhouse [*55] Crackers," which also come in a red box and are the same type of crackers. The same can be said for Nabisco "Nilla" wafers and Keebler's "Golden Vanilla" wafers and, as established through the testimony, for a large number of other companies that make vanilla wafers, and also package them in boxes of a predominantly yellow background color. See defendant's exhibits A, B, D, and C. To the extent that this is prevalent in the market, and it appears to be fairly prevalent, one would expect consumers who are accustomed to looking at packages of similar color to denote similar type products would be more discriminating and careful in looking at the details of the packages to make sure that they are able to pick out the actual product and brand name that they want. That is, they would be accustomed to looking beyond the first initial visual impression to the greater detail of the packages. On the other hand, it has to be pointed out that Keebler's "Pecan Sandies" have had fairly exclusive use of the particular visual impression of its current trade dress for at least ten years, and that there has been no reason, therefore, for purchaser's of Keebler's "Pecan Sandies" to develop a habit [*56] of looking closely at the packages when they go to purchase this particular product. So that the likelihood of confusion as to this particular product may be greater than it would generally be for the overall market of crackers and cookies. Finally, after studying the evidence in detail, I find little or no direct evidence of an intent on the part of Nabisco to actively copy the Keebler trade dress. On the other hand, I cannot help but comment upon how surprising it is that having all of the colors in the rainbow to choose from, Nabisco happens to end up with a yellow background color so similar to that of the already existing "Pecan Sandies" by Keebler. I also find it extremely unlikely that with Keebler's "Pecan Sandies" package containing the descriptor "Rich Shortbread Cookies with Crunchy Pecans" that Nabisco would totally by accident come up with a descriptor for their "Pecan Supremes" of "Rich Shortbread Cookies Baked with Crispy Pecans." The first three words of Nabisco's descriptor are exactly the same as Keebler's long standing descriptive phrase. I also think that the possibility for confusion, especially at the early stages when Nabisco's product first comes out on the [*57] market, is likely to be aggravated and increased by Nabisco's plan of giving to every customer who purchases a box of "Pecan Sandies" automatically at the cash register a coupon for a discount for Nabisco's "Pecan Supremes" next time they come to the store. Whether or not this marketing scheme ever goes into effect, its very existence gives us a rather telling glimpse into Nabisco's thinking and approach in marketing this particular product. Based upon a careful review of all of the above factors and considerations, I find and I recommend that the court find, that Keebler has established a reasonable likelihood of success on the merits in establishing a likelihood of confusion between the two trade dresses.

### BALANCE OF HARMS

The injury which Keebler can expect to suffer if an injunction is not granted has already been discussed above under the discussion of "Irreparable Harm." On the other side of the scale, Nabisco has alleged some substantial economic and non-economic harm, if the injunction is in fact granted. The harm Nabisco stands to suffer can be divided into two categories. First is the cost of the promotions which it had already commissioned for its new product. [*58] This cost apparently is somewhere around $ 128,000.00 according to Nabisco's evidence. Also the cost of the already packaged cookies, which would have to be destroyed goes into the millions. On the other hand, Nabisco is just as worried, if not more so, about the loss or damage to its reputation with both the ultimate consumers and the trade, if, after it has announced a new product, promoted both national and local advertising for it, and, in essence, promised it to its distributors and its consuming public, it fails to deliver the product when promised. This is not a possibility of loss to be taken lightly. Indeed, both parties appear to have a substantial amount at risk. However, I find that the scale tips in favor of Keebler. A close reading of Factual Findings 37 though 71 reveals that to a considerable extent, Nabisco has been responsible for its own jeopardy. In its haste to compete with Keebler, it appears to have proceeded ahead with expenditures and commitments in the face of considerable risk. For example, even after having received a trademark search revealing Keebler's Federal Registration of the Mark "Supreme" for cookies, Nabisco's chief patent and trademark attorney [*59] Mr. Hartman, advised its marketing group that the mark "Pecan Supremes" was available and that they should proceed. Nabisco's "Pecan Supremes" packaging went into production even before they had received a response from the Patent and Trademark Office on their "Intent to Use" application for the mark "Pecan Supremes." So even before receiving this initial office action, Nabisco had already committed time, effort and money and had begun actually producing the packaging it now seeks to save. It was not until January 31 of 1992 after Nabisco had already begun plans and expended money to advertise its "Pecan Supremes" cookies that Hartman contacted Keebler's attorneys to request a consent to Nabisco's registration and use of the "Pecan Supremes" trademark in connection with the cookies. Further, after receiving, on February 27, 1992, Keebler's letter indicating that they would not consent to the mark, and therefore,

knowing that the use of the mark would likely be challenged, nothing was done to slow down Nabisco's production, promotion, or preparation for the marketing of the product. And finally, on March 23 of 1992, Mr. Hartman was informed by one of Keebler's counsel that not only [*60] would Keebler not consent to the use of the "Supreme" trademark by Nabisco, but that Keebler was also very concerned over what it considered to be the extreme similarities between Keebler's trade dress for its "Pecan Sandies," and Nabisco proposed trade dress for its "Pecan Supremes." Two days after this phone call, Nabisco increased the number of newspapers in which its initial advertising for its "Pecan Supremes" would appear and agreed to pay additional money for that expanded service. It is the loss of the money paid for this very advertising that Nabisco now cites as a harm that it would suffer, if the injunction were to be entered. It is clear that Nabisco, had it been more prudent, could have avoided putting itself in the situation where it now has so much at risk if an injunction is actually issued. In one of his letters to counsel of another firm whose trademark Nabisco was also seeking the consent to use, Mr. Hartman made a reference to "Drawing to an inside straight" in an apparent allusion to an attempt by that counsel to bluff his way to the preservation of a trademark, to which he probably was not entitled. It appears to me that Mr. Hartman may have been playing a bit [*61] of poker himself in his dealings with Keebler. It is true that I have found, and I have recommended that the court find, that there is no likelihood of confusion with respect to the trademarks, and therefore Nabisco's rush to get into production and to make commitments before clearing its ability to use the trademark cannot be said to be a direct cause of its predicament today. Nevertheless, I think that the chronology of events and the attitude which Nabisco displayed with respect to the trademark issue, is an indication of the fact that they proceeded without the necessary prudence and caution in this case, and therefore are to some extent at least, responsible for their own predicament. As indicated above, I have also found that there is strong evidence that Keebler has established over the course of many years, a very strong following for its "Pecan Sandies" products. It would be fundamentally unfair to allow a competitor which has failed in its attempt to establish its own pecan shortbread cookie to now attempt to piggyback on the hard earned reputation of another rather than establishing its own place in the market. I therefore find and I recommend that the court find that the [*62] balance of harms tips in favor of Keebler.

### PUBLIC INTEREST

To the extent that the injunction helps to stop or diminish confusion among the public with respect to the origin of the product or purchasing, it will serve the public interest. *A.J. Canfield Co. v. Vess Beverages, Inc., 796 F.2d 903, 905 (7th Cir. 1986).* It is not in the public interest to allow one manufacture to piggyback on the reputation, advertising and established product of another. From a review of all the evidence, I am convinced that Nabisco's "Pecan Supremes" trade dress, as exhibited in plaintiff's exhibit 28, is sufficiently similar in its overall visual impression to Keebler's "Pecan Sandies" trade dress as shown in the plaintiff's exhibit 3I, that there is a substantial likelihood that the consuming public would confuse one with the other. I therefore recommend that the court find that the public interest would best be served by the issuance of an injunction in this case.

### SUMMARY

Accordingly, I recommend that the court preliminarily enjoin Nabisco, its officers, agents, servants, employees, distributors, advertisers, customers, attorneys, and all persons in active [*63] concert or participation with them who receive notice from advertising selling directly or indirectly pending final determination of this action, shortbread cookies with pecans in the trade dress represented by plaintiffs exhibit 28 in these proceedings, or any other substantially similar trade dress.

Respectfully submitted,

RONALD A. GUZMAN

United States Magistrate Judge

DATE: MAY 18, 1992

Any objections to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of receipt of this notice. Failure to file objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn, 474 U.S. 140 (1985)*; *The Provident Bank v. Manor Steel Corp., 882 F.2d 258 (7th Cir. 1989).*

Slip Copy                                                                                                  Page 1
Slip Copy, 2008 WL 111196 (W.D.N.Y.)
**(Cite as: 2008 WL 111196 (W.D.N.Y.))**

**MacKenzie**-**Childs**, Ltd. v. **MacKenzie**-**Childs**
W.D.N.Y.,2008.
Only the Westlaw citation is currently available.
United States District Court,W.D. New York.
**MacKENZIE**-**CHILDS**, LTD., Plaintiff,
v.
Victoria **MacKENZIE**-**CHILDS**, Richard
**MacKenzie**-**Childs** and V & R Emprise, LLC,
Defendants.
Victoria **MacKenzie**-**Childs**, Richard **MacKenzie**-
**Childs**, Plaintiff,
v.
Pleasant Rowland, **MacKenzie**-**Childs**, Ltd., MCL
Acquisition Corporation, MCNY Acquisition
Corporation and **MacKenzie**-**Childs** of New York,
Ltd., Defendants.
**No. 06-CV-6107T.**

Jan. 9, 2008.

Jerauld E. Brydges, Stephen B. Salai, Harter, Secrest
and Emery, LLP, Rochester, NY, for MacKenzie-
Childs Ltd.
Howard D. Leib, New York, NY, Linda T.
Prestegaard, Phillips Lytle LLP, Rochester, NY, Paul
G. Marshall, The Marshall Firm, New York, NY, for
Victoria MacKenzie-Childs, Richard MacKenzie-
Childs and V & R Emprise, LLC.

**DECISION and ORDER**

MICHAEL A. TELESCA, District Judge.

*INTRODUCTION*

**\*1** Plaintiff MacKenzie-Childs, Ltd., a manufacturer
and seller of ceramic goods and housewares, brings
this action pursuant to the Lanham Act and New
York state law claiming that the defendants Victoria
MacKenzie-Childs and Richard MacKenzie-Childs,
and V & R Emprise, Ltd., have, *inter alia,* infringed
plaintiff's trademarks and engaged in unfair
competition. Specifically, plaintiff contends that it is
the owner of the trademarks "Victoria and Richard
MacKenzie-Childs," "Victoria and Richard
MacKenzie-Childs, Ltd.," "MacKenzie-Childs, Ltd.,"
and a stylized logo featuring a thistle.[FN1]Plaintiff
alleges that the defendants, (who are competing
manufacturers and sellers of ceramic goods and

household items) are infringing upon its marks by
using the names "Victoria and Richard MacKenzie-
Childs," "Victoria and Richard," "The Original
MacKenzie-Childs," and the name "V & R Emprise"
with a logo featuring a thistle.

> FN1. Although plaintiff's Complaint alleges
> that it is the owner of trademarks
> incorporating the name "McKenzie-Childs,"
> (with the name "MacKenzie" being spelled
> without an "a") it is clear from the record
> (and the plaintiff's corporate name
> "MacKenzie-Childs, Ltd.,") that the correct
> spelling of the name "MacKenzie" is with
> an "a". Accordingly, the Court presumes
> that plaintiff's alleged marks incorporate the
> correct spelling of the name "MacKenzie."

Defendants deny that the plaintiff owns trademark
rights to the names "Victoria and Richard
MacKenzie-Childs," "Victoria and Richard
MacKenzie-Childs, Ltd.," or "MacKenzie-Childs,"
and therefore claim that they have not infringed upon
plaintiff's marks. Defendants also claim that because
their logo is distinct from the plaintiff's logo, it does
not infringe plaintiff's mark. Defendants further
contend that they own the rights to the mark
"MacKenzie-Childs" and that the plaintiff, and third-
party defendants, are infringing upon that mark.

Before the court are several motions. Plaintiff, and
third-party defendants Pleasant Rowland and
MacKenzie-Childs of New York, Ltd., move for
partial summary judgment dismissing all of
defendants' counterclaims. Plaintiff further moves for
summary judgment on its claim of trademark
infringement, and for a permanent injunction
permanently enjoining the defendants from using the
marks "MacKenzie-Childs," "Victoria and Richard
Mackenzie-Childs," "Victoria and Richard," and the
thistle logo used by V & R Emprise.

Defendants oppose the plaintiff's motion, and move
for partial summary judgment with respect to their
claims under the Visual Artist Rights Act; New York
Civil Rights Law and General Business Law.
Defendants also seek judgment in their favor on their
common law claims of unfair competition,
defamation, and tortious interference with business
relationships.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 2
Slip Copy, 2008 WL 111196 (W.D.N.Y.)
**(Cite as: 2008 WL 111196 (W.D.N.Y.))**

### *BACKGROUND*

In 1974, Defendants Richard Childs ("Richard") and
Victoria MacKenzie ("Victoria") married. In 1983,
they began making and selling ceramic goods of their
own design. In 1985, the couple decided to
incorporate their business, and incorporated under the
name "Victoria and Richard MacKenzie-Childs,
Ltd." ("the Company") Sometime thereafter, the
Company registered two trademarks: "Victoria and
Richard MacKenzie-Childs, Ltd." and "MacKenzie-
Childs, Ltd.1983 Aurora New York."The Company
also registered the mark "MacKenzie-Childs, Ltd.
Aurora New York MC 1983."By 1995, the Company
decided to stop using the first names of Victoria and
Richard in the Company's logos, and in that same
year, abandoned the trademark "Victoria and Richard
MacKenzie-Childs, Ltd." According to the
defendants, the Company's products did not bear any
mark using the first names of Victoria and Richard
after 1995.

**\*2** In 1999, Richard and Victoria incorporated a
second company, "MacKenzie-Childs, NY, Ltd." In
the late 1990's, Victoria and Richard MacKenzie-
Childs, Ltd. and MacKenzie-Childs, NY, Ltd. ("The
Companies") experienced a downturn in business,
and in 2000, the Companies were several million
dollars in debt. According to the defendants, the bank
which held most of the Companies' debt installed a
new President of the Companies, MacDonell Roehm,
Jr. ("Roehm"), and shortly thereafter, Roehm, against
the wishes of Richard and Victoria, began looking for
ways to reorganize the Companies and limit the
bank's losses.

According to the defendants, Roehm approached
Third-Party Defendant Pleasant Rowland
("Rowland") to determine whether or not she was
interested in investing in the Companies. Thereafter,
according to the defendants, Rowland purchased (at a
discount) the Companies' debt from the bank, and, on
the same day that she purchased the debt, called the
Companies' loan. Because the Companies were
unable to repay the debt, they were forced into
bankruptcy.

With the Companies in bankruptcy, Rowland created
two acquisition companies, and through those
companies, made an offer to purchase the assets of
the Companies. The purchase offer was accepted by

Roehm and approved by the bankruptcy court.
Shortly after the asset sale was completed, Roehm
took a position with Rowland's new Company which
had purchased the Companies' assets.

Pursuant to the terms of the asset sale, the Companies
agreed to sell, *inter alia,*"All Intellectual Property ...
and all goodwill associated with the foregoing ...."
Asset Purchase Agreement at p. 2. "Intellectual
Property" is defined in the Asset Purchase Agreement
in relevant part as

mean[ing] all intellectual property, including, without
limitation, ... all trademarks, service marks, trade
dress, logos, trade names, brand names and corporate
names (including, without limitation, the name
"MacKenzie-Childs", and all derivatives thereof),
together with all translations, adaptations,
derivations, and combinations thereof and including
all good will associated therewith, and all
applications, registrations, and renewals in
connection therewith ....

Asset Purchase Agreement at p. 37.

Following the completion of the sale of the
Companies' assets, Rowland renamed her acquisition
companies MacKenzie-Childs, Ltd., and MacKenzie-
Childs of New York, Ltd. The company formerly
known as Victoria and Richard MacKenzie-Childs,
Ltd. was renamed MC Aurora, Ltd., and the company
formerly know as MacKenzie-Childs, NY, Ltd. was
renamed MC Madison, Ltd.

According to the defendants, following the sale of the
assets of the Companies, Rowland offered Victoria
and Richard $10,000,000 not to compete with
Rowland's companies, and not to use their name in
competition with her companies. Richard and
Victoria declined Rowland's offer, and defendants
claim that as a result, Rowland (who owned much of
the couples' personal debt) called Richard and
Victoria's personal loans, and thereby caused Richard
and Victoria to file for bankruptcy protection.
Richard and Victoria contend that Rowland
purchased many of the couples' personal assets and
property in the bankruptcy proceeding.

**\*3** In 2005, Richard and Victoria decided to reenter
the ceramics business, and incorporated a company
known as V & R Emprise, LLC. V & R Emprise

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

branded its products with a logo consisting of the names "Victoria and Richard" and an emblem design incorporating a torch bearing stylized "V" and "R" initials and the word "emprise, and a thistle. V & R Emprise filed trademark applications for the logos, which plaintiff has opposed.

On February 22, 2006, Plaintiff Mackenzie-Childs, Ltd. filed suit against Richard and Victoria, and V & R Emprise, LLC., claiming that the defendants are infringing upon their trademarks. Plaintiff seeks an injunction prohibiting the defendants from using the names "MacKenzie-Childs," "Victoria and Richard MacKenzie-Childs," "Victoria and Richard," and the thistle design used by V & R Emprise.

On May 22, 2006, defendants filed a counterclaim against plaintiff, Pleasant Rowland, and MacKenzie-Childs of New York, Ltd., claiming that the plaintiff/counterclaim defendants do not own rights to the name "MacKenzie-Childs" or "Richard and Victoria MacKenzie-Childs, Ltd.," and as a result, are liable to defendants under a host of federal and state laws, and common-law causes of action. Specifically, defendants contend that because they cancelled their trademark "Richard and Victoria MacKenzie-Childs, Ltd.," in 1995, the trademark was not an asset of the company that could be sold as part of the Asset Purchase Agreement. Defendants further contend that the name "MacKenzie-Childs" cannot be used by the plaintiff/counterclaim-defendants because the original Companies did not have a trademark for that name, and accordingly, could not convey it in the Asset Purchase Agreement.

### DISCUSSION

I. *Motions for Summary Judgment Standard of Review*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."When considering a motion for summary judgment, all inferences and ambiguities must be resolved in favor of the party against whom summary judgment is sought. *R.B. Ventures, Ltd. v. Shane,* 112

F.3d 54 (2nd Cir.1997). If, after considering the evidence in the light most favorable to the nonmoving party, the court finds that no rational jury could find in favor of that party, a grant of summary judgment is appropriate. *Annis v. County of Westchester,* 136 F.3d 239, 247 (2nd Cir.1998).

II. *Plaintiff's Motion for Summary Judgment*

A. *Trademark Infringement*

Plaintiff alleges that it is the owner of the marks "Richard and Victoria MacKenzie-Childs, Ltd.", "MacKenzie-Childs, Ltd.1983 Aurora New York", and "MacKenzie-Childs". Plaintiff alleges that defendants have infringed these marks in connection with their attempts to reenter the ceramic and housewares market under the corporate name "V & R Emprise" and by using the trademark "Victoria and Richard".

**\*4** To establish a claim of trademark infringement under the Lanham Act, a plaintiff must demonstrate that " 'it has a valid mark entitled to protection and that the defendant's use of it is likely to cause confusion.'" *Arrow Fastener Co. v. Stanley Works,* 59 F.3d 384, 390 (2nd Cir.1995) (quoting *Gruner + Jahr USA Publishing v. Merideth Corp.,* 991 F.2d 1072, 1075 (2nd Cir.1993).

In the instant case, plaintiff contends that it is the rightful owner of the valid marks "Richard and Victoria MacKenzie-Childs, Ltd.", "MacKenzie-Childs, Ltd.1983 Aurora New York", and "MacKenzie-Childs", and that it is the owner of the corporate names Victoria and Richard MacKenzie-Childs, Ltd. and MacKenzie-Childs, NY, Ltd. In support of this contention it relies on the terms of the asset purchase agreement which provides that the plaintiff purchased "all intellectual property, including, without limitation, ... all trademarks, service marks, trade dress, logos, trade names, brand names and *corporate names (including, without limitation, the name "MacKenzie-Childs", and all derivatives thereof)*...." (emphasis added).

While it is undisputed that the plaintiff owns the trademark "MacKenzie-Childs, Ltd.1983 Aurora New York", "MacKenzie-Childs, Ltd. Aurora New York MC 1983." and the corporate names "Victoria and Richard MacKenzie-Childs, Ltd." and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

"MacKenzie-Childs, NY, Ltd .".", defendants claim that the plaintiff is not the rightful owner of the trademarks "Richard and Victoria MacKenzie-Childs, Ltd." or "MacKenzie-Childs". In support of their argument, they contend that the original Companies abandoned the use of the trademark "Richard and Victoria MacKenzie-Childs, Ltd." prior to 1995, and therefore, that name was not, and could not have been sold to the plaintiff in the asset purchase sale. Defendants further allege that the name "MacKenzie-Childs" was never trademarked and is not a corporate name, and accordingly, the plaintiff did not purchase, nor may it use, that name.

It is axiomatic that the owner of a trademark may abandon the mark. Pursuant to the Lanham Act, a trademark is abandoned when the trademark holder discontinues use of the mark with the intent not to continue using it. 15 U.S.C. § 1127. A trademark is presumptively abandoned if the mark has not been used for three or more consecutive years. Moreover, the trademark owner may expressly abandon a mark by cancelling the mark. *See Defiance Button Machine Co. v. C & C Metal Products, 759 F.2d 1053, 1059 (2nd Cir.1985).* A trademark that is abandoned may not be conveyed to another. An abandoned trademark is not capable of assignment. *Money Store v. Harris Corp. Finance, Inc., 689 F.2d 666 (7th Cir.1982)* (*citing Avon Shoe Co. v. David Crystal, Inc., 171 F.Supp. 293 (S.D.N.Y.1959)*, aff'd, *279 F.2d 607 (2d Cir.1960)*, cert. denied, *364 U.S. 909, 81 S.Ct. 271, 5 L.Ed.2d 224).*

Here the evidence in the record suggests that the original companies abandoned the trademark "Richard and Victoria MacKenzie-Childs, Ltd." in 1995 when it cancelled the mark, and when it stopped using the mark. If in fact the mark was abandoned, then the original Companies could not have conveyed that mark in the asset sale. Although there is no evidence in the record to suggest that the mark was not abandoned, because there has been no discovery on the issue, the court can not say, at this stage, as a matter of law, that the mark was abandoned. I therefore deny plaintiff's motion for summary judgment seeking a declaration that it is the owner of the mark "Victoria and Richard MacKenzie-Childs, Ltd.". Because there is no dispute that the plaintiff purchased the trademark "MacKenzie-Childs, Ltd.1983 Aurora New York" and "MacKenzie-Childs, Ltd. Aurora New York MC 1983." in the

2001 asset purchase sale, I grant plaintiff's motion for summary judgment seeking a declaration that it is the owner of those trademarks.

**\*5** With respect to the purported trademark "MacKenzie-Childs", defendants allege that because the name "MacKenzie-Childs" was neither trademarked by the original Companies, nor the corporate name of either of the Companies, that name, as a matter of law, could not have been conveyed to the plaintiff in the 2001 asset sale, and therefore the plaintiff and counterclaim defendants do not have the right to use that trademark, nor prohibit the defendants from using that trademark.

There is no evidence in the record to suggest that the original Companies ever trademarked the name "MacKenzie-Childs" standing alone, nor is there any evidence to suggest that either Richard or Victoria, as individuals, authorized any entity to use the name "MacKenzie-Childs" standing alone. Accordingly, despite the fact that the asset purchase agreement purported to sell the name "MacKenzie-Childs" to the plaintiff, there is no evidence in this record to suggest that the original Companies had the authority to convey that trademark.

While plaintiff alleges that "Victoria and Richard voluntarily transferred, [in the asset sale] for due consideration the right to use the intellectual property of their company, including their names ...."*See* Plaintiff's Memorandum of Law in Support of its Motion for Summary Judgment at p. 16, that contention is not correct, as neither Richard nor Victoria were the "sellers" in the asset sale. Rather, the companies (which were no longer under the control of Richard or Victoria) were the sellers, and Richard and Victoria did not receive *any* consideration in the sale. Because Richard and Victoria, as individuals, did not sell their names, and there is no evidence in the record before the court indicating that the original Companies had the right to sell the name "MacKenzie-Childs, I deny plaintiff's motion for summary judgement seeking a declaration that it is the owner of the trademark "MacKenzie-Childs."

Plaintiff's allegation that the thistle design used by defendants infringes on plaintiff's trademark, presents a question of fact that makes it inappropriate for resolution on a motion for summary judgment. There

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

are questions of fact as to whether or not the designs are similar and/or confusing. Accordingly, I deny plaintiff's motion for summary judgment with respect to the thistle design.

### B. *Misrepresentation under 15 U.S.C. § 1125a*

Defendants contend in the Second Cause of Action of their Counterclaim that the Plaintiff, by using the mark "MacKenzie-Childs" has misrepresented the source of the goods it creates, and has tried to create the impression that its goods are made by Richard and Victoria, all in violation of 15 U.S.C. § 1125a. Plaintiff and Counterclaim defendants move for summary judgment dismissing this claim.

15 U.S.C. § 1125a provides in relevant part that:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which-

**\*6** (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

Plaintiff moves for summary judgment against the defendants with respect to this claim on grounds that plaintiff owns the trademark names at issue, and therefore cannot be liable for using the trademarked names in commerce. Because I have granted plaintiff's motion for a declaratory judgment that it is the owner of the marks "MacKenzie-Childs, Ltd.1983 Aurora New York" and "MacKenzie-Childs, Ltd. Aurora New York MC 1983" I find that

use of those names does not constitute misrepresentation. However, there is a question as to whether or not plaintiff has the right to the mark "MacKenzie-Childs" standing alone, and I decline to grant plaintiff's motion for summary judgment with respect to the use of the mark "MacKenzie-Childs".

### C. *Visual Artist Rights Act*

Defendants Richard and Victoria claim in the Third and Fourth Causes of Action of their Counterclaim that the plaintiff and counterclaim defendants have used Richard and Victoria's names on works of art which were not created by them, and by so doing, have violated the Visual Artists Rights Act. Richard and Victoria further contend that the plaintiff and counterclaim defendants have intentionally mutilated, distorted, or otherwise modified their works of art in violation of the Visual Artists Rights Act.

Section 106A of the Visual Artists Rights Act ("VARA") provides in relevant part that:

the author of a work of visual art ... shall have the right ... to prevent the use of his or her name as the author of any visual work of art which he or she did not create ... [and] shall have the right to prevent the use of his or her name as the author of a visual work of art in the event of a distortion, mutilation, or other modification of the work which would be prejudicial to his or her honor or reputation; and ... subject to [certain] limitations ... shall have the right to prevent any intentional distortion, mutilation, or other modification of that work which would be prejudicial to his or her honor or reputation, and any intentional distortion, mutilation, or modification of that work is a violation of that right ....

