## CASES AND AUTHORITIES

**1.**  *Allahverdi v. Regents of University of New Mexico*,
        228 F.R.D. 696 (D. N.M. 2005)

**2.**  *Banks v. Office of the Senate Sergeant-at-Arms*,
        222 F.R.D. 7 (D. D.C. 2004)

**3.**  *Dimitrijevic v. TV&C GP Holding Inc.*,
        2005 U.S. Dist. LEXIS 41399 (S.D. Tex. Aug. 24, 2005)

**4.**  *In re Ullico Inc. Litigation*,
        2006 U.S. Dist. LEXIS 97578 (D. D.C. July 18, 2006)

**5.**  *IOSTAR Corp. v. Stuart*,
        2007 U.S. Dist. 96862 (D. Utah 2008)

**6.**  *Kendall v. GES Exposition Servs.*, Inc.,
        174 F.R.D. 684 (D. Nev. 1997)

**7.**  *Larson v. Correct Craft, Inc.*,
        2006 U.S. Dist. LEXIS 78028 (M.D. Fla. Oct. 25, 2006)

**8.**  *Portis v. City of Chicago*,
        1997 U.S. Dist. LEXIS 15827, 2005 WL 991995
        (N.D. Ill. April 15, 2005)

**9.**  *Ridge Chrysler Jeep, L.L.C. v. Daimler Chrysler Servs. N. Am., L.L.C.*,
        2004 U.S. Dist. LEXIS 26861 (N.D. Ill. Dec. 29, 2004)

**10.** *Safeco Ins. Co. of Am. v. Rawstron*,
        181 F.R.D. 441 (C.D. Cal. 1998)

**11.** *Sondker v. Philips Elecs. N.*,
        2004 U.S. Dist. LEXIS 14477 (N.D. Ill. July 26, 2004)

**12.** *Stephens v. City of Chicago*,
        203 F.R.D. 353, 361 (N.D. Ill. 2001)

**13.** *Talevski v. Carter*,
        2007 U.S. Dist. LEXIS 44794 (N.D. Ind. June 18, 2007)

**14.** *The Mitchell Co. v. Campus*,
        2008 U.S. Dist. LEXIS 47505 (S.D. Ala., June 16, 2008)

**15.** *Track Sys. v. New Investor World, Inc.*,
2002 U.S. Dist. LEXIS 21320 (N.D. Ill. Nov. 4, 2002)

**16.** 7 Moore's Federal Practice §33.30 (3rd Ed. 2008)

# 1

*Allahverdi v. Regents of University of New Mexico,* 228 F.R.D. 696 (D. N.M. 2005)

LEXSEE 228 F.R.D. 696

### HOUMAN ALLAHVERDI, M.D., Plaintiff v. REGENTS OF the UNIVERSITY OF NEW MEXICO; UNIVERSITY OF NEW MEXICO HOSPITALS; DAVID WILKS, M.D., PAUL ROTH, M.D., SALLY BACHOFER, Defendants

### No. CIV 05-0277 JB/DJS

### UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW MEXICO

### 228 F.R.D. 696; 2005 U.S. Dist. LEXIS 14611

### July 11, 2005, Decided

**SUBSEQUENT HISTORY:** Motion granted by *Allahverdi v. Regents of the Univ. of N.M., 2006 U.S. Dist. LEXIS 28783 (D.N.M., Apr. 25, 2006)* Summary judgment granted, in part, summary judgment denied, in part by *Allahverdi v. Regents of the Univ. of N.M., 2006 U.S. Dist. LEXIS 27682 (D.N.M., Apr. 25, 2006)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff doctor filed a motion pursuant to *Fed. R. Civ. P. 26, 33*, and *37* for an order to compel answers to interrogatories or, in the alternative, granting leave to exceed the interrogatory limit in connection with an action against defendants, a university, a hospital, and associated individuals.

**OVERVIEW:** Plaintiff served defendants with interrogatories and other discovery. Defendants served their response to the discovery, making objections primarily based on the number of interrogatories, which defendants argued exceeded the amount that the Federal Rules of Civil Procedure allowed. Defendant also failed to provide information to an interrogatory requesting information concerning witnesses. The court held that, by answering some and not answering other interrogatories, defendants waived their objection as to the number of interrogatories served. The court

concluded that plaintiff made a good faith attempt to comply with the permissible number of interrogatories under *Fed. R. Civ. P. 33*. Defendants' initial disclosures did not contain all of the information requested or warranted under the interrogatory seeking information about witnesses.

**OUTCOME:** The court granted plaintiff's motion in part and ordered defendants to submit an amended answer to an interrogatory and to complete answers to other interrogatories. The court denied plaintiffs' request for fees.

**CORE TERMS:** interrogatory, discovery, scheduling, answer to interrogatory, Federal Rules, attempt to comply, propounded, exceeded, answering, oppose

### LexisNexis(R) Headnotes

*Civil Procedure > Discovery > Methods > Interrogatories > General Overview*
[HN1] When a party believes that another party has asked too many interrogatories, the party to which the discovery has been propounded should object to all interrogatories or file a motion for protective order. The responding party should not answer some interrogatories and object to the ones to which it does not want to respond.

228 F.R.D. 696, *; 2005 U.S. Dist. LEXIS 14611, **

**COUNSEL:** **[\*\*1]** For Plaintiff: Steven K. Sanders, Donald Sears, Law Offices of Steven K. Sanders, Albuquerque, New Mexico

For Defendants: Marcia E. Lubar, Mark D. Trujillo, Beall & Biehler, Albuquerque, New Mexico

**JUDGES:** James O. Browning, UNITED STATES DISTRICT JUDGE

**OPINION BY:** James O. Browning

**OPINION**

**[\*697]** *MEMORANDUM OPINION AND ORDER*

**THIS MATTER** comes before the Court on the Plaintiffs Motion for Order to Compel Answer to Interrogatories or in the Alternative Granting Leave to Exceed Interrogatory Limit, filed June 10, 2005 (Doc. 15). The Court held a hearing on this matter on July 7, 2005. Consistent with the Court's ruling at the hearing on this motion, and for the reasons given at the time of the hearing, the Court will grant Plaintiff Houman Allahverdi's motion to compel in part and deny in part.

*PROCEDURAL BACKGROUND*

Allahverdi served the Defendants with interrogatories and other discovery on April 11, 2005. *See* Certificate of Service (Doc. 5). On April 22, 2005, pursuant to the Initial Scheduling Order, the parties met with the Honorable James O. Browning, United States District Judge, for a *rule 16* conference to discuss this case. On May 19, 2005, after receiving no **[\*\*2]** response to the discovery from the Defendants, Allahverdi's attorney sent a letter requesting that the Defendants answer the discovery and notifying the Defendants that, because they had not requested an extension of time, he would not agree to any objections to the discovery. *See* Letter from Steven K. Sanders to Marcia E. Lubar and Mark D. Trujillo at 1 (dated May 19, 2005). On May 23, 2005, the Defendants served their response to the discovery, making objections primarily based on the number of interrogatories which the Defendants argued

exceeded the amount that the Federal Rules of Civil Procedure allow.

On May 25, 2005, Allahverdi's attorney called the Defendants' attorney, Mark D. Trujillo, and requested that the Defendants withdraw the objections, and answer the discovery completely and without objection. Allahverdi's attorney also notified the Defendants' attorney that the answers to the discovery, which the Defendants did give, were not complete and requested that the Defendants supplement the answers. Allahverdi cited in particular interrogatory number one, which requests information concerning witnesses; **[\*698]** the Defendants have not provided that information.

On June 10, 2005, Allahverdi **[\*\*3]** filed a Motion for Order to Compel Answer to Interrogatories or in the Alternative Granting Leave to Exceed Interrogatory Limit. The Defendants oppose this motion. The Defendants did not agree to supplement the answers or to answer the remaining discovery.

*ANALYSIS*

Allahverdi, pursuant to *rules 26*, *33*, and *37* of the Federal Rules of Civil Procedure, requests that the Court order the Defendants to answer certain interrogatories. In the alternative, Allahverdi prays for an order granting him leave to exceed the interrogatory limit set out in *rule 33* and order the Defendants to answer the interrogatories that he has propounded.

**I. THE DEFENDANTS' ANSWERS TO THE INTERROGATORIES WERE TIMELY.**

Pursuant to the Initial Scheduling Order, the time allowed for discovery "will run from the *Rule 16* initial scheduling conference." Initial Scheduling Order at 1, filed March 30, 2005 (Doc. 4). The Defendants submitted the answers on May 23, 2005 and they thus were timely. *See id.; Fed. R. Civ. P. 33(b)(3).*

**II. BECAUSE ALLAHVERDI MADE A GOOD FAITH ATTEMPT TO COMPLY WITH THE NUMBER [\*\*4] OF INTERROGATORIES ALLOWED UNDER RULE 33, THE COURT WILL GRANT ALLAHVERDI'S MOTION TO COMPEL.**

228 F.R.D. 696, *; 2005 U.S. Dist. LEXIS 14611, **

[HN1] When a party believes that another party has asked too many interrogatories, the party to which the discovery has be propounded should object to all interrogatories or file a motion for protective order. The responding party should not answer some interrogatories and object to the ones to which it does not want to respond. By answering some and not answering others, the Defendants waived this objection.

If Allahverdi had prepared a number of interrogatories that greatly exceeded the number of twenty-five, the Court might be inclined to equitably adjust the number that the Defendants have to answer. After reviewing Allahverdi's interrogatories, however, the Court concludes that Allahverdi made a good faith attempt to comply with the permissible number of interrogatories under *rule 33 of the Federal Rules of Civil Procedure.* Accordingly, the Court will grant Allahverdi's motion to compel, and will order the Defendants to respond to interrogatory numbers five and six.

### III. THE DEFENDANTS' ANSWER TO INTERROGATORY NUMBER ONE IS INCOMPLETE.

[**5] The Defendants' initial disclosures do not contain all of the information requested or warranted under interrogatory number one. Accordingly, the Court orders the Defendants to submit an amended answer to interrogatory number one. [1]

> 1 At the hearing, Allahverdi did not oppose the Defendants' request that the Court not impose a fine. *See* Transcript of Hearing at 7:10-19 (taken July 7, 2005).
>
> The Court's citations to the transcript of the hearing refer to the Court Reporter's original, unedited version. Any finalized transcript may contain slightly different page and/or line numbers.

**IT IS ORDERED** that the Plaintiffs Motion for Order to Compel Answer to Interrogatories or in the Alternative Granting Leave to Exceed Interrogatory Limit is granted in part. The Defendants shall submit an amended answer to interrogatory number one and to complete answers to interrogatories numbers five and six. The Plaintiffs' request for fees is denied.

7/11/05

James O. Browning

UNITED STATES DISTRICT JUDGE

# 2

*Banks v. Office of the Senate Sergeant-at-Arms*, 222 F.R.D. 7 (D. D.C. 2004).

LEXSEE 222 F.R.D. 7

**ROY BANKS, Plaintiff, v. OFFICE OF THE SENATE SERGEANT-AT-ARMS and DOORKEEPER, Defendant.**

**Civil Action No. 03-56 (HHK/JMF), Civil Action No. 03-686 (HHK/JMF), Civil Action No. 03-2080(HHK/JMF)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

*222 F.R.D. 7; 2004 U.S. Dist. LEXIS 9952*

**May 3, 2004, Decided**

**SUBSEQUENT HISTORY:    [**1]**
Motion denied by, Motion to strike denied by, Motion granted by *Banks v. Office of the Senate Sergeant-at-Arms & Doorkeeper, 226 F.R.D. 113, 2005 U.S. Dist. LEXIS 2851 (D.D.C., 2005)*

**PRIOR HISTORY:** *Banks v. Office of the Senate Sergeant-at-Arms, 222 F.R.D. 1, 2004 U.S. Dist. LEXIS 3416 (D.D.C., 2004)*

**DISPOSITION:    [**2]** Discovery motions ruled on.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff employee sued defendant, the Office of the Senate Sergeant-at-Arms (SAA), alleging discrimination claims under Title VII of the Civil Rights Act of 1964. The case generated 18 motions, which fell into two categories. Procedural motions were not before the magistrate. Before the magistrate were the parties' discovery motions.

**OVERVIEW:** Among the court's actions were the following: First, the employee's motion to strike portions of a witness's errata sheet was denied as premature, hypothetical, and non-justiciable. Second, SAA's motion for a protective order from supernumerary interrogatories was denied in part and granted in part. Third, SAA's motion to compel

discovery from the Office of Compliance was denied without prejudice, as the present posture did not present an actual question to decide. Fourth, SAA's motion to compel discovery was granted in part and denied in part. Fifth, the employee's motion to compel SAA to answer his request for interrogatories was granted in part and denied in part. Sixth, SAA's motion for a protective order from plaintiff's 150 requests for admissions and requests for expedited ruling was denied. The magistrate rejected SAA's argument the requests were not timely served. Seventh, SAA's motion for protective order regarding the employee's notice of video deposition was denied without prejudice. Eighth, the employee's motion to preclude SAA from offering testimony concerning the subject matter of his notice of deposition and request for fees and costs was denied.

**OUTCOME:** The magistrate resolved, in 13 numbered paragraphs, the outstanding discovery motions in the order they were filed.

**CORE TERMS:** interrogatory, deposition, discovery, log, protective order, deadline, attorney's fees, reply, privileged, notice, disability, lawsuit, asking, branch manager, untimely, finalist, disclose, counted, federal rules, discoverable, conversation, counseling, propounded, mediation, subpoena, summary judgment, answered, waived, phone, sex

**LexisNexis(R) Headnotes**

*Civil Procedure > Discovery > Methods > Oral Depositions*

[HN1] *Fed. R. Civ. P. 30(e)* grants a witness the right to make changes in form or substance in her deposition provided the witness signs a statement indicating the changes and the reasons for them. If a motion for summary judgment has been filed, the witness's modifying what she said can so disrupt the movant's legal arguments that courts may hesitate to permit the change despite the literal command of *Rule 30(e)* that it be permitted.

*Civil Procedure > Discovery > Methods > Interrogatories > General Overview*

[HN2] See *Fed. R. Civ. P. 33(a)*.

*Civil Procedure > Discovery > Methods > Interrogatories > General Overview*

[HN3] Regarding *Fed. R. Civ. P. 33*, the courts have attempted to formulate more conceptual approaches, asking whether one question is subsumed and related to another or whether each question can stand alone and be answered irrespective of the answer to the others. This is anything but a bright-line test.

*Civil Procedure > Discovery > Methods > Interrogatories > General Overview*

[HN4] Regarding combining in a single interrogatory a demand for information and a demand for the documents that pertain to that event, these are two distinct demands because knowing that an event occurred is entirely different from learning about the documents that evidence it occurred. Thus, a demand for information about a certain event and for the documents about it should be counted as two separate interrogatories.

*Civil Procedure > Discovery > Methods > Interrogatories > General Overview*

[HN5] Lawyers, sensitive to the numerical restriction, inter alia, subdivide interrogatories so that after they introduce a topic, they demand to know in detail all the particulars about it, frequently introducing their specific demands with the phrase "including but not limited to." Thus, they may ask their opponent to state whether a particular product was tested and then demand to know when the tests occurred, who performed them, how and where they were conducted and the result. In such a situation, all the questions relate to a single topic, testing, and it would unfair and draconian to view each of the demands as a separate interrogatory. This approach ends, however, the moment the interrogatory introduces a new topic that is in a distinct field of inquiry. Thus, in the "testing" example, asking how the results of the tests were used in any advertising about the product's fitness for a particular purpose would have to be viewed as a separate interrogatory.

*Civil Procedure > Counsel > General Overview*
*Civil Procedure > Discovery > Methods > Interrogatories > General Overview*

[HN6] U.S. Dist. Ct., D. D.C., R. 7(m) requires lawyers to conscientiously attempt to resolve discovery matters before presenting the issue to the court.

*Civil Procedure > Discovery > Methods > Interrogatories > Use*

[HN7] A party's opinions and contentions are discoverable by interrogatory. *Fed. R. Civ. P. 33(c)*. As to requests for opinions or contentions that call for the application of law to fact, they can be most useful in narrowing and sharpening the issues, which is a major purpose of discovery. *Fed. R. Civ. P. 33(c)* advisory committee's note. Asking a party how one count of his complaint differs in its legal theory from a second count is perfectly legitimate.

*Civil Procedure > Discovery > Methods > Interrogatories > General Overview*
*Civil Procedure > Discovery > Relevance*
*Legal Ethics > Client Relations > Attorney Fees > Fee Agreements*

[HN8] Assessing one's settlement posture by knowing what one's opponent is paying counsel is not a legitimate use of discovery; discovery seeks

222 F.R.D. 7, *; 2004 U.S. Dist. LEXIS 9952, **

relevant evidence, not ammunition for settlement discussions, as welcome as they may be.

*Civil Procedure > Discovery > Disclosures > Mandatory Disclosures*

[HN9] The Federal Rules of Civil Procedure require parties, as part of their initial disclosures, to provide the name and, if known, the address and telephone number of each individual likely to have discoverable information that the disclosing party may use to support its claims or defenses. *Fed. R. Civ. P. 26(a)(1)(A).*

*Civil Procedure > Discovery > Disclosures > Mandatory Disclosures*

[HN10] If a potential witness is an employee of the defendant and defendant agrees to produce for deposition or trial its employees upon reasonable notice, defendant must provide plaintiff with the witness's work address and phone number.

*Civil Procedure > Discovery > Disclosures > Mandatory Disclosures*

[HN11] *Fed. R. Civ. P. 26(a)(3)* only requires the plaintiff to give names of certain witnesses who plaintiff expects to testify at trial, at least 30 days prior to trial or upon submission of his pretrial statement. Thus, the plaintiff has no duty to disclose the exact witnesses he intends to call until then.

*Civil Procedure > Discovery > Methods > Written Depositions*

[HN12] The federal courts do not permit a witness to refuse to answer a question that is irrelevant. Instead, the witness must answer the question, subject to the objection.

*Civil Procedure > Discovery > Disclosures > Mandatory Disclosures*
*Civil Procedure > Discovery > Protective Orders*

[HN13] A party can secure a protective order under *Fed. R. Civ. P. 26* upon a showing of good cause.

*Civil Procedure > Discovery > Methods > Oral Depositions*
*Civil Procedure > Pretrial Judgments > General Overview*
*Civil Procedure > Judgments > Relief From Judgment > General Overview*

[HN14] Regarding a *Fed. R. Civ. P. 30(b)(6)* notice of deposition, and the preclusion from offering testimony at trial as to the subject matter, such relief requires a showing that the violation of the rule or of the court's orders pertaining to discovery is so gross that no lesser sanction is appropriate.

*Civil Procedure > Discovery > Privileged Matters > General Overview*

[HN15] See *Fed. R. Civ. P. 26(b)(5).*

*Civil Procedure > Discovery > Misconduct*
*Civil Procedure > Discovery > Privileged Matters > General Overview*

[HN16] The withholding of a privilege log may subject a party to sanctions under *Fed. R. Civ. P. 37(b)(2)* and may be viewed by the court as a waiver of any privilege or protection. *Fed. R. Civ. P. 26* advisory committee's note.

*Civil Procedure > Discovery > Misconduct*
*Civil Procedure > Remedies > Costs & Attorney Fees > Attorney Expenses & Fees > Statutory Awards*

[HN17] Under *Fed. R. Civ. P. 37(a)(4)*, the court may, in its discretion and after providing the non-prevailing party an opportunity to respond, award attorney's fees to the prevailing party following the court's resolution of a motion to compel.

*Civil Procedure > Discovery > Methods > Interrogatories > General Overview*

[HN18] Unlike requests for the production of documents, an interrogatory must simply be answered separately and fully in writing under oath, unless it is objected to, in which event the objecting party shall state the reasons for objection and shall answer to the extent the interrogatory is not objectionable. *Fed. R. Civ. P. 33(b)(1).* As with requests for the production of documents, however,

under *Rule 33(b)(4)*, the failure to object in a timely fashion to interrogatories constitutes a waiver of any objections unless good cause is shown.

*Civil Procedure > Discovery > Privileged Matters > General Overview*

[HN19] While privilege logs have become the universal means of claiming a privilege when a party claims that certain documents are privileged from discovery, there is nothing in the Federal Rules of Civil Procedure that requires the filing of a privilege log when a party claims a privilege as to a deposition question or an interrogatory. A party can comply with the requirement of *Fed. R. Civ. P. 26(b)(5)* by otherwise communicating sufficient information to enable other parties to assess the applicability of the privilege or protection. Thus, in a given case, a well-formed objection to a question, whether oral or written, may suffice.

*Legal Ethics > Professional Conduct > Opposing Counsel & Parties*

[HN20] Rule number one of professionalism and civility among lawyers is: a deal is a deal.

**COUNSEL:** For ROY BANKS, Plaintiff (1:03-cv-00056-HHK-JMF): William P. Farley, LEAD ATTORNEY, John F. Karl, Jr., McDonald & Karl, Washington, DC.

For OFFICE OF THE SENATE SERGEANT-AT-ARMS AND DOORKEEPER OF THE UNITED STATES [**3] SENATE, Defendant (1:03-cv-00056-HHK-JMF): Katherine Anne Goetzl, LITTLER MENDELSON, Ronald I. Tisch, LITTLER MENDELSON, P.C., Washington, DC.

**JUDGES:** JOHN M. FACCIOLA, UNITED STATES MAGISTRATE JUDGE.

**OPINION BY:** JOHN M. FACCIOLA

**OPINION**

**[*8] MEMORANDUM OPINION**

This *Title VII* case has now generated eighteen motions that must be resolved. The motions fall into two categories. First, there are procedural motions, some of which ask the presiding judge, Judge Kennedy, to modify deadlines he has set for the end of discovery and the filing of dispositive motions. These motions are not before me, but I have resolved others that seek the modification of deadlines pertaining to discovery motions. Second, there are discovery motions filed by the parties seeking various forms of relief and they are before me.

**[*9] INTRODUCTION**

Roy Banks ("plaintiff), an employee of the Senate Sergeant-at-Arms ("SAA" or "defendant") claims that 1) he was denied a promotion to branch manager because of his race or sex; 2) he was retaliated against for seeking counseling with the Office of Compliance; 3) he was subjected to a hostile work environment based on his race, age, alleged disability, or sex; 4) he was discriminated **[**4]** against because of his sex; 5) he was denied leave under the Family and Medical Leave Act because of his sex, race, or the fact that he filed complaints of discrimination; 6) he was denied an accommodation for his disability; 7) he was denied disability leave; 8) he was terminated because of his race, age, alleged disability, sex, or in retaliation; and 9) SAA improperly handled his compensation claims. Defendant's Motion for Summary Judgment, page 1.

**DISCUSSION**

I. Procedural Posture

Some of the motions filed by the defendant, SAA, seek to compel plaintiff to provide discovery. Both plaintiff and defendant have filed numerous discovery motions. However, defendant has also moved Judge Kennedy to extend the time within which to complete discovery and file motions for summary judgment. Judge Kennedy, however, did not rule on defendant's motion for an extension of the previously established deadlines for the completion of discovery and the filing of motions for summary judgment. Confronted with these deadlines, SAA filed its motion for summary judgment. Despite that filing, I will now resolve the outstanding discovery motions in the order they were filed.

II. **[**5]** Analysis

A. Plaintiff's Motion to Strike Portions of Alvin Macon's Errata Sheet [# 20]

Rule [1] 30(e) of the Federal Rules of Civil Procedure[HN1] grants a witness the right to make changes in form or substance in her deposition provided the witness signs a statement indicating the changes and the reasons for them.

> 1   Unless otherwise indicated, references to a "Rule" are to the Federal Rules of Civil Procedure.

If a motion for summary judgment has been filed, the witness's modifying what she said can so disrupt the movant's legal arguments that courts may hesitate to permit the change despite the literal command of *Rule 30(e)* that it be permitted. [2]

> 2   In the reported cases, the courts have not been consistent. Courts have refused to make a change at all, re-opened discovery to permit the movant to interrogate the witness as to the change she wishes to make, permitted the change (leaving to the court the task of assessing the significance of the change for the motion before it), or permitted the change only upon a particular showing. See *Burns v. Bd. of County Comm'rs, 330 F.3d 1275, 1282-83 (10th Cir. 2003)*; *Podell v. Citicorp Diners Club, Inc., 112 F.3d 98, 103 (2d Cir. 1997)*; *Garcia v. Pueblo Country Club, 299 F.3d 1233, 1242 (10th Cir. 2002)*; *Thorn v. Sundstrand Aerospace Corp., 207 F.3d 383, 389 (7th Cir. 2000)*; *Summerhouse v. HCA Health Services of Kansas, 216 F.R.D. 502 (D. Kan. 2003)*; *Pepsi-Cola Bottling Co. v. Pepsico, Inc., 2002 U.S. Dist. LEXIS 5840, 2002 WL 511506 (D. Kan. 2002)*; *Walker v. Yellow Freight Sys., 1999 U.S. Dist. LEXIS 16128, 1999 WL 955364 (E.D. La. Oct. 19, 1999)*; *Rios v. Welch, 856 F. Supp. 1499 (D. Kan. 1994)*; *Rios v. Bigler, 847 F. Supp. 1538 (D. Kan. 1994)*.

[**6]  It is clear, however, that SAA is not relying on either Macon's testimony as given or as to be corrected to establish that there is no genuine issue of material fact and SAA is entitled to judgment. I have reviewed that motion and its attachments and cannot find a single reference to Macon, let alone his deposition. The motion to correct the deposition is, therefore, academic and raises a question that is beyond the court's jurisdiction and must be denied. *Los Angeles v. Lyons, 461 U.S. 95, 75 L. Ed. 2d 675, 103 S. Ct. 1660 (1983)*.

If the motion for summary judgment is denied and Macon is called as a witness and impeached with the portion of the deposition he is trying to correct, there will still be time enough to consider Macon's application. Until that occurs, however, the question presented by this motion is premature, hypothetical and non-justiciable. Id.

[*10]  B. Defendant's Motion for a Protective Order from Supernumerary Interrogatories [# 29]

1. The Problem

By his Order of January 5, 2004, Judge Kennedy restricted the parties in these three consolidated cases to 30 interrogatories. Before that Order had issued, plaintiff served two sets of interrogatories. According [**7] to plaintiff, the first set of interrogatories was comprised of nineteen questions and the second eight, for a total of twenty-seven. SAA sees it differently, insisting that one question in the first set (number 8) and seven in the second set (numbers 1-6 & 8) contained subparts and, when those subparts are counted as separate interrogatories, plaintiff has propounded many more interrogatories than Judge Kennedy permitted by the January 5, 2004 Order.

2. Analysis

When *Rule 33(a)* was amended to limit the number of interrogatories that can be propounded, the draftsmen appreciated that the numerical restriction could be evaded by "joining as 'subparts' questions that seek information about discrete separate subjects." *Fed. R. Civ. P. 33* advisory committee's note. Therefore, the numerical limitation in the rule is stated as [HN2] "not exceeding 25 in number including all discrete subparts." *Fed. R. Civ. P. 33(a)*.

[HN3] Identifying a "discrete subpart" has proven difficult. While a draconian approach would be to view each participial phrase as a subpart, [3] the courts have instead attempted to formulate more conceptual [**8] approaches, asking whether one

question is subsumed and related to another or whether each question can stand alone and be answered irrespective of the answer to the others. *Kendall v. GIES Exposition Services, 174 F.R.D. 684 (D. Nev. 1997).* But, as another court has stated, this is anything but a bright-line test. *Safeco of America v. Rawstron, 181 F.R.D. 441, 445 (C.D. Cal. 1998).* It may also beg the question presented.

> 3    See *Valdez v. Ford Motor Co., 134 F.R.D. 296 (D. Nev. 1991).*

Perhaps a more pragmatic approach, reminiscent of Justice Stewart's memorable "definition" of pornography, [4] would be to look at the way lawyers draft interrogatories and see if their typical approaches threaten the purpose of the rule by putting together in a single question distinct areas of inquiry that should be kept separate.

> 4    *Jacobellis v. Ohio, 378 U.S. 184, 197, 12 L. Ed. 2d 793, 84 S. Ct. 1676* (Stewart J., concurring) (stating, as to pornography, "I know it when I see it").

**[**9]** The first and most obvious example is the [HN4] combining in a single interrogatory of a demand for information and a demand for the documents that pertain to that event. Clearly, these are two distinct demands because knowing that an event occurred is entirely different from learning about the documents that evidence it occurred. Thus, a demand for information about a certain event and for the documents about it should be counted as two separate interrogatories.

[HN5] Lawyers, sensitive to the numerical restriction, also subdivide interrogatories so that after they introduce a topic, they demand to know in detail all the particulars about it, frequently introducing their specific demands with the phrase "including but not limited to." Thus, they may ask their opponent to state whether a particular product was tested and then demand to know when the tests occurred, who performed them, how and where they were conducted and the result. In such a situation, all the questions relate to a single topic, testing, and it would unfair and draconian to view each of the demands as a separate interrogatory. This approach ends, however, the moment the interrogatory introduces a new topic that is in a distinct **[**10]** field of inquiry. Thus, in the

"testing" example, asking how the results of the tests were used in any advertising about the product's fitness for a particular purpose would have to be viewed as a separate interrogatory.

After reviewing the interrogatories at issue, I find myself agreeing with SAA as to interrogatory 8 of the first set and interrogatories 2, 5, 6, and 8 of the second set, insofar as these interrogatories first demand information **[*11]** and then demand the documents pertaining to it.

I also find, however, that SAA is arguing in favor of using the draconian approach of counting every subdivision of an interrogatory as a separate question. I rejected that method as unfair. For example, in objecting to interrogatory 4 of the second set, SAA insists that asking about what duties plaintiff was given or had taken away is distinct from asking who added them or took them away. Those two topics are too intimately and logically connected to have to be divided into two separate questions.

However, since several of the remaining interrogatories do speak to more than one topic, they must be counted as more than one. I will now explain what I mean more specifically as to each of these **[**11]** interrogatories.

a. Interrogatory 2 of the Second Set

In addition to demanding documents, this interrogatory raises three topics: 1) plaintiff's evaluations, 2) plaintiff's loss of certain duties because of them, and 3) what information was provided to the evaluators and from whom did it come. Thus, including the demand for documents, I find that this compound question should be counted as four interrogatories.

b. Interrogatory 3 of the Second Set

This interrogatory speaks first to the SAA's general hiring practices and then to the hiring of the person for the position of Manager for the Capitol Facilities. As those are separate topics, this question should be counted as two interrogatories.

c. Interrogatory 6 of the Second Set

This interrogatory speaks to two distinct topics: 1) the determination that plaintiff was not entitled to disability leave and 2) the number of employees in the past ten years who were denied disability leave.

Since this question also seeks documents, it should be counted as three interrogatories.

By my calculations, plaintiff propounded eight more interrogatories than permitted. [5] I can either grant plaintiff leave to exceed the number permitted **[**12]** by Judge Kennedy's Order, permit plaintiff to propound a new set of interrogatories that complies with the Order, or grant a protective order, relieving the SAA of the obligation to answer the last eight interrogatories to which SAA objected, interrogatories 4, 6, and 8.

> 5     Plaintiff propounded twenty-seven interrogatories but in my view they should be counted as thirty-eight. Plaintiff was entitled to propound thirty, leaving a balance of eight.

I will not grant plaintiff leave to exceed the number of interrogatories permitted by Judge Kennedy; judicial orders are to be obeyed, not ignored. I appreciate that some sections of the interrogatories that demand documents may just as easily be considered Requests for Production of Documents. I do not know whether plaintiff propounded any such Requests and if it did not, it may not be necessary to issue a protective order because once the demand for documents now made in the interrogatories are formulated as Requests for Production, SAA may be willing to answer the **[**13]** interrogatories that remain.

To solve this problem, I am going to demand that the parties do something that, in my judgment, they have yet to do: cooperate. The pleadings in this case indicate to me that these lawyers have all but ignored the obligation imposed by Rule 7.1(m) of the Local Civil Rules[HN6] , that they conscientiously attempt to resolve discovery matters before presenting the issue to the court. While the parties claim in their motions that they have fulfilled this responsibility, all they seem to do is to exchange nasty letters and equally nasty phone calls. I now will provide them with the opportunity to forge a compromise. I expect them to meet and attempt to agree on what documents will be exchanged and what interrogatories will be answered, now that they have the benefit of my thinking. I certainly hope that they can resolve their differences and relieve themselves and the court of further time and expense. If they cannot resolve

their differences, within two weeks, they shall advise me by *praecipe* that they cannot and I will return to the issues presented by this motion.

**[*12]**     C. Defendant's Motion to Compel Discovery From the Office of Compliance ("D's Mot. to Compel") **[**14]** [# 36]

Plaintiff invoked the mandatory conciliation and mediation provisions of the Congressional Accountability Act, *2 U.S.C. § 1401-1403* ("CAA"). [6] In a prior opinion, I stated of these provisions:

> In subjecting agencies within the legislative branch to monetary liability for claims of race and other discrimination, Congress created a system that requires an employee of such an agency who complains of such discrimination to engage first in counseling and then mediation. *2 U.S.C.A. §§ 1401 &1402 (1997)*. Once counseling and mediation have ended, the employee must make an election. *161 He can either file an action in a district court or initiate an administrative proceeding by filing a complaint with the Office of Compliance. *2 U.S.C.A. § 1404 (1997)*. If the employee chooses the administrative remedy, a hearing officer resolves the case and either party may appeal that officer's decision to the Board of Directors of the Office of Compliance. *2 U.S.C.A. § 1406 (1997)*. Appeal of the decisions from this Board lies in the United States Court of Appeals for the Federal Circuit. *2 U.S.C.A. § 1407(a)(1) **[**15]** .
>
> Congress has elected to shield portions of this process from public inquiry. First, all counseling and mediation "shall be strictly confidential." *2 U.S.C. § 1416(a) &(b) (1997)*. Additionally, "all proceedings and deliberations of hearing officers and the Board, including any related records, shall be confidential." *2 U.S.C.A. § 1416(c)*

*(1997)*. The only exception pertinent here would be for the final decisions specified in *2 U.S.C.A. § 1416(f) (1997)*, i.e., those made by a hearing officer or the Board of Directors in favor of an employee or by the Board if it has reversed the decision of a hearing officer in favor of an employee. *2 U.S.C.A. § 1416(f) (1997)*.

*Waters v. United States Capitol Police Board, 216 F.R.D. 153, 161 (D.D.C. 2003)*.

6    All references to the United States Code or the Code of Federal Regulations are to the electronic versions that appear in Westlaw or Lexis.

SAA served **[**16]** a subpoena upon the Office of Compliance, created by Congress to, *inter alia,* supervise the counseling and mediation processes, demanding production of the documents plaintiff submitted to the Office of Compliance, including his requests for counseling and mediation and the documents provided him. D's Mot. to Compel, Exhibit 1, Schedule A.

The Office of Compliance, citing the confidentiality provisions of the CAA, discussed in my earlier opinion, resisted surrendering the forms that plaintiff filled out to commence the conciliation process in the six instances where plaintiff invoked the process. SAA insists that the documents alone will permit it to ascertain whether plaintiff in fact exhausted the administrative remedy. See *Halcomb v. Office of the Senate Sergeant-At-Arms of the United States Senate, 209 F. Supp. 2d 175 (D.D.C. 2002)* (administrative remedy provided by the CAA must be exhausted as pre-condition to suit in the District Court).

I believe that in its present posture this case does not present an actual question for me to decide. Whatever may be the proper resolution of the abstract question that is raised by the enforcement of a subpoena issued by the employing agency and **[**17]** refused by the Office of Compliance, the real question is whether the plaintiff, having elected to pursue a case in the District Court, may nevertheless insist that the

confidentiality provisions of the CAA bar its opponent from seeing the documents he filed to invoke the conciliation process when those documents are relevant to a defense that the employing agency wishes to investigate and, if appropriate, assert. Thus, in my view, I am going to insist that plaintiff show cause why I should not order the Office of Compliance to comply with the subpoena. If plaintiff has no objection, I will hear from the Office of Compliance as to why it should still not be compelled to comply with the subpoena. I will permit SAA to be heard as to all issues presented, once plaintiff responds to the order to show cause.

**[*13]**    D. Defendant's Motion to Compel Discovery from Plaintiff [# 37]

Defendant claims insufficiencies in plaintiff's responses to interrogatories and requests to produce documents.

1. Interrogatories

In interrogatories 1 and 2, SAA asked how Count III and Count IV of the complaint set forth a distinct cause of action from Count III and what legal theories animated Counts III **[**18]** and IV. In response, plaintiff first objected on the grounds that the question "seeks an answer to a pure question of law" but then proceeded to provide a lengthy answer.

First, plaintiff's objection is inappropriate. [HN7] A party's opinions and contentions *are* discoverable by interrogatory. See *Fed. R. Civ. P. 33(c)* & advisory committee's note ("As to requests for opinions or contentions that call for the application of law to fact, they can be most useful in narrowing and sharpening the issues, which is a major purpose of discovery."). Asking a party how one count of his complaint differs in its legal theory from a second count is perfectly legitimate.

Second, I have read the answers plaintiff provided, and I am afraid that I do not understand how the answers to the interrogatories actually speak to the question presented. Plaintiff will, therefore, have to provide a much clearer explanation of how the counts differ in legal theory from each other. The crucial point is not what evidence plaintiff will tender in support of each

count but how the claim made in one count is different from and not duplicative of another.

I disagree, however, **[**19]** with SAA's contention that plaintiff's answer to SAA's interrogatory 11, that asked plaintiff to indicate how he was victimized by sexual discrimination, is inadequate and find that it answers the interrogatory sufficiently.

## 2. Requests for Production of Documents

### a. Fee Agreements

Plaintiff refuses to produce his fee agreement with his counsel. While I agree that agreements as to fees are not privileged, [7] they become relevant, at best, when plaintiff prevails and seeks a fee. Whether such agreements are discoverable and whether plaintiff waived the privilege by his allegedly untimely response to the request to produce can wait until then. In the meanwhile, I reject the notion that there may be someone else paying counsel's fees other than plaintiff as too fanciful to justify compelling production of the fee agreement. Furthermore, [HN8] assessing one's settlement posture by knowing what one's opponent is paying counsel is not a legitimate use of discovery; discovery seeks relevant evidence, not ammunition for settlement discussions, as welcome as they may be.

> [7] Edna Selan Epstein, The Attorney Client Privilege and the Work-Product Doctrine, at 67 (4th ed. 2001).

### [**20] b. Mitigation

SAA propounded three requests for documents pertaining to plaintiff's seeking and securing work since being fired and to his application (if any) for disability retirement. Resisting SAA's motion to compel a response, plaintiff represents to the court, through his counsel, that plaintiff "does not have any documents that he did not turn over to Defendant." Banks' Opposition to the Sergeant-at-Arms' Motion to Compel Discovery from Plaintiff at 15. I will, therefore, deem plaintiff to have represented by his counsel, an officer of this court, that there are no documents sought by any of SAA's Requests for Production of Documents that have not been turned over to SAA. If that representation proves not to be correct, SAA may seek sanctions.

E. Plaintiff's Motion Pursuant to *Rule 37* to Compel Defendant to Answer Plaintiff's Request for Interrogatories ("P's Mot. to Compel") [# 38]

Plaintiff moves the court to order defendant to answer fully and completely Plaintiff's First Set of Interrogatories, Request Numbers 2, 4, 5, 16, and 18. [8] I will consider each Interrogatory Request in turn.

> [8] Defendant has agreed to supplement Request Numbers 6, 8, 10, 12, 13, and 14 but has not yet provided the supplemental responses. It shall do so within 30 days of the issuance of this Memorandum and Opinion.

### [**21] [*14] 1. Interrogatory Number 2

Plaintiff's Interrogatory Number 2 states:

> Identify by name, current address, job title, and telephone number each and every person with knowledge of the facts which are the subject of this lawsuit, such identification shall include a summary of the facts and information for each witness defendant expects to testify in this matter on behalf of defendant.

In response, defendant provided the names and contact information of several managers at SAA, as well as the subjects about which each person had knowledge. Two witnesses were listed as having knowledge about "the selection process used in 2001-2002 regarding the Branch Manager of Capitol Facilities position." P's Mot. to Compel, Exhibit B at 5-6. Another witness was identified as the selecting official. Id. at 6. Defendant also stated that it had not yet identified the witnesses whom it intends to call at trial. P's Mot. to Compel at 7-8.

Plaintiff contends that defendant's response is inadequate and that he is entitled to discover: 1) additional information regarding other terminated employees, including their race and 2) personnel information concerning the officials involved in selecting **[**22]** the finalists for the Manager of Capitol Facilities and in making the decision to terminate him. Id. Plaintiff also insists that

222 F.R.D. 7, *; 2004 U.S. Dist. LEXIS 9952, **

defendant has refused to disclose the names of other employees that have information regarding the facts underlying the instant lawsuit. Id. at 8.

Defendant claims that in his motion, plaintiff seeks information that he did not seek in the initial interrogatory, namely information regarding other terminated employees. Defendant's Opposition to Plaintiff's Motion to Compel Defendant to Answer Plaintiff's Request for Interrogatories ("D's Opp. to Mot. to Compel") at 6. Defendant also argues that he should not be compelled to respond to Interrogatory Number 2 because it seeks information protected by the work-product privilege, *i.e.,* the identification of his trial witnesses and a summary of their expected testimony. Id. at 3. In addition, defendant maintains that the interrogatory is ambiguous and overbroad because it seeks all witnesses with knowledge of the "facts" that are the "subject of this lawsuit." Id. at 5-6. Rather, according to defendant, because plaintiff included a wide variety of allegations in his complaints and because [**23] he failed to clarify the information he sought before filing the instant motion, defendant should not be required to provide any additional information in response to this interrogatory. Id.

Defendant is, in part, correct in its argument. Plaintiff is not entitled to discover information about "other terminated employees, including their race" because that information was not requested in the interrogatory. Plaintiff is only entitled to discover potential witnesses with knowledge of facts underlying the lawsuit. As defendant points out, however, plaintiff's complaints contain many allegations, and determining "each and every person" who may have knowledge of each fact alleged by plaintiff may be near impossible. In addition, in his motion, plaintiff names the very witnesses he wants defendant to disclose. For example, plaintiff lists the names of SAA employees he believes have knowledge of the facts underlying the lawsuit. P's Mot. to Compel at 8. In addition, plaintiff states that, *via* the depositions of other witnesses, he has learned the identity of the official who made or confirmed the decision to terminate him. Plaintiff's Reply in Further Support of His Motion to [**24] Compel Defendant to Answer Plaintiff's Request for Interrogatories ("P's Reply to Mot. to Compel") at 5-6.

Therefore, I will order defendant to provide the business addresses and phone numbers of the witnesses plaintiff has named in his motion and reply: Alvin Macon, Karen Miller, Karen Ellis, Mr. Banks' warehouse co-workers, Ms. Goldring, Ms. Coates, Keith Kennedy, Mr. Pickle, Catherine Brooks, and Ann Harkins. In addition, even though it may be impossible to identify each and every person who knows something - no matter how trivial - about the instant action, [HN9] the Federal Rules of Civil Procedure require parties, as part of their initial disclosures, to provide "the name and, if known, the address [*15] and telephone number of each individual *likely to have discoverable information* that the disclosing party may use to support its claims or defenses ...." *Fed. R. Civ. P. 26(a)(1)(A)* (emphasis added). In addition, it is not only appropriate but also necessary for defendant to identify with specificity the people who were the decisionmakers in this case. Therefore, I will order defendant to identify clearly all individuals who reviewed or supervised [**25] plaintiff's work and all individuals who reviewed his application for the position he sought. Defendant must also disclose the officials that: 1) narrowed the candidate list to two finalists, 2) made the final selection for the Branch Manager position, and 3) decided to terminate Mr. Banks. [9]

> 9     The identities of some of these individuals may have already been provided to Mr. Banks *via* deposition testimony or other discovery methods, but to clarify matters, especially in light of the barrage of discovery disputes currently before the court, I will order defendant to provide this information in a single document.

[HN10] If a potential witness is an employee of the defendant and defendant agrees to produce for deposition or trial its employees upon reasonable notice, defendant must provide plaintiff with the witness' work address and phone number. See *Waters v. United States Capitol Police Board, 216 F.R.D. 153, 164-65 (D.D.C. 2003)* (stating that, under similar circumstances, providing home contact [**26] information would be unnecessary). Otherwise, defendant must provide that witness' home address and phone number if they are known.

222 F.R.D. 7, *; 2004 U.S. Dist. LEXIS 9952, **

As for witnesses expected to be called at trial, I will not order defendant to disclose their names, nor will I order defendant to produce a summary of the witnesses' anticipated testimony. Such a request is premature. Under the local and federal rules, a party must provide such information, but it need not do so until it makes its pretrial disclosures, at least thirty days before trial or upon submission of its pretrial statement. *Fed. R. Civ. Pro. 26(a)(3)*; LCvR 16.5(b). Since no trial date has yet been set in this case, defendant has no obligation to reveal the witnesses it may call. In addition, requiring defendant to disclose the names of witnesses he anticipates calling would violate the work-product privilege. As I explained in another case:

Defendant is not entitled to the exact list of witnesses planning to testify as of this date. *Fed.R.Civ.P. 26(a)(3)*[HN11] only requires the plaintiff to give names of certain witnesses who plaintiff expects to testify at trial, [**27] at least 30 days prior to trial or upon submission of his pretrial statement. Local Rule 209(b)(1)(iv). Thus, the plaintiff has no duty to disclose the exact witnesses he intends to call until then .... The disclosure defendant requests of the names of the witnesses who provided statements to plaintiff's counsel crosses the boundary into work product because the names requested are interwoven with the preparation of plaintiff's case. Here, the plaintiff decided from all of the employees of the IRS with potentially relevant information who he wanted to interview. Clearly such decisions constitute "strategy" and a lawyer's "mental process" in preparing for litigation. This information is therefore work product and not discoverable information.

Chiperas v. Rubin, No. CIV.A.96-130, 1998 WL 531845, at *1 (D.D.C. Aug. 24, 1998).

2. Interrogatory Number 4

Plaintiff's Interrogatory Number 4 states:

Identify by name, address, and social security number and position applied for, all persons who have applied for any position at the Office of the Senate Sergeant at Arms and Doorkeeper of the Senate which Plaintiff applied to, whether the application was oral [**28] or written during the period of December 1995 through the present, including the date of the application and whether the person was ultimately hired.

Defendant objects to this interrogatory on grounds of relevance, overbreadth, undue burden, and invasion of privacy of third parties. D's Opp. to Mot. to Compel at 8-9. In response to the interrogatory, defendant stated that 267 people applied for the position of Branch Manager of Capitol Facilities and that plaintiff and Ralph Rouse, the selectee, were the only two finalists.

[*16] Plaintiff finds defendant's response to be inadequate [10] because it failed to identify any of the 265 other applicants. Plaintiff summarized his dissatisfaction and frustration with defendant's responses by stating that he believes he is entitled to discover "whether all of the African-Americans who applied for the position were similarly or better qualified than Rouse." P's Mot. to Compel at 9.

10    Plaintiff also criticizes defendant's response because defendant failed to provide contact information for Mr. Rouse. However, Mr. Rouse's contact information was provided in response to Interrogatory Number 2. Plaintiff also objects to defendant's failure to provide information regarding whether the other 265 applicants were ultimately hired in the Branch Manager position or another position. As defendant explains in its opposition, however, this criticism is frivolous. D's Opp. to Mot. to Compel at 8 n.7. Because defendant explained that Mr. Rouse was hired for the position, it can be easily inferred that none of the other 266 applicants were selected for the

job. In addition, because plaintiff applied only to be Branch Manager, that is the only position for which information was sought in this interrogatory. Id.

[**29] Defendant maintains that the names and qualifications of the 265 applicants, besides plaintiff, who were not selected as finalists and, therefore, not presented to SAA for consideration are irrelevant. D's Opp. to Mot. to Compel at 9. Defendant also claims that disclosing such information would constitute an unwarranted intrusion into the privacy rights of the other applicants. Id. at 9-10.

Defendant is correct. The names and qualifications of the 265 applicants who were not chosen to be finalists are irrelevant to whether the selecting official discriminated against plaintiff when he chose Mr. Rouse. In addition, while the information may be relevant to whether the initial review of applicants was discriminatory, plaintiff cannot claim that he was discriminated against during the first round of application decisions because he survived that round and was named as a finalist. In addition, knowing the identities of the 265 applicants would only be helpful to plaintiff if he knew their races, but plaintiff did not seek that information in the interrogatory and defendant has stated that it did not collect data on the applicants' racial backgrounds. Therefore, the information requested [**30] in Interrogatory Number 4 is irrelevant to plaintiff's lawsuit, and I will not compel defendant to respond.

### 3. Interrogatory Number 5

Plaintiff's Interrogatory Number 5 states:

> For each of the employees identified in Number "4" above, state with specificity each and every reason why each employee was offered a position or the reasons the person was not offered a position.

In light of my discussion regarding Interrogatory Number 4, I will similarly not compel defendant to provide this information.

### 4. Interrogatory Number 16

Plaintiff's Interrogatory Number 16 states:

> Please completely identify all witnesses you expect to call at trial, including the expected nature of their testimony.

For the reasons stated in my discussion of Interrogatory Number 2, I will similarly not order defendant to provide plaintiff with this information.

### 5. Interrogatory Number 18

Curiously, in his motion to compel, plaintiff lists Interrogatory 18 but fails to explain why he is seeking a court order compelling defendant to respond more fully to this interrogatory. Defendant also fails to address the particulars of Interrogatory 18. [11] Because neither party addressed [**31] the merits of this request, I will not compel defendant to file any supplemental responses to this interrogatory.

> 11 Ostensibly because of defendant's failure to address Interrogatory Number 18, plaintiff states that defendant "concedes the motion" as to Interrogatory Number 18. P's Reply to Mot. to Compel at 10.

F. Defendant's Motion for a Protective Order from Plaintiff's Request for Admissions; Request for Expedited Ruling ("D's Mot. for P.O.") [# 47]

Defendant has moved the court for a protective order from answering plaintiff's 150 requests for admission, claiming that requests [*17] for admissions were not timely served. D's Mot. for P.O. at 1.

Plaintiff's requests for admissions were hand-delivered on January 20, 2004. Id. at 3. Under *Rule 36*, defendant's response was due on February 19, 2004, thirty days after the requests were served. However, according to the court's original scheduling order, all discovery was scheduled to close by February 17, 2004. Therefore, under the original scheduling [**32] order, the requests for admission were untimely. See *Fed. R. Civ. P. 36*; *Gluck v. Ansett Australia LTD, 204 F.R.D. 217,*

*219-20 (D.D.C. 2001)* (finding that the "text, structure and purpose of the federal rules ... suggest that service of plaintiff's requests for [admissions] was subject to the discovery deadline). *See also Toone v. Federal Express Corp., 1997 U.S. Dist. LEXIS 11637, No. CIV.A.96-2450, 1997 WL 446257, at *8 (D.D.C. July 30, 1997)* (finding that plaintiff's motion to compel responses to his requests for admissions should be denied because of untimely service, failure to file a motion to extend the discovery deadline, and failure to file a motion to shorten the time for defendant's response).

On February 5, 2004, however, the court granted defendant's motion to amend the discovery schedule. [12] Under the amended order, discovery was set to close on February 24, 2004. The court also extended each party's deadlines for responding to outstanding discovery by one week. Thus, according to defendant, its new deadline to respond to the requests for admission was February 26, 2004. Id. at 3.

> 12   The court ordered: "The defendant shall have an additional week to respond to discovery and to file any opposition or reply briefs; plaintiff shall have an additional week to respond and to file any opposition or reply briefs. The discovery cut-off date is extended to February 24, 2004." February 5, 2004 Minute Entry.

[**33]   Under the original scheduling order and according to the revised discovery schedule, the requests for admissions were untimely. However, plaintiff barely missed the deadline. He served the requests 28 days before the close of discovery, and defendant's duty to answer the requests fell only two days outside the prescribed discovery period.

These facts are clearly distinguishable from the eleventh-hour situations in which this court has protected a party from answering untimely requests for admissions. In Gluck v. Ansett Australia Ltd., plaintiff submitted requests for admissions within one week of the discovery deadline. *Gluck, 204 F.R.D. at 218.* In Toone v. Fed. Express Corp, the requests for admissions were served on the same day that discovery was set to close, and under the Rules, the defendant had until the day of the original trial date to respond. *Toone, 1997 U.S. Dist. LEXIS 11637, 1997 WL 446257, at *8.*

In a situation more analogous to this one, the Southern District of New York required a party to respond to untimely requests for admissions because: 1) they were only untimely by a day or two, 2) counsel explained that they were served on a Monday after a messenger [**34] failed to pick them up on a Friday, and 3) the parties still had two months before the close of expert discovery. *Revlon Consumer Prods. Corp. v. Estee Lauder Cos., 2003 U.S. Dist. LEXIS 13004, No. CIV.A.5960, 2001 WL 521832, at *1 (S.D.N.Y. May 16, 2001).* Similarly, plaintiff in this case missed the deadline by only two days, and his counsel explained that the requests were supposed to be delivered 4 days earlier. Because of an emergency closing at defendant's office and an intervening holiday weekend, however, the requests were served the following Tuesday. Plaintiff's Opposition to Sergeant-at-Arms' Motion for Protective Order at 3. In addition, it was defendant that moved to enlarge the discovery period, and it did so without bringing to light this deadline dispute. In light of all of these factors, I will order defendant to respond to plaintiff's 150 requests for admissions within 30 days of the date of this Memorandum Opinion. Given the confusion surrounding the deadlines, however, I will not grant plaintiff's cross-motion for attorney's fees and costs [13] related to this motion.

> 13   See Opposition to the Seargent-At-Arms' Motion for a Protective Order from Plaintiff's Request for Admissions and Cross Moves for the Award of Attorney's Fees and Costs [# 55].

[**35]   [*18]   G. Defendant's Motion for Protective Order Regarding Plaintiff's *Rule 30(b)(6)* Notice of Video Deposition [# 57] and Plaintiff's Motion to Preclude Defendant from Offering Testimony Concerning the Subject Matter of Plaintiff's *Rule 30(b)(6)* Notice of Deposition and Request for Attorneys' Fees and Costs [# 59]

On February 10, 2004, plaintiff served a notice of deposition upon SAA pursuant to *Rule 30(b)(6).* It listed 35 topics on which testimony was sought. On February 18, 2004, SAA advised plaintiff's counsel that SAA would be moving for a protective order within two days time. Plaintiff indicated he would nevertheless go forward with the deposition on February 23, 2004, a Monday. On February 20,

222 F.R.D. 7, *; 2004 U.S. Dist. LEXIS 9952, **

2004, SAA did file a motion for protective order objecting to several of the 35 topics as irrelevant because they dealt with a matter (workmen's compensation claim) that was the subject of a pending motion to dismiss. Thus, SAA filed its motion for a protective order on Friday afternoon and the deposition proceeded the following Monday. Since neither Judge Kennedy nor I sleep here on the weekends, it was impossible for either of us to rule on the motion for a protective order; [**36] indeed, plaintiff still had 11 days under our Local Rules to respond to it. LCvR 7.1(b).

1. Supervision of Depositions Generally

The premise of defendant's motion is that it is an appropriate exercise of the judicial supervision of discovery to issue a protective order to prevent counsel from asking a question that is irrelevant or so ineptly phrased that it can be condemned as vague or ambiguous. The problem with that premise is that, as I have pointed out in this very case, [HN12] the federal courts do not permit a witness to refuse to answer a question that is irrelevant. Instead, the witness must answer the question, subject to the objection. On the other hand, if SAA has it right, federal courts should go to the opposite extreme and, when a 30(b)(6) deposition is taken, not only permit the witness to refuse to answer an irrelevant question but rule in advance as to what topics are relevant.

Alternatively, [HN13] a party can secure a protective order under Rule 26 upon a showing of good cause. Although those words are designed to be malleable, all can agree that insisting that a federal court act to prevent the possibility that irrelevant questions will be asked at a deposition is completely [**37] unprecedented and would require the court to micro-manage the discovery process. That is the exact opposite of what a court is supposed to be doing in enforcing Rule 1. In any event, the worst that can happen when a party asks a 30(b)(6) witness questions about an irrelevant topic is that the process will be unnecessarily time-consuming. While there are more pleasant ways to pass the time, that kind of "burden" has to be endured in any deposition because, as I have explained, a witness must answer even irrelevant questions in a non-30(b)(6) deposition. To have one rule for the ordinary deposition and a completely

different one for 30(b)(6) depositions makes no sense, particularly when some lawyers hardly need encouragement to make discovery more expensive and when, given crowded dockets, the court may not be able to act as promptly as the parties hope on a motion to preclude the party taking the 30(b)(6) deposition from asking certain questions. Moreover, there is time and power enough after the deposition has been taken to punish the party or lawyer who wasted everyone's time. Thus, without precluding the possibility of reaching a different decision in a case where there is more obvious [**38] abuse, I will exercise my discretion in this case and deny SAA's motion for a protective order.

I appreciate that there remains open the necessity of taking one or more 30(b)(6) depositions as to the remaining 27 topics. I feel an urgent necessity to supervise that process for several reasons. I have reviewed carefully the list of topics in Plaintiff's Rule 30(b)(6) Notice of Video Deposition to Defendant's Office of the Senate Sergeant at Arms and Doorkeeper. In most respects, it certainly does not describe with "reasonable particularity the matters on which examination is requested." Fed. R. Civ. P. 30(b)(6). Instead, each of the topics reads like an interrogatory or a section of a request for production of documents. For example, topic 20 defines a "topic" as: "The sum and [*19] substance of all conversations between Ann Harkins and any employee of the SAO concerning Mr. Banks from January 1, 2002 and March 20, 2002, the date of those conversations, where those conversations took place, the reason for those conversations, the person who requested that a conversation (which includes any meeting) take place." It almost goes without saying that [**39] this "topic" is absurdly overbroad; conversations about Mr. Banks' hair style or his new suit cannot possibly be relevant to this lawsuit.

I am afraid that many of the other "topics" suffer from the same or similar problems. However, I have neither the time nor the inclination to "flyspeck" them. Instead, I will wipe the slate clean and require the parties to attempt in good faith to arrive at a mutually agreeable listing of topics for the 30(b)(6) depositions that are to be taken and the 30(b)(6) witnesses who will speak to them. In arriving at that list, I expect the parties to find topics that will insure that the 30(b)(6) depositions

Case 1:08-cv-00526    Document 148-3    Filed 08/21/2008    Page 22 of 179

222 F.R.D. 7, *; 2004 U.S. Dist. LEXIS 9952, **

are meaningful exercises in ascertaining information that has not been previously discovered or are necessary to ascertain the position SAA took or takes as to factual and legal issues that have arisen. By taking these depositions, plaintiff is certifying to me that he will not ask questions that duplicate questions previously asked of other witness or seek information that he already has by virtue of responses to other discovery devices. The list of topics, that will have to be approved by me before the deposition is taken, will have to be consistent [**40] with that certification.

2. The McComish Deposition

I now turn to the McComish deposition.

Plaintiff seeks an extraordinary remedy, the preclusion from offering testimony at trial as to the subject matter of Plaintiff's February 10, 2004 *Rule 30(b)(6)* Notice of Deposition. Since that Notice covers every issue in the lawsuit, plaintiff is, in effect, seeking a default judgment. Such [HN14] relief requires a showing that the violation of the rule or of the court's orders pertaining to discovery is so gross that no lesser sanction is appropriate. *Zenian v. District of Columbia, 283 F. Supp. 2d 36 (D.D.C. 2003)*. I have reviewed the McComish deposition carefully, and I cannot find in it any basis for the remedy plaintiff seeks. To the contrary, I find that McComish answered conscientiously and completely the questions as to the specific things she did with reference to plaintiff's demand that he be accommodated because of his asserted disability. I appreciate that plaintiff takes her to task for not investigating certain matters, but she is under no obligation to investigate anything if she otherwise answers the questions on the basis of her knowledge. The courts understandably [**41] guard against the gamesmanship of a corporation, for example, naming as a *30(b)(6)* witness a person who knows nothing about the topics and does nothing to inform himself about them so that his deposition threatens to be a series of cynical "I do not know" statements. See e.g., *In re Vitamins Antitrust Litig., 216 F.R.D. 168 (D.D.C. 2003)*. There was nothing like that whatsoever in this case. The witness explained what she did in reference to the processing of plaintiff's request for an accommodation and identified other persons who may have other information about that topic and the somewhat related issue of plaintiff's applying for workmen's compensation. Once she spoke of what she did and of what others did or might know, she fulfilled her responsibility. She had no responsibility to investigate plaintiff's case for him.

I certainly appreciate that she refused to answer certain questions as being beyond the scope of the topics she agreed to testify to and refused to answer others on the grounds of privilege. It is my intention, however, that once the parties have agreed upon the proper topics for the remaining *30(b)(6)* depositions, they will then agree upon [**42] what *30(b)(6)* witnesses will speak to what topic. Once that is done, the areas that McComish refused to discuss will have been covered by other witnesses, rendering her refusal moot. As to the issue of privilege, it is my repeated experience that I cannot rule on the legitimacy of a claim of privilege in a deposition without knowing the context of the situation, which can only be secured by my asking the witness the circumstances in which the privileged communication took place. Hence, unless it is unnecessary to do so, I intend to re-commence [*20] her deposition before me, and I will rule on the application of the privileges claimed as to each question in which they are asserted. I will, however, postpone resuming the deposition in my presence until all the other *30(b)(6)* depositions are taken, so that I can ask McComish additional questions. It may well be that these other depositions may render the assertion of the privilege insignificant and the resources that would be consumed in resolving whether or not the privilege was properly claimed can be conserved until then.

H. Plaintiff's Motion to Compel Defendant to Fully and Completely Respond to Plaintiff's Third Request for Production [**43] of Documents and Provide Identified Documents ("P's 2nd Mot. to Compel") [# 61] and Plaintiff's Motion to Compel Defendant to Provide Privilege Log and Motion for an Order that Defendant Has Waived Privilege as to Responsive Documents Not Produced ("P's 3rd Mot. to Compel") [# 71]

1. Background History

On July 30, 2003, Banks served his first document request on SAA. See P's 3rd Mot. to Compel, Exhibit A. On September 16, 2003, SAA

responded. See Id., Exhibit B. Rather than provide the responsive documents along with a privilege log, SAA withheld the documents and indicated that the documents were privilege. Id.

On November 18, 2003, Banks served his second document request on SAA. See id., Exhibit C.

On January 12, 2004, Banks served his third document request on SAA. See id., Exhibit D. Banks also requested by letter that a privilege log be provided prior to plaintiff's taking of depositions in this matter. On February 23, 2004, SAA responded to Bank's third document request, giving the same response that it had previously. See id., Exhibit G.

On numerous occasions, Banks attempted to obtain a privilege log from SAA. See id., Exhibits E, **[**44]** H, I, and J. Finally, on March 23, 2004, SAA provided Banks with a "comprehensive privilege log." Defendant's Opposition to Plaintiff's Motion to Compel Production of a Privilege Log ("D's 3rd Opp.") at 1.

### 2. Analysis

Banks seeks the production of a privilege log by SAA as well as an order from this court declaring that SAA has waived its assertion of any and all privileges as to these documents because the privilege log was not produced in a timely fashion. SAA counters that the motion is now moot because a privilege log has been produced. D's 3rd Opp. at 1. SAA also contends that it has not waived any privileges and that the log itself provides Banks with the information it needs to challenge, on a substantive level, the privileges asserted. Id. at 1-2.

#### a. Documents

Under *Rule 26(b)(5)*, a party is required to submit a privilege log when asserting a privilege as to any otherwise discoverable material:

> [HN15] When a party withholds information otherwise discoverable under these rules by claiming that it is privileged or subject to protection as trial preparation material, the party shall make the claim expressly and shall describe the nature of the documents, communications, **[**45]** or things not produced or disclosed in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the applicability of the privilege or protection.

In addition, [HN16] the withholding of such a privilege log may subject a party to sanctions under *Rule 37(b)(2)* and may be viewed by the court as a waiver of any privilege or protection. *Fed. R. Civ. P. 26* advisory committee's note. See also *Avery Dennison Corp. v Four Pillars, 190 F.R.D. 1, 2 (D.D.C. 1999)*.

In the case at bar, while SAA did ultimately provide Banks with a privilege log, it was not provided in a timely fashion. Nevertheless, a privilege log *was* provided and, therefore, the issue of waiver is not raised.

By the same token, SAA's only excuse for the five-month delay in providing the privilege log is that it took time to prepare it. **[*21]** D's 2nd Opp. at 2. [HN17] Under *Rule 37(a)(4)*, the court may, in its discretion and after providing the non-prevailing party an opportunity to respond, award attorney's fees to the prevailing party following the court's resolution of a motion to compel. See *Cobell v. Norton, 213 F.R.D. 16, 28-29 (D.D.C. 2003)*. **[**46]** Although SAA did ultimately file a privilege log, I will order SAA to show cause why Banks should not be awarded attorney's fees and costs for having to file a motion to compel in the first instance.

Furthermore, the failure to file the privilege log occurs, according to plaintiff, in a disturbing context. Plaintiff complains that on March 26, 2004, he received 300 documents that were apparently responsive to requests that were served on July 30, 2003, September 16, 2003 and November 18, 2003. March 26, 2004 was six days before discovery was to close and after plaintiff had taken depositions which, he claims, might have been used to prepare for the deposition or interrogate the deponent.

The record does not reflect any reason for that delay. Nor did SAA ever ask for court permission to delay its response to the three requests for

production of documents. The absence of any such court permission and plaintiff's claim of prejudice resulting from that delay compel me to require SAA to show cause why sanctions, in addition to the attorney's fees I am awarding, should not be awarded plaintiff. I expect SAA to justify the delay and the alleged failure to secure judicial permission and **[**47]** to rebut any claim of prejudice that plaintiff asserts. My Order will, therefore, allow ample time for plaintiff to respond and for SAA to reply.

b. Interrogatories

[HN18] Unlike requests for the production of documents, an interrogatory must simply "be answered separately and fully in writing under oath, unless it is objected to, in which event the objecting party shall state the reasons for objection and shall answer to the extent the interrogatory is not objectionable." *Fed. R. Civ. P. 33(b)(1)*. As with requests for the production of documents, however, under *Rule 33(b)(4)*, the failure to object in a timely fashion to interrogatories constitutes a waiver of any objections unless good cause is shown. *See Byrd v. Reno, 1998 U.S. Dist. LEXIS 11855, No. CIV.A.96-2375, 1998 WL 429676, at *4 (D.D.C. Feb. 12, 1998).* There is no claim by Banks that SAA failed to object in a timely fashion to any of the interrogatories, and therefore, waiver is not an issue.

Plaintiff also claims, however, that SAA "failed to provide a witness log for the Interrogatory Communications which the Defendant claimed were privileged." Reply at 2. This claim is also made as to assertions **[**48]** of privilege made by a witness during a deposition. Thus, it appears that plaintiff thinks that once a party or a witness claims a privilege, that party or witness must file a privilege log. [HN19] While privilege logs have become the universal means of claiming a privilege when a party claims that certain documents are privileged from discovery, there is nothing in the Federal Rules of Civil Procedure that requires the filing of a privilege log when a party claims a privilege as to a deposition question or an interrogatory. A party can comply with the requirement of *Rule 26(b)(5)* by otherwise communicating sufficient information to "enable other parties to assess the applicability of the privilege or protection." Thus, in a given case, a

well-formed objection to a question, whether oral or written, may suffice. Since there is no obligation to file the "witness" or "interrogatory" logs plaintiff seeks, SAA cannot be sanctioned for not providing them.

c. *In Camera* Review

As just noted, there are now 400 documents claimed to be privileged. I have reviewed the privilege log and find, as I invariably do, it is useless. See *Marshall v. D.C. Water & Sewage Auth., 214 F.R.D. 23, 25 n. 4* **[**49]** and cases cited therein (D.D.C. 2003). I will, therefore, order the production of all documents claimed to be privileged for my *in camera* evaluation.

I. Defendant's Motion to Reopen Plaintiff's Deposition and Memorandum of Law in Support Thereof [# 70]

Counsel now representing SAA did not represent it at the plaintiff's deposition, and **[*22]** he now seeks to reopen that deposition for another day. In opposition, plaintiff and his counsel filed sworn declarations attesting that plaintiff, who was in pain during his deposition due to recent surgery, agreed to continue the deposition until 8:25 p.m., an hour and one half hour longer than the seven hours permitted by *Rule 30(d)(2)*, with the understanding that SAA would then complete the deposition and not have to resume it. SAA, by its new counsel, claims that it was the illness of the court reporter that caused the adjournment. Significantly, SAA does not tender an attestation either from the court reporter indicating that his or her illness was the reason for the adjournment or from prior counsel for SAA, denying the agreement plaintiff claims was made. Hence, plaintiff's and his counsel's attestations are unrebutted and carry the **[**50]** day. I will not permit the deposition to be resumed but will invoke what I consider [HN20] Rule Number One of professionalism and civility among lawyers-a deal is a deal.

**CONCLUSION**

A detailed Order accompanies this Memorandum Opinion.

Dated: May 03, 2004

JOHN M. FACCIOLA

UNITED STATES MAGISTRATE JUDGE

## ORDER

Pursuant to the accompanying Memorandum Opinion, the following is, hereby,

**ORDERED:**

1. Plaintiff's Motion to Strike Portions of Alvin Macon's Errata Sheet [# 20] is **DENIED.**

2. Defendant's Motion for a Protective Order from Supernumerary Interrogatories [# 29] is **DENIED** in part and **GRANTED** in part. In addition, counsel will meet in person and in good faith attempt to arrive at an agreement as to which of the interrogatories will be answered and what documents, sought by the interrogatories will be produced. Such meeting will take place within fifteen days of this Order and counsel will file a joint report of their meeting within ten days thereafter, indicating what, if any, further judicial action is required.

3. Defendant's Motion to Compel Discovery From the Office of Compliance [# 36] is

**DENIED [**51]** without prejudice. In addition, plaintiff must show cause in writing within 30 days of the date of this Order why I should not order the Office of Compliance to comply with the subpoena. If plaintiff has no objection, the Office of Compliance will respond in writing within 30 days thereafter as to why it should still not be compelled to comply with the subpoena. Similarly, SAA will have until 30 days after the Office of Compliance's submission to respond as to all issues presented by either the Office of Compliance or plaintiff.

4. Defendant's Motion to Compel Discovery from Plaintiff [# 37] is

**GRANTED** in part and **DENIED** in part. In addition, plaintiff will have to provide in writing within 30 days of the date of this Order a response to interrogatories 1 and 2 that provides a much clearer explanation of how the counts differ in legal theory from each other.

5. Plaintiff's Motion Pursuant to *Rule 37* to Compel Defendant to Answer Plaintiff's Request for Interrogatories [# 38] is **GRANTED** in part and **DENIED** in part. In addition, defendant will supplement in writing within 30 days of the date of this Order Request Numbers 6, 8, 10, 12, 13, **[**52]** and 14. Defendant will also provide the business addresses and phone numbers of the witnesses plaintiff has named in his motion and reply: Alvin Macon, Karen Miller, Karen Ellis, Mr. Banks' warehouse co-workers, Ms. Goldring, Ms. Coates, Keith Kennedy, Mr. Pickle, Catherine Brooks, and Ann Harkins. Finally, defendant will identify clearly all individuals who reviewed or supervised plaintiff's work and all individuals who reviewed his application for the position he sought. Defendant must also disclose the officials that: 1) narrowed the candidate list to two finalists, 2) made the final selection for the Branch Manager position, and 3) decided to terminate Mr. Banks.

6. Defendant's Motion for a Protective Order from Plaintiff's Request for Admissions; Request for Expedited Ruling [# 47] is **DENIED.** In addition, defendant will respond to plaintiff's 150 requests for admissions within 30 days of the date of this Order. Finally, plaintiff's cross-motion for attorney's fees and costs, contained within plaintiff's Opposition to the Seargent-At-Arms' Motion for a Protective Order from Plaintiff's Request for Admissions and Cross

222 F.R.D. 7, *; 2004 U.S. Dist. LEXIS 9952, **

Moves for the Award of Attorney's Fees and **[**53]** Costs [# 55] is **DENIED.**

7. Defendant's Motion for Protective Order Regarding Plaintiff's *Rule 30(B)(6)* Notice of Video Deposition [# 57] is **DENIED** without prejudice. In addition, the parties will attempt in good faith to arrive at a mutually agreeable listing of topics for the *30(b)(6)* depositions that are to be taken and the *30(b)(6)* witnesses who will speak to them. The list of topics and corresponding list of witnesses should be submitted to me for approval within 30 days of the date of this Order.

8. Plaintiff's Motion to Preclude Defendant from Offering Testimony Concerning the Subject Matter of Plaintiff's *Rule 30(b)(6)* Notice of Deposition and Request for Attorneys' Fees and Costs [# 59] is **DENIED.**

9. Plaintiff's Motion to Compel Defendant to Fully and Completely Respond to Plaintiff's Third Request for Production of Documents and Provide Identified Documents [# 61] is **DENIED** and Plaintiff's Motion to Compel Defendant to Provide Privilege Log and Motion for an Order that Defendant Has Waived Privilege as to Responsive Documents Not Produced [# 71] is **DENIED.** In addition, SAA will show cause in writing within **[**54]** 30 days of the date of this Order why Banks should not be awarded attorney's fees and costs for having to file a motion to compel in the first instance. Finally, I

o. identify all documents generated in connection with the concern line complaint.

will order SAA to show cause in writing within 30 days of the date of this Order why sanctions should not be awarded against it. Plaintiff will then have 30 days within which to respond and SAA will then have 15 days within which to reply. Finally, SAA will produce within 30 days of the date of this Order all documents claimed to be privileged for my *in camera* review.

10. Defendant's Motion to Reopen Plaintiff's Deposition and Memorandum of Law in Support Thereof [# 70] is **DENIED.**

11. Defendant's Request for Clarification of Scheduling Order [# 35] is **DENIED** as moot.

12. Motion for Extension of Time to File Response to Motion to Compel [# 40] is **GRANTED** *nunc pro tunc.*

13. Defendant's Motion for an Expedited Ruling on Defendant's Motion for Limited Extension of Discovery Period and Deadline for Dispositive Motions and Memorandum of Law in Support [# 77] is **DENIED** as moot.

**SO ORDERED.**

Dated: MAY 3, 2004

JOHN M. FACCIOLA

UNITED STATES **[**55]** MAGISTRATE JUDGE

INTERROGATORY NO. 13:

13. State Tyco's total wealth or its worth of all assets owned as of December 31, 2003 and including:

a. its total value of all assets, whether tangible, intangible, personal property, and real property as shown

2005 U.S. Dist. LEXIS 41399, *

on its audited, consolidated financial balance sheet reported to its shareholders on its annual report;

b. its annual gross income for fiscal year 2003 as shown on its audited income statement to its shareholders; and

c. the total value of its net worth (total assets less all liabilities **[*30]** as shown on its balance sheet and reported to its shareholders) as of December 31, 2003.

# 3

*Dimitrijevic v. TV&C GP Holding Inc.,*
2005 U.S. Dist. LEXIS 41399 (S.D. Tex. Aug. 24, 2005)

**ALEXANDER DIMITRIJEVIC, Plaintiff, vs. TV&C GP HOLDING INC., Defendant.**

**CIVIL ACTION H-04-3457**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION**

*2005 U.S. Dist. LEXIS 41399*

**August 24, 2005, Decided**
**August 24, 2005, Filed**

**CORE TERMS:** interrogatory, warehouse, discrete, termination, complete answer, human resource, separately, answered, attended, reduction in force, years preceding, technician, main question, counted, handle, valve, advisory committee, counting, asking, brand names, supervisor, annual, field of inquiry, numerical, countable, logically, foreman, appointment, selecting, desk

**COUNSEL:** [*1] For Alexander Dimitrijevic, Plaintiff: Hak K Dickenson, Carrie Anne Arnett, Dickenson And Arnett LLP, Houston, TX.

For TV & C GP Holding Inc, Defendant: Thomas Michael Melo, David J Comeaux, Ogletree Deakins et al, Houston, TX.

**JUDGES:** Stephen Wm Smith, United States Magistrate Judge.

**OPINION BY:** Stephen Wm Smith

**OPINION**

**MEMORANDUM AND ORDER**

Before the court is plaintiff Alexander Dimitrijevic's motion to compel answers to interrogatories (Dkt. 16) in this employment discrimination case, which has been referred to this magistrate judge for pre-trial management. The motion is granted in part and denied in part.

On March 16, 2005, Dimitrijevic served a set of interrogatories on defendant TV&C GP Holding Inc. ("Tyco") consisting of thirteen numbered questions and 122 separately lettered subparts. Tyco responded on April 25, answering the first five numbered interrogatories and 47 of the separately lettered subparts, but declining to answer the remainder as exceeding the federal limit of 25 interrogatories. *See FED. R. CIV. P. 33(a)*; S.D. TEX. LOC. R. 33.1. Dimitrijevic moves to compel Tyco to answer the remaining interrogatories, contending [*2] that the subparts seek information closely related to the main interrogatory, and therefore are not separate questions to be counted toward the numerical limit.

*Federal Rule of Civil Procedure 33(a)* provides that, absent leave of court or written stipulation, interrogatories are not to exceed 25 in number, "including all discrete subparts." *See FED. R. CIV. P. 33(a)*. [1] Dimitrijevic obtained neither written stipulation nor leave of court, so the applicable limit is 25.

1

Local Rule 33.1 largely mirrors the federal rule, although it omits the modifier "discrete." S.D. TEX. LOC. R. 33.1 ("No more than twenty-five interrogatories (counting sub-parts) may be served without leave of court."). Whether intentional or not, this difference in phrasing cannot be construed to impose a greater restriction on interrogatories than *Rule 33(a)*, because local rules cannot alter the federal discovery rules in this respect. *See FED. R. CIV. P. 26(b)(2)*

advisory committee notes to 2000 Amendment, at P 29-30; *St. Paul Fire & Marine Ins. Co. v. Birch, Stewart, Kolasch & Birch, LLP, 217 F.R.D. 288, 289 (D. Mass. 2003)*.

[*3] However, counting to 25 is not always easy, as this case illustrates. The source of the difficulty is ascertaining when to count a subpart as a separate interrogatory. The rule does not define the term "discrete subparts." See *Krawczyk v. City of Dallas, 2004 U.S. Dist. LEXIS 30011, No. Civ. 3:030CV-0584D, 2004 WL 614842, at * 2 (N.D. Tex. Feb. 27, 2004)*. The Advisory Committee briefly addressed the issue in the notes accompanying the text of *Rule 33(a)*:

> Parties cannot evade this presumptive limitation through the device of joining as "subparts" questions that seek information about discrete separate subjects. However, a question asking about communications of a particular type should be treated as a single interrogatory even though it requests that the time, place, persons present, and contents be stated separately for each such communication.

*FED. R. CIV. P. 33(a)* advisory committee notes to 1993 Amendment.

Except for interrogatories asking about "communications of a particular type," the Advisory Committee actually provides little guidance for distinguishing between "discrete" subparts, separately countable, from "non-discrete" subparts, [*4] which are not. No general test or formula is offered to assist courts in determining when a particular subpart is merely a device to evade the numerical limit. Nor have the courts been very successful in devising a uniform approach to the problem. *See generally, Safeco of America v. Rawstron, 181 F.R.D. 441, 444-45 (C.D. Cal. 1998)* (gathering cases).

Understandably, the parties approach this question from polar extremes. Dimitrijevic argues that a subpart is not "discrete" and thus not countable if it shares a "common theme" with its primary, numbered interrogatory. *See* 8A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2168.1, at 261 (2d ed. 1994) ("It would appear that an interrogatory containing subparts directed at eliciting details concerning the common theme should be considered a single question, although the breadth of an area inquired about may be disputable."). Dimitrijevic alternatively describes this as the "logically and necessarily related" test. *See* 7 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE P 33.30[2] (3d ed. 1997) ("The better view is that subparts may be counted as part of one interrogatory if they are [*5] logically and necessarily related to the primary question."). Thus, he argues that the eight subparts of Interrogatory No. 6 are logically related and share the common theme of how sales orders are physically processed at the warehouse. [2] Unsurprisingly, Dimitrijevic contends that **each** of his listed subparts share a common theme with the primary question, and therefore **none** should be counted as a separate question.

2    The Interrogatories are set forth in Appendix A.

And that is precisely the problem with the "common theme" test: almost never will it yield a separately countable, discrete subpart. All subparts can be said to share a theme with the primary question; otherwise they would not really be a "subpart." Any mildly creative lawyer can invent a rubric sufficiently elastic to cover the most disparate of topics: Dimitrijevic's first 12 numbered interrogatories could just as easily be redesignated as subparts of a single interrogatory under the common theme of "liability." The "logically and [*6] necessarily related" formula has essentially the same flaw because, as the Supreme Court has observed in another context, "everything is related to everything else." *See California Div. of Labor Standards Enf. v. Dillingham, 519 U.S. 316, 335, 117 S. Ct. 832, 136 L. Ed. 2d 791 (1997)* (Scalia, J., concurring) (discussing ERISA preemption of state laws which "relate to" ERISA benefit plans); *New York Conf. of Blue Cross v. Travelers Ins. Co., 514 U.S. 645, 655, 115 S. Ct. 1671, 131 L. Ed. 2d 695 (1995)* ("If relate to' were taken to extend to the furthest stretch of its indeterminacy, then for all

practical purposes preemption would never run its course, for really, universally, relations stop nowhere' . . . . " (citation omitted)). In short, neither the common theme nor the logical relationship formulas are particularly useful in drawing the line on the slippery slope between subparts which are discrete' and those which are not. Either formula invites evasion of the presumptive limitation on interrogatories under *Rule 33(a)*, thereby defeating the purpose of the 1993 amendments.

Tyco's proposed test is skewed in the opposite direction. Tyco would focus on whether the subpart "introduces a new topic that is in a distinct **[\*7]** field of inquiry." *See* **Banks v. Office of the Senate Sergeant at Arms, 222 F.R.D. 7, 10 (D.D.C. 2004)**. Of course, any given topic may encompass distinct fields of inquiry, and yet be intimately related to other topics. In the communication example given by the Advisory Committee, the four specified aspects of the communication ("time, place, persons present, and contents") could fairly be classified as four distinct "fields of inquiry," yet the Committee would count them as a single interrogatory. Everything depends on how narrowly or broadly the term "distinct field of inquiry" is construed. Tyco would apply the term so narrowly that all listed subparts become separate interrogatories. Because Tyco's proposed test merely substitutes one vague phrase ("distinct field of inquiry") for another ("discrete subparts"), it offers little practical guidance here.

However, Tyco points to an alternative test which holds more promise. In *Kendall v. GES Exposition Services, Inc., 174 F.R.D. 684 (D. Nev. 1997)*, the court held that interrogatory subparts are to be counted as discrete subparts unless they are "logically or factually subsumed within and necessarily **[\*8]** related to the primary question." *Id. at 686*. A recent district court decision added a helpful gloss: ***"If the first question can be answered fully and completely without answering the second question***, then the second question is totally independent of the first and not factually subsumed within [it].'" *Krawczyk, 2004 U.S. Dist. LEXIS 30011, 2004 WL 614842, at \* 2* (emphasis added). This "full and complete answer" standard, although still somewhat imprecise, has two distinct advantages over the other tests discussed. First, it is the same standard already employed by the federal

rules to measure the sufficiency of interrogatory answers. *See FED. R. CIV. P. 33(b)* ("Each interrogatory shall be answered separately and fully . . . ") and *37(a)(3)* ("An evasive or incomplete disclosure, answer, or response shall be treated as a failure to disclose, answer, or respond.") Enlisting this standard as a guide for counting interrogatory subparts has the virtue of Occam's razor-avoiding needless multiplication of legal standards. Case law delineating the contours of a "complete" interrogatory answer under *Rule 37(a)(3)* would help define **[\*9]** a "countable" subpart under *Rule 33(a)*, and vice versa.

The "full and complete answer" standard also has the virtue of common sense. If a full and complete answer to the primary question would necessarily encompass the specific information sought by the subpart, then there is no reason to separately count the subpart. By explicitly listing the subpart, the proponent is not truly seeking additional information but merely giving notice of the type of information that a full and complete answer to the main question should contain. The proponent is already entitled to the information specified in the subpart by virtue of *Rule 37(a)(3)*'s completeness requirement. It would be unfair to penalize the proponent for simply making explicit his expectation of what should be incorporated within a proper response to the primary question. On the other hand, if the subpart seeks information beyond the scope of the primary question, then there is nothing unfair about separately counting it against the numerical limit. [3]

> 3  This test does not provide useful guidance when the interrogatory contains implicit subparts "imbedded" within an overbroad main question. *See Safeco of America v. Rawstron, 181 F.R.D. 441, 445 (C.D. Cal. 1998)* (interrogatory asking for factual basis for denial of any of 50 requests for admission treated as discrete subparts). The interrogatories at issue here do not present this problem.

**[\*10]**   Although not always yielding bright lines, this "full and complete answer" standard is consistent with available precedent, as well as the views expressed by the Advisory Committee. When an interrogatory asks a party to describe or identify

communications of a particular type, it is reasonable to expect a full and complete answer to include the "time, place, persons present, and content" for each such communication. Similarly, when an interrogatory seeks the identity of a witness, a full and complete answer would naturally include the person's name, address, telephone number, and perhaps other identifying information such as job title and employer. See *Bakhico Co. v. Shasta Beverages, Inc., 1998 U.S. Dist. LEXIS 7564, No. Civ. 3:94-CV-1780-H, 1998 WL 249209, * 3 (N.D. Tex. May 14, 1998)* (giving name and phone number only was "not a very full identification of witnesses"). On the other hand, an interrogatory inquiring about an employer's general hiring practices is separate and distinct from a subpart inquiring about a specific hiring decision, because the former can be answered fully and completely without addressing the latter. ***Banks, 222 F.R.D. at 11***. Similarly, an interrogatory **[*11]** asking the reasons for the elimination of the plaintiff's job can be fully answered without naming the decision-makers, so a subpart seeking their identity should be counted separately. *Nyfield v. Virgin Islands Tel. Corp., 200 F. R. D. 246, 248 (D.V.I. 2001)*. For the same reason, "a demand for information about a certain event and for the documents about it should be counted as two separate interrogatories." ***Banks, 222 F.R.D. at 9***.

It should be emphasized that the "full and complete answer" standard involves comparison between the primary question and its subpart, not (as Tyco apparently contends) between one subpart and another. Dimitrijevic rightly points out that under such an approach an interrogatory would almost never have legitimate (i.e. uncountable) subparts, because a subpart nearly always seeks specific details fully answerable without reference to other subparts. *Cf. Kendall v. GES Exposition Services, Inc., 174 F.R. D. 684, 686 (D. Nev. 1997)* (analyzing "whether the first question is primary and subsequent are secondary to the primary question.").

With this standard in mind, we turn to the interrogatories at hand. A **[*12]** summary review of the 13 numbered questions and 122 separately lettered subparts plainly reveals that Dimitrijevic has exceeded the permissible limit. *See, e.g., Williams v. Board of County Commissioners, 192*

*F.R.D. 698, 701-02 (D. Kan. 2000)* (finding, after summary review of interrogatories containing 117 subparts, that numerical limit was exceeded and that plaintiff need not answer interrogatories as propounded). For example, Interrogatory No. 1 contains at least seven different questions; the primary question deals with "all reasons supporting a case for reduction in force at the warehouse," while each of the subparts (except for subpart f) seeks specified information which may or may not have supported a reduction in force. *See, e.g.,* Interrogatory No. 1.d. ("information on increase or decline in business orders"). The primary question could certainly be fully answered without disclosing the information sought by these subparts. Likewise, Interrogatory No. 8 contains 17 discrete subparts, asking not only about the general selection process for warehouse foreman, but also details on the selection of six named individuals. Even assuming the other numbered interrogatories **[*13]** contained no discrete subparts (which is not the case), Dimitrijevic's interrogatories exceed the maximum permitted by *Rule 33(a)*.

Having found these interrogatories in violation of *Rule 33(a)*, the next question is the appropriate remedy. The choice is whether to permit resubmission of another set of interrogatories conforming to the numerical limit, or simply to require answers to the first 25 questions (properly counted) of the existing set. [4] "Since service of more than 25 interrogatories is not permitted, the entire set of interrogatories is impermissible. Respondent can either object to the set as a whole or object to the excess." THE HON. DAVID HITTNER, ET AL., RUTTER GROUP PRACTICE GUIDE: FEDERAL CIVIL PROCEDURE BEFORE TRIAL § 11:1695 (5th Cir. ed. 2005); see also *Traina v. Blanchard, 1998 U.S. Dist. LEXIS 5634, No. Civ. A. 97-0348, 1998 WL 483485, * 4 (E.D. La. April 15, 1998)* (entire set objectionable). Here, Tyco has responded to the first five numbered interrogatories [5] and objected to the balance on numerosity grounds. For this reason, as well as the fact that the discovery deadline has now passed, it would be inappropriate to permit Dimitrijevic the opportunity to propound a **[*14]** reformulated set of interrogatories. Accordingly, the court will undertake to determine whether Tyco has indeed answered 25 interrogatories, and if not, to

2005 U.S. Dist. LEXIS 41399, *

determine how many more questions must be answered to reach that limit.

> 4    One authority has suggested that the responding party might be allowed to pick and choose which 25 interrogatories to answer, but no reported case has adopted this approach. THE HON. DAVID HITTNER, ET AL., RUTTER GROUP PRACTICE GUIDE: FEDERAL CIVIL PROCEDURE BEFORE TRIAL § 11:1695 (5th Cir. ed. 2005).
>
> 5    Dimitrijevic has not challenged the sufficiency of these answers by Tyco.

What follows is the court's tally of discrete subparts contained in the 5 interrogatories answered by Tyco:

Interrogatory No. 1:

As explained above, this interrogatory consists of seven separate questions. Subpart f ("any other reason(s) for reduction in force") is redundant in light of the main question.

Interrogatory No. 2:

This interrogatory contains four separate questions. The main [*15] question asks about training sessions on workplace harassment, and subparts a-f, h, and j-n seek information that a complete answer to the main question would entail: dates, duration, speaker, subject matter, attendees. Subparts g, i, and o deal with the existence of specific documents, and therefore constitute discrete subparts as explained in **_Banks, 222 F.R.D. at 10_**.

Interrogatory No. 3:

This interrogatory, seeking information about Dimitrijevic's termination meeting, contains at least two separate questions. Subparts a-c and e-f ask about meeting details which a complete answer would provide: time, duration, location, and what was said. Subpart d concerns documents, which is a separate question. Subparts g and h, asking about "other" conversations, acts, and information, are somewhat vague and arguably countable as separate questions. But it is more fitting to consider these

subparts as mere gap-fillers that are subsumed within the main question.

Interrogatory No. 4:

This interrogatory seeks a description of the organizational structure of the human resource office in Houston, and contains four separate questions. Subparts a-f seek the name, title and [*16] functions of various persons in that office, all of which information would be contained within a full response to the main question. Subparts g, h, and i each seek discrete information which is not limited to the Houston office, and therefore each counts as a separate question.

Interrogatory No. 5:

This interrogatory, which essentially asks for a detailed map of the warehouse, counts as a single question. Each subpart inquires about the physical location of persons and things within the warehouse, all of which would be included on a complete warehouse diagram.

Properly counting all discrete subparts, therefore, Tyco has answered 18 interrogatories to date. Dimitrijevic is therefore entitled to answers to the next seven interrogatories.

As it happens, the next interrogatory (No. 6) contains at least seven discrete subparts. Subparts a and b would be included in a complete answer to the main question dealing with the "physical process of how sales orders for valves and flow control products at the warehouse are retrieved, assembled, and packaged." Subparts c-h each seek discrete information, such as the names of individual technicians, particular tools, decision-makers, and [*17] frequency of job assignments. Tyco will satisfy its obligation under the discovery rules by providing full and complete answers to Interrogatory No. 6 and all of its designated subparts. The remainder of the interrogatories need not be answered.

The jurisprudence of interrogatory counting is as imprecise as it is tedious. Reasonable minds may certainly disagree on where the lines should be drawn, but the rule presupposes such lines and gives the court the discretion to draw them. Parties are well advised to avoid risking an unfavorable court count by either seeking leave of court in

advance or negotiating a written stipulation from the other side. Neither course was followed here, and so it is

ORDERED that Plaintiff's motion to compel (Dkt. 16) is granted in part and denied in part. Tyco is ordered to provide full and complete answers to Interrogatory No. 6 and all its subparts by close of business on September 1, 2005. All other requested relief is denied.

Signed on August 24, 2005, at Houston, Texas.

Stephen Wm Smith

United States Magistrate Judge

ATTACHMENT

## APPENDIX A

INTERROGATORY NO. 1:

1. State all reasons supporting a case for reduction in force [*18] at the warehouse in connection with discharge of Dimitrijevic and other employees at the warehouse in May 2003, including:

a. decline in business or profit for the years of 2001, 2002, 2003 or such projection for 2004;

b. studies, evaluations, or projections of needs of the workforce for 2001, 2002, 2003, and 2004;

c. customer contractions or expansion, including termination or modification of contracts with Tyco;

d. information on increase or decline of business orders;

e. any labor costs study, evaluation, or analysis of workforce at the warehouse;

f. any other reason(s) for the reduction in force; and

g. identify all documents that reflect or support reduction in force in May 2003.

INTERROGATORY NO. 2:

2. Describe any training or instructional setting in which employees at the warehouse attended to discuss or receive information or instruction on work harassment, including what the law is, how to behave, how to avoid problems, or any such similar coaching or teaching, including for each of such meeting:

a. when the meeting was held;

b. who attended the meeting;

c. who gave the instruction;

d. the subject [*19] matter of the instruction;

e. how long the instruction lasted;

f. whether the meeting involved discussion;

g. whether there was a sign up sheet for the meeting;

h. whether it was in connection with any other meeting;

i. whether any literature was given out to the attendees;

j. whether Paul Austin attended the meeting;

k. whether Emit Hosford attended the meeting;

1. whether Sean Wolfe attended the meeting;

m. whether Dimitrijevic attended the meeting;

n. whether Rudy Lopez attended the meeting; and

o. whether any notes were taken by the employees.

INTERROGATORY NO. 3:

3. On the day of discharge of Dimitrijevic, explain the facts and circumstances regarding his termination, including:

    a. when the meeting was held;

    b. what was said to Dimitrijevic at the time of termination and who said it;

    c. how long the meeting lasted;

    d. whether any documents were given to Dimitrijevic;

    e. where the termination meeting took place;

    f. what Dimitrijevic said to those present at the meeting;

    g. any other conversation or act took place; and

    h. any other information provided by Tyco or received [*20] by Tyco not discussed from subparts a-g.

INTERROGATORY NO. 4:

4. Describe the organizational structure and functions of human resource office in Houston, which is responsible for providing personnel-related services to employees at the warehouse, including:

    a. the person who is head of the human resource office in Houston;

    b. the name, title and functions of the person(s) to whom the head human resource person in Houston reports;

    c. the name, title and functions of another human resource personnel to whom the head of the human resource office in Houston reports;

    d. the location of the person to whom the head of the Houston human resource office reports;

    e. the names, titles, and descriptions of all managers and supervisors reporting to the person who is the head of the Houston human resource office;

    f. all functions performed by the head of the Houston human resource office;

    g. identify any particular person or persons with the human resource office who ordinarily handles or coordinates the function of identifying employees who are subject to reduction in cost;

    h. identify any particular person or persons with the human resource [*21] office who ordinarily handles or coordinates the persons who handle work harassment and related issues; and

    i. identify any particular person or persons with the human resource office who ordinarily handles or coordinates the toll free 1-800-number that handles employee complaints.

INTERROGATORY NO. 5:

5. Describe the physical locations or various parts of the warehouse as of May 1, 2003, including the locations of the offices, lockers, the break room, valve automated center, and whether the inventories are kept, including:

    a. where Paul Austin's office/desk was located;

    b. where Emit Hosford's office/desk was located;

    c. where Sean Wolfe's office/desk was located;

    d. where Dimitrijevic's desk was located on January 1, 2003;

e. where Dimitrijevic's desk was located as of May 1, 2003;

f. where valve automated center is located in relationship to the offices of the supervisor/foreman;

g. where the break room is located; and

h. where the inventories are kept at the warehouse relative to the employees' offices.

INTERROGATORY NO. 6:

6. Explain the physical process of how sales orders for valves and flow control [*22] products at the warehouse are retrieved, assembled, and packaged in connection with the valve automated center as of May 1, 2003, including:

a. describe types of sales order to be filled daily by Tyco from end users and distributors;

b. explain the general types of sales orders or equipment that requires assembly;

c. names of individual technicians who were capable of assembling the sales orders referred to in subpart b.;

d. name the types of tools and machinery used and required by technicians for assembly as referred to in subpart b.;

e. describe who pulls the parts from the warehouse, whether technician, laborer, or temporary worker;

f. state whether a walkie-talkie is assigned to each technician;

g. describe who decides which technician fill which purchase order; and

h. describe whether the job assignment occurs daily.

INTERROGATORY NO. 7:

7. Describe and explain the assignment of various brand names of inventories kept by Tyco at the warehouse and how the brand names would be assigned to technicians, including:

a. names of top fifteen (15) primary products (determined by brand names and quantity of annual sales [*23] for past four years) held at the warehouse as of May 1, 2003;

b. identify the names of technicians assigned to each of the brand names as of May 1, 2003;

c. identify all of the brand names of inventory or products that Dimitrijevic was responsible to handle while he was an employee;

d. the brands of valves that Dimitrijevic assembled as of January 1, 2003;

e. the brands of valves that Dimitrijevic assembled as of May 1, 2003;

f. explain and describe whether Sean Wolfe, Eddie Key, and Mark Gullet were cross-trained on any KTM products during April and May of 2003;

g. explain whether any other technicians other than those named in subpart f. were cross-trained for KTM, Decote, and MCF brands in April-May of 2003; and

h. explain if Dimitrijevic was cross-trained to assemble and/or handle any new or different brand names with which he did not have experience prior to January 1, 2003.

INTERROGATORY NO. 8:

8. Describe how the supervisors, foremen, and/or lead persons for the Tyco warehouse were selected or appointed, including:

a. what factors were considered in selecting Paul Austin as the supervisor;

b. what factors were **[*24]** considered in appointing Emit Hosford as the foreman;

c. what factors were considered in selecting Sean Wolfe as the lead person;

d. persons involved in selecting Austin as the manager of the warehouse;

e. persons involved in selecting Hosford as a foreman;

f. persons involved in selecting Wolfe as a lead person;

g. whether a meeting was held to decided on either Austin, Wolfe, or Hosford would receive an appointment or selection and if so who attended the meeting;

h. name all persons who gave approval for the appointment of Austin and Hosford as a supervisor and foreman, respectively;

i. whether any memo or letter was written in connection with the appointment of Austin, Wolfe, or Hosford;

j. describe what factors were involved in appointment of Raymond Cooper as a lead person (or however his title or position is described);

k. describe Raymond Cooper's background;

1. describe factors involved in the appointment of Jeff Lacomb as a lead person (or however his position was described);

m. describe Lacomb's experience and background, including previous employment experience at Tyco;

n. name and describe any other person who **[*25]** was named as a lead person during the same period of time Dimitrijevic worked at the warehouse;

o. describe factors involved in transfer of Dana Evan Leach to the warehouse; and

p. describe Mr. Leach's previous experience and background, including his experience at Tyco.

INTERROGATORY NO. 9:

9. Describe the reduction in workforce process of May 2003 in which Dimitrijevic was terminated, including:

a. the names and titles of person involved in the decision making;

b. the name and title of the ultimate decision maker;

c. when the decision was made;

d. whether any decisions made through a meeting and if so, who was at the meeting;

e. describe or state all considerations and factors involved in deciding the cause or need for a workforce reduction at the warehouse;

f. whether any memo was generated in connection with the reduction in force before or after the event of reduction in force;

g. whether any replacement workers were hired subsequent to the reduction in force;

h. how any replacement workers were selected;

i. the persons involved in the decision making of hiring replacement workers; and

j. persons involved [**26**] in hiring of employees at the warehouse to replace Dimitrijevic after he was terminated, including the final decision maker.

INTERROGATORY NO. 10:

10. Describe Tyco's business operation in Houston area, including:

a. names of all Tyco's and its subsidiaries operating in Harris county and other counties in which Tyco and its subsidiaries are subject to jurisdiction of the U.S. District Court, Southern District;

b. describe the nature or type of business in sufficient detail with respect to the operations in Houston area for the companies named in subpart a.;

c. describe and explain in sufficient detail the revenues earned from each company's business operations in Houston area for the companies named in subpart a.;

d. describe the number of employees, contract workers, and other extent of manpower in the Houston area for the companies named in subpart a.; and

e. describe by cost or fair market value the assets and real and personal property located in the Houston area for the companies named in subpart a.

INTERROGATORY NO. 11:

11. Describe and explain the history of Dimitrijevic's salary, bonus, and other employee benefits he had [**27**] accrued or experienced with Tyco, and including:

a. his salary per annum at the time of his termination;

b. his salary for each year of the four years preceding his termination;

c. his annual pay increases of the five years preceding his termination;

d. his bonuses received for the termination year and four years preceding his termination;

e. his 401K annual contributions for the five years preceding his termination;

f. his 401K annual contributions matched by the company for the five years preceding his termination;

g. his health insurance premiums paid by the company for the five years preceding his termination;

h. his other insurance premiums, including health and accident premiums, paid by Tyco for the five years preceding his termination;

i. his vacation and holidays benefits paid by Tyco for the five years preceding his termination; and

j. all other benefits, including fringe benefits, paid by Tyco for the five years preceding the termination.

INTERROGATORY NO. 12:

12. Explain and describe how Hispanic employees' complaints lodged in connection with toll free concern line, 1-800-714-1994, were investigated [**28**] and handled, as referred in Plaintiffs Original Petition, P 31 and including:

a. name and title of all persons involved in the investigation;

b. describe all meetings held in connection with the complaint;

c. describe who attended each meeting, the substances of the discussions, when the meetings

2005 U.S. Dist. LEXIS 41399, *

occurred, and whether any memos were generated;

d. name all persons who were interviewed in connection with the complaint;

e. state or describe whether any statement was obtained from any individual employee, including any supervisor or manager;

f. state whether any meetings were held by human resource department in connection with the complaint and describe for such meetings, who attended, when and where it was held, and the substance of the discussions;

g. state whether any particular company procedure was followed with regard to 1-800-714-1994 concern complaint;

h. state whether any voice recording was made in connection with 1-800-714-1994 complaint and identify the location of the recordings;

i. state and describe whether any assistance was sought from corporate headquarters with regard to the complaint and description of the assistance; **[*29]**

j. name and title of all person involved in the decision making process of the conclusion involved in subpart j.;

k. state and describe any evaluation or analysis of the complaint filed;

l. describe whether any conclusion was reached with regard to the complaint filed;

m. whether any letter or memo was written in connection with the resolution of the event regarding the complaint filed;

n. provide a brief description of any memo/letter in connection with

item discussed in subpart m. and identify any person copied in the memo; and

o. identify all documents generated in connection with the concern line complaint.

INTERROGATORY NO. 13:

13. State Tyco's total wealth or its worth of all assets owned as of December 31, 2003 and including:

a. its total value of all assets, whether tangible, intangible, personal property, and real property as shown on its audited, consolidated financial balance sheet reported to its shareholders on its annual report;

b. its annual gross income for fiscal year 2003 as shown on its audited income statement to its shareholders; and

c. the total value of its net worth (total assets less all liabilities **[*30]** as shown on its balance sheet and reported to its shareholders) as of December 31, 2003.

# 4

*In re Ullico Inc. Litiga*tion,
2006 U.S. Dist. LEXIS 97578 (D. D.C. July 18, 2006)

2006 U.S. Dist. LEXIS 97578, *

**In re ULLICO INC. LITIGATION; RELATED TO: ALL CASES**

**Civil Action No. 03-01556 (RJL/AK)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

*2006 U.S. Dist. LEXIS 97578*

**July 18, 2006, Filed**

**PRIOR HISTORY:** *In re Ullico Inc. Litig., 237 F.R.D. 314, 2006 U.S. Dist. LEXIS 49071 (D.D.C., 2006)*

**CORE TERMS:** interrogatory, discrete, identification, entity, separable, counted, failures to act, requesting, factually, counting, reply, single line, discovery, subsumed, law firms', exceeded, stock, total number, specific allegation, eliciting, approving, logically, fiduciary, allegations contained, adequately disclosed, factual basis, contested

**COUNSEL:** **[*1]** For JOSEPH A. CARABILLO, Plaintiff: Khuong G. Phan, LEAD ATTORNEY, Patrick M. McMullen, O'MELVENY & MYERS, L.L.P., Washington, DC; April Min, JACKSON KELLY PLLC, Washington, DC; Chungmoon Choi, Washington, DC; David S. Preminger, Keller Rohrback L.L.P., New York, NY; Rose A. Saxe, ROSEN PREMINGER & BLOOM LLP, New York, NY; Michelle L. Perry, KALIJARVI, CHUZI & NEWMAN, P.C., Washington, DC.

For ULLICO INC., Defendant: Anthony J. Trenga, LEAD ATTORNEY, James A. Bensfield, Kevin Gerard Mosley, Victor Tabak, Brian Andrew Hill, Matthew T. Reinhard, MILLER & CHEVALIER, CHARTERED, Washington, DC; Mark J. Rochon, MILLER & CHEVALIER, Washington, DC.

For ADMINISTRATOR OF THE ULLICO INC. EMPLOYEES' LIFE AND HEALTH WELFARE PLAN, ADMINISTRATOR OF THE ULLICO INC. PENSION PLAN AND TRUST, ADMINISTRATOR OF THE UNION LABOR LIFE AUXILIARY RETIREMENT BENEFITS

PLAN, MARK SINGLETON, in his capacity as a Plan Administrator, ULLICO INC. EMPLOYEES' LIFE AND HEALTH WELFARE PLAN, ULLICO INC. NON-QUALIFIED DEFERRED COMPENSATION PLAN, ULLICO INC. PENSION PLAN AND TRUST, UNION LABOR LIFE AUXILIARY RETIREMENT BENEFITS PLAN, UNION LABOR LIFE INSURANCE COMPANY, Defendants, Counter Claimants: Anthony J. Trenga, Brian **[*2]** Andrew Hill, LEAD ATTORNEYS, Kevin Gerard Mosley, Victor Tabak, Matthew T. Reinhard, MILLER & CHEVALIER, CHARTERED, Washington, DC.

For ANN J. O'BRIEN, Trustee, Defendant: Timothy Kevin Howard, MERCK & CO., INC, North Wales, PA.

For PACIFIC LIFE INSURANCE COMPANY, Defendant, Counter Defendant: William Glenn Merten, LEAD ATTORNEY, JORDEN BURT LLP, Washington, DC.

For PLAN ADMINISTRATION COMMITTEE OF THE ULLICO INC. PENSION PLAN AND TRUST, Defendant, Counter Claimant: Anthony J. Trenga, LEAD ATTORNEY, Brian Andrew Hill, Kevin Gerard Mosley, Victor Tabak, Matthew T. Reinhard, MILLER & CHEVALIER, CHARTERED, Washington, DC.

For UNION LABOR LIFE INSURANCE COMPANY, ULLICO INC. NON-QUALIFIED DEFERRED COMPENSATION PLAN, UNION LABOR LIFE AUXILIARY RETIREMENT BENEFITS PLAN, Counter Claimants: Anthony J. Trenga, LEAD ATTORNEY, Brian Andrew Hill,

Kevin Gerard Mosley, Victor Tabak, Matthew T. Reinhard, MILLER & CHEVALIER, CHARTERED, Washington, DC.

For ANN J. O'BRIEN, Counter Defendant: Matthew John Herrington, Roger E. Warin, STEPTOE & JOHNSON, LLP, Washington, DC; Timothy Kevin Howard, MERCK & CO., INC, North Wales, PA.

For ROBERT A. GEORGINE, Counter Defendant: Bryan Anthony Erman, Randall J. Turk, **[*3]** BAKER BOTTS, LLP, Washington, DC; Karen M. Wahle, O'MELVENY & MYERS, LLP, Washington, DC.

For JAMES W. LUCE, Counter Defendant: Shannon M. Barrett, Pro Hac Vice, LEAD ATTORNEY, O'MELVENY & MYERS, LLP, Washington, DC; Karen M. Wahle, Patrick M. McMullen, Robert N. Eccles, Stephen Bradley Perkins, O'MELVENY & MYERS, LLP, Washington, DC; Robert E. Scully, Jr., Stites & Harbison, PLLC, Alexandria, VA.

For JOHN K. GRELLE, Counter Defendant: Ari Karen, James E. Fagan, III, LEAD ATTORNEYS, VENABLE LLP, Washington, DC; Shannon M. Barrett, Pro Hac Vice, LEAD ATTORNEY, Karen M. Wahle, O'MELVENY & MYERS, LLP, Washington, DC; Kara M. Maciel, KRUPIN O'BRIEN, LLC, Washington, DC; Patrick M. McMullen, Stephen Bradley Perkins, O'MELVENY & MYERS, L.L.P., Washington, DC; William Heath Ihrke, RUTAN & TUCKER, LLP, Costa Mesa, CA.

For ROBERT A. GEORGINE, Plaintiff: Randall J. Turk, LEAD ATTORNEY, Bryan Anthony Erman, BAKER BOTTS LLP, Washington, DC.

For JOHN K. GRELLE, Plaintiff: Ari Karen, James E. Fagan, III, LEAD ATTORNEYS, VENABLE LLP, Washington, DC; Khuong G. Phan, LEAD ATTORNEY, Patrick M. McMullen, O'MELVENY & MYERS, L.L.P., Washington, DC; Chungmoon Choi, Washington, DC.

For JAMES W. LUCE, Plaintiff: **[*4]** Khuong G. Phan, LEAD ATTORNEY, Patrick M. McMullen,

O'MELVENY & MYERS, L.L.P., Washington, DC; Robert E. Scully, Jr., LEAD ATTORNEY, Stites & Harbison, PLLC, Alexandria, VA; Chungmoon Choi, Washington, DC.

For ULLICO INC., Counter Claimant, Counter Defendant: Kevin Gerard Mosley, Matthew T. Reinhard, Victor Tabak, Brian Andrew Hill, Anthony J. Trenga, MILLER & CHEVALIER, CHARTERED, Washington, DC.

For JOSEPH A. CARABILLO, Counter Defendant: Shannon M. Barrett, Pro Hac Vice, LEAD ATTORNEY, Karen M. Wahle, Patrick M. McMullen, Stephen Bradley Perkins, O'MELVENY & MYERS, LLP, Washington, DC.

For JOSEPH A. CARABILLO, Counter Defendant: Shannon M. Barrett, Pro Hac Vice, LEAD ATTORNEY, Karen M. Wahle, Patrick M. McMullen, Robert N. Eccles, Stephen Bradley Perkins, O'MELVENY & MYERS, LLP, Washington, DC.

For ROBERT A. GEORGINE, Cross Defendant: Bryan Anthony Erman, Randall J. Turk, BAKER BOTTS, LLP, Washington, DC.

For JOHN K. GRELLE, Counter Claimant: James E. Fagan, III, LEAD ATTORNEY, VENABLE LLP, Washington, DC; Patrick M. McMullen, Stephen Bradley Perkins, O'MELVENY & MYERS, LLP, Washington, DC; Victor Tabak, MILLER & CHEVALIER, CHARTERED, Washington, DC.

For ULLICO INC., Counter Claimant: **[*5]** Anthony J. Trenga, LEAD ATTORNEY, Brian Andrew Hill, Kevin Gerard Mosley, Victor Tabak, Matthew T. Reinhard, MILLER & CHEVALIER, CHARTERED, Washington, DC.

For JOSEPH A. CARABILLO, Counter Defendant: Shannon M. Barrett, Pro Hac Vice, Patrick M. McMullen, Stephen Bradley Perkins, O'MELVENY & MYERS, LLP, Washington, DC.

For JAMES W. LUCE, Counter Defendant: Robert E. Scully, Jr., LEAD ATTORNEY, Stites & Harbison, PLLC, Alexandria, VA; Shannon M.

Barrett, Pro Hac Vice, Karen M. Wahle, Patrick M. McMullen, O'MELVENY & MYERS, LLP, Washington, DC.

For JOHN K. GRELLE, Counter Defendant: James E. Fagan, III, LEAD ATTORNEYS, VENABLE LLP, Washington, DC; Shannon M. Barrett, Pro Hac Vice, Patrick M. McMullen, Stephen Bradley Perkins, O'MELVENY & MYERS, L.L.P., Washington, DC.

For JOSEPH A. CARABILLO, JAMES W. LUCE, Cross Claimants: Patrick M. McMullen, O'MELVENY & MYERS, L.L.P., Washington, DC.

For JOHN K. GRELLE, Cross Claimant: James E. Fagan, III, LEAD ATTORNEYS, VENABLE LLP, Washington, DC; Patrick M. McMullen, O'MELVENY & MYERS, L.L.P., Washington, DC.

For ROBERT A. GEORGINE, Cross Defendant: Bryan Anthony Erman, BAKER BOTTS, LLP, Washington, DC.

**JUDGES:** ALAN KAY, UNITED STATES MAGISTRATE JUDGE.

**OPINION BY:** ALAN KAY

**OPINION**

**MEMORANDUM [*6] ORDER**

Pending before the Court is Counterclaim Defendant James W. Luce's Motion to Compel Responses to His Second Set of Interrogatories by ULLICO Or, Alternatively, for Leave to Serve Additional Interrogatories ("Motion") [183] and the Memorandum in support of the Motion ("Memorandum") [184]; ULLICO's opposition to the Motion ("Opposition") [195]; and Counterclaim Defendant James W. Luce's reply to the Opposition ("Reply") [211].[1]

> 1 Counterclaim Defendant Luce's Reply is consolidated with a reply filed by John K. Grelle, relating to his motion to compel [181].

Counterclaim Defendant James W. Luce ("Counterclaim Defendant" or "Luce") seeks to compel Defendants and Counterclaim Plaintiffs ULLICO Inc., *et al.* ("ULLICO") to respond to Interrogatories Nos. 24, 25, and 26 contained in Luce's Second Set of Interrogatories. Pursuant to *Fed. R.Civ. P. 37(a)(4)*, Counterclaim Defendant requests that ULLICO pay his reasonable expenses incurred in making this Motion, including attorneys' fees.

Background

This Motion is factually similar to the motion to compel [177] filed by Counterclaim Defendant Carabillo and ruled upon by this Court in a Memorandum Order [224] dated June 30, 2006, and the motion [*7] to compel [181] filed by Counterclaim Defendant Grelle and ruled upon by this Court in a Memorandum Order [225] dated June 30, 2006. Discovery in this case commenced on June 3, 2005, in connection with the trial court's Consolidation and Scheduling Order [115]. That Order provides that "[e]ach party shall serve no more than 50 interrogatories upon any other party without leave of Court." [115] at 5. The Order further states that "[t]he parties must produce documents to which they have not raised an objection on a rolling basis." [115] at 4.

On March 31, 2006, Luce served his First Set of Interrogatories, containing seventeen numbered interrogatories, on ULLICO. *See* Motion, Exhibit A. On May 8, 2006, ULLICO served its Objections and Responses to the First Set of Interrogatories. *See* Motion, Exhibit B. ULLICO objected that the seventeen interrogatories comprising the First Set of Interrogatories exceeded the 50- interrogatory limit set by the trial court, when including all discrete subparts. Despite its objections, ULLICO provided responses to the seventeen interrogatories and those responses are not contested in this Motion.

On April 13, 2006, Counterclaim Defendant Luce served his Second [*8] Set of Interrogatories, consisting of nine interrogatories, and ULLICO filed its "Objections and Responses" on May 15, 2006. *See* Motion, Exhibits C and D. ULLICO provided responses to Interrogatories Nos. 18, 19, 20, 21, 22, and 23, but did not provide any substantive response to Interrogatories Nos. 24, 25, and 26, instead relying on its objection that Luce

had exceeded the limit on interrogatories, including discrete subparts. *Id.* Luce now moves this Court for an Order directing ULLICO to respond to those three interrogatories contained within his Second Set of Interrogatories.

Analysis

Inclusion of Subparts

Counterclaim Defendant Luce asserts that the trial court's limit on interrogatories in the Consolidation and Scheduling Order does not specifically incorporate the "discrete subpart" language from *Fed. R. Civ. P. 33 (a)*, which states that a party may serve written interrogatories "not exceeding 25 in number including all discrete subparts." [2] The Court notes that a failure to include the "discrete subpart" limitation would allow each party to serve 50 interrogatories, each containing unlimited subparts, which would effectively negate the trial court's attempt to impose reasonable **[*9]** limits on discovery. Furthermore, Luce's argument is inconsistent with the terms of the Scheduling Order [115] stating that "[u]nless modified below, the limits on discovery in *Federal Rules of Civil Procedure 26-37* shall apply." [115] at 4. While it is undisputed that the trial court expanded the numerical limit on interrogatories from 25 to 50, there was no modification regarding the counting of subparts. Accordingly, as this Court held in its prior Memorandum Orders [224], [225] relating to this same issue, the interrogatories must be examined to determine whether they include subparts, and if so, whether the total number of interrogatories exceeds fifty.

2    This "discrete subpart" language was added to *Rule 33* as part of the 1993 amendments.

Counting Subparts

3

3    The case law relating to determination of subparts is the same as that which was applied in this Court's Memorandum Orders [224], [225].

In analyzing whether a subpart is a separate question, the Court looks to whether the subpart "introduces a line of inquiry that is separate and distinct from the inquiry made by the portion of the interrogatory that precedes it." *Willingham v. Ashcroft, 226 F.R.D. 57, 59 (D.D.C. 2005). See* **[*10]** *also Kendall v. GES Exposition Services, Inc., 174 F.R.D. 684, 685 (D. Nev. 1997)* ("Probably the best test of whether subsequent questions, within a single interrogatory, are [logically or factually] subsumed and [necessarily] related, is to examine whether the first question is primary and subsequent questions are secondary to the primary question.") (following *Ginn v. Gemini Inc., 137 F.R.D. 320, 321 (D. Nev. 1991).)*

An interrogatory "directed at eliciting details concerning a *common theme*" should not be counted as multiple interrogatories. *Cardenas v. DorelJuvenile Group, Inc., 231 F.R.D. 616, 620 (D. Kan. 2005).* This Court has rejected as unfair the "draconian approach of counting every subdivision of an interrogatory as a separate question." *Banks v. Office of the Senate Sergeant-at-Arms, 222 F.R.D. 7, 11 (D.D.C. 2004).*

Review of Contested Interrogatories

At issue in this Motion are three of the twenty-six interrogatories served by Luce. ULLICO responded to twenty-three interrogatories, despite its objection that Luce exceeded the 50-interrogatory limitation set by the trial court, but ULLICO refused to respond to the final three interrogatories. As a preliminary matter, ULLICO **[*11]** agrees with Luce that "Interrogatory Nos. 1, 8, 14-22, and 25-26 of his second two sets of consecutively numbered interrogatories each represent a single interrogatory including discrete subparts." Opposition at 19, n.2. In calculating the total number of interrogatories served by Luce, this Court will undertake an examination of the thirteen interrogatories alleged by ULLICO to have multiple subparts. The Court notes that its analysis of each interrogatory is consistent with the analysis found in the June 30, 2006 Memorandum Orders [224], [225].

First Set of Interrogatories

Interrogatory No. 2

Interrogatory No. 2 asks for an identification of each amendment to the "Qualified Plan" during a

twenty year period, including the terms of the amendment(s) and the date(s); entity approving such amendment(s); documents authorizing such amendment(s); and whether the amendment was "properly authorized." ULLICO argues that this interrogatory should be counted as four interrogatories, corresponding to the four lines of inquiry. The Court finds that inquiries about the terms and date of amendments and the entity approving them are "logically and factually subsumed" within the primary inquiry about [*12] amendments. *Kendall, 174 F.R.D. at 685*. A request for documents counts as a second inquiry. *See Banks, 222 F.R.D. at 10* ("[A] demand for information about a certain event and for the documents about it should be counted as two separate interrogatories.") The issue of authorization of amendments is separable from the general inquiry about amendments, and it therefore constitutes a third inquiry. Interrogatory No. 2 accordingly counts as three interrogatories.

Interrogatory No. 3

Interrogatory No. 3 references allegations contained in P100 in the Answer and Counterclaim and asks ULLICO for a description of actions or failures to act by Counterclaim Defendants that violated the Qualified Plan and the requirements of ERISA. This Interrogatory further requests identification of documents. There is no indication of the number of "actions or failures to act" that are alleged by ULLICO, or whether such actions are separable. The Court treats this Interrogatory No. 3 as two interrogatories, one requesting information, and another requesting identification of documents.

Interrogatory No. 4

Interrogatory No. 4 references a specific allegation in the Answer and Counterclaim relating to Luce's actions [*13] or failures to act that damaged ULLICO in a specific manner. This constitutes a single unified inquiry but the request for identification of documents should be treated as a separate inquiry. *Banks, 222 F.R.D. at 10*. Accordingly, Interrogatory No. 4 counts as two interrogatories.

Interrogatory No. 5

Interrogatory No. 5 mirrors Interrogatory No. 4 in requesting information about Luce's actions or failures to act, referencing a specific allegation in the Answer and Counterclaim. This interrogatory also includes a request for identification of documents. Interrogatory No. 5 counts as 2 interrogatories.

Interrogatory No. 6

Interrogatory No. 6 inquires whether Luce was acting in the capacity of a fiduciary when he took the actions described in Interrogatories Nos. 4 and 5. The Court finds that Interrogatory No. 6 counts as two interrogatories because the inquiry contained therein relates back to two separate and discrete interrogatories. *See Safeco v. Rawstron, 181 F.R.D. 441 (CD. Cal. 1998)* (finding that interrogatories requesting information supporting the denial of requests for admissions should be construed as containing a subpart correlating with each discrete request for admission).

Interrogatory [*14] No. 7

Interrogatory No. 7 asks for identification of persons who performed Luce's functions [prior to his resignation] and a description of such persons' "job title, responsibilities, and total compensation over the past two years . . . ." The information requested in Interrogatory No. 7 is part of a single line of inquiry, even though several pieces of information are sought. *See Safeco, 181 F.R.D. at 444* ("[A]n interrogatory containing subparts directed at eliciting details concerning the common theme should be considered a single question . . . .") (quotation omitted). Interrogatory No. 7 counts as a single interrogatory.

Interrogatory No. 9

This Interrogatory asks for a description of "any terms of the Deferred Compensation Plan" that were allegedly not "adequately disclosed" and the factual basis for such allegations. This Interrogatory asks for information that is part of a single line of inquiry. *See id.* Interrogatory No. 9 counts as a single interrogatory.

Interrogatory No. 10

Interrogatory No. 10 is similar to Interrogatory No. 9 insofar as it requests a description of "those aspects or terms of the 'stock valuation system'" that were allegedly not "adequately disclosed" and the **[*15]** factual basis for such allegations. Interrogatory No. 10 concerns a single topic and should be treated as a single interrogatory.

Interrogatory No. 11

Interrogatory No. 11 requests a detailed description of losses or harm incurred by the Deferred Compensation Plan as a result of alleged breaches of fiduciary duty, and it also asks for identification of documents. The Court finds that inquiries about the nature and type of loss or harm and the amount thereof are "logically and factually subsumed" within the primary inquiry about loss or harm. *Kendall, 174 F.R.D. at 685*. The request for identification of documents is treated as a second, separate inquiry. Interrogatory No. 11 thus counts as two interrogatories.

Interrogatory No. 12

This Interrogatory requests information about actions taken by Luce in connection with the design, creation, approval or implementation of the 1998 and 1999 Stock Offer Programs. The court finds that these inquiries about two distinct Stock Offer Programs are separable and do not rely on each other and therefore, Interrogatory No. 12 is treated as two interrogatories.

Interrogatory No. 13

Interrogatory No. 13 asks for a description of actions taken by Luce in connection **[*16]** with the creation, approval, or implementation of the 1998, 1999, and 2000 Repurchase Programs. While the main topic of this Interrogatory is "Repurchase Programs," there are three separate and separable Programs for which three separate responses may be made. Interrogatory No. 13 is counted as three interrogatories.

Second Set of Interrogatories

Interrogatory No. 23

This Interrogatory requests details relating to "corporate waste," and involving ULLICO's or Carabillo's association with Capitol Link, APCO, and Karin Vaughn Carabillo. This Interrogatory references allegations on pages 56-57 of ULLICO's Answer and Counterclaim. A review of those pages indicates that the allegations relating to Capitol Link and Karin Vaughn Carabillo are linked, and there are no references to APCO. Accordingly, the Court determines that this Interrogatory is treated as a single line of inquiry, and counts as one interrogatory.

Interrogatory No. 24

This Interrogatory relates to allegations contained on pages 57-59 of ULLICO's Answer and Counterclaim and requests a description of actions taken by Luce in furtherance of "corporate waste" with respect to "retention of and payment to Sidley Austin, LLP, AON Consulting, **[*17]** Robert Juliano, and 'ten different law firms' . . . ." ULLICO argues that this request represents thirteen discrete lines of inquiry, one for each entity named, counting the ten law firms as separate entities. The Court finds that because ULLICO's Answer and Counterclaim uses the term "ten different law firms" without further distinction or explanation, this term may be viewed as relating to one entity. Interrogatory No. 24 may thus be counted as four interrogatories to correspond to the four different entities, because such responses are separable.

Conclusion

The Court finds that the total number of interrogatories contained within Luce's First and Second Sets of Interrogatories is 39, which is under the 50-interrogatory limit set by the trial court. Accordingly, it is this 18th day of July, 2006,

ORDERED that Counterclaim Defendant James W. Luce's Motion to Compel Responses to His Second Set of Interrogatories by ULLICO or, Alternatively, for Leave to Serve Additional Interrogatories [183] is granted in part and denied in part. Subject to any objections unrelated to the number of interrogatories, ULLICO will provide its responses to Interrogatories Nos. 24, 25, and 26 from Luce's Second **[*18]** Set of Interrogatories, within 10 days of the date of this Memorandum Order. Luce's alternative request for leave to serve additional interrogatories is thus moot and the Court declines to award sanctions in favor of Luce.

2006 U.S. Dist. LEXIS 97578, *

/s/

ALAN KAY

UNITED STATES MAGISTRATE JUDGE

# 5

*IOSTAR Corp. v. Stuart,* 2007 U.S. Dist. 96862 (D. Utah 2008)

2007 U.S. Dist. LEXIS 96862, *

**IOSTAR Corporation, a Delaware company, Plaintiff, v. JAMES STUART, an individual; GEORGE FRENCH, an individual; RICHARD BUSCH, an individual; COMTACT CORPORATION, a Florida company; and SPACE STATION DEVELOPMENT CORPORATION, a Wisconsin company, Defendants.**

**Case No. 1:07 CV 133 DB**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH, NORTHERN DIVISION**

*2007 U.S. Dist. LEXIS 96862*

**April 25, 2007, Decided
April 25, 2007, Filed**

**PRIOR HISTORY:** *IOSTAR Corp. v. Stuart, 2007 U.S. Dist. LEXIS 96756 (D. Utah, Apr. 9, 2007)*

**CORE TERMS:** interrogatory, discovery, discrete, identification, scheduling, counting, disclosure, cause of action, logically, subsumed

**COUNSEL:** [*1] For IOSTAR, a Delaware company, Plaintiff, Counter Defendant: D. Craig Parry, LEAD ATTORNEY, Michael T. Hoppe, LEAD ATTORNEY, Robert B. Lochhead, LEAD ATTORNEY, Bentley J. Tolk, John P. Snow, PARR WADDOUPS BROWN GEE & LOVELESS, SALT LAKE CITY, UT.

For James Stuart, an individual, Defendant: Richard A. Rappaport, LEAD ATTORNEY, Bradley M. Strassberg, COHNE RAPPAPORT & SEGAL, SALT LAKE CITY, UT.

For George French, an individual, Defendant, Counter Claimant: John W. Mackay, LEAD ATTORNEY, Samuel C. Straight, LEAD ATTORNEY, RAY QUINNEY & NEBEKER (SLC), SALT LAKE CITY, UT.

For Richard Busch, an individual, Defendant, Counter Claimant: Richard F. Ensor, LEAD ATTORNEY, YOUNG HOFFMAN STRASSBERG & ENSOR LLP, SALT LAKE CITY, UT.

For James Stuart, ThirdParty Plaintiff: Bradley M. Strassberg, Richard A. Rappaport, COHNE RAPPAPORT & SEGAL, SALT LAKE CITY, UT.

For Robert D'Ausilio, ThirdParty Defendant, Counter Defendant: D. Craig Parry, LEAD ATTORNEY, Robert B. Lochhead, LEAD ATTORNEY, Bentley J. Tolk, PARR WADDOUPS BROWN GEE & LOVELESS, SALT LAKE CITY, UT.

For James Stuart, Counter Claimant: Bradley M. Strassberg, LEAD ATTORNEY, Richard A. Rappaport, LEAD ATTORNEY, COHNE RAPPAPORT & SEGAL, SALT LAKE [*2] CITY, UT.

For Sylvia D'Ausilio, J. Patrick Rau, Counter Defendants: D. Craig Parry, LEAD ATTORNEY, Robert B. Lochhead, LEAD ATTORNEY, PARR WADDOUPS BROWN GEE & LOVELESS, SALT LAKE CITY, UT.

For IOSTAR, Counter Defendant: D. Craig Parry, LEAD ATTORNEY, John P. Snow, LEAD ATTORNEY, Michael T. Hoppe, LEAD ATTORNEY, Robert B. Lochhead, LEAD ATTORNEY, Bentley J. Tolk, PARR WADDOUPS BROWN GEE & LOVELESS, SALT LAKE CITY, UT.

For Robert D'Ausilio, Counter Defendant: Robert B. Lochhead, LEAD ATTORNEY, Bentley J. Tolk,

PARR WADDOUPS BROWN GEE & LOVELESS, SALT LAKE CITY, UT.

**JUDGES:** David Nuffer, U. S. Magistrate Judge. District Judge Dee Benson.

**OPINION BY:** David Nuffer

**OPINION**

**MEMORANDUM DECISION AND ORDER GRANTING IN PART MOTION TO COMPEL RESPONSES TO DISCOVERY**

Defendant James Stuart seeks to compel Plaintiff IOSTAR Corporation (IOSTAR) and Third Party Defendant Robert D'Ausilio (collectively the IOSTAR Parties) to respond to discovery served January 11, 2008. [1] The IOSTAR Parties object because the interrogatories delivered [2] allegedly exceed the number of 25 permitted by the scheduling order [3] in this case.

Defendant James Stuart ("Stuart") has served on the Answering Parties approximately 170 interrogatories, including discrete **[*3]** subparts. Although Stuart purported to serve 25 Interrogatories on each of IOSTAR and D'Ausilio, the actual number is approximately 170 because: (1) each of Stuart's 25 Interrogatories requests certain substantive information, a separate identification of witnesses, and a separate identification of documents, for a total of 75 discrete subparts; (2) in seeking the bases in Interrogatory No. 25 for each denial of Stuart's Requests for Admission, Stuart added another 36 discrete subparts; and (3) Stuart's Interrogatory Nos. 2-20 and 22-24 add approximately an extra 59 discrete subparts, since each of those Interrogatories is comprised of multiple discrete subparts relating to the substance of this case. [4]

1   Defendant Dr. James Stuart's Motion to Compel Responses to Discovery, docket no. 58, filed February 20, 2008.
2   The interrogatories (and requests for admission and production) are attached as Exhibit 2 to Defendant Dr. James Stuart's Memorandum in Support of Motion to Compel Responses to Discovery (Supporting Memorandum), docket no. 59, filed February 20, 2008.
3   Scheduling Order, docket no. 47, filed January 14, 2008.
4   IOSTAR's Memorandum in Opposition to Defendant Dr. James Stuart's Motion **[*4]** to Compel Responses to Discovery (Opposition Memorandum) at 2, docket no. 66, filed March 10, 2008.

The magistrate judge believes the IOSTAR Parties' math is correct, even though their analysis may be overly technical. The magistrate judge also believes that the case law cited by the IOSTAR Parties is correct. The magistrate judge also agrees with most of the characterizations of the interrogatories.

.   Interrogatories which ask for "substantive information, a separate identification of witnesses, and a separate identification of documents" [5] are indeed compound, and have been held to have three discrete subparts. [6]

.   The 25th interrogatory asks for the basis of denial of each of Stuart's 12 requests for admission. Another case has held that "[a]llowing service of an interrogatory which requests disclosure of all of the information on which the denials of each of [the] requests for admissions were based . . . essentially transforms each request for admission into an interrogatory." [7]

.   IOSTAR Parties claim that interrogatories 2-20 and 22-24 seek information on more than one discrete subject and thus must each be counted as more than one interrogatory. [8] In some instances, the compounding **[*5]** started with IOSTAR's complaint. Some of the interrogatories

simply quote from one or more logically related paragraphs of the complaint. [9] Others seek a broad range of information on a specific cause of action [10] or defense to the Stuart's claims. [11] The determination of whether an interrogatory is actually one or many depends on whether subparts are "logically or factually subsumed within and necessarily related to the primary question." [12]

> Probably the best test of whether subsequent questions, within a single interrogatory, are subsumed and related, is to examine whether the first question is primary and subsequent questions are secondary to the primary question. Or, can the subsequent question stand alone? Is it independent of the first question? [13]

5  Opposition Memorandum at 2.

6  *Banks v. Office of the Senate Sergeant-At-Arms, 222 F.R.D. 7, 10 (D.D.C. 2004).*

7  *Safeco of America v. Rawstron, 181 F.R.D. 441, 445 (C.D. Cal. 1998).*

8  Opposition Memorandum at 2 and 13-16.

9  E.g., Interrogatories Nos. 2-5, 7.

10  E.g., Interrogatories Nos. 6, 8-20.

11  E.g., Interrogatories Nos. 21-24.

12  *Kendall v. GES Exposition Services, Inc., 174 F.R.D. 684, 685 (D. Nev. 1997)* (citation omitted).

13  *Id.*

The magistrate [*6] judge is aware that in actual practice these technical specifications for counting interrogatories are more often breached than observed. It is necessary to inquire after facts, and essential to know about witnesses and

documents which tend to prove those facts. It is nearly a universal practice to ask why a request for admission was denied, as human nature requires more than a binary response. Contention interrogatories often focus on an entire claim or defense. In fact, most complex cases such as this one, with "a 24-page, 134 paragraph Complaint . . . alleging fifteen causes of action" [14] would normally have a nearly identical set of interrogatories. The magistrate judge sees discovery like this in motions to compel or for protective order which address other more substantive issues, and ignore the counting of discovery requests. (Of course, many cases have far fewer interrogatories, and others have no discovery disputes.)

14  Supporting Memorandum at 2.

In order to define issues and organize toward resolution of cases like this, discovery is necessary. Deliberate outlining of issues, and identification of factual predicates, from witnesses and exhibits, such as is requested in these [*7] interrogatories, is probably the best way to accomplish the task. Stuart has identified the major issues from his point of view, and put forth discovery. As Magistrate Judge Facciola has suggested, simple counting may "beg the question presented." [15] The question is how we move the case along.

15  *Banks, 222 F.R.D. at 10.*

The IOSTAR Parties have essentially refused to respond, based on the number of interrogatories. Therefore, nothing has been accomplished to focus, define, and resolve the essential dispute, and we are caught in a side-discussion about how to get there from here.

It appears the IOSTAR Parties' focus on numbers is a short-hand way of saying the burden is too great. The definitions strapped on to modern discovery geometrically expand the scope of even "fewer than twenty-five interrogatories" because of "the use of definitions . . . that attempt to force an opponent to provide information about every document, witness, or event." [16] These interrogatories suffer from this understandable but overwhelming attempt to be exhaustive. No attorney wants to ask for less than "all" evidence, but a search for minutiae is an excessive burden.

16   *Lawrence v. First Kansas Bank & Trust Co., 169 F.R.D. 657, 662 (D.Kan. 1996)*(quoting  **[\*8]** William W. Schwarzer et al., *Civil Discovery and Mandatory Disclosure: A Guide to Efficient Practice,* 4-5 to 4-7 (2d ed.1994)).

After careful review, in light of the parties' clear briefing, the magistrate judge is convinced that the interrogatories are a reasonable tool for defining and refining this case, if they are answered in a *fair and reasonable* way. 25 important areas of inquiry are presented. Depositions would take days, and involve many people, and would be relatively disorganized and complex. It is time to get to the substance of this case and the interrogatories are a good way to do it.

The IOSTAR Parties will need to be reasonably complete in their responses, and Stuart will need to be reasonable in his assessment of responses before making a motion to compel. The court will not require precise delivery of "a particularized statement of *each and every* fact;" "the identity of each person who has any knowledge;" and "the identity of *each and every* document . . .which contains *any* facts which would *tend* to support . . . allegations" 17 But the court will require more than the summary rejection of the discovery that the IOSTAR Parties have made.

17   Definitions, James Stuart's First Set of Interrogatories, Requests for Production of Documents and Requests for Admission to IOSTAR Corporation and Robert D'ausilio at 6, **[\*9]** attached as Exhibit 2 to Supporting Memorandum.

## ORDER

IT IS HEREBY ORDERED that the motion to compel 18 is GRANTED IN PART in that the IOSTAR Parties shall, on or before May 16, provide reasonable answers to James Stuart's First Set of Interrogatories, Requests for Production of Documents and Requests for Admission to IOSTAR Corporation and Robert D'Ausilio. To the extent that this order is in conflict with the Scheduling Order, that order is amended accordingly.

18   Defendant Dr. James Stuart's Motion to Compel Responses to Discovery, docket no. 58, filed February 20, 2008.

IT IS FURTHER ORDERED that in addition to any other efforts to communicate about any further issues on this discovery, counsel shall meet and confer in person before any further motion related to this discovery is filed.

April 25, 2007.

BY THE COURT:

/s/ David Nuffer

David Nuffer

U. S. Magistrate Judge

# 6

*Kendall v. GES Exposition Servs.*, Inc., 174 F.R.D. 684 (D. Nev. 1997)

SUZY L. KENDALL, Plaintiff, vs. GES EXPOSITION SERVICES, INC., et al., Defendant.

CV-S-96-414-RLH

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEVADA

*174 F.R.D. 684*; *1997 U.S. Dist. LEXIS 15827*

August 8, 1997, Decided
August 8, 1997, Received and Filed; August 12, 1997, Entered and Served

**DISPOSITION:** [**1] Plaintiff's Motion to Compel Discovery ( # 37) granted to the extent that Defendants shall provide answers to Interrogatories 25, 26 and 27 and denied in all other aspects. Demands for attorneys fees denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Before the court was plaintiff's motion to compel discovery in an employment dispute.

**OVERVIEW:** Plaintiff served interrogatories numbered 1- 31, and a request to produce. Request No. 29 referred to interrogatory no. 29. Defendants determined that some of the interrogatories contained discrete subparts which it argued should be counted separately. By defendants' calculation, they had answered the maximum number allowed by U.S. Dist. Ct., D.NV., R 33-1(b) (i.e., 40) when they had answered the first 24 interrogatories and objected to the remainder on the grounds that they exceeded the number allowed. Consequently, defendants responded to request no. 29 as being not applicable. The court reviewed each interrogatory and found that some did contain subparts which should have been counted as separate interrogatories. However the court found that interrogatory no. 29 actually exceeded the 40 interrogatories which were allowed by the local rule and thus defendants were not required to answer it, or the corresponding request to produce.

**OUTCOME:** The motion to compel discovery was granted in part and denied in part because the court found that some of the interrogatories were actually independent question rather than subparts.

**CORE TERMS:** interrogatory, counted, discrete, subsumed, calculation, discovery, reprimand, warning, qualifications, factually, answered, freight, salary, attorneys' fees, separately, logically, drafted, administered

**LexisNexis(R) Headnotes**

*Civil Procedure > Discovery > Methods > Interrogatories > General Overview*
[HN1] U.S. Dist. Ct., D. Nev. R. 33-1(b) states as follows: unless otherwise ordered by the court or stipulated by the parties, the total number of interrogatories propounded to each party by any other party shall be limited to 40, including discrete subparts. The interrogatories shall be tailored to the needs of the particular case. Failure to comply with the provisions of this rule may result in sanctions.

*Civil Procedure > Discovery > Methods > Interrogatories > General Overview*
[HN2] The rule requiring the counting of the number of interrogatories "including subparts" uses the term "discrete subparts." The word, "discrete," essentially means, "separate."

Case 1:08-cv-00526    Document 148-3    Filed 08/21/2008    Page 55 of 179

174 F.R.D. 684, *; 1997 U.S. Dist. LEXIS 15827, **

*Civil Procedure > Discovery > Methods > Interrogatories > General Overview*

[HN3] Interrogatory subparts are to be counted as part of but one interrogatory for the purpose of U.S. Dist. Ct., D. Nev. R. 190(1)(c) if they are logically or factually subsumed within and necessarily related to the primary question.

*Civil Procedure > Discovery > Methods > Interrogatories > General Overview*

[HN4] The best test of whether subsequent questions, within a single interrogatory, are subsumed and related, is to examine whether the first question is primary and subsequent questions are secondary to the primary question. Or, can the subsequent question stand alone? Is it independent of the first question? Genuine subparts should not be counted as separate interrogatories. However, discrete or separate questions should be counted as separate interrogatories, notwithstanding they are joined by a conjunctive word and may be related.

**COUNSEL:** For KENDALL, SUZY L, Plaintiff: VICTOR M PERRI, ESQ., Las Vegas, NV.

For GES EXPOSITION SERVICES, INC, Defendant: MALANI L. KOTCHKA, ROSE MARIE REYNOLDS, Smith & Kotchka, Las Vegas, NV.

**JUDGES:** ROGER L. HUNT, United States Magistrate Judge.

**OPINION BY:** ROGER L. HUNT

**OPINION**

**[*684] ORDER**

(Motion to Compel-- # 37)

Before the Court is **Plaintiff's Motion to Compel Discovery** ( # 37, filed June 9, 1997). It is accompanied by an Affidavit of Edgar Carranza, Esq. ( # 38) which purports to show good faith attempts to confer with Defendant to secure disclosure prior to intervention by the Court. GES's Opposition ( # 43) was filed July 11, 1997. Plaintiff's Reply ( # 45) was filed August 1, 1997.

The dispute arises from the interpretation and application of Local Rule 33-1(b) [1] and **[*685]** *Fed. R. Civ. P. 33(a)* to "discrete subparts" of interrogatories. The Court finds that both parties have misconstrued the rules. The Court further finds that neither party has made a good faith effort to resolve **[**2]** the dispute, but their intransigence makes resolution impossible, short of the Court's intervention. Accordingly, the Court will address the motion, but will decline to award attorneys' fees. [2]

> 1    [HN1] LR33-1(b) states as follows: "Unless otherwise ordered by the court or stipulated by the parties, the total number of interrogatories propounded to each party by any other party shall be limited to forty (40), including discrete subparts. The interrogatories shall be tailored to the needs of the particular case. Failure to comply with the provisions of this rule may result in sanctions.
>
> 2    The Court considered ordering both parties to reimburse the Court for the necessity of taking to the time make exhaustive examination of each interrogatory to determine whether it involved one or more questions.

Plaintiff Kendall has served three sets of interrogatories. The first set was numbered Interrogatories No. 1-13. The second set was numbered 14-29. The second set was numbered 30-31. She has also served requests to produce. **[**3]** Request No. 29, which refers to Interrogatory No. 29, is the one at issue here.

Defendants determined that some of the interrogatories contained discrete subparts which should be counted separately. By Defendants' calculation, they had answered the maximum number allowed by Local Rule 33-1(b) (i.e., 40) when they had answered the first 24 interrogatories and objected to the remainder on the grounds that they exceeded the number allowed. Consequently, Defendants responded to Request No. 29 as being not applicable.

Plaintiff contends that all portions of each interrogatory are related to and subsumed in the first question of the interrogatory. Defendants arbitrarily determined that the use of the words,

"and" and "also" identified discrete subparts which should be counted separately. Correspondence was exchanged and discussions held wherein both sides of the argument adamantly stood by their positions (although apparently there has been supplementation of some responses to discovery requests). Thus, the matter is before this Court.

Prior decisions by Magistrate Judges of this District have dealt with this question when [HN2] the rule required the counting of the number of interrogatories [**4] "including subparts." *Valdez v. Ford Motor Company, 134 F.R.D. 296 (D.Nev. 1991)* (by Judge Robert J. Johnston), and *Ginn v. Gemini Inc., 137 F.R.D. 320 (D.Nev. 1991)* (by Judge Lawrence R. Leavitt). The rules now use the term "discrete subparts." The word, "discrete," essentially means, "separate."

This Court favors the approach of Judge Leavitt, in *Ginn*, particularly in view of the clarification in the language of the rules. [3] The Court understands that the author of *Valdez* acknowledges that the *Ginn* decision is correct, at least in view of the current rule language.

3   Former Local Rule 90-1(c) was modified (and renumbered to LR 33-1(b)) in 1995 to include the word, "discrete."

*Ginn* held as follows:

The Court therefore holds that [HN3] interrogatory subparts are to be counted as part of but one interrogatory for the purpose of Local Rule 190, subd. 1(c) if they are logically or factually subsumed within and necessarily related to the primary question.

*Ginn, 137 F.R.D.* [**5] *at 322.*

This Court agrees with that decision and adopts it herein. However, the more difficult question is determining whether the subparts are "logically or factually subsumed within and necessarily related to the primary question." If the questions are relevant to the case, it could be argued that all the interrogatories are "related." If that were the case, then all the interrogatories would only be counted

as one and there could never be an excessive number. By the same token, the mere inclusion of "and" or "also" in a question (or double question) does not automatically mean the questions are separate or "discrete" and not subsumed within the initial or primary question.

Probably [HN4] the best test of whether subsequent questions, within a single interrogatory, are subsumed and related, is to examine whether the first question is primary and subsequent questions are secondary to the primary question. Or, can the subsequent question stand alone? Is it independent of the first question? Genuine subparts should not be counted as separate interrogatories. However, discrete or separate questions [*686] should be counted as separate interrogatories, notwithstanding they are joined by a conjunctive [**6] word and may be related.

By way of example of both kinds of questions, the Court will refer to examples from the interrogatories in dispute. The following constitute interrogatories with legitimate subparts which are subsumed in the primary question:

**INTERROGATORY NO. 10:** Was "KENDALL" given any warning/reprimand during her employment with Defendants? If so, identify each warning/reprimand by date of incident, brief description of the incident and person who administered the warning/reprimand by name, gender, position and address.

**INTERROGATORY NO. 16:** In response to Plaintiff's Interrogatory No. 8, Defendants Answer by stating, inter alia, that Kendall was "called to work in freight GES after December 1991 and declined the work." Identify each and every instance by date, show and labor list reflecting Defendants' assertion that Kendall was called to work in freight at GES and declined. Also, identify the person who administered the labor call and drafted the labor list.

Case 1:08-cv-00526     Document 148-3     Filed 08/21/2008     Page 57 of 179

174 F.R.D. 684, *; 1997 U.S. Dist. LEXIS 15827, **

In the first example, all the questions are designed to describe any warning/reprimand. In the second example, the questions seek to identify instances where the Plaintiff was [**7] called to work but declined. The subsequent questions in each interrogatory are necessary to complete the details required in the identification.

The following are examples of independent questions being improperly combined into one interrogatory (sometimes by using "and" or "also" to join the questions):

**INTERROGATORY NO. 1:** Identify fully the minimum qualifications for an employee to be hired onto "freight," including, but not limited to, the ability to drive heavy machinery, experience in the industry, and all other criteria used by Defendants. Also, identify any document in which these qualifications are articulated.

**INTERROGATORY NO. 11:** State, with particularity, the value of "KENDALL'S" yearly compensation while employed by Defendants, including, but not limited to, salary, incentive payments, bonuses, life insurance, contributions to pensions plan medical insurance and state the basis by which the Defendant arrives at the value for each. Also, set forth the value of all increases to salary and other benefits that "KENDALL" would have received as a matter of course if she would have continued to be employed by Defendants, giving the inclusive [**8] dates during each was applicable

In the first example, the first question asks for a description of qualifications. The second question asks for a description of documents. The first question can be answered fully and completely without answering the second question. The second question is totally independent of the first and not "factually subsumed within and necessarily related to the primary question." *See Lawrence v. First*

*Kansas Bank & Trust Co., 169 F.R.D. 657, 660-661 (D.Kan. 1996).* The second question is really a fugitive request for production of documents and the discovery effort would be better served in that format.

In the second example, the first question, which contains a number of legitimate subparts, asks for a calculation of past compensation and benefits actually received by the Plaintiff. The second question, however, asks for a calculation of speculative increases in salary and benefits based upon a hypothetical situation. While both questions may be related to the issue of Plaintiff's claims for damages, they are separate and distinct questions which require separate calculations. Each question is independent of the other and can stand alone. The second [**9] question is not subsumed in the first.

It is evident from the foregoing that the motion should be granted in part and denied in part. Many of the interrogatories have discrete subparts and some do not. In keeping with the spirit of the moving and opposing papers, the Court will not restate each interrogatory and the response thereto. It will identify each interrogatory and whether it shall be counted as one, or more than one, interrogatory, for the purposes of *Rules 33* and LR 33-1. It will then direct responses to the appropriate interrogatories (and one request to produce) in keeping with its decision.

[*687] Interrogatory No. 1 should be counted as two separate interrogatories.

Interrogatory No. 2 should be counted as three separate interrogatories.

Interrogatory No. 3 should be counted as three separate interrogatories.

Interrogatory No. 4 should be counted as two separate interrogatories.

Interrogatory No. 5 should be counted as only one interrogatory.

Interrogatory No. 6 should be counted as only one interrogatory.

Interrogatory No. 7 should be counted as only one interrogatory.

Interrogatory No. 8 should be counted as only one interrogatory.

Interrogatory No. 9 should be [**10] counted as only one interrogatory.

Interrogatory No. 10 should be counted as only one interrogatory.

Interrogatory No. 11 should be counted as two interrogatories.

Interrogatory No. 12 should be counted as only one interrogatory.

Interrogatory No. 13 should be counted as only one interrogatory.

Interrogatory No. 14 should be counted as two interrogatories.

Interrogatory No. 15 should be counted as two interrogatories.

Interrogatory No. 16 should be counted as only one interrogatory.

Interrogatory No. 17 should be counted as only one interrogatory.

Interrogatory No. 18 should be counted as two interrogatories.

Interrogatory No. 19 should be counted as two interrogatories.

(Interrogatory No. 19 could have been drafted as one legitimate interrogatory but it was not.)

Interrogatory No. 20 should be counted as two interrogatories.

Interrogatory No. 21 should be counted as one interrogatory.

Interrogatory No. 22 should be counted as one interrogatory.

Interrogatory No. 23 should be counted as one interrogatory.

Interrogatory No. 24 should be counted as one interrogatory.

Interrogatories No. 1 through 24 constitute 36 interrogatories rather than the 40 claimed by Defendants. [**11] Therefore, Defendants are ordered to answer the next four interrogatories. However, the Court notes that Interrogatory No. 26 should be counted as two interrogatories. Defendants are required to answer Interrogatories Nos. 25, 26 and 27.

Because Defendants are not required to answer Interrogatory No. 29, the Court finds the Response to Request to Produce No. 29 adequate and will deny the motion in that regard.

For the reasons stated above,

**IT IS HEREBY ORDERED** that Plaintiff's Motion to Compel Discovery ( # 37) is granted in part and denied in part as follows: It is granted to the extent that Defendants shall provide answers to Interrogatories 25, 26 and 27 within 21 days of the date of this order. It is denied in all other aspects.

**IT IS FURTHER ORDERED** that demands for attorneys fees are denied.

Dated August 8, 1997.

ROGER L. HUNT

United States Magistrate Judge

# 7

*Larson v. Correct Craft, Inc.,*
2006 U.S. Dist. LEXIS 78028 (M.D. Fla. Oct. 25, 2006)

**BORDEN M. LARSON, Plaintiff, -vs- CORRECT CRAFT, INC., WILLIAM SNOOK & ROBERT TODD, Defendants.**

**Case No. 6:05-cv-686-Orl-31JGG**

**UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF FLORIDA, ORLANDO DIVISION**

*2006 U.S. Dist. LEXIS 78028*

**October 25, 2006, Decided**

**SUBSEQUENT HISTORY:** Motion denied by *Larson v. Correct Craft, 2007 U.S. Dist. LEXIS 30857 (M.D. Fla., Apr. 26, 2007)*

**PRIOR HISTORY:** *Larson v. Correct Craft, 2006 U.S. Dist. LEXIS 72387 (M.D. Fla., Oct. 4, 2006)*

**CORE TERMS:** interrogatory, thru, confer, identification, separately, discovery, telephone, attachments, good faith attempt, asking, affirmative defenses, counterclaims, enumerated, moving party, opposing counsel, responding party, unavailable, propounded, item of evidence, burdensome, responded, exceeded, propound, counted, unduly, Local Rule, good faith effort, disputed issues, undue burden, communicate

**COUNSEL:** [*1] For Borden M. Larson, Plaintiff: Beecher A. Larson, Law Office of Beecher A. Larson, Longwood, FL.

For Correct Craft, Inc., William Snook, Robert Todd, Defendants: Douglas C. Spears, Stump, Callahan, Dietrich & Spears, P.A., Orlando, FL.

For Allen, Dyer, Doppelt, Milbrath & Gilchrist, P.A., Movant: Herbert L. Allen, Allen, Dyer, Doppelt, Milbrath & Gilchrist, PA, Orlando, FL.

For Brian Gilchrist, Movant: Brian R. Gilchrist, Allen, Dyer, Doppelt, Milbrath & Gilchrist, PA, Orlando, FL.

For Correct Craft, Inc., Counter Claimant: Douglas C. Spears, Stump, Callahan, Dietrich & Spears, P.A., Orlando, FL.

For Borden M. Larson, Counter Defendant: Beecher A. Larson, Law Office of Beecher A. Larson, Longwood, FL.

**JUDGES:** JAMES G. GLAZEBROOK, UNITED STATES MAGISTRATE JUDGE.

**OPINION BY:** JAMES G. GLAZEBROOK

**OPINION**

**ORDER**

This cause came on for consideration without oral argument on the following motion:

> **MOTION: LARSON'S SECOND MOTION TO COMPEL ANSWERS TO HIS RE-SUBMITTED FIRST SET OF INTERROGATORIES (Doc. No. 92)**
>
> **FILED: September 25, 2006**
>
> **THEREON** it is **ORDERED** that the motion is **DENIED.**

**I. BACKGROUND**

Larson initially [*2] filed this case in state court on April 22, 2004. Docket 2. On May 27, 2004, while the case was still pending in state court, Plaintiff served a set of 20 interrogatories upon Defendant Correct Craft. Docket 56 at 1. Correct Craft objected and partially responded to the

interrogatories on July 20, 2004, but did not answer under oath, and counsel did not sign the response as to the objections. Docket 61 at 1.

Defendants removed the case to federal court on May 5, 2005. Docket 1. On November 22, 2005, Plaintiff sought Correct Craft's consent to serve an additional set of 16 interrogatories. Docket 56 at 2. Correct Craft refused to agree to the additional interrogatories and contended that Plaintiff already had exceeded the 25 interrogatory limit because the first set of interrogatories contained distinct subparts. Docket 56 at 2. Plaintiff then moved to exceed the 25 interrogatory limit (Docket 56), and moved to strike Correct Craft's previous response as the answers to the interrogatories were not made under oath and the attorney had failed to sign as to the objections. Docket 61.

On January 6, 2006, the Court denied Plaintiff's motion to exceed the 25 interrogatory limit, and granted [*3] the motion to strike the unverified and unsigned interrogatory answers. As Plaintiff clearly wanted to propound more than 25 interrogatories, the Court thought it would be better for Plaintiff to "start fresh" with his interrogatories, and so it struck the previously served interrogatories. Docket 66 at 2. The Court contemplated that this order would permit Plaintiff to evaluate which of the 36 interrogatories he wished to propound, and perhaps to re-evaluate the wording of the interrogatories to address Correct Craft's arguments that the interrogatories contained distinct subparts.

On January 23, 2006, Plaintiff propounded his Second Set of Interrogatories, which are at issue here. Plaintiff's Second Set of Interrogatories set forth 13 enumerated questions with various subparts. [1] Many of these interrogatories ask Correct Craft to identify all facts, documents and evidence in support of admissions and denials in its Amended Answer to the First Amended Complaint, [2] and all facts, documents and evidence in support of Correct Craft's counterclaims. On February 21, 2006, Correct Craft timely objected generally to the definitions and instructions as making the response unduly burdensome [*4] and creating so many subparts as to exceed the 25 interrogatory limit. Correct Craft also raised a number of specific objections to individual interrogatories.

1    Larson's brief states that the interrogatories at issue are set forth in Attachment 1. Docket 92-1 at 2. The interrogatories in Attachment 1 contains 13 enumerated interrogatories. Docket 92-2. The brief, however, purports to set forth 21 enumerated interrogatories. Correct Craft's answers are attached at Attachment 2 and contain responses to 22 interrogatories. Docket 92-3. Because Plaintiff greatly exceeded the 25 interrogatory limit, as discussed below, the Court has limited its analysis to those 13 interrogatories contained in Attachment 1.

2    The First Amended Complaint is 35 pages long, excluding the attachments, and has 129 separately numbered paragraphs (not counting the numerous subparagraphs).

After the passage of almost six months, on August 8, 2006, Plaintiff contacted Correct Craft for the first time about its response. Docket 92-1 at [*5] 2. On that date, Plaintiff sent Correct Craft a draft of the instant motion with a short cover letter asking for Correct Craft's "comments" by August 14, 2006. Docket 92-4. On August 15, 2006, Correct Craft responded by letter. With respect to one of the interrogatories, Correct Craft responded that it did not understand Plaintiff's argument and attempted to explain Correct Craft's reason for its response. Correct Craft stood by its other objections. Correct Craft attempted to explain why Plaintiff's interrogatories were improper, and that it "was amenable to [Plaintiff] trying to rephrase various of the interrogatories to focus the inquiry." Docket 92-5 at 3. Plaintiff did not confer further with Correct Craft before filing its motion on September 25, 2006, six days before the discovery deadline. Docket 92-1 at 2. [3]

3    Larson's Local Rule 3.01(g) statement alleges that attorney Larson attempted to confer in person with defense counsel Spears before he received Spears's letter dated August 15, 2006. Docket 92-1 at 43. Attorney Larson alleges Spears refused to confer in person, despite this Court's express order that parties are to confer in person or by telephone prior to the filing of a motion. See Docket 45 at 4. Attorney Larson telephoned Spears on the day the motion was

filed, but Spears was unavailable. Attorney Larson filed the motion at 1:37 p.m. on the same day that he telephoned Spears. No supplemental 3.01 (g) statement has been filed, and Correct Craft's response did not address Larson's allegations in his 3.01(g) statement.

[*6] II. **ANALYSIS**

A. **Plaintiff Failed to Satisfy the Conference Requirements Before Filing the Motion**

*Federal Rule of Civil Procedure 37* requires the movant to make a good faith attempt to resolve the discovery dispute before filing a motion to compel discovery responses. *Fed. R. Civ. P. 37(a)(2)(B)*. Local Rule 3.01(g) also requires a moving party to confer with opposing counsel prior to filing a motion to compel "in a good faith effort to resolve the issue." If the parties are unable to resolve their differences, Rule 3.01(g) requires the moving party to file a statement with his motion that certifies he has conferred with opposing counsel and the parties could come to no resolution. Although Plaintiff certifies that he complied with the conference requirement of Local Rule 3.01(g), the Court finds that he failed to satisfy the underlying purpose of the rule or the Court's Case Management and Scheduling Order ("CMSO").

The purpose of Local Rule 3.01(g) "is to require the parties to communicate and resolve certain types of disputes without court intervention." *Desai v. Tire Kingdom, Inc., 944 F. Supp. 876, 878 (M.D. Fla. 1996).* [*7] The term "communicate" has been further clarified to mean, "to speak to each other in person or by telephone, in a good faith attempt to resolve disputed issues." *Davis v. Apfel, 93 F. Supp. 2d 1313, 2000 WL 1658575 *2 n.1 (M.D. Fla. August 14, 2000).* The CMSO reiterates that the term "confer" in Rule 3.01(g) "requires a substantive conversation *in person or by telephone* in a good faith effort to resolve the motion without court action and does not envision an exchange of ultimatums by fax or letter." Docket 45 at 4 (emphasis in original). Local Rule 3.01(g) also states, "[a] certification to the effect that opposing counsel was unavailable for a conference before filing a motion is insufficient to satisfy the parties' obligation to confer."

Attorney Larson's letter asking for Correct Craft to comment on a draft motion and then failing to respond to Correct Craft's comments is not a good faith attempt to resolve disputed issues. *See, Cardenas v. Dorel Juvenile Group, Inc., 230 F.R.D. 635, 637 n. 14 (D. Kan. 2005)* ("the term 'reasonable effort to confer' means more than mailing, telefaxing, or e-mailing a single letter to the opposing party; '[i]t requires that **[*8]** the parties in good faith converse, confer, compare views, consult and deliberate, or in good faith attempt to do so.'"); *Bayou Steel Corp. v. Danieli Corp., 2001 U.S. Dist. LEXIS 5946, 2001 WL 456349 *1 (E.D. La., April 30, 2001)* ("Exchanging letters may be a step in the process, but it is not a substitute for such a conference."). Although defense counsel Spears' allegedly refused to confer in person before he sent his letter, the letter makes it clear that he was willing to try to work something out with Attorney Larson.

Local Rule 3.01(g) places the onus on the moving party to engage in the required conference. Attorney Larson's telephone call to Spears on the same day that the motion was filed, and proceeding to file the motion at 1:37 p.m. when Spears was unavailable, does not fulfill the conference requirements. Nor did Larson supplement his Local Rule 3.01(g) statement to inform the Court about Correct Craft's position after he talked to Spears. Based on Correct Craft's response, the Court suspects that Larson failed to follow up with Spears after the motion was filed.

The Middle District Discovery Handbook provides that Local Rule 3.01(g) is strictly enforced. Middle District Discovery **[*9]** (2001) at 20. The CMSO also provides that the Court "will deny motions that fail to include an appropriate, complete Rule 3.01(g) certificate." Docket 45 at 4. The Court finds that Attorney Larson failed to comply with the conference requirement of Local Rule 3.01(g) and this Court's Order. Denial of the motion to compel is warranted.

B. **Plaintiff's Interrogatories Exceeded the Twenty-Five Interrogatory Limit and are Unduly Burdensome**

Even if Plaintiff had sufficiently conferred before filing the motion and even if the motion were timely filed, the motion to compel would still

be without merit because he has propounded interrogatories grossly in excess of the twenty-five interrogatory limit and are unduly burdensome.

## 1. Numerosity

Plaintiff's interrogatories essentially ask Correct Craft to identify every piece of information and every document that supports its position in the litigation. Illustrative of Plaintiff's interrogatories is Interrogatory No. 4, which asks:

> In your Amended Answer dated August 12, 2005, you deny paragraphs 1 thru 5, 8 thru 12 thru 22, 25 thru 40, 42 thru 44, 46 thru 48, 50 thru 57, 59, 61 thru 70, 72 thru 82, 84 thru 90 thru 94, **[*10]** and 119 thru 122 of the plaintiff's First Amended Complaint. Are you, or any of agents or persons acting on your behalf, aware of any fact, observation, document, or item evidence that either directly or indirectly, indicates that evidence may exist regarding the subject question which was denied. If your answer is anything other than an unqualified "no," for each and every such fact, observation, document, and item of evidence, please set forth following information separately, fully, specifically, and in detail:
>
> > a. A detailed description of the fact, observation, document, or item of evidence, setting forth names, dates, times, places and any other information that might assist the identification and location of the subject information.
> >
> > b. The name, address, telephone number or other means of identification of each person who has possession or first hand knowledge of the subject fact, observation, document, or item of evidence, and that person's relationships to the parties herein.
> >
> > c. The method or manner by which you obtained knowledge of this information, setting forth, names, dates, times, places and any other details that relate to the manner in which you obtained **[*11]** such knowledge.
> >
> > d. If the subject information is documentary, will you please attach a copy to your answers to these interrogatories.

Plaintiff propounds similar interrogatories that seek to discover all facts and documents supporting Correct Craft's admissions in its answer, its ten affirmative defenses, and its counterclaims.

In an analogous situation, a party propounded interrogatories asking the responding party to state every fact, identify every document and identify every witness that supported the responding party's denial of requests for admission. *Safeco of Am. v. Rawstron, 181 F.R.D. 441, 442 (C.D. Cal. 1998)*. The court ruled that where the underlying request for admission concerned different, separate or discreet matters, the interrogatory would be viewed as containing a subpart for each request. *Id. at 446*. Further, the court found a strong presumption that each underlying request constituted a separately countable subpart. *Id.* Other courts also have found that an interrogatory that combines a request for identification of information with a request for identification of documents constitutes two separate interrogatories. **[*12]** *See Kendall v. GES Exposition Serv., Inc., 174 F.R.D. 684, 686 (D. Nev. 1997)*; *Banks v. Office of the Senate Sergeant-at-*

*Arms, 222 F.R.D. 7, 10-11 (D.D.C. 2004)*. The Court agrees with the approach taken by these other courts.

Analyzing the complaint, the answer and the counterclaims, the Court counts the number of interrogatories as follows:

Interrogatory No.3 (admissions to complaint allegations):

Interrogatory 3 references 10 separate paragraphs of the complaint, which the Court finds are distinct. Interrogatory 3 equals 20 interrogatories (requesting facts and documents (x2) for 10 unique allegations).

Interrogatory No. 4 (denial of complaint allegations):

Interrogatory 4 references 81 separate paragraphs, plus numerous subparagraphs, of the complaint. The Court finds 53 of those paragraphs set forth distinct allegations. As the interrogatory calls for both identification of facts and documents, Interrogatory No. 4 equals 106 interrogatories.

Interrogatory No. 5 (lack of knowledge):

Interrogatory 5 asks Correct Craft to describe each effort it made to ascertain information as to allegations, some of which were **[*13]** coupled with admissions or denials. The Court finds there are 20 distinct paragraphs referenced in Interrogatory No. 5 that should be separately counted.

Interrogatory No. 6 (affirmative defenses):

Interrogatory 6 asks Correct Craft to identify all facts and documents regarding its ten affirmative defenses. The Court finds there are 20 distinct questions in Interrogatory No. 6 that should be separately counted.

Interrogatory Nos. 7-11 (counterclaims):

The Court finds that Interrogatory Nos. 7-11 each contain two distinct questions relating to identification of facts and identification of documents. These interrogatories should count as 10 separate interrogatories.

Interrogatory Nos. 2, 12, 13

Interrogatory No. 2 consists of one interrogatory. Interrogatory Nos. 12 and 13 each contain two distinct questions as to facts and documents. These interrogatories, therefore, total 5 in number.

6 asks Correct Craft to identify all facts and documents regarding its ten affirmative defenses. The Court finds there are 20 distinct questions in Interrogatory No. 6 that should be separately counted.

Based on the above, Plaintiff's 13 enumerated **[*14]** interrogatories actually contained 181 separate and distinct questions.

2. Undue Burden

Besides the grossly excessive number of interrogatories, the courts have long held that an interrogatory asking a party to identify *every* fact, document or witness in support of a denial or allegation of fact creates an unreasonable burden on the responding party. *See, Safeco, 181 F.R.D. at 447*. As aptly explained by another court:

To state 'all' facts in support of a negative proposition, of course, includes an inventory of evidence which defendant itself would offer at trial to refute the claims of plaintiff. Beyond that, however, it would further require defendant to provide essentially a review of facts and commentary to support its evaluation, if any, that the anticipated evidence of plaintiff as to each disputed paragraph of the complaint simply lacks weight or credibility. The request for 'all'

facts, based not only upon knowledge, but also upon simply information and belief, adds a significant and reasonable burden to the task of the answering party.

*Id., quoting Lawrence v. First Kansas Bank & Trust Co., 169 F.R.D. 657, 663 (D. Kan. 1996).* **[*15]** The Court finds that Plaintiff's interrogatories were inappropriate and created an undue burden upon Correct Craft.

For all the reasons stated above, Plaintiff's motion to compel is **DENIED.**

**DONE** and **ORDERED** in Orlando, Florida on October 25, 2006.

JAMES G. GLAZEBROOK

UNITED STATES MAGISTRATE JUDGE

# 8

*Portis v. City of Chicago,*
1997 U.S. Dist. LEXIS 15827, 2005 WL 991995 (N.D. Ill. April 15, 2005)

3 of 9 DOCUMENTS

**RONALD PORTIS, MADRIC LANCE, and EMMETT LYNCH,
individually and on behalf of a class, Plaintiffs, v. CITY OF CHICAGO, et
al. Defendants.**

**No. 02 C 3139**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT
OF ILLINOIS, EASTERN DIVISION**

*2005 U.S. Dist. LEXIS 7972*

**April 15, 2005, Decided**

**SUBSEQUENT HISTORY:** Motion granted by, in part, Motion denied by, in part *Portis v. City of Chicago, 2005 U.S. Dist. LEXIS 18241 (N.D. Ill., Aug. 24, 2005)*

**PRIOR HISTORY:** *Portis v. City of Chi., 347 F. Supp. 2d 573, 2004 U.S. Dist. LEXIS 26891 (N.D. Ill., 2004)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs, representatives of a class of persons who were arrested for nonviolent ordinance violations and detained, sued defendants, a city and city officials, asserting claims under *42 U.S.C.S. § 1983* for violations of their federal civil rights. Before the court was the city's motion to quash the class representatives' interrogatories and the class representatives' motion to compel responses to those interrogatories.

**OVERVIEW:** This was a class action suit challenging the way the city detained persons who were arrested for nonviolent ordinance violations that required only a fine. The court examined each of the interrogatories at issue and compelled the answers to some, while ruling that others were quashed. For example, the court determined that an interrogatory that sought requests for definitions of various terms used by the city in answers to

previous interrogatories sought unnecessary clarification. The terms "backlog," "personnel shortage," "personnel deployment," and "large groups" were not vague, but were understandable on their face. However, the city's reference to a 20:1 ratio of arrestees to police personnel required more clarification with respect to what information the ratio was derived from and who was included in each group. With respect to other interrogatories, the court declined to compel answers because it concluded that further information could be better pursued in depositions. However, to the extent that the city intended to present a report, analysis, or study at trial, the court noted that the city was required to supplement its answers to disclose any such information.

**OUTCOME:** The court granted the city's motion to quash in part, and denied it in part. Similarly, the court granted the class representatives' motion to compel in part, and denied it in part.

**CORE TERMS:** interrogatory, discovery, class members', personnel, backlog, classwide, arrestee, arrest, detention, shortage, arrested, releasing, custody, ratio, answers to interrogatories, supplemental, disclose, large number, police station, unavoidable delays, deployment, interrog, supplemental answers, unusual circumstances, processing, ordinance, myriad, intend, watch, logs

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Pleadings > Answers*
*Civil Procedure > Discovery > Methods > Interrogatories > Use*
*Evidence > Demonstrative Evidence > General Overview*

[HN1] The use of interrogatories is governed by *Fed. R. Civ. P. 33*, which is intended to enable a party to prepare for trial, to narrow the issues and thus help determine what evidence will be needed at the trial, and to reduce the possibility of surprise at trial. The primary purpose for interrogatories is to help determine the existence, identity, and location of witnesses, documents and other tangible evidence as a prerequisite to planning further discovery. Under *Rule 33*, each interrogatory must be answered separately and fully in writing under oath, unless it is objected to, in which event the objecting party shall state the reasons for objection and shall answer to the extent the interrogatory is not objectionable. *Fed. R. Civ. P. 33(b)(1)*. *Rule 33* thus imposes a duty to provide full answers to interrogatories--i.e., all the information within the responding party's knowledge and control.

*Civil Procedure > Discovery > Methods > General Overview*
*Civil Procedure > Discovery > Privileged Matters > General Overview*
*Civil Procedure > Discovery > Undue Burdens*

[HN2] Although as a general matter, parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim of defense of any party, *Fed. R. Civ. P. 26(b)(1)*, discovery is not without limits. The manner and scope of discovery must be tailored to some extent to avoid harassment or being oppressive. A court has power under *Fed. R. Civ. P. 26(b)(2)* to limit the frequency or extent of use of otherwise permissible discovery methods if the discovery sought is unreasonably cumulative or duplicative, if the discovery is obtainable from some other source that is more convenient, less burdensome, or less expensive, if the party seeking discovery has had ample opportunity to obtain the information sought, and/or if the burden or expense of the discovery outweighs its likely benefits.

*Civil Procedure > Pleading & Practice > Pleadings > Answers*
*Civil Procedure > Discovery > Methods > Interrogatories > General Overview*

[HN3] Under *Fed. R. Civ. P. 33(d)*, if a party opts to produce business records rather than provide a written response to an interrogatory because the burden of ascertaining the answer is substantially the same for each side, the responding party must specifically identify the records from which the answer may be obtained.

*Civil Procedure > Discovery > Disclosures > General Overview*
*Civil Procedure > Discovery > Methods > Interrogatories > General Overview*

[HN4] Under *Fed. R. Civ. P. 26(e)(2)*, parties have a duty to supplement their interrogatory answers. Further, if parties fail to properly supplement their answers as required by *Rule 26(e)(2)*, they will be barred under *Fed. R. Civ. P. 37(c)(1)* from using evidence at trial that has not been disclosed, unless the failure is harmless.

*Civil Procedure > Class Actions > Judicial Discretion*
*Civil Procedure > Discovery > Methods > Interrogatories > General Overview*

[HN5] Under *Fed. R. Civ. P. 33*, a party has a right to serve 25 written interrogatories upon another party, and may obtain leave of court to serve additional interrogatories consistent with the principles of *Fed. R. Civ. P. 26(b)(2)*.

**COUNSEL:** [*1] For Ronald Portis, individually and on behalf of a class, Plaintiff: Thomas Gerard Morrissey, Thomas G. Morrisey, Chicago, IL; Judson H. Miner, Miner Barnhill & Galland, Chicago, IL; Mark G. Weinberg, Attorney at Law, Chicago, IL; Robert Hugh Farley, Jr., Robert H. Farley, Jr. Ltd., Naperville, IL.

For Mardric E Lance, Emmett Lynch, individually and on behalf of a class., Plaintiffs: Judson H. Miner, Miner Barnhill & Galland, Chicago, IL;

2005 U.S. Dist. LEXIS 7972, *

Robert Hugh Farley, Jr., Robert H. Farley, Jr. Ltd., Naperville, IL.

For City of Chicago, a Municipal corporation, Terry G Hillard, Superintendent of the Chicago Police Department, Joseph Griffin, Francis Kehoe, Evert Johnson, Robert Johnson, Defendants: Amy Renee Skaggs, City of Chicago, Department of Law, Chicago, IL; Brian Joseph Murray, June K. Ghezzi, Morgan Reid Hirst, Jones Day, Chicago, IL; Mara Stacy Georges, Corporation Counsel, City of Chicago, Chicago, IL.

For Joan Riskey, Defendant: Brian Joseph Murray, June K. Ghezzi, Morgan Reid Hirst, Jones Day, Chicago, IL.

**JUDGES:** Magistrate Judge Nan R. Nolan, Judge Robert W. Gettleman.

**OPINION BY:** NAN R. NOLAN

**OPINION**

**MEMORANDUM OPINION & ORDER**

Plaintiffs Ronald Portis, Mardric Lance **[*2]** and Emmett Lynch have brought this class action lawsuit against defendants City of Chicago, Terry Hillard, Joseph Griffin, John Riskey, Francis Kehoe, Evert Johnson and Robert Johnson asserting claims under *42 U.S.C. § 1983* for violations of their federal civil rights. Plaintiffs, who were arrested for nonviolent ordinance violations which impose only a fine, allege they were "unlawfully detained for prolonged periods of time after completion of all administrative steps incident to their arrests for non-custodial ordinance violations," in violation of their civil rights. *Portis v. City of Chicago, 2004 U.S. Dist. LEXIS 10609, No. 02 C 3139, 2004 WL 1284010, at *1 (N.D. Ill. June 10, 2004).* [1] This matter is before the court for ruling on *Defendant's Motion to Quash Plaintiffs' Twelfth Set of Interrogatories* [2] and *Plaintiffs' Motion to Compel,* which seeks responses to plaintiffs' twelfth set of interrogatories. As explained below, both defendants' motion to quash and plaintiffs' motion to compel are granted in part and denied in part.

1    The district court has certified a class defined as "all persons who, during the class period, were arrested on ordinance violations which carry no jail time in the City of Chicago and who were detained for more than two hours after all administrative steps incident to the arrest, except non-discretionary ministerial acts, were completed." *Id.*

**[*3]**

2    According to defendants, the interrogatories at issue are actually the thirteenth set of interrogatories served by plaintiffs. The court shall refer to the interrogatories as the twelfth set, however, because that is the title on the discovery served by plaintiffs.

**Background**

Plaintiffs' twelfth set of interrogatories relate to interrogatories 5 and 6 from plaintiffs' fifth set of interrogatories. On August 19, 2004, plaintiffs served defendants with a fifth set of interrogatories which asked, as relevant here, whether "there is a classwide explanation for the detention of arrestee-class members that exceeds four hours from the time of arrest to the time of release" (interrogatory number 5) and whether "there is a classwide explanation for the detention of arrestee-class members that exceeds two hours from the time of lockup and booking to the time of release" (interrogatory number 6). (Pls.' Mot., Ex 2.) On October 26, 2004, plaintiffs filed a motion to compel answers to interrogatories 5 and 6 (as well as others), [3] because defendants had not yet filed any answers or objections. **[*4]** Plaintiffs withdrew that motion to compel on November 4, 2004, however, after receiving responses from defendants. In *Defendants' Answers and Objections to Plaintiffs' Fifth Set of Interrogatories* dated November 2, 2004, in addition to raising several objections to interrogatories 5 and 6, defendants answered that "the arrestee class members' detentions lasted less than 48 hours and are thus presumptively reasonable under the governing Supreme Court law set forth in *County of Riverside v. McLaughlin [500 U.S. 44, 114 L. Ed. 2d 49, 111 S. Ct. 1661 (1991)]* and its progeny." [4] (Defs.' Mot. to Quash, Ex. 3.)

3    *See Plaintiffs' Motion to Compel Defendants to Provide Answers to Plaintiffs'*

2005 U.S. Dist. LEXIS 7972, *

*Second Supplemental Interrogatories and Fifth Set of Interrogatories* (Docket 158).
4  The district court has previously rejected defendants' reliance on the *Riverside* forty-eight hour rule. *E.g., Portis v. City of Chicago, 2004 U.S. Dist. LEXIS 10609, No. 02 C 3139, 2004 WL 1284010, at *1-2 (N.D. Ill. June 10, 2004).*

On December 8, 2004, plaintiffs **[*5]** filed a second motion to compel answers to interrogatories 5 and 6 (as well as others), [5] asserting that defendants' answers to those interrogatories were nonresponsive. In briefing that motion, defendants took the position that the *Riverside* explanation was their answer, whereas plaintiffs contended that the *Riverside* explanation was really an objection that no explanation was necessary. At the hearing on the motion to compel on January 11, 2005, the court informed the parties that it made no difference whether the *Riverside* explanation was characterized as an answer or objection. Rather, the significant issue was whether defendants intended to offer a classwide explanation at trial for the length of the class members' detentions other than their *Riverside* explanation. In other words, if defendants intended to rely solely on their *Riverside* explanation, they were entitled to do so, but if there was more to their defense, they had to disclose their position. The court thus ruled that if defendants intended to offer a classwide explanation other than their *Riverside* explanation at trial, defendants had to disclose the classwide explanation by supplementing their **[*6]** answers to interrogatories 5 and 6 no later than Friday, January 14, 2005. (Minute Order of 1.11.05.) [6]

5  *See Plaintiffs' Motion to Compel Defendants to Provide Answers to Plaintiffs' Second Supplemental Set of Interrogatories and Fifth Set of Interrogatories* (Docket 181).
6  Neither party appealed this order.

In *Defendants' Court-Ordered Supplemental Answers and Objections to Interrogatories 5 and 6 of Plaintiff's Fifth Set of Interrogatories,* in addition to raising further objections and noting that their investigation continued, defendants supplemented their answers as follows:

The evidence shows that the length of the detentions was reasonable under the *Fourth Amendment*. There is a natural and widespread backlog within the Chicago Police District stations that existed during the class period, and that exists where there is a ratio of arrestees to total police force of approximately 20:1, let alone a ratio of arrestees to the personnel working intake, processing and release at the district **[*7]** stations, which far outstrips 20:1. Similarly, unavoidable delays can be caused by there being a large number of arrestees on a given night in a given district, there being people [that] are arrested in large groups, transporting arrested persons from one facility to another, personnel shortages, personnel deployment, unusual circumstances in a district, and myriad other practical realities. The unavoidable delays that occur, combined with the total lack of any evidence of improper purpose creating such delay, establishes that the length of the detentions was reasonable.

(Defs.' Mot. to Quash, Ex. 4.) After reviewing the supplemental answers, in a minute order dated January 19, 2005, the court denied plaintiffs' motion to compel as it related to interrogatories 5 and 6, noting that defendants had supplemented their answers and further explained their objections.

According to plaintiffs, the supplemental answers to interrogatories 5 and 6 are vague, not fully responsive, and fail to address important parts of the questions. Rather than returning to court with another motion to compel or appealing the court's order of January 19, 2005, plaintiffs opted to serve the twelfth **[*8]** set of interrogatories and an accompanying document request in an effort to obtain further detail. For example, in the twelfth set of interrogatories, plaintiffs ask defendants (1) to define the term backlog used in the supplemental answers, (2) to identify, by date and police station, when a backlog existed that explains the delays in releasing class members from detention, (3) to

explain in detail how a backlog causes or explains such delays, (4) to identify all documents, including but not limited to reports, studies, or analyses, that explain that a backlog causes or explains such delays, (5) to identify each person who will testify to the fact that a backlog explains or causes such delays, and (6) to identify and explain all reasons why class members were not issued a ticket rather than arrested "once they were identified and it was determined that there were no warrants for their arrest or when it was determined that they would not be fingerprinted when a backlog exists." (Pls.' Mot., Ex. 6, Interrog. 3.) Plaintiffs ask similar questions regarding the 20:1 ratio, personnel shortages, personnel deployment, arrests of people in large groups, etc.

Defendants now ask the court to [*9] quash plaintiffs' twelfth set of interrogatories, contending that some of the questions are repetitive of previously served interrogatories, and that the remainder of the interrogatories are abusive and oppressive. Plaintiffs counter with a motion to compel responses to the twelfth set of interrogatories, which plaintiffs characterize as "specific, focused discovery seeking information that is not only relevant but necessary and that has not been provided." (Pls.' Mot. Compel at 3.)

**Discussion**

[HN1] The use of interrogatories is governed by *Rule 33 of the Federal Rules of Civil Procedure*, "which is intended to enable a party to prepare for trial, to narrow the issues and thus help determine what evidence will be needed at the trial, and to reduce the possibility of surprise at trial." Wright, Miller & Marcus, *Federal Practice & Procedure: Civil 2d* § 2162. According to the Manual for Complex Litigation, the primary purpose for interrogatories is to "help determine the existence, identity, and location of witnesses, documents and other tangible evidence as a prerequisite to planning further discovery." *Manual for Complex Litigation,* [*10] *Fourth,* § 11.461 (1994). Under *Rule 33*, each interrogatory must be "answered separately and fully in writing under oath, unless it is objected to, in which event the objecting party shall state the reasons for objection and shall answer to the extent the interrogatory is not objectionable." *Fed. R. Civ. P. 33(b)(1). Rule 33* thus imposes a duty to provide

full answers to interrogatories--*i.e.,* all the information within the responding party's knowledge and control. *Bell v. Woodward Governor Co., 2005 U.S. Dist. LEXIS 4451, No. 03 C 50190, 2005 WL 289963, at *2 (N.D. Ill. Feb. 7, 2005)*; *Hanley v. Como Inn, Inc., 2003 U.S. Dist. LEXIS 7130, No. 99 C 1486, 2003 WL 1989607, at *4 (N.D. Ill. Apr. 28, 2003).*

[HN2] Although as a general matter, parties "may obtain discovery regarding any matter, not privileged, that is relevant to the claim of defense of any party[,]" *Fed. R. Civ. P. 26(b)(1)*, discovery is not without limits. "The manner and scope of discovery must be tailored to some extent to avoid harassment or being oppressive." *Ocean Atlantic Woodland Corp. v. DRH Cambridge Homes, Inc., 262 F. Supp. 2d 923, 926-927 (N.D. Ill. 2003).* [*11] A court has power under *Rule 26(b)(2) of the Federal Rule of Civil Procedure* to limit the frequency or extent of use of otherwise permissible discovery methods if the discovery sought is unreasonably cumulative or duplicative, if the discovery is obtainable from some other source that is more convenient, less burdensome, or less expensive, if the party seeking discovery has had ample opportunity to obtain the information sought, and/or if the burden or expense of the discovery outweighs its likely benefits. *Fed. R. Civ. P. 26(b)(2)*; *Patterson v. Avery Dennison Corp., 281 F.3d 676, 681 (7th Cir. 2002).*

Defendants' answers to interrogatories 5 and 6, as supplemented, provide a broad statement of defendants' classwide explanation for the length of the class members' detentions. In a nutshell, defendants' position is that there is natural and widespread backlog in processing arrestees at police stations throughout the City of Chicago. Plaintiffs contend defendants' answers are completely inadequate. While the court agrees that plaintiffs are entitled to some additional detail, plaintiffs' [*12] twelfth set of interrogatories are riddled with problems, ranging from being cumulative to being burdensome. As explained below, the court is quashing the twelfth set of interrogatories in part, but ordering defendants to provide some of the information sought in the twelfth set of interrogatories.

**A. Interrogatories 1 & 2**

The first interrogatory of the twelfth set asks defendants to describe in detail all of the reasons why "class members individually or as a class were not issued a ticket once they were identified and it was determined that there were no outstanding warrants for their arrest." (Pls.' Mot., Ex. 6.) This interrogatory is cumulative of discovery previously served, yet more oppressive. The court has given plaintiffs broad latitude to take discovery regarding the City of Chicago's policies and practices for issuing tickets and for arresting persons who violate non-jailable ordinances, and to discover information regarding individuals who have been ticketed for non-jailable ordinance violations. (*E.g.,* Order of 7.6.04; Order of 1.11.05; Minute Order of 1.19.05.) Asking for each and every individual and classwide reason that the arrestee class members were not [*13] ticketed instead of arrested, however, takes the ticketing discovery one step further, crossing into the realm of unreasonably burdensome discovery. There are thousands of class members in this case, and as plaintiffs themselves acknowledge, they are challenging the reasonableness of the lengths of their detentions, not the fact that they were arrested. Because interrogatory number one exceeds the limits of fairness, that interrogatory is quashed. [7]

> 7    To be clear without being repetitive, where the court grants defendants' motion to quash as it relates to a particular interrogatory, plaintiffs' motion to compel is denied. Likewise, where the court grants plaintiffs' motion to compel regarding a particular interrogatory, defendants' motion to quash is denied.

The second interrogatory asks defendants to describe in detail the steps involved in processing the class members as of January 1, 2000 between the time the arrestees were issued a CB number and the time they were released, to describe any changes in those [*14] processing steps since January 1, 2000, and to explain the reason for any such changes. This interrogatory is unrelated to interrogatories 5 and 6 of the fifth set, and defendants offer no particular reason why the interrogatory should be quashed. Accordingly, regarding the second interrogatory, defendants' motion to quash is denied and plaintiffs' motion to compel is granted.

## B. Interrogatories 3-11

Interrogatories 3-11 ask defendants detailed questions regarding terms used in their supplemental answers to interrogatories 5 and 6 from the fifth set. For example, as explained earlier, interrogatory three asks defendants (1) to define the term backlog used in the supplemental answers, (2) to identify, by date and police station, when a backlog existed that explains the delay in releasing class members from detention, (3) to explain in detail how backlog causes or explains such delays, (4) to identify all documents, including but not limited to reports, studies, or analyses, that explain that a backlog causes or explains such delays, (5) to identify each person who will testify to the fact that a backlog explains or causes such delays, and (6) to identify and explain all reasons [*15] why class members were not issued a ticket rather than arrested "once they were identified and it was determined that there were no warrants for their arrest or when it was determined that they would not be fingerprinted when a backlog exists." (Pls.' Mot., Ex. 6, interrog. 3.) Plaintiffs follow with similar questions regarding the terms "20:1 ratio" (interrogatory 4), "a large number of arrestees" (interrogatory 5), "large groups" (interrogatory 6), "personnel shortage" (interrogatory 8), "personnel deployment" (interrogatory 9), and also asks comparable questions regarding how the transportation of arrestees from one facility to another causes unavoidable delays, and what types of "unusual circumstances" and "myriad other practical realities" cause such delays (interrogatories 7, 10-11 respectively).

Aside from one exception, plaintiffs' requests for definitions of various terms seek unnecessary clarification. The terms "backlog," "personnel shortage," "personnel deployment," "large number of arrestees" and "large groups" are not vague--they are understandable on their face. Moreover, those terms do not seem amenable to a precise definition, at least in the context of defendants' [*16] classwide explanations. Plaintiffs understandably want more information regarding how, for example, a "large number of arrestees" or a "large group" creates an unavoidable delay in processing or otherwise contribute to backlog in a police station. Requiring defendants to come up with a definition

is not the answer, however. Rather, in the court's view, those are areas plaintiffs can more effectively explore through depositions, which allow greater flexibility than interrogatories for plaintiffs to frame questions and follow-up on the answers. Wright, Miller & Marcus, *Federal Practice & Procedure: Civil 2d* § 2163. The term "20:1 ratio," on the other hand, requires further explanation. Plaintiffs seek a definition "in terms of the type of police personnel included (*e.g.,* does it include all people on duty, civilian personnel, etc.) and the type of arrestees (*e.g.,* felony, misdemeanor, etc.) That is a reasonable inquiry which defendants are ordered to answer to the best of their ability. Additionally, defendants are directed to identify what information the 20:1 ratio is derived from. Likewise, defendants are directed to respond, to the full extent possible, to subpart (e) **[*17]** of interrogatory 4, which asks defendants to "state the desired ratio of police personnel and arrestees and identify all documents that support defendants answer." (Pls.' Mot., Ex. 6, interrog. 4(e).)

In subpart (a) of interrogatories 3-6 and 8-11, plaintiffs ask defendants to identify, by date and police station, when a given problem--backlog, the 20:1 ratio, large number of arrestees, the arrest of large groups, personnel shortages, personnel deployment issues, unusual circumstance, and myriad other practical realities--existed that explains the delay in releasing class members from detention. (*See* Pls.' Mot., Ex. 6, subpart, (a) of Interrogs. 3-6 and 8-11.) This request imposes an unreasonable burden on defendants. To answer plaintiffs' request, defendants would have to examine the events that took place at every police station in the city every day for a period several years. If defendants have conducted such an analysis, the court will require them to disclose the results (as discussed further below). However, certain statements made by defense counsel at the hearing on March 15, 2005 left the court with the understanding that defendants have not performed such an analysis. **[*18]** Perhaps an analysis of the daily events taking place at police stations across the city would bolster defendants' classwide explanation. But if defendants have decided not perform such analysis, the court will not order them to do so. It is their prerogative to decide how to present their defense. (*But see* Section D below regarding duty to disclose and to supplement).

Subpart (a) of interrogatories 3-6 and 8-11 are therefore quashed.

In subpart (b) of interrogatories 3-11, plaintiffs ask defendants to explain in detail how a particular problem (backlog, the 20:1 ratio, a large number of arrestees, the arrests of large groups, transportation of arrested persons from one facility to another, a personnel shortage, personnel deployment issues, unusual circumstances, and myriad other practical realities) causes or explains unavoidable delays in releasing class members from custody. (*See* Pls.' Mot., Ex. 6, subpt. (b) of interrogs. 3-11.) On a general level, the crux of defendants' classwide explanation is evident from the supplemental answers: in busy, metropolitan police stations like Chicago's, there regularly is a backlog of work to do, and the backlog is exacerbated when there **[*19]** are a large number of arrestees, personnel shortages, etc. To the extent plaintiffs wish to explore defendants' explanation in greater detail and explore whether particular problems occur routinely or on a sporadic basis, plaintiffs can more efficiently accomplish their goal through depositions, which are preferable to interrogatories "if a searching interrogation of the other party is desired." Wright, Miller & Marcus, *Federal Practice & Procedure: Civil 2d* § 2163. As noted earlier, depositions offer greater flexibility than interrogatories for plaintiffs to frame questions, follow up on the deponent's answers, and clarify evasive answers. *Id.* As a result, the court quashes subpart (b) of interrogatories 3-11.

Plaintiffs also ask defendants to identify all documents that explain how a particular problem (backlog, personnel shortages, arrests of large groups, etc.) causes or explains unavoidable delays in releasing class members from police custody. In their supplemental answers, defendants identified five categories of documents: "(i) the arrest reports of the members of the class certified by Judge Gettleman on March 5, 2003; (ii) watch commander logs, rosters of persons **[*20]** in custody, and detention reports for the dates of the arrests of the members of the class certified by Judge Gettleman on March 5, 2003; (iii) the general orders previously produced in this case; (iv) any statistical analysis of any of the above; and (v) annual reports of the Chicago Police Department." (Pls.' Mot., Ex. 6 at 7.) Plaintiffs contend they need more specific

responses, so in subpart (c) of interrogatories 3-11, plaintiffs ask defendants to identify all documents, including but not limited to any reports, studies or analyses, that explain or demonstrate how a particular problem (*e.g.,* backlog, the 20:1 ratio, personnel shortages, etc.) explains the delay in releasing class members after they have been assigned a CB number. (Pls.' Mot., Ex. 6., interrogs. 3-11 at subpart (c).) At the hearing on March 15, 2005, plaintiffs further informed the court that although they do not need more specific responses relating to the arrest reports and general orders, they need defendants to produce the Chicago Police Department's annual reports, and they need more specific responses regarding which watch commander logs, rosters of persons in custody, and detention reports defendants **[*21]** are relying on to support their classwide defense.

From the twelfth set of interrogatories, it is clear that plaintiffs want to know whether defendants have done any analysis of the documents that supports defendants' classwide explanation, and if so, plaintiffs want to review any reports, studies or analyses that exist. Although defendants' supplemental answers to interrogatories 5 and 6 of the fifth set reference "any statistical analysis" of the arrest reports, watch logs, detention reports and logs of persons in custody, at the hearing on March 15, 2005, defendants' counsel reported that they have not undertaken such an analysis, at least not at this point. As noted earlier, it is defendants' prerogative to determine how to defend their case--the court will not order defendants to conduct an analysis to support their theory. But in the event defendants intend to offer an analysis, report, or study in support of their classwide explanation, defendants must disclose any such analysis, report or study in time for plaintiffs to take necessary discovery. *See Fed. R. Civ. P. 26(e)(2)* (requiring supplemental disclosures to interrogatories when **[*22]** warranted); *Fed. R. Civ. P. 37(c)(1)* (barring parties from using evidence at trial that is responsive to discovery requests but has not been disclosed, unless the failure to disclose is harmless). It is unclear whether this is something defendants intend to pursue, and if so, whether it is something they intend to pursue through a fact witness, through an expert witness, or both. If defendants plan to offer *only* expert testimony on the matter, disclosure can wait until

expert discovery. If, however, defendants intend to present a report, analysis or study through a fact witness, defendants must supplement their interrogatory answers and disclose any such report, analysis or study no later than April 29, 2005, in order to allow plaintiffs time to take any necessary, additional discovery before fact discovery closes on May 16, 2005.

Regarding identification of documents supporting their classwide defense, defendants are also ordered to produce the annual reports of the Chicago Police Department that are referenced in defendants' supplemental answers to interrogatories 5 and 6. As for plaintiffs' oral request for more specificity regarding **[*23]** which watch commander logs, rosters of persons in custody, and detention reports defendants are relying on to support their classwide defense, the court declines to order defendants to identify such documents by bates number because it would be unreasonably burdensome to require defendants to make such specific identifications. [8] There are a large number of detention reports, and for every day of the class period, which spans several years, there are three watch commander logs per day and a roster of persons in custody for each of the three daily shifts. In addition to being burdensome, such an order would be tantamount to ordering defendants to perform an analysis that, thus far, they have chosen not to undertake. Defendants' motion to quash is granted in part and denied in part as it relates to subpart (c) of interrogatories 3-11.

> 8   [HN3] Under *Rule 33(d) of the Federal Rules of Civil Procedure*, if a party opts to produce business records rather than provide a written response to an interrogatory because the burden of ascertaining the answer is substantially the same for each side, the responding party must specifically identify the records from which the answer may be obtained. *Fed. R. Civ. P. 33(d)*. Here, however, defendants did not invoke *Rule 33(d)*--they provided a written explanation of their classwide defense, albeit a broad one.

**[*24]**   The next issue relates to defendants' identification of witnesses with knowledge regarding their classwide defense. Interrogatories 5 and 6 of the fifth set asked defendants to identify all

witnesses with knowledge of defendants' classwide explanations. In their supplemental responses, defendants identified as witnesses all members of the class, and "all members of the Chicago Police Department who were involved in the arrests and detentions and who might appear on the arrest records produced to plaintiffs, including arresting officers, watch commanders, desk sergeants and lockup personnel, many of whom have already been deposed in this action, including but not limited to all witnesses produced for deposition pursuant to *Rule 30(b)(6)* notice." (Defs.' Mot. to Quash, Ex. 4 at 7.) In subpart (d) of interrogatories 3-11 of the twelfth set, plaintiffs followed up with a more specific request, asking defendants to identify each person who will testify to the fact that a particular problem (backlog, personnel shortages, etc.) explains or causes the delays in releasing class members from police custody. (Pls.' Mot., Ex. 6, interrogs. 3-11, subpart (d).) Although defendants' supplemental **[*25]** responses to interrogatories 5 and 6 responded to the interrogatories as originally posed, the court finds that at this stage in discovery, in order to avoid the unfair surprise at trial, plaintiffs are entitled to a list of which witnesses defendants are likely to call to testify regarding its classwide defense. Plaintiffs need to decide which witnesses to depose, and they cannot make an informed decision when the pool of potential witnesses includes every class member and every police officer who interacted with the class members. Accordingly, the court denies the motion to quash as it relates to subpart (d) of interrogatories 3-11.

In subpart (e) of interrogatories 3 and 5-11 of the twelfth set, plaintiffs ask defendants to identify and explain all reasons--including but not limited to policy, custom and practice reasons--why class members were not issued a ticket rather than arrested "once they were identified and it was determined that there were no warrants for their arrest or when it was determined that they would not be fingerprinted" when a particular problem (backlog, personnel shortages, arrests of large groups, etc.) would cause a delay in their release. (Pls.' Mot., Ex. **[*26]** 6, subpart (e) of interrogatories 3, 5-11.) Like the first interrogatory of the twelfth set discussed earlier, the court finds these requests cumulative of the ticketing discovery

previously served, yet more oppressive. Subpart (e) of interrogatories 3 and 5-11 are therefore quashed.

Interrogatory number 7 of the twelfth set relates to defendants' position that the transportation of arrested persons from one facility to another contributes to delays in releasing the class members. The court has already ruled on each part of interrogatory 7 except for subpart (a). In subpart (a) of interrogatory number 7, plaintiffs ask defendants (1) to state whether there are circumstances in which a person who is arrested for non-jailable ordinance violation would be transferred from one facility to another *after* the police have identified the arrestee, determined that there are no outstanding warrants, determined that the arrestee will not be fingerprinted, and have issued the arrestee a CB number; (2) if so, to state under what circumstances a transfer would occur; and (3) to identify all documents, including Chicago Police Department General Orders, relating to such transfers. This is a reasonably **[*27]** focused inquiry, aside from the request to identify documents, which could be construed broadly. [9] The court limits the request for identification of documents to Chicago Police Department General Orders and documents reflecting policies, practices or customs relating to transfers. With that limitation, the court otherwise denies defendants' motion to quash as it relates to subpart (a) of interrogatory 7.

> 9    For example, assuming there are circumstances in which class members would be transferred to another facility after many of the processing steps have taken place, the request for identification of documents could be broadly construed to require defendants to identify every document relating to every class member who was transferred from one facility to another. Such a requirement would require defendants to search through the records relating to every class member, and thus would impose an unreasonable burden.

In the initial paragraph of interrogatories 10 and 11 of the twelfth set, plaintiffs ask defendants **[*28]** to identify each "unusual circumstance" and to identify the "myriad of other practical realities" that explain unavoidable delays in releasing the class

members from custody. [10] It is evident that defendants used those terms as catch-all expressions. Defendants need not further clarify those phrases in their written interrogatory answers at this time, however, as addressed in Section D below, defendants have a duty to supplement their interrogatory answers under *Rule 26(e)(2)*. Additionally, plaintiffs may explore the "unusual circumstances" and "myriad of other practical realities" in depositions.

> 10   The court has already ruled on subparts (a-e) of interrogatories 10-11 in other parts of this opinion.

## C. Interrogatory 12

The last interrogatory of the twelfth set, interrogatory 12, asks defendants to identify by title all databases containing computer-accessible information that the City of Chicago maintains (or has maintained, or has access to) that contain information regarding (a) arrests, (b) names [*29] of arrestees, (c) date, time, shift, station and/or district of arrest, and (d) personnel, staffing and deployment data by date, shift, station and/or district. Defendants raised no specific objection to interrogatory 12, and the court finds that it is a reasonably focused inquiry regarding information relevant to defendants' classwide defenses. Accordingly, the court denies defendants' motion to quash as it relates to interrogatory 12.

## D.  Defendants' Duty to Supplement Interrogatory Answers under *Rule 26(e)(2)*

The court reminds defendants that [HN4] under *Rule 26(e)(2) of the Federal Rules of Civil Procedure*, they have a duty to supplement their interrogatory answers. *Fed. R. Civ. P. 26(e)(2)*. Further, if defendants fail to properly supplement their answers as required by *Rule 26(e)(2)*, defendants will be barred under *Rule 37(c)(1)* from using evidence at trial that has not been disclosed, unless the failure is harmless. *Fed. R. Civ. P. 37(c)(1)*; *For Your Ease Only, Inc. v. Calgon Carbon Corp., 2003 U.S. Dist. LEXIS 20267, No. 02 C 7345, 2003 WL 22682361, at *2 (N.D. Ill. Nov. 12, 2003).* **[*30]** In other words, if defendants' persist with their broad classwide explanation in response to interrogatories 5 and 6, they are stuck with those answers and will not be

permitted to present more specific, detailed evidence at trial that has not been disclosed to plaintiffs. By way of example only, if defendants persist with the broad explanation that "personnel shortages" contribute to the delays in releasing class members from custody, defendants should not expect to present a statistical analysis regarding personnel shortages at trial to support their general explanation. [11]

> 11   If plaintiffs' interrogatories relate to issues that defendants intend to address inexpert discovery, defendants should disclose those intentions.

## E. Objection to the Number of Interrogatories Served by Plaintiffs

Defendants have also objected that plaintiffs have far exceeded the number of interrogatories permitted as of right under *Rule 33 of the Federal Rules of Civil Procedure.* [HN5] Under **[*31]** *Rule 33*, a party has a right to serve 25 written interrogatories upon another party, and may obtain leave of court to serve additional interrogatories "consistent with the principles of *Rule 26(b)(2).*" *Fed. R. Civ. P. 33*. Earlier in discovery, the court exercised its discretion under *Rule 26(b)(2)* to expand the limit on the number of interrogatories because this is a class action lawsuit. Specifically, in an order issued July 6, 2004, the court overruled defendants objection that plaintiffs had exceeded the 25 interrogatories permitted under *Rule 33*, "primarily because this is a complex class action involving multiple plaintiffs." (Order of 7.6.04 at 2 n.1, docket 114.) The court further explained that it had no intention of permitting unlimited interrogatories, and directed the parties to be prepared to address the appropriate limits at the next status. (*Id.*) The issue regarding interrogatory limits fell through the cracks, however, and has not been addressed yet. Although the court does not know how many interrogatories the parties have served, it is clear that plaintiffs have served more than 25 interrogatories. [12] The court has not based **[*32]** its ruling on defendants' motion to quash and plaintiffs' motion to compel on the number of interrogatories that have been served. However, at the hearing on April 27, 2005, the parties should be prepared to address how much additional written

discovery (if any) they anticipate serving in this matter.

12   Defendants contend that plaintiffs have served more than 200 interrogatories, counting subparts. (Defs.' Mot. to Quash P 16.) The accuracy of that count is questionable, however. "An interrogatory containing subparts directed at eliciting details concerning a 'common theme' should generally be considered a single question. On the other hand, an interrogatory which contains subparts that inquire into discrete areas should, in most cases, be counted as more than one interrogatory." *Swackhammer v. Sprint Corp. PCS, 225 F.R.D. 658, 664-665 (D. Kan. 2004)*. According to defendants' count, the twelfth set of interrogatories alone totals 49 interrogatories counting subparts, yet by the court's count, the total is more like 12. Defendants likely counted every subpart as a separate interrogatory, but in the court's view, most of the subparts for each of the 11 interrogatories were directed at the common theme of the particular interrogatory. The exception was subpart (e) included in interrogatories 3, 5, 7-11 which asks for the reasons the class members were not ticketed. The court deems this an inquiry into a separate, discrete area, and counts it as a twelfth interrogatory.

**[*33] Conclusion**

For the reasons set forth above, defendants' motion to quash plaintiffs' twelfth set of interrogatories is granted in part and denied in part, as is plaintiffs' motion to compel responses to those interrogatories. To the extent defendants' motion to quash is denied, defendants have 14 days to answer plaintiffs' twelfth set of interrogatories. Additionally, if defendants intend to present a report, analysis or study in support of their classwide defenses through a fact witness (as opposed to an expert witness), defendants must supplement their interrogatory answers and disclose any such report, analysis or study no later than April 29, 2005, in order to allow plaintiffs time to take any necessary, additional discovery before fact discovery closes on May 16, 2005.

ENTERED:

NAN R. NOLAN

United States Magistrate Judge

Dated: April 15, 2005

# 9

*Ridge Chrysler Jeep, L.L.C. v. Daimler Chrysler Servs. N. Am., L.L.C.,*
2004 U.S. Dist. LEXIS 26861 (N.D. Ill. Dec. 29, 2004)

LEXSEE 2004 U.S. DIST. LEXIS 26861

**RIDGE CHRYSLER JEEP L.L.C., d/b/a MARQUETTE CHRYSLER JEEP
and SALES, INC., d/b/a DODGE OF MIDLOTHIAN, Plaintiffs, vs.
DAIMLER CHRYSLER SERVICES NORTH AMERICA, L.L.C. d/b/a
CHRYSLER FINANCIAL COMPANY, L.L.C., Defendant.**

**Case No.: 03 C 760**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT
OF ILLINOIS, EASTERN DIVISION**

*2004 U.S. Dist. LEXIS 26861*

**December 29, 2004, Decided
December 30, 2004, Docketed**

**SUBSEQUENT HISTORY:** Dismissed by *Ridge Chrysler Jeep, LLC v. Daimlerchrysler Servs. N. Am. LLC, 2006 U.S. Dist. LEXIS 63664 (N.D. Ill., Sept. 6, 2006)*

**PRIOR HISTORY:** *Ridge Chrysler Jeep, L.L.C. v. Daimler Chrysler Servs. N. Am., L.L.C., 2003 U.S. Dist. LEXIS 21754 (N.D. Ill., Dec. 2, 2003)*

**DISPOSITION:** Defendant's Motion to Strike Plaintiffs' Expert granted, and Plaintiffs' Motion to Compel Discovery denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs, automobile dealerships, sued defendant, a finance company, alleging breach of contract, tortious interference with prospective business or economic advantage, violation of the Automobile Dealers' Day in Court Act, and violation of the Illinois Motor Vehicle Franchise Act. The company moved to strike the dealerships' expert witness. The dealerships moved to compel discovery.

**OVERVIEW:** The company claimed that it was prejudiced by the dealerships' unexplained failure to disclose their expert witness in a timely manner pursuant to *Fed. R. Civ. P. 26(a)(2)*. The court held

that the dealerships' expert witness testimony would be excluded because the dealerships failed to disclose their expert witness, as required under *Fed. R. Civ. P. 26(a)(2)* until four months after the expert disclosure deadline had passed and the dealerships failed to demonstrate that their tardy expert witness disclosure was justified. The court then held that the dealerships were not entitled to their requested discovery because they failed to comply with the requirements under *Fed. R. Civ. P. 37(a)(2)(B)* and U.S. Dist. Ct., N.D. Ill., E. Div., R. 37.2. The court found that the dealerships waited until four days before the close of discovery to file their motion to compel concerning discovery issues which were well known to the dealerships and which the company had addressed, and reasonably assumed were resolved, over one year previously, and that the dealerships failed to show that they attempted to consult with the company's counsel regarding their requests.

**OUTCOME:** The company's motion to strike the dealerships' expert was granted. The dealerships' motion to compel was denied.

**CORE TERMS:** discovery, deadline, disclosure, expert witness, deposition, dealerships, audit, disclose, discovery dispute, failed to disclose, conversations, scheduling, dealer, work product doctrine, appearance, expert report, expert

2004 U.S. Dist. LEXIS 26861, *

testimony, attorney client privilege, interrogatories, untimely, deposed, discovery requests, prejudiced, scheduled, timely manner, challenging, introducing, pre-hearing, financing, harmless

**LexisNexis(R) Headnotes**

*Civil Procedure > Discovery > Disclosures > Mandatory Disclosures*
*Evidence > Testimony > Experts > General Overview*
[HN1] *Fed. R. Civ. P. 26(a)(2)* requires parties to disclose their expert witnesses in accordance with a court's order. The purpose of *Fed. R. Civ. P. 26* is to prevent any unfair, prejudicial surprise. Failure to comply with *Fed. R. Civ. P. 26(a)* results in the automatic and mandatory exclusion of expert testimony unless the party to be sanctioned can show that its violation was either justified or harmless.

*Civil Procedure > Discovery > Disclosures > Mandatory Disclosures*
*Evidence > Testimony > Experts > Admissibility*
[HN2] The United States Court of Appeals for the Seventh Circuit has explained that a court has the power to exclude expert testimony, if the expert was not disclosed in a timely manner, because the tardy disclosure prejudices the other party. When one party fails to comply with a court's pre-hearing order without justifiable excuse, thus frustrating the purposes of the pre-hearing order, the court is certainly within its authority to prohibit that party from introducing witnesses or evidence as a sanction. A court's scheduling order provides simple and unequivocal deadlines. The defendant needs to conduct sufficient discovery of the plaintiff's experts and their opinions to prepare for trial properly. Adherence to established guidelines is essential if all parties are to have a fair opportunity to present their positions. In the absence of a compelling excuse, a district court is well within its discretion to exclude untimely proffered evidence or testimony.

*Civil Procedure > Discovery > Motions to Compel*

[HN3] *Fed. R. Civ. P. 37(a)(2)(B)* requires parties to meet and confer, in a good faith effort to resolve discovery disputes, before filing a motion to compel with the court. *Fed. R. Civ. P. 37(a)(2)(B)*.

*Civil Procedure > Discovery > Motions to Compel*
[HN4] See U.S. Dist. Ct., N.D. Ill., E. Div., R. 37.2.

*Civil Procedure > Discovery > Motions to Compel*
[HN5] Failure to comply with the local district court rules concerning discovery motions is not merely a harmless technicality, but can be a fatal mistake.

*Civil Procedure > Discovery > Motions to Compel*
[HN6] U.S. Dist. Ct., N.D. Ill., E. Div., R. 37.2 requires personal consultation. An exchange of letters does not constitute compliance.

*Civil Procedure > Discovery > Motions to Compel*
[HN7] Where a party has waited to bring a motion to compel until the eve of a discovery deadline, the court is justified in denying the motion.

**COUNSEL:** [*1]  For RIDGE CHRYSLER JEEP L.L.C. DBA MARQUETTE CHRYSLER JEEP, SALES, INC. DBA DODGE OF MIDLOTHIAN, Plaintiffs: William J. Harte, Erik Daniel Gruber, Joseph E. Tighe P.C., Chicago, IL; R. Eugene Pincham, Attorney at Law, Chicago, IL; Nick Geanopolous, Edward R. Vrdolyak, Ltd., Chicago, IL; William H. Hooks, Hooks Law Offices, P.C., Chicago, IL; Robert L. Tucker, Robert L. Tucker & Associates, Chicago, IL; Steve W. Berman, Christopher O'Hara, Hagens & Berman, Seattle, WA; Dennis E. Both, Town of Cicero, Cicero, IL; Edward R. Vrdolyak, Attorney at Law, Chicago, IL; Elizabeth A. Fegan, Timothy Allen Scott, Hagens Berman LLP, Chicago, IL.

For DAIMLERCHRYSLER SERVICES NORTH AMERICA, L.L.C. DBA CHRYSLER FINANCIAL COMPANY, L.L.C., Defendant: Martin Peter Greene, Eileen Marie Letts, Greene & Letts, Chicago, IL; Jeffrey R Fink, William Robert Bay, Paul D Lawrence, Thompson Coburn, St.

Louis, MO; Francis X. Buckley, Jr., Thompson & Mitchell, St. Louis, MO; Matthew Roy, DaimlerChrysler Services North, America L.L.C., Farmington Hills, MI; Krissa P Lubben, Thompson Coburn, LLP, St. Louis, MO.

For DAIMLERCHRYSLER SERVICES NORTH AMERICA, L.L.C. DBA CHRYSLER FINANCIAL COMPANY, L.L.C., Counter-Claimant: **[\*2]** Martin Peter Greene, Eileen Marie Letts, Greene & Letts, Chicago, IL; William Robert Bay, Paul D Lawrence, Thompson Coburn, St. Louis, MO; Francis X. Buckley, Jr., Thompson & Mitchell, St. Louis, MO; Matthew Roy, DaimlerChrysler Services North America L.L.C., Farmington Hills, MI; Krissa P Lubben, Thompson Coburn, LLP, St. Louis, MO.

For RIDGE CHRYSLER JEEP L.L.C. DBA MARQUETTE CHRYSLER JEEP, SALES, INC. DBA DODGE OF MIDLOTHIAN, Counter-Defendants: Erik Daniel Gruber, Joseph E. Tighe P.C., Chicago, IL; R. Eugene Pincham, Attorney at Law, Chicago, IL; Nick. Geanopolous, Edward R. Vrdolyak, Ltd., Chicago, IL; William H. Hooks, Hooks Law Offices, P.C., Chicago, IL; Robert L. Tucker, Robert L. Tucker & Associates, Chicago, IL; Steve W. Berman, Christopher O'Hara, Hagens & Berman, Seattle, WA; Dennis E. Both, Town of Cicero, Cicero, IL; Edward R. Vrdolyak, Attorney at Law, Chicago, IL; Timothy Allen Scott, Hagens Berman LLP, Chicago, IL.

For GERALD W GORMAN, ELIZABETH A GORMAN, Counter-Defendants: James J. Roche, Michaela S. Stapleton-Corcoran, LeeAnn Marie Crow, James J. Roche and Associates, Chicago, IL.

**JUDGES:** Magistrate Judge Arlander Keys, Judge Wayne R. Andersen.

**OPINION BY:** ARLANDER KEYS

**OPINION**

**MEMORANDUM OPINION AND ORDER**

**[\*3]** This case is before the Court on two motions: Defendant's Motion to Strike Plaintiffs' Expert, and Plaintiffs' Motion to Compel Discovery. For the reasons set forth below, the Court grants Defendant's Motion to Strike, and denies Plaintiffs' Motion to Compel Discovery.

**Facts & Procedural History**

On February 3, 2003, Plaintiffs Ridge Chrysler Jeep L.L.C. [1] and Sales, Inc. [2], ("the Dealerships"), sued Daimler Chrysler Services North America, L.L.C., d/b/a Chrysler Financial Company, L.L.C. ("Chrysler Financial"). In their Complaint, the Dealerships, which are both owned by Gerald Gorman, allege that Chrysler Financial adopted an internal corporate policy of refusing to provide financing to non-suburban African-American car buyers, regardless of their creditworthiness, and then punished the Dealerships for refusing to go along with that discriminatory practice. The Dealerships alleged breach of contract, tortious interference with prospective business or economic advantage, violation of the *Automobile Dealers' Day in Court Ac*t, and violation of the Illinois Motor Vehicle Franchise Act.

1    Formerly doing business as Marquette Chrysler Jeep at 65th Street and Western Avenue in Chicago, Illinois.

**[\*4]**

2    Doing business as Dodge of Midlothian, in Midlothian, Illinois.

The Dealerships' Complaint piggybacked on another case filed that same day by a putative class of minority plaintiffs, who allege that Chrysler Financial engaged in predatory lending practices by refusing to give lower financing rates to otherwise qualified minority car buyers. *See Coburn v. DaimlerChrysler Servs. N. Am., L.L.C., 289 F. Supp. 2d 960, No. 03 C 759, 2003 WL 22425007 (N.D. Ill. Oct. 23, 2003)* (Judge Castillo).

On October 14, 2003, the Court entered a very generous scheduling order, in accordance with the parties' previous agreement, setting forth various discovery deadlines. This order directed Plaintiffs to disclose their expert witness(es) on or before June 11, 2004, and instructed Defendant to disclose its expert(s) on or before September 3, 2004. The parties agreed that Plaintiffs' expert witnesses would be deposed by July 23, 2004, and that Defendant's experts would be deposed by October 15, 2004. The Order provided that all discovery would be completed by December 10, 2004.

2004 U.S. Dist. LEXIS 26861, *

Shortly thereafter, the parties became [*5] engaged in a discovery dispute. Defendant had objected to a number of Plaintiffs' discovery requests, citing privilege, relevance, and other grounds for withholding the evidence. On November 14, 2003, Plaintiffs sent Defendant a letter, challenging Defendants' justifications for withholding the testimony and/or evidence in dispute. One week later, Defendant responded to Plaintiffs' letter, addressing each of Plaintiffs' complaints and, in most instances, explaining why the disputed evidence would not be forthcoming. Defendant concluded by stating that: "We trust that this letter addresses the issues in your November 14 letter. We would be happy to discuss those issues with you further, if you wish." [3]

3  Plaintiffs would wait over one year before raising these issues again.

[*6] Plaintiffs did not respond to Defendant's letter, and discovery proceeded. On June 11, 2004, Plaintiffs' expert disclosure deadline passed without any disclosure. Conversely, Defendant disclosed its retained expert and his expert report on September 3, 2004, as scheduled. In a letter to Plaintiffs, dated that same day, Defendant's counsel noted that Plaintiffs had failed to disclose an expert witness by June 11, 2004, and explained that Defendant was willing to extend the deadline for deposing its own expert witness, if Plaintiffs so desired, because "October will be an extremely busy month for depositions in this matter." Defs. Motion to Strike, Ex. 2.

In addition to numerous depositions, October was marked by a resurgence of discovery disputes between the parties. On October 5, 2004, Defendant filed an Emergency Motion for Sanctions. against Plaintiffs, claiming that Plaintiffs had persistently failed to answer Defendant's damages interrogatories, despite an order from the Court directing Plaintiffs to do so. Pursuant to the Court's order, Plaintiffs responded to the damages interrogatories on October 15, 2004. In their response, Plaintiffs referenced an attached letter report [*7] from accountant Carl Woodward. Mr. Woodward's letter report described his experience with automobile dealerships and accounting, and estimated Plaintiffs' damages at approximately $ 22 million.

On October 20, 2004, Defendant filed a Motion to Strike Mr. Woodward's report [4]; Defendant noted that the deadline for disclosing expert witnesses had long since passed, and urged the Court to prohibit Plaintiffs from sneaking this expert letter in through the "back door." In addition, Defendants pointed out that Mr. Woodward's letter report did not comply with rule 26(a)(2)(B)'s requirements for expert reports, because it failed to set forth the data and other information that formed the basis of his opinions and failed to disclose his compensation or relevant prior experience.

4  Two days later, on October 22, 2004, attorney Elizabeth Fegan filed an appearance on behalf of Plaintiffs

In response, Plaintiffs argued that any claim that Defendant was prejudiced by the delayed disclosure could be cured by an extension [*8] of the discovery deadline. The Court informed the parties in open court that the discovery deadline was firm, and that it would not be extended.

Confronted with the Court's refusal to extend the discovery deadline, Plaintiffs scheduled numerous depositions, and filed a Motion to Compel. The subject of the Motion was the evidence that was at the heart of the parties' November 2003 discovery dispute, as memorialized by Plaintiffs' letter, dated November 14, 2003, and Defendant's response, dated November 21, 2003. Notably, Plaintiffs had not made any attempts to obtain this evidence in the one year following Defendant's responsive November 21, 2003 letter.

## DISCUSSION

Currently before the Court are Defendant's Motion to Strike Plaintiffs' Expert, and Plaintiff's Motion to Compel Discovery. The Court will address each Motion in turn.

### I. Motion to Strike

Defendant asks the Court to bar Plaintiffs from introducing or relying upon the testimony of Mr. Woodward and/or his letter report at trial. Defendant argues that it has been prejudiced by Plaintiffs' unexplained failure to disclose Mr. Woodward in a timely manner, arguing that

2004 U.S. Dist. LEXIS 26861, *

Plaintiffs' untimely disclosure has hindered **[\*9]** its ability to prepare for trial.

Plaintiffs insinuate that Defendant has failed to carry its burden [5] of establishing that it was prejudiced by Plaintiffs' delay, responding, literally,: "no harm, no foul." Declining to give any reason whatsoever for waiting four months after the expert disclosure deadline to identify Mr. Woodward, Plaintiffs tacitly acknowledge at least a degree of prejudice by suggesting that the Court could resolve the problem by extending the discovery deadline.

> 5    Of course, the law does not place the burden of establishing harm on Defendant.

Initially, the Court notes that Plaintiffs did not seek leave of Court to submit Mr. Woodward's report. Instead, Plaintiffs simply attached Mr. Woodward's letter report to its responses to Defendant's interrogatories -- a full four months after the expert disclosure deadline had passed. Plaintiff's unorthodox and untimely disclosure violates *Rule 26* and warrants granting Defendant's Motion to Strike.

[HN1] *Rule 26(a)(2)* of the Rules of Civil Procedure **[\*10]** requires parties to disclose their expert witnesses in accordance with a court's order. The purpose of *Rule 26* is to prevent any unfair, prejudicial surprise. *Scranton Gillette Communications, Inc. v. Dannhausen, 1998 U.S. Dist. LEXIS 23261, No. 96 C 8353, 1998 WL 566668, at \*2 (N.D.Ill. Aug. 18, 1998).* Failure to comply with *Rule 26(a)* results in the "automatic and mandatory" exclusion of expert testimony "unless the party to be sanctioned can show that its violation . . . was either justified or harmless." *Baker v. Indian Prairie Community Unit, 1999 U.S. Dist. LEXIS 17221, 1999 Wl 988799, at \*1 (N.D. Ill. Oct. 27, 1999).*

[HN2] The Seventh Circuit has explained that a court has the power to exclude expert testimony, if the expert was not disclosed in a timely manner, because the tardy disclosure prejudices the other party:

> 'When one party fails to comply with a court's pre-hearing order without justifiable excuse, thus

frustrating the purposes of the pre-hearing order, the court is certainly within its authority to prohibit that party from introducing witnesses or evidence as a sanction.' *In re Maurice, 21 F.3d 767, 773 (7th Cir. 1994).* The [court's] scheduling order **[\*11]** provided simple and unequivocal deadlines. The defendants needed to conduct sufficient discovery of plaintiff's experts and their opinions to prepare for trial properly. Adherence to established guidelines is essential if all parties are to have a fair opportunity to present their positions. In the absence of a compelling excuse, a district court is well within its discretion to exclude untimely proffered evidence or testimony.

*Hill v. Porter Memorial Hosp., 90 F.3d 220, 224 (7th Cir. 1996).*

As stated above, Plaintiffs have not attempted to demonstrate that their tardy disclosure of Mr. Woodward was justified. Nevertheless, Plaintiffs insist that Defendant has not been harmed by the delay, because: 1) Defendant had done little in the way of discovery on the issue of damages; and 2) Defendant's expert reports concerned only liability, and not damages [6].

> 6    Plaintiffs further argue that any problem that Defendant might have encountered in completing the necessary discovery would be moot if the Court would extend the discovery deadline. However, the Court has already refused to extend the now-passed discovery deadline.

**[\*12]** Plaintiffs' argument fails to account for the possibility that Defendant did little in the way of discovery on the damages issues and failed to disclose a damages expert *precisely because* Plaintiff did not disclose a damages expert. Defendant has complied with the Court's discovery deadlines every step of the way. After Plaintiff failed to disclose any expert witnesses by the June 11, 2004 deadline, Defendants wrote to Plaintiffs, confirming their intention to proceed to trial

without expert testimony. Defendants reasonably relied upon this belief in selecting their expert witnesses, scheduling discovery, and preparing for trial.

With the significant amount of discovery scheduled during the final weeks before the discovery deadline, it would have been unfair to ask Defendants to take on the additional burden of digesting Mr. Woodward's report, deposing Mr. Woodward, and retaining its own damages expert. Plaintiffs' desire to enjoy the luxury of proceeding to trial on their own timetable, without regard for the Court's previous scheduling order, is clearly outweighed by the prejudice to Defendant in this case. Therefore, the Court grants Defendant's Motion to Strike.

### [*13] II. Plaintiffs' Motion to Compel.

On December 6, 2004-four days before the close of discovery - Plaintiffs filed a Motion to Compel, seeking an array of evidence that it had not inquired about in almost thirteen months. Specifically, Plaintiffs argue that they are entitled to: 1) discovery related to other dealers in the Chicago Zone; 2) have the Court inspect, *in camera,* Mr. Gerry Beverman's notes and the DSC Audit Investigation to determine whether they are subject to the work product doctrine or attorney client privilege; 3) test the foundation for Defendant's assertion that conversations between Tim Devine, Jim Lawn, Bob Knight, and Jurgen Walker were privileged; and 4) to depose Chrysler Financial's President, Jurgen Walker.

Because the Court finds that Plaintiffs' Motion to Compel is a clear case of too little, too late, and because Plaintiffs have failed to comply with *Rule 37(a)(2)(B) of the Federal Rules of Civil Procedure* as well as Local *Rule 37.2,* the Court denies Plaintiffs' Motion.

[HN3] *Rule 37(a)(2)(B)* requires parties to meet and confer, in a good faith effort to resolve discovery disputes before filing a motion to compel [*14] with the court. *Fed. R. Civ. P. 37(a)(2)(B).* Similarly, *Local Rule 37.1* provides that [HN4] "the Court may deny any discovery motion . . ., unless counsel for the moving party files with the Court, at the time of filing the motion, a separate statement showing that the attorney making the motion has

made a reasonable effort to reach agreement with opposing attorney(s) on the matter(s) set forth in the motion." [HN5] "Failure to comply with the local rules is not merely a 'harmless technicality,' but can be a 'fatal' mistake." *Servin v. GATX Logistics, Inc., 187 F.R.D. 561, 563 (N.D.Ill.1999) quoting Waldridge v. American Hoechst Corp., 24 F.3d 918, 923 (7th Cir.1994),*

Plaintiffs contend that they have satisfied the *Rule 37* requirement, because "on numerous occasions" they have "attempted to confer with Defense counsel." Pls' Motion to Compel at 5. The Court disagrees.

With regard to the "other dealer" evidence, Mr. Beverman's notes, and the DSC Audit Special Investigation, Plaintiffs can cite to only one such attempt -- its November 14, 2003 letter challenging Defendant's objection to producing certain evidence [*15] and permitting certain testimony [7]. This letter is clearly insufficient to satisfy Plaintiffs' obligations under Federal and Local *Rule 37.*

> 7  [HN6] "Local *Rule 37.2* requires personal consultation. An exchange of letters does not constitute compliance." *Tax Track Sys. v. New Investor World, Inc., 2002 U.S. Dist. LEXIS 21320, No. 01 C 6217, 2002 WL 31473818, at *7, n. 6 (N.D. Ill. Nov. 4, 2002).*

In their November 14, 2003 letter, Plaintiffs noted that Defendant objected to Plaintiffs' discovery requests concerning other dealerships in the Chicago Zone on relevancy and privacy grounds. Plaintiffs forcefully argued their position that the information was highly relevant and discoverable, and attempted to allay Defendant's privacy concerns by suggesting that the parties seek a protective order.

Defendant thoroughly defended its position regarding "other dealer" discovery in its November 21, 2003 response to Plaintiffs' November 14, 2003 letter. Defendant cited to and discussed seven cases that supported its position that [*16] the other dealer discovery was not relevant to Plaintiffs' claims. Similarly, Defendant explained that Mr. Beverman's October 2, 2002 notes were protected by the work product doctrine. Plaintiffs did not

2004 U.S. Dist. LEXIS 26861, *

challenge Defendant's interpretation of the cited caselaw or the work product doctrine.

Plaintiffs' letter also noted that it had received a one page document referring to the DSC Audit Special investigation, and requested that Defendant forward any investigation materials, the audit, and a report of the investigation. In response, Defendant requested that Plaintiffs "provide us with the bates number of the one-page document that refers to a 'DSC Audit Special Investigation' so that we can better address [your concerns.]" Pls. Motion to Compel, Ex. 5, Defs. Nov. 21, 2003 letter, p. 6 P, 10. Plaintiffs never identified the relevant bates number or otherwise followed up with Defendant's request [8].

> 8   Subsequently, on April 4, 2004 Defendant identified an audit of Chrysler Financial's Chicago Zone as items 42-54 on its Amended Privilege Log. Plaintiffs never challenged Defendant's assertion that the audit and related documents were protected by the attorney client privilege and/or work product doctrine.

[*17]   Defendant concluded its November 21, 2003 letter by noting that "we trust that this letter addresses the issues in your November 14 letter. We would be happy to discuss those issues with you further if you wish." Of course, Plaintiffs never again contacted Defendant about the discovery issues raised in the letter until it filed this Motion to Compel -- more than one year after Defendant defended its objections, and only four days before the close of discovery.

Plaintiffs exerted even less effort in attempting to comply with *Rule 37* with regard to Mr. Devine's testimony. Plaintiffs deposed Mr. Devine on December 12, 2003--over one year ago. At the deposition, Defendant's counsel asserted that the attorney--client privilege protected conversations between Mr. Devine, other executives from Chrysler Financial, and their counsel. Plaintiffs' counsel agreed that he did not intend to ask Mr. Devine about conversations at which counsel was present. *See* Timothy Devine 12/12/03 Dep. at pp. 200-201. Plaintiffs never again raised the issue until they filed this Motion to Compel.

Plaintiffs do not even pretend to have complied with *Rule 37* with regard to Mr. Devine's testimony, but argue [*18]   instead that it never waived its right to the testimony it now seeks. A review of Mr. Devine's testimony, however, clearly indicates that they have done just that. Mr. Devine testified that he had discussions with the Chrysler Financial executives in question *only* in the presence of counsel, and Mr. O'Hara agreed that he was not attempting to elicit testimony with regard to conversations where counsel was present. There is no factual basis for believing that Mr. Devine was not telling the truth. It would be inappropriate at this late juncture to allow Plaintiffs to go back on a fishing expedition and ask Mr. Devine questions that they now wish they had asked.

Finally, Plaintiffs demand that Defendant produce its President and CEO, Jurgen Walker, for deposition. Plaintiffs have never issued a notice to take Mr. Walker's deposition, or formally requested that he be made available. Despite the fact that Defendant informed Plaintiffs on two occasions that it would only produce Mr. Walker for a deposition if ordered by the Court [9], Plaintiff waited to file its Motion to Compel until four days before the close of discovery. [HN7] Where a party has waited to bring a motion to compel until [*19]   the eve of a discovery deadline, the court is justified in denying the motion. *See Harris v. City of Seattle*, 315 F. Supp. 2d 1112, 1118-19 (W.D. Wash. 2004).

> 9   Defendant's stated position obviates the need for Plaintiffs to pursue a *Rule 37* conference on this matter.

Plaintiffs' Motion to Compel raises issues that Defendant addressed, and reasonably assumed were resolved, over one year ago. Defendant methodically prepared for trial and conducted discovery under the assumption that Plaintiffs had dropped the objections raised both in the November 14, 2003 letter and in Mr. Devine's deposition. The Court acknowledges that Plaintiffs filed their Motion to Compel in advance of the discovery deadline. However, they filed it so late as to make it impossible to conduct the requested discovery within the discovery period.

The issues that dominate Plaintiffs' Motion were well known to Plaintiffs for over one year, and yet Plaintiffs failed to pursue them. It strikes the

2004 U.S. Dist. LEXIS 26861, *

Court that it was not until October 22, 2004, when [*20] Ms. Fegan filed her appearance on Plaintiffs' behalf, that Plaintiffs demonstrated that they were serious about conducting discovery in this case. Prior to her appearance, the Court was unsure as to whether Plaintiffs were conducting any of their own discovery, as opposed to responding to Defendant's discovery requests and motions to compel. Shortly after her appearance, Ms. Fegan filed a response and opposition to Defendant's Motion to Strike Plaintiffs' Expert, as well as the belated Motion to Compel Discovery of Evidence that her co-counsel had apparently conceded more than a year earlier, and a Motion for Extension of the Discovery Deadline. Although Plaintiffs have not even attempted to show good cause for an extension of the discovery deadline, they appeared to be genuinely surprised when the Court did not extend it as a matter of course. Such requests are not automatically granted by this Court. It appears that Plaintiffs have conducted--or attempted to conduct--more discovery since early November than at any time during the past thirteen months. The flurry of activity since November tends to bear this out. Unfortunately, it was not possible for Plaintiffs to conduct the bulk [*21] of their discovery during the final six weeks of the thirteen month discovery period. But it is Plaintiffs--not Defendant--who must endure the harsh results of this tactical decision.

## CONCLUSION

For the reasons set forth above, the Court grants Defendant's Motion to Strike Plaintiffs' Expert. In addition, the Court denies Plaintiffs' Motion to Compel.

Dated: December 29, 2004

ENTER:

ARLANDER KEYS

United States Magistrate Judge

# 10

*Safeco Ins. Co. of Am. v. Rawstron*, 181 F.R.D. 441 (C.D. Cal. 1998)

LEXSEE 181 F.R.D. 441

**SAFECO OF AMERICA, Plaintiff, v. ROBERT RAWSTRON AND CARLA RAWSTRON, Defendants.**

**No. CV 96-5139-KMW(AJWx)**

**UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA**

*181 F.R.D. 441*; *1998 U.S. Dist. LEXIS 21374*

**May 15, 1998, Decided**
**May 18, 1998, Filed; May 19, 1998, Entered**

**DISPOSITION:** [**1] Defendant's motion as to interrogatories 10-12 denied. Defendants' motion as to requests 9 and 10 granted. Defendants' motion as to requests 16-19 granted in part and denied in part. Defendants' motion as to request 27 granted. Defendants' motion as to request 32 granted in part and denied in part.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant insureds brought a motion to compel plaintiff insurer to provide further responses to a first and second request for production of documents, and their first set of interrogatories. Insureds claimed that every sub-part they requested in their interrogatories were in compliance with *Fed. R. Civ. P. 36 (a)*, and that the sub-parts were not violative of the numerical restriction in that rule.

**OVERVIEW:** Insureds brought suit against its' insurer and during the discovery phase a dispute arose surrounding the number of interrogatories allowable under *Fed. R. Civ. P. 33(a)*. Insureds requested a description of every person, witness, or paper that supported any denial in their requests for admissions, which were 50 in number. Insurer claimed that the requests for admissions as written were really interrogatories, and that they far exceeded the allowable number under the rule. The court agreed that the questions as phrased were

unduly burdensome, but that *Fed. R. Civ. P. 33(a)*, failed to define the term discrete sub-parts when calculating the numerical limits. The court reasoned that requests for admissions under *Fed. R. Civ. P. 36*, were not really discovery devices; they were not designed to elicit information. It said that allowing service of an interrogatory which requested disclosure of all of the information on which the denials of each of 50 requests for admissions were based, transformed each request for admission into an interrogatory which was prohibited under the rules.

**OUTCOME:** Insureds' motion as to interrogatories 10-12 was denied. The motion as to requests 9 and 10 was granted, and the motion as to requests 16-19 was granted in part and denied in part. Defendants' motion as to request 27 was granted. Defendants' motion as to request 32 was granted in part and denied in part.

**CORE TERMS:** interrogatory, counted, numerical, separately, discovery, discrete, local rule, responding party, subsumed, unduly, admit, coverage, time period, circumvent, burdensome, responsive, insurance contract, production of documents, oppressive, logically, factually, lettered, homeowners' policies, concurrently, underwriting, unqualified, discovery processes, single question, written response, propounding party's

**LexisNexis(R) Headnotes**

181 F.R.D. 441, *; 1998 U.S. Dist. LEXIS 21374, **

*Civil Procedure > Discovery > Methods > Interrogatories > General Overview*
[HN1] *Fed. R. Civ. P. 33(a)* provides in part: without leave of court or written stipulation, any party may serve upon any other party written interrogatories, not exceeding 25 in number including all discrete subparts.

*Civil Procedure > Discovery > Methods > Interrogatories > General Overview*
[HN2] An interrogatory containing subparts directed at eliciting details concerning the common theme should be considered a single question, although the breadth of an area inquired about may be disputable. On the other hand, an interrogatory with subparts inquiring into discrete areas is more likely to be counted as more than one for purposes of the limitation.

*Civil Procedure > Discovery > Methods > Interrogatories > General Overview*
[HN3] Interrogatory subparts are to be counted as part of but one interrogatory if they are logically or factually subsumed within and necessarily related to the primary question.

*Civil Procedure > Discovery > Methods > Admissions > Effect*
*Civil Procedure > Discovery > Methods > Interrogatories > General Overview*
[HN4] The purpose of *Fed. R. Civ. P. 36(a)* is to expedite trial by establishing certain material facts as true and thus narrowing the range of issues for trial. Their goal is to eliminate from the trial matters as to which there is no genuine dispute. Therefore, requests for admissions are not principally discovery devices, and they are not to be treated as substitutes for discovery processes to uncover evidence.

*Civil Procedure > Discovery > Methods > Admissions > General Overview*

*Civil Procedure > Discovery > Methods > Interrogatories > General Overview*
[HN5] Requests for admissions are not principally discovery devices, and allowing service of an interrogatory which requests disclosure of all of the information on which the denials of each requests for admission essentially transforms each request for admission into an interrogatory.

*Civil Procedure > Discovery > Methods > Admissions > Responses*
[HN6] The answer to a request for admission shall specifically deny the matter or set forth in detail the reasons why the answering party cannot truthfully admit or deny the matter under *Fed. R. Civ. P. 36(a)*. Each request for an admission should be phrased simply and directly so that it can be admitted or denied without explanation.

**COUNSEL:** For SAFECO INSURANCE COMPANY OF AMERICA, plaintiff: Raymond H Goettsch, W Casey Walls, LaTorraca & Goettsch, Long Beach, CA.

For ROBERT RAWSTRON, defendant: Jeffrey F Sax, Jeffrey F Sax Law Offices, Los Angeles, CA.

For CARLA RAWSTRON, defendant: David L Brandon, Brandon & Hilton, Los Angeles, CA.

For CARLA RAWSTRON, counter-claimant: David L Brandon, Brandon & Hilton, Los Angeles, CA.

For SAFECO INSURANCE COMPANY OF AMERICA, counter-defendant: Raymond H Goettsch, W Casey Walls, LaTorraca & Goettsch, Long Beach, CA.

**JUDGES:** ANDREW J. WISTRICH, United States Magistrate Judge.

**OPINION BY:** ANDREW J. WISTRICH

**OPINION**

 [*442] ORDER

Before the Court is the motion of defendants Robert Rawstron and Carla Rawstron to compel

181 F.R.D. 441, *; 1998 U.S. Dist. LEXIS 21374, **

plaintiff Safeco Insurance Company of America to provide further responses to (1) defendants' first request for production of documents, (2) defendants' second request [**2] for production of documents, and (3) defendants' first set of interrogatories. The Court has considered the papers filed by the parties and the arguments made by counsel during the hearing on the motion.

For the most part, defendants' motion presents a rather mundane discovery dispute. One aspect of it, however, possesses interest, and appears to present a question of first impression. The issue of interest is whether an interrogatory which asks for the basis for the denial of each request for admission comprising a set of requests for admissions constitutes a single interrogatory or multiple interrogatories for the purposes of the numerical limit contained in *Rule 33(a) of the Federal Rules of Civil Procedure*. Neither plaintiff nor defendants have cited any case deciding the issue.

**Defendants' First Set of Interrogatories.**

Defendants served a set of requests for admissions accompanied by a set of interrogatories. At issue are three interrogatories relating to plaintiff's responses to defendants' requests for admissions, not plaintiff's responses to defendants' requests for admissions themselves. Interrogatories 10, 11 and 12 ask plaintiff to state every fact, identify every [**3] document, and identify every witness which supports plaintiff's response to each request for admission which was not unqualifiedly admitted. Plaintiff denied at least some of the underlying requests for admissions, including 2, 10, 11 and 12, and provided some information regarding those denials in response to interrogatories 10-12.

It is not unusual for a party to serve a set of requests for admissions accompanied by a set of interrogatories, and for the set of interrogatories to include one or more interrogatories seeking disclosure of the basis for each response to any request for admission which was not admitted without qualification. Of this genre, the interrogatories served by defendants in this case are typical:

"10. For each of YOUR responses to the Requests for Admissions served upon YOU concurrently with these interrogatories that was not an unqualified admission, state in detail every fact which supports YOUR response.

11. For each of YOUR responses to the Requests for Admissions served upon YOU concurrently with these interrogatories that was not an unqualified admission, IDENTIFY every DOCUMENT which supports YOUR response.

[*443] 12. For each of YOUR responses to the [**4] Requests for Admissions served upon YOU concurrently with these interrogatories that was not an unqualified admission, IDENTIFY every witness with knowledge which supports YOUR response." [1]

---

1   For the purposes of this motion, the Court construes the terms "you" and "your" as used in defendants' discovery requests to refer to the plaintiff in this action, namely, Safeco Insurance Company of America, rather than to the apparently non-existent entity "Safeco Insurance Company" mistakenly named by defendants.

Plaintiff objected to interrogatories 11 and 12 on the ground that because interrogatories 10-12 contained twelve separate subparts, one for each of the twelve requests comprising defendants' set of requests for admissions, the total number of interrogatories served by defendants exceeded the numerical limit imposed by *Rule 33(a)*. The question is whether that objection was warranted.

[HN1] *Rule 33(a)* provides in part:

"Without leave of court or written stipulation, any party may serve upon any other [**5] party written interrogatories, not exceeding 25 in number including all discrete subparts . . .."

181 F.R.D. 441, *; 1998 U.S. Dist. LEXIS 21374, **

The numerical limit was added in 1993. Before then, courts acknowledged that "sheer numerosity is not an objection." *Compagnie Francaise D'Assurance Pour Le Commerce Exterieur, 105 F.R.D. 16, 42 (S.D. N.Y. 1984).* As the Advisory Committee explained, "the purpose of this revision is to reduce the frequency and increase the efficiency of interrogatory practice." *See* Advisory Committee Note to 1993 Amendment to Fed.R.Civ.2. 33, 146 F.R.D. 675 (1993). The amendment was based upon a recognition that, although interrogatories may be a valuable discovery tool, "the device can be costly and may be used as a means of harassment . . .." Advisory Committee Note, 146 F.R.D. at 675. "The aim [of the numerical limit] is not to prevent needed discovery, but to provide judicial scrutiny before parties make potentially excessive use of this discovery device." Advisory Committee Note, 146 F.R.D. at 676.

One issue that has arisen in implementing the numerical limit contained in *Rule 33(a)* is how interrogatories should be counted. [2] In particular, although *Rule 33(a)* states that "discrete [**6] subparts" should be counted as separate interrogatories, it does not define that term.

> 2  The same issue occasionally arose prior to the 1993 amendment when some courts, either by local rule or by order, imposed limits on the number of interrogatories that could be served, but it has been raised with increasing frequency since the 1993 amendment.

Interrogatories often contain subparts. Some are explicit and separately numbered or lettered, while others are implicit and not separately numbered or lettered. Extensive use of subparts, whether explicit or implicit, could defeat the purposes of the numerical limit contained in *Rule 33(a)* by rendering it meaningless, unless each subpart counts as a separate interrogatory. On the other hand, if all subparts count as separate interrogatories, the use of interrogatories might be unduly restricted or requests for increases in the numerical limit might become automatic. *See Ginn v. Gemini, Inc. 137 F.R.D. 320, 322 (D. Nev. 1991)*

(suggesting that this approach "could [**7] too quickly exhaust the propounding party's supply of interrogatories, and unnecessarily cramp the party's fact-gathering ability").

The Advisory Committee addressed this issue and provided some guidance as to when subparts should and should not count as separate interrogatories.

> "Each party is allowed to serve 25 interrogatories upon any other party, but must secure leave of court (or stipulation from the opposing party) to serve a larger number. Parties cannot evade this presumptive limitation through the device of joining as 'subparts' questions that seek information about discrete separate subjects. However, a question asking about communications of a particular type should be treated as a single interrogatory even though it requests that the time, place, persons present, and contents be stated separately for each such communication."

[*444]  Advisory Committee Note, 146 F.R.D. at 675-676.

A respected commentator has elaborated on that statement as follows:

> "It would appear [HN2] that an interrogatory containing subparts directed at eliciting details concerning the common theme should be considered a single question, although the breadth of an area inquired about may [**8] be disputable. On the other hand, an interrogatory with subparts inquiring into discrete areas is more likely to be counted as more than one for purposes of the limitation."

8A Charles A. Wright, Arthur R. Miller & Richard L. Marcus, Federal Practice and Procedure § 2168.1, at 261 (2d ed. 1994).

181 F.R.D. 441, *; 1998 U.S. Dist. LEXIS 21374, **

One question that is easily answered is whether subparts must be separately numbered or lettered to count as multiple interrogatories. The better view is that they need not be, or any party could easily circumvent the rule simply by eliminating the separate numbering or lettering of the subparts. *See, e.g., Prochaska & Associates v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 155 F.R.D. 189, 191 (D. Neb. 1993)* (holding that "not numbering the sub-parts of interrogatories does not change the fact that, if the interrogatories require discrete pieces of information, those interrogatories are to be counted as if the sub-parts were specifically itemized.").

The more difficult question is when differences in the information sought should render subparts "discrete." Perhaps understandably, the answers supplied by the courts have held not been entirely consistent. Some courts have held **[**9]** that if the subparts are "subsumed within" or "necessarily related to" the "primary question," they should be counted as one interrogatory rather than as multiple interrogatories.*See, e.g., Ginn, 137 F.R.D. at 321* (stating that "[HN3] interrogatory subparts are to be counted as part of but one interrogatory for the purpose of [our local rule] if they are logically or factually subsumed within and necessarily related to the primary question."); *Clark v. Burlington Northern Railroad, 112 F.R.D. 117, 120 (N.D. Miss. 1986)* (holding that "an interrogatory is to be counted as but a single question for purposes of [our local rule], even though it may call for an answer containing several separate bits of information, if there is a direct relationship between the various bits of information called for. On the other hand, interrogative sentences or phrases which are not directly related in subject matter, even though not separately enumerated or numbered by the interrogating party, will be counted as separate questions."; applying a local rule which limited interrogatories to 30, and which also provided that "any subpart of a question shall be counted as a question"), quoting *Holcombe* **[**10]** *v. Southern Towing Co.,* No. D.C. 81-167-LS-O, Order of March 17, 1982, at 4 (N.D. Miss. 1982); *Myers v. United States Paint Co., 116 F.R.D. 165, 165-166 (D. Mass. 1987)* (holding that subparts need not be counted as separate interrogatories if they are a "logical extension of the basic interrogatory."). By contrast, other courts have held that subparts always should be counted.

*See, e.g., Aetna Casualty & Surety Co. v. W. W. Grainger, Inc., 170 F.R.D. 454, 454 (E.D. Wis. 1997)* (rejecting the contention that, in applying a local rule stating that in applying a local rule stating that "the 15 permissible interrogatories may not be expanded by the creative use of subparts," subparts need not be counted if they are a "logical extension" of or "directly related" to a basic interrogatory); *Valdez v. Ford Motor Co., 134 F.R.D. 296, 298 (D. Nev. 1991)* (holding that local rule limiting interrogatories to "40 including subparts" "requires that every part of an interrogatory be counted and subject to the limitation of 40 . . . even when a subpart relates to the main interrogatory."). Although these cases all were applying local rules, the issue in applying the numerical limit contained **[**11]** in *Rule 33(a)* is essentially the same.

Of the two lines of pre-amendment cases applying numerical limits contained in local rules, the former approach seems more consistent with the spirit of the numerical limit contained in *Rule 33(a)* than does the latter. By modifying the term "subparts" with the term "discrete," and by providing the guidance it did in its interpretative note accompanying the 1993 amendment to *Rule 33*, the Advisory Committee was likely indicating a preference for the more flexible approach **[*445]** exhibited in *Ginn* and *Clark,* rather than the more rigid approach reflected in *Aetna* and *Valdez.* Although this approach possesses the benefit of flexibility, that benefit comes at a cost. The lack of a clear and easily applied rule about how subparts should be counted leads to disagreements between counsel and costly motions to compel responses.

In the only case to decide the issue based on *Rule 33* since the 1993 amendment to *Rule 33(a)* went into effect, the court in *Kendall v. GES Exposition Services, Inc., 174 F.R.D. 684 (D. Nev. 1997)*, followed *Ginn* and construed the term "discrete subparts" as meaning that "interrogatory subparts are to be counted as **[**12]** one interrogatory . . . if they are logically or factually subsumed within and necessarily related to the primary question." *Kendall, 174 F.R.D. at 685*, quoting *Ginn, 137 F.R.D. at 322.* As the court recognized in *Kendall,* however, such statements provide little guidance because it is still necessary to address the question whether a subpart is "logically or factually subsumed within and

181 F.R.D. 441, *; 1998 U.S. Dist. LEXIS 21374, **

necessarily related to the primary question." The court in *Kendall* then went on to explain:

"Probably the best test of whether subsequent questions, within a single interrogatory, are subsumed and related, is to examine whether the first question is primary and subsequent questions are secondary to the primary question. Or, can the subsequent question stand alone? Is it independent of the first question? Genuine subparts should not be counted as separate interrogatories. However, discrete or separate questions should be counted as separate interrogatories, notwithstanding [that] they are joined by a conjunctive word and may be related."

*Kendall, 174 F.R.D. at 685.* Unfortunately, despite heroic effort, this formula also falls short of a bright-line test.

Consideration [**13] of the nature and purpose of requests for admissions suggests the manner in which the narrow issue raised by defendants' motion should be resolved. "[HN4] The purpose of *Rule 36(a)* is to expedite trial by establishing certain material facts as true and thus narrowing the range of issues for trial." *Asea, Inc. v. Southern Pacific Transport Co., 669 F.2d 1242, 1245 (9th Cir. 1981); see* Advisory Committee Note to 1970 Amendment to *Fed.R.Civ.P. 36*, 48 F.R.D. 531-532 (1970) ("*Rule 36* serves two vital purposes, both of which are designed to reduce trial time. Admissions are sought, first to facilitate proof with respect to issues that cannot be eliminated from the case, and secondly, to narrow the issues by eliminating those that can be."). Their goal "is to eliminate from the trial matters as to which there is no genuine dispute." *People of the State of California v. The Steamship Jules Fribourg, 19 F.R.D. 432, 436 (N.D. Cal. 1955).* Therefore, [HN5] requests for admissions are not principally discovery devices, *see* 8A Wright, Miller & Marcus, § 2252, at 524-525 ("Strictly speaking *Rule 36* is not a discovery procedure at all, since it presupposes that the party proceeding under it [**14] knows the facts or has

the document and merely wishes its opponent to concede their genuineness. A party who desires to discover what the facts are should resort to other discovery rules rather than *Rule 36*.") (footnotes omitted), and they "are not to be treated as substitutes for discovery processes to uncover evidence . . .." *The Steamship Jules Fribourg, 19 F.R.D. at 436; see 7 Moore's Federal Practice § 36.02[2]* (3d ed. 1998) ("Because *Rule 36* was not designed to elicit information, to obtain discovery of the existence of facts, or [to] obtain production of documents, requests for admission should not be used as a method of discovery for those purposes.") (footnote omitted). Allowing service of an interrogatory which requests disclosure of all of the information on which the denials of each of 50 requests for admissions were based, however, essentially transforms each request for admission into an interrogatory. This is not the purpose requests for admissions were intended to serve, and because *Rule 36* imposes no numerical limit on the number of requests for admissions that may be served, condoning it would circumvent the numerical limit contained in *Rule 33(a)*. [**15] *See generally, In re Olympia Holding Corp., 189 B.R. 846, 853 (Bkrtcy. N.D. Fla. 1995)* ("Requests for admissions and interrogatories are not interchangeable procedures. . . Utilizing interrogatories disguised as requests for admissions in an attempt [*446] to circumvent a local rule limiting the number of interrogatories is an abuse of the discovery process.") (citations omitted).

In addition, as a general matter, requests for admissions deal with discrete or separate subjects. *See Fed.R.Civ.P. 36(a)* ("Each matter of which an admission is requested shall be separately set forth."). A set of requests for admissions may address a wide variety of disparate topics. For example, it may contain a request for an admission that a document is authentic, an admission that a meeting occurred on a specified date, an admission that the responding party received a document that was mailed to it, and an admission that an individual was acting as the agent of the responding party during a specified period of time. Each of those four requests for admissions is entirely independent of the others, is unrelated to the others, and is not subsumed within or inextricably intertwined with the others. One [**16] might be admitted and the others might be denied. Similarly,

a set of requests for admissions might seek admissions as to the authenticity of 100 documents. The documents may deal with different topics, may have been created by different persons or entities, and may have been prepared on different dates. Each of those 100 requests for admission would address a subject matter discrete or separate from each of the others. Accordingly, an interrogatory that asks the responding party to state facts, identify witnesses, or identify documents supporting the denial of each request for admission contained in a set of requests for admissions usually should be construed as containing a subpart for each request for admission contained in the set. [3] Therefore, each of defendant's requests for admissions as to which a response to the three interrogatories would be required if the request were not admitted should be treated as a separately countable subpart of each of the three interrogatories.

> 3   The same general rule should apply to analogous interrogatories regarding responses to requests for admissions declining to admit allegations contained in a complaint or an answer.

**[**17]** This does not mean, of course, that every interrogatory of this sort **necessarily** contains a separate subpart for each underlying request for admission. In principle, the requests for admissions must be examined and the relationship among them must be determined. For example, perhaps an interrogatory seeking the basis for the denial of three requests for admissions which asked the responding party to admit that a specified meeting occurred on May 25, May 26, or May 27 should not be viewed as containing three subparts because each of the three requests for admissions concerned the same subject, that is, the date on which a specified meeting took place. Where the underlying requests for admissions concern different, separate, or discrete matters, however, the interrogatory should be viewed as containing a subpart for each request. As a practical matter, this will almost always be the case. *See, e.g., S.E.C. v. Micro-Moisture Controls, 21 F.R.D. 164, 166 (S.D. N.Y. 1957)* ("It is well settled that requests for admissions . . . are required to be simple and direct, and should be limited to singular relevant facts."). Therefore, although courts should be cautious about encrusting **[**18]** the rules of civil procedure with

"interpretive barnacles", *see* Charles E. Clark, Special Problems Drafting and Interpreting Procedural Codes and Rules, 3 Vand. L. Rev. 493, 498 (1950), a strong presumption that each underlying request for admission constitutes a separately countable subpart should be adopted. Though it falls slightly short of constituting a bright-line test, such a presumption will tend to conserve litigants' resources by making it relatively clear what is and is not permitted, and will tend to avoid "sapping the court's limited resources in order to resolve hypertechnical disputes." *Ginn, 137 F.R.D. at 322*.

Adopting such a rule should not unduly restrict access to needed information during discovery. Often, the basis for the denial of a request for admission is unimportant. For example, if an admission as to the authenticity of a document is sought, what the propounding party really wants to know whether it must be prepared to prove that the document is authentic at the time of trial, or whether the responding party will essentially stipulate that such effort will not be necessary. In this situation, preparation of a detailed account of the basis for the **[**19]** denial **[*447]** would merely be a waste of everyone's time. The same can be said of many other matters that are properly the subject of requests for admissions. Occasionally, however the issue is significant and follow-up information is needed. If the subject of a request for admission is an important and disputed one, it may be well worth expending one of a limited number of interrogatories to learn the basis for the denial. In this situation, however, service of the request for admission was probably pointless, and service of an interrogatory alone probably would have been more efficient.

Defendants' contention that plaintiff was required to "set forth in detail an affirmative explanation of how it underwrites its homeowners' insurance policies, how it rates the aggregate risks, and how it separately determines the policy limits to permit [defendants] to evaluate whether the denial of the [request for admission] was in good faith and based upon what facts" confirms the soundness of this approach. When responding to requests for admissions, explanation generally is unnecessary. "[HN6] The answer [to a request for admission] shall specifically deny the matter or set forth in

detail the reasons **[\*\*20]** why the answering party cannot truthfully admit or deny the matter." *Fed.R.Civ.P. 36(a)*. "Each request for an admission should be phrased simply and directly so that it can be admitted or denied without explanation." 8A Wright, Miller & Marcus § 2258 at 546-547; *see United Coal Companies v. Powell Construction Co., 839 F.2d 958, 968 (3d Cir. 1988)* ("*Rule 36* should not be used unless the statement of facts sought to be admitted is phrased so that it can be admitted or denied without explanation."). Explanation is only required if the party cannot truthfully admit or deny. By arguing that plaintiff must fully explain its business practices in responding to interrogatories 10-12, defendants are plainly attempting to convert requests for admissions into interrogatories. This would sidestep the numerical limit contained in *Rule 33(a)*. "Efforts to use other devices such as requests for admissions to circumvent the limitation on number of interrogatories should not be sustained." 8A Wright, Miller & Marcus § 2168.1, at 12 (Supp. 1997), citing *In re Olympia Holding Corp., 189 B.R. at 853* (holding that instructions accompanying requests for admissions purporting to require the defendant **[\*\*21]** to explain why any request that was not admitted could not be admitted improperly transformed the requests for admission into interrogatories because *Rule 36* does not require a party to explain why a request was denied, but only why it cannot admit or deny the request).

Plaintiff also objected to defendants' interrogatories on the ground that they were unduly burdensome and oppressive. Because not all of defendants' interrogatories exceeded the numerical limit, it is necessary for the Court to address this objection as well.

One court has aptly described the problem presented by interrogatories of the type served by defendants, which purport to require a party to specify **all** facts, documents, and witnesses that support the denial of a statement or allegation of fact. As it explained in holding that such interrogatories placed an unreasonable burden on the responding party:

> "Part of that burden arises in this case by the characteristic common to these interrogatories for asking defendant to provide 'all' facts in support of its denials of allegations pled by plaintiff. To state 'all' facts in support of a negative proposition, of course, includes an inventory of evidence **[\*\*22]** which defendant itself would offer at trial to refute the claims of plaintiff. Beyond that, however, it would further require defendant to provide essentially a review of facts and commentary to support its evaluation, if any, that the anticipated evidence of plaintiff as to each disputed paragraph of the complaint simply lacks weight or credibility. The request for 'all' facts, based not only upon knowledge, but also upon simply information and belief, as a significant and reasonable burden to the task of the answering party."

*Lawrence v. First Kansas Bank & Trust Co., 169 F.R.D. 657, 663 (D. Kan. 1996)*. This assessment is both accurate and applicable to the interrogatories served by defendants in this case. Plaintiff's objection that interrogatories **[\*448]** 10-12 are unduly burdensome and oppressive is well taken.

Consideration of the requests for admissions confirms this impression. For example, request for admission 10 asks plaintiff to "admit that in YOUR underwriting process of the INSURANCE CONTRACT, YOU underwrite the following coverages separately from each other: dwelling, other structure, personal property, and loss of use. The term "insurance contract" is not defined **[\*\*23]** in the materials the parties have presented to the Court, and defendants have not supplied the Court with the definition section, if any, contained in their set of requests for admissions. Therefore, it must be assumed that the term "insurance contract" is not limited to the particular contract issued to defendants, and that instead defendants are seeking an admission regarding plaintiff's underwriting of homeowners' policies generally. In addition, neither the requests for admissions nor the corresponding interrogatories contained any time limitation. Accordingly, every document contained in the files of any of plaintiff's other insureds that would tend

181 F.R.D. 441, *; 1998 U.S. Dist. LEXIS 21374, **

to support plaintiff's implicit assertion that it does not separately determine limits of coverage for the listed coverages separately would have to be identified. Similarly, each of plaintiff's employees who participated in or possesses some information about the underwriting of any homeowner's policy in which the limit of coverage for the listed coverages was not determined separately, would have to be identified. Finally, with respect to the identification of facts, as the court suggested in *Lawrence,* the universe of potentially **[\*\*24]** responsive information is almost endless.

Defendants' counsel should have considered these practical problems before serving such broad discovery requests, rather than waiting until the inevitable objections are received before trying to salvage the requests by limiting them to what is really needed.

Notwithstanding its objections, plaintiff also responded to portions of interrogatories 10 and 11. Since the interrogatories were objectionable, both because they violated the numerical limit contained in *Rule 33(a)* and because they were unduly burdensome and oppressive, the Court has no occasion to consider the adequacy of plaintiff's responses.

For the foregoing reasons, defendant's motion as to interrogatories 10-12 is **denied.** The other aspects of this motion are relatively routine.

**Defendants' First Request for Production of Documents.**

Requests 9 and 10 seek production of plaintiff's articles of incorporation and bylaws. The relevance of these documents is minimal, and collecting them for the entire period of several decades during which plaintiff has been in existence would be unduly burdensome, at least in light of the likely benefit of their production. *See* **[\*\*25]** *Fed.R.Civ.P. 26(b)(2)(iii).* Therefore, as to requests 9 and 10, defendants' motion is **granted,** but the time period is limited to July 1, 1996 to the present.

Requests 16-19 seek production of all documents which plaintiff filed with the California or Washington Secretary of State in Department of Incorporations during the time period 1992 through the present. The documents sought possess minimal relevance. Contrary to defendants' suggestion,

production of the documents does not appear to be necessary "to make sure that all parties are properly before the court." Moreover, insofar as punitive damages are concerned, the information can be obtained in a more efficient manner. Plaintiff is directed to produce complete financial statements for its most recent fiscal year, and to provide such updated quarterly or annual financial statements as it may prepare in the ordinary course of business through and including June 30, 1998, no later than fourteen (14) days prior to trial. Therefore, as to requests 16-19, defendants' motion is **granted in part and denied in part.**

Request 27 seeks production of all communications between plaintiff and any other insurer which refer to defendants **[\*\*26]** during the time period January 1, 1992 to the present. Such documents should be readily identifiable, limited in number, and are relevant to the subject matter of this action. Therefore, as to request 27, defendants' motion is **granted.** Plaintiff is directed to produce all unprivileged documents responsive to this request, regardless of whether they were created before or after this action was filed. To take only of the most obvious example, documents created on or after the date plaintiff filed this **[\*449]** action may describe plaintiff's conduct before plaintiff filed this action. If plaintiff withholds any responsive documents from production on the ground of any privilege or protection, plaintiff shall comply with *Fed.R.Civ.P. 26(b)(5). See generally, Miller v. Pancucci, 141 F.R.D. 292, 302 (C.D. Cal. 1992).* Plaintiff contends that this aspect of defendants' motion is moot because plaintiff represents that it already has produced all documents responsive to this request. If so, service of a supplemental verified written response expressly so stating will suffice to constitute compliance.

**Defendants' Second Request for Production.**

Request 32 seeks production of items placed **[\*\*27]** on the agenda of plaintiff's board of directors' meetings referring to homeowners policies for two years prior to the date on which defendants first purchased an insurance contract from plaintiff to the present. As to request 32, defendants' motion is **granted in part and denied in part.** The time period is limited to January 1,

1992 to September 30, 1996. All agenda items concerning other subjects may be redacted.

As to all of the respects in which defendants' motion was granted, plaintiff shall provide additional written responses, produce documents, or serve a privilege log within eleven (11) days, unless otherwise indicated.

**IT IS SO ORDERED.**

DATED: *5-15-98*

ANDREW J. WISTRICH

United States Magistrate Judge

# 11

*Sondker v. Philips Elecs. N.,*
2004 U.S. Dist. LEXIS 14477 (N.D. Ill. July 26, 2004)

LEXSEE 2004 U.S. DIST. LEXIS 14477

**BRIAN SONDKER, Plaintiff, v. PHILIPS ELECTRONICS NORTH, AMERICA, Defendant.**

**No. 03 C 2167**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*2004 U.S. Dist. LEXIS 14477*

**July 26, 2004, Decided**
**July 27, 2004, Docketed**

**DISPOSITION:** [*1] Defendant's motion for summary judgment granted in part and denied in part. Defendant's motion to strike denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff former employee sued defendant employer, alleging breach of contract, quantum meruit, and a violation of the Illinois Wage Payment and Collection Act, *820 Ill. Comp. Stat. 115/1 et seq.*, related to commissions allegedly owed to the employee. The employer moved for partial summary judgment and to strike two exhibits attached to the employee's memorandum in opposition to the partial summary judgment motion.

**OVERVIEW:** The motion to strike the exhibits was denied because a letter produced by the employer indicating that it had requested all attachments to the e-mails utilized as evidence in the case did not satisfy the requirements of U.S. Dist. Ct., N.D. Ill., R. 37.2. Summary judgment was inappropriate on the breach of contract claim related to three transactions as there were issues of fact as to whether contracts were signed for those transactions, which would have entitled the employee to commissions. However, the employer was granted summary judgment on the breach of contract related to a transaction that was not covered under the parties commission plan. There

was also insufficient evidence to show that the employee was entitled to commissions for a transaction involving a community hospital as the employee admitted that another transaction for which he was paid a commission was the same transaction. The employer was granted summary judgment on the Illinois Wage Payment and Collection Act and quantum meruit claims related to the community hospital and uncovered transactions as those commissions had not been earned.

**OUTCOME:** The motion to strike was denied. The motion for partial summary judgment was granted with respect to all of the claims involving the community hospital and uncovered transactions, but was denied with respect to three other transactions.

**CORE TERMS:** summary judgment, partial, Collection Act, commission plan, quantum meruit, movant's, admits, contract claim, non-moving, attachment, e-mail, genuine issue, discovery, customer's, owe, matter of law, commission agreement, issue of material fact, material fact, moving party, reasonable trier of fact, attempt to resolve, good faith, spreadsheet, deposition, disclosure, genuine, booking, authority to approve, admissible

**LexisNexis(R) Headnotes**

2004 U.S. Dist. LEXIS 14477, *

*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*
*Civil Procedure > Summary Judgment > Standards > Materiality*
[HN1] Summary judgment is appropriate when the record reveals that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c).*

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Movants*
*Civil Procedure > Summary Judgment > Motions for Summary Judgment > General Overview*
*Civil Procedure > Summary Judgment > Supporting Materials > Affidavits*
[HN2] In seeking a grant of summary judgment the moving party must identify those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. This initial burden may be satisfied by presenting specific evidence on a particular issue or by pointing out an absence of evidence to support the non-moving party's case. Once the movant has met this burden, the non-moving party cannot simply rest on the allegations or denials in the pleadings, but, by affidavits or as otherwise provided for in *Fed. R. Civ. P. 56*, must set forth specific facts showing that there is a genuine issue for trial. *Fed. R. Civ. P. 56(e).* A genuine issue in the context of a motion for summary judgment is not simply a metaphysical doubt as to the material facts. Rather, a genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the nonmoving party. The court must consider the record as a whole, in a light most favorable to the non-moving party, and draw all reasonable inferences that favor the non-moving party.

*Civil Procedure > Discovery > Misconduct*
[HN3] Pursuant to *Fed. R. Civ. P. 37(a)(2)*, if a party moves for sanctions against another party because of the other party's failure to disclose discovery, the movant is required to include a certification that the movant has in good faith conferred or attempted to confer with the party not

making the disclosure in an effort to secure disclosure without court action.

*Civil Procedure > Discovery > Misconduct*
[HN4] Pursuant to U.S. Dist. Ct., N.D. Ill., R. 37.2, if a party files a motion relating to the production of discovery the movant must supply a statement indicating that: (1) after consultation in person or by telephone and good faith attempts to resolve differences the parties are unable to reach an accord, or (2) the movant's counsel unsuccessfully attempted to meet with, or contact by phone, counsel for the non-movant.

*Contracts Law > Breach > Causes of Action > General Overview*
[HN5] Under Illinois law, for a breach of contract claim a plaintiff must establish that: (1) there was a valid and enforceable contract, (2) the plaintiff met his obligation(s) under the contract, (3) the defendant breached its obligation(s) under the contract, and (4) the plaintiff suffered an injury as a result of the breach.

**COUNSEL:** For BRIAN SONDKER, plaintiff: Stephen Bernard Horwitz, Sugarman & Horwitz, Chicago, IL.

For PHILIPS ELECTRONICS NORTH AMERICA CORP., a Delaware Corporation, defendant: Joel H. Spitz, Michael Ross Phillips, McGuireWoods LLP, Chicago, IL.

**JUDGES:** Samuel Der-Yeghiayan, United States District Judge.

**OPINION BY:** Samuel Der-Yeghiayan

**OPINION**

**MEMORANDUM OPINION**

　　SAMUEL DER-YEGHIAYAN, District Judge

　　This matter is before the court on Defendant's motion for partial summary judgment and Defendant's motion to strike. For the reasons stated below, we deny the motion to strike and we grant

[*2] in part and deny in part the motion for partial summary judgment.

## BACKGROUND

Defendant Philips Medical Systems ("Philips") employed Plaintiff Brian Sondker ("Sondker") as a Service Sales Specialist ("SSS") from June 2000 until January 20, 2003. As a SSS Sondker's job was to get customers to sign contracts to service Philips' medical equipment and equipment of other manufacturers. Sondker received a base salary and commissions at Philips. Sondker signed a commission plan each year that stated the terms of his commission agreement. Sondker submitted to Philips a spreadsheet listing ninety-five transactions that Sondker was claiming commissions for during 2002. Philips management reviewed the spreadsheet and agreed to pay the commissions except for twenty-two of the listed transactions. Sondker brought the instant suit alleging that Philips owes him commissions for the twenty-two transactions. Sondker states in his complaint that Philips failed to pay him commissions of $ 152,212.87. However, Sondker's memorandum in opposition to Philip's motion for partial summary judgment acknowledges that, subsequent to the filing of the complaint Philips made commission payments to Sondker [*3] in the amount of $ 64,364.43, and that the amount in issue is now $ 87,848.44. Sondker brought a three count complaint, which includes an Illinois Wage Payment and Collection Act, *820 ILCS 115/1 et seq.,* claim (Count I), a breach of contract claim (Count II), and in the alternative a *quantum meruit* claim (Count III). Philips filed a motion for partial summary judgment seeking summary judgment only in regards to sought commissions for certain transactions. Philips has also filed a motion to strike Exhibits 3A and 3B attached to Sondker's memorandum in opposition to Philips' partial summary judgment.

## LEGAL STANDARD

[HN1] Summary judgment is appropriate when the record reveals that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c)*. [HN2] In seeking a grant of summary judgment the moving party must identify "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)* [*4] (quoting *Fed. R. Civ. P. 56(c)*). This initial burden may be satisfied by presenting specific evidence on a particular issue or by pointing out "an absence of evidence to support the non-moving party's case." *Id. at 325*. Once the movant has met this burden, the non-moving party cannot simply rest on the allegations or denials in the pleadings, but, "by affidavits or as otherwise provided for in [*Rule 56*], must set forth specific facts showing that there is a genuine issue for trial." *Fed. R. Civ. P. 56(e)*. A "genuine issue" in the context of a motion for summary judgment is not simply a "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp, 475 U.S. 574, 586, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986)*. Rather, a genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*; *Insolia v. Philip Morris, Inc., 216 F.3d 596, 599 (7th Cir. 2000)*. The court must consider the record as a whole, in a light [*5] most favorable to the non-moving party, and draw all reasonable inferences that favor the non-moving party. *Anderson, 477 U.S. at 255*; *Bay v. Cassens Transport Co., 212 F.3d 969, 972 (7th Cir. 2000)*.

## DISCUSSION

### I. Motion to Strike

Philips seeks to strike Sondker's Exhibits 3A and 3B attached to Sondker's memorandum in opposition to the partial motion for summary judgment. According to Philips, Sondker failed to produce the exhibits during discovery and asks the court, pursuant to *Federal Rule of Civil Procedure 37(c)*, to bar Sondker from using those exhibits in attempting to defeat the motion for partial summary judgment. Exhibits 3A and 3B represent hard copies of attachments to e-mails. The e-mails were previously supplied during Sondker's deposition, but the attachments were not produced. Sondker contends that Philips is not entitled to any relief under *Federal Rule of Civil Procedure 37* because

Philips failed to attempt to resolve the issue with Sondker prior to filing the motion to strike as is required under *Federal Rule of Civil Procedure 37(a)(2)* **[*6]** and Local *Rule 37.2*.

[HN3] Pursuant to *Federal Rule of Civil Procedure 37(a)(2)*, if a party moves for sanctions against another party because of the other party's failure to disclose discovery, the movant is required to "include a certification that the movant has in good faith conferred or attempted to confer with the party not making the disclosure in an effort to secure disclosure without court action." [HN4] Pursuant to Local *Rule 37.2*, if a party files a motion relating to the production of discovery the movant must supply a statement indicating that: 1) "after consultation in person or by telephone and good faith attempts to resolve differences [the parties] are unable to reach an accord," or 2) the movant's counsel unsuccessfully attempted to meet with, or contact by phone, counsel for the non-movant.

Philips has produced a letter dated January 8, 2004 from M. Phillips to S. Horwitz which indicates that Philips requested all attachments to the e-mails being utilized as evidence in this case by Sondker. However, this letter does not satisfy the requirements of Local *Rule 37.2*. Since Philips has not provided the court with the statement required **[*7]** pursuant to Local *Rule 37.2*, we deny the motion to strike.

II. Breach of Contract Claim

Philips argues that it is entitled to summary judgment on the breach of contract claim because he did not obtain signed contracts in regards to some transactions, some commissions were not covered under his commission agreement, and some transactions were redundant. [HN5] Under Illinois law, for a breach of contract claim a plaintiff must establish that: 1) there was a "valid and enforceable contract," 2) the plaintiff met his obligation(s) under the contract, and 3) that the defendant breached its obligation(s) under the contract, and 4) the plaintiff suffered an injury as a result of the breach. *Priebe v. Autobarn, Ltd., 240 F.3d 584, 587 (7th Cir. 2000)*.

A. Meier Transactions

Philips contends that it does not owe any commissions to Sondker for signed contracts for Advanced Healthcare ($ 401,562), Menomonee Falls Medical Group ($ 568,412), and St. Joseph's Community Hospital ($ 1,129,329) (R SF 17). The alleged transactions were handled by another SSS Laura Meier ("Meier") who left Philips in the first quarter of 2002. Meier's territory was divided up when she left Philips **[*8]** and the above mentioned three transactions were put on Sondker's list of transactions. It was agreed that, although Sondker would not get a full commission for the alleged transactions, Sondker would get a booking credit for them, meaning that the sale would count towards the overall sales volume for 2002. Sondker admits, pursuant to Local *Rule 56.1*, that the 2002 Commission Plan provided that he would receive commissions only for "processed orders" which required that Sondker provide Philips with a signed contract. (R SF 8). Sondker fails to dispute Defendant's 56.1 fact number 8 and Sondker acknowledges in his response to the claimed fact that he understood the processing of orders to "consist of the submission of a transmittal form and the customer's signed contract." (R SF 8). Sondker admits that he does not have a copy of a signed contract for any of the three contracts.

Sondker does however point to a report prepared by Gene Prendergast and Steve Pence ("Pence") at Philips entitled "East & Central Zone Sales Forecast and Market Overview." The report lists the three Meier transactions indicating that Sondker was to receive booking credits for the three Meier transactions. (R **[*9]** SF 17). Sondker also submitted Exhibits 3A and 3B to his response to the motion for partial summary judgment. The exhibits are an attachment to an e-mail called the "ETW Report." The report is further evidence that a contract was signed for the Advanced Healthcare Transaction. It is not clear that the report would be admissible at trial. However, at this juncture there is a sufficient possibility that the report can be properly admitted by Sondker at trial.

Philips argues that employees such as Pence did not have authority to approve commissions. Philips contends that only its personnel at its Bothell, Washington office had authority to review commission requests. However, whether or not Pence and other Philips employees had authority to

approve commissions, the statements and reports from other Philips employees are evidence that create a legitimate dispute as to whether or not a contract was signed for the Meier transactions. Philips also bases its contention on the affidavit of its Senior Director of Service Sales Administration, Laurence Simanek ("Simanek"). Simanek states in his affidavit that he "found no evidence that a contract had ever been signed by these customers. . . **[*10]** ." Although, if this statement is admissible at trial, it would bolster Philips' position, it is far from definitive evidence sufficient to warrant judgment as a matter of law. Therefore, we deny the motion for summary judgment in regards to the three Meier transactions.

B. HealthSouth Transaction

Philips contends that it does not owe Sondker commissions for the HealthSouth transaction because it was not covered under the 2002 commission plan. Sondker admits, pursuant to Local *Rule 56.1*, that his 2002 commission plan only covered 2002 transactions only and admits that the HealthSouth contract became effective in 2001 and thus was not covered by the plan. (R SF 19-22). Sondker argues that he was told by Pence to include the transaction on his 2002 report because it was a part of the Marconi deals. However, even if that were true, Sondker does not claim that he failed to receive his commissions for the transaction in 2001 and simply because he was told to list it on his 2002 report is not sufficient reason to justify collecting commissions a second time for the transaction.

C. LaPorte Community Hospital

Philips argues that it was not obligated to give Sondker commissions **[*11]** for the LaPorte Community Hospital transaction because Sondker had listed another transaction in 2002 that already covered the LaPorte Community Hospital transaction. Philips contends that Sondker is not entitled to duplicative commissions for the same contract. Sonker admits pursuant to Local *Rule 56.1* that the two entries for LaPorte refer to the same transaction. (R SF 24). We agree that there is insufficient evidence for a reasonable trier of fact to conclude that Sondker is entitled to commissions for the LaPorte Community Hospital transaction.

III. Illinois Wage Payment and Collection Act and Quantum Meruit Claims

Philips claims that it is entitled to summary judgment in regards to the Illinois Wage Payment and Collection Act claim and the Quantum Meruit claim to the extent that they are based on the above transactions. We agree that Sondker is only entitled to recover under the Wage Payment and Collection Act for "earned commissions." *820 ILCS 115/2*. Therefore, we grant Philips' motion for summary judgment on the Wage Payment and Collection Act in regards to the HealthSouth transaction or the LaPorte Community Hospital transactions. Also, in regards to the quantum **[*12]** merit claim there is not sufficient evidence for a reasonable trier of fact to conclude that Sondker should recover any commissions under the 2002 commission plan for the HealthSouth transaction or the LaPorte Community Hospital transaction.

**CONCLUSION**

Based on the foregoing analysis, we deny Philips' motion for summary judgment in regards to the above mentioned three Meier transactions. We grant Philips' motion for summary judgment in regards to the HealthSouth transaction or the LaPorte Community Hospital transactions. We deny Philips' motion for summary judgment on the Wage Payment and Collection Act and quantum meruit claims in regards to the above mentioned three Meier transactions. We grant Philips' motion for summary judgment on the Wage Payment and Collection Act and quantum meruit claims in regards to the HealthSouth transaction or the LaPorte Community Hospital transactions.

Samuel Der-Yeghiayan

United States District Court Judge

Dated: July 26, 2004

# 12

*Stephens v. City of Chicago*, 203 F.R.D. 353, 361 (N.D. Ill. 2001)

LEXSEE 203 F.R.D. 353, 361

**LESLEY STEPHENS, Plaintiff, v. CITY OF CHICAGO, a municipal corporation, RICK J. SANTELLA, RUDY URIAN, EILEEN JOYCE, and ADRIENNE KANE, Defendants.**

**Case No. 98 C 809**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*203 F.R.D. 353; 2001 U.S. Dist. LEXIS 21620*

**September 27, 2001, Decided**
**September 28, 2001, Docketed**

**DISPOSITION:** [**1] "Plaintiff's motion for reconsideration was denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff city employee moved for reconsideration from order that denied the employee's motion to compel discovery from defendant city and its officials in an action under *42 U.S.C.S. § 1983* in which the employee alleged that he was denied promotions because of unlawful race discrimination and political patronage.

**OVERVIEW:** The city employee moved for reconsideration from a trial court order that denied a motion to compel discovery from defendant city and its officials in a *42 U.S.C.S. § 1983* action in which the employee alleged that he was denied promotions because of unlawful race discrimination and political patronage. The employee alleged that each position was unlawfully given to white males, and that those males were less qualified for the position than he was. The trial court denied the motion for reconsideration because there was no basis for reconsideration, given that the employee failed to plead any additional facts. The trial court held that a motion for reconsideration was only appropriate when the court had misunderstood a party, made a decision outside the adversarial

issues, had made an error of apprehension, not reasoning, or where a significant change in the law had occurred or significant new facts had been discovered. The court found the discovery sought was overly broad in scope and time, sought irrelevant matter, and was predatory in nature. The court held that it had not misunderstood any aspect of the motion to compel, nor did it make any error of apprehension or reasoning.

**OUTCOME:** The motion for reconsideration was denied and, for the second time, the court denied the employee's motion to compel discovery from a city and its officials because the discovery sought was overly broad in scope and time and was predatory in nature.

**CORE TERMS:** discovery, interrogatory, discovery requests, promotion, political patronage, promoted, affiliation, overly broad, reconsider, nos, predatory, decision-maker, sponsorship, deposition, appointed, onerous, vague, reconsideration, purportedly, burdensome, open-court, elected, personnel files, above-quoted, nepotism, unduly, race discrimination, repair, documents relating, disciplinary

**LexisNexis(R) Headnotes**

203 F.R.D. 353, *; 2001 U.S. Dist. LEXIS 21620, **

*Civil Procedure > Judgments > Relief From Judgment > Motions to Alter & Amend*
[HN1] A motion for reconsideration is only appropriate when 1) the court has misunderstood a party, 2) the court has made a decision outside the adversarial issues presented to the court by the parties, 3) the court has made an error of apprehension, not reasoning, 4) a significant change in the law has occurred, or 5) significant new facts have been discovered.

*Civil Procedure > Pleading & Practice > Pleadings > Rule Application & Interpretation*
[HN2] A complaint may not rest upon conclusions of fact unsupported by allegations of specific facts from which such conclusions may be drawn.

*Civil Procedure > Pleading & Practice > Pleadings > Rule Application & Interpretation*
*Civil Procedure > Discovery > Protective Orders*
[HN3] Conclusory allegations all too often, intentionally or unintentionally, form the predicate for abusive discovery.

*Civil Procedure > Discovery > Protective Orders*
[HN4] An allegation that one is qualified for a position, without supporting facts, will not support a massive predatory discovery.

*Civil Procedure > Discovery > Protective Orders*
*Governments > Legislation > Overbreadth*
[HN5] The predatory nature of a discovery request is exemplified by its overbreadth.

**COUNSEL:** For LESLEY STEPHENS, plaintiff: Edward Ted Stein, Edward Arthur Voci, Elena M. Dimopoulos, Karen E. Tamburro, Kevin R. Vodak, Law Offices of Edward T. Stein, Chicago, IL.

For CITY OF CHICAGO, ILLINOIS, STREET & SANITATION, RICK J SANTELLA, defendants: Mara Stacy Georges, City of Chicago, Law Department, Corporation Counsel, Chicago, IL.

For CITY OF CHICAGO, ILLINOIS, STREET & SANITATION, RICK J SANTELLA, RUDY URIAN, EILEEN JOYCE, ADRIENNE KANE, defendants: Edward C. Jepson, Jr., Kerry L. Sorvino, Aaron Robert Gelb, Vedder, Price, Kaufman & Kammholz, Chicago, IL.

For CITY OF CHICAGO, ILLINOIS, STREET & SANITATION, RICK J SANTELLA, EILEEN JOYCE, ADRIENNE KANE, defendants: Nadine C. Abrahams, Peter Hines, City of Chicago, Law Department, Corporation Counsel, Chicago, IL.

For RICK J SANTELLA, EILEEN JOYCE, ADRIENNE KANE, defendants: Derrick Matthew Kedziora, City of Chicago, Law Department, Corporation Counsel, Chicago, IL.

For RUDY URIAN, defendant: James Patrick Nally, James P. Nally **[**2]** PC, Chicago, IL.

**JUDGES:** W. Thomas Rosemond, Jr., United States Magistrate Judge.

**OPINION BY:** W. Thomas Rosemond, Jr.

**OPINION**

[*354] *ORDER*.

Before this Court is "*Plaintiff's Motion For Reconsideration Of Plaintiff's Motion To Compel Discovery Responses From Defendants City, Santella, Joyce And Kane Regarding Political Patronage*". The motion seeks reversal of our *Order* of April 12, 2001 *denying "Plaintiff's Motion To Compel Discovery Responses From Defendants City, Santella, Joyce And Kane." The motion is denied*.

As correctly noted in "*Plaintiff's Memorandum In Support Of Motion For Reconsideration Of Plaintiff's Motion To Compel Discovery Responses From Defendants City, Santella, Joyce And Kane Regarding Political Patronage*" [HN1] a motion for reconsideration is only appropriate when:

    **1**. The court has misunderstood a party,

    **2**. The court has made a decision outside the adversarial issues presented to the court by the parties,

**3**. The court has made an error of apprehension, not reasoning,

**4**. A significant change in the law has occurred, or

[*355]

**5**. Significant new facts have been discovered. [1]

As always, plaintiff [**3] is deliberately vague with its charges against the Court. In any event, we resolve plaintiffs' broad and non-specific challenges as follows.

1  *See, Bank of Waunakee v. Rochester Cheese Sales, Inc., 906 F.2d 1185, 1191 (7th Cir. 1990).*

**Ground (4)**, quoted above, is unavailable to the plaintiff as a challenge to the Court's *Order* of April 12, 2001, because no significant change in the law has occurred, and plaintiff does not assert that it has. Apparently, the motion to reconsider is predicated on the remaining grounds noted above, although no attempt to be specific about the matter is made.

An apparent attempt is made to base the motion to reconsider on ground **(5)** above. At Page 2 and 3 of "*Plaintiff's Memorandum In Support Of Motion For Reconsideration*", plaintiff states the following:

Discovery in this case has revealed more information about this [political patronage] policy, practice, or custom. For example, Ernie Greb, Director of Operations, also worked [**4] for Alderman Mell's organization, along with former Deputy Commissioner Urian, both of whom have advanced rapidly through the ranks at Fleet, also known as "Mell's Place". Both Mr. Urian and Mr. Greb obtained positions for which the Plaintiff applied and was qualified. Plaintiff has learned that during the job interview of the Commissioner's brother, Gary Santella, for one of the positions for which Plaintiff applied and was qualified, Mr. Urian and Mr.

Greb allegedly assisted Gary Santella in answering the interview questions and, when the Fleet Personnel employee questioned this, she was told "didn't you get the phone call [from the Commissioner's Office]." Plaintiff has also learned that Patrick Ward, the decision-maker at the downtown Personnel Office, and others, volunteered in political campaigns. Upon information and belief, several of the other persons promoted instead of the Plaintiff were also politically connected to figures like Ald. Mell and Mike Madigan.

Discovery for this action has been open for approximately 36 months or since the April 30, 1998 filing date of the original complaint, and yet the plaintiff still makes charges "on information and belief." By [**5] now, the plaintiff ought to know. Plaintiff has sought and obtained multiple extensions of time within which to complete fact discovery. If he does not know after more than three years of discovery, it is because he never knew, and his case is based on speculation, and his discovery requests nothing more than fishing expeditions.

In any event, we analyze the above-quoted section of plaintiff's motion to compel. Plaintiff never states that the above-noted, purportedly, significant facts are "new" or that they were unknown at the time of the filing of his February 29, 2000 motion to compel. This omission in and of itself is sufficient to say that he has failed to satisfy ground **(5)**.

Moreover, the purportedly "significant" facts are by no means significant. There is no allegation nor any facts pled from which one could infer that the plaintiff is qualified to hold the positions of Director of Operations or Deputy Commissioner, or that he ever applied for those positions. If the plaintiff is unqualified for these positions or never applied for them, then political patronage had nothing to do with his non-promotion to these positions.

Again, with respect to his purportedly new [**6] facts, the plaintiff is intentionally vague. He never identifies what positions Messrs. Urian and

Greb obtained that he applied for and was more qualified for than they. He also never identifies when these "positions" became available or whether they are within the applicable statute of limitations. Plaintiff never identifies what position Mr. Gary Santella obtained for which the plaintiff was more qualified.

The misleading nature of the above-quoted section of plaintiff's motion to reconsider is all the more apparent when one realizes that Mr. Rudy Urian has held the position of Deputy Commissioner, Bureau of Operational Service, since June of 1994. [2] Likewise, [*356] Mr. Ernie Greb has held the position of Director of Operations since June 16, 1994. [3] By his own allegations, plaintiff did not begin to complain to defendants Santella, Urian, and other supervisors about the lack of minorities in middle and upper management positions until **late** 1994. [4] June is not late 1994. More importantly, by his own allegations, the first promotion that he sought and did not obtain was that of Manager of Vehicle Adjustments - not that of Deputy Commissioner, nor that of Director of Operations. [**7] And, most importantly of all, he did not seek the position of Manager of Vehicle Adjustments **until February of 1995**. How then could any information regarding how Messrs. Urian and Greb obtained their positions **in 1994** be deemed significant, or for that matter relevant? And, how can it be argued with a straight face that the plaintiff applied for positions held by Messrs. Urian and Greb when the only positions that either of them has ever held since June of 1994 is their present positions which they held long before the plaintiff ever applied for any of the positions of which he now complains?

2   Exhibit G, "*Plaintiff's Motion To Compel Discovery Responses From Defendants City, Santella, Joyce And Kane*."

3   Exhibit G.

4   Amended Complaint, at P 26.

No significance can be attached to the fact that "Patrick Ward, the decision-maker at the downtown Personnel Office, and others, volunteered in political campaigns." So what? There is no allegation that any of Patrick Ward's decisions [**8] directly affected the plaintiff's ability to be

promoted to positions for which he applied and was the most qualified candidate.

None of the "facts" recited on Pages 2 and 3 of "*Plaintiff's Motion For Reconsideration*" are "new" or "significant". Accordingly, ground **(5)** is not a basis for grant of the motion to reconsider.

Purportedly, the motion to reconsider rests primarily on grounds **(1), (2),** and **(3)** quoted above. Ground **(2)** is clearly unavailing. The Court did not make a decision outside of the adversarial issues presented by the parties. And, plaintiff can point to no such circumstance. Further, as we demonstrate hereinafter, none of the remaining two grounds supports the motion to reconsider.

**First**, plaintiff argues that, in resolving his motion to compel, the Court considered some matters that were not at issue, and omitted to consider some that were. More specifically, plaintiff criticizes the Court for discussing Document Request No. 1 of *Plaintiff's Third Request For Production*, which was not at issue, and for purportedly failing to discuss Interrogatory No. 4 of *Plaintiff's Second Set Of Interrogatories* and Document Request [**9] Nos. 11 and 12 of *Plaintiff's Third Request For Production*, which were at issue. The challenge is without merit.

**Document Request No. 1** reads in pertinent part as follows:

All documents stating your policies, regulations, guidelines, or procedures for using political patronage as a factor in hiring, promotion, or disciplinary decisions for the Department of Fleet Management for the years 1993 to the present. [5]

Document Request No. 1 was discussed in the April 12th *Order* because it corresponded to Interrogatory No. 2, and because it permitted the Court to illustrate the type of political patronage paper discovery that was being sought by the plaintiff. It also was a vehicle by which the Court could better illustrate the obstacles that lay in pursuit of such discovery such as the *Shakman Consent Decree*. [6] Because of the *Shakman Decree*, the City probably did not maintain records that related in any way to

an employee's political affiliation. And, indeed, the City confirmed this presumption.

5  Exhibit C, at 6, *supra*, n. 2.

6  *Shakman v. Democratic Organization of Cook County*, 481 F. Supp. 1315, 1358 (N.D.Ill. 1979), *reversed in part sub nom, Shakman v. Dunne*, 829 F.2d 1387 (7th Cir. 1987), *cert. denied*, 484 U.S. 1065, 98 L. Ed. 2d 991, 108 S. Ct. 1026 (1987).

[**10] As we noted in our April 12th *Order*, it was the City's position that to require it to compel its employees to answer questions concerning their political associations would potentially expose it to charges of having violated the *Shakman Consent Decree*. According to the City, under the *Shakman Decree*, the City was enjoined from, among other [*357] things, "conditioning, basing or knowingly prejudicing or affecting any term or aspect of governmental employment, with respect to one who is at the time already a governmental employee, upon or because of any political reason or factor." [7] Forcing it to ask its employees about their political affiliations, argued the City, creates the potential of future litigation based on alleged violations of the *First Amendment* and the *Shakman Decree*. Continuing in this vein, the City argued in its memorandum of law that if it was "required to obtain information regarding the political affiliation of the employees plaintiff has identified, any of these employees [could] claim, in a subsequent proceeding, that the City was aware of their political affiliation and that any actions taken [with respect to] them were motivated by this knowledge. [**11] "

7  *Shakman, 481 F. Supp. at 1358.*

With respect to the Court's non-identification of each and every political patronage discovery request at issue, rather than identify each and every political patronage discovery request, the Court simply chose to refer to them in general terms as the "political patronage" discovery requests. Given the *Shakman Consent Decree*, and given that each and every discovery request at issue was overly broad in scope and time, given that each such discovery request sought irrelevant matter, and given that each was unduly vague, onerous and burdensome, the Court concluded, then and now, that the defendants'

objections to the plaintiff's political patronage discovery requests should be sustained. The Court did not identify Interrogatory No. 4 and Document Request Nos. 11 and 12 specifically, because it saw no need to do so. It sustained the defendants' relevancy, vagueness, onerous, and burdensome objections to *all* of the plaintiff's political patronage discovery [**12] requests. Again, specific identification was unnecessary. There should not have been any confusion. In any event, we unambiguously clarify the matter now. Before doing so, we give some background to better understand the context in which the motion to compel arose.

The underlying action is essentially a *§ 1983* civil rights race discrimination and "failure to promote" case. Plaintiff Lesley Stephens is an African-American male employee of the City of Chicago, who presently holds the position of Accident Adjustor with the Department of Fleet Management. Allegedly, Fleet is responsible for the repair, inventory, maintenance, and fueling of over 5000 City-owned vehicles in over 30 City departments. **Fleet employs nearly six hundred employees** and controls a budget of over $ 60 million.

In January of 1987, plaintiff held the position of Acting Assistant Superintendent and Acting General Foreman with the Department of Fleet Management. He left the department for approximately five years for disability leave. He returned from disability leave in 1993. Upon his return, he was reinstated to the position of Accident Adjustor, a non-management position in Fleet's Adjustment Section. [**13] Allegedly, this was a demotion in pay and level of responsibility. As Accident Adjustor, plaintiff was responsible for inspecting and estimating body and mechanical damage to City vehicles; arranging for repairs; negotiating costs of and evaluating repair work; and maintaining records of accident reports, damages, and repair costs. Assertedly, his performance was outstanding.

The gist of plaintiff's amended complaint is that he was denied promotions due to unlawful race discrimination and political patronage. With respect to each position he alleges was unlawfully given to white males, he charges conclusorily that these males were less qualified for the position than he

was. He never pleads any facts from which one could deduce that this is so:

> [HN2] *A complaint may not rest upon conclusions of fact unsupported by allegations of specific facts from which such conclusions may be drawn.* [8]

Even the liberal notice pleading of the *Federal Rules of Civil Procedure* require more [*358] than what plaintiff alleges. As we detail hereinafter, the plaintiff uses his conclusory allegations as the predicate to launch overly broad and predatory discovery requests.

> 8   *Hills of Palos Condominium Assoc., Inc. v. I-Del, Inc.,* 255 Ill. App. 3d 448, 476, 626 N.E.2d 1311, 1331, 193 Ill. Dec. 760, 780 (1st Dist. 1993)* (emphasis added).

[**14]  In open-court, at the May 3, 2001 oral argument on the motion to reconsider, *Stephens* counsel argued that the Court considered Interrogatory No. 1 which was not at issue. We disagree.

In Paragraphs 17 and 18, at pages 4 and 5 of "*Plaintiff's Motion To Compel Discovery Responses From Defendants City, Santella, Joyce And Kane,*" plaintiff specifically charges that "Defendant has no legitimate argument for refusing to answer ***interrogatory no. 1*** and request for production no. 3 from the Third discovery requests ...." (emphasis added). ***Interrogatory No. 1 of the Plaintiff's Second Set of Interrogatories*** reads as follows:

> 1. Provide the following information regarding all current and former City of Chicago Department of Fleet Management or its predecessor agencies or departments' employees who received promotions to any position, including but not limited to the positions Plaintiff applied for [for] the years 1993 to present:
>
> **a**. Full name;
>
> **b**. Race;

> **c**.    Date(s)    of promotion(s);
>
> **d**.    Position(s) promoted to, and position(s) promoted from;
>
> **e**. All job titles held by that Person at the Department of [**15] Fleet Management and dates those job titles were held;
>
> **f**. The basis or bases for the promotion(s);
>
> **g**. The qualifications held by The person for the promotion(s);
>
> **h**. The name of the person(s) who conducted the interview(s) for the promotion(s) (if no interview were conducted for a position, please so state);
>
> **i**. The name of the person(s) who made the promotion decision(s); and
>
> **j**.    Whether that person has ever received any kind of warning, reprimand or discipline at any time during that person's employment at the Department of Fleet Management. [9]

As we noted in our April 12, 2001 *Order*, all of plaintiff's discovery requests were overboard in scope and time. So that there is no mistake about the matter, we rule that Interrogatory No. 1, quoted above, is overly broad as to scope and time and, therefore, seeks wholly irrelevant matter.

203 F.R.D. 353, *; 2001 U.S. Dist. LEXIS 21620, **

Accordingly, we again sustain the defendants' objections to this Interrogatory.

> 9  "*Defendants City, Santella, Joyce And Kane's Objections And Responses To Plaintiff's Second Set Of Interrogatories And Third Request For Production*", at 4, *Exhibit C to*, "*Plaintiff's Motion To Compel Discovery Responses From Defendants City, Santella, Joyce And Kane*".

[**16]  Interrogatory No. 1 is an example of the ***predatory*** nature of virtually each and every one of plaintiff's discovery requests. It is clear from such overly broad discovery requests that plaintiff seeks to make discovery so onerous and burdensome in terms of manpower, costs, and the general disruption to the defendants' business so as to coerce a settlement. In his motion to reconsider, plaintiff makes no effort whatsoever to narrow the above-quoted interrogatory. Indeed, no effort whatsoever is made in the motion to reconsider to narrow any of the discovery requests at issue, even though one of the grounds for denying the motion to compel was the overbreadth of the plaintiff's discovery requests.

In any event, returning to the predatory nature of the Interrogatory, Interrogatory No. 1 unabashedly seeks discovery of "employees who received promotions to any position, including but not limited to the positions Plaintiff applied for [for] the years 1993 to present." What possible relevance could information regarding "***any position***", including secretarial or janitorial positions, to which plaintiff ***never*** applied, have to do with any of the plaintiff's § [**17]  *1983* "failure to promote" claims or, in particular, his political patronage claims. It must be remembered that the plaintiff has not filed a class action.

With respect to his individual *§ 1983* "failure to promote" claim, plaintiff's pleadings [*359] are wholly deficient to support this obvious fishing expedition. Plaintiff has never alleged that he was "*the most qualified*" for each and every position for which he applied. Nor does he ever allege that he was "*as qualified as the person who got the position, and but for the race discrimination or political patronage*" he would have received the promotion. Instead, plaintiff conclusorily alleges that he was qualified for a particular position, or

that the person who received the promotion was less qualified than he. No facts from which one could deduce this are ever pled. Such [HN3] conclusory allegations all too often - intentionally or unintentionally - form the predicate for abusive discovery.

Far too often, in his pleadings, plaintiff uses examples of employment positions which purportedly were denied him, which are and were inappropriate and improper. For example, plaintiff charges that he was unlawfully prevented from being promoted [**18]  to the position of Director of Operations due to political patronage. On May 3, 2001, in open-court, defendants demonstrated that discovery has revealed that charge to be baseless. According to the defendants, employees are ***not*** promoted to the position of Director of Operations. It is a position obtained ***through appointment only***. Moreover, the position is a *Shakman* exempt position. Therefore, an individual's political affiliation and political sponsorship may legitimately be taken into account. Using the position of Director of Operations as an example of unlawful political patronage is more than specious. It is misleading and improper.

Arguably, every employee in plaintiff's work division - like plaintiff - was "***minimally***" qualified for the Director position. That does not mean that every so "*minimally*" qualified worker, like the plaintiff, had any chance in Hades of ever getting such an appointed position. Defendants maintain that plaintiff never had any chance of obtaining such a position, because, in part, he lacked the years of experience and the ***continuous*** years of employment due to his five year break in service on disability [**19]  leave. Apparently, discovery has revealed that plaintiff often applied for positions for which he was never the most qualified or even as qualified as the person who received the promotion. Clearly, unless the plaintiff was qualified for the positions for which he applied, the political affiliation or political sponsorship of the individuals promoted over him is irrelevant. In any event, [HN4] an allegation that one is qualified for a position, without supporting facts, will not support the massive predatory discovery that plaintiff seeks.

Another of plaintiff's discovery requests at issue was Document Request No. 3. ***Request for Production No. 3*** reads as follows:

203 F.R.D. 353, *; 2001 U.S. Dist. LEXIS 21620, **

Any and all documents relating in any way to any and all current and former Department of Fleet Management or its predecessor agencies or departments' employees and their promotions to any position within Fleet, applied for by Plaintiff, for the year 1993 to present, including but not limited to their personnel files, salary and benefits information; and performance appraisals, warnings, reprimands or disciplinary action taken again them. [10]

The above-quoted document request is overly broad in scope and [**20] time and, therefore, seeks wholly irrelevant matter. The document request is also unduly vague. Does it just seek the production of any and all documents relating to any and all Fleet employees, current and former, and their promotions to positions for which the plaintiff applied? Or worse, does the document request seek any and all documents relating in any way to current and former employees of Fleet who applied for positions for which the plaintiff applied irrespective of whether or not they obtained the position or promotion? The document request is vague and burdensome. It also seeks wholly irrelevant matter, *to-wit*: "Any and all documents *relating in any way* to any and all current and former Department of Fleet ... employees", who applied for positions to which the plaintiff applied. For example, what would the *entire* personnel files of these employees, which would include such sundry and irrelevant matters as maternal, sick, or vacation leave papers, have to do with whether or not these individuals [*360] were more or less qualified for the positions than the plaintiff? Accordingly, we again sustained the defendants' objections to this request. [11]

10   Exhibit C.
[**21]
11   It should be noted that without waiving their objections to Document Request No. 3, the defendants did produce to the plaintiff relevant work histories, disciplinary records, performance evaluations, resumes,

curriculum vitae, and related documents. *See*, Exhibit M, at 3.

Next, plaintiff's motion to compel sought production of "the '*daily activity sheets*' maintained by the accident adjustment section at Fleet reflecting the job duties each Accident Adjuster was assigned to perform." [12] First, it must be noted that there is absolutely no interrogatory or document request in "*Plaintiff's First Set Of Interrogatories And Requests For Production To Defendants City Of Chicago, Rick Santella, Eileen Joyce And Adrienne Kane*" which **expressly** calls for such documents. And plaintiff never identifies any such interrogatory or document request in its motion to compel. The request was made by letter.

12   "*Plaintiff's Motion To Compel Discovery Responses From Defendants City, Santella, Joyce And Kane*", at 6.

[**22]   Document requests from plaintiff's first request for production, such as the following, which seek each and every piece of paper relating to the plaintiff are far too general and non-specific to be deemed to have requested such specific material as "daily activity sheets":

1. All documents and things identified or requested to be identified in the answers to Plaintiff's First Set of Interrogatories, designating to which Interrogatory each document is responsive.

2. All documents and other things pertaining to Plaintiff in any way, including any personnel file, in the possession, custody, or control of Defendant City of Chicago. [13]

Document requests like those quoted-above are so overly broad that in asking for everything under the sun, they ask for nothing specific. All of the document requests in *Plaintiff's First Set Of Document Requests* are overly broad in scope and time, and seek wholly irrelevant matter. None includes a specific request for "*daily activity sheets*". Nor will we construe their inappropriate breadth to include such a request. Defendants are not required to produce material not **formally**

Case 1:08-cv-00526     Document 148-3     Filed 08/21/2008     Page 114 of 179

203 F.R.D. 353, *; 2001 U.S. Dist. LEXIS 21620, **

requested. Letter requests [**23] are not a formal document request. Letter requests can be a tool for abusive discovery.

13 "*Defendants City Of Chicago, Santella, Joyce And Kane's Objections And Responses To Plaintiff's First Set Of Interrogatories And Requests For Production To Defendants City Of Chicago, Rick Santella, Eileen Joyce And Adrienne Kane*", at 7, *Exhibit A to*, "*Plaintiff's Motion To Compel Discovery Responses From Defendants City, Santella, Joyce And Kane*".

"*Plaintiff's Motion To Compel Discovery Responses From Defendants City, Santella, Joyce And Kane*" specifically identified Interrogatory Nos. 2 and 4 of *Plaintiff's Second Set Of Interrogatories* and Document Request Nos. 11 and 12 of *Plaintiff's Third Request For Production* as the discovery requests pertaining to the alleged "unlawful political patronage" claim, or Count 3 of the amended complaint. Count 3 of the amended complaint essentially alleges that defendants City of Chicago, Santella, Urian, Joyce, and Kane have unlawfully based hiring and promotion [**24] decisions at all levels of Fleet on political affiliation, support, and allegiance to the Democratic Party and/or political sponsorship by members of the Democratic Party. Allegedly, defendant City's actions reflect a policy, custom, or pattern of official conduct of engaging in unlawful patronage practices:

a. Defendant Urian recommended that Plaintiff seek the support of a political sponsor in order to obtain a promotion, and plaintiff was denied a promotion after he refused to do so;

b. Plaintiff was denied a promotion to the position of Manager of Vehicle Adjustments in favor of Gary Santella, the brother of defendant Santella, the Commissioner of Fleet;

c. Wally West obtained the position of Accident Adjustor and was promoted to Manager of Vehicle Adjustments over Plaintiff based on his connections to Gary Santella;

[*361]

d. On information and belief, defendants have made other hiring and promotion patronage-based decisions for which patronage is an unlawful consideration. [14]

It is the above vague, general, and conclusory allegations which plaintiff seeks to use as a predicate for his predatory discovery requests. With respect [**25] to subparagraph (a) noted above - what position is plaintiff talking about, when was it available, was he the most qualified?

14 Amended Complaint, at 15 and 16.

Subparagraph (b) looks more like a nepotism charge than a political patronage one. Was the plaintiff more qualified than the brother? There are no allegations from which such could be inferred.

Subparagraph (c) is a thin reed upon which to launch massive discovery. What is the nature of the "connections" of which the plaintiff complains - family, friendship, or political? There are no allegations from which one could infer that these so-called connections are unlawful.

Subparagraph (d) is clearly a "fishing expedition" allegation.

The next discovery request at issue is Interrogatory No. 2. ***Interrogatory No. 2*** of *Plaintiff's Second Set Of Interrogatories* reads as follows:

2. Provide the following additional information regarding all current and former City of Chicago Department of Fleet Management [**26] or its predecessor agencies or department employees, identified in answer to interrogatory no. 1, for the years 1993 to present:

a. Their current and former political party membership, if any;

b. Any and all political functions or

Case 1:08-cv-00526    Document 148-3    Filed 08/21/2008    Page 115 of 179

203 F.R.D. 353, *; 2001 U.S. Dist. LEXIS 21620, **

events they have attended;

**c**. Any and all political work (paid or unpaid) in which they have engaged;

**d**. Any and all political contributions they have made;

**e**. Identify any and all Department of Fleet employees who suggested, instructed, told, mentioned, or in any way referred any of these persons to speak with any elected or appointed City official regarding any job, job opening, or promotion at the Department of Fleet Management; and

**f**. Identify any and all conversations had by these persons with any elected or appointed City official regarding any job, job opening, or promotion at the Department of Fleet Management. [15]

Interrogatory No. 2 above is overly broad in scope and time, and seeks wholly irrelevant matter. Accordingly, for the second time, defendants objections thereto are sustained. It should be noted that in his motion to reconsider plaintiff makes no effort to narrow [**27] the breadth of his political patronage discovery requests.

15  Exhibit C, at 4 and 5.

[HN5] The predatory nature of the discovery request is exemplified by its overbreadth. It must be remembered that by plaintiff's own allegations, Fleet employs nearly **six hundred employees**. The absolute ludicrousness of the discovery request is exemplified by subparagraphs **(e)** and **(f)** above, seeking ***"suggestions"*** and ***"conversations"***, respectively, of virtually all six hundred Fleet employees from 1993 to the present.

Not only is Interrogatory No. 2 objectionable because it seeks wholly irrelevant matter, it is further objectionable because it is onerous and unduly burdensome on its face. As we noted in our April 12th *Order*, plaintiff can obtain the information through a less onerous medium, *to-wit*: depositions.

It must be remembered that the primary issue for Count 3 is, "Did the Fleet decision-makers take political affiliation or political sponsorship into account when decisions [**28] regarding promotions were made?" In turn, "Did the decision-makers have knowledge of any political affiliation or political sponsorship of the individuals promoted?" The most direct way to discover the answers to such questions is to orally examine the decision-makers on such matters at their respective depositions. All of the decision-makers have [*362] been deposed. Nothing prevented the plaintiff from inquiring of the deponents along these lines.

Additionally, nothing prevented the plaintiff from pursuing a similar line of inquiry with the individuals who were promoted to positions to which the plaintiff applied. For these individuals, the key inquiry should have been "Did you communicate your political affiliation or political sponsorship or political activity to any decision-maker? Obviously, an individual's political affiliation or political sponsorship or political activity only becomes relevant if it was communicated to the decision-makers. If the decision-makers did not know of these matters, then they could not possibly take them into account when considering whether or not a particular individual should be promoted. Again, plaintiff was free at all relevant times during the course [**29] of discovery to depose the individuals promoted to positions to which the plaintiff applied and inquire of them along these lines. Plaintiff apparently chose not to do so. Our *Order* of April 12th did not preclude deposition discovery along the lines mentioned above. It just precluded plaintiff from obtaining the information through the unduly

Case 1:08-cv-00526    Document 148-3    Filed 08/21/2008    Page 116 of 179

203 F.R.D. 353, *; 2001 U.S. Dist. LEXIS 21620, **

onerous and predatory vehicle of his overly broad and irrelevant paper discovery requests. Forcing the plaintiff to obtain his desired discovery through the vehicle of depositions should have forced him to exercise common sense and focus upon what is key to his civil rights claims.

Accordingly, if plaintiff did not obtain relevant information regarding his political patronage claims during the pendency of discovery, he can blame no one but himself. Prior to the issuance of the April 12th *Order*, on numerous occasions in open-court, the Court instructed the plaintiff to pursue the avenue of oral examination in order to obtain the information that he seeks. Discovery is now closed. If plaintiff did not avail himself of a discovery tool that was always open to him, he may not do so now.

As we have illustrated above, the very overbreadth [**30] of plaintiff's discovery requests - both those at issue and those not at issue - is *indicia* of their *predatory* nature. Further indicia is the following. On May 3d, 2001, in open-court, the defendants represented to the Court that discovery revealed that the named defendants had nothing to do with the "first cut" of potential candidates for any particular employment position. Assertedly, the Department of Employment Services made the "hiring" decisions regarding who from the pool of potential candidates would make it to the *Referral List* from which the named defendants made their selections for promotions. Obviously, if plaintiff did not make the "cut", he can not blame the named defendants unless he believes that they can influence the Department of Employment Services. In any event, the point is that pursuing massive discovery from named defendants who have nothing to do with the initial narrowing of the candidate pool strikes us as abusive discovery. Neither in his motion to compel, nor in his motion to reconsider, does the plaintiff explain his pursuit of such broad discovery from the named defendants given the apparent undisputed role and function of the [**31] Department of Employment Services.

***We turn next to Interrogatory No. 4.*** Although plaintiff identifies Interrogatory No. 4 of *Plaintiff's Second Set Of Interrogatories And Third Request For Production* as a political patronage discovery request, it has more to do with nepotism than political patronage. Interrogatory No. 4 reads as follows:

**4**. Identify any and all relatives (by blood or by marriage) to Defendants Joyce, Santella and Kane who are or have been employed by the City of Chicago, or who have applied for or inquired about possible employment there and for each state:

a. The assistance, if any, given by Defendants Joyce, Santella or Kane to these relatives in seeking employment, applying for employment, or becoming employed by the City;

b. Any and all conversations by Defendants Joyce, Santella or Kane with these relatives regarding their seeking, applying for, or becoming employed by the City;

[*363]

c. Identify all documents relative to this interrogatory, including but not limited to applications for employment, internal memos, letters, notes and other documents. [16]

Interrogatory No. 4 above is overly broad in scope and time, [**32] and thus seeks wholly irrelevant matter. Defendants' relevancy objections thereto are sustained for yet a second time.

16   Exhibit C, at 5 and 6.

The interrogatory is onerous and burdensome, because, among other things, it seeks information on conduct which is not unlawful. Nepotism,

203 F.R.D. 353, *; 2001 U.S. Dist. LEXIS 21620, **

personal friendship, the plaintiff's being a perceived threat to his superior, or the employer's antipathy to irrelevant non-statutorily protected personal characteristics are not unlawful. [17] Nepotism, "while disreputable, is not illegal." [18]

> 17    *Wallace v. SMC Pneumatics, Inc., 103 F.3d 1394, 1399 (7th Cir. 1997).*
> 18    *Bickerstaff v. Nordstrom, Inc., 48 F. Supp. 2d 790, 800 (N.D.Ill. 1999).*

In any event, the predatory nature of the Interrogatory is reflected in, among other things, its request for the identity of any [**33] and all relatives to the defendants who have ***inquired about possible employment*** with the City irrespective of whether or not they even followed through on their inquiries, and irrespective of whether or not they inquired about or applied for positions for which the plaintiff did not apply or had no interest.

More importantly, what has this discovery request to do with any issue in the case. None of the five counts of plaintiff's amended complaint is predicated on a claim for nepotism. There is no allegation that each position for which the plaintiff applied, or even half of the positions for which he applied, were given to relatives of the defendants, and that he was the most qualified for that particular position.

Interrogatory No. 4 has absolutely nothing to do whatsoever with any issue in this lawsuit. In any event, even though the subject matter is wholly irrelevant to the action, the defendants represented in open-court that the plaintiff was never precluded from obtaining the information *via* deposition testimony. [19] *Stephens* counsel simply did not inquire on the matter at any of the defendants' depositions.

> 19    *See*, Official tape-recording of the May 3, 2001 proceedings before the Court.

[**34]    Next, plaintiff sought discovery regarding "other complaints, administrative charges, and lawsuits alleging race discrimination and retaliation". It was the Court's recollection that this request had been denied in open-court. Plaintiff was unsure, because the record was unclear on the matter. We clarify the record, and summarily sustain the defendants' objections to such discovery.

Interrogatory No. 3 of *Plaintiff's First Set Of Interrogatories* and Document Request No. 13 of *Plaintiff's First Request For Production*, which relate to this requested information are both overly broad in scope and time, and seek wholly irrelevant matter.

Finally, at issue under plaintiff's motion to compel were Document Request Nos. 11 and 12 of the Plaintiff's *Third Request For Production*. They read as follows:

> ***Document Request No. 1***. Any and all documents regarding the job qualifications of Mike D'Antonio for the position of Director of Vehicle Maintenance, including but not limited to any job descriptions for that position; Mr. D'Antonio's resume; his personnel file; his political connections, if any, with Mike Madigan or any other elected or appointed official; and his [**35] application for the job.
>
> [***and***]
>
> ***Document Request No. 12***. Any and all documents regarding the job qualifications of Marty Nellis for his present position including but not limited to any job descriptions for that position; Mr. Nellis' resume; his personnel file; his political connections, if any, with any elected or appointed political official; and his application for the job. [20]

Without waiving their objections to the above-quoted document requests, the defendants did produce to the plaintiff the work histories, disciplinary records, resumes, curriculum [*364] vitae, and related documents for the above individuals. [21] Defendants objected primarily to the political patronage aspects of the two document requests, and then only to the vehicle of paper discovery as a means of obtaining the information. Again, nothing prevented the plaintiff from obtaining the information through depositions.

> 20    Exhibit C, at 10.

21    Exhibit M, at 2, "*Plaintiff's Motion To Compel Discovery Responses From Defendants City, Santella, Joyce And Kane*."

[**36]   In any event, as Document Request Nos. 11 and 12 now stand, they are overly broad in scope and time. Both seek wholly irrelevant matter. Accordingly, defendants' objections thereto are again sustained.

It should be noted that no where in his motion to compel did the plaintiff ever discuss the relevancy of the information sought in Document Request Nos. 11 and 12. Footnote 5 of "*Plaintiff's Motion To Compel Discovery Responses From Defendants City, Santella, Joyce And Kane*", is the *only* part of the motion that speaks to Document Request Nos. 11 and 12. It reads as follows:

> Request for production nos. 11 and 12 from the Third discovery requests also request *this information* about political affiliations, but focus on two of the several White persons who were promoted to positions instead of the Plaintiff, Mike D'Antonio and Marty Nelis. [22]

"*This information*", as illustrated by the sentence to which footnote 5 is appended, is information regarding "whether any of *these people* received suggestions or instructions to speak with any elected or appointed City official regarding any City job, and requested identification of all [**37] such conversations with these elected or appointed City officials." [23] "*These people*", as reflected by the preceding sentence, means those "persons who were promoted to the 7 job titles instead of the Plaintiff, such as their political party membership, political functions they have attended, political work in which they have engaged, and political contributions they have made." [24] If, as plaintiff states in footnote 5, Document Request Nos. 11 and 12 were meant to include all of the above, then we further sustain the defendants' objections thereto on the ground that the two document requests are unduly vague. Defendants could not possibly have read Document Request Nos. 11 and 12 to have included the above-referenced matters.

22    "*Plaintiff's Motion To Compel Discovery Responses From Defendants City, Santella, Joyce And Kane*", at 7 n. 5.
23    *Id.*, at 7 (emphasis added).
24    *Id.*, at 7.

*In conclusion*, as we have demonstrated herein, the Court did not misunderstand any [**38] aspect of plaintiff's motion to compel. Nor did the Court make any error of apprehension or reasoning.

*Accordingly, it is adjudged, decreed, and ordered as follows*:

**1.** *For the second time*, "*Plaintiff's Motion To Compel Discovery Responses From Defendants City, Santella, Joyce And Kane*" is denied.

**2.** "*Plaintiff's Motion For Reconsideration Of Plaintiff's Motion To Compel Discovery Responses From Defendants City, Santella, Joyce And Kane Regarding Political Patronage*" is denied.

*So Ordered*.

Dated: September 27, 2001

W. Thomas Rosemond, Jr.

United States Magistrate Judge

# 13

*Talevski v. Carter*,
2007 U.S. Dist. LEXIS 44794 (N.D. Ind. June 18, 2007)

LEXSEE

**SUSIE G. TALEVSKI, Plaintiff v. BERNARD CARTER, Prosecuting Attorney of the 31<st> Judicial Circuit, Lake County, in his individual capacity; BARB McCONNELL, Chief Deputy Prosecutor, lake County Prosecutor's Office in her individual capacity; GINA GREEN, Deputy Prosecutor, Lake County Prosecutor's Office in her individual capacity; MARILYN KORTENHOVEN, Deputy Prosecutor, Lake County Prosecutor's Office in her individual capacity; COUNTY OF LAKE, Defendants**

**Case No. 2: 05 cv 184**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF INDIANA, HAMMOND DIVISION**

*2007 U.S. Dist. LEXIS 44794*

**June 18, 2007, Decided
June 18, 2007, Filed**

**PRIOR HISTORY:** *Talevski v. Carter, 2006 U.S. Dist. LEXIS 31183 (N.D. Ind., May 16, 2006)*

**CORE TERMS:** interrogatory, discovery, discovery requests, digital, state attorney, prosecutors office, recorder, waived, birth, moot, bad faith, recording, recording devices, factual support, true name, wiretapping, prosecutor's, disclosure, answering, arrest, environmental quality, child support, mental health, infections, federal rules, federal civil rights, failed to raise, response to interrogatory, objecting party, good faith attempts

**COUNSEL:** [*1] For Susie G Talevski, Plaintiff: Bryan K Bullock, LEAD ATTORNEY, Law Office of Bryan K Bullock LLC, Merrillville, IN.; Susie Talevski, LEAD ATTORNEY, New York, NY.

For Bernard Carter, Prosecuting Attorney of the 31st Judicial Circuit, Lake County (in his individual capacity), Barb McConnell, Chief Deputy Prosecutor, Lake County Prosecutor's Office (in her individual capacity), Gina Green, Deputy Prosecutor, Lake County Prosecutor's Office (in her individual capacity), Defendants: Patricia Orloff Erdmann, LEAD ATTORNEYS, Cory C Voight,

Juliana B Pierce, Indiana Attorney General's Office - IAG/302, Indianapolis, IN.; Frank R Martinez, III, Highland, IN.

For Marilyn Kortenhoven, Deputy Prosecutor, Lake County [*2] Prosecutor's Office (in her individual capacity), Defendant:J Michael Katz, Law Offices of J Michael Katz, Highland, IN.; Patricia Orloff Erdmann, LEAD ATTORNEY, Cory C Voight, Juliana B Pierce, Indiana Attorney General's Office - IAG/302, Indianapolis, IN.

For Lake County of, Defendant: George C Patrick, Scott A Pyle, George C Patrick & Associates PC, Crown Point, IN.; John S Dull, Merrillville, IN.

**JUDGES:** ANDREW P. RODOVICH, United States Magistrate Judge.

**OPINION BY:** ANDREW P. RODOVICH

**OPINION**

OPINION AND ORDER

    This matter is before the court on Defendant Carter's and Defendant Kortenhoven's Motion to

Compel Discovery and for Sanctions and Other Relief filed by the defendants, Bernard Carter and Marilyn Kortenhoven, on March 26, 2007, and the Motion for State Defendant's Counsel to Again be Ordered to Return the Digital Recorder and for Sanctions filed by the plaintiff, Susie G. Talevski, on May 14, 2007. The defendants' motion to compel is **GRANTED IN PART** and **DENIED IN PART,** and the plaintiff's motion is **DENIED AS MOOT.**

Background

The plaintiff, Susie G. Talevski, was employed as a deputy prosecutor in Lake County, Indiana, from December 5, 2002 until her termination on May 12, 2003. In her complaint, Talevski alleged that she was terminated in retaliation for public comments she made concerning her beliefs regarding the office's employment practices and the impact of the building's poor environmental quality on the health of division employees.

During the course of her employment, Talevski became concerned about her duty to report what she alleged were "ghost" employment practices within the child support division of the [*3] prosecutors office. Specifically, Talevski alleged that Art Torres, paid as full-time investigator for the division, actually performed no work for the office, with the exception of occasional paper shredding. Talevski alleged that various staff members, including Torres' direct supervisor, acknowledged that Torres had no responsibilities in the office. Talevski further alleged that Torres was present in the office only after 3:30 in the afternoon, and despite his title as an investigator, Torres himself admitted that he was assigned no cases. Talevski raised these concerns within the prosecutors office, and on March 25, 2003, reported these concerns to the Office of the United States Attorney for the Northern District of Indiana.

On April 1, 2003, Talevski met with defendants Lake County Prosecutor Bernard Carter and deputy prosecutor Marilyn Kortenhoven. Carter expressed concern over Talevski's comments and explained that Torres' absence from the office was due to his need to conduct his work "in the field." Following this meeting, Talevski met with an agent of the Federal Bureau of Investigation and again expressed her concern regarding Torres' employment.

Talevski also raised [*4] concerns regarding the environmental quality of the Hammond, Indiana building that housed the child support division. She complained that numerous employees at the building suffered from upper respiratory infections, sinus conditions, yeast infections, and frequent headaches, and she raised these concerns at a staff meeting lead by child support division executive director, Gina Green. On May 12, 2003, Green told Talevski that she was prohibited from discussing the building's environmental condition.

On that same day, Talevski was informed that she was to be reassigned to the court room of Lake County Judge Jesse M. Villapando, the son-in-law of the subject of Talevski's ghost employment concerns, Art Torres. Talevski approached Kortenhoven to schedule a meeting to discuss the reassignment with Carter. Talevski alleged that in the course of this conversation, Kortenhoven became angry, grabbed Talevski, causing injury to her arm, and yelled that Talevski was fired.

Talevski filed an initial complaint on March 12, 2005, and an amended complaint on June 20, 2005. Following the district court's ruling on February 1, 2006 granting in part and denying in part motions to dismiss filed by [*5] the defendants, Talevski and the state defendants agreed to begin discovery, despite the fact that the parties had not yet conferred pursuant to *Federal Rule of Civil Procedure 26(f)*. Among others, the initial discovery requests served on Talevski included interrogatories from defendants Carter and Kortenhoven and requests for production by Carter. In an e-mail dated June 14, 2006, Talevski's counsel acknowledged to the defendants that he intended to produce a transcript of an audio recording made by Talevski, without the knowledge of the other parties, of her last meeting at the prosecutor's office. Talevski's counsel expressed difficulty in having the contents of the digital recorder duplicated, and it was not until August 2006, without having copied or transcribed the contents of the device, that he responded to the discovery request by producing the recorder itself.

There is considerable dispute over the parties' communication regarding this device. It remained

2007 U.S. Dist. LEXIS 44794, *

in the state defendants' possession until March 13, 2007, when this court ordered its return to Talevski. Two days later, the state defendants sought reconsideration of this order, **[*6]** suggesting that the device contained evidence that Talevski had violated federal wiretapping laws in making the recording. That same day, the defendants filed an amended motion for reconsideration, now accompanied by a subpoena *duces tecum* for the device issued to the state attorney general by the federal grand jury for "any and all recordings or digital recording devices obtained in the course of discovery proceedings in *Talevski v. Carter, et. al.* Cause # 2:05 CV 184."

On May 14, 2007, Talevski indicated in her motion seeking the return of this device that representations were made to her by federal authorities that no investigation regarding the recordings was ongoing and that the device was being returned. In her motion, Talevski also sought sanctions against the state's counsel for what she termed false accusations of criminal conduct. On May 22, 2007, the state filed notice that the device had been returned to them and, in turn, would be returned to Talevski.

Consequently, Talevski's motion for return of this device is moot, and the only issues remaining are the plaintiff's motions for sanctions and the state defendants' motion to compel.

Discussion

A party is **[*7]** entitled to conduct discovery on any matter that is "relevant to the claim or defenses of any party." *Federal Rule of Civil Procedure 26(b)(1)*. Under the federal rules, relevancy in discovery includes information that may not be admissible, provided that "discovery appears reasonably calculated to lead to discovery of admissible evidence." *Rule 26(b)(1)*; **Chavez v. Daimler Chrysler Corp., 206 F.R.D. 615, 619 (S.D. Ind. 2002)**. Following amendments to *Rule 26*, narrowing relevance from that which is related to the "subject matter" of the case to matters related particularly to "claims or defenses," relevance remains broadly construed. **Sanyo Laser Products, Inc. v. Arista Records, Inc., 214 F.R.D. 496, 500 (S.D. Ind. 2003)** ("The change, while meaningful, is not dramatic, and broad discovery remains the norm.").

A party may seek an order compelling disclosure when an opposing party has failed to respond or has provided evasive or incomplete responses. *Federal Rule of Civil Procedure 37(a)(2)-(3)*. The court has broad discretion when reviewing a discovery dispute and **[*8]** "should independently determine the proper course of discovery based upon the arguments of the parties." **Gile v. United Airlines Inc., 95 F.3d 492, 496 (7th Cir. 1996)**; **Patterson v. Avery Dennison Corporation, 281 F.3d 676, 681 (7th Cir. 2002)** ("[T]he court should consider the totality of the circumstances, weighing the value of material sought against the burden of providing it, and taking into account society's interest in furthering the truthseeking function in the particular case before the court.") (internal citations omitted).

Provided the information sought meets the standard of relevancy described in the federal rules, the "burden rests upon the objecting party to show why a particular discovery request is improper." **Kodish v. Oakbrook Terrace Fire Protection District, 235 F.R.D. 447, 449-50 (N.D. Ill. 2006)**. The objecting party must show with specificity that the request is improper. **Graham v. Casey's General Stores, 206 F.R.D. 251, 254 (S.D. Ind. 2002)**. Discovery, however, is not limitless, "and these limits become more formidable as the showing of need decreases." **Rubin v. Islamic Republic of Iran, 349 F.Supp.2d. 1108, 1111 (N.D. Ill. 2004)** **[*9]** (*quoting* **Eggleston v. Chicago Journeymen Plumbers' Local Union No. 130, 657 F.2d 890, 904 (7th Cir. 1981)**.

The defendants specify a series of deficiencies which they seek to correct through this motion to compel. However, the defendants also assert generally that all of Talevski's objections to their discovery requests have been waived because she failed to raise them in a timely manner. Although *Federal Rules of Civil Procedure 33(b)(4)* and *34(a)* contain different language describing the means for objecting to interrogatories and requests for production, courts uniformly conclude that an objection may be waived if it is not timely raised and good cause for the delay is not shown. **Autotech Technologies Limited Partnership v. Automationdirect.com, Inc., 236 F.R.D. 396, 398 n.2 (N.D. Ill. 2006)**. *See also* **Ayers v. Continental Casualty Company, 240 F.R.D. 216, 222 (N.D. W.**

*Va. 2007)*("Both the language of *Rule 33* and its promulgation history suggest that grounds for objection must be stated in a response filed within the period allowed for **[\*10]** response, and that objections sought to be interposed later are waived unless the waiver is excused for good cause") (internal citations and quotations omitted).

An examination of the parties' initial pretrial steps illustrates why the sanction of waiver is not appropriate in this instance. On March 2, 2006, the state defendants' counsel, via e-mail, asked whether the parties in the case were agreeable to beginning discovery, though they had not yet conferred on a discovery plan. Talevski's counsel agreed, and that same day, was served with Carter's interrogatories and requests for production.

The parties' Rule 26 conference was held on April 14, 2006, and on April 21, 2006, this court held a preliminary pretrial conference. At this conference, Talevski's attorney requested that Carter also serve the discovery requests electronically, which occurred on April 24, 2006. On May 1, 2006, the state defendant's attorney wrote Tavelski's attorney, stating that responses were due on April 4, confirming that the electronic form of the requests were sent on April 24, and calling for a prompt response to the requests. Plaintiff's responses and objections were served on May 22, 2006.

The defendants **[\*11]** correctly noted that Talevski, absent any other agreement between the parties, was required to respond within 30 days of the March 2 service of these discovery requests. However, based upon the parties' initial agreement to begin discovery and the fact that the responses were made within approximately two months, the harsh sanction to waiver is not appropriate. *Anderson v. Hale, 202 F.R.D. 548, 553 (N.D. Ill. 2001)*("Acknowledging the harshness of a waiver sanction, courts have reserved the sanction for those cases where the offending party committed unjustified delay in responding to discovery. Minor procedural violations, good faith attempts at compliance, and other such mitigating circumstances militate against finding waiver."). In addition, though *Rule 26(d)* provides generally that parties may agree to commence discovery prior to conferring on a discovery plan, *Rule 33* states that interrogatories may not be served prior to this

meeting without "leave of court or written stipulation."

There is no indication that the state's discovery requests were met with dilatory tactics or less than a good faith effort at compliance. In addition, circumstances in which **[\*12]** courts have found waiver appropriate are markedly different than the circumstances presented here. Waiver is invoked more commonly when, after having provided responses or a general objection, a party later seeks to assert specific objections or privileges to a request. Talevski has not sought to raise new objections after having failed to raise them with her initial response. *See e.g. Ayers, 240 F.R.D. at 222*; **Safeco Insurance Company of America v. Rawstrom,** *183 F.R.D. 668, 671 (C.D. Cal. 1998)*.

The next general issue raised is Talevski's objection that the defendants exceeded the permitted number of interrogatories. Talevski ceased answering at interrogatory 15, refusing to answer interrogatories 16 through 25, on the contention that the first 15 interrogatories, with subparts, contained more than 30 questions. The defendants counter with the argument that, by answering some interrogatories and refusing others, Talevski waived any objection to the number of interrogatories. This argument is without support in this circuit. The single case the defendants rely upon states this proposition without reference to any case or language within **[\*13]** the federal rules and, in fact, goes on to find that the number of interrogatories did not exceed that which was permitted. *See* **Allahverdi v. Regents of University of New Mexico,** *228 F.R.D. 696, 698 (D.N.M. 2005)*("[T]he Court concludes that Allahverdi made a good faith attempt to comply with the permissible number of interrogatories under *rule 33 of the Federal Rules of Civil Procedure*."). Further, within the Seventh Circuit, there is no support for a rule that prescribes a single acceptable manner of objecting to an excessive number of interrogatories. *See e.g.* **Bell v. Woodward Governor Company,** *2005 U.S. Dist. LEXIS 12969, 2005 WL 3829134 at \*1 (N.D. Ill. June 30, 2005)*. Accordingly, Talevski has not waived this objection.

*Rule 33(a)* states that "any party may serve upon any other party written interrogatories, not exceeding 25 in number including all discrete subparts." Though the rules do not define the means

for identifying "discrete subparts," courts commonly determine that "interrogatory subparts are to be counted as one interrogatory if they are logically or factually subsumed within and necessarily related to the [*14] primary question." *Bell, 2005 U.S. Dist. LEXIS 12969, 2005 WL 3829134 at *1 (quoting **Kendall v. GES Exposition Services, Inc.,** 174 F.R.D. 684, 685 (D. Nev. 1997). See also **Trevino v. ABC American, Inc.,** 232 F.R.D. 612, 614 (N.D. Cal. 2006)*; 8A Charles A. Wright, Arthur R. Miller & Richard L. Marcus, *Federal Practice and Procedure* § 2168.1, at 261 (2d ed. 1994).

The number of interrogatories served by Carter exceeds the limit of 30 agreed to by the parties, but not as drastically as claimed by the plaintiff, who insists that the interrogatories number over 90. Key examples of interrogatory subparts that represent separate questions include defendant Carter's first interrogatory, which asks for Talevski's name, birth date, and address, but then it goes on in subparts to ask Talevski to list degrees that she has earned and her marital status. Subsequent interrogatories that ask for the name, address, and dates of Talevski's past employment become more than one interrogatory when the subparts ask for the details regarding any disciplinary incident that occurred while employed. This question also provides an example of the redundant nature of [*15] the interrogatories served by Carter. For instance, having asked Talevski such details regarding her employment "for the past 10 years," in a new interrogatory, Carter asks for the identical information "since her employment with the Lake County prosecutor's office" in 2003. Finally, interrogatory 15 asks Talevski to "set forth the content of each conversation" with four named co-workers and "all other co-workers," regarding Art Torres. Not only is this the equivalent of five interrogatories, but in asking Talevski to recreate numerous dialogues, it is a form of question particularly ill-suited to the interrogatory form.

The court finds that, at most, Carter's interrogatories number 37. This is not the egregious abuse that Talevski has made it out to be. Further, in light of the fact that other objections raised by Talevski are valid, the court finds that the number of interrogatories posed by the defendant is reasonable, and Talevski may not avoid answering

them solely on the grounds that Carter exceeded the limits. Specifically, those interrogatories to which this objection is not valid are 16, 17, 19, 20, 22, 23, 24 and 25. Accordingly, Talevski is required to respond to these.

[*16] Because interrogatories 18 and 21 ask for nothing that was not covered by interrogatory 6, no response to 18 and 21 is required. In interrogatory 6, Talevski was asked to describe the factual support, including individuals involved, for every event that "constituted a violation of your civil rights and retaliation." Similarly, interrogatory 18 asked for the factual basis for the claim that she was retaliated for speaking out about Torres and the environmental quality of the building, and interrogatory 21 asked for the factual support that defendant Gina Green "ordered you to cease publicly speaking out about your concern regarding alleged environmental toxins."

The defendants next object to Talevski's refusal to provide employment information dating back more than five years when the defendants sought 10 years worth of this information. Based upon the broad scope of discovery and Talevski's burden to object with greater specificity than the oft-invoked statement that the discovery sought is unduly burdensome, the court concludes that Talevski's employment history within a 10-year time frame is within the scope of discovery. See **Davenport v. Indiana Masonic Home Foundation, Inc.,** 2003 U.S. Dist. LEXIS 6350, 2003 WL 1888986 at *3 (S.D. Ind. March 27, 2003)*. [*17] See also **Grace v. City of Xenia, Ohio,** 2006 U.S. Dist. LEXIS 80350, 2006 WL 3196421 at *2 (S.D. Ohio November 2, 2006)*.

The defendants claim that Talevski's response to requests for medical records is improper. With interrogatory 3, Carter asked Talevski to provide records regarding mental health counseling, if Talevski has sought counseling in the past 10 years. The defendants are correct in noting that, in a claim seeking damages based on distress, mental health is relevant. The defendants do not explain their continued insistence regarding this question in the face of Talevski's answer that no mental health treatment was sought during this period. Accordingly, it must be assumed that there are no records. In response to requests for mental health records, no further response is required.

In their requests for production and multiple interrogatories, the defendants also sought medical records for treatment that Talevski received for injuries she alleged she suffered as a result of the defendants' actions. (Interrogatories 4, 7, 10, 22, and Request for Production 3, 11) In response, Talevski provided a signed release for Dr. Nathaniel Ross but refused [*18] to provide a release for Dr. Mary Vanko, Talevski's gynecologist, stating that Dr. Ross was the only doctor who she saw with respect to the harm she alleged in her complaint. The defendants have latched on to Talevski's reference to yeast infections in her complaint and apparently assumed that this condition lead to the visit to Dr. Vanko's office. The assumption is belied by Talevski's response, indicating that her visit to Dr. Vanko was a routine office visit and unrelated to the injuries claimed in her complaint. Accordingly, these records are not responsive to Carter's interrogatories.

The defendants' motion further seeks an order compelling responses to defendant Kortenhoven's interrogatories, to which Talevski has provided no response. Rather, Talevski indicated that these interrogatories were based upon her final meeting with the defendants and could not be answered without access to the digital recorder in the state's possession. The parties dispute this statement. However, the court notes that the recording device has been returned and, accordingly, the objection now is moot.

The defendants also present a handful of loose ends that they have wrapped into their motion that [*19] can be addressed with little need for elaboration. For instance, the defendants note that Talevski has taken a new job. They correctly note that she, under her duty to update discovery responses, must provide this information to the defendants. The defendants further complain that Talevski, in response to interrogatory 10 (seeking information on personal injuries) merely cross referenced her answer to interrogatory 7 (asking for each and every item of damage, including medical expenses). Similarly, Talevski responded to interrogatory 12 (regarding her employment since leaving the prosecutor's office) by reference to interrogatory 2 (seeking employment information for the past 10 years.) The court already has addressed the redundant nature of many of Carter's

interrogatories and will not compel a plaintiff to answer the same question twice.

The defendants next complain that Talevski, in executing a release to provide access to her tax records, completed a Form 8821 instead of the proper Form 4506. There appears to be no disagreement on the right of the defendants to access the information, only a question of whether the proper form has been executed. The court expects the parties are [*20] capable of resolving this issue without further court involvement. Finally, the defendants take issue with Talevski's reference to "possibly other documents" in response to some requests for production. There is no indication that Talevski has withheld any document or that this statement is anything more than an acknowledgment of her duty to update responses as needed.

On May 22, 2006, Talevski indicated in her response to interrogatories propounded by the county defendants that she had just learned that her name, as it appears on her birth certificate, is spelled "Televska," which she explains in her parents' native Macedonian, is the feminine counterpart to the masculine "Talevski." The defendants, however, analogize this circumstance to that in *Dotson v. Bravo, 321 F.3d 663 (7th Cir. 2003)*, in which a twice convicted felon named DeMarco Shaunte Sheppard, filed a civil action under the alias Shaunte Dotson. The defendants claim that Talevski's failure to proceed under her true name is "fatal to her cause of action." The defendants' analogy is misplaced.

In *Dotson,* the court noted that this plaintiff's abuse of the judicial process included:

1) [*21] filing a federal civil rights claim under a false name; 2) serving unverified answers to interrogatories propounded by the City containing lies about his true identity, date of birth, and complete arrest record; 3) serving verified responses to the same interrogatories (following the issuance of a court order compelling such disclosure) that still did not disclose his correct birth date or arrest record; 4) lying under oath about his true name and birth date in a deposition in

Tamika Smith's federal civil rights case; 5) lying about his true name to police when arrested on January 1, 1998, to avoid outstanding arrest warrants; and 6) continuing to conceal his true identity from state officials throughout the multi-year duration of his three state criminal trials and incarceration.

*Dotson, 321 F.3d at 668*

In this instance, the plaintiff, who has always been known as Susie G. Talevski, properly disclosed an easily explained, culturally routine, change of spelling, indicating not a hint of bad faith. The defendants' insistence on raising it is without merit.

On May 14, 2007, the plaintiff filed a motion seeking the return of the digital recording device **[*22]** that was in the defendants' possession until it was briefly under the control of the federal grand jury for the Northern District of Indiana. The defendants, on May 22, 2007, filed notice that the device was mailed to Talevski. Accordingly, that portion of her motion seeking the return of this device is moot.

However, Talevski, in this motion, and the state defendants in their motion to compel, seek sanctions. Talevski does not indicate the basis under which she seeks the imposition of sanctions on the state's attorney. However, the circumstances provide for only limited possibilities. It is clear that sanctions under *Federal Rule of Civil Procedure 11* are not implicated by these circumstances. This rule regards an attorney's certification that filings with the court are not frivolous and are "not being presented for any improper purpose," and specifically exempts application of the rule to conduct arising under the discovery provisions of *Rules 26 through 37. Rule 11(d).*

Sanctions under *Rule 37* include the failure to comply with an order as well as providing false or misleading disclosures. However, it is only under *Rule 37(b)* that sanctions **[*23]** reach an attorney's conduct. *Maynard v. Nygren, 332 F.3d 462, 470 (7th Cir. 2003).* Further, sanctions under *Rule 37* are gauged by the costs incurred because of the violation. *Maynard, 332 F.3d at 471* ("However,

*Rule 37* supports only the reimbursement of fees resulting from the discovery violation."). Under the court's inherent power, sanctions are limited to instances in which the court has found willful disobedience or bad faith. *See Maynard, 332 F.3d at 470 (citing Roadway Express, Inc. v. Piper 447 U.S. 752, 755-56, 100 S.Ct. 2455, 2458-59, 65 L.Ed.2d 488 (1980).* Similarly, in the context of contempt proceedings based upon allegations of fraud on the court, conduct that is analogous to the conduct Talevski alleged here, courts require proof under a clear and convincing standard. *See Maynard, 332 F.3d at 468.*

Talevski argues that counsel for the state defendants acted in bad faith, encouraged a frivolous investigation, and did so with the purpose of evading the this court's order directing the return of the digital recording device. Talevski drew this conclusion based **[*24]** upon inferences created from the circumstances and timing of these events. Specifically, Talevski noted that the state defendants, in their initial motion to reconsider the order directing the return of the device, suggested the possibility of a violation of federal wiretapping laws. Talevski further notes the fact that the federal authorities' interest in the device was aroused just one day after the court ordered its return, but apparently not at any time during the previous eight months. From these details, Talevski asks the court to conclude first that the state's attorney informed the federal authorities about the device and, secondly, did so in bad faith.

Talevski has provided little actual evidence from which the court could make factual findings that support her allegations. The timing of events is suspect, and the notion that Talevski's conduct might have violated federal wiretapping laws is a flimsy proposition. However, Talevski's assumption that only one conclusion can be drawn is made without reference to factual support and cannot be the basis for a finding regarding the state attorney's state of mind. Further, in light of the fact that the device has been returned, **[*25]** and there is no assertion of costs or prejudice beyond delay, *Rule 37* sanctions are not warranted.

Similarly, the state's bid for sanctions against Talevski is not warranted. As described in detail above, the states's motion was granted only in part. Pursuant to *Rule 37(a)(4)(C)*, the court declines to

award sanctions. To the extent further responses from Talevski are required, she is ordered to respond, consistent with this order, within 30 days of the date of this order.

For the foregoing reasons, Defendant Carter's and Defendant Kortenhoven's Motion to Compel Discovery and for Sanctions and Other Relief filed by the defendants, Bernard Carter and Marilyn Kortenhoven, on March 26, 2007, is **GRANTED IN PART** and **DENIED IN PART.** The Motion for State Defendant's Counsel to Again be Ordered to Return the Digital Recorder and for Sanctions filed by the plaintiff, Susie G. Talevski, on May 14, 2007, is **DENIED AS MOOT.**

ENTERED this 18<th> day of June, 2007

s/ ANDREW P. RODOVICH

United States Magistrate Judge

# 14

*The Mitchell Co. v. Campus,*
2008 U.S. Dist. LEXIS 47505 (S.D. Ala., June 16, 2008)

LEXSEE 2008 U.S. DIST. LEXIS 47505

**THE MITCHELL COMPANY, INC., Plaintiff, vs. JOSEPH J. CAMPUS, III, et al., Defendants.**

**CA 07-0177-KD-C**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF ALABAMA, SOUTHERN DIVISION**

*2008 U.S. Dist. LEXIS 47505*

**June 16, 2008, Decided**
**June 16, 2008, Filed**

**PRIOR HISTORY:** *Mitchell Co. v. Campus, 2008 U.S. Dist. LEXIS 3450 (S.D. Ala., Jan. 16, 2008)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** This cause was before the court on what remained of a defendant's motion to compel plaintiff to adequately respond to his first set of discovery requests.

**OVERVIEW:** The court's *Fed. R. Civ. P. 16(b)* scheduling order limited each party to serving upon any other party not more than 25 interrogatories, including all discrete subparts. Moreover, *Fed. R. Civ. P. 33(a)(1)* provided that unless otherwise stipulated or ordered by the court, a party could serve on any other party no more than 25 written interrogatories, including all discrete subparts. District courts in the Eleventh Circuit applied the "related question" test to determine whether the subparts were discrete. Having identified the general test to guide its counting of interrogatory subparts, the magistrate also acknowledged some more specific rules which impacted that count. The magistrate then found that defendant concerned served a total of 33 interrogatories upon plaintiff, thereby exceeding the limit of 25 placed upon the parties in the *Rule 16(b)* scheduling order and by *Fed. R. Civ. P. 33*. In responding to the propounded interrogatories, plaintiff stopped after answering Interrogatory No. 9, claiming those 9 interrogatories

actually amounted to at least 25 interrogatories. Based upon the magistrate's analysis, Interrogatories 1 through 9 constituted a total of 12 interrogatories.

**OUTCOME:** Defendant's motion to compel was granted in part and denied in part. Plaintiff was ordered to serve responses to Interrogatory Nos. 10, 11, 12, 13, 16, 17, and 20, as these interrogatories totaled 13 additional interrogatories.

**CORE TERMS:** interrogatory, counted, identification, subsumed, factually, discrete, logically, undersigned's, separately, misrepresentation, counting, knowledgeable, information relating, documents relating, diligence, advisory committee, simultaneous, elicit, legal matter, expert witness, negotiation, inclusive, omission, inquires, personal knowledge, scheduling, requesting, discovery, connected, entity

**LexisNexis(R) Headnotes**

***Civil Procedure > Discovery > Methods > Interrogatories > Form***
[HN1] *Fed. R. Civ. P. 33(a)(1)* provides that unless otherwise stipulated or ordered by the court, a party may serve on any other party no more than 25 written interrogatories, including all discrete subparts. While, as one court has indicated, the

2008 U.S. Dist. LEXIS 47505, *

word "discrete" essentially means "separate," the majority of district courts to have addressed the issue are in agreement that the process of identifying a discrete subpart has proven difficult. District courts in the Eleventh Circuit, like most district courts in other circuits, have adopted and applied the "related question" test to determine whether the subparts are discrete, asking whether the particular subparts are logically or factually subsumed within and necessarily related to the primary question.

*Civil Procedure > Discovery > Methods > Interrogatories > Form*
[HN2] Regarding whether interrogatory subparts are logically or factually subsumed within and necessarily related to the primary question, in making this determination, a court should decide whether the first question is primary and subsequent questions are secondary to the primary question; or whether the subsequent question could stand alone and is independent of the first question? In other words, if the first question can be answered fully and completely without answering the second question, then the second question is totally independent of the first and not factually subsumed within and necessarily related to the primary question. Genuine subparts should not be counted as separate interrogatories. However, discrete or separate questions should be counted as separate interrogatories, notwithstanding they are joined by a conjunctive word and may be related. Once a subpart of an interrogatory introduces a line of inquiry that is separate and distinct from the inquiry made by the portion of the interrogatory that precedes it, the subpart must be considered a separate interrogatory no matter how it is designated. An interrogatory directed at eliciting details concerning a common theme should not be counted as multiple interrogatories.

*Civil Procedure > Discovery > Methods > Interrogatories > Form*
[HN3] A question asking about communications of a particular type should be treated as a single interrogatory even though it requests that the time, place, persons present, and contents be stated separately for each such communication. *Fed. R.*

*Civ. P. 33* advisory committee's note. An overly restrictive reading of *Rule 33*'s numerical limit would too quickly exhaust the propounding party's supply of interrogatories, and unnecessarily limit that party's fact-gathering ability. Such a result would be not only inconsistent with both the broad discovery envisioned by the Federal Rules of Civil Procedure, but also their purpose of narrowing the factual issues to be resolved at trial and ensuring that all parties to litigation are possessed of relevant facts.

*Civil Procedure > Discovery > Methods > Interrogatories > Form*
[HN4] A demand for information about a certain event and for the documents about it should be counted as two separate interrogatories. Interrogatories which ask for substantive information, a separate identification of witnesses, and a separate identification of documents are indeed compound, and have been held to have three discrete subparts.

*Civil Procedure > Discovery > Methods > Interrogatories > Form*
[HN5] Allowing service of an interrogatory which requests disclosure of all of the information on which the denials of each of the requests for admissions were based essentially transforms each request for admission into an interrogatory.

**COUNSEL:** [*1] For The Mitchell Company, Plaintiff: David J. Middlebrooks, LEAD ATTORNEY, Lehr Middlebrooks & Vreeland, P.C., Birmingham, AL; Donald R. James, Jr., William J. Baxley, LEAD ATTORNEYS, Stewart David McKnight, Baxley, Dillard, Dauphin & McKnight, Birmingham, AL; Walter M. Cook, Jr., LEAD ATTORNEY, William E. Shreve, Jr., Lyons, Pipes & Cook, Mobile, AL.

For Joseph J. Campus, III, Defendant: Alan C. Christian, LEAD ATTORNEY, Johnstone, Adams, Bailey, Gordon & Harris, Mobile, AL; Alison P. Danaceau, James H. Cox, M. Derek Harris, LEAD ATTORNEYS, Atlanta, GA.

For Edsel F. Matthews, Jr., Defendant: Joseph P. H. Babington, LEAD ATTORNEY, Helmsing, Leach, Herlong, Mobile, AL; Annie J. Dike, Helmsing, Leach, Herlong, Newman & Rouse, P.C., Mobile, AL.

For James Young, Defendant: Michael E. Upchurch, Robert J. Mullican, Frazer, Greene, Upchurch & Baker LLC, Mobile, AL.

For Joseph J. Campus, III, Counter Claimant: Alan C. Christian, LEAD ATTORNEY, Johnstone, Adams, Bailey, Gordon & Harris, Mobile, AL; Alison P. Danaceau, M. Derek Harris, LEAD ATTORNEYS, Atlanta, GA.

For The Mitchell Company, Counter Defendant: David J. Middlebrooks, LEAD ATTORNEY, Lehr Middlebrooks & Vreeland, P.C., Birmingham, AL; [*2] Donald R. James, Jr., William J. Baxley, LEAD ATTORNEYS, Stewart David McKnight, Baxley, Dillard, Dauphin & McKnight, Birmingham, AL; Walter M. Cook, Jr., LEAD ATTORNEY, Lyons, Pipes & Cook, Mobile, AL.

**JUDGES:** WILLIAM E. CASSADY, UNITED STATES MAGISTRATE JUDGE.

**OPINION BY:** WILLIAM E. CASSADY

**OPINION**

**ORDER**

This cause is before the Court on what remains of defendant Edsel F. Matthews' motion to compel plaintiff to adequately respond to his first set of discovery requests (*compare* Doc. 131 *with* Doc. 146), Matthews' brief on counting interrogatory subparts (Doc. 147), and plaintiff's reply (Doc. 161). Having considered the substantive contents of these pleadings, and all other pertinent portions of the file, this order is entered pursuant to *28 U.S.C. § 636(b)(1)(A)* and Local Rule 72.2(a).

**FINDINGS OF FACT**

1. On January 28, 2008, Matthews served his first set of interrogatories, requests for production and requests for admission upon The Mitchell

Company. (Doc. 131, Exhibit A) The interrogatory portion of this document reads, as follows:

**INTERROGATORY NO. 1**

Identify each person who has any personal knowledge or information about, or who possesses or controls any data, documents, evidence or other tangible items regarding, [*3] the allegations of the complaint or Plaintiff's claims; and for each such person, state in detail all such facts, information, data, documents, evidence, or tangible items.

**INTERROGATORY NO. 2**

Separately list each legal matter (transaction, case, general advice, or other) as to which TMC claims it established an attorney-client relationship with defendant Matthews at any time; and for each such matter, state the date the relationship was established, state TMC's understanding or contention concerning the scope or terms of the engagement, state the work performed by defendant Matthews during the course of the representation, and identify the date the representation ended.

**INTERROGATORY NO. 3**

For each legal matter identified in the immediately-preceding interrogatory, separately state the position of TMC as to whether defendant Matthews failed to perform satisfactorily, or made any omission in his performance of, any work that TMC engaged defendant Matthews to perform during the course of that representation; and for each such claimed failure to perform, state specifically how defendant Matthews' performance was unsatisfactory, and identify all employees, representatives, or agents of TMC [*4] who have any personal knowledge or who possess any

2008 U.S. Dist. LEXIS 47505, *

documents relating to TMC's position that defendant Matthews failed to perform satisfactorily.

### INTERROGATORY NO. 4

Please identify by date, payee, and amount, all checks written or other payments made by TMC to defendant Matthews or others for legal work on any legal matter identified in response to Interrogatory No. 2.

### INTERROGATORY NO. 5

Separately list each legal matter (transaction, case general advice or other), handled by Defendant Matthews for a person or entity other than TMC, which TMC claims caused or resulted in a conflict of interest for Defendant Matthews in performing legal work for TMC.

### INTERROGATORY NO. 6

List all employees, agents, or representatives of TMC, who had any communications (written or oral) with Defendant Matthews at any time, and for each such individual, provide the inclusive dates of his employment or other relationship with TMC, list the position(s) held by each individual during that time, and provide detailed job descriptions.

### INTERROGATORY [NO.] 7

Separately state the date of, parties to, and substance of each communication between an employee, agent, or representative of TMC, identified in response to the **[*5]** preceding interrogatory, and Defendant Matthews.

### INTERROGATORY NO. 8

In Paragraph 18 of TMC's First Amended Complaint, TMC alleges Defendant Matthews, while representing TMC in various transactions was "[s]imultaneously . . .

representing the Conspirators, Campus and Young without disclosing to The Mitchell Company that Defendant Matthews was in fact an attorney, or an agent for those individuals and companies." (TMC's First Amended Complaint, P 18 [hereinafter "Complaint"]). TMC further avers that this 'simultaneous representation' "denied The Mitchell Company its right to independent counsel, its ability to make informed decisions, the benefit of the exercise of professional judgment by an impartial attorney and counsel free from adverse interests and self-dealing." (Compl., P 18). With respect to these allegations, please specifically identify the alleged "simultaneous representations" and state, describe or list all facts, information, knowledgeable witnesses, and documents relating to these allegations. Include all alleged statements or representations made by Defendant Matthews that relate to these allegations and identify the substance of the alleged representation, the date and **[*6]** place the alleged representation was made, and all documents containing or relating to such alleged representations.

### INTERROGATORY NO. 9

In Paragraph 26 of TMC's Complaint, TMC alleges Defendant Matthews "knowingly and/or willfully and/or recklessly misrepresented [to TMC that] . . . the purchase price of the properties at issue was the lowest and best price available; [Defendant Matthews was] acting in [TMC's] best interest; . . . the properties had not been marked up in order to favor [Matthews, Campus, and Young]; . . . Matthews had no conflict of interest with regard to Plaintiff; . . . the properties were being recommended to Plaintiff because purchase was in

2008 U.S. Dist. LEXIS 47505, *

Plaintiff's best interest . . ." (Compl., P 26). TMC also contends that Defendant Matthews "failed to provide an accurate picture of the properties and financing in question." *(Id.).* With respect to these allegations, please specifically identify each property as to which TMC alleges Matthews made the alleged misrepresentation, and state, describe or list all facts, information, knowledgeable witnesses, and documents relating to these allegations. Include all alleged statements or representations made by Defendant Matthews **[*7]** that relate to these allegations and identify the substance of the alleged representation, the date and place the alleged representation was made, and all documents containing or relating to such alleged representations.

### INTERROGATORY NO. 10

In Paragraph 27 of TMC's Complaint, TMC alleges Defendant Matthews "knowingly and/or willfully and/or recklessly suppressed . . . information necessary for the Plaintiff to make a [sic] informed decision; . . . [and that Defendant Matthews] failed to provide full disclosure and/or provided inaccurate, misleading and untruthful information; . . . provided false or misleading information with the intent to encourage the Plaintiff to invest in the properties; . . . manipulated the affairs of the corporation to the Plaintiff's detriment[;] . . . utilized information and their strategic position for their own preferment; . . . [and] engaged in the dissemination of false information and/or the concealment of material information from Plaintiff." (Compl., P 27). TMC contends Defendants Campus, Young, and Matthews "implemented a scheme, course, and conspiracy of fraudulent acts in order to deceive Plaintiff [and that s]uch

actions constitute an ongoing pattern **[*8]** and practice of fraud." (Compl., P 28). With respect to these allegations, please specifically identify all information Matthews allegedly suppressed and state, describe or list all facts, information, knowledgeable witnesses, and documents relating to these allegations. Include all alleged statements or representations made by Defendant Matthews that relate to these allegations and identify the substance of the alleged representation, the date and place the alleged representation was made, and all documents containing or relating to such alleged representations.

### INTERROGATORY NO. 11

In Paragraph 58 of TMC's Complaint, TMC alleges that Defendant Matthews "acted in concert [with Campus and Young], in order to accomplish a variety of illegal schemes, including but not limited to, multiple improper, illicit and illegal transactions, the overall scheme of which was recommending properties for purchase by The Mitchell Company which were overvalued to Plaintiff's detriment and hiding the true nature of the transactions in question." (Compl., P 58). With respect to these allegations, please specifically identify each "illegal scheme[]" or "illicit and illegal transaction[]" and state, describe **[*9]** or list all facts, information, knowledgeable witnesses, and documents relating to these allegations. Include all alleged statements or representations made by Defendant Matthews that relate to these allegations and identify the substance of the alleged representation, the date and place the alleged representation was made, and all documents containing or relating to such alleged representations.

### INTERROGATORY NO. 12

2008 U.S. Dist. LEXIS 47505, *

In Paragraph 72 of TMC's Complaint, TMC alleges that Defendant Matthews, while acting "at all times relevant to the matters contained herein [as] counsel for The Mitchell Company in the various transactions complained of . . . he negligently failed to disclose his prior relationships with Defendants Campus, Young, and the entities controlled and owned by them; . . . he negligently failed to disclose his actual participation with Defendant[s] Campus, Young and the entities controlled and owned by them; . . . he negligently failed to render independent and honest advice to The Mitchell Company; . . . he negligently deprived The Mitchell Company of the benefit of the exercise of professional judgment by an impartial attorney and counsel free from adverse interests and self-dealing; [*10] . . . he negligently participated and facilitated the actions of Defendants Campus, Young and the entities they controlled to the detriment of The Mitchell Company." (Compl., P 72). TMC avers that "Matthews knowingly participated in the commission of the above alleged actions in violation of the standard of care applicable to him as counsel for The Mitchell Company under the laws of the State of Florida." (Compl., P 73). With respect to these allegations, please specifically identify each alleged act of negligence or failure to meet the standard of care, and state, describe or list all facts, information, knowledgeable witnesses, and documents relating to these allegations. Include all alleged statements or representations made by Defendant Matthews that relate to these allegations and identify the substance of the alleged representation, the date and place the alleged representation was made, and all documents containing or relating to such alleged representations.

## INTERROGATORY NO. 13

In its Complaint, TMC further alleges that Defendant Matthews breached fiduciary duties owed to TMC and negligently and wantonly failed to exercise reasonable care not to injure or damage TMC. With respect [*11] to these allegations, please specifically identify each occasion that Matthews allegedly breached a fiduciary duty, and state, describe or list all facts, information, engagements, knowledgeable witnesses, and documents relating to these allegations. Include all alleged statements or representations made by Defendant Matthews that relate to these allegations and identify the substance of the alleged representation, the date and place the alleged representation was made, and all documents containing or relating to such alleged representations.

## INTERROGATORY NO. 14

Separately list each and every allegedly misleading or false statement or misrepresentation that Plaintiff claims Matthews made at any time relating to Plaintiff's claims and allegations, and, for each, further state the date of the alleged misrepresentation, identify any and all witnesses with personal knowledge of the alleged misrepresentation, describe in detail the substance of the alleged misrepresentation, and identify all documents containing or relating to each alleged misrepresentation.

## INTERROGATORY NO. 15

Separately list each and every material fact that Plaintiff claims Defendant Matthews allegedly suppressed, and, [*12] for each, identify any and all witnesses with

2008 U.S. Dist. LEXIS 47505, *

knowledge of the suppression, describe in detail the substance of the alleged suppression, and identify all documents containing or relating to each alleged suppression.

### INTERROGATORY NO. 16

For each real estate transaction listed in the Complaint or as to which TMC claims any improper conduct by Defendant Matthews, separately describe in detail the site location, due diligence, and decision-making process that TMC undertook before TMC purchased the properties, including a description of how Plaintiff learned of the properties, any and all discussions between or among TMC's employees, agents, and board members concerning TMC's purchase of the properties, any and all board meetings concerning TMC's purchase of the properties, any and all negotiations with third parties concerning purchase of the properties, any and all appraisals, market surveys, valuations, and other similar documents or information available to TMC concerning each property, and all due diligence performed by TMC concerning each property. For each transaction, separately identify the TMC agents, employees, officers or directors personally involved in the recommendation of **[*13]** the purchase to TMC, the negotiation of TMC's purchase of the property with the seller, or any other aspect of TMC's purchase of the property.

### INTERROGATORY NO. 17

Please identify each and every expert witness whom TMC expects to call at the time of trial by providing such expert's name, address, and occupation; place of employment; qualifications to give an opinion, including a list of all publications authored by the witness within the preceding ten (10) years (or if such information is available on the expert's curriculum vitae, such curriculum vitae may be attached instead); all opinions to be expressed in this case and the basis and reasons therefor; the data or information considered by the witness in forming the opinions; any exhibits to be used as a summary of or support for the opinions; the compensation to be paid for the study and testimony; and, a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four (4) years.

### INTERROGATORY NO. 18

Please separately identify, state, or describe any and all documents, information, statements and/or representations TMC and its attorneys have provided to any expert witness **[*14]** identified in the answer to the immediately preceding interrogatory.

### INTERROGATORY NO. 19

Please separately identify any and all documents, information, statements, and/or representations TMC and its attorneys have received from any potential expert witness identified in response to Interrogatory No. 17.

### INTERROGATORY NO. 20

Specify separately by type and amount each and every item of injury or damage for which TMC does or may seek compensation or other recovery in this action, state specifically all dollar amounts claimed for each item of injury or damage, and describe the method by which TMC has computed the dollar amount as to each such item of injury or damage.

### INTERROGATORY NO. 21

For each property identified in the Complaint, please identify:

2008 U.S. Dist. LEXIS 47505, *

(a) When TMC first became aware that the property was for sale;

(b) Every action taken by TMC to assess the fair market value of the property;

(c) Every action taken by TMC to assess the developmental potential of the property;

(d) Every person, agent, or appraiser involved in such actions;

(e) Every action taken to develop or sell the property since TMC acquired the property; and

(f) Every cost associated with such development or sale.

**INTERROGATORY [*15] NO. 22**

Please identify each office[r], director, agent or employee of TMC who has any education, skill, training, experience, or knowledge concerning real estate valuation, investment or development; and for each such person, state and describe his or her education (including any degrees or certifications), training, experience, and knowledge.

**INTERROGATORY NO. 23**

Please identify all real estate owed, bought, sold, developed and/or managed by TMC in the Florida Panhandle or Baldwin or Mobile Counties, Alabama, since 1997; and for each property, state or describe the date TMC acquired or otherwise first conducted any activity concerning the property, the purchase or sale price, the nature of TMC's activity concerning the property (e.g. development into a subdivision), and the current status of TMC's ownership or other activity regarding the property.

**INTERROGATORY NO. 24**

To the extent TMC denies in whole or [in] part any of the Requests for Admission herein, please state, describe and/or identify all facts, information, knowledgeable witnesses, and documents on which TMC relies in denying a request for admission.

*(Id.* at 5-15 (emphasis in original))

2. Plaintiff served its responses to the **[*16]** foregoing interrogatories on March 10, 2008. *(See* Doc. 131, Exhibit C) Plaintiff substantively responded or objected to interrogatories 1 through 10 but refused to answer interrogatories 11 through 24 on the basis that they exceeded **"the permissible amount allowed in this case."** *(Id.* at 9 (emphasis in original)) In response to Interrogatory No. 2, plaintiff stated the following: **"Objection is made to this Interrogatory and its *5 subparts* on the grounds that the information sought is equally available to the defendant Matthews in that he, as TMC counsel presently knows or has access to the legal matters he has handled for the company."** *(Id.* at 3-4; *see also id.* at 3 **("The Plaintiff objects to the last subpart of Interrogatory Number 1 as it is overly broad, unduly burdensome and places upon the plaintiff an impossible burden to identify all facts, information, data, documents, evidence, or tangible items within the possession and knowledge of each of the foregoing witnesses.");** *id.* at 7 **("The remaining subparts of this interrogatory [8] are objected to as they are overly broad and are not limited in time or scope and to answer would require the Plaintiff to outline any and all conversations [*17] and dates relating in any way to the allegations in the complaint which is improper and overly broad."))**

3. On April 21, 2008, defendant Matthews filed his motion to compel plaintiff to adequately respond to his first set of discovery requests. (Doc. 131) The Court entertained the parties' oral arguments on May 15, 2008. *(See* Doc. 146, at 2) After the hearing, the Court entered a discovery order in which the parties were given the following

instructions with regard to interrogatories 11 through 24:

> The Mitchell Company has responded to the first ten interrogatories but, pursuant to their count, their responses to the first ten interrogatories and the discrete subparts contained therein equal or exceed the twenty-five interrogatory limit. [1]

> Matthews spoke to this argument briefly in his motion to compel at pages 5-6 but does not provide a clue as to his counting analysis. His general citation to *Rule 33(a)* and the 1993 Advisory Committee Notes does not provide an adequate basis for the Court to determine that TMC's count of the total number of interrogatories is flawed.

> It is clear from looking at the interrogatories that were attached to the motion to compel that they contain explicit [*18] or implicit subparts. Since this question of deciding the true number of interrogatories that should be counted against the limit on interrogatories is one of first impression in the undersigned's experience and since the parties have not referenced any decisions on this issue by the judges of this Court, before adopting an analysis standard and applying that standard to the interrogatories at issue, it is preferred that Matthews submit an additional brief. Therein he should discuss the applicable standard(s) to be employed and his interpretation of when his set of 24 numbered interrogatories actually reached the limit.

> Accordingly, a ruling on that portion of the motion to compel answers to interrogatories 11-24 is **DEFERRED PENDING THE FILING OF A SUPPLEMENTAL BRIEF** by Matthews. The additional brief shall contain, at a minimum, an analysis as to whether interrogatories 1-10 contain discrete subparts that when counted as separate interrogatories equal or exceed the limit of twenty-five. If Matthews determines that interrogatories 1-10 do not exceed the limit, he shall also provide his analysis as to when the limit is reached. Matthews shall complete his count and file a supplemental [*19] motion not later than the close of business on **May 23, 2008.**

(Doc. 146, at 3-4 (emphasis in original; footnote added))

> 1   The Rule 16(b) scheduling order entered in this case on May 31, 2007, specifically limits each party to service on any other party of no "more than 25 interrogatories, including all discrete subparts[.]" (Doc. 13, P 10.a.)

4. Matthews filed his brief on counting subparts on May 21, 2008.

(Doc. 147) Therein, he generally makes the following argument:

> The standard used by District Courts within the Eleventh Circuit in counting subparts to interrogatories is the "related question" test, which states that subparts that are factually and logically related to an necessarily subsumed within the primary question are inclusive and should not be counted as separate interrogatories. Matthews hereby voluntarily withdraws all subparts requesting a separate identification of documents. The remaining subparts to Interrogatory [] Nos. 1-24 constitute a total of twenty-five (25) interrogatories and therefore do not exceed the permissible limit under *Fed.R.Civ.P. 33(a)* or this Court's Scheduling Order. Matthews requests

this Court compel Plaintiff to fully respond to INT Nos. 11-24.

*(Id.* at 1) **[\*20]** More specifically, Matthews makes the following arguments:

> Plaintiff has improperly counted INT No. 1 as two interrogatories. However, this is a standard interrogatory concerning persons with knowledge and a subpart requesting a short summary of the knowledge and information these persons possess. Such an interrogatory is critical to elicit facts and narrow issues for trial. *Williams, 2007 U.S. Dist. LEXIS 40280, 2007 WL 1630875, \*2.* In *Candela,* the Northern District of Florida found a similar interrogatory, which asked for "persons with documentary evidence in their possession, custody or control, what they ha[d], where [it was], and when it was prepared," counted as one single interrogatory. *Candela, 2008 U.S. Dist. LEXIS 4705, 2008 WL 217119, \*2.* The *Candela* court also found a "standard question about persons with knowledge and the subject area of their knowledge" counted as one interrogatory. *Id.* **INT No. 1 should be counted as one interrogatory** under the same analysis as in *Candela.*

> . . .

> The question [Interrogatory No. 2] contains four related subparts: (1) the date the relationship began; (2) TMC's understanding of the scope of the relationship; (3) the work performed by Matthews during the relationship; and (4) the date the relationship **[\*21]** ended, that are all factually and logically subsumed within the primary question. *Williams, 2007 U.S. Dist. LEXIS 40280, 2007 WL 1630875, \*2.* Each subpart requests information relating to the relationships identified by Plaintiff in

response to the interrogatory and is, therefore, "directed at eliciting details concerning a *common theme." Cardenas v. Dorel Juvenile Group, Inc., 231 F.R.D. 616, 620 (D. Kansas 2005).*

> Also, the fact that this interrogatory seeks information about multiple attorney-client relationships does not mean it should be counted as separate interrogatories. *See Cardenas, 231 F.R.D. at 620* (finding "the fact that [the interrogatory] seeks information about multiple alleged design defects does not turn it into multiple interrogatories."). The subparts of this interrogatory meet the related question test and are inclusive. **INT No. 2 should be counted as one interrogatory.**

> Plaintiff has improperly counted each of the subparts of INT No. 2 as five separate interrogatories. . . . Plaintiff's counting of the subparts requesting the date each relationship began and the date each relationship ended is particularly restrictive of *Fed.R.Civ.P. 33(a).* Subparts such as these fall squarely within the Advisory **[\*22]** Committee's Notes to the 1993 amendment to *Rule 33* which was intended to clarify the numerical limitation on interrogatories. . . .

> The other two subparts regarding TMC's understanding of the scope of each relationship and the work Matthews performed as a result of each relationship are "simply designed to obtain additional details concerning the general theme presented in the primary interrogatory question" and are therefore subsumed within the primary request. *Manship v. U.S., 232 F.R.D. 552, 556 (M.D. La. 2005). See also ULLICO III, 2006 U.S. Dist. LEXIS 97577, 2006 WL 2398745, \* 4* (finding the subparts of an interrogatory requesting the factual basis for a specific claim in the

2008 U.S. Dist. LEXIS 47505, *

Counterclaim regarding impairment of an Auxiliary Plan, as well as (1) describing unfunded liabilities of the Plan and (2) the Plan's failure to provide benefits, to be logically interrelated and counting only as one interrogatory).

. . .

Plaintiff incorrectly counts INT No. 3 as three separate interrogatories. However, these subparts are all factually related. For each legal matter listed in response to INT No. 2, Plaintiff is requested to state (1) whether Matthews failed to satisfactorily perform, (2) if so, how, and (3) identify TMC **[*23]** employees with knowledge of documents that relate to TMC's position. These requests are all logically connected and intended to elicit specific details concerning one common theme: TMC's allegation that Matthews performed unsatisfactory work for TMC. These subparts are, therefore, inclusive and should not be counted separately. *Williams, 2007 U.S. Dist. LEXIS 40280, 2007 WL 1630875, *2*; *Ryan, 2005 U.S. Dist. LEXIS 5983, 2005 WL 662724, * 1.*

Further, the request for identification of knowledgeable persons is equivalent to the Advisory Committee's example of an inclusive subpart that requests the identification of persons present for certain communications. *See Theobles, 247 F.R.D. at 485* (finding a subpart which requests identification of persons with knowledge falls within the categories of "'time, place, persons present and contents,' which, according to the advisory committee, are subparts of a single interrogatory."). . . . For these reasons, **INT No. 3 should be counted as one interrogatory.**

. . .

Plaintiff improperly counted INT No. 6 as three separate interrogatories. This interrogatory contains one primary question: identification of employees who had communication with Matthews, and three related subparts: (1) the dates of employment; **[*24]** (2) positions held; and (3) job descriptions. These subparts are logically related and subsumed within the primary question. *Williams, 2007 U.S. Dist. LEXIS 40280, 2007 WL 1630875, *2.* **INT No. 6 should be counted as one interrogatory.**

In *Candela,* the Northern District of Florida addressed an almost identical interrogatory which requested "information about every employee of Plaintiff who has quit, been fired, or resigned since 2000, with their addresses, and the date they terminated their employment." *Candela, 2008 U.S. Dist. LEXIS 4705, 2008 WL 217119, *2.* The court found these subparts to be "related and connected questions" that should not be counted as separate interrogatories. *See id.* Under this analysis, INT No. 6, which requests the identity of employees, as well as (1) the date of their employment, (2) positions held and (3) job descriptions, should also only be counted as one interrogatory. *See also ULLICO II, 2006 U.S. Dist. LEXIS 97579, 2006 WL 2398744, *3* (finding an interrogatory that requested an identification of persons as well as a "description of such persons' job titles, responsibilities and total compensation over the past two years . . . [to be] part of a single line of inquiry, even though several pieces of information are sought."); *ULLICO I, 2006 U.S. Dist. LEXIS 97578, 2006 WL 2398742, *4* **[*25]** (same).

. . .

INT Nos. **[8]**-13 are similar contention interrogatories which follow the same format by citing

allegations of Plaintiff's Complaint, requesting substantive information relating to allegations and seeking the same corollary information: supporting facts, persons with knowledge and the time, place and substance of any alleged representations. [] INT Nos. 9-13 address Plaintiff's allegations that Defendant Matthews made false statements, misrepresentations (INT No. 9) and omissions (INT No. 10), participated in illegal schemes (INT No. 11), committed acts of professional negligence (INT No. 12) and breached his fiduciary duties (INT No. 13). [] INT Nos. 8-13 are exactly the type of interrogatories which are designed to narrow the factual issues for deposition and trial and ensure all parties possess the relevant facts. *Williams, 2007 U.S. Dist. LEXIS 40280, 2007 WL 1630875, *2.* [] Restricting Matthews' ability to elicit specific facts, persons and documents in support of Plaintiff's claims would "unnecessarily limit [his] fact-gathering ability." []

. . .

In addition, the fact that these interrogatories request information relating to *multiple* alleged simultaneous representations, statements, omissions, **[*26]** illegal schemes, acts of professional negligence and breaches of fiduciary duty does not mean they should be counted as separate interrogatories. This "analysis for counting subparts is substantially flawed because it is based on an analysis of the number of responses that the interrogatory elicits." *ULLICO III, 2006 U.S. Dist. LEXIS 97577, 2006 WL 2398745, *2.* The proper test for determining whether subparts are discrete is to ask whether they are factually related to the primary question, not whether they elicit numerous responses. *See*

*also Candela, 2008 U.S. Dist. LEXIS 4705, 2008 WL 217119, *3* (finding an interrogatory that asked what each of thirty (30) individuals did to interfere with the business relationship at issue to be "sufficiently related" so as to count only as one interrogatory).

. . .

In *ULLICO II,* the court found a request for details relating to an allegation of the complaint concerning corporate waste which linked two corporate entities together did not count as two interrogatories simply because the defendant had linked these two corporate entities together in its request. *See 2006 U.S. Dist. LEXIS 97579, [WL] at *4.* Thus, where Plaintiff has linked multiple instances of alleged simultaneous representation[s], misrepresentations, omissions, **[*27]** or conduct into a single cause of action against Matthews, Matthews is entitled to similarly link these multiple instances of allegedly actionable conduct in his requests for information relating to these allegations. *Id.*

Each of these contention interrogatories is related to one common theme: the allegations asserted by Plaintiff in each of its separate claims or counts against Defendant Matthews. An overly restrictive reading of *Rule 33(a)* in counting the subparts to these interrogatories would unnecessarily limit Matthews' anility to gather facts relating to Plaintiff's claims and narrow the issues for trial. *Williams, 2007 U.S. Dist. LEXIS 40280, 2007 WL 1630875, *2.* **INT Nos. 8-13 should be counted as six separate interrogatories.**

. . .

The subparts to INT Nos. 14 and 15 are all factually related and

intended to elicit details concerning a common theme: Plaintiff's allegation that Matthews made false statements and/or omissions. [] Further, most of these subparts fall directly within the example provided in the Advisory Committee Notes to *Rule 33*, which explains that subparts seeking information relating to communications such as the time, place, persons present and substance of the communications do not count **[*28]** as separate interrogatories. [] INT Nos. 14 and 15 follow[] this format in requesting the date, witnesses with personal knowledge and substance of alleged misrepresentations and/or omissions.

The Middle District of Louisiana addressed a similar interrogatory in *Manship* which requested information about certain communications as well as the substance, dates, places and identifications of persons who participated in the communications. *Manship, 232 F.R.D. at 556.* The court found this interrogatory requested "the content, time, place and persons participating in such communications, information which is logically and factually subsumed within and necessarily related to the primary interrogatory question." *Id.* For this reason, the court in *Manship* did not count these subparts as separate interrogatories. *See [i]d. . . .* INT Nos. 14 and 15 contain the same inclusive subparts and therefore fall within the example provided by the Advisory Committee. **INT Nos. 14 and 15 should, therefore, be counted as two interrogatories.**

. . .

**INT No. 16 should be counted as two separate interrogatories.** The primary question of the first interrogatory asks for information relating to TMC's due diligence and **[*29]** decision making process for purchasing the properties at issue. The related subparts of this question ask how TMC learned of the properties, discussions between agents and board members concerning the properties, board meetings dealing with the purchase of the properties, and the identity of the TMC agents or employees who recommended the purchase to TMC. These merely ask for the "'who, what, when, where and how' information which relates to the common theme present in the request . . ." *Manship, 232 F.R.D. at 556.* These subparts are logically and factually subsumed within the primary question. *Williams, 2007 U.S. Dist. LEXIS 40280, 2007 WL 1630875, *2; Candela, 2008 U.S. Dist. LEXIS 4705, 2008 WL 217119, * 1.*

Further, this interrogatory should not be counted as six separate interrogatories merely because it seeks information relating to six separate properties listed in Plaintiff's Complaint. Such a calculation would be "substantially flawed because it is based on an analysis of the number of responses that the interrogatory elicits." *ULLICO III, 2006 U.S. Dist. LEXIS 97577, 2006 WL 2398745, *2. See also Candela, 2008 U.S. Dist. LEXIS 4705, 2008 WL 217119, *3* (finding an interrogatory asking for information on each of 30 individuals to be "sufficiently related" so as to count only as one interrogatory). **[*30]** Also, Plaintiff linked these properties together in its Complaint in order to form the basis for each of its causes of actions against Matthews. (Complaint, P 13). Therefore, Matthews is entitled to link these properties together in his requests to Plaintiff in order to elicit facts relating to the claims and defenses at issue. *Cardenas, 231 F.R.D. at 620; ULLICO II, 2006 U.S. Dist. LEXIS 97579, 2006 WL 2398744, *4.*

2008 U.S. Dist. LEXIS 47505, *

The second aspect of this interrogatory asks about negotiations between TMC and third parties concerning TMC's purchase of the properties at issue. The related subpart of this interrogatory asks for the identity of TMC agents or employees involved in the negotiations with third parties. The request for the identification of persons knowledgeable about the primary request is not considered a separate interrogatory. *Theobles, 247 F.R.D. at 485.* Thus, **INT No. 16 should be counted as two interrogatories.**

. . .

INT No. 17 is a standard request asking for information about the responding party's retained expert(s). In *Candela,* the court addressed a similar interrogatory which asked for "the expert witnesses Plaintiff intend[ed] to call at trial and then ask[ed] related and connected questions such as their **[*31]** addresses, qualifications, subject matter of their testimony, and grounds for their opinions." *Candela, 2008 U.S. Dist. LEXIS 4705, 2008 WL 217119, *2.* The court found the subparts of this interrogatory to be factually and logically related to the primary question and therefore counted the request as one interrogatory. *Id.* **INT No. 17 should be counted as one interrogatory** under the same analysis.

. . .

INT No[s]. 18 and 19 do not contain subparts. These interrogatories merely ask for the identity and description of certain documents and information. **INT Nos. 18 and 19 should be counted as only two interrogatories.**

. . .

Int No. 20 should be counted as one interrogatory. The primary question is a standard interrogatory directed at Plaintiff's claim for damages. The related subparts ask Plaintiff to specifically state dollar amounts and the method for computation. The court in *Candela* addressed a similar interrogatory which requested a "list of damages, and includ[ed] the related and connected questions of when the damage occurred, to whom damages or expenses were paid, and for what." *Candela, 2008 U.S. Dist. LEXIS 4705, 2008 WL 217119, *2.* The court found the subparts of this interrogatory to be factually subsumed within the primary interrogatory **[*32]** and that they should not, therefore, be counted as discrete subparts. [] Under this analysis, **INT No. 20 should also be counted as one interrogatory.**

. . .

INT No. 21 should be counted as one interrogatory. The primary question seeks information relating to TMC's assessment of the developmental potential and development of the properties at issue. The subparts of this request ask for the time frame of these actions (when TMC first became aware that the property was for sale), the actions taken, the persons involved in these actions, and the costs associated therewith. These subparts are all directed at eliciting details concerning a common theme: TMC's assessment and development of the properties at issue and are, therefore, all inclusive. *See Ryan, 2005 U.S. Dist. LEXIS 5983, 2005 WL 662724, *1.* Also, the fact that this request seeks information relating to six separate properties does not mean it should be counted as six separate interrogatories. *See ULLICO III, 2006 U.S. Dist. LEXIS 97577, 2006 WL 2398745, *2; Cardenas, 231*

*F.R.D. at 620*; *ULLICO II, 2006 U.S. Dist. LEXIS 97579, 2006 WL 2398744, \*4.* **INT No. 21 should be counted as one interrogatory.**

. . .

INT No. 22 should be counted as one interrogatory. The primary question of INT No. 22 asks Plaintiff to identify certain **[\*33]** TMC employees or agents, and the related subpart requests that Plaintiff list the education, training, experience or knowledge of the TMC employees or agents identified in response to the request. This subpart is logically and factually subsumed within the primary question and should, therefore, not be counted as a separate interrogatory. *See Williams, 2007 U.S. Dist. LEXIS 40250, 2007 WL 1630875, \*2*; *Candela, 2008 U.S. Dist. LEXIS 4705, 2008 WL 217119, \*1.* **INT No. 22 counts as one interrogatory.**

. . .

INT No. 23 should be counted as one interrogatory. This request seeks information relating to TMC's ownership/management of properties in a particular area during a particular time. Ths subparts to this question seek the "who, what, when, where and how" information which is logically and factually subsumed within the primary question. *Manship, 232 F.R.D. at 556.* The subparts ask for the date of purchase of the property, the sale price, the nature of TMC's use of the property, and the current status of ownership or other activity. These are all directed at eliciting details central to the common theme of the primary question and should not be counted as separate interrogatories. *Ryan, 2005 U.S. Dist. LEXIS 5983, 2005 WL 662724, \*1.* **INT No. [\*34] 23 constitutes one single interrogatory.**

. . .

Plaintiff has already responded to Matthews' First Set of Requests for Admissions, and Plaintiff only denied a portion of Request for Admission No. 2. . . . Thus, Plaintiff's duties in responding to this interrogatory will only require Plaintiff to provide facts, information and knowledgeable witnesses which support its denial of one Request for Admission. **INT No. 24 should[,] therefore, only be counted as one interrogatory.**

In addition, Plaintiff propounded an almost identical interrogatory to Matthews in its first set of discovery requests to Matthews. Matthews, however, fully responded to Plaintiff's interrogatory despite his denial of all twenty (20) of Plaintiff's Requests for Admissions to Matthews. []

. . .

[I]n case the Court finds INT Nos. 1-24, and their subparts, count as more than twenty-five (25) interrogatories, Matthews is willing to withdraw the following interrogatories, in the following order:

1. INT No. 18

2. INT No. 19

3. INT No. 14

4. INT No. 15

For example, if the Court finds INT Nos. 1-24 count as 26 interrogatories total, Matthews requests the Court omit INT No. 18 and compel Plaintiff to respond to INT Nos. 11-17 and 19-24. **[\*35]** Or, if the Court finds INT Nos. 1-24 count as 27 interrogatories, Matthews requests the Court omit INT No. 19 and compel Plaintiff to respond to INT Nos. 11-17 and 20-24. And so on, down the list.

2008 U.S. Dist. LEXIS 47505, *

(Doc. 147, at 7, 7-9, 9-10, 10-11, 12, 13, 13-14, 14-15, 16-17, 17, 18, 18-19, 19, 20, 20-21, 21 & 22 (emphasis in original; footnotes omitted))

5. Plaintiff filed its reply brief on counting interrogatory subparts on June 3, 2008, same reading, in relevant part, as follows:

> Matthews's interrogatories 1-10, including requests for identification of documents, comprise at least 25 interrogatories including discrete subparts. Authorities cited in Mitchell's previous brief (doc. 143) support Mitchell's count. [2]

> Matthews has now purportedly withdrawn the approximately six requests for document identification included in these interrogatories. At the time Mitchell objected, however, those requests were included. The propriety of Mitchell's objection to Matthews's excessive interrogatories must be considered as of the date Mitchell objected, not after Matthews's purported withdrawal.

> Matthews's interrogatories, not including requests for document identification and not considering whether subparts are [*36] "discrete," include a total of more than 100 subparts by Mitchell's count. This is the type of burden the rule limiting the number of interrogatories was intended to alleviate. Matthews's method of counting, which considers virtually any question bearing any relation, no matter how attenuated, to the "primary question" as being "subsumed" within that question, would swallow the rule and render it virtually meaningless. Under that method, a party can simply make the "primary question" as broad as possible and include an unlimited number of subparts "related to" that question. [] [T]he Introduction to Civil Discovery Practice in the Southern District of Alabama (1988) states that "[c]ounsel shall not use

subparts of interrogatories to evade any limitation on the number of interrogatories set by the Court in the Federal Rule 16(b) Scheduling Order." Id. at Part IV, P A.

> Mitchell discussed Matthews' s interrogatories 8-10 in its previous brief (doc. 143). Matthews's interrogatory 16 is another example of the flaws in Matthews's counting method. . . . Matthews says that because the subparts are supposedly "related to" the "common theme[s]" of "TMC's due diligence and decision making process [*37] for purchasing the properties at issue," interrogatory 16 should be counted a[s] two interrogatories.

> Matthews cannot transform an interrogatory that includes a number of discrete subparts into only two interrogatories simply by referring broadly to "due diligence" and "decision-making process" at the beginning of the interrogatory. Since there are six separate "real estate transactions listed in the Complaint," interrogatory 16 includes at least six interrogatories. See *In re ULLICO Litig., 2006 U.S. Dist. LEXIS 97579, 2006 WL 2398744, *2, 4 (D.D.C. June 30, 2006)* (discussion of interrogatories 2 and 15). It also includes at least six discrete subparts as to each transaction:

> > (1) Description of how Plaintiff learned of the property,

> > (2) Discussions between or among TMC's employees, agents, and board members concerning TMC's purchase of the property,

2008 U.S. Dist. LEXIS 47505, *

(3) Board meetings concerning TMC's purchase of the property,

(4) Negotiations with third parties concerning purchase of the property,

(5) Due diligence performed by TMC concerning each property, and

(6) Identification of TMC agents, employees, officers, or directors personally involved in recommendation of the purchase, negotiation, or other aspects of the purchase.

Other **[\*38]** of Matthews's interrogatories that contain multiple discrete subparts are interrogatories 2, 3, 6, 8-15, 17-19, 21, 23, 24, and possibly others.

Matthews asks the Court to compel Mitchell "to fully respond to INT Nos. 11-24" (doc. 147 at 1, 22). If the Court agrees with Matthews that one or more of these interrogatories do not exceed the 25-interrogatory limit, the Court should not compel Mitchell to "fully respond" to the interrogatory; it should rule that while Mitchell must serve a response, it is free to assert any other objections it may have to the interrogatory. See *In re ULLICO Litig., 2006 U.S. Dist. LEXIS 97579, 2006 WL 2398744, \*5 (D.D.C. June 30, 2006)* (overruling party's objection based on excessive number of interrogatories and ordering that "[s]ubject to any objections unrelated to the number of interrogatories. ULLICO will provide its responses to [certain interrogatories] within [a certain time

frame]") (emphasis added). To do otherwise would unfairly penalize Mitchell for relying in good faith on the 25-interrogatory limitation that the Court included in its Rule 16(b) Scheduling Order.

(Doc. 161, at 1-4 (footnote added))

2    With respect to this particular issue, plaintiff's brief in opposition to **[\*39]** Matthews' motion to compel (Doc. 143) reads, in relevant part, as follows:

Matthews's interrogatories 1-10 should be counted as at least 25 interrogatories because they include discrete subparts that should be counted separately. For example, Matthews's interrogatory 8 asks Mitchell to identify instances of "simultaneous representation" by Matthews of Mitchell and other parties, to identify "knowledgeable witnesses . . . relating to these allegations," and also to "identify . . . all documents containing or relating to such alleged representation." Interrogatory 8 should be counted as at least three interrogatories (and can actually be counted as more than that since there were multiple instances of simultaneous representation and Matthews asks for information about each instance). As another example, interrogatory 9 asks Mitchell to provide substantive information about five misrepresentations alleged in Mitchell's complaint, to also provide information about Mitchell's allegation that Matthews "failed to provide an accurate picture of the

2008 U.S. Dist. LEXIS 47505, *

properties and financing in question," and to identify witnesses and documents relating to these allegations. Interrogatory 9 should be counted **[*40]** as at least six interrogatories (that is, separately as to the allegations of misrepresentation and the allegation of failure "to provide an accurate picture of the properties and financing in question," and separately as to its requests for substantive information, witnesses, and documents about each such allegation), and may be counted as containing as many as eighteen interrogatories (that is, separately as to each of the five misrepresentations referenced and also as to the failure "to provide an accurate picture of the properties and financing in question," and separately as to its requests for substantive information, witnesses, and documents pertaining to each of these misrepresentations and the failure "to provide an accurate picture"). Similarly, interrogatory 10 asks about several different types of misconduct alleged in the complaint (i.e., suppression, providing false information, manipulating corporate affairs, utilizing information and strategic position for Defendants' own preferment, and conspiracy) and seeks substantive information and identification of witnesses and documents pertaining to such allegations. Interrogatory 10 should be counted as at least 15 interrogatories.

Because **[*41]** Matthews's interrogatories 1-10 equal or

exceed 25 interrogatories when each discrete subpart is counted separately, the Court should deny Matthews's motion to compel responses to the remainder of his interrogatories.

*(Id.* at 3-4)

## CONCLUSIONS OF LAW

1. As previously indicated, this Court's *Rule 16(b)* scheduling order, entered on May 31, 2007, limits each party to serving upon any other part "[n]ot more than **25** interrogatories, including all discrete subparts[.]" (Doc. 13, P 10.a.) Moreover, [HN1] *Rule 33(a)(1) of the Federal Rules of Civil Procedure* provides that "[u]nless otherwise stipulated or ordered by the court, a party may serve on any other party no more than 25 written interrogatories, including all discrete subparts."

2. While, as one court has indicated, "[t]he word, 'discrete,' essentially means, 'separate[,]'" *Kendall v. GES Exposition Services, Inc., 174 F.R.D. 684, 685 (D. Nev. 1997)*, the majority of district courts to have addressed the issue are in agreement that the process of "[i]dentifying a 'discrete subpart' has proven difficult." *Banks v. Office of the Senate Sergeant-at-Arms, 222 F.R.D. 7, 10 (D. D.C. 2004)*; *see also Oliver v. City of Orlando, 2007 U.S. Dist. LEXIS 80552, 2007 WL 3232227, *2 (M.D. Fla. 2007)* **[*42]** ("'Resolving questions of whether a subpart to an interrogatory is "discrete" under *Rule 33* such that it should be counted separately can be a difficult task' and 'courts considering this question have applied various tests.'"); *Williams v. Taser Int'l, Inc., 2007 U.S. Dist. LEXIS 40280, 2007 WL 1630875, *2 (N.D. Ga. 2007)* ("Courts have recognized that resolving the question of whether a subpart to an interrogatory is 'discrete' under *Rule 33* such that it should be counted separately can be a difficult task."); *Johnson v. Kraft Foods North America, Inc., 2006 U.S. Dist. LEXIS 80052, 2006 WL 3143930, *1 (D. Kan. 2006)* ("*Rule 33(a)* does not define the term 'discrete subparts,' and courts have struggled to interpret the term's meaning.").

2008 U.S. Dist. LEXIS 47505, *

3. District courts in the Eleventh Circuit, like most district courts in other circuits, have adopted and applied "the 'related question' test to determine whether the subparts are discrete, asking whether the particular subparts are 'logically or factually subsumed within and necessarily related to the primary question.'" *Forum Architects, LLC v. Candela, 2008 U.S. Dist. LEXIS 4705, 2008 WL 217119, *1 (N.D. Fla. 2008)*, citing *Oliver v. City of Orlando, 2007 U.S. Dist. LEXIS 80552, 2007 WL 3232227 (M.D. Fla. 2007)* and *Williams v. Taser Int'l, Inc., 2007 U.S. Dist. LEXIS 40280, 2007 WL 1630875 (N.D. Ga. 2007)*; **[\*43]** *see also Estate of Manship v. United States, 232 F.R.D. 552, 554-555 (2005)* ("[T]he issue in this motion is [HN2] whether the interrogatory subparts are 'logically or factually subsumed within and necessarily related to the primary [interrogatory] question.'... In making this determination, the Court should decide whether the first question is primary and subsequent questions are secondary to the primary question; or whether the subsequent question could stand alone and is independent of the first question? . . . In other words, ' [i]f the first question can be answered fully and completely without answering the second question, then the second question is totally independent of the first and not "factually subsumed within and necessarily related to the primary question".'"), *aff'd*, 2006 WL 594521 (M.D. La. 2006); *Kendall, supra, 174 F.R.D. at 685-686* ("Probably the best test of whether subsequent questions, within a single interrogatory, are subsumed and related, is to examine whether the first question is primary and subsequent questions are secondary to the primary question. Or, can the subsequent question stand alone? Is it independent of the first question? Genuine subparts should not **[\*44]** be counted as separate interrogatories. However, discrete or separate questions should be counted as separate interrogatories, notwithstanding they are joined by a conjunctive word and may be related."); *see Theobles v. Industrial Maintenance Co., 247 F.R.D. 483, 485 (D. V.I. 2006)* ("'[O]nce a subpart of an interrogatory introduces a line of inquiry that is separate and distinct from the inquiry made by the portion of the interrogatory that precedes it, the subpart must be considered a separate interrogatory no matter how it is designated.'"); *In re ULLICO Inc. Litigation, 2006 U.S. Dist. LEXIS 97578, 2006 WL 2398742, *2 (D.*

*D.C. 2006)* ("In analyzing whether a subpart is a separate question, the Court looks to whether the subpart 'introduces a line of inquiry that is separate and distinct from the inquiry made by the portion of the interrogatory that precedes it.' . . . An interrogatory 'directed at eliciting details concerning a *common theme*' should not be counted as multiple interrogatories. . . . This Court has rejected as unfair the 'draconian approach of counting every subdivision of an interrogatory as a separate question.'").

[T]he related question test is the better of the two. First, the related question **[\*45]** test is consistent with Rule 33's Advisory Committee's Notes. *See Fed.R.Civ.P. 33* advisory committee notes to 1993 Amendment (stating that [HN3] "a question asking about communications of a particular type should be treated as a single interrogatory even though it requests that the time, place, persons present, and contents be stated separately for each such communication"). Second, while the Court recognizes that answering interrogatories may be burdensome and that propounding numerous interrogatories may be used as a tool for harassment, it is of the view that an overly restrictive reading of Rule 33's numerical limit would too quickly exhaust the propounding party's supply of interrogatories, and unnecessarily limit that party's fact-gathering ability. Such a result would be not only inconsistent with both the broad discovery envisioned by the Federal Rules, but also their purpose of narrowing the factual issues to be resolved at trial and ensuring that all parties to litigation are possessed of relevant facts.

*Williams, supra, 2007 U.S. Dist. LEXIS 40280, [WL] at *2* (case citations omitted).

4. Having identified the general test which will guide the undersigned's counting of interrogatory subparts, the Magistrate Judge **[\*46]** must also

acknowledge some more specific rules which have or will necessarily impact that count. First, [HN4] "a demand for information about a certain event and for the documents about it should be counted as two separate interrogatories." *Banks, supra, 222 F.R.D. at 10*; *see also id.* ("The first and most obvious example is the combining in a single interrogatory of a demand for information and a demand for the documents that pertain to that event. Clearly, these are two distinct demands because knowing an event occurred is entirely different from learning about the documents that evidence it occurred."). Moreover, in *IOSTAR Corp. v. Stuart, 2007 U.S. Dist. LEXIS 96756, 2008 WL 1924209, *1 (D. Utah 2008)*, the court recognized that "[i]nterrogatories which ask for 'substantive information, a separate identification of witnesses, and a separate identification of documents' are indeed compound, and have been held to have three discrete subparts."

5. Prior to specifically addressing each interrogatory, the undersigned notes that after the hearing on May 15, 2008, the moving party redacted all demands for documents (or document identification) contained in the interrogatories served upon the plaintiff. While plaintiff makes [*47] the argument that this Court must view the interrogatories as initially served, it cites to no authority for that proposition. Accordingly, this argument is rejected and the undersigned will consider each of the twenty-four interrogatories propounded by Matthews to the Mitchell Company in the redacted manner set forth in the moving defendant's brief on counting (Doc. 147).

6. In light of the foregoing, the Court makes the following determinations:

(a) Interrogatory 1 is found to be but one interrogatory. The primary question is directed to identifying any Mitchell Company person with personal knowledge or information, etc., about plaintiff's claims or allegations in the complaint. The secondary question asks that for each person identified in response to the primary question, the facts and information known by each such person. The undersigned finds that facts and information specifically known by a party and its employees are logically and factually subsumed within the primary question asking for identification of individuals possessing relevant facts and information about the complaint and the claims contained therein;

(b) Interrogatory 2 is found to be but one interrogatory. The primary [*48] question asks for a list of all legal matters plaintiff claims it established an attorney-client relationship with Matthews. The undersigned finds that the four remaining inquires about dates each relationship began and ended, the scope of each relationship, and the work performed by the defendant during the relationship are all logically and factually subsumed within the primary inquiry about identifying each attorney-client relationship;

(c) Interrogatory 3 is found to be two interrogatories. First, the interrogatory asks plaintiff to state, with respect to each legal matter identified in response to Interrogatory 2, whether Matthews failed to perform satisfactorily, or made any omission in his performance of work. The related subpart contained in this interrogatory asks plaintiff to specifically state how Matthews' performance was unsatisfactory. The undersigned, however, cannot find that Matthews' request for the identification of all employees, etc. of TMC with knowledge of, or who possess documents relating to, Matthews' unsatisfactory performance is logically and factually subsumed in the identification of such unsatisfactory performance. *See Stuart, supra, 2007 U.S. Dist. LEXIS 96756, [WL] at *1* ("Interrogatories [*49] which ask for 'substantive information, a separate identification of witnesses, and a separate identification of documents' are indeed compound, and have been held to have three discrete subparts."). This subpart can stand on its own;

(d) Interrogatory 4 is found to be but one interrogatory; plaintiff makes no argument to the contrary;

(e) Interrogatory 5 is found to be one interrogatory, plaintiff, again, making no argument to the contrary;

(f) Interrogatory 6 is found to be just one interrogatory. The primary question requests identification of all employees, etc., of TMC who had any written or oral communications with Matthews. The undersigned finds that the three remaining inquires about dates each such identified employee's employment with plaintiff, the position(s) held by such individual, and job descriptions for each identified individual are all

2008 U.S. Dist. LEXIS 47505, *

logically and factually subsumed within the primary inquiry about identifying each employee, etc., who communicated with Matthews. As is clear from plaintiff's response, this interrogatory does not request the "moon" and, therefore, providing the information requested by this defendant would not prove overly burdensome;

(g) Interrogatory [*50] 7 is found to be one interrogatory; plaintiff makes no argument to the contrary;

(h) Interrogatory 8, a contention interrogatory, is counted as two interrogatories. While the primary focus is upon identification of all alleged "simultaneous representations" and the undersigned agrees with Matthews that a description of the facts, information, and knowledgeable witnesses to these allegations of simultaneous representation are subsumed within the primary question, the request for "all alleged statements or representations made by Defendant Matthews that relate to these allegations" and the identification of "the substance of the alleged representation, [and] the date and place the alleged representation was made," is quite a different matter, such that a request for this information can stand on its own;

(i) Similarly, Interrogatory Nos. 9-13, five more contention interrogatories, are counted as two interrogatories each based upon the reasoning set forth with respect to Interrogatory No. 8;

(j) Interrogatory No. 14 is counted as one interrogatory. The primary question asks for a list of every misleading or false statement made by Matthews relating to plaintiff's claims. The undersigned [*51] finds that the three remaining inquires about dates of the alleged misrepresentations, the substance of the alleged misrepresentations, and all witnesses with personal knowledge of the alleged representations are all logically and factually subsumed within the primary inquiry about identifying each misleading or false statement made by Matthews;

(k) Interrogatory No. 15 is counted as one interrogatory based upon the same reasoning as given for Interrogatory No. 14. With respect to this interrogatory, the primary question asks for a list of every material fact suppressed by Matthews. Again, the undersigned finds that the two remaining inquires about the substance of the alleged

suppressions and all witnesses with knowledge of the alleged suppressions are logically and factually subsumed within the primary inquiry about identifying each fact suppressed by Matthews;

(1) Matthews concedes that Interrogatory No. 16 should be counted as two interrogatories. The undersigned is of the opinion that this convoluted interrogatory should be counted as three interrogatories. While defendant may correctly argue that the primary question asks for information relating to TMC's due diligence and decision [*52] making process for purchasing the properties at issue (Doc. 147, at 16), the undersigned finds that TMC's due diligence regarding these properties and the corporation's decision making process for purchasing the properties are improperly lumped together. Certainly, a question about TMC's due diligence could stand on its own separate and apart from a question about TMC's decision making process for purchasing the properties. Because Matthews concedes that information about negotiations between TMC and third parties concerning the plaintiff's purchase of the subject properties is a separate interrogatory, the undersigned concludes that Interrogatory No. 16 should be counted as three interrogatories;

(m) Interrogatory No. 17 is counted as one interrogatory. The primary question asks for plaintiff's identification of its expert witnesses. The undersigned finds that the remaining inquires about each expert's address, occupation, place of employment, qualifications, list of publications, opinions to be expressed and the reasons therefor, all data and information considered in forming opinions, exhibits to be used as support for the opinions, compensation paid for study and testimony, and [*53] a list of other cases the individual has appeared as an expert in the last four years, are all logically and factually subsumed within the primary inquiry about identification of each of plaintiff's expert witnesses. *See Candela, supra, 2008 U.S. Dist. LEXIS 4705, [WL] at *2* ("No. 1 of the Second Set . . . asks for the expert witnesses Plaintiff intends to call at trial and then asks related and connected questions such as their addresses, qualifications, subject matter of their testimony, and grounds for their opinions. Plaintiff's motion is clearly not well taken as to this interrogatory.");

(n) Interrogatory Nos. 18 and 19 do not contain subparts; they are counted as one interrogatory each;

(o) Interrogatory No. 20 is counted as one interrogatory. The primary question asks for each item of damage or injury for which plaintiff seeks compensation. The undersigned finds that the two remaining inquires regarding the specific dollar amount for each item of damage or injury and the methods for computation of same are all logically and factually subsumed within the primary inquiry. *See Candela, supra, 2008 U.S. Dist. LEXIS 4705, [WL] at *2* ("No. 2 asks for a list of damages, and includes the related and connected questions of when the damage occurred, **[\*54]** to whom damages or expenses were paid, and for what. The motion is not well taken as to this interrogatory.");

(p) Interrogatory No. 21 is counted as two interrogatories. While the undersigned sees a connection between when TMC first became aware about the availability for purchase of each piece of property identified in the complaint and the actions taken by TMC to assess the fair market value of each piece of property, as well as the identity of persons involved in such actions, the Magistrate Judge is unable to discern a connection between actions surrounding the purchase of the property with actions taken to actually develop or sell the property. In other words, the inquiry about actions taken by plaintiff to actually develop and sell the subject properties introduces a line of inquiry separate and distinct from the inquiry about when TMC first became aware of the availability of each piece of property and assessed the fair market value of same;

(q) Interrogatory No. 22 is counted as one interrogatory. The primary question asks for identification of any employee, etc., of TMC with any education or experience in real estate valuation, investment or development. The second portion **[\*55]** simply asks for the specific education, experience or training of each such person identified. As defendant correctly argues, this subpart is logically and factually subsumed by the primary question;

(r) Interrogatory No. 23 is counted as one interrogatory. The primary question asks for plaintiff's identification of real estate it has owned, bought, etc., in Mobile and Baldwin Counties in Alabama and in the Florida Panhandle since 1997. The undersigned finds that the four remaining inquires about date of acquisition, purchase price, the nature of TMC's activity concerning the property, and its current status of ownership or other activity regarding the properties, are all logically and factually subsumed within the primary inquiry about the identification of each such piece of real estate;

(s) Interrogatory No. 24 is counted as one interrogatory since it seeks all facts, information and knowledgeable witnesses on which TMC relies in denying a portion of Request for Admission No. 2. *(See* Doc. 147, at 21 & Exhibit A) Plaintiff has admitted all Request for Admissions save a portion of Request for Admission No. 2. *(See id.)* Had plaintiff denied all requests for admission, the undersigned **[\*56]** necessarily would have determined that this interrogatory should be counted as eight interrogatories. *Compare id. with Stuart, supra, 2007 U.S. Dist. LEXIS 96756, [WL] at *1* ("The 25th interrogatory asks for the basis of denial of each of Stuart's 12 requests for admission. Another case has held that [HN5] '[a]llowing service of an interrogatory which requests disclosure of all of the information on which the denials of each of [the] requests for admissions were based . . . essentially transforms each request for admission into an interrogatory.'"). Since the interrogatory is directed solely to plaintiff's basis of denial of that portion of Request for Admission No. 2 denied, it necessarily constitutes only one interrogatory.

7. In light of the foregoing, the undersigned finds that Matthews served a total of 33 interrogatories upon plaintiff, thereby exceeding the limit of 25 placed upon the parties in the *Rule 16(b)* scheduling order and by *Fed.R.Civ.P. 33*. In responding to the propounded interrogatories, plaintiff stopped after answering Interrogatory No. 9, claiming those 9 interrogatories actually amounted to at least 25 interrogatories. Based upon the undersigned's analysis, Interrogatories 1 through 9 constitute a total **[\*57]** of 12 interrogatories. Accordingly, Matthews' motion to compel further responses to interrogatories (Doc. 131; *see also* Doc.147) is **GRANTED IN PART AND DENIED IN PART.** Plaintiff is **ORDERED** to serve

2008 U.S. Dist. LEXIS 47505, *

Matthews with responses to Interrogatory Nos. 10, 11, 12, 13, 16, 17, and 20, as these interrogatories total 13 additional interrogatories, on or before **June 30, 2008.** [3]

> 3   If Matthews desires plaintiff to answer interrogatories other than the ones identified by the Court, plaintiff is to allow Matthews to designate those interrogatories to which a response is to be served. The interrogatories are to be counted as set forth in this order and Matthews' designation of interrogatories to which plaintiff is to serve a response shall not exceed 13 additional interrogatories, for a total of 25.

**CONCLUSION**

In light of the foregoing, Matthews' motion to compel plaintiff to adequately respond to propounded interrogatories (Doc. 131; *see also* Doc. 147) is **GRANTED IN PART AND DENIED IN PART** as specifically set forth in the body of this order.

**DONE** and **ORDERED** this the 16th day of June, 2008.

/s/ WILLIAM E. CASSADY

**UNITED STATES MAGISTRATE JUDGE**

# 15

*Track Sys. v. New Investor World, Inc.,*
2002 U.S. Dist. LEXIS 21320 (N.D. Ill. Nov. 4, 2002)

LEXSEE 2002 U.S. DIST. LEXIS 21320

**TAX TRACK SYSTEMS, CORP., Plaintiff/Counter-defendant, v. NEW INVESTOR WORLD, INC., Defendant/Counter-claimant.**

**Cause No. 01 C 6217**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*2002 U.S. Dist. LEXIS 21320*

**November 1, 2002, Decided
November 4, 2002, Docketed**

**DISPOSITION:** **[*1]** Defendant's Third *Rule 37* Motion for Sanctions granted in part and denied in part. Plaintiff's Motion for Sanctions denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff estate planner sued defendant investment company, alleging, inter alia, breach of a confidentiality agreement and misappropriation of trade secrets related to an estate planning technique and process for financing the purchase of life insurance. The parties cross-moved for sanctions due to discovery misconduct. The motions were referred to a magistrate for disposition.

**OVERVIEW:** No sanctions were necessary or appropriate regarding the planner's potential witness list as there was no basis to conclude that the estate planner had further contact information. Moreover, the trial judge had authority to preclude evidence from a witness for whom no contact information was supplied prior to the close of discovery. The planner's failure to produce documents in response to the supplemental discovery request warranted sanctions given that it failed to fully comply with its offer to produce the documents or the court's order to produce those documents and had unilaterally decided to exempt certain documents created after the lawsuit without timely seeking a protective order. The planner's failure to produce unredacted

versions of a gift compressions techniques letter was sanctionable given the willful disregard for the court's order to produce those documents. The magistrate denied the planner's motion for sanctions and to compel production of certain notes because they involved consultation between the investment company's employee and its counsel. In addition, the planner's production request and interrogatories were overbroad.

**OUTCOME:** The investment company's motion for sanctions was granted in part. The planner was ordered to pay a portion of the company's costs and a witness' statement at a court hearing and his affidavits regarding the gift compression techniques letter were deemed admissions by a party-opponent. The planner's motion for sanctions was denied.

**CORE TERMS:** track, discovery, compression, gift, deposition, unredacted, confidentiality agreement, life insurance, interrogatory, redacted, responsive, protective order, disclosure, lawsuit, waived, documents relating, financed, premium, reply, leveraged, producing, preliminary injunction, counterclaim, production of documents, responded, telephone, confidential information, trade secrets, failure to produce, presenting

**LexisNexis(R) Headnotes**

*Civil Procedure > Discovery > Misconduct*
[HN1] The obligation to respond fully to discovery is enforceable with sanctions. A showing of bad faith is not required for the imposition of sanctions; sanctions may be imposed upon a finding of willfulness, bad faith, or fault on the part of the noncomplying litigant. The court is not required to select the least drastic or most reasonable sanction, but the court may only impose sanctions that are proportionate to the circumstances surrounding the party's failure to comply with the discovery rules.


*Civil Procedure > Pleading & Practice > Pleadings > Answers*
*Civil Procedure > Discovery > Methods > General Overview*
*Civil Procedure > Discovery > Misconduct*
[HN2] Under *Fed. R. Civ. P. 26(b)(1)* provides that a party may obtain discovery of any matter that is relevant to the claim or defense of any party. *Fed. R. Civ. P. 37(a)(2)(B)* enforces this obligation by providing that if a party fails to answer an interrogatory or fails to permit an inspection, the party seeking that discovery may move to compel that discovery. An incomplete or evasive disclosure, answer or response is to be treated as a failure to respond. *Fed. R. Civ. P. 37(a)(3)*. Upon the granting or denying of such a motion the court shall award the reasonable expenses incurred in bringing or resisting the motion, subject to the standards set out in *Fed. R. Civ. P. 37(a)(4)*. If a party fails to obey an order to provide or permit discovery, more severe sanctions can be entered under *Fed. R. Civ. P. 37(b)*. In addition to the explicit authority set out in *Fed. R. Civ. P. 37*, the court has inherent authority to impose sanctions for bad faith conduct.


*Civil Procedure > Judicial Officers > Judges > General Overview*
*Civil Procedure > Discovery > Disclosures > Mandatory Disclosures*
*Civil Procedure > Discovery > Methods > General Overview*
[HN3] If a party should attempt to submit evidence by any witness as to which no contact information was disclosed by that party before the close of discovery, *Fed. R. Civ. P. 37 (c)(1)* provides authority for the trial judge to preclude evidence by

such a witness, if appropriate. The party would have to explain why it was substantially justified in not disclosing more information about that witness as a supplement to its *Fed. R. Civ. P. 26(a)(1)* disclosure during discovery and why that non-disclosure was not harmless. Should this hypothetical situation occur, the ultimate decision belongs to the trial judge.


*Civil Procedure > Counsel > General Overview*
*Legal Ethics > Professional Conduct > General Overview*
*Legal Ethics > Sanctions > General Overview*
[HN4] The Federal Rules of Civil Procedure permit the court to impose sanctions for discovery misconduct on a party, or its counsel, or both. *Fed. R. Civ. P. 37(a)(4)(a)* and *(b)(2)*.


*Civil Procedure > Discovery > Privileged Matters > General Overview*
*Evidence > Privileges > Attorney-Client Privilege > Elements*
*Evidence > Privileges > Attorney-Client Privilege > Waiver*
[HN5] The elements of attorney-client privilege are well established: (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal advisor, (8) except the protection be waived.

**COUNSEL:** For TAX TRACK SYSTEMS CORPORATION, plaintiff: Kevin D Conneely, Robins, Kaplan, Miller & Ciresi, Minneapolis, MN.

For TAX TRACK SYSTEMS CORPORATION, plaintiff: Mark Nicholas Senak, McDonald & McCabe, LLC, Chicago, IL.

For NEW INVESTOR WORLD, INC., defendant: Michael Cullen Borders, Daniel Matthew Noland, Rooks Pitts, Chicago, IL.

For NEW INVESTOR WORLD, INC., counter-claimant: Michael Cullen Borders, Daniel Matthew Noland, Rooks Pitts, Chicago, IL.

For TAX TRACK SYSTEMS CORPORATION, counter-defendant: Kevin D Conneely, Robins, Kaplan, Miller & Ciresi, Minneapolis, MN.

For TAX TRACK SYSTEMS CORPORATION, counter-defendant: Mark Nicholas Senak, McDonald & McCabe, LLC, Chicago, IL.

**JUDGES:** GERALDINE SOAT BROWN, United States Magistrate Judge.

**OPINION BY:** GERALDINE SOAT BROWN

**OPINION**

**MEMORANDUM OPINION AND ORDER**

Geraldine Soat Brown, United States Magistrate Judge

The District Judge has referred this matter for discovery supervision and discovery motions. Presently before the Court is Defendant's Third *Rule 37* Motion for Sanctions [dkt **[*2]** 72], and Plaintiff's Motion for Sanctions. [1] After carefully considering the facts and issues, and observating the unfolding of events in numerous hearings on the various motions, for the reasons set out herein, Defendant's motion is granted in part and denied in part. Plaintiff's motion is denied.

> 1 Defendant's Fourth Motion for Sanctions [dkt 92] will be the subject of a further opinion.

**FACTUAL BACKGROUND**

This case involves a six-Count Amended complaint by plaintiff Tax Track Systems Corp. ("Tax Track") against defendant New Investor World ("NIW") alleging, *inter alia*, breach of a confidentiality agreement and misappropriation of trade secrets. Tax Track alleges that it developed an estate planning technique and process for financing the purchase of life insurance "in the least invasive and most tax-efficient manner." (Am. Compl. P 5.) Tax Track calls this process "Leveraged Life Insurance." (*Id.*) Tax Track alleges that it and NIW entered into a Confidentiality Agreement whereby NIW was **[*3]** granted access to certain confidential information, which Tax Track calls the

"Licensed Material." That information included information listed on a schedule appended to the Confidentiality Agreement and "any additional material developed over the course of the Confidentiality Agreement to facilitate the concept of Leveraged Life Insurance and the Licenced Material." (Am. Compl. PP 9-10.) Tax Track also alleges that NIW agreed not to use any confidential information or the Licensed Material following the termination of the Confidentiality Agreement. Although not alleged in the Amended Complaint, apparently it is undisputed that NIW gave notice on April 4, 2001 to terminate the Agreement with Tax Track. (Tr. Feb. 5, 2002 at 58.)

The District Judge held an evidentiary hearing on Tax Track's motion for a preliminary injunction, at the conclusion of which the motion was denied. (Minute Order of February 5, 2002.) [Dkt 41.] NIW filed a counterclaim on February 28, 2002. [Dkt 46.] Discovery followed, and after one extension, the District Judge ordered a final discovery cutoff of September 30, 2002. [Dkt 77.]

Several motions for sanctions have been filed. On April 23, 2002, this Court **[*4]** granted in part Defendant's Second Motion for Sanctions, ordering Tax Track to produce unredacted copies of the confidentiality agreements entered into by Tax Track with other parties, and awarding NIW its attorneys' fees and costs in connection with the second motion for sanctions. [Dkt 61.] Tax Track's objections to that order were overruled on July 30, 2002. On August 5, 2002, NIW filed Defendant's Third *Rule 37* Motion for Sanctions ("Def.'s 3rd Mot."). On September 16, 2002, Tax Track filed Plaintiff's Motion for Sanctions ("Pl.'s Mot.") A hearing was held on September 25, 2002, at which this Court entered orders to resolve disputes standing in the way of completing discovery before the cutoff date, and reserved the issue of sanctions for later argument, which was held on October 15, 2002. On October 18, 2002, Tax Track filed a motion for a protective order or to amend the complaint, which was denied at a hearing on October 24, 2002. [2] At that hearing, William Gray, Tax Track's president, appeared to answer personally some of the questions that arose at previous hearings. He had not been ordered to appear.

2002 U.S. Dist. LEXIS 21320, *

2   Subsequently the District Judge granted a protective order requiring production of the disputed documents but limited to attorneys' eyes only. [Dkt 95.]

**[\*5]**  This opinion will first discuss the factual background of the motions and then discuss the issue of sanctions.

Defendant's Third *Rule 37* Motion for Sanctions.

Defendant's Third Motion for Sanctions claims three areas of discovery abuse: (a) Tax Track's failure to produce all versions of the "gift compression techniques letter"; (b) Tax Track's failure to identify properly potential witnesses properly in compliance with *Rule 26*; and (c) Tax Track's objections and refusal to respond to NIW's supplemental request for production of documents.

A. Tax Track's failure to produce all versions of the "gift compression techniques letter."

At the preliminary injunction hearing, Tax Track's president, William Gray testified that a document listed in the Confidentiality Agreement as the "leveraged overview memorandum" is also titled "gift compression techniques" in letters or memoranda. (Tr. Feb. 5, 2002 at 73.) The document is the general explanation of the Tax Track program. (*Id.* at 75.) He testified that it was always confidential. (*Id.*) He further testified that before the gift compression techniques memorandum is disclosed, Tax Track requires a potential licensee **[\*6]** to sign a confidentiality agreement. (*Id.* at 70.) [3] When asked whether it was disclosed in some circumstances without the recipient singing a confidentiality agreement, Mr. Gray testified, "Occasionally went to an advisor." (*Id.* at 76.) At the conclusion of the hearing, Tax Track's counsel acknowledged that, "there is an issue that was raised here about where this document [the gift compression techniques memorandum] has actually gone beyond the confines of the people in the confidentiality agreements." However, he argued that Tax Track's disclosure of the gift compression techniques memorandum had been limited so as to not destroy the requisite secrecy. (*Id.* at 112-13.) Thus, the scope of Tax Track's disclosure of the gift compression techniques memorandum to third

parties, with or without a confidentiality agreement, was expressly at issue.

3   The confidentiality agreements between Tax Track and third parties were the subject of NIW's Second Motion for Sanctions.

One version of the gift compression **[\*7]** techniques memorandum was produced prior to the preliminary injunction hearing (bates numbered TT021-028). (Pl.'s Resp. at 1.) No additional versions or copies of the gift compression techniques memorandum were produced until the day before the deposition of William Gray, Tax Track's president. NIW has repeatedly requested information about all of the persons to whom Tax Track provided information that Tax Track now asserts is confidential. Tax Track initially responded that it would only provide that information under certain conditions. *See* Def.'s Interrog. 5 and Pl.'s Answer thereto, served January 5, 2002, attached as Ex. A to Def.'s Reply Support Third Mot. Sanctions ("Def.'s Reply"). Tax Track responded to NIW's Third Motion by saying that it did not understand that NIW wanted *all* versions of the gift compression techniques memorandum. (Pl.'s Resp. at 2.) However, the day before Mr. Gray's July 2002 deposition, Tax Track supplemented its document production with three additional copies of the gift compression techniques memorandum, bates numbered TT082 through TT108. Tax Track states that it did so in order to resolve the dispute about whether NIW wanted all of the versions.  **[\*8]**  (Pl.'s Resp. at 4.) At his deposition on July 2, 2002, however, Mr. Gray testified that Tax Track had not produced "every copy and every version of the letter." (Def.'s Mot., Ex. 2, Gray dep. at 103.) Mr. Gray testified that perhaps "dozens" of such letters had been sent. (*Id.* at 123.) NIW's Third Motion argues that in light of these facts, Tax Track should be barred from presenting any claim that the gift compression techniques memorandum or its contents constitutes a trade secret or is otherwise protectible confidential information

In its Response to NIW's Third Motion for Sanctions, Tax Track states, "Defendant has agreed to produce all unredacted copies of the Gift Compression Techniques Memorandum." (Pl.'s Resp. at 4, *see also* Pl.'s Resp. at 5.) Tax Track

attached to its Response an August 6, 2002 letter from its counsel to NIW's counsel stating, in part, that Tax Track would "unredact" the three gift compression techniques memoranda produced at Mr. Gray's deposition. (Pl.'s Resp., Ex. 7.)

However, as demonstrated at subsequent hearings, Tax Track is unable to keep either its commitment that it would produce "all unredacted copies of the gift compression techniques memorandum" [*9] or even the more modest commitment to produce unredacted copies of the three memoranda produced at Mr. Gray's deposition.

The September 24, 2002 production and the September 25, 2002 hearing.

On September 24, 2002, a month and a half after Tax Track's counsel's August 6, 2002 letter promising the "unredacted" copies of the three gift compression techniques memoranda, and the day before the hearing on NIW's motion in this Court, Tax Track's counsel delivered to NIW's counsel three documents. Tax Track's counsel's cover letter stated, "Enclosed are unredacted copies of the Gift Compression Techniques Memorandum/Leverage Overview Memorandum previously produced as Tax Track documents TT-0082-0094 and TT0097-108." [4] However, even a cursory comparison of the documents demonstrates that the unredacted "copies" produced on September 24, 2002 are not the same documents that had been produced in redacted version at Mr. Gray's deposition almost three months earlier. They are totally different documents (although they are versions of the gift compression techniques memorandum), addressed to other persons, with different calculations. This demonstrated that there were more versions of [*10] the gift compression techniques memorandum than Tax Track had accounted for, let alone produced. For this reason, and consistent with the representations in Tax Track's Response, Tax Track was ordered on September 25, 2002, to produce immediately to NIW unredacted copies of all versions of the gift compression techniques memorandum. (Minute Order of September 25, 2002.) [Dkt 86.]

    4    The cover letter and enclosed documents were tendered to the Court at the September 25, 2002 hearing.

The October 15, 2002 hearing.

At that hearing, Tax Track's counsel stated that there might be a problem producing the unredacted versions of TT82-94 and TT97-108. Thus, Tax Track was also ordered to produce to NIW the original redacted versions that were labeled with those bates numbers. (Minute Order of October 15, 2002.) [Dkt 91.] Counsel for both parties also informed the Court that Tax Track had refused to produce versions of the gift compression techniques memorandum created after the filing of the lawsuit. This [*11] Court ruled that any objection to producing any gift compression techniques memoranda based on time had been waived.

The October 24, 2002 hearing.

Prior to the October 24, 2002 hearing, Tax Track produced an unredacted version of one of the three memoranda, TT97-108 (produced unredacted as TT421-432). However, Tax Track's counsel advised NIW's counsel that Tax Track could not produce either the original redacted version or an unredacted copy of TT82-87 or TT88-94. Tax Track also prepared and submitted to the Court affidavits from Mr. Gray stating, in essence, as follows: There was only one copy of those memoranda in Tax Track's files; Mr. Gray redacted the recipient's name from the document before his deposition because the recipient "remains a potential client of Tax Track"; he left the original redacted copy at his office in Minneapolis when he came to Chicago for his deposition; he returned the original redacted copy of the memoranda to Tax Track's file; but he has not been able to locate the redacted copy. As to TT88-94, Mr. Gray was able to state the name of the two individuals to whom he believes that memorandum was sent. As to TT82-87, his best recollection is that [*12] it was addressed to a Los Angeles accountant whose first name is George, but whose last name Mr. Gray cannot recall.

As stated above, Mr. Gray attended the October 24, 2002 hearing on Tax Track's motion for a protective order and NIW's Fourth Motion for Sanctions. He came to explain why Tax Track could not comply with the order to produce unredacted copies of all versions of the gift compression techniques memorandum. He stated, on the record, that since originally creating the gift

compression techniques memorandum in 1996, the memorandum had gone through various modifications, and over the course of that time he had sent perhaps 600 or 700 copies of that memorandum to various individuals. Some signed confidentiality agreements, some would not sign confidentiality agreements. Mr. Gray would try to get confidentiality agreements, but if he could not, he would send the memorandum anyway. The memorandum was on his computer and his current practice is simply to edit the text to personalize the beginning and the recipient's name, and print it out. He did not keep track of the persons to whom he sent the gift compression techniques memorandum, and it would be impossible at this time to [*13] identify all of the persons to whom he sent some version of the memorandum. Thus, Tax Track concludes that it is impossible to comply with the September 25, 2002 order or the October 15, 2002 order.

B. Tax Track's failure to identify potential witnesses properly in compliance with *Rule 26*.

In its *Rule 26(a)(1)* disclosures on June 14, 2002, Tax Track identified 17 individuals who might have information that might be used to support its claims or defenses. NIW's Third Motion complains of the fact that Tax Track failed to supply any contact information (*e.g.*, address, telephone number) for a number of such persons, for example, "Dan O'Neil, Indiana" and "Scott Beller, Boston Massachusetts." (Pl.'s Mot., Ex. 4 at 2.) Tax Track responds that on August 5, 2002, (the date that NIW filed its Motion), Tax Track supplemented its *Rule 26(a)(1)* disclosure with all of the information that its investigation had subsequently disclosed. (Pl.'s Resp., Ex. 10.) As to some persons, contact information is now provided. However, as to some of the persons there is still no address or telephone number, for example, the entire listing for Dan O'Neil consists of the following: "Dan O'Neil, Indiana. [*14] Mr. O'Neil may have information regarding the relationship between Ash Brokerage, AEGON, Western Reserve Life Assurance Co., Plaintiff Tax Track and Defendant NIW." (*Id.* at 2.) NIW's Third Motion originally requested that Tax Track be required to identify which of those persons whose contact information was provided only in response to the Motion Tax Track plans to call as a witness (for

trial or in an affidavit), so that NIW could depose those persons within the remaining time. Tax Track objected to being required to disclose its witnesses and trial strategy. At the hearing on September 25, 2002, this Court declined to require Tax Track to do so, but observed that it would be very strange if a person for whom Tax Track had no contact information as of the close of discovery (which would mean that Tax Track's agents and counsel had not contacted that person as of the close of discovery) were subsequently called as a witness.

C. Tax Track's objections to NIW's supplemental request for production of documents.

On June 10, 2002, NIW served Tax Track with Defendant's Second Request for Production of Documents. (Def.'s 3rd Mot., Ex. 7.) NIW's Third Motion states that NIW agreed [*15] to extend the time for Tax Track to respond on the express agreement that Tax Track would provide a meaningful response. (Def.'s 3rd Mot. at 6.) NIW complains that, instead of a production of documents, on July 22, 2002, Tax Track served "blanket objections to each and every request and produced no documents." (*Id.*, Ex. 8.) However, after reciting a 20-line "objection" to each category of request, Tax Track also added that, "subject to and without waiving the foregoing objections, plaintiff will make any additional responsive, non-privileged documents--not related to individual client files--available" at Tax Track's Minneapolis, Minnesota offices. (Def.'s 3rd Mot., Ex. 8.) NIW complains that Tax Track's response was a dilatory tactic and that NIW is prejudiced because it is now precluded from doing any follow up to document production or using the documents in depositions.

Tax Track's Response argues that it has the right under *Fed. R. Civ. P. 34* to produce the documents as they are kept in the ordinary course of business. (Pl.'s Resp. at 10.) Tax Track also argues that, given the breadth of the requests, *e.g.*, "all documents used, referred to, or relied upon by plaintiff, [*16] its agents and employees . . . in the creation of any documents relating to premium finance life insurance" (Def.'s Mot., Ex. 7, Def.'s Second Request, Category 5), the only reasonable way to produce the documents is at Tax Track's corporate offices. (Pl.'s Resp. at 11.) Tax Track attaches to its Response a letter dated August 27,

2002 from its counsel to NIW's counsel in which Tax Track's counsel stated:

> My proposal, so the record is clear, was this: if someone from your office wants to come up and "meet and confer" on what exactly you believe falls within the Second Request for Production (Nos. 1-6), we will pay for that person's reasonable airfare and *make available for inspection at Tax Track's corporate offices all of the Company's non-privileged responsive documents for your inspection*. Those that you wish to have produced can then be copied, at defendant's expense. If we are in doubt about whether some particular document(s) are responsive, we can resolve it right there, or at least have a specific area in which we agree to disagree.

(Pl.'s Resp., Ex. 13, emphasis added.) In its Response, Tax Track stated:

> Defendant also takes exception with Tax Track's [*17] offer to produce the documents responsive to Defendant's second production request at Tax Track's offices in Minneapolis, Minnesota. . . . Plaintiff Tax Track has complied with *Rule 34(b)* by making the documents available for inspection as they are kept in the normal court [sic] of business in Minneapolis, Minnesota.

(Pl.'s Resp. at 10.)

At the hearing on September 25, 2002, Tax Track repeated its offer to pay the cost of NIW's counsel's transportation to Minneapolis for the document review, and this Court so ordered, except for documents relating to Tax Track's claimed damages, which were ordered to be produced in Chicago. (Minute Order of September 25, 2002.) Again, the issue of sanctions was reserved.

At the hearing on October 15, 2002, it was revealed that Tax Track had not produced all responsive documents. Rather, Tax Track asserted that it should not be required to produce documents prepared after the filing of the lawsuit because, it argued, production of those documents would injure Tax Track's continuing business efforts. Notably, Tax Track had not moved for any protective order permitting it to withhold documents created after the filing of the lawsuit. Tax Track's [*18] counsel implored the Court for an opportunity to file a motion for a protective order. Thus, Tax Track was ordered to produce any documents required by the September 25, 2002 order no later than October 21, 2002, and file any motion for any protective order relating to any of those documents no later than October 18, 2002 for hearing on October 24, 2002. (As discussed above, any objection to producing gift compression techniques memoranda was held to be waived.) Because discovery is closed and the deadline for filing dispositive motions was at that time only a week away from the scheduled hearing, the order provided: "Any document that the plaintiff is withholding on the basis of its motion for a protective order shall be compiled and housed in plaintiff's counsel's office in Chicago for immediate production upon disposition of the motion for protective order." (Minute Order of October 15, 2002.)

In its Motion for Protective Order, Tax Track sought a protective order providing (a) that Tax Track is not required to produce any documents dated after August 13, 2001 (the date of the filing of the lawsuit), except those relating to completed client insurance cases; (b) that documents [*19] created between July 4, 2001 and August 13, 2001 be produced only under an "attorneys' eyes only designation"; and (c) that NIW be required to make a pre-trial showing of need before NIW could use any Tax Track documents dated after July 4, 2001 in any further proceedings. (Pl.'s Mot. Protective Order at 5.) [Dkt 94.] At the hearing on October 24, 2002, Tax Track's motion was denied, both because Tax Track had waived any such limitation on its response to NIW's second request by offering to produce "all responsive documents," and because the nature of the lawsuit that Plaintiff Tax Track filed and the relief sought (including a preliminary and permanent injunction) puts Tax Track's post-lawsuit activities, including but not limited to how it has maintained the confidentiality of the gift compression techniques memorandum, in issue. [5]

Tax Track cannot preclude NIW from exploring the factual basis for Tax Track's claim that its business will suffer irreparable ongoing damage if an injunction is not issued. Thus, Tax Track was ordered to produce the documents immediately. (Minute Order of October 24, 2002.) [Dkt 93.] As noted above, the District Judge subsequently ordered that the **[*20]** documents be produced limited to "attorneys eyes only" disclosure. (Minute Order of October 25, 2002.)

> 5 *See, e.g.*, Amended Complaint P 13: "The confidentiality of the Licensed Material and confidential information was critical to the ability of Plaintiff Tax Track to maintain its competitive edge in the various markets in which it operated." NIW has denied that allegation. (Answer to First Am. Compl. P 13.) Tax Track alleges that it has suffered and will continue to suffer damages from NIW's misappropriation of its trade secrets. (Am. Comp. P 36.) NIW also denies that allegation. (Answer to First Am. Compl. P 36.) NIW also alleges as an affirmative defense that Tax Track disclosed the allegedly confidential information to others without any confidentiality agreement. (*Id.*, Aff. Defense No. 1.)

Plaintiff's Motion for Sanctions.

Tax Track filed this lawsuit on August 13, 2001. As described above, on February 14, 2002, after denying Tax Track's motion for a preliminary injunction, the District **[*21]** Judge set a discovery cut off of August 13, 2002. NIW's counterclaim was filed on February 28, 2002. On June 4, 2002, Tax Track served NIW with plaintiff's first set of interrogatories and plaintiff's first substantial request for production of documents. (Tax Track's only prior request, served on December 11, 2001 sought only one document: a true and correct copy of NIW Executive Summary Premium Financed Life Insurance memorandum.) In addition to twenty interrogatories, many with multiple subparts, Tax Track's request for production sought 80 categories of documents, including "Any documents relating to Leveraged Life Insurance," "Any documents relating to Premium Financed Life Insurance," "NIW corporate bank statements since the date of its incorporation," and "Any documents maintained in personal files or working files of the following individuals: Grace Krueger, Daen Wombwell and Ric Martin." (Pl.'s Mot., Ex. 3, Request 1, 2, 76, 80.) NIW requested an extension of time to respond, and Tax Track agreed to allow until July 15, 2002. NIW's answers, objections and responses were served the following day, July 16, 2002. Tax Track argues that, by exceeding the agreed extension, NIW has **[*22]** waived any objections.

On July 17, 2002, the day after NIW served its responses, in the course of responding to a letter from NIW's counsel, Tax Track's counsel wrote that NIW had waived any objections by failing to serve a timely response to discovery. (Pl.'s Mot., Ex. 4 at 2.) He did not raise any other issues with respect to NIW's response. The following day, NIW's counsel responded to Tax Track's counsel's letter, stating, in part:

> As you well know, I advised you on the 15th that our discovery would not get out the door until the 16th and you raised no objection. If you are serious in your contention that our objections are not timely under Rule 33, have been waived and desire we file a motion before Judge Brown, please call Dan Noland to discuss the issue as required in local Rule 37.2.

(Def.'s Resp., Ex. 1 at 2.) NIW states that Tax Track never responded to that letter. (Def.'s Resp. at 2.)

As its compliance with Local Rule 37.2's requirement to meet and confer, Tax Track cites its counsel's July 17, 2002 letter, and another letter to NIW's counsel on September 9, 2002 in which Tax Track sought further compliance by September 16, 2002. (Pl.'s Mot. at 1-2, and **[*23]** Ex. 5.) [6] Tax Track's motion further states that on Tuesday, September 10, 2002, Tax Track's counsel had a telephone conference with NIW's counsel, who responded that he would discuss additional compliance with his client. (Pl.'s Mot. at 2.) On Monday, September 16, 2002, Tax Track filed its motion. At that time, Tax Track states, it had not received a response from NIW's counsel. (*Id.*)

6    As noted on this Court's website, Local Rule 37.2 requires personal consultation. An exchange of letters does not constitute compliance.

NIW states that it faxed a letter on September 17, 2002 that it had been in the process of preparing and that there was a further meet and confer on September 18, 2002, at which NIW agreed to withdraw certain objections and produce additional information and documents, which was confirmed by a letter from NIW's counsel on September 20, 2002. (Def.'s Resp., Ex. 3.) Tax Track confirms that since the filing of Tax Track's motion, NIW has supplemented its document production (Pl.'s Reply **[*24]** at 1), but maintains that NIW has waived all of its objections and should be sanctioned for its tardy response and for what Tax Track claims is intentional concealment of documents. The sanction sought in Tax Track's motion for sanctions is dismissal of NIW's counterclaim as well as fees and costs in bringing the motion. (Pl.'s Mot. at 1-2.)

Tax Track's motion focuses on the following: (a) Request 59 (confidentiality agreements entered into by NIW with other entities); (b) certain notes taken by Grace Krueger, NIW's president at the deposition of Mr. Gray on July 2, 2002; and (c) the addresses and telephone numbers of particular individuals (Hal Parker, Rod Sander, and Mark Wilkinson) listed in NIW's responses to interrogatories. Also, Tax Track argues that NIW's answers to certain interrogatories, in which NIW objected and then provided certain information is a "semantic game." (Pl.'s Mem. Supp. Mot. Sanctions at 5.) In all, Tax Track moved on September 16, 2002, to compel further responses to ten of its twenty interrogatories, and to 27 of its 80 document requests.

As of the filing of Plaintiff's Reply (October 10), the confidentiality agreements had been produced (although Tax **[*25]** Track argues, tardily and with intent to conceal) and the information about the individuals was also provided one day after the filing of the motion for sanctions. (Pl.'s Reply at 8.) Grace Krueger's notes were not produced. Tax Track argues that further responses should be required to Interrogatories 2, 3, 4, 5, 6, 7, 8, 14, and 16, and Document Requests 2, 3, 39, 40, 48, 51, 52, 58, 61 through 70, inclusive, 72 through 77 inclusive, and 80. (*Id.* at 9-15.)

Grace Krueger's Notes.

Apparently Ms. Krueger attended Mr. Gray's deposition on July 2, 2002 and took certain notes relating to his testimony (the "Krueger Notes"). At the end of the deposition, Tax Track's counsel requested that the notes be produced, and NIW's counsel objected to producing them. (Pl.'s Mem Supp. Mot. Sanctions at 3.)

At the conclusion of Mr. Gray's deposition, counsel for both parties called this Court by telephone for a ruling on the Krueger Notes. (Def.'s Resp., Ex. 4, Gray dep at 222-25.) Because the issue did not relate to Mr. Gray's deposition, it was not necessary to resolve that day. Tax Track's counsel said that he was concerned that the notes might disappear and not be fully produced if **[*26]** ordered. (*Id.* at 222-23.) He suggested that NIW's counsel take custody and number the note pages, which NIW's agreed to do. (*Id.* at 222-25.) The following day, Tax Track's counsel wrote to NIW's counsel and stated that the Krueger Notes were responsive to Document Requests 1, 2, and 3 (any documents relating to Leveraged Life Insurance, Premium Life Insurance or Financed Life Insurance), and probably many more because of the scope of Mr. Gray's testimony. (Pl.'s Mot., Ex. 1.) Therefore, Tax Track concluded, no further request was required. (*Id.*) The Krueger Notes are not mentioned in the July 17, 2002 letter from Tax Track's counsel (Pl.'s Mot., Ex. 4), although they are mentioned in his September 9, 2002 letter. (Pl.'s Mot., Ex. 5.)

Tax Track argues that NIW waived any objection by failing to list the notes on a privilege log along with its production of documents on July 17, 2002, and from this Tax Track infers that NIW "intended to conceal the Krueger notes from discovery." (Pl.'s Mem. Supp. Mot. Sanctions at 4.) NIW argues that it does not view the Krueger Notes as responsive to any discovery request and, therefore, would not be required to list them in a privilege **[*27]** log. Further, NIW states that, in light of the discussion on the record about the notes, the accusation that NIW intended to conceal them is "baseless." (Def.'s Resp. at 5, n.2.)

## ANALYSIS

Legal Standard.

2002 U.S. Dist. LEXIS 21320, *

There is no doubt that discovery has a central role in civil litigation in the federal courts. "In our system of civil litigation, the discovery process is the principal means by which lawyers and parties assemble the facts, and decide what information to present at trial." *Danis v. USN Communications, Inc., 2000 U.S. Dist. LEXIS 16900*, No. 98 C 7482, 2000 WL 1694325 * 1 (N.D. Ill., October 23, 2000)(Schenkier, M.J.). [HN1] The obligation to respond fully to discovery is enforceable with sanctions. [7] A showing of bad faith is not required for the imposition of sanctions; sanctions may be imposed upon a finding of wilfulness, bad faith, or fault on the part of the noncomplying litigant. *Melendez v. Illinois Bell Telephone Co., 79 F.3d 661, 671 (7th Cir. 1996)*. The court is not required to select the least drastic or most reasonable sanction, but the court may only impose sanctions that are proportionate to the circumstances surrounding the party's failure to comply [*28] with the discovery rules. *Id. at 672*.

> [7] [HN2] *Federal Rule of Civil Procedure 26(b)(1)* provides that a party may obtain discovery of any matter that is relevant to the claim or defense of any party. *Rule 37(a)(2)(B)* enforces this obligation by providing that if a party fails to answer an interrogatory or fails to permit an inspection, the party seeking that discovery may move to compel that discovery. An incomplete or evasive disclosure, answer or response is to be treated as a failure to respond. *Fed. R. Civ. P. 37(a)(3)*. Upon the granting or denying of such a motion the court shall award the reasonable expenses incurred in bringing or resisting the motion, subject to the standards set out in *Rule 37(a)(4)*. If a party fails to obey an order to provide or permit discovery, more severe sanctions can be entered under *Rule 37(b)*. In addition to the explicit authority set out in *Rule 37*, the Court has inherent authority to impose sanctions for bad faith conduct. *Chambers v. NASCO, Inc., 501 U.S. 32, 46, 115 L. Ed. 2d 27, 111 S. Ct. 2123 (1991)*.

[*29] NIW's Third Motion for Sanctions.

Starting with the easiest part of NIW's Third Motion, relating to Tax Track's claimed failure to disclose information about persons listed in its *Rule 26* disclosure, no sanctions are necessary or appropriate at this time. There is no basis to conclude that Tax Track now has further information that was not disclosed. NIW is concerned that persons about whom no contact information was disclosed will subsequently appear as witnesses for Tax Track at trial, in an evidentiary hearing, or in an affidavit submitted by Tax Track in connection with dispositive motions. [HN3] If Tax Track should attempt to submit evidence by any witness as to which no contact information was disclosed by Tax Track before the close of discovery, *Rule 37(c)(1)* provides authority for the trial judge to preclude evidence by such a witness, if appropriate. Tax Track would have to explain why it was substantially justified in not disclosing more information about that witness as a supplement to its *Rule 26(a)(1)* disclosure during discovery and why that non-disclosure was not harmless. Should this hypothetical situation occur, the ultimate decision belongs to the trial judge. [*30] NIW's motion for sanctions on that issue is denied without prejudice to any motion NIW might make under *Rule 37(c)(1)*.

Tax Track's failure to produce all documents sought in NIW's second document request is more complex. When Tax Track's Third Motion was filed, on August 5, 2002, there was a discovery cut off of August 13, 2002, and NIW argued that Tax Track's dilatory response put NIW into a crunch to complete discovery on time. However, Tax Track points out that NIW did not ask for an extension of the discovery cut off, and in fact, NIW opposed Tax Track's motion to extend the cut off. At the September 25, 2002 hearing this Court believed that the issue had been appropriately resolved by adopting Tax Track's offer to pay NIW's expenses to review all responsive documents in Minneapolis. An order embodying Tax Track's offer was entered, except that documents relating to Tax Track's claimed damages were ordered to be produced in Chicago. The subsequent hearings demonstrated that Tax Track did not produce "all" responsive documents, as it had offered and was ordered to do. At the present time, however, after the orders of the District Judge and this Court on October 24 and 25, 2002, [*31] the remaining documents have presumably been produced.

The question of what sanctions, if any, would have been appropriate had Tax Track fully produced the documents as required by its offer and the September 25, 2002 order is now irrelevant. Tax Track did not fully comply with the offer it tendered as a basis for denying NIW's motion or even with the Court's order. Tax Track unilaterally decided to exempt from that production documents created after the lawsuit, but did not seek a protective order to permit such an exemption until October 18--after NIW's counsel went to Minneapolis for the production. Therefore, the Court finds that NIW's Third *Rule 37* Motion for Sanctions was ultimately justified by Tax Track's actions, and, pursuant to *Rule 37(a)(4)(A) and (b)(2)*, orders Tax Track to pay certain costs and attorneys' fees incurred by NIW in preparing and presenting that motion, as further set out below.

The issue of Tax Track's failure to produce all of the unredacted gift compression techniques memoranda is even more serious. From the previous discussion of the preliminary injunction hearing, it is clear that the extent of Tax Track's disclosure of the gift compression techniques [*32] memorandum is a central issue in this case. NIW is entitled to discovery to respond to Tax Track's argument that the disclosure was limited and that Tax Track took reasonable measures to preserve the confidentiality of the gift compression techniques memorandum. In response to NIW's efforts to obtain copies of all of the gift compression techniques memoranda, Tax Track has dribbled documents and information. For example, Tax Track produced redacted versions of three of the memoranda at Mr. Gray's deposition, but he admitted that those were not all the memoranda. Instead, he testified that "dozens" of such memoranda had been sent. Later he admitted that the number was not dozens, but six or seven hundred, and that he can no longer identify all of the persons to whom they were sent.

One of the on-going battles during discovery in this case has been whether Tax Track may redact from its documents information showing to whom the documents were sent. The importance of producing unredacted documents is illustrated by what happened when Tax Track was ordered to produce the unredacted copies of the three redacted memoranda used at Mr. Gray's deposition. Instead

of producing what was ordered, [*33] Tax Track produced three *different* gift compression memoranda (and only on the day before the hearing on sanctions), thus demonstrating beyond doubt that it had not produced all such memoranda in its possession. If Tax Track had not been ordered to produce the unredacted versions, it is questionable whether these additional memoranda would ever have been produced.

Significantly, Tax Track's actions suggest that it believes that it is the judge of what it is required to produce, and can redact and "unredact" documents to suit its purposes. In an earlier example of this belief, Tax Track was prepared to offer into evidence at the preliminary injunction hearing unredacted copies of confidentiality agreements, yet it refused to produce unredacted copies of those documents in subsequent discovery. That was the subject of the sanctions entered on NIW's Second Motion for Sanctions. Likewise, according to his own affidavits, Mr. Gray unilaterally redacted *his only copies* of documents produced at his deposition, even after being sanctioned for producing only redacted documents.

It is also significant that Tax Track's actions are contrary to its representations to the Court and to [*34] NIW's counsel. Tax Track represented that it had agreed to produce all unredacted copies of the gift compression techniques memorandum. (Pl.'s Resp. at 4.) Yet, its production at Mr. Gray's deposition was only a fraction of all of the versions and copies of the memorandum. Likewise, Tax Track's counsel wrote on August 6, 2002 that it would produce unredacted copies of the three memoranda, and included that representation in its Response (filed on August 29, 2002) to NIW's Third Motion for Sanctions. Yet, the documents purporting to be the unredacted memoranda were not delivered until a month later, less than a week before the close of discovery, and even then they were not as represented. The truth about the redacted memoranda was not forthcoming until after two further court hearings on NIW's Third Motion for Sanctions.

The above discussion illustrates that Tax Track did not provide full and complete responses to NIW's discovery about a central issue of the case. Tax Track was at fault for failing to comply with its discovery responsibilities. Tax Track's actions were

certainly at least willful. Accordingly, Tax Track's actions are sanctionable. The only issue is what sanction should **[\*35]** be imposed.

NIW seeks an order that Tax Track be barred from presenting any claim that the gift compression techniques memorandum or its contents constitutes a trade secret. The law favors disposition of issues on the merits rather than as a discovery sanction, although dismissal may be ordered in an appropriate circumstance. *Rodriguez v. M&M/Mars, 1997 U.S. Dist. LEXIS 9036*, No. 96 C 1231, 1997 WL 349989 * 2 (N.D. Ill., June 23, 1997)(Gettleman, J.). In light of Mr. Gray's statements on the record at the October 24, 2002 hearing, as well as his affidavits, the order that NIW seeks is likely to be unnecessary. Although Mr. Gray's statements were not made under oath, they were made on the record at a hearing before the Court, for the purpose of inducing the Court to rule in Tax Track's favor. Because Mr. Gray's testimony at his deposition about the gift compression techniques memorandum was evasive and incomplete in light of his statements on October 24, 2002, Tax Track should be able to use those statements as evidence. Therefore, it is ordered that Mr. Gray's statements at the October 24, 2002 hearing and his affidavits regarding the gift compression techniques memorandum shall be deemed admissions **[\*36]** by a party-opponent pursuant to *Fed. R. Evid. 801(d)(2)* and may be used by NIW as such for any purpose in this lawsuit. [8]

> [8] Those statements may be admissible under *Rule 801(d)(2)* or otherwise even without this order, but this is intended to eliminate any objection to their admissibility.

In addition, Tax Track will be required to pay NIW's fees one-half of the time spent at Mr. Gray's deposition and certain time spent in preparing and presenting NIW's Third Motion, as set out further below. [9] That is because Mr. Gray's testimony at his deposition about the gift compression techniques memorandum was not only evasive and misleading but also improperly limited by his unilateral decision to produce only certain memoranda, and those in redacted form, and thus NIW was required to file its Third Motion and to appear at multiple hearings in order to extricate the truth about Tax Track's use of the gift compression techniques memorandum.

> [9] This is a second and independent basis for the order to pay certain of NIW's fees and costs incurred in connection with the Third Motion.

**[\*37]** [HN4] The Federal Rules permit the court to impose sanctions on a party, or its counsel, or both. *See Rule 37(a)(4)(A)* and *(b)(2)*. After careful consideration of the facts, this Court will give Tax Track's counsel the benefit of the doubt, and conclude that counsel did not advise the sanctionable conduct and therefore sanctions are imposed on Tax Track and not its counsel. This conclusion is supported by Mr. Gray's testimony at his deposition that it was his "interpretation" that NIW only wanted "representative samples" of the gift compression techniques memorandum. (Def.'s 3rd Mot., Ex. 2, Gray dep. at 103.) Likewise, in his affidavits, Mr. Gray admitted that he decided to redact his only copies of the documents produced at his depositions. This Court will not assume that counsel advised him to do so; particularly, this Court will not assume that counsel would represent to the Court and NIW's counsel that unredacted copies would be produced if counsel knew that unredacted copies no longer existed. Furthermore, although Tax Track's counsel represented in its cover letter that the documents delivered to NIW's counsel on September 24, 2002 were unredacted copies of the three memoranda--and **[\*38]** they patently were not--Tax Track's counsel appeared genuinely surprised by that revelation at the hearing. This suggests that Tax Track's counsel, having finally gotten some long-promised documents from the client just the day before the hearing, rushed them over to NIW's counsel without carefully reviewing them.

These facts support the conclusion that Tax Track and its president believe that they have the right to determine what Tax Track will produce in response to discovery. These facts suggest that the client, not counsel, has been at fault.

Tax Track's Motion for Sanctions.

Tax Track's motion is entitled "Plaintiff's Motion for Sanctions" but that motion fails to identify any prejudice to Tax Track that would

justify the Draconian sanction it seeks: the dismissal of NIW's counterclaim. Indeed, Tax Track's motion, memorandum and reply fail to cite or discuss any authority that would support dismissal in these circumstances. It is hard to avoid the conclusion that Tax Track brought its motion as one "for sanctions" more as a response to NIW's three motions for sanctions than in any genuine belief that the Court would order the dismissal of NIW's counterclaim.

Furthermore, **[*39]** with the exception of the Krueger Notes, the specific materials that Tax Track seeks in its motion were produced by NIW the week following the first real Rule 37.2 conference about Tax Track's requests. The balance of Tax Track's motion seeks to compel responses to interrogatories and document requests that individually and collectively are overbroad, as discussed below.

As a threshold matter, the Court finds that NIW has not waived its objections to Tax Track's interrogatories and document requests. Tax Track does not deny the factual scenario set out in NIW's response: That NIW's counsel advised Tax Track's counsel that the responses due on July 15 would be served the following day, on July 16; that Tax Track's counsel did not object; and that the responses including objections were in fact served on July 16. Particularly in light of the large number of interrogatories and requests to which NIW had to respond, the service of responses with objections on July 16 cannot properly be considered a waiver of those objections.

The Krueger Notes.

This Court has reviewed the Krueger Notes, and denies the motion to compel for a number of reasons. First, the Notes are clearly protected **[*40]** work product and attorney-client privileged. Apparently, instead of whispering in her counsel's ear during Mr. Gray's deposition, Ms. Krueger wrote notes, (*e.g.*, "What does that mean?"), for the obvious purpose of discussing portions of the testimony later with her counsel. The notes fit squarely within the scope of attorney-client privilege. [10]

10    [HN5] The elements of attorney-client privilege are well established.

(1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal advisor, (8) except the protection be waived.

*United States v. White, 950 F.2d 426, 430 (7th Cir. 1991).*

Secondly, in connection with Tax Track's argument that NIW waived the privilege by failing to include the Krueger Notes on a privilege log, this Court agrees with NIW that the notes **[*41]** are not responsive to any proper document request. Tax Track's claim that they are responsive to Requests 1, 2 and 3, which request "any documents relating to" leveraged life insurance, premium financed life insurance or financed life insurance, amply illustrates the improperly broad scope of those requests. The Krueger Notes do not discuss leveraged life insurance, premium financed life insurance or financed life insurance except insofar as Mr. Gray's testimony related to those topics. Under Tax Track's construction of its document request, any document that relates in anyway to the general matter at issue in the lawsuit would be required to be produced or listed on a privilege log. That is clearly too broad, particularly under the scope of *Rule 26(b)(1)* as amended in 2000. [11] Thus, Tax Track's motion for sanctions is denied insofar as it seeks production of the Krueger Notes.

11    Prior to December 1, 2000, *Rule 26(b)(1)* provided that "parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party. . . ." Effective

2002 U.S. Dist. LEXIS 21320, *

December 1, 2000, *Rule 26(b)(1)* was amended to narrow the scope of discovery to "any matter, not privileged, that is relevant to the claim or defense of any party. . . ."

[*42] The balance of Tax Track's Motion for Sanctions relates to NIW's objections to further answers to Tax Track's interrogatories and document requests. As noted above, the 80 categories in Tax Track's document request are, individually and collectively, extremely broad. For example, Tax Track's motion asks the Court to overrule NIW's objections to Request 2, which seeks "any documents relating to Premium Financed Life Insurance" and Request 3, which seeks "any documents relating to Financed Life Insurance." (Pl.'s Mot., Ex. 3.) As discussed above, these requests do not conform to scope of discovery in *Rule 26(b)(1)*. Furthermore, NIW's response to Request 2 states, "Since the principal focus of NIW's business is to market premium life insurance, this request encompasses every document in NIW's possession touching on that portion of its business, a request that is neither warranted by the issues in this lawsuit nor by the federal rules." (*Id.*) NIW's response to Request 3 is similar. Tax Track's Reply argues that "Defendant has been in business for less than two years," and, therefore, NIW cannot be overly burdened by having to produce all of its documents. (Pl.'s Reply at 13.) The [*43] length of time that a party has been in business does not justify requiring it to produce every document that relates to a major portion of its business. The requests are simply overbroad.

The overbreadth of Tax Track's requests is further illustrated by considering the collective effects of Requests 72 ("NIW financial statements for each year since the date of its incorporation"); Request 73 ("NIW corporate tax returns for each year since the date of its incorporation"); Request 74 ("Any documents relating to the income, revenue or commissions received by NIW relating to the sale of Premium Life Insurance"); and Request 75 ("Any documents relating to the income, revenue or commissions received by NIW relating to products *other than* Premium Life Insurance")(emphasis added).

Tax Track's interrogatories are similarly broad, for example, Interrogatory 6 asks: "Identify every

individual known to NIW who as knowledge of Financed Life Insurance." (Pl.'s Mot., Ex. 2.)

Tax Track waited four months after the filing of NIW's counterclaim to serve *any* discovery on NIW, and then served these patently overbroad requests. Tax Track further waited until less than a month before the final [*44] close of discovery to make any effort to pursue these requests. As NIW points out, Tax Track's motion to extend the discovery cut off date filed on August 23, 2002 did not mention any problem with NIW's response to document requests or interrogatories. (Def.'s Resp., Ex. 2.) Except for the Krueger Notes, Tax Track has received the documents and information specifically identified in its Motion as significant. There is no basis for compelling NIW to respond further to Tax Track's interrogatories and document requests and certainly no basis for sanctioning NIW for failing to respond further to Tax Track's interrogatories or document requests. Thus, Tax Track's Motion for Sanctions is denied.

## CONCLUSION

For the foregoing reasons, Defendant's Third *Rule 37* Motion for Sanctions is granted in part and denied in part. The following sanctions are imposed upon the plaintiff Tax Track:

1. Plaintiff shall pay defendant's costs and attorneys' fees for the following:

a. Two-thirds of the time spent preparing and filing the Third *Rule 37* Motion for Sanctions, not including any time for interoffice conferences;

b. Two-thirds of the time attending the Court hearing on September 25, 2002, and [*45] all of the time attending the Court hearings on October 15, 2002 and October 24, 2002, not including time to prepare for those hearings; and

c. One-half of the time attending the deposition of William Gray on July 2, 2002, not including time to prepare for that deposition.

2. William Gray's statements at the October 24, 2002 hearing and his affidavits regarding the gift compression techniques memorandum shall be deemed admissions by a party-opponent pursuant to *Fed. R. Evid. 801(d)(2)* and may be used by the defendant as such for any purpose in this lawsuit.

2002 U.S. Dist. LEXIS 21320, *

All other sanctions sought by the defendant are denied.

Defendant's counsel shall submit a specification of fees and costs to Plaintiff's counsel by November 26, 2002. The parties shall follow Local Rule 54.3 (d) through (f) regarding any disputes about the fees and costs.

Plaintiff's Motion for Sanctions is denied.

**IT IS SO ORDERED.**

**GERALDINE SOAT BROWN**

**United States Magistrate Judge**

**DATED: November 1, 2002**

# 16
7 Moore's Federal Practice §33.30 (3rd Ed. 2008)

LEXSTAT 7-33 MOORE'S FEDERAL PRACTICE - CIVIL § 33.30

Moore's Federal Practice - Civil

Copyright 2008, Matthew Bender & Company, Inc., a member of the LexisNexis Group.

Volume 7 Analysis: Civil Rules 30 - 37A
Chapter 33 Interrogatories to Parties
B.  PROCEDURAL REQUIREMENTS
2.  NUMBER AND FORMAT OF INTERROGATORIES

*7-33 Moore's Federal Practice - Civil § 33.30*

**AUTHOR:** by Claudia Wilkenupdates by Robert M. Bloom

## § 33.30 Number of Interrogatories Is Limited

### [1] Original Actions: 25 Interrogatories on Each Other Party, Absent Court Order, Stipulation, or Local Rule

Absent court order or written stipulation of the parties, a party may serve on each other party up to 25 written interrogatories, including discrete subparts.n1 A court may alter the 25-interrogatory limit by order.n2 Some courts have also defined, by local rule, what constitutes an interrogatory. For example, there are local rules in some courts indicating that questions about the existence, location, and custodian of documents will count as only one interrogatory.n2.1 Another court has a local rule providing instructions and questions that parties may choose to use rather than create their own.n2.2 However, a court is prohibited from altering, by local rule, the number of interrogatories permitted under Rule 33.n2.3

As noted, any party may serve interrogatories on any other party to a proceeding (*see § 33.20[2]*).n3 Therefore, in multi-party cases, a party may serve 25 interrogatories on each other party involved. For example, if parties A and B are suing parties X, Y, and Z, then A can serve 25 interrogatories on X, 25 on Y, and 25 on Z, and B can do the same. The interrogatories are subject, however, to objections based on duplication (*see § 33.173*).n4

It appears that when a party is served with interrogatories in excess of the numerical limits, the party may answer the first 25, and object to the remainder.n5 However, one district court has held that when a party is served with interrogatories that exceed the number allowed to be propounded, the interrogated party must object to the excess numbers before responding to any interrogatories. If the interrogated party responds to some of the interrogatories before objecting, it may waive any objection based on the excess numbers. The court found that permitting the responding party to answer certain interrogatories and then object that the total number of interrogatories exceeds the limit essentially would be allowing the party to determine for itself what information to reveal.n6 It appears, however, that the responding party may not have answered the interrogatories in numerical order up to the required number, but rather may have selected the interrogatories of its choosing to answer. This would clearly be improper. In any event, the better rule is to require the responding party to answer the first 25 interrogatories, and object to the remainder.n6.1 The propounding party would then be required to move to compel further answers. This would provide at least some information, and would be in keeping with the spirit of Rule 33(b)(3), which states that interrogatories should be answered to the extent they are not objectionable. An alternate rule, requiring the responding party to

refrain from answering any interrogatories on pain of waiving its objection to the supernumerary questions, would delay the exchange of any information until the propounding party moves to compel.

Just as the respondent is not allowed to choose which supernumerary interrogatories to answer, a proponent of interrogatories cannot circumvent a violation of the numerical limit by voluntarily withdrawing selected supernumerary interrogatories. The operative word in Rule 33 is "serve," and every interrogatory *served* counts against the numerical limit, not just interrogatories that are served and answered. In particular, interrogatories to which objections have been made count toward the numerical limit and the propounding party may not, in an attempt to circumvent the numerical limits, "withdraw" interrogatories for which the respondent served objections.n6.2

### [2] Numerical Limits Include Discrete Subparts

The limit on the number of interrogatories a party may serve includes "all discrete subparts."n7 In other words, a party cannot avoid the numerical limits by asking questions about distinct subjects, but numbering the questions as subparts.n8 Conversely, subparts need not be separately numbered to count as multiple interrogatories. Otherwise, a party could easily circumvent the rule simply by eliminating the separate numbering or lettering of subparts.n8.1 One district court gives an example of a request for admission for a specified meeting. Three dates are provided. The court held that this should not be viewed as containing three interrogatories because each of the time requests were related to the same subject, the date of a specified meeting.n8.2 A party is permitted to ask a general question about a particular kind of communication and then request the time, place, persons present, and contents of each communication without violating the subparts rule.n9 On the other hand, some courts have found that a request for information and a request for documents that pertain to an event are two distinct demands and should be counted as two separate interrogatories "[b]ecause knowing that an event occurred is entirely different than learning about the documents that evidence it occurred."n9.1

Rule 33 does not define "discrete subparts" of an interrogatory. It may be helpful to compare district court decisions interpreting what constitutes a subpart under local rules. These decisions vary widely in whether they require subparts to be counted as separate interrogatories. Some courts have adopted local rules limiting the number of interrogatories while not requiring the counting of subparts as separate interrogatories.n10 Other courts require that each subpart be counted as a separate interrogatory,n10.1 but sometimes make an exception for subparts that call for information directly related to the basic interrogatory.n11

For example, a local rule in the Nevada district requires that every propounded subpart of an interrogatory be counted.n12 One court in that district interpreted the local rule as requiring every part of an interrogatory to be counted separately, regardless of whether the parts were related or not.n13 By contrast, another court in the same district found that the rule meant subparts may be counted as part of one interrogatory if they are "logically or factually subsumed within and necessarily related to the primary question."n14 That court was following the "related question" standard, promulgated by a Mississippi district court, that examines whether the main question sufficiently concerns the subpart such that both may be counted as one interrogatory.n15 Other district courts have also adopted the "related question" standard.n15.1 In applying this standard, some courts examine whether the first question is primary and subsequent questions are secondary to the primary question, or whether the subsequent questions can stand alone.n15.2

Other districts use the similar, but slightly different, "discrete bits" standard. Under that standard, a single question that asks for several pieces of information about the same subject is regarded as one interrogatory, but if they call for discrete bits of information, the subparts are separate.n16 Some courts permit certain types of questions pertaining to background information to be counted as one interrogatory even if those questions contain subparts. For example, local rules in several courts provide that questions about the existence, location, and custodian of documents be treated as only one interrogatory.n16.1 Still other courts, not

concerned about the actual number given to the rule, have local rules providing that any "discrete question" is an interrogatory, whether numbered as an interrogatory or a subpart.n16.2

The better view is that subparts may be counted as part of one interrogatory if they are logically and necessarily related to the primary question.n16.3 However, when a subpart introduces a line of inquiry that is separate and distinct from the inquiry made by the portion of the interrogatory that precedes it, the subpart must be considered a separate interrogatory no matter how it is designated.n16.3.1 This approach is most consistent with the intent of the discovery rules to provide information, not hide information, within reasonable limits.

An interrogatory that asks the responding party to state facts, identify witnesses, or identify documents supporting the denial of each request for admission in a separately served set of requests usually should be construed as containing a discrete subpart for each request for admission contained in the set. This is because each request for admission generally deals with a discrete or separate subject. Requests for admission may, however, be interrelated. Thus, not every interrogatory of this sort necessarily contains a separate subpart for each underlying request for admission. In principle, the requests for admissions must be examined and the relationship among them must be determined. When the underlying requests for admissions concern different, separate, or discrete matters, however, the interrogatory should be viewed as containing a subpart for each request. As a practical matter, this will almost always be the case.n16.4

Overall, the determination of what constitutes a single interrogatory is a decision for the court to make based on the facts and circumstances before it, and the equities involved in the case. The determination may be of limited significance in many cases, in light of the court's discretion to increase the number (*see* [3], *below*) or limit the use of interrogatories (*see § 33.06*).

### [3] Party May Request Additional Interrogatories

### [a] Courts Permit Additional Interrogatories If Benefits Outweigh Burden

To serve more than 25 interrogatories, a party must secure a court order or a written stipulation from the responding party.n17 The court's permission may be granted at a scheduling conference or other pretrial conference (*see* [c], *below*) but, if not, the propounding party may need to file a formal motion.

A court may permit a party to serve additional interrogatories to the extent such additional discovery is consistent with the *Federal Rules of Civil Procedure, Rule 26(b)(2)*.n18 For discussion of Rule 26(b)(2), see Ch. 26, *Duty to Disclose; General Provisions Governing Discovery* , Part C, *Discovery Scope and Limits.* The point of requiring leave of court to serve additional interrogatories is not to curtail necessary discovery, but to permit the court to examine the situation before the parties propound excessive interrogatories.n19

### [b] Courts Evaluate Requests for Additional Interrogatories on Case-by-Case Basis

In evaluating requests to serve additional interrogatories, the courts do not apply any specific criteria, other than balancing the benefits of more discovery against the burden on the responding party (*see* [a], *above*). Rather than applying a rote test, the courts examine each request in the context of the case.n19.1 The propounding party bears the burden of persuading the court that the additional interrogatories are necessary under the circumstances of the case.n20 Some jurisdictions have local rules requiring an express showing of "good cause" before they will grant a request to serve more interrogatories.n21

The court may find numerous interrogatories appropriate in a case involving complex, technical litigation or significant amounts of money.n22 One district court has found that the possibility that the responding party will need to expend considerable effort and expense to answer interrogatories is not alone a reason to disallow them.n23

One district court has noted that courts generally deny a request to serve more than 25 interrogatories when the party seeks to serve more than 25 interrogatories in its initial set of interrogatories. Courts are more likely to grant a request when the party first serves 25 interrogatories, and determines that more information is needed upon reviewing the responses to the original interrogatories. Then that party may seek leave of court to serve additional interrogatories. In such a case, the party seeking additional interrogatories is also more likely to be able to make the necessary particularized showing of need.n23.1

### [c] Court May Grant Leave to Serve Additional Interrogatories in Scheduling Order or at Pretrial Conference

The court may grant leave to serve additional interrogatories when it issues a scheduling order before trial,n24 and courts often address discovery matters at that time. The court may also grant permission to pose additional interrogatories at a pretrial conference.n25

### [4] Parties May Stipulate to Additional Interrogatories

Rather than seeking permission from the court to serve more than 25 interrogatories, the parties may stipulate to a greater number.n26 The Federal Rules of Civil Procedure require that stipulations be written.n27 Some local rules provide that a stipulation may be informal, but must be confirmed in writing.n28 Obtaining a stipulation in writing is always the safer practice.

At least one jurisdiction does not permit the parties to stipulate to more than 30 interrogatories, and requires the parties always to obtain leave of court.n29

For discussion of discovery stipulations, see Ch. 29, *Stipulations About Discovery Procedure* .

### [5] Removed Actions: Propounding Party Must Specify Interrogatories to Be Answered, Seek Additional Interrogatories, or Resubmit

When a case with more than 25 outstanding interrogatories is removed from state court to federal court, the propounding party has three choices.n30 It may (1) move the court to permit the additional interrogatories, (2) specify which 25 of the interrogatories are to be answered, or (3) resubmit 25 interrogatories.n31 For further discussion of removal, see Ch. 107, *Removal* .

**Legal Topics:**

For related research and practice materials, see the following legal topics:
Civil ProcedureDiscoveryMethodsInterrogatoriesGeneral OverviewCivil ProcedureDiscoveryMethodsInterrogatoriesFormCivil ProcedureDiscoveryMethodsInterrogatoriesUse

**FOOTNOTES:**

(n1)Footnote 1. *Fed. R. Civ. P. 33(a)(1)*. For discussion of discovery stipulations, see Ch. 29, *Stipulations About Discovery Procedure* . The reader is cautioned to review the applicable local rules carefully to determine whether, in a particular court, the parties are permitted to stipulate to more interrogatories than allowed by rule. For example, the local rule in one jurisdiction indicates that the limit (30 interrogatories) cannot be waived by stipulation of the parties. *E.D. Va. LR 33*. Local rules in some other courts only refer to the parties' ability to seek a court order, perhaps implicitly denying the parties' ability to stipulate to an increase in the number of interrogatories. *See, e.g.,* D. Wyo. LR 33.1; *M.D. Tenn. LR 9(a)*; E.D. La. LR 33; *N.D. Ind. LR 26.1*.

Local rules change frequently; the practitioner is advised to consult the most recent local rules of the particular district.

(n2)Footnote 2. *Fed. R. Civ. P. 26(b)(2)(A).*

(n3)Footnote 2.1. *See, e.g.,* E.D. Okla. LR 33.1; *M.D. Pa. LR 33.3.*

Local rules change frequently; the practitioner is advised to consult the most recent local rules of the particular district.

(n4)Footnote 2.2. *See W.D. Tex. CV-33(c)* (court "will not entertain any objection to these approved interrogatories, except upon a showing of exceptional circumstances.")

Local rules change frequently; the practitioner is advised to consult the most recent local rules of the particular district.

(n5)Footnote 2.3. **Local rule may not limit number of interrogatories.** *See St. Paul Fire & Marine Ins. Co. v. Birch, Stewart, Kolasch & Birch, LLP, 217 F.R.D. 288, 289 (D. Mass. 2003)* (local rule, which limited interrogatories to 25 *per side*, was superseded by Rule 33, which permits each party to serve 25 interrogatories on any other party).

(n6)Footnote 3. *Fed. R. Civ. P. 33(a)(1).*

(n7)Footnote 4. *See Fed. R. Civ. P. 26(b)(2)(C).*

(n8)Footnote 5. **Objection to excess.** *Cf. Valdez v. Ford Motor Co., 134 F.R.D. 296, 297 (D. Nev. 1991)* (plaintiff objecting to set of interrogatories in excess of numerical limit imposed by local rule answered interrogatories up to limit and objected to the rest).

(n9)Footnote 6. **Objection waived.** *See Herdlein Techs., Inc. v. Century Contractors, Inc., 147 F.R.D. 103, 104 (W.D.N.C. 1993)* (party served with interrogatories in excess of number permitted by court's pretrial order who answered some interrogatories without first moving for protective order could not use excessive number as objection to motion to compel answers to remainder of interrogatories).

(n10)Footnote 6.1. **Best course is to answer first 25 and object.** *Capacchione v. Charlotte-Mecklenburg Sch., 182 F.R.D. 486, 492 n.4 (W.D.N.C. 1998)* (citing **Moore's** and finding that defendant waived objection to number of interrogatories by responding to excess interrogatories without seeking protective order).

(n11)Footnote 6.2. **Proponent may not selectively withdraw supernumerary interrogatories.** *Walker v. Lakewood Condominium Owners Ass'n, 186 F.R.D. 584, 586-588 (C.D. Cal. 1999)* (unless otherwise ordered for good cause shown, every interrogatory served causes responding party to undertake burden of preparing and serving objections to interrogatory, and is counted against numerical limit).

(n12)Footnote 7. *Fed. R. Civ. P. 33(a)(1).*

(n13)Footnote 8. *Fed. R. Civ. P. 33(a)* advisory committee's note (1993) (*reproduced verbatim at § 33App.05[2]*).

(n14)Footnote 8.1. **Unnumbered subparts may count as discrete subparts.** *See Safeco of America v. Rawstron, 181 F.R.D. 441, 444 (C.D. Cal. 1998)* (interrogatory asking responding party to state facts, identify witnesses, or identify documents supporting denial of each request for admission, pursuant to *Fed. R. Civ. P. 36,* contained in set of 50 requests for admissions should be construed as containing discrete subpart for each request for admission, unless request for admission contained same discrete subject).

(n15)Footnote 8.2. **Requests related to same subject.** *See Safeco of America v. Rawstron, 181 F.R.D. 441, 446 (C.D. Cal. 1998)* .

(n16)Footnote 9. *Fed. R. Civ. P. 33(a)* advisory committee's note (1993) (*reproduced verbatim at § 33App.05[2]*).

(n17)Footnote 9.1. **Information and document demand constitute two interrogatories.** *Banks v. Office of the Senate Sergeant-at-Arms, 222 F.R.D. 7, 9 (D.D.C. 2004)* (magistrate judge noted that identifying "discrete subpart" has "proven difficult").

(n18)Footnote 10. **Not counted separately.** *See, e.g., Myers v. United States Paint Co., Div. of Grow Group, Inc., 116 F.R.D. 165, 165-166 (D. Mass. 1987)* (subparts need not be counted as separate interrogatories if they are logical extension of basic interrogatory and seek specified additional information).

(n19)Footnote 10.1. **Numerous district courts follow this practice.** *See e.g.,* M.D. Tenn. LR 9(a)(2) ("Subparts of a question shall be counted as additional questions for purposes of the overall number."); S.D. Ill. LR 13(a) ("Each subpart shall be counted as an individual interrogatory."); N.D. Ga. LR 33.1 ("Each subdivision of one (1) numbered interrogatory shall be construed as a separate interrogatory.").

Local rules change frequently; the practitioner is advised to consult the most recent local rules of the particular district.

(n20)Footnote 11. **Counted separately unless related.** *See, e.g., Clark v. Burlington N. R.R., 112 F.R.D. 117, 120 (N.D. Miss. 1986)* (utilizing "related questions" standard).

(n21)Footnote 12. *See* D. Nev., Rule 33-1.

(n22)Footnote 13. **Always counted separately.** *Valdez v. Ford Motor Co., 134 F.R.D. 296, 298 (D. Nev. 1991)* (local rule required that every part of interrogatory be counted and subject to limitation of 40).

(n23)Footnote 14. **Not counted separately if logically subsumed.** *Ginn v. Gemini, Inc., 137 F.R.D. 320, 321 (D. Nev. 1991)* (adopting related question exception).

(n24)Footnote 15. **Related question standard.** *Clark v. Burlington N. R.R., 112 F.R.D. 117, 118-119 (N.D. Miss. 1986)* (applying related question standard).

(n25)Footnote 15.1. **Adoption of related question standard.** *See, e.g., Safeco of America v. Rawstron, 181 F.R.D. 441, 445 (C.D. Cal. 1998)* (interrogatory subparts are to be counted as one interrogatory if they are logically or factually subsumed within and necessarily related to the primary question, citing *Kendall v. GES Exposition Servs., 174 F.R.D. 684 (D. Nev. 1997)* .

*3d Circuit See, e.g., Nyfield v. Virgin Islands Tel. Corp., 200 F.R.D. 246, 247-248 (D.V.I. 2001)* (magistrate judge adopted "related question" standard to determine whether subparts should be counted as separate interrogatories).

*9th Circuit See, e.g., Safeco of America v. Rawstron, 181 F.R.D. 441, 445 (C.D. Cal. 1998)* (interrogatory subparts are to be counted as one interrogatory if they are logically or factually subsumed within and necessarily related to the primary question, citing *Kendall v. GES Exposition Servs., 174 F.R.D. 684 (D. Nev. 1997))* .

*D.C. Circuit Banks v. Office of the Senate Sergeant-at-Arms, 222 F.R.D. 7, 10 (D.D.C. 2004)* (one approach is to ask whether one question is subsumed in and related to another or whether each question can stand alone and be answered irrespective of the answer to the others).

(n26)Footnote 15.2.  **Whether subsequent question stands alone.** *See, e.g., Nyfield v. Virgin Islands Tel. Corp., 200 F.R.D. 246, 247 (D.V.I. 2001)* (citing *Kendall v. GES Exposition Servs., Inc., 174 F.R.D. 684 (D. Nev. 1997))* .

*5th Circuit See  Estate of Manship v. United States, 232 F.R.D. 552, 555 (M.D. La. 2005)* (if first question can be answered fully and completely without answering second question, then second question is totally independent of first).

*9th Circuit See, e.g.,  Nyfield v. Virgin Islands Tel. Corp., 200 F.R.D. 246, 247 (D.V.I. 2001)* (citing *Kendall v. GES Exposition Servs., Inc., 174 F.R.D. 684 (D. Nev. 1997))* .

(n27)Footnote 16.  **Discrete bits standard.** *Prochaska & Assocs. v. Merrill Lynch Pierce, Fenner & Smith, Inc., 155 F.R.D. 189, 191 (D. Neb. 1993)* (not numbering subparts does not excuse fact that if subparts ask for discrete pieces of information they will be counted as separate questions).

(n28)Footnote 16.1.  *See, e.g.,* N.D. Okla. LR 33.1; E.D. Okla. LR 33.1; N.D. Ohio LR 33.1(b).

Local rules change frequently; the practitioner is advised to consult the most recent local rules of the particular district.

(n29)Footnote 16.2.  D.D.C. LR 207(b); *see also* D. Nev. LR 33.1(b) ("Each inquiry that endeavors to discover a discrete item of information shall be counted as a separate interrogatory.")

Local rules change frequently; the practitioner is advised to consult the most recent local rules of the particular district.

(n30)Footnote 16.3.  **"Logically subsumed" standard is best approach.** *See, e.g.,  Safeco Ins. Co. of Am. v. Rawstron, 181 F.R.D. 441, 445 (C.D. Cal. 1998)* (interrogatory subparts are to be counted as one interrogatory if they are logically or factually subsumed within and necessarily related to the primary question).

*5th Circuit  Estate of Manship v. United States, 232 F.R.D. 552, 555 (M.D. La. 2005)* (if first question can be answered fully and completely without answering second question, then second question is not "factually subsumed within and necessarily related to the primary question").

*9th Circuit See, e.g.,  Safeco Ins. Co. of Am. v. Rawstron, 181 F.R.D. 441, 445 (C.D. Cal. 1998)* (interrogatory subparts are to be counted as one interrogatory if they are logically or factually subsumed within and necessarily related to the primary question).

(n31)Footnote 16.3.1.  **Distinct subject matter is separate interrogatory.** *Willingham v. Ashcroft, 226 F.R.D. 57, 59-60 (D.D.C. 2005)* (magistrate judge found that "as of Interrogatory Number 15, plaintiff in fact propounded 25 interrogatories," and the opposing party was not required to answer any further).

(n32)Footnote 16.4.  **Interrogatory based on requests for admission.** *Safeco of America v. Rawstron, 181 F.R.D. 441, 446 (C.D. Cal. 1998)* (interrogatory asking responding party to state facts, identify witnesses, or identify documents supporting denial of each request for admission contained in set of 50 requests was construed as containing discrete subpart for each request contained in set).

(n33)Footnote 17. *Fed. R. Civ. P. 33(a)(1)*; *see also* Ch. 29, *Stipulations About Discovery Procedure* . The reader is cautioned to review the applicable local rules carefully to determine whether, in a particular court, the parties are permitted to stipulate to more interrogatories than allowed by rule. For example, the local rule in one jurisdiction indicates that the limit cannot be waived by stipulation. *E.D. Va. LR 33*. Local rules in some other courts only refer to the parties' ability to seek a court order, perhaps implicitly denying the parties' ability to stipulate to an increase in the number of interrogatories. *See, e.g.,* D. Wyo. LR 33.1; M.D. Tenn. LR 9(a); *E.D. La. LR 33*; *N.D. Ind. LR 26.1*.

Local rules change frequently; the practitioner is advised to consult the most recent local rules of the particular district.

(n34)Footnote 18. *Fed. R. Civ. P. 33(a)(1)*; *see Fed. R. Civ. P. 26(b)(2)*.

(n35)Footnote 19. *Fed. R. Civ. P. 33(a)* advisory committee's note (1993) (*reproduced verbatim at § 33App.05[2]*); *Capacchione v. Charlotte-Mecklenburg Sch., 182 F.R.D. 486, 492 (W.D.N.C. 1998)* (citing **Moore's**, court denied motion to serve 50 additional interrogatories because plaintiff did not explain nature or subject matter of additional interrogatories or why they were needed).

(n36)Footnote 19.1. **Case-by-case approach.** *Duncan v. Paragon Publ'g, Inc., 204 F.R.D. 127, 128-129 (S.D. Ind. 2001)* (court makes case-by-case analysis "with a particularized showing" by party seeking additional interrogatories in determining whether party may exceed number of interrogatories set forth in Rule 33).

(n37)Footnote 20. *See, e.g.,  M.D. Fla., Rule 3.03(a)* (court may grant request "for cause shown").

(n38)Footnote 21. **Good cause.** *See, e.g.,  Lykins v. Attorney General, 86 F.R.D. 318, 318 (E.D. Va. 1980)* (request to serve additional interrogatories denied for failure to meet local good cause requirement).

(n39)Footnote 22. **Complex cases.** *See, e.g.,  Roesberg v. Johns-Manville Corp., 85 F.R.D. 292, 297 (E.D. Pa. 1980)* (defendant asbestos manufacturer required to answer numerous, detailed interrogatories listing products it had manufactured since 1925 and nature of advertising, education efforts, and government findings); *see also  Manual for Complex Litigation § 11.462* (4th ed. 2004) (noting that in complex litigation, when the range of potentially relevant facts is great and much largely noncontroversial background information must be gathered, adhering to numerical limits may be counterproductive).

(n40)Footnote 23. **Effort and expense.** *Schaap v. Executive Indus., Inc., 130 F.R.D. 384, 387 (N.D. Ill. 1990)* (defendant mobile home manufacturer required to answer interrogatories on entire product line, marketing and sales, complaints filed by buyers, and all lawsuits brought).

(n41)Footnote 23.1. **Additional interrogatories with initial set is usually denied.** *Duncan v. Paragon Publ'g, Inc., 204 F.R.D. 127, 128-129 (S.D. Ind. 2001)* (plaintiff failed to make "particularized showing" as to why it was necessary to exceed 25-interrogatory limit, and failed, first, to exhaust available discovery before seeking leave of court for supplemental discovery).

(n42)Footnote 24. *Fed. R. Civ. P. 33(a)* advisory committee's note (1993) (*reproduced verbatim at § 33App.05[2]*); *see Fed. R. Civ. P. 16(b)*; *see also* Ch. 16, *Pretrial Conferences; Scheduling; Management* .

(n43)Footnote 25. *See Fed. R. Civ. P. 26(a)* advisory committee's note (1983) (*reproduced verbatim at § 07[2]*).

(n44)Footnote 26. *Fed. R. Civ. P. 33(a)(1)*. The reader is cautioned to review the applicable local rules carefully to determine whether, in a particular court, the parties are permitted to stipulate to more interrogatories than allowed by rule. For example, the local rule in one jurisdiction indicates that the limit cannot be waived by stipulation. *E.D. Va. LR 33*. Local rules in some other courts only refer to the parties' ability to seek a court order, perhaps implicitly denying the parties' ability to stipulate to an increase in the

number of interrogatories. *See, e.g.,* D. Wyo. LR 33.1; M.D. Tenn. LR 9(a); E.D. La. LR 33; *N.D. Ind. LR 26.1.*

Local rules change frequently; the practitioner is advised to consult the most recent local rules of the particular district.

(n45)Footnote 27. *Fed. R. Civ. P. 29*, *33(a)(1).*

(n46)Footnote 28. *See, e.g., N.D. Ga. Rule 225-2(a).*

Local rules change frequently; the practitioner is advised to consult the most recent local rules of the particular district.

(n47)Footnote 29. *See, e.g., E.D. Va. LR 33.*

(n48)Footnote 30. *See Fed. R. Civ. P. 81(c)(1)* (federal civil procedure rules govern removed cases).

(n49)Footnote 31. *Fed. R. Civ. P. 33(a)* advisory committee's note (1993) (*reproduced verbatim at § 33App.05[2]*).