IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Miyano Machinery USA, Inc., | ) | |
| | ) | |
| Plaintiff , | ) | Case No. 08 C 526 |
| v. | ) | |
| | ) | Judge Virginia M. Kendall |
| MiyanoHitec Machinery, Inc., Thomas ("Tom") | ) | |
| Miyano, a/k/a Toshiharu Miyano and Steven | ) | |
| Miyano, a/k/a Shigemori Miyano, | ) | |
| | ) | |
| Defendants . | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Miyano Machinery U.S.A., Inc. ("MMU") brings suit against MiyanoHitec Machinery, Inc. ("MiyanoHitec"), Tom Miyano and Steven Miyano alleging trademark infringement in violation of the Lanham Act, 15 U.S.C. §§ 1114 and 1125(a) as well as cybersquatting, unfair competition, deceptive trade practices, and seeking a declaratory judgment. Soon after filing suit, MMU moved for a preliminary injunction barring MiyanoHitec from using any of MMU's trademarks or tradenames, specifically the "Miyano" name, the Miyano plain text mark, and the "winged M" mark. A hearing was held on July eighteenth and twenty-third, 2008. The Plaintiff seeks the injunction prior to the International Machine and Tool Show scheduled to begin September eighth, 2008 in Chicago. For the reasons stated below, this Court grants MMU's Motion for a Preliminary Injunction.

## STATEMENT OF FACTS

### The Marks at Issue

The parties here dispute the use of the trade name "Miyano," the "plain text" and "stylized text" Miyano marks, and the triangle "winged M" mark. MMU argues that they have exclusive rights to use these marks. The triangle "winged M" mark was registered as registration number 1,217,317 on November 23, 1982. Marchionne Testimony at 68:8-11; Pl. Ex. 3. That registration eventually lapsed, and MMU filed to re-register the mark on May 9, 2007, stating a first-use date of January 1, 1970. Pl. Ex. 4. MMU registered the plain text Miyano mark on November 6, 2007, Pl. Ex. 1. The word "Miyano" in the marks has undergone some changes, and the new version is referred to as "stylized." Marchionne at 69:5-12; 23-25; *see also* Olczak 89:10-13. The M in the stylized version is a merger of the letter M and the infinity sign. Marchionne at 69:13-15. MMU registered the "stylized" Miyano text mark on March 7, 1989. Pl. Ex. 2. Tom Miyano testified that the companies began using the stylized Miyano to differentiate the company name from his family name. T. Miyano 112:1-6.

Defendants have opposed MMU's 2007 attempt to re-register the triangle "winged M" mark and have filed to cancel the original registration of the mark. Pl. Ex. 29, 33, 39. In addition, Defendants have petitioned the United States Patent and Trademark Office to cancel MMU's trademark of the non-stylized text Miyano, arguing that Tom Miyano did not give consent to register the mark and that the registration was fraudulently obtained. Pl. Ex. 34.

### The History of MMU

MMJ is a wholly-owned subsidiary of Miyano Machinery, Inc., a Japanese company. ("MMJ"). MMU manufactures and sells lathes, including multiaxis machines, and accessories for

those machines. *See*, *e.g.*, Minemura Testimony at 13:20-14:3. The machines cut metal at a high degree of accuracy and can be used in a variety of trades including the orthopedic implant industry. In the 1960's, prior to the existence of MMU, Dynamic Machine Company became the American national distributor for Miyano Machinery Japan. Marchionne at 36:4-5. At that time, the name "Miyano" and the triangle "winged M" logo were placed on every machine. *Id*. at 36: 8-9. The marks appear as a supplement to this order. At some point thereafter, MMU came into existence, at first using the Dynamic Tools sales facility as their headquarters. They were incorporated in Illinois in 1975. *Id*. at 36:12-16. Dynamic Tools connected MMU with all their distributors, and MMU began distributing the lathes throughout the U.S. *Id*. at 36: 21-25. MMU invested a great deal of money in advertising through their distributors and in magazines and often entered trade shows. *Id*. at 37:3-10.

Initially some problems occurred with the machines MMJ distributed through Dynamic Tools. *Id*. at 38:7-9. Specifically, in the 1960's, the machines had difficulty making heavy cuts. *Id*. at 38: 8-9. However, over two years of adjustments, the machines became some of the best on the market. *Id*. at 38:11-39:10. MMU now distributes their lathes throughout the United States, Central and South America, and Canada. *Id*. at 39:12-16. MMU built a dealer network, good will, and a customer base over their many years' of operation. *Id*. at 37:25-38:4.

MMU and its products are known as "Miyano" in the machine tool industry. *Id*. at 50:14-19; Tom Miyano Declaration at ¶ 6. Indeed, they are referred to as such in various machining industry magazines (*see* Pl. Ex. 8, 11, and 12, such as in an October 2005 issue of TMW Machining World); Marchionne at 1-52:15 (news articles as recent as 2007); *see* Pl. Ex. 6, 10. MMU refers to themselves as Miyano on their own website and in their advertisements. *See* Pl. Ex. 13, 67-68. The

Miyano brand name is still used on MMU products for sale in North America. Seito Testimony at 48:8-13.

Defendant Tom Miyano was the head of MMU and MMJ for many years in Japan prior to 2004. Marchionne at 62:20-25. Tom Miyano is well-known in the machine tool industry and some of MMU and MMJ's good will is likely attributable to him. *Id.* at 63:1-16. Tom Miyano is the named inventor on approximately twenty-three patents in the Machine Tool industry. T. Miyano at 109:9-11.

Tom Miyano left MMJ in 2004 pursuant to an agreement with Japan's Industrial Revitalization Corp. ("IRC"). Pl. Ex. 46, 63. Pursuant to their agreement, the IRC purchased Tom Miyano's shares in MMJ, relieving him of approximately one-hundred-twenty million dollars in debt. As a condition of Japan's relief of this debt, Tom Miyano was required to leave the company and abdicate his role with MMJ. *Id.*

**MMU's Use of the Triangle "Winged M" Mark**

MMU argues that it has used the Miyano name, text marks, and triangle "winged M" mark since its inception. MMU has used the name Miyano on machines, literature, stationary, checks, packing lists, service reports, warranties, shopping bags, on servicemen's and distributors' shirts, and binders and folders given to potential customers. Marchionne 39:20-40:7; Pl. Ex. 9, 16, 44-45, 49, 65, 67. For example, the triangle "winged M" mark is worn on the servicemen's shirt that has been worn by employees of MMU since 1997 or 2000. Marchionne at 40:11-19; Olczak at 76:15-21. Individuals wearing those shirts with the mark travel to customer locations to repair machines throughout North and South America. Olczak at 77:10-20. Indeed, Derek Olczak ("Olczak"),

MMU's service manager, testified that he wears such a shirt when he performs installations, which are included in the sale of the product. *Id*. at 93:18-94:2.

