# Case Law Appendix

- *Scherr v. Volpe,* 466 F.2d 1027 (7th Cir. 1972)(district court did not abuse its discretion in failing to require bond for preliminary injunction)

- *Jovan, Inc. v. A.R. Winarick, Inc.*, 202 U.S.P.Q. 75 (N.D. Ill. 1978)(no bond required for preliminary injunction in copyright infringement case)

- *American Massage Therapy Association, v. Folkers,* 308 F. Supp. 2d 899 (N.D. Ill. 2004)(bond set at $5,000 for preliminary injunction in trademark infringement case)

- *Ford Motor Co., v. Cook,* 25 U.S.P.Q.2d 1050 (N.D. Ill. 1992)(bond set at $20,000 for preliminary injunction in trademark infringement case)

- *Genderm Corp. v. Biozone Labs,* 1992 U.S. Dist. LEXIS 13521 (N.D. Ill. Sept. 2, 1992) (bond set at $75,000 for preliminary injunction in trademark/food & drug law case)

- *Honor Plastic Ind. Co. Ltd v. Lollicup USA, Inc.,* 462 F. Supp. 2d 1122 (E.D. Ca. 2006)(bond set at $36,000 for preliminary injunction in trademark infringement case)

- *Fitger's On-the-Lake, LLC v. Fitger Co.*, 2007 U.S. Dist. LEXIS 93378 (D. Minn. Dec. 19, 2007)(bond set at $25,000 for preliminary injunction in trademark infringement case)

- *Xavier Pierre v. Tomjai Enterprises Corp.*, 408 F. Supp. 2d 1237 (S.D. FL 2005)(bond set at $25,000 for preliminary injunction in trademark infringement case)

- *AFL-CIO v. Maricopa*, 2007 U.S. Dist. LEXIS 18356 (D. Ariz. 2007)(court waived bond where preliminary injunction would not likely result in damages and defendants neither requested nor submitted evidence regarding damages)

- *Anton/Bauer, Inc. v. Energex Systems Corp.*, 1994 U.S. Dist. LEXIS 3195 (S.D.N.Y. 1994)("no justification for delaying an otherwise proper preliminary injunction because of [defendant's] failure to request a bond or set forth the amount necessary in its view"; defendant permitted to move for a bond while preliminary injunction in effect in trademark infringement case)/

- *Conn. General Life Ins. Co. v. New Images of Beverly Hills,* 321 F.3d 878 (9th Cir. 2003)(preliminary injunction upheld without bond requirement)

LEXSEE 466 F2D 1027

**Abraham SCHERR et al., Plaintiffs-Appellees, v. John VOLPE et al., Defendants-Appellants**

**No. 72-1113**

**UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT**

**466 F.2d 1027; 1972 U.S. App. LEXIS 8048; 4 ERC (BNA) 1435; 2 ELR 20453**

**May 23, 1972, Argued**
**August 4, 1972, Decided**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellants, federal and state transportation officials, sought review of a decision from a United States district court granting appellee residents a preliminary injunction and enjoining appellants from further construction of a highway until the requirements of the National Environmental Policy Act (NEPA), specifically 42 U.S.C.S. § 4332(2)(C), had been complied with.

**OVERVIEW:** Appellee residents filed suit against appellants, federal and state transportation officials, charging that appellants failed to comply with the procedural requirements of the National Environmental Policy Act (NEPA), 42 U.S.C.S. § 4332(2)(C), with respect to the upgrading of a section of a state highway. The court affirmed the district court's judgment granting appellees' preliminary injunction enjoining appellants from further construction of the highway until the requirements of NEPA had been complied with. The court held that the injunction was properly premised on appellant's failure to file an environmental impact statement of the kind described in and required by § 4332(2)(C) of NEPA. This statement was required because the environmental consequences of the construction project included an alteration of natural wild life habitats, stripping of forest land with attendant erosion, increased levels of noise, air and water pollution, and interference with the natural beauty and recreational value of the area. The court held the district court did not abuse its discretion in failing to require appellees to post a security as a prerequisite to the granting of the injunction.

**OUTCOME:** The court affirmed the district court's judgment granting appellee residents a preliminary injunction enjoining appellants, federal and state transportation officials, from further construction of a highway until the requirement of the National Environmental Policy Act had been complied with. The court concluded that the project would have a significant impact on the environment and held appellants had failed to consider such impact.

**COUNSEL:** **[**1]** Robert W. Warren, Atty. Gen., Richard E. Barrett, E. Gordon Young, Asst. Attys. Gen., John O. Olson, U.S. Atty., Madison, Wisconsin, for Defendants-Appellants.

Walter L. Harvey, Madison, Wisconsin, Amicus Curiae.

Frederick W. Miller, Allan R. Koritzinsky, Donald W. Large, Madison, Wisconsin, for Plaintiffs-Appellees.

**JUDGES:** Mr. Justic Clark, [*] Sprecher, Circuit Judge and Campbell, Senior District Judge. [**]

> [*]  Associate Justice Tom C. Clark, United States Supreme Court, Retired, is sitting by designation.
> [**]  Senior District Judge William J. Campbell of the Northern District of Illinois is sitting by designation.

**OPINION BY:** CAMPBELL

**OPINION**

[*1029] WILLIAM J. CAMPBELL, Senior District Judge.

This ecology case arises under the National Environmental Policy Act ("NEPA") of 1969. 42 USC § 4321 et seq. On September 7, 1971 the five individual

plaintiffs who reside in the Village of Hartland, Wisconsin, filed suit against John Volpe, United States Secretary of Transportation; Norman Clapp, Wisconsin Secretary of Transportation; William R. Redmond, Chairman, Wisconsin Division of Highways, charging that these officials failed to comply with the [**2] procedural requirements of Section 102(2) (C) of NEPA, 42 U.S.C. § 4332(2) (C), with respect to the upgrading of a section of State Highway 16 from Pewaukee to Oconomowoc, Wisconsin. Following a hearing on the plaintiffs' motion for a preliminary injunction, the district judge on December 7, 1971, 336 F. Supp. 882, enjoined the above officials from further construction of the highway until the requirements of NEPA had been complied with. The Wisconsin highway officials appeal from the entry of the preliminary injunction.

The record discloses that the State of Wisconsin proposed to convert Highway 16 from its present status as a two lane conventional highway to a four lane freeway in northwestern Waukesha County, where the plaintiffs reside, between the communities of Oconomowoc and Pewaukee, a length of approximately twelve miles. It had been determined that the present highway system in this area had become deficient in providing safe and reasonable operating services to the motorists of southeastern Wisconsin. The upgrading project requires the acquisition of additional right-of-way throughout in order to provide for adequate width, frontage [**3] road and interchange construction. The project is part of a Federal-Aid highway program and is jointly financed and supervised by the Federal Highway Administration and the State of Wisconsin.

NEPA became effective on January 1, 1970. Although the Highway 16 project had been in the planning stages for many years, the design hearing was not held until June 30th, 1970, several months after the effective date of the Act. Final federal approval of the design occurred on January 26, 1971. On August 24, 1971 construction contracts were accepted in an amount exceeding one million dollars for a 4.1 mile segment of the entire project. Actual construction of this portion commenced on November 22, 1971.

In its findings of fact the district court noted that the Highway 16 project is located in the Lake Kettle Moraine area, the site of "eleven lakes, two major rivers and their watershed and flood plains, wetlands located just west of the Village of Pewaukee and in and around the county park at Forest and Grass Lakes, the Kettle Moraine forest and other woodlands, wild life habitats, ice age geological formations and rough topography unique to the Kettle Moraine area." Regarding the environmental [**4] consequences of the construction project, the district court specifically found that the immediate effects would include an alteration of natural wild life habitats, stripping of forest land with attendant erosion, increased levels of noise, air and water pollution, and interference with the natural beauty and recreational value of the area.

The ultimate finding of the district court upon which the injunction was premised was that the defendants had failed to file an environmental impact statement of the kind described in and required by § 102(2) (C) of NEPA. The defendants acknowledge that no impact [*1030] statement was filed but argue that the Highway 16 project was not a "major federal action significantly affecting the quality of the human environment" and that therefore it was not necessary to satisfy the procedural requirement of filing an impact statement. Alternatively, the defendants maintain that notwithstanding the absence of an impact statement, they have complied with all of the substantive and procedural requirements of the National Environmental Policy Act of 1969. A third attack on the entry of the preliminary injunction arises from the defendants' contention [**5] that the plaintiffs have made no showing that the construction of the Highway 16 project would result in irreparable harm to the environment. The defendants further claim that Section 102(2) (C) is not applicable to the Highway 16 project because it was in progress prior to January 1, 1970, the effective date of the Act. As a final ground of error the defendants maintain that the district court abused its discretion in refusing to require the plaintiffs to post a security bond as a prerequisite to the granting of the preliminary injunction.

We start with the observation that our function in reviewing the entry of a preliminary injunction is a limited one. Appellate tribunals may set aside the issuance of such injunctions only where it can be said that the discretion vested in the district court with respect to these matters has been improvidently exercised. See Particle Data Laboratories, Inc. v. Coulter Electronics, Inc., 420 F.2d 1174, 1178 (7th Cir. 1969). The circumstances under which motions for preliminary injunction are made and heard illustrate the reasons for the narrow scope of review. The district judge is typically presented with an abbreviated set [**6] of facts, "requiring a delicate balancing of the probabilities of ultimate success at the final hearing with the consequences of immediate irreparable injury which could possibly flow from the denial of preliminary relief." See United States Steel Corp. v. Fraternal Ass'n of Steelhaulers, 431 F.2d 1046, 1048 (3d Cir. 1970). Absent a clear abuse of discretion, the normal course of wisely committing this balancing process to the district judge will not be disturbed. Against this background we proceed to the merits of the controversy.

The broad substantive policies and objectives of NEPA are contained in § 101 thereof. There the Congress expressed its basic goal that the federal government

should strive for the protection of environmental values. Environmental protection was not established as an exclusive goal, rather the Congress restructured priorities in such a way that the ecological consequences of a federal action must now be given consideration. Thus § 101(b) of NEPA provides that "it is the continuing responsibility of the Federal Government to use all practical means, consistent with other essential considerations of national policy," to "assure for all **[**7]** Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings," to attain "an environment without degradation", to "preserve important historic, cultural, and natural aspects of our national heritage," and to insure that "each person should enjoy a healthful environment."

The method by which the national goals would be achieved was left undefined in Section 101. However, Congress did not simply provide us with a promise incapable of realization. Important and much less flexible procedural requirements designed to insure that federal officials meet the sweeping Congressional commitment to the environment are contained in Section 102 of NEPA. The pertinent portions of Section 102 read as follows:

"The Congress authorizes and directs that, *to the fullest extent possible*: . . . (2) all agencies of the Federal Government shall --

(C) include in every recommendation or report on proposals for legislation and other *major Federal actions significantly affecting the quality of the human environment*, **[*1031]** a detailed statement by the responsible federal official on --

(i) the environmental impact of the proposed action,

(ii) **[**8]** any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and

enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, [United States Code] and shall accompany the proposal through the existing agency review processes;" [emphasis supplied].

Through the enactment of these procedural requirements the Congress has not only **[**9]** permitted but has compelled the responsible federal agencies to take environmental values into account. See Calvert Cliffs' Coord. Com. v. United States Atomic Energy Com'n., 146 U.S. App. D.C. 33, 449 F.2d 1109, 1112 (D.C.Cir. 1971). Not only must the environmental consequences of a particular action be considered, but Section 102 requires also that these consequences be weighed and balanced against other considerations, such as financial or social, which may be involved.

The environmental impact statement required by Section 102 is designed to insure that this balancing analysis is given its fullest effect. *Pro forma* compliance with the substantive guidelines of Section 101 simply will not suffice. Section 102 of NEPA provides that its procedures be implemented and carried out "to the fullest extent possible." Thus the somewhat flexible and general guidelines articulated in Section 101 are not to be found in its companion Section 102. Absent a conflict of statutory authority, [1] the responsible federal officials must give full consideration to the environmental consequences of a major federal action significantly affecting

the environment. The procedural [**10] steps outlined in Section 102 apply notwithstanding considerations of administrative difficulty, delay or economic cost. Calvert Cliffs' Coord. Com. v. United States Atomic Energy Com'n, 146 U.S. App. D.C. 33, 449 F.2d 1109, 1115 (D.C.Cir. 1971).

    1   See Section 104 of NEPA. 42 U.S.C. § 4334.

    On January 21, 1971 the Division of Highways of the Department of Transportation of the State of Wisconsin determined that an environmental statement of the kind described in Section 102 of NEPA was not required with respect to the Highway 16 project. The Federal Highway Administration concurred in this determination. Both in the district court and on appeal, the defendants have contended that this determination by the responsible officials was not shown to be arbitrary and capricious by the plaintiffs and that therefore the injunction was improvidently entered inasmuch as no violation of the Act had been demonstrated. Although the record is silent as to the basis of this decision [**11] by the highway officials, the defendants have maintained throughout that they enjoy the untrammeled discretion to determine whether a particular project is "major" and whether it is a project "significantly [*1032] affecting the quality of the human environment." The argument continues that the officials therefore determined that the project was not major and was not one significantly affecting the environment and that this is the reason no impact statement was filed. Thus, the defendants conclude, unless it can be shown that this determination was arbitrary or capricious, no injunction should issue.

    The district judge specifically rejected the contention that these officials possess such broad discretion under Section 102 of NEPA. Judge Doyle reasoned that although the officials must decide in the first instance whether an impact statement is required, their decision is subject to broad judicial review. Implicit in the judge's ruling is the recognition that not all federal actions will require the preparation of an environmental statement. Some actions may be so small and so tenuously related to the environment that it cannot be fairly said that NEPA applies. The judge however [**12] believed that when the agency's failure is challenged, it is the responsibility of the judiciary to construe the statutory standards and thereby decide whether the agency violated the Congressional command.

    We find it unnecessary in the circumstances of this case to determine the extent of an agency's discretion, if any, under Section 102 of NEPA. Based on the state of the record before us we agree with the district court's alternative determination that even if the Federal Highway Administration possessed such discretion, it was most certainly abused here. First we again observe that

the record is absolutely barren of any indication of the basis upon which the agency made its determination that no impact statement was required. This is not to suggest that in every case arising under this section that the responsible federal agency must articulate in writing the reasons why no environmental statement was filed. Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 417, 91 S. Ct. 814, 28 L. Ed. 2d 136 (1971). However where there is no administrative record which would facilitate a full review of the administrative action involved, such findings would certainly [**13] be preferred and would greatly assist the court in its reviewing function.

    Absent the benefit of an administrative record, we must confine ourselves to the language of the statute itself and to the applicable administrative memoranda issued by the United States Department of Transportation. We begin with the Federal Highway Administration Policy and Procedure Memorandum P.P.M. 90-1 dated August 24, 1971. [2] Paragraph 1 of Appendix F of P.P.M. 90-1, designated as "Evaluating Highway Section Environmental Effects", provides that an environmental statement should be prepared and processed for highway sections which are classified as major actions and which are likely to significantly affect the quality of the human environment. This is of course consistent with the requirements of NEPA. Paragraph 2 of Appendix F of P.P.M. 90-1 states as follows:

> "the following should be used to determine whether a proposal to construct or improve a highway section is a major action. . . .
>
>     (b) Major upgrading of an existing highway section resulting in a functional characteristic change (e.g., a [*1033] local road becoming an arterial highway). Such changes usually result by adding [**14] lanes, interchanges, access control, medians, etc., and require extensive right-of-way acquisition and construction (grading, base, paving, bridges, etc.) which have the potential of significantly affecting the environment."

It should be obvious from a reading of the memorandum that the Highway 16 project qualifies as a major federal action. Lanes and interchanges will be added, access control will be altered, and additional right-of-way must be acquired. Also, the construction itself will involve extensive grading and paving. Thus by the express terms of the defendants' own regulation, Highway 16 constitutes a major federal action.

2  P.P.M. 90-1 was not transmitted to the federal agencies until October 24, 1971, which followed the final federal approval of the Highway 16 project but preceded the commencement of actual construction. The defendants in this case, some of whom had access to earlier drafts of the final memorandum, do not contend that it does not represent a reasonable interpretation of the statute at the time these defendants determined that the Highway 16 project was not a "Major Federal Action significantly affecting the quality of the human environment." Thus we agree with the district judge that this memorandum furnishes the appropriate guideline for assessing the actions of the defendants.

[**15]  The second step in the analysis is whether the project is one which will significantly affect the quality of the human environment. Paragraph 3 of Appendix F of P.P.M. 90-1 sets forth criteria for determining whether a major project "significantly affects the environment." These include significant adverse impact on natural ecology; highly controversial projects; disruption of an established community or planned development; and inconsistent with national environmental standards. In its findings of fact, which we hold are not clearly erroneous, the district court determined that: "the immediate effects of the construction now in progress include damage to present natural habitats of various wild animals; stripping of forested land with attendant erosion problems; increased levels of noise, air and water pollution; impingement upon the aesthetic natural beauty and recreational value of the area." Although these findings are earnestly disputed by the defendants, we are satisfied on this record that the Highway 16 project is one that has a significant impact on the quality of the human environment in that area. This is not to say that there will be irreparable damage to the environment [**16] nor that the environmental considerations outweigh the other considerations which attend the planning and construction of a federal highway. We decide only that the project will have a significant impact on the environment and that the consequences to the environment should, as mandated by NEPA, receive the proper consideration by the highway officials involved.

The second contention advanced by the defendants could be characterized as an argument of substantial compliance. Even though no impact statement was filed, NEPA has been complied with, the defendants say, because environmental considerations were expressly taken into account during the planning and development of Highway 16. The defendants seem to suggest that two reports prepared by Wisconsin state officials represent a lawful substitute for the Section 102 impact statement.

One of the reports, called "Highway 16 and the Environment", was compiled by the State Department of Transportation without consultation with the other federal agencies having environmental interests. The report was prepared within a week after the Governor of Wisconsin directed its preparation, and the construction contracts for the project were [**17] signed within one day after the report had been released. Thus, unlike environmental impact statements, this state report was never made available to the public or to those federal agencies required to consider such reports by NEPA. The second report, called "Southeastern Wisconsin Regional Planning Commission Land Use and Transportation Plan", by the defendants' own description gives at best a very minimal consideration to environmental ramifications. Neither plan evidences the kind of balancing of considerations implicated in the requirements of Section 102 of NEPA. No federal agency, including the Department of Transportation and the Federal Highway Administration, was consulted during the preparation of either of these reports. Thus the federal agency responsible for [*1034] this project cannot be said to have met its obligation under the Act. See Calvert Cliffs' Coord. Com. v. United States Atomic Energy Com'n., 146 U.S. App. D.C. 33, 449 F.2d 1109, 1123 (D.C.Cir. 1971).

Next the defendants submit that the injunction should not have issued inasmuch as the plaintiffs failed to show that the construction of Highway 16 would result in irreparable harm to [**18] the environment. The defendants' argument in this respect proceeds from the premise that even though there be a clear violation of the Act, even though, as the district court stated, the responsible federal agency failed to "assemble all pertinent information, to subject it to expert scrutiny and to articulate clearly and in writing an evaluation of the various benefits and costs which are being balanced", that no judicial relief may be afforded the plaintiffs absent a showing on their part that the project would be damaging to the environment. We think the district court's rejection of this theory is particularly relevant: "to suggest that when the federal agencies flatly fail to perform this function, a plaintiff in a lawsuit such as this suit must perform it as a condition to obtaining injunctive relief is to suggest that one of the central purposes of the Act be frustrated." To accept the defendants' argument on this point would thwart the Congressional mandate by rendering impotent the procedural requirements of the National Environmental Policy Act of 1969. What this argument attempts to do is to shift the burdens of considering and evaluating the environmental consequences [**19] of particular federal actions from the agencies Congress intended to bear them to the public, the beneficiary of this legislation. If these agencies were permitted to avoid their responsibilities under the Act until an individual citizen, who possesses vastly inferior resources,

could demonstrate environmental harm, reconsideration at that time by the responsible federal agency would indeed be a hollow gesture. See Arlington Coalition on Transportation v. Volpe, 458 F.2d 1323 (4th Cir. 1972); Calvert Cliffs' Coord. Com. v. United States A. E. Com'n., 146 U.S. App. D.C. 33, 449 F.2d 1109, 1129 (D.C.Cir. 1971).

The kind of "irreparable harm" which must be shown in order to justify the issuance of a preliminary injunction in these cases can be found in the language of the Act itself. As stated in *Calvert Cliffs'*, "Section 102 of NEPA mandates a particular sort of careful and informed decision-making process and creates judicially enforceable duties." Here if the project were allowed to proceed after the plaintiffs had demonstrated a probability of success on the merits, this "careful and informed decision-making process" would be lost forever. In [**20] order to protect the rights of the plaintiffs to have the agency consider the environmental consequences of this project, the district court properly directed that a preliminary injunction issue during the pendency of the proceedings.

The defendants also claim that Section 102 of NEPA does not apply to Highway 16 because this project was in progress prior to January 1, 1970, the effective date of the Act. Although the Act is not to be given retroactive effect, [3] it does apply, as the defendants recognize, to certain projects "ongoing" when the Act became effective. Considering the Congressional command that the Act be complied with "to the fullest extent possible", an ongoing project is subject to the requirements of Section 102 until it has reached that stage of completion where the cost of abandoning or altering the proposed project clearly outweigh the benefits which could flow from compliance with Section 102. Arlington Coalition on Transportation v. Volpe, 458 F.2d 1323, 1332 (4th [*1035] Cir. 1972). Here final federal approval for the project did not occur until over one year after the effective date of the Act. Actual construction was not commenced [**21] until almost two years later. Too, the defendants make no claim that they could not have satisfied the procedures outlined in Section 102. We hold, therefore, that the issuance of the preliminary injunction did not extend retroactive effect to NEPA.

3    Arlington Coalition on Transportation v. Volpe, 458 F.2d 1323 (4th Cir. 1972); Pennsylvania Environmental Council, Inc. v. Bartlett, 454 F.2d 613 (3rd Cir. 1971); Brooks v. Volpe, 319 F. Supp. 90 (W.D.Wash.1970).

The remaining issue concerns the defendants' contention that the district court abused its discretion in refusing to require the plaintiffs to post a security bond as a prerequisite to the granting of the preliminary injunction. Rule 65(c) of the Federal Rules of Civil Procedure provide as follows:

"No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred [**22] or suffered by any party who is found to have been wrongfully enjoined or restrained. No such security shall be required of the United States or of an officer or agency thereof."

It has been held in this circuit that the failure of a district court to require a security under this rule before issuing a restraining order is not reversible error. Urbain v. Knapp Brothers Mfg. Co., 217 F.2d 810, 815 (6th Cir. 1954). Since the amount of the security rests within the discretion of the district judge, the matter of requiring a security in the first instance was recognized in *Urbain* as also resting within the discretion of the district judge. Considering this as well as the strong likelihood of success on the merits which the plaintiffs have demonstrated, we find that the district court did not abuse its discretion in failing to require the plaintiffs to post a security.

For the foregoing reasons, the judgment of the district court granting the preliminary injunction is affirmed.

1 of 2 DOCUMENTS

**Jovan, Inc. v. A.R. Winarick, Inc.**

**No. 77 C 738**

**United States District Court for the Northern District of Illinois, Eastern Division**

*1978 U.S. Dist. LEXIS 19138*; *202 U.S.P.Q. (BNA) 75*

**Mar. 9, 1978**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff corporation moved for an order holding defendant corporation in contempt for violation of an injunction entered by the court ordering defendant to withdraw from the market all booklets that infringed plaintiff's copyright.

**OVERVIEW:** The court entered an order in which it required defendant to withdraw from the market all booklets that infringed on plaintiff's copyright. Plaintiff then moved for an order to hold defendant in contempt because the infringing booklets were still on the market six weeks after the injunction was issued by the court. The court found that it was not necessary that plaintiff apply for an order fixing security before the injunction became effective because the court had discretion as to whether any security at all was required to be given by plaintiff in order to comply with *Fed. R. Civ. P. 65(c)*. The court determined that a valid injunction was issued on the date that the court made its earlier order. The court found that the use of the word withdraw in the order was the same as the word recall and required defendant to not only stop putting out new infringing booklets, but also required defendant to remove all infringing booklets that were on the market at the time the injunction was issued. The court held that defendant was in contempt and was required to pay plaintiff damages as a result.

**OUTCOME:** The court ordered defendant to withdraw all infringing booklets, pay plaintiff damages that resulted from defendant's contempt, and pay plaintiff its attorney's fees.

**CORE TERMS:** injunction, booklet, infringing, withdraw, kits, fixing, posted, contempt, issuance, infringe

**LexisNexis(R) Headnotes**

*Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions*
[HN1] See *Fed. R. Civ. P. 65(c)*.

*Civil Procedure > Judicial Officers > Judges > Discretion*
*Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions*
[HN2] The amount of the security to be posted under *Fed. R. Civ. P. 65(c)* rests within the discretion of the district court, and that the district court has discretion to decide whether to require any security at all.

**COUNSEL:** **[\*1]** Howard B. Rockman, Larry L. Saret, Abraham N. Goldman, and Laff, Whitesel & Rockman, all of Chicago, Ill., for plaintiff.

Myron C. Cass, and Silverman & Cass, Ltd., both of Chicago, Ill., and Robert V. Marrow, and Salon,

1978 U.S. Dist. LEXIS 19138, *; 202 U.S.P.Q. (BNA) 75

Bloustein and Raybin, both of New York, N.Y., for defendant.

**OPINION BY:** KIRKLAND

**OPINION**

Kirkland, District Judge.

This matter is before the Court on plaintiff's Motion for an Order Holding Defendant in Contempt for violation of an injunction entered by this Court on September 1, 1977.

Plaintiff contends that defendant has failed to comply with the Court's Order that it withdraw from the market all booklets which this Court found to infringe plaintiff's copyright. Plaintiff specifically alleges that infringing booklets were still on the market six weeks after entry of the injunction.

Defendant does not dispute plaintiff's allegation that certain booklets were still on the market after issuance of the injunction and argues that there are two reasons for this fact: (1) that the injunction never became effective because of plaintiff's failure to apply for an order fixing security pursuant to *Rule 65(c), Federal Rules of Civil Procedure*; and (2) that even if the **[*2]** injunction became effective, the injunction did not provide that defendant recall booklets which were already on the market. The Court considers these arguments in order.

Failure to Apply for an Order Fixing Security

Defendant first argues that plaintiff failed to apply for an order fixing security for the issuance of the injunction when the Court's order included no provision for such security. Defendant contends that the injunction could not become effective until such security was ordered and posted or until the Court expressly dispensed with the requirement that security be posted. This Court does not agree.

*Rule 65(c), Federal Rules of Civil Procedure* provides that:

[HN1] No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

The Seventh Circuit, in *Scherr v. Volpe, 466 F.2d 1027 (1972)* held that [HN2] the amount of the security to be posted rests within the discretion of the district court, and that the district court has discretion **[*3]** to decide whether to require any security at all. Under these circumstances, this Court finds that a valid injunction was issued on September 1, 1977 and that defendant was bound by its terms.

Interpretation of the Wording of the Injunction

Defendant next asserts that even if the injunction became effective on September 1, 1977, the injunction did not provide that defendant recall all nail kits containing the offending booklet from the market, but rather that defendant place no further kits containing the booklets on the market.

The parties do not agree as to the interpretation of the following language used in this Court's Order:

It is hereby ordered that defendant withdraw all infringing booklets from the market. (emphasis added)

Defendant contends that the Court's choice of the word "withdraw" indicates that the Court intended that defendant place no further kits with infringing booklets on the market but that defendant need do nothing with respect to kits already on retailers' shelves. Defendant argues that the Court's choice of the word "withdraw" over the word "recall" clearly indicates the Court's intention. This Court does not agree.

The meaning of this Court's **[*4]** September 1 Order is clear and unambiguous. This Court intended to prohibit further copying, and further ordered that defendant remove all infringing booklets then on the market.

Further, this Court finds defendant's arguments regarding the expense and burden of removal unpersuasive. The hardship that defendant claims it will suffer is not a result of this Court's Order, but a direct result of its own acts of infringement.

Accordingly, this Court finds that defendant has not complied with this Court's injunction order of September 1, 1977 and that defendant has failed to show good reason for non-compliance.

1978 U.S. Dist. LEXIS 19138, *; 202 U.S.P.Q. (BNA) 75

Defendant is hereby found to be in contempt of this Court's Order of September 1, 1977 for failure to remove from the market all kits containing booklets which infringe plaintiff's copyright.

It is therefore ordered that:

(1) Defendant withdraw all infringing booklets from the market forthwith;

(2) Defendant pay plaintiff damages for such contempt, the amount of such damages to be deter-mined by an accounting of the profits obtained in violation of this Court's Order; and

(3) Defendant pay plaintiff its attorney's fees expended in obtaining this Order, on the ground **[*5]** that defendant and persons in active concert and participation with defendant, willfully, knowingly and intentionally violated this Court's Order of September 1, 1977 by failing to withdraw all infringing booklets from the market.

LEXSEE 308 F. SUPP. 2D 899

**AMERICAN MASSAGE THERAPY ASSOCIATION, Plaintiff, v. CHRIS FOLKERS, d/b/a COUNCIL OVERSEEING MEDICAL & MASSAGE THERAPY ACCREDITATION, and JAMES LATTANZIO, Defendants.**

**No. 03 C 6820**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*308 F. Supp. 2d 899*; *2004 U.S. Dist. LEXIS 4104*

**March 15, 2004, Decided**
**March 16, 2004, Docketed**

**SUBSEQUENT HISTORY:** Later proceeding at *Am. Massage Therapy v. Folkers, 2004 U.S. Dist. LEXIS 12828 (N.D. Ill., July 6, 2004)*

**DISPOSITION:**    [**1] Motion for preliminary injunction granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff massage therapy association filed a motion for a preliminary injunction pursuant to *Fed. R. Civ. P. 65(a)* seeking to enjoin defendants, founders of a new professional massage therapy accreditation council, from infringing upon the association's marks.

**OVERVIEW:** In 1996, the association established a specialized accrediting agency known as the Commission on Massage Therapy Accreditation (COMTA). In 2001, the founders formed the Council Overseeing Medical and Massage Therapy Accreditation (COMMTA) under the auspices of a new professional organization and began promoting the entity through letters and a website to massage therapy school owners and directors. When the founders refused to cease using the COMMTA mark, the association filed suit. In granting a preliminary injunction, the court held that the association was likely to succeed on the merits of its claim because there was a likelihood of confusion between the parties' marks. Specifically, the COMTA and COMMTA marks were very similar, and they both represented the identical product of massage therapy school accreditation. The COMTA mark could be assumed to be fairly strong given the number of schools that had obtained the right to use it, and there were a few instances of actual customer confusion. The damage to the association that would result from the confusion was clear because COMTA's value depended entirely on the esteem in which it was held within the massage industry.

**OUTCOME:** The court granted the motion for a preliminary injunction and enjoined the founders from using the mark COMMTA or any other mark that was confusingly similar to the association's mark.

**CORE TERMS:** massage, therapy, accreditation, commta, preliminary injunction, accredited, injunction, similarity, consumers, website, weigh, public interest, accrediting, advertising, irreparable, harmed, infringing, trademark

**LexisNexis(R) Headnotes**

*Trademark Law > Special Marks > Certification Marks*

308 F. Supp. 2d 899, *; 2004 U.S. Dist. LEXIS 4104, **

*Trademark Law > Subject Matter > Names > General Overview*

[HN1] A certification mark is any word, name, symbol, or device used by a person other than its owner to certify quality, accuracy, or other characteristics of such person's goods or services. *15 U.S.C.S. § 1127.*

*Civil Procedure > Remedies > Injunctions > Elements > General Overview*
*Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions*

[HN2] A party seeking a preliminary injunction under *Fed. R. Civ. P. 65(a)* must demonstrate that: (1) it has some likelihood of succeeding on the merits; (2) it has no adequate remedy at law and will suffer irreparable harm if preliminary relief is denied; (3) the balance of relative harms weighs in the movant's favor; and (4) the public interest will not be harmed if the injunction issues.

*Trademark Law > Likelihood of Confusion > Consumer Confusion > General Overview*
*Trademark Law > Likelihood of Confusion > Intent > General Overview*
*Trademark Law > Likelihood of Confusion > Similarity > Appearance, Meaning & Sound > Appearance*

[HN3] Likelihood of confusion is determined by seven factors: (1) similarity between the marks in appearance and suggestion; (2) similarity of the products; (3) area and manner of concurrent use; (4) degree of care likely to be exercised by consumers; (5) strength of complainant's mark; (6) actual confusion; and, (7) intent of the defendant to palm off his product as that of another.

**COUNSEL:** For AMERICAN MASSAGE THERAPY ASSOCIATION, plaintiff: Jeanette Sanniola Zimmer, Thomas P. White, Schiff Hardin LLP, Chicago, IL.

CHRIS FOLKERS dba Council Overseeing Medical & Massage Therapy Accrediation, defendant, Pro se, Olathe, KS.

JAMES LATTANZIO, defendant, Pro se, Wethersfield, CT.

**JUDGES:** Elaine E. Bucklo, United States District Judge.

**OPINION BY:** Elaine E. Bucklo

**OPINION**

[*900] **MEMORANDUM OPINION AND ORDER**

Plaintiff American Massage Therapy Association ("AMTA"), which was established in 1943, represents and provides services to over 46,000 massage therapists and 375 massage therapy institutions. In 1996, AMTA established the Commission on Massage Therapy Accreditation ("COMTA"), a specialized accrediting agency recognized by the United States Department of Education. Institutions accredited by COMTA may apply for participation in federal financial aid programs. The accreditation process includes on-site observation and evaluation by independent professionals as well as self-study. Currently, 69 schools have been accredited and more are in the application process.

In 2001, the Galen Institute, a massage therapy school owned by [**2] defendant James Lattanzio, applied for COMTA accreditation. That application was denied in May 2003. Shortly afterwards, Mr. Lattanzio [*901] and defendant Chris Folkers formed a new body called the Council Overseeing Medical & Massage Therapy Accreditation ("COMMTA") under the auspices of a new professional organization, the National Organization for the Advancement of Massage Schools and Educators ("NOAMSE"). In June 2003, the defendants began promoting this new body through letters sent to massage therapy school owners and directors and through a website (www.commta.com). To obtain accreditation through COMMTA, a school need only validate that it adheres to its own standards and those of its locality and pay a fee. Two schools have begun advertising themselves as "COMMTA-accredited": Mr. Lattanzio's Galen Institute and the Blue Heron Academy of Healing Arts & Science, a non-COMTA-accredited institution which is owned by a co-chair of NOAMSE.

After numerous requests that the defendants cease using the COMMTA and Council Overseeing Medical & Massage Therapy Accreditation marks

Case 1:08-cv-00526    Document 157-3    Filed 09/10/2008    Page 13 of 101

Page 3

308 F. Supp. 2d 899, *; 2004 U.S. Dist. LEXIS 4104, **

went unheeded, AMTA filed this suit. AMTA moves for a preliminary injunction preventing the defendants from infringing [**3] upon AMTA's marks. I grant the motion.

[HN1] A certification mark is "any word, name, symbol, or device . . . used by a person other than its owner . . . to certify . . . quality, accuracy, or other characteristics of such person's goods or services." *15 U.S.C. § 1127.* [HN2] A party seeking a preliminary injunction under *Rule 65(a) of the Federal Rules of Civil Procedure* must demonstrate that:

> (1) it has some likelihood of succeeding on the merits; (2) it has no adequate remedy at law and will suffer irreparable harm if preliminary relief is denied; (3) the balance of relative harms weighs in the movant's favor; and (4) the public interest will not be harmed if the injunction issues.

*Club Gene & Georgetti Ltd. P'ship v. La Luna Enters., 889 F. Supp. 324, 325 (N.D. Ill. 1995), citing A.J. Canfield Co. v. Vess Beverages, Inc., 796 F.2d 903 (7th Cir. 1986).*

AMTA easily satisfies these criteria. First, it is likely to succeed on the merits of its claim. In order to prevail in this case, AMTA must show that it has a protectable mark (which is not contested) and that a "likelihood of confusion" [**4] exists between the parties' marks. *Meridian Mut. Ins. Co., v. Meridian Ins. Group, Inc., 128 F.3d 1111, 1115 (7th Cir. 1997).* [HN3] Likelihood of confusion is determined by seven factors, all of which weigh in the plaintiff's favor to some degree:

> (1) similarity between the marks in appearance and suggestion; (2) similarity of the products; (3) area and manner of concurrent use; (4) degree of care likely to be exercised by consumers; (5) strength of complainant's mark; (6) actual confusion; and, (7) intent of defendant to palm off his product as that of another.

*Id.* The COMTA and COMMTA marks are extremely similar; the products they represent, accreditation of massage therapy schools, are identical; both marks are used nationwide through communication with owners and operators of such schools; students seeking to enroll in massage therapy school might investigate the organization which accredited the schools, but it seems unlikely; the COMTA mark may be assumed to be fairly strong within the industry if 69 schools went through a rigorous process to obtain the right to use it; AMTA points to a few instances of actual confusion on the part of consumers; [**5] finally, the similarity of the COMTA and COMMTA marks is so great that it is impossible to avoid the inference of intent to confuse consumers.

[*902] Second, AMTA has no remedy at law and may suffer irreparable damage if the injunction is denied. As an accrediting body, COMTA's value depends entirely on the esteem in which it is held within the massage industry. The damage to AMTA which would result from confusion between COMTA and COMMTA is self-evident.

Third, the balance of relative harms weighs in AMTA's favor. COMMTA is a recent coinage whose reputation has apparently yet to spread beyond the schools owned by its founders and board members. The damage the defendants will suffer by being forced to use another mark to identify its accreditation program is much less than the damage AMTA will suffer from dilution of its much more widespread mark.

Lastly, the public interest will be served, not harmed, by protection of intellectual property resulting from the injunction. The motion for a preliminary injunction is granted. [1]

1   Defendants point out that the Canadian Orthopractic Manual Therapy Association has filed a request for extension of time to oppose AMTA's trademark application for the "COMTA" mark with the Trademark Trial and Appeal Board ("TTAB"). This fact is of no consequence to the present action; the question here is whether AMTA is being wrongfully injured by the defendants' ac-

308 F. Supp. 2d 899, *; 2004 U.S. Dist. LEXIS 4104, **

tions, not whether AMTA's use of the COMTA mark is injuring other entities.

**[**6] Elaine E. Bucklo**

United States District Judge

Dated: March 15, 2004

## ORDER

IT IS ORDERED that the defendants, their employees, agents, officers, independent contractors, servants, representatives, and attorneys, and all those who act in concert or participation with them, including without limitation any massage therapy schools and programs that have been accredited by the defendants or to which the defendants have granted a license or permission to use the infringing mark, are preliminarily enjoined from using the mark COMMTA or any other mark that is confusingly similar to the AMTA Marks, including with-

out limitation in marketing, advertising, signage, publications, and on the website associated with the Internet domain name www.commta.com or any other websites;

IT IS FURTHER ORDERED that the plaintiff shall post a bond in the sum of $ 5,000.00 in a form acceptable to the court; and

IT IS FURTHER ORDERED that this preliminary injunction will remain in effect until superceded by a further order of this court; and

IT IS FURTHER ORDERED that a copy of this order shall be served upon defendants by overnight delivery within five days of the date hereof.

**[**7]** DATED this 15th day of March, 2004.

**Elaine E. Bucklo**

United States District Judge

4 of 6 DOCUMENTS

**FORD MOTOR COMPANY, Plaintiff, v. HOWARD COOK, an individual,
d/b/a Cook Enterprises, and GERALD J. MILLSAP, an individual, d/b/a
Cook Enterprises, Defendants.**

**No. 91 C 8273**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT
OF ILLINOIS, EASTERN DIVISION**

*1992 U.S. Dist. LEXIS 13294; 25 U.S.P.Q.2D (BNA) 1050*

**August 28, 1992, Decided
September 3, 1992, Docketed**

**PRIOR HISTORY:** **[*1]** Adopting In Part
Magistrate's Document of June 19, 1992, Reported
at *1992 U.S. Dist. LEXIS 8741*.

**DISPOSITION:** Motion for preliminary injunc-
tion is granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff automobile
manufacturer sued defendants for attempting to re-
sell automobile parts in alleged infringement of the
Lanham Act, *15 U.S.C.S. § 1114*, and unfair compe-
tition laws.

**OVERVIEW:** Defendants purchased automobile
grilles at an auction, and plaintiff claimed that de-
fendants' attempts to resell the grilles infringed
plaintiff's trademark rights, and constituted unfair
competition. Plaintiff filed for a preliminary injunc-
tion, and the court held that plaintiff was likely to
succeed on the merits of the claim. Since the release
of non-genuine goods into commerce was likely to
confuse consumers, the public interest was served
by granting an injunction. As for the balance of
harms, plaintiff's good will and reputation could be
irreparably harmed. Defendants were attempting to
sell non-genuine products containing plaintiff's
trademarks. Defendants had a possibility of suc-
ceeding on the estoppel defense. Plaintiff satisfied

the threshold requirement of showing some likeli-
hood of success on the merits, justifying the grant
of a preliminary injunction.

**OUTCOME:** Plaintiff's motion for preliminary
injunction was granted where plaintiff satisfied
threshold requirements.

**CORE TERMS:** grille, trademark, storage, pre-
liminary injunction, irreparable harm, genuine,
scrap, likelihood of success, supplier, auction, es-
toppel, reputation, inspected, Lanham Act, manu-
factured, nongenuine, obsolete, goodwill, damaged,
threshold, potential harm, distributed, inventory,
consumer, conclusions of law, selling, plastic, in-
ner, quality controls, present case

**LexisNexis(R) Headnotes**

*Trademark Law > Conveyances > General Over-
view*
*Trademark Law > Infringement Actions > Deter-
minations*
[HN1] Unauthorized sale of a genuine product
without the trademark owner's consent does not
violate the Lanham Act.

1992 U.S. Dist. LEXIS 13294, *; 25 U.S.P.Q.2D (BNA) 1050

*Trademark Law > Subject Matter > Grades & Styles*
[HN2] A product will not be considered genuine unless manufactured and distributed under the quality controls established by the trademark owner. Where the owner of the trademark is deprived of its usual opportunity to inspect the product for quality, it will not be considered a genuine product.

*Antitrust & Trade Law > Consumer Protection > Likelihood of Confusion > Trademark Infringement*
*Trademark Law > Infringement Actions > Determinations*
*Trademark Law > Infringement Actions > Remedies > General Overview*
[HN3] When trademark infringement is claimed, irreparable harm and the inadequacy of a remedy at law are presumed.

*Trademark Law > Infringement Actions > Defenses > General Overview*
[HN4] Estoppel is a defense only to damages, not a defense to the injunctive relief.

*Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions*
*Trademark Law > Infringement Actions > Remedies > Equitable Relief > General Overview*
[HN5] As a threshold matter, a party seeking a preliminary injunction must demonstrate some likelihood of succeeding on the merits, and that it has no adequate remedy at law, and will suffer irreparable harm if preliminary relief is denied. If the moving party cannot establish either of these prerequisites, a court's inquiry is over, and the injunction must be denied. If, however, the moving party clears both thresholds, the court must then consider: the irreparable harm the nonmoving party will suffer if preliminary relief is granted, balancing that harm against the irreparable harm to the moving party if relief is denied, and the public interest, meaning the consequences of granting or denying the injunction, to nonparties.

*Trademark Law > Infringement Actions > Remedies > Equitable Relief > General Overview*
[HN6] As a threshold matter, plaintiff must show a likelihood of success on the merits.

*Trademark Law > Infringement Actions > General Overview*
[HN7] See *15 U.S.C.S. § 1114(1)(a)*.

*Trademark Law > Conveyances > General Overview*
*Trademark Law > Infringement Actions > General Overview*
[HN8] The Seventh Circuit has not ruled directly on the viability of a Lanham Act action for the sale of a genuine product without the trademark owner's consent. However, other circuits have found that the unauthorized sale of a trademarked product does not by itself constitute a Lanham Act violation. In essence, these courts have reasoned that the primary wrong that a trademark action remedies is public confusion as to the true source of the goods. Such confusion does not exist when a genuine product bearing a valid mark is sold.

*Trademark Law > Infringement Actions > General Overview*
*Trademark Law > Subject Matter > Labels, Packaging & Trade Dress*
[HN9] A product is not truly genuine unless it is manufactured and distributed under quality controls established by the manufacturer. The Lanham Trademark Act affords the trademark holder the right to control the quality of the goods manufactured and sold under its trademark. The actual quality of the goods is irrelevant. It is the control of quality that a trademark holder is entitled to maintain.

*Trademark Law > Infringement Actions > Remedies > Equitable Relief > General Overview*
[HN10] Irreparable harm and the inadequacy of any remedy at law is presumed if a Lanham Act violation is shown.

**JUDGES:** Hart

1992 U.S. Dist. LEXIS 13294, *; 25 U.S.P.Q.2D (BNA) 1050

**OPINION BY:** WILLIAM T. HART

**OPINION**

*MEMORANDUM OPINION AND PRELIMINARY INJUNCTION ORDER*

Defendants Howard Cook and Gerald Millsap, doing business as Cook Enterprises, purchased automobile grilles at an auction of assets of a bankrupt company. The 3400 grilles, which were originally intended for use on certain models of Ford automobiles, were purchased "as is, where is" for $ 200. Plaintiff Ford Motor Company claims that defendants' attempts to resell these grilles to be used on automobiles infringes on Ford's trademark rights and constitutes unfair competition. This court granted a temporary restraining order restraining defendants from selling the grilles. The parties agreed to continue that order indefinitely pending further resolution of the litigation. Plaintiff's motion for a preliminary injunction was referred to the assigned magistrate judge for a hearing and a report and recommendation. The magistrate judge recommended that a preliminary injunction be granted. Defendants [1] filed objections to the report and plaintiff responded [*2] to those objections.

> 1    Defendants are proceeding *pro se*. The objections were filed by Cook, but will also be considered as regards Millsap.

**I. FINDINGS AND CONCLUSIONS OF THE MAGISTRATE JUDGE**

The magistrate judge's findings of fact and conclusions of law are in her report and recommendation which has been filed in this case. The magistrate judge's findings of facts are summarized as follows.

Woodstock Die Casting manufactured grille assemblies which Ford used on Lincoln model automobiles. Woodstock manufactured the outer grille which they would then assemble with a plastic inner grille supplied by another company. The grilles have registered trademarks of Ford imprinted on them. After being shipped to Ford, Ford would inspect the assembled grilles before selling them to Ford dealers and franchisees. If defects were found, Ford would (a) scrap the parts; (b) return the parts to Woodstock to correct the defect; or (c) return the

parts to Woodstock with directions to scrap the parts.

In 1988, Ford [*3] had a problem with the grille design for Lincoln automobiles in that the grilles caused a whistling sound when the automobiles were driven under certain conditions. A change in design was made and Woodstock was directed to scrap the older versions. Woodstock had about 2400 grilles (the "1988 grilles") in stock at that time. Those 2400 grilles, however, were among the 3400 grilles Cook Enterprises purchased at a 1991 liquidation auction of Woodstock's assets. The other 1000 grilles (the "storage grilles") were ones that Woodstock had kept in storage for several years and which had never been inspected by Ford. Cook Enterprises purchased the 3400 grilles for $ 200 on an "as is, where is" basis. The auction handbook provided that no warranties as to condition, authenticity, or merchantability were given. Woodstock's controller testified that the grilles were being sold as scrap plastic.

Prior to the auction, Ford had been offered the opportunity to purchase the parts. Ford was aware of Woodstock's bankruptcy and its intent to liquidate its stock. Ford made no attempt to block the sale of Woodstock's stock of Ford parts or to ensure that the parts would be used only as scrap.

[*4] Cook Enterprises offered to sell the parts to Ford for $ 75,000, later raised to $ 90,000, but Ford offered only $ 1,000. Cook Enterprises turned down this offer and informed Ford it would try to sell the parts to others. Ford informed Cook Enterprises that it was Ford's position that the parts were not genuine and that any attempt by Cook Enterprises to sell the parts would be a violation of Ford's trademark.

The magistrate judge's conclusions of law are summarized as follows.

[HN1] Unauthorized sale of a genuine product without the trademark owner's consent does not violate the Lanham [HN2] Act. A product, however, will not be considered genuine unless manufactured and distributed under the quality controls established by the trademark owner. Where the owner of the trademark is deprived of its usual opportunity to inspect the product for quality, it will not be considered a genuine product. Since 2400 of the grilles were to be scrapped as inferior and the

1992 U.S. Dist. LEXIS 13294, *; 25 U.S.P.Q.2D (BNA) 1050

other 1000 were never inspected by Ford, they cannot be considered genuine. Therefore, Ford is likely to succeed on the merits of its claim.

[HN3] When trademark infringement is claimed, irreparable harm and the inadequacy of a remedy at [*5] law are presumed. Also, since release of the nongenuine goods into the stream of commerce is likely to confuse consumers, the public interest would be served by the granting of an injunction. As for the balance of harms, Ford's good will and reputation could be irreparably harmed. Cook Enterprises, on the other hand, would suffer only a financial loss that could be remedied by a bond posted by Ford.

Defendants contended that Ford should be estopped because it passed on its opportunity to stop the sale by Woodstock. While indicating that it may have been reasonable for Ford to assume the parts would be sold as scrap only, it was held that [HN4] estoppel is a defense only to damages, not a defense to the injunctive relief that is the subject of the present motion.

## II.  DEFENDANTS' OBJECTIONS TO FINDINGS OF FACT

Defendants' objections primarily pertain to the findings of fact of the magistrate judge. Defendants fail to support their objections with any citations to the record.

Initially, it is noted that one additional finding is made that is not specifically stated in the magistrate judge's proposed findings. The grilles that defendants purchased were the plastic inner grilles, [*6] not the metallic outer grilles or the entire grille assemblies.

In Objections I and II, defendants contend that the record does not support the finding that the 1988 grilles were ordered to be scrapped. The record, however, supports that conclusion. Those objections are denied.

In Objection III, defendants contend that the auction catalog listed the lot of 1988 grilles as "plastic parts" with no specific reference to them as scrap. This is true and the court makes such a finding. This court also makes the additional finding that the 1988 grilles, like the storage grilles, were never inspected by Ford.

As to Objection IV, no additional findings will be made, one way or the other, as to what Larry Lambie said to Howard Cook regarding an aftermarket for the grilles.

Objection V states: "Ford was aware of the bankruptcy action by Woodstock, and knew that the grilles were still on the premises. Their failure to act to protect their interest, constitutes abandonment." Objection X is similar. The court finds, as did the magistrate judge, that Ford knew of Woodstock's bankruptcy and was offered the opportunity to purchase the parts, which Ford declined. Ford also knew the assets [*7] of Woodstock were being liquidated and did nothing to block the sale of the grilles or to ensure that they would be sold only for use as scrap.

Objections VI and VII dispute that the 1988 grilles were obsolete. Those objections are denied.

In Objection VIII, defendants contend that the storage grilles would not have been damaged by exposure to temperature changes. In her proposed findings, the magistrate judge states: "Mr. Casadevall *testified* that as a result [of being in storage, the storage grilles] *may* have been damaged because of exposure to temperature changes." (Emphasis added.) That finding is adopted and it is additionally found that plaintiff has not proven that the storage grilles have actually been damaged or that they are in any way defective. Defendants also contend that Woodstock was a "Q-1" supplier which could inspect its own products. The record, however, only supports that Woodstock was permitted to self-inspect rush orders, known as hotline orders, where Woodstock shipped items directly to a distributor or retailer instead of to Ford. A particular hotline order would involve only one item or a few items. Woodstock did not have permission to generally [*8] conduct the full inspection of the grilles.

In Objection IX, defendants propose a finding that the supplier of the inner grilles would be responsible for any defective inner grilles and therefore defective grilles would have been returned to the supplier. Defendants also wish to infer from such a finding that any grilles Woodstock retained would not be defective. Since the original propositions are not supported by the record, no such findings will be made. As previously stated, the 1988

Case 1:08-cv-00526    Document 157-3    Filed 09/10/2008    Page 19 of 101

Page 5

1992 U.S. Dist. LEXIS 13294, *; 25 U.S.P.Q.2D (BNA) 1050

grilles are found to be obsolete, but no defect in the storage grilles has been proven.

In Objection XI, defendants request the following finding: "Cook Enterprises never implied that the grilles sold by them were warranted by Ford. Any grilles that were sold by Cook Enterprises were sold with the understanding that any recourse available would be through Cook Enterprises not Ford." Such a finding is supported by the record.

In Objection XII, defendants contend that the potential harm to the small business of Cook Enterprises is greater than the potential harm to a large corporation like Ford if 3400 grilles were to be sold. The following additional findings are made. Cook Enterprises is **[*9]** in the machinery moving business. Howard Cook regularly attends auctions, but primarily to offer his moving services to buyers, generally not for the purpose of purchasing and re-selling auctioned items. Cook Enterprises' investment in the grilles is $ 200 plus the cost of transporting the grilles from the auction location. [2] Also, Millsap or Cook Enterprises likely incurred some minimal costs, such as long distance phone calls, in trying to sell the grilles. The investment in the grilles is found not to be a substantial amount. Also, the evidence does not support that Cook Enterprises or either of the individual defendants has suffered or is likely to suffer in the future any significant injury as a result of being precluded from selling the grilles.

> 2    No testimony was presented as to the cost of transportation. While acting in his role as a *pro se* attorney, not while testifying, Howard Cook stated the transportation costs were $ 1,600 to $ 1,700.

The proposed findings of fact of the magistrate judge are **[*10]** adopted as the findings of fact of this court along with the additional findings already stated herein.

### III. CONCLUSIONS OF LAW

Recently, the Seventh Circuit again clarified the appropriate standard to apply when considering a motion for preliminary injunction.

[HN5] As a threshold matter, a party seeking a preliminary injunction must demonstrate (1) some likelihood of succeeding on the merits, and (2) that

it has "no adequate remedy at law" and will suffer "irreparable harm" if preliminary relief is denied. If the moving party cannot establish either of these prerequisites, a court's inquiry is over and the injunction must be denied. If, however, the moving party clears both thresholds, the court must then consider: (3) the irreparable harm the non-moving party will suffer if preliminary relief is granted, balancing that harm against the irreparable harm to the moving party if relief is denied; and (4) the public interest, meaning the consequences of granting or denying the injunction to non-parties.

*Abbott Laboratories v. Mead Johnson & Co.,* No. 91-3492, slip op. at 7 (7th Cir. July 23, 1992) (citations omitted).

All four factors are to be weighed, seeking at all **[*11]** times to minimize the costs of being mistaken. *Id.* at 7 (quoting *American Hospital Supply Corp. v. Hospital Products Ltd., 780 F.2d 589, 593 (7th Cir. 1986))*. Under this sliding scale approach, the more the balance of harms tilts toward the movant, the less the likelihood of success has to be. Conversely, the more the balance of harms tilts toward the nonmovant, the greater the likelihood of success must be. *Abbott,* slip op. at 7. The impact on the public also must be factored into the balance of harms. *Id.* at 7-9. While the Seventh Circuit has "at times framed the sliding scale approach in mathematical terms, it is more properly characterized as subjective and intuitive, one which permits district courts to 'weigh the competing considerations and model appropriate relief.'" *Id.* at 9 (citations omitted).

[HN6] As a threshold matter, plaintiff must show a likelihood of success on the merits. [HN7] Section 32(1) of the Lanham Act provides:

(1) Any person who shall, without the consent of the registrant--

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, **[*12]** distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; . . .

shall be liable in a civil action by the registrant . . .

15 U.S.C. § 1114(1)(a).

As was held by the magistrate judge,

[HN8] The Seventh Circuit has not ruled directly on the viability of a Lanham Act action for the sale of a genuine product without the trademark owner's consent. However, other circuits have found that the unauthorized sale of a trademarked product does not by itself constitute a Lanham Act violation. *Shell Oil Co. v. Commercial Petroleum, Inc., 928 F.2d 104, 107 (4th Cir. 1991)*; *H.L. Hayden Co. of New York, Inc. v. Siemens Medical Systems, Inc., 879 F.2d 1005, 1023 (2d Cir. 1989)*; *NEC Electronics v. CAL Circuit Abco, 810 F.2d 1506, 1509 (9th Cir.), cert. denied, 484 U.S. 851 (1987)*; *Monte Carlo Shirt, Inc. v. Daewoo International (America) Corporation, 707 F.2d 1054, 1057-58 (9th Cir. 1983)*. In essence, these courts have reasoned that the primary wrong that a trademark action remedies is public confusion [*13] as to the true source of the goods; such confusion does not exist when a genuine product bearing a valid mark is sold. *E.g., NEC Electronics v. CAL Circuit Abco, supra, 810 F.2d at 1509.*

Report at 7.

A key issue in this case, therefore, is whether the grilles in defendants' possession can be considered genuine. Again, the Seventh Circuit has not yet spoken on this issue, but the circuits that have considered the issue are in accord.

[HN9] A product is not truly "genuine" unless it is manufactured and distributed under quality controls established by the manufacturer. *El Greco Leather Products Co. v. Shoe World, 806 F.2d 392, 395 (2d Cir. 1986), cert. denied, 484 U.S. 817 (1987)*. The Lanham Trademark Act affords the trademark holder the right to control the quality of the goods manufactured and sold under its trademark. *Id.* "The actual quality of the goods is irrelevant; it is the control of quality that a trademark holder is entitled to maintain." *Id.*

*Shell, 928 F.2d at 107. Accord Matrix Essentials, Inc. v. Karol, 1992 WL 142292 at \*4 (N.D. Ill. June 17, 1992); C.B. Fleet Co. v. Complete Packaging Corp., 739 F. Supp. 393, 398 (N.D. Ill. 1990).* [*14]

The evidence establishes that Ford's quality control procedures provided that the grilles would be inspected by Ford. As to the grilles in question, the evidence establishes that the 1988 grilles were obsolete products, replaced because they caused a whistling sound under certain driving conditions. Neither the 1988 grilles nor the storage grilles have been inspected by Ford. Since the grilles have not gone through the usual inspection process, they are not genuine products. The 1988 grilles are also nongenuine for the additional reason that they are obsolete.

The evidence supports that defendants were attempting to sell nongenuine Ford products containing Ford trademarks and therefore supports that plaintiff is likely to be able to prove a violation of the Lanham Act. However, one more issue must be taken into consideration before reaching a conclusion as to plaintiff's likelihood of success on the merits. *See Pyrodyne Corp. v. Pyrotonics Corp., 847 F.2d 1398, 1403 (9th Cir.), cert. denied, 488 U.S. 968 (1988)* (equitable defenses considered in determining likelihood of success for preliminary injunction ruling). Defendants contend Ford [*15] should be estopped from pursuing its claim against defendants because Ford was offered the opportunity to purchase the grilles before they were sold at the auction, but declined to purchase the grilles and did nothing to ensure that they would only be used as scrap.

Citing *James Burrough Ltd. v. Sign of the Beefeater, Inc., 572 F.2d 574, 578 (7th Cir. 1978)*, the magistrate judge held that, to the extent proven and applicable, estoppel would only preclude damages for the period prior to the suit, but could not preclude injunctive relief which applies to a period after the suit was filed. This court does not read *Beefeater* so broadly. It only indicates that estoppel "may" not be applicable to post-lawsuit relief, depending on the circumstances of the case. The present case does not involve the more common type of laches defense where a trademark owner knew of trademark infringement and failed to seek to enforce its rights for a period of time prior to the lawsuit. Instead, the present case is one where the owner of a trademark is alleged to have abandoned its interest in certain property that had a mark on it.

In *Diamond Supply Co. v. Prudential Paper Products Co., 589 F. Supp. 470, 475-76 (S.D.N.Y. 1984),* [*16] the trademark owner told one of its suppliers to do whatever the supplier wanted with

Case 1:08-cv-00526    Document 157-3    Filed 09/10/2008    Page 21 of 101

Page 7

1992 U.S. Dist. LEXIS 13294, *; 25 U.S.P.Q.2D (BNA) 1050

some excess inventory. The owner was thereafter held to have waived any claim for trademark violation when the supplier sold the inventory to another distributor for sale to the public with the owner's trademark on it. In *El Greco, 806 F.2d at 396*, *Diamond* was distinguished. In *El Greco*, the trademark owner never told its supplier what to do with an uninspected, excess inventory of shoes. The court held that the owner was entitled to assume that the supplier would not dispose of the shoes without first removing the trademark label or seeking instructions from the trademark owner as to what to do with the inventory. Therefore, it was held that the trademark owner in *El Greco* did not waive its trademark claim.

The present case falls somewhere between *Diamond* and *El Greco*. Unlike *Diamond*, Ford did not expressly tell Woodstock to do whatever it wanted with the grilles. Unlike *El Greco*, Ford was given a further opportunity to provide additional instructions as to what to do with the goods, and then failed to respond at that point. On the preliminary **[*17]** injunction motion, it must be held that defendants have a possibility of succeeding on their estoppel defense. On the evidence presented, the estoppel defense would likely be a question for the factfinder.

While defendants have a colorable estoppel defense, it is not so strong that it can be found that plaintiff has no likelihood for success on its trademark claim. Plaintiff, therefore, has satisfied the threshold requirement of showing some likelihood of success on the merits.

The other threshold requirement is a showing of irreparable harm and the inadequacy of any remedy at [HN10] law. Irreparable harm and the inadequacy of any remedy at law is presumed if a Lanham Act violation is shown. *Abbott*, slip op. at 16. "This presumption, it appears, is based upon the judgment that it is virtually impossible to ascertain the precise economic consequences of intangible harms, such as damage to reputation and loss of goodwill, caused by such violations." *Id.* Still, this is only a presumption; the presumption may be overcome.

Obviously, the sale of an obsolete product, especially one with a defect, can cause significant damage to reputation and goodwill. The storage grilles, however, **[*18]** are different. While, for present purposes, those grilles have been shown to be nongenuine because not inspected, they have not been shown to be defective. There is only weak testimony to support that the storage grilles *might* have become defective *if* stored under conditions of extreme temperature change. No evidence supports that any such storage conditions existed or that any such damage actually occurred during storage. If the storage grilles are not damaged, then Ford would not suffer injury to reputation if the storage grilles were sold to consumers. *Cf. Matrix,* 1992 WL 142292 at *5-6.

For purposes of ultimate success on their claim, the actual quality of the uninspected goods is irrelevant. *El Greco, 806 F.2d at 395*; *Shell, 928 F.2d at 107*. For purposes of considering a preliminary injunction, however, potential for harm is highly relevant. The uninspected storage grilles having not been shown to be defective, it has not been shown that Ford's reputation for quality products is likely to be harmed by the distribution of the storage grilles to the public. For purposes of deciding the present motion, the potential harm **[*19]** to reputation for quality if the storage grilles are distributed must be given little if any weight in determining the balance of harms. There is, however, a potential injury to goodwill. If the grilles are distributed to the public in a manner which is likely to cause the public to believe that they are warranted products, which these grilles would not be, Ford's goodwill might be damaged if consumers sought to pursue warranty claims which Ford then denied. *See Matrix,* 1992 WL 142292 at *6. The record, however, supports that defendants do not represent that the grilles are protected by any Ford warranty. Whether that representation would be conveyed on to the consumer level is unknown. Therefore, there is some possibility for injury to Ford's goodwill. Still, it must be concluded, as regards the storage grilles, that Ford has not shown that there is a substantial likelihood of it suffering irreparable harm nor has it been shown that if any such harm occurs, that the degree of harm is likely to be substantial.

Next, the balance of harms must be considered. Key to resolution of the preliminary injunction issue in this case is that defendants have not shown that they would **[*20]** suffer any irreparable harm if the preliminary injunction is granted, but defendants ultimately succeed on the merits of the law-

Case 1:08-cv-00526    Document 157-3    Filed 09/10/2008    Page 22 of 101

Page 8

1992 U.S. Dist. LEXIS 13294, *; 25 U.S.P.Q.2D (BNA) 1050

suit. The only potential harm to defendants is financial injury which can readily be compensated if plaintiff does not succeed on the merits. Plaintiff, on the other hand, has shown the potential for substantial irreparable harm as regards the 1988 grilles and some potential for irreparable harm as regards the storage grilles. As for the public interest, the public would suffer more harm if nongenuine parts that were defective or unwarrantable continued to be in the marketplace prior to plaintiff succeeding on its suit than if defendants' grilles, which would still be available through other means, were kept off the market until defendants succeeded on the merits of this suit. Given the lack of potential irreparable harm to defendants, it must be found that the balance of harms tilts strongly in plaintiff's favor, even as to the storage grilles where the potential harm shown is not substantial.

In light of the balance of harms being heavily in plaintiff's favor, it is not necessary to make a strong showing of likelihood of success on the merits. Therefore, **[*21]** despite defendants' showing as to their estoppel defense, plaintiff has made a sufficient showing as to likelihood of success to justify granting a preliminary injunction.

An appropriate bond in this case will recognize the potential value to the defendants and court costs. The parties do not represent otherwise. Bond is fixed in the sum of $ 20,000.

IT IS THEREFORE ORDERED that:

(1) The court's findings of facts and conclusions of law, adopting in part the report and recommendation of the magistrate judge, are entered herein.

(2) Plaintiff's motion for preliminary injunction is granted.

(3) Subject to the posting of a $ 20,000 surety bond with the Clerk of the Court within 72 hours of the date of this order, defendants are preliminarily enjoined, pending further order of this court, from selling or otherwise disposing of the Ford grilles acquired by purchase from Woodstock Die Casting Co.

(4) Status hearing set for September 8, 1992 at 9:15 a.m.

ENTER:

William T. Hart

UNITED STATES DISTRICT JUDGE

Dated: AUGUST 28, 1992

LEXSEE 1992 U.S. DIST. LEXIS 13521

**GENDERM CORPORATION, Plaintiff, v. BIOZONE LABORATORIES, a California corporation, Defendant.**

**No. 92 C 2533**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*1992 U.S. Dist. LEXIS 13521*

**September 2, 1992, Decided**
**September 3, 1992, Docketed**

**PRIOR HISTORY:**   **[*1]**  Adopting Magistrate's Document of June 12, 1992, Reported at *1992 U.S. Dist. LEXIS 8527.*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff patentee filed a motion for a preliminary injunction to restrain defendant competitor from engaging in alleged false advertising and trademark infringement. After denying a temporary restraining order, the motion for a preliminary injunction was referred to a magistrate which recommended preliminary relief on the patentee's unfair competition claim under the Lanham Trademark Act (Act).

**OVERVIEW:** Capsaicin was a chemical compound that occurred within the capsicum family of hot red peppers. The patentee used an extract called capsaicin in its over-the-counter topical analgesic product. The competitor began marketing a competing topical analgesic and promoted it as containing capsaicin as its active ingredient. The patentee filed a complaint alleging patent infringement, trademark infringement, and unfair competition under the Act. The patentee withdrew its patent infringement claim but added further claims of false labeling and false advertising. The court adopted the magistrate's recommendation of a preliminary injunction against the competitor. It found that the competitor's product was falsely labeled, falsely advertised, bore an infringing trademark, and contained an active ingredient that had not been tested on humans or approved for use in the United States. Accordingly, the court granted the injunction under the Act based on false statements.

**OUTCOME:** The court adopted the magistrate's recommendation to issue a preliminary injunction against the competitor and enjoined the competitor from selling its product without correcting its false labeling.

**CORE TERMS:** ingredient, capsaicin, analgesic, pain, nonivamide, pharmacist, chemical, topical, over-the-counter, trademark, compound, advertising, labeling, package, patient, insert, monograph, capsicum, Lanham Act, label, preliminary injunction, infringement, formula, cream, foods, irreparable, competitor, unfair competition, molecular weight, injunctive relief

**LexisNexis(R) Headnotes**

*Civil Procedure > Judicial Officers > Magistrates > Pretrial Orders*
[HN1] *Fed. R. Civ. P. 72(b)* requires that the court make a de novo determination upon the record and that it consider objections to a report. However, the court is not required to conduct a de novo hearing of evidence.

1992 U.S. Dist. LEXIS 13521, *

*Torts > Business Torts > Fraud & Misrepresentation > General Overview*
[HN2] False statements are presumed to be material.

*Trademark Law > Federal Unfair Competition Law > Lanham Act > General Overview*
[HN3] Section 43(a)(2) of the Lanham Trademark Act prohibits the use of false or misleading representations, and there is a well established presumption that injuries arising from Act violations are irreparable.

**JUDGES:** Hart

**OPINION BY:** WILLIAM T. HART

**OPINION**

**MEMORANDUM OPINION AND PRELIMINARY INJUNCTION ORDER**

**I. INTRODUCTION**

This matter is before the court on the motion of plaintiff GenDerm Corporation ("GenDerm") for a preliminary injunction to restrain defendant BioZone Laboratories ("BioZone") from engaging in alleged false advertising and trademark infringement. After denying a temporary restraining order, the motion for a preliminary injunction was referred to Magistrate Judge Pallmeyer for an evidentiary hearing, a report and a recommendation. Hearings were held, and on June 12, 1992 the magistrate judge filed a report and recommended preliminary relief. On July 7, 1992, BioZone filed objections. On July 15, 1992, GenDerm filed a response to those objections.

The report of the magistrate judge is comprehensive and carefully considers the positions of the parties. The report is adopted and attached hereto as an appendix.

**II. OBJECTIONS TO THE REPORT**

Capsaicin is a chemical compound that occurs within the capsicum family of hot red peppers. For a number of years, GenDerm has used **[*2]** an extract called capsaicin in a 0.025% concentration in its over-the-counter topical analgesic product, ZOSTRIX. (R) In March 1992, BioZone began marketing a competing topical analgesic under the name CAPTRIX. BioZone labeled and promoted CAPTRIX as also containing 0.025% capsaicin as its active ingredient. GenDerm's initial complaint alleged patent infringement, trademark infringement, unfair competition under the Lanham Act and the common law and violations of Illinois and California state law.

After the filing of this action, GenDerm discovered, by tests of CAPTRIX, that the active ingredient is not capsaicin but a compound with a different composition, formula and chemical weight. On May 13, GenDerm withdrew its patent infringement claim but added further claims of false labeling and false advertising. These matters were the subject of a hearing.

The magistrate judge has found that CAPTRIX is falsely labeled; falsely advertised; bears an infringing trademark; and contains an active ingredient that has not been tested on humans or approved for use in the United States.

**A. Request for an Additional Hearing**

Initially, BioZone argues that it is entitled to a de novo **[*3]** evidentiary hearing before the court at which it desires to offer additional proofs. [HN1] *Federal Rule of Civil Procedure 72(b)* requires that the court make a de novo determination upon the record and that it consider objections to a report. However, the court is not required to conduct a de novo hearing of evidence. *United States v. Raddatz, 447 U.S. 667, 678-80 (1980)*; *Advance Coating Technology, Inc. v. LEP Chemical Ltd., 142 F.R.D. 91, 93-94 (S.D.N.Y. 1992)*. Moreover, there is nothing asserted in the requests for additional hearing that could not have been submitted during the hearing before the magistrate judge. The court declines, therefore, to conduct an additional evidentiary hearing. [1]

1    It appears, based upon the supplemental filings, that BioZone seeks an opportunity to prove that its product C[17] is "synthetic capsaicin." Its materials do not so show. Moreover, this contention was expressed to the court when a temporary restraining order was denied. It was largely because counsel

Case 1:08-cv-00526    Document 157-3    Filed 09/10/2008    Page 25 of 101

Page 3
1992 U.S. Dist. LEXIS 13521, *

represented in court that BioZone's product was a cheaper equivalent that this court declined to grant a restraining order.

**[*4]  B. BioZone's False Label and Package Insert**

ZOSTRIX contains capsaicin (C[18]) as its active ingredient. CAPTRIX contains a product described by the experts as nonivamide (C[17]) or pelargonic acid vanillylamide. Although, in its supplemental filings, BioZone seeks to question the use of the name nonivamide, its position does not affect the accuracy of the findings.

BioZone has stated that the active ingredient in CAPTRIX has the molecular weight 305.4 and the formula C[18]H[27]NO[3] and the structure of capsaicin. In fact, the nonivamide in CAPTRIX has the molecular weight 293.4 and the formula C[17]H[27]NO[3]. The product is synthetically derived and not an extract of capsicum hot pepper plants. Also, contrary to the product claim, there is no USP standard for C[17].

It has been stated by BioZone that CAPTRIX is the pharmacological equivalent of GenDerm's product ZOSTRIX. However, there is no support for this claim. No testing has been conducted.

BioZone concedes that it has made false representations but contends that they were not material or injurious. However, as the magistrate judge correctly held, [HN2] false statements are presumed to be material. [HN3] Section 43(a)(2) **[*5]** of the Lanham Act prohibits the use of false or misleading representations, and there is a well established presumption that injuries arising from Lanham Act violations are irreparable. Abbott Laboratories v. Mead Johnson & Co.,    F.2d    (7th Cir. July 23, 1992)

**C. A Change in the CAPTRIX Label and Package Insert**

BioZone's offer to change its promotional statements and label as a part of its objections, and in order to avoid an injunction, comes too late. *United States v. W.T. Grant Co., 345 U.S. 629, 632-33 (1953)*; *Hard Rock Cafe Licensing Corp. v. Concession Services, Inc., 955 F.2d 1143, 1151 (7th Cir. 1992)*; *Scotch Whiskey Association v. Barton Distilling Co., 489 F.2d 809, 813 (7th Cir. 1973)*.

However, its offer will be considered in connection with any relief granted.

**D. The CAPTRIX Mark Infringes Gen-Derm's ZOSTRIX Mark**

The magistrate judge correctly found and concluded that the competing marks share a common suffix and pronunciation; are similar in appearance as presented on the parties' products; compete with each other in identical channels of commerce; and are recommended to patients **[*6]** by physicians or pharmacists based upon package data. GenDerm has shown a likelihood of success on its trademark infringement claim.

On August 26, 1992, BioZone informed the court that it has changed the name of its product to "BioZone Topical Analgesic Cream."

**E. Jurisdiction of the FDA**

BioZone argues that the approval of its product and the interpretation of the FDA publication on external analgesics are matters within the exclusive jurisdiction of the Food and Drug Administration pursuant to the Food, Drug and Cosmetic Act. Here the magistrate judge has not, and this court does not, make a novel interpretation or any interpretation of the FDA's monograph on external analgesics as it may apply to nonivamide or "pelorganic acid vanillylamide." It is merely concluded that C[17] has never been used in a drug in the United States previously, has never been tested on humans and is not listed in the FDA monograph. Accordingly, what is here involved is the propriety of a Lanham Act preliminary injunction based on false statements. See *Grove Fresh Distributors, Inc. v. Flavor Fresh Foods, Inc., 720 F. Supp. 714, 716 (N.D. Ill. 1989)* (orange juice); *McNeill-P.C.C., Inc. v. Bristol-Myers Squibb Co., 938 F.2d 1544, 1549 (2d Cir. 1991)* **[*7]** (over-the-counter analgesics); *Upjohn Co. v. Riahom Corp., 641 F. Supp. 1209, 1222-23 (D. Del. 1986)* (untested hair growth product claimed to be a cosmetic not a drug).

**III. BALANCE OF EQUITIES**

The court agrees with the analysis of the magistrate judge which indicates that preliminary relief is appropriate.

The magistrate judge found that GenDerm has spent substantial sums in testing and promotional

costs. Defendants have invested nothing in testing and have attempted to take a market share by false statements. BioZone has an investment of $ 10,000 in a product which could produce $ 55,000 in gross sales. Between ten and fifteen thousand units have been sold.

As indicated by the Court of Appeals in Abbott Laboratories v. Mead Johnson & Co., F.2d (7th Cir. July 23, 1992), this court should and will consider preliminary injunctive relief tailored to prevent harm to the plaintiff with the least structures appropriate, taking into account BioZone's offer to alter its promotional material.

For the reasons stated in the report, the magistrate judge correctly rejected BioZone's "unclean hands" defense to injunctive relief.

**IV. Requirement  [*8]   for a Bond**

Neither party addresses the appropriate amount of a bond required by *Fed. R. Civ. P. 65(b)* upon the issuance of a preliminary injunction. Considering the small investment and recent entry into the market by BioZone, a bond in the amount of $ 75,000 is judged to be adequate to protect the interests of BioZone.

IT IS THEREFORE ORDERED as follows:

1. Defendant BioZone's objections to the magistrate judge's report are overruled and its request for additional evidentiary hearing on plaintiff's motion for a preliminary injunction is denied. Defendant's motion for leave to file clarification by declarant is denied.

2. Pending further order of this court, defendant BioZone Laboratories is preliminarily enjoined as follows:

A. From selling the product that had been marketed as CAPTRIX without stating on the label and any package insert that the active ingredient is pelargonic acid vanillylamide and, to the extent the chemical formula structure or molecular weight is included, such formula or weight shall not be stated to be capsaicin, C[18]H[27]NO[3], or as having a molecular weight of 305.4.

B. From using the word "capsaicin" alone or with any other term including "synthetic"  [*9]  on its product, and from stating that its active ingredient is purified under U.S.P. standards.

C. From making any advertisements or oral representations comparing its product with ZOSTRIX including statements that they are equivalent or that its product may be substituted for ZOSTRIX.

D. BioZone is ordered to recall all falsely labeled product and inserts for the correction of inaccurate statements as found in this proceeding.

E. BioZone is ordered to submit to this court, on notice and motion, for prior approval, any BioZone promotional advertising material that mentions ZOSTRIX.

3. Within 48 hours of the date of this order, GenDerm Corporation shall file with the Clerk of the Court a surety bond in the amount of $ 75,000.

4. This case is set for a hearing on status on September 14, 1992 at 9:30 a.m.

ENTER:

William T. Hart

UNITED STATES DISTRICT JUDGE

Dated: SEPTEMBER 2, 1992

Appendix

UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION

GENDERM CORPORATION, Plaintiff, v. BIOZONE LABORATORIES, a California partnership, Defendant.

No. 92 C 2533

Judge William T. Hart

Magistrate Judge Rebecca R. Pallmeyer

**REPORT AND RECOMMENDATION**

Capsaicin  [*10]   is a chemical compound that occurs naturally within capsicum, the dried ripe fruit of certain red peppers. For several years, Plaintiff GenDerm Corporation has used capsaicin in a 0.025% concentration in its over-the-counter topical analgesic product, ZOSTRIX (R). Beginning in March 1992, Defendant BioZone Laboratories marketed its own topical analgesic, CAPTRIX TM, as a direct competitor of ZOSTRIX. BioZone labeled and promoted CAPTRIX as also containing 0.025% capsaicin as its active ingredient.

1992 U.S. Dist. LEXIS 13521, *

Plaintiff GenDerm filed its original complaint in this action on April 14, 1992 and a first amended complaint on April 22, 1992. GenDerm's first two complaints charged Defendant BioZone with patent infringement, trademark infringement, unfair competition under the Lanham Act and common law, and violations of Illinois and California state law. Soon after the filing of GenDerm's first amended complaint, tests of the CAPTRIX product performed at GenDerm's direction revealed that the active ingredient in CAPTRIX is not capsaicin but a closely related compound, nonivamide. Nonivamide is synthetically produced and has a chemical formula, composition, and chemical weight different from capsaicin's. **[*11]** On May 13, 1992, GenDerm filed a second amended complaint in which it withdrew the patent infringement claims but added further claims that BioZone was guilty of false labeling and false advertising.

GenDerm's motion for preliminary injunction was referred by District Judge William T. Hart on April 28, 1992. Following a four-day hearing completed on June 1, 1992, the parties submitted proposed findings of fact and conclusions of law. [1] For the following reasons, it is recommended that GenDerm's motion for preliminary injunctive relief be granted.

> 1  Simultaneously with its Proposed Findings of Fact and Conclusions of Law, Defendant BioZone has submitted a motion that the court take judicial notice of certain patents. That motion has not formally been referred to the Magistrate Judge, nor has Plaintiff responded. After this decision had been drafted, Defendant BioZone submitted a new label design for the court's approval. Neither the patents nor the proposed new label design have been considered in this report.

**[*12] FINDINGS OF FACT**

1. Plaintiff GenDerm was founded in 1983 by Joel Bernstein, M.D. GenDerm develops and markets pharmaceutical products for the treatment of pain and certain skin diseases. One of its most successful products is a topical analgesic cream, ZOSTRIX, which is the subject of this litigation. GenDerm employs a twenty-five person research and development staff and has participated in more than ten clinical studies for approval of its products by

the Food and Drug Administration ("FDA"). ZOSTRIX and a related product known as ZOSTRIX HP account for approximately 70% of the company's current worldwide sales, which for the year 1991 totalled slightly less than $ 20 million.

2. Defendant BioZone Laboratories is a California partnership founded in 1989 by Brian Keller, a doctor of pharmacy, and Daniel Fisher, a computer software sales representative who had no previous experience in the pharmaceutical industry. Other than Dr. Keller and Mr. Fisher, BioZone has only a single part-time employee. Since March 1992, BioZone had distributed a topical analgesic cream called CAPTRIX, which BioZone states contains "capsaicin 0.025% weight-by-weight." As of September 1990 (the **[*13]** date of its last financial statement), BioZone had earned less than $ 30,000 in sales. BioZone conducts no laboratory or clinical testing and has never even tested its CAPTRIX product, except that each of the partners applied the cream to his own skin for a few days.

3. Dr. Bernstein has been involved in research involving capsaicin since his days as a graduate fellow in the late 1970's at the University of Chicago and later as a faculty member there and at Northwestern University. Dr. Bernstein developed the commercial ZOSTRIX product prior to 1987. It contains 0.025% of the active ingredient capsaicin by weight. ZOSTRIX HP contains 0.075% capsaicin by weight. Capsaicin is derived from the capsicum family of plants, commonly known as hot pepper plants. The natural substance extracted from the plant, called capsicum oleoresin, has been used by humans for hundreds of years. Capsaicin, which is extracted from capsicum, began to be used alone as an external analgesic in about 1981. Capsaicin is the common name of a single, specific compound. It has the unique Chemical Abstract Service ("CAS") No. 404-86-4 and is defined in the *Merck Index,* an authoritative text on the identity and **[*14]** definition of chemical compounds, as $C[18]H[27]NO[3]$. The *Merck Index* lists capsaicin's molecular weight as 305.4 and includes a drawing of capsaicin's specific chemical structure. The powder containing capsaicin that GenDerm uses in ZOSTRIX is purified from capsicum and contains approximately 65% capsaicin and 35% dihydrocapsaicin, another naturally-occurring compound.

4. ZOSTRIX is sold in a tube and packaged in a box containing an informational package insert. The box, tube, and package insert all indicate that the analgesic contains a single active ingredient, capsaicin 0.025%. According to its labeling, ZOSTRIX is intended "for the temporary relief of peripheral neuralgias such as the pain following shingles (herpes zoster)" and "for the temporary relief of the pain associated with rheumatoid arthritis and osteoarthritis." Prior to its introduction on the market, ZOSTRIX was the subject of $ 1 million worth of testing and development by GenDerm. Since ZOSTRIX was introduced in 1987, GenDerm has spent $ 3 million to $ 4 million in continuing technical studies and more than $ 9 million in promoting the product through the publication of journal advertisements, the distribution **[*15]** of samples, and the sponsoring of continuing education programs for physicians. GenDerm has sought, in part through these efforts, to overcome the initial skepticism of physicians about the effectiveness of a topical pain relief product.

5. GenDerm maintains a sales staff at a cost of $ 3.4 million annually. GenDerm's sales staff devotes approximately one-third of its time to sales of ZOSTRIX and ZOSTRIX HP. ZOSTRIX directs its promotional efforts at physicians and pharmacists. Although ZOSTRIX is an over-the-counter product, it is known as an "ethical drug," that is, a product targeted primarily at physicians and pharmacists rather than users. Physicians ordinarily recommend the use of ZOSTRIX to a patient either verbally or by a written note or prescription. Of the 70 to 75 thousand tubes of ZOSTRIX sold each month, GenDerm's president, Frank Pollard, estimates that at least 75% are sold as a result of physicians' or pharmacists' prescriptions or recommendations. GenDerm holds federal and Illinois state trademark registrations for the mark ZOSTRIX.

6. BioZone Laboratories introduced its CAPTRIX product to the market in March 1992. Like ZOSTRIX, CAPTRIX is also sold in Illinois. **[*16]** BioZone asserts that CAPTRIX contains "capsaicin 0.025% weight-by-weight." In fact, however, CAPTRIX's active ingredient is not identical chemically to ZOSTRIX's. The active ingredient in CAPTRIX instead has the molecular formula $C[17]H[27]NO[3]$, a molecular weight of 293.41, a chemical structure different from capsaicin's, and a

different CAS number, 2444-46-4. Although some chemical suppliers refer to this compound as "synthetic capsaicin," the proper chemical name for the compound is pelargonic acid vanillylamide. The accepted United States Adopted Names ("USAN") common name for pelargonic acid vanillylamide is nonivamide. Nonivamide is a synthetic product and is less expensive than capsaicin. (Dr. Keller testified that nonivamide occurs naturally in capsicum; but according to the more credible testimony of Dr. Dennis West, if nonivamide is present in capsicum at all, it is present only in trace amounts.) The term "synthetic capsaicin" does not appear in recognized pharmaceutical references, nor in two monographs published by the FDA in 1979 and 1983 relating to topical analgesics. Dr. Keller himself testified that the term "synthetic capsaicin" does not appear in pharmaceutical **[*17]** texts and that pharmacists are not familiar with the term. Expert testimony demonstrated that pharmacists are likely to believe that the $C[18]H[27]NO[3]$ compound is the active ingredient in CAPTRIX.

7. CAPTRIX, like ZOSTRIX, is sold in a tube and packaged in a box which contains a package insert. The box, tube, and package insert all identify the single active ingredient in CAPTRIX as capsaicin 0.025%. Like ZOSTRIX, CAPTRIX is sold "for the temporary relief of minor aches and pains of muscles and joints associated with arthritis and for pain associated with peripheral neuralgias." The labeling on the box also identifies CAPTRIX's active ingredient as "purified, USP" -- an accepted reference to the United States Pharmacopeia, a private institution that establishes standards of drug purity. There is in fact no USP purity standard for either nonivamide or capsaicin.

8. The package insert for CAPTRIX states that its active ingredient, capsaicin, "is the pungent principle in fruit of various species of Capsicum, Solanaceae," is defined by the chemical formula $C[18]H[27]NO[3]$ (hereinafter, "C[18]"), has a molecular weight of 305.4, and is described by the chemical structure reproduced **[*18]** in the *Merck Index.* These statements do not accurately describe the actual active ingredient in CAPTRIX, nonivamide (hereinafter sometimes "C[17]"). Nonivamide, a synthetic product, has a different empirical formula, a different molecular weight, and a different chemical structure than capsaicin. Brian

1992 U.S. Dist. LEXIS 13521, *

Keller, the doctor of pharmacy who is one of Bio-Zone's two partners, knew before the marketing of the CAPTRIX product that CAPTRIX's active ingredient was not identical to the C[18] compound. He acknowledged at the hearing that the package insert for BioZone's CAPTRIX product is erroneous. Although Dr. Keller testified that the package insert would be revised, he indicated that BioZone had not made a decision about the wording of the new package insert and what claims would or would not be made.

9. The CAPTRIX package insert specifically states that the product provides relief by blocking the release of substance P and neuropeptides in nerve receptors. The evidence BioZone relied on in support of this claim, however, was a study performed on ZOSTRIX, not CAPTRIX. At the time CAPTRIX was marketed, no product marketed in the United States had ever contained nonivamide as its active [*19] ingredient. Before CAPTRIX was marketed, Dr. Keller was not aware of any studies or tests suggesting that nonivamide is similar to capsaicin in terms of its safety or efficacy. Thus BioZone prepared the package insert for CAPTRIX without any knowledge of the chemical structure of CAPTRIX's actual active ingredient. BioZone began selling CAPTRIX without any testing and without knowing the characteristics of the vehicle (the non-active ingredients in which the active ingredient is suspended) in CAPTRIX. In fact, at the time that BioZone began selling CAPTRIX, Keller knew that the listing of the empirical formula for the active ingredient in the CAPTRIX package insert was wrong and that the labeling of CAPTRIX's active ingredient as "purified, USP" was inaccurate. Only after the filing of this litigation did Dr. Keller read the article upon which BioZone now relies to predict that CAPTRIX's efficacy and safety is similar to that of ZOSTRIX.

10. Existing published reports of research on laboratory animals suggest that there are pharmacological differences between nonivamide and capsaicin. No scientific evidence supports the claims that the efficacy of the analgesic properties of CAPTRIX [*20] and ZOSTRIX are identical or that CAPTRIX is safe and efficacious.

11. Neither BioZone's chief distributor of CAPTRIX, McKesson Telemarketing Service, nor its FDA compliance counsel, Jay Geller, knew until after the filing of this litigation that CAPTRIX contains nonivamide and not capsaicin.

12. In contending that ZOSTRIX and CAPTRIX are equivalent, BioZone chiefly relies on an article about capsaicin that appeared in a recent issue of the journal Critical Reviews in Food Science and Nutrition. [2] According to this article, the C[17] compound and the C[18] compound are structurally very similar and have similar, although not identical, characteristics of "pungency, pain, and desensitization." CAPTRIX had never been tested, however, either in comparison with ZOSTRIX or with the performance of a placebo.

> 2   V.S. Govindarajan & M.N. Sathyanarayana, *Capsicum -- Production, Technology, Chemistry, and Quality. Part V. Impact on Physiology, Pharmacology, Nutrition, and Metabolism; Structure, Pungency, Pain, and Desensitization Sequences,* 29 Critical Reviews in Food Science and Nutrition 435 (1991).

[*21] 13. Approximately 10,000 of the 15,000 units of CAPTRIX produced have already been sold. The cost to BioZone of the remaining 5,000 units of CAPTRIX in its inventory is approximately $ 5,000.00. The total revenue BioZone would expect to receive from the sale of this inventory is $ 55,000.00. BioZone can ascertain the identity of the wholesalers and retailers that have received the CAPTRIX product. In addition to its inventory of packaged CAPTRIX tubes, BioZone also has in its possession approximately $ 5,000.00 worth of unfilled CAPTRIX boxes and tubes, identical in appearance to those in evidence. Their labels contain the same statements and claims as those on the packaged tubes. BioZone has no other inventory relating to the CAPTRIX product.

14. BioZone distributed approximately 100 of 500 promotional flyers it had printed. These flyers were sent to Long Drug Stores, McKesson Telemarketing Service, and possibly some members of the media. The flyer pitches CAPTRIX as an alternative to ZOSTRIX and states that "9 out of 10 physicians who currently prescribe capsaicin based products would prescribe CAPTRIX to their patients." The survey upon which this claim is based in fact consisted [*22] of an interview with ten physicians who were asked not to choose an inde-

pendent preference based on their own comparison but rather to assume that CAPTRIX and ZOSTRIX were equally efficacious and that CAPTRIX was cheaper. The CAPTRIX flyer states, further, that "no other OTC [over-the-counter] topical pain reliever is more effective." No clinical study or other data supports this claim. The CAPTRIX flyer states, further, that "CAPTRIX has achieved significantly better results, when compared to counterirritants, in reducing the pain of arthritis." This claim is literally false because no test comparing CAPTRIX to counterirritants in reducing the pain of arthritis, or for any other purpose, was ever conducted. Finally, the CAPTRIX flyer states that "CAPTRIX provides immediate pain relief and unsurpassed long term pain relief by reducing the transmission of pain." This claim is not supported by any evidence, including the purported "testing" performed by Dr. Keller and Mr. Fisher -- neither of whom suffers from arthritis or shingles -- on their own bodies that lasted no more than a few days.

15. BioZone also distributed to the CAPTRIX sales force a document entitled "Selling Tips" in [*23] which BioZone states, "CAPTRIX cream is a nationally branded substitution for ZOSTRIX cream." At the time the document was drafted, however, BioZone's partners knew of no studies comparing capsaicin to nonivamide. No studies to date have compared CAPTRIX to ZOSTRIX. The "Selling Tips" document further stated:

CAPTRIX has achieved significantly better results, when compared to counterirritants and placebo in reducing the pain of arthritis. Compared to placebo capsaicin showed a 33% reduction in pain from osteoarthritis and a 57% reduction in pain from rheumatoid arthritis.

In fact, CAPTRIX has never been tested against a counterirritant or placebo. The percentage figures quoted above actually appear in a report of a study conducted on ZOSTRIX.

16. Finally, BioZone published a "CAPTRIX Fact Sheet" for its distributors, including McKesson. The fact sheet represents that the active ingredient of CAPTRIX is capsaicin 0.025% and identifies the active ingredient as being "a naturally occurring substance derived from plants." The fact sheet states, further, that "ZOSTRIX offers no advantage to CAPTRIX." This claim suggests that

ZOSTRIX and CAPTRIX have been clinically compared, when in [*24] fact no such study has been conducted.

17. In December 1979, the FDA proposed a monograph on external analgesic drug products. The FDA sought to establish conditions under which such products would be recognized as safe and effective for certain indicated uses and could be sold without prescription. In February 1983, the FDA issued a notice of proposed ruling in the form of a tentative final monograph. Under the 1983 monograph, the FDA would recognize certain external analgesic drug products as safe and effective for sale without a prescription, for the uses indicated. According to the 1983 monograph, subsequently codified at 21 C.F.R. § 348.12, drug products containing "capsaicin" or other "capsicum preparations" are recognized as safe and effective for over-the-counter sale as external analgesics, so long as those products are labeled for "the temporary relief of minor aches and pains of muscles and joints" associated with simple backache, arthritis, strains, bruises or sprains *(see 21 C.F.R. § 348.50(b)(1))*. Although neither the 1979 proposed monograph nor the 1983 tentative final monograph defined the chemical structure of capsaicin, the *Merck Index* did include a drawing [*25] of capsaicin's specific chemical structure.

18. A number of over-the-counter topical analgesic products contain capsicum as their active ingredient. Only ZOSTRIX and CAPTRIX compete in the ethical topical analgesic market, however. Although both ZOSTRIX and CAPTRIX are sold over-the-counter and without a prescription, the products are usually recommended by a physician or pharmacist because arthritis and shingles normally are diagnosed by a physician. When a pharmacist recommends an over-the-counter drug to a patient, or attempts to provide a patient with an over-the-counter drug recommended by the patient's physician, the pharmacist relies on his or her identification of specific active ingredients that are listed on the labels of commercial products. The labeling of CAPTRIX would lead pharmacists to conclude that its active ingredient is identical to that of ZOSTRIX. A pharmacist is likely to substitute a less expensive product for a more expensive one if he or she believes that the cheaper product contains the same active ingredient. A pharmacist might con-

clude from CAPTRIX's labeling that CAPTRIX is equivalent to ZOSTRIX and, consequently, recommend the lower-priced CAPTRIX to [*26] patients whose physicians have directed them to obtain a topical analgesic containing 0.025% capsaicin. The fact that BioZone refused to disclose the true active ingredient to its distributors supports a conclusion that BioZone recognized the value of this potential confusion and hoped to benefit from it.

19. Similarly, as suggested by the ten-physician interview conducted on behalf of BioZone, a physician who would mistakenly believe that CAPTRIX contains the same amount of the same active ingredient as ZOSTRIX is likely to recommend the less expensive CAPTRIX product to a patient. It is reasonable to conclude, therefore, that every purchase of CAPTRIX would result in one fewer purchase of ZOSTRIX.

20. If the untested active ingredient in CAPTRIX proves ineffective or even harmful, GenDerm is likely to suffer damage to its reputation. For example, a dissatisfied customer of CAPTRIX -- who would have no reason to believe that CAPTRIX contains anything other than the active ingredient capsaicin 0.025% -- would be most unlikely to try ZOSTRIX or to recommend it to others. Moreover, a pharmacist or physician who learns of dissatisfaction on the part of any customer or patient resulting [*27] from the product's ineffectiveness or unintended side effects would be most unlikely to recommend ZOSTRIX to other customers or patients out of concern that ZOSTRIX contains the same amount of the same active ingredient as CAPTRIX.

21. The public may also be harmed if patients mistakenly purchase CAPTRIX out of a belief that it is identical to ZOSTRIX. The active ingredient in CAPTRIX has never been tested or approved. Users of CAPTRIX may possibly experience side-effects or harmful reactions from the interaction of CAPTRIX ingredients with other drugs in their body systems. If the active ingredient in CAPTRIX is safe but less effective than the $C[18]$ compound, the physician, pharmacist, or patient (or all three) may conclude that a topical pain reliever does not effectively treat the pain. They may then turn to pain relievers having a higher degree of risk or side effects than GenDerm's product (or any other topical analgesic which may contain capsaicin 0.025%). Because CAPTRIX has only been on the market

since March 1992, several months may pass before any of these potential harms manifest itself.

22. A pharmaceutical manufacturer must ordinarily seek FDA approval before introducing [*28] a new drug into the market. The FDA's master list shows that the ingredient nonivamide (or pelargonic acid vanillylamide) has never been the subject of a new drug application. Even without a new drug application, a drug may be placed on the market if it is generally recognized as safe and effective. In order to fall within this exception, however, a body of independent experts must determine on the basis of published reports that the drug is generally recognized as safe and effective. This published scientific data must be of substantial quantity and reflect the same quality as that required for approval of a new drug application itself, including the results of tests on humans. No data exists which would satisfy this standard for nonivamide. A second exception to the requirement for a new drug application is available for those over-the-counter drugs identified by the FDA's monographs. While the FDA's December 4, 1979 monograph for external analgesics does list capsaicin and capsicum, it does not list nonivamide, pelargonic acid vanillylamide, nor "synthetic capsaicin."

23. As more fully discussed in the Conclusions below, GenDerm has demonstrated that the Defendant's mark CAPTRIX [*29] is likely to be confused with the ZOSTRIX mark. The marks share a common suffix and are pronounced similarly, with emphasis on the first syllable. The products themselves contain an identical cream substance, are designed for identical use, and are marketed in identical channels of commerce. Further, Brian Keller knew of the ZOSTRIX mark at the time he selected the similar CAPTRIX mark. Although Defendant argues that the "-TRIX" suffix has been used in numerous prior registrations and other references, there is no evidence of such prior use in the over-the-counter topical analgesic market.

24. Before marketing its ZOSTRIX product, GenDerm consulted with its FDA counsel and former Chief Counsel for the FDA, Peter Hutt, to review the proposed labeling for ZOSTRIX against the 1979 and 1983 monographs for external analgesic over-the-counter drugs. Mr. Hutt believed that the labeling for ZOSTRIX complied with existing FDA law and regulations. Nevertheless, in January

1988 the FDA wrote to GenDerm objecting to the claim on the ZOSTRIX label that the analgesic provides "temporary relief of pain (neuralgia) associated with and following episodes of shingles (herpes zoster)." After receiving [*30] this letter, Mr. Hutt and Dr. Bernstein met with four FDA employees, including Ray Apodaca, chief of the FDA's Compliance Division, in the FDA's Washington office. At this meeting, Mr. Hutt and Dr. Bernstein explained GenDerm's position that its labeling of ZOSTRIX for a "targeted use" was authorized by the 1979 and 1983 monographs. The FDA took no further regulatory action until June 1991, at which time the FDA's Chicago district office sent Gen-Derm a warning letter concerning the claim on ZOSTRIX label assuring pain relief from herpes zoster. Mr. Hutt responded to the warning letter, this time drafting for GenDerm's president's signature a letter reiterating GenDerm's position and describing the 1988 meeting with Mr. Apodaca. Gen-Derm has heard nothing further from the FDA since June 1991.

25. The July-August 1991 edition of the official FDA magazine, FDA Consumer, contains an article written by a former FDA employee, Ken Flieger, who states:

Capsaicin cream (ZOSTRIX) has been reported by investigators at the pain clinic of Toronto Hospital to reduce pain in a significant percentage of PHN [Post-Herpetic Neuralgias] victims. The researchers say that more than half (56 percent) [*31] of PHN patients who received capsaicin cream for four weeks had good or excellent pain relief, and that 78 percent noted at least some improvement in pain.

Although capsaicin is an over-the-counter drug sold for muscular aches and pains, patients should consult a physician before using it to treat PHN. [3]

Although FDA consumer articles do not reflect official agency policy, FDA staff members do review articles before publication to insure consistency with agency policy. Mr. Hutt staff concluded that the publication of the statements quoted above suggests that the FDA no longer condemns the claims asserted by ZOSTRIX to treat patients suffering from herpes zoster.

3   Ken Flieger, *Shingles -- Or Chickenpox, Part Two*, 25 FDA Consumer 36, 40 (July-August 1991).

26. All of GenDerm's promotional materials and product efficacy claims are reviewed prior to their release by GenDerm's president, its vice-president of sales, its director of regulatory affairs, and its medical department. All claims appearing on ZOSTRIX's [*32] labeling and packaging are similarly reviewed. GenDerm adopted the ZOSTRIX labeling in good faith and in reliance on the advice of competent counsel.

## CONCLUSIONS OF LAW

### Jurisdiction and Venue

1. This court has jurisdiction over the federal trademark claims pursuant to *28 U.S.C. § 1338(a)(b) (1988)*. The court has jurisdiction over the unfair competition claims pursuant to *15 U.S.C. § 1114*. Because these claims involve federal questions, the court also has jurisdiction pursuant to *28 U.S.C. § 1331*. The court has pendent jurisdiction over state law trademark and unfair competition claims. Venue properly exists in this judicial district pursuant to *28 U.S.C. § 1391*.

### Standards for Granting Preliminary Injunction

2. A party seeking a preliminary injunction must establish:

(a) That it has no adequate recourse at law and will suffer irreparable harm if relief is not granted;

(b) That the irreparable harm it would suffer if preliminary relief is denied out-weighs the irreparable harm defendants would suffer from the granting of such relief;

(c) That it has some likelihood of success on the merits; and

(d) That an injunction would not disserve the public [*33] interest.

*United States v. Rural Electric Convenience Cooperative Co., 922 F.2d 429, 432 (7th Cir. 1991); American Hospital Supply Corp. v. Hospital Products, Ltd., 780 F.2d 589, 604 (7th Cir. 1986).*

I. Likelihood of Success

1992 U.S. Dist. LEXIS 13521, *

A. Unfair Competition under Section 43(a) (Count II)

3. Plaintiff's principal claim is for violation of section 43(a) of the Lanham Trademark Act, *15 U.S.C. § 1125(a)*, as amended. That section provides:

(a) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which --

(1) Is likely to cause confusion, or to cause mistake or deceive as to the affiliation, connection or, association of such person with another person, or as to the origin, sponsorship or approval of his or her goods, services, or commercial activities by another person, or

(2) In commercial advertising or promotion, misrepresents the nature, characteristics, qualities or geographic origin of his [*34] or her or another person's goods, services or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

4. The Food and Drug Administration ("FDA"), and not this court, has primary jurisdiction to enforce the Food, Drug and Cosmetic Act of 1938 ("FDCA"), *21 U.S.C. § 301 et seq.,* and the regulations promulgated thereunder by the FDA. Thus, the FDA has jurisdiction to determine whether the compound referred to here as C[17] in BioZone's CAPTRIX topical analgesic complies with the requirements set forth in the 1979 and 1983 monographs governing the sale and distribution of over-the-counter external analgesics. *Weinberger v. Bentex Pharmaceuticals, Inc., 412 U.S. 645, 653 (1973)* (FDA has jurisdiction in an administrative proceeding to determine whether a drug product is a "new drug" within the meaning of the Food, Drug and Cosmetic Act). The Food and Drug Cosmetic Act has not created, nor has it implied, any private right of action or right to relief for misbranding or any other violation of that Act or FDA regulations. *Pacific Trading Co. v. Wilson & Co., Inc., 547 F.2d 367, 367-8, 370-1 (7th Cir. 1976).* [*35]

5. A private litigant does, however, have a private right of action under the Lanham Act for misrepresentation and false description of any goods, including goods which are governed by the FDCA such as pharmaceuticals and foods. *See Grove Fresh Distributors, Inc. v. Flavor Fresh Foods, Inc., 720 F.Supp. 714, 716 (N.D. Ill. 1989)* (Bau, J.). *See also McNeil-P.C.C., Inc. v. Bristol-Myers Squibb Co., 938 F.2d 1544 (2nd Cir. 1991)* (manufacturer of over-the-counter analgesic sued competitor for false and misleading advertising under Lanham Act); *Tambrands, Inc. v. Warner-Lambert Co., 673 F.Supp. 1190 (S.D.N.Y. 1987)* (manufacturer of home pregnancy test kit brought action against competitor for false and misleading advertising); *Ciba-Geigy Corp. v. Thompson Medical Co., Inc., 672 F.Supp. 679 (S.D.N.Y. 1985)* (appetite suppressant). The FDCA or FDA regulations may be utilized in a Lanham Act action to "establish the standard or duty which defendants allegedly failed to meet." *Grove Fresh, 720 F.Supp. at 716.*

6. In order to show a right to relief for unfair competition or false advertisement [*36] under § 43(a) of the Lanham Act, plaintiff must establish: (a) that defendant made material, false, or misleading representations of fact on or in connection with goods, the containers for goods, commercial advertising, or promotion relating to its product; (b) that the misrepresented goods traveled in interstate commerce; (c) that consumers are likely to be confused, mistaken, or deceived as a consequence; and (d) that plaintiff has been, or is likely to be, damaged either by a direct diversion of sales from itself to the defendant or loss of the good will and acceptability that plaintiff's product enjoys with the buying public. *See Data Cash Systems, Inc. v. JS&A Group, Inc., 223 U.S.P.Q. 865, 866 (N.D. Ill. 1984)* (Hart, J.); *Skil Corp. v. Rockwell International Corp., 375 F.Supp. 777, 783 (N.D. Ill. 1974).*

7. Through its president, Brian Keller, BioZone admitted that it falsely labeled its CAPTRIX box, tube, and package insert as containing capsaicin. Specifically, BioZone labeled CAPTRIX as containing as its active ingredient a chemical compound of a specific empirical formula, molecular weight, chemical structure, and purity under USP [*37] standards. The active ingredient actually contained in CAPTRIX has an empirical formula, molecular weight, and chemical structure different

from the active ingredient in ZOSTRIX. No standard of USP purification exists for either CAPTRIX's active ingredient or capsaicin itself. Misrepresentations as to the contents of a product are actionable under the Lanham Act. *Coca-Cola Company v. Tropicana Products, Inc., 690 F.2d 312, 318 (2nd Cir. 1982)* (false visual demonstration suggesting that orange juice contained only fresh-squeezed, unprocessed juice actionable because it is "clearly a misrepresentation as to that product's inherent quality or characteristic"). Mr. Keller's admissions make it highly probable that Plaintiff will be successful in proving at trial that BioZone's representations are literally false.

8. BioZone's mislabeling of CAPTRIX violates relevant provisions of the Food Drug and Cosmetics Act. BioZone's false representation regarding CAPTRIX's active ingredient violates *21 U.S.C. § 352(a)*, which requires that labels not be false or misleading in any particular, and *21 U.S.C. § 352(e)*, which requires that the label bear the common name of the drug.

[**38] 9. Where a manufacturer makes an advertising claim shown to be literally false, the court may enjoin use of the claim "without reference to the advertisement's impact on the buying public." *McNeil-P.C.C., Inc. v. Bristol-Myers Squibb Co., 938 F.2d 1544, 1549 (2nd Cir. 1991)* (quoting *Coca-Cola Co. v. Tropicana Products, Inc., 690 F.2d 312, 317 (2nd Cir. 1982)*).

10. Plaintiff is not required to show that customers were actually confused or deceived; where a claim is false on its face, the court may grant injunctive relief on the basis of its own conclusion that the challenged representations have the "tendency to deceive." *Stiffel Co. v. Westwood Lighting Group, 658 F.Supp. 1103, 1111 (D.N.J. 1987)*; *Skil Corp. v. Rockwell International Corp., 375 F.Supp. 777, 783 (N.D. Ill. 1974)*; *PPX Enterprises, Inc. v. Audiofidelity Enterprises, Inc., 818 F.2d 266, 272 (2nd Cir. 1987)*. The evidence here supports the conclusion that BioZone's representation -- that capsaicin is the active ingredient in CAPTRIX -- has the tendency to deceive doctors and pharmacists to believe that the product does [**39] in fact contain that ingredient. Although physicians and pharmacists are a well-informed and sophisticated audience, *see Plough, Inc. v. Johnson & Johnson Baby Products, Co., 532 F.Supp. 714, 717-18 (D.Del.*

*1982)*, expert testimony in this case, as well as common sense, support the conclusion that Defendant's concealment of its active ingredient prevents even these sophisticated professionals from learning the true identity of the active ingredient. See *Johnson & Johnson v. GAC Int'l, Inc., 862 F.2d 975, 979-80 (2nd Cir. 1988)* (orthodontists might well be deceived by mislabeled materials used in orthodontic brackets). Similarly, expert testimony here supports the notion that the decision of a doctor or pharmacist to recommend a particular over-the-counter drug depends upon his or her knowledge of the drug's active ingredient. Accordingly, representations as to the identity of the ingredient are necessarily material. The survey performed by Defendant here -- more specifically, telephone interviews with ten physicians -- itself demonstrates that a representation that CAPTRIX contains the same active ingredient as ZOSTRIX would influence a physician's [**40] recommendation that his or her patient purchase the CAPTRIX product.

11. Section 43(a) of the Lanham Act prohibits not only false labeling or misidentification of a product but also false representations in advertising. *Data Cash Systems, Inc. v. JS&A Group, Inc., 223 U.S.P.Q. 865, 866 (N.D. Ill. 1984)* (Hart, J.); *Upjohn Co. v. Riahom Corp., 641 F.Supp. 1209, 1222 (D.Del. 1986)*. A product claim is false under the Lanham Act "if the representations cite tests or other authority that does not substantiate the claim made." *Alpo Petfoods, Inc. v. Ralston Purina Co., 720 F.Supp. 194, 213 (D.D.C. 1989), aff'd in part, rev'd in part on other grounds, 913 F.2d 958 (D.C. Cir. 1990)*. Representations found to be unsupported by accepted authority or research may be deemed false on their face and actionable under § 43(a). *McNeil-P.C.C., Inc. v. Bristol-Myers Squibb Co., 918 F.2d 1544, 1549 (2nd Cir. 1991)* (quoting *Alpo Petfoods, Inc., 720 F.Supp. at 213*).

12. Plaintiff here has met its burden of showing that Defendant has made false statements regarding surveys and clinical [**41] tests by demonstrating that in fact no surveys, no clinical trials, and no tests have been performed on CAPTRIX. In *McNeil-P.C.C., supra,* the court found that plaintiff had met the burden of proving the falsity of defendant's advertising claims simply by showing that defendant's own studies did not support its claims. Here, likewise, Plaintiff's proof of the absence of

any tests, clinical trials, and surveys establishes that BioZone's representations regarding CAPTRIX's characteristics -- representations which could only be authenticated or verified by such tests -- were false when made. Where Defendant lacked clinical proof of its representations, its predictions regarding any particular results from use of its product are false and deceptive. *See Ciba-Geigy Corp. v. Thompson Medical Co., Inc., 672 F.Supp. 679, 690-91 (S.D.N.Y. 1985)* (enjoining marketer of appetite control products from making claims of superior efficacy where such claims were not supported by well-controlled clinical tests). *See also Sandoz Pharmaceuticals Corp. v. Richardson-Vicks, Inc., 902 F.2nd 222, 228 n. 7 (3rd 1990)* ("completely unsubstantiated advertising claims" **[*42]** may be "literally false because the advertiser has absolutely no grounds for believing its claim is true"); *Upjohn Co. v. Riahom Corp., 641 F.Supp. 1209, 1224 (D.Del. 1986)* (manufacturer of hair-growth product entitled to injunction against competitor that claimed its product had been clinically tested and shown safe for use where product had actually been subject to only minimal testing).

13. Defendant's misdescriptions of the specific characteristics of its product may not be excused as "mere puffery," *Stiffel Co. v. Westwood Lighting Group., 658 F.Supp. 1103, 1115 (D.N.J. 1987)* (competitor that based claims of superiority of its lamps on purported independent tests did more than simply allege simple superiority; claims therefore were not protected as "puffing"); *Smith-Victor Corp. v. Sylvania Electric Products, Inc., 242 F.Supp. 302, 308-09 (N.D. Ill. 1965)* (statements ascribing absolute qualities to defendant's product can give rise to legal liability if these statements are not true).

14. GenDerm is likely to prevail on the merits of its claim that CAPTRIX contains an unapproved chemical compound as its active ingredient **[*43]** and that its distribution violates the Food Drug & Cosmetic Act. *See 21 U.S.C. § 331(d), 355(a)*. Bio-Zone's marketing of CAPTRIX constitutes unfair competition; without conducting tests or seeking FDA approval of its own product, BioZone falsely holds out CAPTRIX as containing the same active ingredient that is used in ZOSTRIX and thus exploits GenDerm's costly testing and approval effort by selling CAPTRIX at a lower price.

B. Illinois Deceptive Trade Practices Act (Count IV)

15. The Illinois Uniform Deceptive Trade Practices Act, Ill. Rev. Stat. ch. 121-1/2, para. 311 *et seq.* (1989), provides a cause of action for injunctive relief to a competitor that is or may be harmed by the deceptive trade practices of another. *Greenberg v. United Airlines, 206 Ill. App. 3d 40, 46, 563 N.E.2d 1031, 1036-37 (1st Dist. 1990)*, app. denied, *137 Ill.2d 664, 571 N.E.2d 148 (1991)*; *Pain Prevention Lab, Inc. v. Electronic Waveform Labs, Inc., 657 F.Supp. 1486, 1493 (N.D. Ill. 1987)*; *Brooks v. Midas-International Corp., 47 Ill. App. 3d 266, 274-75, 361 N.E.2d 815, 821 (1st Dist. 1977).* **[*44]**

16. To prevail in an action under the Illinois Uniform Deception Trade Practices Act, plaintiff need not prove actual confusion or misunderstanding on the part of the consuming public. GenDerm has shown it is likely to prevail on the merits of its claims against BioZone under the Act in the following respects: (a) Under the Act, a person engages in a deceptive practice when he "represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have . . . ." Ill. Rev. Stat. ch. 121 1/2, para. 312(7). BioZone has violated this section of the Act (i) by falsely representing CAPTRIX's active ingredient; and (ii) by public characterizing the results of a ten-physician interview as "survey" results and promoting results of clinical tests which were never performed; (b) The Act is also violated when a person "represents that goods or services are a particular standard, quality or grade . . . if they are of another." Ill. Rev. Stat. ch. 121 1/2, para. 312(7). BioZone has violated this section of the Act by falsely representing that the active ingredient in CAPTRIX was "purified, USP" when no such standard exists. Further, **[*45]** by mislabeling the active ingredient and invoking comparisons with ZOSTRIX, BioZone represents CAPTRIX as having properties identical to ZOSTRIX.

C. Trademark Infringement (Count I)

17. The Lanham Trademark Act, *15 U.S.C. § 1051 et seq.,* provides a cause of action to the holder of a registered trademark against a party whose allegedly infringing mark "is likely to cause confusion, or to cause mistake, or to deceive." *15*

*U.S.C. § 1114(a)*. Plaintiff need not demonstrate actual instances of confusion or deception; instead, the court may make a factual determination by considering a variety of factors. *Union Carbide Corp. v. Ever-Ready Inc., 531 F.2d 366, 381-83 (7th Cir.), cert. denied, 429 U.S. 830 (1976); CPC Int'l, Inc. v. Caribe Food Distributors, 731 F.Supp. 660, 664 (D.N.J. 1990); McNeil Labs., Inc. v. American Home Products Corporation, 416 F.Supp. 804, 806 (D.N.J. 1976).*

18. The court's conclusion on the likelihood of confusion is a finding of fact. *Forum Corp. of North America v. Forum, Ltd., 903 F.2d 434, 438 (7th Cir. 1990).* The Seventh Circuit has identified seven **[\*46]** specific factors:

The degree of similarity between the marks in appearance and suggestion; the similarity of the products for which the name is used; the area and manner of concurrent use; the degree of care likely to be exercised by consumers; the strength of the complainant's mark; actual confusion; and an intent on the part of the alleged infringer to palm off his products as those of another.

*McGraw-Edison Co. v. Walt Disney Productions, 787 F.2d 1163, 1167-68 (7th Cir. 1986).* Three of these factors -- the similarity of the marks, defendant's intent, and evidence of actual confusion -- are deemed the more important ones. *Ziebart International Corp. v. After Market Associates, Inc., 802 F.2d 220, 226 (7th Cir. 1986).*

19. Defendant BioZone, as the second entrant into the ethical topical analgesic market, bears the responsibility of choosing a mark which will avoid confusion. *Forum Corp., 903 F.2d at 440-41* (reversing denial of injunctive relief where trial court placed burden on plaintiff, which was first in the marketplace). This responsibility falls upon the subsequent entrant because, as courts have observed:

It is **[\*47]** so easy for the honest business man, who wishes to sell his goods upon their merits, to select from the entire material universe, which is before him, symbols, marks and coverings which by no possibility can cause confusion between his goods and those of his competitors, that the courts look with suspicion upon one who, in dressing his goods for the market, approaches so near to his successful rival that the public may fail to distinguish between them.

*McNeil Labs., Inc. v. American Home Products Corp., 416 F.Supp. 804, 807 (D.N.J. 1976)* (quoting *Florence Mfg. Co. v. J. C. Dowd & Co., 178 F. 73, 75 (2nd Cir. 1910)* (finding mark "Extranol" confusingly similar to "Tylenol").

20. Some authorities suggest that a lower threshold of actionable confusion is appropriate in cases involving pharmaceuticals. *See, e.g., Morgenstern Chem. Co. v. G.D. Searle & Co., 253 F.2d 390, 393 (3d Cir.)* (quoting *Cole Chem. Co. v. Cole Labs, 118 F.Supp. 612, 616-17 (E.D. Mo. 1954)), cert. denied, 358 U.S. 816 (1958).* Indeed, in cases involving pharmaceutical products, the courts have concluded that the use **[\*48]** of an identical suffix -- such as "-TRIX" in this case -- is likely to cause confusion. *See G.D. Searle & Co. v. Chas. Pfizer & Co., 265 F.2d 385, 388-89 (7th Cir.), cert. denied, 361 U.S. 819 (1959)* ("Dramamine" and "Bonamine" confusingly similar); *Pennwalt Corp. v. Becton, Dickinson & Co., 434 F.Supp. 758, 761-63 (D.N.J. 1977)* ("Jockex" and "Cruex" confusingly similar); *McNeil Labs., Inc., 416 F.Supp. at 806-07* ("Extranol" and "Tylenol"); *but see Reedco, Inc. v. Hoffman-La Roche, Inc., 667 F.Supp. 1072, 1079-80 (D.N.J. 1987)* (declining to adopt *Morgenstern's* lower threshold; no showing of likelihood of confusion between over-the-counter psoriasis medication "Tegrin" and prescription psoriasis drug "Tegison").

21. Factors supporting a finding of likely confusion here include the following. The marks share a common suffix and are pronounced similarly. Both appear on boxes of similar size, against a white background, and in close proximity to the words "Cream," "Topical Analgesic," and "(Capsaicin 0.025% w/w)." The products themselves are essentially identical in color and texture; **[\*49]** although ZOSTRIX has a tamper-proof seal, both products are white vanishing creams. The two products are designed for identical use, which is a particularly important factor in the context of medicinal goods, *Syntex Labs., Inc. v. Norwich Pharmacal Co., 437 F.2d 566, 569 (2d Cir. 1971).* Factors gravitating against a conclusion of likelihood of confusion include the absence of evidence regarding either the strength of GenDerm's mark or in-

stances of actual confusion. [4] Further, customers purchasing a product such as ZOSTRIX or CAP-TRIX (ordinarily on a physician's recommendation) are likely to exercise a high degree of care and to seek the assistance of a pharmacist. Perhaps most important, however, the evidence here shows that Brian Keller knew of ZOSTRIX at the time he selected the CAPTRIX mark. BioZone intended for CAPTRIX to be a "branded substitution for ZOS-TRIX." Even a comparatively weak trademark is entitled to protection against manufacturers producing similar goods for similar purposes. *Cf. Victory Pipe Craftsmen, Inc. v. Faberge, Inc., 582 F.Supp. 551, 557 (N.D.Ill. 1984).* GenDerm has shown a likelihood of success on the merits of its [*50] trademark infringement claim.

> 4    GenDerm did not perform a survey to determine the likelihood of confusion. In their depositions, Dr. Bernstein and Mr. Pollard did offer anecdotal hearsay evidence that, when asked whether they carried CAPTRIX cream, at least some pharmacists confused the product with ZOSTRIX.

D. Common Law Unfair Competition and Illinois Trademark Claim (Counts III and IV)

22. GenDerm's common law unfair competition claim (Count III) and its claim under the Illinois anti-dilution provision, Ill. Rev. Stat. ch. 140, para. 22 (1989), (Count IV), are "absorbed in a finding" in GenDerm's favor on the trademark infringement claim (Count I). *James Burrough Ltd. v. Sign of Beefeater, Inc., 540 F.2d 266, 274-75 n. 16 (7th Cir. 1976).* [5] Discussion of these claims is therefore unnecessary, *id.,* and GenDerm has shown it is likely to prevail on the merits of those claims, as well.

> 5    Defendant argues that the Illinois trademark law does not provide a cause of action for competitors. Although some authorities so hold, *see Tower Publications, Inc. v. MTS Inc., 21 U.S.P.Q.2d 1303, 1305 (N.D. Ill. 1991)*; *EZ Loader Boat Trailers, Inc. v. Cox Trailers, Inc., 746 F.2d 375, 380 (7th Cir. 1984)*, Defendant's interpretation is not supported by the plain language of the Act. Earlier authorities, consistent with that plain language, interpret the protections of the Illi-

nois law as broader than federal trademark law, thus authorizing relief even to a party that is not necessarily a competitor. *See John Morrell & Co. v. Reliable Packing Co., 172 F.Supp. 276, 276-77 (N.D. Ill. 1959)*; *see also Alberto-Culver Co. v. Andrea Dumon, Inc., 466 F.2d 705, 709 (7th Cir. 1972)*; *Polaroid Corp. v. Polaraid, Inc., 319 F.2d 830, 836-37 (7th Cir. 1963).*

[*51] E. Claim of Unfair Competition under California law (Count VI)

23. "Unfair competition" is prohibited by California law. *Section 17200 of the California Business and Professions Code* prohibits "unlawful, unfair or fraudulent business practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by *[Section 17500* of the Code]." *Section 17500*, in turn, prohibits any "false or misleading statements" made to promote the sale of a product or service. *Cal. Bus. & Prof. Code §§ 17200, 17500* (West 1987). California law provides a private cause of action for injunctive relief against violations of these provisions, §§ 17203, 17535, and case law demonstrates that competitors, too, may avail themselves of such a cause of action. *See Chronicle Publishing Co. v. Chronicle Publications, Inc., 733 F.Supp. 1371, 1380-81 (N.D.Cal. 1989)*; *Century 21 Real Estate Corp. v. Sandlin, 846 F.2d 1175, 1180-81 (9th Cir. 1988).*

24. To recover under *§ 17500*, plaintiff need only show that members of the public are likely to be deceived. *People v. Dollar Rent-A-Car Sys., Inc., 211 Cal. App. 3d 119, 129, 259 Cal. Rptr. 191, 197 (1st Dist. 1989).* [*52] Proof of actual deception, reasonable reliance, and damages are unnecessary. *Committee on Children's Television, Inc. v. General Foods Corp., 35 Cal. 3d 197, 211, 673 P.2d 660, 668, 197 Cal. Rptr. 783, 791 (Cal. 1983).*

25. In granting an injunction in *Chronicle Publishing,* the court characterized a claim of unfair competition under *§ 17200* as "virtually identical" to a claim under section 43(a) of the Lanham Act, *15 U.S.C. § 1125(a). 733 F.Supp. at 1380.* Similarly, evidence establishing that defendant adopted a trade name sufficiently similar to plaintiff's to create a "likelihood of confusion" under federal law supports a finding that plaintiff should prevail under *§ 17500. Cf. Chronicle Publishing, 733 F.Supp. at*

*1381*. GenDerm has demonstrated a likelihood of success on the merits of its California state law claims.

## II. Irreparable Injury

26. Under both the Lanham Act and the Illinois Uniform Deceptive Trade Practices Act, the court may presume that irreparable injury will result where there is a likelihood of proving consumer confusion. See *Calvin Klein Cosmetics Corp. v. Lenox Labs., Inc., 815 F.2d 500, 505 (8th Cir. 1987);* **[*53]** *Bonner v. Westbound Records, Inc., 49 Ill. App.3d 543, 551, 364 N.E.2d 570, 576 (1st Dist. 1977).* Further, where, as here, a defendant's representations are literally false, irreparable injury is presumed. *Coca-Cola Co. v. Tropicana Products, Inc., 690 F.2d 312, 317-318 (2nd Cir. 1982); Tambrands, Inc. v. Warner-Lambert Co., 673 F.Supp. 1190, 1195 (S.D.N.Y. 1987).*

27. Even without the benefit of the presumption, GenDerm has established that BioZone's representations are likely to cause irreparable injury. GenDerm has presented a reasonable basis for such a conclusion, *see Johnson & Johnson v. Carter-Wallace, Inc., 631 F.2d 186, 190 (2nd Cir. 1980);* GenDerm and BioZone are the only direct competitors in the ethical topical analgesic market, and any sales of CAPTRIX correspondingly result in a loss of sales of ZOSTRIX.

28. Moreover, the mislabeling of CAPTRIX induces doctors and pharmacists to believe that this product is the same as ZOSTRIX. If CAPTRIX does not provide effective relief or causes unintended side effects, doctors and pharmacists are likely to conclude that ZOSTRIX will share **[*54]** the same shortcomings. Such circumstances support the conclusion that BioZone's deceptive claims will deny GenDerm part of the legitimate market for GenDerm's tested product, *see Upjohn Co. v. Riahom Corp., 641 F.Supp. 1209, 1225 (D.Del. 1986),* and may irreparably harm ZOSTRIX's reputation and goodwill. *Wynn Oil Co. v. American Way Service Corp., 943 F.2d 595, 607-08 (6th Cir. 1991); Premier Dental Products Co. v. Darby Dental Supply Co., 794 F.2d 850, 859 (3d Cir.), cert. denied, 479 U.S. 950 (1986).*

## III. Balance of Equities

29. A balance of the equities favors Plaintiff. For several years, GenDerm has spent millions of dollars in advertising and promotion costs and in educating physicians and pharmacists. It has conducted numerous clinical tests. The time and money spent by a manufacturer in developing a product may properly be considered when assessing the balance of equities. *Upjohn Co., 641 F.Supp. at 1225.* In contrast, here as in *Upjohn,* "defendants have invested next to nothing in the discovery and development of their product." *Id.* Some authority suggests that **[*55]** enjoining further production of a new product, before it has attained success, may be a "kindness" in that the enjoined party is spared potential further challenges to its mark. *See Bertolli USA, Inc. v. Filippo Bertolli Fine Foods, Ltd., 662 F.Supp. 203, 206 (S.D.N.Y. 1987)* (quoting *George Washington Mint, Inc. v. Washington Mint, Inc., 349 F.Supp. 255, 263 (S.D.N.Y. 1972)).* In any event, BioZone's owners knew at the time they marketed CAPTRIX that the product's active ingredient was not what they represented it to be. They therefore acted at their peril that such marketing would be enjoined. *See Atari, Inc. v. North American Philips Consumer Electronics Corp., 672 F.2d 607, 620* (7th Cir.), *cert denied, 459 U.S. 880 (1982); Helene Curtis Indus., Inc. v. Church & Dwight Co., Inc., 560 F.2d 1325, 1333-34 (7th Cir. 1977).*

## IV. Public Interest

30. The public interest will not be disserved by entry of a preliminary injunction. To the contrary, a strong public interest in preventing misleading advertisements, particularly with respect to pharmaceutical products, supports injunctive relief. **[*56]** *American Home Prods. Corp. v. Johnson & Johnson, 654 F. Supp. 568, 590 (S.D.N.Y. 1987); see also SK&F, Co. v. Premo Pharmaceutical Labs, 625 F.2d 1055, 1067 (3d Cir. 1980); American Home Prods. Corp. v. Chelsea Labs., Inc., 572 F.Supp. 278, 286 (D.N.J. 1982), aff'd, 722 F.2d 730 (3d Cir. 1983); Morgenstern Chem. Co. v. G.D. Searle & Co., 253 F.2d 390, 393-94 (3d Cir.), cert. denied, 358 U.S. 816 (1958).* The public interest will be served by the grant of a preliminary injunction because consumers have a right to know what it is that they are purchasing. *C.B. Fleet Co., Inc. v. Complete Packaging Corp., 739 F.Supp. 393, 399 (N.D. Ill. 1990)* (recognizing public interest in accu-

rate labeling of feminine hygiene products). Although the public interest in competitive pricing permitted the manufacture and distribution of an imitation designer perfume in *Calvin Klein Cosmetics Corp. v. Lenox Labs., Inc.,* 815 F.2d 500, 505 (8th Cir. 1987), the court there concluded that the imitator could use the originator's trademark in a "truthful [*57] way" when advertising that the imitator's product was a copy, so long as such use was unlikely to create confusion in the consumer's mind as to the source of the product being sold. *Id. at 503.* BioZone, here, however, has not truthfully informed the public as to the actual contents of its product and, consequently, its advertising is likely to create confusion in the minds of consumers.

V. Unclean Hands

31. BioZone has challenged GenDerm's standing to seek the equitable relief of a preliminary injunction on the grounds that GenDerm itself is in violation of FDA regulations and therefore has "unclean hands." Specifically, BioZone points out that GenDerm is marketing ZOSTRIX for the "relief following shingles (herpes zoster)," although the FDA has not approved ZOSTRIX for this use. Further, BioZone notes GenDerm's stipulation that dihydrocapsaicin is present in ZOSTRIX. Finally, BioZone suggests it was somehow improper for Dr. Bernstein to develop a commercial product that utilizes a compound he studied with the benefit of university research facilities and support. These circumstances do not show that GenDerm has unclean hands by "'clear, unequivocal and convincing' [*58] evidence," as is required to bar GenDerm's claim for relief under the Lanham Act. *American Home Prods. Corp. v. Johnson & Johnson,* 654 F.Supp. 568, 590 (S.D.N.Y. 1987) (declining to recognize unclean hands defense against plaintiff seeking injunction against false advertising of aspirin) (quoting *Nike, Inc. v. Rubber Mfrs. Ass'n, Inc.,* 509 F.Supp 919, 926 (S.D.N.Y. 1981)). With respect to the claim that ZOSTRIX is being marketed for an unapproved use, GenDerm has demonstrated that its good faith reliance on the advice of competent counsel regarding its labeling bars use of the unclean hands defense. *See HGN Corp. v. Chamberlain, Hrdlicka, White, Johnson & Williams,* 642 F. Supp. 1443, 1454-55 (N.D. Ill. 1986). Nor does the presence of dihydrocapsaicin in the CAPTRIX product taint GenDerm's claims here. Dihydrocap-

saicin is a compound that occurs naturally in capsicum. Capsicum is expressly authorized for use in over-the-counter medications by the FDA monographs. GenDerm properly accounts for the presence of the dihydrocapsaicin by including sufficient quantities of the capsaicin powder so that the finished product in fact contains [*59] 0.025% capsaicin by weight. Nor has BioZone identified any impropriety in Dr. Bernstein's reliance on prior academic work in GenDerm's commercial activity. The unclean hands defense is not available to bar equitable relief.

DISCUSSION

As described more fully in the findings and conclusions set out above, GenDerm has demonstrated that it has a substantial likelihood of prevailing on the merits of its claims of false labeling and false advertising claims under the Lanham Act, its trademark infringement claim, and its related state law claims. Perhaps most damaging to BioZone was the admission of its president, Brian Keller, of knowledge before the marketing of CAPTRIX that the product did not contain the active ingredient identified on its label and described in detail on its package insert. BioZone's representations are literally false. Although irreparable harm to GenDerm may be presumed from such literal falsity, GenDerm has gone further here and adduced expert testimony that the mislabeling may result in recommendations by pharmacists that patients purchase the lower-priced CAPTRIX out of the mistaken belief that this product is the pharmacological equivalent of ZOSTRIX. [*60] If the active ingredient in CAPTRIX is ineffective or harmful, attribution of the dissatisfaction to capsaicin (rather than to CAPTRIX's untested active ingredient) could well result in irreparable harm to ZOSTRIX's reputation and goodwill.

BioZone urges that there is some evidence that its active ingredient, nonivamide, has substantially similar properties to those of capsaicin. BioZone is correct in its contention that the court is not capable of making a determination regarding the safety or efficacy of its product. That argument, however, dooms BioZone's insistence that GenDerm must bear a burden of demonstrating that CAPTRIX is not safe and effective. The court is not capable of determining that such a burden has been met. GenDerm has proven here that BioZone's claims regard-

ing CAPTRIX are literally false. There are no scientific studies on human subjects comparing (1) nonivamide to a placebo; (2) nonivamide to capsaicin; or (3) CAPTRIX to ZOSTRIX. This proof is adequate to support injunctive relief.

GenDerm has suggested that the court seek an advisory opinion from the FDA regarding the acceptability of BioZone's use of nonivamide, pursuant to *section 10.85* of the Administrative **[\*61]** Practices and Procedures for the Department of Health and Human Services, *21 C.F.R. § 10.85 (1991)*. Although the regulation does authorize a request for an advisory opinion on a "matter of general applicability," subparagraph (a)(2)(iv) specifically provides that such a request may be denied if it "covers a particular product or ingredient or label and does not raise a policy issue of broad applicability . . . ." In any event, as both parties' drug law experts acknowledged, over-the-counter drug labeling is not exclusively within the province of the FDA. Even without regard to the FDA's possible conclusions regarding whether a topical analgesic having nonivamide as its active ingredient is fairly authorized by the 1979 and 1983 monographs, this court can conclude that GenDerm has demonstrated that it is likely to prevail on the merits of its false labeling and unfair competition claims.

GenDerm is likely to prevail on its substantive claims against BioZone. Absent injunctive relief, GenDerm may suffer irreparable injury. The balance of hardships favors such relief, and an injunction is not adverse to the public interest. GenDerm's motion should be granted on the terms proposed in **[\*62]** its draft order except that the court need not request an advisory opinion from the FDA.

ENTER:

REBECCA R. PALLMEYER

United States Magistrate Judge

Date: June 12, 1992

LEXSEE 462 F. SUPP. 2D 1122

**HONOR PLASTIC INDUSTRIAL CO. LTD and P&P INTERNATIONAL INC., Plaintiffs, v. LOLLICUP USA, INC., Defendant.**

**CIV-F-06-0707 AWI DLB**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF CALIFORNIA**

*462 F. Supp. 2d 1122; 2006 U.S. Dist. LEXIS 83639*

**November 3, 2006, Decided**
**November 3, 2006, Filed**

**SUBSEQUENT HISTORY:** Motions ruled upon by *Honor Plastic Indus. Co. v. Lollicup USA, Inc., 462 F. Supp. 2d 1122, 2006 U.S. Dist. LEXIS 92530 (E.D. Cal., Dec. 18, 2006)*

**PRIOR HISTORY:**    **[**1]** (Docs. 31 and 65). *Honor Plastic Indus. Co. v. Lollicup USA, Inc., 2006 U.S. Dist. LEXIS 82030 (E.D. Cal., Oct. 31, 2006)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs, a disposable cup manufacturer and its current distributor, filed a motion for a preliminary injunction prohibiting defendant former distributor from using the manufacturer's trademarks in advertising or selling any disposable cup related product. Defendant filed a cross-motion for a preliminary injunction to prohibit plaintiffs from using the word mark at issue.

**OVERVIEW:** The manufacturer asserted trademark rights in a mark that was used on its plastic cups. The manufacturer's application with the Patent and Trademark Office for the mark was under review. The manufacturer also asserted rights in the word "honor" in the context of plastic cup and related product branding and marketing. After the manufacturer terminated its agreement with defendant's parent company, which provided that defendant would be the manufacturer's exclusive distributor in the United States, defendant registered "Honor USA" as a service mark and registered the manufacturer's mark as a trademark with the State of California. Plaintiffs alleged that defendant also began manufacturing and selling plastic cups bearing the manufacturer's mark. The court found that plaintiffs were entitled to a preliminary injunction because they demonstrated probable success on their trademark infringement claim. The evidence showed that the manufacturer was the owner of the trademarks and that defendant's initial use was simply distribution of the manufacturer's product. Further, there was a likelihood of confusion because the marks were identical and were affixed on the same type of products.

**OUTCOME:** The court granted plaintiffs' motion and enjoined defendant from using the trademarks or any confusingly similar variation thereof. The court denied defendant's motion for a preliminary injunction.

**CORE TERMS:** plastic, trademark, cup, silhouettes, distributor, preliminary injunction, selling, registration, manufacturer, ownership, trademark infringement, lid, marketing, brand, enjoined, website, citations omitted, independently, distributing, registered, disposable, variation, confusingly, business name, service mark, advertising, descriptive, abandonment, terminated, fictitious

**LexisNexis(R) Headnotes**

*Trademark Law > Federal Unfair Competition Law > Lanham Act > General Overview*
[HN1] See *15 U.S.C.S. § 1125(a)(1).*

*Evidence > Inferences & Presumptions > Presumptions*
*Trademark Law > Federal Unfair Competition Law > Lanham Act > Remedies*
*Trademark Law > Infringement Actions > Remedies > Equitable Relief > Preliminary Injunctions*
*Trademark Law > Likelihood of Confusion > General Overview*
[HN2] A plaintiff is entitled to a preliminary injunction in a trademark case when it demonstrates either (1) a combination of probable success on the merits and the possibility of irreparable injury or (2) the existence of serious questions going to the merits and that the balance of hardships tips sharply in his favor. With trademark suits, likelihood of confusion is the indispensible element. In order to show a probability of success in the causes of action for trademark infringement, false designation of origin and unfair competition, parties need show that a likelihood of confusion exists. Irreparable injury may be presumed from a showing of likelihood of success on the merits of a trademark infringement claim. A plaintiff is therefore entitled to a preliminary injunction in a trademark case simply when it shows a likelihood of confusion. The same standard applies to registered and unregistered trademarks.

*Trademark Law > Subject Matter > General Overview*
*Trademark Law > Subject Matter > Secondary Meaning > General Overview*
[HN3] There are five categories of trademarks: (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; and (5) fanciful. The latter three categories are deemed inherently distinctive and are automatically entitled to protection because they naturally serve to identify a particular source of a product. A descriptive mark can receive trademark protection if it has acquired distinctiveness by establishing "secondary meaning" in the marketplace.

*Trademark Law > Protection of Rights > Abandonment > General Overview*
[HN4] The Lanham Act deems a mark "abandoned" when its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances. Nonuse for three consecutive years shall be prima facie evidence of abandonment. "Use" of a mark means the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark. *15 U.S.C.S. § 1127*. Minor changes in a mark which do not change the basic, overall commercial impression created on buyers will not constitute any abandonment. So long as the owner continues use of the key element of the registered mark, courts generally will not find abandonment.

*Evidence > Inferences & Presumptions > Presumptions*
*Evidence > Inferences & Presumptions > Rebuttal of Presumptions*
*Evidence > Procedural Considerations > Burdens of Proof > Preponderance of Evidence*
*Trademark Law > Protection of Rights > Registration > Evidence*
[HN5] It is axiomatic in trademark law that the standard test of ownership is priority of use. To acquire ownership of a trademark it is not enough to have invented the mark first or even to have registered it first; the party claiming ownership must have been the first to actually use the mark in the sale of goods or services. When proving ownership of a trademark, federal registration of the mark is prima facie evidence that the registrant is the owner of the mark. Therefore, the registrant is granted a presumption of ownership, dating to the filing date of the application for federal registration, and the challenger must overcome this presumption by a preponderance of the evidence.

*Trademark Law > Infringement Actions > Defenses > Good-Faith Remote Users*
*Trademark Law > Protection of Rights > Priority > General Overview*
[HN6] In the ordinary case of parties competing under the same mark in the same market, it is correct to say that prior appropriation settles the ques-

462 F. Supp. 2d 1122, *; 2006 U.S. Dist. LEXIS 83639, **

tion of ownership. But where two parties independently are employing the same mark upon goods of the same class, but in separate markets wholly remote the one from the other, the question of prior appropriation is legally insignificant, unless at least it appear that the second adopter has selected the mark with some design inimical to the interests of the first user, such as to take the benefit of the reputation of his goods, to forestall the extension of his trade, or the like.

**Evidence > Inferences & Presumptions > Presumptions**
**Trademark Law > Conveyances > Licenses**
**Trademark Law > Infringement Actions > Determinations**
**Trademark Law > Protection of Rights > General Overview**

[HN7] When disputes arise between a manufacturer and distributor, courts will look first to any agreement between the parties regarding trademark rights. But in the absence of an agreement between the parties, the manufacturer is presumed to own the trademark. That presumption applies with equal force to cases involving foreign manufacturers.

**Trademark Law > Infringement Actions > Burdens of Proof**
**Trademark Law > Infringement Actions > Determinations**
**Trademark Law > Likelihood of Confusion > Consumer Confusion > Circuit Court Factors > 9th Circuit Court**

[HN8] A plaintiff will succeed on the merits of its trademark infringement claim under the Lanham Act if it establishes that the defendant's use of its mark gives rise to a "likelihood of confusion" in the consuming public. A likelihood of confusion exists when consumers are likely to assume that a product or service is associated with a source other than its actual source because of similarities between the two sources' marks or marketing techniques. The United States Court of Appeals for the Ninth Circuit has developed an eight-factor test to assess likelihood of confusion: (1) strength of the allegedly infringed mark; (2) proximity or relatedness of the goods; (3) similarity of the sight, sound, and meaning of the marks; (4) evidence of actual confusion;

(5) degree to which the marketing channels converge; (6) type of goods and degree of care consumers are likely to exercise in purchasing them; (7) intent of the defendant in selecting the allegedly infringing mark; and (8) likelihood that the parties will expand their product lines. A trial court need not formally consider all of these factors at the preliminary injunction stage.

**Trademark Law > Likelihood of Confusion > Consumer Confusion > Circuit Court Factors > 9th Circuit Court**

[HN9] Notwithstanding the other "likelihood of confusion" factors, the United States Court of Appeals for the Ninth Circuit has said it is clear error for a trial court to find no likelihood of confusion when two products with virtually identical marks are in the same market.

COUNSEL: For Honor Plastic Industrial Co. Ltd., a Taiwanese company, P&P International, Inc., a California corporation, Plaintiffs: J. Pieter Van Es - PRO HAC VICE, Michael L. Krashin - PRO HAC VICE, Wendell W. Harris - PRO HAC VICE, Banner & Witcoff, Ltd., Chicago, IL, US.; Mark D. Miller, Kimble, MacMichael and Upton, Fresno, CA.

For Lollicup USA, Inc., a California corporation, Defendant: Charles Michael Farano, Farano & Kieviet, LLP, Anaheim, CA.

Honor Plastic Industrial Co. Ltd., a Taiwanese company, P&P International, Inc., a California corporation, Cross Defendants.

Lollicup USA, Inc., a California corporation, Counter Claimant.

For Honor Plastic Industrial Co. Ltd., a Taiwanese company, P&P International, Inc., a California corporation, Counter Defendants: Wendell W. Harris - PRO HAC VICE, Banner & Witcoff, Ltd., Chicago, IL, US.

For Lollicup USA, Inc., a California corporation, Cross Claimant: Charles Michael Farano, Farano & Kieviet, LLP, Anaheim, CA.

462 F. Supp. 2d 1122, *; 2006 U.S. Dist. LEXIS 83639, **

**JUDGES:** Anthony W. Ishii, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Anthony W. Ishii

**OPINION**

**[\*1124] ORDER RE: PRELIMINARY INJUNCTION**

Plaintiffs have moved for a preliminary injunction prohibiting Defendant [\*\*2] from using several trademarks. Defendant opposed the motion. Oral argument was held on October 25, 2006. For the following reasons, the Plaintiffs' motion is granted.

**I. History**

Plaintiffs in the case are Honor Plastic Industrial Co., Ltd. [1] ("Honor Plastic") and P&P International, Inc. ("P&P"). Honor Plastic is a Taiwanese company that **[\*1125]** manufactures a variety of products. For the U.S. market, Honor Plastic made plastic cups and lids with distinctive marks on them starting in 2004. The first mark to be used showed the word "Honor" capitalized with cup silhouettes forming the middle of the "o"s and with curved arrows above and below, forming a circle ("Silhouette Mark"). Honor Plastic filed an application with the U.S. Patent and Trademark Office for this mark on June 30, 2004. The application indicated that the Silhouette Mark was first used in commerce on June 25, 2004. Doc. 34, Ex. O. The application was published for comment on May 3, 2005 and received no opposition. The trademark (Registration No. 2,976,261) was granted on July 26, 2005. The second mark used is identical to the Silhouette Mark, but omits the cup silhouettes in the middle of the "o"s ("Plain Mark"). Honor [\*\*3] Plastic file an application with the U.S. Patent and Trademark Office for the Plain Mark on August 15, 2005 (Serial No. 78693049). The application is still under review and has not yet been published for comment. Honor Plastic asserts trademark rights in both the Silhouette and Plain Marks. Honor Plastic also asserts rights in the word "honor" itself in the context of plastic cup and related product branding and marketing ("Word Mark").

[1] Honor Plastic's original name is in Chinese. Though a more direct translation might use the term "prosperity" instead of "honor," the company has called itself Honor Plastic Industrial Co., Ltd. in English documents since April 2004 at the latest. Doc. 33, Exs. D and E. Honor Plastic also sold product to customers in California under the Honor Plastic name as early as September 2004. Doc. 33, Exs. H and I. In its papers, Lollicup refers to Honor Plastic as Rong-Chin, a transliteration of the Chinese name. Nevertheless, as Honor Plastic has submitted letterhead, shipping documents, and other papers referring to itself as Honor Plastic Industrial Co, Ltd., that is the name that will be used.

[\*\*4] On April 17, 2004, Honor Plastic signed an agreement with CTT International, Inc. ("CTT") of Atlanta, GA which made CTT the exclusive distributor of Honor Plastic's products throughout the United States. One shipment of product was made, totaling $ 32,999 worth of goods. Doc. 33, Ex. D. The boxes in which the products were shipped bore the Silhouette Mark and the words "HONOR USA." [2] Doc. 33, Ex. C. Notwithstanding the agreement with CTT, Honor Plastic directly sold a shipment of plastic cup related products with a value of $ 21,716 (bearing the Silhouette Mark) to Bubble & Crepe (formally named Honor Trading Company in the documents) of Pleasant Hill, CA in September 2004,. Doc. 33, Exs. G, H, I, and J. Honor Plastic terminated the agreement with CTT on December 31, 2004.

[2] There is uncertainty as to whether "Honor USA" was a reference to Honor Plastic or to CTT. The boxes also bore the word "CTT" and a symbol that appears to be a graphical design signifying CTT.

On January 1, 2005, Honor Plastic signed [\*\*5] or endorsed a contract ("Original Agreement") with Taijoint, Inc. ("Taijoint"), another Taiwan company, for Taijoint to be Honor Plastic's exclusive agent for market development and sales in the U.S. market. Doc. 33, Ex. L (Chinese original) and Doc. 34, Ex. Q (English translation). The Original Agreement specified that several of Taijoint's duties under the contract could be performed by Lollicup,

Case 1:08-cv-00526    Document 157-3    Filed 09/10/2008    Page 45 of 101

Page 5

462 F. Supp. 2d 1122, *; 2006 U.S. Dist. LEXIS 83639, **

Taijoint's "U.S. subsidiary company." Doc. 34, Ex. Q. [3] In addition to [*1126] selling plastic cup products, Lollicup also operates a boba tea shop and sells supplies to affiliated boba tea shops. It appears that Lollicup first purchased Honor Plastic cup products for its own use in early 2004. [4] The exact date on which Lollicup first sold Honor Plastic product to third parties is unclear; Lollicup claims to have begun those sales in August or September 2004 and to have held itself out as the original source of the goods. Doc. 50, Yu Declaration, at 2:14-25. Lollicup filed a fictitious business name statement for "Honor America Inc." and "Honor USA Inc." in the County of Los Angeles sometime in February 2005. Doc. 50, Ex. A (no indication of date statement was on the form). On that statement, [**6] Lollicup indicated that it has not yet begun to transact business under those names. On November 17, 2005, Honor Plastic and Taijoint entered into a nonexclusive distribution contract ("Amended Agreement") which superceded the Original Agreement. Doc. 15, Ex. B. The Amended Agreement made no mention of Lollicup.

> 3    Honor Plastic says that the Original Agreement made Lollicup its exclusive distributor in the United States. At oral argument on October 25, 2006, Lollicup's attorney said that Lollicup is not corporately affiliated with Taijoint. The owner of Taijoint is the brother-in-law of a director-shareholder of Lollicup. Furthermore, there is no ongoing contractual relationship between the two; Lollicup submits purchase orders to Taijoint for specific shipments of goods. Notwithstanding these verbal assertions, the evidence suggests that Honor Plastic's characterization of the relationship is accurate. In another suit where Lollicup and Honor Plastic were co-plaintiffs, the complaint stated, "Lollicup is the exclusive distribution agent of [Honor Plastic] and is authorized to distribute products under the 'Honor' trademark in the United States." Doc. 34, Ex. S, at 2:7-12. As part of that litigation Alan Yu, Lollicup's president, stated on October 6, 2005, "That [Lollicup] is the exclusive distributor for [Honor Plastic] in the United States." Doc. 68, Ex. FF, Yu Declaration, at 1:22-24. The court accepts Lollicup

as Taijoint's subsidiary and considers Lollicup to be Honor Plastic's former exclusive distributor in the United States.

[**7]

> 4    Whether this sale was made directly to Lollicup by Honor Plastic or whether this was a sale made through CTT is not specified.

At an unspecified time in 2005 Honor Plastic began distributing plastic cups and lids bearing the Plain Mark in addition to the Silhouette Mark through Lollicup. As stated above, Honor Plastic applied for registration of the Plain Mark on August 15, 2005. On September 20, 2005, the Solo Cup Co. ("Solo") sued Honor Plastic and Lollicup for trademark infringement over the use of cup silhouettes in the Silhouette Mark. Honor Plastic and Lollicup countersued, and litigation ensued. [5] On June 8, 2006, Honor Plastic and Lollicup jointly entered into a settlement with Solo whereby Honor Plastics and Lollicup agreed to discontinue use of any cup silhouettes in its trademarks, essentially giving up the Silhouette Mark while retaining the use of the Plain Mark. Doc. 22, Ex. B. Harris Declaration.

> 5    In that suit, it appears that Honor Plastic and Lollicup were jointly represented by Charles Farano, Lollicup's counsel in this suit. As no party has raised any issue with the representation, the court presumes that any conflict has been waived by Honor Plastic.

[**8] Sometime in late 2005 or early 2006, Honor Plastic terminated the Amended Agreement with Taijoint and ultimately selected P&P, based in Selma, CA, to be its new distributor in the U.S. Lollicup registered "Honor USA" as a service mark (Registration No. 61,563) and the Plain Mark as a trademark (Registration No. 00111367) with the State of California on. January 4, 2006. [6] In late May-early June, Lollicup sent letters to Honor Plastic, P&P, and Plast Techs Enterprises ("Plast Techs," a P&P client) demanding they cease and desist from selling products bearing the Plain Mark. Plaintiffs allege that Lollicup has recently begun manufacturing and selling plastic cups bearing the Plain Mark. In addition, Lollicup has been selling goods bearing the Plain Mark on its websites (www.lollicupstore.com and www.honorusa.com).

462 F. Supp. 2d 1122, *; 2006 U.S. Dist. LEXIS 83639, **

6  Lollicup claims that it applied for the state trademark and service marks in January 2005. Doc. 51, Opposition, at 7:13; Doc. 50, Yu Declaration, at 8:3-5. However, the copies of those applications show that they were made on January 4, 2006. Doc. 34, Exs. U and V.

[**9]  Honor Plastic and P&P filed the present suit against Lollicup for trademark infringement in Fresno on June 6, 2006. The operative complaint is the First Amended Complaint Doc. 15. In pertinent part, Plaintiffs allege trademark infringement under federal and California law and interference with a contractual relationship [*1127] under California law. They seek monetary damages, declaratory relief, and to have Lollicup's California trademark and service mark registrations cancelled.

Meanwhile, Lollicup filed suit against P&P and Plast Techs in the Los Angeles Superior Court on various causes of action related to trademark infringement. The complaint was dated June 4, 2006 but was not filed with the clerk's office until June 8, 2006. That court stayed that case on August 1, 2006. Lollicup then filed suit in the Central District of California on August 16, 2006. On October 19, 2006, Lollicup filed a cross claim against Honor Plastic, P&P, and Plast Techs in this suit for trademark infringement.

Plaintiffs seek a preliminary injunction preventing Lollicup from using any of the Trademarks in advertising or selling any a disposable cup related product. Plaintiffs filed their motion on September 6, 2006, with [**10] hearing set for October 10, 2006.. Lollicup did not file a timely opposition and instead filed an ex parte application to continue the hearing on September 29, 2006. The court transformed the scheduled hearing to one for a temporary restraining order. On October 10, 2006, the hearing was held. The court granted a temporary restraining order enjoining Lollicup from using the Plain Mark or any other confusingly similar mark subject to Honor Plastic's posting of a $ 25,000 bond. Honor Plastic deposited the funds and the preliminary injunction hearing was reset for October 25, 2006. Lollicup filed a timely opposition and Plaintiffs filed a timely reply. Oral argument was held on that date.

## II. Legal Standards

Title *15 U.S.C. § 1125(a)(1)* states: [HN1] "Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which- (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or [**11] association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act."

[HN2] "A plaintiff is entitled to a preliminary injunction in a trademark case when it demonstrates either (1) a combination of 'probable success on the merits' and 'the possibility of irreparable injury' or (2) the existence of 'serious questions going to the merits' and that 'the balance of hardships tips sharply in his favor.'" *GoTo.com, Inc. v. Walt Disney Co., 202 F.3d 1199, 1204-5 (9th Cir. 2000)*, quoting *Sardi's Restaurant Corp. v. Sardie, 755 F.2d 719, 723 (9th Cir. 1985)*. With trademark suits, likelihood of confusion is the indispensible element. "[I]n order to show a probability of success in the causes of action for trademark infringement, false designation of origin [**12] and unfair competition, [parties] need show that a likelihood of confusion exists." *Sardi's Restaurant Corp. v. Sardie, 755 F.2d 719, 723 (9th Cir. 1985)*, citations omitted. "[I]rreparable injury may be presumed from a showing of likelihood of success on the merits of a trademark infringement claim." *Brookfield Communs., Inc. v. West Coast Entertainment Corp., 174 F.3d 1036, 1066 (9th Cir. 1999)*, citing *Metro Publ'g, Ltd. v. San Jose Mercury News, 987 F.2d 637, 640 (9th Cir. 1993)*. "[A] plaintiff is therefore entitled [*1128] to a preliminary injunction in a trademark case simply when it shows a likelihood of confusion." *GoTo.com, Inc. v. Walt Disney Co., 202 F.3d 1199, 1205 (9th Cir. 2000)*. The same standard applies to registered and unregistered

Case 1:08-cv-00526    Document 157-3    Filed 09/10/2008    Page 47 of 101

Page 7

462 F. Supp. 2d 1122, *; 2006 U.S. Dist. LEXIS 83639, **

trademarks. See *Brookfield Communs., Inc. v. West Coast Entertainment Corp., 174 F.3d 1036, 1046 n.6 (9th Cir. 1999).*

### III. Discussion

In this motion Plaintiffs claim they can demonstrate probable success on the merits; Plaintiffs do not argue the alternative standard (case raises serious questions and the balance of hardships tips sharply in their favor).

### [**13] A. Trademarks in Question

Plaintiffs assert protection in the Word Mark ("Honor") itself. [HN3] "There are five categories of trademarks: (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; and (5) fanciful. The latter three categories are deemed inherently distinctive and are automatically entitled to protection because they naturally serve to identify a particular source of a product.... A descriptive mark can receive trademark protection if it has acquired distinctiveness by establishing 'secondary meaning' in the marketplace." *Yellow Cab Co. v. Yellow Cab of Elk Grove, Inc., 419 F.3d 925, 927 (9th Cir. 2005),* citations omitted. The burden of proof is on Plaintiffs to establish that the Word Mark is subject to trademark protection, but Lollicup has not asserted that the Word Mark is generic or descriptive without secondary meaning. Lollicup has been doing business as Honor USA and has a website *(www.honorusa.com)*. Granting a preliminary injunction as to the Word Mark would force Lollicup to give up the fictitious business name, restrict use of the website, and would prohibit Lollicup's use of the "Honor" brand in selling disposable cups and related **[**14]** products.

The relationship between the Silhouette and the Plain Marks must be clarified. The products which Lollicup are now selling bear the Plain Mark. Much of the evidence presented by Plaintiffs refers to sales of products bearing the Silhouette Mark. [HN4] The Lanham Act deems a mark "abandoned," "[w]hen its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances. Nonuse for 3 consecutive years shall be prima facie evidence of abandonment. 'Use' of a mark means the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a

mark." *15 U.S.C. § 1127*. Due to the settlement with Solo, Honor Plastic expressed its intent to abandon the Silhouette Mark. However, the Plain Mark must be seen as a variation of the Silhouette Mark. "Minor changes in a mark which do not change the basic, overall commercial impression created on buyers will not constitute any abandonment. So long as the owner continues use of the 'key element' of the registered mark, courts generally will not find abandonment." *Sands, Taylor & Wood Co. v. Quaker Oats Co., 978 F.2d 947, 955 (7th Cir. 1992),* **[**15]** quoting 1 J. Thomas McCarthy, Trademarks and Unfair Competition § 17:10, at 787 (2nd ed. 1984). The overall visual impression of the two marks is the same. The key element of both is the word "Honor" in all caps. Cf. *Forum Corp. of North America v. Forum, Ltd., 903 F.2d 434, 441 (7th Cir. 1990)* (word "Forum" the key so changing between "The Forum Corporation of North America," "The Forum Corporation," and "The Forum" immaterial). For the purposes of this analysis, the Plain Mark is considered a continuation and evolution of the Silhouette Mark.

### B. Ownership of the Trademarks

[HN5] "It is axiomatic in trademark law that the standard test of ownership is priority **[*1129]** of use. To acquire ownership of a trademark it is not enough to have invented the mark first or even to have registered it first; the party claiming ownership must have been the first to actually use the mark in the sale of goods or services. When proving ownership of a trademark, federal registration of the mark is prima facie evidence that the registrant is the owner of the mark. Therefore, the registrant is granted a presumption of ownership, dating to the filing date of the application for federal **[**16]** registration, and the challenger must overcome this presumption by a preponderance of the evidence." *Sengoku Works v. RMC Int'l, 96 F.3d 1217, 1219 (9th Cir. 1996),* citations omitted.

### 1. Use by Honor Plastic

Honor Plastic filed an application with the U.S. Patent and Trademark Office for the Silhouette Mark on June 30, 2004, which was granted on July 26, 2005 (Registration No. 2,976,261). Honor Plastic sold $ 32,999 worth of cups to CTT in April 2004 and $ 22,069.50 worth of cups and lids to

Bubble & Crepe in September 2004. Doc. 33, Exs. D and J. The general sales manager of Honor Plastic states that all of the cups and sleeves in which they were shipped were labeled with the Silhouette Mark. Doc. 33, Chang Declaration, at 3:11-12 and 4:4-5. However, the principal register for the Silhouette Mark shows that it was first used on June 25, 2004. Doc. 34, Ex. O. This evidence establishes that Honor Plastic owned and was using (selling products bearing) the Silhouette Mark in the United States as of June 2004.

Lollicup argues that Honor Plastic only had "single sales in two limited areas prior to [Lollicup's] marketing efforts." Doc. 51, Opposition, at 9: [**17] 10-12. That ignores the fact that CTT was acting as a distributor of Honor Plastic's products in the overall U.S. market and presumably resold the goods to other parties. Lollicup itself admits to having procured Honor Plastic products before August 2004. This fact alone suggests that the goods had wider distribution than Lollicup has suggested.

Further, Lollicup seems to implicitly admit that Honor Plastic was the first company associated with the Word Mark in the disposable plastic cup business. Lollicup says "By September 2004, Lollicup was getting orders from distributors for the [Honor Plastic] "Honor" product line..." Doc. 51, Opposition, at 4:25-26. That is, in the minds of distributors, the products labeled "Honor" was already a distinct brand tied to Honor Plastic.

Lollicup also notes that Honor Plastic's application for the Silhouette Mark was unopposed. Doc. 51, Opposition, at 6:19-20. The application was published for opposition on May 3, 2005. Lollicup notes that it advertised product bearing the Trademarks at least "five months before [Honor Plastic's] trademark application was published." Doc. 50, Yu Declaration, at 11. Yet, Lollicup chose not to oppose Honor Plastic's [**18] application when it was published. Lollicup does not say that it was unaware of the application. As stated above, once an application for trademark is granted, that party is presumed to have established ownership of the mark as of the filing date of the application. See *Sengoku Works v. RMC Int'l, 96 F.3d 1217, 1219 (9th Cir. 1996).*

**2. Use by Lollicup**

Lollicup has presented evidence of use of the Trademarks, but none of it predates Honor Plastic's use. That is, Lollicup's initial use was simply distribution of Honor Plastic product. Honor Plastic clearly says "[Honor Plastic] never sold its cup or lid products to [Taijoint] or [Lollicup] prior to August 2004." Doc. 67, Chang Declaration, at 2:16-17. Lollicup's statement is ambiguous. Alan Yu states, "In the early [*1130] part of 2004, in view of the price and quality of the [Honor Plastic] product, I began to explore the possibility of selling the plastic cups that I was importing from [Honor Plastic] to the suppliers from which I was obtaining the plastic glasses and cups here in the United States.... Lollicup sales personnel began selling "Honor" products throughout Southern California in August 2004, [**19] using the name "Honor." Doc. 50, Yu Declaration, at 2:14-25. The text suggests that Lollicup had some access to Honor Plastic's products in early 2004, but did not sell those goods (use the Trademarks) until August 2004.

In February 2005, Lollicup filed a fictitious business name statement for "Honor America Inc." and "Honor USA Inc." in the County of Los Angeles. On January 4, 2006, Lollicup filed a state trademark registration for the Plain Mark. As part of the state registration, Alan Yu stated that the mark was first used on May 1, 2005. Doc. 34, Ex. U.

Lollicup argues that any prior use of the Trademarks by Honor Plastic would only grant limited rights to the Trademarks in "areas where prior use was substantial enough to create common-law rights." Doc. 51, Opposition, at 9:12-15. However, all of the cases Lollicup cites to deal with parties who independently adopted a common trademark in good faith. See *Adray v. Adry-Mart, Inc., 76 F.3d 984, 987 (9th Cir. 1995)* (two electronics stores independently using "Adray" family name); *Hanover Star Milling Co. v. Metcalf, 240 U.S. 403, 412, 36 S. Ct. 357, 60 L. Ed. 713, 1916 Dec. Comm'r Pat. 265 (1916)* ("junior use adopted mark "in perfect good faith, with [**20] no knowledge that anybody else was using or had used those words in such a connection"); *Natural Footwear, Ltd. v. Hart, Schaffner & Marx, 760 F.2d 1383, 1391 n.16 (3rd Cir. 1985)* (junior user unaware for approximately four years that another company used the common mark). As Honor Plastic points out, [HN6] "In the

462 F. Supp. 2d 1122, *; 2006 U.S. Dist. LEXIS 83639, **

ordinary case of parties competing under the same mark in the same market, it is correct to say that prior appropriation settles the question. But where two parties independently are employing the same mark upon goods of the same class, but in separate markets wholly remote the one from the other, the question of prior appropriation is legally insignificant, unless at least it appear that the second adopter has selected the mark with some design inimical to the interests of the first user, such as to take the benefit of the reputation of his goods, to forestall the extension of his trade, or the like." *Hanover Star Milling Co. v. Metcalf, 240 U.S. 403, 415, 36 S. Ct. 357, 60 L. Ed. 713, 1916 Dec. Comm'r Pat. 265 (1916)*. Here, with the distributor relationship between Honor Plastic and Lollicup, the court is not dealing with two parties independently employing the same mark in separate markets.

**[**21] 3. Manufacturer v. Distributor**

Plaintiffs allege the relationship between Honor Plastic and Lollicup was that of manufacturer and distributor. Lollicup disputes that characterization, but its previous representations clearly indicate that it was Honor Plastic's distributor, acting as its agent in marketing and selling the Trademarked goods.

[HN7] "When disputes arise between a manufacturer and distributor, courts will look first to any agreement between the parties regarding trademark rights. But in the absence of an agreement between the parties, the manufacturer is presumed to own the trademark. That presumption applies with equal force to cases involving foreign manufacturers." *Sengoku Works v. RMC Int'l, 96 F.3d 1217, 1220 (9th Cir. 1996)*. Neither the Original Agreement nor the Amended Agreement directly discusses trademark rights. See Doc. **[*1131]** 34, Exs. Q and R. The language of the Original Agreement does suggest that Honor Plastic sought to ensure that customers knew the Honor brand. Part of the agreements states, "[Honor Plastic] does not agree for its U.S. clients (including its distributors) to change the brand name "HONOR" imprinted at the bottoms of the container **[**22]** products in principle. However, if each order is more than 500, it will consider client requests to print other customized packaging designs with HONOR brand name included." Doc. 34, Ex. Q. In the suit against Solo, Mr. Yu declared under penalty of perjury that "the 'Honor' trademark has been assigned to [Lollicup]. A copy of said as-

signment is attached hereto and marked as Exhibit A." Doc. 68, Ex. FF, at 2:1-2. In fact, the "assignment" referred to is a Lollicup drafted text that Honor Plastic refused to sign. Doc. 67, Chang Declaration, at 2:19-20.

The proposed agreement actually states, in relevant part,

> With the consent and approval of [Honor Plastic], [Lollicup] is given a license and is entitled to use the name "HONOR" and any logos, trademarks or tradenames that [Honor Plastic] has used or uses, in the past, now or in the future, to market, advertise, sell and distribute the Product in the Territory. If this Agreement is terminated, [Lollicup] shall be entitled to continue to use the name "HONOR" and any logos, trademarks and tradenames of [Honor Plastic] in order to sell or dispose of any inventory of the Product that is still in the possession of [Lollicup] **[**23]** at time of termination, otherwise [Lollicup] will cease to use the name "HONOR" and any logos, trademarks and tradenames of [Honor Plastic] after such termination.

Doc. 68, Ex. FF. Contrary to Mr. Yu's interpretation, the text suggests that Lollicup acknowledged the Trademarks belonged to Honor Plastic, reinforcing the implication of the

Original Agreement..

Lollicup argues that despite the relationship between the parties, Lollicup should prevail based on the precedent in a District of Nebraska case which granted trademark rights to the distributor, *Wrist-Rocket Mfg. Co. v. Saunders, 379 F. Supp. 902 (D. Neb. 1974)*, affirmed in part and reversed in part by *516 F.2d 846*. In that case, a manufacturer and distributor came together and branded a product the "Wrist Rocket" (the mark whose ownership the parties dispute). Before the agreement, the manufacturer had called the product "Howard's Wrist Locker Slingshot." Importantly, "The evidence discloses that Ellenburg sold no slingshots under the name 'Wrist Rocket' after the name was developed

Case 1:08-cv-00526     Document 157-3     Filed 09/10/2008     Page 50 of 101

Page 10

462 F. Supp. 2d 1122, *; 2006 U.S. Dist. LEXIS 83639, **

by Saunders and before the first group was delivered to Saunders Archery Target Company in the late **[**24]** summer of 1954." *Wrist-Rocket Mfg. Co. v. Saunders, 379 F. Supp. 902, 910 (D. Neb. 1974). Wrist-Rocket* is distinguishable as the Eighth Circuit explained, "This is not then a case where a distributor appropriates to its own use an existing trademark of the manufacturer. The issue here is who, as between the manufacturer and distributor, has ownership of a trademark created after the formation of the business relationship." *Wrist-Rocket Mfg. Co. v. Saunders Archery Co., 516 F.2d 846, 850 (8th Cir. 1975).* In this case, the Trademarks were in use/created before Honor Plastic and Tai-joint signed the distributorship agreement, or indeed before the two companies had contact in 2004. Honor Plastic had sold product to CTT in April 2004. The product was shipped in boxes that showed both the Silhouette Mark and the term "Honor USA." Honor Plastic also made an application to the U.S. Patent and Trademark Office concerning the Silhouette Mark in June 2004. The Trademarks were not something that were created in the course of Honor Plastic's and Lollicup's business relationship.

**[*1132] B. Likelihood of Confusion**

[HN8] "A plaintiff will succeed on the merits of **[**25]** its trademark infringement claim under the Lanham Act if it establishes that the defendant's use of its mark gives rise to a 'likelihood of confusion' in the consuming public. A likelihood of confusion exists when consumers are likely to assume that a product or service is associated with a source other than its actual source because of similarities between the two sources' marks or marketing techniques. The Ninth Circuit has developed an eight-factor test to assess likelihood of confusion: 1) strength of the allegedly infringed mark; 2) proximity or relatedness of the goods; 3) similarity of the sight, sound, and meaning of the marks; 4) evidence of actual confusion; 5) degree to which the marketing channels converge; 6) type of goods and degree of care consumers are likely to exercise in purchasing them; 7) intent of the defendant in selecting the allegedly infringing mark; and 8) likelihood that the parties will expand their product lines." *Metro Pub. v. San Jose Mercury News, 987 F.2d 637, 640 (9th Cir. 1993)*, citations omitted. A trial court need not formally consider all of these factors at the preliminary injunction stage. *Apple Computer, Inc. v. Formula International, Inc., 725 F.2d 521, 526 (9th Cir. 1984).* **[**26]**

Taking factors two and three, it is undisputed that the marks used by Lollicup and Honor Plastic are identical (the Plain Mark) and affixed on the same type of products (plastic cups, lids, and packaging). [HN9] Notwithstanding the other factors, the Ninth Circuit has said it is clear error for a trial court to find no likelihood of confusion when two products with virtually identical marks are in the same market. *Lindy Pen Co. v. Bic Pen Corp., 796 F.2d 254, 257 (9th Cir. 1986).* In addition, both sides agree that there is actual confusion in the market. Doc. 50, Yu Declaration, at 8:13-19; Doc. 32, Brief, at 26:25-27:1.

**C. Bond Amount**

Lollicup seeks a bond of $ 10 million if any preliminary injunction is granted, presumably based on its total estimated gross sales for the upcoming year. Lollicup claims sales of hot and cold cups totaled $ 2.66 million in 2005 and $ 4.5 million thus far in 2006. Doc. 50, Yu Declaration, at 7:1-5. However, Lollicup's own attached sales summary shows that sales of cups, glasses, and lids from April 2004 through August 2006 only totaled $ 2.70 million. Doc. 50, Ex. M. At oral argument, Lollicup's attorney was directly asked about **[**27]** the discrepancy, but could provide no rational explanation for it. These figures are contradictory and can not be relied on. The court is forced to use the evidence and financial figures provided by Honor Plastic in determining the proper bond amount.

The preliminary injunction does not oust Lollicup from the industry. It only prohibits Lollicup from using any of the Trademarks on the products it sells or in any advertisement. Lollicup is free to sell products that have no marks on them or to adopt a dissimilar mark as its own. The court must then estimate what amount of business Lollicup would lose under the new mark compared with its sales under its existing mark. See *Russell v. Caesar, 2001 U.S. Dist. LEXIS 23679, *22 (N.D. Cal. 2001)* (court must estimate amount of lost sales when winery forced to sell wine under new label). On its websites, Lollicup already sells equivalent products bearing other marks (Karat, Solo). See Doc. 68. Ex. Z. Customers might very well purchase these other

Case 1:08-cv-00526    Document 157-3    Filed 09/10/2008    Page 51 of 101

Page 11

462 F. Supp. 2d 1122, *; 2006 U.S. Dist. LEXIS 83639, **

products instead, greatly lessening any loss Lollicup might suffer. Honor Plastic claims that total sales to Lollicup to date total $ 1.97 million. Doc. 67, Chang Declaration, **[*1133]** at 3: **[**28]** 5-12. Based on those figures, Honor Plastic estimates that gross sales of Lollicup's Trademark bearing goods total approximately $ 84,923/month. Doc. 66, Reply, at 20:16-19. P&P asserts that the gross margin in the industry (distributing plastic cups and lids) averages 6-8%. Doc. 69, Spencer Declaration, at 2:7-11. So, net monthly profit on goods bearing the Trademarks is estimated at $ 5,095-$ 6,794. The court will infer that Lollicup might lose $ 2,000 a month in profit based on its inability to sell goods bearing the Trademarks. Assuming an 18 month interval until the case is resolved, a $ 36,000 bond is appropriate.

### D. Lollicup's Motion for Preliminary Injunction

On October 19, 2006, Lollicup filed what it termed an "application for an ex part order enjoining cross-defendants from doing business under the name 'Honor' or 'Honor USA.'" Doc. 63, Notice. The court interprets this as a motion for preliminary injunction to prohibit Plaintiffs from using the Word Mark. The motion calls for relief diametrically in conflict with Plaintiffs' motion. As the court is granting Plaintiffs' motion, Lollicup's motion is denied.

### IV. Order

Pending further order of the court, **[**29]** it is hereby ORDERED that:

1. Defendant Lollicup, its officers, agents, servants, employees, representatives, partners, and all persons acting in concert or participating with it are enjoined from using the Trademarks (namely the word "Honor" capitalized with curved arrows above and below, forming the impression of a circle and the word "Honor" itself as a brand) or any confusingly similar variation thereof printed on or in association with any disposable cup or related products that Lollicup distributes, imports, sells, manufactures, or otherwise promotes. Defendant Lollicup is

enjoined from representing itself as Honor USA; is enjoined from distributing literature, advertising, marketing material, or business cards bearing the name "Honor" in any format; and is enjoined from distributing products bearing the Trademarks. Defendant Lollicup must cease use of the website (www.honorusa.com) unless there is an agreement with Plaintiffs as to its future operation.

2. Defendant Lollicup, its officers, agents, servants, employees, representatives, partners, and all persons acting in concert or participating with it be, and hereby are specifically enjoined from using the Trademarks or any **[**30]** confusingly similar variation thereof at tradeshows and are specifically enjoined from using a booth display bearing the name "Honor" in any format.

3. Defendant Lollicup, its officers, agents, servants, employees, representatives, partners, and all persons acting in concert or participating with it are required to, no later than November 15, 2006, segregate all products in their possession, custody, or control that bear any of the Trademarks or any confusingly similar variation thereof and destroy or store these products in a secure location.

4. Defendant Lollicup must file with the court and serve on Plaintiffs an affidavit setting forth in detail the manner and form in which Lollicup has complied with the terms of this injunction by 4 PM November 15, 2006.

This preliminary injunction shall take effect immediately on the condition that Plaintiffs file a bond in the sum of $ 36,000 within three (3) business days of entry of this order. Upon posting this $ 36,000 bond, the temporary restraining order bond of $ 25,000 will be released.

IT IS SO ORDERED.

**Dated: November 3, 2006**

  **/s/ Anthony W. Ishii**

  UNITED STATES DISTRICT JUDGE

LEXSEE 2007 U.S. DIST LEXIS 93378

**Fitger's On-the-Lake, LLC a Minnesota limited liability company, Plaintiff, vs. The Fitger Company, LLC, a Connecticut limited liability company, Fitger Brewing Company LLC, a Connecticut limited liability company, Michaud Distributing, Inc., a Minnesota corporation, United States Fire-Arms Manufacturing, a Connecticut Corporation, and Douglas Donnelly, an individual, Defendants.**

**Civil No. 07-CV-4687 (MJD/RLE)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MINNESOTA**

*2007 U.S. Dist. LEXIS 93378*

**December 19, 2007, Decided**
**December 19, 2007, Filed**

**CORE TERMS:** fitger, beer, brewery, trademark, brewing, injunction, succeed, logo, false statements, consumer, bottled, site, label, irreparable, distinctive, literally, www, com, public interest, advertising, sponsorship, licensee, domain, web, Lanham Act, trademark infringement, implied license, trade practices, course of business, ownership

**COUNSEL:** **[*1]** For Fitger's On-the-Lake, LLC, a Minnesota limited liability company, Plaintiff: Felicia J Boyd, LEAD ATTORNEY, Mary Andreleita Walker, LEAD ATTORNEY, Faegre & Benson LLP, Minneapolis, MN.

For Fitger Company, LLC, The, a Connecticut limited liability company, Fitger Brewing Company LLC, a Connecticut limited liability company, United States Fire-Arms Manufacturing, a Minnesota corporation, Douglas Donnelly, an individual, Defendants: Edward R Schwartz, LEAD ATTORNEY, Christie, Parker & Hale, LLP, Pasadena, CA; Nicholas Ostapenko, Paul W Wojciak, Johnson Killen & Seiler, Duluth, MN.

For Michaud Distributing, Inc., a Minnesota corporation, Defendant: Paul W Wojciak, Johnson Killen & Seiler, Duluth, MN.

**JUDGES:** Michael J. Davis, U.S. District Judge.

**OPINION BY:** Michael J. Davis

**OPINION**

**PRELIMINARY INJUNCTION**

This matter came for hearing before the Court on December 18, 2007, on the motion of Plaintiff Fitger's On-the-Lake, LLC for a Preliminary Injunction. Felicia J. Boyd, Faegre & Benson, LLP appeared on behalf of the Plaintiff. Edward R. Schwartz, Christie, Parker & Hale, LLP, and Paul W. Wojciak, Johnson Killen & Seiler, appeared on behalf of the Defendants.

1. *Dataphase Systems, Inc. v. CL Systems, Inc., 640 F.2d 109, 113 (8th Cir. 1981)*, **[*2]** sets forth four factors relevant to the question of whether an injunction should issue: (1) the threat of irreparable harm to the moving party if an injunction is not granted, (2) the harm that may be suffered by the moving party if injunctive relief is denied compared to the effect on the non-moving party if the relief is granted, (3) the public interest, and (4) the probability that the moving party will succeed on the merits.

2. It is probable that Plaintiff Fitger's On-the-Lake, LLC ("Fitger's") will succeed on the merits of all of its claims.

3. To succeed on a claim for trademark infringement under Section 43(a) of the Lanham Act, *15 U.S.C. § 1125(a)*; violation of the Anticyber-squatting Consumer Protection Act, *15 U.S.C. § 1125(d)(1)(A)* and a claim for trademark infringement under the common law of Minnesota, a plaintiff must establish that the plaintiff's mark is a valid trademark and that the defendant's use is likely to confuse consumers as to the source of the product.

4. The Fitger's Inn and Brewery Complex is located on the site of a brewery that is over 125 years old with a distinctive appearance of an industrial smokestack and water tower bearing the Fitger's name and its **[*3]** Ship and Star Logo:

[SEE PHOTOGRAPH IN ORIGINAL]

5. Duluth's first brewery was started by Sidney Luce in 1857. Luce built his brewery a block and a half from our present site, and utilized a small, clear brook which later was known as Brewery Creek. His brewery grew, and in 1881 Michael Fink purchased the brewery. Fink built a new, larger brewery on the present Fitger's site. Fink's Lake Superior Brewery soon hired a new brewmaster, a young German named August Fitger who graduated from one of Germany's premier brewing schools. Within the year, August Fitger owned half of the brewery. Then, in 1884, Percy Anneke bought into the brewery and became Fitger's partner. The brewery was renamed the A. Fitger & Co. / Lake Superior Brewery.

6. The brewery's beer production continued for forty years, until Prohibition (1920 -1933) changed matters for all breweries around the nation. Many went out of business. Fitger's stayed alive by turning out new products such as soda pop and candy bars. Candy lovers in Duluth during the "Roaring Twenties" enjoyed the Fitger's Flapper, the Fitger's Spark Plug, the Five Cent Fitger's Nut Goodie, the King Bee Nougat, and Fitger's Skookum . . . "A Bully Good Bar." **[*4]** Along with the candy bars, Fitger's produced Lovit Pop.

7. After the repeal of Prohibition, Fitger's resumed brewing strong beer, and business boomed during the 1930's. Production was up to 100,000

barrels a year by 1940. During this time, the Brewery also produced Silver Spray Champagne, advertised as "The Best Mixer In A Crowd." The Beerhalter family purchased the Brewery in 1944, and operated if for the next quarter century. Fitger's Brewery closed its doors on September 30, 1972, ending 115 years of brewing on the shores of Lake Superior.

8. The Fitger's Inn and Brewery Complex was re-opened in September of 1984 with a 48 room hotel, two full service restaurants, and a retail center. The Fitger's Brewhouse is once again brewing beer on the premises for on-site and off-site consumption.

9. Due to its extended history, Fitger's has numerous distinctive trademarks and logos that serve to differentiate Fitger's products and services in the market. Each of these marks (collectively referred to herein as the Fitger's Marks) belongs exclusively to Fitger's and are of significant value. The marks include:

. FITGER'S;

. [SEE PHOTOGRAPH IN ORIGINAL]

(hereinafter referred to as the Star and Ship **[*5]** Logo);

. DOG'S HEAD LAGER;

. [SEE PHOTOGRAPH IN ORIGINAL]

(hereinafter referred to as the Dog's Head Lager Label]

FITGER'S REX BEER;

. [SEE PHOTOGRAPH IN ORIGINAL]

(hereinafter referred to as the Fitger's Rex Beer Label);

. NORDLAGER;

. [SEE PHOTOGRAPH IN ORIGINAL]

(hereinafter referred to as the Fitger's Nordlager Label)

. PICKWICK;

2007 U.S. Dist. LEXIS 93378, *

.   [SEE PHOTOGRAPH IN ORIGINAL]

(hereinafter referred to as the Pickwick Label);

.   FITGER BUILDING CIRCA 1911; and

.   [SEE PHOTOGRAPH IN ORIGINAL]

(hereinafter referred to as the Fitger Building Logo).

Fitger's owns exclusive common law trademark rights to each of the above Fitger's Marks.

10. Fitger's has used the Fitger's marks alone and in combination with each other on a large number of goods and services for decades including, signage on the front of the Fitger's Inn and Brewery Complex; letterhead, notepads, note cards, postcards, envelopes, business cards, brochures, pens; books about Fitger's and its history; blended coffees; coffee mugs, beer steins drinking glasses, shot glasses, wooden boxes to hold glasses; clothing; cutting boards; serving trays; candle holders; coasters; and promotional posters, calendars of events, print and broadcast advertisements, and billboards. **[*6]** Plaintiff has previously sold beer under the Fitger's name under an agreement with Rohlfing of Duluth, Inc., which predates Defendants' use of the Marks for sales of beer.

11. In addition to these uses of the Fitger's Marks, the Fitger's Marks are used in connection with the sale of beer produced by the Fitger's Brewhouse under implied license from Fitger's for both on-site and off-site consumption. Indeed, each week, the Fitger's Brewhouse sells an average of 360 refillable, sixty-four-ounce "growlers" of Fitger's beer so that customers can take home Fitger's beer to enjoy.

12. "The existence of an implied license depends on the objective conduct of the parties." *Lutheran Ass'n of Missionaries & Pilots, Inc. v. Lutheran Ass'n of Missionaries & Pilots, Inc., No. Civ.03-6173 PAM/RLE, 2004 U.S. Dist. LEXIS 27164, 2004 WL 2730104, at *8 (D. Minn. Nov. 19, 2004)* (unpublished). "An **[*7]** implied license arises out of the objective conduct of the parties,

which a reasonable person would regard as indicating that an agreement has been reached. Permission to use the marks along with the exercise of reasonable control over such use can lead to the conclusion that an implied license existed even where no written agreement was made." *Northwest Airlines, Inc. v. NWA Fed. Credit Union, No. 03-3625 (DWF/SRN), 2004 U.S. Dist. LEXIS 17766, 2004 WL 1968662, at *5 (D. Minn. Sept. 2, 2004)* (unpublished) (citations omitted). The Court examines whether the plaintiff "monitored and controlled the use of the [mark]," whether the alleged licensee "used the mark subject to the authorization and control of plaintiff, and [whether] both parties understood this arrangement." *Birthright v. Birthright Inc., 827 F. Supp. 1114, 1135 (D.N.J. 1993)* (citation omitted). An implied licensee acquires no ownership interest in the mark and cannot transfer rights to another party. *Lutheran Assoc. of Missionaries & Pilots, Inc., 2004 U.S. Dist. LEXIS 27164, 2004 WL 2730104, at *10 n.7; see also E.G.L. Gem Lab Ltd. v. Gem Quality Inst., Inc., 90 F. Supp. 2d 277, 300 (S.D.N.Y. 2000).*

13. In this case, Plaintiff and Fitger's Brewhouse have a licensor/licensee **[*8]** relationship because 1) they executed various lease agreements memorializing their understanding that Plaintiff alone owned the Marks and that Fitger's Brewhouse was a mere licensee and both Nelson and Raymond averred that they understood this when they entered the original lease; 2) there were restrictive covenants in the lease agreements limiting the use of the Fitger's Mark to the leased location and precluded the use of the Fitger's name on beer sold off of the premises; 3) Plaintiff controlled Fitger's Brewhouse's use of the Marks by, for example, requiring that it cease the sale of a CD which featured the Fitger's NORDLAGER label; and 5) Plaintiff's Vice President regularly discusses promotions, expansion, and changes to the Brewhouse menu with Fitger's Brewhouse.

14. The Fitger's Marks are known throughout Minnesota and the country as identifying Fitger's as a source of quality services and products. The Fitger's Marks are of great and incalculable value to Fitger's, which spends thousands of dollars each year on advertising and promotion that prominently features the Fitger's Marks.

15. Fitger's extensive use in interstate commerce of the Fitger's Marks has caused the public [*9] to associate goods and services bearing the Fitger's mark and logos with Fitger's and Fitger's alone.

16. Fitger's closely controls the use and reproduction of the Fitger's Marks to ensure that all of its current and potential customers can rely upon the marks as signifying quality services and products.

17. Fitger's substantial investment in and use of the Fitger's Marks has helped it realize substantial revenue.

18. Fitger's also maintained a web site at www.fitgers.com where it advertises its products and services and provides information about the hotel, the Fitger's Brewhouse, and the history of the company. This website also features several of the Fitger's Marks.

19. Consumers associate the Fitger's Marks exclusively with Plaintiff. The Fitger's Marks are each distinctive and famous.

20. Defendants The Fitger Company, LLC, Fitger Brewing Company LLC, Michaud Distributing, Inc., United States Fire-Arms Manufacturing, and Douglas Donnelly (collectively "TFC") knowingly and intentionally have manufactured, promoted, and sold bottled beer that incorporates the Fitger's Marks without permission from Plaintiff Fitger's to do so.

The following is a picture of Defendants' beer bottle:

[SEE [*10] PHOTOGRAPH IN ORIGINAL]

Defendants' bottle incorporates the FITGER'S mark and the Star and Ship Logo and a Fitger's predecessor company name "A. Fitger & Co." A. Fitger & Co. is not the actual brewer of the beer.

21. Defendants' packaging is shown below:

[SEE PHOTOGRAPH IN ORIGINAL]

Defendants' packaging includes the Fitger's Marks in multiple locations.

22. Armed with this knowledge, defendant Donnelly, acted to trade on the goodwill of the Fitger's Marks and to deceive consumers as to the origin of his products. Defendant Donnelly created companies that included the Fitger's name as part of the company name. Defendant TFC filed applications for federal trademark registration for the FITGER'S mark, DOG'S HEAD mark, REX mark, PICKWICK mark, NORDLAGER mark, the SILVER SPRAY mark and the Star and Ship Logo. Defendant Donnelly has signed statements of use for many of these applications.

23. In filing for each of these federal trademark registrations, defendant TFC falsely advised the United States Patent and Trademark Office under oath that TFC was the sole owner of each of the subject marks and that it had the exclusive right to use the marks for the goods described in the applications. Defendant [*11] TFC had no factual basis for these false statements of ownership and trademark rights.

24. Defendants' use of the Fitger's Marks to identify their bottled beer has created a likelihood of confusion as to the source of the bottled beer.

25. Defendants' have intentionally tried to confuse consumers as to the source of their bottled beer by using identical copies of all of the Fitger's Marks on the product and the product packaging. The fact that Donnelly may be related to August Fitger does not grant Defendants the right to use Fitger's Marks and trade in their goodwill. *See W-K-M Div. Of Joy Mfg. Co. v. WK Indus., 2 U.S.P.Q.2d 1967, 1968 (S.D. Tex 1987)* ("[A] person has no right to use his name as a trademark simply because of the fortuity of his parents and their choice of names.").

26. Multiple instances of actual consumer confusion, mistake and/or deception has resulted from Defendants' use of all of the Fitger's Marks on their bottled beer product and product packaging.

27. Defendants adopted the domain name www.fitger.com with the bad faith intent to confuse, mislead and profit from the use of the "Fitger" mark. The domain name www.fitger.com is virtually indistinguishable from www.fitgers.com

28. [*12] To succeed on its claim for false advertising under the Lanham Act, *15 U.S.C. § 1125(a)*, a plaintiff must establish (1) that the defendant made a false statement of fact about its product in a commercial advertisement, (2) that the statement actually deceived or has a tendency to deceive a substantial segment of its audience, (3)

the deception is likely to influence the purchasing decision, (4) the defendant caused the false statement to enter interstate commerce, and (5) the plaintiff has been or is likely to be injured as a result.

29. Defendants have made literally false statements on its products and in its marketing literature. These statements include, but are not limited to, "Since 1881;" "Welcome to the Official Fitger Beer Site;" "Fitger Brewing Company -- Since 1881 -- Celebrating 125 years of Brewing Excellence;" and "Doug Fitger."

30. Likewise, Defendants' website and attached press release include false statements, including, but not limited to, the following:

> . "The Fitger Brewing Company is proud to Celebrate the 125th Anniversary of Fitger's Beer with our Original Family Recipe issued in a Special 125th Anniversary 6-Pak Carrier and Bottle."

> . "Originally founded in Duluth, [*13] MN, on the shores of Lake Superior by August Fitger, the Fitger Brewing Co. was once the largest of the regional brewers with over 100,000 barrels produced at the height of manufacture in the 1930s."

> . "Fitger Brewing Co.--best known for traditional lagers under the Fitger's(R)[,] Nordlager(R), Rex(R), Dog's Head(R), Pickwick(R) and A. Fitger & Co's(R), trademark labels [sic], the original Fitger Brewing Co. continued throughout prohibition to brew and deliver 'Non-Alco' beer and the manufacture and distribution of products as diverse as soda, candy, and cigars."

31. Defendants have not brewed beer of any kind "Since 1881" nor are they celebrating their "125th Anniversary." Defendants' references to "since 1881" and "125 years of brewing excellence" would, when considering the website, press release, and products, each in their entirety, send the necessarily implied message that Defendants have been in operation since 1881. Defendants' statement that "Fitger Brewing Co." was "[o]riginally founded in Duluth, MN, on the shores of Lake Superior by August Fitger" is literally false because such a statement made by an entity called Fitger Brewing Co., unequivocally conveys the message that [*14] August Fitger founded Defendant FBC in Duluth many years ago. The marks at issue have not yet been registered to Defendants.

32. The noted statements are have a tendency to mislead consumers and are material.

33. Defendants have caused their literally false statements to enter interstate commerce.

34. Fitger's has been injured as a result of Defendants' literally false statements, and is likely to continue to be injured by these literally false statements.

35. To succeed on its claim for deceptive trade practices under *Minn. Statute §§ 325D.44(2)*, a plaintiff must show that the defendant in the course of business, has caused likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services.

36. To succeed on its claim for deceptive trade practices under *Minn. Statute §§ 325D.44(3)*, a plaintiff must show the defendant in the course of business, has caused a likelihood of confusion or of misunderstanding as to affiliation, connection, or association with, or certification by, another.

37. To succeed on its claim for deceptive trade practices under *Minn. Statute §§ 325D.44(5)*, a plaintiff must show the defendant in the course of business, [*15] has represented that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have.

38. To succeed on its claim for deceptive trade practices under *Minn. Statute §§ 325D.44(13)*, a plaintiff must show the defendant in the course of business, has engaged in other conduct which similarly created a likelihood of confusion or of misunderstanding.

39. Fitger's likelihood of success on its Lanham Act claims also demonstrates it is likely to prevail on its claims under *Minnesota Stat. § 325D.44. See DeRosier v. 5931 Business Trust, 870 F. Supp. 941, 948 (D. Minn. 1994).*

40. Defendants' past actions indicate that it will continue to violate Plaintiff's rights.

41. Defendants' actions are in violation of Section 43(a) of the Lanham Act, *15 U.S.C. § 1125(a)*, *Minn. Statute §§ 325D.44(2)-(3)*, *(5)*, and *(13)*, and the common law of Minnesota.

42. To succeed on its claim of dilution and tarnishment under *Minn. Stat. § 333.285*, a plaintiff must show that the defendants has engaged in conduct likely to dilute and tarnish the distinctive **[*16]** quality of the marks.

43. Fitger's has shown that it has the owner of the Fitger's Marks and that those marks are famous and distinctive within the meaning of *Minn. Stat. §333.285.* The Fitger's Marks have been used for years in connection with the Fitger's Brewhouse and hotel located on the site of the historic brewery for a variety of products, including beer and beer-related products. Plaintiff has shown that, in relation to beer, it and its licensee have used the Fitger's Marks exclusively. Plaintiff has invested substantial sums in advertising and promotions that prominently feature the Fitger's Marks. These ads appear throughout the Upper Midwest and Canada and reach tens of thousands of people. Defendants' use of the Fitger's Marks has diluted and tarnished the distinctive quality of the Fitger's marks, and Defendants willfully intended to cause dilution. Defendants began using the Marks solely to capitalize on Plaintiff's reputation and history, and Defendants have profited from their actions. Defendants' continued use of the Fitger's Marks is likely to dilute and tarnish the Fitger's Marks.

44. The Court has reviewed Defendants' allegations of unclean hands and concludes that **[*17]** the record does not support an unclean hands defense to this preliminary injunction.

45. Fitger's has suffered irreparable injury as a result of Defendants' unlawful actions and will continue to suffer irreparable injury if Defendants' trademark infringement and literally false statements are allowed to continue. Irreparable harm exists as a matter of law where there is a trademark infringement. *Minnesota Mining & Mfg. Co. v. Taylor, 21 F. Supp. 2d 1003, 1004 (D. Minn. 1998).* The same presumption of irreparable harm applies to false advertising. *See United Indus. Corp. v. Clorox Co., 140 F.3d 1175, 1183 (8th Cir. 1998).*

46. The irreparable harm that Plaintiff will suffer clearly outweighs any potential harm Defendants may suffer from the granting of this Order, particularly in light of the substantial investment Plaintiff has made in developing its trademarks.

47. It is in the public interest to protect the Fitger's Marks because Defendants' use of the Fitger's Marks is likely to confuse, and has actually confused, the public as to both the source and sponsorship of Defendants' bottled beer. Infringement of trademarks is inherently contrary to the public interest. *See Am. Dairy Queen Corp. v. New Line Prods., Inc., 35 F. Supp. 2d 727, 733 (D. Minn. 1998).* **[*18]** It is further in the public interest to prevent Defendants from making false and misleading statements about the source, sponsorship and affiliation of their bottled beer because such statements are likely to mislead customers and cause them to purchase a beer believing that it originated from, or is otherwise sponsored by, affiliated with or endorsed by, Plaintiff. It is in the public interest to prevent the circulation of products that are intended to deceive consumers as to their source or qualities.

48. Thus, the *Dataphase* factors weigh in favor of issuance of an order preliminarily enjoining Defendants as more fully described below.

49. Plaintiff requests no bond or a de minimis bond. Defendants request a bond, but do not request a particular amount. The Court concludes that some bond is necessary because Defendants' businesses are at risk if this injunction is wrongfully issued. Based on its review of the record, the Court orders Plaintiff to post a bond in the amount of $ 25,000.00.

Upon consideration of the files, records, and proceedings in this action, **IT IS HEREBY ORDERED** that Plaintiff Fitger's On-the-Lake, LLC's motion for a preliminary injunction [Docket No. 3] is **GRANTED [*19]** as follows:

1) Defendants and their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of the order, are preliminarily enjoined from:

(a) using any of the Fitger's Marks, or any other similar term(s) or logo(s) likely to cause confusion therewith, including "A. Fitger & Co." and "www.fitger.com" as Defendant's domain name, directory name, web site, or web page, in buried code or metatags on Defendant's web site or web page, or in connection with the retrieval of data or information or on other goods or services, or in connection with the advertisement, marketing, distribution, sale or offer for sale of its goods and/or services related to beer. To the extent that Defendants have shipped any products that include any of the Fitger's Marks, or marks confusingly similar thereto, Defendants are directed to immediately recall those products from any retail or sales outlet, including the recall of any all promotional materials associated therewith, including, but not limited to, any and all advertising, circulars, price lists, signs, banners, business stationary, prints, packages, labels, containers, freights, **[\*20]** cartons, receptacles, wrappers, art work, and other materials in its possession or custody or under Defendants' control that infringe and/or dilute any of Fitger's Marks;

(b) otherwise infringing Fitger's rights in any of the Fitger's Marks and in the domain name "www.fitgers.com," including registration of any other domain name that is similar to or likely to cause confusion with the Fitger's Marks;

(c) from unfairly competing with Fitger's;

(d) from using any other trademark, service mark, trade name, corporate name, word or symbol or doing any other acts likely to induce the belief that Defendants' commercial activities, products, services or business, are Fitger's commercial activities, products, services or business or that Defendants are in any way authorized or sponsored by or connected, endorsed, or associated with Fitger's or with Fitger's commercial activities, products, services or business; and

(e) from using any other trademark, service mark, trade name, corporate name, word or symbol or doing any other acts likely to dilute or tarnish any of the famous Fitger's Marks.

2007 U.S. Dist. LEXIS 93378, *

2) Defendants, and all others acting in concert with them, are directed to file with the Court and to serve **[*21]** on Fitger's within (5) days after service of this injunction on Defendants a report in writing setting forth in detail the manner and form in which Defendants have complied with the injunction.

3) Defendants are directed to file with the Court and to serve on Fitger's within (5) days after service of this injunction, a detailed accounting showing the sales and shipment of any bottled beer product that included any of the Fitger's Marks as well as the amount of beer products that were returned to Defendants following compliance with the recall directives herein.

4) Defendants are directed to advise the United States Patent and Trademark Office in connection with the pending trademark applications for "Fitger's" (U.S. Serial No. 78798573), "Dog's Head" (U.S. Serial No. 78798569), "Rex" (U.S. Serial No. 78798582), "Pickwick" (U.S. Serial No. 78798578), "Nordlager" (U.S. Serial No. 78798580), and the Star and Ship Logo (U.S. Serial No. 78798576) and any other trademark application that is based in whole or in part on a word, symbol or design used by Plaintiff Fitger's or any of its predecessor entities, that the ownership and use rights that are the subject of each of said applications has **[*22]** been challenged in this proceeding, to provide a copy of this Order with each submission, and to request that examination of each of said applications be immediately suspended pending decision by this Court as to the ownership of the marks that are the subject of said applications.

5) This order shall be effective immediately.

6) Plaintiff is ordered to post a bond in the amount of twenty-five thousand dollars ($ 25,000.00).

Dated: December 19, 2007

s / Michael J. Davis

Michael J. Davis

U.S. District Judge

UNITED STATES DISTRICT COURT

LEXSEE 408 F. SUPP 2D 1237

**XAVIER PIERRE TANCOGNE and GAPARDIS HEALTH AND
BEAUTY, INC., Plaintiffs, vs. TOMJAI ENTERPRISES CORPORATION,
AIMALOHI IMANA, and G&P FACTORY OUTLET CORP., Defendants.**

**Case Number 05-21327-CIV-LENARD-KLEIN**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT
OF FLORIDA**

*408 F. Supp. 2d 1237*; *2005 U.S. Dist. LEXIS 37603*; *19 Fla. L. Weekly Fed. D
149*

**November 15, 2005, Decided**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Alleging infringement of registered trademarks of cosmetic products, plaintiffs sued defendants under the Trademark Counterfeiting Act of 1984, *15 U.S.C.S. §§ 1116-17*; §§ 32 and 43 of the Lanham Trademark Act, *15 U.S.C.S. §§ 1114 and 1125*; and Florida common law prohibiting unfair competition and unjust enrichment. Both parties moved for preliminary injunction pursuant to *15 U.S.C.S. §§ 1114 and 1116* and *Fed. R. Civ. P. 65*.

**OVERVIEW:** Applying the Eleventh Circuit's seven-part test for determining the likelihood of confusion and the four-part test for a preliminary injunction, the court found that plaintiffs were entitled to an injunction. Plaintiffs satisfied the two most important factors of the Eleventh Circuit test-- strength of the mark and actual confusion. Plaintiffs' "Paris Fair & White" trademark was suggestive, and was sufficiently strong to merit protection against the directly competing use by defendants of a copy of plaintiffs' mark bearing the name "Fair & Brite Paris." There was ample evidence of actual confusion, testified to by both plaintiffs' and defendants' witnesses. Defendants' mark bore great similarity to that of plaintiffs, and defendants' four skin-lightening products were identical to four of plaintiffs' bestselling products. The retail outlets and the consumers for the two competing lines were identical. The evidence further demonstrated defendants' intent and bad faith in copying plaintiffs' marks. Plaintiffs demonstrated a likelihood of success on the merits and showed that they would be irreparably harmed if defendants were not enjoined from using their copy of plaintiffs' marks.

**OUTCOME:** The court granted plaintiffs' motion for preliminary injunction and denied defendants' motion for preliminary injunction.

**CORE TERMS:** trademark, preliminary injunction, similarity, trade dress, fuchsia-colored, lightening, injunction, descriptive, suggestive, color, infringement, customers, retail, skin, counterfeit, advertising, reputation, packaging, irreparable, cosmetic, consumer, copied, tube, registered, injunctive, infringing, confused, enjoined, beauty, outlets

**LexisNexis(R) Headnotes**

*Civil Procedure > Remedies > Injunctions > Elements*
[HN1] A preliminary injunction should be granted only if: (1) the moving party has a substantial likelihood of success on the merits; (2) failure to issue the preliminary injunction will result in irreparable

408 F. Supp. 2d 1237, *; 2005 U.S. Dist. LEXIS 37603, **;
19 Fla. L. Weekly Fed. D 149

injury; (3) the harm facing the moving party out-weighs the potential damage that the injunction poses to the nonmoving party; and (4) issuing the injunction would not be adverse to the public interest.

***Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions***
[HN2] At the preliminary injunction stage, a court may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the evidence is appropriate given the character and objectives of the injunctive proceeding.

***Civil Procedure > Remedies > Injunctions > Elements***
***Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions***
[HN3] A preliminary injunction is an extraordinary and drastic remedy and will not be granted unless the movant clearly establishes the burden of persuasion as to the four prerequisites.

***Trademark Law > Infringement Actions > Remedies > Equitable Relief > Preliminary Injunctions***
[HN4] While equitable relief in a trademark case should be narrowly tailored to cure the ongoing harm by distinguishing the infringing product from the original, preliminary injunctive relief is often appropriate in such cases because of the potential for irreparable injury that can cause damage to a trademark holder's reputation that are not easy to calculate, compensate, or prove with specificity.

***Trademark Law > Trademark Counterfeiting Act > Civil Actions > Elements***
***Trademark Law > Trademark Counterfeiting Act > Civil Actions > Evidence***
[HN5] Section 32 of the Lanham Act, *15 U.S.C.S. § 1114(1)*, provides for liability of a person who, without consent of a trademark registrant, uses in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark which is likely to cause confusion, or to cause mistake, or to deceive. In the U.S. Court of Appeals for the Elev-

enth Circuit, seven factors have been identified to assist in answering the question of whether there is a likelihood of confusion between the registered mark and the alleged infringing mark. They are: (1) the type of trademark; (2) the similarity of the marks; (3) the similarity of the products the marks represent; (4) the similarity of the parties' retail outlets and purchasers; (5) the similarity of the advertising media used; (6) the defendant's intent; and (7) actual confusion. Of these seven factors, the Eleventh Circuit considers the type of mark and the evidence of actual confusion to be the two most important factors. In reviewing the evidence, there are no set rules as to how much evidence of confusion is needed; rather, a district court must take into consideration the circumstances surrounding each particular case. To establish a likelihood of confusion all factors do not have to be resolved in favor of the plaintiff.

***Trademark Law > Subject Matter > Strength***
[HN6] Type of mark denotes the strength of a mark. The stronger the mark, the greater the protection it is afforded. Four categories of strength are recognized: (1) generic; (2) descriptive; (3) suggestive; or (4) arbitrary or fanciful. These categories are based on the relationship between the name and the service or good it describes.

***Trademark Law > Subject Matter > Names > Generic Names > General Overview***
[HN7] A generic name suggests the basic nature of the article or service, and usually gets no protection. Thus, the terms "bank," "electrician," "soap," or "restaurant" standing alone would receive no trademark protection.

***Trademark Law > Subject Matter > Descriptive & Laudatory Terms > General Overview***
***Trademark Law > Subject Matter > Descriptive & Laudatory Terms > Descriptive Terms Defined***
***Trademark Law > Subject Matter > Secondary Meaning > General Overview***
[HN8] A descriptive term identifies qualities or characteristics of the goods or services with which they are connected, such as color, odor, function, dimensions, or ingredients. Examples of such terms

408 F. Supp. 2d 1237, *; 2005 U.S. Dist. LEXIS 37603, **;
19 Fla. L. Weekly Fed. D 149

are "sweet," "large," "mellow," and "strong," or "cleanser," "detergent," and "conditioner." If a word mark is found to be descriptive, it is protectable only if the owner can show the mark has acquired a secondary meaning. To establish a secondary meaning in the Eleventh Circuit, a plaintiff must show that the primary significance of the term in the minds of the consuming public is not the product, but the producer.

*Trademark Law > Subject Matter > Suggestive Terms*
[HN9] A suggestive terms suggests, rather than describes, a characteristic of the goods or services and requires an effort of the imagination by the consumer in order to be understood as descriptive. The combination of two or more descriptive words as a composite mark may result in a suggestive term.

*Trademark Law > Subject Matter > Suggestive Terms*
[HN10] A suggestive mark is entitled to protection against infringement under the trademark laws.

*Trademark Law > Subject Matter > Strength*
[HN11] An arbitrary or fanciful mark receives the most protection based on the strength of the mark. Fanciful marks are terms which are "coined" and have no apparent meaning.

*Trademark Law > Subject Matter > Strength*
[HN12] An arbitrary term is one in common use, but applied to a product or service unrelated to its meaning, so that the word neither describes nor suggests the product or service.

*Trademark Law > Subject Matter > Strength*
[HN13] In assessing the strength of a mark, and attempting to fit a term into a precise category, one court has observed that the useful labels generic, descriptive, suggestive, or arbitrary or fanciful are central tones in a spectrum; they tend to merge at their edges and are frequently difficult to apply.

*Trademark Law > Subject Matter > Geographic Terms > General Overview*
*Trademark Law > Subject Matter > Geographic Terms > Protectable Terms*
[HN14] Ordinarily, a geographical term by itself receives no trademark protection. It is no different than any other generic or descriptive term. However, when used in combination with other descriptive terms, the synergy of the combined term is entitled to protection under the trademark laws.

*Trademark Law > Subject Matter > Strength*
[HN15] A consideration in determining the strength of the mark is third-party use. Extensive third-party use of a term weakens the mark.

*Trademark Law > Subject Matter > Strength*
*Trademark Law > Trademark Counterfeiting Act > Civil Actions > General Overview*
[HN16] No single factor is determinative of the degree of *15 U.S.C.S. § 1114* protection. Marks must be compared in their entireties in connection with the particular goods or services for which they are used.

*Trademark Law > Likelihood of Confusion > Similarity > General Overview*
[HN17] In evaluating the similarity of marks, the inquiry must be the overall impression created by the marks, including a comparison of the appearance, sound and meaning of the marks, as well as the manner in which they are displayed. Likelihood of confusion cannot be predicated on dissection of a mark, that is, on only part of a mark.

*Trademark Law > Subject Matter > Colors*
[HN18] Color, in the absence of secondary meaning, can never be inherently distinctive.

*Trademark Law > Likelihood of Confusion > Similarity > General Overview*
[HN19] Courts look with suspicion upon one who approaches so near to his successful rival that the public may fail to distinguish between them. This

408 F. Supp. 2d 1237, *; 2005 U.S. Dist. LEXIS 37603, **;
19 Fla. L. Weekly Fed. D 149

weighs heavily on the similarity scale in the calculus of the likelihood of confusion.

***Trademark Law > Likelihood of Confusion > Intent > General Overview***
***Trademark Law > Likelihood of Confusion > Similarity > General Overview***
[HN20] A court may examine the defendants' subjective intent in assessing the likelihood of confusion between the two marks. If a plaintiff can show that a defendant adopted a mark of the plaintiff with the intent of deriving benefit from the reputation of the plaintiff, that fact alone may be sufficient to justify the inference that there is confusing similarity. To determine whether a defendant has acted in bad faith, a court must examine whether the defendant adopted its mark with the intention of capitalizing on the plaintiff's reputation and goodwill and any confusion between his and the senior user's product.

***Trademark Law > Likelihood of Confusion > Intent > Circumstantial Evidence***
[HN21] Intent, most often, must be proved by circumstantial evidence.

***Trademark Law > Likelihood of Confusion > Consumer Confusion > Circuit Court Factors > General Overview***
[HN22] Although evidence of actual confusion between trademarks is not necessary for a finding of likelihood of confusion, any such actual confusion is the best such evidence.

***Trademark Law > Likelihood of Confusion > Consumer Confusion > Circuit Court Factors > General Overview***
[HN23] Very little proof of actual confusion would be necessary to prove the likelihood of actual confusion.

***Trademark Law > Likelihood of Confusion > Consumer Confusion > Circuit Court Factors > 11th Circuit Court***
[HN24] Actual confusion is one of the two factors considered in Eleventh circuit to be the most important in determining likelihood of confusion. The most persuasive evidence in assessing the likelihood of confusion is proof of actual confusion.

***Trademark Law > Likelihood of Confusion > Consumer Confusion > Circuit Court Factors > General Overview***
[HN25] While very little proof of actual confusion would be necessary to prove the likelihood of confusion, an almost overwhelming amount of proof would be necessary to refute such proof.

***Civil Procedure > Remedies > Injunctions > Elements > Irreparable Harm***
***Trademark Law > Infringement Actions > Remedies > Equitable Relief > General Overview***
[HN26] A sufficiently strong showing of likelihood of confusion caused by trademark infringement may by itself constitute a showing of a substantial threat of irreparable harm.

***Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions***
[HN27] *Fed. R. Civ. P. 65(c)* provides that no preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined.

***Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions***
[HN28] A court has the discretion to issue a preliminary injunction without requiring the plaintiffs to give security, notwithstanding the seemingly mandatory language of *Fed. R. Civ. P. 65(c)*. Whether or not to require a bond in any particular case--and the amount of any such bond demanded--is within the discretion of the trial judge. For instance, the bond requirement may be waived if bond is not requested, or if no evidence is presented that a party will suffer damages from the issuance of an injunction.

408 F. Supp. 2d 1237, *; 2005 U.S. Dist. LEXIS 37603, **;
19 Fla. L. Weekly Fed. D 149

*Civil Procedure > Pleading & Practice > Defenses,
Demurrers, & Objections > Affirmative Defenses*
[HN29] Unclean hands cannot be asserted against a
party seeking relief as a free-floating defense un-
connected to the conduct at issue. The conduct must
be directly related to the plaintiffs' trademark claim
against the defendants.

**COUNSEL:** **[\*\*1]** For Xavier Pierre Tancogne,
Gapardis Health and Beauty, Inc., Plaintiff: David
M. Rogero, Esq., Coral Gables, FL.

For Tomjai Enterprises Corporation &, Aimalohi
Imana, Defendant: Michael H. Blacker, Esq., Mi-
ami, FL; John H. Oltman, Esq., Ft. Lauderdale, FL.

For G&P Factor Outlet Corp., Defendant: Tom F.
Almon, Esq., Miami, FL.

**JUDGES:** THEODORE KLEIN, UNITED
STATES MAGISTRATE JUDGE.

**OPINION BY:** Klein

**OPINION**

 **[\*1241] ORDER (i) GRANTING PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNC-
TION, AND (ii) DENYING DEFENDANT
TOMJAI ENTERPRISES CORPORATION'S
MOTION FOR PRELIMINARY INJUNCTION**

    This matter comes before the Court upon Plain-
tiffs' Motion for Preliminary Injunction (**D.E. No.
19**) filed on July 8, 2005; Defendant/Counter-
Plaintiff Tomjai Enterprises Corporation's ("Tom-
jai") Motion for Preliminary Injunction and Re-
straining Order (**D.E.** No. 43-1, 43-2) filed on Au-
gust 1, 2005; and the affidavits and declarations
filed by both sides in support of and opposition to
the preliminary injunction motions. [1] The Court
conducted an evidentiary hearing on September 28
and October 6-7, 2005, during which both sides
presented testimony and evidence. Based on the
motions and responses thereto, **[\*\*2]** the testimony
of witnesses (live and by affidavit), the evidence in
the record, and the oral and written arguments of
counsel, the Court GRANTS Plaintiffs' motion for
preliminary injunction and DENIES Defendant

Tomjai Enterprise Corporation's motion for pre-
liminary injunction, for the reasons set forth below.

    1    Based on the parties' consent, this case
    was referred to the undersigned United States
    Magistrate Judge to take all necessary and
    proper action as required by law and to ren-
    der a final Order on all pretrial motions.
    (D.E. No. 76).

**INTRODUCTION**

**A. Procedural History**

    Plaintiffs Xavier Pierre Tancogne ("Tancogne")
and Gapardis Health and Beauty, Inc. ("Gapardis")
commenced this action against Defendants Tomjai
Enterprises Corporation ("Tomjai") and its Presi-
dent, Aimalohi Imana ("Imana"), as well as G&P
Factory Outlet Corp. ("G&P") (D.E. No. 1). [2] Plain-
tiffs seek relief under the Trademark Counterfeiting
Act of 1984, *15 U.S.C. §§ 1116-17*; *Sections 32* and
*43* of **[\*\*3]** the Lanham Trademark Act, *15 U.S.C.
§§ 1114*, *1125*; as well as Florida common law pro-
hibiting unfair competition and unjust enrichment.

    2    The Court will use the term "Plaintiffs" to
    mean one or both Plaintiffs, and "Defen-
    dants" to mean Tomjai and/or Imana, unless
    a distinction is necessary. The Court will dis-
    tinguish the individual parties when neces-
    sary.

    Defendants answered, raising numerous af-
firmative defenses, and filed a Counterclaim against
Plaintiffs, alleging trademark and trade dress viola-
tions, tortious interference, and slander (D.E. Nos.
15-1, 40). [3]

    3    Following the entry of Judge Lenard's
    Orders dated July 12 and 22, 2005 (D.E.
    Nos. 30, 39), only Defendants' Verified An-
    swer -- filed as Docket Entry No. 15-1 -- re-
    mained in the record. Defendants' Counter-
    claim was filed shortly thereafter, on July 26,
    2005, as Docket Entry No. 40.

    **[\*\*4]** Both Plaintiffs and Defendants have
filed motions for preliminary injunction pursuant to
the Lanham Act, *15 U.S.C. 1114*, *1116*, **[\*1242]**
and *Federal Rule of Civil Procedure 65*. (D.E. Nos.
19 and 43). Plaintiffs, in their motion, claim that

Case 1:08-cv-00526    Document 157-3    Filed 09/10/2008    Page 65 of 101

Page 6

408 F. Supp. 2d 1237, *; 2005 U.S. Dist. LEXIS 37603, **;
19 Fla. L. Weekly Fed. D 149

Defendants' use of their mark infringes on Plaintiffs' mark and has created a likelihood of confusion among the relevant buying public. Defendants, in their motion, claim that Plaintiffs' products infringe on Defendants' use of their mark and trade dress and creates a likelihood of confusion among the public. They also seek to restrain Plaintiffs from tortiously interfering with their business relationships with their customers.

## B. Factual Background

Plaintiff Gapardis is the exclusive licensee and distributor for Plaintiff Tancogne with regard to the sale of cosmetic products imported and distributed by Tancogne. Tancogne owns a collection of registered trademarks, including "Fair & White," "Paris Fair & White," and "Fair & White Health Security Labo Derma Paris." Defendant Imana owns, operates, and manages Defendant Tomjai as its sole operator and director. Tomjai is also engaged [**5] in the distribution and sale of beauty and cosmetic products on the retail and wholesale markets.

This case concerns the alleged infringement of trademarks related to cosmetic supplies, marketed primarily to ethnic Carribean and African women, that are designed to lighten the skin. Plaintiffs market and sell a large line of lightening products that include four items: lightening lotion, lightening cream, lightening gel, and exfoliating lightening soap. Defendants market and sell only four items, identical to those four of Plaintiffs' products set forth above. Plaintiffs market, sell, and distribute their line of products under the name "Paris Fair & White" pursuant to the registered marks. Defendants' products are marketed, sold, and distributed under the name "Fair & Brite Paris." [4]

> 4   Defendants filed an application with the U.S. Patent and Trademark Office in January 2004 to register the mark "Fair & Brite" although the products bear the mark "Fair & Brite Paris."

Plaintiffs' marks have been used on a variety [**6] of cosmetic products and are distributed through some 6,000 retail stores in the United States, including some 250 stores in Florida. In the past two years, Plaintiffs have sold almost one and a half million units of products bearing the "Paris Fair & White" and "Fair & White" marks. Although Defendants' distribution network is much smaller, they sell and distribute their products to the same retail stores.

Both competing lines of products contain the word "Paris" on the label of each of their products. Plaintiffs' use of the word "Paris" is such that it appears before the words "Fair & White," while the word "Paris" on Defendants' product appears after the name "Fair & Brite." Plaintiffs' line of products are manufactured in Paris, and are packaged in a variety of colors and forms. They recently added a line of products in a fuchsia-colored package. Defendants' four products are all packaged in an identical fuchsia color.

Plaintiffs claim that Defendants' use of the brand name "Fair & Brite Paris" so closely resembles Plaintiffs' name and design as to infringe on Plaintiffs' trademark rights, resulting in monetary damages as well as harm to the reputation and goodwill that Plaintiffs [**7] have earned with regard to their products in the eyes of consumers. Plaintiffs assert that Defendants purposely incorporated similar trademark elements with an intent to reproduce and counterfeit Plaintiffs' trademark and to confuse those members of the consuming public intent on purchasing Plaintiffs' "Fair & White" and [*1243] "Paris Fair & White" products to be deceived into purchasing Defendants' "Fair & Brite" products instead. Moreover, Plaintiffs contend the similarity and confusion is enhanced by virtue of Defendants' adoption of a trade dress in a fuchsia-colored packaging which copies Plaintiffs' new line of fuchsia-colored packaged products.

In Defendants' Response to Plaintiffs' Motion for Preliminary Injunction, Defendants contend that they took pains to distinguish their trade name and dress from any other competing products on the marketplace, including Plaintiffs'. Defendants claim that their use of the name "Fair & Brite" together with the word "Paris" simply describes the "nature of the product and its purpose." See Defendants' Response (D.E. No. 65) at 4 n. 1. The inclusion of the word "Paris" simply denotes the place of manufacture of their products. Moreover, they [**8] assert, the choice of color, the inclusion of a crescent moon logo, and the type of dispenser containing the product all created a distinctive packaging that could easily be distinguished from the Plaintiffs' line of "Paris Fair & White" products. In their coun-

Case 1:08-cv-00526    Document 157-3    Filed 09/10/2008    Page 66 of 101

Page 7

408 F. Supp. 2d 1237, *; 2005 U.S. Dist. LEXIS 37603, **;
19 Fla. L. Weekly Fed. D 149

terclaim, Defendants contend that Plaintiffs have infringed on their "Fair & Brite" trademark and trade dress by copying Defendants' four-product fuchsia-colored line.

**Preliminary Injunction Standard**

All parties agree that [HN1] a preliminary injunction should be granted only if: 1) the moving party has a substantial likelihood of success on the merits; 2) failure to issue the preliminary injunction will result in irreparable injury; 3) the harm facing the moving party outweighs the potential damage that the injunction poses to the non-moving party; and 4) issuing the injunction would not be adverse to the public interest. See, e.g., *Int'l Cosmetics Exch., Inc. v. Gapardis Health & Beauty, Inc., 303 F.3d 1242, 1246 (11th Cir. 2002)*; *Am. Red Cross v. Palm Beach Blood Bank, Inc., 143 F.3d 1407, 1410 (11th Cir. 1998)*. [HN2] At the preliminary injunction stage, the Court may rely **[**9]** on "affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the evidence is appropriate given the character and objectives of the injunctive proceeding.'" *Levi Strauss & Co. v. Sunrise Int'l Trading, Inc., 51 F.3d 982, 985 (11th Cir. 1995)* (citation omitted). [HN3] A preliminary injunction is an "extraordinary and drastic remedy" and will not be granted unless the movant clearly establishes the burden of persuasion as to the four prerequisites. *McDonald's Corp. v. Robertson, 147 F.3d 1301, 1306 (11th Cir. 1998)* (citations omitted).

[HN4] While equitable relief in a trademark case should be narrowly tailored to cure the ongoing harm by distinguishing the infringing product from the original, see *B.H. Bunn Co. v. AAA Replacement Parts Co., 451 F.2d 1254, 1269 (5th Cir. 1971)*, preliminary injunctive relief is often appropriate in such cases because of the potential for irreparable injury that can cause damage to a trademark holder's reputation that are not easy to calculate, compensate, or prove with specificity. See *Power Test Petroleum Distribs., Inc. v. Calcu Gas, Inc., 754 F.2d 91, 95 (2nd Cir. 1985)* **[**10]** (noting that "reputation is not calculable nor precisely compensable" in its assessment of the irreparable injury prong); *Multi-Local Media Corp. v. 800 Yellow Book, Inc., 813 F. Supp. 199, 202 (E.D.N.Y. 1993)* ("Federal courts have long recognized the need for immediate injunctive relief in trademark infringement cases due to the amorphous nature of the damage to the trademark and the resulting difficulty of proving monetary damages.").

**Lanham Act Standard**

[HN5] *Section 32* of the Lanham Act (*15 U.S.C. § 1114(1)*) provides for liability of a **[*1244]** person who, without consent of a trademark registrant, uses in commerce "any reproduction, counterfeit, copy, or colorable imitation of a registered mark" which "is likely to cause confusion, or to cause mistake, or to deceive." In this circuit, seven factors have been identified to assist in answering the question of whether there is a likelihood of confusion between the registered mark and the alleged infringing mark. They are: (1) the type of trademark; (2) the similarity of the marks; (3) the similarity of the products the marks represent; (4) the similarity of the parties' retail outlets **[**11]** and purchasers; (5) the similarity of the advertising media used; (6) the defendant's intent; and (7) actual confusion. *Lone Star Steakhouse & Saloon, Inc. v. Longhorn Steaks, Inc., 122 F.3d 1379, 1382 (11th Cir. 1997)*; *Dieter v. B & H Indus. of S.W. Fla., Inc., 880 F.2d 322, 326 (11th Cir. 1989)*.

Of these seven factors, the Eleventh Circuit considers the type of mark and the evidence of actual confusion to be the two most important factors. *Longhorn Steaks, 122 F.3d at 1382*; *Dieter, 880 F.2d at 326*. In reviewing the evidence, there are no set rules as to how much evidence of confusion is needed; rather, a district court "must take into consideration the circumstances surrounding each particular case." *Dieter, 880 F.2d at 325 n.3*. To establish a likelihood of confusion all factors do not have to be resolved in favor of the plaintiff. See *Safeway Stores, Inc. v. Safeway Disc. Drugs, Inc., 675 F.2d 1160, 1167 (11th Cir. 1982)*.

**ANALYSIS**

**I. Plaintiffs' Motion for Preliminary Injunction**

1. Type of Mark

[HN6] This factor denotes the strength of the mark. The **[**12]** stronger the mark, the greater the protection it is afforded. *John H. Harland Co. v. Clarke Checks, Inc., 711 F.2d 966, 973-74 (11th Cir. 1983)*. Four categories of strength are recog-

408 F. Supp. 2d 1237, *; 2005 U.S. Dist. LEXIS 37603, **;
19 Fla. L. Weekly Fed. D 149

nized: (1) generic; (2) descriptive; (3) suggestive; or (4) arbitrary or fanciful. *Am. Television v. Am. Communications, 810 F.2d 1546, 1548 (11th Cir. 1987).* These categories are based on the relationship between the name and the service or good it describes.

[HN7] A generic name suggests the basic nature of the article or service, and usually gets no protection. *Id. at 1548.* Thus, the terms "bank," "electrician," "soap," or "restaurant" standing alone would receive no trademark protection.

[HN8] A descriptive term identifies qualities or characteristics of the goods or services with which they are connected, such as color, odor, function, dimensions, or ingredients. Examples of such terms are "sweet," "large," "mellow," and "strong," or "cleanser," "detergent," and "conditioner." If a word mark is found to be descriptive, it is protectable only if the owner can show the mark has acquired a secondary meaning. *Freedom Sav. & Loan Ass'n v. Way, 757 F.2d 1176, 1182 n.5 (11th Cir. 1985).* [**13] To establish a secondary meaning in this circuit, a plaintiff "must show that the primary significance of the term in the minds of the consuming public is not the product, but the producer." *Vision Center v. Optiks, Inc., 596 F.2d 111, 118 (5th Cir. 1979)* (citation omitted).

[HN9] A suggestive terms suggests, rather than describes, a characteristic of the goods or services and "requires an effort of the imagination by the consumer in order to be understood as descriptive." *Am. Television, 810 F.2d at 1549.* The combination of two or more descriptive words as a composite mark may result in a suggestive term. 2 McCarthy on Trademarks and Unfair Competition § 11.26 (4th ed.). Thus, for example, in *Application of Colonial Stores, Inc., 394 F.2d 549, 55 C.C.P.A. 1049 (C.C.P.A. 1968),* [*1245] the terms "sugar" and "spice" were considered individually to be descriptive terms for bakery products, since they described ingredients of some bakery goods. However, when combined, they became suggestive, since the combination evoked more than just a description of ingredients. See *Vision Center, 596 F.2d at 116* ("common ordinary words can be combined in [**14] a novel or unique way and thereby achieve a degree of protection denied to the words when used separately."); *In re DeSoto, Inc., 172 U.S.P.Q. 497 (T.T.A.B. 1972)* (FAMOUS FLOCKS non-

descriptive of woven wall covering). [HN10] A suggestive mark is entitled to protection against infringement under the trademark laws. *Sun-Fun Products, Inc. v. Suntan Research & Dev., Inc., 656 F.2d 186, 191 n.5 (5th Cir. 1981); Soweco, Inc. v. Shell Oil Co., 617 F.2d 1178, 1184 (5th Cir. 1980).*

The fourth and final category, [HN11] arbitrary or fanciful, receives the most protection based on the strength of the mark. Fanciful marks are terms which are "coined" and have no apparent meaning. Examples of such terms are "Cingular," "Kodak," and "Xerox." [HN12] An arbitrary term is one "in common use, but applied to a product or service unrelated to its meaning, so that the word neither describes nor suggests the product or service." *Jellibeans, Inc. v. Skating Clubs of Georgia, Inc., 716 F.2d 833, 841 (11th Cir. 1983).* An example of such an arbitrary term is Apple Computers.

[HN13] In assessing the strength of a mark, and attempting to fit a term into a precise category, one [**15] court observed that "these useful labels are instead central tones in a spectrum; they tend to merge at their edges and are frequently difficult to apply." *Soweco, 617 F.2d at 1183.*

In this instance, the composite term "Fair & White" suggests the effect that the line of products at issue here, i.e., skin lightening agents, will have when the consumer uses them. The combined term does not describe ingredients of the products or their quality. The products themselves are not "fair" and "white." Instead, the terms arouse the imagination, and conjure up an image of what the products are intended to do: make the skin fair and white. Thus, the trademarked term "Fair & White" falls at the edge of the category "suggestive," merging at the border of terms which are descriptive, [5] and is therefore entitled to a modicum of protection against infringement; the protection it receives, although limited, requires taking into account the nature of the alleged infringing product, the scope of the infringement, and the degree of competition between the products at issue.

5   For example, "Fair & White" could also apply to other products such as toothpaste or laundry detergent, and it would suggest that those products do rather than describing a characteristic of the goods or services.

Case 1:08-cv-00526    Document 157-3    Filed 09/10/2008    Page 68 of 101

Page 9

408 F. Supp. 2d 1237, *; 2005 U.S. Dist. LEXIS 37603, **;
19 Fla. L. Weekly Fed. D 149

[**16] The trademarked term "Paris Fair & White" lies further on the continuum of the strength of the mark, and is entitled to greater protection than "Fair & White." However, it is more suggestive, since the term "Paris" in connection with cosmetics connotes the geographical center of style and beauty, and thus requires the consumer to exercise some imagination that the product embodies a particular quality or attribute. See, e.g., *id. at 1184* ("If used as a trademark for refrigerators, the term Penguin' would be suggestive."). [HN14] Ordinarily, a geographical term by itself receives no protection. See, e.g., *World Carpets, Inc. v. Dick Littrell's New World Carpets, 438 F.2d 482, 485-86 (5th Cir. 1971)* (citing *15 U.S.C. § 1502(e)(2)*, court explained that "Congress has expressly left accessible to all potential users those names of subdivisions of the earth -- regions, [*1246] nations, counties, towns, rivers, lakes, and other natural and artificial geographical units -- which could be employed to draw public attention to the origin of a product or the situs of a business."). It is no different than any other generic or descriptive [**17] term. However, when used in combination with other descriptive terms, the synergy of the combined term is entitled to protection under the trademark laws. See, e.g., *California Cooler, Inc. v. Loretto Winery, Ltd., 774 F.2d 1451, 1455 (9th Cir. 1985)* (court rejected the argument that the words "California" and "Cooler," which admittedly were geographic and generic in nature, were incapable of achieving distinctness; court held that the validity of the composite term "California Cooler" was not judged by examining its parts but rather by viewing the trademark as a whole). The distinction between the status of protection afforded "Fair & White" and "Paris Fair & White" is largely academic, since it is essentially Plaintiffs' "Paris Fair & White" mark that is at issue here. As stated, it is entitled to greater protection because of its suggestive nature.

[HN15] Another consideration in determining the strength of the mark is third-party use. *Sun Banks of Fla., Inc. v. Sun Fed. Sav. & Loan, 651 F.2d 311, 315-16 (5th Cir. 1981)*. Extensive third-party use of a term weakens the mark. Id.; *Amstar Corp. v. Domino's Pizza, Inc., 615 F.2d 252, 260 (5th Cir. 1980)*. [**18] Defendants have introduced a number of other competing products with purportedly similar names to show third-party use, as well as to show that the individual terms in Plaintiffs' marks are commonly used in the names of competing products. They include "Derma White," "Dermo White," "Skin White," "Body White," "Fairskin," "Naturally Fair," "Fair & Beautiful," "Fair & Lovely," "Sure White," "Maxi Light," and "Fair and Balance." None of these competing products uses the combination trademark term "Fair & White," or "Paris Fair & White," and therefore do not qualify as third-party use. In addition, Plaintiffs have shown that they, themselves, own one of those products and have taken action to enjoin the usage of those that closely resemble Plaintiffs' mark.

The use of the individual terms "Paris," "fair," or "white" alone or with other words do not constitute third-party use of the precise terms "Fair & White," or "Paris Fair & White" which are the registered marks at issue here. However, use of those individual terms, i.e., "Paris," "fair," and "white," receive little protection in view of their descriptive nature and extensive third-party use. See, e.g., *Freedom Sav. & Loan Ass'n, 757 F.2d at 1182* [**19] (noting other businesses offering real estate and financial services use the name "Freedom"); *Amstar Corp., 615 F.2d at 259-60* (use of "Domino" by Plaintiff's sugar brand suffers diminished strength of its mark in view of extensive third-party use of "Domino" in connection with many other products, thereby precluding relief against Defendant, Domino's Pizza). It is only in combination that the terms would be entitled to some protection.

Defendants contend that because the individual words in Plaintiffs' mark are all used in other skin lightening products, they therefore get no trademark protection. To *be* sure, the words in the trademark, "Paris," "fair," and "white" are all common words. Were the businesses or products of the alleged infringers in this case different from that of Plaintiffs, there would be less inclination to protect the use of them even in combination. Plaintiffs might be hardpressed to prevent a totally different product or service from using those words. See, e.g., *Sun Banks of Fla., 651 F.2d at 316-17*. But where, as here, and as will be elucidated in later sections of this order, Defendants are capitalizing [*1247] on those words [**20] with identical products directed to the same market and bearing a similar mark; by virtue of Defendants essentially playing on the registered word combination with a close copy, Plaintiffs are entitled to the protection of the trademark laws

Case 1:08-cv-00526    Document 157-3    Filed 09/10/2008    Page 69 of 101

Page 10

408 F. Supp. 2d 1237, *; 2005 U.S. Dist. LEXIS 37603, **;
19 Fla. L. Weekly Fed. D 149

against this particular use, as opposed to non-competing uses. However, since Defendants are not using the exact term "Paris Fair & White," other factors, especially actual confusion and intent, take on added significance. [HN16] No single factor is determinative. Marks must be compared in their entireties in connection with the particular goods or services for which they are used. *In re National Data Corp., 753 F.2d 1056, 1058 (Fed. Cir. 1985).*

### 2. Similarity of the Mark

[HN17] In evaluating the similarity of marks, the inquiry must be "the overall impression created by the marks, including a comparison of the appearance, sound and meaning of the marks, as well as the manner in which they are displayed." *E. Remy Martin & Co., S.A. v. Shaw-Ross Int'l Imports, Inc., 756 F.2d 1525, 1531 (11th Cir. 1985).* "Likelihood of confusion cannot be predicated on dissection of a mark, that is, on only part of a mark." *In re National Data Corp., 753 F.2d at 1058.* [**21] In this instance, there is considerable similarity between the marks. "Fair & Brite" has a similar sound as "Fair & White," and by Defendants using the term "Brite" instead of "Bright," it has enhanced the similarity of the look of the terms. The font in the competing products is extremely similar, and the stylized ampersand of Defendants is identical to that of Plaintiffs.

Defendants' placement of the words "Fair & Brite" with the words "Fair" over the word "Brite," connected with an ampersand, with the word "Paris" prominently displayed next to the name, is remarkably similar to Plaintiffs' display of "Fair & White" and "Paris" on their products. In addition, Defendants have chosen a fuchsia background color (described by Plaintiffs as pink) which is identical to a new line of products introduced by Plaintiffs. [6] Although Defendants' line of products are different from Plaintiffs' fuchsia-colored line, and are in actuality the same as Plaintiffs' other products packaged in different forms and colors, their fuchsia-colored line is confusingly similar in appearance to Plaintiffs' fuchsia colored line. The gray-white lettering on Defendants' products is virtually identical to the [**22] gray-white lettering on Plaintiffs' new product line. The overall look and appearance of Defendants' line is virtually identical to Plaintiffs' new line.

6   [HN18] Color, in the absence of secondary meaning, can never be inherently distinctive. *Wal-Mart Stores, Inc. v. Samara Bros., Inc., 529 U.S. 205, 120 S. Ct. 1339, 146 L. Ed. 2d 182 (2000).* But the other elements of the two marks are virtually identical in appearance.

Although "Fair & White" products are packaged in a variety of forms and colors, Defendants' depiction of their mark is so similar to Plaintiffs' mark so as to create an overall impression of striking similarity with the Plaintiffs' various lines. These are strong considerations in determining the likelihood of confusion.

Defendant Imana contends that she developed the fuchsia-colored line of products first, and that Plaintiffs copied her design. However, there is no credible evidence to support this proposition. Considering that Plaintiffs have a long-established line of products using many different colors on [**23] their packaging, and Defendants were total newcomers to the market, there would be little incentive or logical justification for Plaintiffs to copy Defendants' mark or trade dress. Given the similarities between Defendants' and Plaintiffs' marks and designs, it is impossible to attribute these resemblances to [*1248] mere coincidence; one of them copied the mark and design of the other.

After considering the testimony of witnesses for both sides, the Court finds Plaintiffs' witnesses to be credible on the issue of their earlier design and use of their mark on the fuchsia line of products, and rejects the testimony presented by Defendants on their claim of an earlier design and use of its mark.

Buttressing this conclusion is the fact that Plaintiffs' fuchsia-colored line appeared in prototype form in Paris in early 2004 and was marketed in other countries in the autumn of 2004. Imana, or those acting on her behalf, would have had access to the Plaintiffs' product line's design. Imana, on the other hand, staunchly contends that her design was a closely guarded secret and was not available to anyone until its launch in the United States in January, 2005. [7] Plaintiffs' fuchsia colored-line [**24] first appeared on the shelves in the United States in March, 2005. Based on all the testimony from both sides, it would have been physically impossible for

Plaintiffs to copy Defendants' design and get their products into the market in one month. Only in Greek mythology did Athena spring full-grown from the forehead of Zeus. Mortals require planning and preparation for such a birthing event. Moreover, Imana presented highly dubious testimony that her Paris chemist tested her products by having Imana and a few of her friends try the products and report the results back to the chemist. The chemist issued no written report, but apparently opined that the products were safe and efficacious based on the unscientific anecdotal results reported by Imana and her friends. [8]

> 7    Defendants did present testimony that their products were sold in Africa at the end of 2004.
>
> 8    Plaintiffs presented credible testimony that there is a 6-12 month testing period for new products, and a 6-8 month lead time in preparing packaging for such products. Plaintiffs' fuchsia-colored lines required and used such time before coming to the market.

[**25]  One other testimonial vignette bears note. Defendant Imana attempted to justify her use of the word "Paris" in her products' labels by claiming that her products were in fact manufactured in Paris. However, Michel Farah, Plaintiff Gapardis' principal, testified that he owned a tube-packaging machine which he lent to a company in Switzerland to be used for manufacturing and packaging some of Plaintiffs' other products. In a court-authorized raid, Farah discovered the presence of "Fair & Brite" soap on the premises, and also learned that the company was using his machine to package Defendants' tube products in Switzerland. He was able to verify this by batch coding on the "Fair & Brite" tubes he examined elsewhere, and by the unique crimping done on the bottom of the tubes after they were filled. In response, Imana testified that the empty tubes were shipped from Switzerland to Paris, where they were then filled. Presumably, since the tubes were totally closed at that point, the process would have been similar to squeezing toothpaste back into a tube, and then sealing it with the puncturable metal seal before the cap is placed on the tube. The Court finds Imana's testimony on this point [**26]  not worthy of belief.

Defendants' introduction of various third party products also supports the similarity of the marks at issue here. The third party products contain various different names, different colors, design, fonts, and layouts. Of all the infinite possibilities, Defendants chose an overall look and design which is virtually identical to that of  [*1249]  Plaintiffs. [HN19] Courts look with suspicion upon one who "approaches so near to his successful rival that the public may fail to distinguish between them." *Chevron Chem. Co. v. Voluntary Purchasing Groups, Inc., 659 F.2d 695, 704 (5th Cir. 1981)* (citation omitted). This weighs heavily on the similarity scale in the calculus of the likelihood of confusion.

3. Similarity of the Products the Marks Represent

The products at issue here are identical. Defendants have four products: lightening lotion, lightening cream, lightening gel, and exfoliating lightening soap. Plaintiffs have the same products, albeit packaged differently. All are intended to lighten the skin.

4. Similarity of the Parties' Retail Outlets and Purchasers

The retail outlets and purchasers of Plaintiffs' and Defendants' products are identical,  [**27] even though Defendants' network is much smaller than Plaintiffs'.

5. Similarity of the Advertising Media Used

Defendant Imana testified that she advertises on Haitian and Jamaican television and radio. Defendants also have a website and advertise their products on their website. Plaintiffs do no TV or radio advertising. They advertise in trade journals and on their website. The similarity of advertising is minimal. This is a relatively minor factor compared to the other components analyzed to determine the likelihood of confusion.

6. Defendants' Intent

[HN20] The Court may also examine Defendants' subjective intent in assessing the likelihood of confusion between the two marks. *John H. Harland Co., 711 F. 2d at 977* (if "a plaintiff can show that a defendant adopted a mark of the plaintiff with the intent of deriving benefit from the

reputation of the plaintiff, that fact alone may be sufficient to justify the inference that there is confusing similarity.'" (citation omitted)). "To determine whether a defendant has acted in bad faith, a court must examine whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill **[**28]** and any confusion between his and the senior user's product.'" *Michael Caruso & Co., Inc. v. Estefan Enters., Inc., 994 F. Supp 1454, 1462(S.D. Fla. 1998)* (citing *The Sports Authority, Inc. v. Prime Hospitality Corp., 89 F.3d 955 964 (2d Cir. 1996))*.

[HN21] Intent, most often, must be proved by circumstantial evidence. *Jellibeans, 716 F.2d at 843.* In this instance, Defendant Imana had more than passing familiarity with Plaintiffs' products. She had distributed the "Paris Fair & White" line beginning in 1997, but after learning that Plaintiff Gapardis had an exclusive distributorship for the products, she stopped distributing them. She testified that she began designing and developing the "Fair & Brite" line in 2004, and began distribution in February 2005. She stated that she used the term "Brite" because her customers didn't want white, but instead wanted bright skin. She also testified that she was aware of the "Fair & White" and the "Paris Fair & White" lines, that she had concerns about Michel Farah (Gapardis' principal), and that is why she made her products' design and marks so different. She claims she was unaware of Plaintiffs' fuchsia-colored **[**29]** line and that Gapardis copied her design and marks. Coincidentally, her line of products replicate Plaintiffs' best selling products.

The Court finds Defendant Imana's testimony not credible. Her claimed reason for choosing the word "Brite" is disingenuous, since a perusal of the labels on her **[*1250]** products discloses that all claim to be skin lightening agents. The one product that has the words "Brighten Lotion" on its label, also states in the "Indications" section on the back of the product that it "acts against the formulation of new pigment spots while lightening the skin quickly" (emphasis supplied). As for her claim that she did all she could to make the products different, that too is not credible. Examining all the third party products, and the infinite variables that are employed by these products, it defies logic and common sense that the only combination Defendant

Imana could come up with wound up bearing such an uncanny resemblance to Plaintiffs' products.

For the reasons stated earlier and in this subsection, the Court finds that Defendants copied Plaintiffs' trademark on all their products, and also copied Plaintiffs' fuchsia-colored line's trademark and design. In so doing, **[**30]** they exercised bad faith by attempting to capitalize on Plaintiffs' reputation and goodwill established for their products, and in particular, in their best selling products; they thereby created confusing similarity between the products.

**7. Actual Confusion**

[HN22] Although evidence of actual confusion between trademarks is not necessary for a finding of likelihood of confusion, any such actual confusion is the best such evidence. *E. Remy Martin & Co., 756 F.2d at 1529; John H. Harland Co., 711 F.2d at 978.* Although the extent of such actual confusion will determine the weight to be given it, the court in John H. Harland Co. noted that in *Safeway Stores Inc., 675 F.2d at 1166-67,* the court held that two instances of actual confusion were "worthy of consideration" as sufficient evidence of actual confusion. The court further cited *World Carpets, 438 F.2d at 490,* which held that "reason tells us that . . .[HN23] very little proof of actual confusion would be necessary to prove the likelihood of actual confusion."

[HN24] Actual confusion is one of the two factors considered in this circuit to be the most important in determining **[**31]** likelihood of confusion. *Longhorn Steaks, 122 F.3d at 1382; Dieter, 880 F.2d at 326.* "The most persuasive evidence in assessing the likelihood of confusion is proof of actual confusion." *Alliance Metals, Inc. v. Hinely Indus., Inc., 222 F.3d 895, 907 (11th Cir. 2000).*

In this instance, there was ample evidence of actual confusion. Zaher El Khatib, a wholesale distributor of Plaintiffs' products, testified that he heard customers on several occasions in retail stores refer to the "Fair & Brite" products as the new "Fair & White." His declaration, supported by testimony, stated he found "Fair & Brite" products displayed in one of the display cases intended for the exclusive display of "Fair & White" products. When he asked the retailer why this had been done, the retailer re-

Case 1:08-cv-00526    Document 157-3    Filed 09/10/2008    Page 72 of 101

Page 13

408 F. Supp. 2d 1237, *; 2005 U.S. Dist. LEXIS 37603, **;
19 Fla. L. Weekly Fed. D 149

sponded that he thought the "Fair & Brite" product was part of the "Fair & White" line. In Michel Farah's declaration and testimony, he also cited reports of confusion from retailers and consumers who thought "Fair & Brite" was a new line of "Fair & White" products.

Defendants called several retailers to testify that they were not confused by the two separate [**32] lines, and that no customers complained to them that they were confused. Of course, a lack of complaints does not prove that the customers were not confused. This testimony has little probative value. [HN25] "While very little proof of actual confusion would be necessary to prove the likelihood of confusion, an almost overwhelming amount of proof would be necessary to refute such proof." *Soweco, 617 F. 2d at 1186* (quoting *World Carpets, 438 F. 2d at 489*).

[*1251] Perhaps the most damaging testimony of actual confusion came from one of Defendants' own witnesses. Sofia Longchamp testified that she works for and is paid by Defendant Tomjai. She is physically located at the premises of another Defendant, G & P Factory Outlet, apparently there to promote Tomjai's products. She talks to retail customers on a regular basis. She stated that of the 100 or so people that she talked to about "Fair & Brite" and "Fair & White," about 50% (or about 50 of them) were confused about the two lines of products. Some were confused by the name, and others were confused by the appearance of the two different lines. This is considerable evidence of actual confusion.

**Application  [**33]  of Law to Facts**

Employing the seven-part test for determining the likelihood of confusion, and the four-part test for a preliminary injunction, it is clear that Plaintiffs are entitled to injunctive relief.

Likelihood of Confusion

Plaintiffs have satisfied the two most important factors, i.e., strength of the mark and actual confusion. Plaintiffs' "Paris Fair & White" trademark is suggestive, and is sufficiently strong to merit protection against the directly competing use by Defendants' copy of Plaintiffs' mark which bears the name "Fair & Brite Paris." There was ample evidence of actual confusion, testified to by Plaintiffs'

witnesses and at least one of Defendants' witnesses. Defendants' mark bears great similarity to that of Plaintiffs, and Defendants' four products are identical to four of Plaintiffs' products, which are their best sellers. The retail outlets and the consumers for the two competing lines are identical. The evidence further demonstrates Defendants' intent and bad faith in copying Plaintiffs' marks. The only element that is not present is identity of advertising, but this factor is insignificant in light of the presence of the other six.

[**34] Elements of Injunction

Plaintiffs have shown a likelihood of success on the merits based on the considerations set forth above, and under prevailing standards have satisfied the requirement of showing that they will be irreparably harmed if Defendants are not enjoined from using their copy of Plaintiffs' marks. See, e.g., *McDonald's, 147 F.3d at 1310* [HN26] ("a sufficiently strong showing of likelihood of confusion [caused by trademark infringement] may by itself constitute a showing of . . . a substantial threat of irreparable harm." (citing *E. Remy Martin & Co., 756 F.2d at 1530*)). Additionally, Plaintiffs have presented other evidence of irreparable injury. Two of Defendants' "Fair & Brite" products (a lotion and a creme) contain hydroquinone, a skin-bleaching substance which the FDA does not permit for over-the-counter sales in concentrations greater than 2.0%. The labeling on these "Fair & Brite" products does not indicate the concentration of hydroquinone contained therein. Defendant Imana testified that she directed her manufacturer to follow FDA guidelines, but she provided no evidence that FDA regulations were being met. Furthermore,    [**35] Imana acknowledged that no independent testing of the concentration of hydroquinone in her products is done. The Court also notes the unscientific method by which the original testing of Defendants' products was conducted. To the extent that consumers confuse Defendants' products with Plaintiffs', Plaintiffs face damage to their reputation and loss of customers caused by distribution of a possibly harmful substance. *Id. at 1309-10* (damage to McDonald's reputation and loss of customers which could be caused by distribution of an allegedly inferior and possible dangerous product held out as McDonald's product [*1252] constituted irreparable harm). The threatened injury to the trademark

408 F. Supp. 2d 1237, *; 2005 U.S. Dist. LEXIS 37603, **;
19 Fla. L. Weekly Fed. D 149

owners outweighs whatever damage the injunction may cause to the alleged infringers, and the injunction would not be adverse to the public interest.

### Posting of Security Bond

[HN27] *Federal Rule of Civil Procedure 65(c)* provides that no preliminary injunction

> shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is [**36] found to have been wrongfully enjoined. . . .

[HN28] This Court has the discretion to issue a preliminary injunction without requiring Plaintiffs to give security, notwithstanding the seemingly mandatory language of the rule. See, e.g., *Univ. Books and Videos, Inc. v. Metro. Dade County, 33 F. Supp. 2d 1364, 1374 (S.D. Fla. 1999)*; *Popular Bank of Fla. v. Banco Popular de P.R., 180 F.R.D. 461, 463-65 (S.D. Fla. 1998)*; *Campos v. I.N.S., 70 F. Supp. 2d 1296, 1310 (S.D. Fla. 1998)*. "Whether or not to require a bond in any particular case -- and the amount of any such bond demanded -- is within the discretion of the trial judge." *Univ. Books, 33 F. Supp. 2d at 1374* (noting that security generally was not required when, e.g., the party seeking the injunction has a high probability of succeeding on the merits of its claim). For instance, the bond requirement may be waived if bond is not requested, or if no evidence is presented that a party will suffer damages from the issuance of an injunction. See *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills, 321 F.3d 878, 882-83 (9th Cir. 2003)* (defendant [**37] failed to ask court to set a bond or submit evidence as to what damages she might incur as a result of the injunction); *Halo Mgmt. LLC v. Interland, Inc., 308 F. Supp. 2d 1019, 1027 n.11 (N.D. Cal. 2003)* (defendant failed to request bond or present any evidence (other than unsupported assertions of monetary risk) regarding its likely damages).

In this case, the issue of bond was raised initially by District Judge Lenard when she ordered Plaintiffs, in conjunction with their motion for preliminary injunction, to "provide a good faith as-

sessment of the sum that would adequately compensate both Defendants for their costs and damages if it is determined that Defendants were wrongfully enjoined or restrained." See Order to Show Cause (D.E. No. 49) at 2. [9] Plaintiffs responded by explaining that Defendants had not presented any evidence of any monetary damages they would sustain if a preliminary injunction in Plaintiffs' favor were issued. See Plaintiffs' Response to Order to Show Cause (D.E. No. 61) at 2. Plaintiffs therefore suggested that as there was no evidentiary basis upon which to set the amount of bond, given the court's wide discretion in this matter, [**38] none need be set.

> 9  At that same time, noting there had been no response to Plaintiffs' preliminary injunction motion, Judge Lenard ordered Defendants to show cause why the motion should not be granted.

Defendants subsequently moved to strike Plaintiffs' motion for preliminary injunction on the ground that Plaintiffs had failed to provide a good faith assessment in violation of court order. See Defendants' Motion Strike (D.E. No. 68) at 2. In responding to the motion to strike, Plaintiffs pointed out that Defendants, who by now had filed their opposition to the preliminary injunction motion, still had not offered any evidence regarding the damages they (Defendants) would suffer if the injunction were improvidently granted. See Plaintiffs' Response to "Motion Strike" ( [*1253] D.E. No. 79) at 2. Accordingly, Plaintiffs maintained their position that no bond need be set. On the same day that Plaintiffs responded to the motion to strike, Defendant Imana filed an affidavit (in support of her own motion for preliminary [**39] injunction) in which she averred that "the costs and damages which may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained are to the best of my belief approximately $ 25,000.00." (D.E. No. 83 at 2).

Under the circumstances, the Court finds that a preliminary injunction bond in the amount of $ 10,000.00 is adequate to compensate Defendants should it later be determined they were wrongfully enjoined in this action. Plaintiffs are ordered to post bond in the amount of $ 10,000.00 within forty-eight (48) hours after receipt of this Order.

408 F. Supp. 2d 1237, *; 2005 U.S. Dist. LEXIS 37603, **;
19 Fla. L. Weekly Fed. D 149

## II. Defendants' Motion for Preliminary Injunction

Defendants seek to enjoin Plaintiffs from infringing on their "Fair & Brite" trademark and trade dress, and also to restrain Plaintiffs from interfering with their business relationships with their customers.

As for Defendants' requested relief for trademark infringement, the motion is denied for the same reasons that Plaintiffs' motion is granted. The Court has made factual findings, including some relating to credibility of the witnesses, and has determined that Plaintiffs' fuchsia-colored line of products preceded Defendants' line, that Defendants' **[**40]** mark and packaging copied Plaintiffs' mark and packaging, and that Plaintiffs are entitled to the protection afforded by the trademark laws.

As for Defendants' claim for tortious interference, Defendants failed to show irreparable harm entitling them to injunctive relief. Defendant were able to quantify their sales and potential losses as a result of Plaintiffs' alleged tortious interference. The testimony clearly showed that money damages are available and capable of calculation to compensate Defendants for any proven tortious interference. Accordingly, injunctive relief based on this claim is inappropriate.

Unclean Hands

Defendants also seek to bar Plaintiffs from obtaining an injunction based on the equitable doctrine of unclean hands. Specifically, Defendants claim two separate acts: first, they claim that Plaintiffs' fuchsia-colored line copies their trademark. This contention was dealt with and disposed of in the preceding sections. Defendants' other contention is that Plaintiff Gapardis copied the trademark and trade dress of their different product called "African Beauty, MJ" with a competing product called "African Queen, MJ."

"African Queen, MJ" is distributed **[**41]** by Plaintiff Gapardis, as the exclusive licensee of a separate corporation named Mitchell International Cosmetics Limited ("Mitchell"). That company has instituted a separate infringement action in this court against Tomjai for infringing certain of its

products other than those at issue here, including the MJ Royal African Products line, which includes "African Queen, MJ." Defendants have counterclaimed for infringement of their "African Beauty, MJ" product, claiming that Gapardis' "African Queen, MJ" product is a counterfeit copy of their trademark.

Defendants failed to prove that Gapardis's trademark infringed on their mark. That question is one of the primary ones in Mitchell International Cosmetics Limited v. Tomjai Enterprises Corporation, Case No. 05-21956-CIV-Lenard, and this Court will not pretermit that issue on the scant evidence presented here. The parties **[*1254]** must fully litigate that question in the other pending suit.

Finally, [HN29] unclean hands cannot be asserted against a party seeking relief as a freefloating defense unconnected to the conduct at issue. The conduct must be directly related to Plaintiffs' claim against Defendants. *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co., 324 U.S. 806, 65 S. Ct. 993, 997, 89 L. Ed. 1381, 1945 Dec. Comm'r Pat. 582 (1945)*; **[**42]** *JTH Tax, Inc. v. H&R Block E. Tax Servs., Inc., 128 F. Supp. 2d 926, 949 (E.D. Va. 2001)*. In this instance, the alleged conduct relates to an entirely unrelated matter, and therefore the defense is inapplicable.

## CONCLUSION

Based on the foregoing discussion, the Court hereby

**ORDERS and ADJUDGES** that

1) Plaintiffs' Motion for Preliminary Injunction (**D.E.** No. 19) is **GRANTED**, as follows:

Defendants, their subsidiaries, parents, affiliates, agents, servants, employees, directors, officers, and attorneys and those persons or entities in active concert or participation with them, shall be preliminarily enjoined

(a) from using counterfeit products bearing Plaintiffs' trademarks or reproductions, counterfeits, copies, or colorable imitations thereof; such products consist of all Defendants' products bearing either "Fair & Brite" or "Fair & Brite Paris" marks or labels;

408 F. Supp. 2d 1237, *; 2005 U.S. Dist. LEXIS 37603, **;
19 Fla. L. Weekly Fed. D 149

(b) except for surrendering to Plaintiffs the counterfeit products, from possessing, receiving, manufacturing, assembling, distributing, warehousing, shipping, transshipping, transferring, storing, advertising, promoting, offering, selling, offering or holding for sale, **[\*\*43]** disposing, or in any other manner handling or dealing with any goods, packaging, wrappers, containers and recepticals, and any catalogues, price lists, promotional materials and the like bearing a copy or colorable imitation of Plaintiffs' trademarks and/or trade dress;

(c) from infringing Plaintiffs' trademarks and/or trade dress;

(d) from otherwise unfairly competing with Plaintiffs;

(e) from using any reproduction, counterfeit, copy, or colorable imitation of Plaintiffs' trademarks and/or trade dress in connection with publicity, promotion, sale, or advertising of goods sold by Defendants, including, without limitation, health and beauty products bearing a copy or colorable imitation of Plaintiffs' trademarks and/or trade dress;

(f) from affixing, applying, annexing, or using in connection with the same any goods, false description or any representation, including words or other symbols, falsely describing, falsely representing such goods as being those of Plaintiffs and from offering such goods in commerce;

(g) from using any trademark, trade name, or trade dress in connection with the manufacture, sale, or distribution of any goods which may be calculated to falsely represent **[\*\*44]** such goods as

being connected with, approved by, or sponsored by Plaintiffs;

(h) from destroying, altering, disposing of, moving, removing, concealing, tampering with or in any manner secreting any and all business records, invoices, correspondence, books of account, receipts or any other documents or things relating or referring in any manner to the manufacture, advertising, receiving, acquisition, importation, purchase, sale or offer for sale, distribution, warehousing, or transfer of any counterfeit products bearing Plaintiffs' trademarks and/or trade dress; and

(i) from assisting, aiding, or betting any other person or business entity in engaging **[\*1255]** in or preforming any of the activities referred to in subparagraphs (a) through (h) above.

Plaintiffs shall post bond in the amount of $ 10,000.00 within forty-eight (48) hours after receipt of this Order.

2) Defendant/Counter-Plaintiff Tomjai Enterprises Corporation's Motion for Preliminary Injunction and Restraining Order (D.E. No. 43-1, 43-2) is **DENIED.**

3) Defendants/Counter-Plaintiffs Tomjai Enterprises Corporation and Aimalohi Imana's Motion to Strike (**D.E.** No. 68), filed on August 30, 2005, is **DENIED.**

**[\*\*45] DONE AND ORDERED** in Chambers at Miami, Florida, this 15 day of November, 2005.

THEODORE KLEIN

UNITED STATES MAGISTRATE JUDGE

FOCUS - 5 of 12 DOCUMENTS



Analysis
As of: Sep 09, 2008

**American Federation of State, County and Municipal Employees, AFL-CIO, Local 3190, Plaintiff, vs. Maricopa County Board of Supervisors, et al., Defendants.**

**No. CV 06-2128-PHX-SMM**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF ARIZONA**

**2007 U.S. Dist. LEXIS 18356**

**March 13, 2007, Decided
March 14, 2007, Filed**

**SUBSEQUENT HISTORY:** Motion denied by Am. Fedn. & Mun. Emples., AFL-CIO, Local 3190 v. Maricopa County Bd. of Supervisors, 2007 U.S. Dist. LEXIS 18528 (D. Ariz., Mar. 14, 2007)

**COUNSEL:** [*1] For American Federation of State, County and Municipal Employees, AFL-CIO, Local 3190, Plaintiff: Daniel Lee Bonnett, Jennifer Lynn Kroll, Susan Joan Martin, LEAD ATTORNEYS, Martin & Bonnett PLLC, Phoenix, AZ.

For Maricopa County Board of Supervisors, Maricopa County, Arizona, Fulton Brock, individually and his official capacity as a Maricopa County Supervisor, Don Stapley, individually and his official capacity as a Maricopa County Supervisor, Andrew Kunasek, individually and in his official capacity as a Maricopa County Supervisor, Max W Wilson, individually and in his official capacity as a Maricopa County Supervisor, David Smith, individually and in his official capacity as a Maricopa County Manager, Defendants: Charles L Fine, Cyrus Benjamin Martinez, John Mark Ogden, LEAD ATTORNEYS, Littler Mendelson PC, Phoenix, AZ.

**JUDGES:** Stephen M. McNamee, United States District Judge.

**OPINION BY:** Stephen M. McNamee

**OPINION**

**MEMORANDUM OF DECISION AND ORDER**

This is an action to enjoin the County of Maricopa and Maricopa County Manager David Smith from enforcing two written policies that govern the way in which third parties may engage in "solicitation" of County employees and post information [*2] on employee bulletin boards located in County facilities. The Complaint in this matter was filed pursuant to 42 U.S.C. §§ 1983 and 1988 for alleged deprivations of Plaintiff's rights secured by the First and Fourteenth Amendments of the United States Constitution. (Dkt. 1, PP41-47.)

Now pending before the Court is Plaintiff American Federation of State, County and Municipal Employees, AFL-CIO, Local 3190's ("Local 3190") Application for Preliminary Injunction (Dkt. 2) and Defendants Maricopa County Board of Supervisors' (the "Board"), Maricopa County's (the "County"), Maricopa County Manager David Smith's ("Smith"), and Maricopa County Supervisors, Fulton Brock's, Don Stapley's, Andrew Kunasek's, and Max Wilson's Motion to Dismiss Plaintiff's Motion for a Preliminary Injunction and Complaint. [1] (Dkt. 21.)

    1  The merits of Defendants' Motion to Dismiss Local 3190's Complaint will be addressed in a separate Order.

Local 3190 now challenges actions engaged in by only the County and Smith [*3] (collectively, "Defendants"). Specifically, the implementation and enforcement of two written policies that regulate "solicitation" and "posting of general notices" in County facilities. [2] At the hearing, counsel for Local 3190 clarified its request for a preliminary injunction: Local

3190 seeks an injunction to enjoin and restrain "Defendants, their officers, representatives, agents, servants, employees, attorneys and all persons acting in concert or participation with Defendants" from enforcing the County's solicitation and posting policies against Local 3190. In the alternative, Local 3190 seeks an injunction requiring Defendants to amend the County's solicitation and posting policies.

> 2    In addition to the solicitation and posting policies, the Local 3190 originally challenged a May 17, 2006 Resolution that eliminated certain employee payroll deductions. See dkt. 2 at 4-12. On February 2, 2007, the parties notified the Court that this issue has been settled. See Dkt. 41. Therefore, the constitutionality of the May 17 Resolution is no longer before the Court. At oral argument, counsel for Local 3190 reiterated that the dues check-off issue is now moot and the remaining claims are only directed at the County of Maricopa and County Manager Smith. Based on these representations, Counts I, II, and V of Local 3190's Complaint will be dismissed, in addition to the following Defendants: the Maricopa County Board of Supervisors, Fulton Brock, Don Stapley, Andrew Kunasek, and Max W. Wilson.

[*4]    After considering the parties' briefs, evidence presented by Local 3190 [3] in the form of declarations and exhibits, and the arguments of counsel at the Preliminary Injunction Hearing held on February 15, 2007, the Court now issues the following ruling on Local 3190's Application for Preliminary Injunction.

> 3    Defendants presented no evidence in opposition to Local 3190's Application for Preliminary Injunction.

## FINDINGS OF FACT

### The Parties

1. Local 3190 is a private, voluntary, nonprofit labor organization affiliated with the American Federation of State, County and Municipal Employees, AFL-CIO International Union ("AFSCME International"), which is the largest labor organization representing public employees in the United States.

2. Local 3190 works closely with Public Employees AFSCME Council 97, AFL-CIO ("Council 97"), which is a voluntary, nonprofit labor organization representing state, county and municipal employees throughout the State of Arizona. (Dkt. 6, P8.)

3. AFSCME [*5] International, Council 97, and Local 3190 organize and work for social and economic justice in the workplace through political action and legislative advocacy. (Dkt. 8, P8.)

4. The officers and representatives of Local 3190 frequently meet with supervisory or management employees of the County to discuss wages, hours, and other terms and conditions of employment including, health and safety, employee discipline, grievances, hiring, promotions, demotions, transfers, and work assignments on behalf of both members of Local 3190 and many of the County's non-supervisory employees. (Id.)

5. Each of Local 3190, Council 97, and AFSCME International are labor organizations within the meaning of A.R.S. § 23-1301.

6. Local 3190 encourages all eligible County employees to become members of Local 3190 and to support Local 3190's and its affiliates' political action committee, the "PEOPLE Fund." (Dkt. 6, P10.)

7. One reason Local 3190's members are politically active is because the hours, wages and working conditions of public employees are generally established through the political process. (Dkt. 6, PP8-12.)

8. The County of Maricopa is a political subdivision of [*6] the State of Arizona.

9. Defendant David Smith is the County Manager for Maricopa County, duly appointed and acting as agent for the Board of Supervisors regarding administration and enforcement of various resolutions of the Board of Supervisors and County policies and procedures, including the solicitation and posting policies challenged by Local 3190 in the present case.

### Local 3190's Requests for Access to County Facilities

10. In a July 7, 2004 letter, Local 3190 requested permission to access any "County Facility Break Room and/or Lunch Room, for the purpose of handing out informational flyers" ("Break Room Forum"). (Dkt. 8, Ex. 10.) On August 13, 2004, County Manager Smith denied the request by stating, it "will be inappropriate to provide your organization special access to our county lunch & break rooms." (Id.)

11. On March 9, 2006, Local 3190 requested permission for "immediate access to employee mailboxes so that we may in turn place flyers and membership applications in them." (Id.) Local 3190's letter stated that, on March 3, 2006, the Arizona Probation Officer Association ("AZPOA") placed flyers in employee mailboxes for its picnic and [*7] "left flyers in employee

mailboxes that on the back of the flyer had a membership application." (Id.)

12. Representatives of Local 3190 have made numerous written and verbal requests of the County to be provided access to County property, including bulletin boards, employee assigned mailboxes, the Employee Benefits Fair, lunch rooms, break rooms, employee lounges, meeting areas, employee paychecks, employee paycheck envelopes, and other locations where non-work related information and advertisements are displayed (collectively, "County Property"), in order to post, distribute, and make available to interested County employees information about AFSCME International, Council 97, and Local 3190. (Dkt. 6, P32.)

13. Representatives of Local 3190 have made numerous written and verbal requests of the County to be provided access to County Property to post, distribute, and make available to interested County employees information about how to become members of Local 3190. (Id.)

14. Despite numerous written and verbal requests, the County has continuously denied or refused to respond to Local 3190's requests to be provided access to County Property for purposes of communicating **[*8]** Local 3190's mission, purpose, and membership options to interested County employees. (Id., P33.)

**The County's Written Solicitation and Posting Policies**

15. The County has two written policies, Policy & Procedure No. A1502 and Policy & Procedure No. A1917 (the "Policies"), that purport to regulate "solicitation" "during working hours, in working areas, in all County buildings, facilities and grounds" and the "posting of general notices" on "all County facilities." Dkt. 8, Ex. 6.

16. County Policy A1502 regulates solicitation and provides, in pertinent part:

### A. Purpose

To provide a system in which to *monitor and control the level and type of solicitation that is directed toward county employees to reduce negative impacts and conflicts of interest.*

### B. Policy

Soliciting among County employees for any purpose is prohibited *during working hours, in working areas, in all County buildings, facilities and grounds.* This applies to all solicitations, selling or peddling, and distribution of sales/informational material or propaganda of every nature whether by County employees or other persons not in the employ of the County, **[*9]** unless prior authorization by the County Manager's office or an authorized designee has been obtained.

Solicitors who have not received permission to distribute informational material, including pamphlets, brochures, bulletins, or any other type of material, are *restricted to public places such as sidewalks or parking lots or other facilities that are available for public use. Solicitors may not place material in employee lounges/break rooms, the cafeteria, or any work area.*

### C. Definitions

Soliciting: to make petition to; to approach with a request or plea; to urge to support one's cause.

### D. Authority and Responsibility

All County employees are responsible for ensuring that *soliciting activities, as described in the policy, do not interfere with the normal and effective completion of work assigned.* If persons outside of the County employ are engaged in unauthorized solicitation, then it is the responsibility of management personnel to advise the solicitor of the procedure for obtaining authorization prior to distributing material or contacting County employees and that they should either terminate their activities or remove themselves **[*10]** from County premises. If the solicitor continues such activities, the manager in charge should notify County security.

The County Manager is authorized to approve items of solicitation to all county employees. This authority may be delegated to Department Directors as deemed appropriate.

### E. Procedures

Anyone having *an item of interest to other employees* may request permission from the County Manager's Office or the Department Director (whichever is

applicable) for approval to post/distribute information or contact County employees.

1. The request to solicit should be made 5 days prior to expected posting or distribution of material or contact with employees.

2. The County Manager or Department Director will review all solicitation information and materials.

3. If the County Manager or Department Director denies the request for solicitation, the requestor will be notified that the items will not be distributed nor may County employees be approached.

4. If the request is approved, the requestor may distribute or post materials in specified locations or arrange meetings with County employees in accordance with the County Manager's or Department [*11] Director's Instructions.

5. Additionally, custodial personnel will be alert for unauthorized solicitation materials and will discard them immediately.

6. Repeated violations of this policy should be reported to the County Manager.

Dkt. 8, Ex. 6, County Policy A1502 ("Solicitation Policy"), emphasis added.

17. County Policy A1917 regulates posting and provides, in pertinent part:

### A. Purpose

To *restrict indiscriminate posting of notices on County property while ensuring that County employees have an opportunity to view authorized general information notices/flyers.*

### B. Policy

The County Manager's Office has authorized *"employee"" bulletin boards to be hung at various, designated locations in County facilities to provide centralized locations for posting approved notices.* The bulletin boards are to be used for the *sole purpose of posting 'authorized' information such as general notices of*

*interest, value, or help to County employees.* Only those documents which have been approved by the County Manager or the manager responsible for the facility/location are authorized to be displayed. Documents that have not been approved [*12] or are not posted on a bulletin board (e.g. on walls, elevators, etc.) are subject to removal. Notices shall not remain on the bulletin board for a period of more than two weeks unless the approving authority grants an extension. A discard date should be noted on the document.

*This policy encompasses all County facilities, both inside and outside.* This policy does not apply to official public notices.

### C. Authority and Responsibility

The County Manager or facility/location manager are solely authorized to approve the posting of notices on County bulletin boards.

The facility/location managers should designate an employee to maintain respective bulletin boards and be responsible for posting and discarding notices on a weekly basis.

### D. Procedures

1. Notice(s) for County-wide distribution should be delivered to the County Manager's office or the facility/location manager's office five days prior to anticipated posting date of notice(s). Notices that are specific to a department, division, or work location should be submitted to the appropriate manager in charge.

2. Upon submission the notice *will be reviewed for appropriateness and employee* [*13] *or citizen benefit* and a determination will be made if posting will be allowed.

3. If authorization is denied, then the notices may not be posted on the bulletin board nor on any other structure. A designated employee will notify the denied party. If authorization is granted, then the notice(s) will be initialed by the approving authority and the expiration

date clearly visible. A designated employee will then post the notices.

4. Additionally, custodial personnel will remove all notices from non-designated areas and will inspect all areas of the buildings regularly to ensure that unauthorized notices are removed.

5. Repeated violations of this policy should be reported to the County Manager or the appropriate facility/location manager.

Dkt. 8, Ex. 6, County Policy A1917 ("Posting Policy"), emphasis added.

18. Solicitors who do not receive permission to distribute informational material are permitted to engage in solicitation in "public places," such as "sidewalks or parking lots or other facilities that are available for public use." (Dkt. 8, Ex. 6 at A1502,B.)

19. Local 3190 has not alleged, nor does it contend, that Defendants have interfered with [*14] its attempts to engage in solicitation in any of these "public places."

**The County's Practices**

**Materials Posted on Employee Bulletin Boards ("Bulletin Board Forum")**

20. Maricopa County has a number of buildings where County employees regularly report or are assigned in the normal course of their job duties. Many of these buildings have entry ways and common areas open to the public. Two such buildings, the Maricopa County Superior Courthouse (the "Courthouse") and adjacent Maricopa County Office Building (the "Office"), are located on West Jefferson Street in downtown Phoenix, Arizona. (Dkt. 6, P28; Dkt. 8, P28.)

21. The hallways and common areas of County buildings are generally open to the public and, like virtually all other County buildings, have lunch rooms, break rooms, cafeterias, rest areas, employee lounges, bulletin boards, or some combination thereof. (Dkt. 6, P28; Dkt. 8, P28.)

22. Local 3190 has presented evidence that third parties have posted advertisements, solicitations, and brochures on or adjacent to at least one bulletin board, located in the employee lunch room at the Southeast Court facility in Mesa, Arizona. (Dkt. 8, P29.) **[*15]** Some organizations, such as the Hard Rock Cafe, Top Spoke Motorcycle Rentals, The Wax Museum at Fisherman's Wharf, a vacation company (www.alladream.com), Disneyland, and the Boyce

Thompson Arboretum have posted flyers promoting purely recreational activities. (Id., Ex. 8.) Others have posted materials related to charities, including the United Way. Other organizations have posted advertisements for services, such as Steve's Mobile Auto Repair, Main Street Financial, Nextel, Danny's Car Wash, and Kayphil Sports and Fitness. Other postings promote special services, including MariSol Federal Credit Union, Mariflex Flexible Spending Accounts, Legal Connect, Sprint, United Pet Care, Equity Residential, and Liberty Mutual. (Id.)

**Intranet Connection to Employee Services Management ("Intranet Forum")**

23. County employees are given a user name and password to access the County intranet website from regularly assigned or available computer workstations and from personal computers in employees' homes. (Dkt. 6, P28.)

24. The County's intranet website provides a link under the heading "Employee Services Management Association" ("ESMA"). (Id., P31.)

25. Local 3190 **[*16]** has presented evidence that the ESMA link on the County's intranet website connects to ESMA's web page. ESMA's web page contains information and advertisements from third-parties about discounts available to County employees for life and disability insurance, sporting and entertainment events, theme parks, airline travel, cruises, automobiles, restaurants, and health and fitness. (Dkt. 8, P31, Ex. 9.)

**Paycheck Envelopes and Paychecks ("Paycheck Forum")**

26. County employees are paid by checks that are either delivered in pay envelopes or in assigned employee mailboxes. (Dkt. 6, P28; Dkt. 8, P28.)

27. Local 3190 has presented evidence that third parties have been permitted to solicit County employees by distributing flyers in employee paycheck envelopes or attached to employee paychecks. (Dkt. 8, P29.) Paycheck distributions include ads from Disneyland, MariSol Credit Union, vacation travel, and blood drives. (Id.)

**Employee Mailboxes ("Mailbox Forum")**

28. County employees are assigned mailboxes. (Dkt. 6, P28.)

29. Local 3190 has presented evidence that the AZPOA has been permitted to solicit County employees by distributing flyers for an **[*17]** AZPOA picnic and AZPOA membership applications in County employee mailboxes. See Dkt. 8, Ex. 10.

### The Employee Benefits Fair ("Benefits Fair Forum")

30. Local 3190 has presented evidence that the County periodically hosts an "Employee Benefits Fair" to inform employees of the wide range of benefits available to them.

31. The Employee Benefits Fair is held during working hours on County property at various locations. (Dkt. 6, P30; Dkt. 8, P30.)

32. At the Employee Benefits Fair, third party vendors are permitted to distribute information promoting their services, including dental, vision, health, and life insurance. (Dkt. 8, P30.)

## CONCLUSIONS OF LAW

### A. Ripeness

Defendants contend Local 3190's allegation that the County has applied the Posting Policy in a discriminatory manner is not ripe because Local 3190 "has not identified a single bulletin board that is open to the public or employees at large for posting material." (Dkt. 20 at 13.) Moreover, because Local 3190 "has offered no evidence that the County has forbidden it from posting anything on [such a bulletin board], or that anything the Union has posted on it has been removed **[\*18]** by the County," Defendants urge the Court to avoid Local 3190's claim that they have enforced the Posting Policy in a discriminatory manner. (Id.)

The Court rejects Defendants' ripeness argument. Local 3190 presented evidence that Defendants have repeatedly refused its written and verbal requests to access County Property in order to distribute and post information about the benefits of membership in Local 3190. See Dkt. 6, PP27, 32-33; Dkt. 8, PP27, 32-33, Ex. 10. Thus, this issue is ripe.

### B. Preliminary Injunction Standard

The purpose of a preliminary injunction is to preserve the status quo among the parties pending a final decision on the merits of the action. See Fed. R. Civ. P. 65; Chalk v. U.S. Dist. Court, 840 F.2d 701, 704 (9th Cir. 1988); Regents of the University of California v. ABC, Inc., 747 F.2d 511, 514 (9th Cir. 1984). Therefore, findings of fact and conclusions of law made in connection with a preliminary injunction are not binding adjudications. The court may come to opposite conclusions at the trial on the merits. See University of Texas v. Camenisch, 451 U.S. 390, 395, 101 S. Ct. 1830, 68 L. Ed. 2d 175 (1981). Although **[\*19]** Rule 65 establishes the procedural requirements for obtaining a preliminary injunction, the substantive requirements for injunctions are defined by applicable federal case law and statutes.

Courts in the Ninth Circuit have adopted an "alternative standard" for granting a preliminary injunction under which the moving party can meet its burden by demonstrating either (1) a combination of probable success on the merits and the possibility of irreparable harm if relief is not granted, or (2) the existence of serious questions going to the merits of the case and a balance of hardships that tips sharply in the movant's favor. International Jensen v. Metrosound U.S.A., 4 F.3d 819, 822 (9th Cir. 1993). These two formulations "are not separate tests but the outer reaches of 'a single continuum.'" Regents of Univ. of Cal., 747 F.2d at 515 (citation omitted).

### C. Reasonable Probability of Success on the Merits

#### 1. First Amendment

The First Amendment applies not only to legislative enactments, but also to less formal governmental acts, such as the County Policies and practices at issue here. See Faith Center Church Evangelistic Ministries v. Glover, 462 F.3d 1194, 1200-02 (9th Cir. 2006) **[\*20]** (applying First Amendment analysis to County's library meeting policy prohibiting access for "religious purposes"). Neither party disputes that solicitation and posting information constitute forms of speech protected by the First Amendment. See Village of Schaumburg v. Citizens for a Better Environment, 444 U.S. 620, 633, 100 S. Ct. 826, 63 L. Ed. 2d 73 (1980); Giebel v. Sylvester, 244 F.3d 1182, 1186-87 (9th Cir. 2001). However, it is well-settled that "the government need not permit all forms of speech on property that it owns and controls." International Soc'y for Krishna Consciousness v. Lee, 505 U.S. 672, 678, 112 S. Ct. 2701, 120 L. Ed. 2d 541 (1992) ("ISKCON"). Rather, "[t]he existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue." Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 44, 103 S. Ct. 948, 74 L. Ed. 2d 794 (1983). The Supreme Court "has adopted a forum analysis as a means of determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes. **[\*21]** " Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 800, 105 S. Ct. 3439, 87 L. Ed. 2d 567 (1985). Thus, the Court will set forth this forum analysis and the principles applicable to the six fora at issue here.

#### Forum Analysis

The Supreme Court has recognized several types of forums. The first is the traditional public forum: "places which by long tradition or by government fiat have been devoted to assembly and debate," such as streets and

parks. Perry, 460 U.S. at 45. In a traditional public forum, "the rights of the State to limit expressive activity are sharply circumscribed"; the state may only enact content-neutral "time, place, and manner" restrictions or content-based rules that are "necessary to serve a compelling state interest" and "narrowly drawn to achieve that end." Id.

A second type of forum -- the non-public forum -- consists of "[p]ublic property which is not by tradition or designation a forum for public communication." Id. at 46. To maintain a non-public forum, the government must employ "selective access" policies, whereby forum participation is governed by "individual, non-ministerial judgments." Ark. Educ. Television Comm'n v. Forbes, 523 U.S. 666, 680, 118 S. Ct. 1633, 140 L. Ed. 2d 875 (1998) **[*22]** (Forbes); see also Cornelius, 473 U.S. at 804. The government may be more restrictive in its regulation of speech in a non-public forum than in a traditional public one. The government may "reserve the [non-public] forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." Perry, 460 U.S. at 46.

A third category lies in between, and is a hybrid of, the other two forums. This type of forum is "created by government designation of a place or channel of communication for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects." Cornelius, 473 U.S. at 802. The forum may be of either "a limited or unlimited character." ISKCON, 505 U.S. at 678. The government cannot create such a forum "by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse." Cornelius, 473 U.S. at 802. The Supreme Court has sometimes referred to **[*23]** these intermediate forums as "designated public" forums, see, e.g., United States v. Am. Library Ass'n, Inc., 539 U.S. 194, 206, 123 S. Ct. 2297, 156 L. Ed. 2d 221 (2003); Forbes, 523 U.S. at 677-79; Lamb's Chapel v. Center Moriches Union Free Sch. Dist., 508 U.S. 384, 392, 113 S. Ct. 2141, 124 L. Ed. 2d 352 (1993); ISKCON, 505 U.S. at 678, but at other times the Court has used the phrase "limited public" forums to describe this category, see, e.g., Am. Library Ass'n, 539 U.S. at 206; Good News Club v. Milford Central School, 533 U.S. 98, 105-06, 121 S. Ct. 2093, 150 L. Ed. 2d 151(2001); Santa Fe Indep. Sch. Dist. v. Doe, 530 U.S. 290, 303-04, 120 S. Ct. 2266, 147 L. Ed. 2d 295 (2000); Cornelius, 473 U.S. at 804, 811; Perry, 460 U.S. at 47-48.

Although the Supreme Court has never squarely addressed the difference between a designated public forum and a limited public forum, its most recent opinions suggest that there indeed is a distinction. In a limited public forum, the government creates a channel for a specific or limited type of expression where one did not previously exist. In such a forum, "the State may be justified 'in reserving [its forum] for certain groups or **[*24]** for the discussion of certain topics,'" subject only to the limitation that its actions must be viewpoint neutral and reasonable. Good News Club, 533 U.S. at 106-07 (citation omitted). In a designated public forum, by contrast, the government makes public property (that would not otherwise qualify as a traditional public forum) generally accessible to all speakers. In such a forum, regulations on speech are "subject to the same limitations as that governing a traditional public forum" -- namely, strict scrutiny. ISKCON, 505 U.S. at 678. The Ninth Circuit has also held that a limited public forum, a forum opened only to certain speakers or for discussion of certain subjects, is in fact a subset of the larger category of designated public forums intentionally opened by the government for "public discourse." See Hopper v. City of Pasco, 241 F.3d 1067, 1074 (9th Cir. 2001).

To summarize, in a traditional public forum the government may only establish content-neutral "time, place, and manner" restrictions or content-based rules that are "necessary to achieve a compelling state interest" and are "narrowly drawn to achieve that interest. **[*25]** " Perry, 460 U.S. at 45. A designated public forum is "subject to the same limitations as that governing a traditional public forum." ISKCON, 505 U.S. at 678. In a limited public forum, however, the government may restrict access to "certain groups" or to "discussion of certain topics," subject to two limitations: the government restrictions must be both "reasonable in light of the purpose served by the forum," and viewpoint neutral. Good News Club, 533 U.S. at 106-07. Finally, in a non-public forum the government may employ a "selective access" policy in which "individual non-ministerial judgments" govern forum participation, again subject to the same two limitations: the policy must be reasonable and viewpoint neutral. Forbes, 523 U.S. at 680; see also Perry, 460 U.S. at 46. Thus, while the Constitution imposes more severe restrictions on government regulation of private speech in traditional and designated public fora than in limited public fora and non-public fora, even in the last two categories government restrictions must be reasonable and viewpoint neutral.

### Type of Forum Created

**[*26]** The primary test for determining the relevant forum is defined by "the access sought by the speaker." Cornelius, 473 U.S. at 801. In the present case, Local 3190 seeks access to six forums: (i) County facility lunch and break rooms in order to distribute "informational

flyers," the Break Room Forum (supra at 4, P10); (ii) employee bulletin boards, the Bulletin Board Forum (supra at 8-9, PP20-22); (iii) the County's Intranet page, the Intranet Forum (supra at 9, PP23-25); (iv) County employee paycheck envelopes and paychecks, the Paycheck Forum (supra at 10, PP26-27); (v) County employee assigned mailboxes, the Mailbox Forum (supra at 10, PP28-29); and (vi) the Employee Benefits Fair, the Benefits Fair Forum (supra at 10, PP30-32).

### None of the Six Fora are Public Forums

In the present case, Local 3190 has presented no evidence that any of the six fora have "traditionally been available for public expression." ISKCON, 505 U.S. at 678. Local 3190 appears to contend the fora at issue here are traditional public forums because many County buildings "have entry ways and common areas open to the public" and "are generally [*27] open to the public." (Dkt. 2 at 9.) This argument is not persuasive.

"The mere physical characteristics of the property cannot dictate forum analysis." United States v. Kokinda, 497 U.S. 720, 727, 110 S. Ct. 3115, 111 L. Ed. 2d 571 (1990) (holding, the sidewalk leading to the entry of the post office is not the traditional public forum open to expressive activity); see also Greer v. Spock, 424 U.S. 828, 835-37, 96 S. Ct. 1211, 47 L. Ed. 2d 505 (1976) (holding, even though a military base permitted free civilian access to certain unrestricted areas, the base was a non-public forum); Forbes, 523 U.S. at 678 ("reject[ing] the view that traditional public forum status extends beyond its historic confines"). Like the post office at issue in Kokinda, there is no evidence that the County has ever expressly dedicated its facilities' entry ways or common access areas to any type of expressive activity. See Kokinda, 497 U.S. at 730. Moreover, "[t]he government does not create a public forum by . . . permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse." Cornelius, 473 U.S. at 802; see also Perry, 460 U.S. at 47 [*28] ("[S]elective access does not transform government property into a public forum"). Thus, none of the six fora are traditional public forums.

### None of the Six Fora are Designated Public Forums

The difficult question is whether the County has established designated public fora, limited public fora, or non-public fora. As noted, a designated public forum exists where the government "intentionally open[s] a nontraditional forum for public discourse." Cornelius, 473 U.S. at 802. In addressing this question, the Court must consider (1) "the policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum" and (2) the nature of the property at issue

and its compatibility with expressive activity. Id. at 802-04. The Court's consideration of the nature of the property at issue depends upon whether "the principal function of the property would be disrupted by expressive activity." Id. at 804. In determining whether the County intended to create a designated or limited public forum with respect to any of the six fora at issue here, the Court [*29] also considers the practice of the government because there are situations where the government creates a designated public forum by failing to enforce the restrictions it has placed on the use of the forum. See Giebel, 244 F.3d at 1188; Hopper, 241 F.3d at 1075-77. Limited public forum status may be lost where policy restrictions, in practice, are not enforced, or "if exceptions are haphazardly permitted." Hopper, 241 F.3d at 1076.

None of the fora at issue here fit the description of a "designated public forum," because no evidence demonstrates that the County intended, by policy or practice, to make any of the six fora generally accessible to all speakers or "public discourse." See ISKCON, 505 U.S. at 678-79 (in a designated public forum, the government makes public property generally accessible to all speakers); Hopper, 241 F.3d at 1074 ("public discourse").

### Three Fora are Limited Public Forums

### Bulletin Board, Mailbox, and Paycheck Fora

Under the Policies, "solicitation" includes posting, distribution of material, and contact with employees. See Dkt. 8, Ex. 6 at A1502, [*30] E(1), (3)-(4). Local 3190 has presented evidence that, pursuant to both the Solicitation and Posting Policies, the AZPOA has been permitted access to the Mailbox Forum to distribute information, several third parties have been permitted access to the Paycheck Forum to distribute information, and many third parties have been permitted access to the Bulletin Board Forum to post notices. See Dkt. 8, P29 and Exs. 8, 10. The County has not submitted any evidence to contradict Local 3190's evidence in this regard. Thus, the Court will analyze these Fora and the Policies together.

With respect to the Bulletin Board, Mailbox, and Paycheck Fora, the County's Solicitation and Posting Policies clearly state that solicitation and posting are not permitted unless they have been approved by the County Manager, the County Manager's Office, or the facility/location manager. See Dkt. 8, Ex. 6 at A1917, B; A1502, B, E. In addition, to receive approval for solicitation and distribution, material must be "an item of interest to other employees"; to receive approval for posting, material must be a "general notice[] of interest, value, or help to County employees" that is "appropriate"

and will [*31] "benefit" employees or citizens. See id. at A1502, E; A1917, B, D(2). Although not dispositive, the Posting and Solicitation Policies, which limit the content of material that may be posted, distributed, or used to solicit employees in work areas during work hours, demonstrate the County's intent to create a limited public forum closed to subjects that are not "of interest, value, or help" to County employees. See Cornelius, 473 U.S. at 805 ("The decision of the Government to limit access to the [forum] is not dispositive in itself; instead, it is relevant for what it suggests about the Government's intent in creating the forum."); cf. Christ's Bride Ministries, Inc. v. Southeastern Pennsylvania Transp. Auth., 148 F.3d 242, 252 (3d Cir. 1998) (city's practice of permitting "virtually unlimited access" to forum and excluding "only a very narrow category of ads" created designated public forum). By limiting access to County facilities in this manner, the County's Solicitation and Posting Policies do not render the County's Bulletin Board, Mailbox, and Paycheck Fora generally accessible to all speakers. Moreover, Local 3190 has presented no evidence [*32] to show that County officials have not consistently enforced either Policy. See Children of the Rosary v. City of Phoenix, 154 F.3d 972, 976 (1998)(no public forum when city "consistently restricted political and religious advertising" on buses).

The County's Bulletin Board, Mailbox, and Paycheck Fora are not designated public fora for the additional reason that the County "is acting as a proprietor, managing its internal operations, rather than acting as lawmaker with the power to regulate or license." ISKCON, 505 U.S. at 678; Cornelius, 473 U.S. at 804 (the court should determine whether "the principal function of the property would be disrupted by expressive activity"). As the Ninth Circuit has stated, "where the government acts in a proprietary capacity . . . to facilitate the conduct of its internal business, the Supreme Court generally has found a nonpublic forum, subject only to the requirements of reasonableness and viewpoint neutrality." DiLoreto v. Downey Unified Sch. Dist. Bd. of Educ., 196 F.3d 958, 966 (9th Cir. 1999). Here, it cannot reasonably be disputed that the County maintains employee bulletin [*33] boards and mailboxes for the purpose of communicating with its employees. Likewise, employee paychecks are obviously necessary for the County to facilitate and conduct its internal business. Moreover, the County's written Policies demonstrate its intent to provide limited access to facilities and employees "during working hours, in working areas, and in all County buildings, facilities, and grounds" (see Dkt. 8, Ex. 6 at A1502, B). Cornelius, 473 U.S. at 805-06 ("[T]he Government has the right to exercise control over access to the federal workplace in order to avoid interruptions to the performance of the duties of its employees."). Indeed, the purpose of the Solicitation Policy -- to "monitor and control the level and type of solicitation that is directed toward county employees to reduce negative impacts and conflicts of interest" (Dkt. 8, Ex. 6 at A1502, A) -- demonstrates that, although the Policies are compatible with limited types of expressive activity, none of the three Fora are intended to undermine the County's primary function as an employer.

The present case is similar to DiLoreto, where the Ninth Circuit held that a high school baseball fence [*34] opened for commercial advertising was not intended to designate a forum for unlimited expressive activity. 196 F.3d at 967. The DiLoreto Court emphasized that, because the school district "excluded certain subjects from the advertising forum as sensitive or too controversial," the fence was a non-public forum open for a limited purpose. Id. at 966-67; Hills v. Scottsdale Unified Sch. Dist., 329 F.3d 1044, 1049 (9th Cir. 2003) (because school district screened submissions for suitability and frequently rejected flyers for various reasons, "the District's policies and practices indicate a lack of intent to designate a forum for all expressive activity"). By restricting the Solicitation and Posting Policies to topics of "interest, value or help" to County employees, the Policies "indicate a lack of intent to designate a forum for all expressive activity." Hills, 329 F.3d at 1049. Moreover, Local 3190 has presented no evidence that the County permits certain entities to engage in solicitation or posting without first obtaining permission under the Policies. Thus, the County's Policies create a limited public forum, and [*35] will be permissible if they are viewpoint neutral and reasonable in light of the purpose served by the Fora. See Good News Club, 533 U.S. at 106-07 (in a limited public forum, the government creates a channel for a specific or limited type of expression where one did not previously exist).

**Non-public Fora**

**Intranet Forum**

With respect to the County's Intranet Forum, Local 3190 has presented no evidence that the general public or unlimited third parties are provided access to County employees via the ESMA link. Instead, Local 3190's evidence demonstrates that, if County employees choose to do so, they may access ESMA's web page from the County's Intranet site. Supra at 9, PP24-25. Although ESMA's web page displays information about discounts available to County employees, there is no evidence that ESMA's web page or the County's Intranet Forum provides links by which County employees can access other third parties' websites. Local 3190 has therefore failed to show that the purpose and structure of the

County's Intranet Forum is to provide a forum of unlimited public expression or a forum for public discourse. Rather, the evidence demonstrates **[\*36]** that the County has provided a link by which County employees can access ESMA alone.

The closed structure of the Intranet Forum indicates the County's intent not to open it to the general public, but instead to ESMA alone. Cornelius, 473 U.S. at 802-03 (government creates a designated public forum by intending to open the forum to public discourse). Based on this "selective access" policy, the Court finds that the Intranet Forum is a non-public forum. See Forbes, 523 U.S. at 680 (to create a non-public forum, the government must employ "selective access" policies, whereby forum participation is governed by 'individual, non-ministerial judgments").

### Break Room Forum

With respect to the Break Room Forum, the Solicitation Policy clearly provides that "[s]olicitors may not place material in employee lounges/break rooms, the cafeteria, or any work area." Id., Ex. 6 at A1502, B. Because solicitation in the Break Room Forum is prohibited, clearly the County did not intend to open those areas for expression by third parties. See Desyllas v. Bernstine, 351 F.3d 934, 943 (9th Cir. 2003)("areas that were not approved for posting **[\*37]** flyers also are not designated public fora because the university did not intend to open them for expression, as manifested by the university's Bulletin Board Posting Policy"; "the campus areas not approved for handbill-posting are nonpublic fora"). Thus, the Break Room Forum to which Local 3190 requested access is a non-public forum. Id. The County's Solicitation Policy, prohibiting solicitation in the Break Room Forum, is permissible if "'the limitation is reasonable and not based on the speaker's viewpoint.'" See Desyllas, 351 F.3d at 943 (citation omitted).

### Insufficient Evidence to Categorize

### Benefits Fair Forum

Neither party has submitted sufficient evidence for the Court to definitively categorize the Benefits Fair Forum. Although Local 3190 generally describes the forum, no evidence has been presented that the County maintains a written policy or a specific practice with respect to allowing third parties to participate in the Benefits Fair. Local 3190 admits that the Benefits Fair is hosted by the County during normal working hours at various locations on County property, but also contends third party vendors are permitted to promote **[\*38]** a variety of services and products, including dental, vision, health and life insurance. (Dkt. 8, P30.) It appears that the Benefits Fair Forum is a non-public forum open only

to third parties with whom the County has contracted to provide health and other benefits to County employees. Local 3190 readily admitted that it does not provide health or insurance, and merely advocates for increased benefit packages. Because neither party has submitted evidence of the County's policy or practice with respect to the admission of participants to the Benefits Fair, or a list of participants therein, the Court will not speculate on whether the Benefits Fair Forum is a designated or limited public forum or a non-public forum. See Cornelius, 473 U.S. at 804 (government limited forum through consistent policy of restricting participation to appropriate agencies and requiring permission).

### Summary

In sum, of the five fora that may be categorized here, the evidence shows that none of them are traditional public forums or designated public forums. The five fora include three limited public fora and two non-public fora. Thus, restrictions to access imposed by the County are **[\*39]** permissible if they "are viewpoint neutral and reasonable in light of the purpose served by the forum." Compare Hopper, 241 F.3d at 1074-75 ("In a limited public forum, restrictions that are viewpoint neutral and reasonable in light of the purpose served by the forum are permissible.")(citing Rosenberger v. Rector & Visitors of the Univ. of Virginia, 515 U.S. 819, 829, 115 S. Ct. 2510, 132 L. Ed. 2d 700 (1995)) With Desyllas, 351 F.3d at 943 ("'[t]he government may limit expressive activity in nonpublic fora if the limitation is reasonable and not based on the speaker's viewpoint.'")(citation omitted).

### Application of Limited Public Fora Analysis

Local 3190 contends it has demonstrated a reasonable probability of success on the merits because Defendants have engaged in viewpoint discrimination. (Dkt. 2 at 23-24.) With respect to the Bulletin Board, Mailbox, and Employee Paycheck Fora, access to which is governed by either the Solicitation or Posting Policy, the Court agrees that Defendants have engaged in viewpoint discrimination by excluding Local 3190. However, the Court does not find that Defendants have engaged in viewpoint discrimination by excluding **[\*40]** Local 3190 from the Intranet and Break Room Fora.

When the government establishes a limited public forum, it is not required to and does not allow persons to engage in every type of speech. Instead, the government may be justified "in reserving [its forum] for certain groups or for the discussion of certain topics." Rosenberger, 515 U.S. at 829; see also Lamb's Chapel, 508 U.S. at 392-393. The government's power to restrict speech, however, is not without limits. The restriction must not discriminate against speech on the basis of

viewpoint, Rosenberger, 515 U.S. at 829, and the restriction must be "reasonable in light of the purpose served by the forum," Cornelius, 473 U.S. at 806; Good News Club, 533 U.S. at 107. For example, where a group seeks to speak on a "subject otherwise permissible" in a particular forum, but from a religious standpoint, the government cannot constitutionally exclude the speech. See Lamb's Chapel, 508 U.S. at 394 (school permitting organizations to speak about child rearing and families in after-school forum could not prohibit group presenting films on **[*41]** same topics from religious standpoint); Good News Club, 533 U.S. at 108-09 (forum permitting any group promoting the "moral and character development of children," could not restrict access to Good News Club because they promoted same goals); Rosenberger, 515 U.S. at 831 ("By the very terms of the SAF prohibition, the University does not exclude religion as a subject matter but selects for disfavored treatment those student journalistic efforts with religious editorial viewpoints").

In Lamb's Chapel, for example, the local New York school district issued rules and regulations permitting "social, civic, or recreational uses" on school property when not in use for school purposes, while prohibiting use by any group "for religious purposes." 508 U.S. at 387. Citing this prohibition, the school district excluded a church that wanted to present films teaching family values from a Christian perspective. Id. at 387-89. The Supreme Court held that, because the films "no doubt dealt with a subject otherwise permissible" under the rule, the teaching of family values, the district's exclusion of the church was unconstitutional **[*42]** viewpoint discrimination. Id. at 394.

Similarly, in Rosenberger, a student organization at the University of Virginia was denied funding for printing expenses because its publication, Wide Awake, offered a Christian viewpoint that "'challenge[d] Christians to live, in word and deed, according to the faith they proclaim and . . . encourage[d] students to consider what a personal relationship with Jesus Christ means.'" 515 U.S. at 822-26. The University did not "exclude religion as a subject matter" but "select[ed] for disfavored treatment those student journalistic efforts with religious editorial viewpoints." Id. at 831. The Supreme Court concluded simply that the university's denial of funding to print Wide Awake was viewpoint discrimination, just as the school district's refusal to allow Lamb's Chapel to show its films was viewpoint discrimination. Id.

**Bulletin Board Forum**

In the present case, the County's Posting Policy provides that information may be posted if it is "of interest, value, or help to County employees," so long as

it is "appropriate" and will "benefit" an "employee or citizen." (Dkt. 8, **[*43]** Ex. 6 at A1917, B, D(2).) Local 3190 presented undisputed evidence that, among others, the list of entities permitted to post information includes United Pet Care, whose flyer promotes a healthcare plan for pets that could "interest," benefit and "help" County employees who own pets. (Dkt. 8, Ex. 8.) Local 3190 is an organization that, like United Pet Care, requested permission to post information promoting the benefits of membership in its labor organization, which could "interest," benefit and "help" certain County employees. Notwithstanding Local 3190's request to post information on a permissible topic, however, the County refused Local 3190 access to the Bulletin Board Forum. Defendants have presented no evidence demonstrating that Local 3190's information would not benefit, help, or interest County employees, nor did it submit evidence showing that such information was not appropriate. Indeed, the County provided absolutely no evidence explaining why Local 3190 was denied access to any of the six fora at issue here. Applying Lamb's Chapel and Rosenberger, the Court concludes that, because Local 3190 sought to post information on a subject otherwise permissible under the **[*44]** terms of the Posting Policy, Defendants' exclusion of Local 3190 from the Bulletin Board Forum was unconstitutional viewpoint discrimination. See Lamb's Chapel, 508 U.S. at 394; Rosenberger, 515 U.S. at 831.

**Mailbox and Paycheck Fora**

For the same reasons, the Court finds that Defendants unconstitutionally denied Local 3190 access to the County's Mailbox and Paycheck Fora. The County's Solicitation Policy provides that if an "item of interest to other employees" is approved, the requestor "may distribute or post materials in specified locations or arrange meetings with County employees in accordance with the County Manager's or Director's instructions." (Dkt. 8, Ex. 6 at A1502, E(4).) Local 3190 presented evidence that the AZPOA was provided access to the Mailbox Forum to distribute its newsletter, flyers for a picnic, and membership applications, and "www.getawaytoday," a vacation company, was provided access to the Paycheck Forum to distribute flyers advertising vacations. (Id., Exs. 7, 10.) As previously explained, Local 3190 is an organization that, like the AZPOA and www.getawaytoday, may "interest" certain County employees. Moreover, **[*45]** Local 3190 is a labor organization that appears to be indistinguishable from the AZPOA. [4] Because Local 3190 sought access to the Mailbox and Paycheck Fora to distribute information permitted under the terms of the Solicitation Policy, and the County has not submitted any evidence demonstrating that access to such fora was properly denied or that Local 3190's information did not

satisfy the terms of the Solicitation Policy, the Court has no alternative but to find that Defendants' exclusion of Local 3190 from the Mailbox and Paycheck Fora was unconstitutional viewpoint discrimination. See Lamb's Chapel, 508 U.S. at 394. [5]

> 4    At argument, counsel for Defendants asserted that the AZPOA is distinguishable from Local 3190 because probation officers are *state employees* and received permission to access the Mailbox Forum *from the State*. Regardless of whether probation officers are state employees, Defendants presented no evidence in opposition to Local 3190's application for a preliminary injunction. Thus, there is no basis in the record for the Court to find that the State granted the AZPOA access to the County's Mailbox Forum.

[*46]

> 5    Because the Court finds that exclusion of Local 3190 from the Bulletin Board, Mailbox and Paycheck Fora was unconstitutional viewpoint discrimination, it will not address whether the restrictions in the Policies are reasonable. See Good News Club, 533 U.S. at 107 n.2.

**Application of Non-Public Forum Analysis**

**Intranet Forum**

**Reasonableness**

In a non-public forum, restrictions on access "can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum" and all the surrounding circumstances. Cornelius, 473 U.S. at 806; see also Perry, 460 U.S. at 49 ("access policy [in non-public forum] based on the status of the respective unions rather than their views" was constitutional). The "reasonableness" analysis thus focuses on whether differential access is consistent with preserving the property for the purpose to which it is dedicated. See Perry, 460 U.S. at 50-51. In Perry, for example, the Supreme Court held that [*47] denying access to the school's internal mail system to unions other than the school's official bargaining unit was reasonable given the school's purpose to use the mail system for communication of school business, and to prevent the system from becoming a battlefield for competing unions. Id. at 51-52. In Lehman v. City of Shaker Heights, 418 U.S. 298, 94 S. Ct. 2714, 41 L. Ed. 2d 770 (1974), the Supreme Court held that the city's decision to exclude political advertising from bus signs was reasonable given the city's desire to generate revenue and the potential for "lurking doubts about [political] favoritism, and sticky administrative problems . . . in

parceling out limited space to eager politicians." Lehman, 418 U.S. at 304 (plurality opinion); see also Children of the Rosary v. City of Phoenix, 154 F.3d 972, 976 (9th Cir. 1998) ("[A] review of the city's standards and practices indicates that the city has not opened a public forum [for ads on its bus panels]. The city has consistently restricted political and religious advertising"). In Kokinda, the Supreme Court held that prohibiting solicitation on postal property was reasonable because [*48] the purpose of the forum (a sidewalk from the parking lot to the post office) was to accomplish the most efficient postal delivery system. 497 U.S. at 727 (plurality opinion). Accordingly, the special nature and function of County facilities are relevant to evaluating the limits the County has imposed on expressive activity via the two non-public fora at issue here. Cornelius, 473 U.S. at 802 (although the forum was the charitable drive itself, Court could consider the special nature and function of federal workplace in evaluating access limits).

The Court concludes that the differential access provided to ESMA and Local 3190 with respect to the County's Intranet Forum is reasonable because it is consistent with the County's "legitimate interest in 'preserv[ing] the property . . . for the use to which it is lawfully dedicated.'" Perry, 460 U.S. at 50-51 (citation omitted). Providing an Intranet link to ESMA's web page effectively allows "the County" to communicate with its employees about discounts and other benefits provided to County employees. Likewise, the ESMA link enables ESMA to fulfill its obligation to provide benefits to County [*49] employees. Id. Although membership in Local 3190 is available "to any non-supervisory employee of Maricopa County," the *option to join Local 3190* differs substantially from the benefits ESMA is required to provide to County employees. (Dkt. 6, P6.) In contrast to the benefits provided by ESMA, County employees can only become members of Local 3190 "by completing and signing a Membership Application and Payroll Deduction Authorization Card." (Id., P7.) Because ESMA is officially responsible for providing benefits to County employees, and Local 3190 does not occupy a similar position in the County's employment structure, denying Local 3190 access to the County's Intranet Forum is reasonable. See Perry, 460 U.S. at 51-52 (denying access to school's internal mail system to unions other than the school's official bargaining unit was reasonable given the school's purpose to use the mail system for communication of school business); ISKCON, 505 U.S. at 689 (in examining the compatibility between the prohibited speech and the particular forum, the court looks to whether the restrictions on speech are reasonably related to maintaining the environment [*50] that the government has deliberately created).

**Viewpoint**

Nothing in the record indicates that Defendants refused to permit Local 3190 access to the County's Intranet Forum in order to discourage one viewpoint and encourage another. Rather, based on ESMA's official position in the operational structure of the County system, the Court finds that ESMA "obtained a status that carried with it rights and obligations that no other . . . organization [, including Local 3190,] could share." Perry, 460 U.S. at 49 n.9. No evidence has been presented that Local 3190 occupies a similar official position in the structure of the County, nor that any organization other than ESMA has a webpage link on the County's Intranet Forum. By providing a web page link in its Intranet Forum to the entity that is responsible for providing a service to its employees, the Court finds that the County's Intranet access policy is based solely on the speaker's identity. See Perry, 460 U.S. at 49 ("Implicit in the concept of the nonpublic forum is the right to make distinctions in access on the basis of subject matter and speaker identity. These distinctions may be impermissible **[*51]** in a public forum but are inherent and inescapable in the process of limiting a nonpublic forum to activities compatible with the intended purpose of the property."); DiLoreto, 196 F.3d at 969 (no viewpoint discrimination where class of speakers is categorically excluded from limited public forum regardless of stand speaker takes on topic). Thus, the Court finds that Defendants did not engage in viewpoint discrimination by excluding Local 3190 from the Intranet Forum.

**Break Room Forum**

**Reasonable**

The Court finds that Defendants' rejection of Local 3190's request to engage in solicitation in the County's Break Room Forum is "reasonable in light of the purpose served by the forum," because the Solicitation Policy is aimed at reducing negative impacts and conflicts. See Dkt. 8, Ex. 6 at A1502, (A). An additional purpose of the Solicitation Policy is to "monitor and control the level and type of solicitation that is directed toward County employees." (Id.) The usual purpose of employee break rooms, lounges, and lunch rooms is to allow employees to relax and refresh in a neutral environment. Thus, the Court finds that denying access to the **[*52]** Break Room Forum to Local 3190 is consistent with the County's purposes of controlling the level and type of solicitation permitted and reducing negative impacts and conflicts that could arise from solicitation efforts in a neutral environment. See Desyllas, 351 F.3d at 944 (removing flyers from columns was reasonable because

it was consistent with university's purpose to preserve the appearance of campus structures).

**Viewpoint**

No evidence has been presented to show that Defendants have permitted any entity access to the Break Room Forum for the purpose of solicitation, nor that they have not consistently denied access to all entities and individuals who seek access to such forum in order to distribute information. (Dkt. 8, Ex. 10.) Moreover, there is no indication in the record that the County rejected Local 3190's request to access the Break Room Forum in order to suppress Local 3190's views. Thus, the Court finds that Defendants did not engage in viewpoint discrimination by denying Local 3190 access to the Break Room Forum.

**Conclusion on First Amendment**

Based on the analysis above, the Court finds that Defendants unconstitutionally refused **[*53]** to permit Local 3190 access to the County's Bulletin Board, Mailbox, and Paycheck Fora because the refusal was motivated by a desire to stifle Local 3190's particular perspective and viewpoint. Thus, Local 3190 has demonstrated a substantial likelihood of success on the merits of its First Amendment claim with respect to the County's Bulletin Board, Mailbox, and Paycheck Fora. The Court further concludes that Local 3190 has not demonstrated a substantial likelihood of success on the merits of its First Amendment claim with respect to the County's Intranet, Break Room, and Benefits Fair Fora.

**2. Equal Protection**

Local 3190 alleges that differential access provided to third parties constitutes impermissible content discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment. With respect to the Break Room Forum, Local 3190 has not presented any evidence to show that the County provides access to other third parties.

With respect to the Intranet Forum, the Court has rejected this assertion when cast as a First Amendment claim, and it fares no better under the guise of an Equal Protection claim. As explained above, Local 3190 did not have a First **[*54]** Amendment or other right of access to the County's Intranet Forum. Supra at 19-20. ESMA's access to the Intranet Forum, therefore, does not burden a fundamental right of Local 3190. As a result, Defendants' decision to grant access to ESMA is not tested by the strict scrutiny applied when government action impinges upon a fundamental right protected by the Constitution. See San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 17, 93 S. Ct. 1278, 36 L. Ed. 2d 16 (1973). Defendants' policy denying access to Local

3190 need only rationally further a legitimate state purpose. That purpose is clearly demonstrated by the special responsibility and official position ESMA occupies in the County's structure as an employer. See supra at 19-20. [6]

> 6 Because the Court has already concluded that the restrictions in the Bulletin Board, Mailbox, and Paycheck Fora are unconstitutional in violation of the First Amendment, it will not address Local 3190's Equal Protection claims with regard to such Fora.

Similarly, because Local [*55] 3190 has not provided sufficient evidence to show that it had a First Amendment or other right of access to the County's Benefits Fair Forum, Defendants' denial of access to Local 3190 need only rationally further a legitimate state purpose. From the evidence submitted by Local 3190, it appears that the County furthers a legitimate state purpose by admitting only third parties with whom the County has contracted to provide health and other benefits to County employees. See supra at 21.

For these reasons, the Court concludes that Local 3190 has not demonstrated a substantial likelihood of success on the merits of its Equal Protection claim with respect to the County's Intranet, Break Room, and Benefits Fair Fora.

### D. Irreparable Injury

It is well-settled that a party seeking the deprivation of liberties protected by the First Amendment constitute irreparable injury. See Elrod v. Burns, 427 U.S. 347, 373, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976) (plurality); Foti v. City of Menlo Park, 146 F.3d 629, 643 (9th Cir. 1998) ("[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.") (quoting Elrod, 427 U.S. at 373). [*56]

In the present case, Local 3190 has established the existence of irreparable injury supporting the entry of injunctive relief with respect to the County's Bulletin Board, Mailbox, and Paycheck Fora, each of which is governed by the terms of the Solicitation and Posting Policies. Thus, Local 3190 will suffer irreparable harm if injunctive relief is denied with respect to these three fora alone.

Relying on the Supreme Court's decision in Perry, Defendants primarily contend Local 3190 will not suffer irreparable harm because, as a matter of law under Perry, success on the merits is unlikely. See Dkt. 20 at 11-13 (arguing that, as a matter of law, "employee mail boxes, the intranet, the Employee Benefits Fair, and paycheck envelopes are not designated public fora"). The Court

rejects Defendants' argument that Perry prevents access to the six fora at issue here *as a matter of law* because the County, like the school district at issue in Perry, is a government employer. As shown above, in "determining when the government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes, [*57] " Cornelius, 473 U.S. at 800, the Court "must examine the terms on which the forum operates," including fact specific terms, such as government intent, and the policy and practice of the government. Hopper, 241 F.3d at 1075. Moreover, the Court has already found that Local 3190 is likely to succeed on the merits of its claim with regard to the Bulletin Board, Mailbox, and Paycheck Fora. Thus, Defendants' argument is moot.

Defendants also contend a preliminary injunction is not appropriate because other avenues of communication are available to Local 3190 while the present litigation is pending. However, "'one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place.'" Reno v. ACLU, 521 U.S. 844, 889, 117 S. Ct. 2329, 138 L. Ed. 2d 874 (1997)(citation omitted).

### E. Bond Requirement

Federal Rule of Civil Procedure 65(c) provides that "[n]o restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party [*58] who is found to have been wrongfully enjoined or restrained . . . ." Fed.R.Civ.P. 65(c). "[T]he purpose of such a bond is to cover any costs or damages suffered by the government, arising from a wrongful injunction . . . ." Gorbach v. Reno, 219 F.3d 1087, 1092 (9th Cir. 2000). Although a preliminary injunction will not be issued without security by the applicant under Federal Rule of Civil Procedure 65(c), a district court has wide discretion in setting the amount of a bond, and the bond amount may be zero if there is no evidence the party will suffer damages from the injunction. See Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills, 321 F.3d 878, 882 (9th Cir. 2003) (stating "[a] judge could dispense with the bond requirement when no request for a bond was ever made in district court"); see also Gorbach, 219 F.3d at 1092.

**In the present case, Defendants have not requested a bond, nor have they submitted any evidence regarding their likely damages. The Court further finds that the preliminary injunction ordered here will not likely result in any damages to Defendants. Thus, the Court will waive the bond requirement. [*59] See Connecticut Gen. Life Ins. Co., 321 F.3d at 882; Gorbach, 219 F.3d at 1092.**

**CONCLUSION**

The Court concludes that Local 3190 is likely to succeed on its claim that Defendants' denial of access to the County's Bulletin Board, Mailbox, and Paycheck Fora violates the Free Speech Clause of the First Amendment because the 1991 Solicitation and Posting Policies, as applied to Local 3190, are unconstitutional. The Court further concludes that Local 3190 will suffer irreparable harm if injunctive relief is denied with respect to the County's Bulletin Board, Mailbox, and Paycheck Fora, access to which is provided under the Solicitation and Posting Policies. Accordingly,

**IT IS HEREBY ORDERED GRANTING** Local 3190's Application for a Preliminary Injunction as outlined below. (Dkt. 2.)

**IT IS FURTHER ORDERED DISMISSING** Counts I, II, and V of Local 3190's Complaint with prejudice.

**IT IS FURTHER ORDERED DISMISSING** Defendants Maricopa County Board of Supervisors, Fulton Brock, Don Stapley, Andrew Kunasek, and Max W. Wilson from Local 3190's Complaint with prejudice.

**IT IS FURTHER ORDERED** that Defendants Maricopa County and David **[*60]** Smith, as well as each of their officers, representatives, agents, servants, employees, attorneys, and all persons acting in concert or participation with such Defendants, are hereby enjoined and restrained, pending the final disposition of the matters involved herein, from barring or preventing Local 3190 from utilizing the Bulletin Board, Mailbox, and Paycheck fora, pursuant to the terms of the Solicitation and Posting Policies. See supra at 17-19. **Because Local 3190 failed to produce evidence that its exclusion from the Benefits Fair, Intranet, and Break Room Fora is unconstitutional, this restraining order does not apply to the Benefits Fair, Intranet, and Break Room Fora.**

**IT IS FURTHER ORDERED** that no bond requirement will be imposed pursuant to Federal Rule of Civil Procedure 65(c). Supra at 31-32.

DATED this 13<th> day of March, 2007.

Stephen M. McNamee

United States District Judge

FOCUS - 11 of 12 DOCUMENTS

**ANTON/BAUER, INC., Plaintiff, v. ENERGEX SYSTEMS CORPORATION, Defendant.**

**93 Civ 4682 (VLB)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**1994 U.S. Dist. LEXIS 3195**

**January 11, 1994, Decided**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** In a trademark and patent infringement case that plaintiff corporation brought against defendant corporation, plaintiff's motion for a preliminary injunction was granted to the extent of barring trademark infringement by defendant. It was also decided that it was unnecessary to reach the patent issues then. Defendant subsequently filed a motion for reconsideration.

**OVERVIEW:** Defendant argues that the decision on the injunction was premature because further submissions were contemplated, that an injunction bond should have been imposed, and that an agreement permitting a limited use of the trademarks existed. In considering the matter, the court allowed defendant's further submissions but concluded, by what they said and did not show, that plaintiff's trademarks were being infringed, that deception was occurring, and that relief was justified. Defendant advertised that it rebuilt plaintiff's batteries to be compatible with certain camera systems, but the court concluded that defendant had failed to show that its rebuilt product functioned in the same way. Further, defendant had failed to provide evidence that it informed customers that its product might not have performed in an identical manner. Although defendant did not show the extent of possible injury that a bond would have protected against, the court allowed defendant to apply for an order requiring a bond. Defendant did not previously post a bond, but the court concluded that plaintiff would not have been harmed by defendant's delayed application for such a bond.

**OUTCOME:** The court reaffirmed its former ruling that had granted plaintiff a preliminary injunction, but the court also modified the former ruling to provide that defendant had a right to make a delayed application for plaintiff to post an injunction bond in an appropriate amount.

**COUNSEL:** [*1] For plaintiff: Allen D. Brufsky, Esq., Kramer, Brufsky & Cifelli, Southport, CT.

For defendant: Stanley J. Yavner, Esq., New City, NY.

**JUDGES:** BRODERICK

**OPINION BY:** VINCENT L. BRODERICK

**OPINION**

MEMORANDUM ORDER

VINCENT L. BRODERICK, U.S.D.J.

I

This is a trademark and patent infringement suit brought by plaintiff Anton/Bauer, Inc. ("Anton/Bauer") against the defendant Energex Systems Corporation ("Energex"). By memorandum order dated December 13, 1993 Anton/Bauer's motion for a preliminary injunction was granted to the extent of barring trademark infringement on the part of Energex and holding it unnecessary to reach the patent issues at this time.

Energex moves for reconsideration by means of a memorandum of law containing factual statements, many of them sworn, as well as argument, which is sworn to by an officer of Energex, accompanied by exhibits which are not numbered as exhibits to the motion. The grounds for the motion include (a) that the decision was premature because further submissions were contemplated, (b) that an injunction bond was not imposed under Fed.R.Civ.P. 65, and (c) that an agreement permitting limited use of Anton/Bauer's trademarks exists, Motion at 2, n 1. A large portion of the motion [*2] is directed to refuting various arguments

made by Anton/Bauer which were not adopted by the memorandum order and hence need not be discussed.

II

The further submissions referred to by Energex would have related to the patent aspects of the case, which were not reached in the decision actually made. To the extent, however, that Energex may have been precluded from being fully heard as a result of the timing of the December 13, 1993 ruling, the current motion provided an opportunity to rectify the situation.

As of the present time all parties have clearly had a full opportunity to be heard; in particular Energex has had the benefit of knowledge of the court's evaluation of the evidence and an opportunity to respond based on that information.

Based upon all of the submissions now on file, including Energex's current motion papers, the former ruling is reaffirmed with the modifications set forth below; the December 13, 1993 memorandum order is accordingly made part of this memorandum order without being repeated here.

The additional submissions of Energex by what they say and what they do not show, combine to confirm that Anton/Bauer's trademarks are being infringed, deception is occurring, **[*3]** and relief is justified. Defendant's Exhibit 6, for example, the first unnumbered and unpaginated exhibit to Energex's current motion, immediately following page 19, contains an advertisement in its right column which states in part as follows:

> Energex rebuilds the sealed Anton/Bauer Logic Series R PROPAC 13 or 14 and COMPAC 13 or 14 batteries.
>
> * * *
>
> The result is a new battery *that is 100% compatible with your existing camera and charging system* . . .

Energex has failed to show, even in its current motion papers, that its rebuilt product will in fact function in the same way as the sealed Anton/Bauer pack. The actual cells used are not necessarily the same, nor will the testing and recharging part of Anton/Bauer's system necessarily react in the predicted way with the unknown battery cells contained in the opened and refilled sealed pack.

Energex has shown no evidence of ever informing customers that its products might or might not perform in

an identical manner to that of the sealed or other Anton/Bauer offerings.

III

Energex did not request an injunction bond in any of its responses to Anton/Bauer's motion for a preliminary injunction. In its current motion, Energex **[*4]** argues that "no preliminary injunction under any theory is valid until the court considers the bond requirement," but contains no information with regard to the extent of injury against which the bond might provide protection, or the amount of bond sought. Energex thus continues to default with respect to the very question it now raises. There would be no justification for delaying an otherwise proper preliminary injunction because of Energex's failure to request a bond or set forth the amount necessary in its view. See Fed.R.Civ.P. 1 as amended in 1993. [1]

> 1    "These rules . . . shall be construed and administered to secure the just, speedy, and inexpensive determination of every action."

Nor would it be appropriate to deny Energex an opportunity to seek a bond under Fed.R.Civ.P. 65 merely because of its delay in making the application if a bond is necessary to protect Energex's interests. Anton/Bauer would not be prejudiced by such a delayed application, provided that the preliminary injunction were in effect in **[*5]** the interim. Anton/Bauer in its response to Energex's motion for reconsideration states that it is amenable to providing a bond if called for.

Energex may apply for an order requiring Anton/Bauer to post a bond in an appropriate amount, based on evidence of the consequences of the injunction.

IV

Anton/Bauer has not contested Energex's position that to the extent any agreement between the parties permits Energex to use certain Anton/Bauer trademarks under defined conditions, the preliminary injunction is inapplicable.

SO ORDERED.

Dated: White Plains, N.Y.

January 11, 1994

/s/ John S. Martin, USDJ for

VINCENT L. BRODERICK, U.S.D.J.

LEXSEE 321 F.3D 878

**CONNECTICUT GENERAL LIFE INSURANCE COMPANY; EQUITA-
BLE LIFE ASSURANCE; CIGNA EMPLOYEE BENEFITS SERVICES
INC.; AETNA U.S. HEALTHCARE, INC.; UNITED HEALTHCARE
CORPORATION; HUMANA INC.; AETNA LIFE INSURANCE COM-
PANY, Plaintiffs - Appellees, v. NEW IMAGES OF BEVERLY HILLS, et
al., Defendants, and HAYA ZILKA, Defendant - Appellant.**

**No. 02-55883**

**UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

*321 F.3d 878*; *2003 U.S. App. LEXIS 3782*; *55 Fed. R. Serv. 3d (Callaghan) 54*;
*2003 Cal. Daily Op. Service 1914*

**February 11, 2003, Argued and Submitted, Pasadena, California
March 3, 2003, Filed**

**SUBSEQUENT HISTORY:** Subsequent appeal at
*Conn. Gen. Life Ins. Co. v. New Images of Beverly
Hills, 97 Fed. Appx. 782, 2004 U.S. App. LEXIS
9963 (9th Cir. Cal., 2004)*

**PRIOR HISTORY:**     [**1]    Appeal from the
United States District Court for the Central District
of California. D.C. No. CV-99-08197-TJH. Terry J.
Hatter, Jr., District Judge, Presiding.
*Conn. Gen. Life Ins. Co. v. New Images of Beverly
Hills, 2003 U.S. App. LEXIS 3957 (9th Cir. Cal.,
Mar. 3, 2003)*

**DISPOSITION:**    Grant of injunction affirmed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs, insurance
companies, sued defendants, medical clinics and a
patient recruiter, alleging insurance fraud. The
United States District Court for the Central District
of California granted the insurance companies' re-
quest for a preliminary injunction against the pa-
tient recruiter and froze her assets except for the
payment of expenses in the ordinary course of liv-
ing and businesses expenses. The recruiter ap-
pealed.

**OVERVIEW:** The recruiter was the ex-wife of one
of the doctors who worked in the medical clinics.
The insurance companies alleged that the medical
clinics engaged in a scheme in which surgeons
would perform elective cosmetic surgeries and then
submit fraudulent bills and medical records to the
insurance companies, assigning bogus diagnoses
and misrepresenting the surgeries performed. The
insurance companies asserted that the recruiter re-
ceived as payment for patient recruiting more than $
260,000. The court of appeals found that the injunc-
tion was proper because the recruiter provided no
legitimate explanation for the money she received
from the corrupt clinics; her history of fraudulent
intra-family transfers and refusal to disclose asset
information in defiance of court orders; and the re-
cruiter's convenient divorce settlement established
the possibility of irreparable injury. Because the
recruiter did not request a bond the district court did
not abuse its discretion by not reaching the bond
issue. The issue of the scope of the injunction was
raised for the first time on appeal and would not be
entertained. The recruiter could petition to modify
the injunction.

**OUTCOME:** The grant of the injunction was af-
firmed.

321 F.3d 878, *; 2003 U.S. App. LEXIS 3782, **;
55 Fed. R. Serv. 3d (Callaghan) 54; 2003 Cal. Daily Op. Service 1914

**CORE TERMS:** injunction, preliminary injunction, patient, irreparable injury, declaration, recruiter, contempt, surgery, divorce, fraudulent, discovery, restraining order, clinics, equitable relief, asset-freezing, probable, settlement, misconduct, conceal, balance of hardships, money damages, probability of success, remains free, equitable, entertain, vacated, clarify, waived, modify, insurance fraud

**LexisNexis(R) Headnotes**

*Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions*
*Civil Procedure > Appeals > Standards of Review > Abuse of Discretion*
*Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review*
[HN1] A preliminary injunction should be vacated only if the district court abused its discretion by basing its decision on an erroneous legal standard or on clearly erroneous factual findings.

*Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions*
[HN2] To obtain a preliminary injunction, a party must make a clear showing of either (1) a combination of probable success on the merits and a possibility of irreparable injury, or (2) that its claims raise serious questions as to the merits and that the balance of hardships tips in its favor.

*Civil Procedure > Appeals > Reviewability > Preservation for Review*
*Criminal Law & Procedure > Appeals > Reviewability > Preservation for Review > Exceptions to Failure to Object*
[HN3] Absent exceptional circumstances, arguments raised for the first time on appeal are not considered.

*Civil Procedure > Remedies > Damages > Monetary Damages*
*Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions*

[HN4] A district court has authority to issue an asset-freezing injunction where equitable relief is sought, even though substantial money damages are also claimed.

*Civil Procedure > Remedies > Bonds > General Overview*
*Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions*
[HN5] See *Fed. R. Civ. P. 65(c).*

*Civil Procedure > Remedies > Bonds > General Overview*
*Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions*
*Civil Procedure > Appeals > Reviewability > General Overview*
[HN6] With regard to *Fed. R. Civ. P. 65(c)*, a district court is afforded wide discretion in setting the amount of the bond, and the bond amount may be zero if there is no evidence the party will suffer damages from the injunction.

*Civil Procedure > Remedies > Bonds > General Overview*
*Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions*
*Civil Procedure > Appeals > Reviewability > Preservation for Review*
[HN7] The United States Court of Appeals for the Ninth Circuit holds that the language of *Fed. R. Civ. P. 65(c)* does not absolve the party affected by the injunction from its obligation of presenting evidence that a bond is needed, so that the district court is afforded an opportunity to exercise its discretion in setting the amount of the bond.

**COUNSEL:** Joel R. Bennett, Bennett & Fairshter, Pasadena, California, for Defendant-Appellant.

Lawrence C. Fox, Kornstein, Veisz, Wexler & Pollard, New York, New York, for Plaintiffs-Appellees.

**JUDGES:** Before: B. FLETCHER and HAWKINS, Circuit Judges, and BURY, * District Judge. Opinion by Judge Hawkins.

*   Honorable David C. Bury, United States District Judge for the District of Arizona, sitting by designation.

**OPINION BY:** HAWKINS

**OPINION**

[*879]  HAWKINS, Circuit Judge:

Defendant Haya Zilka appeals from the district court's grant of a preliminary injunction freezing her assets. She attacks the injunction on a variety of grounds, many of which were never presented to the district court. All are without merit and we affirm.

The background of this case is long and colorful. Plaintiffs -- branches of four major medical insurance companies -- filed a complaint in 1999 against dozens of individuals involved in an alleged insurance [*880] fraud scheme at ten outpatient surgery clinics in Southern California. The alleged scheme involved surgeons [**2] who would perform elective cosmetic surgeries and then submit fraudulent bills and medical records to plaintiffs, assigning bogus diagnoses and misrepresenting the surgeries performed. For example, various facial cosmetic surgeries were documented and billed as procedures to correct deviated septums; breast implants were billed as biopsies; tummy tucks became hernia or gynecological surgeries. The fraud was aided by patient recruiters who sought patients, primarily Asian-American women, from all over the country and were paid a fee per patient.

Haya's now ex-husband Ezeckiel Zilka was a surgeon at several of the clinics during the time these fraudulent acts occurred. Plaintiffs obtained a judgment of over five million dollars against Ezeckiel on two RICO claims. Plaintiffs then attempted to determine Ezeckiel's assets to enforce their judgment against him, and served discovery on him, his wife Haya and their son. The Zilkas resisted discovery and defied various court orders, which eventually led the district court to find them in contempt and to incarcerate Haya and Ezeckiel. We affirmed their incarceration for civil contempt in January, 2002.

Shortly thereafter, plaintiffs amended [**3] their complaint to add Haya Zilka and her company

DAS International ("DAS") as defendants, alleging that she was involved in the fraud scheme as a patient recruiter. The complaint alleged that DAS received 29 checks from the Westwood Clinic (one of the hotbeds of the insurance fraud) as payments for patient recruiting, totaling more than $ 260,000.

Plaintiffs then sought a temporary restraining order and preliminary injunction against Haya to freeze her assets and prevent her from making material asset transfers. Plaintiffs cited previous intra-family transfers that appeared to be for the purpose of frustrating creditors. These transfers included the purchase of the Zilkas' Beverly Hills mansion in their son's name and the sale of the Pacific Wilshire Surgery Center to Haya's company for only $ 20,000. Plaintiffs also pointed out that the Zilkas filed for divorce shortly after the district court issued its order compelling discovery, and that the divorce settlement purports to vest all the family's significant assets with Haya.

In support of their allegations against Haya, plaintiffs submitted declarations from two insiders who testified that Haya was a patient recruiter. Plaintiffs [**4] also submitted the checks from Westwood to DAS for $ 261,000, and the checks from DAS to "sub-recruiters," most in standard per-patient multiples of $ 1500, $ 1600 or $ 1700. In her opposition, Haya did not submit a declaration explaining the checks, but asserted that the checks by themselves did not prove she was a recruiter. She also argued that the insider declarations were inadmissible because they were not based on first-hand knowledge. [1]

   1   The declarations were admissible -- they specifically describe acquiring knowledge of Haya's recruiting from Haya herself.

Judge Letts granted plaintiffs' motion to amend their complaint, granted the temporary restraining order, and issued an order to show cause why an injunction imposing similar restraints should not issue. The restraining order precluded Haya from transferring any assets without consent, except for payment of expenses in the ordinary course of living and business expenses not exceeding $ 2500 per month.

Shortly thereafter, Judge Letts recused [*881] himself [**5] voluntarily after Haya's counsel filed

321 F.3d 878, *; 2003 U.S. App. LEXIS 3782, **;
55 Fed. R. Serv. 3d (Callaghan) 54; 2003 Cal. Daily Op. Service 1914

a scathing declaration criticizing the judge. [2] Judge Terry Hatter then took over the case. In May 2002, Judge Hatter granted the preliminary injunction, finding that the Zilkas had previously engaged in misconduct and attempts to conceal assets and that it was probable Zilka would engage in similar and additional misconduct in the future.

> 2   In the recusal order, Judge Letts noted that the "declaration appears to be an exercise in forum shopping through the means of 'judge baiting' accompanied by threats, done with a view either to influencing the judge's future conduct in the case or causing him to recuse himself."

A. Preliminary Injunction Standard

[HN1] A preliminary injunction should be vacated "only if the district court abused its discretion by basing its decision on an erroneous legal standard or on clearly erroneous factual findings." *FTC v. Affordable Media, LLC, 179 F.3d 1228, 1233 (9th Cir. 1999)*. [HN2] To obtain a preliminary injunction, a party **[**6]** must make a clear showing of either (1) a combination of probable success on the merits and a possibility of irreparable injury, or (2) that its claims raise serious questions as to the merits and that the balance of hardships tips in its favor. *F.D.I.C. v. Garner, 125 F.3d 1272, 1277 (9th Cir. 1997)*.

Haya asserts that plaintiffs have not shown a likelihood that they will succeed on the merits. Plaintiffs, however, presented fairly significant evidence of Haya's involvement in the fraudulent scheme, including that her acts were sufficiently related to the other illegal acts, were over a sufficient period of time, and that she was a substantial participant. *See   Howard v. America Online, Inc., 208 F.3d 741, 746 (9th Cir. 2000)* (discussing requirements of RICO claim). Moreover, while attacking the merits of plaintiffs' RICO claim, Haya ignores the viability of plaintiffs' claims under the Unfair Competition Act and for unjust enrichment. Furthermore, Haya has provided no legitimate explanation for the money she received from the corrupt clinics. On these facts, the district court could have easily concluded plaintiffs have a probability of success on **[**7]** the merits of their claims.

Haya also claims that plaintiffs did not bear their burden of establishing the possibility of irreparable injury or that the balance of hardships tipped in their favor. The district court, however, expressly found that it was not only possible, but probable that Haya would engage in misconduct to conceal or dissipate assets. This finding was not clearly erroneous in light of the Zilka family's history of fraudulent intra-family transfers, their refusal to disclose asset information in defiance of court order and their convenient divorce settlement.

Haya also contends that the delay in adding her as a defendant is evidence that no irreparable injury would occur. Plaintiffs had known of Haya's activities as a patient recruiter since some time in 2000, but did not add her to the complaint until January 2002. However, the irreparable injury that forms the basis of the injunction did not stem from Haya's activities as a patient recruiter; rather, it was the more recent discovery of the Zilkas' divorce and suspect property settlement in December 2001 that led to adding Haya as a defendant and seeking the injunction. Thus, plaintiffs actually acted promptly to **[**8]** attempt to avoid the harm of dissipating assets.

Haya contends it was error for the court to consider her prior contempt as a basis for granting the injunction, especially   **[*882]**   since in the same order the court vacated the contempt order and released Haya from incarceration. However, her prior contempt -- which involved concealment of asset information from discovery -- is extremely relevant to the concern that Haya might conceal or dissipate assets. In any event, the prior contempt was only one of many factors the court considered; even if improper, the remaining considerations suffice to support the court's decision. [3]

> 3   Haya also argues in her brief that the district court must give full faith and credit to the divorce decree she and Ezeckiel entered into during the lawsuit. This argument is not relevant to the issues before this court; there is no suggestion of how the divorce decree impacts the injunction, and plaintiffs are not in this proceeding attempting to reach those assets as community property.

In **[**9]** sum, the district court did not abuse its discretion by determining that plaintiffs had demon-

strated a probability of success on the merits and a possibility of irreparable injury if the injunction did not issue. *Garner, 125 F.3d at 1277.* It was therefore appropriate for the court to grant plaintiffs' request for a preliminary injunction.

## B. Authority to Enter the Injunction

In addition to asserting that it was error for the court to enter the injunction, Haya contends that the court lacked the equitable authority to do so, because the "true gravamen" of the complaint is for money damages, even though the complaint admittedly also contains claims for equitable relief. This issue is raised for the first time on appeal, and we therefore treat the issue as waived. *In re Am. West Airlines, 217 F.3d 1161, 1165 (9th Cir. 2000)* ([HN3] absent exceptional circumstances, arguments raised for the first time on appeal are not considered). [4]

> 4    Moreover, even if we were to reach the issue, we would find it meritless. *See United States v. Rahman, 198 F.3d 489, 494-99 (4th Cir. 1999)* ([HN4] district court has authority to issue asset-freezing injunction where equitable relief is sought, even though substantial money damages are also claimed).

## [**10] C. Failure to Require a Bond

Haya contends that the district court also erred because it failed to require plaintiffs to post a bond in connection with the injunction. [5] Haya did not, however, ask the court to set a bond or submit any evidence as to what damages she might incur as a result of the injunction.

> 5    *Federal Rule of Civil Procedure 65(c)* provides that:
>
> > [HN5] No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to be

wrongfully    enjoined    or    restrained.

[HN6] The district court is afforded wide discretion in setting the amount of the bond, *Walczak v. EPL Prolong, Inc., 198 F.3d 725, 733 (9th Cir. 1999)*, and the bond amount may be zero if there is no evidence the party will suffer damages from the injunction. *Gorbach v. Reno, 219 F.3d 1087, 1092 (9th Cir. 2000)*. Because [**11] Haya failed to request a bond or submit any evidence regarding her likely damages, we will not entertain this argument for the first time on appeal. *See Aoude v. Mobil Oil Corp., 862 F.2d 890, 896 (1st Cir. 1988)* (refusing to hear argument regarding the need for bond because the district court had not been requested to set a bond); *Clarkson Co. v. Shaheen, 544 F.2d 624, 632 (2d Cir. 1976)* (finding judge could dispense with bond requirement because no request for a bond was ever made in district court).

[*883] We recognize that some other circuits have held that a motion to set bond is not required to preserve the issue for appeal. *See*, *e.g.*, *Coquina Oil Corp. v. Transwestern Pipeline Co., 825 F.2d 1461, 1462(10th Cir. 1987)*. We do not, however, believe [HN7] that the language of *Rule 65(c)* absolves the party affected by the injunction from its obligation of presenting evidence that a bond is needed, so that the district court is afforded an opportunity to exercise its discretion in setting the amount of the bond. Without such evidence before it, the district court did not abuse its discretion by not reaching the bond issue. *See Gorbach, 219 F.3d at 1092.* [**12]

## D. Scope of Injunction

Haya also contends that the scope of the injunction is overly broad because it affects all her assets, as opposed to specific assets that were fraudulently obtained. This issue is also raised for the first time on appeal, and we cannot entertain the argument because further factual development would be required in order to determine which, if any, of Haya's assets might not be appropriately available as equitable relief. *See In re Am. West Airlines, 217 F.3d at 1165.* Haya, however, remains free to petition the district court to modify the injunction. *See, e.g.*, *Federal Sav. & Loan. Ins. Corp. v. Dixon, 835*

*F.2d 554, 565(5th Cir. 1987)*(noting that defendants could attempt to prove in district court that certain assets they possess were acquired "at a time or through such means that there is no likelihood that they were acquired" from fraudulent practices and thus obtain a release from an asset-freezing injunction).

Similarly, Haya contends that the term "asset" as used in the injunction is impermissibly vague and ambiguous. This complaint was also never made to the district court and, as with the scope issue, **[**13]** the proper approach would be for Haya to seek a modification or clarification of the injunction from the district court. *See Commodity Futures Trading Comm'n v. Co Petro Mktg. Group, Inc., 700 F.2d 1279, 1285(9th Cir. 1983)*(noting that if there is a question about the terms of an injunction, attorney should attempt to clarify with the court).

## CONCLUSION

Because plaintiffs demonstrated a likelihood of success on the merits and a possibility of irreparable injury, the district court did not abuse its discretion by entering an asset-freezing injunction against Haya Zilka. Haya has waived her argument that the district court lacked the equitable authority to enter the injunction and that the court erred by failing to require a bond. She remains free to petition the district court to require a bond, modify the scope of the injunction, or clarify the meaning of the injunction, but we cannot address these arguments for the first time on appeal. The grant of the injunction is AFFIRMED.