17 U.S.C. § 106A. Accordingly, to state a claim under VARA, a plaintiff must first establish that he or she is the author of a visual work of art. A "work of visual art" is defined in relevant part as:
a painting, drawing, print, or sculpture, existing in a single copy, in a limited edition of 200 copies or fewer that are signed and consecutively numbered by the author, or, in the case of a sculpture, in multiple cast, carved or fabricated sculptures of 200 or fewer that are consecutively numbered by the author and bear the signature or other identifying mark of the author ....

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**\*7** 17 U.S.C. § 101.

Plaintiff and the counterclaim defendants move for summary judgment against Richard and Victoria with respect to their claims under the Visual Artists Rights Act on grounds that the defendants have failed to allege that plaintiff has used the defendants' names on any work of visual art, and further contend that such an allegation would be impossible, because plaintiff and the counterclaim defendants have not created any works of visual art as that term is defined under VARA.

I find, however, that Richard and Victoria have stated a cause of action under VARA, and that summary judgment with respect to their VARA counterclaims is premature. Richard and Victoria, consistent with the notice-pleading provisions of Rule 8 of the Federal Rules of Civil Procedure, have alleged that they are the authors of works of visual art as defined by VARA. *See* Answer and Counterclaim at ¶ 92. Richard and Victoria have further alleged that they object to the plaintiff and counterclaim defendants' use of their names on works of art which they did not create, and that the plaintiff and counterclaim defendants have modified their works of art without permission, and to their detriment. *See* Answer and Counterclaim at ¶¶ 93, 94, 97, 98. Such claims state a cause of action under VARA.

With respect to the plaintiff and counterclaim defendants' claims that Richard and Victoria have never produced works of visual art as that term is used in VARA, this court cannot make such a finding as a matter of law given the fact that no discovery has taken place on the issue.

Plaintiff and counterclaim defendants further contend that because the works of art, if any, that were created by Richard and Victoria were works for hire, they cannot be considered works of visual art under VARA. Again, however, this contention is premature, as there has been no discovery on this issue. Accordingly, I deny without prejudice plaintiff and counterclaim defendants' motion for summary judgment with respect to Richard and Victoria's claims under VARA.

D. *New York Civil Rights Law and Section 133 of the New York General Business Law.*

In the Fifth and Sixth Causes of Action of their Counterclaim, Richard and Victoria allege that the plaintiff and counterclaim defendants' use of the name "MacKenzie-Childs" violates their rights under Sections 50 and 51 of the New York Civil Rights Law and Section 133 of the New York Business Law.

Section 50 of the New York Civil Rights Law provides in relevant part that "A person, firm or corporation that uses for advertising purposes or for the purposes of trade, the name, portrait or picture of any living person without having first obtained the written consent of such person ... is guilty of a misdemeanor." Section 51 of the Civil Rights Law creates a private right of action for alleged violations of § 50. Section 133 of the General Business Law provides in relevant part that:

No person, firm or corporation shall, with intent to deceive or mislead the public, assume, adopt or use as, or as part of, a corporate, assumed or trade name, for advertising purposes or for the purposes of trade, or for any other purpose, any name, designation or style, or any symbol or simulation thereof, or a part of any name, designation or style, or any symbol or simulation thereof, which may deceive or mislead the public as to the identity of such person, firm or corporation or as to the connection of such person, firm or corporation with any other person, firm or corporation ....

**\*8** N.Y. Gen Bus. Law. § 133.

Plaintiff argues that it is entitled to use the name "MacKenzie-Childs" because it purchased that right in the asset sale. However, for the reasons set forth above, I find that it is not clear from the record that the original companies had the authority to convey the name "MacKenzie-Childs" to the plaintiff, nor is it clear that Richard or Victoria authorized the original companies to use the name "MacKenzie-Childs." Because Richard and Victoria, as individuals, did not sell the use of the name "MacKenzie-Childs" to the plaintiff, and because there is no evidence in the record before the court indicating that as a matter of law the original Companies had the right to sell the name "MacKenzie-Childs," I find that Richard and Victoria have stated a claim under Sections 50 and 51 of the New York Civil Rights Law and Section 133 of the New York General Business Law, and therefore, I

deny plaintiff's motion for summary judgment with respect to these claims.

E. *Misappropriation, Unfair Competition, Deceptive Acts, and False Advertising*

Defendants, in the Seventh Cause of Action of their Counterclaim, contend that the plaintiff and counterclaim defendants have misappropriated the name "MacKenzie-Childs" and have unlawfully used that name in connection with their business. Defendants' Eighth Counterclaim alleges that the plaintiff and counterclaim defendants' use of the trademark "MacKenzie-Childs" constitutes unfair competition pursuant to Section 360-l of the New York General Business Law. Defendants' Ninth Counterclaim alleges that the plaintiff and counterclaim defendants' use of the trademark "MacKenzie-Childs" constitutes a deceptive business practice under Section 349 of the New York General Business Law. Defendants' Tenth Counterclaim alleges that the plaintiff and counterclaim defendants engaged in false advertising by using the name "MacKenzie-Childs" in commerce in violation of Section 350 of the New York General Business Law.

Plaintiff and counterclaim defendants contend that because they own the trademark "MacKenzie-Childs," they possess the lawful right to use that name. Accordingly, the plaintiff and counterclaim defendants seek summary judgment against the defendants with respect to the Seventh, Eighth, Ninth and Tenth Causes of Action set forth in defendants' Counterclaims.

As stated above, however, it is not clear at this early stage of the litigation whether or not the Companies had the authority to sell the name "MacKenzie-Childs." As a result, it can not be said as a matter of law that the plaintiff's use of the name "MacKenzie-Childs" is lawful. Additionally, defendants have stated a claim under Section 349 of the New York General Business Law in that the Complaint, when read as a whole, alleges that the plaintiff and counterclaim defendants have engaged in deceptive business practices that have harmed the public. Although the plaintiff alleges that the public has not been harmed by any of its alleged acts, that question is unsuitable for resolution at this stage of the litigation, prior to any discovery on the issue. I therefore deny plaintiff's motion for summary

judgment with respect to Counterclaims Seven, Eight, Nine, and Ten.

F. *Defamation*

**\*9** Richard and Victoria allege in their Eleventh Cause of Action that the plaintiff's use of the name "MacKenzie-Childs" on work that was not created by either Richard or Victoria (and which in the opinion of Richard and Victoria is inferior) suggests that Richard and Victoria designed those works, and therefore constitutes a defamation of them by the plaintiff.

To state a claim of defamation under New York law, a plaintiff must allege the existence of "a false statement, published without privilege or authorization to a third party, constituting fault as judged by, at a minimum, a negligence standard, and, it must either cause special harm or constitute defamation per se." *Dillon v. City of New York, 261 A.D.2d 34, 704 N.Y.S.2d 1, 5 (N.Y.A.D. 1 Dept., 1999).*

Richard and Victoria's allegations fail to set forth statements that are false or constitute fault. Accordingly, this claim is dismissed without prejudice.

G. *Tortious Interference with Contract*

Defendants' Twelfth Cause of Action alleges that the plaintiff and counterclaim defendants have tortiously interfered with their business relationships by threatening the defendants' clients, and attempting to induce those clients not to sell the defendants' goods.

To state a claim for tortious interference with business relations, the plaintiff must show: (1) business relations with a third party; (2) interference with those relations; (3) that the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) injury to the plaintiff. *Scutti v. Park Place Entertainment Corp., 322 F.3d 211, 215 (2003).* In this case, the defendants/counterclaim-plaintiffs have made such allegations.

Plaintiff moves for summary judgment against the defendants on grounds that it was justified in its actions because it was attempting to enforce its rights

Slip Copy, 2008 WL 111196 (W.D.N.Y.)
**(Cite as: 2008 WL 111196 (W.D.N.Y.))**

as the rightful owner of its trademarks, and because it did not have a wrongful purpose for contacting the defendants' clients, it can not be held liable for tortious interference. Because however, there has been no discovery with respect to this issue, I decline to hold as a matter of law that the plaintiff did not have a wrongful purpose in contacting the defendants' clients and deny plaintiff's motion for summary judgment.

### H. *Fraud on the Trademark Office and Cancellation of Trademarks.*

Defendants' Thirteenth Counterclaim seeks a declaration from this Court preventing the trademark office from issuing the trademark "MacKenzie-Childs" to the plaintiff. According to the Counterclaim, the plaintiff fraudulently failed to inform the trademark office that the name "MacKenzie-Childs" is the name of living persons, and that those living persons object to the use of their names by the plaintiff.

Defendants' Fourteenth Counterclaim seeks a cancellation of the trademarks "MacKenzie-Childs, LTD. Aurora, New York MC 1983" and "MacKenzie-Childs, LTD.1983 Aurora, New York" on grounds that the plaintiff has used those marks in an intentionally deceptive way.

**\*10** Plaintiff moves for summary judgment against the defendants on grounds that it owns the marks "MacKenzie-Childs, LTD. Aurora, New York MC 1983" and "MacKenzie-Childs, LTD.1983 Aurora, New York," and that it purchased the right to use the mark "MacKenzie-Childs."

As stated previously in this Decision, there is a dispute as to the ownership of the name "MacKenzie-Childs," accordingly, I decline to grant plaintiff's motion for summary judgment dismissing this claim. Additionally, while it is undisputed that plaintiff is the owner of the marks "MacKenzie-Childs, LTD. Aurora, New York MC 1983" and "MacKenzie-Childs, LTD.1983 Aurora, New York," there has been no discovery with respect to the defendants' claim that plaintiff has used these marks to intentionally deceive the public. Accordingly, I deny plaintiff's motion for summary judgment with respect to this claim.

### III. *Defendants' motion for Summary Judgment*

Defendants move for partial summary judgment against the plaintiff and counterclaim defendants and seek an order that they are entitled to use the trade name "Victoria and Richard." Defendants claim that the plaintiff and counterclaim defendants do not own any mark that incorporates the names "Victoria" or "Richard," and that because the marks are sufficiently distinct from the marks owned by the plaintiff, the trade name "Victoria and Richard" does not infringe any mark owned by the plaintiff. Plaintiff contends that it owns the rights to the mark "Victoria and Richard MacKenzie-Childs, Ltd.," either by purchasing it in the asset sale or through continuing goodwill, and that the mark "Victoria and Richard" is confusingly similar to its mark.

I find that there are questions of fact that preclude granting defendants' motion for summary judgment at this early stage of the litigation, prior to the initiation of discovery. However, pursuant to defendants' request for "other and further relief which as to the Court may seem just, proper and equitable" (*See* Defendants' Notice of Cross Motion, docket item no. 27) [FN2] I hereby issue a preliminary injunction maintaining the status quo with respect to defendants' use of the mark "Victoria and Richard", and the thistle and torch logo, and enjoin plaintiff from interfering with the defendants' continued use of the mark "Victoria and Richard".

> FN2.*See also* Memorandum of Law in Support of Defendants and Counterclaim Plaintiffs' Motion for Partial Summary Judgement and in Opposition to Plaintiff's and Counterclaim Defendants' Motion For Summary Judgement at 9-10 ("Victoria and Richard are clearly entitled to a ruling finding that they, and only they, are owners of all trademark rights as to the mark "Victoria and Richard" and enjoining plaintiff from interfering with Victoria and Richard's use of said mark.")

Although the evidence in the record strongly suggests that the plaintiff does not own the mark, "Victoria and Richard MacKenzie-Childs, Ltd." such a finding can not be made conclusively at this time because discovery is needed to determine whether or not the mark "Victoria and Richard MacKenzie-Childs, Ltd."

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

was abandoned prior to the 2001 asset sale. Pursuant to the terms of that sale, plaintiff purchased the intellectual property of the Companies, including the trademarks "MacKenzie-Childs, Ltd.1983 Aurora New York" and "MacKenzie-Childs, Ltd. Aurora New York MC 1983."While plaintiff contends that it also purchased rights to the mark "Victoria and Richard MacKenzie-Childs, Ltd.," that mark had been cancelled in 1995, six years prior to the asset sale. Furthermore, according to the defendants, the mark had been abandoned as of 1993, when the original companies decided to stop using the names "Richard" and "Victoria" on the Companies' products. As such, the mark "Victoria and Richard MacKenzie-Childs, Ltd.," was presumptively abandoned well before the asset sale ever took place, and if so, could not have been transferred in the asset sale. While there is no evidence in the current record to suggest that the mark was not abandoned, plaintiff should be given an opportunity to develop such evidence. Accordingly, I deny defendants' motion for summary judgment on this issue.

**11** I do, however, find that the defendants are entitled to an injunction maintaining the status quo with respect to defendants' use of the mark "Victoria and Richard" and the thistle and torch logo, and prohibiting the plaintiff from interfering with the defendants' use of those marks. To be entitled to a preliminary injunction, a party must demonstrate: (1) that it is subject to irreparable harm; and (2) that it will either likely succeed on the merits of the case, or that there are sufficiently serious questions going to the merits of the case to make them a fair ground for litigation and that a balancing of the hardships between the parties weighs decidedly in favor of the party requesting the relief. *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70, 72 (2nd Cir.1979).*

For the reasons set forth above, I find that the defendants will likely succeed on their claim that plaintiff does not own the trademark "Victoria and Richard MacKenzie-Childs, Ltd." Additionally, because the mark "Victoria and Richard" is not a derivative of any mark owned by the plaintiff, I find that defendants will likely succeed on their claim that they are entitled to use the mark "Victoria and Richard." I further find that the defendants have sufficiently established that they will be irreparably harmed if their right to use the trademark "Victoria

and Richard" is interfered with by the plaintiff. In a trademark case, irreparable harm may be demonstrated by establishing likelihood of success on the merits, even in the absence of proof of actual injury to business. *Hasbro, Inc. v. Lanard Toys, Ltd., 858 F.2d 70, 73 (2nd Cir.1988)* ("In a Lanham Act case a showing of likelihood of confusion establishes both a likelihood of success on the merits and irreparable harm.")

With respect to the thistle and torch emblem, questions of fact preclude any grant of summary judgment on the issue of whether or not the defendants' emblem infringes on the plaintiff's mark. While neither party has established that it will likely succeed on the merits with respect to infringement claims involving the thistle and torch emblem, the claims are legally cognizable and constitute a serious basis for litigation. *See Jackson Dairy, Inc., 596 F.2d at 72* (where party seeking injunction is unable to establish likelihood of success on the merits, party must demonstrate that there are sufficiently serious questions going to the merits of the case to make them a fair ground for litigation, and that a balancing of the hardships between the parties weighs decidedly in favor of the party requesting the relief). In the instant case, the harm that would befall the defendants if they were not allowed to continue to use the design of their choosing is greater than the harm that would befall the plaintiff as a result of defendants' continued use of the logo. The logo currently used by the defendants is used in conjunction with the mark "Victoria and Richard," and as such, there is little likelihood of confusion that could be created by the defendants' use of the logo. I therefore enjoin plaintiff and counterclaim defendants from interfering with the defendants' use of its thistle and torch emblem in conjunction with the mark "Victoria and Richard."

IV. *Plaintiff's motion for Injunctive Relief*

**12** Plaintiff seeks an injunction permanently enjoining the defendants from using the marks "MacKenzie-Childs," "Victoria and Richard Mackenzie-Childs," "Victoria and Richard," and the thistle logo used by V & R Emprise. "To obtain a permanent injunction, a plaintiff must demonstrate (1) actual success on the merits and (2) irreparable harm."*Cartier v. Aaron Faber, Inc., 512 F.Supp.2d 165, 171 (S.D.N.Y., 2007)* (citing *Gucci Am., Inc. v.*

*Duty Free Apparel, Ltd.,* 286 F.Supp.2d 284, 290 (S.D.N.Y.2003)).

In the instant case, for the reasons set forth in section II above, I find that plaintiff has failed to establish actual success on the merits of its Lanham Act claims, and therefore I deny plaintiff's request for a permanent injunction.

### CONCLUSION

For the reasons set forth above, I hereby:

1) deny plaintiff's motion for summary judgment in its favor on the issue of infringement by defendants' use of the marks "Victoria and Richard" and the thistle and torch logo (Section II(A));

2) deny plaintiff's motion for summary judgment seeking a declaration that it is entitled to use the mark "MacKenzie-Childs"

3) grant plaintiff's motion for summary judgment seeking a declaration that it is entitled to use the marks "MacKenzie-Childs, Ltd.1983 Aurora New York" and "MacKenzie-Childs, Ltd. Aurora New York MC 1983."(Section II(A));

4) deny plaintiff's motion for summary judgment seeking a declaration that it is the owner of the mark "Victoria and Richard MacKenzie Childs, Ltd." (Section II(A));

5) deny plaintiff's motion for summary judgment seeking dismissal of defendants' Second Counterclaim alleging misrepresentation. (Section II(B));

6) deny plaintiff's motion for summary judgment seeking dismissal of defendants' Third and Fourth Counterclaims alleging violations of the Visual Artists Rights Acts (Section II(C));

7) deny plaintiff's motion for summary judgment seeking dismissal of defendants' Fifth and Sixth Counterclaims alleging violations of New York Civil Rights and General Business laws (Section II(D));

8) deny plaintiff's motion for summary judgment seeking dismissal of defendants' Seventh, Eighth,

Ninth, and Tenth Counterclaims alleging misappropriation, unfair competition, deceptive business practices, and false advertising. (Section II(E));

9) grant plaintiff's motion for summary judgment seeking dismissal of defendants' Eleventh Counterclaim alleging defamation (Section II(F));

10) deny plaintiff's motion for summary judgment seeking dismissal of defendants' Twelfth Counterclaim alleging tortious interference with contract (Section II(G));

11) deny plaintiff's motion for summary judgment seeking dismissal of defendants' Thirteenth and Fourteenth Counterclaims alleging violations of trademark law (Section II(H));

12) deny defendant's motion for summary judgment seeking a declaration that it is entitled to use the trademark "Victoria and Richard" (Section III);

**\*13** 13) deny defendants' motion for summary judgment seeking a declaration that it is entitled to use the thistle and torch logo (Section III);

14) grant defendants' motion for a preliminary injunction and enjoin the plaintiff and counter-claim defendants from interfering with defendants' use of the mark "Victoria and Richard" and the thistle and torch logo (Section III);

15) deny plaintiff's motion for injunctive relief. (Section IV).

Finally, due to the complexity of the issues presented in this case, and in light of the fact that discovery has not yet taken place, I direct the parties to enter into mediation before Magistrate Judge Payson. The parties shall contact Judge Payson to schedule the mediation. Discovery, and defendants' motion to disqualify counsel shall be stayed pending the outcome of the mediation process.

ALL OF THE ABOVE IS SO ORDERED.

W.D.N.Y.,2008.
MacKenzie-Childs, Ltd. v. MacKenzie-Childs
Slip Copy, 2008 WL 111196 (W.D.N.Y.)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1983 WL 51954 (Trademark Tr. & App. Bd.), 218 U.S.P.Q. 287
**(Cite as: 218 U.S.P.Q. 287)**

**C**In re McKee Baking Company

Patent and Trademark Office Trademark Trial and
Appeal Board

Decided Apr. 15, 1983
United States Patents Quarterly Headnotes

**TRADEMARKS**
**[1] Marks and names subject to ownership --
Names -- Individuals (§ 67.5215)**
 Applicant who has furnished written consent to
registration of portrait with application that issued as
registration made part of record by applicant's claim
of ownership thereof, should not be required to
resubmit consent for each application to register mark
comprised in whole or in part of same portrait,
provided that subsequent application is for same
goods or such goods as are encompassed by
registration for which consent was submitted; once
applicant has proved to satisfaction of Patent and
Trademark Office that it has consent to register
particular portrait name or signature for named goods
as specified in Lanham Act Section 2(c),
requirements of statute has been fulfilled.

**TRADEMARKS**
**[2] Marks and names subject to ownership --
Names -- Individuals (§ 67.5215)**
 If second contemporaneous application was pending
at time first application to register portrait was filed,
there would be reason to require copy of consent in
each such application, in order that each application
be complete.

**\*288** Appeal from Trademark Examining Attorney.

 Application for registration of trademark of McKee
Baking Company, Serial No. 226,809. From decision
refusing registration, applicant appeals. Reversed.

 Donald A. Kaul, Washington, D.C., for applicant.

 Before Allen, Fruge, and Sams, Members.

 Fruge, Member.

 McKee Baking Company filed an application to
register the mark "LITTLE DEBBIE" and a design

comprised of a sign on which said word mark appears
above the portrait of a young girl for cakes, cookies
and pies. First use of the mark as presented was
alleged to be September 18, 1977. It was further
alleged that the word mark and portrait were first
used August 23, 1960. Applicant claimed ownership
of Registration Nos. 735,443, [FN1] 783,765, [FN2]
967,756, [FN3] 968,788 [FN4] and others.

 The applicant was requested to identify the person
shown in the portrait and, if that of a living
individual, to submit the written consent of said
individual to registration of the portraits. [FN5]

 Applicant responded that the portrait is that of the
daughter of applicant's president, Ellsworth McKee,
whose consent is of record in Registration No.
783,765 and that Registration No. 968,788 is also a
registration of the same portrait; that inasmuch as the
portrait is already the registered mark of applicant,
there should be no reason to require applicant to
provide consent to register its own trademark. The
Examining Attorney adhered to his position and
finally refused registration. Applicant appealed.

 The Examining Attorney bases his refusal to register
on the requirement in Section 2(c) for the written
consent to registration of the portrait, name or
signature of a particular living individual and on
Trademark Rule 1.4(b) which specifies that "(s)ince
each application file should be complete in itself, a
separate copy of every paper to be filed in an
application should be furnished for each application
to which the paper pertains * * * *"

 [1] It is the Board's position that, having furnished
a written consent to registration of the portrait with
the application which issued as Registration No.
783,765 (which was made part of this record by
applicant's claim of ownership thereof), applicant
should not be required to resubmit the consent for
each application to register a mark comprised in
whole or in part of the same portrait, provided that
the subsequent application is for the same goods or
such goods as are encompassed by the registration
for which consent was submitted. Once an
application has proved to the satisfaction of this
Office that it has consent to register a particular
portrait name or signature for the named goods as
specified in Section 2(c), the requirement of the
statute has been fulfilled.

1983 WL 51954 (Trademark Tr. & App. Bd.), 218 U.S.P.Q. 287
**(Cite as: 218 U.S.P.Q. 287)**

[2] As to Trademark Rule 1.4(b), if, at the time the first application to register the portrait was filed, a second contemporaneous application had been pending, there would be reason to require a copy of the consent in each such application in order that each application would be complete. However, in this case we are dealing with a single application and inasmuch as there is a valid and subsisting registration of the portrait, in fact two such registrations, which clearly state on their face that the required consent is of record, all that is necessary to make the instant application complete is a claim of ownership of those prior registrations. Finally, the Examining Attorney's implication that the Office should re-examine the proof of consent in view of the fact that the subject of the mark is no longer a minor is beyond the scope of the statute and the rules.

 In view of the foregoing, the refusal to register is reversed.

FN1 Issued July 31, 1962, Section 8 affidavit accepted, Section 15 affidavit filed, renewed.

FN2 Issued January 19, 1965, Section 8 affidavit accepted, Section 15 affidavit filed.

FN3 Issued Sept. 4, 1973, Section 8 affidavit accepted, Section 15 affidavit filed.

FN4 Issued Sept. 18, 1973, Section 8 affidavit accepted, Section 15 affidavit filed.

FN5 The applicant was also requested to submit written consent to registration of the name, but this ground of refusal was withdrawn.

P.T.O. T.T.A.B.

218 U.S.P.Q. 287

END OF DOCUMENT

C
84 U.S.P.Q.2d 1856, 2007 WL 2422997 (Trademark Tr. & App. Bd.)

THIS OPINION IS A PRECEDENT OF THE TTAB

Trademark Trial and Appeal Board
Patent and Trademark Office (P.T.O.)

PARIS GLOVE OF CANADA, LTD.
v.
SBC/SPORTO CORP.

CANCELLATION 92044132

August 22, 2007

Before Seeherman, Kuhlke and Taylor
Administrative Trademark Judges

By the Board:

Petitioner seeks to cancel respondent's Registration No. 1756155 for the mark AQUA
STOP in rectangular form, discussed in more detail *infra*, alleging that 1)
respondent has abandoned the mark shown in the registration by failing to use it,
in its registered form, for at least three years, with no intention of resuming
such use; 2) respondent has abandoned the subject mark by engaging in naked
licensing thereof; and 3) respondent has maintained the registration fraudulently.
As to its fraud claim, petitioner alleges that the combined declaration of use
(Trademark Act §8 - 10 year)/application for renewal (Trademark Act §9) filed by
respondent in 2002 stated under oath that the mark as shown in the registration
remained in use when the mark was no longer used in its registered form. Petitioner
alleges further that respondent knew this statement was false and misleading when
made and that such statement would (if accurate) induce the Office to accept the
combined declaration, which the Office did.

In its answer, respondent denies the salient allegations of the petition to cancel.

This case now comes up on respondent's fully briefed motion for summary judgment in
its favor on all counts of the petition to cancel and respondent's fully briefed
motion to strike certain exhibits submitted by petitioner.

**Respondent's motion to strike Exhibit 2 from petitioner's response to respondent's
motion for summary judgment**
Respondent seeks to strike as unauthenticated petitioner's Exhibit 2, which is
composed of 1) the first page of a Google "hit list" search summary (1-10) for the
term AQUA STOP; 2) an article from "Forestry and British Timber," which includes a
reference to AQUASTOP waterproof linings for boots; and 3) printouts from two on-
line catalogs apparently offering third-party AQUA STOP branded items. Relying on

84 U.S.P.Q.2d 1856, 2007 WL 2422997 (Trademark Tr. & App. Bd.)                    Page 2

the policy set out at TBMP §528.05(e) (2d ed. rev. 2004), respondent argues that the exhibits are not properly of record because they were not introduced by way of affidavit or declaration.

In response, petitioner argues that the materials were tendered to show that factual disputes remain for resolution at trial as to whether the change(s) respondent has made to the form of the mark covered by the subject registration constitutes a material alteration such that third parties would not have fair notice as to the mark used under and protected by the registration.

Materials which qualify as printed publications under Trademark Rule 2.122(e), 37 C.F.R. §2.122(e), including electronic versions thereof, are considered self-authenticating. *See* TBMP §704.08 (2d ed. rev. 2004). *See also Weyerhaeuser Co. v. Katz,* 24 USPQ2d 1230 (TTAB 1992). On a motion for summary judgment, or a response to a motion, such materials may be submitted simply as an attachment or exhibit to the proffering party's brief, without the need for any separate authentication. *See* TBMP §528.05(e) (2d ed. rev. 2004).

**\*2** Petitioner's submission from "Forestry and British Timber" qualifies as a printed publication under Trademark Rule 2.122(e). On its face, it identifies the publication and the date published. Accordingly, respondent's motion to strike is denied as to the article from "Forestry and British Timber."