The triangle "winged M" mark and the Miyano name also appear on a machine warranties (e.g. a machine warranty issued April 25, 2008 bears the "winged M" Marchionne 42:14-43:8; 44:24-25). A similar form has been in use since the 1970's, and this exact form has been in use since January of 1998. *Id*. at 45:1-9; 16-24. The triangle "winged M" mark also appears on a packing slips that have been used since th early 1980's (e.g. an order shipped on January 26, 2007, *Id*. at 47:1-48:10), service reports (e.g. a report on September 27, 2005, Olczak at 79:22-80:12), and on information regarding MMU's maintenance training classes for customers, which is available only to customers and incorporated into the price of the product itself. *Id*. at 81:14-82:18. The triangle "winged M" also appears on invoices for machine repairs (e.g. invoices issued on May 2, 2002 and June 26, 2003. *Id*. 83:6-24; 84:13-85:8). It is also worthy of note that the triangle "winged M" mark appeared on the actual refurbished and resold machine that the May 2, 2002 invoice refers to. *Id*. 84:6-12. In addition, the Miyano name and triangle "winged M" mark also appear on folders, shopping bags, and sample parts handed out at the International Machine Tool Show up until at least 2000. Marchionne at 48:12-50:13.

The Miyano name and the triangle "winged M" mark also appear on MMU's website. Minemura at 9:16-10:15. Only dealers and authorized customers have access to the website, which has been active for about three years. *Id*. at 10:16-18; 11:12-14.

As for the machines themselves, Henry Marchionne, corporate advisor to MMU and also a former president of MMU and MMU employee for at least 36 years, testified that MMU stopped putting the triangle "winged M" mark on most of its machines by 1999. Marchionne at 72: 7-14.

Olczak confirmed, noting that the mark does not appear on most new machines and that he has not seen it on a new machine in at least seven years. Olczak at 87:11-17. However, Yoshiharu Seito ("Seito"), the president of MMJ, testified that the triangle "winged M" has been used on machines in the past five years, and noted that the machines last a long time; so machines displaying the mark are still in operation. Seito at 48: 14-23, 62:22-63:2. Indeed, it appears that the triangle "winged M" does not appear on machines in MMU's 2007 product guide. Minemura 23:22-25:10. Similarly, it does not appear on MMU machines in MMU's 2000, 2004 and 2006 IMTS pamphlets, Minemura at 29:16-30:11; 32:1-10, although the mark appears on a mechtron machine in the 2004 pamphlet. *Id*. at 30:12-18.

However, the triangle "winged M" mark still appears on at least two series of MMU machines: Ocean and Mectron machines. For example, the triangle "winged M" mark appears on Miyano's Ocean line of machines and has for at least 10 years. *Id*. at 18:7-19:15, 19:23-20:2. Such machines have been sold in the United States for at least twenty years, and the last sale of such a machine took place in December of 2007. *Id*. at 19:19-24, 20:9-12. The mark on the Ocean machines is slightly different than the exact registered mark in that the text is stylized and the word "ocean" also appears. *Id*. at 22:10-23:6. The triangle "winged M" also appears on Mectron series machines. *Id*. at 40:12-41:6. Although they are not technically MMU machines, MMU distributed Mectron's machines in the United States, and Akihiko Minemura ("Minemura"), the General Manager of MMU, believed that they had some responsibility for the quality. *Id*. at 31:8-12; 35:17-24.

**Events Leading to this Lawsuit**

The year after his father was required to leave MMJ, Defendant Steven Miyano, Tom Miyano's 29 year-old son, formed Defendant MiyanoHitec in March of 2005, although it was originally incorporated as "Hitec Machinery International, Inc." Pl. Ex. 17, 19. Tom Miyano joined the company in October of 2006, although Steven remains the sole owner. Steven Miyano Testimony 70:12-16; Pl. Ex. 17. In September of 2006, the company changed its name from Hitec Machinery International, Inc. to MiyanoHitec because Steven Miyano wanted to put his name on it. S. Miyano at 71:11-16. He was aware that MMU was already using the name Miyano in the United States. *Id*. at 71:17-21. MiyanoHitec officially registered its name change on November 3, 2006.[1] MiyanoHitec plans to manufacture and sell CNC Lathes, most notably a multiaxis machine. *Id*. at 74: 2-6. Steven Miyano claims to have designed the multiaxis machine, although his undergraduate degree is in economics and he has taken only a one week course in CAD design. *Id*. at 74:7-24; 75: 8-12. He alleges that he had the requisite experience to design such a complex machine because the machine tool industry is "in his blood," he "grew up" in the industry, and he has visited all of MMU and MMJs facilities. *Id*. at 77:8-22. Steven Miyano claims that Tom Miyano is not part of the company but is merely "helping" him. *Id*. at 76:8-10. Tom Miyano testified that he is helping Steven Miyano to design, produce, and sell new machines and is the coinventor on the relevant patent applications. T. Miyano 109: 12-20.

Seito met with Tom Miyano and Steven Miyano on November 7, 2006 at Tom Miyano's request. Seito at 43:17-44:7, 44:19-20. At that meeting Tom Miyano asked Seito to give him or sell

---

[1] MiyanoHitec may now actually be doing business as Tom and Steven Miyano Machinery. S. Miyano at 87:2-5.

to him the triangle "winged M" logo. *Id*. at 45:25-46:9. Tom Miyano gave Seito two business cards for his business then called Hitec Machinery International, Inc. *Id*. at 46:16-47:5. Tom and Steven Miyano did not mention the impending name change to MiyanoHitec Machinery. *Id*. at 47:6-8; S. Miyano 72:25-73:6. MMU rejected Mr. Miyano's proposal. Seito 47:16-18.

Despite Seito's lack of agreement, Tom and Steven Miyano began to use the name "MiyanoHitec" and have continued to use the almost identical version of the "winged M" logo on their business cards and web site. *See* Pl. Ex. 20-27, 53. Their "winged M" logo appears identical to MMU's "winged M" that appears inside a triangle in its logo. MMU's counsel sent a cease and desist letter to MiyanoHitec, demanding that they stop using the Miyano name and the "winged M" mark. Pl. Ex. 21. In return, Defendants offered to use a disclaimer, but MMU responded that this was not satisfactory. Pl. Ex. 52. Defendants responded, indicating that they were now doing business as "Tom & Steven Miyano Machinery" and intended to use a disclaimer. *Id*.