Internet printouts which are not the electronic equivalents of printed publications do not fall within the parameters of Trademark Rule 2.122(e). *Raccioppi v. Apogee, Inc.,* 47 USPQ2d 1368 (TTAB 1998). However, like other materials which are not self-authenticating, Internet materials may be admissible as evidence in connection with a summary judgment motion, if competent and relevant, provided they are properly authenticated by an affidavit or declaration pursuant to Fed. R. Civ. P. 56(e). *See* TBMP §528.05(e) (2d ed. rev. 2004).

Relying on *In re Fitch IBCA, Inc.,* 64 USPQ2d 1058 (TTAB 2002), petitioner argues that it is well established that "Google hit-lists" are directly admissible into evidence, although the probative value of such lists will vary depending on the circumstances. Petitioner's reliance on an *ex parte* case is misplaced. The Board takes a more permissive stance with respect to the admissibility and probative value of evidence in an *ex parte* proceeding than it does in *inter partes* proceedings. *See* TBMP §1208 (2d ed. rev. 2004). Thus, the Board tolerates some relaxation of the technical requirements for evidence in an *ex parte* case. *Id.* However, as shown by *Fitch, supra,* even with the relaxed evidentiary standards in an *ex parte* proceeding, search result summaries from search engines such as Google are of limited probative value. *See also* TBMP §1208.03 (2d ed. rev. 2004).

Petitioner, arguing that *Raccioppi v. Apogee, Inc., supra,* does not state that a declaration or affidavit is required to authenticate all types of Internet material, asks the Board to reexamine and clarify the holding therein in view of technological advances since the decision issued. Petitioner contends that the authentication concerns expressed in *Raccioppi* no longer exist in view of the Internet Archive. According to petitioner, this database permanently archives over 55 billion Internet websites published since 1996 and the Archive's "Wayback Machine" feature provides searchable, free access showing each date on which a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

website has undergone a significant change. Alternatively, it is petitioner's position that the standard articulated in *Raccioppi* applies solely to the movant on summary judgment because the non-movant need only assert that material factual issues remain for trial.

**\*3** We disagree with petitioner's position that *Raccioppi* does not require that a declaration or affidavit be submitted in order to authenticate Internet material. In *Raccioppi, id.* at 1370, the Board clearly stated that "[t]he element of self-authentication which is essential to qualification under Rule 2.122(e) cannot be presumed to be capable of being satisfied by Internet printouts." Thus, the Board considered, "… as a question of first impression, whether print-outs of articles downloaded from the Internet, which have been introduced by means of a declaration of the person who accessed this information on the Internet, constitute admissible evidence for purposes of summary judgment." The Board made it clear in *Raccioppi* that it was only because this material was submitted by declaration that the Internet printouts were found admissible.

As to applicant's argument that the Internet Archive makes the holding in Raccioppi obsolete, the database itself is not self-authenticating and there is no reason to treat its existence as authenticating the pages in its historical record. We note that even petitioner characterizes the "Wayback Machine" as showing "each date on which a website has undergone a significant change." (Emphasis added.) What may be insignificant to the archivers for the "Wayback Machine" may have significance from the standpoint of evidentiary value in a trademark proceeding. Thus, changes to a website, or in this case the excerpts taken from a website that appear in a Google search summary, may not appear in the Internet Archive. Moreover, in recent cases that have discussed or dealt with evidence from the Internet Archive, supporting declarations accompanied the evidence. *See, for example, St. Luke's Cataract and Laser Institute, P.A. v. Sanderson, 70 Fed. R. Evid. Serv. 174 No. 8:06-CV-223, 2006 WL 1320242 (M.D.Fla. May 12, 2006)* ("Plaintiff requests that printouts of pages from the laserspecialist.com and the lasereyelid.com websites taken from www.archive.org (hereinafter referred to as the "Internet Archive") and supporting declarations be admitted to show how the sites have appeared at various times since 2000."). *See also Novak v. Tucows, Inc., No. 06-CV-1909, 2007 WL 922306 (E.D.N.Y. March 26, 2007),* in which even a declaration was found to be insufficient to authenticate Internet printouts, including exhibits from the Internet Archive and its "Wayback Machine" feature, because the declarant lacked the requisite personal knowledge to establish that the documents were what he proclaimed them to be.

Petitioner also asserts that the standard for authentication of Internet evidence set forth in *Raccioppi* applies solely to the moving party. However, we see no logical support for this position. Rule 56(e) of the Federal Rules of Civil Procedure provides that if the party moving for summary judgment has supported its motion with affidavits or other submissions which if unopposed would establish its right to judgment, the nonmoving party may not rest on mere denials or conclusory assertions, but rather must proffer countering evidence, by affidavit or as otherwise provided in Fed. R. Civ. P. 56, showing that there is a genuine factual dispute for trial. *See* Fed. R. Civ. P. 56(e); Wright, Miller & Kane, 10B Fed. Prac. & Pro. Civ.3d §2739 (2007); and TBMP §528.01 (2d ed. rev. 2004). Rule 56 refers specifically to the pleadings, depositions, answers to interrogatories, admissions and affidavits. Because Board trial practice differs somewhat from a proceeding in a Federal Court, evidence that could be filed under a notice of reliance, *see*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

84 U.S.P.Q.2d 1856, 2007 WL 2422997 (Trademark Tr. & App. Bd.)                    Page 4

Trademark Rule 2.122, may also be submitted in support of or in opposition to a
motion for summary judgment. Rule 56 clearly requires that the countering evidence
submitted by the nonmoving party be by affidavit or as otherwise provided by the
rule.

**\*4** Petitioner's Google "hit list" search summary and excerpts from on-line catalogs
are neither self-authenticating nor otherwise authenticated. Accordingly,
respondent's motion to strike is granted in part as to these materials.

**History of Registration No. 1756155**
The Board first must look at the history of the registration before turning to
respondent's motion for summary judgment.[FN1] Registration No. 1756155 issued on
March 2, 1993 for the following mark:



(hereinafter "AQUA STOP rectangular form" or "rectangular
form") for "footwear, namely, rubbers and boots." The following depicts the
specimen submitted in support of registration:

On May 16, 2002, respondent filed its combined declaration of continued use
(Trademark Act § 8 - 10 year) and renewal for its registration (Trademark Act §9).
The following depicts the specimen submitted:

84 U.S.P.Q.2d 1856, 2007 WL 2422997 (Trademark Tr. & App. Bd.)                Page 5



(Hereinafter "2002 specimen" or "duckman" specimen.) On July 30, 2002, the Post Registration Division accepted the Section 8 declaration and granted the Section 9 renewal.

On January 3, 2005, respondent filed an amendment to its mark pursuant to Trademark Act §7(e) with the Post Registration Division seeking "to change the lay-out of the letters" as follows:

(hereinafter "AQUASTOP semicircular form" or "semicircular form").[FN2] On January 27, 2005, this proceeding commenced with the filing of the petition to cancel.

Respondent's post registration amendment, pending with the Post Registration Division, has yet to be considered.

**Respondent's motion for summary judgment**

For purposes of its motion, respondent admits "… that the mark depicted in the use specimen filed in the Combined Declaration of Use/Application for Renewal [*i.e.*, the 2002 specimen] and as currently being used by Registrant is not identical in stylization to the mark as originally registered." Respondent asserts, however, that it has not abandoned the mark or committed fraud on the USPTO.

We address first some procedural matters. Contrary to petitioner's contention, respondent's motion for summary judgment is not premature because it was filed before any discovery commenced. Had petitioner believed it needed discovery in order to respond to respondent's motion, it was incumbent upon petitioner to file a motion for discovery pursuant to Fed. R. Civ. P. 56(f). Further, respondent's motion is not procedurally defective, as petitioner claims, for failure to specify the material facts that are allegedly undisputed. While a listing of allegedly undisputed facts as a preamble to a motion for summary judgment is often proffered

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

84 U.S.P.Q.2d 1856, 2007 WL 2422997 (Trademark Tr. & App. Bd.)                    Page 6

and is preferred by the Board, there is no requirement as to the form for setting
forth undisputed facts.

In a motion for summary judgment, the moving party has the burden of establishing
the absence of any genuine issue of material fact and that it is entitled to
judgment as a matter of law. *See* Fed. R. Civ. P. 56. A genuine dispute with respect
to a material fact exists if sufficient evidence is presented that a reasonable
fact finder could decide the question in favor of the non-moving party. *See*
*Opryland USA Inc. v. Great American Music Show, Inc.*, 970 F.2d 847, 23 USPQ2d 1471
(Fed. Cir. 1992). Thus, all doubts as to whether any particular factual issues are
genuinely in dispute must be resolved in the light most favorable to the non-moving
party. *See* *Olde Tyme Foods Inc. v. Roundy's Inc.*, 961 F.2d 200, 22 USPQ 1542 (Fed.
Cir. 1992).

**\*5** We consider in turn respondent's motion with respect to each of the three
grounds alleged in the petition to cancel.

1) Respondent's motion as to petitioner's claim that respondent has abandoned the
mark shown in the registration by failing to use it, in its registered form, for at
least three years, with no intention of resuming such use.
Underlying this abandonment allegation is a supposition by petitioner that
respondent now uses its mark in the forms shown in the 2002 specimen (*i.e.*, the
semicircular form, the linear form, and the duckman display),[FN3] and that the
original rectangular form is no longer in use. For purposes of its motion,
respondent has conceded that the semicircular mark depicted in the 2002 specimen
and as currently being used by respondent is not identical in stylization to the
rectangular mark that was originally registered. Thus, there is no genuine issue
that respondent does not use the mark in the original rectangular form, but uses it
in the semicircular form. There is also no genuine issue, as discussed below, that
respondent also uses the mark in linear form and as shown in the duckman specimen
display.[FN4]

In support of its motion, respondent argues that no new mark is created by its
change from AQUA STOP rectangular form to AQUASTOP semicircular form. Respondent
contends its modernized form of the mark is not a material alteration of the
registered mark because the word portion is the dominant portion of both forms,
thus providing a continuing commercial impression. According to respondent, the
change in form does not constitute abandonment of the mark or a break in the
continuous usage of the mark. Respondent notes that it also uses AQUA STOP in
linear form on the back of its 2002 hang tag specimen, which was introduced by the
declarations of respondent's president and respondent's attorney. A copy of the
back of the hangtag specimen is reproduced below:

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Aqua Stop® = Water Proof
Thermal Insulation includes
Dupont Thermolite® insole

In response, petitioner argues that respondent has abandoned its registered
rectangular form mark in favor of one or more additional marks (semicircular form,
linear form, or the complete duckman specimen display). Petitioner contends that
respondent's registered mark in rectangular form is an integrated, stylized mark
composed of elements which are linked to a common effect, making the stylization
inseparable from the literal element. According to petitioner, issues for trial
exist as to "… whether the Original Mark remains in use, and if not, when
Registrant-Respondent's use of the Original Mark discontinued; what other forms of
the mark have been used since that date, and whether such forms constitute material
alterations of the Original Mark." Petitioner's Response to Respondent's Motion for
Summary Judgment p. 5.

Petitioner's position that respondent still may be using its mark in the registered
rectangular form (the "Original Mark") does not raise a genuine issue for trial
because, if true, petitioner cannot prevail on its claim of abandonment based on a
change in the form of use by respondent. In any event, as noted *supra*, for purposes
of this summary judgment motion respondent admits that it is not currently using
the mark in the identical stylization in which the mark is registered. Thus, there
exists no genuine issue of material fact that, according to respondent's
conditional admission, respondent is not using the mark in its original registered
rectangular form. Nor, in view of the declaration of respondent's president that it
is using the mark in the forms shown on the hang tag, and petitioner's concession
of such use, is there any genuine issue that respondent is using the mark in the
semicircular and linear forms that appear on the 2002 specimen. We thus turn to the
question of whether these forms of the mark constitute use of the registered mark.
That is, we must determine whether a genuine issue of material fact exists that the
forms of the mark now in use constitute a material alteration from the form of the
mark as registered.

*6 "Material alteration" is the standard for evaluating whether a change in the
form of a registered mark is permissible. *See* Trademark Rules 2.72 and 2.73, 37
C.F.R. §§2.72 and 2.73. A material alteration exists if the old and new formats do
not create the same general commercial impression. *See* J. Thomas McCarthy, 3
McCarthy on Trademarks and Unfair Competition § 19:58:50 and 19:133 (4th ed. 2007).
In contrast, a change in the form of a mark does not constitute abandonment or a
break in continuous use if the change neither creates a new mark nor changes the
commercial impression of the old mark. *Id.* at §17:26. Marks entirely comprised of
words can sometimes be varied as to their style of lettering, size and other
elements of form without resulting in a material alteration of the mark. *See Ex
parte Squire Dingee Co.*, 81 USPQ 258, *recon. denied*, 81 USPQ 543 (Comm'r Pats.
1949) (amendment from rectangular lettering to script not a material alteration);
and TMEP §1609.02(a) (4th ed. April 2005). With respect to Section 8 filings, mere

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

84 U.S.P.Q.2d 1856, 2007 WL 2422997 (Trademark Tr. & App. Bd.)                Page 8

changes in background or styling, or modernization, are not ordinarily considered
to be material changes in the mark. *See* TMEP §1604.13 (4th ed. rev. April 2005).

We find that, although the displays are not identical, they are substantially the
same. Thus, there is no material alteration between the original, registered AQUA
STOP rectangular form of the mark which shows the words depicted on two lines, and
the semicircular and linear forms which depict the words on one line and, in the
case of the semicircular form, as one word. This is because the commercial
impression of the mark is dependent upon the literal terms AQUA STOP and not on the
rectangular, semicircular or linear forms of display. The particular stylizations
of the semicircular and linear forms simply do not change the essential nature of
the rectangular form mark. Nor, contrary to petitioner's characterization, does the
duckman display on the 2002 specimen constitute a different form of the AQUA STOP
mark. The additional elements on the hang tag are not integral to the term AQUA
STOP such that a new composite AQUA STOP mark results. The term WATERPROOF
identifies a quality of the goods. The other elements, the duckman design and the
term SPORTO, are separate from the AQUA STOP mark. A similar, multi-element
arrangement exists in the original specimen where other elements include a design
suggesting rain, the term SPORTO, and the phrase KEEP THE MOISTURE OUT AND THE
COMFORT IN.[FN5]

The cases relied upon by petitioner are distinguishable insofar as integral design
elements were found to be part of the original marks. In *In re CTB Inc.*, 52 USPQ2d
1471 (TTAB 1999), applicant sought to change its special form mark from



**\*7** to standard character form, TURBO, thus deleting the
swirling design element, which was determined to be "an essential part of the
original mark and hence 'integrated' into the composite." In *In re Dillard
Department Stores*, 33 USPQ2d 1052 (Comm'r 1993), the registrant sought to change
its mark from

to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# INVESTMENTS

The Commissioner determined that the registered mark clearly contained "salient design features apart from the word portion" and that, particularly in view of the goods involved (clothing items), "the syllabication and unique layout could lead someone to view the mark as a play on the terms 'in' and 'vestments'." Thus, the proposed amendment was found to be a material alteration of the mark as registered.

Unlike the cases referenced by petitioner, there is no design feature in the registered rectangular form of the mark that is integral to the word portion of the mark. Further, both the semicircular and linear forms of the mark convey the same commercial impression. Moreover, the semicircular form of the mark maintains the commercial impression of the registered mark in the context of the overall duckman display (i.e., it is a separate element from the other wording and designs on the specimen). Thus, respondent's change in the style of its lettering does not constitute a material alteration of the mark as registered.[FN6]

Because there is no genuine issue of material fact that respondent's uses of the term AQUA STOP in the semicircular and linear forms do not constitute material alterations of the registered rectangular form, as a matter of law petitioner's claim of abandonment must fail. Accordingly, respondent's motion for summary judgment on this ground is granted.

2) Respondent's motion as to petitioner's allegation that respondent has maintained the registration fraudulently
Respondent argues that it did not commit fraud in maintaining its registration because nothing was concealed from the USPTO. That is, respondent submitted the front side of the duckman specimen displaying the semicircular form of the mark with its 2002 combined Sections 8 and 9 declaration and the Post Registration Examiner accepted the declarations based on the specimen submitted.[FN7]

In response, petitioner contends that the 2002 combined declaration "embodied a material alteration" to the involved registration and that such declaration "was tendered with the full knowledge of the deficiency, in anticipation that the Office would rely on the Declaration, and that the registration would be renewed." Petitioner's Response to Respondent's Motion for Summary Judgment p. 22. Petitioner argues that a factual issue on its fraud claim remains in dispute as to respondent's intent and whether "respondent's commercial activities constituted ongoing use of the Original Mark in commerce so as to provide a proper basis" in support of the declaration. Petitioner's Response to Respondent's Motion for Summary Judgment p. 23.

**8** Fraud in obtaining a renewal of a registration amounts to fraud in obtaining a registration. *See Torres v. Cantine Torresella S.r.L.*, 808 F.2d. 46, 1 USPQ2d 1483 (Fed. Cir. 1986). Fraud in obtaining a trademark registration occurs "when an applicant knowingly makes false, material representations of fact in connection with his application." *Id.* "If a registrant files a verified renewal application stating that its registered mark is currently in use in interstate commerce and that the label attached to the application shows the mark as currently used when,

in fact, he knows or should know that he is not using the mark as registered and *that the label attached to the registration is not currently in use*, he has knowingly attempted to mislead the PTO." *Id.* (Emphasis added.) The Court in *Torres*, citing *In re Holland, 737 F.2d 1015, 1019, 222 USPQ 273 (Fed. Cir. 1984)*, recognized that "[i]t is the practice of the office to allow renewal on the basis of a label which presents the mark in a somewhat different form from the form in which the mark is registered if the specimen does not show a material alteration of the mark as registered."

Here, no genuine issue of material fact exists that when respondent filed its combined §§8 and 9 declaration it submitted the duckman specimen with the semicircular display of the term AQUASTOP. Nor is there a genuine issue that respondent was using the mark in the form shown in the duckman specimen at that time. The Office reviewed the submissions and accepted the declaration. Thus, there is no genuine issue that respondent truthfully apprised the Office of the manner of use of its mark when it filed its declaration, and nothing was concealed or withheld from the Office. Petitioner has not shown that there are any issues of material fact in dispute with respect to respondent's intent and as to whether respondent's activities constituted use of the registered mark. Because the statements made by respondent in its combined declaration were truthful, *i.e.*, that it was using the mark as shown in the specimen submitted with the declaration, respondent's intent in making the statements is not material. As for the adequacy of the specimen to demonstrate use of the registered mark, that does not go to the issue of fraud. At most, it can go to the issue of abandonment, but as discussed above, because we find that the semicircular form is not a material alteration of the rectangular form, there has been no abandonment of the mark. Accordingly, we find that there are no genuine issues of material fact with respect to the ground of fraud and that, as a matter of law, respondent did not commit fraud in maintaining its registration.

3) Respondent's motion for summary judgment as to petitioner's allegation that respondent has abandoned the subject mark by engaging in naked licensing thereof

**\*9** Respondent argues that there has been no abandonment due to naked licensing. According to respondent, as supported by the declaration of its president,[FN8] respondent's branded goods are manufactured to its specifications by its vendors. The declaration states that respondent designs the goods, samples products from each vendor, controls distribution and pricing, and controls the use of the AQUA STOP mark on the goods, including supplying the hang tags and packaging in controlled numbers to its manufacturers. The declaration further explains that, while respondent's goods to Canadian customers may have been "dropped shipped" (directly shipped from the manufacturers), its goods to U.S. customers are warehoused and shipped by respondent.

In response, petitioner argues that respondent's motion is not accompanied by copies of its license agreements with foreign manufacturers or distributors, or by affidavits from such entities attesting to the terms of the licensing agreements and conditions of sale. Petitioner contends that genuine issues of material fact remain for trial with respect to the relationship respondent has with the third parties, whether respondent has written agreements with the third parties, and the degree to which respondent has exercised control over the quality of goods bearing the mark(s) and the manners and forms in which the mark is and has been displayed.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Petitioner relies on the declaration of respondent's president submitted in a Canadian proceeding wherein she states that respondent "contracts for the manufacture of footwear bearing the trademark AQUA STOP with various manufacturers in a number of countries" and that respondent "receives orders from its Canadian distributors … directs foreign manufacturers to distribute products directly to the said distributors in Canada" and the Canadian distributors "are invoiced directly by Sporto's manufacturers."

A trademark registration may be cancelled if the mark has become "abandoned." *See* Trademark Act §45, 15 U.S.C. §1127. A mark can become abandoned by any act or omission of the registrant which causes the mark to lose its significance as an indication of origin. Thus, uncontrolled and "naked" licensing can result in such a loss of significance of a trademark that a registration should be cancelled. *See* J. Thomas McCarthy, 3 McCarthy on Trademarks and Unfair Competition §18:48 (4th ed. 2007).

There exists no genuine issue of material fact that respondent contracts with foreign companies for the manufacture of its goods. On this point, the declaration of respondent's president submitted in support of its motion is consistent with the declaration submitted in the Canadian proceeding. In the present proceeding, respondent's president elaborated on the nature of the relationship between respondent and the foreign manufacturers. Based on the evidence of record, there is no genuine issue of material fact that respondent does not license its mark but, rather, contracts for manufacture of the goods under its mark. Nothing argued by petitioner raises a genuine issue of fact as to this. Thus, as a matter of law, respondent has not abandoned its mark due to naked licensing.

**\*10** Accordingly, no genuine issues of material fact exist as to any of petitioner's claims, and we find that respondent is entitled to judgment on each of these claims as a matter of law. Respondent's motion for summary judgment is granted and the petition to cancel is dismissed with prejudice.

In view of our finding herein that the mark which is the subject of respondent's request for amendment does not constitute a material alteration of the registered mark, the file will be forwarded to the Post Registration Division to grant respondent's pending request for amendment of the registration.

FN1. The evidentiary record in a cancellation proceeding includes, without action by any party, the file of the registration which is the subject of the proceeding. *See* Trademark Rule 2.122(b).

FN2. In responding to respondent's motion for summary judgment, petitioner argues that respondent could have moved the Board to amend the mark in its registration prior to the filing of the motion for summary judgment. However, as petitioner itself has noted, respondent had filed a request to amend the registration prior to the commencement of this proceeding.

FN3. The linear form refers to the mark as it appears on the reverse side of respondent's hang tag, *see infra*. We note that petitioner characterizes the entire 2002 specimen as an additional version of respondent's mark. Although we have accepted this characterization for purposes of our discussion herein, we do not

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

suggest by this that we consider AQUASTOP and the duckman design as shown in the specimen to form a single mark.

FN4. As part of its response to the motion for summary judgment petitioner states at p. 13 that a genuine dispute exists regarding whether respondent has abandoned the "original" mark, *i.e.*, the mark shown in the registration, essentially considering as irrelevant the fact that respondent uses other forms of the mark. In view of respondent's concession, made for the purpose of this motion, that it is not using the rectangular form of the mark shown in the registration, there is no genuine issue of fact that this form of the mark is not in use. Further, applicant's claim of abandonment requires a determination of whether the other forms of the mark constitute continuing use of the registered mark, *i.e.*, whether these forms are or are not a material alteration of the rectangular form of the mark. If the varying forms of the mark are substantially the same and there is no genuine issue of material fact that there is no material alteration, then the abandonment claim on this basis fails.

FN5. Petitioner references a "black bullet" under the second "a" in AQUASTOP with respect to the 2002 specimen. However, the element referenced is actually the hole which allows the tag to hang on the item to which it is attached.

FN6. We note petitioner's assertion that respondent has misused the registration symbol by using it in connection with the linear form of the mark on the reverse side of the hang tag, and that petitioner intends to amend its petition to add this as a ground for cancellation after proceedings resume herein. However, because we find that the linear form is not a material alteration of the registered mark, no purpose would be served by allowing such an amendment.

FN7. The declaration was filed through the USPTO's TEAS electronic filing system, and therefore only the front side of the specimen was scanned.

FN8. Petitioner's objection to the declaration of respondent's president on the bases that the credibility of the declarant has not been tested and the assertions made are self-serving in nature is overruled. Such declarations are permissible on summary judgment even though they are self-serving in nature and there is no opportunity for cross-examination of the declarant. *See* TBMP §528.05(b) (2d ed. rev. 2004).

 84 U.S.P.Q.2d 1856, 2007 WL 2422997 (Trademark Tr. & App. Bd.)
END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

27 U.S.P.Q.2d 1224

1993 WL 266611 (Trademark Tr. & App. Bd.), 27 U.S.P.Q.2d 1224
**(Cite as: 27 U.S.P.Q.2d 1224)**

**C**Pro-Cuts

v.

Schilz-Price Enterprises Inc.

U.S. Patent and Trademark Office Trademark Trial
and Appeal Board

Concurrent Use No. 698

Decided May 11, 1993
Released June 1, 1993

United States Patents Quarterly Headnotes

## TRADEMARKS AND UNFAIR TRADE PRACTICES

**[1] Acquisition, assignment, and maintenance of marks -- Acquisition through use -- Priority of use (Section 305.0503)**

Party which seeks to "tack" its use of earlier mark onto its use of later mark for same goods or services may do so only if marks are indistinguishable from one another or are legal equivalents, in that they create same commercial impression and do not differ materially from one another, and fact that two marks may be confusingly similar does not necessarily mean that they are legal equivalents; "Pro-Cuts" and "Pro-Kut," for hair care services, are confusingly similar but are not legal equivalents, and thus applicant cannot, in concurrent use proceeding, "tack" onto its use of "Pro-Cuts" earlier use of mark "Pro-Kut."

## TRADEMARKS AND UNFAIR TRADE PRACTICES

**[2] Acquisition, assignment, and maintenance of marks -- Scope of trademark -- As to territory (Section 305.0205)**

Applicant which has conceded that other parties commenced use of mark "Pro-Cuts" before applicant, and that those parties have continuously used mark to date, and which does not assert exclusive rights to mark in San Francisco Bay area, is not entitled to geographically unrestricted registration.

## TRADEMARKS AND UNFAIR TRADE PRACTICES

**[3] Acquisition, assignment, and maintenance of marks -- Scope of trademark -- As to territory**

**(Section 305.0205)**
**Practice and procedure in Patent and Trademark Office -- Interpartes proceedings -- Concurrent use proceedings -- In general ( Section 325.0307.01)**

Trademark Trial and Appeal Board will not, in contested concurrent use registration proceeding, grant concurrent use applicant registration for area greater than what was claimed by applicant at trial, since to do so would be unjust to other parties, who are entitled to notice prior to trial of area for which applicant seeks registration, as well as extent of area conceded by applicant to other parties.