In spite of the fruitless meeting with Seito and the letter from MMU's counsel, MiyanoHitec began exhibiting at minority trade shows in 2007, attending four shows and using the name and the logo. S. Miyano at 80:11-18; Pl. Ex. 53. MiyanoHitec has already attended the minority trade fair in Detroit. S. Miyano at 73:9-10. At that trade fair, they displayed a small piece of paper at their cubicle containing a "disclaimer" indicating that they were not affiliated with MMU. *Id*. at 73:17-21; Pl. Ex. 53. Steven Miyano asserts that such a disclaimer was used at all the trade shows. S. Miyano at 81:24-82:3. He asserts that he does not want to be associated with MMU/MMJ because the quality of his machine (which is yet to be displayed or sold) is superior. *Id*. at 82:9-18.

MMU is now aware that MiyanoHitec is planning on attending the International Manufacturing Technology Show ("IMTS") in September of 2008. Seito at 48:24-25. IMTS is one

of the three largest machinery tool shows in the world. *Id.* at 44:11-15. Steven Miyano stated that they have spent appoximately 300 to 400 thousand dollars in preparation for IMTS. S. Miyano at 80:19-81:5. Steven Miyano says he intends to display a larger disclaimer and he will direct consumers looking for MMU to their booth at the IMTS show. *Id.* at 83:1-20. Notably, he does not assert that his new company will be unable to survive if it is unable to receive orders at the IMTS show. *Id.* at 84:14-20. Also notably, he was extremely evasive when questioned at the hearing as to why a disclaimer is necessary if there would not be any confusion between MMU and MiyanoHitec. *Id.* at 85: 12-86:10.

MiyanoHitec has not yet sold any machines, but it plans to bring one for exhibition at the IMTS show. *Id.* at 75: 15-16, 85:6-11. Steven Miyano hopes to sell five to ten of his multiaxis machines at the IMTS show. *Id.* at 78:20-25. Each machine costs approximately fifty to seventy thousand dollars. *Id.* at 79:18. MiyanoHitec will also be showing a second single spindle turret machine, for which Steven Miyano hopes to receive 10 to 15 orders. *Id.* at 79:8-16. Steven Miyano plans to place the "winged M" mark on the machines, and he has already been using the name MiyanoHitec and the mark on the company's folders, shirts, and website. *Id.* at 75:20-76:7.

MMU became aware of Tom and Steven Miyano's use of the name and mark due to specific instances of confusion between the MMU and the MiyanoHitec. Machine Tool Bearing, one of MMU's vendors, having seen the MiyanoHitec website, called to ask if it was affiliated with MMU. Marchionne at 52:20-53:5. Also, Dunn & Bradstreet called MMU in 2008 to ask if they were affiliated with MiyanoHitec. *Id.* at 53:7-15. Lastly, the Association for Manufacturing Technology, the entity that manages the machine tool shows and regularly deals with machine tool builders, called MMU to inquire regarding the IMTS show. The caller was looking for MMU on the list of

exhibitors and asked if they were MiyanoHitec. *Id*. at 53:16-54:2. Still, it is worthy of note that buyers of the relevant machines generally do extensive research before purchasing the machines because they are extremely expensive and will be used for a long period of time. *Id*. at 65:13-67:4; Minemura 27:11-14.

When questioned as to why he should be allowed to use the "winged M" mark, Steven Miyano asserted that it is his "family symbol." S. Miyano at 81:6-12. Steven Miyano testified that if he cannot use the symbol and his family name, Miyano, his identity will be erased and he will be and forced to turn his back on his ancestors. *Id*. 84:3-13. When asked if he could sell the same machine under a different name, Steven Miyano, rather than directly responding, repeatedly asserted that he wanted "his name" on the machine, eventually stating that he could "possibly" do so. *Id*. at 87:9-23. Steven Miyano admitted that he knew MMU held a trademark for the triangle "winged M," stylized Miyano, and the name Miyano in the United States, but felt he should be able to use them anyway. *Id*. at 88:16-89:5, 90:11-91:4.

## STANDARD

A party seeking a preliminary injunction must demonstrate: 1) some likelihood of success on the merits; 2) that it has no adequate remedy at law; and 3) that it will suffer irreparable harm if a preliminary injunction is not granted. *Promatek Indus., Ltd. v. Equitrac Corp.*, 300 F.3d 808, 811 (7th Cir. 2002) *citing Ty, Inc. v. Jones Group*, 237 F.3d 891, 895 (7th Cir. 2001). If the moving party satisfies those conditions, then the Court considers: 1) any irreparable harm that a preliminary injunction would cause to the non-moving party, balancing such harm against irreparable harm that will be suffered by the moving party if the injunction is denied; and 2) the effect of granting or denying the preliminary injunction on the public interest. *Ty*, 237 F.3d at 895. The court weighs

these factors on a sliding scale. That is, the stronger a showing on one element, the less of a showing is necessary on another. *Promatek*, 300 F.3d at 811 *citing Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d. 6, 12 (7th Cir. 1992). This approach is not mathematical but better characterized as "subjective and intuitive, one which permits district courts to weigh competing considerations and mold appropriate relief." *Ty*, 237 F.3d at 895-96.

## DISCUSSION

### Likelihood of Success on the Merits

MMU need only demonstrate that it has a "better than negligible" chance of succeeding on the merits for this Court to grant a preliminary injunction. *Id.* at 897 *citing Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1084 (7th Cir. 1988). Here, MMU brings an action for trademark infringement under §§32 and 43(a) of the Lanham Act, as well as state law unfair competition claims, arguing that MiyanoHitec is infringing on its trade name, its plain text Miyano mark, and its triangle "winged M" mark. To prevail on its claims, MMU must establish that: 1) it has a protectible trademark; and 2) the infringers' use is likely to cause confusion among consumers. *See*, *e.g. Promatek*, 300 F.3d at 812 *citing Ty*, 237 F.3d at 897.[2]

### *MMU's Text Miyano Trademark is Protectible*

MMU has registered the MIYANO plain text mark with the United States Patent and Trademark Office ("Trademark Office"), Reg. No. 3,328,718, and in its registration asserted that it has used the mark in commerce since 1975. Pl. Ex. 1. Such registration is prima facie evidence of the registrant's "exclusive right to use the registered mark in commerce." 15 U.S.C. § 1115(a).