**\*1224** Concurrent use proceeding between Pro-Cuts and Hawkins Pro-Cuts Inc., joined as party plaintiff, and Schilz-Price Enterprises Inc. On Schilz-Price Enterprises' motion to substitute successor in interest; on Pro-Cuts' motion for further extension of time to respond to motion to substitute, on Pro-Cuts' motion to suspend proceedings, on Enterprises' motion for extension of time to respond to motion to suspend, and on Pro-Cuts' response to show cause order. Order to show cause deemed discharged; Enterprises' motion to extend time denied as moot; Pro-Cuts' motion to extend time granted; Pro-Cuts' motion to suspend denied; Enterprises' motion to substitute granted to extent that Duke Specialty Ventures Inc. is joined as party defendant.

Karen M. Simonek, of Cooter & Gell, Washington, D.C., for applicants.

Neal A. Smith, of Limbach & Limbach, San Francisco, Calif., for opposers.

Before Sams, Rice, and Rooney, members.

Rice, member.

This case now comes up on (1) Schilz-Price Enterprises, Inc.'s (hereinafter "Enterprises") motion, filed May 11, 1992, to substitute a successor in interest, (2) Pro-Cuts and Hawkins Pro-Cuts, Inc.'s (hereinafter referred to jointly and severally as "applicant," except as otherwise indicated) motion, filed September 24, 1992, for a further extension of time to respond to Enterprises' motion to substitute, (3) applicant's motion, filed October 16, 1992, to suspend proceedings herein pending consideration by the Board of the effect of a recent assignment to

27 U.S.P.Q.2d 1224                                                                                                   Page 2
1993 WL 266611 (Trademark Tr. & App. Bd.), 27 U.S.P.Q.2d 1224
(Cite as: 27 U.S.P.Q.2d 1224)

applicant of a particular registration, (4) Enterprises' consented motion, filed November 9, 1992, for an extension of time to respond to applicant's "motion to suspend" and to file a reply brief in support of its own motion to substitute, and (5) applicant's response to a show cause order issued by the Board on February 4, 1993.

The show cause order may be determined quickly. On October 13, 1992, applicant filed a revocation of all previous powers of *1225 attorney. On the same date, applicant's attorneys of record filed a request for leave to withdraw as counsel for applicant in this proceeding. In an action dated November 19, 1992, the Board granted the request, suspended proceedings herein, and allowed applicant 30 days in which to either appoint new counsel, or file a paper stating that it wished to represent itself. Having received no response from applicant to this action, the Board, in an action mailed February 4, 1993, allowed applicant 20 days in which to show cause why judgment should not be entered against applicant in view of applicant's apparent loss of interest in the case. In its response to the show cause order, applicant stated that new counsel had, in fact, entered an appearance in behalf of applicant even before applicant's previous counsel withdrew, and that new counsel had filed numerous papers in applicant's behalf since that time. A review of the record confirms applicant's statements. Accordingly, the order to show cause is deemed discharged, and henceforth correspondence for applicant will be sent to the attorney who signed the appearance, namely, Karen M. Simonek, of the firm of Cooter & Gell, 1201 New York Avenue, N.W., Suite 900, Washington, D.C. 20005.

We turn next to Enterprises' consented motion for a one-month extension of time to respond to applicant's "motion to suspend," and for a like extension of time to file a reply brief in support of its own motion to substitute. The motion to extend was filed on November 9, 1992, and had not yet been associated with the file of this case when the Board issued its November 19, 1992 order suspending proceedings herein and allowing applicant 30 days in which to either appoint new counsel, or file a paper stating that it wished to represent itself. Proceedings have remained suspended to date, and the briefs in question have not been filed. However, applicant's "motion to suspend" can be determined without a responding brief from Enterprises. Moreover, reply

briefs normally are not favored by the Board, and Enterprises' motion to substitute can be determined by the Board without further briefing by Enterprises. In view of the length of time that the proceedings between the parties have consumed, and in order to expedite matters herein, both applicant's motion to suspend and Enterprises' motion to substitute are determined below. Accordingly, Enterprises' motion to extend is denied as moot.

As to the two remaining motions, namely, applicant's "motion to suspend" and Enterprises' motion to substitute, a recitation of the history of this case will be helpful to an understanding of the motions. On April 25, 1983, applicant Pro-Cuts filed an application (Serial No. 73/422,960) for a geographically unrestricted registration of the mark "PRO-CUTS" and design for hair styling and cutting services. In the application, applicant claimed first use of the mark, and first use of the mark in interstate commerce, on May 1, 1982. The application was eventually published for purposes of opposition, and was opposed (Opposition No. 72,232, filed July 29, 1985) by Enterprises, which pleaded priority of use and likelihood of confusion.

During opposer Enterprises' main testimony period in the opposition (but at a time when Enterprises had apparently not yet taken testimony because the parties had been negotiating, albeit unsuccessfully, for settlement), applicant Pro-Cuts filed a motion seeking, in essence, to substitute its successor in interest, Hawkins Pro-Cuts, Inc., in its stead, and also seeking to amend its application to one for concurrent registration. Specifically, applicant sought to amend its application to one seeking registration for the area comprising the States of Texas, Oklahoma, Louisiana, Arkansas, Florida, Missouri, Alabama, New Mexico, Mississippi, Georgia, Kentucky, Tennessee, Kansas, and Colorado. Recited in the proposed amendment as an exception to applicant's right to exclusive use was Enterprises, said by applicant to have been using the mark "PRO-CUTS" for hairstyling and cutting services in the State of California since June 21, 1979. Applicant also indicated its willingness to accept entry of judgment against itself in the opposition with respect to its right to a geographically unrestricted registration.

In a decision dated April 24, 1987, the Board granted both of applicant's motions. Specifically, applicant's

COPR. © 2008 The Bureau of National Affairs, Inc.

27 U.S.P.Q.2d 1224                                                                                                                Page 3
1993 WL 266611 (Trademark Tr. & App. Bd.), 27 U.S.P.Q.2d 1224
**(Cite as: 27 U.S.P.Q.2d 1224)**

motion to amend its application to one seeking concurrent registration was granted; judgment was entered against applicant in the opposition with respect to its right to a geographically unrestricted registration; and the present concurrent use proceeding was instituted to determine applicant's right to the geographically restricted registration sought. In addition, applicant Pro-Cuts' motion to substitute was granted to the extent that its successor in interest, Hawkins Pro-Cuts, Inc., was joined as a party defendant in the opposition, and as a party plaintiff in the concurrent use proceeding.

Immediately after the institution of the concurrent use proceeding, and prior to the filing by Enterprises of an answer under Rule 2.99(d)(2) (in its answer, Enterprises contended, inter alia, that applicant should **\*1226** not be granted any registration at all because applicant adopted and used its mark with knowledge of Enterprises' prior use thereof), applicant moved to amend its application to enlarge the territory for which it sought registration to the area comprising all of the United States except for the State of California. The motion was granted by the Board, over the objections of Enterprises, and the case went to trial on that basis. Both parties took discovery and testimony. After applicant's main brief on the case had been filed, Enterprises filed its motion to substitute. Applicant, in turn, filed a brief in opposition thereto, and its own "motion to suspend."

Against the foregoing background, we turn to applicant's motion to suspend proceedings herein pending consideration by the Board of the effect of a recent assignment to applicant of a particular registration, namely, Registration No. 1,144,560, issued December 23, 1980 (affidavit Section 8 accepted, affidavit Section 15 filed) from an application filed June 23, 1978, claiming use since November 1, 1975, for the mark "PRO-KUT" and design for hair styling services.

In support of its motion, applicant asserts that it stands in the shoes of its assignor; that the mark in the assigned registration is confusingly similar to the mark in its present application; and that applicant is thus entitled to rely on the registration for priority purposes in this proceeding. In addition, applicant asserts that the evidence of record in this case shows that Enterprises itself (despite its pleadings and interrogatory answers to the contrary) has never used the mark "PRO-CUTS"; that instead, use of the mark has been made by 12 limited partnerships (known as Hair Ventures I-XII), whose use was not controlled by, and did not inure to the benefit of, Enterprises; that 11 of the limited partnerships (Hair Ventures II-XII) did not begin use of the mark until after issuance of the registration which has now been assigned to applicant; that the first limited partnership (Hair Venture I) commenced use in 1979, after the filing of the application which matured into applicant's registration, but prior to the issuance of the registration; and that the assigned registration gives applicant rights superior to any rights previously asserted by any party in this proceeding.

Accordingly, applicant requests in its motion that the Board suspend proceedings herein and consider at this time the effect of the assignment of the registration to applicant; that applicant be granted a geographically unrestricted registration; and that Enterprises be denied registration. Alternatively, applicant requests that if the Board determines that applicant is entitled only to a concurrent use registration, applicant be granted a registration for the entire United States except for the area within a three-mile radius of Hair Venture I, i.e., the only one of the limited partnerships which began use of the mark "PRO- CUTS" prior to the issuance of applicant's assigned registration.

Applicant's request that Enterprises be denied registration cannot be granted by the Board. Enterprises did file an application for registration, namely, application Serial No. 73/482,557, filed May 29, 1984 for a geographically unrestricted registration of the mark "PRO-CUTS" for hairdressing salon services for men, women and children. An assignment of the application to Enterprises' asserted successor in interest, Duke Specialty Ventures, Inc., was recorded in the Assignment Branch of the Patent and Trademark Office at reel 730, frame 139. However, that application is not involved in this proceeding, and the Board has no jurisdiction over it. Rather, the application is still before the Examining Attorney, in Law Office 8, and has been suspended pending the outcome of this proceeding. Thus, the question of Enterprises' and/or Duke Specialty Ventures, Inc.'s right to registration is not before the Board. That question cannot, and will not, be determined in this proceeding, unless the application

27 U.S.P.Q.2d 1224                                                        Page 4

1993 WL 266611 (Trademark Tr. & App. Bd.), 27 U.S.P.Q.2d 1224
**(Cite as: 27 U.S.P.Q.2d 1224)**

is amended to seek concurrent registration, is published without successful opposition, and is added to this proceeding. Cf.: Georgia-Southern Oil Inc. v. Richardson, 16 USPQ2d 1723 (TTAB 1990)

Nor are applicant's requests that it be granted a geographically unrestricted registration, or at least a registration for the entire United States except for the area within a three-mile radius of Hair Venture I, well taken. As noted above, these requests are based upon applicant's acquisition of Registration No. 1,144,560, and its claim that the assigned registration gives applicant rights superior to any rights previously asserted by any party to this proceeding. In essence, applicant seeks to "tack," for purposes of priority, the earlier use of the assigned mark onto the use of the mark sought to be registered herein.

[1]  A party seeking to "tack" its use of an earlier mark onto its use of a later mark for the same goods or services may do so only if the earlier and later marks are legal equivalents, or are indistinguishable from one another. To meet the



The mark shown in the assigned registration is the mark "PRO-KUT" and design, as shown below (in reduced form):



Aside from the differences between the marks in spelling and pluralization, there is a very material difference between them because of their different design features. In short, although we agree that these marks are confusingly similar, they clearly are not legal equivalents.  [FN1] Under the circumstances, applicant cannot tack onto its use of the mark "PRO-CUTS" and design the earlier use of the mark "PRO-KUT" and design. While applicant's ownership of the assigned registration might well enable it to prevail in an opposition against any application owned by Enterprises (or its asserted successor, Duke Specialty Ventures, Inc.) for an unrestricted registration of the mark "PRO-CUTS" and design for hairdressing salon services, the assigned registration is of no particular benefit to applicant in this proceeding, where the critical question is applicant's date of first use of its

legal equivalents test, the marks must create the same commercial impression, and cannot differ materially **\*1227** from one another. Thus, the fact that two marks may be confusingly similar does not necessarily mean that they are legal equivalents. See, for example: Lincoln Logs Ltd. v. Lincoln Pre-Cut Log Homes Inc., 971 F.2d 732, 23 USPQ2d 1701 (Fed. Cir. 1992); Van Dyne-Crotty Inc. v. Wear-Guard Corp., 926 F.2d 1156, 17 USPQ2d 1866 (Fed. Cir. 1991); Tlco Corp. v. Ideal Security Hardware Corp., 527 F.2d 1221, 188 USPQ 485 (CCPA 1976); Baroid Drilling Fluids Inc. v. Sun Drilling Products, 24 USPQ2d 1048 (TTAB 1992); and American Paging Inc. v. American Mobilphone Inc., 13 USPQ2d 2036 (TTAB 1989), affirmed in an unpublished opinion, 17 USPQ2d 1726 (Fed. Cir. 1990).

In the present case, the mark sought to be registered by applicant is the mark "PRO-CUTS" and design, as shown below:

mark sought to be registered (or a legal equivalent thereof). Cf.: Baroid Drilling Fluids Inc. v. Sun Drilling Products, supra.
For the foregoing reasons, applicant's "motion to suspend" is denied.

This brings us to Enterprises' motion to substitute. [FN2] Although Enterprises specifically asks in its motion that we substitute as user herein the twelve limited partnerships, Hair Ventures I-XII, and their asserted current owner, Duke Specialty Ventures, Inc. (hereinafter "Duke"), it appears to us that what the motion really seeks is the substitution of Duke as user.

In support of the motion, Enterprises asserts that it is

27 U.S.P.Q.2d 1224                                                                                                    Page 5

1993 WL 266611 (Trademark Tr. & App. Bd.), 27 U.S.P.Q.2d 1224
**(Cite as: 27 U.S.P.Q.2d 1224)**

a small closely held corporation; that it has done business through a number of hair care limited partnerships; that the money of each partnership was invested in a particular hair salon; that either William Schilz (president of Enterprises) or, after its inception, his corporation, Enterprises, was the general partner in each limited partnership; that it was William Schilz who actually ran the chain of salons, the limited partners being mere passive investors; that all of the rights and assets, in the "PRO-CUTS" business, of William Schilz himself, Enterprises, and 11 of the 12 limited partnerships, including their rights in the mark "PRO-CUTS" and the good will of the business associated therewith, have been sold to Duke; that the remaining limited partnership (Hair Venture XI) has been sold to a third party, which has been granted a license by Duke to use the mark "PRO-CUTS" for one year only; that the limited partnerships, having been sold, no longer exist; and that a short testimony period can be had for the purpose of allowing the parties to introduce evidence concerning, inter alia, the sale of the hair salon partnerships to Duke.

**\*1228** Enterprises also cites certain admissions made by applicant in applicant's brief on the case. The pertinent portion of applicant's brief on the case reads as follows:

. . . Defendant alleges, and Applicant does not contest, that four of the California users (Hair Ventures I-IV) commenced use of the PRO-CUTS mark before Applicant and have continuously used the mark to date. Thus, even though the California users themselves have forfeited the right to prove their uses, Applicant's acquiescence to these allegations of use specify them as exceptions, in the San Francisco Bay area only, to Applicant's claim of territorially exclusive use. (citation omitted)

Second, Applicant does not assert in this proceeding exclusive rights against the latter eight California users in the Bay area only. Applicant has no desire to become mired in whatever claims or cross-claims may exist between and among the twelve California users. Applicant does, therefore, acquiesce to the naming of all twelve California users (Hair Ventures I-XII) as exceptions, in the Bay area only, to Applicant's claim of territorially exclusive use of the PRO-CUTS mark.

It is Enterprises' contention that if applicant "truly wishes to define the Hair Ventures as third parties" to its concurrent use applications and wants them included in this proceeding, "then the third parties should be given the opportunity to defend themselves and substitute for themselves their legitimate successor in interest, which has purchased all the rights to all of the Hair Ventures and user."

Enterprises' motion to substitute is accompanied by the declaration of its attorney. The declaration, in turn, is accompanied by certain exhibits identified therein, including redacted copies of an "AGREEMENT OF PURCHASE AND SALE OF ASSETS" dated March 7, 1990, and a "BILL OF SALE AND ASSIGNMENT" dated April 30, 1990. [FN3]

The first document is an agreement between

WILLIAM F. SCHILZ and SCHILZ-PRICE ENTERPRISES, INC., a California corporation (collectively with William F. Schilz the "General Partner"), the limited partnerships named in Schedule 1 (individually, including the General Partner, "Seller", in the aggregate "Sellers"), and DUKE SPECIALTY VENTURES, INC., a California corporation ("Buyer")

whereby Sellers agree to sell to Buyer all of the assets and properties owned and utilized by Sellers on or in connection with the business of owning and operating in the aggregate 11 hair care salons under the name "PRO-CUTS". The agreement is signed by Duke and by Hair Ventures I, II, IV, V, VI, VIII, IX, X, and XII, the ten limited partnerships listed in Schedule 1. [FN4] Signature on behalf of Hair Venture I is made by William F. Schilz as an individual. Signature on behalf of the other nine listed Hair Ventures is made by William F. Schilz as president of Enterprises, the General Partner.

The second document is a bill of sale and assignment between

Schilz-Price Enterprises, Inc., a California corporation (the "General Partner"), the Limited Partnerships named in Schedule 1 (the "Sellers"), and Duke Specialty Ventures, Inc., a California corporation ("Buyer")

27 U.S.P.Q.2d 1224                                                                                                           Page 6

1993 WL 266611 (Trademark Tr. & App. Bd.), 27 U.S.P.Q.2d 1224
**(Cite as: 27 U.S.P.Q.2d 1224)**

whereby the Sellers sell, convey, transfer, assign and deliver to Duke the assets of their hair care salon business, including the mark "PRO-CUTS" and the good will associated therewith. The document is signed by the same parties, and in the same manner, as the first document (again, there is no reference anywhere to Hair Venture III).

Applicant, in its brief in opposition to the motion, asserts that Enterprises never itself used the mark "PRO-CUTS" nor did it license any other entity to do so; that the users of the marks were the 12 limited partnerships in the San Francisco Bay area; that Enterprises cannot benefit from the use by the limited partnerships because that use was not licensed or controlled by Enterprises; that Enterprises was not even incorporated until one year after the use by Hair Venture I commenced; that Enterprises therefore has no standing to participate in this proceeding, which should be dismissed; that Enterprises had no transferable interest in the mark; that only the partnerships, and not Enterprises, are listed in the assignment document as assignors; that Enterprises is not a proper **\*1229** party to this proceeding; that whatever rights the partnerships had have assertedly been transferred to Duke; and that because they no longer have any rights in the mark, they should not be substituted as party defendants herein.

Applicant also asserts that the substitution of Duke as a party defendant at this late date would be unduly prejudicial to applicant; that Enterprises' delay in moving to substitute is not excused by the fact that applicant named the wrong party in its application as an exception to its right to exclusive use; that applicant was misled, by Enterprises' pleadings in the opposition, into naming Enterprises as an exception; that Enterprises continued its deception in its answer herein and in the interrogatory answers which it provided in this proceeding; that applicant did not know about the limited partnerships until the taking by Enterprises of the testimony deposition of Enterprises' president during this proceeding; that Enterprises' proposed additional evidence is contrary to its previous evidence, including its interrogatory answers, wherein Enterprises denied that it was a partner in any partnership; and that Enterprises' motion to substitute should be denied because of Enterprises' failure to provide truthful interrogatory answers.

[2] There are a number of problems with applicant's position. To begin with, "standing" is a concept which has to do with whether a plaintiff has a right to maintain a proceeding. This concept has no applicability to a defendant in a concurrent use proceeding. Second, applicant accepted entry of judgment against itself in the opposition with respect to its right to an unrestricted registration, and that judgment carries with it certain res judicata effects. Third, applicant has conceded in its brief on the case that Hair Ventures I-IV commenced use of the mark "PRO-CUTS" before applicant and have continuously used the mark to date, and also that applicant does not assert exclusive rights against the other Hair Ventures users in the San Francisco Bay area. It is manifest therefrom that applicant is not entitled to a geographically unrestricted registration. Fourth, even when a user in a concurrent use proceeding defaults (and there has been no default here), the applicant still has the burden of proving its entitlement to the concurrent registration sought. See: Rule 2.99(d)(3). Fifth, one of the questions which must be determined in a concurrent use proceeding is who is the owner of the adverse rights recognized by the concurrent use applicant, and who thus should be the party defendant to the proceeding and the named exception in any concurrent use registration which may ultimately be issued to applicant.

While the ultimate decision in this case as to who is the owner of the adverse rights recognized by applicant will have to await final decision (or agreement of the parties), the documents submitted by Enterprises in support of its motion to substitute indicate that at least 10 of the limited partnerships have assigned whatever rights they may have had in the mark to Duke. Inasmuch as the partnerships no longer have any rights in the mark, and indeed, according to Enterprises, no longer exist, it would be pointless to join them as party defendants to this proceeding. On the other hand, the assignment document indicates, at least prima facie, that Duke now owns the rights which the 10 listed limited partnerships had in the mark.

It is not clear to the Board whether Enterprises still claims to have had, in and of itself, any ownership rights in the mark, and, if so, whether whatever rights

27 U.S.P.Q.2d 1224                                                                                      Page 7

1993 WL 266611 (Trademark Tr. & App. Bd.), 27 U.S.P.Q.2d 1224
**(Cite as: 27 U.S.P.Q.2d 1224)**

Enterprises may have had have been assigned to Duke. We note in this regard that the assignment document is not signed by Enterprises in its own right but rather only as the general partner of 9 of the 10 signing limited partnerships. We also note that Enterprises apparently was not incorporated until one year after Hair Venture I commenced use of the mark, and was not the general partner in that firm. Further, the brief and supporting documents submitted by Enterprises in connection with its motion to substitute are totally silent with respect to the rights of Hair Venture III.

Accordingly, Enterprises' motion to substitute is granted only to the extent that Duke is hereby joined with Enterprises as a party defendant herein.

Moreover, the Board is mystified and deeply troubled by Enterprises' interrogatory answers, which, inter alia, claimed use of the mark by Enterprises; denied that Enterprises was a partner in any partnership; and stated that Enterprises owned and managed 12 hair care salons which rendered their services under the mark, but were not separate legal entities. These interrogatory answers effectively denied applicant the opportunity to obtain meaningful discovery concerning ownership of the adverse rights.

Under the circumstances, justice demands that the discovery and testimony periods be reopened, if applicant so desires, in order that applicant can take discovery concerning both this matter and the apparent transfer of rights in the mark to Duke, and introduce evidence thereon. Applicant is allowed until 30 days from the date hereof in which to advise the Board whether it wishes to have the discovery and testimony periods reopened. **\*1230** If applicant chooses to have these periods reopened, the party defendants will also be allowed an opportunity to offer additional evidence.

One final matter requires the Board's attention. The briefs submitted by the parties in connection with the foregoing motions indicate that in its brief on the case, applicant, which went to trial on the basis of an application seeking concurrent registration for the area comprising all of the entire United States except for the State of California, now asks that it be granted a registration for all of the United States except for the San Francisco Bay area.

[3] It is not the practice of the Board, in a contested concurrent use registration proceeding, to grant a concurrent use applicant a registration for an area greater than that which it claimed at trial. To do otherwise would be unjust to the other party or parties to the proceeding, who are entitled to notice prior to trial of the area for which applicant seeks registration as well as the extent of the area conceded by applicant to the other party or parties. Applicant itself recognized as much when it moved, just after the institution of this proceeding, to enlarge the territory for which it sought registration to that upon which it went to trial. Ordinarily, a request by a concurrent use applicant, at this late stage of the proceeding, to enlarge the territory for which it seeks registration would be denied.

However, the Board, in its determination above of Enterprises' motion to substitute, has offered applicant the option of having the discovery and testimony periods reopened. If applicant opts for reopening, the Board will entertain a motion from applicant to amend its application to seek a concurrent registration covering a larger area than that which applicant sought at the time of trial. The motion, if filed, should be filed within 30 days from the date hereof and should describe the area for which applicant now wishes to seek registration with specificity. A description reading "all of the United States except for the San Francisco Bay area" is not sufficiently definite. The excepted area, if less than an entire state, should be described in terms of counties or in other specific and definite terms. If the motion is granted, the party defendants will be allowed to take discovery and offer additional evidence concerning applicant's right to a registration for the enlarged area. The granting of such a motion does not, of course, necessarily mean that applicant will be granted a registration for the area sought. Whether applicant is entitled to a concurrent registration, and, if so, for the area sought or for some lesser area, is a matter to be determined at final hearing based on the evidence of record (in the absence of the submission by the parties of a persuasive settlement agreement).

In summary, the order to applicant to show cause is deemed discharged; Enterprises' motion filed November 9, 1992 to time is denied as moot;

1993 WL 266611 (Trademark Tr. & App. Bd.), 27 U.S.P.Q.2d 1224
**(Cite as: 27 U.S.P.Q.2d 1224)**

applicant's motion filed September 24, 1992 to extend time is granted; applicant's "motion to suspend" is denied; and Enterprises' motion to substitute is granted to the extent that Duke Specialty Ventures, Inc. is joined as a party defendant herein. In addition, applicant is allowed until 30 days from the date hereof in which to advise the Board whether it wishes to have the discovery and testimony periods reopened in this case, and, if applicant opts for reopening, until the same time to file, if it so desires, a motion to amend its application to enlarge the territory for which it seeks registration.

 Proceedings herein, including the time for the party defendants to file their brief on the case, will remain otherwise suspended pending applicant's response to the above.  [FN5]

> FN1  Applicant also acquired, by assignment, another, later, registration, namely, registration No. 1,461,575, issued October 20, 1987 from an application filed October 29, 1986 with a claimed date of first use of May 1, 1986, for the mark "PRO-KUT" with a different palm tree design for, inter alia, hair styling services. Although the two registered marks are not legal equivalents of applicant's mark "PRO-CUTS" and design, we agree with applicant's contention that they are confusingly similar to that mark. Likewise, they are confusingly similar to the "PRO-CUTS" and design mark of Enterprises. accordingly, both registrations must be added to this proceeding. In the event that the Board ultimately determines that applicant is entitled to a concurrent use registration for the mark "PRO-CUTS" and design, the two registrations will be geographically restricted also.

> FN2  In view of the circumstances set forth

therein, and because Enterprises filed no objection thereto, applicant's motion filed September 24, 1992 for a further extension of time to respond to Enterprises' motion to substitute is granted, and applicant's response filed October 16, 1992 is accepted as timely.

> FN3  These documents were executed after Enterprises' testimony period closed, on August 30, 1989, but before the beginning of applicant's rebuttal testimony period, which, as reset, closed October 25, 1990.

> FN4  As noted above, Hair Venture XI was sold to a third party, which assertedly was granted a license by Duke to use the mark for one year only. No reference is made anywhere in the agreement or accompanying attachments to Hair Venture III, notwithstanding the fact that the agreement purports to sell 11 of the limited partnerships to Duke.

> FN5  It appears to the Board that this is a case which could, and probably should, be settled. If, upon further consideration, the parties wish to resume negotiations for settlement, and notify the Board thereof, the Board will suspend applicant's time to file the responses called for above. For information concerning settlement agreements in concurrent use registration proceedings, see: Meijer, Inc. v. Purple Cow Pancake House,226 USPQ 280 (TTAB 1985).

P.T.O. T.T.A.B.