---

[2] The elements of state and federal law trademark and unfair competition claims are for the most part congruent. *TMT N. Am., Inc. v. Magic Touch GmbH*, 124 F.3d 876, 881 (7th Cir. 1997).

Defendants argue that MMU's registration invalid, arguing in particular that the registration was fraudulently obtained and that Tom Miyano did not give the required consent for the registration.

*Fraud and Abandonment*

MiyanoHitec argues that MMU misrepresented its original date of use of the plain text Miyano to the Trademark Office in its application. Specifically, MiyanoHitec argues that MMU is not entitled to the 1975 priority date, its represented date of first use, because in 1995, the original registration of the mark was cancelled for failure to file a declaration of continued use. Hitec bears a heavy burden in proving fraud under these circumstances. Indeed, "fraud must be shown by clear and convincing evidence in order to provide a basis for either cancellation or damages," and it may be found to exist "only where there is a deliberate attempt to mislead the Patent Office into registering the mark." *Money Store v. Harriscorp Fin., Inc.*, 689 F.2d 666, 670 (7th Cir. 1982).

An incorrect date of first use is not a material representation that serves as grounds for cancellation so long as the first use preceeded the application date. *Pony Express Courier Corp. v. Pony Express Delivery Serv.*, 872 F.2d 317, 319 (9th Cir. 1989); *see also* 6 *McCarthy on Trademarks & Unfair Competition* § 31:74 (4th ed. 2008) (the Trademark Board has consistently held that a misstatement of the date of first use is not fraudulent so long as there has been valid use of the mark prior to the filing date). Here, MiyanoHitec makes no argument that MMU did not use the plain text mark until after it filed for the 2007 trademark. They have failed to meet their burden that the registration was fraudulently obtained.

In a related argument, MiyanoHitec asserts that MMU abandoned the plain text mark because it failed to file a timely declaration stating that it continued to use the mark, resulting in the cancellation of its original registration. A mark may be deemed "abandoned" when its use has been

discontinued with no intent to resume such use. *Sands, Taylor & Wood Co. v. Quaker Oats, Co.*, 978 F.2d 947, 955 (7th Cir. 1992). The burden for proving abandonment falls on MiyanoHitec. *See, e.g.*, *Roulo v. Russ Berrie & Co., Inc.*, 886 F.2d 931, 935 (7th Cir. 1989). Once again, although allowing a mark to expire may be taken into account as evidence of abandonment, *see Koretz v. Heffernan*, No. 92 C 5419, 1993 WL 524438, at * 4 (N.D.Ill. December 3, 1993), such expiration does not in itself establish abandonment. *See,* 3 *McCarthy* 17:4 n 5 (4th Ed. 2008) *citing Jean Patou, Inc. v. Aristocrat Prod. Corp*, 202 U.S.P.Q. 130 (TTAB 1979) ("allowing a federal registration to expire does not *per se* prove abandonment"); *Rodgers v. Wright*, 544 F.Supp.2d 302, 309 (S.D.N.Y. 2008) (same). This is logical, considering that the two specific factors named above must be proven to establish abandonment and that common law trademark rights exist independent of registration. *Sands, Taylor & Wood Co.*, 978 F.2d at 954 ("trademark rights derive from the use of a mark in commerce and not from mere registration of the mark"); *Volkswagenwer Aktiengesellschaft v. Wheeler*, 814 F.2d 812, 819 (1st Cir. 1987) (cancellation of a registration does not extinguish common law rights); *California Cooler v. Loretto Winery, Ltd.*, 774 F.2d 1451, 1454 (9th Cir. 1985) ("deficiencies in registration, such as failure to renew, or even cancellation, do not affect common law trademark rights").

<u>Consent</u>

Defendants argue that the registration for the plain text Miyano mark is invalid because MMU failed to get Tom Miyano's consent to trademark his last name. MiyanoHitec is correct that Section 1052(c) of the Lanham Act requires a registeree to receive "written consent" from an individual in order to register a "name, portrait, or signature identifying a particular living individual." 15 U.S.C. § 1052(c). Here, however, MMU received Tom Miyano's consent to register

the text Miyano mark.  Tom Miyano signed the original trademark applications for the stylized and plain text Miyano marks as well as the Miyano motto.  *See* Pl. Ex. 36-38.  When the person who's name appears in the mark signs the application, his consent to registration is presumed.  TMEP 5th 1206.03(b) *citing Alford Mfg. Co. v. Alfred Electronics*, 137 U.S.P.Q. 250 (TTAB 1963) *aff'd* 333 F.2d 912 (C.C.P.A. 1964).  MiyanoHitec cites no caselaw indicating that this consent no longer applies because Tom Miyano did not sign the re-registration of the mark.  Nor have Defendants presented any support for the position that the marks could be taken back once Tom Miyano agreed to abdicate his role with the company in return for the relief of millions of dollars of corporate debt.

### *The Miyano Trade Name is Protectible*

MiyanoHitec also argues that MMU's "Miyano" trade name is not protectible.  In general, personal names are not protectible unless the have acquired a secondary meaning.  *Peaceable Planet v. Ty, Inc.*, 362 F.3d 986, 990 (7th Cir. 2004).  It is unclear if MMU needs to clear this hurdle, as it is unclear at this point if the American public perceives "Miyano" as a personal name.  *See Id.*  In any case, Miyano has acquired secondary meaning and is thus entitled to protection.

A term has secondary meaning if through its use, the public has come to associate the term with a product or service.  *Int'l Kennel Club*, 846 F.2d at 1085.  Factors relevant to this determination include: 1) the amount and manner of advertising; 2) the volume of sales; 3) the length and manner of use; and 4) consumer testimony and surveys.  *Id.*  At the preliminary injunction stage, consumer surveys are not necessary evidence.  *Id.* at 1086.

MMU asserts, and their recent trademark application indicates, that it has identified itself using the word "Miyano" since 1975. Pl. Ex.1.  The title appears in large letters on a wide range of materials, including the machines themselves, and also servicemen's shirts, warranties, invoices, and

various promotional items. *See*, *e.g.*, Pl. Ex. 9. "Miyano" appears in large letters on MMU's signage at trade shows. Pl. Ex. 67. More importantly, MMU also provided evidence of how consumers use the term, Miyano, indicating, for example, that machines are simply identified as "Miyano" when they are sold on Ebay. Pl. Ex. 7. In addition, MMU and its products are referred to as "Miyano" advertisements, trade magazines, and articles from other news sources, including U.S. News and World Report. Pl. Ex. 6, 8, 10-12. Indeed, both Marchionne and Tom Miyano himself stated that MMU is known in the machine tool world as "Miyano." Marchionne at 50:14-19; Tom Miyano Declaration at ¶ 6.