27 U.S.P.Q.2d 1224

END OF DOCUMENT

COPR. © 2008 The Bureau of National Affairs, Inc.

6 U.S.P.Q.2d 1205                                                                 Page 1

1988 WL 252476 (Trademark Tr. & App. Bd.), 6 U.S.P.Q.2d 1205
**(Cite as: 6 U.S.P.Q.2d 1205)**

C Societe Civile Des Domaines Dourthe Freres
v.
S.A. Consortium Vinicole De Bordeaux Et De La
Gironde

Patent and Trademark Office Trademark Trial and
Appeal Board

Opposition No. 70,438

Decided January 25, 1988
United States Patents Quarterly Headnotes

**TRADEMARKS AND UNFAIR TRADE
PRACTICES**
**[1] Practice and procedure in U.S. Patent and
Trademark Office -- Interpartes PTO proceedings
-- Standing (§ 325.0303)**
**Types of marks -- Names -- Individuals and
surnames (§ 327.1703)**
Corporate opposer's use of term, "Dourthe," as part
of its corporate name, in connection with same or
similar goods or services for which applicant seeks to
register "Dourthe," is sufficient to establish opposer's
standing, but does not establish standing on behalf of
individual corporate officer, Phillipe Dourthe, since
evidence does not show any commercial activity or
use of name on his own behalf.

**TRADEMARKS AND UNFAIR TRADE
PRACTICES**
**[2] Types of marks -- Names -- Individuals and
surnames (§ 327.1703)**
Recognition of "Dourthe" as surname in France has
no bearing upon its right to be registered in U.S.,
since determination as to whether term is surname
depends upon its primary significance to relevant
purchasing public, and since relevant purchasing
public for "Dourthe" wine will be U.S. public, even
though parties involved in application are French.

**TRADEMARKS AND UNFAIR TRADE
PRACTICES**
**[3] Types of marks -- Names -- Individuals and
surnames (§ 327.1703)**
Evidence, in opposition proceeding concerning use
of term "Dourthe" for wine, demonstrating that
applicant has sought to impress upon wine purchasers
significance of name "Dourthe" in production and

distribution of wine, and that applicant's references to
"Dourthe" as name of particular family are reinforced
by appearance, on wine labels and in advertisements,
of name and signature of Pierre Dourthe, constitutes
prima facie case that primary meaning of "Dourthe"
is that of surname, especially in view of lack of any
dictionary meaning for term.

**TRADEMARKS AND UNFAIR TRADE
PRACTICES**
**[4] Types of marks -- Names -- Individuals and
surnames (§ 337.1703)**
Trademark Act's Section 2(e)(3), which restricts
trademark registration of name which identifies "a
particular living individual," does not apply to
surnames, except in those cases in which particular
individual is known by surname alone.

**TRADEMARKS AND UNFAIR TRADE
PRACTICES**
**[5] Registration and its effects -- Federal
registration -- Foreign applicants (§ 315.0310)**
**International issues -- Foreign imports -- In
general (§ 370.0301)**
U.S. distributor of goods manufactured by foreign
producer does not acquire right of ownership in
manufacturer's mark merely by its importation and
sale of such goods, and distributor may not apply to
register mark without right of ownership, unless
distributor places in record assignment of ownership
rights in mark for U.S. and written consent to
registration or written agreement between parties that
distributor is to be owner of mark in U.S.

**\*1206** Opposition brought by Societe Civile Des
Domaines Dourthe Freres and Philippe Dourthe
against application, serial no. 296,274, filed February
9, 1981, by S.A. Consortium Vinicole De Bordeaux
Et De La Gironde. Registration refused.

Fleit, Jacobson, Cohn & Price, Washington, D.C.,
for Societe Civile Des Domaines, Dourthe Freres,
and Philippe Dourthe.

Robert A. Van Kirk and Chilton, Alix & Van Kirk,
Hartford, Conn., for S.A. Consortium Vinicole De
Bordeau Et De La Gironde.

Before Sams, Rooney, and Simms, members.

COPR. © 2008 The Bureau of National Affairs, Inc.

6 U.S.P.Q.2d 1205                                                                              Page 2

1988 WL 252476 (Trademark Tr. & App. Bd.), 6 U.S.P.Q.2d 1205
**(Cite as: 6 U.S.P.Q.2d 1205)**

Rooney, Member.

An opposition has been filed by Societe Civile Des Domaines Dourthe Freres and Philippe Dourthe to registration of the mark DOURTHE for wines. [FN1]

The grounds for opposition are set forth below. Opposers are and have been engaged in the manufacture, sale, distribution, advertising and promotion of wine in commerce between France and the United States. Opposer, Dourthe Freres, uses and has used the mark DOURTHE PERE ET FILS in connection with wine in commerce with the United States. Opposers and applicant are engaged in the sale and promotion of their goods in the same trade channels and to the same purchasers. Opposers believe they will be damaged by the registration sought by applicant for the following reasons. Opposers allege their belief that DOURTHE is primarily merely a surname and unregistrable under Section 2(e)(3); that DOURTHE is unregistrable under Section 2(c) as well since it is the family name of a well-known wine-producing family in France and applicant is not entitled to register the surname and thus exclude members of the family from using that surname for wine. Opposers further allege that in failing to advise the Examining Attorney that DOURTHE is a surname with no other significance, applicant committed fraud on the Office. Finally, opposers allege that the original applicant Dourthe, U.S.A., Inc. was not the owner of the mark when it filed the application and had no legal basis on which to file the application in its own name.

Applicant denied the salient allegations of the notice of opposition.

The record consists of applicant's answers to opposers' interrogatories and certain enumerated exhibits filed therewith, a copy of a French document with translation evidencing a change of name of "S.A. Dourthe Freres" to "Consortium Vinicole de Bordeaux et de la Gironde" (CVBG) executed on February 25, 1965 and filed with the Bordeaux Tribunal of Commerce, [FN2] a copy in French, with translation, of a change of name of "Societe Civile Agricole et Viticole du Domaine de Maucaillou" to "Societe Civile des Domaines Dourthe Freres" dated June 20, 1966, [FN3] a copy in French and translation of a letter from R. Dourthe to Philippe

Dourthe acknowledging the filing of an application to register the mark DOURTHE PERE ET FILS for wine in the National Industrial Property Office (France) and consenting to its use and registration, executed February 22, 1984 and registered in Bordeaux on February 27, 1984, a certificate of label approval issued by the U.S. Bureau of Alcohol, Tobacco and Firearms dated 1983 [FN4] for a label reading "1976 Chateau Maucaillou Wine shipped by Dourthe Freres Bordeaux, France", copies of the files of U.S. trademark applications Ser. No. 526,549 and Ser. No. 526,550 filed for the marks DOURTHE PERE ET FILS and a father and son portrait design, respectively, both for wines and both signed by Philippe Dourthe as an officer, all submitted by opposers under notices of reliance; [FN5] copies of relevant portions **1207** of telephone directories from thirty major U.S. cities offered by applicant under a notice of reliance to show the absence of listings of persons with the surname Dourthe [FN6] and copies of pages from a number of dictionaries offered under opposers' notice of reliance in rebuttal. [FN7] Both parties filed briefs and were represented at the oral hearing held in this matter.

[1] In its brief, applicant has raised questions regarding opposers' standing to bring this opposition. With respect thereto, it is well settled that the purpose for which inquiry is made as to a party's standing is "to prevent litigation where there is no real controversy between the parties. . ." See Jewelers Vigilance Committee, Inc. v. Ullenberg Corp., 2 USPQ2d 2021 (Fed. Cir. 1987), citing Lipton Industries, Inc. v. RalstonPurina Co., 670 F.2d 1024, 213 USPQ 185 (CCPA 1982). All that is necessary is that the opposer have a real interest in the proceeding. It is the Board's opinion that use by a corporate opposer of the challenged term as part of its corporate name in connection with the same or similar goods or services is sufficient to establish said opposer's real interest in a proceeding in which the right to register that term as a trademark indicating source in applicant is to be determined. Apart therefrom, the corporate opposer, in this case, has filed an application to register a mark consisting in part of the term in question, which application has been suspended pending resolution of this opposition. These facts show a sufficient commercial interest in the subject matter of this proceeding to establish the standing of opposer, Dourthe Freres, to pursue this opposition. Having shown such an interest, an

6 U.S.P.Q.2d 1205                                                                    Page 3

1988 WL 252476 (Trademark Tr. & App. Bd.), 6 U.S.P.Q.2d 1205
**(Cite as: 6 U.S.P.Q.2d 1205)**

opposer is entitled to rely on any statutory ground that may preclude applicant's right to register. [FN8] See *Lipton Industries*, supra.

On the other hand, there is no evidence of record which would establish that Philippe Dourthe has any interest in the term "Dourthe" except to the extent that it is his surname. That is, Philippe Dourthe has shown no commercial activity or use of the name on his own behalf but only in terms of his position as a corporate officer of Dourthe Freres.  [FN9] Thus, Philippe Dourthe has not **1208** proved his standing to challenge, as an individual, the application filed by applicant and the opposition must be dismissed as to Philippe Dourthe.

Turning to the merits of this proceeding, we will first discuss the surname allegation.

[2] Whether or not a term is considered to be primarily merely a surname and unregistrable under Section 2(e)(3) depends upon what is perceived to be the primary significance of that term to the relevant purchasing public. See In re Luis Caballeros, S.A., 223 USPQ 353 (TTAB 1984) and cases cited therein. It is opposer's burden to present a prima facie case showing that DOURTHE is primarily merely a surname. Because of the French origin of the parties involved herein, it is important to note that the relevant purchasing public whose perception is significant herein is the American public. The fact that DOURTHE is recognized as a surname in France has no bearing on its right to be registered in the United States. See In re Wickuler-Kupper-Brauerei, KGaA, 221 USPQ 469 (TTAB 1983).

Opposer has submitted certain exhibits which it received in response to its interrogatories to applicant. These consist of, inter alia, the certificate of incorporation issued by the state of Connecticut to Dourthe, U.S.A., Inc. signed by Pierre Dourthe as an incorporator thereof (Opposer's exhibit 2); advertisements for applicant's wines placed by applicant in a number of publications (Opposer's exhibits 3, 4 and 7) and labels for applicant's wine bottles (Opposer's exhibits 5 and 6). In both Exhibits 3 and 4 next to a picture of several wine bottles is a text saying, among other things, ". . . For five generations, Dourthe wines have embodied the best in French winemaking. They're unmistakably French

wines like Pierre Dourthe Vin Rouge, a smooth, full-bodied red, and Pierre Dourthe Vin Blanc, a dry, crisp white. . ." In both ads a signature, apparently that of Pierre Dourthe, appears directly on the labels of the bottles of wine which are depicted therein, while to the right of the bottles is the caption "The lovely wines of Pierre Dourthe." According to the interrogatory answers, Exhibit 3 appeared in *Sports Illustrated* on Sept. 12, 1983 and in various other magazines (primarily in New England) between July 1983 and June 1984 and Exhibit 4 appeared in the *Providence Journal*, November 18, 1983, and in various other newspapers (primarily in the New England area) during the period July 1984 to June 1985. Opposer's Exhibit 7 is another of applicant's advertisements. In this one, in addition to pictures of applicant's wine bottles (again with the Pierre Dourthe signature across the label), we find the statement, "Dourthe the number one family-owned wine exporters out of Bordeaux" and "Imported by the family that bottles and ships Dourthe Bordeaux Blanc." The label exhibits (5 and 6), again bear the name, Pierre Dourthe, and Exhibit 6 (the rear label) says "This excellent dry table wine comes from France, the world's foremost producer of fine wines, and is produced by the Dourthe family (pronounced Dort) fifth generation exporters of superior wines . . . Dourthe Vineaux Rouge and . . . are both produced in keeping with the quality tradition of the Dourthe family."

[3] It appears from the foregoing, that applicant itself has sought to impress upon the relevant public, i.e., purchasers and users of wine, the significance of the name DOURTHE in the production and distribution of wine. It has promoted its products through ads, of which those previously noted are illustrative, in magazines, newspapers, store promotions and billboards. Between July of 1983 and June of 1985, applicant spent $1,400,000 for such advertising and promotion. Although applicant did not provide sales figures, it is likely in view of its advertising expenditures that it had substantial sales during that same period. We find it difficult to believe that the relevant public could ignore the obvious references to DOURTHE as the name of a particular family reinforced by the appearance in the advertisements and on the labels of the name and/or signature of one individual named Pierre Dourthe. We conclude that opposer has presented a prima facie case that the primary meaning of DOURTHE is that of a

COPR. © 2008 The Bureau of National Affairs, Inc.

1988 WL 252476 (Trademark Tr. & App. Bd.), 6 U.S.P.Q.2d 1205
**(Cite as: 6 U.S.P.Q.2d 1205)**

surname. Moreover, opposer's case is buttressed by the various dictionaries (of which, as previously stated we may take judicial notice) evidencing the absence of any other meaning for the term.

Applicant's evidence in response to opposer's case consists of copies of relevant pages from the telephone directories of thirty major cities in the United States in which there is not a single listing for DOURTHE. However, this negative evidence is insufficient to rebut opposer's prima facie case. Rather, it is incumbent on applicant to show that DOURTHE has some other meaning which is well enough known to the public that it cannot be said that the primary significance thereof is that of a surname. This applicant has failed to do.

Apart from the foregoing, applicant has admitted that Dourthe is a surname (see answers to Interrogatories No. 39 and 41) **\*1209** although asserting that it is a surname only in France and that, even there, it is rare. However, in view of applicant's advertising efforts which appear to be intended to impress upon the relevant purchasing public the significance of the DOURTHE name in connection with the wine industry and its origin with the French family of that name, we cannot give credence to applicant's argument that DOURTHE has surname significance only in France. In the absence of any other known meaning for the term, it is doubtful that the public would consider it to be anything other than a surname. Rare surnames are no more registrable on the principal register than others which are commonly used. See In re Etablissements Darty et Fils, 759 F.2d 15, 225 USPQ 652 (Fed. Cir. 1985).

Under Section 2(c) of the Trademark Act, no trademark which distinguishes applicant's goods from like goods of others may be refused registration on the principal register on account of its nature unless it

Consists of or comprises a name, portrait, or signature identifying a particular living individual except by his written consent . . .

[4] Opposer's pleading does not allege that DOURTHE is the name of a particular living individual but that it is the surname of a well-known family in France. While surnames may be unregistrable under Section 2(e)(3), Section 2(c) does not apply to surnames except in those cases

where a particular individual is known by a surname alone. Since that is not the case here, opposer has failed to show that applicant's mark is unregistrable under Section 2(c).

As to the allegation that applicant committed fraud by failing to advise the Examining Attorney that DOURTHE is a surname with no other significance, we note that in the examination process it is the burden of the Examining Attorney to prove that a mark is primarily merely a surname. See In re Wickuler-Kupper-Brauerei, supra. The burden shifts to the applicant only after a prima facie case has been made by the Examining Attorney. In this case, the surname question was raised in the first Office action and withdrawn, apparently because the Examining Attorney found no evidence to support the rejection. Applicant does not have a burden to support the Examining Attorney's position. Moreover, applicant clearly stated in its response that while there may be someone somewhere in the world whose surname is the same as a designation sought to be registered as a word mark, that does not render such a mark "primarily merely a surname". Opposer has not proved its fraud allegation.

Finally, opposer alleges that the original applicant Dourthe, U.S.A., Inc. did not own the mark at the time the application was filed and concludes that the application is therefore void ab initio.

Dourthe, U.S.A., Inc. filed the application on February 9, 1981, claiming first use of the mark DOURTHE on June 1, 1980 for wines. The specimens of record indicate that applicant imported the wine from Dourthe Freres, Bordeaux, France. [FN10] A question of ownership of the mark as between applicant and the foreign producer of the goods was raised in the Office action of January 25, 1982. In response, applicant filed a copy of an assignment of the application to CVBG. [FN11] The Examining Attorney then inquired "whether applicant/importer is a related company of the foreign manufacturer . . . or if, prior to the filing date of this application . . ., applicant had obtained an assignment of the U.S. rights in the mark together with the business and good will appurtenant thereto or written consent from the owner to register the mark in the United States." It was stated by the Examining Attorney that applicant/importer apparently had no ownership rights to convey to the assignee. Applicant

6 U.S.P.Q.2d 1205                                                                                                Page 5

1988 WL 252476 (Trademark Tr. & App. Bd.), 6 U.S.P.Q.2d 1205
**(Cite as: 6 U.S.P.Q.2d 1205)**

then informed the Examining Attorney that since applicant was the only party to have used the mark in the United States it had acquired the right to register, and that the specimen labels, applied to the wine bottles in France, are used only for applicant. Finally, applicant stated that it is a wholly owned subsidiary of CVBG, the foreign vintner and while applicant, as sole user in the United States, has acquired the right to register, applicant's use inures to its parent's benefit and the assignment of applicant's rights to the parent is no more than a housekeeping matter. The Examining Attorney then suspended action on the application pending recordation of the assignment, following which the mark was published for opposition.

Opposer argues that there is a presumption that a distributor of a foreign producer's goods does not have the right to apply for registration in the absence of an agreement **1210** between the parties, citing In re Eucryl Limited, 193 USPQ 377 (TTAB 1976). While recognizing that, with respect to parent-subsidiary relationships, the determination as to who should apply for registration is generally left to the parties and that it is possible for the use of a mark in such a situation to inure to the benefit of the parent or of the subsidiary, opposer notes that the TMEP Section 1201.02 states, inter alia, that the use of the mark inures to the benefit of the party which does the controlling and is thereby the owner of the mark. It is concluded by opposer that because applicant's wine is produced in and emanates from France at CVBG's French location, it does not appear that Dourthe, U.S.A., being a United States distributor and a Connecticut corporation, could properly exercise control over the nature and quality of the wines marketed under the DOURTHE designation. Opposer notes, in further support of its position, applicant's statement in its December 8, 1982 response to the Examining Attorney that "while applicant as the sole user of the mark in the United States, has acquired the right to register, applicant's use inures to the benefit of its parent company. . .".

[5] As opposer contends, a U.S. distributor of goods manufactured by a foreign producer does not acquire the right of ownership in the manufacturer's mark merely by virtue of its activity as the importer and seller of the foreign producer's goods, and, without the right of ownership, the distributor may not apply to register the mark. The exception is where the U.S. importer or distributor places in the record an assignment of ownership rights in the mark for the U.S. (including the business and goodwill), a written consent to registration in the importer's name, or, a written agreement or acknowledgment between the parties that the importer is to be the owner of the mark in the United States. See TMEP §1201.04(a) and cited cases.

This case, however, involves more than simply an importer/producer situation. The parties here are in the position of parent/subsidiary. [FN12] In a parent/subsidiary situation, the owner of the mark is not always the parent. Which is to be considered the owner is dependent upon the particular situation which exists between them. Quoting from the TMEP §1201.02(b), ". . . in this area, where a full knowledge of the arrangements between the parties and the legal conclusions to be drawn therefrom, are primarily the responsibility of the parties rather than the Office, the decision as to whether the parent or the subsidiary is to be regarded as owner of a mark for purposes of registration should be made between the parties themselves." Thus, applicant/assignee (CVBG), parent of the applicant/assignor (Dourthe, U.S.A.) has expressed its position that the applicant/assignor had the right to register at the time the application was filed. Opposer's arguments to the contrary cannot alter the arrangement between these related parties.

In view of the foregoing, the opposition is dismissed as to Philippe Dourthe but is otherwise sustained. Registration to applicant is refused.

FN1 Ser. No. 296,274 filed February 9, 1981 by Dourthe U.S.A., Inc. and subsequently assigned to S.A. Consortium Vinicole de Bordeaux et de la Gironde. First use as of June 1, 1980 was alleged.

FN2 Opposers assert that the filing with the Bordeaux Tribunal of Commerce occurred on May 12, 1985. Although the French copy of the document contains what appears to be the seal of said tribunal, the date of filing, if it appears thereon, is illegible. Individuals listed as taking part in the activity were Roger Dourthe, Andre Dourthe, Philippe Dourthe and Jean-Paul Jauffret.

1988 WL 252476 (Trademark Tr. & App. Bd.), 6 U.S.P.Q.2d 1205
**(Cite as: 6 U.S.P.Q.2d 1205)**

FN3 Individuals named as shareholders are Andre Dourthe, Jean Roger Dourthe, Jean Philippe Dourthe, et al.

FN4 The month and day are illegible.

FN5 Applicant objected in its brief to the letter of consent as hearsay and irrelevant to this proceeding, to the certificate of label approval as hearsay and lacking in probative value regarding use in the U.S., and to the application files as hearsay and self-serving. Further objection was made to all four of these exhibits on the ground that they came into existence subsequent to the filing of the application involved herein. As to the latter objection, it has long been settled that registration must be determined on the basis of the facts as they exist at the time the question is under consideration. See In re Hoffman House Sauce Co., 137 USPQ 486 (TTAB 1963) and Oxford Pendaflex Corporation v. olodex Corporation, 204 USPQ 249 (TTAB 1979). Thus, the fact of their coming into being subsequent to the filing of applicant's application has no bearing on the admissibility of the foregoing exhibits. As to the other objections, these documents were not offered for the truth of their contents but merely for what they show on their face. Each document is relevant to the issue of the significance of the mark in question herein. Therefore, applicant's objections are not well taken.

FN6 Applicant also relied on a copy of a judgment issued on December 4, 1985 by the General Trial Court of Paris, Third Division, First Section in an action between the parties hereto. The relevance thereof, as stated by applicant, is to show that the French court proclaimed that opposers have no legal right to use of the trademark or trade name DOURTHE and are in fact enjoined by the French court from using same in connection with wine. Opposers objected to this material, in their brief, on the ground that the judgment is irrelevant to proceedings in the U.S. In response, applicant asserted that the judgment is

relevant insofar as it exhibits applicant's good-faith belief that it had the exclusive right to use the DOURTHE mark and its well-founded belief that opposers had no rights in the mark, either abroad or in the U.S. Applicant also indicated that the French case has been appealed to the French Supreme Court. It is well settled that the findings of a foreign tribunal are not relevant to the issues in a proceeding concerning the right to register a trademark in the U.S. See Hiram Walker & Sons, Inc. v. Canadian Distilleries Ltd., 176 USPQ 156 (TTAB 1972). Even if we were to consider the court's determination for the purpose of establishing applicant's good faith belief in its right to file its application (applicant's second choice as to the document's relevance), the fact that the decision is not yet final would militate against our relying thereon for any purpose.

FN7 Applicant's motion to strike the material in opposers' notice as being improper rebuttal is granted since evidence offered to establish the surname significance of applicant's mark is part of opposers' case-in-chief. See General Electric Co. v. Graham Magnetics Incorporated, 197 USPQ 690 (TTAB 1977). However, since the Board takes judicial notice of material in dictionaries, such matter found in opposers' notice of reliance has been considered. See Marcal Paper Mills, Inc. v. American Can Co., 212 USPQ 852 (TTAB 1981).

FN8 The Board expressed its opinion in the case of Fioravanti v. Fioravanti Corrado S.R.L., 230 USPQ 36 (TTAB 1986), involving a surname issue, that "cases on standing to oppose based on Sections 2(e)(1) and 2(e)(2) are unquestionably analogous." Thus, one's real interest in the question of whether a particular term is registrable in view of the prohibitions of Sections 2(e)(1), (2) or (3) is not dependent upon the challenging party's having previously used that term in connection with the same or similar goods but only with that party's being in a position to use said term in its business activities.

1988 WL 252476 (Trademark Tr. & App. Bd.), 6 U.S.P.Q.2d 1205
**(Cite as: 6 U.S.P.Q.2d 1205)**

FN9 There is considerable argument concerning Mr. Philippe Dourthe's position, expertise and recognition in the wine industry in France. However, argument is insufficient to establish these facts and there is no probative evidence of Mr. Philippe Dourthe's identity except as a member of the family named Dourthe and an officer of opposer corporation. Moreover, even if his position in the industry had been proved, it does not establish that Philippe Dourthe has any commercial interest in the mark as an individual performing on his own behalf.

FN10 There is a document of record showing the change of name of Dourthe Freres to Consortium Vinicole de Bordeaux et de la Gironde (CVBG) on February 25, 1965.

FN11 Because there was no domestic representative named, the document was refused recordation. Applicant explained the foregoing and indicated that it would file a new assignment. Subsequently, on April 22, 1983, applicant filed a new assignment executed on March 25, 1983 which was recorded June 27, 1983.

FN12 This case differs also from *In re Eucryl* supra, cited by opposer. In that case, both the foreign manufacturer of the goods and the U.S. distributor thereof were independent entities which happened also to be subsidiaries of the same parent.

P.T.O. T.T.A.B.

6 U.S.P.Q.2d 1205

END OF DOCUMENT

COPR. © 2008 The Bureau of National Affairs, Inc.



ℂIn re Umax Data System Inc.

U.S. Patent and Trademark Office Commissioner of
Patents and Trademarks

No. 95-514

Decided September 9, 1996
Released October 22, 1996

United States Patents Quarterly Headnotes

**TRADEMARKS AND UNFAIR TRADE
PRACTICES**
**[1] Practice and procedure in Patent and
Trademark Office -- Ex parte proceedings -- In
general (Section 325.0501)**

**JUDICIAL PRACTICE AND PROCEDURE**
**Procedure -- Judicial review -- Standard of review
-- Trademarks and unfair trade practices (Section
410.4607.11)**
Commissioner of Patents and Trademarks, in
deciding petition to review adverse decision of
examiner on proposed amendment to registered mark
under 15 USC 1057, will henceforth review decision
to determine whether it was correctly made, rather
than for clear error or abuse of discretion, since
standards for determining propriety of amendments
to marks are same for both registrations and
applications.

**TRADEMARKS AND UNFAIR TRADE
PRACTICES**
**[2] Registration and its effects -- Federal
registration -- Procedure, form, and content --
Amendments or corrections (Section 315.0303.04)**

Post registration examiner's refusal to accept
amendment of registration pursuant to 15 USC
1057(e) is reversed, since nature of proposed
amendment, which would minimally change
stylization of term "Umax," is such that commercial
impression of modified mark is essentially same as
that of original mark.

**\*1540** Petition of Umax Data System Inc., owner of
trademark registration no. 1,614,692, issued
September 25, 1990 ("Umax" (stylized)), for reversal
of post registration examiner's refusal to accept
amendment to registration pursuant to 15 USC
1057(e). Granted.

Joseph A. Degrandi and Helen Hill Minsker, of
Beveridge, DeGrandi, Weilacher & Young,
Washington, D.C., for petitioner.

Hampton, assistant commissioner for trademarks.

Umax Data System, Inc. has petitioned the
Commissioner to reverse the decision of the Post
Registration Examiner refusing to accept an
amendment, pursuant to Section 7(e) of the
Trademark Act, 15 U.S.C. Section 1057(e), of the
mark in the above-identified registration. Trademark
Rules 2.146(a0(2) and 2.176 provide appropriate
authority for the requested review.