### *"Winged M" Mark*

#### *The "Winged M" Mark was not abandoned*

MiyanoHitec next claims that it is entitled to use its "winged M" mark in part because MMU abandoned a similar triangle "winged M" mark. As noted above, a mark is deemed abandoned by its user if the user has discontinued use with the intent not to resume the use. *Sands, Taylor & Wood Co.*, 978 F.2d at 955. If the user fails to use the mark for three consecutive years, it is prima facie evidence of abandonment. *Id.* MMU provided the Court with sufficient evidence to show that it continues to use the mark on warranties, some new and refurbished machines, shirts, packing slips and other documents and has done so within the last three years.

MiyanoHitec argues that even if the marks are occasionally used, they have not been used "in commerce" as required by 15 U.S.C. § 1127. According to Section 1127, "use in commerce" means "bona fide use in the ordinary course of trade, and not made merely to reserve a right in the mark." 15 U.S.C. § 1127. As such, a mark is used in commerce on goods when "it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels

affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale." *Id*. A mark is used in conjunction with services "when it is used or displayed in the sale or advertising of services." *Id*. Neither residual or token use nor mere promotional use on goods in a different course of trade constitute proper "use" under the Lanham Act. *Emergency One, Inc. v. Am. Fireeagle, Ltd.*, 228 F.3d 531, 536 (4th Cir. 2000); *MB Fin. Bank., N.A. v. MB Real Estate Serv., L.L.C.*, No. 02 C 5925, 2003 WL 21462501, at * 9 (N.D.Ill. June 23, 2003).

MMU provided adequate evidence showing that MMU used the triangle "winged M" both on its products and in conjunction with services within the past three years. As noted above, the Ocean and Mectron machines display the "winged M" mark, as do machines refurbished by Miyano. Minemura at 19:23-20:2, 40:12-41:6; *See Emergency One*, 228 F.3d at 536 (repair and recyclying services might be sufficient commercial use to prevent abandonment, but only if the mark appeared on the repaired goods or documents associated with them or their sale). MMU also places the mark on items associated with its services, including on its service providers' shirts, warranties, and on its offers of training. *See*, *e.g.*, Pl. Ex. 9, 44, 49. In addition, the logo currently appears on MMU's website. *See*, *e.g.*, Pl. Ex. 67, Olczak 76:15-21, 81:14-82:18. This constitutes enough evidence to satisfy the Court at this stage that the mark is used in commerce such that it was not abandoned.

### *Tacking of the "Winged M" Mark*

MiyanoHitec next contends that MMU may not "tack" its use of the "winged M" mark with block Miyano lettering to that of the "winged M" logo with stylized Miyano lettering.[3] Under the

---

[3] The concept of "tacking" is invoked both in determining the priority of use and and in determining whether a given mark has been abandoned. *See MB*, 2003 WL 21462501, at *10. Although it appears that MinyanoHitec is putting forth an argument on tacking primarily to show

"tacking" doctrine, "minor changes in a mark which do not change the overall commercial impression created on buyers" do not lead to abandonment of the prior, similar mark. *Sands, Taylor & Wood Co.*, 978 F.2d at 955; *MB*, 2003 WL 21462501, at *10. As long as the key elements of the mark remain, it has not been abandoned. *Id.* Similarly, the Trademark and Trial Appeals Board has stated that a change in a mark is permissible so long as it does not involve a "material alteration." *Paris Glove of Canada v. SBC/Sporto Corp.*, 84 U.S.P.Q.2d 1856 (TTAB 2007). A material alteration exists if the two marks do not "create the same general commercial impression." *Id. citing* 3 *McCarthy on Trademarks and Unfair Competition* §§ 19:58.50, 19:133 (4th Ed. 2007); *see also Brookfield Commc'n, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036, 1048 (9th Cir. 1999) ("tacking should be allowed if two marks are so similar that consumers would regard them as essentially the same").

Here, the two marks are for all practical purposes identical except that one includes the word Miyano spelled out in block lettering, and the other included the word Miyano spelled out in stylized lettering. Modernization of a mark or changes in styling generally do not change the commercial impression of the mark. *Paris Glove*, 84 U.S.P.Q.2d 1856; *see also In re Umax Data Systems, Inc.*, 40 U.S.P.Q.2d 1539, 1541 (October 22, 1996) (minimal change in "stylization" of the term UMAX in the mark did not change the commercial impression of the mark). As the change in the "winged M" logo constitutes a small stylistic change in font, the use of the stylized "winged M" logo does not constitute abandonment of the block "winged M" logo. Notably, the TTAB found no material change in *Paris Glove* where the mark changed from block lettering stacked on two levels to one

_____

that MMU abandoned the triangle "winged M" mark, this Court notes that it is also relevant to its fraud claim regarding the first use date listed in the recent trademark application.

level of text in an oval shape - a more significant change than the change in the text of the "winged M" logo here.  *See*, *e.g.*, *Paris Glove*,  84 U.S.P.Q.2d 1856.

*Fraud*

MiyanoHitec next asserts that MMU's trademark on the triangle "winged M" logo should be cancelled as fraudulently procured because MMU applied to renew the triangle "winged M" logo featuring the block lettering word Miyano when it was in fact using the triangle "winged M" logo featuring the stylized word Miyano.  *See*, Pl. Ex. 4.  In addition to being very difficult to prove, as MiyanoHitec's own citation states, fraud only occurs when the applicant makes false "material representations of fact" in conjunction with the application.  *Torres v. Cantine Torresella*, 808 F.2d 46, 48 (Fed. Cir. 1986).  Here, even if this Court were to hold that MMU incorrectly asserted in its application that it was currently using the block text triangle "winged M," MMU did not make a *material* misrepresentation because, as discussed above, the two versions of the mark create the same commercial impression.  *See Id*. at 49 (decision that mark submitted with application was materially different relied on Board's decision that the mark created a different commercial impression).

For the reasons stated above, MMU has presented evidence showing that it has a "better than negligible" chance of proving that it has protectible trademarks in the Miyano trade name, the text Miyano mark, and the triangle "winged M" mark.  Therefore, this Court must next determine whether there is a likelihood of confusion between MMU and MiyanoHitec.