*Facts*
In letter mailed August 9, 1995, the Post Registration
Examiner refused to accept the proposed amendment
on the ground that it constituted a material alteration
of the mark as registered. The original mark and the
proposed amended mark are shown below:

COPR. © 2008 The Bureau of National Affairs, Inc.

40 U.S.P.Q.2d 1539                                                                                                    Page 2
1996 WL 657223 (Com'r Pat. & Trademarks), 40 U.S.P.Q.2d 1539
**(Cite as: 40 U.S.P.Q.2d 1539)**



Mark as Registered

**UMAX**

**Proposed Amended Mark**

*Analysis and Decision*

Trademark Act Section 7(e), 15 U.S.C. Section 7(e), provides, in part, " the Commissioner for good cause may permit any registration to be amended . . . Provided, That the amendment . . . does not alter materially the character of the mark." The Act does not state any other standard related to the amendment of marks; "material alteration" is the standard for evaluating amendments to marks at all relevant stages of processing, during examination of the application and after registration. See 37 C.F.R. Sections 2.72 and 2.173; TMEP Sections 807.14(a), 1603.10 and 1605.08.

When an Examining Attorney refuses to allow an amendment to a mark in an application, the Applicant may appeal to the Trademark Trial and Appeal Board. *See* Sections 12(b) and 20 of the Act of 1946, 15 U.S.C. Sections 1062(b), and 1070; 37 CFR Sections 2.141, and 2.142; and TBMP chapter 1200. In determining an *ex parte* appeal, the Board reviews the appealed decision of an Examining Attorney to determine if it was correctly made. TBMP Section 1217.

By contrast, under Trademark Rules 2.146(a)(2) and 2.176, a Registrant may petition the Commissioner for review of an adverse action on a request for amendment of a registration pursuant to Section 7. However, in the past, the Commissioner has reversed the action of a Post Registration Examiner only where there has been a clear error or abuse of discretion. *In re Richards-Wilcox Manufacturing Co., 181 USPQ 735 (Comm'r Pats. 1975); Ex parte Peerless Confection Co., 142 USPQ 278 (Comm'r Pats. 1964).*

[1] Consequently, the adverse action of a Post Registration Examiner on a request for **\*1541** amendment of a registration pursuant to Section 7 has been subject to a different standard of review than an Examining Attorney's final refusal to allow an amendment to a mark in an application. However, since the standards for determining the propriety of amendments to marks are the same for registrations and applications, the Commissioner believes that a Registrant whose amendment has been refused is entitled to the same standard of review that is available to an Applicant who seeks to amend a mark in an application. Henceforth, in deciding a petition to review the adverse decision of an Examiner on a proposed amendment to a registered mark under Section 7 of the Trademark Act, the Commissioner will review the decision to determine whether it was a correct one. To the extent that they state that the Commissioner will reverse an Examiner's decision on a Section 7 amendment only for clear error or abuse of discretion, *In re Richards-Wilcox*http://www.westlaw.com/Find/Default.wl?rs=dfa1.0&vr=2.0&DB=867&FindType=Y&SerialNum=1974022880*Manufacturing Co., 181 USPQ 735 (Comm'r Pats. 1974)* and *Ex parte Peerless Confection Co., 142 USPQ 278 (Comm'r Pats. 164)* are overruled.

The general test of whether an alteration is material is whether the mark would have to be republished after the alteration in order to fairly present the mark for purposes of opposition. If one mark is sufficiently different from another mark as to require republication, it is tantamount to a new mark appropriate for a new application. *In re Wine Society of America Inc., 12 USPQ2d 1139 (TTAB 1989); In*

1996 WL 657223 (Com'r Pat. & Trademarks), 40 U.S.P.Q.2d 1539
**(Cite as: 40 U.S.P.Q.2d 1539)**

*re Nationwide Industries Inc.,* 6 USPQ2d 1882 (TTAB 1988); *In re Pierce Foods Corp.,* 230 USPQ 307 (TTAB 1986), *Visa International Service Association v. Life-Code Systems, Inc.,* 220 USPQ 740(TTAB 1983); *In re E.M. Townsend & Co.,* 143 USPQ 318 (Comm'r Pats. 1964).

[2] In this case, the Petitioner seeks to amend the mark by minimally changing the stylization of the term UMAX. The nature of the proposed change is such that the commercial impression of the modified mark is essentially the same as that of the original mark.

The petition is granted. The registration file will be returned to the Post Registration Section for further processing.

Comm.Pat. & T.M.

40 U.S.P.Q.2d 1539

END                     OF                  DOCUMENT

COPR. © 2008 The Bureau of National Affairs, Inc.

McCarthy on Trademarks and Unfair Competition, Fourth Edition
Database updated June 2008

J. Thomas McCarthy

Chapter 17. Loss of Trademark Rights
I. INTRODUCTION

References

## § 17:4. Procedural contexts of abandonment

**West's Key Number Digest**

West's Key Number Digest, Trademarks 🗝1153
West's Key Number Digest, Trademarks 🗝1154

Alleged abandonment may become significant in a number of possible legal
situations:
(1) Defendant charged with infringement may raise the defense that plaintiff has
abandoned its mark;[FN1]
(2) Abandonment may result in a break in the chain of priority where the parties
each claim prior use,[FN2] unless the junior party's first use came after the
senior party's resumption of use;[FN2.50]
(3) An abandoned mark cannot be federally registered, because proof of use is a
predicate to registration;[FN3]
(4) Registration of an abandoned mark may be prevented in an Opposition
proceeding by one who would be injured by registration;[FN4]
(5) Registration of a mark which has been abandoned may be cancelled at any time
upon the petition of one who would be injured by the continuing
registration;[FN5]
(6) An abandoned trademark is not capable of assignment.[FN6] Once the mark has
been abandoned though nonuse, there is no property right left to be transferred
to another.

[FN1] Abandonment is a good defense even as against the owner of an
"incontestable" federally registered mark. Lanham Act § 33(b)(2), 15 U.S.C.A.
§ 1115(b)(2).

[FN2] See, e.g., Beech-Nut Packing Co. v. P. Lorillard Co., 273 U.S. 629, 71
L. Ed. 810, 47 S. Ct. 481 (1927); Golenpaul v. Rosett, 174 Misc. 114, 18
N.Y.S.2d 889, 45 U.S.P.Q. 45 (1940); Sunbeam Corp. v. Merit Enterprises,
Inc., 451 F. Supp. 571, 203 U.S.P.Q. 494 (S.D.N.Y. 1978) (abandonment
precludes tracing priority); Conwood Corp. v. Loew's Theatres, Inc., 173
U.S.P.Q. 829 (T.T.A.B. 1972) (abandonment breaks chain of priority); Auburn
Farms Inc. v. McKee Foods Corp., 51 U.S.P.Q.2d 1439, 1999 WL 588247
(Trademark Trial & App. Bd. 1999) (abandonment by senior user A breaks the
chain of priority such that other party Z who started use during A's period

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:08-cv-00526    Document 129    Filed 06/21/2008    Page 100 of 128

MCCARTHY § 17:4                                                    Page 2
3 McCarthy on Trademarks and Unfair Competition § 17:4 (4th ed.)

of nonuse has priority and ownership of the mark). *See* § 16:9.

[FN2.50] Income Tax Service Co. v. Fountain, 475 F.2d 655, 177 U.S.P.Q. 388 (C.C.P.A. 1973) (abandonment of A is irrelevant where A's first use after alleged abandonment is prior to B's first use); General Cigar Co. v. G.D.M. Inc., 988 F. Supp. 647, 45 U.S.P.Q.2d 1481 (S.D.N.Y. 1997) (since the senior user's resumed use in 1992 was prior to the junior user's 1997 first use, the issue of the senior user's pre-1992 abandonment is not relevant). *See* similar issue discussed at § 18:18.

[FN3] *See* §§ 19:1, 19:22 to 19:24 (no registration without use).

[FN4] *See* § 20:13.

[FN5] *See* §§ 20:55 to 20:63. But allowing a federal registration to expire does not per se prove abandonment. Jean Patou, Inc. v. Aristocrat Products Corp., 202 U.S.P.Q. 130 (T.T.A.B. 1979). *See* Acme Valve & Fittings Co. v. Wayne, 386 F. Supp. 1162, 183 U.S.P.Q. 629 (S.D. Tex. 1974) (failure to renew registration is relevant); Luvera v. Pepperidge Farm, Inc., 186 U.S.P.Q. 302 (T.T.A.B. 1975) (failure to use notice of registration does not prove abandonment).

[FN6] Money Store v. Harriscorp Finance, Inc., 689 F.2d 666, 675, 216 U.S.P.Q. 11, 19 (7th Cir. 1982), judgment aff'd, 885 F.2d 369, 12 U.S.P.Q.2d 1282, 15 Fed. R. Serv. 3d 139 (7th Cir. 1989); Auburn Farms Inc. v. McKee Foods Corp., 51 U.S.P.Q.2d 1439, 1944, 1999 WL 588247 (Trademark Trial & App. Bd. 1999).

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

MCCARTHY § 17:4

END OF DOCUMENT

3 McCarthy on Trademarks and Unfair Competition § 17:12 (4th ed.)


McCarthy on Trademarks and Unfair Competition, Fourth Edition
Database updated June 2008

J. Thomas McCarthy

Chapter 17. Loss of Trademark Rights
III. Abandonment through Non-Use of Mark

References

**§ 17:12. Clear and convincing proof of abandonment is required**

**West's Key Number Digest**

West's Key Number Digest, Trademarks  🔑1156

   Since abandonment results in a forfeiture of rights, the courts are reluctant to find an abandonment. The New York Court of Appeals stated in a 1938 case that "Abandonment being in the nature of a forfeiture, must be strictly proved."[FN1] The majority of courts have interpreted the "strictly proved" rule to mean that evidence of the elements of abandonment must be clear and convincing.[FN2]

   Even though sales of a branded product may decrease to a mere trickle, a court is likely to refuse to find that the mark has become abandoned.[FN2.25] On the other hand, where evidence of continued sales consists of "suspicious documents" and testimony is "disingenuous" and "intentionally value or unclean," adverse inferences will be made and abandonment found.[FN2.75]

   The extent to which the courts will go to avoid finding abandonment is illustrated in the Supreme Court's *Beech-Nut* case.[FN3] There, plaintiff claimed that any prior rights acquired by defendant in the mark BEECH-NUT had been abandoned. Trade in the American Tobacco Co's BEECH-NUT tobacco had declined to the point that in one year, only twenty-five pounds were sold. The trademark was then dormant and in the following year American Tobacco Co. sold the mark, along with many others, to defendant Lorillard. Four years later, Lorillard resuscitated the mark and began selling tobacco under the mark BEECH-NUT. The Supreme Court held that there had been no abandonment. Justice Holmes stated:

   The mere lapse of time was not such that it could be said to have destroyed the right as a matter of law. A trademark is not only a symbol of existing good will, although it commonly is thought of only as that. Primarily it is a distinguishable token devised or picked out with the intent to appropriate it to a particular class of goods and with the hope that it will come to symbolize good will. … Therefore, the fact that the good will once associated with it has vanished does not end at once the preferential right of the proprietor to try it again upon goods of the same class with improvements that renew the proprietor's hopes.

   However, the Federal Circuit takes a minority view such that in inter-partes

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

proceedings before the Trademark Board to preclude or cancel a registration, the
burden on the challenger to prove abandonment is the "preponderance of the
evidence" standard, not the traditional "clear and convincing" standard.[FN4] Since
all other courts follow the "clear and convincing" standard, this ruling results in
the paradox that it is easier to cancel or oppose a registration on the ground of
abandonment than it is to attack the validity of the mark itself in a federal court
infringement suit.

[FN1] Neva-Wet Corp. v. Never Wet Processing Corp., 277 N.Y. 163, 13 N.E.2d
755 (1938). *Accord* Saratoga Vichy Spring Co. v. Lehman, 625 F.2d 1037, 208
U.S.P.Q. 175 (2d Cir. 1980) (citing treatise); United States Jaycees v.
Philadelphia Jaycees, 639 F.2d 134, 209 U.S.P.Q. 457 (3d Cir. 1981); Miller
Brewing Co. v. Oland's Breweries (1971), Ltd., 548 F.2d 349, 192 U.S.P.Q. 266
(C.C.P.A. 1976) (evidence must "leave no room for doubt or speculation" and
must lead to the "inescapable conclusion" that use of mark was discontinued
"with intent to abandon it to the world"); Interstate Brands Corp. v. Way
Baking Co., 403 Mich. 479, 270 N.W.2d 103, 202 U.S.P.Q. 846 (1978), cert.
denied, 444 U.S. 869, 62 L. Ed. 2d 94, 100 S. Ct. 144, 203 U.S.P.Q. 640
(1979) (citing treatise); Wallpaper Mfrs., Ltd. v. Crown Wallcovering Corp.,
680 F.2d 755, 214 U.S.P.Q. 327 (C.C.P.A. 1982) (citing treatise); Prudential
Ins. Co. v. Gibraltar Financial Corp., 694 F.2d 1150, 217 U.S.P.Q. 1097 (9th
Cir. 1982), cert. denied, 463 U.S. 1208, 77 L. Ed. 2d 1389, 103 S. Ct. 3538
(1983); P. A. B. Produits et Appareils de Beaute v. M. Usellini, 570 F.2d
328, 196 U.S.P.Q. 801 (C.C.P.A. 1978)(proof of the elements needed to trigger
the statutory presumption of abandonment must be "strictly proved" because
abandonment is "in the nature of a forfeiture.").

[FN2] Mathy v. Republic Metalware Co., 35 App. D.C. 151 (App. D.C. 1910)
("Abandonment being in the nature of a forfeiture, it is incumbent upon the
person alleging it to prove by clear and convincing evidence that the right
claimed has been relinquished."); Saunders v. Stringer, 265 Mich. 301, 251
N.W. 342 (1933) ("Abandonment must, however, be strictly proven where a
forfeiture is claimed on that ground."); Dial-A-Mattress Operating Corp. v.
Mattress Madness, Inc., 841 F. Supp. 1339, 33 U.S.P.Q.2d 1961 (E.D. N.Y.
1994), reconsideration denied, 847 F. Supp. 18 (E.D.N.Y. 1994), ops. combined
at, 33 U.S.P.Q.2d 1961, 1965 (E.D.N.Y. 1994) ("[A]n affirmative defense
alleging a break in plaintiff's chain of priority under the doctrine of
abandonment must be proven by clear and convincing evidence."); EH Yacht, LLC
v. Egg Harbor, LLC, 84 F. Supp. 2d 556, 53 U.S.P.Q.2d 1640 (D.N.J. 2000)
("Abandonment being in the nature of a forfeiture," the elements of
discontinuance of use and intent not to resume use must be "strictly proved."
This means proof by clear and convincing evidence.).

[FN2.25] Bishop v. Equinox Int'l Corp., 47 U.S.P.Q.2d 1949 (10th Cir. 1998)
(trademark owner's sales fell during a five-year period to an average of
ninety-eight bottles per year, but no abandonment was found); Cumulus Media,
Inc. v. Clear Channel Communications, Inc., 304 F.3d 1167, 64 U.S.P.Q.2d
1353, 1359, 53 Fed. R. Serv. 3d 823 (11th Cir. 2002) (Proof of abandonment
requires "strict" proof. Even though "use" means more than token use, a
continuous low level use on business cards and an office sign constituted
sufficient "use" to prevent a finding of abandonment at the preliminary
injunction stage.).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

MCCARTHY § 17:12                                                                    Page 3
3 McCarthy on Trademarks and Unfair Competition § 17:12 (4th ed.)

[FN2.75] Cerveceria Modelo, 55 U.S.P.Q.2d 1298, 2000 WL 827785 (Trademark Trial & App. Bd. 2000).

[FN3] Beech-Nut Packing Co. v. P. Lorillard Co., 273 U.S. 629, 71 L. Ed. 810, 47 S. Ct. 481 (1927).

[FN4] Cerveceria Centroamericana, S.A. v. Cerveceria India, Inc., 892 F.2d 1021, 13 U.S.P.Q.2d 1307 (Fed. Cir. 1989).

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

MCCARTHY § 17:12

END OF DOCUMENT

3 McCarthy on Trademarks and Unfair Competition § 17:26 (4th ed.)


McCarthy on Trademarks and Unfair Competition, Fourth Edition
Database updated June 2008

J. Thomas McCarthy

Chapter 17. Loss of Trademark Rights
IV. CHANGES IN USAGE: PRODUCTS AND FORMAT

References

**§ 17:26. Changes in format of mark: abandonment, priority and tacking-on—Continuing commercial impression rule**

**West's Key Number Digest**

West's Key Number Digest, Trademarks    ☞1161

    In general, neither abandonment nor loss of the ability to tack-on to achieve priority will occur if the new form of the mark creates the same commercial impression as did the old form. That is, the change in form of a mark does not constitute abandonment or a break in continuous use if the change neither creates a new mark nor changes the commercial impression created by the old mark.[FN1] On the other hand, a change of format which alters the overall commercial impression of a mark results in a case where the mark owner cannot claim priority of use dating from first use of the old form of the mark.[FN2] Improper tacking can result in "abandonment" of the old form of the mark only if the elements of abandonment are satisfied: non-use with intent not to resume use.[FN2.5]

    The test is one of continuity. A mark can be modified or changed without abandonment or loss of priority if done in such a way that the continuing common element of the mark retains its impact and symbolizes a continuing commercial impression.[FN3] Trademark rights inure in the basic commercial impression created by a mark, not in any particular format or style. The Court of Customs and Patent Appeals (C.C.P.A.) has stated that, "The law permits a user who changes the form of its mark to retain the benefit of its use of the earlier form, without abandonment, if the new and old forms create the same, continuing commercial impression."[FN4] The court approved the following language of the Trademark Board:

    It is settled that a person may change the display of a mark at any time because whatever rights he may possess in the mark reside in the term itself rather than in any particular form or arrangement thereof. … [A] change which does not alter its distinctive characteristics represents a continuity of trademark rights. Thus, where the distinctive character of the mark is not changed, the mark is, in effect, the same and the rights obtained by virtue of the earlier use of the prior form inure to the later form.[FN5]

    While the traditional rule requiring a continuing commercial impression is easy to state, its application sometimes results in apparently inconsistent decisions.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:08-cv-00526    Document 129    Filed 06/21/2008    Page 105 of 128

MCCARTHY § 17:26                                                              Page 2
3 McCarthy on Trademarks and Unfair Competition § 17:26 (4th ed.)

For example, in one case in 1976, the C.C.P.A. held that the owner of the mark HOME PROTECTION CENTER could not tack on its prior use of HOME PROTECTION HARDWARE where another party made use of the later mark in the interim. The court viewed the marks as creating a different commer cial impression.[FN6] The change from the generic name "center" to the generic name "hardware" was deemed significant enough to break the continuity of overall impression. On the other hand, in a 1978 case the same court concluded that the user of AMERICAN SECURITY BANK could tack on the prior use of AMERICAN SECURITY to achieve priority because the deletion of the generic name "bank" did not alter the overall commercial impression of the mark.[FN7]

In the late 1980s, the Trademark Board and the Federal Circuit began to apply the continuing commercial impression test with much more rigor and strictness than in the past. For example, in a 1989 Board decision affirmed by the Federal Circuit, a registrant was not permitted to tack on its prior use of the mark AMERICAN MOBILPHONE and star and stripe design to achieve priority of use for AMERICAN MOBILPHONE PAGING with an identical star and stripe design. The two marks, while differing by only one word, were held to create "different commercial impressions and hence are not legally identical."[FN8] The addition of the generic name "paging" was regarded as sufficient to alter the commercial impression of the composite marks.

Continuing the trend towards a stricter application of the test, in 1991, adopting a very exacting test of tacking on a new format to achieve the priority date of an old format, the Federal Circuit stated that the required degree of similarity between new and old formats is greater than the familiar test of a likelihood of confusion.[FN9] Rather, the "same, continuing commercial impression" test requires a greater, albeit undefined, degree of similarity to permit tacking on, the court saying that tacking on is only "occasionally permitted" in the "rare instances" where the old and new formats are "legal equivalents." The court held that prior use of the slogan "CLOTHES THAT WORK FOR THE WORK YOU DO" cannot be tacked on for priority purposes to later use of the slogan "CLOTHES THAT WORK," with both formats used for uniforms and work clothes. The deletion of the second half of the slogan was deemed significant enough to change the commercial impression. Without articulating detailed reasons, the court simply concluded that: "Merely from review of the marks, it is clear that they create different commercial impressions."[FN10] The Federal Circuit cited as an example of a case in which tacking is properly permitted a previous Board decision in which the prior use of the word mark BLUE BIRD with a picture of a bluebird on vegetables, was properly tacked on to later use of the word mark BLUE ROBIN with a picture of a blue-colored bird.[FN11]

Summarizing the new, more rigorous and demanding application of the "tacking" rule, the Trademark Board stated:

A party seeking to "tack" its use of an earlier mark onto its use of a later mark for the same goods or services may do so only if the earlier and later marks are legal equivalents, or are indistinguishable from one another. To meet the legal equivalents test, the marks must create the same commercial impression and cannot differ materially from one another. Thus, the fact that two marks may be confusingly similar does not necessarily mean that they are legal equivalents.[FN12]

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Following the Federal Circuit *Van Dyne-Crotty* rule, the Ninth Circuit stated that the standard for tacking is "exceedingly strict" and is applied "only in the exceptionally narrow instance" where consumers would regard the old and new marks as "essentially the same."[FN13] The court held that it would not permit tacking of the earlier use of THE MOVIE BUFF's MOVIE STORE to the later use of MOVIEBUFF.COM to achieve priority over a rival.

It has been held that tacking is a question of fact, not law and that therefore there must be some evidence demonstrating that consumer perception is that the old and new versions of the marks create the same commercial impression.[FN14] The same decision held that it is irrelevant to the tacking question whether the older version of the mark is still in use or not.[FN15]

[FN1] Lyon Metal Products, Inc. v. Lyon, Inc., 134 U.S.P.Q. 31 (T.T.A.B. 1962); Humble Oil & Refining Co. v. Sekisui Chemical Co., 165 U.S.P.Q. 597 (T.T.A.B. 1970); Joseph & Feiss Co. v. Tempco Quilters, Inc., 171 U.S.P.Q. 378 (T.T.A.B. 1971) (slight change in form of mark is not abandonment); Sands, Taylor & Wood Co. v. Quaker Oats Co., 978 F.2d 947, 24 U.S.P.Q.2d 1001 (7th Cir. 1992) (changing use of the mark from the registered version of THIRST-AID—FIRST AID FOR YOUR THIRST to the later version of THIRST-AID continued the "key element" and was not an "abandonment" of registered rights).

[FN2] Owens-Illinois, Inc. v. Optimist International, 173 U.S.P.Q. 120 (T.T.A.B. 1972) (removing letters from design background changed the overall commercial impression of the unitary mark); Unitec Industries, Inc. v. Cumberland Corp., 176 U.S.P.Q. 62 (T.T.A.B. 1972) (change from three "Cs" in a circle to two "Cs" in a circle); Viviane Woodard Corp. v. Roberts, 181 U.S.P.Q. 840 (T.T.A.B. 1974) (cannot tack on use of ALTER EGO to later use of EGO for priority); General Mills, Inc. v. Frito-Lay, Inc., 176 U.S.P.Q. 148 (T.T.A.B. 1972)(change from UNYUMS to ONYUMS breaks priority); Super Valu Stores, Inc. v. Exxon Corp., 11 U.S.P.Q.2d 1539 (T.T.A.B. 1989) (Applicant was not permitted to tack on its prior use of a tiger design and slogan PUT A TIGER IN YOUR TANK for gasoline products to achieve priority of use for TIGER MART for convenience stores. The marks were held not to create the same continuing commercial impression, the Board adopting the test that the old and new marks must "be recognized as one and the same mark." Also, the services were not the "same or substantially identical.").

[FN2.5] Iowa Health System v. Trinity Health Corp., 177 F. Supp. 2d 897, 923 (N.D. Iowa 2001) ("In short, the court concludes that 'improper tacking' can be, but is not necessarily, a species of 'abandonment' that could result in cancellation of a [registration of a] mark… if the 'improper tacking' also is shown to satisfy the elements of 'abandonment'…").

[FN3] Hess's of Allentown, Inc. v. National Bellas Hess, Inc., 169 U.S.P.Q. 673 (T.T.A.B. 1971). *See* Restatement (Third) of Unfair Competition § 32, comment b (Tentative Draft No. 3, 1991) ("A change in the form or appearance of a trademark does not result in abandonment if the new format continues the same commercial impression as the prior format.").

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

MCCARTHY § 17:26                                                         Page 4
3 McCarthy on Trademarks and Unfair Competition § 17:26 (4th ed.)


[FN4] Ilco Corp. v. Ideal Sec. Hardware Corp., 527 F.2d 1221, 188 U.S.P.Q. 485 (C.C.P.A. 1976) (different commercial impression found on the facts).

[FN5] Humble Oil & Refining Co. v. Sekisui Chemical Co., 165 U.S.P.Q. 597 (T.T.A.B. 1970) (S-LON changed to ESLON). Claiming priority from use of prior form of mark: Compania Insular Tabacalera, S.A. v. Camacho Cigars, Inc., 167 U.S.P.Q. 299 (T.T.A.B. 1970), dismissed, 171 U.S.P.Q. 673 (D.D.C. 1971); Gulf States Paper Corp. v. E-Z Por Corp., 171 U.S.P.Q. 566 (T.T.A.B. 1971); Fotomat Corp. v. Cochran, 437 F. Supp. 1231, 194 U.S.P.Q. 128 (D. Kan. 1977) ("Minor modifications of a trademark do not constitute abandonment."); In re Flex-O-Glass, Inc., 194 U.S.P.Q. 203 (T.T.A.B. 1977) (slight "modernization" of design mark does not prevent tacking on for priority). *See* Lefkowitz, "Tips from the T.T.A.B. (Re tacking on of use)," 66 Trademark Rep. 530 (1976).

[FN6] Ilco Corp. v. Ideal Sec. Hardware Corp., 527 F.2d 1221, 188 U.S.P.Q. 485 (C.C.P.A. 1976).

[FN7] American Sec. Bank v. American Sec. & Trust Co., 571 F.2d 564, 197 U.S.P.Q. 65 (C.C.P.A. 1978).

[FN8] American Paging, Inc. v. American Mobilphone, Inc., 13 U.S.P.Q.2d 2036 (T.T.A.B. 1989), aff'd, 17 U.S.P.Q.2d 1726 (Fed. Cir. 1990) ("While we concede that this is a close question, we believe that purchasers would distinguish the two marks and would not consider them to be the same." Board was affirmed by the Federal Circuit with Lourie, J. dissenting).