**_Likelihood of Confusion_**

In determining whether a likelihood of confusion exists between the marks at issue, this Court considers: 1) the similarity of the marks in appearance and suggestion; 2) the similarlity of

the products bearing the marks; 3) the area and manner of concurrent use; 3) the degree of care likely to be used by consumers; 5) the strength of the mark; 6) any evidence of actual confusion; and 7) the defendant's intent. *Ty*, 237 F.3d at 897. None of these factors is dispositive, and different factors will weigh more or less heavily depending on the particular facts and circumstances of the case. *Id*. at 898 *citing Int'l Kennel Club*, 846 F.2d at 1087. However, the similarlity of the marks, the intent of the defendant, and evidence of confusion are generally the most important factors. *Id*. *citing G. Heilman Brewing Co., Inc. v. Anheuser Busch, Inc.*, 873 F.2d 985, 999 (7th Cir. 1989).

<u>Similarity of the Marks</u>

In determining whether two marks are similar, the Court considers what happens in the marketplace rather than simply looking at the two marks side-by-side. *Ty*, 237 F.3d at 898 *citing James Burrough Ltd. v. Sign of Beefeater, Inc.*, 540 F.2d 266, 275 (7th Cir. 1976). Here, MMU's trade name, text Miyano mark, and triangle "winged M" mark are very similar to MiyanoHitec's trade name and "winged M" mark.

MiyanoHitec argues its marks are different from MMU's largely because they are placed in a different context. That is, MMU places the "winged M" inside a triangle logo whereas MiyanoHitec uses it alone, and neither party is called just "Miyano" but rather they are Miyano Machinery and MiyanoHitec/Tom and Steven Miyano Machinery. This argument fails because "if one word or feature of a composite trademark is the salient portion of the mark, it may be given greater weight than the surrounding elements." *Ty*, 237 F.3d at 898 *quoting Henri's Food Prods. Co., Inc. v. Kraft, Inc.*, 717 F.2d 352, 356 (7th Cir. 1983). Here, the "winged M" and the word "Miyano" are the salient portions of the marks.

MMU's triangle "winged M" mark is similar to MiyanoHitec's "winged M." Indeed, the "winged M" itself appears to be identical - MiyanoHitec simply does not put it inside a triangle. This similarity of marks would lead the consumer to assume that the two companies are affiliated, as it seems incredibly unlikely that two companies operating in the same industry would mark items with identical "winged M's", whether inside a triangle or not, if they were not affiliated. More notably, the context surrounding the "winged M" in MMU's mark does nothing to differentiate it. Indeed, it is merely surrounded by a triangle and the word "Miyano" - a word that, as discussed below, appears prominently in both of the relevant companies' names. *Compare Sullivan v. CBS Corp.*, 385 F.3d 772, 777-78 (7th Cir. 2004) (CD of music from CBS's Survivor series differentiated from CD from band Survivor because Survivor series music clearly marked with symbol and slogans affiliated with the series and not in any way with the band).

Defendant MiyanoHitec/Tom and Steven Miyano Machinery's trade names are also similar to MMU's trade name and text Miyano mark. Again, the salient portion of the mark should be given greater weight than surrounding elements. *Ty*, 237 F.3d at 898 *citing Henri's*, 717 F.2d at 356. Here, MMU puts only "Miyano" in its symbol or in text on its products. *See*, *e.g.*, Pl. Ex. 3. To this end, it has trademarked its text mark of the word Miyano. Pl. Ex. 1-2. In addition, Mr. Marcionne testified that MMU is known as "Miyano" in the the machine tool industry, and this testimony is supported by the fact that Ebay listings refer to MMU machines for sale simply as "Miyano," and news articles and advertisements also refer to MMU simply as Miyano. *See*, *e.g.*, Marchionne 38:8-9; Pl. Ex. 6-8, 10-12. Clearly, the word Miyano is the dominant portion of MMU's trade name. *See Ty*, 237 F.3d at 899 ("the word "Beanie" is a well-known and famous part of the Ty mark, rendering

it the more salient portion of the mark and therefore deserving greater weight than surrounding elements")

Defendants names are similar to MMU's. They also contain the words "Miyano" and "Machinery," merely adding either "Hitec" or Tom and Steven Miyano's first names. However, Miyano remains the salient portion of the names, and the addition of the other words surrounding the salient word does not undermine the similarlity of the names. *Id.* at 899 (addition of surrounding marks to "Beanie Racers" mark including the word "racers" and NASCAR and corporate sponsor marks did not render it dissimilar to Ty's Beanie Babies mark); *Eli Lilly & Co v. Natural Answers, Inc.*, 233 F.3d 456, 462-63 (7th Cir. 2000) (differing letters in "PROZAC" and "HERBROZAC" did not render marks dissimilar); *Int'l Kennel Club,* 846 F.2d at 1088 (addition of geographical term in "International Kennel Club of Chicago" did not render it dissimilar from "International Kennel Club").

<u>Similarity of Products</u>

For the purposes of determining likelihood of confusion, "a closely related product is one which would reasonably be thought by the buying public to come from the same source, or thought to be affiliated with, connected with, or sponsored by the trademark owner." *Ty*, 237 F.3d at 900 *citing Sands, Taylor & Wood Co.*, 978 F.2d at 958. Put simply, MMU sells very unique lathes. *See, e.g.* Minemura at 13:20-14:3. Although MiyanoHitec has yet to sell any machines, Steven Miyano testified that it intends to sell CNC lathes. S. Miyano at 74:2-6. He asserted that he believes Hitec's lathes to be unique in their ability to work on multiple axes. However, they are still lathes and will be used in the same markets, and in addition, MiyanoHitec also intends to sell single axis lathes. *Id.* at 79:8-16. Thus, the parties sell the same type of machine. A consumer could easily think that the machines came from the same source or at the very least, the companies were affiliated. *See Eli*

*Lilly*, 233 F.3d at 464 (finding prozac and a dietary supplement to be similar products as dietary supplements and drugs serve similar functions and supplements are an area of natural expansion for pharmaceutical companies).

<u>Area and Manner of Concurrent Use</u>

In assessing the area and manner of concurrent use, this Court considers whether "there is a relationship in use, promotion, distribution, or sales between the goods and services of the parties. *Ty*, 237 F.3d at 900 *citing Forum Corp. of N. Am. v. Forum, Ltd.*, 903 F.2d 434, 442 (7th Cir. 1990). MiyanoHitec concedes that it intends to market and sell its product at the IMTS show this September, where MMU also intends to market and sell its machines as it has for several years. MiyanoHitec intends to sell products very similar to MMU's and intends to market those products through the same channels and to the same consumers. Additionally, it is worthy of note that both MMU and MiyanoHitec are Illinois corporations, thus operating in the same geographic area.