[FN9] Van Dyne-Crotty, Inc. v. Wear-Guard Corp., 926 F.2d 1156, 17 U.S.P.Q.2d 1866 (Fed. Cir. 1991).

[FN10] 17 U.S.P.Q.2d at 1868-69; O-M Bread, Inc. v. United States Olympic Committee, 65 F.3d 933, 36 U.S.P.Q.2d 1041 (Fed. Cir. 1995) (Applying the *Van Dyne-Crotty* rule to the Olympic statute grandfather clause permitting continued use of "Olympic" marks which started before 1950. A variation of a mark used prior to 1950 is exempt only if it creates the same commercial impression and is not "materially different" from the earlier version. "[T]he proposed use of OLYMPIC KIDS for bakery products is not a permitted extension of Roush's grandfathered rights to the mark OLYMPIC." These are "different marks" that "present a different commercial impression and are not legal equivalents."); Data Concepts, Inc. v. Digital Consulting, Inc., 150 F.3d 620, 47 U.S.P.Q.2d 1672 (6th Cir. 1998) (cannot tack on prior use of an abstract logo to later use of initials to gain priority).

[FN11] Laura Scudder's v. Pacific Gamble Robinson Co., 136 U.S.P.Q. 418, 419 (T.T.A.B. 1962) ("[W]hile the marks differ in a number of respects, they nevertheless create substantially the same general impression, namely, that of a blue-colored bird, and hence are believed to symbolize a single and continuing trademark right in applicant.").

[FN12] Pro-Cuts v. Schilz-Price Enters., Inc., 27 U.S.P.Q.2d 1224, 1226-27

(T.T.A.B. 1993) (Holding that applicant cannot tack for priority purposes the older use of PRO-KUT in distinctive lettering framed by two palm trees onto the later use of PRO-CUTS in different distinctive lettering, framed by a rounded rectangle. "Aside from the differences between the marks in spelling and pluralization, there is a very material difference between them because of their different design features. … [T]hey clearly are not legal equivalents.").

[FN13] Brookfield Communications, Inc. v. West Coast Entertainment Corp., 174 F.3d 1036, 1048-49, 50 U.S.P.Q.2d 1545, 1552 (9th Cir. 1999).

[FN14] Navistar International Transportation Corp. v. Freightliner Corp., 52 U.S.P.Q.2d 1074, 1998 WL 1120389 (N.D. Ill. 1998) (adding that because consumer perception is the key, the rule of picture-word equivalency used in the infringement context does not apply in the tacking situation. For example, the prior use of a picture of an eagle should not automatically be regarded as creating the same commercial impression as the word "eagle.").

[FN15] Navistar International Transportation Corp. v. Freightliner Corp., 52 U.S.P.Q.2d 1074, 1077, 1998 WL 1120389 (N.D. Ill. 1998) ("We see no reason why defendants should not be allowed to claim priority by tacking onto the older mark even if they are still using it, so long as the older and newer mark make the same commercial impression." Summary judgement on the tacking issue was denied.).

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

MCCARTHY § 17:26

END OF DOCUMENT

Case 1:08-cv-00526     Document 129     Filed 06/21/2008     Page 109 of 128

MCCARTHY § 17:27                                                           Page 1
3 McCarthy on Trademarks and Unfair Competition § 17:27 (4th ed.)

McCarthy on Trademarks and Unfair Competition, Fourth Edition
Database updated June 2008

J. Thomas McCarthy

Chapter 17. Loss of Trademark Rights
IV. CHANGES IN USAGE: PRODUCTS AND FORMAT

References

**§ 17:27. Changes in format of mark: abandonment, priority and tacking-on—Illustrative applications of the rule**

**West's Key Number Digest**

West's Key Number Digest, Trademarks 🔑1161

Non-trademark use which is analogous to a trademark suffices for tacking on. For example, an applicant was permitted to tack on a different format of its mark as used in a non-technical trademark context. While applicant claimed a 1977 first use of the exact form of the applied-for mark, applicant made a pre-1974 use of the same mark in slightly different formats as a trade name and in a brochure, which was held sufficient for tacking on that prior use.[FN1]

If an abbreviation is likely to create the same commercial impression on buyers as the original, the user can trace back his first use to use of the original for priority purposes.[FN2]

If the old and new versions, while similar in wording, convey a substantially different meaning, tacking-on is not permitted. For example, a change from the mark MARCO POLO to POLO was held to create a different commercial impression because of the different connotations of the word "Polo."[FN3] Similarly, an applicant for registration was not permitted to tack on its prior use of SHAPE UP to achieve priority of use of SHAPE for a physical fitness magazine because the words have different meanings.[FN4]

The Sixth Circuit held that a company could not tack its earlier use of the abstract logo, shown in in Fig. 17:27A, onto its later use of the initials DCI to achieve priority over another's use of the mark DCI.[FN5]

**Fig. 17:27A. LOGO THAT COULD NOT BE TACKED ONTO LATER USE OF MARK "DCI"**



© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:08-cv-00526    Document 129    Filed 06/21/2008    Page 110 of 128

MCCARTHY § 17:27                                                        Page 2
3 McCarthy on Trademarks and Unfair Competition § 17:27 (4th ed.)

Use of a trademark in a slightly different form than that shown in a federal registration does not constitute abandonment.[FN6] As one court stated: "The law seems to be that as long as the new mark is closely related to the old, the old mark's registration protects the new one as well."[FN7]

Minor changes in a mark which do not change the basic, overall commercial impression created on buyers will not constitute any abandonment and will not interrupt the user's chain of ownership back to adoption and use of the original form. That is, the owner will be permitted to "tack-on" the prior format for priority purposes. As the Ninth Circuit observed:

Without tacking, a trademark owner's priority in his mark would be reduced each time he made the slightest alteration to the mark, which would discourage him from altering the mark in response to changing consumer preferences, evolving aesthetic developments, or new advertising and marketing styles.[FN8]

Because small changes in trademark format are a minor element on which to base a drastic holding of abandonment, the courts hardly ever find abandonment where the key element of the mark continues through new formats. For example, the following changes have been held either not to constitute abandonment or to permit tacking-on: a rearrangement of words;[FN9] the combination of a mark with another word;[FN10] the dropping of a non-essential word from a mark;[FN11] adding a letter in a word without changing its phonetic impact;[FN12] the dropping of a background design and continuing use of a word mark;[FN13] the embellishment of a word or letter with a design;[FN14] the insertion of a hyphen;[FN15] a change in lettering style;[FN16] and a modernization of a picture mark.[FN17]

[FN1] In re Nuclear Research Corp., 16 U.S.P.Q.2d 1316 (T.T.A.B. 1990) ("[W]hile these prior uses are not for the exact mark now sought to be registered, the marks are substantially similar to the mark at issue. That is, through the years, the marks have presented the same, continuing commercial impression, namely the letters NRC.").

[FN2] Vacuum-Electronics Corp. v. Electronic Engineering Co., 150 U.S.P.Q. 215 (T.T.A.B. 1966) (Electronic Engineering Co. abbreviated to EECO). See § 7:18.

[FN3] Polo Fashions, Inc. v. Extra Special Products, Inc., 451 F. Supp. 555, 200 U.S.P.Q. 161 (S.D.N.Y. 1978).

[FN4] Corporate Fitness Programs, Inc. v. Weider Health & Fitness, Inc., 2 U.S.P.Q.2d 1682 (T.T.A.B. 1987), set aside, 7 U.S.P.Q.2d 1828 (T.T.A.B. 1988) (and also because there was no continuity of use of SHAPE UP).

[FN5] Data Concepts, Inc. v. Digital Consulting, Inc., 150 F.3d 620, 47 U.S.P.Q.2d 1672 (6th Cir. 1998)

[FN6] Xerox Corp. v. Litton Educational Publishing, Inc., 169 U.S.P.Q. 750 (T.T.A.B. 1971); Puritan Sportswear Corp. v. Shure, 307 F. Supp. 377, 165 U.S.P.Q. 71 (W.D. Pa. 1969).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:08-cv-00526     Document 129     Filed 06/21/2008     Page 111 of 128

MCCARTHY § 17:27                                                        Page 3
3 McCarthy on Trademarks and Unfair Competition § 17:27 (4th ed.)

[FN7] Li'l' Red Barn, Inc. v. Red Barn System, Inc., 322 F. Supp. 98, 167 U.S.P.Q. 741 (N.D. Ind. 1970), aff'd per curiam, 174 U.S.P.Q. 193 (7th Cir. 1972).

[FN8] Brookfield Communications, Inc. v. West Coast Entertainment Corp., 174 F.3d 1036, 1048, 50 U.S.P.Q.2d 1545, 1552 (9th Cir. 1999) (no tacking was permitted on the facts).

[FN9] Miami Credit Bureau, Inc. v. Credit Bureau, Inc., 276 F.2d 565, 125 U.S.P.Q. 87 (5th Cir. 1960) (change from CREDIT BUREAU OF MIAMI to MIAMI CREDIT BUREAU).

[FN10] Drexel Enterprises, Inc. v. Richardson, 312 F.2d 525, 136 U.S.P.Q. 25 (10th Cir. 1962) (1939: HERITAGE in script; 1949: HERITAGE-HENDRON; 1956: HERITAGE in block letters; no abandonment or loss of priority); McCabe-Powers Auto Body Co. v. American Truck Equipment Co., 150 F. Supp. 194, 113 U.S.P.Q. 217 (D. Or. 1957) (AMERICAN changed to POWERS-AMERICAN; no abandonment of rights in AMERICAN); American Sec. Bank v. American Sec. & Trust Co., 190 U.S.P.Q. 271 (T.T.A.B. 1976), aff'd, 571 F.2d 564, 197 U.S.P.Q. 65 (C.C.P.A. 1978) (Change from AMERICAN SECURITY to AMERICAN SECURITY BANK did not alter commercial impression. Tacking-on permitted.); D & J Master Clean, Inc. v. Servicemaster Co., 181 F. Supp. 2d 821 (S.D. Ohio 2002) (can add word "clean" onto long time use of SERVICE MASTER mark and claim priority of SERVICE MASTER CLEAN mark back to first use of SERVICE MASTER mark: "[I]t is only a revised version of a trademark that has been used for nearly fifty years.").

[FN11] Proxite Products, Inc. v. Bonnie Brite Products Corp., 206 F. Supp. 511, 134 U.S.P.Q. 122 (S.D.N.Y. 1962) (PROX BONNIE BLUE to BONNIE BLUE); Hess's of Allentown, Inc. v. National Bellas Hess, Inc., 169 U.S.P.Q. 673 (T.T.A.B. 1971) (HESS BROS. to HESS); Puritan Sportswear Corp. v. Shure, 307 F. Supp. 377, 165 U.S.P.Q. 71 (W.D. Pa. 1969) (change from PURITAN SPORTSWEAR, THE CHOICE OF ALL AMERICANS to PURITAN); Artiste Permanent Wave Co. v. Hulsman, 271 Ky. 695, 113 S.W.2d 55 (1938) (Reversal of lower court which held that use of three different names in six years barred relief: Corporate name was ARTISTE PERMANENT WAVE CO. Trade name changed from ARTISTE BEAUTY SHOPPE to ARTISTE SHOPPE. Held to be a "trivial change" which did not change commercial impact of key word ARTISTE.); Sands, Taylor & Wood Co. v. Quaker Oats Co., 978 F.2d 947, 24 U.S.P.Q.2d 1001, 1008 (7th Cir. 1992) (changing the mark THIRST-AID—FIRST AID FOR YOUR THIRST by dropping the slogan to result in THIRST-AID only dropped a non-essential part, continued the "key element" and was not an "abandonment" of registered rights).

[FN12] Humble Oil & Refining Co. v. Sekisui Chemical Co., 165 U.S.P.Q. 597 (T.T.A.B. 1970) (Change from S-LON to ESLON. Tacking-on permitted.).

[FN13] Xerox Corp. v. Litton Educational Publishing, Inc., 169 U.S.P.Q. 750 (T.T.A.B. 1971); Vacuum-Electronics Corp. v. Electronic Engineering Co., 150 U.S.P.Q. 215 (T.T.A.B. 1966) (change from design of "Electronic Engineering Co." to EECO).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN14] Smith & Wesson, Inc. v. Galef, 292 F. 314 (D.N.Y. 1923)(change from "S & W" to "S & W" embellished and enclosed in circle).

[FN15] Norwich Pharmacal Co. v. Chas. Pfizer & Co., 165 U.S.P.Q. 644 (T.T.A.B. 1970) (change from UNBURN to UN-BURN); Beech-Nut Packing Co. v. P. Lorillard Co., 299 F. 834 (D.N.J. 1924), aff'd, 7 F.2d 967 (3d Cir. 1925), aff'd, 273 U.S. 629, 71 L. Ed. 810, 47 S. Ct. 481 (1927) (change from BEECHNUT to BEECH-NUT).

[FN16] Drexel Enterprises, Inc. v. Richardson, 312 F.2d 525, 136 U.S.P.Q. 25 (10th Cir. 1962); John B. Stetson Co. v. Playboy of Miami, Inc., 154 U.S.P.Q. 63 (T.T.A.B. 1967), rev'd, 426 F.2d 394, 165 U.S.P.Q. 686 (C.C.P.A. 1970); Jay-Zee, Inc. v. Hartfield-Zodys, Inc., 207 U.S.P.Q. 269 (T.T.A.B. 1980) (change of background design and change from script to "shadowed" block letters).

[FN17] Dreyfus Fund, Inc. v. Royal Bank of Canada, 525 F. Supp. 1108, 213 U.S.P.Q. 872 (S.D.N.Y. 1981) (change of logo from realistic lion to stylized lion; creates a continuing commercial impression and continuity of use).

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

MCCARTHY § 17:27

END OF DOCUMENT

McCarthy on Trademarks and Unfair Competition, Fourth Edition
Database updated June 2008

J. Thomas McCarthy

Chapter 31. Defenses to Infringement of Trademarks
III. FRAUD IN OBTAINING TRADEMARK REGISTRATION
A. GENERALLY
3. Types of Fraud in the Procurement of a Trademark Registration

References

**§ 31:74. Misstatement of date of first use**

**West's Key Number Digest**

West's Key Number Digest, Trademarks    🔑1382
West's Key Number Digest, Trademarks    🔑1520

　　Fraud has often been alleged because a trademark registrant claimed a date of
first use in a use-based application which was earlier than the actual date of
first use. Such an attack seems always to have failed on the facts, the courts
saying that the falsity was either not fraudulent or not material.[FN1] For
example, the Trademark Board found no fraud or unclean hands from an alleged
misstatement of the date of first use, stating that an erroneous date of first use
is immaterial because it "could not possibly result in the allowance of a
registration which would otherwise not be allowed, as long as there was technical
trademark use prior to the filing of the application."[FN2]

　　The Trademark Board has consistently held for many years that a misstatement of
the date of first use in a use-based application is not fraudulent as long as there
has been some valid use of the mark prior to the filing date.[FN3] That is, the
exact date of claimed first use is immaterial to the grant of a registration, just
so long as the first use in fact preceded the filing date of a use-based
application.

　　If there is a false statement of pre-application use in a use-based application
and in fact no use occurred until *after* the filing of the application, then the
registration is invalid not only for being void ab initio,[FN4] but also for
fraud.[FN5]

　　In inter partes proceedings, a trademark registration in and of itself is proof
of use only as of its filing date, not as of the date of first use claimed in the
application.[FN6] However, in some cases there may be some evidentiary advantage to
an earlier claimed use date, for a heavier burden of proof is imposed when a
registrant seeks to prove actual use earlier than the claimed use date.[FN7] That
is, there occasionally may be some incremental evidentiary benefit to a registrant
claiming an early use date.[FN8] However, in the vast majority of cases, a

misstatement of use date within the pre-filing time frame will be immaterial both
to the validity of the registration and to registrant's burden of proof.

An error in the claimed date of first use is not a ground of ex parte refusal to
register.[FN9]

[FN1] National Tuberculosis Ass'n v. Summit County Tuberculosis & Health
Ass'n, 122 F. Supp. 654, 101 U.S.P.Q. 387 (D. Ohio 1954); Travelodge Corp. v.
Siragusa, 228 F. Supp. 238, 141 U.S.P.Q. 719 (N.D. Ala. 1964), aff'd, 352
F.2d 516, 147 U.S.P.Q. 379 (5th Cir. 1965); Henderson v. Peter Henderson &
Co., 9 F.2d 787 (7th Cir. 1925); Rick v. Buchansky, 609 F. Supp. 1522, 226
U.S.P.Q. 449 (S.D.N.Y. 1985), dismissed without op., 770 F.2d 157 (2d Cir.
1985) (erroneous date of claimed first use later than actual first use is not
fraud because not material and not intentional); Pony Express Courier Corp.
v. Pony Express Delivery Service, 872 F.2d 317, 10 U.S.P.Q.2d 1475 (9th Cir.
1989) (To prove fraud that would result in cancellation of a registration,
there must be a material misrepresentation in the application. "The claim of
a date of first use is not a material allegation as long as the first use in
fact preceded the application date." No fraud found on the facts.); Aveda
Corp. v. Evita Marketing, Inc., 706 F. Supp. 1419, 12 U.S.P.Q.2d 1091 (D.
Minn. 1989) (a misstatement of the date of claimed first use in a use-based
application is not fraudulent as long as there was some use prior to the
filing date); Lewis v. Microsoft Corp., 410 F. Supp. 2d 432, 78 U.S.P.Q.2d
1060 (E.D. N.C. 2006), aff'd, 2007 WL 995541 (4th Cir. 2007) (an incorrect
date of alleged first use is not material and not fraudulent as long as the
actual use preceded the filing of a use-based application).

Compare Midwest Fur Producers Ass'n v. Mutation Mink Breeders Ass'n, 127 F.
Supp. 217, 103 U.S.P.Q. 389, 104 U.S.P.Q. 144 (D. Wis. 1954) (false statement
as to use of mark and time of first use held fraudulent).

[FN2] Colt Industries Operating Corp. v. Olivetti Controllo Numerico S.p.A.,
221 U.S.P.Q. 73, 1983 WL 51834 (T.T.A.B. 1983) (similarly, the false
allegation of first use by an opposer is not fraud, since the allegation must
be backed up by proof).

[FN3] Philco Corp. v. Clary Corp., 123 U.S.P.Q. 420, 1959 WL 6336 (T.T.A.B.
1959); Hecon Corp. v. Magnetic Video Corp., 199 U.S.P.Q. 502, 1978 WL 21245
(T.T.A.B. 1978); Visual Information Institute, Inc. v. Vicon Industries,
Inc., 209 U.S.P.Q. 179, 1980 WL 39038 (T.T.A.B. 1980) (noting the provisions
of T.M.R.P. 2.126); General Mills, Inc. v. Nature's Way Products, Inc., 202
U.S.P.Q. 840, 1979 WL 24844 (T.T.A.B. 1979); CarX Service Systems, Inc. v.
Exxon Corp., 215 U.S.P.Q. 345, 1982 WL 52058 (T.T.A.B. 1982); Western
Worldwide Enterprises Group, Inc. v. Qingdao Brewery, 17 U.S.P.Q.2d 1137,
1990 WL 354566 (T.T.A.B. 1990) (the Trademark Board has repeatedly held that
for a use-based application, an erroneous date of first use does not
constitute fraud so long as there was some valid use of the mark prior to the
filing).

[FN4] See §§ 19:1 to 19:5.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN5] Orient Express Trading Co. v. Federated Dep't Stores, Inc., 2
U.S.P.Q.2d 1106, 1987 WL 6163 (S.D.N.Y. 1987), modified, in part, on
reconsideration, 3 U.S.P.Q.2d 1387 (S.D.N.Y. 1987), remanded, 838 F.2d 1203
(2d Cir. 1987), later proceeding, 842 F.2d 650, 6 U.S.P.Q.2d 1308 (2d Cir.
1988) (Application filed in April 1975 claimed a December 1974 first use
whereas in fact first provable use did not occur until November 1975, after
the application was filed. Averment of continuous use in § 15 affidavit was
found false, as was claim of use on all products listed in the registration.
While a misstatement of the date of first use alone would be a "minor
inaccuracy" not sufficient by itself for finding fraud, the totality of false
statements justifies a finding of fraud and cancellation of the
registrations.). *Author's Comment:* The precedential force of this decision is
seriously impaired by the opaque and contradictory opinion below and the
vague and superficial opinion on affirmance.

[FN6] *See* T.M.R.P. 2.126, moved in 1983 to T.M.R.P. 2.122(b)(2), stating that
the claimed date of first use is not evidence and that a date of first use
must be established by competent evidence; §§ 20:28 to 20:29, 20:71.

[FN7] *See* §§ 20:28 to 20:29, 20:71.

[FN8] *See* Stanspec Co. v. American Chain & Cable Co., 531 F.2d 563, 189
U.S.P.Q. 420 (C.C.P.A. 1976).

[FN9] In re W.R. Case & Sons Cutlery Co., 12 U.S.P.Q.2d 1544, 1989 WL 274383
(T.T.A.B. 1989).

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

MCCARTHY § 31:74

END OF DOCUMENT

McCarthy on Trademarks and Unfair Competition, Fourth Edition
Database updated June 2008

J. Thomas McCarthy

Chapter 31. Defenses to Infringement of Trademarks
III. FRAUD IN OBTAINING TRADEMARK REGISTRATION
A. GENERALLY
3. Types of Fraud in the Procurement of a Trademark Registration

References

## § 31:76. Failure to disclose use by others—Analyzing the oath

**West's Key Number Digest**

West's Key Number Digest, Trademarks 👉1382
West's Key Number Digest, Trademarks 👉1520

Prior to October 30, 1999, when the application was signed by a declaration under 18 U.S.C.A. § 1001, the signing person declared that:

[H]e/she believes the applicant to be the owner of the trademark/service mark sought to be registered, or, if the application is being filed under 15 USC 1051(b) [ITU application], he/she believes applicant to be entitled to use such mark in commerce; to the best of his/her knowledge and belief no other person, firm, corporation, or association has the right to use the above identified mark in commerce, either in the identical form thereof or in such near resemblance thereto as may be likely, when used on or in connection with the goods/services of such other person, to cause confusion, or to cause mistake, or to deceive; the facts set forth in this application are true; and that all statements made of his/her own knowledge are true and all statements made on information and belief are believed to be true.[FN1]

After the 1998 Trademark Law Treaty amendments to the Lanham Act became effective in 1999, the language of the verification required by section 1 as to knowledge of other marks was slightly changed, but the essential content of the required verification was not changed. After the Trademark Law Treaty Amendments, the statute requires the applicant to verify that: "to the best of the verifier's knowledge and belief, no other person has the right to use such mark in commerce either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods of such other person, to cause confusion, or to cause mistake, or to deceive."[FN2] The PTO has implemented the Trademark Law Treaty Implementation Act statutory amendments into the application oath which is effective after October 30, 1999:

The undersigned, being warned that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 18 U.S.C. § 1001, and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that such wilful false statements may jeopardize the validity of the application
or any resulting registration, declares that he/she is properly authorized to
execute this application on behalf of the applicant; that he/she believes the
applicant to be the owner of the trademark/service mark sought to be registered,
or, if the application is being filed under 15 U.S.C. § 1051(b), he/she believes
applicant to be entitled to use such mark in commerce; to the best of his/her
knowledge and belief no other person, firm, corporation, or association has the
right to use the mark in commerce, either in the identical form thereof or in
such near resemblance thereto as to be likely, when used on or in connection
with the goods/services of such other person, to cause confusion, or to cause
mistake, or to deceive; and that all statements made of his/her own knowledge
are true; and that all statements made on information and believe are believed
to be true.[FN3]

It should be noted that in the application "oath" declarant states that to the
best of his or her "knowledge and belief" no other firm "has the *right* to use" the
mark or a confusingly similar mark "in commerce." The oath is phrased in terms of
subjective *belief*, such that it is difficult, if not impossible, to prove objective
falsity and fraud so long as the affiant or declarant has an honestly held, good
faith belief.[FN4] The application oath is essentially an averment of the affiant
or declarant's belief that no other firm has the legal right to use the mark or a
confusingly similar mark in interstate or foreign commerce.

There is nothing in the oath or the statute which requires applicant to disclose
anyone who in fact may be using the mark, but does not, in the applicant's belief,
possess the legal *right* to use.[FN5] The oath is not a guarantee that no other firm
has a legal right to use the mark. Simply because after litigation, another may
succeed in proving in the PTO or in court that it does have a legal right to use,
does not mean that the signer of the oath committed fraud and was a liar.[FN6] The
signer of an application oath should not be put in the position of a fortune teller
as to what the courts will hold in future as to the trademark rights of others.

There is no fraud if applicant signs the oath and is aware of another party's
prior use of the designation in a non-trademark sense, such as use in a purely
descriptive sense or in an ornamental manner. Thus, another party's prior non-
trademark use of a shamrock design in St. Patrick's Day promotions is not such a
prior use as to make the oath fraudulent.[FN7]

Fraud is a serious and deadly allegation which should not be judged with the
convenient benefit of hindsight.[FN8] As Judge Rich noted, the statute and
implementing oath, "require the statement of *beliefs* about exclusive rights, not
their actual possession. Appellant has produced no evidence impugning appellee's
beliefs."[FN9] Similarly, the C.C.P.A., in affirming the dismissal of a fraud
charge, said that one who alleges fraud must specifically allege (and assumably,
prove) the declarant-applicant's knowledge of a third party's "right to use" and
its belief that such third party's use would be confusingly similar.[FN10]

[FN1] *See* Lanham Act § 1(a) to (b), 15 U.S.C.A. § 1051(a) to (b).

[FN2] 1998—Pub. L. 105-330, 112 Stat. 3064, amending Lanham Act § 1(a) and §
1(b) (effective October 30, 1999). The same language for the verified

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

statement is contained in T.M.R.P. 2.33(b).

[FN3]  Official PTO Form 1478 (Dec. 1999), reproduced herein as Form 19-3 at
§ 19:55.

[FN4] Kemin Industries, Inc. v. Watkins Products, Inc., 192 U.S.P.Q. 327,
1976 WL 21132 (T.T.A.B. 1976); Stanfield v. Osborne Indus., 52 F.3d 867, 34
U.S.P.Q.2d 1456 (10th Cir. 1995), cert. denied, 516 U.S. 920, 133 L. Ed. 2d
217, 116 S. Ct. 314 (1995) (when veracity of application oath is challenged,
"[i]t is, therefore, the applicant's subjective belief that is at issue"; no
fraud found); Woodstock's Enterprises Inc. (California) v. Woodstock's
Enterprises Inc. (Oregon), 43 U.S.P.Q.2d 1440, 1444, 1997 WL 440268 (T.T.A.B.
1997) (quoting treatise with approval); Resorts of Pinehurst, Inc. v.
Pinehurst Nat'l Corp., 148 F.3d 417, 47 U.S.P.Q.2d 1465 (4th Cir 1998)
(quoting treatise with approval and finding no fraud); Maids to Order of
Ohio, Inc. v. Maid-to-Order, Inc., 78 U.S.P.Q.2d 1899, 1908, 2006 WL 936993
(T.T.A.B. 2006) (quoting treatise with approval and finding no fraud).