<u>Customer's Degree of Care</u>

Where customers are sophisticated and put a great deal of care into selecting and buying a product, confusion is less likely. *Rust Env't & Infrastructure, Inc. v. Teunissen*, 131 F.3d 1210, 1217 (7th Cir. 1997). Here, MMU admits that its products are expensive, usually costing tens of thousands of dollars, and therefore purchasers are generally deliberative and sophisticated. *See*, *e.g.*, Seito 64:1-3. However, the fact that consumers are sophisticated does not mean that there is no likelihood of confusion as a matter of law. *Computer Care v. Serv. Sys. Enter., Inc.*, 982 F.2d 1063, 1070 (7th Cir. 1992). Here, MMU argues in particular that their potential customers are still subject to "initial interest confusion."

Although this factor would weigh more heavily in MMU's favor if its machines were more subject to impulse buy, this Court agrees that initial interest confusion is likely to occur between MMU and MiyanoHitec, as both use the salient Miyano name and the "winged M" and sell to the same consumers. Even if customers are sophisticated and generally buy only after extensive negotiations, technical sophistication in a particular industry does not amount to trademark sophistication. *CAE, Inc. v. Clean Air Engineering, Inc.*, 267 F.3d 660, 683 (7th Cir. 2001). The Lanham Act protects against such initial interest confusion, which occurs when a customer takes interest in a product because of the similarlity of a mark, even if the customer realizes the actual source of the products before completing a sale. *Promatek*, 300 F.3d at 812. A trade show like IMTS, where consumer are likely to be engaged in initial investigation of the machines, is particularly susceptible to initial interest confusion. Indeed, MiyanoHitec implicitly acknowledges the likelihood of initial interest confusion through its past conduct. Specifically, it posted a disclaimer, noting that it is not related to MMU, on its booth at past trade fairs and claims that it will do the same in the future and will escort any confused customers to the MMU booth at IMTS. S.Miyano at 81:24-82:3.

A website is also a likely forum for initial interest confusion, and notably, MiyanoHitec also posts the allegedly infringing material on its website. It is irrelevant whether this initial confusion is brief or that the confusion is eventually cured if the trademark infringement has already occurred. *Id*. *citing Forum Corp.*, 903 F.2d at 442 n. 2; *see also Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc.*, 128 F.3d 1111, 1117 (7th Cir. 1997) ("injuries to goodwill, as well as economic injuries from lost sales opportunites, can take place from consumer confusion").

<u>*Strength of Marks*</u>

The strength of a mark is determined by its distinctiveness or its "tendency to identify the products sold under the mark as emanating from a particular . . . source." *Eli Lilly*, 233 F.3d at 464 *citing Sands, Taylor & Wood Co.*, 978 F.2d at 959. As noted above, the Miyano name is a strong mark. Customers associate it with MMU's machines. Machines resold on Ebay are listed as "Miyano," and MMU and its machines are referred to as "Miyano" in advertisements, trade publications, and other news sources. Pl. Ex. 6-8, 10-12. [4]

Arbitrary or fanciful marks are inherently strong and are thus entitled to full protection under trademark law. *Mil-Mar Shoe Co., Inc. v. Shonac Corp.*, 75 F.3d 1153, 1156 (7th Cir. 1996); *Personeta, Inc. v. Persona Software, Inc.*, 418 F.Supp.2d 1013, 1017 (N.D.Ill. 2005). The triangle "winged M" mark is an arbitrary and fanciful mark. It is not an image of an readily identifiable object, and it is not by its nature representative of MMU or its products. As such, the triangle "winged M" is a strong mark, and in any case, "whether a mark is weak or not is of little importance where the conflicting mark is identical and the goods are closely related." *Sands, Taylor & Wood Co.*, 978 F.2d at 959 *quoting* 2 McCarthy on Trademarks and Unfair Competition 11:24 (4th Ed. 2007).

_Actual Confusion_

MMU has cited three incidents of actual confusion: 1) one of MMU's vendors, having seen the MiyanoHitec website, called to ask if MiyanoHitec was affiliated with MMU; 2) Dunn & Bradstreet called MMU in 2008 to ask whether they were affiliated with MiyanoHitec; and 3) the

---

[4] MiyanoHitec argues that the "Miyano" mark is inherently weak because it is a surname. However, "names are treated as strong marks upon a showing of secondary meaning." *E.J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1291 (9th Cir. 1992); *see also Mil-Mar Shoe Co.*, 75 F.3d at 1156 (descriptive marks are protected if they have "secondary meaning" in the relevant community). As discussed above, this Court finds ample evidence that "Miyano" has acquired secondary meaning.

Association for Manufacturing Technology, a group that managing machine tool shows and as such, regularly deals in the machine tool industry, mistook MMU for MiyanoHitec when reviewing a list of exhibitors for the upcoming IMTS show. Marchionne at 52:20-54:2. Although this evidence of actual confusion is minimal, it weighs slightly in MMU's favor, and regardless, likelihood of confusion may be proven even where there is no evidence of actual confusion. *CAE*, 267 F.3d at 685.

*MiyanoHitec's Intent*

The intent factor looks to whether the defendant sought to "pass off" its products as having come from the plaintiff. *Packman v. Chicago Tribune Co.*, 267 F.3d 628, 644 (7th Cir. 2001). Put another way, it looks to the defendant's intent to confuse consumers, not merely its intent to use a mark already in use." *Meridian Mut. Ins. Co.*, 128 F.3d at 1120. The evidence here shows that Tom Miyano seeks to associate his products with MMU.

Tom Miyano has shown a pattern of deceptive behavior toward MMU, and this behavior leads to the conclusion that he was attempting to benefit from passing off his new products as associated with MMU. Based on his agreement with the Japanese government, Tom Miyano was relieved of massive debt but was required to leave MMU. Pl. Ex. 46, 63. However, soon after his required departure, his inexperienced son started a company that intended to make basically the same products. Pl. Ex. 17, 19; S. Miyano at 70:12-16. Tom Miyano appears to have put the company under his sons' name to hide his own involvement. Indeed, this conclusion is supported by Steven Miyano's testimony indicating that his education and experience in the machining industry amounted to a one week design course and general exposure to the industry during his childhood. *See* S. Miyano at 74:2-6; 77:8-22.