[FN5] Wurzburger Hofbrau Aktiengesellschaft v. Schoenling Brewing Co., 331 F.
Supp. 497, 169 U.S.P.Q. 714 (S.D. Ohio 1971), aff'd, 175 U.S.P.Q. 391 (6th
Cir. 1972), cert. denied, 409 U.S. 1042, 34 L. Ed. 2d 492, 93 S. Ct. 529, 176
U.S.P.Q. 33 (1972); Robert B. Vance & Associates, Inc. v. Baronet Corp., 487
F. Supp. 790, 205 U.S.P.Q. 24 (N.D. Ga. 1979); King-Size, Inc. v. Frank's
King Size Clothes, Inc., 547 F. Supp. 1138, 216 U.S.P.Q. 426 (S.D. Tex. 1982)
(quoting treatise); Marshak v. Sheppard, 666 F. Supp. 590, 3 U.S.P.Q.2d 1829
(S.D.N.Y. 1987) (applicant's belief that other users of the mark were
infringers "is entirely consistent with the declaration to the PTO that no
other person had the right to use the mark for which he applied"; no fraud
found); Dial-A-Mattress Operating Corp. v. Mattress Madness, 841 F. Supp.
1339 (E.D.N.Y. 1994), recons. denied, 847 F. Supp. 18 (E.D.N.Y. 1994), ops.
combined at 33 U.S.P.Q.2d 1961, 1971 (E.D.N.Y. 1994) ("The applicant has no
obligation, however, to disclose known users believed to be infringing the
applicant's rights in the mark"; no fraud found.); Society of Accredited
Marine Surveyors, Inc. v. Scanlan, 75 U.S.P.Q.2d 1944, 2005 WL 670541 (D.
Mass. 2005) (there is no obligation on the applicant to disclose to the PTO
any other known users of the mark).

[FN6] See, e.g., Metro Traffic Control, Inc. v. Shadow Network, Inc., 104
F.3d 336, 41 U.S.P.Q.2d 1369 (Fed. Cir. 1997) (While applicant signed a false
oath regarding his company's exclusive use of a mark, because of the complex
corporate relationship with another party using the same mark in another
territory, the oath was not fraudulent. The applicant's misstatements did not
represent a "conscious effort to obtain for his business a registration to
which he knew it was not entitled.").

[FN7] Kelly Services, Inc. v. Greene's Temporaries, Inc., 25 U.S.P.Q.2d 1460,
1992 WL 430461 (T.T.A.B. 1992) ("[T]he statutorily prescribed application
statement regarding ownership of a word or design constitutes a claim only of
the exclusive right to use the same as a mark. Before signing the application
including the statement, the declarant need not consider whether fair, non-
trademark uses of the word or design may be made or, if the declarant is

already aware of such uses, then they need not be disclosed, since they are
not antithetical to the applicant's claim.").

[FN8] Robert B. Vance & Associates, Inc. v. Baronet Corp., 487 F. Supp. 790,
205 U.S.P.Q. 24 (N.D. Ga. 1979) (subsequent holding of the court has no
bearing on applicant's state of mind at the time the application oath was
signed).

[FN9] American Sec. Bank v. American Sec. & Trust Co., 571 F.2d 564, 197
U.S.P.Q. 65 (C.C.P.A. 1978).

[FN10] King Automotive, Inc. v. Speedy Muffler King, Inc., 667 F.2d 1008, 212
U.S.P.Q. 801 (C.C.P.A. 1981) (noting that applicant has no duty to disclose
to the PTO results of a trademark search showing others' use of mark
different from applied-for mark and that failure to disclose such information
does not qualify as fraud absent an intent to mislead). *See* Bart Schwartz
International Textiles, Ltd. v. Federal Trade Commission, 289 F.2d 665, 129
U.S.P.Q. 258 (C.C.P.A. 1961).

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

MCCARTHY § 31:76

END OF DOCUMENT

Patent and Trademark Office

TRADEMARK MANUAL OF EXAMINING PROCEDURE
CHAPTER 800 APPLICATION REQUIREMENTS
807 DRAWING
807.03 STANDARD CHARACTER DRAWINGS
Fifth Edition, 2007

807.03 Standard Character Drawings

37 C.F.R. §2.52(a) Standard character (typed) drawing. Applicants who seek to register words, letters, numbers, or any combination thereof without claim to any particular font style, size, or color must submit a standard character drawing that shows the mark in black on a white background. An applicant may submit a standard character drawing if:

 (1) The application includes a statement that the mark is in standard characters and no claim is made to any particular font style, size, or color;

 (2) The mark does not include a design element;

 (3) All letters and words in the mark are depicted in Latin characters;

 (4) All numerals in the mark are depicted in Roman or Arabic numerals; and

 (5) The mark includes only common punctuation or diacritical marks.

 Effective November 2, 2003, Trademark Rule 2.52, 37 C.F.R. §2.52, was amended to replace the term "typed" drawing with "standard character" drawing. Applicants who seek to register a mark without any claim as to the manner of display must submit a standard character drawing that complies with the requirements of 37 C.F.R. §2.52(a).

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Patent and Trademark Office

TRADEMARK MANUAL OF EXAMINING PROCEDURE
CHAPTER 1200 SUBSTANTIVE EXAMINATION OF APPLICATIONS
1206 REFUSAL ON BASIS OF NAME, PORTRAIT OR SIGNATURE OF PARTICULAR LIVING
INDIVIDUAL OR DECEASED U.S. PRESIDENT WITHOUT CONSENT
1206.03 CONSENT OF INDIVIDUAL OR PRESIDENT'S WIDOW REQUIRED
Fifth Edition, 2007

1206.03(b) Implicit Consent

 When a particular individual identified by matter in a mark is also the person who signed the application, then his or her consent to registration will be presumed. Alford Mfg. Co. v. Alfred Electronics, 137 USPQ 250 (TTAB 1963), aff'd, 333 F.2d 912, 142 USPQ 168 (C.C.P.A. 1964) ("The written consent to the registration of the mark 'ALFORD' by Andrew Alford, the individual, is manifested by the fact that said person executed the application...."); Ex parte Dallioux, 83 USPQ 262, 263 (Comm'r Pats. 1949) ("By signing the application, the applicant here obviously consents....").

 The mere incorporation of a business and consent to the business's use of the mark does not constitute implied consent to the registration of the mark. Krause v. Krause Publications, Inc., 76 USPQ2d 1904 (TTAB 2005) (Cancellation petitioner did not give implied consent to register when he incorporated the business, sold his stock in the business and pledged his assets to finance expansion and acquisitions, and acquiesced in the corporation's use of the mark for 50 years, where there was no evidence that petitioner expressly stated that the mark was the property of the corporation and petitioner did not agree to refrain from use of the name in any subsequent business); In re New John Nissen Mannequins, 227 USPQ 569 (TTAB 1985) (consent to register not implied from appearance of the name "John Nissen" in a deed of incorporation of applicant's predecessor, nor from existence of foreign registrations incorporating the name). Compare, In re D.B. Kaplan Delicatessen, 225 USPQ 342, 344 (TTAB 1985) (consent to the use and registration of the mark D. B. KAPLAN'S DELICATESSEN, for restaurant services, found to be implicit in the terms of a "buy-out" agreement that relinquished all property rights in the name and forbade its use by the named party in any subsequent business).

 An applicant does not have to submit a new consent if a consent to register is already part of the record in the file of a valid registration for a mark comprised in whole or in part of the same name, portrait or signature for the same goods or services. In this situation, the applicant only has to claim ownership of that existing registration. If an applicant has submitted a consent to register in an application that has not matured to registration, a new consent is not required for pertinent co-pending applications, but the applicant must submit a copy of the consent for each pending application. In re McKee Baking Co., 218 USPQ 287 (TTAB 1983) (applicant's claim of ownership of a prior registration that includes a consent to register in the record held sufficient for purposes of complying with the consent requirement of the Act); 37 C.F.R. §2.193(a).

 See TMEP §813 regarding a statement of consent of a living individual to the registration of his or her name or likeness.

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Patent and Trademark Office

TRADEMARK MANUAL OF EXAMINING PROCEDURE
CHAPTER 1600 REGISTRATION AND POST REGISTRATION PROCEDURES
1604 AFFIDAVIT OF USE OR EXCUSABLE NONUSE OF MARK IN COMMERCE UNDER §8
1604.13 DIFFERENCES IN THE MARK AS USED ON THE SPECIMEN AND THE MARK AS
REGISTERED
Fifth Edition, 2007

1604.13 Differences in the Mark as Used on the Specimen and the Mark as Registered

 The mark to which the §8 affidavit pertains must be essentially the same as the mark that appears in the registration. Where the specimen reflects a change in the mark since the registration issued, acceptance of the affidavit will depend on the degree of change. A material alteration of the mark will result in refusal of the affidavit on the ground that the registered mark is no longer in use. In re International Nickel Co., Inc., 282 F.2d 952, 127 USPQ 331 (C.C.P.A. 1960); In re Continental Distilling Corp., 254 F.2d 139, 117 USPQ 300 (C.C.P.A. 1958); Ex parte Richards, 153 USPQ 853 (Comm'r Pats. 1967). See also Torres v. Cantine Torresella S.r.l., 808 F.2d 46, 1 USPQ2d 1483 (Fed. Cir. 1986); In re Holland American Wafer Co., 737 F.2d 1015, 222 USPQ 273 (Fed. Cir. 1984).

 Mere changes in background or styling, or modernization, are not ordinarily considered to be material changes in the mark. See Ex parte Petersen & Pegau Baking Co., 100 USPQ 20 (Comm'r Pats. 1953) (change in matter determined to be mere background and type face held not a material alteration of "PETER PAN" mark). Whether the change in a mark as used on the specimen is a material change is a question of fact that the Post Registration examiner must determine on a case-by-case basis.

 Generally, the standard used to determine whether a change is material under §8 is the same as the standard used to determine whether the mark in a registration may be amended under 15 U.S.C. §1057(e). If the mark could be amended under §7(e) because the character of the mark had not been materially altered, then the specimen filed with the §8 affidavit should be accepted. In determining whether a change constitutes a material alteration, the USPTO will always compare the mark in the specimen to the mark as originally registered. See TMEP §§807.14 et seq. and 1609.02(a) for additional information about material alteration.

 However, where the registered mark is currently used as one of several elements in a composite mark, the decision as to whether to accept the specimen requires consideration of whether the registered mark makes an impression apart from the other elements of the composite mark. If the display of the composite is such that the essence of the registered mark makes a separate impression, then the specimen may be sufficient for purposes of the §8 requirement. In many cases, word elements are severable from design elements, because words tend to dominate in forming a commercial impression. In re DeWitt International Corporation, 21 USPQ2d 1620 (Comm'r Pats. 1991). If the mark, as used on the §8 specimen, creates a separate impression apart from any other material on the specimen, then the specimen may be accepted as evidence of current use of the registered mark.

 If the examiner determines that the mark on the specimen is a material alteration of the registered mark, a substitute specimen may be filed. If the substitute specimen is filed after expiration of the relevant filing period specified in §8 of the Act, the owner must pay the deficiency surcharge required by §8(c)(2) of the Act and 37 C.F.R. §2.6. See TMEP §1604.12(c) regarding substitute specimens, and 37 C.F.R. §2.164 and TMEP §§1604.17 et seq. regarding the procedures for correcting deficiencies in a §8 affidavit.

END OF DOCUMENT

**Trademark Registration Practice**
James E. Hawes and Amanda V. Dwight
**Database updated November 2004**

**Chapter 5. Responding to Formal Rejections**

References; Index

§  5:9. Drawing

The application must identify the mark sought to be registered. This is done by including, as a separate sheet in the application, a drawing showing the mark. All applications filed after November 1, 2003, must include a separate drawing page. Drawings are discussed in §  3:31; Form C-2a et seq show various drawings.

As part of the examination process, the Trademark Attorney will compare the mark with the mark shown on the specimens of record presented on the drawing. If it is determined that the two do not correspond, that conclusion usually will be stated in language substantially as follows:

The mark _____ shown on the drawing does not agree with the mark _____ actually used, as evidenced by the specimens of record. Either the drawing should be amended so that the mark thereon agrees with the mark as actually used, or specimens showing use of the mark presented in the drawing should be submitted.

In the latter event, the use of the substitute specimens as of a date at least as early as the filing date of the application must be supported either by an affidavit or by a declaration in accordance with 37 C.F.R. §  2.20.

This requirement is fairly self-explanatory. If the applicant wishes to register the mark shown on the drawing, then substitute specimens showing use of that mark should be submitted to the PTO and supported by an affidavit or a declaration confirming the information given in the foregoing paragraph. Following the guidance for preparation of amendments given in § §  4:6-4:13, and the sample form for such amendments presented as Form C-4a of Appendix C, the amendment requesting substitution of new specimens for those originally presented would be phrased: "Please substitute the three specimens attached to the accompanying declaration for those originally presented."

The declaration which must accompany the application would be prepared generally along the lines of Form C-4c. The declarant would include paragraphs which state:

Attached hereto are three specimens which show the mark as applied to--(here, describe the goods or services in connection with which the mark is shown in the specimens, which must be encompassed by the description of goods presented in the application).
The specimens were in use by the applicant on and prior to _____ (the filing date of the application) and are still in such use.

If the applicant decides instead to amend the drawing to conform it to the mark shown on the original specimens, then a new drawing meeting the requirements discussed in §  3:31 would be prepared and submitted as an attachment to the response or the original drawing withdrawn from the PTO files and corrected by a bonded draftsman. When preparing that drawing it would be well to discuss with the Trademark Attorney by telephone exactly what the Trademark Attorney thinks the mark to be, so that the new drawing presents the mark which both the applicant and the Trademark Attorney agree to be shown on the original specimens.[FN1] The response would include in the amendment Section a paragraph substantially as follows: "Please substitute the attached drawing for the drawing originally submitted."

In the "Remarks" Section of the response, a paragraph of the following sort would be included:
The Trademark Attorney has asserted that the mark shown on the drawing does not agree with the

mark actually used on the submitted specimens. By a foregoing amendment, substitution of the drawing attached hereto for that originally submitted is requested. The attached drawing presents the mark as shown on the specimens of record.

But note that the amendment may not "materially alter" the character of the mark.[FN2] 37 C.F.R. § 2.52 was amended in 1999 to state that the drawing depicts the mark sought to be registered. Prior to this amendment to the rules, the mark sought to be registered was determined by the specimens filed with the application for an application based on use in commerce and by the foreign registration for an application based upon foreign registration. The TTAB has held that 1999 amendment to 37 C.F.R. § 2.52 now means that the drawing filed with the original application is determinative of the mark for which registration is sought.[FN2.1] This clears up any ambiguities that might result from any inconsistencies between the description of the mark, specimens and the drawings.

In certain instances, it may be possible to amend a mark to add an element which the applicant has already registered for the same  goods or services covered by the application under consideration. For example, an amendment adding a housemark or a well known registered mark to the mark sought to be registered, when supported by the specimens, was permitted even though it would normally be considered a material alteration of the mark.[FN3] However, an applicant may not delete matter on this basis. Any proposed amendment to delete matter from a mark must be evaluated as to whether the deletion would represent a material alteration of the mark without regard to whether or not the matter to be deleted is the subject of an existing registration.[FN4]

Which of the above courses is to be followed--new specimen or a changed drawing--depends upon the objectives of the application. If, in fact, the mark shown on the drawing is that for which registration is sought, then new specimens should be presented with the response and with an appropriate affidavit or declaration. At times, such specimens are not available. If they were used prior to the filing date of the application and copies are available or can be reconstructed, the declaration should describe this situation in reasonable detail. If, however, such specimens were not used prior to filing the application and it is necessary to rely on the specimens originally submitted, it will then be necessary to convince the Trademark Attorney that the mark sought to be registered and shown on the specimens originally submitted with the application is a separate and distinct mark, and makes a commercial impression upon the consumer distinct from any other mark or design presented on the original specimens. If it is possible to convince the Trademark Attorney of this, the requirement will be withdrawn. If it is not, the requirement will be made final and can only be challenged by an appeal. [FN5]

A specific example may help to illustrate the foregoing. "Duraflame" is a mark used to identify an artificial fireplace log product. It includes, above and between the "a" and the "m," a flame-like design. An application was filed to register that flame-like design alone, and fireplace log wrappers presenting the mark as just described were submitted as specimens. The Trademark Attorney required the drawing to be amended to present the word "Duraflame" together with the flame symbol.[FN6] If the Trademark Attorney could have been convinced that the flame made a distinct commercial impression, separate and apart from the word, the requirement would have been withdrawn. Rather than trying to do this, it was possible to locate through the applicant's advertising agency some flame-symbol price tags that had been used in connection with the displays of the logs prior to filing of the application. These flame-symbol price tags were submitted as substitute specimens, together with an appropriate declaration, and the Trademark Attorney withdrew his requirement that the drawing be amended.

[FN1] Telephone interviews are discussed in § 4:12, supra.

[FN2] In re Tetrafluor, Inc., 17 USPQ2d 1160 (Comm. PT 1990). For a discussion of the "material alteration" standard, see § 24:7, infra. 37 C.F.R. § 2.72(a) prohibits any amendment to an application for trademark registration which materially alters the mark. 37 C.F.R. § 2.52(a) specifies that the mark sought to be registered is the mark which appears in the drawing of the application.

[FN2.1] In re Who? Vision Systems Inc., 57 U.S.P.Q.2d (BNA) 1211, 2000 WL 33147118 (Trademark

Trial & App. Bd. 2000), overruling In re ECCS, Inc., 94 F.3d 1578, 39 U.S.P.Q.2d (BNA) 2001 (Fed. Cir. 1996) and In Re Dekra E.V., 44 U.S.P.Q.2d (BNA) 1693, 1997 WL 732342 (Trademark Trial & App. Bd. 1997).

[FN3] In re Nationwide Indus., Inc., 6 USPQ2d 1882 (TTAB 1988); Florasynth Labs., Inc. v. Mulhens, 122 USPQ 284 (Comm. Pats. 1959). See also In re Dekra E.V., 44 USPQ2d 1693 (TTAB 1997). In Examination Guide 3- 99, part IX, effective October 30, 1999, the PTO announced that it no longer accepts amendments to cure "internal inconsistencies," such as the application's mark not corresponding to the mark shown on the specimen or for a § 44(d) application in the referenced foreign application, if the amendments materially alter the mark on the original drawing. Whether or not the PTO can reverse a decision of the Federal Circuit in this fashion remains to be seen.

[FN4] Trademark Examination Guide No. 1-92 (part B4).

[FN5] See Chapter 14.

[FN6] Amending the drawing might well raise "material alteration" problems-- see § 24:7, infra.

© West, a Thomson business

TMREGPRAC § 5:9
END OF DOCUMENT

**Trademark Registration Practice**
James E. Hawes and Amanda V. Dwight
**Database updated November 2004**

**Chapter 24. Maintaining Trademark Registrations**

Index

§ 24:7. Correcting a federal trademark registration--Correction of mistakes by the registrant--Requests requiring republication

A mistake which occurred in good faith through the fault of the applicant will not result in issuance of a certificate of correction if it involves a change in the registration which would require republication of the mark.[FN1]

A change which would require republication of a mark, also termed a material alteration, is a change which would render the mark sufficiently different from the registered mark to not create the same impression--it would not strike the average consumer as being essentially the same mark as the registered mark. [FN2] Put differently, the changed mark must contain what is the essence of the original mark, otherwise it will present a different commercial impression and require republication.[FN3]

Examples of some of the more typical corrections are:

1. To correct the registrant's name, state of incorporation or address.
2. Where the mark has been assigned prior to issuance of the registration, to change the name of the registrant from that of the applicant to that of the assignee.
3. To correct the mark; for example, it may have been given in the application, and registration, as two separate words whereas in fact it is a single word.
4. To add or delete goods or services from the listing given in the registration.
5. To correct a date of first use.
6. To change the classification.[FN3.1]

A mark that is the subject of an application for federal registration also may be amended to add the applicant's registered mark for the same goods or services; this is an exception to the material alteration standard.[FN4]

Other changes can present problems. If, in a mark consisting of words and a surrounding design, the word is the essence of the mark and the design is merely background embellishment or display, not integrated into the mark in a necessary way, the removal or change of the design will not be a material alteration of the mark.[FN5] On the other hand, if a design is integrated into a mark and is a distinctive feature necessary for recognition of the mark, then a substantial change in the design, or its elimination altogether, would materially alter the mark.[FN6]

A word normally can be varied as to the style of lettering, size, and other elements of form without resulting in a material alteration of the mark.  A non-unique or descriptive word might be deleted if the essence of the mark in appearance or meaning is not changed thereby,[FN7] but a unique word which is necessary to the significance of the mark may not be deleted by a certificate of correction.[FN8] Nor may a picture or design be substituted for a word or phrase; that would be a material alteration.[FN9]

When a mark is solely a picture or design, an alteration must be evaluated on the basis of whether the new design conveys the same impression, or creates a fundamentally different impression, one contrary to the significance of the original mark; would the new design be recognized by the ordinary consumer as the same mark? If it is a new mark, one conveying a fundamentally different impression, then the change would require republication and could not be effected by a certificate of correction.[FN10] Whether or not the change would require republication, it is important to preserve the distinctiveness of the mark, for the value of the mark is largely determined by its distinctiveness.[FN11]

In summary, features of a registered mark which impart to it a uniqueness, or distinctiveness, which the public has come to recognize as an identification of source, must be retained in the registration. A request for "correction"

of a mistake by the registrant which seeks to change any such feature will be deemed to seek a material alteration in the registered mark, requiring its republication, and therefore such a request will be rejected and the change denied.

If the registrant, upon requesting correction of its mistake, receives a rejection which asserts that one or more of the requested corrections will constitute a material alteration of the mark, the registrant may either delete that correction from the original request, or seek to show that the correction will not change any feature of the mark which gives it a uniqueness or distinctiveness which the public has come to recognize as an identification of source. Such a showing might be made, for example, by presenting evidence that the registrant has used the registered mark in various slightly different ways, thereby tending to negate the uniqueness or distinctiveness of such changed features.

Should the PTO persist in a refusal to correct a mistake by the registrant, which the registrant believes to not be well founded, the registrant may petition the Commissioner.[FN12] If such changes cannot be effected by a certificate of correction, a new registration may be sought to achieve the same result.

[FN1] Section 7(g) of the Act; 37 C.F.R. § 2.175(a).

[FN2] In re Nationwide Indus., Inc., 6 USPQ2d 1882 (TTAB 1988), which includes examples of both material alterations and immaterial changes. The use of the singular rather than the possessive form of a mark is not deemed to be a material alteration, as it does not significantly alter the term's meaning or impression. See In re DeWitt Int'l Corp., 21 USPQ2d 1620, 1623 n.5 (Comm. PT 1991), and the case there cited. Also, in In re Umax Data Sys. Inc., 40 USPQ2d 1539 (Comm. PT 1996), an amendment of a drawing to change its letters from a stylized configuration to a more block-like configuration was deemed "minimal" and allowed because the commercial impression of the modified mark was essentially the same as the original. But substitution of a drawing of a blue star for a drawing that read "Design of a Blue Star" was refused as a material alteration. In re Meditech Int'l Corp., 25 USPQ2d 1159 (TTAB 1990). For further discussion of the "material alteration" standard, see § 3:49, supra. For a discussion of the related "mutilation" standard, see § 3:16, supra. None of these decisions address any aspect of the mark other than its visual appearance. Yet most marks are often spoken and heard in the marketplace by customers and potential customers. Surely, this aspect of a mark's use should be considered, too, given its importance in the marketplace. When it is, very likely many of the prior material alterations will become immaterial changes.

[FN3] 37 C.F.R. § 2.72(a) prohibits any amendment to an application for registration that materially alters "the mark," and 37 C.F.R. § 2.52(a) clarifies that "the mark" sought to be registered is the mark which appears on the drawing of the application. Therefore, the drawing may not be substantially modified even to correct a typo in the mark. In re Who? Vision Systems Inc., 57 U.S.P.Q.2d (BNA) 1211, 2000 WL 33147118 (Trademark Trial & App. Bd. 2000). This decision followed a change in the rules and overrules In re ECCS, Inc., 94 F.3d 1578, 39 U.S.P.Q.2d (BNA) 2001 (Fed. Cir. 1996) and In Re Dekra E.V., 44 U.S.P.Q.2d (BNA) 1693, 1997 WL 732342 (Trademark Trial & App. Bd. 1997) which allowed amendment of the drawing to overcome an internal inconsistency.

[FN3.1] Effective November 2, 2003, changes or corrections to classification after publication or registration will no longer require republication of the mark. This change in policy applies only to Section 1 and 44 applications. Section 66(a) applications cannot be changed from the classification assigned by the IB.

[FN4] Florasynth Labs., Inc. v. Mulhens, 122 USPQ 284 (Comm. Pats. 1959); In re John La Batt Ltd., 26 USPQ2d 1077 (Comm. PT 1992).

[FN5] See Ex parte Petersen & Pegau Baking Co., 100 USPQ 20 (Comm. Pats. 1953); Ex parte Hanna Paint Mfg. Co., 103 USPQ 217 (Comm. Pats. 1954).

[FN6] In re Richards-Wilcox Mfg. Co., 181 USPQ 735 (Comm. Pats. 1974); Ex parte Peerless Confection Co., 142 USPQ 278 (Comm. Pats. 1964).

[FN7] The background words "Vino de" were allowed to be substituted for "Gran Vino" in a wine label design in In re Larios S.A., 35 USPQ2d 1214 (TTAB 1995). Yet a request to cancel clearly descriptive words from a registered mark was deemed to be a material alteration in In re Dillard Dep't Stores Inc., 33 USPQ2d 1052 (Comm. PT 1994).

[FN8] See In re Continental Distilling Corp., 254 F.2d 139, 117 USPQ 300 (CCPA 1958).

[FN9] In re Abolio y Rubio SACI y G, 24 USPQ2d 1152 (TTAB 1992); In re Hacot-Colombier, 105 F.3d 616, 41 USPQ2d 1523 (Fed. Cir. 1997).

[FN10] In re Dillard Dep't Stores Inc., 33 USPQ2d 1052 (Comm. PT 1994).

[FN11] See Stewart, "Preserving Distinctiveness of a Symbol Mark After Embellishment," 61 TMR 201-07 (1971).

[FN12] 37 C.F.R. § 2.176; petitions are discussed in Chapter 13.

© West, a Thomson business

TMREGPRAC § 24:7
END OF DOCUMENT