In addition, Tom Miyano also used MMU's marks despite specifically being denied permission to use them by MMU. Seito 47:16-18. After receiving a cease and desist letter from MMU's counsel, MiyanoHitec began putting a tiny disclaimer on their cubicle at trade shows. S. Miyano at 73:17-21. However, a disclaimer this tiny could only be intended to avoid litigation, not to prevent confusion. In addition, Steven Miyano's testimony that he actively did not want MiyanoHitec to be associated with MMU and that he wanted to use the Miyano name and symbol only to show respect to his family heritage lacks credibility in light of his acquiescence to the line of questioning regarding his reasons for using the mark. In essence, he simply want to use it and believes he should be able to use it. His testimony actually supports the inference that MiyanoHitec fully intended to associate their products with MMU.

### Irreparable Harm

Damages suffered as a result of trademark infringement are presumed to be irreparable because it is nearly impossible to calculate the precise economic harm caused by damage to goodwill and reputation on account of such infringement. *Ty*, 237 F.3d at 902 *citing Abbott Labs.*, 971 F.2d at 16. However, where a plaintiff inexcusably delays in moving for a preliminary injunction, this presumption may cease to exist as a court may infer from the delay that there is no actual threat of irreparable harm. *See*, *e.g. MB*, 2003 WL 21462501, at *20 *citing Ohio Art Co. v. Lewis Galoob Toys, Inc.*, 799 F.Supp. 870, 887 (N.D.Ill. 1992).

MiyanoHitec asserts that here, MMU undercuts its claim of irreparable harm because it delayed in seeking a preliminary injunction, arguing that MMU knew that Tom and Steven Miyano planned to enter the machine tool business as early as late 2006 or early 2007. No such delay occurred. Once MMU became aware of Tom and Steven Miyano's intent to enter the lathe market

and use the Miyano name and the "winged M" mark, it began a good faith effort to resolve the matter with Tom and Steven Miyano.  *See*, Pl ex. 21, 52.  This effort failed, however, and in early 2007, MMU received notice that MiyanoHitec intended to attemd the IMTS show and that their use of the name Miyano was causing confusion as to whether they were affiliated with MMU.  *See* Seito at 48:24-25; Marchionne at 53:16-54:2.  MMU filed suit on January 24, 2008  and requested a preliminary injunction on February 1, 2008, immediately after learning of the confusion.

Regardless, any conceivable delay is only relevant to the extent that MMU lulled MiyanoHitec into a "false sense of security."  *Ty*, 237 F.2d at 903.  That is, it is relevant to the extent they caused MiyanoHitec to believe that no harm would come from them using the marks.  Here, MMU did no such thing.  When Tom Miyano met with Mr. Seito in 2006, he was specifically told that MMU would not him permission to use the marks.  Seito at 47:16-18.  In addition, after finding out that Tom and Steven Miyano were using the Miyano name and "winged M" anyway, MMU's counsel sent MiyanoHitec a cease and desist letter.  Pl. Ex. 21.  A good faith discussion ensued, but at no point did MMU indicate to MiyanoHitec that MMU would allow MiyanoHitec to use the marks.

## **Balance of Harms**

This Court must next compare the harm that will be suffered by MMU if the preliminary injunction is denied to the harm that will be suffered by MiyanoHitec if the preliminary injunction is granted.  As noted above, irreparable damage is presumed in cases of trademark infringement.  *Ty*, 237 F.3d at 902 *citing Abbott Labs.*, 971 F.2d at 16.  Such damage occurs, even absent proof of loss of business, because the owner of the mark's repution, goodwill and the quality of the goods associated therewith are placed outside of its control.  *Int'l Kennel Club*, 846 F.2d at 1091.  As such,

the owner of the mark stands to lose "years of nurturing its business." *Ty*, 237 F.3d at 903. Such a threat to MMU is particularly salient here.

Although he claims he had his experienced father's help, Steven Miyano, a twenty-nine year old with almost no relevant work or educational experience, claims to have designed MiyanoHitec's products himself. S. Miyano 74:7-75:12. The Court percieves this situation as reasonably likely to lead to quality problems in at least the early years of the machine's production. Indeed, even absent Steven Miyano's lack of experience, new machines produced from new designs are likely to be prone to problems until they are refined through complaints and resultant "tweeking." Marchionne at 38:7-9.

To the contrary, MiyanoHitec will suffer little or no harm if it is enjoined from using the Miyano name and "winged M" symbol. It would simply need to go by a different name and refrain from putting a "winged M" design on its machines, a situation Steven Miyano admitted in his testimony. MiyanoHitec originally went by a different name, Hitec Machinery International, Inc., and it can suffer no harm to its own goodwill as it is a fledgling company. Most notably, it has not sold or taken an order for a single machine. S. Miyano at 75:15-16.

Regardless, this Court discounts any potential harm that could be incurred by MiyanoHitec as a result of the grant of a preliminary injunction because it knew in advance that MMU asserted a right to the marks. In assessing any irreparable harm that MiyanoHitec may suffer, this Court "excludes any burden it voluntarily assumed by proceeding in the face of a known risk." *Ty*, 237 F.3d at 903. Here, Tom Miyano asked Seito if he could purchase MMU's marks, and Seito specifically refused. Seito at 47:16-18. Additionally, Steven Miyano testified that he knew MMU was using the name Miyano and the triangle "winged M" symbol in the United States. Having

chosen to use the marks despite this knowledge, they cannot now complain that making the necessary changes will be harmful. *See Ty*, 237 F.3d at 903 *citing Ideal Indus.*, 612 F.2d at 1026. As such, MMU stands to be greatly and irreparably harmed if the preliminary injunction is not granted, whereas MiyanoHitec stands to weather little to no relevant harm if the preliminary injunction is granted.

**Public Interest**

Although the public interest does not weigh particularly heavily in this case, the public interest is generally served by the enforcement of trademark laws as such laws prevent confusion among and deception of consumers. *Eli Lilly*, 233 F.3d. at 469. Indeed, granting an injunction under these circumstance serves the public's interest in not being deceived about the products they are purchasing. *A.J. Canfield Co. v. Vess Beverages, Inc.*, 796 F.2d 903, 910 (7th Cir. 1986).

For the reasons stated above, this Court finds that MMU has shown an adequate likelihood of success on the merits and risk of irreparable harm, and the balance of harms favors the grant of preliminary injunction. As such, MMU's Motion for a Preliminary Injunction preventing MiyanoHitec from using any of MMU's trademarks, servicemarks, or any other marks likely to cause confusion is granted.

So ordered.

_____
Virginia M. Kendall, United States District Judge
Northern District of Illinois

Dated: September 5, 2008

**Exhibit 1 - Plain Text Miyano**

# MIYANO

**Exhibit 2 - "Stylized" Miyano**



**Exhibit 3 - Triangle "Winged M" Mark**

